United States District Court　　　　　　Eastern District New York

---

PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
HABEAS CORPUS FOR A PERSON IN STATE CUSTODY

---

DANIEL RAMOS, PETITIONER,

-against-

WILLIAM A. LEE, RESPONDENT.

ADDENDUM PAGES 1 - 15

9. (f) Grounds raised: <u>(i) The trial court erred in determining that the seven-year-old complainant was swearable and in not reviewing that determination after her untrustworthy testimony; (ii) Appellant's right to present his defense and sixth amendment right to confront witnesses against him were violated when the trial court would not allow complainant's mother to be recalled to the witness stand to testify to her state of mind in relation to a prior incident, and when the trial court curtailed her cross examination; (iii) The trial court erred in failing to meaningfully respond to a jury note and in not asking the jury for further clarification; (iv) The trial court's bias against the defense throughout the trial deprived appellant of his due process right to a fair trial and his right to present a defense; (v) The trial court erred in allowing Baran to testify that complainant told him about prior incidents, when that prior consistent statement was improper bolstering; (vi) The jury's verdict were against the weight of the evidence; (vii) The sentence imposed on appellant was unnecessarily harsh and excessive under the circumstances; and (viii) Appellant's fourth amendment right against unreasonable searches and seizures was violated where the police did not have probable cause to arrest him, and his fourteenth amendment right to due process was violated where his written statement was involuntary and used against him at trial.</u>

12. **GROUND ONE:**

THE TRIAL COURT ERRED IN DETERMINING THAT THE SEVEN-YEAR-OLD COMPLAINANT WAS SWEARABLE AND IN NOT REVIEWING THAT DETERMINATION AFTER HER UNTRUSTWORTHY TESTIMONY.

The complainant in this case, M.F.R., was a seven-year-old who did not meet the statutory standard for giving either sworn or unsworn testimony. Most of this child's testimony was contradictory and confusing and the trial court erred in not revisiting its erroneous determination to allow her to testify.

This seven-year-old's testimony consisted of she never lied (T.780), that it was not true that the incident happened five times previously (T.780,782), but subsequently said it was true, and that it happened in her mother's room, with her wearing pajamas and both of them were standing up and petitioner bending down to lick her "coochie" (T.781,787). She claimed her mother was home, on the porch, during the daytime, all five times (T.788,800-01), but she also stated that it happened at night when her mother was not home (T.797). She stated that petitioner took off her pants and "[put] his pecker in" her "butt" and it hurt (T.788-89). This child said she told her mother about this incident but then immediately said she did not know if she told her (T.789,793).

What is clear, consistent and not contradictory, is that Kathleen McAllister, a registered sexual assault nurse examiner who conducted a sexual assault exam on the seven-year-old complainant in the pediatric emergency room (T.824) testified that she examined the child's vagina and anus, and there were **no findings or injuries** (T.840-41,845). This completely contradicts the child's testimony that petitioner "put his pecker in" her "butt" three times in her mother's

room, at night while her mother was out, and it hurt each time (T.797-98).

This child testified at the swearability hearing that **she did not know** what an oath meant (T.753-54). She understood the difference between the truth and a lie but she had no understanding of an oath, and therefore, its nature and consequences. Under these circumstances, the trial court erred when it allowed this seven-year-old child to testify under oath.

**GROUND TWO:**

APPELLANT'S RIGHT TO PRESENT HIS DEFENSE AND SIXTH AMENDMENT RIGHT TO CONFRONT THE WITNESSES AGAINST HIM WERE VIOLATED WHEN THE TRIAL COURT WOULD NOT ALLOW COMPLAINANT'S MOTHER TO BE RECALLED TO THE WITNESS STAND TO TESTIFY TO HER STATE OF MIND IN RELATION TO A PRIOR INCIDENT AND WHEN THE TRIAL COURT CURTAILED HER CROSS-EXAMINATION.

Petitioner was denied his right to present his theory of the case to the jury, which is that the complainant's brother was sexually abused by an uncle and when the complainant's mother saw petitioner dressing the complainant, she incorrectly concluded that her daughter was being sexually abused. When the trial court denied petitioner's application to recall the seven-year-old complainant's mother, it erroneously denied petitioner from demonstrating to the jury relevant and important facts bearing on the trustworthiness of crucial testimony.

