*Vol I*

1

1    STATE OF NEW YORK  :  NASSAU COUNTY

2        SUPREME COURT  :  PART 44

3    ----------------------------------------X

4    THE PEOPLE OF THE STATE OF NEW YORK,

5         -against-                    Ind. No. 742N-14

6    DANIEL RAMOS,

7                        Defendant.

8    ----------------------------------------X

9    HEARING

10                        September 25, 2014
                          262 Old Country Road
11                        Mineola, New York

12   B E F O R E :

13       HON. TERESA K. CORRIGAN,
             Acting Supreme Court Justice

14

15

16   A P P E A R A N C E S :

17       HON. KATHLEEN M. RICE
             Nassau County District Attorney
18           BY:  ANTHONY PERRI, ESQ., of Counsel
             Assistant District Attorney
19                        For the People

20

21       HON. KENT V. MOSTON
             Nassau County Legal Aid Society
22           40 Main Street
             Hempstead, New York  11550
23           BY:  MICHAEL BERGER, ESQ., of Counsel
                      For the Defendant

24
                          JOANNE HORROCKS, CSR
25                        Senior Court Reporter

J.H.

Proceedings                          2

1          THE CLERK:   Indictment 742N of 2014, People

2     of the State of New York versus Daniel Ramos.

3     Counsels, your appearance for the record, please.

4          MR. PERRI:   For the People, Assistant

5     District Attorney Anthony Perri.

6          MR. BERGER:   Michael Berger, Legal Aid

7     Society for Daniel Ramos.

8          THE CLERK:   And are you Daniel Ramos?

9          THE DEFENDANT:   Yes.

10          THE CLERK:   And you appear here with your

11     attorney, Mr. Berger, who is seated at the counsel

12     table with you?

13          THE DEFENDANT:   Yes.

14          MR. PERRI:   Let the record reflect there is

15     also a sworn Spanish Interpreter present.  Madam

16     Interpreter, can you please state your appearance on

17     the record?

18          THE INTERPRETER:   Martha Harrigan.

19          THE CLERK:   Thank you.  Are the People reedy

20     to proceed to hearing?

21          MR. PERRI:   Yes, your Honor, the People are

22     ready to proceed.

23          THE CLERK:   Defense counsel ready?

24          MR. BERGER:   Yes, your Honor.

25          THE COURT:   All right, People, would you like

Proceedings                    3

1        to put the scope of the hearing on the record, please?

2                    MR. PERRI:  Yes, your Honor.  The hearing is

3        a stipulated to hearing for what is commonly referred

4        to as a Mapp, Huntley, Dunaway hearing.  It is with

5        respect to oral and written statements alleged to have

6        been made by the defendant at the time immediately

7        prior to being taken into custody and when he was taken

8        into custody, that there are issues both pre and post

9        Miranda statements in this case.  There's also the

10       question of probable cause for taking the defendant

11       into custody during this case.

12                    Furthermore, your Honor, with respect to the

13       Mapp component of this hearing, the issue of seizure

14       with respect is to the buccal swab taken from the

15       defendant the People allege to have been done on

16       consent when he was taken into custody after probable

17       cause was established that he had oral sexual contact

18       with a six year old girl, the victim in this case, your

19       Honor.

20                    THE COURT:  All right, thank you.

21                    Is there anything you want to put on the

22       record about what you turned over?

23                    MR. PERRI:  Yes, your Honor.  The People have

24       handed over Rosario material to both Court and the

25       defense, including addendum of material, including the

J.H.

Proceedings                    4

1      memo book of Officer Boccio.

2                    Your Honor, the hearing as far as scheduling

3      goes due to the Jewish holidays, the People and defense

4      agreed to go forward with respect to the initial

5      arresting officer today and that the detective, who is

6      unavailable due to the holiday, will be called at a

7      later date, your Honor.

8                    THE COURT:  All right, thank you.  Mr.

9      Berger, do you agree with the parameters of the

10     hearing?

11                   MR. BERGER:  I do.

12                   THE COURT:  Do you acknowledge receipt of the

13     materials turned over?

14                   MR. BERGER:  I do.

15                   THE COURT:  And do you acknowledge that we're

16     only hearing from the AO today, and that's on consent

17     of both parties?

18                   MR. BERGER:  Certainly.

19                   THE COURT:  All right, very good.

20                   People, call your first witness.

21                   MR. PERRI:  Your Honor, the People call

22     Officer Boccio.

23

24

25

1    P.O.   J O S E P H   B O C C I O, Shield 3462, a witness

2         called on behalf of the People, after having been first

3         duly sworn by the Clerk of the Court, was examined and

4         testified upon his oath as follows:

5                   THE CLERK:  Officer, please state your full

6         name, spell your last name, give your shield and your

7         command.

8                   THE WITNESS:  Officer Joseph Boccio,

9         B-O-C-C-I-O, shield 3462, Nassau County First Precinct.

10                  THE CLERK:  Thank you.

11                  THE COURT:  You may inquire.

12                  MR. PERRI:  Thank you, your Honor.

13   DIRECT EXAMINATION

14   BY MR. PERRI:

15        Q.    Officer Boccio, who are you currently employed by?

16        A.    Nassau County Police Department.

17        Q.    And how long have you been a police officer?

18        A.    Almost 12 years now.

19        Q.    And prior to being employed by Nassau County --

20                  MR. BERGER:  Judge, is it possible to have

21        the District Attorney at the lectern so I can hear?  It

22        seems like too low.

23                  THE COURT:  Absolutely.

24        Q.    Officer Boccio, prior to being employed by the

25   Nassau County Police Department, were you employed

1    previously in law enforcement?

2        A.   Yes.

3        Q.   Who were you employed by?

4        A.   New York City Police Department.

5        Q.   And how long were you officer with New York City?

6        A.   Three years.

7        Q.   And what's your current command?

8        A.   First Precinct.

9        Q.   And what area does the First Precinct cover?

10       A.   Roosevelt, Uniondale, Baldwin, East Meadow,

11   Merrick, Bellmore and a little tiny piece of Wantagh.

12       Q.   Drawing your attention to October 16th of 2013,

13   were you working that day?

14       A.   Yes.

15       Q.   Were you working a day or night tour?

16       A.   Day.

17       Q.   And that day, were you working alone or with a

18   partner?

19       A.   Partner.

20       Q.   And who was your partner that day?

21       A.   Officer Thomas Wigand.

22       Q.   Were you in plainclothes or working in uniform?

23       A.   Uniform.

24       Q.   A uniform substantially similar to what you're

25   wearing today?

P.O. J. Boccio - People - Direct      7

1        A.    Yes.

2        Q.    And were you working on foot or in a car?

3        A.    In a car.

4        Q.    And is that a marked or unmarked car?

5        A.    It's a marked car.

6        Q.    At approximately 5:21 p.m. that day, did you

7   receive any radio assignments?

8        A.    Yes.

9        Q.    And what was the nature of the radio assignment

10   that you received at approximately that time?

11       A.    It was a female who wanted to report a sex abuse

12   to her six year old.

13       Q.    And upon receiving that radio assignment, what, if

14   anything, did you do upon receiving that?

15       A.    We responded to the scene.  We met up with our

16   complainant, Crystal Ramirez.

17       Q.    And where was the scene where you encountered

18   Crystal Ramirez?

19       A.    It's the rear of 124 Park Avenue in Roosevelt.

20       Q.    And is Roosevelt, is that in Nassau County, New

21   York State?

22       A.    Yes, it is.

23       Q.    And when you responded there, did you, in fact,

24   encounter Crystal Ramirez?

25       A.    Yes, I did.

J.H.

1     Q.   Who did you encounter her near Mya Ramirez.

2     A.   Yes.

3     Q.   Officer, who is Mya Ramirez?

4     A.   The daughter of Crystal Ramirez.

5     Q.   Could you describe Mya Ramirez to the Court?

6     A.   A young girl under the age of 10.

7     Q.   Did there come a time where you spoke with Crystal

8  Ramirez?

9     A.   Yes.

10    Q.   What, if anything, did Crystal Ramirez say to you?

11    A.   She told us that Daniel Ramos licked her

12  daughter's vagina.

13    Q.   And did she actually use the term vagina?

14    A.   She used coochie.

15    Q.   And after Crystal Ramirez said that to you, did

16  there come a time where you encountered an individual or met

17  a person named Daniel Ramos?

18    A.   Yes.

19    Q.   How did you become aware of Daniel Ramos?

20    A.   He was standing in the parking lot.  She pointed

21  him out.

22    Q.   When you say, she pointed him out, is that Crystal

23  Ramirez?

24    A.   Yes.

25    Q.   After Crystal Ramirez pointed out -- sorry,

1    withdrawn.

2              Do you see the individual that you observed there

3    named Daniel Ramos present in the courtroom today?

4         A.   Yes.

5         Q.   And could you please identify him by pointing to

6    him and describing an article of clothing that he's wearing?

7         A.   White sweat shirt right there (indicating).

8              MR. PERRI:  Your Honor, I'd ask the record to

9         reflect that the witness has identified the defendant.

10             THE COURT:  It will so reflect.

11             MR. PERRI:  Thank you.

12        Q.   Officer, after Crystal Ramirez identified the

13   defendant as the person who allegedly had licked her

14   daughter's vagina, what, if anything, did you do next?

15        A.   Went to speak to Daniel Ramos while my partner

16   stayed with Crystal.

17        Q.   And was your partner Officer Widgand?

18        A.   Correct.

19        Q.   Where was Daniel Ramos in comparison to Crystal

20   Ramirez?

21        A.   He was about 20 feet away.  It's a parking lot

22   behind the building, standing, leaning up against the car.

23        Q.   When you approached the defendant, did you

24   identify yourself as a police officer?

25        A.   I did.

1    Q.   And what, if anything, did you say as you
2  approached him?

3    A.   I said, What's going on?  Why are we here?

4    Q.   After making that statement to the defendant,
5  what, if anything, did he say in response?

6    A.   He said, Arrest me.  She's saying I raped her
7  daughter.

8    Q.   After the defendant made that statement to you,
9  what, if anything, did you say in response?

10    A.   I said, I'm going to need a little more than that.
11  What exactly happened?

12    Q.   And after you made that statement to the
13  defendant, did the defendant respond?

14    A.   Yes.

15    Q.   And what, if anything, did the defendant say to
16  you?

17    A.   He said, It was a mistake.  I licked her once in
18  the bedroom.

19              MR. BERGER:  I'm sorry, could the reporter
20         read the answer?

21              THE COURT:  She can.

22              (The requested portion was read.)

23    Q.   While you were speaking with the defendant, where
24  was your -- were you armed?

25    A.   Yes.

1     Q.    Where was your firearm located?

2     A.    In my right side waist level.

3     Q.    And was the defendant in handcuffs at that time

4   when you spoke with him?

5     A.    No.

6     Q.    Aside from the two questions that you testified

7   to, prior to the defendant making those statements about the

8   conduct alleged, did you make any other statements, any

9   threats or promises to the defendant?

10    A.    No.

11    Q.    Did you make any offer of leniency to him if he

12  would speak with you?

13    A.    No.

14    Q.    After the defendant made the second statement that

15  you testified to, what, if anything, did you do in response?

16    A.    I placed him under arrest.

17    Q.    And was he handcuffed at that time?

18    A.    Yes.

19    Q.    And after the defendant was taken into custody at

20  that time, what happened next with respect to Crystal and

21  Mya Ramirez?

22    A.    They were transported to Nassau County Medical

23  Center.

24    Q.    Did any other officers arrive at the scene prior

25  to their leaving?

1       A.    Yes, they did.

2       Q.    And what other officers responded to the scene?

3       A.    There was officers Tedeschi and Johnson.

4       Q.    And who did Crystal and Mya Ramirez leave with to

5    go to NUMC?

6       A.    They left with Tedeschi and Johnson.

7       Q.    Did there come a time where Crystal Ramirez gave a

8    written statement to the police department?

9       A.    Yes.

10      Q.    And to which officer did she give that to?

11      A.    Officer Tedeschi.

12      Q.    And was that written statement in sum and

13   substance similar to what she had orally reported to you?

14      A.    Yes.

15      Q.    And after taking the defendant into custody, was

16   anyone in the Nassau County Police Department outside of

17   your precinct notified about the allegations that were made

18   that afternoon?

19      A.    Yes.

20      Q.    And who was notified inside of the police

21   department?

22      A.    Special Victims.

23      Q.    When you spoke with the defendant, what language

24   were you speaking?

25      A.    English.

1       Q.   At any time in speaking -- and what language did

2   the defendant respond to you in?

3       A.   In English.

4       Q.   At any time did you have difficulty communicating

5   with the defendant in English?

6       A.   No.

7       Q.   Was he able to follow your directions and

8   understand your requests?

9       A.   Yes.

10                MR. PERRI:   Nothing further, your Honor.

11                THE COURT:   Thank you.   Cross-examination,

12       Mr. Berger?

13   CROSS-EXAMINATION

14   BY MR. BERGER:

15       Q.   Officer Boccio, did you prepare any notes or

16   memoranda in connection with this case?

17       A.   I did not.

18       Q.   So everything you have testified to here has been

19   based upon your own recollection?

20       A.   Yes.

21       Q.   Well, did you have occasion to read anything

22   before testifying here today?

23       A.   Yes.

24       Q.   What did you read?

25       A.   The arrest packet prepared by Special Victims.

J.H.

1        Q.   Did anything contained in that arrest packet

2    relate to what you did when you arrived at the scene on

3    October 16th, 2013?

4        A.   The narrative in it probably just states that I

5    arrived and I spoke to pretty much the whole story.

6        Q.   But that narrative, did it discuss -- did it have

7    actually what you say you said to him, what you said to the

8    mother and what they said to you?

9        A.   No.

10       Q.   So what you are testifying to here today is based

11   upon your own independent recollection; is that correct?

12       A.   Yes.

13       Q.   And this is nearly a year later?

14       A.   Yes.

15       Q.   Did you discuss this case with anybody prior to

16   testifying here today?

17       A.   Yes.

18       Q.   Who was that?

19       A.   The District Attorney.

20       Q.   And did that take place up in his office?

21       A.   Yes.

22       Q.   Was that this morning?

23       A.   Yes.

24       Q.   Did it happen at any other time?

25       A.   I believe we had a hearing sometime ago.

1       Q.    You met with him earlier?

2       A.    A while ago, a couple months ago.  I don't recall

3    exactly when.

4       Q.    And when you met with him, did you read -- what

5    was the report you said you read, a summary?

6       A.    It's an arrest summary.

7       Q.    Arrest summary.  You read that this morning?

8       A.    Yes.

9       Q.    Anything else besides the arrest summary?

10      A.    I reviewed the deposition by Officer Tedeschi.

11            MR. BERGER:  May I have that produced,

12      please?

13            MR. PERRI:  It's in your Rosario.  It's the

14      32-B of the victim.  I believe what the officer is

15      referring to is the 32-B, the supporting deposition of

16      the complainant, the mother of the victim, Crystal

17      Ramirez.  That was included in the Rosario material.

18            MR. BERGER:  Yes, I thought maybe I am

19      mistaken.

20      Q.    Did you say you read a report by Officer Tedeschi?

21      A.    I read the supporting deposition.

22      Q.    Of Officer Tedeschi?

23      A.    Yes.

24            MR. BERGER:  Is that in the material as well?

25            MR. PERRI:  Your Honor, I believe Officer

Case 2:19-cv-01125-JS-AYS   Document 7-1   Filed 05/31/19   Page 16 of 273 PageID #: 152

1      Tedeschi prepared the supporting deposition that was

2      signed based upon his conversations of Crystal Ramirez.

3          Q.   Are you saying then that you read the statement of

4  Crystal Ramirez, or did you read a different report written

5  by Officer Tedeschi?

6          A.   The statement from Crystal Ramirez to Officer

7  Tedeschi.

8          Q.   That's what your referring to?

9          A.   Correct.

10         Q.   Now, when you used the phrase, I read the arrest

11 packet, did you read anything else other than the statement

12 given by Crystal Ramirez to Officer Tedeschi?

13         A.   Different sheets in the arrest pocket.  I'm not

14 sure exactly what the name of each sheet is, but yes.

15         Q.   And would the content -- do you remember the

16 content of what you read?

17         A.   Some of it.

18         Q.   Would you tell me, please, what it was that --

19 what the content was?

20         A.   The 911 assignment, the part that she says that

21 they are six years old, she wants to report abuse.  That I

22 recall being in the 911 call.

23         Q.   That's all?

24         A.   Of substance.

25         Q.   Did you happen to listen to the 911 call?

J.H.

Case 2:19-cv-01125-JS-AYS   Document 7-1   Filed 05/31/19   Page 17 of 273 PageID #: 153

1    A.   I did not.

2    Q.   Do you remember what words you received on the

3 radio call?  You made reference to it when the prosecutor

4 asked you before.  But do you remember the words you

5 received on your radio transmission?

6    A.   I don't.

7    Q.   Well, you told Mr. Perri before that you received

8 a call about sexual abuse to a six year old?

9    A.   Correct.

10   Q.   You remember that?

11   A.   Yes, because we have a computer screen on it that

12 comes up, and it wasn't verbally transmitted over radio due

13 to the nature of the call.

14   Q.   So what you're saying is you read this on your

15 computer screen?

16   A.   Correct.

17   Q.   And that's what you remember independently now

18 because you didn't make a note about it, correct?

19   A.   No.  I remember it coming over the computer

20 screen.

21   Q.   But you're saying you remember that's based upon

22 your own independent recollection?

23              MR. PERRI:  Objection.  Asked answered.

24              THE COURT:  I'll let him answer it again.

25   That's what is based on your recollection?

J.H.

1           THE WITNESS:  Yes.

2           THE COURT:  Next question.

3      Q.   Did you happen to hear the 911 call when Miss

4  Crystal Ramirez made it to the 911?  Did you hear that?

5      A.   The call she made or --

6      Q.   Yes, the call she made.

7      A.   No, I did not.

8      Q.   So when you're saying that you remember the

9  computer screen in your car, you remember the exact words

10 being a female reporting a sexual abuse to a six year old?

11          MR. PERRI:  Objection.  Asked and answered,

12     your Honor.

13          THE COURT:  Sustained.

14          MR. BERGER:  That's the basis, asked and

15     answered, Judge?

16          THE COURT:  I think I have heard it three

17     times now that on the computer screen, this officer saw

18     sexual abuse of a six year old.  That's based on his

19     current recollection, and no notes were made.

20          Next question.

21     Q.   Did it specify what the nature of the sexual abuse

22 was?

23     A.   No, it did not.

24     Q.   Now, when you arrived, do you remember where the

25 address was that you arrived?

J.H.

1    A.    Yes.

2    Q.    What was that?

3    A.    124 Park Avenue.

4    Q.    You were directed to go to that address?

5    A.    Yes.

6    Q.    Were you directed to speak with anybody there?

7    A.    I don't recall if it said the name of the person

8    in the call.

9    Q.    Well, were you told the address was a house, an

10   apartment?  You were not given a name of somebody to

11   contact?

12   A.    I don't recall if it was in the 911 call or not.

13   But when we pulled up, Crystal Ramirez waved to us, and we

14   walked over to her.

15   Q.    When you saw we, were you in the car with somebody

16   else?

17   A.    Yes.

18   Q.    Who was that?

19   A.    Officer Wigand.

20   Q.    So what's the first thing you did when you saw

21   Miss Ramirez wave, signal to you, yes?

22   A.    Yes.

23   Q.    So what did you do when you got out?

24   A.    Parked our car, and me and my partner approached

25   her.

1    Q.    And what was said by you to her, if anything?

2    A.    I asked, What's going on?

3    Q.    And what did she say to you?

4    A.    She said that Daniel Ramos licked her daughter's

5    believe it was coochie.

6    Q.    Did you make a note of that?

7    A.    I did not.

8    Q.    Did you ask her if she saw that?

9    A.    I did.

10   Q.    And what did she say?

11   A.    No, she did not see it.

12   Q.    So did you talk to her daughter?

13   A.    Briefly.

14   Q.    And what did you -- what did you say to her, and

15   what did she say to you?

16   A.    I said, What happened? And she said that he

17   licked her I believe it was coochie or coulter. I don't

18   recall exactly coochie or what, coulter.

19   Q.    And this is something the six year old said to

20   you?

21   A.    Yes.

22   Q.    And you made a note of that?

23   A.    I did not.

24   Q.    What you're saying then today is based upon your

25   independent recollection of what happened of approximately a

J.H.

1    year ago?

2         A.   Yes, yes.

3         Q.   Was Officer Wigand with you when this was said?

4         A.   Yes.

5         Q.   Do you know if he made a note or memorandum about

6    that?

7         A.   I don't believe he did.

8         Q.   Was Officer Wigand with you when you approached

9    Miss Ramirez at first?

10        A.   Yes.

11        Q.   And when you approached Miss Ramirez and she said

12   to you that Mr. -- did she use the word Daniel Ramos?

13        A.   Yes.

14        Q.   Did she point to him?  Was he in view at that

15   time?

16        A.   Not until we asked where is he.

17        Q.   And what did she say?

18        A.   She pointed to him in the parking lot.

19        Q.   And how far away was he from you at that point?

20        A.   Maybe 20 feet.

21        Q.   So what was he doing?

22        A.   He was leaning up against one of the cars, the

23   back of a car in the parking lot.

24        Q.   And when you approached Miss Ramirez, where was

25   her daughter at that time?

1    A.    Sitting on the steps next to her.

2    Q.    Next to her?

3    A.    Yes.

4    Q.    So her daughter heard what her mother was saying

5    to you?

6    A.    I'm not aware if she heard her, but she was in the

7    vicinity of.

8    Q.    You say right next to her on the steps, correct?

9    A.    Correct.

10   Q.    How far away was the daughter sitting next to her

11   mother when she made that statement?

12   A.    Two, three feet.

13   Q.    And after Miss Ramirez told you, you then asked

14   the daughter, Mya, what happened?

15   A.    Correct.

16   Q.    And her words were?

17   A.    He licked my -- I don't recall if it's coulter or

18   coochie.

19   Q.    And what words did Miss Ramirez, her mother, use

20   when she first made that statement to you?

21   A.    I believe it was coochie.

22   Q.    So when you say you believe, you're not sure of

23   that either?

24   A.    I don't recall the exact word coulter or coochie

25   by both of them.

J.H.

1     Q.    So am I correct in assuming that you did not take

2  Mya, the daughter, aside and privately talk to her out of

3  the presence of her mother?

4     A.    I did not at that time.

5     Q.    Did you at any time?

6     A.    I did not personally.

7     Q.    Did you see anybody else do it?

8     A.    Not at that scene.

9     Q.    Where did you see that happen?

10     A.    I didn't see it -- I didn't see it at all.

11     Q.    Oh, so you did not witness any police officer take

12  the daughter aside separately and talk to her privately

13  outside the earshot of her mother?

14     A.    I did not witness it.

15     Q.    Did you learn of that?  Did you learn if that had

16  happened from any other police officers?

17     A.    I did not learn.

18     Q.    Do you know if any other police officers took a

19  statement from the daughter?

20     A.    I don't believe a statement was taken from the

21  daughter.

22     Q.    So after -- now, did you -- when did you first

23  hear the name Daniel Ramos?

24     A.    From Crystal Ramirez.

25     Q.    Did she say that to you before or after you spoke

1  to the daughter?

2          A.    Before.

3          Q.    And so after Miss Ramirez told you what she said

4  her daughter said, you asked her who did it?

5          A.    No.

6                    THE COURT:  Who is the her in that question?

7                    MR. BERGER:  I'm sorry, Judge?

8                    THE COURT:  The second her, I need to know

9          which her that was.

10          Q.    When you asked Crystal Ramirez what happened, she

11  told you, and then you asked her who did it?

12          A.    She said, Daniel Ramos did it.

13          Q.    So she used the word Daniel Ramos first when she

14  said to you -- she said to you, Daniel Ramos licked her

15  daughter's coochie?

16          A.    I asked, Who did it, in that conversation.

17          Q.    So after she told you -- in other words, when she

18  first said to you -- let's go back.

19                You asked her what happened, and did she use the

20  name Daniel Ramos first, or did she -- what did she say to

21  you, a friend licked her daughter's coochie or somebody did?

22  Did she specify initially?

23          A.    She said someone licked.

24          Q.    Someone?

25          A.    Yes.

1    Q.   And did you say to her who is that someone?

2    A.   I said, Do you know this person?  Who is it?  She

3 said, Yes, it's Daniel Ramos.

4    Q.   And then you asked her what, where he is?

5    A.   Well, then I spoke to the daughter for a few

6 minutes.

7    Q.   For a few minutes?

8    A.   Approximately.

9    Q.   What else did you say to the daughter, and what

10 did she say to you?

11    A.   I don't recall anything else the daughter said.

12    Q.   But you recall it was a few minutes?

13    A.   Approximately.

14    Q.   How long did it take you to ask her what happened

15 and she said to you someone licked her coochie?

16    A.   Repeat the question?

17    Q.   How long did it take when you asked the question

18 what happened and she said someone licked my coochie?

19    A.   I don't recall the exact timeframe how long it

20 took her to respond.

21    Q.   Seconds?  Wouldn't it be seconds?

22    A.   No.  She was a little -- she was a little

23 aggressive at first answering my question.

24    Q.   She was a little what?

25    A.   She was a little shy to answer my question.  She

1    did not just blurt it out.

2         Q.   So then tell me exactly how that happened.  You

3    went over to the daughter?

4         A.   I didn't go over to her.  She was standing right

5    next to.

6         Q.   What did you say to her?

7         A.   I said, What happened?

8         Q.   What did she say?

9         A.   She said that he licked my coulter or coochie.

10        Q.   And when she said, he, did she give a name?

11        A.   She didn't.

12        Q.   And did she point to anyplace when she said that

13   to you?

14        A.   No, she didn't.

15        Q.   And after she said he licked my coochie, let's

16   assume that's what the word was at the time, what did you

17   say to her?

18        A.   That's all I said to her.

19        Q.   So that didn't take minutes, did it?

20        A.   Well, she didn't answer promptly when I was

21   talking to her.

22        Q.   Okay.  So tell me -- let me get this so I

23   understand.  You said what happened, and there was a delay?

24        A.   There was a delay.  How long exactly that was, I

25   don't recall.

1    Q.    Well, you're recollecting what happened that day,

2    aren't you?

3    A.    I recall that was said that day, not how long it

4    was taken to be said.

5    Q.    You only recall what was said and not the amount

6    of time it took?

7    A.    Correct.

8    Q.    Aren't you attempting as you testify here today,

9    Officer, to recreate what happened that day?

10   A.    As much as I can remember, yes.

11   Q.    And you're thinking back to that day and trying to

12   tell us here in court what happened and how it happened,

13   right?

14   A.    Correct.

15   Q.    So I'm asking you to do that now and asking you to

16   think back to what you say happened.  And after you asked

17   her, the girl, what happened, how long did it take before

18   she responded to you?

19              MR. PERRI:  Objection.

20              THE COURT:  You can answer it one more time.

21   A.    A few minutes.

22   Q.    Okay.  She took a few minutes before she said to

23   you, he licked my coochie?

24   A.    No.  You said how long was the conversation with

25   her first.

Case 2:19-cv-01125-JS-AYS   Document 7-1   Filed 05/31/19   Page 28 of 273 PageID #: 164

P.O. J. Boccio - People - Cross      28

1    Q.   No.  I asked you how long the pause was after you
2    asked her what happened.
3        A.   That may have been 15, maybe 30 seconds.
4        Q.   And after the 15 to 30 seconds, she said, he
5    licked my coochie?
6        A.   Correct, or coulter.  I don't recall which one
7    exactly.
8        Q.   Right, okay.  I understand.  You don't recall the
9    word exactly.
10           After that answer, what else happened between you
11   and the girl?
12       A.   That's all.
13       Q.   But -- so that's 30 seconds at most.  You said
14   minutes before.
15       A.   I was waiting to see if she said anything else
16   before I continued the conversation with mom.
17       Q.   But I asked you how long the conversation was, and
18   you said it was minutes.
19               MR. PERRI:  Objection.
20               THE COURT:  Sustained.
21               MR. BERGER:  Judge, the right to press a
22        witness is what cross-examination allows.
23               THE COURT:  You have pressed.  I got it.
24       Q.   Well, is the answer that it took 30 seconds in the
25   conversation or two minutes?

J.H.

1          MR. PERRI:  Objection.

2          THE COURT:  Sustained.

3      Q.   So your answer is that you waited for another

4  minute-and-a-half approximately before doing what?

5      A.   Moving my attention back to the mother.

6      Q.   Officer Wigand is with you there at the time?

7      A.   Yes.

8      Q.   Did you ask her who the, he, was?

9      A.   She told me it was Daniel Ramos.

10     Q.   I asked you before --

11     A.   When you say she, who are you referring to?

12     Q.   The daughter.

13     A.   No, she did not tell me who his name was.

14     Q.   So my question to you was did you ask Mya who it

15  was who licked her coochie?

16     A.   I did not.

17     Q.   And then is it that you turned your attention to

18  Miss Ramirez?

19     A.   Correct.

20     Q.   And what did you say to her, and what did she say

21  to you?

22     A.   I said, Where is Daniel Ramos?

23     Q.   So had Miss Ramirez already used the name, Daniel

24  Ramos, prior to you talking to Mya?

25     A.   Yes, she did.

1    Q.    Did you ask Miss Ramirez if she saw this happen?

2    A.    Yes, I did.

3    Q.    And what did she say?

4    A.    She said she did not see it happen.

5    Q.    Now, after you -- withdrawn.

6          After you spoke with Mya, did you then -- was it

7    then that you asked Miss Ramirez where Daniel Ramos was?

8    A.    Yes.

9    Q.    And she pointed to what, 20 feet away, someplace

10   where he's leaning against a car?

11   A.    Yes.

12   Q.    And what did you do then?

13   A.    I left Crystal Ramirez to go talk to him, Daniel

14   Ramos.

15   Q.    And what was the first thing you said to him?

16   A.    I said, What's going on here?  Why am I here?

17   Q.    And what did he say to you?

18   A.    He goes, Arrest me.  She's saying I raped her

19   daughter.

20   Q.    Now, did you write this down anywhere?

21   A.    I did not.

22   Q.    And this is something you independently recollect?

23   A.    I do.

24   Q.    Now, after you spoke -- going back just a moment

25   to this minute-and-a-half or so that you're just standing

J.H.

1    there looking at Mya after she said to you, he licked my

2    coochie, you never asked who it was who did this?

3          A.    No, I didn't.

4          Q.    Now, when you walked over to Mr. Ramos, was it

5    your intention to arrest him?

6          A.    Not yet.

7                MR. PERRI:  Objection.  Relevance.

8                THE COURT:  The answer is out, so it's fine.

9    Not yet, you said?

10               THE WITNESS:  Correct.

11               THE COURT:  Thank you.

12         Q.    And why was it not your -- why were you not ready

13   to arrest him at that point?

14               MR. PERRI:  Objection.

15               THE COURT:  Sustained.

16               MR. BERGER:  I can ask his state of mind and

17         motivation, Judge.  This is a police officer --

18               THE COURT:  And if you want to lay the case

19         on probable cause and what he thinks versus what the

20         facts prove, we can have that conversation later.  But

21         he can think whatever he wants to think.  I need to

22         develop the facts to understand probable cause existed.

23               MR. BERGER:  But you have to determine based

24         upon the answers whether they are credible or not.  The

25         credibility is also an issue for a factfinder.

J.H.

1          THE COURT:  It is.

2          MR. BERGER:  So at this point in time I think

3    it's -- the Court should know exactly what the police

4    officer's motivation and intentions were at that time.

5          THE COURT:  People?

6          MR. PERRI:  Your Honor, the People would

7    continue their objection as there is no relevance to

8    that information, so that in the subjective opinion of

9    the police officer whether or not at that moment he had

10   probable cause to arrest the defendant does not

11   directly go to his credibility.  There's no objective

12   way to assess the truthfulness of such a statement of

13   whether or not he believed he had the probable cause at

14   that time.  It's his own subjective opinion.

15         THE COURT:  Mr. Berger?

16         MR. BERGER:  What his -- he's in uniform.  He

17   has been given information.  The question is whether or

18   not a person in the defendant's position would

19   reasonably believe that he would be in custody at the

20   time.

21         THE COURT:  And the officer approached him I

22   heard I think maybe about seven times now and asked the

23   following.  In some phrase, and I can go back and find

24   it in my notes, I think it was, What's going on?  Why

25   am I here?

1          MR. BERGER:  That doesn't mean that he did

2     not -- that he intended to let him go.

3          THE COURT:  It doesn't matter what he

4     intended to do.  He walked up to him and asked a

5     question.  I have the answer to that question.  I'll

6     take more questions and answers about what's happened

7     and the facts.

8          But at the end of the day, it is irrelevant

9     in a probable cause determination as to whether this

10    officer thought at that very moment he could arrest

11    someone or if he thought he could never arrest him or

12    if he thought five minutes later he could arrest him.

13    It is the facts that are developed based on -- applied

14    to the law that is given to me, and I'm waiting to have

15    some facts developed.

16          MR. BERGER:  We need to know whether a

17    reasonable person in Mr. Ramos's position would know

18    whether or not he was free to leave.

19          THE COURT:  And how does that change based on

20    his state of mind?

21          MR. BERGER:  Because his actions can affect

22    his state of mind.

23          THE COURT:  Ask him his actions, because his

24    state of mind is in his head.  I'm pretty confident

25    your client couldn't see or read what was in his head.

1    Why don't you ask him his actions, and then maybe we

2    will get somewhere factually.

3                 MR. BERGER:  I'm asking him his actions can

4    be reflected in his state of mind, Judge.  If he says

5    he was not free to go, that would be significant for a

6    factfinder.