Those relevant and important facts that the jury was not allowed to hear concerned the sexual abuse history of the other child, an illustration of the family dynamics, and the mother's unusual reaction of jumping to an incorrect conclusion upon seeing petitioner dressing

3.

her daughter and how that reaction influenced the seven-year-old into making a false statement. In 2007, the mother discovered an uncle in the act of sexually abusing her son. Counsel wanted to demonstrate to the jury that the mother's reaction to seeing her daughter being dressed by petitioner caused her to believe she was experiencing the same "traumatic situation" as before, and "her frame of mind was such that she assumed this may be going on again" (T.1083-84). The jury should have been permitted to know that the mother reacted "hastily and emotionally, and may have come to a conclusion" when she saw petitioner dressing her daughter (T.1084). The mother's state of mind was a relevant and important fact because it was her actions that influenced her seven-year-old daughter to make the false claim against petitioner (T.1095-96).

After the mother testified for the People, defense moved for a mistrial stating that he could not present a defense when the court would not let him delve into the mother's habit of watching pornography with her children, and a six-year-old child typically would not know the phrase "ate her coochie" (T.662-63), which is exactly what the mother said to the complainant upon encountering petitioner dressing her. The court's curtailment of the mother's cross-examination and denial of defense counsel's application to recall her to the witness stand deprived petitioner of his Sixth Amendment right of confrontation, violated his constitutional right to present a defense, and deprived the jurors from hearing the defense's theory of the case.

## GROUND THREE:

THE TRIAL COURT ERRED IN FAILING TO MEANINGFULLY RESPOND TO A JURY NOTE AND IN NOT ASKING THE JURY FOR FURTHER CLARIFICATION.

During the course of the jury's deliberations, they sent out five (5) notes. The second note asked the court, <u>inter alia</u>, "to hear the 911 call from Crystal (Mother) of the transcript, if it was on record. If it's on the record, can we see/hear it" (T.1597). The court stated it would respond by advising the jury that an audiotape or transcript of the 911 call was not in evidence (T.1598). Defense counsel continuously objected thereafter, arguing that the court should make further inquiry because Crystal discussed the 911 call in her testimony on cross-examination, and **that was in the record** (T.1598-99,1602-03,1614-18). The jury might not be "smart" enough or "sophisticated in the ways of the system" to ask again for the 911 testimony (T.1615).

When the court declined to provide the jurors with information they plainly wanted and incorrectly characterized the state of the evidence, by stating that "an audiotape or transcript of the 911 call was not in evidence", the court abused its discretion. It was clear that the jurors wanted to hear Crystal's testimony about the 911 call and it was error for the court not to seek clarification from the jurors.

## GROUND FOUR:

THE TRIAL COURT'S BIAS AGAINST THE DEFENSE THROUGHOUT THE TRIAL DEPRIVED APPELLANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL AND HIS RIGHT TO PRESENT A DEFENSE.

Throughout the course of petititoner's trial, many of the trial

5

court's rulings violated petitioner's due process rights and resulted in a trial that was decidedly skewed in the People's favor. The court's bias was so evident defense counsel was constrained to move for a mistrial, or a recusal (T.731-36). The court's bias was manifest through the following record evidence.

Defense counsel stated that the judge yelled at him the day before about the irrelevant Rape Shield Law, made a sarcastic comment about petitioner being the source of the pornography information, agreed to review the therapy records in camera so defense counsel could not see all of them to use as possible impeachment material, and refused to sign a subpoena for the release of Police Department Protocols concerning "interviewing children in alleged sex offense cases" (T.731-34). Defense counsel contended that the judge, as a former prosecutor (T.744), was "instinctively protecting" the "whole complainant's case," including when she initially denied counsel's request to play the 911 call (T.735-36). The court denied the application for a mistrial or recusal, and turned over to both parties one page of the complainant's therapy records, which were dated subsequent to the date of the incident, and therefore, according to defense counsel, irrelevant to the point he was making (T.736-39).