7                 THE COURT:  Go ahead, ask him if he was free

8    to go, and then we will go through the whole thing

9    about investigative detention.

10                Go ahead, Officer, answer the next question.

11   Q.    Did you intend to let him go at that point?

12   A.    No, I did not.

13   Q.    And why was that?

14   A.    Because I was conducting an investigation.

15   Q.    Okay.  So now you ask him what's going on here,

16   correct?

17   A.    Correct.

18   Q.    And at this point in time you know that he's the

19   person who has been pointed to by this mother, correct?

20   A.    Correct.

21   Q.    This mother who didn't see what happened, correct?

22   A.    Correct.

23   Q.    And you go up and you say, What's going on here?

24   And he says, Arrest me, she says I raped her daughter,

25   correct, right?

P.O. J. Boccio - People - Cross      35

1    A.   Correct.

2    Q.   But that's not what you were told, was it?

3         MR. PERRI:   Objection.

4         THE COURT:   Sustained.   I don't understand

5    the question.

6    Q.   You were not told by anybody that Daniel Ramos had

7    raped anybody?

8    A.   I didn't ask that.

9    Q.   So he says, Arrest me.  She says I raped her

10   daughter, correct?

11   A.   Correct.

12   Q.   Now what happens?  What's the next thing?

13   A.   I'm going to need a little more than that.

14   Q.   And he -- go ahead.

15   A.   And he says, It was a mistake.  I licked her in

16   the bedroom.

17   Q.   And did you --

18   A.   I'm not sure if that's the word-for-word that was

19   used.  I did not write that down.

20   Q.   And you never wrote a report to that effect, did

21   you?

22   A.   A handwritten report?

23   Q.   Yes.

24   A.   No, I did not.

25   Q.   You never made a memorandum or note to the effect

Case 2:19-cv-01125-JS-AYS   Document 7-1   Filed 05/31/19   Page 36 of 273 PageID #: 172

1   as to what you say he said?

2        A.   No.

3        Q.   So this is something you said you remember

4   independently of your own independent recollection?

5        A.   Correct.

6        Q.   Now, he said, I licked her in the bedroom?

7        A.   Correct.

8        Q.   He did not say where he licked her, did he?

9        A.   I don't recall if that was in the statement or

10  not.

11       Q.   He did not -- you did not ever say that he said

12  where he licked her?

13       A.   I just said I don't recall if that was in the

14  statement.

15       Q.   In what statement?

16       A.   That he made to me.  If I can refresh my notes

17  from what I said word-for-word.

18       Q.   You have notes as to what he said?

19       A.   In the arrest report, there is documentation on

20  what was said.  But it was not handwritten, correct.

21       Q.   I asked you if you prepared any notes or memoranda

22  in connection with this case.  You told me no.

23       A.   I personally did not.

24       Q.   What does it matter what's in the arrest report if

25  you didn't write it?

J.H.

1    A.    I told a Special Victims detective what was said.

2    Q.    Who was that Special Victims detective?

3    A.    I believe it was Detective Baran.  It's a Special

4  Victims case.  They prepare the paperwork.

5              MR. BERGER:  Do I have that document?  What

6         number is that?

7              MR. PERRI:  Your Honor, what I believe

8         defense counsel is inquiring about and what the witness

9         is testifying to is the arrest report, District

10        Attorney summary report which has been provided in the

11        Rosario packet to counsel, what was previously referred

12        to as the 85A or the crime report which was prepared

13        according to the witness by the Special Victims Squad.

14             MR. BERGER:  I'm just asking for the number

15        in the Rosario packet, that's all.

16             THE COURT:  There's a cover sheet on your

17        packet.

18             MR. BERGER:  I have the cover sheet.

19             THE COURT:  NCPD District Attorney summary

20        85A appears to have page 15 next to it.  District

21        Attorney summary report also appears to have a number

22        24 next to it.  Did you also say arrest reports, Mr.

23        Perri?

24             MR. PERRI:  Your Honor, the Special Victims

25        Squad prepared all the paperwork in this case, but the

1    specifically what would have possibly what the witness

2    and defense counsel are referring to, a summary of any

3    oral admissions would be the crime report, the District

4    Attorney summary report of what was previously referred

5    to as an 85A.

6              MR. BERGER:  I just want to know the number

7    that you're referring to in your document.  I don't see

8    the crime report.

9              THE COURT:  Mr. Perri, why don't you take

10   this and give counsel a page number.

11             MR. PERRI:  Your Honor, I direct defense

12   counsel, for the record, to page 16 which is the first

13   copy of the District Attorney's summary report that has

14   page two out of four of that document which then does

15   have a section entitled, Defendant's admissions.

16             THE COURT:  Thank you.  Do you see, Mr.

17   Berger?

18             MR. BERGER:  I do.

19             THE COURT:  Thank you.

20   CROSS-EXAMINATION

21   BY MR. BERGER:  (CONTINUED)

22        Q.   When did you say that you made this statement to

23   the Special Victims, is that Detective Baran?

24        A.   Yes.

25        Q.   At what time?

1       A.   I don't recall what time.

2       Q.   That day?

3       A.   That day or that night.

4       Q.   And when this statement was made to you, did you

5   write it down contemporaneously?

6       A.   I did not write it down ever.

7       Q.   Where were you -- you say you made this statement

8   to -- was it Detective Baran?

9       A.   Correct.

10      Q.   Where were you when you made this statement to

11  him?

12      A.   At the Special Victims Squad.

13      Q.   And where was that?

14      A.   I believe it's in Bethpage.

15      Q.   You don't recall?

16      A.   I now how to get there.  I don't know the exact

17  town.

18      Q.   And do you remember whether other people were in

19  the room when you were talking to officer -- Detective

20  Baran?

21      A.   I don't recall officers in the room.

22      Q.   Was Officer Wigand there with you?

23      A.   He was in the Special Victims Unit with me.  I

24  don't recall if he was in the room when I made the

25  statement.

J.H.

1        Q.   You recall the statement, you don't recall if he

2    was there?

3        A.   Correct.  It's a big office.

4        Q.   But was Officer Wigand with you when you went over

5    to Mr. Ramos?

6        A.   No, he was not.

7        Q.   Now, when you say you made this statement -- when

8    you told this to Detective Baran, was he writing it down?

9        A.   I don't recall what he was doing.

10       Q.   So you didn't see him write this down, correct?

11       A.   I don't recall.

12       Q.   Or type it?

13       A.   I don't recall if he was writing or typing it.

14       Q.   So you're not saying that he was, in fact,

15   transcribing it, you're just saying he may have been doing

16   it or he may not, you just don't remember one way or the

17   other?

18                  MR. PERRI:  Objection.  Relevance.

19                  THE COURT:  Sustained.

20                  MR. BERGER:  How is that sustained, Judge?

21       I'm asking whether or not he either remembers him

22       typing it or writing it or whether he doesn't remember

23       at all if he did either of those two things.

24                  THE COURT:  I have already heard from this

25       officer that he gave the statement in a room in

1       Bethpage.  He doesn't recall who was around, and he

2       doesn't recall whether it was being written or typed.

3       He simply gave the statement.

4          Q.    So then you don't know when this was ever typed by

5    anybody, do you?

6                    MR. PERRI:  Objection.

7                    THE COURT:  Sustained.  Relevance.  It

8       doesn't matter when it was typed by somebody else.

9       This officer gave the statement.  Can we stick with

10      what this officer did, please?

11                   MR. BERGER:  I'm not assuming as a fact that

12      he gave the statement to him.  This is what I have a

13      right to challenge on cross-examination.

14                   THE COURT:  And how does your question about

15      whether somebody else typed it let me know whether or

16      not he gave the statement?

17                   MR. BERGER:  Because it has to be verifiable.

18      It has to be credible.  You have a right -- you have to

19      determine credibility on this witness.

20                   THE COURT:  So then this officer would have

21      been better to just stand here and say, yeah, I saw him

22      typing.  He typed it right in front of me.  He said

23      look at it.  He showed it to me.

24                   He's telling you I don't recall.  I'm going

25      to evaluate it.  From there, Mr. Berger, it's

P.O. J. Boccio - People - Cross        42

1    irrelevant what he did.  We have his answer with

2    regards to this small section.

3    CROSS-EXAMINATION

4    MR. BERGER:  (CONTINUED)

5        Q.   My question is:  Do you know when this statement

6    that is contained in this document was ever prepared?

7                    MR. PERRI:  Objection.

8                    THE COURT:  I'll take an answer.  Do you know

9        when it was prepared?

10                   THE WITNESS:  Sometime in between when we got

11       there and when we finished our arrest.

12       Q.   How do you know that?

13       A.   Because it's in the arrest report.

14       Q.   Well --

15       A.   And I didn't type the arrest report.

16       Q.   I'm sorry?

17       A.   It's in the arrest report or whatever, I'm sorry,

18   whatever it was referred to as.

19       Q.   You prepared it?

20       A.   I did not prepare it.  I told you the detective

21   prepared it.

22       Q.   So you used this -- you read this today before

23   testifying, correct?

24       A.   Correct.

25       Q.   And that helped refresh your recollection; did it

J.H.

1   not?

2        A.   A little bit.

3        Q.   Right, because you couldn't remember everything

4   that went on that day without looking at the documents,

5   right?

6             MR. PERRI:   Objection.

7             THE COURT:   Overruled.   You used it to help

8        you with your testimony today?

9             THE WITNESS:   Correct.

10             THE COURT:   Next question.   Mr. Berger, also

11        find a natural spot to break, and we will continue

12        after lunch, unless you are only going to be a few

13        minutes.   I don't want to cut you short on your cross.

14             MR. BERGER:   We might be able to finish,

15        Judge.

16             THE COURT:   Go ahead.

17        Q.   So when he said to you, Arrest me, she says I

18   raped her daughter, what -- and then you asked him, What

19   happened, and he gave you that statement with respect to

20   licking her, he didn't say where he licked her, did he?

21        A.   I don't recall if he said it in the statement.

22   I'd have to refresh my memory if he specified where.

23        Q.   I'm asking you to remember now what you say he

24   said to you in the parking lot.

25        A.   And I'm telling you I don't remember the exact

1    word-for-word statement.  I remember him saying, I licked

2    her, and it was a mistake.  I don't recall if he said the

3    exact location where he licked her.

4        Q.   You don't have a specific recollection of him

5    telling you where he licked her, do you?

6        A.   I don't recall if he said where he licked her.

7        Q.   Well, when you say you don't recall, I'm asking

8    you as you sit here today do you have a specific

9    recollection of him saying to you where he licked her?

10                MR. PERRI:  Objection.

11                MR. BERGER:  It calls for yes or no, Judge.

12                THE COURT:  I just got the answer.  He

13           doesn't remember if the individual even said where he

14           licked her.

15                MR. BERGER:  No.  I don't remember is

16           different from yes or no, I have a specific

17           recollection.

18        Q.   That's all I'm asking you to give me an answer to

19    as to whether you have a specific memory of where he said he

20    licked her.

21        A.   I have a recollection of the conversation but not

22    the word-for-word statement given.

23        Q.   Officer, do you remember as you sit here today,

24    it's just a yes or no --

25        A.   It's an I do not recall.

J.H.

P.O. J. Boccio - People - Cross          45

1    Q.    You don't remember him saying where he licked her?

2    A.    I do not recall what his exact wording was,

3    whether it was yes, no or maybe.

4    Q.    You are trying to remember what he said to you

5    here, aren't you?

6              MR. PERRI:  Objection.

7              THE COURT:  Are you trying to remember what

8         he said?

9              THE WITNESS:  I am trying to remember.

10   Q.    My question is as you sit here today, do you have

11   a specific recollection of where he said he licked her?

12             MR. PERRI:  Objection.

13             THE COURT:  Mr. Berger, I have heard four

14        times this officer say I don't even recall if he told

15        me where he licked her.  So if that is the case, how

16        can he change his answer any other way?  You can ask

17        the question 15 different times in 15 different ways.

18        It's not going to change his answer.

19             MR. BERGER:  Judge, there's a difference

20        between having a specific recollection today, September

21        25th, as to whether or not -- and I'm just trying to

22        get an answer if he has that recollection today,

23        because I don't recalls can become something else down

24        the road where all of a sudden he does recall.

25             All I'm asking for is a simple answer, does

1       he have a specific recollection today as to whether or

2       not he said where he licked her, period.  That's all.

3                   THE COURT:  The problem with the question is

4       he's already told us he doesn't even know if he ever

5       said where he licked her.  So you're putting a fact

6       into that question that hasn't even been established by

7       this officer.

8                   MR. BERGER:  No.  He can say I have no

9       recollection of whether he said where he licked her,

10      period.  If that's what he's saying, let him say that,

11      judge.  That's all I'm asking.

12                  THE COURT:  I'm going to let him answer the

13      question how he wants to answer the question because it

14      is his testimony.  But I'm not going to have it asked

15      15 times in 15 different ways.  Ask the question one

16      last time.

17                  Officer, if you can answer it, please answer

18      it, and then move on.

19                  MR. BERGER:  Since when do we let witnesses

20      answer questions the way they want to?

21                  THE COURT:  Excuse me?  You ask a question,

22      he answers it to the best of his ability as he sees

23      fit.  You don't put words in his mouth.  I don't put

24      words in his mouth.  People don't put words in his

25      mouth.  He will answer the question based on what he

1    knows from that event, what he recalls here today.

2              And I'm not going to have it twisted 17

3    different ways to try to play games with recall,

4    remember, maybe, maybe not.

5              MR. BERGER:  That's what witnesses do.  They

6    play games with recall and remember.

7              THE COURT:  Right now, Mr. Berger, the only

8    one playing a game quite frankly is you.  Ask your last

9    question, and let's move on.

10             MR. BERGER:  Judge, that is totally

11   inappropriate to say I'm playing games.  I have a right

12   to pinpoint the witness and get a specific answer.  If

13   you don't want to let me do that, okay.  To tell me I

14   am playing games, that's inappropriate.

15             THE COURT:  Mr. Berger, what I see is you get

16   an answer, and when you don't like the answer, you then

17   try to ask the question again.  And when you don't like

18   the next answer, you try to ask it again.  We are not

19   going to have the same question asked 15 times until

20   you get somewhere that satisfies you when this officer

21   has been consistent for this portion of what we're

22   talking about, has been consistent as to what he

23   recalls or doesn't recall about the location of where

24   this individual is alleged to have licked this young

25   girl.

P.O. J. Boccio - People - Cross        48

1          MR. BERGER:  The question is does he have a

2     specific recollection today, and that's what I think

3     I'm entitled to get an answer to.

4          THE COURT:  Ask the question.

5  CROSS-EXAMINATION

6  BY MR. BERGER:  (CONTINUED)

7     Q.   Officer, yes or no, do you have a specific

8  recollection today that Mr. Ramos told you where he licked

9  this girl?

10     A.   I don't remember today specifically if it was even

11  in the statement.

12     Q.   After he made that statement to you, I licked her

13  once in the bedroom, it was a mistake, what did you do?

14     A.   I placed him under arrest.

15     Q.   And you placed him under arrest for what?

16          MR. PERRI:  Objection.

17          THE COURT:  Sustained.

18     Q.   What did you place her under arrest for?

19          MR. PERRI:  Objection.

20          THE COURT:  Go ahead and tell us what did you

21     place him under arrest for?

22          THE WITNESS:  For licking a six year old

23     based on what the mother said and what the daughter

24     said.

25     Q.   The mother didn't see what happened, correct?

J.H.

P.O. J. Boccio - People - Cross          49

1        A.   Correct.

2        Q.   And the daughter didn't tell you who did it, did

3   she?

4        A.   Correct.

5        Q.   Correct?

6        A.   Correct.

7             THE COURT:  Mr. Berger, I don't want to cut

8   you short and we have to get your client back across

9   the street, so why don't I see everybody at 2:15, and

10  we will finish this hearing then.

11            MR. PERRI:  Yes, your Honor.

12            THE COURT:  Thank you.

13            (Whereupon, a luncheon recess was taken.)

14

15

16

17

18

19

20

21

22

23

24

25

J.H.

1    A F T E R N O O N   S E S S I O N

2                    (Police Officer Joseph Boccio resumed the

3         witness stand.)

4                    THE CLERK:  Case on hearing continued,

5         Indictment 742N of 2014, People versus Daniel Ramos.

6         Let the record reflect that all parties are present.

7                    Are the People ready?

8                    MR. PERRI:  Yes, the People are ready to

9         proceed.

10                   THE CLERK:  Defense counsel ready?

11                   MR. BERGER:  Yes.

12                   THE CLERK:  Officer Boccio, you're reminded

13        you're still under oath.

14                   THE WITNESS:  Yes.

15                   THE COURT:  You may continue, Mr. Berger.

16                   MR. BERGER:  Thank you, your Honor.

17   CROSS-EXAMINATION

18   BY MR. BERGER:  (CONTINUED)

19        Q.   I believe, Officer, we left off where I had asked

20   you I think you had said that Miss Ramirez did not tell you

21   she saw what happened, correct?

22        A.   Correct.

23        Q.   And that the girl didn't say -- didn't give you

24   the name of the person?

25        A.   That's correct.

1    Q.    Now, you went over there, and you testified about

2    the conversation you had with him in which you said that he

3    said -- in which he said, I licked her once in the bedroom;

4    do you remember saying that's what he told you that?

5    A.    He said, It was a mistake.  I licked her in the

6    bedroom.

7    Q.    Right.  Now, after he said that to you, did you

8    say anything to him?

9    A.    No, I did not.

10   Q.    What did you do?

11   A.    I placed him under arrest.

12   Q.    And did you tell him what he was under arrest for?

13   A.    No, I did not.

14   Q.    And when you placed him under arrest, does that

15   mean you put handcuffs on him?

16   A.    Correct.

17   Q.    And what did you do with him?

18   A.    Placed him in the back of my police car.

19   Q.    Was there any further conversation between you and

20   the defendant?

21   A.    No.

22   Q.    Did you transport him to the Special Victims Unit?

23   A.    Yes, I did.

24   Q.    And were you with any other officer at the time?

25   A.    Officer Wigand.

J.H.

P.O. J. Boccio - People - Cross          52

1   Q.   And how long -- by the way, what time was it that

2   you placed him under arrest?

3   A.   I don't recall the arrest time.

4   Q.   What time did you arrive at the scene?

5   A.   Scene of the incident?

6   Q.   At the address of Miss Ramirez.

7   A.   Approximately 1725 hours, give or take a few

8   minutes.

9   Q.   So approximately 5:25 in the afternoon?

10   A.   Correct.

11   Q.   What time was it that you arrested him, or how

12   much later did you arrest him?

13   A.   I don't recall the exact timeframe from when he

14   was placed under arrest from when I got there.

15   Q.   You cannot tell us how much time approximately

16   from the time you arrived until the time you put handcuffs

17   on?

18   A.   I don't recall.

19   Q.   Ten minutes, 20 minutes, a half hour?

20   A.   I do not recall.

21   Q.   You can't even estimate?

22            MR. PERRI:   Objection.

23            THE COURT:   Sustained.

24   Q.   Was it an hour?

25   A.   I do not recall.

J.H.

P.O. J. Boccio - People - Cross      53

1     Q.   Was it two hours?

2              MR. PERRI:  Objection.

3              THE COURT:  Sustained.

4     Q.   What time did you transport him to the Special

5  Victims Unit?

6     A.   I do not recall that off the top of my head.

7     Q.   Well, would you be able to look at anything that

8  might refresh your recollection?

9     A.   The 911 dispatch notes should say when we

10  transported.

11     Q.   But as you sit here now, you can't even give us an

12  approximate time as to how long it took that you were at 124

13  Park?

14     A.   That's correct.

15     Q.   But you've told us a lot of things that you say

16  you do remember about that day?

17              MR. PERRI:  Objection.

18              THE COURT:  Sustained.

19     Q.   Did you enter into your memo book what time you

20  transported him?

21     A.   No, I did not.

22     Q.   I have been provided with a copy of the pages of

23  your memo book as it relates to that day.

24     A.   Okay.

25     Q.   You provided that to the District Attorney today?

1    A.   I did.

2    Q.   And by the way, between this morning and today and

3    this afternoon, did you discuss this case with anybody?

4    A.   I did not.

5    Q.   Did you discuss it with the District Attorney?

6    A.   No.

7    Q.   Now, this memo book, when were the entries made?

8    A.   Which entries?

9    Q.   Well, I have been provided with memo book entries

10   reflecting October 16th, 2013, which is the day of this

11   incident.

12   A.   Okay.

13   Q.   When did you make those entries in that book?

14   A.   Which entries are you referring to?

15   Q.   All of them.

16   A.   On October 16th.

17   Q.   Well, did you make them at different times of that

18   day, or did you make them at the end of the day?

19   A.   No, I made them at different times during the day.

20   Q.   You made an entry here, I take it 1722 refers to

21   military time?

22   A.   Correct.

23   Q.   And then you have entry about arrest at 0550.  Is

24   that relating to this case?

25   A.   Yes.  That's the disposition of the case.

J.H.

1    Q.    What does that mean, disposition of the case?

2    A.    That means the call was 1722, and then the 1064

3    time is the arrest -- that's not the arrest time.  That was

4    the disposition of that call.

5    Q.    What does that mean, 1064?

6    A.    That means that is an arrest on that call.

7    Q.    And you wrote down, Daniel Ramos, correct?

8    A.    Correct.

9    Q.    Now, when did you make that entry?

10    A.    At the Special Victims Unit.

11    Q.    Am I correct in assuming the entry you have here

12    is 1722, I don't know, is that is 1680 or 1080?

13    A.    1080.

14    Q.    What does that mean?

15    A.    That means I'm on my way to the call or the call

16    was dispatched at that time, same thing.

17    Q.    The call was dispatched at 1722?

18    A.    There's created and dispatched.  Dispatched at

19    1722.

20    Q.    So what does 1080 mean though?

21    A.    That means I'm responding to that call.

22    Q.    Did you make that entry at that time?

23    A.    Yes.

24    Q.    And the entry of 124 Park Avenue, did you make the

25    entry at that time?

1      A.   Yes.

2      Q.   And that was so you could have a written entry of

3    where you were going, correct?

4      A.   Correct.

5      Q.   Help refresh -- keep that so you would know where

6    to go, correct?

7      A.   No.

8      Q.   You didn't write it down so you would have the

9    address?

10      A.   No.  That's not what the purpose is of writing it

11    down.

12      Q.   Why did you write it down then?

13      A.   To recall the address in the future if needed and

14    for supervisors to verify.

15      Q.   And you made that entry at 1722?

16      A.   Yes.

17      Q.   Now, the next entry is 0550.  What does that mean?

18      A.   That's -- repeat the time?

19      Q.   0550.

20      A.   That was the disposition of the call, arrest, and

21    that's when I was done.

22      Q.   What does that mean, the disposition of the call?

23    In other words, you had military time in the previous entry?

24      A.   0550 is military time.

25      Q.   So the following morning is when you --

1      A.    -- were completed with the arrest.  That's when I
2   signed off.
3      Q.    We are talking about 5:50 in the morning?
4      A.    Correct.
5      Q.    Of the next day?
6      A.    Correct.
7      Q.    And you made -- now, the entry -- if you need to
8   look at this, I'll show it to you, Officer.  The entry of
9   1064, I don't know if that's something male, Daniel Ramos.
10  Do you know what that is, that marking before?
11     A.    The slash with a W?
12     Q.    No.
13            MR. BERGER:  Officer, could you just show
14     him.  Let's mark it for ID.
15            THE COURT:  Mark it defense A for
16     identification.
17            (Defendant's Exhibit A is marked for
18     identification.)
19     Q.    Do you see you have a 1064 and then there's
20  something there that precedes Daniel Ramos?
21     A.    Correct.
22     Q.    What is that?
23     A.    It says one male.
24     Q.    One male, okay.  May I have it back, please.  Now,
25  do you know when you made that entry?

1      A.   Yes.

2      Q.   When did you do that?

3      A.   You said where or when?

4      Q.   When?

5      A.   I don't recall when.  It was at the Special

6   Victims Unit.

7      Q.   You signed off that day at 5:50 in the morning?

8      A.   Correct.

9      Q.   Were you at the Special Victims Unit when you did

10  that?

11     A.   When I signed off, no.

12     Q.   Where were you, at the First Precinct?

13     A.   No.  I was at my relieving point.

14     Q.   When did you leave the Special Victims Unit?

15     A.   Approximately 5:30.

16     Q.   5:30 in the morning?

17     A.   Correct.

18     Q.   Now, the entry of 1064, one male, Daniel Ramos, do

19  you recall when you made that entry?

20     A.   At the Special Victims Unit.  I don't recall at

21  what point in the night I wrote that.

22     Q.   And is there a reason why you made that entry?

23     A.   It's procedure.

24     Q.   What procedure?

25     A.   The first --

1          MR. PERRI:  Objection.  Relevance.

2          THE COURT:  I'll allow it.  Go ahead.

3     A.   First line, 1080, describes where we are going and

4 the type of call.  And then after that, it describes the

5 disposition of the call.

6     Q.   No, but 1064, one male, Daniel Ramos?

7     A.   The disposition of that call was an arrest of one

8 male, Daniel Ramos.

9     Q.   The word arrest was written at the next line,

10 0550?

11    A.   The arrest number was written under that.

12    Q.   Yes.

13    A.   Right.

14    Q.   So the procedure you are talking about is when

15 you -- what is -- why did you enter one male, Daniel Ramos?

16         MR. PERRI:  Objection.  Relevance.

17         THE COURT:  Go ahead and answer it.

18    A.   That is the disposition of the call I got, one

19 male, Daniel Ramos arrested.

20    Q.   Now, did it ever occur to you to enter in your

21 memo book the statements that you say he made to you?

22    A.   No.

23    Q.   Do you recall when it was that you say you gave

24 these statements to Detective Baran that evening?

25    A.   No, I do not.

J.H.

1    Q.    Was it before midnight, after midnight?

2    A.    It was prior to midnight.

3    Q.    Prior to midnight.

4          And do you know approximately how much time -- you

5    drove the defendant to the Special Victims Unit, correct?

6    A.    Correct.

7    Q.    Was there any conversation in the car?

8    A.    No.

9    Q.    You say he spoke to you in English when you saw

10   him at 124 Park?

11   A.    Yes.

12   Q.    And he spoke very clearly in English?

13   A.    Yes.

14   Q.    You understood him completely and clearly?

15   A.    Crystal clear.

16   Q.    Now, when you brought him to the Special Victims

17   Unit, where did you bring him?  Did you put him in somebody

18   else's care or custody?

19   A.    He was put in a room for holding.

20   Q.    You put him there?

21   A.    Yes.

22   Q.    And did you see him again?

23   A.    Yes.

24   Q.    Where did you see him?

25   A.    He was in that room all night.

1    Q.   And you were observing him?

2    A.   Part of the night.

3    Q.   Until when?

4    A.   Random times.

5    Q.   Was it your job to keep an eye on him?

6    A.   It was my job to make sure he didn't exit the

7    room.

8    Q.   I understand.  And were you in the room with him?

9    A.   No.

10   Q.   You were outside the room?

11   A.   Yes.

12   Q.   Was there a glass to this room?

13   A.   Yes.

14   Q.   So you could observe him?

15   A.   Yes.

16   Q.   Did you see anybody else go in there?

17   A.   Yes.

18   Q.   Who was that?

19   A.   Detective Baran.

20   Q.   When did he go in?

21   A.   I don't recall what time.  No recollection of what

22   time he went in there.

23   Q.   Was it before midnight?

24   A.   I have no recollection of what time he went in

25   there.

J.H.

1    Q.    You do you recall him going in?

2    A.    Yes.

3    Q.    You have that specific recollection?

4    A.    Yes.

5    Q.    And how long had you been at Special Victims

6    before you saw him go in there?

7    A.    I do not know.

8    Q.    An hour, two hours, three hours?

9    A.    I do not know.

10   Q.    When he was in there, was he in there alone, or

11   was there another officer?

12   A.    He was in there alone a little bit, and then

13   another detective went in there a few minutes.

14   Q.    When you say he was alone for a little bit, how

15   much time are we talking about?

16   A.    I saw him there for 20 minutes, but then I left

17   and went to a different part of the office.

18   Q.    And then did you go back?

19   A.    A little while later.

20   Q.    And when you went back, what did you see?

21   A.    The detective still in the office with him.

22   Q.    Just Detective Baran?

23   A.    Yes.

24   Q.    And the other detective who went in, did you know

25   who that was?

J.H.

P.O. J. Boccio - People - Cross          63

1    A.   I don't recall which one.

2    Q.   But you knew that detective?

3    A.   Yes.

4    Q.   Approximately, can you tell us about when you

5    arrived at Special Victims Unit?

6    A.   No, I cannot.  But that is in the transmissions of

7    me transporting him.

8    Q.   The 1722 entry is when you received the call?

9    A.   That is when the call was dispatched.

10   Q.   That you received, and you were dispatched to go

11   to 124?

12   A.   Correct.

13   Q.   How much time approximately were you at 124 Park

14   Avenue?

15   A.   A couple hours.

16   Q.   A couple of hours?

17   A.   Maybe, maybe a couple of hours, maybe two, maybe

18   longer.

19   Q.   It could be longer?

20   A.   It could be.  It could be shorter.

21   Q.   Well, you are just giving us an approximation,

22   right?

23   A.   Right.

24   Q.   And that's your best estimate?

25   A.   Approximately.

J.H.

1    Q.   Would it be fair to say then that based upon what

2    you've told us that the time that you were there until you

3    arrested him was what, five, 10 minutes?

4    A.   No.  I feel it was longer than that.

5    Q.   How much time would you say?

6    A.   I don't know.  I don't know what my arrest time

7    was.

8    Q.   Well, but I'm asking you now to think about and

9    recreate in your mind.  You know when you arrived?

10   A.   Approximately.

11   Q.   And you have described to us talking to the

12   mother, talking to the daughter, then going over to the

13   defendant, talking to him briefly and arresting him.

14   A.   Okay.

15   Q.   How much time when you think about it would you

16   estimate that to be?

17              MR. PERRI:  Objection.  Asked and answered.

18              THE COURT:  Sustained.

19              MR. BERGER:  Judge, every moment that the

20        defendant's in police custody becomes relevant

21        especially at a Huntley hearing.  That's part of this

22        hearing.

23              THE COURT:  I have heard you believe you were

24        there about two hours, it could be less, it could be

25        more.  Can you recreate in your mind the timeline, yes

1          or no, as you sit here today?  Are you in a position to

2          as asked recreate the timeline in your mind?

3                    THE WITNESS:  Not exactly.

4                    THE COURT:  Next question.

5          Q.    My question is you know when you arrived.  You

6    have told us what you did.  You told us you spoke to the

7    mother and the daughter.  You told us you spoke to the

8    defendant, and you told us you arrested him, correct?

9          A.    Correct.

10          Q.    You remember those things happening, right?

11          A.    Yes.

12          Q.    And as you sit here now, can you tell us if that

13    took 10 minutes, an hour, an hour-and-a-half, any

14    approximation?

15          A.    No.

16                    MR. PERRI:  Objection.

17          Q.    You can't tell us?

18          A.    No.

19          Q.    But you are approximating leaving the area in

20    about two hours after you arrived?

21                    MR. PERRI:  Objection.

22                    THE COURT:  Sustained.

23          Q.    Is that your answer?

24                    MR. BERGER:  On what basis, Judge?

25                    THE COURT:  Because he told us it could have

1    been more, it could have been less, that it was

2    approximately two hours.

3        Q.   Right, now, how much time was the defendant

4    sitting in the car after you arrested him?

5        A.   Maybe a half hour.

6        Q.   And then after that half hour, you then transport

7    him to the Special Victims Unit?

8        A.   I don't recall the timeframe of when I transported

9    him.

10       Q.   But I asked you before to give us a best

11   approximation of how long you were there at 124 Park, and

12   your estimation was about two hours?

13       A.   Give or take.

14       Q.   It could have been a little less, could have been

15   a little more?

16       A.   Correct.

17       Q.   Now you're saying to us that after you arrested

18   him, he was in the car for a half an hour, approximately?

19       A.   Approximately.

20       Q.   Right.  So in that hour-and-a-half approximately

21   before that, are you telling us all you did was talk to the

22   woman, talk to the daughter, talk to him and arrest him, and

23   that's just what happened?

24       A.   No, that's not just what happened.

25       Q.   What else happened?

J.H.

1      A.    Supervisors were notified, Special Victims was

2    notified.

3      Q.    Right.

4      A.    That takes time.

5      Q.    So you have approximated that the defendant was in

6    your car for a half an hour?

7      A.    It could be more, it could be less.  That's

8    approximate.

9      Q.    That's an approximate ballpark figure?

10     A.    Approximate.

11     Q.    What happened in the hour-and-a-half prior to that

12   time that he was sitting in the car before you transported

13   him to Special Victims Unit?  What happened for that

14   hour-and-a-half before then with respect to the defendant?

15              MR. PERRI:  Objection.

16              THE COURT:  Sustained.

17              MR. BERGER:  The basis, Judge?

18              THE COURT:  Because I said so.  Next

19     question.

20     Q.    Now, you mentioned there was -- was it Detective

21   Tedeschi?

22     A.    Officer Tedeschi.

23     Q.    Did you say a written statement was taken by him?

24     A.    He took a statement from Crystal Ramirez.

25     Q.    Were you present when that happened?

J.H.

Case 2:19-cv-01125-JS-AYS   Document 7-1   Filed 05/31/19   Page 68 of 273 PageID #: 204

1    A.    No.

2    Q.    Where did that happen, if you know?

3    A.    I'm unaware where that happened.

4    Q.    How do you know he took a statement?

5    A.    Because I read it.

6    Q.    You didn't see him take the statement?

7    A.    I did not.

8    Q.    And you read that statement that day or today?

9    A.    Both.  I didn't read it thoroughly today.  I read

10   it in detail that day.