During jury deliberations, defense counsel made another motion for mistrial, contending that "the Court has exhibited a bias towards the prosecution and against the defense," possibly because the judge was "a career prosecutor" (T.1612). Defense counsel maintained that the court sustained objections to defense counsel's summation, but overruled objections to the prosecutor's closing, without basis (T.1612-14). In addition, one of the jury notes asked to hear the

6.

mother's 911 call or to see a transcript of the call, and the court told the jury those were not in evidence without inquiring if they meant that they wanted to hear the mother's testimony relating to the 911 call, a response which was continuously objected to by defense counsel (T.1614-18). Counsel also argued that "[t]he Court shouldn't be thinking in terms of who it is helping and who it is not helping," but rather, "what do they [the jurors] want" and can the court "give it to them [the jurors]?" (T.1616). The People opposed, and the Court denied the mistrial and/or the recusal motions (T.1618-19).

The court exhibited bias against the defense continuously throughout the trial, and not limited solely to those instances delineated by defense counsel in his mistrial motions. The court erroneously found (T.725-26) that the complainant's ten-year-old brother, who was sexually abused seven years earlier, could testify after he responded "I don't know" when asked if he understood what an oath was (T.691) and stated "I swear to the truth" and when you do not tell the truth "You would not, um, be out of here as soon as possible" (T.691,724-29). The court denied defense's multiple motions to recall the mother to the witness stand to testify as to her state of mind during the incident, and how it related to a similar prior traumatic incident. Indeed, at one point, the court listed one of its reasons for denial of the motions as the DNA evidence and petitioner's statement which were present in the case. Defense counsel correctly argued that the court had already decided the case in its mind, that the evidence was overwhelming against petitioner, and its rulings were colored by that bias. Based upon these facts, it was imperative for the court to recuse itself.

## GROUND FIVE:

THE TRIAL COURT ERRED IN ALLOWING BARAN TO TESTIFY THAT COMPLAINANT TOLD HIM ABOUT PRIOR INCIDENTS, WHEN THAT PRIOR CONSISTENT STATEMENT WAS IMPROPER BOLSTERING.

The trial court erred when it allowed Baran to testify that the complainant nodded her head up and down when he asked her if any incidents with petitioner had occurred previously, when those incidents were brought up on cross-examination merely to show the inconsistency in the number of occurrences, and not as an allegation of a recent fabrication.

Prior to Police Officer Baran's testimony, the People made an application to have Baran testify to the fact that the complainant told him at the hospital that petitioner had abused her prior to the instant incident, as a rebuttal to defense's portrayal of the complainant's testimony regarding prior incidents as a "recent fabrication" (T.908-09). The People contended that defense counsel had opened the door to the testimony regarding prior incidents, and Baran's testimony should come in as rebuttal, and "completing a narrative and explaining procedures" (T.908-09,913).

Defense counsel argued that the sexual assault nurse expert witness testified that there was no notation regarding any prior incidents in her notes, and the complainant had testified that she told the prosecutor it happened once previously, and told her therapist it happened five times previously (T.910,913,929-30). Counsel brought it up on cross-examination "solely to show the inconsistency in the number of times she [complainant] claims this happened in order to show it didn't happen at all," and "inconsistency

8.

is a reflection of lack of credibility" (T.913-14).

The court erroneously ruled Baran could testify that the complainant told him that there were prior incidents, and it was allowing that in for "credibility purposes only" but noted defense counsel's exception (T.916,934-35). The court also erred in allowing Baran to testify that the complainant nodded her head up and down when he asked her if there were prior incidents and in that defense counsel was not contending the complainant's statement was a recent fabrication. Police Officer Baran's testimony constituted improper bolstering which requires a reversal of petitioner's conviction and remanding for a new trial.

### GROUND SIX:

THE JURY"S GUILTY VERDICTS WAS AGAINST THE WEIGHT OF THE EVIDENCE.