11   Q.    And your reading of these documents -- so you

12   read -- you read basically the case -- the District Attorney

13   showed you the case file, correct, today, this morning?

14   A.    I don't know what the case file, what you're

15   referring to exactly.

16   Q.    But you read a number of documents?

17   A.    Correct.

18   Q.    And that helped refresh your recollection?

19   A.    On some things.

20   Q.    Well, when you read Ms. Ramirez' statement, did it

21   help refresh your recollection about anything?

22   A.    No.

23   Q.    Why is it that you read it?

24         MR. PERRI:  Objection.

25         THE COURT:  Why did you read it?

1           THE WITNESS:  Just to see what officer --

2      what she said to Officer Tedeschi.

3      Q.   Did you read your grand jury testimony today?

4      A.   No, I did not.

5      Q.   Have you ever read your grand jury testimony prior

6      to testifying here?

7      A.   For this case?

8      Q.   Yes.

9      A.   No.

10     Q.   You did testify in the grand jury though, right?

11     A.   I recall I did.

12     Q.   I'm sorry?

13     A.   I recall I did.

14          MR. BERGER:  I have nothing further.  Thank

15     you.

16          THE COURT:  Redirect, please.

17          MR. PERRI:  Briefly, your Honor.  Your Honor,

18     I ask that this be marked as People's 1 for ID,

19     five-page document.

20          (People's Exhibit 1 is marked for

21     identification.)

22          MR. PERRI:  I ask it be shown to the witness.

23          MR. BERGER:  Objection.  Nothing should be --

24     questions haven't been asked yet.

25          THE COURT:  Sets a foundation, counselor.

1

2    REDIRECT EXAMINATION

3    BY MR. PERRI:

4        Q.    Officer, you testified you did not read what

5    defense counsel referred it as your grand jury testimony; is

6    that correct?

7        A.    Correct.

8        Q.    Did you review an item or document called your

9    grand jury minutes in my presence this morning prior to

10   testifying today?

11       A.    Yes, I did.

12            MR. PERRI:  It can be withdrawn.  It doesn't

13       have to be shown to the witness.  I apologize, your

14       Honor.

15            THE COURT:  No problem.

16       Q.    Officer, you also testified you did not recall the

17   exact time of the arrest of the defendant; is that correct?

18       A.    Correct.

19       Q.    And is there -- is that information contained in

20   the District Attorney's summary report?

21       A.    Yes, it is.

22       Q.    And would reviewing the District Attorney's

23   summary report, would that refresh your recollection as to

24   the time of arrest?

25       A.    Yes, it would.

P.O. J. Boccio - People - Redirect        71

1           MR. PERRI:  Your Honor, I ask this be marked

2       as People's 2 for ID.  It's a four-page document,

3       District Attorney's summary report.

4           (People's Exhibit 2 is marked for

5       identification.)

6       Q.   Officer --

7           MR. BERGER:  Judge, I object to that.  I

8       don't know there's any foundation to even it show to

9       him.  If I could have a voir dire?

10          THE COURT:  He just asked if that was

11      something that could refresh his recollection.  He said

12      it was the DA's summary report.  It's just been marked.

13          MR. BERGER:  If he didn't prepare it, how is

14      that --

15          THE COURT:  I believe there's a lovely case

16      and I wish I could remember the name of it where one of

17      our justices on the Court of Appeals said if an officer

18      or a witness could look at the bottom of a shoe and it

19      could refresh his recollection, then the bottom of the

20      shoe should be shown.  It doesn't matter who created

21      the report.  If it can refresh his recollection, it can

22      be utilized by the witness.  Objection overruled.

23      Q.   Officer, I ask that you take a look at that

24   document, review it to see if it does refresh your

25   recollection.  When you are done examining it, please put it

J.H.

P.O. J. Boccio - People - Redirect        72

1    face down, and we will be ready to continue.

2         A.   Okay.

3              MR. PERRI:  I ask that it be taken from the

4         witness.

5         Q.   Officer, did that document, in fact, refresh your

6    recollection as to the time of the arrest?

7         A.   It did.

8         Q.   What was the time of the arrest of the defendant

9    when he was taken into custody?

10        A.   1800 hours or 6 p.m.

11        Q.   Thank you, Officer.  Officer, you also testified

12   that you did not recall the exact time at which point the

13   defendant was transported from the scene to Special Victims

14   Squad; is that correct?

15        A.   That's correct.

16        Q.   And you also testified that the 911 logs would

17   refresh your recollection; is that correct?

18        A.   Correct.

19             MR. PERRI:  Your Honor, I ask this be marked

20        for ID, seven-page document and shown to the witness.

21             THE COURT:  People's 3 for ID, please.

22             (People's Exhibit 3 is marked for

23        identification.)

24             MR. PERRI:  I ask it be shown to the witness.

25        Q.   Officer, I ask that you review that document, look

P.O. J. Boccio - People - Recross      73

1    through it.  If it does refresh your recollection as to what

2    time the defendant was transported from the scene to Special

3    Victims Squad, please put it down face down, and then you

4    can respond.

5         A.    Okay.

6              MR. PERRI:  I ask the document be taken from

7         the witness.

8         Q.    Officer, what time -- did that document, in fact,

9    refresh your recollection, Officer?

10        A.    It did.

11        Q.    And what time was the defendant transported from

12   the scene to Special Victims?

13        A.    1828 hours or 6:28 p.m.

14             MR. PERRI:  Thank you, Officer.  Nothing

15        further, your Honor.

16             THE COURT:  Any recross?

17             MR. BERGER:  Yes.

18   RECROSS-EXAMINATION

19   BY MR. BERGER:

20        Q.    Officer, you looked at the District Attorney's

21   summary report, correct?

22        A.    I did.

23        Q.    And then the District Attorney asked you if you --

24   if that document refreshed your recollection as to the time

25   of the arrest.

J.H.

1    A.   It did.

2    Q.   How did that refresh your recollection?

3         MR. PERRI:  Objection.

4         THE COURT:  Rephrase.  I don't understand the

5    question.

6    Q.   You didn't prepare that report, did you?

7    A.   No.

8    Q.   Whatever you looked at there was not prepared by

9    you; somebody else prepared a document or some information

10   that said it's 6 o'clock, right?

11   A.   It was typed by somebody else.

12   Q.   Typed by somebody?

13   A.   Correct.

14   Q.   So all you know that you're reading something that

15   somebody else typed, but you didn't prepare that, did you?

16   A.   I did not prepare it.

17   Q.   So how does reading that refresh your

18   recollection?

19        MR. PERRI:  Objection.

20        THE COURT:  Sustained.  Counselor, I don't

21   know what you expect his answer to be.  He looked at

22   it.  It refreshed his recollection.

23        MR. BERGER:  The answer is it's a document

24   that somebody else prepared.  It really doesn't refresh

25   my recollection.

1          THE COURT:  Counselor, quite frankly I'm not

2     going to battle with you over this entire hearing.  You

3     know the law.  I know you know the law.  I know you

4     know the law with regards to refreshing recollection.

5     There's no jury here.  This might work in front of a

6     jury.  It's not working here.  It's a hearing.

7          MR. BERGER:  You are the factfinder.  This is

8     absurd to think that he could look at a District

9     Attorney's summary report, see that somebody else

10    entered 6 o'clock, and then he repeats it here, and

11    that's refreshing recollection?

12         THE COURT:  So counselor, what you want me to

13    believe is because it's the District Attorney's summary

14    report, the DAs went out and were at the scene and made

15    the arrest and did the interrogation and did whatever

16    else it is?

17         MR. BERGER:  I don't know who wrote that.

18         THE COURT:  Where do you think the

19    information came from, counselor?  I have to use my

20    common sense.  You're asking me to throw my common

21    sense out the window.

22         MR. BERGER:  Because a report was written by

23    somebody that means it's correct?  See, he can testify

24    as to what he saw and what he tasted and what he heard

25    and what he smelled, because that's what he has

Case 2:19-cv-01125-JS-AYS   Document 7-1   Filed 05/31/19   Page 76 of 273 PageID #: 212

1    personal knowledge of.

2              THE COURT:  And what refreshed his

3    recollection?

4              MR. BERGER:  Somebody else's entry in the

5    report.  That is ridiculous that is what is being

6    accepted by the factfinder to refresh his recollection?

7              THE COURT:  I guess I'm ridiculous.  Next

8    question.  Counselor, neither you nor I are new at

9    this.  We both have been doing our job.  I may be doing

10   this job for a short period of time.  But you and I

11   have both been on opposite sides of the table for quite

12   a length of time in the criminal world.  We both know

13   what the law is.  We both know what can be utilized to

14   refresh recollection, and we both know exactly what it

15   is that needs to be proven at this hearing by the

16   People, and we both know what your job is at this

17   hearing.

18             But to sit here and act as if a report simply

19   because it wasn't created, typed by the person on the

20   stand can never refresh that individual's recollection

21   is ridiculous.

22             MR. BERGER:  Well, it becomes relevant that

23   whether he prepared it or not.

24             THE COURT:  And I know he didn't.

25             MR. BERGER:  Fine.  Then all he's doing is

P.O. J. Boccio - People - Recross          77

1    reading from something that somebody else prepared, and
2    that doesn't mean that it refreshes his recollection.
3    Obviously he is repeating what somebody else wrote
4    down.  But how does it --
5              THE COURT:  In your opinion, counselor.
6              MR. BERGER:  Well, it's pretty obvious.  I
7    mean I could see where you could show something to
8    somebody even if it's the bottom of a shoe and it might
9    in some way refresh his recollection.  But I have a
10   right to ask how it does, and you are not letting me do
11   that.
12             THE COURT:  All right, how did it refresh
13   your recollection, Officer?
14             THE WITNESS:  I told Detective Baran the
15   arrest time.  He typed into his report.
16   RECROSS-EXAMINATION
17   BY MR. BERGER:  (CONTINUED)
18        Q.   As you're sitting here now, you're telling us that
19   you told him the time of the arrest; is that right?
20        A.   Correct.
21        Q.   Even though it's not written in your memo book?
22        A.   Correct.
23        Q.   And so you didn't remember it before when I asked
24   you, but now by looking at that, you are assuming he wrote
25   down what you told him?

J.H.

1      A.    Correct.

2      Q.    Even though you don't have a specific recollection

3  of having -- do you have a specific recollection of telling

4  him that?

5      A.    My arrest time?

6      Q.    Yes.

7      A.    I remember telling him my arrest time.  I didn't

8  remember exactly what the time was.

9      Q.    When I asked you what time it was that you

10  arrested, did you say to me I told to the detective I don't

11  remember, I know he wrote it down?  Did you say that to me?

12      A.    You didn't ask that question.

13      Q.    I asked you before how long he was there at 124,

14  and you said give or take two hours.

15              MR. PERRI:  What is the question?

16              MR. BERGER:  I'm laying the foundation.

17              THE COURT:  Let's start the question.  Go

18      ahead.  There's no question before you, Officer.

19      Q.    You told us that you arrived there at about 5:22,

20  correct?

21      A.    5:25.

22      Q.    Thereabouts.  Your entry book -- all right, 5:25.

23  I asked you how long you were there.  You said give or take

24  two hours, maybe a little more, maybe a little less.  And

25  now it turns out that you're there -- the arrest time is

J.H.

1  barely a half hour later, right?

2      A.   Okay.

3      Q.   So when you were giving me the estimation before,

4  when you said it was two hours, you were trying to think

5  back and give the best estimation you could, correct?

6      A.   Okay.

7      Q.   Right.  You were trying to be accurate, weren't

8  you?

9            MR. PERRI:  Objection.

10           THE COURT:  I'll take an answer.  Were you

11      trying to be accurate?

12           THE WITNESS:  I was trying to be accurate.

13     Q.   So what you were doing is thinking back to the

14  events of that day of the 16th of October, right?

15     A.   I was trying to figure out how long I was at the

16  scene for, not all events.

17     Q.   And your estimation was maybe a little more than

18  two hours, maybe a little less?

19     A.   I said it could have been up to or earlier, an

20  hour more, an hour less.

21     Q.   It turns out it's at least an hour-and-a-half

22  less, right?

23     A.   Not true.  He was placed under arrest 30 minutes

24  after I was there.  That's not how long we were at the

25  scene.  I did not transport him immediately after he was

J.H.

1    under arrest.

2         Q.   So what you're saying then is that you arrive at

3    the scene, you question the mother, which takes a minute or

4    so.  You question the daughter, which takes you say up to

5    two minutes even though she gives you an answer that takes

6    up to 30 seconds.

7                   MR. PERRI:  Objection.  Commentary, your

8         Honor.

9                   THE COURT:  Sustained as to commentary.

10                   MR. BERGER:  Commentary?  What kind of

11        objection?  I'm laying a foundation of what he

12        testified to.

13                   THE COURT:  No.  I think you added in a

14        statement there.  Again, that is no jury here.  So go

15        ahead.

16        Q.   So you talk to the mother, a few sentences you

17   told us what you spoke to her.  You said the daughter's

18   conversation took two minutes even though what you testified

19   it took a few seconds to recite.  You talk to the defendant.

20   A couple of answers he gives you, and you arrest him, right?

21        A.   Correct.

22        Q.   And you couldn't tell me how much time that took,

23   approximately?

24        A.   What time are you asking for?

25                   MR. PERRI:  Objection.

P.O. J. Boccio - People - Recross      81

1    Q.   I asked you how long it took you to arrest him

2    from the time you arrived at the scene.

3              THE COURT:  Yes, you asked him that question.

4    Go ahead.  What's the question before the officer?

5    Q.   What was your answer to that?

6    A.   I don't recall what my answer was to that.

7              MR. PERRI:  Objection.

8              THE COURT:  Sustained.

9    Q.   When you gave the estimate of two hours,

10   approximately, give or take two hours before you transported

11   to the Special Victims Unit, now as you think about, is that

12   accurate?

13   A.   No, it's a little over.

14   Q.   Just a little?

15             MR. PERRI:  Objection.

16             THE COURT:  Sustained as to just a little.

17   Q.   Well, a little over --

18             THE COURT:  I can tell time, counselor.  I

19        have the times before me.

20             MR. BERGER:  He's the witness.  He's giving

21        answers.

22   Q.   It turns out it's approximately an hour-and-a-half

23   of over, isn't it?

24   A.   An hour-and-a-half over what?

25   Q.   The arrest time according to what refreshed your

J.H.

1    recollection was 6 o'clock?

2         A.   Okay.

3         Q.   And you arrive there at about 5:30.

4              MR. PERRI:  Your Honor --

5              THE COURT:  Yes.

6              MR. PERRI:  The People object on the basis

7         defense counsel's questioning is confusing and vague,

8         confusing both the arrest time with the time the

9         defendant was taken from the scene, that there's not an

10        hour-and-a-half difference between the total time the

11        officer is at the scene and the time after his

12        recollection was refreshed he was at the scene.

13             THE COURT:  I have no notes, counselor.  I

14        will go off my notes and my findings of fact.  Next

15        question.

16             MR. PERRI:  Yes, your Honor.

17        Q.   Now, you testified, you said that it was a little

18   off, and it turns out that you had arrested him within a

19   half hour of your arrival, correct?

20        A.   A little more.

21        Q.   A few minutes more, 5:25 to 6 o'clock, okay?

22        A.   Okay.

23        Q.   You told us before that the defendant sat in the

24   car for half an hour after you arrested him?

25        A.   Approximately.

1          Q.    It turns out was that correct?

2          A.    No, that exact number's not correct.

3          Q.    In fact, you looked at the log to see when you

4     transported him, and what was the time that you transported

5     him?

6          A.    I'd have to refresh my memory again on that.

7          Q.    So from the time you looked at it from before to

8     now, you don't remember?

9          A.    Correct.  It's not a relevant time for us

10    normally.  It's not something that sticks in our head.

11         Q.    But you say it refreshed your recollection when

12    you looked at the document, right?

13         A.    Correct.

14         Q.    And you didn't prepare that document?

15         A.    Correct.

16         Q.    Right?  So in what way did it refresh your

17    recollection?

18                    THE COURT:  Which document are we talking

19         about?

20                    MR. BERGER:  The logs.

21                    THE COURT:  The 911 logs?

22                    MR. BERGER:  Yes.

23         Q.    In what way -- aren't you just repeating what you

24    are reading in the logs?

25         A.    No.  I was the one who dispatched those times over

1   the radio, and Detective Baran got those times from our log.

2   That log merely states what time I put myself over the

3   radio.

4       Q.   To say what, to transporting him?

5       A.   Correct.

6       Q.   So you remember doing that, right?

7       A.   Yes, I remember doing it.

8       Q.   And you remember by looking at the log what time

9   you said it?

10      A.   Correct.

11              MR. PERRI:   Objection.

12              THE COURT:   We already have the answer.

13      That's fine.

14      Q.   Now, when you say you prepared the log, how did

15   you prepare it?

16              MR. PERRI:   Objection.

17              THE COURT:   Sustained.

18              MR. BERGER:   Why is that, Judge?

19              THE COURT:   Because I have no testimony

20      before me that he prepared a log.

21      Q.   Didn't you say you entered that log?

22      A.   I did not enter the log.  Dispatcher.

23              MR. PERRI:   If defense counsel wishes a read

24      back, he can have a read back of the testimony.

25              MR. BERGER:   Please, don't tell me how to

1      conduct my cross-examination.

2              THE COURT:  Mr. Berger, you will stop.  Mr.

3      Perri, you will stop.

4              The testimony the Court recalls is that this

5      detective says that his recollection was refreshed by

6      looking at the 911 log because he's the individual who

7      called in the time that would be generated on the log.

8      Next question.

9      Q.    Does the document you looked at reflect that

10     you're the one who called in the time?

11     A.    Yes.  It states my car number, meaning I

12     dispatched it.

13     Q.    Was there another officer in that car as well?

14     A.    Yes.

15     Q.    So when I asked you before when it was you

16     transported him to SVU, you said maybe two hours, a maybe a

17     little more, maybe a little less, your recollection was off

18     on that, correct?

19     A.    On the timeframe, correct.

20     Q.    Now, I asked you before whether you had read your

21     grand jury testimony, and your answer to me was no.  Do you

22     remember saying that?

23     A.    I remember saying that.

24     Q.    And now the District Attorney gets up on redirect

25     and says to you, you did read the grand jury minutes, right?

J.H.

P.O. J. Boccio - People - Recross       86

1      A.   I was unaware that was my grand jury testimony I

2   was reading.

3      Q.   What did you think it was?

4           MR. PERRI:  Objection.

5           THE COURT:  I'll take an answer.

6      A.   Just documents prepared by the counsel.

7      Q.   It was your testimony though, right?

8      A.   It was.

9      Q.   I mean you have seen what testimony looks like;

10  haven't you, Officer?

11     A.   I have.

12     Q.   So when you read that this morning, did you

13  recognize that it was you who was saying those things?

14     A.   Yes.  I just didn't realize it was my grand jury

15  testimony.

16     Q.   What did you think it would be?

17     A.   I wasn't sure.  I was just reading it.

18     Q.   So when I asked you if you had read your grand

19  jury testimony and you said no --

20     A.   I misunderstood your question.

21     Q.   What was confusing about it?

22          MR. PERRI:  Objection.

23          THE COURT:  Sustained.

24          MR. BERGER:  Judge, he said he misunderstood

25      my question.  I can't ask him what was confusing about

J.H.

P.O. J. Boccio - People - Recross          87

1    my question?

2              THE COURT:  Sure, go ahead, I'll overrule

3    myself.  Tell us what was confusing about the question,

4    Officer, why you answered the way you did?

5              THE WITNESS:  The District Attorney described

6    it as being my grand jury minutes, and I believe you

7    said as my testimony.  And I recall what he said as

8    being what I was reading and that they were, in fact,

9    the same thing.  I was unaware of that before based on

10   the way it was worded.

11   Q.   So your answer is that you were confused between

12   the word testimony and minutes?

13   A.   Correct.

14             MR. BERGER:  Nothing further.

15             THE COURT:  Thank you, Officer.  You may step

16   down.

17             (The witness was excused.)

18             THE COURT:  When are we continuing this

19   hearing?

20             MR. PERRI:  I believe the discussions in the

21   back were October 3rd, your Honor.

22             (Continued on the following page.)

23

24

25

J.H.

P.O. J. Boccio - People - Recross          88

1               THE COURT:  I'll see you all on October 3rd.

2               MR. PERRI:  Yes, your Honor.

3        *          *          *          *          *          *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J.H.

```
 1   STATE OF NEW YORK  :  NASSAU COUNTY

 2      SUPREME COURT  :  PART 44

 3   ----------------------------------------X

 4   THE PEOPLE OF THE STATE OF NEW YORK,

 5         -against-                      Ind. No. 742N-14

 6   DANIEL RAMOS,

 7                         Defendant.

 8   ----------------------------------------X

 9   HEARING

10                         October 3, 2014
                          262 Old Country Road
11                        Mineola, New York

12   B E F O R E :

13      HON. TERESA K. CORRIGAN,
             Acting Supreme Court Justice
14

15


16   A P P E A R A N C E S :

17      HON. KATHLEEN M. RICE
             Nassau County District Attorney
18           BY:  ANTHONY PERRI, ESQ., of Counsel
             Assistant District Attorney
19                     For the People

20


21      HON. KENT V. MOSTON
        Nassau County Legal Aid Society
22           40 Main Street
             Hempstead, New York  11550
23      BY:  MICHAEL BERGER, ESQ., of Counsel
                  For the Defendant
24
                          JOANNE HORROCKS, CSR
25                        Senior Court Reporter
```

J.H.

1              THE CLERK:  This is Indictment 742N of 2014,

2    People of the State of New York versus Daniel Ramos on

3    for a continued hearing.  Let the record reflect that

4    all parties are present.

5              Are the People ready to proceed?

6              MR. PERRI:  Yes, your Honor, the People are

7    ready to proceed.

8              THE CLERK:  Defense counsel ready?

9              MR. BERGER:  Yes, your Honor.

10             THE COURT:  All right.

11             THE CLERK:  And interpreter, could you please

12   put your appearance on record?

13             THE INTERPRETER:  Arnoldo Lemus.  Good

14   morning, your Honor.

15             THE COURT:  Good morning.  People?

16             MR. PERRI:  Yes, your Honor.  The People have

17   turned over and would like to make a record with

18   turning over of three additional documents as part of

19   the Rosario materials and have copies for the Court's

20   Rosario packet.  The first item is the English side of

21   the Miranda rights card which no markings were made.

22   The Spanish side of the card had already been turned

23   over which markings have been made.

24             The People also turned over to defense and

25   provided for the Court a copy of the buccal swab

J.H.

Proceedings                          91

1       collection kit taken by Detective Baran, and finally

2       the time in, time out log from the Special Victims

3       Squad from October 16th.

4                   THE COURT:  Do you acknowledge receipt,

5       Mr. Berger?

6                   MR. BERGER:  I do.

7                   THE COURT:  Anything else for the record,

8       People?

9                   MR. PERRI:  No, your Honor.

10                  THE COURT:  Mr. Berger?

11                  MR. BERGER:  No, your Honor.

12                  THE COURT:  Call your next witness.

13                  MR. PERRI:  Your Honor, the People call

14      Detective Maurice Baran.

15  D E T .   M A U R I C E  H.  B A R A N , Shield 571, a

16      witness called on behalf of the People, after having

17      been first duly sworn by the Clerk of the Court, was

18      examined and testified upon his oath as follows:

19                  THE CLERK:  Detective, please state your full

20      name, spell your last name, give your shield and your

21      command.

22                  THE WITNESS:  Maurice H. Baran, B-A-R-A-N,

23      shield 571, Nassau County Police Department Special

24      Victims Squad.

25                  THE COURT:  Detective, just give your shield

1    again, please?

2                    THE WITNESS:  571.

3                    THE COURT:  Thank you.  People, you may

4        inquire.

5                    MR. PERRI:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MR. PERRI:

8        Q.    Detective Baran, who are you currently employed

9    by?

10       A.    The Nassau County Police Department.

11       Q.    And how long have you been employed by the police

12   department?

13       A.    I'm in my 30th year.

14       Q.    And what is your current rank?

15       A.    Detective.

16       Q.    And how long have you been a detective?

17       A.    I'm in my 20th year.

18       Q.    And you said you're current assignment is the

19   Special Victims Squad.  How long have you been assigned to

20   Special Victims?

21       A.    Six years.

22       Q.    Could you describe for the Court what are the

23   responsibilities of the Special Victims Squad?

24       A.    We investigate sex crimes against adults and

25   children and serious physical injury against children.

1    Q.    Detective, were you working as a detective in the

2    Special Victims Squad on October 16th of 2013?

3    A.    Yes, I was.

4    Q.    And while you were working that day, did you

5    become involved in an investigation involving a child, Mya

6    Ramirez?

7    A.    Yes, I did.

8    Q.    Can you explain how you became notified of an

9    investigation involving Mya Ramirez?

10   A.    I was notified by Detective Pacheco,

11   P-A-C-H-E-C-O, that a Sergeant Sacks, S-A-C-K-S, had called

12   Special Victims Squad to report that there was an incident

13   involving sexual abuse of a six year old girl.

14   Q.    And after receiving that notification, what, if

15   anything, did you do in response to that?

16   A.    I called Sergeant Sacks back on the phone number

17   given to me for him.  He told me that there was a six year

18   old girl who had been sexually abused in Roosevelt.

19         He said that someone was under arrest for that and

20   asked me what the next step should be.  I advised him to

21   have the girl transported to the medical center in East

22   Meadow for a sexual assault exam.

23   Q.    And when you say the medical center, you mean

24   Nassau University Medical Center?

25   A.    Yes.

J.H.

Case 2:19-cv-01125-JS-AYS   Document 7-1   Filed 05/31/19   Page 94 of 273 PageID #: 230

1    Q.   And did that, in fact, happen?

2    A.   Yes, it did.

3    Q.   And how do you know that Mya Ramirez was

4    transported to NUMC?

5    A.   Because later that evening when I went there

6    myself, I met with her and her mother and the police

7    officers who were involved in the transport.

8    Q.   And what were the names of the officers that were

9    involved in that case?

10   A.   Police Officer Tedeschi, T-E-D-E-S-C-H-I, was

11   involved, and I believe Officer Carlton, although I am not

12   sure who the second officer was.

13   Q.   And when you arrived at the medical center, did

14   there come a time where you spoke with Crystal Ramirez?

15   A.   Yes, I spoke with both Crystal Ramirez and her

16   daughter Mya.

17   Q.   And when you spoke with Crystal Ramirez, did she

18   tell you Mya's age?

19   A.   Yes, she did.

20   Q.   And what age did she tell you her daughter was at

21   that time?

22   A.   She said that Mya was six years old.

23   Q.   And what, if anything else, did Crystal Ramirez

24   tell you about the alleged incident?

25   A.   She told me she had been home.  The defendant was

1    visiting with her as well as another male by the name of

2    Prince.  Mya had come home from school and gone into the

3    house.

4              There came a point in time when Crystal went into

5    the house also and saw that the defendant was standing

6    behind Mya in the kitchen, and Mya had her pajama bottoms

7    and underwear down to around her ankles.

8         Q.   Did Crystal report to you whether anyone else was

9    in the kitchen with Mya and Daniel Ramos?

10        A.   She did, and she said there's nobody else there.

11        Q.   And what, if anything, did she tell you happened

12   next?

13        A.   She asked, What's going on?  And Mya said that

14   Danny -- I can't remember if she said ate my coochie or

15   licked my coochie, at which point she said that defendant

16   immediately denied that anything had taken place.

17             MR. BERGER:  Judge, could I have just the

18        answer read back, please?

19             THE COURT:  Absolutely.

20             (The requested portion was read.)

21        Q.   And what, if anything, did she inform you happened

22   next?

23        A.   She started yelling at the defendant to get out of

24   the house, which he apparently did.  She spoke to Mya about

25   what had happened and if it had ever happened before.  While

J.H.

she's speaking with Mya, apparently the defendant was calling in, she said was calling into the window, Mya's lying. I didn't do anything. And there came a point in time where she called 911.

Q. And after speaking with Crystal Ramirez, did you speak with Mya Ramirez?

A. Yes, I did, briefly.

Q. And what, if anything, did Mya Ramirez inform you?

A. She informed me that defendant had placed his mouth on her vagina.

Q. And where did that conversation take place?

A. It took place in the pediatric emergency room area of the Nassau University Medical Center in an examination room.

Q. And what were the exact words that Mya Ramirez used to convey that information to you?

A. She said that, He ate my coochie.

Q. And during that conversation, were you aware of who she was talking about with respect to the, He, in that sentence?

A. Yes.

Q. And who -- what individual were you discussing with Mya Ramirez when she said, He ate my coochie?

MR. BERGER: Judge, I'm going to object. The question should be what was said, not to lead the

1    witness in this regard.

2              THE COURT:  All right, sustained as to

3       leading.  Rephrase the question.

4       Q.    Detective, were you discussing any particular

5    individual's actions with Mya Ramirez that day?

6              MR. BERGER:  Objection.

7              THE COURT:  Overruled.

8       A.    Yes, I was.

9       Q.    And who were you discussing with Mya Ramirez?

10      A.    The defendant, Daniel Ramirez -- Ramos.

11      Q.    And was it after -- sorry, withdrawn.

12            What, if anything, did you do after speaking with

13   Mya Ramirez?

14      A.    I left the examination room, and I informed her

15   mother what the protocol is going to be in this particular

16   case.

17      Q.    And when you say, the protocol, what do you mean?

18      A.    I told her that she's going to be examined, she,

19   being Mya, is going to be examined by a professional nurse

20   examiner.  There will be an advocate that will respond to be

21   with the family to ensure Mya's wellbeing and that I will

22   return later that night after the completion of the exam and

23   bring the family back to my office in Bethpage so we can

24   conduct a videotaped interview of Mya.

25      Q.    And did you receive any documents from -- you said

J.H.

1    Officer Tedeschi was at the medical center.  Did you receive

2    any documents from Officer Tedeschi?

3        A.   Not at that time.  But later when I returned that

4    evening, he gave me a deposition which he had completed with

5    Crystal Ramirez.

6        Q.   And did you read that document?

7        A.   Yes, I did.

8        Q.   And what, if anything, did you learn from that

9    document in comparison to what you had heard your first time

10   at NUMC that day?

11       A.   She confirmed the details of the incident as she

12   had given them to me.  And there were a few additional

13   details such as when she asked Mya why Mya didn't tell her,

14   Crystal, earlier that this was an ongoing situation, that

15   Mya said she was afraid.

16       Q.   Detective, did there come a time where you met an

17   individual named Daniel Ramos as part of your investigation

18   into this incident?

19       A.   Yes.

20       Q.   Could you please explain to the Court how you

21   encountered Daniel Ramos for the first time?

22       A.   He was transported to the Special Victims Unit by

23   the arresting officers, and he was brought in about, if I

24   recall, 7:10 p.m. prior to my first trip to the medical

25   center.

1      Q.   And when you say he was transported by the

2   arresting officers, was one of the officers Officer Boccio?

3      A.   Yes, it was.

4      Q.   And do you see the individual who you met with

5   that day, do you see Daniel Ramos in the courtroom

6   presently?

7      A.   Yes, I do.

8      Q.   And could you please identify him by an article of

9   clothing and by pointing him out?

10      A.   He's directly in front of me to the right, and

11   he's wearing a white puffy winter down-type jacket

12   (indicating).

13          MR. PERRI:  Your Honor, may the record

14      reflect that the witness has identified the defendant?

15          THE COURT:  It will so reflect.

16          MR. PERRI:  Thank you, your Honor.

17      Q.   And where in the Special Victims Squad did you

18   meet Daniel Ramos?

19      A.   I met him initially when he came in the front

20   door, and I directed the officers to bring him down the hall

21   to the arrest room.

22      Q.   And could you please describe for the Court the

23   arrest room in Special Victims?

24      A.   It's a room with a door, a desk, three chairs.  It

25   has a handcuff which is attached to a ring on the desk.  The

1    room is about eight by eight.

2              Next to the door is large glass window, two-way

3    window.  There's a computer on the desk, a telephone and a

4    keyboard.

5         Q.   And did there come a time on October 16th that you

6    spoke with the defendant?

7         A.   Yes.

8         Q.   And what, if anything, did you do when -- what, if

9    anything, did you say when you first sat to speak with the

10   defendant?

11        A.   When I first approached him after I returned from

12   the hospital, I asked him if he needed anything to eat,

13   drink, to go to the bathroom, is there anything I needed to

14   know about him medically.  He said no, he was fine.

15        Q.   And when you were speaking with him, what language

16   were you using at that time?

17        A.   English.

18        Q.   And was the defendant able to respond to your

19   questions?

20        A.   He did respond, yes.

21        Q.   And what language did he respond in?

22        A.   English.

23        Q.   And were the answers that he gave, were they --

24   were you able to understand his responses?

25        A.   Yes.

1      Q.   And did the defendant -- in response to your

2  questions, did the defendant request any food or anything to

3  drink?

4      A.   No.  He said he was fine.

5      Q.   And did he request any medical care?

6      A.   No.

7      Q.   And after that initial conversation, what happened

8  next?

9      A.   Um, I told him that I was going to read him his

10  rights, and I asked him if he would prefer his rights read

11  to him in Spanish or English.

12     Q.   And why did you ask him whether he would prefer

13  his rights to be read in Spanish or English?

14     A.   He spoke to me with a Spanish accent, and I wanted

15  to be sure that he was read his rights in a language which

16  he could understand and which he preferred.