Based upon the testimony of the People's witnesses, all of the credible evidence, the verdicts in this case were unreasonable. The evidence in this case supports the conclusion that petitioner was not guilty. He testified under oath that he was attempting to dress the seven-year-old complainant with her underwear and pajama bottoms when her mother walked in and jumped to an incorrect conclusion about what she was seeing (T.1304-05,1337). Petitioner's testimony was consistent with his DNA having gotten on her underwear, in that he had touched the underwear in his attempt at clothing her. Furthermore, adding to reasonable doubt, it was determined by **both testifying DNA experts** that the DNA on the child's underwear came from **two males** -- one of

which was petitioner and the other which was an "unknown male."

Dr. Karl Reich, an expert in the field of DNA analysis, testified that, with respect to the underwear stains, the vast majority of the DNA was from a female, but male DNA was detected, although it was **"not the amount of male DNA"** that would be **"consistent with it being saliva"** (T.1217-18). There was no way to know with a scientific degree of certainty that there was male saliva present (T.1217). The amount of male DNA present in the underwear stains was more consistent as coming from touching than from saliva (T.1217-18). If petitioner touched the underwear, as he did upon attempting to dress the child, and then the underwear was then put on, DNA could transfer to the vulva area (T.1264).

The dried secretions on the three samples were not saliva, so Dr. Reich concluded that there was "not a lot of saliva" on the samples (T.1218-19). DNA from saliva could be transferred by touch even after the saliva had dried (T.1220-21). The prosecution's expert, Dr. Christopher Chillseyzn, an expert in forensic genetics and DNA analysis from the Nassau County Medical Examiner's Office, also testified that the DNA from the underwear was from the complainant and an "unknown male" (T.873,882). Further testing revealed "a mixture of at least two male individuals" (T.873,880-81).

Appellant also denied saying many of the statements in his written statement. At the time of his arrest he did not read English too well nor did he understand the written statement "too well" (T.1314-15). The detectives who took the statement from petitioner wrote down some of petitioner's version of what transpired and added statements of their own version. Petitioner only wrote a letter in

Spanish "[s]aying sorry" because he was told to do so by P.O. Baran (T.1322-23,1359-60,1368). He apologized for the mother being "super angry," because he did not like to "offend people," and because he was "also very scared" (T.1323,1360).

Although there was a written statement and DNA evidence, petitioner's explanations belied the jury's determination of guilt of the charges beyond a reasonable doubt. The complainant's account was unworthy of belief and sounded like the fabrication of a seven-year-old. It was contradictory, confusing, and incredible, and as she was the sole witness to the incident, no one else testified as to the specific facts of petitioner's alleged conduct that day.

Taking into account all of the various factors delineated above leads to the conclusion that no reasonable juror could conclude that petitioner was guilty of the charged crimes beyond a reasonable doubt. The jury's determination of guilt was not supported by the record, in a case where the seven-year-old complainant's testimony was contradictory and confusing, the complainant was never interviewed by the police, no other witness saw the incident, the nurse who examined the complainant did not write anything in her medical records about any evidence of prior abuse, and there was DNA evidence of two males on her underwear.

**GROUND SEVEN:**

THE SENTENCE IMPOSED ON APPELLANT WAS UNNECESSARILY HARSH AND EXCESSIVE UNDER THE CIRCUMSTANCES.

Petitioner is a first-time offender who was sentenced to a determinate term of fifteen years of imprisonment and ten years of post-release

supervision on the single felony charge of criminal sexual act in the first degree.

Even the People acknowledged at sentencing that petitioner had "no prior criminal contact with the criminal justice system" and stated that he had been offered sentences of five years before indictment, seven years before hearing, and ten years before trial (S:3,15). Petitioner had "led an exemplary life" and was a Bus driver for children" and character witnesses "had only the kindest and best things to say about him" (S:9-10). Petitioner claimed he was innocent and should not be penalized for going to trial, especially since he had "an unblemished record" (S:10-11,14-15). He could not "admit and be remorseful when his position is that he didn't do anything and didn't do what was charged here" (S:16).