17     Q.   And did that, in fact, happen, was he read his

18  rights in Spanish?

19     A.   Yes.  I asked Detective Pacheco to assist me and

20  to read the defendant his rights in Spanish from the rights

21  card, Form 233.

22     Q.   And were you present for the reading of the

23  defendant's rights?

24     A.   Yes, I was.

25          MR. PERRI:  Your Honor, I ask this be marked

Det. M. Baran - People - Direct        102

1    as People's 2 for identification.

2              THE COURT:  Let's mark it.

3              MR. PERRI:  4, I'm sorry.

4              THE COURT:  Let's mark it as 4, please.

5              (People's Exhibit 4 is marked for

6         identification.)

7              MR. PERRI:  Your Honor, for the record, it's

8         a two-page document that's stapled together.  I ask

9         that it be shown to the witness?

10             THE COURT:  It may.

11        Q.   Detective, do you recognize People's 4 for

12   identification?

13        A.   Yes, I do.

14        Q.   And what do you recognize it to be?

15        A.   It's a photocopy of a rights card known in the

16   police department as a Form 233, the one that was read to

17   the defendant by Detective Pacheco on August 16th, 2013 at

18   2340 hours, which is 11:40 p.m.

19        Q.   And how do you know that that is a copy of the

20   card that was used that night?

21        A.   I remember the defendant writing the word, Si, in

22   large letters, and then signing his name afterwards in a

23   fancy handwriting or fancy signature.  It has Detective

24   Pacheco's name and time stamp on one margin, and it has my

25   name and shield number on the other margin.

J.H.

1      Q.   And when you say it has your name, is that your

2   signature?

3      A.   Yes, it is.

4      Q.   And is that card in substantially the same

5   condition as it was on the day that the defendant signed it?

6      A.   Yes, it is.

7      Q.   And is that an exact photostatic copy of the

8   rights card?

9      A.   I believe it is.

10          MR. PERRI:  Your Honor, I ask that People's 4

11   be moved into evidence.

12          THE COURT:  Let's show it to Mr. Berger

13   first, please.

14          MR. BERGER:  Can I have a voir dire, judge,

15   please?

16          THE COURT:  You may.

17   VOIR DIRE EXAMINATION

18   BY MR. BERGER:

19      Q.   Detective, did you sign this card?

20      A.   Yes, I did.

21      Q.   And did any other officer sign this card?

22      A.   Detective Pacheco signed the card.

23      Q.   Do you understand Spanish?

24      A.   No, I don't.

25      Q.   So you can't tell us what it is that was read to

1    the defendant at this time, correct?

2          A.   That's correct.

3                MR. BERGER:  For the purpose of the hearing,

4          Judge, I have no objection.

5                THE COURT:  All right, very good.  Thank you.

6          Let's move it into evidence and mark it People's 4.

7                (People's Exhibit 4, previously marked for

8          identification, is received and marked in evidence.)

9    DIRECT EXAMINATION

10   BY MR. PERRI:  (CONTINUED)

11         Q.   Detective, with respect to People's 4 in evidence,

12   were you present when Detective Pacheco used the original

13   that People's 4 is a photocopy of?

14         A.   Yes, I was.

15         Q.   And after -- and did you witness Detective Pacheco

16   speaking Spanish to the defendant?

17         A.   Yes, I did.

18         Q.   And did the markings that you said were the words,

19   Si, and the defendant's signature, were those made after

20   Detective Pacheco spoke Spanish to the defendant?

21         A.   Yes, they were.

22         Q.   After the defendant signed the rights card,

23   People's 4 and marked it with, Si, what, if anything,

24   happened next?

25         A.   Detective Pacheco signed the card, and then he

J.H.

1    handed it to me, and I signed the card.

2         Q.    And after the two of you signed the card, did you

3    continue to speak with the defendant?

4         A.    Yes, I did.

5         Q.    And did the defendant respond to you?

6         A.    Yes, he did.

7         Q.    And in what language did you use to speak with the

8    defendant at that time?

9         A.    English.

10        Q.    And what were you discussing with the defendant,

11   what were you saying to him?

12        A.    I asked him to briefly tell me what happened

13   between himself and Mya.

14        Q.    And was the defendant able to respond to your

15   question?

16        A.    Yes, he was.

17        Q.    And what language did he use to respond to you?

18        A.    English.

19        Q.    And what, if anything, did the defendant tell you

20   in response to your question of what happened between him

21   and Mya?

22        A.    He told me he was just tickling her and playing

23   with her.

24        Q.    And did you continue to speak with the defendant

25   after that?

1      A.   Yes.  I asked him if he would like to give a

2  statement that I would type that would be presented along

3  with all the other paperwork in the case that would be his

4  version of what happened.

5      Q.   And did that, in fact, take place, did the

6  defendant tell you that he wanted to give a written

7  statement?

8      A.   Yes, he did.

9      Q.   And did you, in fact, type that statement?

10     A.   Yes.  I then booted into or I opened a Microsoft

11  Word program on the computer, on the desktop in that room

12  and began to ask him to tell me what happened.  And as he

13  told me, I typed what he told me.

14          Sometimes we'd have a question and answer.  I

15  wouldn't understand something, and I might ask him to

16  explain something.  And on occasion if he went into a

17  tangent that was not on the topic, I might ask him to just

18  get back to the matter at hand and continue to the story

19  about he and Mya.

20          After he gave me his statement, I printed it, and

21  then I brought it back into the arrest room.

22          MR. PERRI:  Your Honor, I ask this two-page

23     document be marked as People's 5 for identification.

24          THE COURT:  It may.

25          (People's Exhibit 5 is marked for

1      identification.)

2                    MR. PERRI:  Your Honor, I ask that the item,

3         People's 5, be shown to the witness.

4                    THE COURT:  It may.

5         Q.    Detective, do you recognize People's 5 for

6      identification?

7         A.    Yes, I do.

8         Q.    What do you recognize it to be?

9         A.    It's a photocopy of the statement that I typed

10     during -- while having a conversation with the defendant.

11        Q.    And is that an exact photostatic copy?

12        A.    I believe it is.

13        Q.    And Detective, how do you know that this is --

14     what do you recognize about the document that leads you to

15     believe that it is the statement given by Daniel Ramos on

16     October 16th into October 17th?

17        A.    Well, it has a confidential sex crime victim

18     stamped in red at the top, and that's my particular stamp.

19     Other detectives have different lettering, different width

20     of the letters.  I remember the corrections that were made

21     on it when it was read to him.  It has my signature at the

22     bottom.  It has the defendant's signature at the bottom and

23     Detective Pacheco's signature at the bottom of page one.

24     And on page two, it has the three signatures again and the

25     address that the defendant said he was living at in his

1   writing under his signature as I asked him to put his

2   address down under his signature on page two.

3        Q.   And Detective --

4             MR. PERRI:  Your Honor, I ask that People's 5

5        be moved into evidence.

6             THE COURT:  Show it to Mr. Berger, please.

7             MR. BERGER:  For the purpose of this hearing,

8        I have no objection.

9             THE COURT:  Thank you, Mr. Berger.  Let's

10       have it marked into evidence as People's 5.

11            (People's Exhibit 5, previously marked for

12       identification, is received and marked in evidence.)

13       Q.   Detective, on People's 5, you know that there are

14  markings.  Do you see markings where there are the letters D

15  and R on the first page?

16       A.   Yes, I do.

17       Q.   Could you please explain to the Court what those

18  markings signify?

19       A.   Whenever the defendant would make a correction, I

20  asked him to actually make the correction on the form and

21  then put his initials next to the correction.  The initials

22  D and R are for Daniel Ramos.

23       Q.   And next to those, do you see another marking?

24       A.   Yes.

25       Q.   An R and a P?

J.H.

1    A.    Yes, R and P.

2    Q.    Can you explain what the R and P signify?

3    A.    There came a point when time when Detective

4  Pacheco was reading the statement back to the defendant in

5  Spanish.  There would come a point in time when Detective

6  Pacheco would put his initials next to the defendant's

7  initials.

8    Q.    So in addition to -- withdrawn.

9         And did there come a time where the defendant

10 signed the statement?

11   A.    Yes.

12   Q.    And prior to the defendant signing the statement,

13 what, if any, instructions or warnings did you give him

14 before he signed the document?

15   A.    Well, he had been given his Miranda rights before

16 our conversation.  Miranda rights are printed in summary

17 form on the statement.

18        And I told him while we were having our

19 conversation initially, I just want you to tell me the

20 truth.  Don't make anything up and just the truth.

21   Q.    And did the defendant see that document before or

22 after he made the corrections?

23   A.    He signed the document after he made the

24 corrections.

25   Q.    All the information contained in People's 5, all

1   the facts in that document, where did they come from?

2        A.   I typed them as he was relating to me the story.

3             MR. PERRI:  Your Honor, I'd ask if the

4        detective could please read the defendant's statement,

5        People's 5, into the record at this time.

6             THE COURT:  Just read it slowly, please.

7        A.   On the upper left-hand corner is the case number,

8   203 -- I'm sorry, 2013CR338372, SVS, the number 504, the

9   time of 2344, and the date of October 16th, 2013.

10            Statement of Daniel Ramos.  My name is Daniel

11  Ramos.  I live at 781 Coleridge Road in Uniondale.  My wife

12  Juana lives there with me with my son Carlo, age 31, and my

13  other son, David Ramos, who is 23.  I work for NICE in

14  Nassau County as a bus driver.  My social security number is

15  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.  The social security number that I gave was the

16  corrected social security number.

17       Q.   How did you know that the original social security

18  number in the document was wrong?

19       A.   He had told me I had gotten it wrong.  He said,

20  That's not right.

21       Q.   Did he say that in Spanish or English?

22       A.   In English.

23       Q.   And was the social security number corrected?

24       A.   Yes.  I gave him the document and a pen, and I

25  asked him to write the correct social security number

1    underneath it and put a line through the incorrect social

2    security number.

3        Q.   Please continue, Detective.

4        A.   I continued reading after he handed the document

5    back to me after putting the correct social security number

6    and initialing it.  I have been told by the detective that I

7    have the right to remain silent and that any statements I

8    make may be used against me in court.  I have been told that

9    I have the right to talk with a lawyer before answering any

10   questions or to have a lawyer present at any time.  Further,

11   I have been advised that if I cannot afford to hire a

12   lawyer, one will be provided to me, and I have the right to

13   keep silent until I have had the chance to talk to a lawyer.

14        I understand my rights and make the following

15   statement freely and voluntarily.  I am willing to give this

16   statement without talking with a lawyer or having one

17   present.

18        Today, Wednesday, October 16th, 2013, I am

19   normally off from work but had put my name on the list for

20   extra work, and I got five hours today.  I worked from about

21   6:30 a.m. until about 11:30 a.m.

22        When I finished working today -- I'm sorry, when I

23   finished -- when I was finishing work today, I got a call

24   from my friend, Crystal Ramirez.  I know her husband

25   Scoobie.  Crystal told me to come to her house today after

1    work and hang out and have a few drinks with her.  I forgot

2    what street she lives on, but she lives in back of the deli.

3             I bought a $20 bottle of Long Island Iced Tea

4    because she asked me to bring some liquor so we could drink.

5    I also bought her a pack of Newport 100s.  Crystal drinks

6    every day and smokes a lot too.  I encourage her to keep the

7    door closed so the smoke doesn't go into the house and hurt

8    the kids.

9             I got to her house, and we went onto the porch and

10   started drinking, and she started smoking.  After a short

11   time, a black guy came by and joined us on the porch.  He

12   was there a little bit, and then he left.  I stayed with

13   Crystal drinking after he left.

14            I was still there when the kids came home, and

15   they went inside the house to make their homework.  I helped

16   them today to do their homework.  I told Crystal to help

17   them, and she told me to help them.  So I went inside the

18   house and helped them.

19            When they finished their homework, I went back

20   outside to drink with Crystal.  After a while, I told

21   Crystal I needed to use the bathroom, and she said, Go ahead

22   and use the bathroom.

23            So I went inside the house, and the little girl

24   was following me all around.  So went I went to the

25   bathroom.  I told her to stay out of the bathroom, and I

1    went in.

2         When I came out of the bathroom, she was still
3    there waiting for me in the kitchen.  I told her I was going
4    to tickle her, and I pulled down her pants and underwear,
5    and I tickled her pussy with my mouth.  I told her to pull
6    up -- to pull her pants up, and just then Crystal came into
7    the kitchen and saw the little girl with her pants down and
8    said to me, What are you doing?  I said, I wasn't doing
9    nothing.  She then asked the little girl what was I doing,
10   and she said I was licking her pussy.  I said to Mya that I
11   was playing -- quote, Playing with you, but she said, quote,
12   No, you was licking my pussy, en quote.  The little girl was
13   scared of her mother.

14        Crystal then told me to get out, and I did.  I
15   made a big mistake, and I am very sorry for what I did.

16        I am presently in Special Victims Squad detective
17   office where I am giving this statement to Detective Baran
18   who has typed it for me, and Detective Pacheco has read it
19   to me in Spanish, and it is correct and true.

20        Q.   Detective, what, if anything -- sorry, withdrawn.
21   Did there come a time when the defendant wrote anything else
22   down that evening?

23        A.   Yes, he did.

24        Q.   And what did the defendant write?

25        A.   I asked him if he wanted to write a letter to

Det. M. Baran - People - Direct          114

1    Crystal and Mya, and he said he did.  He would like to.  And
2    I gave him a piece of paper and a pen, and he wrote
3    something in Spanish.
4              MR. PERRI:  I ask that this be marked for
5         identification as People's 6, your Honor.
6              THE COURT:  Let's mark it.
7              (People's Exhibit 6 is marked for
8         identification.)
9              MR. PERRI:  I ask that it be shown to the
10        detective.
11        Q.   Detective, do you recognize People's 6 for
12   identification?
13        A.   Yes, I do.
14        Q.   And what do you recognize it to be?
15        A.   It's the letter or note that defendant wrote to
16   Crystal and Mya while he was in Special Victims Bureau on
17   the morning of October 17th.
18        Q.   And is that an exact photostatic copy of the
19   letter the defendant wrote?
20        A.   I believe it is.
21        Q.   And do you recognize -- I'm sorry, withdrawn.
22             Were you present for the defendant writing the
23   apology letter you just described?
24        A.   Yes, I was.
25        Q.   And do you recognize the handwriting that is in

J.H.

1    the document before you?

2         A.   I recognize his signature on the bottom, and I

3    remember reading the first line where he says to Crystal and

4    Mya, and that's the only part of it that I understood.

5         Q.   Does it appear to be in the same or substantially

6    the same condition as it was on that day?

7         A.   Yes, it does.

8              MR. PERRI:  Your Honor, I ask that People's 6

9         be moved into evidence.

10             THE COURT:  Let's show it to Mr. Berger

11        first, please.

12             MR. BERGER:  No objection for the purpose of

13        this hearing.

14             THE COURT:  Thank you.  Let's have it marked

15        as People's 6 in evidence.

16             (People's Exhibit 6, previously marked for

17        identification, is received and marked in evidence.)

18        Q.   Detective, just to clarify, where was the

19   defendant when you wrote People's 6?

20        A.   He was sitting at the desk in the arrest room at

21   Special Victims Squad in Bethpage.

22        Q.   And was that the same area where the written

23   statement that was People's 5 was written?

24        A.   Yes, it was.

25        Q.   And during the time that you were with -- I'm

1    sorry.  Did the defendant write People's 6 in his own

2    handwriting?  Did he write it himself?

3         A.   Yes, he did.

4         Q.   And did he do that after giving you the statement

5    that was People's 5 in evidence?

6         A.   Yes, he did.

7         Q.   And during the time period that you were with the

8    defendant in that room, in the interview room, where was

9    your -- were you armed?

10        A.   No, I was not.

11        Q.   Was Detective Pacheco, was he armed?

12        A.   No, he was not.

13        Q.   Was the defendant handcuffed while he was inside

14   that room?

15        A.   He had initially one hand cuffed.  His left hand

16   was cuffed.  And I believe when I took the statement from

17   him, I uncuffed him so he could be more comfortable.

18        Q.   And did you make the defendant any promises or

19   threats in order to get him to give you the statement and

20   the apology letter, People's 5 and People's 6?

21        A.   No, I did not.

22        Q.   Did you offer him any leniency by the police

23   department or by the District Attorney's office in order to

24   get him to sign People's 5 or to write People's 6?

25        A.   No, I did not.

J.H.

1        Q.    Did Detective Pacheco, in your presence, did he

2    make any promises or threats against the defendant?

3        A.    Not in English.

4        Q.    But Detective Pacheco did speak with the defendant

5    in your presence?

6        A.    Yes, he did.

7        Q.    After the defendant wrote the apology letter,

8    what, if anything, happened next between you and the

9    defendant?

10       A.    I told him I had some paperwork to do.  I asked

11   him, again, if he needed anything to eat or drink or

12   bathroom.  I'm not sure what he responded.  I left the room,

13   and I began to process the arrest.

14       Q.    And during the arrest processing, was there a

15   buccal swab taken from the defendant?

16       A.    A short time after I began to process the arrest

17   and inform my supervisor of the status of the case, I went

18   back into the arrest room, and I asked the defendant if he

19   would give his DNA in a sample.

20       Q.    And when you asked the defendant if he would give

21   his DNA in a sample, what was his response?

22       A.    He said, Sure.

23       Q.    And could you describe for the Court the process

24   of how the defendant's DNA was sampled that day, what a

25   buccal swab is?

1      A.    After he said, Sure, I retrieved a small yellow

2   envelope from the storage room.  I opened it.  I put on the

3   gloves that come with the kit.  It's a buccal swab kit.  I

4   put on the gloves, and I began filling out the card that

5   comes along with the kit.

6          There's a point where the defendant is asked for

7   his signature.  I gave him the card and asked him to write

8   his signature on the card with a pen I provided and to put

9   his date of birth underneath.  I filled out the rest of the

10  card.  I gave the card -- I signed it.  I gave the card to

11  Detective Pacheco to sign to witness the buccal swab

12  procedure.

13         I removed two swabs, Q-Tip type swabs from the

14  kit.  I asked the defendant to open his mouth, and I rubbed

15  one swab on the left side of his check, and I rubbed the

16  other swab on the right side of his cheek.  I then placed

17  them on the desk overhanging the desk in such a way that the

18  cotton portion was not in contact with the desk, and I let

19  them dry.  I finished filling out whatever paperwork was

20  associated with the card.  I took his thumbprints with a

21  black ink pad on the spot where the card requests it.

22         After about five or eight minutes, I put the swabs

23  back into the kit and sealed the kit and ultimately

24  forwarded that kit to EMU, emergency management unit at the

25  police department.

1    Q.    Just to clarify, Detective, when you asked the

2    defendant to open his mouth, what language were you

3    speaking?

4    A.    English.

5    Q.    And when you asked the defendant to open his

6    mouth, what did he do in response to your request?

7    A.    He opened his mouth.

8    Q.    Did you make the defendant -- did you make any

9    threats or promises to the defendant in order to get him to

10   give you the DNA sample?

11   A.    No.

12   Q.    Did Detective Pacheco make any threats or promises

13   to the defendant in order to give you the DNA sample?

14   A.    Not that I'm aware of.

15         MR. PERRI:  Nothing further, your Honor.

16         THE COURT:  Thank you.  Cross-examination,

17   please.

18   CROSS-EXAMINATION

19   BY MR. BERGER:

20   Q.    Detective, did you make any notes or memoranda in

21   connection with this case?

22   A.    Yes, I did.

23   Q.    What did you make?

24   A.    There are a few notes in my case jacket.

25         MR. BERGER:  Have I been provided with those

Det. M. Baran - People - Cross          120

1     notes, Mr. Perri?

2               THE COURT:  Have they been turned over?

3               MR. PERRI:  Yes, your Honor, the notes in the

4     case jacket have been turned over.

5               THE COURT:  Can you just identify them in the

6     Rosario packet, please?

7               MR. PERRI:  Under Section F of the Rosario

8     packet.

9               MR. BERGER:  Just give me the pages.

10              MR. PERRI:  Number 11, which is labeled

11    notes, which is page 40, and then has Confidential For

12    Law Enforcement Use Only title at the top of the page

13    and some notes written down.

14              MR. BERGER:  Page 40, any other pages?

15              MR. PERRI:  And also page 64, your Honor,

16    under the same section of Detective Baran's jacket.  On

17    page 64, there is no page 64 of handwritten notes, your

18    Honor.

19              THE COURT:  Thank you.

20              MR. BERGER:  Just for the record, Mr. Perri,

21    page 64 has one word called, Rosebelle, is that what

22    you're referring to?

23              MR. PERRI:  Yes, your Honor.

24              MR. BERGER:  And page 40 is the other page

25    you indicated, right?  Is that correct Mr. Perri?

J.H.

Det. M. Baran - People - Cross        121

1                MR. PERRI:  Yes.  Your Honor, just to clarify

2        what I'm stating, this is about handwritten notes that

3        were turned over, and they are in a section that is

4        entitled Detective Baran's case jacket which contains

5        all the other documents that Detective Baran has turned

6        over to the People which we have provided to the

7        defense.

8                THE COURT:  Understood.

9                MR. PERRI:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MR. BERGER:  (CONTINUED)

12        Q.    You're the carrying Detective, correct?

13        A.    Yes.

14        Q.    So I'm not asking about documents that have been

15   turned over to you but I'm only asking about the documents

16   you prepared.  And from what I understand, there are the

17   case notes that you prepared on page 40; you recognize that

18   page?

19        A.    Yes.

20        Q.    And then the one on page 64 which has just the

21   word, Rosebelle; is that correct?

22        A.    Yes.

23        Q.    Now, you also prepared what is marked in evidence

24   number 5, prepared it in the sense that you typed it at the

25   computer, correct?

1    A.   Yes.

2    Q.   Other than those three items, did you prepare

3  anything else in connection with this case?

4    A.   No.

5    Q.   So when you have testified to certain facts and

6  circumstances that happened, for example, at the hospital

7  with -- when you spoke to Crystal and you spoke to Mya, you

8  didn't make any notes at that time what they said to you,

9  did you?

10   A.   Correct.

11   Q.   So what you are testifying to today is based upon

12  your own independent recollection of what you say happened

13  on that -- on October 16th?

14   A.   Correct.

15   Q.   Now, did you have occasions to talk to anybody

16  prior to testifying here today?

17   A.   Yes.

18   Q.   Who was that?

19   A.   I talked to the District Attorney.

20   Q.   Anybody else?

21   A.   I talked to Detective Pacheco.

22   Q.   And where did that happen?

23   A.   That happened in the District Attorney's office.

24   Q.   So this morning -- was it this morning?

25   A.   Yes.

J.H.

Det. M. Baran - People - Cross          123

1    Q.   So you spoke with the District Attorney.  And when

2    you did that, Detective Pacheco was present?

3    A.   Yes, he was.

4    Q.   And you were in a room, and it was in his office,

5    I assume?

6    A.   Yes.

7    Q.   So you heard Detective Pacheco talk to the

8    District Attorney as well?

9    A.   Yes.

10   Q.   So you could hear what he was saying?

11   A.   Yes.

12   Q.   And he was sitting next to you and near you when

13   you were talking to Mr. Perri?

14   A.   Yes.

15   Q.   Now, prior to this morning, did you talk to

16   Detective Pacheco about this case at any time?

17   A.   I mentioned -- I didn't talk about the case.   I

18   just mentioned that we have court on the Ramos case coming

19   up on Friday.

20   Q.   And when did you discuss that with him?

21   A.   The day I received the court notification.  It

22   might have been Tuesday.  Regardless of when I received the

23   court notification, I talked to Detective Pacheco about it

24   on Tuesday.

25   Q.   Did you testify in the grand jury in this case?

1      A.    I don't recall doing so.

2      Q.    I'm sorry?

3      A.    I don't recall doing so.

4      Q.    Well, does that mean no?

5      A.    It means I don't recall.  It's an I don't recall

6  heavily leaning to no.

7      Q.    Did you -- I may have misheard.  Did you mention a

8  Detective Tachairo or was that Pacheco?

9      A.    I don't know any Detective Pachairo.

10     Q.    You mentioned something about a Detective

11 Tachairo, and then you said something about Sergeant Sacks.

12 Did you talk to a Sergeant Sacks?

13     A.    Yes, I did.

14     Q.    And is Sergeant Sacks the only person you spoke to

15 prior to going to NUMC concerning this case?

16     A.    No.  I spoke to my supervisor.

17     Q.    Who is that?

18     A.    Detective Sergeant Matedero, M-A-T-E-D-E-R-O.

19     Q.    And approximately what time of the day was that?

20     A.    It was approximately 6 o'clock.

21     Q.    And what did he say to you?

22     A.    I don't recall.

23     Q.    How do you recall that you spoke to the sergeant

24 concerning this case?

25     A.    I would have been obligated to notify the superior

Det. M. Baran - People - Cross          125

1    officer that there's an arrest coming in.

2          Q.   So you initiated the contact with Sergeant

3    Matedero?

4          A.   Yes.

5          Q.   So all you knew that there was an arrest coming

6    in?

7          A.   I don't understand your question, all I knew.

8          Q.   How did you know that there was an arrest coming

9    in?

10         A.   I had spoken to Sergeant Sacks.

11         Q.   What did Sergeant Sacks say to you?

12         A.   He said that there was a three -- six year old

13   girl who had been sexually abused and that the subject is in

14   custody.

15         Q.   Did he say what the nature of the abuse was?

16         A.   He said it was a sexual abuse.

17         Q.   I know.  I heard that.  But did he say

18   specifically what was alleged to have occurred?

19         A.   No.

20         Q.   And is it as a result of Sergeant Sacks giving you

21   this information that you contacted Sergeant Matedero?

22         A.   Yes.

23         Q.   Now, and you got this call approximately 6

24   o'clock, correct?

25         A.   Before that.

Det. M. Baran - People - Cross          126

1      Q.   When did you get the call from Sergeant Sacks?

2      A.   I didn't take the call from Sergeant Sacks.  I was

3  notified about a quarter to 6, 10 of 6.  I don't remember.

4      Q.   I thought you had indicated you spoke to Sergeant

5  Sacks?

6      A.   I did.

7      Q.   So when was the first time you got a call in

8  connection with this case, quarter to 6?

9      A.   I don't know.  I didn't get a call that I fielded.

10     Q.   I'm sorry?

11     A.   I did not field a call on this case.

12     Q.   When were you first notified about getting

13  involved in this case?

14     A.   About a quarter to 6.

15     Q.   And who did that?

16     A.   Detective Pacheco.

17     Q.   And what did Detective Pacheco say to you?

18     A.   He handed me a note and said I have to call

19  Sergeant Sacks.

20     Q.   And what did the note say, just to call Sergeant

21  Sacks?

22     A.   There was some information on it.  I don't

23  recall -- I don't want to say what's on the note if I don't

24  recall.

25     Q.   Well, do you have that in your case jacket that

J.H.

Det. M. Baran - People - Cross        127

1    could refresh your recollection?

2        A.    Yes.

3        Q.    Would you get that for me?

4        A.    Sure.

5              MR. PERRI:   Your Honor, could it be shown to

6        the People?

7              THE COURT:   It can.   Do you want it marked,

8        Mr. Berger, for ID so that we have a complete record of

9        what the detective is utilizing to refresh his

10       recollection?

11             MR. BERGER:   Sure, Judge.

12             THE COURT:   B for identification.

13             (Defendant's Exhibit B is marked for

14       identification.)

15             THE COURT:   Please show it to counsel.

16             MR. BERGER:   I would like to see it as well.

17       Q.    Is Defendant's B for identification what you're

18   referring to as to the notes provided to you by Detective

19   Pacheco?

20       A.    Yes.

21       Q.    And is that -- is all the writing on B the notes

22   he gave you, or was anything added afterwards?

23       A.    There was some things were added afterwards.

24       Q.    By who?

25       A.    By me.

Case 2:19-cv-01125-JS-AYS   Document 7-1   Filed 05/31/19   Page 128 of 273 PageID #: 264

Det. M. Baran - People - Cross        128

1    Q.   Okay, so that's another item that you made notes
2    on in connection with this case, correct?

3    A.   Yes.

4    Q.   In addition to the other ones we listed before?

5              MR. PERRI:  Your Honor, objection as was one
6         of the items listed.

7              THE COURT:  No one's saying at the moment
8         that it hasn't been turned over in Rosario.  It has
9         been turned over, so it's no problem.  Mr. Berger can
10        go through all the Rosario and find whatever pages he
11        needs as can you, counselor.

12             So you added some notes after the fact?

13             THE WITNESS:  Yes, your Honor.

14             THE COURT:  Next question.

15   Q.   But my question to you before was what notes and
16   memoranda did you prepare.  You indicated the ones that are
17   on page 40 and 64.  And now I'm just saying to you or asking
18   you this is another writing that you prepared in this case,
19   correct?

20             MR. PERRI:  Objection, your Honor.  How can
21        the witness testify as to whether or not something is
22        in the People's Rosario packet?

23             THE COURT:  All right, well, that's
24        overruled.

25             Detective, you now are saying that this is

J.H.

Det. M. Baran - People - Cross          129

1    yet another document that you wrote some notes on,

2    correct?

3                MR. PERRI:  Your Honor, may we --

4                THE WITNESS:  Your Honor, I never intended to

5    not to mention this.  I was under the impression that

6    he had all my notes that I prepared from the packet for

7    ADA Perri.

8                THE COURT:  Just so the record is clear,

9    nobody is saying that Mr. Berger doesn't have

10   everything, and nobody is saying the People haven't

11   turned this over.

12               I want to clarify this is a document within

13   the paperwork that does contain some of your

14   handwriting?

15               THE WITNESS:  That's correct.

16               MR. PERRI:  Your Honor, but this was --

17   defense counsel's mischaracterizing the prior testimony

18   in that this was one of the two documents he questioned

19   the witness about and the witness just provided the

20   original of one of the two documents that he was

21   already questioned about.

22               THE COURT:  So this is page 40 then?

23               MR. PERRI:  Yes, your Honor.

24               THE COURT:  Of the Rosario?

25               MR. PERRI:  Yes, your Honor.

1          THE COURT:   Thank you for clarifying that.

2     CROSS-EXAMINATION

3     BY MR. BERGER:   (CONTINUED)

4          Q.   Which part did you write on what's on page 40?

5          A.   The part on the right.

6          Q.   Just say it, please?

7          A.   2861, 4861C, Chairi, 2861, 8939-Jose, 8780,

8     Carlton-102, Wigand-112.

9          Q.   Are these numbers and writings all in connection

10    with this case?

11         A.   Yes.

12         Q.   To what do they refer the numbers, 2361, 4861C,

13    what does that mean?

14         A.   They all refer to different things.

15         Q.   So tell me what 2361 refers to.

16         A.   The ambulance number.

17         Q.   4861C?

18         A.   The serial number of the operator of the

19    ambulance?

20         Q.   2361?

21         A.   The ambulance number.

22         Q.   8939, Jose?

23         A.   Serial number.

24         Q.   Of?

25         A.   One of the officers at the hospital.

Det. M. Baran - People - Cross        131

1     Q.    And who is Carlton, and who is Wigand?

2     A.    They were also officers at the hospital.  And the

3   102 and 112 refers to car numbers.

4     Q.    So the note that you received from Pacheco, for

5   the record, what -- withdrawn.

6           When you received the note from Pacheco, do you

7   know whether the defendant had been in custody at that

8   point?

9     A.    I don't recall if I knew.

10    Q.    But you had a note that said and the subject was

11   53 years old, correct?

12    A.    Correct.

13    Q.    Now, when -- where were you when he handed you to

14   note?

15    A.    At my desk.

16    Q.    And then what did you do?

17    A.    I called Sergeant Sacks back at the number listed.

18    Q.    And did you have a conversation with him?

19    A.    Yes, I did.

20    Q.    And what did he say to you, and what did you say

21   to him?

22    A.    He said to me that there's a six year old girl who

23   was sexually abused, and he said they have a guy under

24   arrest.

25    Q.    And this is at about a quarter of 6?

Det. M. Baran - People - Cross          132

1      A.    I think it was later.  It was like sometime, a few

2  minutes later.

3      Q.    Between a few minutes thereafter?

4      A.    To the best of my recollection.

5      Q.    So then what did you do?

6      A.    I advised him to have the six year old girl

7  transported to the Nassau University Medical Center and to

8  have the defendant transported to Special Victims Unit.

9      Q.    And then did you then go to Nassau University

10 Medical Center?

11     A.    I don't understand the use of the word, then.  Do

12 you imply immediately after talking to Sergeant Sacks?

13     Q.    Yes.

14     A.    No.

15     Q.    How long did you remain then at your Special

16 Victims Unit?

17     A.    At least an hour-and-a-half.

18     Q.    And then did there come a time -- during that

19 hour-and-a-half, did you have any conversations with anybody

20 about this case?

21     A.    No.

22     Q.    Okay, so then what happened after an

23 hour-and-a-half?

24     A.    Then I went to the medical center.

25     Q.    And approximately what time did you arrive there?

1      A.    Approximately 1940, 45, which would be 7:45 p.m.

2      Q.    You told us -- and when you went there, is the

3  first person you spoke to Crystal?

4      A.    No.

5      Q.    Who did you speak to?

6      A.    I don't remember the first person.

7      Q.    Was it in connection with this case?  We are only

8  talking about in connection with this case.

9      A.    I don't remember the first person.

10      Q.    What's the first -- who is the first person you

11  spoke to in connection with this case that you do remember?

12               MR. PERRI:  Objection.  Asked and answered.

13               THE COURT:  Overruled.

14               MR. BERGER:  Asked and answered?

15               THE COURT:  Overruled.

16      A.    The first person I spoke to in connection with

17  this case is Detective Pacheco.