Here, according to the pre-sentence investigation report, petitioner is a naturalized United States citizen with a valid New York driver's license. He was gainfully employed as a bus driver prior to the incident. He was 57 years old. The current offense represents petitioner'ss only involvement with the criminal justice system. A final recommendation from the Probation Department who conducted the investigation for the pre-sentence report, merely indicated, "Imprisonment at the New York State Department of Correctional Services mandatory" (p.8). The mandatory minimum period of imprisonment is five years and there was no recommendation to exceed that. The biased sentencing judge, who refused to recuse himself upon motion, independently decided to exceed the minimum by 10 years. A sentence of 15 years, when the minimum is 5 years, is a significant increase for a 57 year-old school bus driver for children, who never

had experience with the criminal justice system.

In this case, there was no physical or lasting injury to the victim. According to the pre-sentence report states that the complainant "is now doing very well." There is no need for petitioner to have an increased term of incarceration for other than personal retribution. Petitioner would not benefit from additional years in a correctional facility. The objectives of deterrence and isolation would be readily accomplished through a lesser term, and while there is no reason to believe any need exists for further retribution, such a need would in any event be fulfilled without petitioner serving the unnecessarily harsh and excessive sentence he received.

### GROUND EIGHT:

APPELLANT'S FOURTH AMENDMENT RIGHT AGAINST UNREASONABLE SEARCHES AND SEIZURES WAS VIOLATED WHERE THE POLICE DID NOT HAVE PROBABLE CAUSE TO ARREST HIM, AND HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS WAS VIOLATED WHERE HIS WRITTEN STATEMENT WAS INVOLUNTARY AND USED AGAINST HIM AT TRIAL.

The hearing court erred in determining that the police had probable cause to arrest petitioner where the information P.O. Boccio relied upon to effectuate the arrest was unreliable. At the hearing, Boccio testified that when he resoonded to the scene, the mother told him that someone "licked her daughter's [...] coochie," and when pressed about who did that, she said petitioner had (H-1:8,20,24-25). The mother did not see petitioner do that "H-1:20,30,48-50). Boccio asked the mother what happened and she mimicked that "he licked her [...] coochie or coulter" (H-1:20,22,25-26). It took "a few minutes"

for the mother to respond to his question (H-1:25-27). The complainant never said who licked her (49-50).

The police did not have probable cause to arrest petitioner, as the information came from a six-year-old girl with "no indicia of reliability" who was only "repeating what her mother said" (H-2:91-93). Mother and daughter were sitting right next to each other when the mother told the police that petitioner "ate my daughter's cuchi" (H-2:93-94). The mother never witnessed the incident (H-2:94,98). The officer asked the daughter right in front of her mother what happened, and it took her 15-30 seconds to repeat back what she had heard her mother just say (H-2:94-98).

The hearing court also erred in finding that petitioner's written statement was given voluntarily when it was given in English, although he asked for his Miranda rights to be read to him in Spanish and had written an apology letter in Spanish at the request of the police (H-1:101,113-16,142,149-54,156-58,203,205,209).

After P.O. Baran typed the statement and asked petitioner to read it aloud, petitioner said he wanted the statement read to him in Spanish (H-1:172-73,186). Baran asked petitioner if he wanted to write a letter to the mother and daughter, he said yes, and he "wrote something in Spanish" (H-1:113-16,151-52,203,205,209). P.O. Baran testified that he knew Spanish was petitioner's native language (H-1:150-51). The written statement was given by petitioner in indecisive English and typed by Baran in English. This statement, purportedly given by petitioner, displayed a fluency in the English language which was not consistent with his difficulties in speaking English. Petitioner had a Spanish interpreter by his side during every day of

the hearings and trial. It was evident that he could not effectively communicate in English and his statement was, therefore, involuntary, violating his Fourteenth Amendment right to due process.

Daniel Ramos
15A3367
Eastern NYCF
P.O. Box 338
30 Institution Rd.
Napanoch, N.Y. 12458

Clerk of the United States
District Court, E.D.N.Y.
100 Federal Plaza
Central Islip, N.Y. 11722

LONG ISLAND OFFICE
MAR 14 2019
U.S. DISTRICT COURT E.D.N.Y.
RECEIVED CLERK'S OFFICE