18      Q.    And he had been there before you?

19      A.    Where?

20      Q.    At the Nassau University Medical Center.

21      A.    No.

22      Q.    When did you talk to Detective Pacheco?

23      A.    In the office about quarter of 6.

24      Q.    Detective, we are now -- you have told us that you

25  had a conversation with him; did you not?

J.H.

1      A.   Yes.

2      Q.   Now, you say you remained at the unit until for an

3  hour-and-a-half or so, and you went to the Nassau University

4  Medical Center, correct?

5      A.   Yes.

6      Q.   That's where we are at?

7      A.   You asked me who is the first person I had in

8  connection with this case.

9      Q.   When you got to the hospital.

10      A.   I don't remember.

11      Q.   Well, who is the first person you spoke to that

12  you do remember about this case?

13      A.   I don't remember the first person I spoke to.

14      Q.   You did talk to somebody about this case when you

15  got to the medical center, didn't you?

16      A.   Yes.

17      Q.   Tell me the first person you remember you spoke

18  to.

19      A.   I don't remember the first person.  However, I did

20  speak at some point to detective -- Officer Tedeschi.  I

21  spoke to Officer Wigand, and I may have previously spoke

22  with Officer Carlton.

23      Q.   What did Officer Tedeschi tell you?

24      A.   He didn't tell me anything.  He just told me that,

25  well --

1       Q.    Tell me.

2       A.    He didn't have any details of the case.  He just

3    told me that he was there with the mother and the child, and

4    he may have been at that house one time before for some

5    other incident.

6       Q.    That they may have been at that house before?

7       A.    He may have been at that house.

8       Q.    Tedeschi?

9       A.    Yes.

10      Q.    Did he tell you what it was about?

11      A.    The other incident?

12      Q.    Yes.

13      A.    No.

14      Q.    You didn't ask?

15      A.    No.

16      Q.    So then you also said you spoke to an Officer

17   Wigand?

18      A.    Yes.

19      Q.    What was that about?

20      A.    I don't remember.  Just it would have been just

21   who was where and what happened at the scene.

22      Q.    Well, what did they tell you happened at the

23   scene, or what did he tell you?

24      A.    It's not 100 percent clear to me at this point a

25   year later who told exactly what.  I would be hesitant to

J.H.

Det. M. Baran - People - Cross          136

1    testify as to what Officer Wigand told me if I'm going to

2    confuse it with what Officer Tedeschi told me or Officer

3    Carlton or the arresting officers later.

4         Q.   So you cannot even tell us what Officer Carlton

5    told you?

6         A.   Correct.

7         Q.   You were able to tell us what Tedeschi told you

8    before?

9         A.   Yes.

10        Q.   So as you sit here now, you cannot recall what

11   Carlton said, what Officer Carlton said to you?

12        A.   That's correct.

13        Q.   Now, there came a time when you spoke with Crystal

14   Ramirez?

15        A.   Yes.

16        Q.   And what did you say to her, and what did she say

17   to you?

18        A.   I asked her to tell me what happened.

19        Q.   So what did she say?

20        A.   She said that she was hanging out with the

21   defendant and another guy, and the kids came home.  And the

22   other guy's name was Prince.  And when he went to leave, she

23   walked him to the front.  She sat with him on the stoop for

24   some period of time.

25             And when she came back in after he had left, she

1  didn't see the defendant on the porch any longer, so she

2  went inside to see where he was.  And she entered the

3  kitchen, and she saw him standing behind Mya who had her

4  pajamas and underwear down by her ankles.

5      Q.   Did you make notes of this?

6      A.   No.

7      Q.   This is something you say you remember

8  independently of your own independent recollection?

9      A.   Yes.

10      Q.   Anybody with you when you spoke to her?

11      A.   No.

12      Q.   So she didn't tell you that she observed any

13  sexual abuse, did she?

14      A.   No, she didn't.

15      Q.   Now, when you spoke to her, was Mya there?

16      A.   No.

17      Q.   Did you then go talk to Mya?

18      A.   Yes.

19      Q.   Where was Mya when you spoke to her?

20      A.   She was in an examination room.

21      Q.   And was she being examined, or was she alone?

22      A.   She wasn't alone, but she wasn't being examined.

23      Q.   Who else was in the room?

24      A.   There was some nurse or somebody in the medical

25  staff there.  I don't know if it's a nurse or just an aide

Det. M. Baran - People - Cross        138

1    or volunteer.

2         Q.   And did you have a conversation with Mya?

3         A.   Yes.

4         Q.   And what did she say to you, and what did you say

5    to her?

6         A.   I said, What happened today?  And she said, Danny

7    ate my coochie, or she said, He ate my coochie.  And I said,

8    Who?  And she said, Danny.

9              And so I asked her, Has it ever happened before?

10   And she said, Yes.  Then I said, Okay, we'll talk later.

11        Q.   Did you ask her how many times?

12        A.   No.

13        Q.   Did you ask her when?

14        A.   No.

15        Q.   Did you write this down?

16        A.   No.

17        Q.   So then when you told us before she said to you,

18   Danny ate my coochie, and then you correct yourself, which

19   was it that you were recalling?

20        A.   I don't think she said Danny at first.  I think

21   she said, He ate my coochie.  And then I said, Who?  And she

22   said, Danny.

23        Q.   So is that clear to you that -- is your

24   recollection clear about that?

25        A.   That's my recollection, yes.

Det. M. Baran - People - Cross        139

1    Q.   Is your recollection clear about that?

2    A.   Yes.

3    Q.   And that is -- are her exact words?

4    A.   Yes.

5    Q.   So I heard the words, ate my coochie.  What was

6    said before that by her, if anything?

7    A.   Hello, when I said hello.

8    Q.   No, you asked her what happened, correct?

9    A.   Yes.

10   Q.   Did she say to you, Ate my coochie?

11   A.   He ate my coochie.

12   Q.   So she used the word, He?

13   A.   Yes.

14   Q.   And that was the entire conversation that you can

15   recall?

16   A.   That was the entire conversation.

17   Q.   Now, I am correct from your testimony that neither

18   Crystal's statement or Mya's statement was written down by

19   you?

20   A.   That's correct.

21   Q.   Now, did there come a time when you came into

22   contact with the defendant?

23   A.   Yes.

24   Q.   Was that also at the Nassau University Medical

25   Center?

1    A.    No.

2    Q.    Where was that?

3    A.    That was in Special Victims Squad.

4    Q.    And when was it?  At what time was it the first

5  time you came in contact with him?

6    A.    Approximately 7:10.

7    Q.    And you were in contact with him in the arrest

8  room, correct?

9    A.    Not at 7:10.

10    Q.    At what time when you went to the arrest room was

11  it?

12    A.    It was about 11:30, 11:35 probably closer to.

13    Q.    11:30 is when you came in contact with him in the

14  arrest room?

15    A.    About that.

16    Q.    And you had no contact with him -- what happened

17  at 7:10?  Did you talk to him then?

18    A.    No.

19    Q.    So you just saw him then?

20    A.    Correct.

21    Q.    And what did you do from 7:10 to 11:30?

22    A.    I had been to the hospital twice.  I had another

23  interview with another victim, and I may have assisted one

24  of the other detectives on something else.

25    Q.    So your initial contact face-to-face is at 11:30?

1        A.    I don't know how you define face-to-face.  I saw
2   him face-to-face at 7:10.
3        Q.    You didn't have any interaction with him at 7:10?
4        A.    No.
5        Q.    So you had some interaction with him at 11:30 in
6   the arrest room?
7        A.    11:30, 35, yes.
8        Q.    Now, he was U-bolted to the desk?  I mean he was
9   cuffed to the U-bolt?
10       A.    He was cuffed to a bolt on the desk.
11       Q.    And it was just you and he in the room?
12       A.    Yes, initially.
13       Q.    Right.  When was it that the statements -- the
14  statement, both statements were completed, what time was it?
15       A.    I'm not sure which statements you are referring to
16  in the plural.
17       Q.    Let's talk about People's 5.
18       A.    Is that the statement of Daniel Ramos?
19       Q.    Yes.
20       A.    Okay.  Are you asking when it was completed?
21       Q.    Yes, when he signed it.
22       A.    Probably in the area -- I don't have an exact time
23  stamp.  About an hour later, 45 minutes later.
24       Q.    Later of 11:30?
25       A.    Later from the time that we initially began it,

J.H.

1   which was 2340, about 45 minutes to 50 minutes after that,

2   maybe a few minutes more.

3        Q.   You started at 2340 --

4        A.   Well, his rights were given to him at 2340.  I

5   started the statement -- I started talking to him for a few

6   minutes before that.  Then I went into the Microsoft Word

7   program, and that was at 2344 and then started taking his

8   statement while he was talking to me about what happened.

9        Q.   So on People's 5, we know when you started typing,

10  but we don't know when you completed it, correct?

11       A.   That's correct.

12       Q.   And your estimation is how long?

13       A.   Forty-five minutes, 50 minutes.  When you say

14  completed, I'm referring to when I printed it out and began

15  reading it to him.  Well, I asked him to read to me

16  actually, and then I read it to him.

17       Q.   You asked him to read it to you?

18       A.   Yes.

19       Q.   He read the entire statement to you?

20       A.   He read the first paragraph out loud, and then he

21  read the rest of it in an undertone.

22       Q.   What does that mean, in an undertone?

23       A.   Quietly.

24       Q.   Does that mean aloud?

25       A.   It means aloud but quietly.

Det. M. Baran - People - Cross          143

1      Q.    Well, could you hear him when he -- hear him utter

2   every word?

3      A.    No.

4      Q.    So you say you had him -- that the rights were

5   read aloud; is that what you're saying?

6      A.    Detective Pacheco gave him the rights out loud,

7   yes.

8      Q.    No.  We're talking about the statement that was

9   People's 5.

10      A.    No, the rights were not read out loud.  Well, they

11   were read by him, not by me.

12      Q.    Detective, I am not talking about the rights now.

13   I understand that preceded.  Are you saying to me that he

14   read the statement, People's 5?

15      A.    Correct.

16      Q.    And you said that he started with the rights and

17   read them aloud?

18      A.    I don't believe I said that.

19      Q.    Okay.  Did he read the statement aloud, any part

20   of it?

21      A.    Yes.

22      Q.    What part?

23      A.    The first paragraph.

24      Q.    Relating to what?

25      A.    The heading, my name is Daniel Ramos, I live at

J.H.

1  such and such address.

2      Q.   So he never read the rights aloud you're saying to

3  me?

4      A.   He read it in an undertone.

5      Q.   By the undertone, you mean you couldn't hear what

6  he was saying; is that correct?

7      A.   I could hear some words but not each and every

8  word.

9      Q.   And that's what you mean by undertone?

10     A.   Yes.

11     Q.   So is that true of the entire statement?

12     A.   No.

13     Q.   So he didn't read the entire statement even in an

14  undertone?

15     A.   No, he did, and sometimes he read it out loud to

16  me.

17     Q.   Do you remember which words he read out loud to

18  you?

19     A.   Can I see the statement?

20     Q.   So as you sit here now, you don't recall the

21  words -- the subject matter, you don't have to give me

22  verbatim, but you don't recall the words he read out loud?

23     A.   I don't want to testify incorrectly.

24     Q.   I know.  But by reading the statement, is that

25  going to refresh your recollection as to what you remember

1    he said?

2        A.   Yes.

3        Q.   Really?  So by reading it, you'll be able to tell

4    us which words he read aloud?

5        A.   Yes.

6        Q.   And is that because you marked the statement with

7    certain markings which would tell you which words he read

8    aloud?

9        A.   Yes.

10       Q.   What marking did you put on the statement?

11       A.   That's actually a mischaracterization to say I

12   made the markings, but he made the markings.

13       Q.   You are talking about the corrections?

14       A.   Yes.

15       Q.   So would it be correct to say that where it's

16   marked DR and your initials, those are the statements that

17   he read aloud?

18       A.   That's not a correct statement to make.

19       Q.   Well, you said you would know by looking at the

20   statement from the markings you put which statement -- which

21   part of the statement he read aloud, correct?

22       A.   I didn't put any markings on the statement.

23       Q.   I asked you how you would know if you looked at

24   the statement which parts he read aloud, and you said you

25   had put markings on the statement.

J.H.

1        A.    I didn't put any markings on the statement.

2        Q.    So then my question to you is by looking at the

3   statement, how would you know which parts of the statement

4   he read aloud?

5        A.    Because I would look and see where he made the

6   corrections.

7        Q.    And so my question to you is are you saying that

8   where he made the corrections is where he read the statement

9   aloud?

10       A.    Yes.

11       Q.    And those are the -- and I see three areas on the

12   statement.  Would it be correct to say that it's those three

13   areas that he read aloud?

14       A.    Well, there's four areas, but yes, that would be

15   correct.

16       Q.    The fourth being the correction of the social

17   security number?

18       A.    Yes.

19       Q.    I'm talking about the body of the statement, there

20   are three, correct?

21       A.    Yes.

22       Q.    Now, did you videotape or audiotape the session

23   from 11:40 on?

24       A.    No.

25                  THE COURT:  Mr. Berger, let's just take a

J.H.

1          quick break so anyone who needs to use the facility

2          can, and then we will come back and keep going.

3                    MR. BERGER:  Sure.

4                    (A recess was taken.)

5                    THE CLERK:  Case on hearing continued,

6          Indictment 742N of 2014, People versus Daniel Ramos.

7          Let the record reflect that all parties are present.

8                    People ready?

9                    MR. PERRI:  Yes, your Honor, People are

10         ready.

11                   THE CLERK:  Defense counsel ready?

12                   MR. BERGER:  Yes, your Honor.

13                   THE CLERK:  And Detective, you're reminded

14         you're still under oath.

15                   THE WITNESS:  Yes.

16                   THE COURT:  Okay, Mr. Berger, you can

17         continue.

18    CROSS-EXAMINATION

19    BY MR. BERGER:  (CONTINUED)

20         Q.   Detective, you said you sat down at a computer and

21    started to type what you say Mr. Ramos said to you, correct?

22         A.   Yes.

23         Q.   Is what's contained on People's 5 a verbatim

24    statement of what he said?

25         A.   It is.

J.H.

1   Q.   So you may have asked various questions, you wrote

2   down or typed down -- typed verbatim what he was saying to

3   you?

4   A.   Yes.  I might have asked him to explain something

5   to me, but when he explained it, I typed what he said.

6   Q.   Exactly word-for-word?

7   A.   Yes.

8   Q.   So let's go back a few minutes.  By the way, when

9   you -- withdrawn.

10       When you were engaging in this process of asking

11  questions and typing down what he said, was anybody else

12  present in the room?

13  A.   No.

14  Q.   Well, now, a few minutes earlier, you told us --

15  you told us before on direct examination -- by the way, did

16  you tell the defendant what he was accused of?

17  A.   I'm sorry, you mean the charge?

18  Q.   Yes.

19  A.   I don't think I told him the charge.

20  Q.   Didn't you say before that he denied that anything

21  happened?

22  A.   Yes.

23  Q.   What did he say that in response to?

24  A.   To Crystal saying get the fuck out.

25  Q.   No.  You told us that he told you he denied that

Det. M. Baran - People - Cross          149

1    anything happened.

2              MR. PERRI:  Objection.

3         A.   I don't --

4              THE COURT:  Sustained.  Just to put some

5    context, Mr. Berger.  Ask another question to set up

6    the context.

7         Q.   Didn't the defendant tell you during the course of

8    your interaction with him that he denied that anything

9    happened to the girl?

10        A.   No.

11        Q.   So let's go back at 2340 when you say you had a

12   conversation with him in the room, and you asked him about

13   what language he wished to be communicated in, correct?

14        A.   No.

15        Q.   Didn't it come about when he said he wanted to

16   have the rights card read in Spanish?

17        A.   I'm sorry, I don't understand.  Didn't what come

18   about?

19        Q.   The rights cards was read to him by whom?

20        A.   Detective Pacheco.

21        Q.   Who speaks Spanish?

22        A.   Yes.

23        Q.   How did that come about?

24        A.   I asked him which language he felt more

25   comfortable getting his rights in, English or Spanish.

J.H.

1    Q.    You used the word rights, you said which language

2    would you be more comfortable getting your rights in?

3    A.    Yes.

4    Q.    And he said Spanish?

5    A.    Yes.

6    Q.    Did you ask him which language he would be more

7    comfortable being interviewed in?

8    A.    Yes.

9    Q.    And what did he say?

10   A.    He says he could try to talk to me in English.

11   Q.    He could try to talk to you in English is what he

12   said?

13   A.    Yes.

14   Q.    Now, he had already told you that he was more

15   comfortable in getting his rights in Spanish.  Did you

16   attempt to get a Spanish-speaking detective to come in and

17   interview him?

18   A.    No.

19   Q.    Even though he told you he would try to talk to

20   you in English, correct?

21   A.    That's correct.

22   Q.    It's clear to you, is it is not, both then and

23   now -- well, withdrawn.

24         It's clear to you that he was a Spanish-speaking

25   person, that was his native language, correct?

J.H.

1      A.    Yes.

2      Q.    And that he was more comfortable speaking Spanish,

3   correct?

4      A.    I don't know that he was more comfortable speaking

5   Spanish.

6      Q.    When you testified about People's 6 in evidence,

7   which was the apology letter, correct?

8      A.    Yes.

9      Q.    You asked him to do that?

10     A.    I asked him if he would like to do that.

11     Q.    You asked him if he would like to write an apology

12  letter?

13     A.    Write a letter.

14     Q.    And he said what?

15     A.    Yes.

16     Q.    And did you have that letter written in the same

17  manner in which you took the statement by sitting at the

18  computer and having him tell you in English what he wanted

19  to say?

20     A.    Obviously not.

21     Q.    You didn't do that, did you?

22     A.    No.

23     Q.    You had him write it in his language that he felt

24  more comfortable writing, correct?

25     A.    Gave him a piece of paper and a pen at his

Det. M. Baran - People - Cross          152

1    request.

2         Q.   And he wrote it in Spanish, correct?

3         A.   Yes.

4         Q.   Even though you spoke to Crystal, and she's an

5    American, correct?

6              MR. PERRI:  Objection.

7         A.   I don't know.

8              THE COURT:  Overruled.  Do you have any idea?

9              THE WITNESS:  No.

10        Q.   She spoke to you in English; did she not?

11        A.   Yes.

12        Q.   Did she have a Spanish accent?

13        A.   She had some kind of slight accent.

14        Q.   Can you tell us what it was?

15        A.   No.

16        Q.   So let's go back to 2340.  Were you there with

17   anybody else at that time?

18        A.   Yes.

19        Q.   Who was that?

20        A.   Detective Pacheco.

21        Q.   And was Detective Pacheco there because he spoke

22   Spanish?

23        A.   Detective Pacheco was there because he was

24   available.  He spoke Spanish, and we normally give Miranda

25   rights with a second detective witnessing it.

J.H.

Det. M. Baran - People - Cross        153

1    Q.    I'm sorry, you normally give what was that?

2    A.    Miranda rights to a second detective present, with

3    a second detective present.

4    Q.    Now, were you and Detective Pacheco in this arrest

5    room before -- together before anything was said to the

6    defendant?

7    A.    No.

8    Q.    You were in there first?

9    A.    Yes.

10   Q.    So is it at that time you said to him which

11   language would you prefer to have your rights read to you

12   in?

13   A.    No.

14   Q.    What happened first?

15   A.    I asked him if he needed anything to drink or eat

16   or use the bathroom.

17   Q.    After that.

18   A.    I said, we're -- I'm going to read you your

19   rights.  Do you prefer them being read to you in English or

20   Spanish?

21   Q.    And he said, Spanish, correct?

22   A.    Yes.

23   Q.    And you did that without even telling him what he

24   was charged with?

25   A.    Correct.

1    Q.   Did you ever tell him what he was charged with?

2    A.   I don't recall doing so.

3    Q.   Did you ever directly ask the defendant if he

4 licked her vagina?

5    A.   No, I did not.

6    Q.   Did you ever tell him that that's what he was

7 being charged with?

8    A.   No, I did not.

9    Q.   So after he tells you that he would prefer to have

10 his rights read to him in Spanish, is that when you got

11 Detective Pacheco?

12    A.   Yes.

13    Q.   Now, Detective Pacheco comes into the room at

14 approximately what time?

15    A.   I'm going to guess at the same time, 2338, 2339.

16    Q.   When was it that you first saw the defendant in

17 the after room that night?

18    A.   About 2335, 2336.

19    Q.   So Detective Pacheco was available pretty readily;

20 was he not?

21    A.   Yes.

22    Q.   And you say Detective Pacheco read something from

23 a rights card, the Spanish portion, correct?

24    A.   He appeared to be reading from the Spanish portion

25 of the rights card.

J.H.

1    Q.    But since you don't speak Spanish, you don't know
2    what he said, do you?
3    A.    Correct.
4    Q.    Now, you signed -- you signed People's 4 in
5    evidence as a witness, correct?
6    A.    Yes.
7    Q.    But you -- but you signed -- what were you
8    witnessing?
9    A.    That the defendant had signed his name three
10   places.
11   Q.    You are not witnessing that he waived his rights,
12   are you?
13   A.    I'm just signing that I witnessed him signing the
14   card in three different places.
15   Q.    Right.
16   A.    And I do know the word, Si.  I mean that's
17   probably one of the few Spanish words I do know, and I hear
18   him say, Si, on two occasions.  And, I'm sorry, and I saw
19   him write the word, Si, immediately after saying the word,
20   Si.
21   Q.    And how long did that process take?
22   A.    Two minutes.
23   Q.    And then what happened?  Did you ask Detective
24   Pacheco to leave?
25   A.    No.

1    Q.    Did he remain inside the room?

2    A.    For a moment.

3    Q.    What does that mean?

4    A.    A short time.

5    Q.    What does that mean, a minute?

6    A.    Maybe a minute.

7    Q.    Ten minutes?

8    A.    Not 10 minutes.  Maybe a minute.

9    Q.    He wasn't there when you started to question,

10   correct?

11   A.    He was there when I started to question, and he

12   was on the way out once we had a conversation going.

13   Q.    Do you remember what portion of what you said to

14   the defendant Detective Pacheco was present for?

15   A.    He was present when I asked the defendant if he

16   would want to give a statement to have his version of what

17   happened attached to all the paperwork.  And I asked him I'm

18   not sure -- and Pacheco was there when I said, Do you want

19   to do it in English or do you want to do it in Spanish, and

20   he said, I'll try in English.

21         And I think at that point Detective Pacheco left

22   and said, Call me if you need me.

23   Q.    So he said to you he would try to in English,

24   correct?

25   A.    Yes.

1    Q.   And still you haven't told him what it is he's

2    charged with?

3         A.   He didn't ask me.

4         Q.   What is that you wanted him to tell you a

5    statement about?

6              MR. PERRI:   Objection.

7              THE COURT:   Sustained.

8         Q.   Did you indicate to him in any way what it was

9    that you wanted the defendant to give you a statement about?

10        A.   Yes.

11        Q.   What did you say to him?

12        A.   What happened today with Mya?

13        Q.   And what did he say?

14        A.   Before the statement part are you asking me?

15        Q.   Yes.

16        A.   He said that he was just playing with her and he

17   was tickling her and he tickled her with his mouth.

18        Q.   And did you write that down?

19        A.   No.

20        Q.   So he told you that he just tickled her with his

21   mouth, correct?

22        A.   Yes.

23        Q.   But he didn't tell you where he tickled her with

24   his mouth?

25        A.   At that point, no, he did not.

Det. M. Baran - People - Cross        158

1       Q.    Did you ever offer him a Spanish-speaking

2   detective to talk to when he was going to give this

3   statement?

4       A.    I don't know how you use the word offer.

5       Q.    Detective, he told you when you asked him would he

6   rather have his rights in English or Spanish, and he told

7   you Spanish, correct?

8       A.    Yes.

9       Q.    So did you offer him the same option when it came

10  to telling you what it was that happened that day?

11      A.    Yes.

12      Q.    You did?

13      A.    Yes.

14      Q.    You offered him a Spanish-speaking detective?

15      A.    No.   I asked him does he want to tell me what

16  happened, does he want to talk in English or Spanish.

17      Q.    You did give him that option?

18      A.    Yes.   I said that several times, counselor.

19      Q.    This is the question now.   He said to you he would

20  try in English, correct?

21      A.    Yes.

22      Q.    Those are his words?

23      A.    Yes.

24      Q.    Did that raise a question in your own mind that it

25  was not necessarily the best language he wanted to talk in?

1             MR. PERRI:  Objection.

2             THE COURT:  Sustained.

3             MR. BERGER:  And why is that objection

4        sustained?

5             THE COURT:  I am not going to give you my

6        reasons for sustaining objections.  It is sustained.

7             MR. BERGER:  It enhances the process if I can

8        be -- if it can be made clear to me exactly what is

9        wrong with the question.

10             THE COURT:  Counselor, ask your next

11        question.

12        Q.   So when he used the word, I'll try, did that

13   suggest to you that he might not be successful in talking in

14   English?

15             MR. PERRI:  Objection.

16             THE COURT:  I'm sorry, I didn't hear the

17        whole question, I'm sorry.

18        Q.   When he said to you, I'll try, did that suggest to

19   you at all that he might not be as effective in talking in

20   English than he would be in Spanish?

21             MR. PERRI:  Objection.

22             THE COURT:  Counselor, I'm just not sure

23        where you're going with whether it suggested something.

24        I'm trying to determine whether or not a statement was

25        given, whether it was based on a knowing and voluntary

1    waiver of Miranda.  What this detective thinks in his

2    head quite frankly is irrelevant to whether or not

3    where the People are proving here whether or not your

4    client has given a knowing, intelligent and voluntary

5    waiver.

6              MR. BERGER:  If we can excuse the detective,

7    I'll tell you why I think it would be relevant.

8              THE COURT:  Why don't you come up.

9              (The following occurs at sidebar outside of

10   the hearing of the jurors.)

11             MR. BERGER:  You have to determine how the

12   statement was given.  This is a relevant consideration

13   as to whether or not it was even given.  If he's trying

14   give it in English, he may be successful, he may not be

15   successful.

16             THE COURT:  I appreciate that.  But how does

17   this detective saying he might not have been successful

18   prove that point that I think you're getting to with

19   all of the questions?  It's irrelevant what he thought

20   as to whether or not the statement was actually made,

21   whether it's his statement and whether it was after a

22   knowing and voluntary and intelligent waiver.

23             MR. BERGER:  This has to go to the

24   credibility of this detective.  The question I have if

25   I'm questioning somebody I'm making sure they speak the

1    language very well.  Wouldn't you want to get an

2    accurate statement from somebody who prefers to speak

3    in Spanish?

4              THE COURT:   But that's not the point here.

5    That's not the point of this hearing.  The point of

6    this hearing is whether or not this statement that is

7    before me was, one, made by your client, and two, also

8    was it made after a knowing, intelligent, voluntary

9    waiver and if the contents of the statement are

10   actually statements of your client or at least adopted

11   by him.

12             MR. BERGER:   If the better practice is giving

13   him a choice to speak in Spanish or not and he fails to

14   do that, that's reflective of whether or not what he

15   has put down in the statement is accurate or not and

16   whether or not he intended to give an accurate

17   statement.

18             THE COURT:   But the better practice isn't

19   what's on trial at this hearing, and you have made --

20   you've already established that your client, I believe

21   it, said I will try, and that statement's given in

22   English.  It's been established.  What his thought

23   process was to the better practice, I don't see it

24   being relevant.

25             MR. BERGER:   It's relevant because he is not

1      interested in getting a truthful statement.

2              THE COURT:  You can argue that.

3              MR. BERGER:  But I want him to be able to say

4      to me I didn't -- I didn't even consider it.  Let him

5      say I didn't consider it.  I asked him whether he did

6      even consider giving him the option when he said he

7      would try.  Try means an effort, but he may not

8      succeed.

9              THE COURT:  You've already established that.

10     He asked him would he like to talk to me in English or

11     Spanish, and he said, I will try, in English, and

12     that's how the statement was taken.  It's all been

13     established.

14             So going down the road of a better practice

15     and whether he even contemplated letting him speak in

16     Spanish, you're forgetting the rest of the testimony

17     that you haven't gotten to cross him on yet which is

18     the whole point when they start to do the whole read

19     back process, at some point other officer comes back in

20     for the read back process.  So you haven't gotten to

21     that part yet.

22             But to now spend time to discuss the better

23     practice, I just don't see that is relevant to what I

24     have to decide.

25             MR. BERGER:  Because you have to decide,

1    getting back to what you originally said, you have to

2    decide whether or not he gave this statement.

3              THE COURT:  Okay.

4              MR. BERGER:  So when somebody ignores better

5    practice in order to show you, A, beyond a reasonable

6    doubt, I'm telling you that he took this statement

7    after the rights, that has to be beyond a reasonable

8    doubt, that we did everything to make sure that this

9    was going to be as accurate as possible.  And not only

10   that, it's a red flag when he says I'll try to speak in

11   English.

12             THE COURT:  I don't disagree with that

13   statement that you just made that I'll try, and it is

14   something I have to consider.

15             MR. BERGER:  So if his intentions are to get

16   a fair and accurate statement and he refuses to do the

17   better practice, that's something you should consider

18   with respect to his credibility here.

19             THE COURT:  But he's already told you he

20   didn't bring in a Spanish-speaking person for the

21   statement.  They did it in English.  I don't know where

22   else we are going with this.

23             MR. BERGER:  That he deliberately ignored a

24   better practice.

25             THE COURT:  Sure, go ahead and ask the

1    question.

2              MR. PERRI:  Your Honor, the focus of the

3    entire hearing is the effect of the police's actions

4    and actual statements on the defendant's ability to

5    understand his rights, to waive his rights and to give

6    a statement.  It's not what is going on in the police

7    officers' heads.  The defendant's not privy to that.

8    There's no reason to get into the detective's

9    decision-making process in interacting with --

10             THE COURT:  I agree wholeheartedly, but to

11   move this case forward, I am going to allow Mr. Berger

12   to ask if he contemplated him bringing a Spanish

13   speaking person to take the statement.  Once we get an

14   answer, we will move on because it is not relevant for

15   purposes of the hearing.

16             MR. PERRI:  Yes, your Honor.

17             (The following takes place in open court.)

18   CROSS-EXAMINATION

19   BY MR. BERGER:  (CONTINUED)

20        Q.   Detective, when he told you that I would try, did

21   you consider the fact of bringing in a Spanish-speaking

22   detective at that time?

23        A.   If he faltered, failed or otherwise couldn't

24   express himself, I was prepared to ask Detective Pacheco to

25   come back in.

J.H.

1          Q.    I'm saying at that time.

2          A.    At that time when he said, I'll try, I made the

3     decision that we'll try, and if he falters, fails or can't

4     express himself, I will bring back Detective Pacheco.

5          Q.    Now, since you didn't videotape or audiotape this

6     confession, we have only your testimony as to what actually

7     was said by the defendant, correct?

8          A.    That's correct.

9                THE COURT:  Mr. Berger, I didn't realize the

10          time.  You can keep going.  Find a convenient place to

11          break in the next couple of minutes.

12               MR. BERGER:  Can we come up for a second?

13               THE COURT:  Sure.

14               (A discussion was held off the record at the

15          bench.)

16               THE COURT:  All right, back on the record.

17          Detective, we're going to suspend the hearing at this

18          time.  There is a holiday that requires people to leave

19          a little early today.  So we are going to allow for

20          that to happen.

21               You're in the middle of cross.  You know,

22          don't speak with the prosecutor.  I will see you next

23          Tuesday on October 7th.  And when I say don't speak to

24          the prosecutor, I mean simply about your testimony.

25          I'll see you next Tuesday, October 7th.

1          Do we have a time, Mr. Berger, that you can

2    be here, 10 o'clock?

3          MR. BERGER:  I can probably be here at 10.  I

4    have to make sure I take care of my other cases.

5          THE COURT:  Let's put it down at 10 o'clock.

6    If that's going to be a problem, please call us Monday,

7    and let us know so we can adjust the schedule.  Thank

8    you so much.

9    *         *         *         *         *         *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J.H.

1   STATE OF NEW YORK  :  NASSAU COUNTY

2     SUPREME COURT  :  PART 44

3   ----------------------------------------X

4   THE PEOPLE OF THE STATE OF NEW YORK,

5       -against-           Ind. No. 742N-14

6   DANIEL RAMOS,

7               Defendant.

8   ----------------------------------------X

9   HEARING

10              October 7, 2014
                262 Old Country Road
11              Mineola, New York

12   B E F O R E :

13      HON. TERESA K. CORRIGAN,
         Acting Supreme Court Justice
14

15

16   A P P E A R A N C E S :

17      HON. KATHLEEN M. RICE
        Nassau County District Attorney
18        BY:  ANTHONY PERRI, ESQ., of Counsel
        Assistant District Attorney
19             For the People

20

21      HON. KENT V. MOSTON
      Nassau County Legal Aid Society
22        40 Main Street
        Hempstead, New York  11550
23      BY:  MICHAEL BERGER, ESQ., of Counsel
            For the Defendant
24

            JOANNE HORROCKS, CSR
25            Senior Court Reporter

1          THE CLERK:  Indictment 742N of 2014, People

2     versus Daniel Ramos on for a continued hearing.  Let

3     the record reflect a that all parties are present.  A

4     sworn Spanish interpreter is present.

5          Are the People ready to proceed?

6          MR. PERRI:  Yes, your Honor.

7          THE CLERK:  Defense counsel ready?

8          MR. BERGER:  Yes, your Honor.

9          THE CLERK:  And Detective Baran, you are

10     reminded you're still under oath.

11          THE WITNESS:  Yes.

12          THE COURT:  All right, when we last broke,

13     Mr. Berger, you were in the middle of your cross.

14     Please continue.

15          MR. BERGER:  Thank you.

16   D E T .   M A U R I C E   B A R A N, a witness called on

17     behalf of the People, after having been previously duly

18     sworn by the Clerk of the Court, was examined and

19     testified upon his oath as follows:

20   CROSS-EXAMINATION

21   BY MR. BERGER:  (CONTINUED)

22     Q.   Detective, drawing your attention to an area I

23   asked you about last week, you told me that you and Officer

24   Pacheco had been in the District Attorney's office prior to

25   your testimony discussing the case.  Do you recall that?

J.H.

Det. M. Baran - People - Cross          169

1      A.   Yes.

2      Q.   Now, did the subject matter of those conversations

3   with Mr. Perri include the giving of the rights to

4   Mr. Ramos?

5      A.   No.

6      Q.   Did the subject matter of those discussions

7   include the taking of the statement of Mr. Ramos?

8      A.   Yes.

9      Q.   And it included the circumstances of the taking of

10  the statement; is that correct?

11     A.   Yes.

12     Q.   And you heard Officer Pacheco say what he

13  remembered about the taking of the -- the circumstances of

14  the taking of the statement, correct?

15     A.   Yes.

16     Q.   And did those conversations have the effect of

17  refreshing your recollection concerning those matters?

18          MR. PERRI:  Objection.

19          THE COURT:  Only because I don't think I

20     understood the question.

21     Q.   Did the conversation that you heard of Officer

22  Pacheco telling Mr. Perri about the circumstances of the

23  taking of the statement have the effect of refreshing your

24  recollection concerning what happened the day that you took

25  the statement?

J.H.

1         MR. PERRI:  Objection.  The witness has never

2    said he didn't remember, your Honor.

3         THE COURT:  Sustained.

4         MR. BERGER:  He doesn't have to say that,

5    Judge.  All --

6         THE COURT:  I don't think you have laid any

7    foundation for such a question though, Mr. Berger.

8         MR. BERGER:  If he had read a document, I

9    could ask him if that helped refresh his recollection.

10   It doesn't matter whether he -- this is cross, not

11   direct.

12        In fact, your Honor, Mr. Perri asked the

13   witness before this detective to look at a document

14   where the witness didn't even say he needed his

15   recollection refreshed.  Nevertheless, it was shown to

16   that witness.

17        THE COURT:  I understand that, Mr. Berger.

18   Right now, we are at a point when we left off last

19   week, we weren't at this area.  I'm not saying you have

20   to pick up where you left off last week.  You most

21   certainly don't.  But I don't have any, as I see it,

22   foundation before me for that question being asked.  I

23   think it's an appropriate objectionable question.  I'm

24   not saying it might not become appropriate down the

25   line, but at this point in time, the objection is

Det. M. Baran - People - Cross          171

1    sustained.

2              MR. PERRI:  Your Honor, just with reference

3    to defense counsel's comment that you sustained defense

4    counsel's objection with respect to showing Officer

5    Boccio the document, the officer was not shown the

6    document.  It was never put into evidence.

7              MR. BERGER:  That is not what happened,

8    Judge.  But I won't argue that point now.

9              THE COURT:  Ask your next question.

10              MR. BERGER:  This is cross-examination.

11   CROSS-EXAMINATION

12   BY MR. BERGER:  (CONTINUED)

13       Q.   Did any of the conversation you had with Mr. Perri

14   refresh your recollection about the circumstances of what

15   happened on the day you questioned the defendant?

16              MR. PERRI:  Objection.

17              THE COURT:  Sustained.

18              MR. BERGER:  And is that because of a

19   foundation problem, Judge?

20              THE COURT:  That is because of everything I

21   have already discussed with you this morning.

22       Q.   Drawing your attention to the time when you say

23   you were taking the statement from the defendant, did you

24   read the entire statement to him in English aloud?

25       A.   No.

J.H.

1      Q.    Did anybody read the statement to him in Spanish
2   aloud?
3      A.    Yes.
4      Q.    And who was that?
5      A.    Detective Pacheco.
6      Q.    How do you know he read the entire statement to
7   him?
8      A.    I don't.
9      Q.    So what you're saying is Detective Pacheco read
10   something to him in Spanish, correct?
11      A.    Correct.
12      Q.    What that was, you're not sure?
13      A.    That's correct.
14      Q.    Did -- by the way, is it Officer Pacheco or
15   detective?
16      A.    Detective.
17      Q.    Did Detective Pacheco say anything to Mr. Perri in
18   your meeting with him last week about the statement and
19   having read it to him?
20      A.    Yes.
21      Q.    What did he say?
22      A.    He said that he initialed the corrections while he
23   was reading -- to the best of my recollection, he said he
24   initialed the statement corrections while reading it to him.
25      Q.    When you say to the best of your recollection,

Det. M. Baran - People - Cross          173

1    does that mean you don't have a good recollection about it?

2          A.    It means that it was several days ago, and I could

3    be mistaken as to the exact words that he used.

4          Q.    Well, so, I'm asking you whether or not you heard

5    Detective Pacheco say to Mr. Perri that he read the entire

6    statement to him in Spanish.

7          A.    Yes.

8          Q.    You heard that?

9          A.    Yes.

10         Q.    So there's no question about your recollection on

11   that point, correct?

12         A.    Correct.

13         Q.    So what is it that you have a question about with

14   respect to your recollection?

15         A.    His wording about the explanation of his putting

16   his initials on the document.

17         Q.    But you don't speak Spanish, correct?

18         A.    Correct.

19         Q.    How do you know he read the entire statement to

20   him?

21               MR. PERRI:  Objection.

22               THE COURT:  Sustained.  We already have that

23         this detective said he read something to him in

24         Spanish.

25         Q.    So you don't know that he read the entire

J.H.

1    statement, do you, Detective?

2         A.   That's correct.

3         Q.   How much time did you -- did it take for Detective

4    Pacheco to read anything in Spanish to the defendant?

5         A.   I don't recall.

6         Q.   Can you estimate?

7         A.   Between two and 12 minutes.

8         Q.   During the course of his reading or what you say

9    was reading Spanish to him, did the defendant ever interrupt

10   him?

11        A.   I don't recall.

12        Q.   Well, now, you say you remember him reading

13   something to him in Spanish, correct?

14        A.   Correct.

15        Q.   And you have estimated that it took between two

16   and 12 minutes, correct?

17        A.   Correct.

18        Q.   And you're sitting there watching this happen,

19   correct?

20        A.   I'm standing there watching it happen.

21        Q.   Or standing there.

22             And during the course of that two to 12 minutes,

23   you don't recall whether or not the defendant interrupted

24   him to say anything?

25        A.   That's correct.

1   Q.   But you say he, Detective Pacheco, asked him to

2   initial certain parts of the statement?

3   A.   No.

4   Q.   He never asked him to do that?

5   A.   No.

6   Q.   You did, you say?

7   A.   Yes.

8   Q.   Now, you told us that the defendant read the top

9   portion of the statement having to do with his personal

10  pedigree information; do you remember telling us that last

11  week?

12  A.   Yes.

13  Q.   And then you never really heard him read the rest

14  of the statement, correct?

15  A.   I heard him read the parts of the statement where

16  there are corrections, but the rest was in an undertone.

17  Q.   In other words, the three areas, not counting the

18  social security part, the three areas you're saying you

19  heard the defendant read those portions aloud, correct?

20  A.   Yes.

21  Q.   But none of the rest of the statement?

22  A.   Correct.

23  Q.   And was Detective Pacheco there as well when that

24  happened?

25  A.   I don't remember.  I don't think so.

J.H.

1    Q.   Well, did the part where you asked the defendant
2    to make these corrections in those three areas, did that
3    happen when Detective Pacheco was there?
4    A.   I don't remember, but I don't think so.
5    Q.   The part when you say Detective Pacheco read
6    something in Spanish to him, was that before or after these
7    corrections were made?
8    A.   After.
9    Q.   So was Detective Pacheco there at any time during
10   your questioning of the defendant and your typing down this
11   statement what's marked 5 in evidence?
12   A.   Maybe just for the first minute or two of our
13   conversation, and then he went out.
14   Q.   So when the defendant said to you, when you asked
15   him if he could speak to you in English and he said he would
16   try, was Detective Pacheco there at all?
17   A.   Yes, I believe he was.
18   Q.   And when did Detective Pacheco leave the
19   interrogation room?
20   A.   At some point during our conversation.  I didn't
21   note it.
22   Q.   Were you typing at the computer at that point?
23   A.   I don't recall.
24   Q.   Was there anything said by him or you, that is
25   Detective Pacheco and you as to the fact that he was going

J.H.

1    to leave the room?

2         A.   I think I gave him an indication that I'm okay,

3    but I don't recall what that indication would have been or

4    was.

5         Q.   And then he left?

6         A.   Yes.

7         Q.   And did you give him that indication after the

8    defendant said he would try to communicate with you in

9    English?

10        A.   Yes.

11        Q.   So you did not ask Detective Pacheco to remain

12   there to assist you in case the communication was not

13   successful in English by the defendant?

14        A.   It's my recollection that he stayed until there

15   was communication, and then I gave him a signal or a word or

16   comment, and then he left.

17        Q.   At that time when you gave him that signal, had

18   you begun to type already?

19        A.   I don't recall.

20        Q.   Well, approximately where were you in the

21   interrogation process when you indicated to Detective

22   Pacheco that he could leave?

23        A.   That's the same question.  I don't recall at what

24   point I was at.  I don't recall if I was typing at that

25   point or just having a conversation with the defendant.

Det. M. Baran - People - Cross          178

1    Q.    Drawing your attention back to the hospital for a
2    moment, I believe you told us last week that you had asked
3    Mya if this had ever happened before.  Do you remember
4    testifying to that?
5    A.    Yes.
6    Q.    What did she say?
7    A.    She indicated that it had.
8    Q.    Well, what do you mean, she indicated?  What did
9    she say?
10   A.    I don't recall her words.  She may have nodded.
11   She may have said yes.  I don't recall.
12   Q.    Did you ask her when it had happened?
13   A.    No.
14   Q.    Did you ask her where it had happened before?
15   A.    The subject already spoken about was his eating
16   her coochie.  That was the subject.  So when I said to her,
17   has it, the subject still remained his putting his mouth on
18   her vagina.
19   Q.    I understand that.  But when you asked her, and
20   you don't recall whether she nodded or said yes, correct?
21   A.    Correct.
22   Q.    Was anybody else in the room at that time?
23   A.    No.
24   Q.    And you made no note about that, did you?
25   A.    Correct.

1     Q.   And that's something you remember of your own

2    independent recollection, correct?

3     A.   Correct.

4     Q.   And yet while you say you remember it, you don't

5    remember whether she uttered a sound or whether she nodded

6    her head; is that correct?

7     A.   Correct.

8     Q.   And you asked no follow-up questions to that

9    response; is that right?

10     A.   That's correct.

11     Q.   Did you ask her at that time what preceded the

12   action of, He ate my coochie?  Did you ask her what preceded

13   that between the defendant and her?

14     A.   No.

15     Q.   Did you ask any circumstances about what had

16   happened other than that general statement that, He ate my

17   coochie?

18     A.   No.

19     Q.   I believe you answered this, but when you

20   interviewed Crystal Ramirez, did you make any notes at that

21   time?

22     A.   No.

23     Q.   You mentioned Police Officer Tedeschi last week.

24   Do you recall?

25     A.   Yes.  I believe it's pronounced Tedeschi.

1    Q.    Tedeschi.  Did he have any contact with Mya?

2    A.    I don't know.

3    Q.    Who had the conversation with Mya with respect to

4    why she didn't say anything about this earlier?

5              MR. PERRI:  Objection.

6              THE COURT:  If you understand the question,

7    I'll take the answer.

8              THE WITNESS:  I'm not sure I understand his

9    question.

10   Q.    Didn't you testify last week that somebody asked

11   Mya why, if this happened before, she didn't say anything?

12   A.    I don't recall testifying about that.

13   Q.    Just so the record is clear, today's Tuesday.  You

14   testified last Friday.  And you're telling us that you don't

15   remember saying that Mya was asked why she didn't say

16   anything before this time as to these actions happening, and

17   you don't recall what you testified to with respect to her

18   answer?

19   A.    I don't remember that being discussed.  I know

20   it's in Crystal's statement, but I don't recall discussing

21   it on Friday or any other date for that matter.

22   Q.    You don't remember testifying about that subject

23   matter is what you are saying?

24             MR. PERRI:  Objection.

25             THE COURT:  Overruled.  You don't remember?

1          THE WITNESS:  That's correct.

2     Q.    Let me ask you you say that -- withdrawn.

3          Did you engage in a conversation with the

4    defendant prior to starting to type People's 5?

5     A.    Yes.

6     Q.    And how long did that conversation take?

7     A.    Three to four minutes, I estimate.

8     Q.    I'm sorry?

9     A.    Three to four minutes.

10     Q.    What was the subject matter of that three to four

11    minute conversation?

12     A.    The incidents that happened earlier that day

13    between he and Mya.

14     Q.    How did that conversation begin?

15     A.    Do you want to tell me what happened?

16     Q.    And then what did he say?

17     A.    I don't remember the exact order of what he said,

18    but in sum and substance, he said he went into the house to

19    help Mya with homework.  I think he made some disparaging

20    comment about Crystal.

21          And then he said that he was just tickling the

22    girl with his mouth.  He wasn't -- he didn't do anything --

23    anything else to her other than that.

24          At that point I stopped our conversation and

25    started -- and loaded the program on the computer.

1    Q.    What did he say he was tickling with her mouth?

2    A.    Her vagina.

3    Q.    He used that word?

4    A.    I don't remember what word he used.  I think he

5    used the word pussy, but I have to remind myself.

6    Q.    How would you remind yourself?

7    A.    By rereading the statement.

8    Q.    So you're saying that the conversation that took

9    place at three or four minutes is identically placed on the

10   written statement here?

11   A.    That comment is placed because he repeated it to

12   me while I was typing.

13   Q.    What did he repeat to you?

14   A.    I would have to look at the statement to refresh

15   my memory exactly.

16   Q.    So as you sit here now, without looking at the

17   statement, you don't have a specific recollection of exactly

18   what he said in that regard; is that true?

19   A.    Not that I want to testify to.

20   Q.    In other words, you don't have a specific

21   recollection about it, correct?

22   A.    Not that I want to testify to.

23   Q.    And by that, you mean because you're not sure

24   about it, you don't want to say it under oath, correct?

25   A.    Correct.

1    Q.    Now, you told us on Friday that what is contained

2  on People's 5 is a verbatim statement of Mr. Ramos, correct?

3    A.    Yes.

4    Q.    Now, how is it that the social security number was

5  written down in error at the top?

6    A.    I just typed it too quickly and got the wrong

7  numbers.  I think -- I think he gave me the wrong numbers,

8  and then when he had a chance to view them, he saw that they

9  were incorrect.  He was giving to them to me off the top of

10 his head.  He was struggling and little bit, and he gave me

11 the wrong numbers.

12        Then when he actually saw it, when he actually saw

13 it, he told me the correct numbers, and I told him to line

14 out the incorrect social and to put the correct social

15 underneath it.

16   Q.    And when was it that he made that correction,

17 after you had completed the typing of the statement?

18   A.    Yes.

19   Q.    And that -- I believe you indicated that first

20 paragraph is the one that he read aloud to you?

21   A.    Yes.

22   Q.    And he told you that Crystal had asked him to buy

23 Longed Island Iced Tea so she could drink?

24   A.    Yes.

25   Q.    He told you that he encouraged her to keep the

J.H.

1    doors closed so the smoke from cigarettes would not go

2    inside the house and hurt the kids?

3         A.   Yes.

4         Q.   And he told you that he helps them with their

5    homework?

6         A.   Yes.

7         Q.   Now, he told you that I pulled down her pants and

8    underwear, and I tickled her pussy with my mouth?

9         A.   Yes.

10        Q.   Those were his exact words?

11        A.   Yes.

12        Q.   Did you ask him why he did that?

13        A.   No.

14        Q.   Did you ask him if he had ever done that before?

15        A.   I have to say no, I don't recall asking that

16   question.

17        Q.   Did you ask him why he did that?

18        A.   No.

19        Q.   Did he say to you that the little girl was scared

20   of her mother?

21        A.   I don't recall.  I'd have to review the statement

22   again.

23        Q.   During your typing of People's 5, was Detective

24   Pacheco in the room at any time?

25        A.   Not that I recall.

J.H.

1    Q.    So you're saying he may have been, but you don't

2  remember now?

3    A.    It's a no, but I'm hesitant to -- he might have

4  come into the room for a moment to hand me a note or

5  something.  I don't want to --

6    Q.    Other than that, other than handing you a note,

7  you don't have a specific -- withdrawn.

8         Do you have a specific recollection of him doing

9  that?

10   A.    No.

11   Q.    Do you have a specific recollection as you sit

12 here now for Detective Pacheco being in the room while you

13 were typing this statement?

14   A.    I don't have a specific recollection, but he might

15 have stayed in the room until I started typing and then

16 left.

17   Q.    Subsequent to his leaving when you gave him a

18 signal of some sort, right, you said you gave him a signal

19 of some sort to leave, right?

20   A.    Yes.

21   Q.    And you told us it took what, about 45 minutes for

22 you to type this?

23   A.    I'm estimating it probably took about 45 minutes.

24   Q.    And in that period of time subsequent to his

25 initially leaving, did he ever come back?

J.H.

1       A.   Well, I don't recall his coming back, but he may

2   have come back in to give me a note or relay a message to

3   me.

4       Q.   Now, when you finished the statement, did you ask

5   the detective to read it to him in Spanish?

6       A.   No.

7       Q.   But you say there came a time when Detective

8   Pacheco started reading something in Spanish to him,

9   correct?

10       A.   Yes.

11       Q.   And when he was reading something in Spanish, was

12   he holding either the original or a copy of what's now

13   People's 5 in evidence?

14       A.   He was holding the original up to his face.

15       Q.   And how long did he read in Spanish?

16       A.   I'd have to only estimate.

17       Q.   Give us an estimation.

18       A.   Three to 12 minutes.

19       Q.   That's your estimation, three to 12 minutes?

20       A.   Somewhere between three and 12 minutes.

21       Q.   Did you ask Detective Pacheco to do that?

22       A.   To do what?

23       Q.   To read the statement to him.

24       A.   Yes.

25       Q.   Why did you do that?

1          MR. PERRI:  Objection.

2          THE COURT:  Overruled.

3      A.   Because I asked the defendant if he wants it now

4  read to him again in Spanish.

5      Q.   Again in Spanish?

6      A.   Well, not again in Spanish, but if he wants the

7  statement read again in Spanish.

8      Q.   But you hadn't read it to him the first time.

9      A.   Correct.

10     Q.   So what was the again about?

11     A.   He had read it.

12     Q.   You don't know that he read it; you know that he

13  held it up, correct?

14     A.   Well, I know -- are we speaking about the

15  defendant right now?

16     Q.   Yes.

17     A.   I know that he held it up, and he pointed out

18  mistakes.  But I don't know if he was actually reading it or

19  just found those three mistakes randomly.

20     Q.   Who pointed out the mistakes, you or the

21  defendant?

22     A.   I believe he did.

23     Q.   When you say, I believe, are you certain about

24  that?

25     A.   I'm certain about absolutely one of the mistakes.

J.H.

Det. M. Baran - People - Cross          188

1        Q.    What, the social security number?

2        A.    Besides the social security number, the little

3   girl, the word girl.

4        Q.    So you're saying that while he wasn't speaking out

5   loud, he noticed a mistake with respect to the word girl,

6   and he pointed that out to you?

7        A.    Yes.

8        Q.    How about the other two?

9        A.    I don't have a clear recollection of that, so I'm

10  hesitant to testify to that.  But I remember specifically I

11  was surprised about him, the word girl.

12       Q.    So after that was corrected, what did the

13  defendant then do with the statement, if anything?

14       A.    He kept reading it.

15       Q.    But not aloud?

16       A.    No.

17       Q.    So you don't know that he was reading it, you just

18  know that he held it up in front of his face, right?

19       A.    Correct.

20       Q.    Now, after those three corrections were made, did

21  you ask him to sign the statement?

22       A.    No.

23       Q.    Who did?

24       A.    Well, I did ask him to sign it eventually but not

25  immediately after he read those -- the statement and

J.H.

1    corrected the errors.

2         Q.    When was he asked to sign the statement?

3         A.    After Detective Pacheco read the statement to him

4    in Spanish.

5         Q.    Well, now, did you call or indicate in some way

6    that Detective Pacheco should come into the room and read

7    the statement?

8         A.    Yes.

9         Q.    In Spanish?  You did?

10        A.    Yes.

11        Q.    How did you do that?

12        A.    I don't recall.

13        Q.    Well, was he in the room when you asked him to do

14   that?

15        A.    No.

16        Q.    So did you have to leave the room to get him?

17        A.    Not necessarily.

18        Q.    Well, but of your -- do you recall how that

19   happened?

20        A.    It happened so many times, I don't specifically

21   recall this particular incident.  But I don't have to leave

22   the room for that to happen.

23        Q.    Why?  How would you communicate with him?

24        A.    Open the door and yell out, Ray.

25        Q.    So when he came in, what did you say to him?

J.H.

1     A.    Could you read the statement to the defendant in

2  Spanish.

3     Q.    Why did you do that?

4     A.    Because the defendant took up my offer of doing

5  it.

6     Q.    What offer?

7     A.    The offer to read it in Spanish.

8     Q.    When did you make that offer?

9     A.    After he finished reading the statement on his

10  own.

11     Q.    Well, after -- you don't know that he was reading

12  it, but at some point in time what did he do to indicate he

13  was not looking at it, reading it anymore, he put it down?

14     A.    He put the paper down and looked up at me.

15     Q.    At that point in time you asked him if he wanted

16  it reread to him in Spanish?

17     A.    Yes.

18     Q.    Why did you do that?

19          MR. PERRI:  Objection.

20          THE COURT:  Overruled.  I'll take it one more

21     time.

22     A.    It was a courtesy to him so he couldn't come back

23  later down the road and say that he didn't understand

24  anything that he was signing.  Those were actually two

25  separate answers.

J.H.

1      Q.    So you were not sure that he understood what was

2   in English here, correct?

3      A.    Oh, I was sure that he understood English very

4   well.

5      Q.    Then why did you ask Detective Pacheco to read it

6   in Spanish?

7                MR. PERRI:   Objection.

8                THE COURT:   Do you want to say the words one

9        more time?

10     A.    So that defendant could not come later and say he

11   does not understand English and sign something which he

12   didn't understand or had no idea what was written.

13     Q.    Well, Detective, you could have had Detective

14   Pacheco actually type the statement in Spanish too; couldn't

15   you have?

16     A.    Detective Pacheco was on another case at that

17   point in time, and in any case, this is my case.

18     Q.    So you don't get anybody in the office to get --

19   who speaks Spanish to come in and do it in Spanish?

20                MR. PERRI:   Objection.

21                THE COURT:   Sustained.

22     Q.    What other case was Detective Pacheco on?

23                MR. PERRI:   Objection.

24                THE COURT:   Sustained.

25                MR. BERGER:   That was his answer, Judge.

Det. M. Baran - People - Cross          192

1          THE COURT:  It doesn't matter what other case

2     he was on.  It has nothing to do with this hearing.

3          Q.   But wasn't the defendant being totally cooperative

4     with you?

5          A.   Yes.

6          Q.   So why did you have a belief that he would come

7     back at some later point and say he didn't understand?

8          MR. PERRI:  Objection.

9          THE COURT:  Sustained.

10         MR. BERGER:  Judge, can we excuse the witness

11     for a minute?

12         THE COURT:  We sure can.

13         (The witness exited the courtroom.)

14         THE COURT:  All right, the witness is out of

15     the room.  Yes, Mr. Berger?

16         MR. BERGER:  Judge, we have somebody whose

17     native language is Spanish.  That's clear.  The

18     statement is taken supposedly in English.  Supposedly

19     the defendant was going to try and give him an English

20     statement.  But now he calls in a detective who speaks

21     Spanish to read it to him, and he gives some excuse

22     about so he can't say later on that he didn't

23     understand, when if that were true, get a

24     Spanish-speaking detective to come in, take the

25     statement in Spanish, let the defendant read it in

1    Spanish and make the statement then.

2            But it seems really intuitively obvious here

3    that this detective is attempting to make excuses for

4    why, what is very obvious to me, that this statement is

5    being taken in a language is not the defendant's that

6    the People intend to use as a statement against him in

7    court.

8            And I can't inquire that there are serious

9    doubts that I suggest to this Court that it should have

10   concerning the taking of the statement?  And this

11   detective is now trying to cover what was from my

12   position a statement that is not the defendant's,

13   that's our position here at this hearing, and to ask

14   him why he wanted Detective Pacheco to come in and read

15   it in Spanish and to give an answer that he has given

16   seems to me I should have a right to pursue.

17           THE COURT:  I don't know if you are done

18   questioning this witness.  So everything you have just

19   said if that's your summation after the hearing, I'll

20   listen to it then.  I have an answer to a question as

21   to why did he have Detective Pacheco come in.  Quote, I

22   asked him as a courtesy and also so he could not come

23   back and a later time and say he did not understand.

24   That's the answer to the question.

25           If you want to pursue the courtesy, if you

J.H.

1     want to pursue it, ask the appropriate question.

2            But at the point in time when we left off,

3     your last question after asking was the defendant

4     cooperative, the answer was yes.  So then why were you

5     concerned he might come back and say he didn't

6     understand, that has absolutely nothing to do with what

7     I am deciding at this hearing, one.  Two, you already

8     got your answer to that question.  It was a two

9     part-answer, as a courtesy, and so that he couldn't

10    come back and say he didn't understand.  It was in a

11    follow-up question by you and an answer given that was

12    this detective saying, I knew very well that this

13    defendant understood English in response to it.

14           So you can make your argument at the close of

15    the hearing.  I will listen to your argument.  I have

16    not finished evaluating this detective's credibility.

17    I have not finished evaluating this case in total

18    because I haven't heard all of the evidence.  But I'm

19    not going to stop in the middle of the hearing for you

20    to give some sort of a summation-type argument when all

21    you need to do is ask your next question, and I will

22    rule on whether or not it's going to be a sustained

23    objection if an objection is even made.

24           MR. BERGER:  But I'm asking the questions

25    because I am challenging the credibility of this

1    detective.  To me, from my perspective, it's pretty

2    obvious as to what's going on here.  But if you don't

3    let me ask the follow-up questions to say so that he

4    can't come back later and yet he says he's cooperative,

5    I should be able to press him on that point.

6          The fact that I have gotten some answers

7    which aren't to me credible still should enable me --

8    even if you thought they were credible, should enable

9    me to press him on an answer that he's given.  That's

10   all I'm saying, that I'm going to suggest to this Court

11   that that kind of an answer is not believable.

12         THE COURT:  Which answer is not believable,

13   so that he wouldn't come back and challenge it in

14   court?

15         MR. BERGER:  Yes.

16         THE COURT:  Really, that's not believable?

17   So why are we at a hearing if that's not believable?

18   Why are we at at a hearing?  Doesn't every defendant

19   have the right to come in and challenge a statement in

20   court?  Isn't that their right to do so?  So shouldn't

21   every detective appreciate and understand and have in

22   the back of their mind that there's going to be a

23   potential hearing with regards to the taking of the

24   statement?  Isn't that what this is all about?

25         MR. BERGER:  Yes.

1    THE COURT:  So why would you then have to

2    press further with regards to an answer you've already

3    been given when it is obvious to this Court that a

4    detective of 30 years would appreciate and understand

5    that there would likely be a hearing as to whether or

6    not the statement given was voluntary after a knowing

7    and intelligent waiver?

8    MR. BERGER:  Really, judge, if that's the

9    case, why don't we videotape.

10   THE COURT:  We are not going through best

11   practices.  Wouldn't it be wonderful it Big Brother

12   taped every move we ever made anywhere in this world,

13   because then there would never be a question as to who

14   did what.  Welcome to where we live.  Doesn't happen.

15   MR. BERGER:  It goes on now.  There are

16   videos going on all over this country.

17   THE COURT:  Mr. Berger, do you have anymore

18   questions for this detective?  I am not going to debate

19   with you in the middle of this hearing why, whether and

20   when videotaped confessions are going to take place.

21   Do you have anymore questions for the detective?

22   MR. BERGER:  The point is if he is attempting

23   to wiggle out of an answer that is logically

24   inconsistent, I should have the opportunity to press

25   him on that.

1          THE COURT:  Why don't you ask your next

2     question, and then if there's an objection, I will rule

3     on it as I see fit.

4          MR. BERGER:  Very well.

5          THE COURT:  Please re-seat the witness.

6          (The witness resumed the witness stand.)

7  CROSS-EXAMINATION

8  BY MR. BERGER:  (CONTINUED)

9     Q.   Detective, what courtesy were you extending to

10 Mr. Ramos by having Detective Pacheco read the statement in

11 Spanish?

12    A.   If he had a preference for having that read to him

13 in Spanish.

14    Q.   Didn't he say to you before with respect to the

15 rights card he had a preference for it being said in

16 Spanish?

17    A.   That was the rights card.

18    Q.   That's right.  And here's a statement that was

19 taken in English, correct?

20    A.   Well, that is correct.  But they are two very

21 different items.

22    Q.   Why is that?

23    A.   One is very technical language, it's very

24 technical legal language, and the other is his own words.

25    Q.   Well, did Detective Pacheco explain to him in

J.H.

1    Spanish what it means to have the right to remain silent?

2          A.    I don't know.  I don't understand Spanish.

3          Q.    Did he just read the card straight through?

4          A.    It appeared to me he was reading something while

5    holding up the card in front of him.

6          Q.    It isn't as if he was going off extemporaneously

7    and going off explaining something without looking at the

8    card?

9          A.    No.

10         Q.    And you have had occasion to read rights in

11   English, haven't you?

12         A.    Yes.

13         Q.    And you know how long that takes; do you not?

14         A.    Yes.

15         Q.    How long would you say it takes you to read a card

16   in English, the right's card?

17         A.    Two or three minutes.

18         Q.    Did Detective Pacheco take longer than two or

19   three minutes to do that?

20         A.    Not that I recall.

21         Q.    So even though the rights card was technical and

22   different from the statement in your view, as far as you

23   know, Detective Pacheco didn't explain what it meant to

24   remain silent?

25              MR. PERRI:  Objection.

J.H.

Det. M. Baran - People - Cross          199

1      THE COURT:  You can answer the question.  Do

2   you even know?

3      THE WITNESS:  I don't understand the

4   question.

5      THE COURT:  You had no idea what Pacheco was

6   saying because you don't speak Spanish, correct?

7      THE WITNESS:  Correct.

8      THE COURT:  Next question.

9   Q.   So in the one hand your explanation for

10  differentiating the statement from the rights card was the

11  rights card is technical and the statement is not?

12  A.   The statement is in his own words, words that he

13  is familiar with, and the rights card is a card where he

14  might not -- he may not be familiar with those words because

15  of the technical nature of the card.

16  Q.   But the -- but the statement requires accurate

17  statements of fact; does it not?

18  A.   No.

19  Q.   Isn't that what you're asking for him to give you,

20  statements of fact?

21  A.   It's what I'm hoping for, but it doesn't always

22  constitute statements of fact.

23  Q.   Correct.  But did you think he was being truthful

24  with you when he was talking to you?

25      MR. PERRI:  Objection.

J.H.

Det. M. Baran - People - Cross          200

1          THE COURT:  Overruled.  Did he appear
2     truthful?
3          THE WITNESS:  He appeared truthful.
4     Q.   He appeared cooperative?
5     A.   Yes, he did.
6     Q.   And you were hoping that he would give you an
7     accurate statement; were you not?
8     A.   Yes.
9     Q.   Did he ever say to you that he licked her pussy
10     for sexual gratification?
11     A.   No.
12     Q.   So the courtesy that you were extending to him by
13     having Detective Pacheco read it in Spanish was what,
14     Detective?
15     A.   If he preferred to hear it again in Spanish, then
16     I was going to certainly accommodate that.
17     Q.   Did he tell you that he preferred to hear it in
18     Spanish?
19     A.   He answered the word, Yes.
20     Q.   I'm sorry?
21     A.   He answered, Yes.
22     Q.   To your question was what, what was your question
23     that he answered yes to?
24     A.   Would you like Detective Pacheco to read it in
25     Spanish to you?

J.H.

1    Q.    And is that when you called Detective Pacheco in?

2    A.    Yes.

3    Q.    And what did you say to Detective Pacheco?

4    A.    I don't recall.  I did ask him to read the

5    statement, but I don't recall exactly what I asked.

6    Q.    Did you tell him why you were asking him to read

7    it?

8    A.    No, I did not.

9    Q.    In Spanish?  And were you there the entire time

10   the detective read it?

11   A.    Yes.

12   Q.    And during that course of that time, did the

13   defendant ever interrupt him and correct something?

14   A.    I don't recall him doing so, but I could be

15   mistaken.

16   Q.    You're sitting there, aren't you?

17   A.    Yes.

18   Q.    You're listening to Detective Pacheco, correct?

19   A.    Yes.

20   Q.    Was there ever an interruption of Detective

21   Pacheco by the defendant?

22   A.    I don't recall, but it might have happened.  I

23   don't recall it occurring, but I could be mistaken.

24   Q.    Was it you who asked the defendant to put his

25   initials where those three corrections in the body were?

1      A.    Yes.

2      Q.    After the statement -- when was it that the

3  defendant you say put his signature on People's 5?

4      A.    After Detective Pacheco finished reading something

5  to him.

6      Q.    Reading -- you mean he had People's 5 in his hand?

7      A.    Yes.

8      Q.    And was it immediately thereafter?

9      A.    Yes.

10     Q.    And who asked the defendant to sign the statement?

11     A.    I did.

12     Q.    And Detective Pacheco was there?

13     A.    Yes.

14     Q.    And after he signed People's 5, what's the very

15  next thing that was said to the defendant by either you or

16  Detective Pacheco?

17     A.    I don't recall.

18     Q.    What's the next thing that happened?

19     A.    Well, there came a point in time where we

20  completed the arrest processing and transported him to

21  detention.  But I don't remember the exact next thing that

22  happened after the statement was completed.

23     Q.    Well, you mentioned an apology letter which is

24  People's 6 in evidence?

25     A.    Oh, yes.

J.H.

Det. M. Baran - People - Cross          203

1    Q.    You just forgot that?

2    A.    Yes.

3    Q.    So how did that come about?

4    A.    After he finished the statement, I asked him if he

5    wanted to write a letter to the family, and he said, Yes.

6    Q.    And did he tell you what he wanted to say?

7    A.    No.

8    Q.    Did you take it down on the computer?

9    A.    No.

10   Q.    Why not?

11   A.    Because I don't type Spanish.

12   Q.    So he wanted to write in Spanish, correct?

13   A.    I don't know if he wanted to or not.  He indicated

14   that he would write a letter to them in Spanish -- he would

15   write a letter to them.  And I gave him pen and paper, and

16   he wrote it in Spanish.

17   Q.    And you asked him if he wanted to write a letter

18   to them for what purpose?

19              MR. PERRI:  Objection.

20              THE COURT:  Overruled.

21   A.    To acquire more evidence in the case.

22   Q.    Did you not think you had enough evidence based on

23   People's 5?

24              MR. PERRI:  Objection.

25              THE COURT:  Sustained.

1           MR. BERGER:  Judge, he just gave that answer.

2      Q.   What more evidence were you looking for?

3           MR. PERRI:  Objection.

4           THE COURT:  Sustained.

5      Q.   Did you acquire more evidence in the case?

6           MR. PERRI:  Objection.

7           THE COURT:  Only because -- sustained as to

8      form.  That's pretty wide open.  It could take on

9      months and weeks and years of further investigation.

10     If you want to narrow it, you can.

11          MR. BERGER:  It's the context of this

12     so-called apology letter.

13          THE COURT:  You can put it into that context.

14     That wasn't the question.

15     Q.   Did the apology letter provide more evidence for

16     you?

17     A.   I don't know.

18     Q.   You to this day, you don't know what it says?

19     A.   I know what it says.

20     Q.   What does it say?

21          MR. PERRI:  Objection.

22          THE COURT:  Is it in evidence?

23          MR. BERGER:  Yes.

24          MR. PERRI:  It is in evidence in Spanish,

25     your Honor.

1          THE COURT:  Do you know what it says?

2          THE WITNESS:  Well, I do.  I don't know if

3     it's evidence.  I don't know if it's been admitted -- I

4     don't know if it can be challenged.  I don't know if it

5     constitutes any evidence.

6          Q.    It doesn't matter if it's being challenged.  I am

7     only asking you if it provides more evidence in this case?

8          A.    Since I'm not an attorney, I would have to say I

9     don't know.

10         Q.    You're a detective, aren't you?

11         A.    Yes.

12         Q.    Why did you take the statement, People's 5?

13         A.    To acquire more evidence.

14         Q.    Okay.  So now you felt you needed more evidence,

15    and you asked him if he would write a letter to Crystal?

16              MR. PERRI:  Objection sustained as to form.

17         Q.    You asked him if he would write a letter to

18    Crystal, correct?

19              MR. PERRI:  Objection.

20              THE COURT:  No, that's all right.

21         A.    I think I asked him if he wanted to write a letter

22    to the family.

23         Q.    And his answer was, you say, Yes?

24         A.    Yes.

25         Q.    And you asked him that because you want to acquire

1    more evidence in the case?

2        A.    Yes.

3        Q.    And what more evidence were you looking?

4              MR. PERRI:  Objection.

5              THE COURT:  Overruled.  If you understand the

6        question.

7              THE WITNESS:  I think I do.

8              THE COURT:  Go head and answer.

9              THE WITNESS:  As much evidence as I could

10       acquire.

11       Q.    What more were you looking for in this case?

12             MR. PERRI:  Objection.

13             THE COURT:  Is your answer any different?

14             THE WITNESS:  No.

15       Q.    Were you looking for an additional statement from

16   him?

17       A.    No.

18       Q.    So then why did you ask him if he would write a

19   letter to the family?

20       A.    Because I was under the impression it's additional

21   evidence to be used against a defendant in court.

22       Q.    Yes, a statement made by the defendant, correct?

23       A.    Yes.

24       Q.    Was there something lacking in the first statement

25   number 5 that you wanted to get him by writing a statement?

1          MR. PERRI:  Objection.

2     Q.   Number 6?

3          THE COURT:  Not that it matters, but I'll

4     take your opinion.

5     A.   No.

6     Q.   What additional evidence did you hope to get with

7     this letter of apology?

8     A.   Are you asking me what specific type of evidence

9     or what specific category?  I don't understand the question.

10    Q.   A statement -- you wanted him to make a statement

11    just like the statement number 5, which is the statement

12    against his interest, correct?

13    A.   Yes.

14    Q.   So what is it that you were looking for him to say

15    in People's 6 that was lacking in People's 5?

16          MR. PERRI:  Objection.  Relevance, your

17     Honor, as to this hearing.

18          THE COURT:  Overruled.  Were you looking for

19     him to say something in one and not in the other?

20          THE WITNESS:  Nothing specific.

21    Q.   So were you totally satisfied with the statement

22    you had obtained in People's 5?

23          MR. PERRI:  Objection.

24          THE COURT:  Sustained.

25    Q.   Do you know now what People's 6 says, Detective,

1    in Spanish?

2         A.    I know one tiny part.

3         Q.    What part?

4         A.    Where he says, I'm sorry.

5         Q.    Other than that, is there anything in there that

6    refers to any actions he may have engaged in with Mya?

7         A.    Not that I recall, but I haven't heard the letter

8    translated for over a year.

9         Q.    Now, you did have occasion to speak with Crystal

10   that night, correct?

11        A.    Yes.

12        Q.    Her primary language was English?

13        A.    I don't know what her primary language was.  We

14   spoke English.

15        Q.    Did she ever indicate to you she'd want to speak

16   to you in Spanish?

17        A.    No.

18        Q.    Or speak to somebody in Spanish?

19        A.    No.

20        Q.    Did you hear the 911 call in this case?

21        A.    No.

22        Q.    Did you ask the defendant to write in Spanish to

23   them?

24        A.    No.

25        Q.    The defendant wanted to write in Spanish?

1     MR. PERRI:  Objection.

2     THE COURT:  Sustained.

3     Q.   Did anybody ask the defendant to write in Spanish?

4     A.   Not to my knowledge.

5     Q.   How is it that the defendant came to write the

6  number 6 in Spanish?

7     A.   I don't know.

8     Q.   So what you did was you gave him a piece of paper

9  and pencil, right?

10     A.   Or a pen.

11     Q.   Whatever it was, and you asked him if he would

12  like to say something to the family?

13     A.   Your order is incorrect.  I asked him if he wants

14  to write a letter to the family.  He indicated yes.  So I

15  gave him a pad and a pen.

16     Q.   Okay.  And he did, and he did it in Spanish,

17  correct?

18     A.   Yes.

19     Q.   Now, there came a time after he wrote that what's

20  People's 6 in evidence.  What happened after that?

21     A.   We completed the -- I completed the arrest

22  processing, or we completed the arrest processing, and he

23  was transported to detention.

24     Q.   At about what time was that?

25     A.   4 o'clock.

J.H.

1    Q.   In the morning?

2    A.   Yes.

3    Q.   Now, that's the sequence you remember, correct?

4    A.   Yes.

5    Q.   So what happened to when this buccal swab was

6    taken; when did that happen?

7    A.   Somewhere between the letter and transporting to

8    detention.

9    Q.   Which letter?

10   A.   Whatever he wrote in Spanish.

11   Q.   Oh, so when I asked you about the sequence, you

12   forgot that?

13   A.   Yes.

14   Q.   So my asking you about that refreshed -- reminded

15   you about it?

16   A.   Yes.

17   Q.   What did you say to the defendant with respect to

18   giving this buccal swab?

19   A.   I don't remember the exact words I used.

20   Q.   In sum and substance?

21   A.   Would you be willing to give a DNA sample or

22   sample of your DNA.

23   Q.   And what did he say?

24   A.   Sure.

25   Q.   Did he ask you why you were doing that?

Det. M. Baran - People - Redirect        211

1    A.   No.

2    Q.   Just said, Sure?

3    A.   Sure.

4         MR. BERGER:  Judge, I just need a second,

5    because it's written in Spanish.

6         THE COURT:  Go right ahead.

7         MR. BERGER:  Thank you, Judge.  I have no

8    further questions.

9         THE COURT:  Any redirect?

10        MR. PERRI:  Very briefly, your Honor.

11        THE COURT:  Sure.

12  REDIRECT EXAMINATION

13  BY MR. PERRI:

14   Q.   Detective Baran, is the Special Victims Squad

15  equipped with any video recording or audio recording devices

16  in the interview room?

17   A.   No.

18   Q.   Detective, while discussing the incident with the

19  defendant before and then while you were typing People's 5

20  which the People allege is the statement of the defendant,

21  at any time did the defendant falter, hesitate or find it

22  difficult to speak to you in English?

23   A.   No.

24   Q.   If you know, Detective, when Detective Pacheco

25  stepped out of the interview room with you as you were with

1   the defendant, did he remain in the Special Victims Squad in

2   Bethpage?

3        A.   Yes.

4                  MR. PERRI:   Nothing further, your Honor.

5                  THE COURT:   Anything on those limited

6        questions?

7                  MR. BERGER:   Yes.

8   RECROSS-EXAMINATION

9   BY MR. BERGER:

10       Q.   Are you telling me, Detective, there was no video

11  or audio equipment in the Special Victims Squad?

12       A.   That's correct.

13       Q.   In the entire -- how big is this squad?

14       A.   I'm sorry, I don't understand the question.

15       Q.   Where is the squad?

16       A.   Bethpage.

17       Q.   The address?

18       A.   15 Grumman Road West.

19       Q.   How big is it?

20       A.   Feet-wise?

21       Q.   Yes.

22       A.   I couldn't tell you.

23       Q.   How many rooms are in it?

24                 THE COURT:   In the SVU section?

25       Q.   Are there other police department sections in

J.H.

1   there?

2        A.    No.

3        Q.    How big is this building?

4        A.    It's a squad room, a CO's office, deputy CO's

5   office and a kitchen, a bathroom and two interview rooms.

6        Q.    And are you telling me that you could not get

7   access to a video recorder or audio recorder if you wanted

8   it?

9        A.    Correct.

10       Q.    If you asked your supervisors for one, you could

11   not get it?

12             MR. PERRI:  Objection.

13             THE COURT:  Overruled.

14       A.    Correct.  There's nothing in the police

15   department.  Theres no portable or -- there is no portable

16   video equipment that we have access to.

17       Q.    In the entire police department of Nassau County?

18       A.    I can't answer that, just that we have access to.

19       Q.    You are a detective for how many years?

20       A.    Nineteen.

21       Q.    Have you ever heard of an interview by audio and

22   video occurring in Nassau County?

23       A.    Yes.

24       Q.    So it could be done if you wanted it to, right?

25       A.    In theory.

1    Q.   No, in actuality?

2    A.   No.  In theory.  There's two places in Nassau

3  County that interview defendants, and those places have to

4  be free and manned at that time.

5    Q.   And you could always move the defendant to one of

6  those places; could you not?

7    A.   It's not -- that's not my call, Mr. Berger.

8    Q.   I know.  But it could be done, couldn't it?

9    A.   In theory, it could be.

10    Q.   In actuality, it could be?

11    A.   I don't know if those places were operational at

12  that time.  It would not make sense to move somebody to a

13  building which is locked up and we have no access to it.

14    Q.   The building with video equipment would be locked

15  up?

16    A.   Yes.

17           THE WITNESS:  Your Honor, the department

18       recognizes -- I don't know if I am speaking out of

19       line, the department recognizes the difficulty, and we

20       are moving to new quarters.  One of reasons is so that

21       they can install video and audio equipment in the

22       arrest room.

23           But at this point in time it's not -- because

24       of the small size and the lack of any portable

25       equipment, it's not being done in Special Victims

1    Squad.

2         Q.   Detective, you can go into an ordinary camera

3    store and get a video camera, can't you?

4         A.   For personal use, I could.

5         Q.   Cell phones have video equipment, don't they?

6         A.   Yes, they do.

7         Q.   They take videos; we see them all the time, right?

8         A.   Yes.

9              MR. BERGER:  Nothing further.

10             THE COURT:  Thank you very much, Detective.

11             THE WITNESS:  Thank you.

12             THE COURT:  You may step down.

13             (The witness was excused.)

14             THE COURT:  Let's take a five-minute break,

15    and then, People, you'll call your next witness.

16             MR. PERRI:  Yes, your Honor.

17             (A recess was taken.)

18             THE CLERK:  Case on hearing continued

19    Indictment 742N of 2014, People versus Daniel Ramos.

20    Let the record reflect that all parties are present.

21    The Spanish interpreter is present.

22             People ready to proceed?

23             MR. PERRI:  Yes, your Honor.

24             THE CLERK:  Defense counsel ready?

25             MR. BERGER:  Yes, your Honor.

1              THE COURT:  Please call your next witness.

2              MR. PERRI:  The People call Detective

3         Pacheco, your Honor.

4    D E T .   R E I N A L D O   P A C H E C O , Shield 1179,

5         a witness called on behalf of the People, after

6         having been first duly sworn by the Clerk of the

7         Court, was examined and testified upon his oath as

8         follows:

9              THE CLERK:  You may be seated.  Detective,

10        please state your full name, spell your last name, give

11        your shield and your command.

12             THE WITNESS:  Sure.  It's Reinaldo Pacheco,

13        R-E-I-N-A-L-D-O, last name P-A-C-H-E-C-O.  Shield

14        number is 1179, and I work for Special Victims Squad.

15             THE CLERK:  Thank you.

16             THE COURT:  You may inquire.

17             MR. PERRI:  Thank you, your Honor.

18   DIRECT EXAMINATION

19   BY MR. PERRI:

20        Q.   Good morning, Detective Pacheco.  You said you

21   work for the Special Victims Squad.  That's part of the

22   Nassau County Police Department?

23        A.   That's correct.

24        Q.   And how long have you been with the Nassau County

25   Police Department?

Det. R. Pacheco - People - Direct         217

1      A.   Just about 15 years.

2      Q.   And how long have you been a detective?

3      A.   Just about five years.

4      Q.   And how long have you been with the Special

5   Victims Squad?

6      A.   Just about five years.

7           MR. BERGER:  Can we have him raise his voice

8   a little bit, Judge?

9           THE COURT:  Absolutely.

10      Q.   And, Detective, are you able to read and speak

11   Spanish?

12      A.   Yes.

13      Q.   And what was the first language that you learned

14   growing up?

15      A.   Spanish.

16      Q.   And at what point did you learn the English

17   language?

18      A.   In school.

19      Q.   Detective, were you working on October 16th of

20   2013?

21      A.   Yes.

22      Q.   And on that day, were you working alone or with

23   Detective Baran?

24      A.   I believe I was working alone.

25      Q.   And did there come a time that you became involved

1  in an investigation into an individual named Daniel Ramos?

2      A.   Yes.

3      Q.   Was that Detective Baran's case?

4      A.   Yes.

5      Q.   And did there come a time on October 16th into

6  October 17th of 2013 where you met an individual named

7  Daniel Ramos?

8      A.   Yes.

9      Q.   And where did you meet Daniel Ramos?

10     A.   In the interview room.

11     Q.   And where is the interview room located you are

12  talking about?

13     A.   In the Special Victims Squad.

14     Q.   Was the individual Daniel Ramos, was he alone or

15  with anyone else, a member of department?

16     A.   He was with Detective Baran.

17     Q.   And do you see that individual in the room

18  presently?

19     A.   Yes.

20     Q.   And could you please identify him by pointing him

21  out and naming an item of clothing he's wearing?

22     A.   Sure.  He's wearing like a white shirt, long

23  sleeve, wearing glasses (indicating).

24          THE COURT:  The record will indicate

25      indicating the defendant.

J.H.

1            MR. PERRI:  Thank you, your Honor.

2       Q.   Did there come a time where you spoke with the

3  defendant?

4       A.   Yes.

5       Q.   And where did that take place?

6       A.   In the interview room.

7       Q.   And what was the substance of your initial

8  conversation or what you said to the defendant?  What was

9  your interaction?

10       A.   Basically it was just to read him his rights.

11       Q.   And when you say, Read him his rights, how did you

12  do that?

13       A.   From a Miranda card.

14            MR. PERRI:  Your Honor, I'm asking that the

15       witness be shown what's in evidence as People's 4.

16            THE COURT:  He may be shown.

17       Q.   Detective, do you recognize what's already in

18  evidence as People's 4?

19       A.   Yes.

20       Q.   And what do you recognize that two-page document

21  to be?

22       A.   The Miranda card.

23       Q.   And how do you know that that is your Miranda card

24  or the Miranda card from the interview with Daniel Ramos

25  that day?

Det. R. Pacheco - People - Direct        220

1        A.    It has my signature, Detective Baran's signature

2    and Daniel Ramos's signature.

3        Q.    And approximately what time did you meet with the

4    defendant on October 16th of 2013?

5        A.    2340 hours.

6        Q.    Now, the document there that you have before you

7    is two pages, correct?

8        A.    That's correct.

9        Q.    And the original rights card, how are those two

10   pages, how do they appear on the original rights card?

11       A.    It's front and back.  One's English, one is

12   Spanish.

13       Q.    And to your knowledge, are the Spanish and English

14   sides, are they accurate translations of each other?

15       A.    Yes.

16       Q.    And on that date, October 16th, did you read the

17   defendant his rights in Spanish or in English?

18       A.    In Spanish.

19              MR. PERRI:  Your Honor, I ask that the

20          witness read the English portion of the rights card,

21          same section that he read in Spanish as he did that day

22          into the record.

23              THE COURT:  So you want him to read the

24          English translation of what he said in Spanish into

25          the record?

J.H.

1          MR. PERRI:  Yes.

2          THE COURT:  Okay.  Read slowly, please.

3      A.   Police Department, County of Nassau, New York.

4  Notification of rights prior to custodial interrogation.

5  Before asking any questions, you should understand you have

6  the right to remain silent and that any statement you make

7  may be used against you in court.  Also, you have the right

8  to talk to a lawyer before answering any questions or have a

9  lawyer present at any time.  If you cannot afford a

10 lawyer -- if you cannot afford to hire a lawyer, one will be

11 furnished for you if you wish, and you have the right to

12 keep silent until you have had a chance to talk with a

13 lawyer.  Do you understand?

14         Now that I have advised you of your rights, are

15 you willing to answer questions?

16     Q.   Now, Detective, what you just stated in English,

17 did you make the same statement in Spanish on October 16th

18 of 2013 to the defendant?

19     A.   Yes.

20     Q.   And what, if anything, did the defendant do in

21 response to you making that statement to him in Spanish?

22     A.   He read the bottom half.

23     Q.   And what, if any, markings did the defendant make?

24     A.   He signed the card.

25     Q.   And do you recognize those markings on People's 4

J.H.

Det. R. Pacheco - People - Direct          222

1    at this time?

2         A.    Yes.

3         Q.    And could you describe those markings that you

4    observed -- can you describe those markings that the

5    defendant made in your presence into the record?

6         A.    Sure, it says, Si, and with his signature across.

7         Q.    And did he do that once or more than once?

8         A.    It's his signature is in the card three times.

9         Q.    And when did he make those other markings of his

10   signature?

11        A.    What do you mean?

12        Q.    Did he do them all at once or was it --

13        A.    After they were read.

14        Q.    And after being provided that card, after signing

15   that card, what, if anything, did you do next?

16        A.    I left.

17             MR. BERGER:    I can't hear the answer.

18        A.    I left.

19        Q.    And who was left -- was there anyone left in the

20   interview room with the defendant?

21        A.    Yes.

22        Q.    And who was that?

23        A.    Detective Baran.

24        Q.    And when you were in the presence of the defendant

25   and Detective Baran, did you hear the defendant at any time

J.H.

Det. R. Pacheco - People - Direct          223

1    speaking in English?

2         A.    Yes.

3         Q.    And was he communicating with Detective Baran in

4    English?

5         A.    Yes.

6         Q.    Did you ever observe him while you were in the

7    room with him having difficulty communicating with Detective

8    Baran in English?

9         A.    No.

10        Q.    Did there come a time on October 16th into October

11   17th that you returned to the interview room?

12        A.    Yes.

13        Q.    And could you please describe why did you return

14   to the interview room?

15        A.    I was asked to go back and to read the statement

16   that Daniel Ramos has given to Detective Baran back to him.

17        Q.    And who asked you to return to the interview room?

18        A.    Detective Baran.

19             MR. PERRI:  I ask that People's 4 be taken

20        from the witness and People's 5 be shown to the

21        witness.

22             THE COURT:  It may.

23             MR. PERRI:  Thank you, your Honor.

24        Q.    Detective, I ask you to take a look at People's 5

25   already in evidence.  Do you recognize People's 5?

J.H.

1   A.   Yes.

2   Q.   What do you recognize it to be?

3   A.   The statement that I read back.

4   Q.   When you say it's the statement that you read

5   back, is that the statement that you read to the defendant

6   on October 16th of 2013?

7   A.   Yes.

8   Q.   Had it already been printed out prior to you

9   coming to the room?

10   A.   Yes.

11   Q.   And when you came into the room, were there any

12   markings on it before you read the statement?

13   A.   Yes.

14   Q.   And what were those markings that were already on

15   the statement?

16   A.   Daniel Ramos's initials.

17   Q.   Where do those initials appear on the statement?

18   A.   On certain lines.  It appears three times.

19   Q.   And was there anything marked on the paper next to

20   those initials when you came into the room?

21   A.   Was anything marked, you said?

22   Q.   Was there anything else marked besides from just

23   the initials, was there anything next to the initials?

24   A.   No.  My initials which I did afterwards.

25   Q.   And when you say afterwards, you mean after you

1  translated the statement?

2       A.   That's correct.

3       Q.   When you entered the room, what, if anything --

4  sorry, could you please describe the process of how you

5  translated the statement to the defendant?

6       A.   I basically read it back to him.

7       Q.   And when you say you read it back to him, did you

8  give an accurate translation of what was written on the

9  page?

10      A.   Yes.

11           MR. BERGER:  Can we have a little less

12      leading?

13           THE COURT:  We can.  Try not to lead.

14           MR. PERRI:  Sorry, your Honor.

15      A.   Yes, I read it back to him in Spanish.

16      Q.   Did you read the entire statement?

17      A.   Yes.

18      Q.   And what, if anything, happened after you read the

19  statement in Spanish to the defendant?

20      A.   He signed it.

21      Q.   And did anyone else sign the statement after you

22  read it to him?

23      A.   I signed it, and Detective Baran signed it.

24      Q.   And you stated that you made markings of your

25  initials.  Can you please describe to the Court why you made

Det. R. Pacheco - People - Direct        226

1   those markings of your initials?

2       A.   That's just to show the changes that were made in

3   the statement themselves.

4       Q.   Were those changes made to the statement and the

5   defendant's initials, were those present before you read the

6   statement in Spanish?

7       A.   Yes.

8              MR. PERRI:  I ask that People's 5 be taken

9          from the witness, and I ask that People's 6 be shown to

10         the witness.

11      Q.   Detective, do you recognize People's 6?

12      A.   Yes.

13      Q.   And what do you recognize it to be?

14      A.   This is, I guess, an apology letter from -- or a

15  letter that Daniel Ramos wrote.

16      Q.   And were you present for the writing of this

17  letter?

18      A.   No.

19      Q.   Are you able -- in looking over and examining

20  People's 6, are you able to translate that letter?

21      A.   Yes.

22             MR. PERRI:  I'd ask that the witness

23         translate the letter into the record for the Court,

24         your Honor, for the record.

25             THE COURT:  Go right ahead.  Speak slowly.

J.H.

1          THE WITNESS:  Sure.  Crystal and Maya, I am

2     writing this letter to you asking for pardon, a

3     thousand pardons.  The truth is that I'm very remorse

4     for what happened.  I never intended to do any harm to

5     any of you let alone to the kids.

6          I hope, Crystal, that you read this letter

7     and take conscious and retract the charges against me.

8     I never meant to harm, to harm, but forgive -- but

9     forgive and retract the charges against me.  Daniel

10    Ramos.

11         MR. PERRI:  I ask that People's 6 be taken

12    from the witness.

13    Q.    Detective, did you make the defendant -- while

14    speaking to him in Spanish, did you make any threats or

15    promises to the defendant in order to get the statement or

16    the apology letter that you've been shown today?

17    A.    No.

18    Q.    Did you offer him any promises of leniency by the

19    District Attorney's office or the police department when you

20    were speaking to him in Spanish?

21    A.    No.

22    Q.    Did you observe any other members of law

23    enforcement including Detective Baran make any such promises

24    or threats?

25    A.    No.

1      Q.    When you were speaking with the defendant in the
2   interview room, were you armed?
3      A.    No.
4                   MR. PERRI:  Nothing further, your Honor.
5                   THE COURT:  Thank you.  Cross-examination,
6      Mr. Berger.
7   CROSS-EXAMINATION
8   BY MR. BERGER:
9      Q.    Detective, did you prepare any notes or memoranda
10  in connection with this case?
11     A.    Notes, no.
12     Q.    Memoranda?
13     A.    I have no notes.  I didn't write anything.
14     Q.    You didn't write anything?
15     A.    No.
16     Q.    So what you are testifying here today is based on
17  your own independent recollection?
18     A.    Yes.
19     Q.    Your independent recollection of what happened
20  approximately a year ago, correct?
21     A.    That's correct.
22     Q.    Did you have occasion to discuss this case with
23  anybody prior to testifying?
24     A.    Just when -- with Detective Baran.
25     Q.    And where did you have that discussion?

1    A.   DA's office.

2    Q.   And what was the content of that discussion?

3    A.   Just basically what my involvement was.

4    Q.   And specifically, what was your involvement?

5    A.   Reading back the statement.

6    Q.   Reading back the English statement?

7    A.   Reading back the English statement to Spanish and

8    reading the rights card.

9    Q.   And when you discussed that, Detective Baran --

10   you said you discussed it with Detective Baran, correct?

11   A.   Yes.

12   Q.   And did he discuss it with you as well what his

13   involvement was in this case?

14   A.   I don't know about the whole case.  I was just

15   talking about my -- what I did.

16   Q.   But did you hear what he did?

17   A.   No.

18   Q.   He never discussed with you what he did?

19   A.   As far as interviewing, that's about it.  We

20   didn't get into exactly what he said or how it came about

21   the statement or the questions asked.

22   Q.   So you never got into a discussion with Detective

23   Baran about the circumstances under which he took the

24   statement?

25   A.   No.

J.H.

1    Q.   Did the discussion you had with Detective Baran --

2    withdrawn.

3         Did you also have a discussion with the Assistant

4    District Attorney, Mr. Perri?

5    A.   Yes.

6    Q.   And were you both in the room when that happened?

7    A.   Yes.

8    Q.   And did you hear what Detective Baran had to say

9    to Mr. Perri?

10   A.   I don't recall what -- I don't recall.

11   Q.   I'm only asking you if you could hear Detective

12   Baran talking to Mr. Perri.

13   A.   I heard him speak.

14   Q.   And you heard him discuss his involvement in the

15   taking of the statement, correct?

16   A.   I don't recall if that's what they were talking

17   about.

18   Q.   You were there?

19   A.   I was there for my half.

20   Q.   I understand.  But when he spoke, you were still

21   sitting in that room; were you not?

22   A.   Yes.

23   Q.   And as you sit here now, you don't know even the

24   subject matter of what Detective Baran spoke to Mr. Perri

25   about?

J.H.

1    A.    I don't remember.

2    Q.    So you don't even remember if it was about this

3    case; is that fair to say?

4    A.    It was about the case, but I don't remember

5    details on what the conversation was like.

6    Q.    Without going into details, do you remember the

7    subject matter of what Detective Baran talked about?

8    A.    Just remember about my statement.   That's what

9    they were asking.

10   Q.    About your statement?

11   A.    About the statement when I read it back.

12   Q.    When was it for the first time that you saw the

13   defendant that night?

14   A.    I saw him in the interview room.

15   Q.    At about what time?

16   A.    I don't know what time he came in.

17   Q.    Do you remember the events of that night?

18   A.    Other than the fact that they called me to do the

19   translation on the rights card, I was doing my own thing.

20   Q.    What were you doing?

21   A.    I had other cases.

22   Q.    Do you remember those cases?

23   A.    No, I do not.

24   Q.    And did they use you because you speak Spanish?

25   A.    Yes.

1    Q.    Any other officer or detectives in there in that

2    unit speak Spanish?

3    A.    Yes.

4    Q.    Did you testify in the grand jury in connection

5    with this case?

6    A.    I don't recall.  I don't think I did.

7    Q.    Now, do you remember when for the first time you

8    met the defendant?

9    A.    Yes.

10   Q.    And can you tell me approximately what time that

11   was?

12   A.    The time that was on the rights card more or less.

13   Q.    So the rights card helps you remember what time it

14   was, correct?

15   A.    That's correct.

16   Q.    Now, you were talking out in the hallway with Mr.

17   Perri just this morning; were you not?

18   A.    Yes.

19   Q.    What was the subject of that conversation?  Did it

20   have to do with this case?

21   A.    He was just asking me just my general questions,

22   how long I been with the job and that type of thing.

23   Q.    About your job?

24   A.    You know, how long I been with the department.

25   Q.    Did it have anything to do with the subject matter

1    of this case?

2         A.   As far as the dates.  That's about it.

3         Q.   I'm sorry?

4         A.   Date and time.

5         Q.   Date and time of the case?

6         A.   Date and time that I had in conjunction with the

7    case.

8         Q.   Well, did you not know the date involved prior to

9    your coming to court this morning?

10        A.   Yes, I did.

11        Q.   So the discussion out in the hallway, did that

12   have something to do with this case as well?

13        A.   It was just the date, yes.

14        Q.   But you knew that already before you came to

15   court, right?

16        A.   Yes.

17        Q.   So what was the discussion in the hallway about?

18        A.   That's what it was, the date and time, date and

19   time and what I did.

20        Q.   And what do you mean what you did?

21        A.   Basically I read him the statement.

22        Q.   Did the conversation have anything to do with

23   Detective Baran's testimony?

24        A.   No.

25        Q.   Now, when you -- how many times did you discuss

1   this case with Detective Baran before your testimony here

2   this morning?

3        A.   I didn't.

4        Q.   I thought you told us you did.

5        A.   This morning?

6        Q.   No, I'm not saying -- prior to this morning, how

7   many times did you discuss this case with Detective Baran?

8        A.   The time we came, maybe twice.

9        Q.   Once in Mr. Perri's office and once where?

10       A.   Could have been at the office.

11       Q.   At Special Victims Squad?

12       A.   Special Victims.

13       Q.   And did the subject matter of those discussions

14   involve your involvement in reading the statement to the

15   defendant?

16       A.   Yes.

17       Q.   And did it include reading the rights to the

18   defendant?

19       A.   Yes.

20       Q.   Now, did your discussions with Detective Baran

21   have the effect of refreshing your recollection about what

22   happened?

23       A.   No.  I remember what happened.

24       Q.   You did?

25       A.   Yeah.

1     Q.    Can you tell us when it was for the first time,

2   not counting the night of October 16th, 2013, when it was

3   for the first time you discussed this case with Detective

4   Baran?

5     A.    Probably prior to getting the court notification.

6     Q.    You mean to get court notification --

7     A.    For here.

8     Q.    For coming to the hearing?

9     A.    Um-hum.

10    Q.    You have to answer yes or no.

11    A.    Yes.

12    Q.    So my question is how long ago was that?

13    A.    Like a week ago, I guess.

14    Q.    And did the subject matter that you and Detective

15  Baran talked about include the fact that the defendant

16  speaks Spanish but that the statement is in English?

17    A.    Yes.

18    Q.    And did it include the circumstances under which

19  the statement was taken in English that night?

20    A.    Rephrase the question?

21    Q.    Did your conversations with him include when you

22  were in the room when the statement was being taken?

23    A.    I wasn't in the room when the statement was being

24  taken.

25    Q.    But did that come up?

1        A.   No.

2        Q.   So how did you remember that you were not in the

3    room?

4              MR. PERRI:   Objection.

5              THE COURT:   Overruled.

6        A.   I was not working with him.  Like I explained to

7    you later, I was doing something else.  I was not working

8    with Detective Baran.

9        Q.   But you say you remember doing certain things in

10   that room, correct?

11       A.   That's correct.

12       Q.   And you were with Detective Baran at the time,

13   correct?

14       A.   No, I was not.  I was called in.

15       Q.   Okay.  You were called in, and both of you were

16   there, right?

17       A.   That's correct.

18       Q.   And both of you had involvement with the defendant

19   in that room, correct?

20       A.   That's correct.

21       Q.   And I'm asking you whether or not your discussions

22   with Detective Baran included what you and he saw and did

23   with the defendant in that room.

24       A.   Again, my involvement was to read the statement.

25   I wasn't there for the statement itself, like I explained,

Det. R. Pacheco - People - Cross          237

1    and I read the rights card.

2        Q.    Please, Detective, don't tell me what you

3    explained.  My question was:  Did your conversations with

4    Detective Baran before coming to court include what you and

5    he did with the defendant in that interrogation room?

6        A.    Yes.

7        Q.    And you told him your involvement, and he told you

8    his involvement, correct?

9        A.    That's correct.

10       Q.    Now, there came a time when you came into this

11   interrogation room, and Detective Baran was there with the

12   defendant?

13       A.    That's correct.

14       Q.    And so was this the first time that you are

15   meeting Mr. Ramos?

16       A.    That's correct.

17       Q.    And what is the first thing you said to him, if

18   anything?

19       A.    I don't recall.

20       Q.    As you sit here now, you do remember going into

21   the room, don't you?

22       A.    I do.

23       Q.    And you do not remember what you said to him and

24   what he said to you?

25       A.    I know that he was speaking with Detective Baran.

J.H.

1    About what, I don't recall.  He was asked if he wanted the

2    rights either if English or in Spanish.

3         Q.   Who asked that?

4         A.   I did.

5         Q.   How did you know to ask that question?

6         A.   Hum?

7         Q.   How did you know to ask that question of

8    Mr. Ramos?

9         A.   Because he said he spoke English and Spanish.

10        Q.   Who did he say that to?

11        A.   Detective Baran.

12        Q.   So then let me ask you this:  What is the first

13   thing you do remember being said in that room when you

14   entered it either by you, Detective Baran or the defendant?

15        A.   Basically I must have asked him about his rights,

16   did he want them in English or in Spanish.

17        Q.   Did you ask that, or did Detective Baran ask that?

18        A.   I don't recall if I asked or Detective Baran

19   asked, but I know it was asked.

20        Q.   But not having met him before you walked into that

21   room, how did you even know he spoke Spanish?

22        A.   Detective Baran told me.

23        Q.   When did he tell you that?

24        A.   I guess prior to bringing me, calling me over.

25        Q.   Prior to calling you over, what does that mean?

                                                            J.H.

1      A.    I was at my desk.  I was summonsed to go over to
2  where they were.

3      Q.    You were summonsed by?

4      A.    Detective Baran.

5      Q.    And what did he say to you when he summonsed you?

6      A.    He says, Be there.  We are going to read this guy
7  his rights.  And I said, Okay.

8      Q.    Did he say why he wanted you to be there?

9      A.    Hum?  In case he didn't understand or there was a
10  problem.

11      Q.    In case he didn't understand, what does that mean?
12  Did he tell you why he might not understand?

13      A.    No.

14      Q.    He didn't tell you he speaks --

15      A.    Told me he speaks Spanish, yes.

16      Q.    Did he tell you that outside the room?

17      A.    As we were walking in.

18      Q.    Well, he asked you to accompany him into the room,
19  right?

20      A.    Um-hum.

21      Q.    What did he say to you to ask you to accompany him
22  into the room?

23      A.    He wanted me to be present while he read -- while
24  his rights were being read.

25      Q.    To be present while the rights were being read?

J.H.

1     A.   Yes.

2     Q.   While Baran was going to read the rights?

3     A.   We didn't know.  Again, when we asked him, asked

4  him if he wanted them read in English or Spanish and he

5  was --

6     Q.   Detective, before we get to that point, you are

7  not in the room yet.

8     A.   Um-hum.

9     Q.   You are telling us that Detective Baran came to

10  see you?

11     A.   That's correct.

12     Q.   And he wanted your assistance?

13     A.   That's correct.

14     Q.   Did he tell you why he wanted your assistance?

15     A.   Yes.

16     Q.   Why?

17     A.   Whether to read him his rights in Spanish in case

18  the guy wanted his rights being read in Spanish.

19     Q.   You're at your desk, right?  He comes over to you?

20     A.   That's correct.

21     Q.   What does he say to you?

22     A.   He's like, Could you come in here and help me out,

23  be present while I read him his rights.

24     Q.   While I, meaning I, Detective Baran, reads him his

25  rights?

1      A.    Right.

2      Q.    And did you say to him, why do you need me to be

3   with you?

4      A.    I don't recall if that's exactly the words I used.

5      Q.    I understand.  But in sum and substance, did you

6   say to Detective Baran, why do you need me?

7      A.    I might have.

8      Q.    And did he explain to you?

9      A.    Yes.

10     Q.    What, that there's a language issue?

11     A.    Because he speaks Spanish.

12     Q.    Pardon?

13     A.    Because he spoke Spanish.

14     Q.    He wanted you there because he told you the

15  defendant spoke Spanish, right?

16     A.    That's correct.

17     Q.    So you believed based upon what Detective Baran

18  told you that you were going in there to assist with a

19  Spanish-speaking person, correct?

20     A.    Possibly.  Again, I didn't know.  He said he does

21  speak English.

22     Q.    But he called you because --

23     A.    In case he had to translate something.

24     Q.    Because was he uncertain as -- did he express to

25  you any uncertainty as to whether he spoke sufficient

Det. R. Pacheco - People - Cross     242

1   English?

2        A.   No.

3        Q.   Why were you going in?

4             MR. PERRI:   Objection.

5             THE COURT:   Overruled.   Go ahead.

6        A.   He was basically asking him whether he, you know,

7   if he felt more comfortable either in English or Spanish.

8   He says the guy does speak both English and Spanish.

9        Q.   So when you went in there, what is it --

10  withdrawn.

11            Now, the two of you walk into this room.   You see

12  the defendant, correct?

13       A.   That's correct.

14       Q.   And who -- and what is the first thing that is

15  said?

16       A.   That I don't recall exactly the first thing that

17  was said.

18       Q.   What's the first thing you do remember being said?

19       A.   I remember asking him -- I don't know if that's

20  the first thing that was said, but I do remember asking him

21  did he want his rights read in English or Spanish.   Whether

22  I said it or Detective Baran said it, I don't recall.

23       Q.   And what was the answer?

24       A.   And he was very matter of fact.   He said he really

25  didn't care.   He said very matter of fact, he said, Spanish.

1    Q.   He said he really didn't care?

2    A.   Yes.

3    Q.   That's what he said to you?

4    A.    It didn't matter to him.  He didn't use the words

5  I don't care.  He was very as a matter of fact, telling me

6  that to read them in Spanish to him.

7    Q.   So you don't know that he didn't care, do you?

8    A.   No.

9    Q.   Because he didn't use those words, did he?

10   A.   No, no.

11   Q.   So he gave you an answer.  The answer was I want

12  it read to me in Spanish, right?

13   A.   Yes.

14   Q.   You understood that, correct?

15   A.   That's correct.

16   Q.   And you understood he was a Hispanic individual?

17   A.   Yes.

18   Q.   Did you know whether he had been arrested before?

19   A.   No.

20   Q.   Did you know whether he had ever been read his

21  rights before?

22   A.   No.

23   Q.   But you were then going to use your language

24  skills to read him the rights card in Spanish, correct?

25   A.   That's correct.

J.H.

1    Q.   And you wanted to read them to him so that he

2    understood what his rights were, correct?

3    A.   That's correct.

4    Q.   So did you explain to him what each right meant in

5    your own language, in your own words?

6    A.   No.  He understood.

7    Q.   He understood what it meant -- did you read him

8    the right that he had the right to remain silent?

9    A.   Yes, I did.

10   Q.   And that anything can be used against -- anything

11   he says can be used against him in court?

12   A.   Yes.

13   Q.   Did you explain to him what that meant?

14   A.   No.

15   Q.   What it means to use something against you in

16   court?

17   A.   No.

18   Q.   You didn't explain that to him, did you?

19   A.   No.

20   Q.   In fact, is it correct to say that you just read

21   through the card straight through without pausing or

22   explaining anything; is that right?

23   A.   I read the card, yes.

24   Q.   How long did it take you to do that?

25   A.   I guess as long as it took me to read it here.

J.H.

1      Q.   You tell me.  You were there.  You say you read it

2  from the card.

3      A.   A couple of minutes.

4      Q.   And by, A couple of minutes, do you mean two?

5      A.   Give or take.

6      Q.   Give or take a few seconds, one way or the other?

7      A.   No.

8      Q.   Pardon?

9      A.   A little more than two minutes.

10     Q.   A little more than two minutes?

11     A.   Um-hum.

12     Q.   Now, do you need the card in front of you to

13  remember what it was you read to him?

14     A.   Yes.

15     Q.   You have I take it read this card before in

16  Spanish to a number of accused?

17     A.   Yes.

18     Q.   And I take it you read it in English as well?

19     A.   Yes.

20     Q.   And do you remember reading him that part of the

21  statement that says, And that you have the right to keep

22  silent until you have had a chance to talk to a lawyer?

23     A.   If it's on the top half, yes.

24     Q.   What do you mean?

25     A.   You are talking about --

1    Q.    The English?

2    A.    No, the Spanish side.  Yes, I did read him that

3    half.

4    Q.    Do you remember as you sit here now what rights

5    you read to him?

6    A.    Sure.

7    Q.    What are they?

8    A.    Not off the top of my head.  All the rights are

9    off the card.

10   Q.    Did you audiotape or videotape your reading of

11   these rights?

12   A.    No.

13   Q.    So we have essentially your testimony saying that

14   you read all of the rights, correct?

15                MR. PERRI:  Objection.

16                THE COURT:  Overruled.  That's what we have,

17       right?

18                THE WITNESS:  Yes.

19                THE COURT:  Thank you.

20   Q.    And as you sit here now, you don't even remember

21   the rights you read?

22   A.    Yes.

23   Q.    That's correct?

24   A.    It's on the card, um-hum.

25   Q.    No, no.  I'm asking you you say you read him the

J.H.

1   rights.

2         A.   Correct.

3         Q.   I'm asking you as you sit here now if you remember

4   the rights that you read to him.

5         A.   Yes.

6         Q.   Can you tell us what they were?

7              THE COURT:   Can you tell us not

8       word-for-word?

9              THE WITNESS:   Yes.  You have the right to

10      remain silent, anything you say can be use against you

11      in court.  You have the right to speak to an attorney

12      prior to answering any questions that we ask.  I asked

13      him did he understand.  He said yes.  Now that I have

14      asked you these questions, are you willing to answer

15      questions, and he said yes.

16             THE COURT:   That and that's the sum and

17      substance of the rights, but you read them directly

18      from the card?

19             THE WITNESS:   Always, yes.

20        Q.   Did you tell him what he was being questioned

21   about?

22        A.   No.

23        Q.   Did you tell him I'm not going to be asking you

24   these questions?

25        A.   No.

J.H.

1    Q.   Did you read to him, now that I have advised you
2  of your rights, are you willing to answer questions?
3    A.   Yes.
4    Q.   Did you tell him and by the way, I'm not going to
5  ask you questions, Detective Baran is?
6    A.   No.
7    Q.   So you say that he wrote the word, Si, correct,
8  how many times?
9    A.   I believe it was twice.
10    Q.   And you asked him a question, Now that I have
11  advised you of your rights, are you willing to answer
12  questions, correct?
13    A.   Yes.
14    Q.   But you never told him what you were going to ask
15  him about, right?
16    A.   That's correct.
17    Q.   Did you sign this card?
18    A.   Yes.
19    Q.   And you signed it, and what did that mean when you
20  signed the card?
21    A.   That I was present there, and I read him the
22  rights.
23    Q.   And that you witnessed his signature?
24    A.   Yes.
25    Q.   That's what your signature means?

J.H.

1      A.    Yes, the time and date that the card was read to

2   him.

3      Q.    And who wrote that?

4      A.    I did.

5      Q.    After you witnessed the signature, did you remain

6   in the room?

7      A.    No.

8      Q.    Why did you leave?

9      A.    Again, I was working on something else.

10     Q.    Do you recall what you were working on?

11     A.    I do not.

12     Q.    Anybody ask you to leave the room?

13     A.    No.   I already had something going on prior to

14  this.

15     Q.    Did Detective Baran ask you to leave the room?

16     A.    No.

17     Q.    Did he give you any kind of signal to leave the

18  room?

19     A.    No.

20           THE COURT:  Mr. Berger, find a good place to

21      break.

22           MR. BERGER:  We can do it now, Judge, if it's

23      okay.

24           THE COURT:  Very good.  All right, we are

25      going to take a lunch break now.  If you could be back

J.H.

Det. R. Pacheco - People - Cross        250

1        let's say 2:15, please.

2                    MR. PERRI:  Yes, your Honor.

3                    THE COURT:  See everyone at 2:15.  Thank you.

4                    (Whereupon, a luncheon recess was taken.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J.H.

1    A F T E R N O O N    S E S S I O N

2                    THE CLERK:  Case on hearing continued,

3         Indictment 742N of 2014, People versus Daniel Ramos.

4         Let the record reflect all parties are present.  The

5         sworn Spanish interpreter is present.

6                    And Detective, you are reminded you're still

7         under oath.

8                    THE COURT:  All right, whenever you're ready,

9         Mr. Berger.

10                   MR. BERGER:  Thank you.

11   CROSS-EXAMINATION

12   BY MR. BERGER:  (CONTINUED)

13        Q.   Detective, you were shown a copy of the rights

14   card this morning, you identified it, and you indicated a

15   time on it; do you remember that?

16        A.   Yes.

17        Q.   And when was that time entered on the card?

18        A.   That time is taken when the rights card -- when

19   it's being read.

20        Q.   When it was being read or when it was being

21   signed?

22        A.   Well, basically when I read it, and I take note of

23   the time when it's being read, and then we'll sign it

24   afterward.

25        Q.   So you're saying you signed it after the card was

1    read?

2         A.   Yes.

3         Q.   Was it signed after the defendant put his

4    signature on the card?  Did you put the time down then?

5         A.   I put the time that I noted down was the time that

6    I started to read the card.

7         Q.   When you started to read the card?

8         A.   Yes.

9         Q.   Now, did the defendant read the card at all?

10        A.   Yes.

11        Q.   He read it aloud?

12        A.   Yes.

13        Q.   In what language?

14        A.   Spanish.

15        Q.   And was that read by him after or before he signed

16   it?

17        A.   That was -- he read the bottom half after he

18   signed that he understood.

19        Q.   But he signed it after he wrote the word, Si,

20   correct?

21        A.   That's correct.

22        Q.   And one of the questions there is, Do you

23   understand?

24        A.   Right.

25        Q.   So he put down, Si, correct?

J.H.

1       A.    That's correct.

2       Q.    And then you had him answer the word, put the

3   word, Si, down again; did you not?

4       A.    Yes, I did.

5       Q.    And then you had him sign his name, correct?

6       A.    Yes.

7       Q.    And now you have him read the card in Spanish?

8       A.    The bottom of the card.

9       Q.    What do you mean, The bottom of the card?

10      A.    The second half of the notification.

11      Q.    What do you mean by the second half?  Tell us in

12  substance what --

13      A.    If you give me the card.

14      Q.    So you don't remember independently now what you

15  read without looking at it?

16      A.    It's the bottom half of the card.  Basically the

17  same thing that he was advised by detectives.

18      Q.    And you had him read it aloud, correct?

19      A.    Correct.

20      Q.    And Detective Baran was there at the time?

21      A.    That's correct.

22      Q.    Now, did you ever say to the defendant that if he

23  signs the card, the judge will believe that he is truthful,

24  and she will release him?

25      A.    No.

1    Q.   You didn't say anything like that?

2    A.   No.

3    Q.   Well, now, when you entered the room, you say that

4    it was Detective Baran who asked him if he would rather have

5    the rights in Spanish or English, correct?

6    A.   I said I didn't recall exactly which one.

7    Q.   It could have been you?

8    A.   It could have been me.

9    Q.   So the question was would you rather have the

10   rights in English or Spanish, and he answered Spanish,

11   correct?

12   A.   Correct.

13   Q.   You remember him saying that?

14   A.   Yes.

15   Q.   And is that the first thing you remember him

16   saying?

17   A.   More or less.

18   Q.   Yes?

19   A.   Yes.

20   Q.   I mean as you sit here now, can you think of him

21   saying anything else before that?

22   A.   I don't recall.

23   Q.   As you sit here now, what you're saying is you

24   don't recall him saying anything else before that?

25   A.   No.

1     Q.    That is correct?

2     A.    Yes.

3     Q.    And then you went ahead, and you read him the

4    card, correct?

5     A.    That's correct.

6     Q.    You had him sign?

7     A.    That's correct.

8     Q.    Then you say you had him read the bottom part of

9    the card?

10    A.    That's correct.

11    Q.    Did you have him sign that part too?

12    A.    Yes.

13    Q.    And then you left?

14    A.    Then I left.

15    Q.    So based upon what you -- based upon what you have

16   told us then, you then left the room.  So you only heard him

17   use the word Spanish when he was asked by Detective Baran

18   what language he wanted to be read the rights in, correct?

19    A.    He did speak some English.  I don't know what --

20    Q.    When did he do that?

21    A.    Earlier on.

22    Q.    Earlier than what?

23    A.    When he was talking to Detective Baran.

24    Q.    Well, didn't you and Detective Baran walk into the

25   room together?

1    A.   Yes.

2    Q.   So what did you hear Detective Baran say to him?

3    A.   I don't recall.

4    Q.   How do you know he was speaking English?

5    A.   Because I heard him speak English.

6    Q.   And what is it that you heard him say?

7    A.   I don't recall the conversation, but he did speak

8  English.

9    Q.   And you don't even remember the subject matter of

10 what was said?

11   A.   I do not.

12   Q.   You don't even remember any of the English words

13 he used?

14   A.   I do not.

15   Q.   But you are sure that he spoke English?

16   A.   Yes.

17   Q.   And you have a specific recollection as you sit

18 here now that he spoke English?

19   A.   Yes.

20   Q.   And when you think about that, no words come to

21 mind?

22   A.   No.

23   Q.   But you have that recollection?

24   A.   Yes.

25   Q.   How long did that conversation last where say you

J.H.

1    hear the defendant speaking English?

2        A.    Very short.

3        Q.    And by that, can you estimate minutes, seconds?

4        A.    Might have been minutes.

5        Q.    Minutes?

6        A.    Could have been minutes.

7        Q.    You're telling us that according to your

8    testimony, he had no difficulty speaking English, right?

9        A.    Correct.

10       Q.    But you can't tell us how you know that?

11       A.    I heard him speak English.

12       Q.    You say that you heard him speak English, and you

13   have no recollection of what he said?

14       A.    I don't know what it was about.

15       Q.    I'm sorry, sir?

16       A.    I don't recall.

17       Q.    Is there anything that would help you recall?  You

18   have to answer.

19       A.    No.

20       Q.    So you left the room, and how long were you out of

21   this room until you reentered it?

22       A.    I don't recall.

23       Q.    Hours, minutes?

24       A.    Could have been.  I don't recall.

25       Q.    Could have been what?

1      A.   Could have been hours.  I don't know.

2      Q.   Now, there came a time when you were asked to go

3  back into the room?

4      A.   That's correct.

5      Q.   And who did that?

6      A.   Detective Baran.

7      Q.   And where were you when that happened?

8      A.   Exactly, I don't recall.  I was in the SVS office.

9      Q.   In the what office?

10      A.   In our office.

11      Q.   Do you remember what you were doing when you were

12  asked?

13      A.   Could have been at my desk.  Don't recall.

14      Q.   But you were able to get up right away and go in,

15  right?

16      A.   That's correct.

17      Q.   You didn't say I'm in the middle of something, I

18  have to finish it before I can come in?

19      A.   Not that I can't recall.  Could have.  I don't

20  know.

21      Q.   You do remember him coming to ask you to come in,

22  don't you?

23      A.   Somewhat.

24      Q.   Well, either yes or no, not somewhat.  Do you

25  remember him asking you to come in?

1    A.   Well, he did because I -- he did.

2    Q.   He did?

3    A.   Yes.

4    Q.   And you remember that?

5    A.   Yes.

6    Q.   And where were you when that happened?

7    A.   That I don't know.  Might have been at my desk.

8    Q.   So you have a specific recollection of him asking

9    you, you just don't know where you were?

10    A.   I was in the office somewhere.  Whether I was at

11    my desk or somewhere else, I don't recall.

12    Q.   Were you in the middle of anything?

13    A.   I was probably in the middle of something, because

14    I have my on stuff going on.

15    Q.   Detective, I'm not asking you probably.  I'm

16    asking you whether you have a recollection.

17    A.   Then I probably would say yes, I was in the middle

18    of something.

19    Q.   So what was it?

20    A.   I don't recall.

21    Q.   So you don't have a recollection of what you were

22    in the middle of if you were?

23    A.   No.

24    Q.   So what did he say to you to ask you to come back

25    into the room?

J.H.

1    A.    Just asked me if I would read it back to him in

2  Spanish.

3    Q.    So when you walked in -- and the, it, being what,

4  People's 5?

5    A.    The statement.

6    Q.    The statement?

7    A.    Um-hum.

8    Q.    And I think you told us that you initialed the

9  statement, correct?

10    A.    Yes.

11    Q.    But you didn't see him put his initial -- you

12  didn't see the defendant put his initials there, did you?

13    A.    That's correct.

14    Q.    So you didn't witness him putting his initials?

15    A.    That's correct.

16    Q.    But you did put your signature on it, on the

17  statement, because you indicated before that you witnessed

18  him --

19    A.    No, I didn't say witnessed.  I said it was there.

20    Q.    No, no.  But with respect to the rights card --

21    A.    With respect to the rights card, yes.

22    Q.    That's what your signature meant that you

23  witnessed it, correct?

24    A.    Yes.

25    Q.    So you put your initials next to another set of

1    initials or two sets?

2          A.    Um-hum.

3          Q.    And what did that mean?

4          A.    Well, what that meant was when I read it back --

5    when I read it back to him in Spanish, I let him know that

6    those are the words that were changed.  So I initialed it to

7    show that, yes, these are the words that were changed on

8    there.

9          Q.    But you don't know who changed them, do you?

10         A.    The corrections, no, I do not.

11         Q.    So what do your initials mean?

12         A.    Well, I do, because it's his -- those are his

13   initials.

14         Q.    But you -- anybody could put DR there, right,

15   Daniel Ramos?  You know the name of the defendant?

16         A.    That's correct.

17         Q.    So anybody could put DR there, right?

18         A.    Well, I don't think anybody would put them in.

19   Those are his initials.

20         Q.    But when you put your initials there, isn't that

21   signifying that you are witnessing him put his initials

22   down?

23         A.    No.  I just -- I used it, my initials, when I

24   translated back to him to let him know that that's a

25   correction that was made, basically is he in agreement with

J.H.

1    that.

2        Q.    When you read this back, you say you read the

3    whole thing back?

4        A.    That's correct.

5        Q.    Did you audiotape that or videotape it?

6        A.    Did not.

7        Q.    So we have just your testimony to that effect that

8    you read the whole thing back to him?

9        A.    That's correct.

10       Q.    Was Detective Baran there at the time?

11       A.    Yes, he was.

12       Q.    Did you say anything to him in English, the

13   defendant, that is?

14       A.    No.

15       Q.    Do you remember answering Mr. Perri's questions

16   earlier this morning when he asked you what you did with

17   People's 5, the statement, and you said I basically read it

18   back to him?

19       A.    Yes.

20       Q.    Did you say anything about stopping at the

21   corrections and pointing that out?

22       A.    No, I did not.

23       Q.    But you insist that's what happened?

24       A.    Yes.

25       Q.    And what was his reaction when you went to point

J.H.

1    out those three changes in the body of the statement?

2         A.    Who are you referring to?

3         Q.    The defendant.

4         A.    He was okay with it.

5         Q.    Did you have the defendant read the statement in

6    English or Spanish?

7         A.    No.

8         Q.    Let me ask you this:  The statement says, I am

9    giving this statement to Detective Baran who has typed it

10   for it me, and Detective Pacheco has read it to me in

11   Spanish, and it is correct and true.  Is that part of the

12   statement that you say you read to him?

13        A.    Yes.

14        Q.    Now, did the defendant look over your shoulder

15   when you were reading People's 5 to him?

16        A.    Was he looking over my shoulder?

17        Q.    Yes.

18        A.    No.  He was across from me.

19        Q.    He was across from you.  So it would be upsidedown

20   for him to be able to read it, right?

21        A.    Yes.

22        Q.    Correct?

23              So how is it that the defendant can say that you

24   read to him in Spanish when he's not looking over your

25   shoulder?

1              MR. PERRI:  Objection.

2              THE COURT:  Do you understand the question?

3              THE WITNESS:  Yes.

4              THE COURT:  You can answer.

5       A.   He was given the statement back.

6       Q.   What do you mean he was given it back?

7       A.   To sign it.

8       Q.   To sign it?

9       A.   Um-hum.

10      Q.   But he didn't read it in front of you, did he?

11      A.   Not in front of me.

12      Q.   And as far as you know, he didn't read it in front

13   of anybody, correct?

14      A.   That's correct.

15      Q.   So how does the defendant know that you read it to

16   him?

17              MR. PERRI:  Objection.

18              THE COURT:  Sustained.

19      Q.   You didn't witness him read it, correct?

20      A.   That's correct.

21      Q.   So if you had left out a sentence or two, he

22   wouldn't know whether you read the whole thing to him or

23   not, would he?

24              MR. PERRI:  Objection.

25              THE COURT:  Sustained.

1    Q.    You asked the defendant to sign a statement --
2    withdrawn.
3         That statement was signed before you read it to
4    him in Spanish?
5    A.    No.
6    Q.    Afterwards?
7    A.    Yes.
8    Q.    So you asked the defendant to sign a statement in
9    which it says that Detective Pacheco has read it to me,
10   correct?
11   A.    That's correct.
12   Q.    And you tell us he wasn't looking over your
13   shoulder to see it, right?
14   A.    That's correct.
15   Q.    So the defendant doesn't know whether you read it
16   to him, does he?
17        MR. PERRI:  Objection.
18        THE COURT:  Sustained.
19   Q.    Does the defendant know that you read him the
20   statement?
21        MR. PERRI:  Objection.
22        THE COURT:  Sustained.
23   Q.    Did you ask the defendant whether or not you had
24   read him the statement?
25   A.    Did I ask him, no.

J.H.

1      Q.   Now, in this case, did you witness the defendant

2   sign People's 5?

3      A.   Yes.

4      Q.   And that's what your signature means on there,

5   correct?

6      A.   That's correct.

7      Q.   That you witnessed him sign it?

8      A.   That's correct.

9      Q.   But you didn't witness him read it, correct?

10     A.   That's correct.

11     Q.   And you didn't even witness him give it to

12  Detective Baran, did you?

13     A.   That's correct.

14     Q.   So the only way the defendant would be aware of

15  the content is your reading this statement in Spanish?

16              MR. PERRI:  Objection.

17              THE COURT:  Sustained.

18     Q.   As far as you know, do you have any other reason

19  to believe the defendant was aware of the content of the

20  statement other than what you say you read?

21              MR. PERRI:  Objection.

22              THE COURT:  Well, I'll take an answer as far

23       as you know, all the knowledge that you have, do you

24       know of any other way that the defendant knew of the

25       statement other than you reading it?  And hearsay's

1          allowed.  It's been asked.  Do you have any other

2          information about whether or not the defendant knew

3          what was in the statement?

4                    THE WITNESS:  According to, again, I think he

5          read it with Detective Baran.

6          Q.   But you don't know that, do you?

7          A.   I wasn't there.

8          Q.   So you don't know whether he read it with

9     Detective Baran or not, correct?

10         A.   Correct.

11         Q.   So now what's the next thing that happened after

12    he signed the statement?

13         A.   I left.

14         Q.   You left?

15         A.   That's correct.

16         Q.   That was the end of your contact with the

17    defendant?

18         A.   That's correct.

19         Q.   And that's what you remember clearly as you sit

20    here now and testify?

21         A.   That's correct.

22         Q.   So did you have anything to do with People's 6 in

23    evidence?

24         A.   Which is --

25         Q.   The so-called apology letter?

Det. R. Pacheco - People - Cross          268

1    A.    No.

2    Q.    You were not asked to read it that night?

3    A.    He did ask me what it said.

4    Q.    Who did?

5    A.    Detective Baran.

6    Q.    And did you tell him?

7    A.    Yes.

8    Q.    Did you write down for him an English translation

9    for that statement?

10   A.    Did not.

11   Q.    Were you present when the defendant wrote People's

12   6?

13   A.    I was not.

14   Q.    You were not, you said?

15   A.    No.

16   Q.    No, that's correct?

17   A.    That's correct.

18   Q.    Now, you say that you read the sentence to him

19   that I tickled her pussy with my mouth; is that correct?

20   A.    That's correct.

21   Q.    And how would you say that in Spanish?

22         MR. PERRI:  Objection.

23         THE COURT:  Well, it can't be taken down, so

24   there's no way to record the answer.  So in light of

25   that, I will sustain the objection.

J.H.

Det. R. Pacheco - People - Cross          269

1          MR. BERGER:  I have nothing further.  Thank

2     you.

3          THE COURT:  Redirect?

4          MR. PERRI:  No, thank you, your Honor.

5          THE COURT:  Thank you very much.  You are

6     excused.

7          MR. BERGER:  One second, please, Judge.

8     There are some notes that were written.  If the

9     interpreter could just tell me --

10          (Mr. Berger and the interpreter conferred.)

11          MR. BERGER:  Thank you, judge.  I have

12     nothing further.

13          THE COURT:  All right, you may step down.

14          (The witness was excused.)

15          THE COURT:  People, any other witnesses?

16          MR. PERRI:  No, your Honor.  The People rest.

17          THE COURT:  Mr. Berger, are you putting on

18     any sort of a case for this hearing?

19          MR. BERGER:  No, your Honor.

20          THE COURT:  All right.  So do we want to do

21     argument now?

22          MR. BERGER:  No, Judge.  I want to get the

23     minutes, and I want to prepare and do some research,

24     because I think we have a fairly interesting and close

25     issue here, and Joanne has indicated it would take a

J.H.

Proceedings                                270

1    little bit of time.  With the Court's indulgence, could

2    I --

3            THE COURT:  That's fine.  Let's pick a date.

4    When did you think you can have everything that you

5    need, Mr. Berger, and then take a couple of weeks to

6    prepare whatever it is you are going to prepare and get

7    it to the People?  They need to respond.

8            MR. BERGER:  Well, we'll do some research.

9    We can either have an argument.

10           THE COURT:  Off the record.

11           (A discussion was held off the record.)

12           THE COURT:  Do you want to have something

13   prepared, whether it be -- if it's going to be oral,

14   you will have to let Mr. Perri know.  If you want to

15   prepare something, how about we say do you want

16   November 7th or November 12th?

17           MR. BERGER:  November 7th is fine.

18           THE COURT:  All right.  So if it's going to

19   be written, please have it written by November 7th.

20           And then People, you can respond in writing

21   by how about November 25th; does that work?

22           MR. PERRI:  Yes, your Honor.

23           THE COURT:  So November 7th for written.

24           MR. BERGER:  I may ask the Court, if your

25   Honor is interested in doing it that way, may I just

1    ask the Court to have oral argument on the 7th?  I

2    should be ready by that time for sure.

3                THE COURT:  Either way.

4                MR. BERGER:  If there's an involved legal

5    issue, I will certainly get a memo to you on that.

6                THE COURT:  Fair enough.  Let me have the

7    schedule in place.  So November 7th for defense.

8    November 25th for People?

9                MR. PERRI:  Yes, your Honor.

10               THE COURT:  And then do you want to have a

11   reply framework in case we do it in writing, Mr.

12   Berger?

13               MR. BERGER:  If it comes to that, sure.

14               THE COURT:  If it comes to that.  So that if

15   it does, I'll take your reply by December 5th.  Is that

16   enough time?  That's about two weeks.

17               MR. PERRI:  Yes, your Honor.

18               THE COURT:  So December 5th for any reply if

19   we need to go that way.

20               Now, if you determine, Mr. Berger, after

21   receiving the minutes on or about October 24th that you

22   can do everything orally, let Mr. Perri know.  And then

23   will both of you be available for oral arguments here

24   on the 7th of November?

25               MR. BERGER:  I think so.

Proceedings                    272

1          MR. PERRI:  There's a chance I would be

2     engaged on trial before Judge Gugerty.  But there are

3     two other trials scheduled in October before that.

4     Otherwise I would be free.

5          THE COURT:  We'll say the 7th.  If you're

6     actually engaged, you will let me know.  And if we have

7     to kick it a few days, we'll kick it a few days.

8          I'm going to put this down as an appearance

9     date on November 7th with the production of your

10     client.  If that's going to change, please make sure

11     you let us know so that we're not wasting everyone's

12     time coming in for no reason.  Thanks, everyone.

13  *          *          *          *          *          *

14  This is certified to be a true and accurate transcript of my

15  stenographic notes taken in the above-captioned matter.

16

17     _____

18     Joanne Horrocks, CSR
       Official Court Reporter

19

20

21

22

23

24

25

J.H.

Index                                        273

INDEX TO WITNESSES

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **For the People:** | | | | |
| P.O. Joseph Boccio | 5 | 13 | 70 | |
| Det. Maurice Baran | 92 | 119 | 211 | 212 |
| Det. Reinaldo Pacheco | 216 | 228 | | |


INDEX TO EXHIBITS

|  | ID | EVD |
|---|---|---|
| **For the People:** | | |
| 1 - Testimony - 5 pgs. | 69 | |
| 2 - Summary Report, 4 pgs. | 71 | |
| 3 - Logs - 7 pgs. | 72 | |
| 4 - Rights, copy, 2 pgs. | 102 | 104 |
| 5 - Statement, copy, 2 pgs. | 106 | 108 |
| 6 - Handwritten note, copy, | 114 | 115 |
| **For the Defendant:** | | |
| A - Notes | 56 | |
| B - Notes | 127 | |

J.H.