

1

```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    COUNTY OF NASSAU : CRIMINAL TERM PART 43

 3    ------------------------------------------X
      THE PEOPLE OF THE STATE OF NEW YORK,    :   Indictment
 4                                            :   No. 742N/14
                -against-                     :
 5                                            :
      DANIEL RAMOS,                           :   VOL. I
 6                                            :
                          Defendant.          :   Trial
 7    ------------------------------------------

 8                              May 5-11, 12-14, 2015
                               May 19-21, 26-29, 2015
 9                             262 Old Country Road
                               Mineola, New York
10
      B E F O R E:
11
            HONORABLE TERESA K. CORRIGAN,
12                        Acting Supreme Court Justice

13
      A P P E A R A N C E S:
14
                  MADELINE SINGAS
15                Acting Nassau County District Attorney
                  For the People
16                BY:  ANTHONY PERRI, ESQ.,
                             Assistant District Attorney
17                           of Counsel

18                HON. KENT MOSTON
                  Nassau County Legal Aid Society
19                Attorneys for Defendant
                  40 Main Street
20                Hempstead, New York
                  BY: MICHAEL BERGER, ESQ., of Counsel
21

22                Spanish Interpreter:  Carmen Knight

23                      *         *         *
24
25                                KAREN M. MASLER
                                  Senior Court Reporter
```

kmm

Proceedings                2

1                    THE CLERK:  Case on trial, Indictment Number
2        742N of 2014, People of the State of New York vs.
3        Daniel Ramos.
4                    MR. PERRI:  Anthony Perri, for the People.
5        Good morning.
6                    MR. BERGER:  Michael Berger, Legal Aid
7        Society, for Mr. Ramos.
8                    THE INTERPRETER:  Carmen Knight, New York
9        State interpreter.
10                   THE CLERK:  Are you Daniel Ramos?
11                   THE DEFENDANT:  Yes.
12                   THE CLERK:  Do you appear here with your
13       attorney, Mr. Berger?
14                   THE DEFENDANT:  Yes.
15                   THE CLERK:  You may be seated, sir.
16                   Are both sides ready?
17                   MR. PERRI:  Yes, your Honor.
18                   MR. BERGER:  Yes, your Honor.
19                   THE COURT:  Before we start jury selection,
20       we have preliminary matters we need to take care of.
21                   First, People, you turned over Rosario; is
22       that correct?
23                   MR. PERRI:  The People handed over a Rosario
24       packet to the Court and to defense counsel.
25                   THE COURT:  Mr. Berger, do you acknowledge

Proceedings                    3

1        receipt of that?

2                MR. BERGER:  I acknowledge receipt of

3        documents that is numbered approximately 371 pages.

4        That has been turned over to me by Mr. Perri this

5        morning.

6                THE COURT:  The Court will mark that Court

7        Exhibit I.

8                Additionally, Mr. Berger, have you had an

9        opportunity to go over the Antommarchi waiver with your

10       client?

11               MR. BERGER:  I have not.

12               THE COURT:  Before we finish with the

13       Antommarchi waiver, Mr. Ramos, I want to address with

14       you a letter that you sent to me personally that I have

15       now marked as a motion, which asks me to give you a new

16       lawyer.

17               Mr. Ramos, I've read over the letter, I've

18       discussed it with Mr. Berger and with Mr. Perri, and

19       it's my understanding that Mr. Berger has discussed

20       this letter with you; is that correct, sir?

21               THE DEFENDANT:  Yes.

22               THE COURT:  Mr. Ramos, do you want me to

23       inquire of you now regarding your request for a new

24       attorney, or do you want to stay with Mr. Berger?

25               THE DEFENDANT:  I want to stay with

kmm

Proceedings                    4

1          Mr. Berger.

2                    THE COURT:  Are you thereby withdrawing your

3          request for a new attorney?

4                    THE DEFENDANT:  Yes, okay.

5                    THE COURT:  I don't want to hear okay.  I

6          need to know whether or not this is what you want to

7          do.  Do you want to withdraw your request for a new

8          lawyer?

9                    THE DEFENDANT:  Yes.

10                    THE COURT:  Mr. Ramos, has anyone forced you

11          to withdraw your request for a new attorney?

12                    THE DEFENDANT:  No.

13                    THE COURT:  Has anyone threatened you?

14                    THE DEFENDANT:  No.

15                    THE COURT:  Is it you and you alone that has

16          decided you do not want a new attorney?

17                    THE DEFENDANT:  Yes.

18                    THE COURT:  People, do you want to be heard?

19                    MR. PERRI:  No, your Honor.

20                    THE COURT:  Mr. Berger, anything for the

21          record on this?

22                    MR. BERGER:  I would state, for the record, I

23          have seen Mr. Ramos at least twice since that time.  We

24          had excellent conferences, and we're both ready to

25          proceed.

Proceedings                    5

1           THE COURT:  Very good.   The motion is being

2      marked withdrawn.   Thank you.

3           Mr. Ramos, I'm holding up in front of you a

4      piece of paper that says Antommarchi waiver on it; do

5      you see this document?

6           THE DEFENDANT:  Yes, I see it.

7           THE COURT:   Is this the document you just

8      went over with your attorney with the help of the

9      interpreter?

10          THE DEFENDANT:  Oh, yes.

11          THE COURT:   And is this your signature above

12     where -- above where it says the word defendant?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Do you understand what you waived

15     by signing this document, sir?

16          THE DEFENDANT:  Yes.

17          THE COURT:  And do you understand, Mr. Ramos,

18     that normally you would have the right to be present

19     during any material stage of the trial, when impaneling

20     the jury and that if we had a conversation up here at

21     my desk, you would have the right to come up to my desk

22     if that's what you wanted to do, but by signing this

23     paper, you are relying on your attorney to come up to

24     the bench, and then to let you know exactly what has

25     been said while you remain at the table.  Do you

Proceedings                    6

1      understand that?

2             THE DEFENDANT:  Yes.

3             THE COURT:  And is that what you would like

4      to do?

5             THE DEFENDANT:  Yes.

6             THE COURT:  This will be marked as Court

7      Exhibit II.

8             The next item I have here is the People's

9      witness list, which I'll mark as Court Exhibit III.

10            Now, Mr. Berger, I'm not asking that you

11     necessarily provide me a witness list at this time.  I

12     do require that you provide me with any names of

13     potential witnesses when I do jury selection.  I do

14     delineate for the jury what names are the People's

15     names and what names are the defendant's names.  I also

16     advise the jury that these are potential witnesses or

17     names they may hear during the case.  Do you have any

18     names to give me, sir?

19            MR. BERGER:  Christy Hernandez, Dr. Karl

20     Reich.

21            THE COURT:  Spell the last name for me,

22     please.

23            MR. BERGER:  R-E-I-C-H, maybe.  Stephany

24     Ramos.

25            THE COURT:  Christy Hernandez, Karl Reich and

                                                       kmm

Proceedings                      7

1        Stephany Ramos.

2                    MR. BERGER:  Yes, your Honor.

3                    THE COURT:  Anyone else?

4                    MR. BERGER:  No, your Honor.  I reserve the

5        right to produce others but at this point those are the

6        only possible names that I'm aware of.

7                    THE COURT:  Fair enough.  I appreciate that.

8        I want to make sure that we are in a posture to

9        proceed.

10                   Mr. Berger, I'm sure you have spoken with

11       your client about a potential plea bargain in this

12       scenario.  I want everyone on notice, as the Court

13       understands it, there are two counts in the indictment.

14       The first count being criminal sexual act in the first

15       degree, which I understand carries a minimum sentence

16       of five years incarceration, and a maximum sentence of

17       twenty-five years incarceration, and endangering the

18       welfare of a child, which is an A misdemeanor, which

19       carries a maximum sentence of one year incarceration.

20                   Mr. Berger, is your client aware of the

21       charges that he is facing and the possible sentences?

22                   MR. BERGER:  He is.

23                   THE COURT:  And are we proceeding to trial at

24       this time?

25                   MR. BERGER:  We are.

Proceedings                    8

1          THE COURT:  Very good.

2          People, I'll hear you now on any

3     preliminaries you have.

4          MR. PERRI:  Yes.  The People have an

5     application under Molineaux.  Your Honor, although, the

6     People concede that use of evidence of prior bad acts

7     and crimes to prove the defendant's actual propensity

8     to complete the crime that is before the Court

9     contained in the indictment that would be inadmissible

10     as a matter of law --

11          THE COURT:  It's about custody?

12          MR. PERRI:  The People would state that they

13     should be allowed to elicit testimony regarding certain

14     prior bad acts and uncharged crimes for two reasons:

15     The first, it's material to ask aspects of the People's

16     case other than propensity, and second, the probative

17     value of the evidence outweighs any incidental

18     prejudice that such testimony may cause.  The testimony

19     of the People are seeking to elicit, clearly from

20     Crystal Ramirez Ramos, as follows:

21          On at least one occasion it is alleged that

22     the defendant, in the preceding months to the incident,

23     contained in the indictment, had oral sexual contact

24     with the victim's vagina while alone with her in her

25     mother's bedroom at the same location.

kmm

Proceedings                    9

1           At that time the defendant also allegedly

2      exposed his penis and touched his penis to the buttocks

3      to the six-year old victim.   In preparing for my

4      testimony, the evidence has been repeated, disclosed by

5      her in the same fashion, there's an earlier disclosure

6      that defense counsel has given notice contained in the

7      32B, the supporting deposition of Crystal Ramirez, and

8      there was also testimony about it at the hearing that

9      was conducted in this case.

10          Your Honor, the non-propensity reasons is

11     that the People argue -- justify the admission of this

12     testimony are fundamentally three-fold.   The first is

13     that the People argue this testimony, and the

14     allegations contained in the indictment, constitutes

15     one ongoing course of criminal conduct, and although,

16     the People were not able to present a course of conduct

17     charge in the grand jury due to the young age of the

18     victim and inability to pinpoint the earlier alleged

19     incident outside of the -- within a two-month range,

20     that would be required in order to present to the grand

21     jury a course of criminal conduct charge in the first

22     degree.

23          The People believe and argue to the Court

24     that these two charges, these two incidents together

25     are part of an ongoing criminal conduct against this

kmm

Proceedings                    10

1    child perpetrated by the defendant.

2              Second, the People believe it's valid

3    background material that is explained to the jury, the

4    relationship that existed between the defendant and the

5    alleged victim in this case, that this incident

6    contained in the indictment did not happen out of

7    nowhere.  It was not as a spontaneous incident in the

8    kitchen, but there was conduct the People would argue

9    is grooming and actual sexual abuse that occurred prior

10   to the date of incident in this case.

11             And finally, third, your Honor, the People

12   argue that proper evidence of motive and intent of the

13   defendant, that the People argue this rebuts the

14   defendant's own statements that his conduct, the

15   statements to the police that were the subject of the

16   Huntley hearing, that his conduct of having oral

17   contact with the private areas of the alleged victim

18   was not sexual in nature, that it was for the purpose

19   of tickling her.

20             Whereas this evidence shows that because

21   there was a prior occasion where this occurred in

22   seclusion in an intimate setting in the bedroom of the

23   victim's mother, when she was isolated from her

24   brother, and the defendant exposed his own genitals

25   during that incident, the sexual purpose and criminal

1    nature of the defendant's intent would be proven in its

2    proper evidence in the People's case in chief.

3            We handed up to the Court and provided

4    defense counsel with a copy of several cases from the

5    Second Department.  First of which says, that the

6    exception to the Molineaux rule are not confined

7    notice.  People v. DeJesus 24 AD3d, 464, which do not

8    confine prior incidents of criminal conduct against an

9    alleged victim, even if they are similar in nature to

10   course of conduct charges.  In that case, which was

11   assault in the first degree, prior evidence of

12   assaults, and a history of violence between the parties

13   was allowed in by the Second Department in 2005 because

14   it went to the intent of the defendant and went to

15   their preexisting relationship.

16           People also provided to the Court with People

17   vs. Corvino, 19 AD2d, 842, decided by the Second

18   Department in 1993.  That case applies Molineaux

19   exceptions to cases involving sex crimes.  That case

20   was forcible sodomy, as well as rape of an individual.

21   At the trial, pursuant to the Court's Molineaux hearing

22   there, the victim was allowed to testify to prior

23   instances of rape and for sodomy, which are the same

24   charges contained in the indictment, none of which were

25   course of conduct charges.  And the parties were known

1     to each other before the alleged sex crimes took place,

2     that was found to be admissible because it was

3     necessary to determine the nature, purpose, and intent

4     of the defendant's conduct in that case, and it was

5     essential there in testimony determining the criminal

6     case of the defendant's conduct.  It wasn't limited to

7     the cases.  The Second Department applied the same rule

8     of Corvino statutory sex crimes.  In that case, where a

9     twelve-year old girl was raped by her mother's

10    long-term boyfriend, the Second Department allowed

11    testimony about prior contact in an intimate setting

12    between the defendant and the victim in that case,

13    prior to the incident alleged in the indictment, and

14    that constituted the defense's conviction there.

15         Finally, the People handed up People vs.

16    Ames, 96AD2d, 867, decided reasonably 2012.  Where, the

17    defendant whose -- there is a charge of course of

18    conduct, as well as sex abuse, and endangering the

19    welfare of the child.  The Court allowed the child

20    victim to testify about uncharged sexual contact that

21    occurred between the victim and the defendant predating

22    the items of the incidents that were charged in the

23    indictment in that case.

24         Again, the Court there found it was

25    background information that put the alleged abuse

Proceedings                    13

1    contained in the indictment into a context so the jury

2    was able to follow a complete narrative of the abuse

3    that occurred.

4              In this case, where the allegations that it

5    occurred in the kitchen of the residence of the child,

6    with the mother who was a friend of the defendant,

7    where he was over and it occurred there in the kitchen,

8    the People would argue that this information about a

9    prior occasion where it was done in secret in a

10   bedroom, where the defendant was obviously deriving

11   sexual pleasure from his conduct, would be essential to

12   the jury in deciding whether or not the defendant had

13   the same intent, the same criminal sexual intent in

14   this case, and for them understanding that the

15   defendant's actions on the date of incident did not

16   occur in a vacuum, but were part and parcel of a whole.

17   The People find it more probative than prejudicial.

18   The Court, in its discretion, could provide a detailed

19   limited instruction to alleviate any danger of

20   prejudice occurring against the defendant, and were the

21   Court not to decide to allow such testimony, the People

22   would ask to be heard with respect to what we would

23   allege to open the door to such testimony in the

24   future.

25              THE COURT:  Thank you.  Do you want to

kmm

Proceedings                    14

1      respond, or do you have an objection to allowing it in?

2              MR. BERGER:  Mr. Perri said we had notice.

3      We really didn't -- he provided me with Crystal's

4      statement, which doesn't show any firsthand knowledge

5      of what is claimed here.  Mya did not apparently

6      testify in the grand jury.  This is made up, the whole

7      cloth.

8              Our position simply is, anything that was

9      contained in the police statement that purportedly was

10     made in the statement by the defendant with respect to

11     sexual acts or the acts involved here, our position is

12     the defendant never made such statements and so,

13     therefore, what do we have?  We have nothing except

14     what is claimed to be an act that occurred, but a

15     six-year old that gave no statements to anybody.  We

16     had notice of this until recently, because Crystal --

17     not only did the mother see the incident in this case,

18     she didn't see what supposedly happened a month or two

19     ago.  They're attempting to bootstrap themselves with

20     the Molineaux theory which shouldn't apply.  I won't

21     address the other cases.

22             THE COURT:  The record will reflect we did

23     have conferences regarding this matter in my chambers

24     prior to coming out here today.  I did speak to both of

25     the attorneys about some of my thoughts with regards to

kmm

1     this request by the People.  The Court is going to deny

2     the People's application at this time based on the

3     Court's understanding of the case law, even though

4     information may be found relevant, there still needs to

5     be that weighing of probative versus prejudicial.

6     Based on what the Court's current understanding of the

7     defense's position is, which is that Mr. Ramos did not

8     commit this act, plain and simple, I am not going to

9     allow the testimony in at this time.  If, during the

10    trial, information comes to light that shifts that

11    defense in a way that opens the door -- I'm not saying

12    you can't change your defense.  You can do whatever you

13    want, Mr. Berger.  If information comes out that

14    questions the intent of Mr. Ramos, if he determines or

15    decides he's going to say he committed the act or

16    implied he committed the act, but the intent was

17    different, if there is some sort of indication at trial

18    that this quote/unquote never happened before and this

19    is a dangerous statement for me to make, never happened

20    before, that could be perfectly fine.  Never happened

21    before in some other context might open the door.  I

22    can't predict what is going to come out.  I'm not going

23    to give a roadmap to either of you on how to try the

24    case.  I'm simply putting you both on notice that if at

25    a point in time, Mr. Perri, you believe the door has

Proceedings                16

1      been opened, do not start asking questions until we

2      have a conversation outside the presence of the jury

3      discussing why the door is opened.

4              I'll hear from both of you with regards to

5      that and then I'll adjust my ruling accordingly if it

6      needs to be adjusted.

7              People, do you understand?

8              MR. PERRI:  People understand, and that would

9      be our position as well, your Honor.

10             THE COURT:  I'll note for the record I know

11     you don't agree with my initial ruling and that's fine,

12     but that is my ruling at this time.

13             MR. BERGER:  I would say, for the record, the

14     defendant's position is these acts never happened.

15     They're so-called tickling business that is set forth

16     in the statement was not made by the defendant at all,

17     and so, our defense will be it never happened now and

18     it never happened before.

19             THE COURT:  Fair enough.

20             MR. BERGER:  With respect to this now, are

21     there any other matters with respect to Sandoval.

22             THE COURT:  Yes.  Let's do Sandoval.  Is

23     there anything?

24             MR. PERRI:  Your Honor, it would simply be

25     the same request for the same testimony.  It was the

kmm

1       same request for the same prior bad act to

2       cross-examine the defendant with respect to one

3       previous occasion where we allegedly he did sexually

4       abuse this child.

5              THE COURT:  The ruling remains.  It's not to

6       be brought up in the Sandoval context, again, unless

7       something comes out that makes it inappropriate for it

8       to be questioned, and I'll take that at the point in

9       time that it happens.

10              The length of the trial, we have agreed we're

11      going to pick today and tomorrow.  If we need more time

12      to pick, we'll cross that bridge when we get to it.

13      We're going to have testimony May 11th through May

14      14th, May 19th, 20th, and 21st, and the 26th through

15      the 29th as the outside date, agreed, People?

16              MR. PERRI:  Yes, your Honor.

17              MR. BERGER:  Yes, your Honor.

18              THE COURT:  Anything else for the record

19      before we bring in the panel?

20              MR. PERRI:  Just that I conferenced with

21      defense counsel we have a Detective Baron from the

22      special victims squad carrying detective here today

23      with basically three items of physical evidence that

24      were recovered from the alleged victim in our case, her

25      pajama pants, her underwear, as well as the sexual

Proceedings                    18

1    assault kit.  We'll open those in the defendant's

2    presence after jury selection this morning during the

3    luncheon recess and allow defense counsel to inspect

4    those items.

5              THE COURT:  Anything else?

6              MR. BERGER:  No, your Honor.

7              THE COURT:  Can we bring in the jury, please.

8              (Whereupon, the jury panel entered the

9    courtroom and was duly sworn by the clerk of the

10   court.)

11             THE COURT:  Good morning, everyone.  Welcome

12   to Nassau County Court, Supreme Court Part 43.  My name

13   is Teresa Corrigan.  I'm going to be the judge in this

14   matter today.  We're about to begin the process of

15   selecting a jury in a criminal case.  It is estimated

16   that this trial is going to take about two-and-a-half

17   weeks, but with a lot of time off in between, and I'll

18   get to a schedule with you shortly.

19             Before I explain the jury selection process,

20   I do want to thank you all for being here.  I realize,

21   as do the attorneys, it may be an inconvenience for

22   some of you.  I'm sure you could appreciate a trial by

23   jury is and has been the cornerstone of our system of

24   justice, yours and mine for more than two hundred

25   years.

Proceedings                    19

1            Now, the name of the case we're starting

2      today is the People of the State of New York against

3      Daniel Ramos.  The words, the People of the State of

4      New York in that title means the government of the

5      State of New York.  The government is represented by

6      the Acting District Attorney of Nassau County Madeline

7      Singas.

8            In referring to the People of the State of

9      New York, that is in referring to the government, we

10     normally will use the shorthand terminology, the

11     People, during this trial.  That part of the title of

12     this case refers to the People of the State of New

13     York, does not mean that the People of this state want

14     any particular verdict.  The People of this state are

15     satisfied by the just verdict of a fair jury.

16            Mr. Ramos is often referred to as the

17     defendant in this trial.  The defendant is charged in

18     this case --  you have to be completely sworn in.

19            (Whereupon, a prospective juror was duly

20     sworn by the clerk of the court.)

21            THE COURT:  Let me reintroduce myself to you.

22     I'm Teresa Corrigan.  I'm the judge in this matter.

23     You are in Part 43.  We're about to start a criminal

24     trial, and it's called the People of State of New York

25     against Daniel Ramos.

Proceedings                    20

1          PROSPECTIVE JUROR:  Gurwin Pinkits.

2          THE COURT:  It's very nice to meet you.  Go

3     ahead and have a seat.

4          We're up to the part where I was telling you

5     what Mr. Ramos is charged with in this particular case.

6     He's charged with two counts.  The first count is

7     criminal sexual act in the first degree, and the second

8     count is endangering the welfare of a child.

9          Now, we begin this trial by selecting a jury.

10    A criminal case jury is composed of twelve people.  In

11    addition to the twelve jurors, we will also select two

12    alternate jurors in this matter.  An alternate juror is

13    one who may serve in place of one of the first twelve

14    jurors, should some presently unforeseen extraordinary

15    emergency arise that makes it totally impossible for

16    one of the first twelve jurors to complete the trial.

17         Juror number one, that is the first juror

18    sworn in, is by our law, known as the foreperson of the

19    jury.  During the trial, the foreperson has the same

20    responsibilities as any other juror.  At the end of the

21    trial, however, during the jury's deliberations, we ask

22    the foreperson to sign any written inquiry which the

23    jury sends to the Court and to announce the jury's

24    verdict, guilty or not guilty, here in the courtroom.

25    The foreperson can, but does not have to chair the

1       jury's discussions during the deliberations.

2               Now, if you have participated in jury

3       selection in a criminal case before, you may notice

4       that the method of jury selection varies so to some

5       extent from judge to judge, but the essence of each

6       procedure is the same.  It involves a combination of

7       explanations of the law and questions all designed to

8       help each of you, as well as the lawyers decide whether

9       you can sit as a juror in this case and be fair in

10      judging whether the defendant is guilty or not guilty

11      of a charged crime.

12              My jury selection procedure is as follows:  I

13      will first, I will explain some of the basic laws that

14      applies to this case and all criminal trials.  I do

15      this in part because if you are selected as a juror you

16      will be required to follow the law whether you agree

17      with it or not.  Later I'll be asking you whether you

18      understand the law that I have explained and whether

19      you can accept it and follow it.

20              Second, the clerk will call the random, the

21      names of fourteen jurors who will take a seat in the

22      area to my left, which is called the jury box.  I'll

23      then ask the jury in the jury box a series of questions

24      that you will respond to either via a show of hands or

25      an actual response if that is required.  Then after I'm

1    done asking questions, the lawyers will each be given

2    an opportunity to stand before you and address you and

3    ask you questions as well.

4          Finally, when the lawyers are finished, all

5    of the jurors will be excused for a few moments and

6    it's during that time that the lawyers will be given an

7    opportunity, as required by the law, to excuse one or

8    more of the jurors in the jury box.  Those jurors who

9    are not excused become members of the jury and, we

10    repeat that procedure until we get an entire jury.

11          Let me introduce the parties and the lawyers

12    to you.  Later in the proceedings I'm going to ask you

13    if you believe you know either the defendant or any of

14    the attorneys.  As I stated earlier, the defendant in

15    this case is Daniel Ramos, and he is represented by

16    Michael Berger.  In this case, the People are

17    represented by Acting District Attorney of Nassau

18    County Madeline Singas.  Ms. Singas's, in turn, is

19    represented by an assistant district attorney, Anthony

20    Perri.

21          The purpose of a trial is for a jury to

22    decide on the basis of evidence presented in a

23    courtroom whether a person who is accused of a crime by

24    the People is guilty or not guilty of that crime.

25          In a trial, the jury's responsibility to

1    evaluate fairly the testimony and other evidence

2    presented here in this courtroom and decide what the

3    believable and accurate facts are with respect to what,

4    if anything, took place at the time and place in

5    question.  The jury is, therefore, known as the finders

6    of the fact or the judges of the facts.

7         After the jury has determined the facts, the

8    jury must apply to the facts the law as I explain it,

9    regardless of whether the jury agrees with the law.

10   And then without fear, favor, bias, prejudice, sympathy

11   or consideration of a possible sentence or punishment,

12   you must render a decision known as a verdict stating

13   whether the defendant is guilty or not guilty of a

14   charged crime.

15        To decide the facts in the case, the jury

16   must consider only the evidence presented in this case,

17   in this courtroom.  So it is important that you

18   understand what evidence is because that is what you

19   base your decision on, and it is important to

20   understand some things that you will hear about that

21   are not evidence because you do not base your decision

22   on those things.

23        First, what is evidence?  There are three

24   general types.  One, there is evidence that comes from

25   a stipulation of the parties.  A stipulation is

1       information both parties agree to present to the jury

2       as evidence without calling a witness to testify to

3       that information.

4              Second, there is evidence that comes from the

5       introduction into evidence of physical objects, such as

6       documents, photographs, clothing, or possibly even a

7       chart.

8              And finally, as you know, the most common

9       form of evidence is the testimony of people based on

10      questions asked by the lawyers and, perhaps, asked by

11      the Court, but never asked by the jury.

12             So what is not evidence?  First, the charges

13      in this case are set forth in a document known as an

14      indictment.  The indictment is simply a piece of paper

15      that states the charges.  Neither the indictment

16      itself, nor the fact that an indictment has been filed,

17      constitutes evidence.  The defendant has pleaded not

18      guilty to the charges contained in the indictment and

19      this trial is to decide whether the defendant is guilty

20      or not guilty.

21             Second, what the lawyers say at any time is

22      not evidence.  The lawyers are not witnesses.  What I

23      say is not evidence, as I am not a witness.

24             Third, a question of a witness by a lawyer or

25      by the Court is by itself not evidence.  It is the

1    question with the answer that is the evidence.  So, you

2    are not to conclude from a question alone that anything

3    I assumed in the question to be true is true, no matter

4    how detailed or specific the question is, nor are you

5    to draw any inference either favorable or unfavorable

6    to either side from the content of a question alone.

7          You must consider the question with the

8    witness's answer and decide whether you find the answer

9    believable and accurate because, again, it is the

10   question with the answer that is the evidence.

11         There are three fundamental principles of law

12   that serve as a foundation as the American system of

13   criminal justice, and they apply in all criminal

14   trials, and it's important that you know what they are.

15   They are the presumption of innocence, the burden of

16   proof, and the requirement of proof beyond a reasonable

17   doubt.

18         Throughout these proceedings the defendant is

19   presumed to be innocent.  As a result, you must find

20   the defendant not guilty, unless on the evidence

21   presented at this trial you conclude that the People

22   have proven the defendant guilty beyond a reasonable

23   doubt.  That a defendant does not testify as a witness

24   is not a factor from which any inference unfavorable to

25   the defendant may be drawn.

1          The defendant is not required to prove that

2     he is not guilty.   In fact, the defendant is not

3     required to prove or disprove anything.

4          To the contrary, the People have the burden

5     of proving the defendant guilty beyond a reasonable

6     doubt.   That means, before you can find the defendant

7     guilty of a crime, the People must prove beyond a

8     reasonable doubt every element of the crime, including

9     that the defendant is the person who committed that

10    crime.

11         The burden of proof never shifts from the

12    People to the defendant.   If the People fail to satisfy

13    their burden of proof, you must find the defendant not

14    guilty.   If the People satisfy their burden of proof,

15    you must find the defendant guilty.   Just because the

16    defendant is sitting there in the chair accused of and

17    charged with a crime, does not and cannot mean that he

18    starts this case with any sort of strike against him in

19    your eyes.   He is presumed innocent.   You may not and

20    must not begin your evaluation of this case by assuming

21    just because he is seated there he must have done

22    something wrong.

23         The law uses the term proof beyond a

24    reasonable doubt to tell you how convincing the

25    evidence of guilt must be to permit a verdict of

1    guilty.  The law recognizes in dealing with human

2    affairs there are very few things in this world that we

3    know with absolute certainty.  Therefore, the law does

4    not require the People to prove a defendant guilty

5    beyond all possible doubt.

6              On the other hand, it is not sufficient to

7    prove that the defendant is probably guilty.  In a

8    criminal case the proof of guilt must be stronger than

9    that.  It must be beyond a reasonable doubt.  A

10   reasonable doubt is an honest doubt of the defendant's

11   guilt for which a reason exists based on the nature and

12   quality of the evidence.  It is an actual doubt, not an

13   imaginary doubt.  It's a doubt a reasonable person

14   acting in a matter of this importance would likely be

15   able or because or of the lack of convincing evidence

16   NOTE!!! /-FRPBLT.

17             Proof of guilt beyond a reasonable doubt is

18   proof that leaves you so firmly convinced that the

19   defendant's guilt, that you have no reasonable doubt of

20   the existence of any of the elements of crimes or of

21   the defendant's identity as the person who committed

22   the crime.  If you are not convinced beyond a

23   reasonable doubt that the defendant is guilty of a

24   charged crime, you must find the defendant not guilty

25   of that crime.

1          If you are convinced beyond a reasonable

2     doubt that the defendant is guilty of a charged crime,

3     then you must find the defendant guilty of that crime.

4          Because this is a criminal case, the police

5     are involved and will be testifying at this trial.  We

6     treat police officers the same way as we do the

7     civilian witnesses.  Police officers can tell the

8     truth, be mistaken, or lie just like anyone else.  You

9     must evaluate a police officer's testimony for

10    truthfulness and accuracy in the same way you would

11    evaluate the testimony of any other witnesses.

12          Now, some of you may have been the

13    unfortunate victim of a crime or know someone who has

14    been a victim of a crime.  Certainly, that was an

15    unpleasant experience for you.  If you have had such an

16    experience or know someone who has, you may not use

17    this trial as the vehicle to exact your revenge upon

18    the person who perpetrated the crime against you, or

19    your family or friend, or to try to right a wrong done

20    to someone in the past, having nothing at all to do

21    with this defendant and this case.  As I'm sure you can

22    actually appreciate this courtroom is not the place for

23    that.

24          During the trial you will hear me and perhaps

25    the lawyers use the term elements of a crime.  What

kmm

Proceedings                29

1       constitutes a crime is defined by the written law of

2       New York.  Each written definition contains several

3       parts including generally the specification of the

4       conduct prohibited, the state of mind with which the

5       conduct must have been performed, and in some instances

6       a result from that conduct.  Those parts of the written

7       definition of a charged crime, plus the identification

8       of a person as the person who committed the crime

9       charged is what is meant by the term elements of the

10      crime charged.

11              Now, the jury's verdict, whether guilty or

12      not guilty, must be unanimous.  That is each and every

13      juror must agree to the verdict.  Since twelve people

14      seldom agree immediately on anything to reach a

15      verdict, you must deliberate with the other jurors.

16              What does it mean to deliberate?  It means

17      you should consult with each other, listen to each

18      other, give each other's views careful consideration

19      and reason together when considering the evidence, and

20      when you do deliberate you should do so with a view

21      towards reaching an agreement if it can be done without

22      circumventing individual judgment.  Even you must

23      decide the case for yourself, but only after a fair and

24      impartial consideration of the evidence with the other

25      jurors.  You should not surrender an honest view of the

Proceedings                    30

1    evidence simply because you want the trial to end or

2    you are outvoted.  At the same time, you should not

3    hesitate to reexamine your views and change your

4    opinions if you become convinced it was not correct.

5              We're now going to call the random names, the

6    fourteen of you and ask you to take a seat in the jury

7    box.  After you are seated, I'll ask each of you

8    certain questions and then the lawyers will be given an

9    opportunity to ask questions.  Let me just say this:

10   If you are not called into the jury box, I ask that you

11   pay attention anyway, because I guarantee you, before

12   the day is over, each one of you will have found your

13   way into this jury box and rather than have to repeat

14   everything over and over, thereby extending the day

15   longer than it needs to be, I want to be able to simply

16   say you have been listening, right, and you have an

17   answer for the questions that have been asked.

18             Give your attention to the clerk, please, and

19   listen to the officers.

20             THE CLERK:  Jeffrey A. Collins,

21   C-O-L-L-I-N-S.  That is seat number one.

22             Seat number two, Jerome Valin, V-A-L-I-N.

23             Seat number three, Luis Fuentes,

24   F-U-E-N-T-E-S.  First name L-U-I-S.

25             Seat number four, Catherine Spruck,

1        S-P-R-U-C-K.

2                Seat number five, Evelyn Tessler,

3        T-E-S-S-L-E-R.  First name Evelyn.

4                Seat number six, Daniel Demott, D-E-M-O-T-T.

5                Seat number seven, Linda Wisselman,

6        W-I-S-S-E-L-M-A-N.

7                Seat number eight Fatima Ranalahete,

8        F-A-T-I-M-A, last name R-A-N-A-L-A-H-E-T-E.

9                Seat number nine Rhonda Mollick,

10       M-O-L-L-I-C-K.  First name Rhonda.

11               Seat number ten, Tabata Esquivel.  First name

12       T-A-B-A-T-A.  Last name, E-S-Q-U-I-V-E-L.

13               Seat number eleven, Damion John Chin,

14       C-H-I-N.

15               Seat number twelve, Laura Ioveno,

16       I-O-V-E-N-O.

17               Seat number thirteen, James Corbett,

18       C-O-R-B-E-T-T.

19               Seat number fourteen, Mark Danen, D-A-N-E-N.

20               THE CLERK:  The box is full, your Honor.

21               THE COURT:  Welcome to the front of the

22       courtroom, everyone who has now just joined us.  Is

23       there anybody here in the first -- up in the front

24       fourteen seats that does not understand the English

25       language, or has trouble understanding me speak, raise

Proceedings                    32

1      your hands if that is your situation.

2                     Mr. Fuentes.

3                     Tell me what language.  Obviously, it's

4      Spanish.  Yes, sir.

5                     PROSPECTIVE JUROR:  Yes.

6                     THE COURT:  What is it that you are having

7      trouble with, sir?

8                     PROSPECTIVE JUROR:  I do not understand

9      correctly.  I do not understand much.

10                    THE COURT:  Thank you very much, madam

11     interpreter.

12                    How long have you been in the country?

13                    PROSPECTIVE JUROR:  Twenty years, your Honor.

14                    MR. BERGER:  Consent.

15                    MR. PERRI:  Yes, your Honor.

16                    THE CLERK:  Seat number three, Scott Percoco,

17     P-E-R-C-O-C-O.

18                    THE COURT:  Welcome, Mr. Percoco.

19                    PROSPECTIVE JUROR:  Thank you.

20                    THE COURT:  Any trouble with the English

21     language?

22                    PROSPECTIVE JUROR:  No.

23                    THE COURT:  Let me ask each of you up front.

24     You heard those principles of law that I was just

25     explaining to each of you.  I need to know whether or

                                                        kmm

Proceedings                    33

1    not you will each abide by that, whether or not you

2    like it, whether or not you believe in it, whether or

3    not you think the entire system should be changed.   I

4    need to know, will you follow my instructions regarding

5    them and let me remind you what they are.

6              One, you must accept, agree and follow that a

7    defendant is presumed innocent.

8              Two, that the People have the burden of proof

9    of guilt beyond a reasonable doubt.

10             And three, that if the defendant does not

11   testify as a witness, that is not a factor from which

12   any inference unfavorable to him may be drawn by you.

13   If you cannot follow those principles of law, again,

14   not that you don't like them, but if you cannot follow

15   them, please raise your hand.

16             Let the record reflect no hands have been

17   raised.

18             Next, I need to know, can each of you promise

19   when it comes time to deliberate at trial, or to reach

20   a verdict of guilty or not guilty, that each of you

21   will discuss the evidence with your fellow jurors and

22   each of you will consider what your fellow jurors have

23   to say all with a view towards reaching a verdict,

24   knowing if it can be done without surrendering your

25   individual judgment?

1        We're trying to learn early on, are you the

2   type of person -- there is nothing wrong with this.

3   I'm right, I'm always right, I don't really care what

4   you say.  I don't care what the evidence is.  I'm

5   right.  That's okay, but it's probably not a good idea

6   to be sitting in the jury room where we expect you and

7   the law requires that you deliberate.  If that's your

8   personality, go ahead and through your hands up there

9   for me.  No hands have been raised.

10        Can each of you promise me you will decide

11   the case without fear, favor, sympathy, bias, or

12   prejudice for or against the People, the defendant, or

13   a witness, whether that witness is a police officer or

14   a civilian?  If you cannot give me that promise and

15   assurance, raise your hand.

16        Lastly, can you each promise at this time you

17   will be fair in deciding this case, raise your hand if

18   you do not feel, with the limited knowledge you have so

19   far about the case, you could not be fair.  No hands

20   have been raised.  All right, now.

21        You have heard me introduce --

22        MR. PERRI:  I believe, Ms. Ranalahete raised

23   her hand.

24        THE COURT:  I'm sorry, Ms. Ranalahete, did

25   you raise your hand?

Proceedings                    35

1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  With regards to which part are

3     you having trouble?

4              PROSPECTIVE JUROR:  The child part.

5              THE COURT:  Now, I appreciate that you heard

6     simply what the charges are in this case, you know

7     nothing else about this matter, and if I told you that

8     Mr. Ramos, as he sits here right now, is innocent of

9     all charges, there is no evidence of anything about

10    that.  He's presumed innocent.  Are you saying you

11    wouldn't be able to sit on a case such as this?

12             PROSPECTIVE JUROR:  No, because I have two

13    small child.

14             THE COURT:  Ms. Ranalahete, many of the

15    jurors in this room have small children, or

16    grandchildren, or nieces, or nephews.  We're all in the

17    same position.  I need to know if you can follow the

18    law as I give it to you, evaluate the evidence as you

19    hear it in this case and come to a decision,

20    understanding we are all in the same position of having

21    children or knowing children; can you do that, ma'am?

22             PROSPECTIVE JUROR:  I don't believe I can.

23             THE COURT:  Any further questions?

24             MR. BERGER:  Consent.

25             MR. PERRI:  No, your Honor.  Consent.

kmm

1              THE COURT:  On consent you are excused from
2      this case.  Let me explain just because you are walking
3      out of this door it doesn't mean you are Scott free.
4      There is a whole other lot of trials going on.  Keep
5      that in mind before you start telling me you want to
6      run out this door because you never know what is behind
7      door number two.  Good luck to you, ma'am.
8              THE CLERK:  Kwan Tam, K-W-A-N last name.
9      T-A-M.
10              THE COURT:  Welcome.  You heard everything I
11      said so far.  Is there anything you need to tell me?
12              PROSPECTIVE JUROR:  Actually, I'm not very --
13      I'm too excited.
14              THE COURT:  Is it the language?  Do you
15      understand English?
16              PROSPECTIVE JUROR:  Little bit.
17              THE COURT:  Consent?
18              MR. BERGER:  Consent.
19              MR. PERRI:  Yes, your Honor.
20              THE CLERK:  Seat eight, Steven O'Brien,
21      O-B-R-I-E-N.
22              THE COURT:  Welcome, Mr. O'Brien.  Have you
23      been paying attention?
24              PROSPECTIVE JUROR:  Very closely.
25              THE COURT:  Is there anything you need to

1       tell me so far?

2                    PROSPECTIVE JUROR:  No.

3                    THE COURT:  You did hear me introduce to you

4       Mr. Berger, and Mr. Perri, and Mr. Ramos.  Do any of

5       you believe that you know either the defendant, his

6       attorney, the assistant district attorney, or even me

7       or any of my court staff?  Do any of us look familiar

8       to you?  Do you know us?  Do our names sound familiar?

9       Let the record reflect no hands have been raised.

10                   What I would like to do now, I'm going to

11      read you a list of names.  These are names of

12      individuals who you will either hear their name during

13      the trial, or they may come to testify at the trial.

14      It's definitely a situation we need to know if any of

15      these names sound familiar to you.  Crystal Ramirez,

16      Mya Feliciano Ramirez, Sincere Feliciano Ramirez,

17      Police Officer Joseph Boccio, Police Officer Carl

18      Wigand, Police Officer Thomas Tedeshi, Detective

19      Maureen Boran, Detective Reinaldo Pacheco, a nurse by

20      the name of Kathleen McAllister, Christopher

21      Chillseyzn, Christy Hernandez, Karl Reich, Stephany

22      Ramos, or an employee supervisor of the NICE, N-I-C-E,

23      Transportation Company.  If any of those names sound

24      familiar or you believe you know those individuals,

25      please raise your hand now.  No hands have been raised.

Proceedings                    38

1          Now I want to get into specifics about each

2     of you two.  The first two areas we'll cover will be

3     health and ability to sit here based on health and the

4     length of trial.

5          First let me handle health.  Raise your hand

6     for me if any of you has a health issue that prevents

7     you from sitting here?  Understand that doesn't mean

8     uncomfortable with this situation.  That means you have

9     an appointment that can't be switched, you are under a

10    doctor's care and he advised you not to be here.  You

11    have surgery coming up.  It's not just the

12    inconvenience.  If there is a significant medical issue

13    that requires you to not be part of this jury, raise

14    your hand and keep your hand up until I get it written

15    down.  Ms. Mollick.

16          PROSPECTIVE JUROR:  I'm a type one diabetic,

17    your Honor.  I have multiple injections during the

18    course of the day.  I'm on very tight medications.  I

19    have to eat, snack frequently, use the restroom

20    frequently.  Very limiting.

21          THE COURT:  With regards to snacking in the

22    courtroom, if you need to grab something to get your

23    sugars, okay that will not become an issue with regards

24    to having to use the facility, but for during jury

25    selection, I usually take a break about every hour

Proceedings                           39

1    because nobody can listen for more than an hour without

2    stretching and using the facility.  With that

3    understanding, do you think you still would be able to

4    sit or would it be a problem?

5                 PROSPECTIVE JUROR:  No, I don't think.

6                 THE COURT:  Any questions?

7                 MR. BERGER:  Consent.

8                 MR. PERRI:  No.  Consent.

9                 THE COURT:  On health issues.

10               THE CLERK:  Cassidee Lubarsky,

11   C-A-S-S-I-D-E-E, last name L-U-B-A-R-S-K-Y.

12               THE COURT:  Welcome.

13               PROSPECTIVE JUROR:  Hello.

14               THE COURT:  Anything you need to tell me so

15   far?

16               PROSPECTIVE JUROR:  No.

17               THE COURT:  The next thing I need to talk to

18   you about is the length of the trial.  We know that

19   jury service and jury duty interrupts our workday,

20   interrupts what we like to do.  However, it's the most

21   important thing we can do as individuals because it's

22   the best justice system out there, if you compare it to

23   the entire country.  That doesn't mean there aren't

24   really good valid reasons why people can't sit for any

25   length of time.

1            Let me give you a rundown how the trial will

2    happen.  For this week, let's say you are picked as a

3    juror today, you don't need to be back here until

4    Monday.  Jury selection is happening this week.  The

5    inconvenience could be just today for you.  That's one.

6            Starting next week, we will work May 11th,

7    12th, 13th, and 14th, Monday, Tuesday, Wednesday,

8    Thursday.  You will be off on Friday.  Everybody has

9    things to do.  They can't put off for every Friday.

10   You can go back and do whatever you want to do in your

11   regular lives.

12           The following week you will only be asked to

13   work Tuesday, the 19th, Wednesday, which is the 20th,

14   and Thursday, which is the 21st.  We then have Memorial

15   Day weekend and the kids are off from school and people

16   go away.  So, there is no trial on Friday, the 22nd.

17   You can either go back to work or do whatever else you

18   need to do the following week and that will be it; if

19   it's even needed.

20           The following week we will be here the 26th,

21   27th, 28th, and 29th.  That's the outside limit.  With

22   that understanding of the dates, you will need to be

23   here, knowing you have days off in between.  Please

24   raise your hand if there is any reason you cannot sit

25   on this case based on that?  Keep your hands up for me,

Proceedings                    41

1        please.  I need to mark it first.

2                    Number four.

3                    PROSPECTIVE JUROR:  I'm recovering from

4        cancer, and I have very important doctors' appointments

5        on the 14th.

6                    THE COURT:  It will be the morning, the

7        afternoon?

8                    PROSPECTIVE JUROR:  1:50, 2:00 in the

9        afternoon.

10                   THE COURT:  Is that your only conflict?

11                   PROSPECTIVE JUROR:  I had plans for memorial

12       weekend.

13                   THE COURT:  We're off the Friday and Monday.

14                   PROSPECTIVE JUROR:  Okay.

15                   THE COURT:  It's just that doctors'

16       appointment on May 14th?

17                   PROSPECTIVE JUROR:  Actually, I need to also

18       go to an appointment at 10:15 on the 13th as well, that

19       is the Wednesday just before that Thursday.

20                   THE COURT:  Thank you.  Sit tight.

21                   Next hand was Mr. O'Brien.

22                   PROSPECTIVE JUROR:  I had yearly vacation

23       plans for the 17th and 24th.

24                   THE COURT:  Ms. Lubarsky.

25                   PROSPECTIVE JUROR:  I'm going on vacation the

Proceedings                    42

1      27th and 28th.

2                  THE COURT:  You are leaving the 27th?

3                  PROSPECTIVE JUROR:  Yes.

4                  THE COURT:  Mr. Chin.

5                  PROSPECTIVE JUROR:  I'm going away on Monday,

6      this coming Monday to Florida.  I won't be back until

7      Friday.

8                  THE COURT:  Thank you.

9                  Ms. Ioveno.

10                 PROSPECTIVE JUROR:  I'm a teacher in the

11     city, an athletic director of single game.  We're in

12     the playoffs for tryouts all during May.

13                 THE COURT:  Do me a favor, it's hard to hear

14     in this room.  I have a reporter taking everything down

15     and someone who is helping us with Mr. Ramos.  If you

16     could repeat.

17                 PROSPECTIVE JUROR:  I'm a school teacher and

18     athletic director at the high school.  We have games I

19     need to be at every afternoon at school and tryouts for

20     the fall sports all through the month of May.

21                 THE COURT:  Thank you.  Mr. Corbett, I

22     believe I saw your hand.

23                 PROSPECTIVE JUROR:  I'm an attorney and sole

24     practice litigator.  I have numerous court appearances

25     during that period of time.

kmm

Proceedings                    43

1           THE COURT:  No one can put an appearance for

2      you.

3           PROSPECTIVE JUROR:  I'm the only attorney in

4      my office and some of these cases, large insurance

5      cases, commercial, Hurricane Sandy cases, you can't

6      pick up and figure out what it is doing.

7           THE COURT:  Do you remember I said I want to

8      ask any questions of these individuals who put forth

9      vacation or other timing issues.

10          MR. BERGER:  Not I.

11          MR. PERRI:  No, your Honor.

12          THE COURT:  Each of you that has given me a

13     reason based on timing that can't be here, I'll excuse

14     you from this case.  There might be one that is shorter

15     that will suit your needs.  Juror number four, you are

16     excused.  Mr. O'Brien, juror number eight, sitting in

17     seat eight, you are excused.  Nine, you are excused.

18     Mr. Chin, sitting in seat eleven, you are excused.

19     Ms. Iovino, seat twelve, you are excused.  Sitting in

20     seat thirteen, you are excused.

21          Enjoy your time and your work requirements or

22     commitments.  And again, there might be a shorter trial

23     better for all of you.

24          THE COURT:  Refill those seats.

25          THE CLERK:  Seat number four, Carolyn

Proceedings                    44

1      Aragona, A-R-A-G-O-N-A.

2               Seat number eight will be Anthony Martins,

3      M-A-R-T-I-N-S.

4               Seat number nine will be Eleanor Arzt,

5      A-R-Z-T.

6               Seat number eleven will be Madeline Taxier,

7      T-A-X-I-E-R.

8               Seat number twelve, Steven Mastino,

9      M-A-S-T-I-N-O.

10              Seat number thirteen, Irwin Blau, B-L-A-U.

11              MR. PERRI:  Could I have the name of the

12     juror seated in number nine?

13              THE CLERK:  Eleanor Arzt, A-R-Z-T.

14              THE COURT:  Welcome, everyone, who just made

15     it to the front of the courtroom.  I hope you all have

16     been listening carefully.  By way of recap, you will

17     raise your hand for me if, one, if you don't understand

18     the language; two, you have any issues with following

19     those principles of law that I've been talking about.

20     Again, you don't have to like them, but you have to

21     follow them.

22              I need to know if you recognize any of the

23     people in the courtroom or any of those people that

24     were on the list of names that I read out, and

25     additionally, I need to know if there is any sort of

1     health issue, or if the length of the trial is a

2     problem and you let me know if you need to reread the

3     dates.  Raise your hand if you come to the front of the

4     courtroom and you have an issue.  Keep your hands up.

5              We're batting a thousand today.

6              Ms. Aragona.

7              PROSPECTIVE JUROR:  I work full time.  I need

8     to know the dates.

9              THE COURT:  You want me to give them to you

10    again?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Once you are picked, you don't

13    have to be back until Monday.  We're working the 11th

14    through the 14th, the 19th, 20th, and 21st.  And then

15    the 26th through the 29th, if we need to go that far.

16    You can stay at the moment.

17             PROSPECTIVE JUROR:  Yeah.  It interferes with

18    work.  I mean, any case is going to.

19             THE COURT:  Work is always going to be

20    interfered with.  I appreciate you being able to stick

21    around for at least awhile.  The next hand I saw was

22    Mr. Martin.  Yes, sir.

23             PROSPECTIVE JUROR:  I think the problem is --

24             MR. PERRI:  Yes, your Honor.  He's my

25    brother's father-in-law.

Proceedings                    46

1              THE COURT:  Fair enough.

2              Ms. Arzt.

3              PROSPECTIVE JUROR:  I'm pregnant, and I have

4    multiple doctors' appointments in the next week.

5              THE COURT:  Ms. Taxier.

6              PROSPECTIVE JUROR:  I'm okay.

7              THE COURT:  Ms. Mastino.

8              PROSPECTIVE JUROR:  Last time I served, years

9    ago, I believe he was a defense attorney.

10             THE COURT:  The fact that you believe you had

11   Mr. Berger as the defense attorney many years ago, my

12   question to you is:  Do you feel that will get in the

13   way of you being able to sit in this case to be fair

14   and impartial?

15             PROSPECTIVE JUROR:  I don't think so.

16             THE COURT:  I'm going to leave you, and I'm

17   sure there will be additional questions.  That's your

18   only problem at the moment.

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Mr. Blau.

21             PROSPECTIVE JUROR:  I'm a physician.  I had

22   to arrange for coverage for this week.  There is no way

23   I could stretch it out until June.

24             THE COURT:  Do either of the attorneys want

25   to ask any questions of the individuals that I believe

Proceedings                47

1       I will let go if you are both okay with it?  That would

2       be Mr. Mastino.  There is no question there.  Ms. Arzt,

3       I will excuse you if you are all okay with that, and

4       Mr. Blau, any questions for those individuals?

5                  MR. PERRI:  No, your Honor.

6                  MR. BERGER:  No, your Honor.

7                  THE COURT:  On consent?

8                  MR. PERRI:  Yes, your Honor.

9                  THE COURT:  The individuals sitting in seats

10      eight, nine, and thirteen, you are excused with the

11      thanks of the Court.

12                 THE CLERK:  Seat eight, James Clarke,

13      C-L-A-R-K-E.

14                 Seat number nine, Susan Salvant,

15      S-A-L-V-A-N-T.

16                 Seat number thirteen will be Jill Darold,

17      D-A-R-O-L-D.

18                 THE COURT:  Welcome to the front of the

19      courtroom to those of you who just joined me.  I hope

20      you have been listening carefully.  Raise your hand and

21      let me know if there is anything you need to tell me so

22      far.

23                 Mr. Clarke, anything you need to tell me?

24                 PROSPECTIVE JUROR:  No.

25                 THE COURT:  Ms. Salvant, anything?

kmm

1                    PROSPECTIVE JUROR:  I have an appointment on

2          the 13th.  That was it.

3                    THE COURT:  What time was that appointment?

4                    PROSPECTIVE JUROR:  9:00 in the morning.

5                    THE COURT:  How long do you expect it to

6          last?

7                    PROSPECTIVE JUROR:  It's the clinic at the

8          Nassau County Medical Center, and I'm also on vacation.

9                    THE COURT:  When are you on vacation?

10                   PROSPECTIVE JUROR:  Friday, and then I'm on

11         vacation Monday and Tuesday.

12                   THE COURT:  Next week?

13                   PROSPECTIVE JUROR:  Yes.

14                   THE COURT:  Who else just joined me?

15         Ms. Darold.

16                   PROSPECTIVE JUROR:  It's the childcare.  I'm

17         going through a separation.  I'm responsible for

18         getting my young daughter on the bus in the morning and

19         in the afternoon getting her off the bus at 3:30, and

20         also my son has special needs.  I need to be home.  I

21         work part time for that reason.

22                   THE COURT:  I understand.  Thank you.  Does

23         either attorney want to question either Ms. Salvant or

24         Ms. Darold?

25                   MR. PERRI:  No, your Honor.

1              MR. BERGER:  No, your Honor.

2              THE COURT:  You are both excused.  Thank you.

3              THE CLERK:  Seat number nine, Romaine Jones,

4      R-O-M-A-I-N-E.  Last name J-O-N-E-S.

5              Seat number thirteen, John Brottenberg,

6      B-R-O-T-T-E-N-B-E-R-G.

7              THE COURT:  Welcome, Ms. Jones and

8      Mr. Brottenberg, is there anything you need to tell me

9      so far?

10             PROSPECTIVE JUROR:  I started a new job

11     recently, and timing is just not good.

12             THE COURT:  Do they pay for jury duty?

13             PROSPECTIVE JUROR:  Three days.

14             THE COURT:  Mr. Brottenberg.

15             PROSPECTIVE JUROR:  I'm okay.

16             THE COURT:  Any questions for Ms. Jones?

17             MR. BERGER:  I would consent.

18             MR. PERRI:  Yes, your Honor.

19             THE COURT:  Good luck with your new job.

20             PROSPECTIVE JUROR:  Thank you.

21             THE CLERK:  Seat number nine will be Carol

22     Ann Kubinski, K-U-B-I-N-S-K-I.

23             THE COURT:  Welcome.

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Anything you need to tell me?

Proceedings                    50

1          PROSPECTIVE JUROR:  Except I just want to ask
2     you, deliberations are only during the day, right?
3          THE COURT:  Correct.  There is no longer any
4     sequestration, no hotel, no free meals on the county.
5          PROSPECTIVE JUROR:  I can do without free
6     meals.
7          THE COURT:  So now let me get back to the
8     questions for everybody.  I thank all of you who sat
9     quietly and patiently.  The next thing we need to do,
10    if you or a person close to you, if it's a friend or
11    family member has been a victim of a crime or a witness
12    to a crime, raise your hand.  If you, a friend, or a
13    family member has been a victim of a crime or a witness
14    to a crime.
15          Put your hands down.  Let's start with
16    Mr. Collins.  Yes, sir?
17          PROSPECTIVE JUROR:  Twenty-three years ago my
18    apartment was robbed.
19          THE COURT:  Is that it?
20          PROSPECTIVE JUROR:  That's it.
21          THE COURT:  Anything about that incident that
22    makes you believe you can't sit here?
23          PROSPECTIVE JUROR:  No, nothing.
24          THE COURT:  You appreciate and realize that
25    what happened has nothing to do with you?

kmm

1           PROSPECTIVE JUROR:  I gotcha.

2           THE COURT:  Mr. Valin.

3           PROSPECTIVE JUROR:  I'm a retired police

4    officer.  I've witnessed crimes.

5           THE COURT:  Every day, I would say, yes.

6    NYPD?

7           PROSPECTIVE JUROR:  NYPD.

8           THE COURT:  How long were you on the NYPD?

9           PROSPECTIVE JUROR:  From 1964 to 1984.

10          THE COURT:  I appreciate as part of your job

11   you have witnessed criminal activity.  Do you believe

12   you could sit here in this case, not throw that

13   experience out the window, that's unrealistic, but

14   appreciate and understand you have to decide this case

15   on what comes from here and the law I give to you?

16          PROSPECTIVE JUROR:  Agree, your Honor.

17          THE COURT:  You can do that?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  I'm sure there will be further

20   questions with regards to that.

21          The next hand, I believe, I saw was

22   Mr. Clarke.  Yes.

23          PROSPECTIVE JUROR:  My house was burglarized

24   when I was younger.  The whole family was in the house.

25          THE COURT:  Was that here in Nassau County?

1           PROSPECTIVE JUROR:  Nassau County.

2           THE COURT:  Was anyone ever caught for that?

3           PROSPECTIVE JUROR:  I think they were

4     eventually, a couple of years later.

5           THE COURT:  Did you have to come into the

6     courtroom with regard to that action?

7           PROSPECTIVE JUROR:  No, my father did.  He

8     was a New York City policeman.

9           THE COURT:  Anything about that experience

10    from all of those years ago that makes you believe you

11    can't sit here, listen to this evidence, evaluate this

12    evidence, apply it to the law I give you and make a

13    fair decision in this case?

14          PROSPECTIVE JUROR:  I could.

15          THE COURT:  Thank you very much.  I

16    appreciate that.  I believe it is number ten.

17          PROSPECTIVE JUROR:  My son's friend was

18    abused.

19          THE COURT:  Was that here in Nassau County?

20          PROSPECTIVE JUROR:  In Nassau County.

21          THE COURT:  Was someone arrested for that?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  A person was arrested?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Did you participate in that

Proceedings                     53

1        action in any way?

2                    PROSPECTIVE JUROR:  Not at all.

3                    THE COURT:  Was there a court proceeding?

4                    PROSPECTIVE JUROR:  I believe so, yes.

5                    THE COURT:  Were you there?

6                    PROSPECTIVE JUROR:  No, I was not.

7                    THE COURT:  Anything about the fact that you

8        know someone who was abused makes you believe that you

9        can't sit in this case and be fair and impartial and

10       evaluate this evidence and apply it to the law I give

11       you?

12                   PROSPECTIVE JUROR:  Yes.  Unfortunately,

13       because it's a child case, I'm against that.

14                   THE COURT:  It's too close?

15                   PROSPECTIVE JUROR:  Yes.

16                   MR. BERGER:  Consent.

17                   MR. PERRI:  Consent.

18                   THE COURT:  Thank you very much for your

19       honesty in that.  You will be excused.

20                   THE CLERK:  Seat number ten, Michael

21       McDonough, M-C-D-O-N-O-U-G-H.  First name Michael.

22                   THE COURT:  Welcome.  Anything you need to

23       tell me so far?

24                   PROSPECTIVE JUROR:  No.

25                   THE COURT:  The next question I have for the

Proceedings                54

1    entire panel is:  Have you or anyone close to you,

2    whether it be a friend or family member ever been

3    convicted of a crime, convicted of having committed a

4    crime?  Raise your hand if you know someone who has or

5    you, yourself, has been.  Do you or anyone close to

6    you, be it a friend or family member have any pending

7    criminal charges or civil lawsuits going on, whether it

8    be here or in another county?  Raise your hands with

9    pending actions within your background.

10                Ms. Aragona?

11                PROSPECTIVE JUROR:  I'm in a lawsuit for a

12   motorcycle accident.

13                THE COURT:  Is that here in Nassau County?

14                PROSPECTIVE JUROR:  Yes.

15                THE COURT:  Is it coming close to trial?

16                PROSPECTIVE JUROR:  I don't believe so.

17                THE COURT:  Have you been in a courtroom yet

18   with regards to it?

19                PROSPECTIVE JUROR:  No.

20                THE COURT:  Do you have an attorney assigned

21   to you or helping you?

22                PROSPECTIVE JUROR:  Yes.

23                THE COURT:  Is there anything about the fact

24   that you are in the middle of a civil litigation that

25   prevents you from sitting here in this case and

1   evaluating this evidence and applying it to the law I

2   give you?

3           PROSPECTIVE JUROR:  No.

4           THE COURT:  Can you give me assurance you

5   will not go home, call your attorney on a civil case,

6   listen, this is just what happened in court.  I don't

7   have a clue what they are talking about.  Explain it to

8   me.  Can you give me assurance you wouldn't do that?

9           PROSPECTIVE JUROR:  Yeah, I wouldn't do that.

10          THE COURT:  Does anyone else have that

11  situation?  No hands have been raised.

12          You all heard the charges in the case.  It's

13  two charges.  You heard other individuals talk a little

14  bit about it.  It involves a child.  You also heard me

15  say to some jurors, we all either have children, know

16  children, or relatives to children whether it is an

17  aunt, uncle, Godparents, whatever the situation may be.

18  What I need to know from you, not whether or not this

19  case makes you uncomfortable.  I think a trial, no

20  matter what the charge is, makes people uncomfortable.

21          What I need to know, does the nature of the

22  case, the little bit that you know about it, does the

23  nature of the case make it absolutely impossible for

24  you to sit as a juror, evaluate the evidence that comes

25  before you from the witness stand, apply it to the law

Proceedings                 56

1       that I give to you and come out with a fair and
2       impartial verdict in this case?  If you just know you
3       simply cannot do that, raise your hand, please.
4                    THE COURT:  Mr. Percoco.
5                    PROSPECTIVE JUROR:  I will try to be fair.  I
6       always believe where there is smoke, there is fire.  If
7       he didn't do anything, then why is he sitting there?
8                    THE COURT:  Let me say to everybody, I
9       understand that might be someone's inner things.  I
10      need to know from each of you, so far you have given me
11      the assurance.  You will not just assume and presume
12      that Mr. Ramos has done anything because you haven't
13      heard the evidence.  I appreciate what you said, sir,
14      and I'm getting the sense you can't get past that.
15      This might not be the case for you.  Is it accurate in
16      my saying you can't get past it?
17                   PROSPECTIVE JUROR:  Yeah, I tried.
18                   THE COURT:  I'd rather your honesty.
19                   PROSPECTIVE JUROR:  I didn't want to look at
20      him.  I'm sorry.
21                   THE COURT:  Mr. Demott.
22                   PROSPECTIVE JUROR:  Same thing.  All I could
23      think about is my teenage daughters right now.  I think
24      I'm already jumping to conclusions.
25                   THE COURT:  Any questions?

Proceedings                    57

1              MR. BERGER:  Consent.

2              MR. PERRI:  Consent.

3              THE COURT:  Thank you very much for your

4     honesty.  Mr. Percoco and Mr. Demott, you are both

5     excused from this case.

6              THE CLERK:  Seat number three, Milton Allen,

7     A-L-L-E-N.

8              Seat number six, Constance Volpe, V-O-L-P-E.

9     Constance, first name, C-O-N-S-T-A-N-C-E.  That's a

10    female.

11             THE COURT:  Welcome, Mr. Allen and Ms. Volpe.

12    I know you have both been paying attention while you

13    were sitting in the back.

14             Mr. Allen, is there anything you need to tell

15    me, sir?

16             PROSPECTIVE JUROR:  Yes, ma'am.  I am child

17    care provider, for many years, and looking in the face

18    of those innocent children and to know that somebody

19    would abuse a child, it would be very hard for me to --

20    I don't think I would give a fair trial too because to

21    me, hurting a child, is hurting me.

22             THE COURT:  Do you understand, Mr. Allen,

23    there is no proof that Mr. Ramos has done anything,

24    he's simply been accused of something, but there's

25    nothing that says he's actually done anything?  Do you

Proceedings                    58

1      realize that?

2                 PROSPECTIVE JUROR:  Yes, I do.

3                 THE COURT:  Are you telling me you can't get

4      past just the charge?

5                 PROSPECTIVE JUROR:  It would be very hard,

6      your Honor, because just the thought of abusing a

7      child --

8                 THE COURT:  Thank you, sir.

9                 Ms. Volpe, anything you need to tell me?

10                PROSPECTIVE JUROR:  I have two doctors'

11     appointments, the 11th and the 18th, and I also have a

12     wedding out of the area on the 29th, if it did go that

13     long.

14                THE COURT:  The wedding on the 29th, let's

15     put that to the side for a moment.  The 18th, we're not

16     here, the 11th; what time is that appointment?

17                PROSPECTIVE JUROR:  11:15 a.m.

18                THE COURT:  Is it an appointment that could

19     be rescheduled?

20                PROSPECTIVE JUROR:  I could try to ask.

21                THE COURT:  If you could reschedule, could

22     you sit then?

23                PROSPECTIVE JUROR:  Yes.

24                THE COURT:  I'll have you stay with us for a

25     while and we'll see how we work things out.  The 29th

                                                        kmm

Proceedings                    59

1      is an outside date, so I think that's fine.  I just

2      want to make sure you can reschedule the doctors'

3      appointments.

4                   PROSPECTIVE JUROR:  And the 18th.  That was

5      the 19th, 20th and 21st for that week?

6                   THE COURT:  Correct.

7                   PROSPECTIVE JUROR:  How late is the day

8      usually, in case I need to do an evening appointment?

9                   THE COURT:  Everyone will be out of here no

10     later than 4:30 on any day.  We break by 4:30, the

11     latest.  Thank you very much.

12                  Do either of the attorneys want to ask

13     Mr. Allen any questions?

14                  MR. PERRI:  No, your Honor.

15                  MR. BERGER:  No.  I consented to Mr. Allen.

16                  THE COURT:  Very good.  Thank you very much.

17     There's probably a different case that would be better

18     for you, sir.

19                  PROSPECTIVE JUROR:  Yes, your Honor.

20                  THE CLERK:  Seat number three, Ronald

21     Kratzer, K-R-A-T-Z-E-R.

22                  THE COURT:  Welcome.

23                  PROSPECTIVE JUROR:  How are you?

24                  THE COURT:  Have you been paying attention?

25                  PROSPECTIVE JUROR:  Absolutely.

Proceedings                 60

1        THE COURT:  Anything you need to tell me?

2        PROSPECTIVE JUROR:  No.

3        THE COURT:  The next question for my entire

4    group up front here, you know that under our law a

5    police officer is no more or less believable solely and

6    simply because he or she is a police officer.  Is there

7    any reason you cannot evaluate a police officer's

8    testimony for truthfulness and accuracy, just as you

9    would the testimony of anyone else?  I need you to

10   raise your hand if you are sitting there saying, I

11   don't care if the evidence in front of me is that this

12   guy is lying.  If he is a cop, he is telling the truth.

13   Does anybody have that belief they cannot evaluate a

14   cop's testimony like they would anyone else?  Raise

15   your hand if you have that situation.

16        No hands have been raised.

17        During this trial you are not allowed to

18   visit or view the place where the crimes charged was

19   allegedly committed.  In this case that location is

20   Park Avenue in Roosevelt, New York.  Please raise your

21   hand and let me know if for any reason whether it's to

22   get back and forth, to come back and forth to home,

23   work or a friend's house; do any of you need to pass

24   Park Avenue in Roosevelt in coming to this case in your

25   daily lives?

kmm

1              Let the record reflect no hands have been

2      raised.

3              Do any of you have any religious belief that

4      would prevent you from sitting in judgment of a person

5      and voting guilty or not guilty?  Any religious beliefs

6      that are a problem?  Raise your hand.  No hands have

7      been raised.

8              Has anyone here ever served on a prior

9      criminal jury?  I know we have at least one,

10     Mr. Mestino.  Raise your hands, prior criminal.  Let's

11     do criminal and civil jurors.  Keep your hands up for

12     one moment.

13             Let's start with you, Mr. Collins.

14             PROSPECTIVE JUROR:  Criminal in 1992, in the

15     borough of Queens.  I was an alternate juror.

16             THE COURT:  Obviously, you didn't get to the

17     end?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  Anything about that experience

20     that makes you believe you can't do your job here in

21     this case?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  The next hand, I believe, I saw

24     and I might have it wrong in the front row, is there

25     anybody, number seven.

Proceedings                        62

1                    PROSPECTIVE JUROR:  It was a criminal case in

2          New York City.  It was prior to 1986.

3                    THE COURT:  Without telling me the verdict,

4          did you reach a verdict?

5                    PROSPECTIVE JUROR:  Yes.

6                    THE COURT:  Is there anything about that

7          experience that makes you believe that you cannot sit

8          and be fair and impartial in this case?

9                    PROSPECTIVE JUROR:  Not at all.

10                    THE COURT:  You appreciate whatever law you

11         might have remembered from that time, you have to put

12         it out of your head, the law comes from me.  Do you

13         appreciate that?

14                    PROSPECTIVE JUROR:  I do.

15                    THE COURT:  And could you follow that?

16                    PROSPECTIVE JUROR:  I can.

17                    THE COURT:  Mr. Clarke, criminal or civil?

18                    PROSPECTIVE JUROR:  Criminal and civil.

19                    THE COURT:  Here in Nassau County?

20                    PROSPECTIVE JUROR:  Yes.

21                    THE COURT:  How long ago, sir?

22                    PROSPECTIVE JUROR:  Ten years, or more.

23                    THE COURT:  Without telling me the verdict in

24         the criminal case, did you reach a verdict?

25                    PROSPECTIVE JUROR:  I was an alternate juror.

1           THE COURT:  What about the civil case,

2     without telling me the verdict, did you get to the

3     verdict in the civil case?

4           PROSPECTIVE JUROR:  Settled.

5           THE COURT:  Is there anything about those two

6     experiences that makes you believe you cannot sit here

7     as a fair and impartial juror?

8           PROSPECTIVE JUROR:  No.

9           THE COURT:  You will be able to follow my

10    instructions?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Ms. Kabinsky.

13          PROSPECTIVE JUROR:  Yes.  I believe I'm going

14    to say 30 years ago I was an alternate on a civil

15    malpractice.

16          THE COURT:  Here in Nassau County?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Is there anything about that

19    experience that makes you believe you can't sit in this

20    case?

21          PROSPECTIVE JUROR:  Could I say something

22    about this case?  This case was covered in the Newsday.

23    Now that I'm sitting here, the defendant does look

24    familiar to me from Newsday.

25          THE COURT:  I have to tell you, as you sit

1    here, I have no idea if it was or was not.  Let me give

2    you all quick instructions with regards to that.  If

3    there is any news coverage of this case, or if there

4    has been prior news coverage of this case, you cannot

5    read, view, or listen to any accounts or discussions of

6    the case reported by newspapers, television, radio, the

7    Internet, or any other news media.  You cannot research

8    any fact, issue, or law related to this case whether by

9    discussion with others, by research in the library, or

10   Internet, or by any other means or source.  There's a

11   good reason for that.  Your decision must be based

12   solely on the firsthand account of the evidence

13   presented to you in this courtroom.  It may not be

14   based on some reporter's view or opinion, or upon your

15   own independent research.  Does everyone understand

16   that instruction?

17          So to you, Ms. Kabinsky, I don't know whether

18   it was or was not, but I need to know, can you put out

19   of your mind any inquiry that is going on in your brain

20   right now with regards to, hey, was this covered, maybe

21   I'll go back and look?  Can you give me your assurance

22   that you will not do that and whether or not it was

23   covered, you will explore whatever the newspaper said

24   because we all know how accurate newspapers are,

25   sarcasm.  You need to actually make your decision from

1      this courtroom and the evidence in this courtroom.  Can

2      you do that now?

3                  PROSPECTIVE JUROR:  I will try my best.

4                  THE COURT:  When you say, try your best, that

5      gives me a little bit of a concern.  It gives me pause.

6      Let me give you all a little story with regards to that

7      that goes along that line.  Let's say you have a bucket

8      list and on the bucket list you want to jump out of an

9      airplane.  You get up the courage to go do it.  You go

10     through training up in the airplane with your

11     instructor.  He says the last thing we have to do

12     before we jump, I have to check your backpack and shoot

13     and make sure you are good to go and then you have to

14     check mine.  Once we give both each other the thumbs

15     up, we're good to go and then we'll jump.  The

16     instructor checks the backpack first, you look at the

17     backpack. I can do this.  I know I can do it.  You

18     pull on the tabs.  You are good to go, says the

19     instructor, and he says to you, all right, turn around.

20     I will try to check your straps.  We'll see how it

21     goes.

22                  Are you going to jump out of the plane when

23     he is trying to check your straps, or do you want to

24     make sure he does check your straps?  You want to make

25     sure he does.  We don't want anyone -- I appreciate the

1    thought, I will try, but that concerns us.  That means

2    it could go either way.  I need to know that you will

3    put out of your mind whatever it is you think you

4    remember from a source that has nothing to do with what

5    is going to happen in this courtroom, and I need to

6    know that you will not go back and look it up.  You

7    will not research this case, and you will decide this

8    case from the evidence alone presented here.  If you

9    can't do that, that's okay.  I need to understand from

10   you if you can give us that assurance.

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Very good.  Thank you very much.

13   Mr. Mastino, let's go through the questions.

14             PROSPECTIVE JUROR:  Criminal.

15             THE COURT:  Without telling me a verdict, did

16   you reach a verdict?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  That was obviously here in Nassau

19   County?

20             PROSPECTIVE JUROR:  In Mineola.

21             THE COURT:  How long ago approximately?

22             PROSPECTIVE JUROR:  Greater than ten years.

23             THE COURT:  I need you to be honest.  I give

24   you that guarantee.  I need to know, if there is

25   anything about that experience that makes you sit here

1        now and say you know what, I can't do it again, I can't

2        do it with these two attorneys, I just can't do it; is

3        there anything like that going through your head?

4                    PROSPECTIVE JUROR:  No.

5                    THE COURT:  Is there anything going through

6        your head that you are saying to yourself, this won't

7        be fair to the People, you know that, Mr. Berger, if he

8        is sitting here, I know exactly which way I'm voting.

9                    PROSPECTIVE JUROR:  No.

10                   THE COURT:  You will be able to listen to the

11       evidence, evaluate the evidence, and follow the law?

12                   PROSPECTIVE JUROR:  Yes.

13                   THE COURT:  I need to know now, has anyone

14       ever served on a grand jury, the one-month process?

15       Raise your hand if you ever served on a grand jury.

16       Let the record reflect no hands were raised.

17                   The last question before I ask you, a quick

18       series of questions, has anyone here, other than

19       Mr. Valin, we know Mr. Valin's background.  Does anyone

20       here have friends, family members, or themselves are in

21       law enforcement, within the court system, sheriff's

22       department, attorney general's office, district

23       attorney's office, anything like that law enforcement

24       related?

25                   Number one, law enforcement, sir?

Proceedings                    68

1          PROSPECTIVE JUROR:  My nephew is a lawyer.

2    His wife is an assistant DA in Manhattan.

3          THE COURT:  I'll take the information first

4    and then I'll ask the group of questions to all of you.

5          Mr. Valin, other than yourself, is there

6    anything more that we need to know?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Number three.

9          PROSPECTIVE JUROR:  I work for the FBI.  I

10   have fellow members and friends in law enforcement.

11         THE COURT:  Have you ever testified?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Ms. Argona.

14         PROSPECTIVE JUROR:  I have an uncle and

15   friends who are police officers.

16         THE COURT:  Tesler, anything?

17         PROSPECTIVE JUROR:  My nephew's good family

18   friends were attorneys.

19         THE COURT:  Are those criminal attorneys or

20   civil?

21         PROSPECTIVE JUROR:  It's civil.

22         THE COURT:  Is that here in Nassau County?

23         PROSPECTIVE JUROR:  Yes.

24         THE COURT:  Ms. Volpe, anything?

25         PROSPECTIVE JUROR:  My dad is a retired

kmm

Proceedings                    69

1          police officer, and I have three cousins who are police

2          officers.

3                      THE COURT:  Ms. Wisselman?

4                      PROSPECTIVE JUROR:  I'll work for a law firm.

5          My husband is an attorney.

6                      THE COURT:  Is that law firm here in Nassau

7          County?

8                      PROSPECTIVE JUROR:  It is.

9                      THE COURT:  Do you go to court for that law

10         firm?

11                     PROSPECTIVE JUROR:  No.

12                     THE COURT:  Does that firm handle civil or

13         criminal matters?

14                     PROSPECTIVE JUROR:  Matrimonial and Family

15         Court.

16                     THE COURT:  Mr. Clarke, anything?

17                     PROSPECTIVE JUROR:  My father was on NYPD.

18         He was assigned to the academy.  I have relatives in

19         law enforcement, and I have a lot of friends and

20         relatives who are attorneys, and I work with attorneys

21         every day in my job.

22                     THE COURT:  The job that you have, is that as

23         an attorney?

24                     PROSPECTIVE JUROR:  Civil cases.

25                     THE COURT:  Here in Nassau County?

Proceedings                      70

1            PROSPECTIVE JUROR:  Yes.

2            THE COURT:  Did you, yourself, ever testify?

3            PROSPECTIVE JUROR:  No.  Depositions.

4            THE COURT:  Thank you.

5            Ms. Kubinsky, anything in the law enforcement

6     background or attorney background?

7            PROSPECTIVE JUROR:  I have cousins, but I

8     don't see them.  They are police in Suffolk and New

9     York City, but I don't see them.

10           THE COURT:  Mr. McDonough.

11           PROSPECTIVE JUROR:  Friends in law

12    enforcement.

13           THE COURT:  Ms. Taxier.

14           PROSPECTIVE JUROR:  Friend who is an

15    attorney, and a friend who is a judge.

16           THE COURT:  The friend that is an attorney,

17    here in Nassau County?

18           PROSPECTIVE JUROR:  Yes.

19           THE COURT:  Criminal or civil?

20           PROSPECTIVE JUROR:  Civil.

21           THE COURT:  The friend that is a judge here

22    in Nassau County?

23           PROSPECTIVE JUROR:  No.

24           THE COURT:  Mr. Mastino?

25           PROSPECTIVE JUROR:  Sister-in-law's husband

1       is NYPD, and good friend is a court officer in

2       Hempstead criminal, and the other in Queens Criminal

3       Court.

4                    THE COURT:  Mr. Brottenberg.

5                    PROSPECTIVE JUROR:  A dear friend is a judge

6       in Glen Cove, and I have friends also that are

7       attorneys.

8                    THE COURT:  Nassau criminal or civil?

9                    PROSPECTIVE JUROR:  Criminal, and two cousins

10      NYPD.

11                   THE COURT:  Mr. Danen, anything?

12                   PROSPECTIVE JUROR:  Friends in law

13      enforcement.

14                   THE COURT:  I have an entire panel that has

15      someone that is in law enforcement, whether it be

16      yourself or a friend, or someone who is an attorney.

17      Here's where the questions goes.  I need you to all

18      understand and appreciate a couple of things.  One, you

19      have to give me an assurance that you are not going to

20      call your friend or your family member and say, hey,

21      I'm sitting on this case, I don't know what these

22      people are doing, can you fill me in on what's going

23      on?  That's one.  Is there anyone that cannot give me

24      assurance that you will not call your friends or your

25      family members to discuss this case if you are chosen

1       as a juror?  Raise your hand if you feel like you know

2       I live with the person, how am I not supposed to

3       discuss.  If that's your situation, raise your hand.

4                       To all of you who know attorneys, the law as

5       to you will come from me.  That's it.  If you don't

6       understand the law, you will be given instructions on

7       what you need to do with regards to that.  I need an

8       assurance from each of you that you will get the law

9       from me and me alone, and not call your friends who are

10      judges, or attorneys and ask them to explain the law to

11      you.  Raise your hand if you feel like you just can't

12      do that.  You are the type of person who will have to

13      ask somebody else for your opinion.

14                      Let the record reflect no hands have been

15      raised.

16                      Additionally, I need to know, each of you

17      with all of this familiarity with law enforcement, can

18      you each give me that assurance, that you will not

19      treat the individuals who come into this courtroom that

20      are law enforcement differently than you would treat

21      the civilians that come into this courtroom as

22      potential witnesses?  Raise your hand if there will be

23      an issue with that.

24                      PROSPECTIVE JUROR:  The only thing I have

25      to -- I hold police with the highest regard.  That's

kmm

1      respect, integrity to be police officers, tremendous.

2                  THE COURT:  I imagine in holding them in the

3      highest regard you also hold them to a higher standard

4      of how they need to behave?

5                  PROSPECTIVE JUROR:  Correct.

6                  THE COURT:  Will you evaluate them fairly

7      with regards to their testimony when they come into

8      this courtroom and testify?

9                  Mr. Brottenberg, have you ever known -- not

10     personally, have you ever been in a situation where you

11     said yourself, that that police officer is really

12     messed up, he did a bad job, or he did something wrong?

13                 PROSPECTIVE JUROR:  Me personally, no.

14                 THE COURT:  Have you ever been in a situation

15     where you heard something in news coverage, or you

16     listened to something and said I would be that guy that

17     could be in trouble, that doesn't --

18                 PROSPECTIVE JUROR:  I look at everybody

19     objectively.  Honestly, I don't put too much credence

20     in what I read in the paper.

21                 THE COURT:  You want to hear the evidence?

22                 PROSPECTIVE JUROR:  Yeah, it could be swayed.

23     Newspaper articles, radio, anything.

24                 THE COURT:  Do you appreciate, or do you

25     believe that an officer can lie?

Proceedings                         74

1            PROSPECTIVE JUROR:  Yeah, I think anybody can

2       lie.

3            THE COURT:  Do you believe an officer could

4       tell the truth?

5            PROSPECTIVE JUROR:  Yes, I believe they will

6       tell the truth more than they will ever lie.

7            THE COURT:  Anyone else have anything they

8       need to discuss with me on that topic?

9            I'll ask you all general questions now, and

10      then we'll take a lunch break and then right after the

11      lunch break when you come back the attorneys will ask

12      you their questions and then we'll go from there.

13           Starting with you, Mr. Collins, tell me

14      please, sir, in what town do you reside?

15           PROSPECTIVE JUROR:  Massapequa.

16           THE COURT:  How long have you been there,

17      sir?

18           PROSPECTIVE JUROR:  Since 2012.  Almost 13

19      years.

20           THE COURT:  What is the highest level of

21      school that you have attended?

22           PROSPECTIVE JUROR:  College.

23           THE COURT:  Do you have a degree, sir?

24           PROSPECTIVE JUROR:  No.

25           THE COURT:  Do you work?

kmm

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Are you retired?

3          PROSPECTIVE JUROR:  Social Security.

4          THE COURT:  Prior to getting to Social

5    Security, what type of work did you do, sir?

6          PROSPECTIVE JUROR:  Unemployed for twenty-two

7    years.  Temporary, a day here and so on.

8          THE COURT:  Are you married?

9          PROSPECTIVE JUROR:  Single.

10         THE COURT:  Children?

11         PROSPECTIVE JUROR:  As far as I know, no.

12         THE COURT:  That's extremely honest.  How do

13   you like to spend your spare time, sir?

14         PROSPECTIVE JUROR:  Listen to music.

15         THE COURT:  Mr. Collins, are you on social

16   media?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  No Facebook?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  No blog?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  I'll have to save my comments for

23   the next person then.

24         Let's turn to number two.

25         PROSPECTIVE JUROR:  East Atlantic Beach, New

kmm

Proceedings                    76

1       York.

2                    THE COURT:  How long have you been there?

3                    PROSPECTIVE JUROR:  Since 1985.

4                    THE COURT:  Highest level of school?

5                    PROSPECTIVE JUROR:  Some college.

6                    THE COURT:  Any sort of associate's degree or

7       diploma from college?

8                    PROSPECTIVE JUROR:  No.

9                    THE COURT:  We know that you did work, you're

10      retired now, sir?

11                   PROSPECTIVE JUROR:  Yes.

12                   THE COURT:  Do you have any other employment

13      as a retired officer?

14                   PROSPECTIVE JUROR:  No.

15                   THE COURT:  Are you married?

16                   PROSPECTIVE JUROR:  No.

17                   THE COURT:  Any children?

18                   PROSPECTIVE JUROR:  Yes.

19                   THE COURT:  How many?

20                   PROSPECTIVE JUROR:  Two.

21                   THE COURT:  Grown or school age?

22                   PROSPECTIVE JUROR:  I'm sorry?

23                   THE COURT:  Grown or school age?

24                   PROSPECTIVE JUROR:  Grown.

25                   THE COURT:  What do they do for a living?

kmm

1          PROSPECTIVE JUROR:  Son is a counselor, and

2     my daughter is a clerical worker.

3          THE COURT:  What do you do like to do with

4     your spare time?

5          PROSPECTIVE JUROR:  I ride motorcycles, I

6     shoot, and I bowl, and I cook.

7          THE COURT:  That keeps you busy?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Are you on social media?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  Do you have a Facebook page?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  When you woke up this morning,

14    did you write Mineola criminal courts to update your

15    status?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  I need to get assurance from all

18    of you who are on social media that if you are picked

19    as jurors, you will not discuss this case, whether it

20    be a private message, no PMing and no posting with

21    regards to jury service.

22         Mr. Valin, can you give me assurance you will

23    not use social media to discuss this case if you are

24    chosen?

25         PROSPECTIVE JUROR:  You have my assurance,

Proceedings                    78

1          your Honor.

2                    THE COURT:  Do you also blog?

3                    PROSPECTIVE JUROR:  No.

4                    THE COURT:  For anyone who likes to blog, you

5          cannot blog about this case if you are chosen as a

6          juror.  Just keep that in mind as I get to each of you.

7          Thank you very much.

8                    Number three, town.

9                    PROSPECTIVE JUROR:  Massapequa.

10                   THE COURT:  How long?

11                   PROSPECTIVE JUROR:  Twenty-one years.

12                   THE COURT:  Highest level of school?

13                   PROSPECTIVE JUROR:  Associates.

14                   THE COURT:  In what?

15                   PROSPECTIVE JUROR:  Electronics.

16                   THE COURT:  Married?

17                   PROSPECTIVE JUROR:  Yes.

18                   THE COURT:  Children?

19                   PROSPECTIVE JUROR:  Yes, one.

20                   THE COURT:  Does your spouse work?

21                   PROSPECTIVE JUROR:  Yes.

22                   THE COURT:  What does he or she do?

23                   PROSPECTIVE JUROR:  School teacher.

24                   THE COURT:  Child school age or graduated?

25                   PROSPECTIVE JUROR:  Grade school.

Proceedings                          79

1                    THE COURT:  Grade school?

2                    How do you like to spend your spare time?

3                    PROSPECTIVE JUROR:  Family.

4                    THE COURT:  Blogging?

5                    PROSPECTIVE JUROR:  No, social media.

6                    THE COURT:  Number four.

7                    PROSPECTIVE JUROR:  Town?

8                    THE COURT:  Town.

9                    PROSPECTIVE JUROR:  Williston Park.

10                   THE COURT:  How long have you been there?

11                   PROSPECTIVE JUROR:  About twenty years.

12                   THE COURT:  Highest level of school?

13                   PROSPECTIVE JUROR:  High school diploma and

14         certification in trade school.

15                   THE COURT:  Do you work?

16                   PROSPECTIVE JUROR:  Yes.

17                   THE COURT:  What do you do?

18                   PROSPECTIVE JUROR:  I baby-sit, dog groomer

19         and manage a gelato store.

20                   THE COURT:  Are you married?

21                   PROSPECTIVE JUROR:  No.

22                   THE COURT:  Children?

23                   PROSPECTIVE JUROR:  No.

24                   THE COURT:  How do you like to spend your

25         spare time?

Proceedings                    80

1              PROSPECTIVE JUROR:  Quadding, motorcycles.

2              THE COURT:  Social media?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Can you give me that assurance

5      you will not talk about this case if you are chosen as

6      a juror?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Let's turn to Ms. Tessler.  What

9      town do you live in?

10             PROSPECTIVE JUROR:  Port Washington.

11             THE COURT:  How long have you been there?

12             PROSPECTIVE JUROR:  Since 1992.

13             THE COURT:  Highest level of school?

14             PROSPECTIVE JUROR:  Master's degree.

15             THE COURT:  In what?

16             PROSPECTIVE JUROR:  Logistics.

17             THE COURT:  Are you retired?

18             PROSPECTIVE JUROR:  Yes, retired.

19             THE COURT:  From what?

20             PROSPECTIVE JUROR:  Photography.

21             THE COURT:  Do you have any children?

22             PROSPECTIVE JUROR:  Yes, two.

23             THE COURT:  Are they grown or school age?

24             PROSPECTIVE JUROR:  One grown.  One is in the

25     Peace Corps in Africa, and the other one is still in

1          the University in Montreal.

2                    THE COURT:  How do you like to spend your

3          spare time?

4                    PROSPECTIVE JUROR:  Hiking, sailing, be with

5          my friend.

6                    THE COURT:  Social media?

7                    PROSPECTIVE JUROR:  Very rarely.

8                    THE COURT:  Don't pick up the bug and start

9          being on it.

10                   Let's turn to Ms. Volpe.  What town?

11                   PROSPECTIVE JUROR:  Bethpage.

12                   THE COURT:  How long?

13                   PROSPECTIVE JUROR:  Fifty years.

14                   THE COURT:  Highest level of school?

15                   PROSPECTIVE JUROR:  Master's degree.

16                   THE COURT:  In what?

17                   PROSPECTIVE JUROR:  Occupational therapy.

18                   THE COURT:  Are you married?

19                   PROSPECTIVE JUROR:  No.

20                   THE COURT:  Significant other?

21                   PROSPECTIVE JUROR:  No.

22                   THE COURT:  Children?

23                   PROSPECTIVE JUROR:  No.

24                   THE COURT:  How do you like to spend your

25          spare time?

Proceedings                    82

1              PROSPECTIVE JUROR:  Cooking, reading,

2     exercising.

3              THE COURT:  Social media?

4              PROSPECTIVE JUROR:  Facebook.

5              THE COURT:  Did you write down coffee cup

6     with court system next to it?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Don't start going on to discuss

9     this case if you are chosen as a juror.

10             Ms. Wisselman, what town?

11             PROSPECTIVE JUROR:  Port Washington.

12             THE COURT:  How long?

13             PROSPECTIVE JUROR:  Twenty-seven years.

14             THE COURT:  Highest level of school?

15             PROSPECTIVE JUROR:  Graduate school.  Human

16    development and child study.

17             THE COURT:  Are you married?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  Spouse?

20             PROSPECTIVE JUROR:  Attorney.

21             THE COURT:  Remind me, criminal or civil?

22             PROSPECTIVE JUROR:  Matrimonial, family law.

23             THE COURT:  Children?

24             PROSPECTIVE JUROR:  Two.

25             THE COURT:  Grown or school age?

Proceedings                    83

1                 PROSPECTIVE JUROR:  Grown.  One is a

2       hospitality hotel manager, and the other is a business

3       analyst.

4                 THE COURT:  How do you like to spend your

5       spare time?

6                 PROSPECTIVE JUROR:  Tennis, biking,

7       traveling.

8                 THE COURT:  Social media for you?

9                 PROSPECTIVE JUROR:  Yes.  But no, I did not.

10                THE COURT:  You did not post about being here

11      and you give me assurance you wouldn't post about this

12      case.  Thank you so much.

13                Mr. Clarke, town?

14                PROSPECTIVE JUROR:  Garden City.

15                THE COURT:  How long?

16                PROSPECTIVE JUROR:  Twenty-five years.

17                THE COURT:  Highest level of school?

18                PROSPECTIVE JUROR:  Graduate school.

19                THE COURT:  For what?

20                PROSPECTIVE JUROR:  Business administration.

21                THE COURT:  Are you married?

22                PROSPECTIVE JUROR:  Yes.

23                THE COURT:  Does your spouse work?

24                PROSPECTIVE JUROR:  No.

25                THE COURT:  Any children?

kmm

1               PROSPECTIVE JUROR:  Four.

2               THE COURT:  Grown or school age?

3               PROSPECTIVE JUROR:  Three out of school, one

4     is in college.

5               THE COURT:  Did I ask you what you do for a

6     living?

7               PROSPECTIVE JUROR:  I'm in insurance and

8     insurance claims.

9               THE COURT:  How do you like to spend your

10    spare time?

11              PROSPECTIVE JUROR:  Sports.

12              THE COURT:  Are you on social media?

13              PROSPECTIVE JUROR:  Very little.

14              THE COURT:  Don't pick up the bug and go on

15    it now.  Don't talk about this case on social media.

16              Ms. Kubinski, what town?

17              PROSPECTIVE JUROR:  Glen Head since 1951.

18              THE COURT:  Highest level of school?

19              PROSPECTIVE JUROR:  Graduate school.

20              THE COURT:  For what?

21              PROSPECTIVE JUROR:  MSW, master's in social

22    work.

23              THE COURT:  Do you work?

24              PROSPECTIVE JUROR:  Retired from Nassau

25    County Department of Health.

Proceedings                85

1              THE COURT:  Married?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Any children?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  How do you like to spend your

6    spare time?

7              PROSPECTIVE JUROR:  Reading, music.

8              THE COURT:  With regards to your work, have

9    you ever been asked to testify in a courtroom?

10             PROSPECTIVE JUROR:  Health Department, no.  I

11   was very briefly with child services at DSS, but that

12   was like back in the '80's.

13             THE COURT:  That employment, did you ever

14   have to testify in court?

15             PROSPECTIVE JUROR:  In child services

16   certainly, yes.

17             THE COURT:  How often did you testify?

18             PROSPECTIVE JUROR:  Not very often.

19             THE COURT:  Do you understand and appreciate

20   that you still need to follow whatever happens in this

21   courtroom with regards to this case if you are chosen

22   as a juror?

23             PROSPECTIVE JUROR:  Of course.

24             THE COURT:  Thank you.

25             Mr. McDonough, what town?

kmm

1               PROSPECTIVE JUROR:  Merrick.

2               THE COURT:  How long?

3               PROSPECTIVE JUROR:  Ten years.

4               THE COURT:  Highest level of school?

5               PROSPECTIVE JUROR:  Bachelor of science,

6        computer science.

7               THE COURT:  Do you work?

8               PROSPECTIVE JUROR:  Yes.

9               THE COURT:  What do you do?

10              PROSPECTIVE JUROR:  Computer programmer.

11              THE COURT:  Married?

12              PROSPECTIVE JUROR:  Yes.

13              THE COURT:  Spouse?

14              PROSPECTIVE JUROR:  Accountant.

15              THE COURT:  Do you have any children?

16              PROSPECTIVE JUROR:  No.

17              THE COURT:  How do you like to spend your

18       spare time?

19              PROSPECTIVE JUROR:  Playing sports and

20       sleeping.

21              THE COURT:  Social media?

22              PROSPECTIVE JUROR:  I am, and I wouldn't

23       post.

24              THE COURT:  Thank you, sir.

25              Ms. Taxier, what town?

1              PROSPECTIVE JUROR:  Port Washington.

2              THE COURT:  How long?

3              PROSPECTIVE JUROR:  Three months.

4              THE COURT:  Where were you before that?

5              PROSPECTIVE JUROR:  Roslyn.

6              THE COURT:  How long?

7              PROSPECTIVE JUROR:  Twenty years.

8              THE COURT:  Highest level of school?

9              PROSPECTIVE JUROR:  Associates.

10             THE COURT:  In what?

11             PROSPECTIVE JUROR:  Liberal Arts.

12             THE COURT:  Do you work?

13             PROSPECTIVE JUROR:  Sales.

14             THE COURT:  For what?

15             PROSPECTIVE JUROR:  In Nordstrom.

16             THE COURT:  Are you married?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Spouse work?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  What does he or she do?

21             PROSPECTIVE JUROR:  Sales, garment center.

22             THE COURT:  Any children?

23             PROSPECTIVE JUROR:  Yes, three.

24             THE COURT:  School age?

25             PROSPECTIVE JUROR:  Youngest in first year of

Proceedings                          88

1    college.

2              THE COURT:  Older two are grown?

3              PROSPECTIVE JUROR:  Working.  My daughter is

4    a counselor, and my son is in recruiting.

5              THE COURT:  Counselor for what?

6              PROSPECTIVE JUROR:  Drug rehab.

7              THE COURT:  And recruiting for what?

8              PROSPECTIVE JUROR:  An on-line type of thing

9    for doctors' appointments.  I don't even know.

10             THE COURT:  How do you like to spend your

11   spare time?

12             PROSPECTIVE JUROR:  Teach, cooking, TV.

13             THE COURT:  Social media?

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Will you give me your assurance

16   not to talk about the case?

17             Mr. Mastino, what town?

18             PROSPECTIVE JUROR:  Syosset.

19             THE COURT:  How long?

20             PROSPECTIVE JUROR:  Forty-three years.

21             THE COURT:  Highest level of school?

22             PROSPECTIVE JUROR:  Bachelor in business.

23             THE COURT:  Do you work?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  What do you do?

Proceedings                    89

1              PROSPECTIVE JUROR:  Rep manager.

2              THE COURT:  Are you married?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  What does your spouse do?

5              PROSPECTIVE JUROR:  She is an aide in an

6      elementary school.

7              THE COURT:  Children?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  How many?

10             PROSPECTIVE JUROR:  Two.

11             THE COURT:  School age?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  How do you like to spend your

14     spare time?

15             PROSPECTIVE JUROR:  Just with the family.

16             THE COURT:  Social media?

17             PROSPECTIVE JUROR:  No, ma'am.

18             THE COURT:  Mr. Brottenberg, what town?

19             PROSPECTIVE JUROR:  Glenn Head.

20             THE COURT:  How long?

21             PROSPECTIVE JUROR:  Six years.  Glen Cove for

22     forty-two years.

23             THE COURT:  Highest level of school?

24             PROSPECTIVE JUROR:  Some college.

25             THE COURT:  What do you do?

Proceedings                90

1                PROSPECTIVE JUROR:  Sales manager for

2     commercial construction supplying.

3                THE COURT:  Are you married?

4                PROSPECTIVE JUROR:  Yes.

5                THE COURT:  What does your spouse do?

6                PROSPECTIVE JUROR:  Works in an elementary

7     school.

8                THE COURT:  Do you have children?

9                PROSPECTIVE JUROR:  Two children.

10               THE COURT:  Grown or school age?

11               PROSPECTIVE JUROR:  Both, one in elementary

12    and one in high school.

13               THE COURT:  How do you spend your spare time?

14               PROSPECTIVE JUROR:  Weight lifting and

15    coaching little league baseball.

16               THE COURT:  Social media?

17               PROSPECTIVE JUROR:  I am not.

18               THE COURT:  Mr. Danen, you sat here quietly,

19    what town do you reside in?

20               PROSPECTIVE JUROR:  Just moved back to

21    Levittown.

22               THE COURT:  You just moved back to Levittown?

23    Where were you before that?

24               PROSPECTIVE JUROR:  Service.

25               THE COURT:  And I said, thank you for

1        service.

2                    What is your highest level of school?

3                    PROSPECTIVE JUROR:  Some college.

4                    THE COURT:  Do you work, sir?

5                    PROSPECTIVE JUROR:  Just got a job, yes.

6                    THE COURT:  Doing what?

7                    PROSPECTIVE JUROR:  Part time, grocery store.

8                    THE COURT:  Is it going to be a problem for

9        you to be here?

10                   PROSPECTIVE JUROR:  No.

11                   THE COURT:  Are you married?

12                   PROSPECTIVE JUROR:  No.

13                   THE COURT:  Do you have children?

14                   PROSPECTIVE JUROR:  No.

15                   THE COURT:  What do you like to do in your

16       spare time?

17                   PROSPECTIVE JUROR:  Motorcycle, play pool.

18                   THE COURT:  Social media?

19                   PROSPECTIVE JUROR:  Unfortunately.

20                   THE COURT:  Can you give me your assurance

21       that you won't talk about this case on social media if

22       you are chosen?

23                   PROSPECTIVE JUROR:  I will not.

24                   THE COURT:  Given the hour, here's what we'll

25       do, I will give you your lunch break at this point.

1    I'm going to ask that you listen to the court officers

2    and report wherever they tell you to report at 2:00

3    with the hopes we'll all be back in the courtroom no

4    later than ten after two so we can keep the process

5    going.  Let me give you a couple of admonitions.  You

6    don't know anything about the case.  It's impossible to

7    talk about it.  Even if you feel that urge to do so,

8    please try not to discuss this case because you must

9    keep an open mind throughout this process.  You cannot

10   permit anyone to discuss this case in your presence, so

11   don't have anyone walk up to you and say, hey, are you

12   in Corrigan's courtroom?  This is what I heard.  Don't

13   let anyone talk to you about the case over the lunch

14   hour.  Don't let the lawyers or witnesses talk to you

15   and just so you know, if we see you over the lunch

16   break, we'll ignore you.  Don't take it personally.

17   That's what we have to do to avoid the appearance of

18   impropriety.

19           Don't run over to the park over in Roosevelt

20   and try to look at the area where the crime was

21   committed.  Don't go on your phones to research whether

22   the case was in the media or not.  You are not allowed

23   to do it.  Have a great lunch and see you all around

24   two.

25           (Whereupon, a luncheon recess was taken.)

```
 1                     A F T E R N O O N   S E S S I O N

 2

 3

 4            THE CLERK:  Indictment 742N of 2014, Daniel

 5    Ramos.  Appearances are noted on the record.  Spanish

 6    interpreter present.  Prospective jurors are not

 7    present.

 8            MR. PERRI:  People are ready.

 9            MR. BERGER:  Defendant ready.

10            THE COURT:  Before I bring in the jurors, one

11    matter has come to my attention.  There's an

12    outstanding motion.

13            MR. PERRI:  It was buccal swab motion filed

14    in case.  There was a suppression of any evidence at

15    the hearing.  The buccal swab at the hearings was found

16    by the Court to be inadmissible and we're proceeding

17    forward on that evidence and so we withdraw that

18    motion.

19            THE COURT:  We'll call --

20            MR. PERRI:  During the luncheon recess, the

21    People and defense counsel did examine open and examine

22    the physical evidence.  The People intend on presenting

23    in this case, included is a rape kit, a child's

24    underwear and child's pair of pajamas, as the carrying

25    detectives present the unsealed contain and allowed the
```

 1      defense to inspect the evidence.

 2                    THE COURT:  Were you present?

 3                    MR. BERGER:  I was.

 4                    THE COURT:  You got to see whatever it is you

 5      needed to see?

 6                    MR. BERGER:  I did.

 7                    THE COURT:  Anything else before I bring in

 8      the jurors?

 9                    MR. PERRI:  No, your Honor.

10                    THE COURT:  I will give you each twenty

11      minutes.  If at some point when you are close to twenty

12      minutes, if you are making progress and you need to go

13      longer, give me the high sign.  If you need additional

14      time, I could give it to you.

15                    MR. BERGER:  I could say I'll need additional

16      time.  After the first round I don't need to take as

17      long.  I would appreciate the Court's indulgence

18      especially in a case as sensitive as this.

19                    THE COURT:  I'm going to let you know when

20      we're at twenty minutes and you let me know if you need

21      additional time, and then I will give you additional

22      time.

23                    MR. PERRI:  Thank you, your Honor.

24                    MR. BERGER:  Thank you, your Honor.

25                    (Whereupon, the jury panel entered the

1    courtroom.)

2              THE CLERK:   Let the record reflect the

3    presence of the properly seated juror.

4              Acceptable by the People?

5              MR. PERRI:   Yes.

6              THE CLERK:   Defense?

7              MR. BERGER:   Yes.

8              THE CLERK:   Both sides ready?

9              MR. PERRI:   Yes.

10             MR. BERGER:   Yes.

11             THE COURT:   Welcome back.   I hope you enjoyed

12   your lunch break.   Without further delay, I'll allow

13   the attorneys to start to speak to you.   I will give

14   you the reminder what the lawyers say at any time is

15   not evidence.   Thus, what they are about to say to you

16   in their questions to you is not evidence.   The

17   importance of this rule is you must decide the case on

18   the evidence, and not what the lawyers say and what I

19   say.

20             So, without any further delay, Mr. Perri, you

21   may inquire.

22             MR. PERRI:   Ladies and gentlemen of the jury,

23   my name, again, is assistant district attorney Anthony

24   Perri.   I'm representing the People of the State of New

25   York, the government in this case on behalf of Madeline

Proceedings                        96

1    Singas, Acting District Attorney of Nassau County.

2              Now, first of all, I would like to thank you

3    for your service and taking your time out today and

4    possibly for several days in the future considering the

5    evidence in this case, and to explain to you that at

6    this stage of the trial, it's a unique stage in that

7    it's the only time myself or Mr. Berger will actually

8    interact with you back and forth.  This is the only

9    chance we'll get to ask you questions or you get to ask

10   us questions and there be an actual conversation

11   between us.

12             And part of the purpose of that is that both

13   sides are trying to find jurors that both fit this case

14   and themselves are going to be able to take it

15   seriously, be deliberative, consider all of the

16   evidence fairly and openingly, and work to a verdict in

17   this case at the end of it.

18             As we're talking with you today, we're

19   looking for honest answers, truthfulness, and for each

20   of you to be forthcoming as possible.  If there are any

21   concerns you have at any level, why you would not be a

22   fair and impartial juror for this case, you need to

23   voice this now, even if it does require speaking in

24   private with the judge, the defense counsel.

25             For something you feel that is private, you

Proceedings                    97

1    don't want to talk in a group, you can ask to do that
2    as well.  The most important thing is to get a full and
3    clear answer to each and every one of you.
4              As you heard with the judge, who explained
5    the indictment, the accusation in this case, this is a
6    case about child sexual abuse.  And that the allegation
7    in this case, this is just an allegation at this time,
8    is namely that the defendant is alleged to have had
9    oral sexual contact, meaning his mouth to the vulva and
10   vagina of the alleged victim, a six-year old child.
11   This is a painful topic.  It's a serious case, as all
12   criminal cases, but it is also unique.  And although,
13   already the judge has questioned you a bit about
14   whether or not you feel you will be able to sit, I want
15   to ask again, to each and everyone of you, if
16   understanding what the topic is, it's not that it's
17   easy.  No jury deliberation is easy.  No criminal case
18   to be a juror to sit, to sit through the evidence and
19   come to a decision is easy, because this case isn't
20   easy, doesn't mean you can be a fit juror to listen to
21   the evidence and to come to a verdict.
22              I would like to ask if there is anyone that
23   has had any experience in their family or close friends
24   dealing with cases that involve child abuse?  Does
25   anyone know me or met me previously?

kmm

1          Just specifically, Ms. Kubinski.

2          PROSPECTIVE JUROR:  I knew you were going to

3     ask me.

4          MR. PERRI:  You stated you worked for the

5     Department of Health, that you did at one point work

6     for child services, DSS?

7          PROSPECTIVE JUROR:  Yes.

8          MR. PERRI:  When you worked with DSS and

9     worked in child services, did you receive any

10    specialized training?

11         PROSPECTIVE JUROR:  Yes.

12         MR. PERRI:  Are you familiar with the term

13    forensic interview?

14         PROSPECTIVE JUROR:  Yes.

15         MR. PERRI:  Were you trained as a forensic

16    interviewer?

17         PROSPECTIVE JUROR:  No, but I'm familiar with

18    the term.

19         MR. PERRI:  Did you work on cases where there

20    were allegations of child sexual abuse?

21         PROSPECTIVE JUROR:  Both children services

22    and the Health Department, so both departments.

23         MR. PERRI:  Do you feel comfortable having

24    had those experiences, being able to separate your

25    knowledge and expertise and be able to listen to the

kmm

Proceedings                    99

1       evidence in this case and decide this case on the

2       evidence and merits of this case?

3                    PROSPECTIVE JUROR:  Yes.

4                    MR. PERRI:  You did say, although, you worked

5       for DSS and child services, the last department you

6       worked for the Accounts Department?

7                    PROSPECTIVE JUROR:  No, the Health

8       Department.

9                    MR. PERRI:  What was your position in the

10      Health Department?

11                   PROSPECTIVE JUROR:  Medical social worker.

12                   MR. PERRI:  What is the job of a medical

13      social worker?

14                   PROSPECTIVE JUROR:  I was assigned to

15      different programs.  First I was assigned to clinics.

16      I worked in Hempstead, Freeport, Roosevelt, Long Beach,

17      New Cassel, Elmont.

18                   MR. PERRI:  What did you do when you were

19      assigned to the Health Department?

20                   PROSPECTIVE JUROR:  I worked with the

21      children and families in the clinic.

22                   MR. PERRI:  Are you still working in that

23      capacity?

24                   PROSPECTIVE JUROR:  No.

25                   MR. PERRI:  When did you retire?

```
 1                PROSPECTIVE JUROR:  December of 2007.

 2                MR. PERRI:  Was it your decision to move from

 3      working with DSS to the Health Department?

 4                PROSPECTIVE JUROR:  Yes.

 5                MR. PERRI:  Why did you work in the Health

 6      Department instead of DSS?

 7                PROSPECTIVE JUROR:  I wasn't that happy with

 8      DSS.  I felt like it was a difficult job.  I didn't

 9      have the support of the department.

10                MR. PERRI:  Do you feel comfortable sitting

11      as a juror in this case dealing with one subset of the

12      kind of cases you may have handled at DSS?

13                PROSPECTIVE JUROR:  I have seen it all, so I

14      have experience.

15                MR. PERRI:  Are you able to separate yourself

16      from that experience and what you have seen in the past

17      and judge this case on the facts that are presented to

18      you in this case?

19                PROSPECTIVE JUROR:  Yes.

20                MR. PERRI:  There will be multiple types of

21      witnesses that the People intend to present, that we

22      intend to put before you, adult witnesses, civilians,

23      members of law enforcement, medical professionals,

24      scientific witnesses, but there is also -- it is the

25      People's intention in this case to present child
```

1    witnesses that will be called to testify in court.  Is

2    there anyone here that feels uncomfortable, can't be

3    fair and impartial when listening and evaluating a

4    child witness who comes to call and testify?

5               Mr. Collins, how do you feel about listening

6    to a child witness?

7               PROSPECTIVE JUROR:  It's okay with me.

8               MR. PERRI:  Do you feel comfortable with the

9    Judge's direction on evaluating the testimony and

10   trying to decide whether or not you find them credible?

11              PROSPECTIVE JUROR:  Yes.

12              MR. PERRI:  Ms. Tesler?

13              PROSPECTIVE JUROR:  Yes.

14              MR. PERRI:  How do you feel?  You are shaking

15   your head a little bit.  How do you -- sorry to put you

16   on the hot seat.  How do you feel about having to

17   listen to the testimony, not just adults, but also

18   children in this case?

19              PROSPECTIVE JUROR:  The whole thing is, your

20   Honor, uncomfortable, but it's not a child, adult.

21   It's the same thing.

22              MR. PERRI:  One of the instructions the Judge

23   has already given you and given to everyone, is

24   testimony is evidence, and that if you are given the

25   testimony of someone telling their story, explaining

Proceedings                    102

1    what happened to them, if you believe them beyond a

2    reasonable doubt, you find them credible and believe

3    them beyond a reasonable doubt, would you then feel

4    comfortable finding someone, finding a verdict based on

5    that evidence, finding someone guilty if you found a

6    witness's testimony credible beyond a reasonable doubt?

7              PROSPECTIVE JUROR:  Yes.

8              MR. PERRI:  Ms. Aragona, how do you feel

9    about that?  Do you feel comfortable, testimony is

10   evidence, it's not just like on TV with SCI, videos,

11   that there is a moment where everything comes together,

12   people telling their stories; do you feel comfortable

13   with that?

14             PROSPECTIVE JUROR:  Yes.

15             MR. PERRI:  What would you use in judging

16   children and adults sitting up there in front of you or

17   strangers to them, telling what allegedly something

18   horribly traumatic that happens in their family, what

19   would you use to judge whether or not someone is

20   telling the truth?

21             PROSPECTIVE JUROR:  Going by the evidence.

22   What you go by, both sides of the story.

23             MR. PERRI:  You go by both sides of the

24   story.  You heard the judge explain the defense has no

25   burden.  The defendant does not, under the laws and the

                                                      kmm

1    Constitution of State of New York and Federal United

2    States, he does not have to testify.

3              PROSPECTIVE JUROR:  Yes.

4              MR. PERRI:  Do you feel comfortable with the

5    fact that the defendant does not have to testify and

6    that's the Judge's instructions?

7              PROSPECTIVE JUROR:  Yes.

8              MR. PERRI:  Will you hold it against him if

9    he doesn't take the stand and try to explain himself to

10   you?

11             PROSPECTIVE JUROR:  No.

12             MR. PERRI:  Ms. Tesler, will you follow the

13   Judge's instructions?  You shook your head again.  Will

14   you also follow the Judge's instructions that the

15   defendant doesn't have to take the stand?

16             PROSPECTIVE JUROR:  Yes.

17             MR. PERRI:  The defendant doesn't have to put

18   on a case?

19             PROSPECTIVE JUROR:  Yes.

20             MR. PERRI:  When evaluating the credibility

21   of witnesses, I'll put forth the credibility of a child

22   witness.  Does anyone disagree with the fact or the

23   idea that testimony, people react differently to

24   trauma, that every person doesn't react in the same

25   cookie cutter way?

1            Ms. Taxier, do you believe people react to
2     the same trauma that occurs to them?
3            PROSPECTIVE JUROR:  Yes.
4            MR. PERRI:  Would you expect every witness
5     that experienced the same incident to testify the exact
6     same manner?
7            PROSPECTIVE JUROR:  No.
8            MR. PERRI:  Now, would you believe that
9     different witnesses testifying about the same incident
10    could have different answers to some degree?
11           PROSPECTIVE JUROR:  I would just think maybe
12    some memory could be blocked out so they might not be
13    fully aware of what happened at the time, so they may
14    not be one hundred percent on what happened.  It may
15    differ.
16           MR. PERRI:  You said you have three children?
17           PROSPECTIVE JUROR:  Yes.
18           MR. PERRI:  How old is your youngest child?
19           PROSPECTIVE JUROR:  Nineteen.
20           MR. PERRI:  Did your child have a 14th
21    birthday yet?
22           PROSPECTIVE JUROR:  Did he have one?  Yes.
23           MR. PERRI:  Do you remember everyone at his
24    14th birthday?
25           PROSPECTIVE JUROR:  No.

1           MR. PERRI:  Do you remember what he was

2      wearing on his 14th birthday?

3           PROSPECTIVE JUROR:  No.  I see what you are

4      getting at.  Memory is an issue.

5           MR. PERRI:  Does that mean your son or your

6      daughter didn't have a 14th or 18th birthday?

7           People also testified, talking about

8      witnesses' credibility, having connection in the family

9      to police officers, and just because you have family

10     members that are police officers or friends that are

11     police officers, or somehow involved in law

12     enforcement, doesn't necessarily mean that you have a

13     favorable opinion of law enforcement, and that it could

14     equally mean you have an opposite opinion.

15          I want to ask several people, they did say

16     they have connection to law enforcement.

17          Looking at Mr. Collins, you said there was

18     two, three years ago there was a robbery in your

19     apartment?

20          PROSPECTIVE JUROR:  Yes.

21          MR. PERRI:  How would you describe the police

22     conduct during that incident?  Were you satisfied with

23     the police?

24          PROSPECTIVE JUROR:  No, they came and looked

25     around and left.  That's all.

Proceedings                    106

1          MR. PERRI:  And I forget if you said, was

2     there an arrest made in that case?

3          PROSPECTIVE JUROR:  No.

4          MR. PERRI:  They never caught whoever it was?

5          PROSPECTIVE JUROR:  No.

6          MR. PERRI:  Have you had any other negative

7     interactions with the police?

8          PROSPECTIVE JUROR:  No.

9          MR. PERRI:  While I'm with you, Mr. Collins,

10    you had a variety of jobs that were temporary.  What

11    were the last two jobs you had with respect to working?

12         PROSPECTIVE JUROR:  From '75 to summer of

13    2010, first week of 2011, working at Jones Beach.

14         MR. PERRI:  What did you do there?

15         PROSPECTIVE JUROR:  We clean up a bit.

16         MR. PERRI:  You said you are currently on

17    Social Security; is that a retirement benefit?

18         PROSPECTIVE JUROR:  Disability.

19         MR. PERRI:  For physical disability?

20         PROSPECTIVE JUROR:  Yes.

21         MR. PERRI:  Do you feel comfortable being

22    able to sit through the trial and listen to the

23    testimony?

24         PROSPECTIVE JUROR:  Yes.

25         MR. PERRI:  Ms. Taxier, you mentioned a very

Proceedings                    107

1        close friend was a judge?

2                 PROSPECTIVE JUROR:  Yes.

3                 MR. PERRI:  Who is that?

4                 PROSPECTIVE JUROR:  Rosemary Montelbano.

5                 MR. PERRI:  Where?

6                 PROSPECTIVE JUROR:  In Brooklyn.

7                 MR. PERRI:  Do you understand, as the judge

8        has instructed you, you can't reach out to your friend

9        who is a judge for advice, or questions, or bouncing

10       ideas off of that judge as with anyone connected to the

11       law or law enforcement during this trial?

12                PROSPECTIVE JUROR:  Yes.

13                MR. PERRI:  You have to say that out loud.

14                PROSPECTIVE JUROR:  Yes.

15                MR. PERRI:  Mr. Danen, you said you were in

16       the military?

17                PROSPECTIVE JUROR:  Correct.

18                MR. PERRI:  What branch?

19                PROSPECTIVE JUROR:  Navy Corps with the

20       Marine Corps.

21                MR. PERRI:  Were you deployed?

22                PROSPECTIVE JUROR:  Stationed overseas for

23       three years.

24                MR. PERRI:  Where were you stationed?

25                PROSPECTIVE JUROR:  Iwakuni.

1              MR. PERRI:  I know you recently got out of

2      the service and thank you again for that.  But, while

3      you were in the service, did you receive any

4      specialized training?

5              PROSPECTIVE JUROR:  Medical training.

6              MR. PERRI:  Were you a medical man?

7              PROSPECTIVE JUROR:  I was.

8              MR. PERRI:  Do you have long-term career

9      plans or ideas at this point?

10             PROSPECTIVE JUROR:  Still going over there

11     dealing with family issues.

12             MR. PERRI:  Not to pry too deeply, with

13     respect to whatever family issues you are having at

14     this time, will any of those interfere for you to

15     listen consistently as a juror in this case?

16             PROSPECTIVE JUROR:  No.

17             MR. PERRI:  You said you have friends in law

18     enforcement?

19             PROSPECTIVE JUROR:  Old friends.

20             MR. PERRI:  Are you currently in contact with

21     them?

22             PROSPECTIVE JUROR:  Off and on.

23             MR. PERRI:  Have you ever had any negative

24     interactions with law enforcement?

25             PROSPECTIVE JUROR:  No.

1                    MR. PERRI:  Ms. Volpe, you said you have your

2          father and some of your cousins who were police

3          officers?

4                    PROSPECTIVE JUROR:  Yes.

5                    MR. PERRI:  Have you had any negative

6          interactions with police officers?

7                    PROSPECTIVE JUROR:  No.

8                    MR. PERRI:  Are you able to fairly and

9          honestly judge their credibility, whether they are

10         telling the truth or lying, or whether they are to be

11         believed?

12                   PROSPECTIVE JUROR:  Yes.

13                   MR. PERRI:  I don't know if I misunderstood

14         you.  You said you have a master's in occupational

15         therapy?

16                   PROSPECTIVE JUROR:  Yes.

17                   MR. PERRI:  You currently work as an

18         occupational therapist?

19                   PROSPECTIVE JUROR:  Yes.

20                   MR. PERRI:  For a service, or on your own?

21                   PROSPECTIVE JUROR:  For the Catholic Health

22         System.

23                   MR. PERRI:  How long have you lived in

24         Bethpage?

25                   PROSPECTIVE JUROR:  All my life, fifty years.

1               MR. PERRI:  And do you currently reside with

2          anyone?

3               PROSPECTIVE JUROR:  No.

4               MR. PERRI:  We talked a little bit about this

5          with respect to witnesses that you will be judging the

6          facts, not the defense attorney, not myself, not to

7          judge the facts, it's your job.  One of the things

8          we're looking for in jurors, you have common sense, if

9          you could apply your every day experiences and what you

10         learned about life and human nature to the question

11         that is put before you about whether or not the People

12         reached their burden.  The Judge said the People's

13         burden is proof beyond a reasonable doubt.  It's not

14         proof beyond all doubt.  It's not certainty.

15              Ms. McDonough, do you feel comfortable as a

16         juror that the People don't have to prove their case to

17         a certainty?

18              MR. BERGER:  Objection.

19              THE COURT:  Overruled.

20              MR. PERRI:  Do you feel comfortable with

21         following the Judge's instruction, the People don't

22         have to prove their case to a certainty, but have to

23         prove their case beyond a reasonable doubt?

24              PROSPECTIVE JUROR:  Yes.

25              MR. PERRI:  And, Mr. Clarke, do you also, do

Proceedings                    111

1       you agree if the People prove their case beyond a
2       reasonable doubt, if they put forth credible evidence
3       that meets their burden, you could find the defendant
4       guilty?

5                   PROSPECTIVE JUROR:   Yes.

6                   MR. PERRI:   And Mr. Valin, do you feel if the
7       People prove their case beyond a reasonable doubt, you
8       could be able to find the defendant guilty?

9                   PROSPECTIVE JUROR:   Yes.

10                  MR. PERRI:   Part of the role of a juror is
11      you will be able to be called on to deliberate, take an
12      oath to deliberate, reach your own conclusion as to
13      whether or not the defendant is guilty where the People
14      have reached their burden or not.

15                  You can't, as the Judge will instruct you and
16      already instructed you, you can't make a compromise
17      because you want to get out of here.   Everyone wants to
18      be done with their service as a juror.

19                  Ms. Wisselman, if you were in the minority,
20      if you are deliberating in the minority and maybe even
21      you are against the other eleven jurors, you disagree
22      one way or another, what would you do as a juror during
23      deliberations if that were the case, if you were not in
24      the majority and you were in the minority?

25                  PROSPECTIVE JUROR:   I would probably try to

Proceedings                    112

1    suggest everybody present their reason for why they

2    feel the verdict should be one way or another, and I

3    would try to present my argument as well.

4              MR. PERRI:  If that went on multiple days, if

5    that went on for two days, what would you do at that

6    point?

7              PROSPECTIVE JUROR:  I would assume there is a

8    protocol if we couldn't come to a decision.

9              MR. PERRI:  I'm asking you if there is a

10   point after two days, I'm going to throw up my hands

11   and say, I don't believe you guys are right to get this

12   done with.

13             PROSPECTIVE JUROR:  No.

14             MR. PERRI:  Ms. Tesler, how do you feel about

15   that?  If you are in the minority and you can't

16   convince other people to your side, would you -- how do

17   you feel about being in that position?

18             PROSPECTIVE JUROR:  I believe I wouldn't give

19   up.

20             MR. PERRI:  And even if it took days?

21             PROSPECTIVE JUROR:  Yes.

22             MR. PERRI:  Mr. Mastino, what about you?

23   What would you do, in favor of your position during

24   deliberations in order to reach a verdict?

25             PROSPECTIVE JUROR:  I would explain my

Proceedings                113

1    rationale for my belief and listen to everybody else,

2    and see if we could hopefully come to an agreement at

3    that point.

4            MR. PERRI:  Mr. Brottenberg, what about you,

5    that's if you were, if you were in the majority, if you

6    were on the majority initially and you get back to

7    deliberations, how would you work with people who agree

8    with you?

9            PROSPECTIVE JUROR:  I would apply common

10   sense and facts of the case and say -- you know,

11   express my beliefs, why I feel strongly about them and

12   that's all anybody can really do.

13           MR. PERRI:  Ms. Volpe, when you are examining

14   a witness, listening to a witness, deciding whether or

15   not to believe them, what would you listen for to use

16   to evaluate whether or not you should trust what they

17   are saying?

18           PROSPECTIVE JUROR:  If they are consistent in

19   what they are saying, if there is no change in their

20   facts of what they believe happened to them.

21           MR. PERRI:  Would you agree, when important

22   aspects, as the judge will instruct you on at some

23   point, whether or not the person has a motive to lie,

24   is something to gain?

25           PROSPECTIVE JUROR:  I don't understand what

1      you are asking me.

2                  MR. PERRI:  Would you be looking for whether

3      or not there is a reason someone would lie?

4                  PROSPECTIVE JUROR:  Yes.

5                  MR. PERRI:  Ms. Aragona, aside from talking

6      about consistency, evidence, is there anything else you

7      would look for in listening to a witness in whether or

8      not they should be believed?

9                  PROSPECTIVE JUROR:  I'm sorry.  You are

10     asking me what I would look for after they give

11     everything?

12                 MR. PERRI:  From your everyday life, common

13     sense to judge whether or not you should believe the

14     testimony of an individual.

15                 PROSPECTIVE JUROR:  How their stories go to

16     see if they are lying.  I don't know, emotional-wise.

17                 MR. PERRI:  Would you agree it's not very

18     important whether or not you like the person?

19                 PROSPECTIVE JUROR:  Oh, yeah.

20                 MR. PERRI:  Do you think it's important that

21     you like every witness?

22                 PROSPECTIVE JUROR:  No.

23                 MR. PERRI:  Ms. Kubinski, do you have to like

24     every witness the People put forth to judge their

25     credibility?

1           PROSPECTIVE JUROR: No.

2           MR. PERRI:  Mr. Valin, do you have to like

3      every witness we put on the stand?

4           PROSPECTIVE JUROR:  No.

5           MR. PERRI:  Likability is something different

6      from credibility, not everyone you hear from is someone

7      you want to hang out with and go to dinner with.  After

8      the trial is over, you may not want to see them again.

9      That doesn't get to the heart of whether or not the

10     defendant has been proven guilty beyond a reasonable

11     doubt.

12          THE COURT:  Mr. Perri, it's been twenty

13     minutes.  Do you need a few more?

14          MR. PERRI:  Just one moment, your Honor.

15          Thank you, your Honor.

16          THE COURT:  Mr. Berger.

17          PROSPECTIVE JUROR:  Can I make a statement?

18          THE COURT:  No, thank you.

19          MR. BERGER:  Good afternoon, prospective

20     members of the panel.  My name is Michael Berger and

21     I'm formerly from Brooklyn, New York, residing in Lake

22     Success in Nassau County for fifty years.  If any of

23     you know me, with the exception of Mr. Mastino.

24          I have a lot of different questions than what

25     has already been asked by the Judge and by Mr. Perri.

1    I ask all of you in the back to pay attention too

2    because you will eventually be asked.

3         In addition, I'm going to be asking -- I may

4    pick on one person here.  If the answer you would give

5    would be different or significant, you could tell

6    whether or not it would be important, raise your hand

7    and let me know.  When I ask the question of one

8    person, I'm really asking all fourteen of you.

9         I must start out by saying, Mr. Perri and I

10   are looking to find fair-minded jurors, twelve neutral

11   jurors.  We are asking our questions because we think

12   we know what questions should be asked in this kind of

13   case.  There are no wrong answers here.  If you give an

14   answer that you concede suggested prejudice, raise your

15   hand and let us know.  Heaven forbid you were sitting

16   where Mr. Ramos was, you would want twelve neutral

17   fair-minded individuals sitting in judgment of you.

18        That's why we heard before, some people

19   expressed upset with respect to the nature of the

20   charges and they had to excuse themselves.  I'm sure

21   there may be things in your mind in the next few

22   minutes that may, all of a sudden say, you know what, I

23   shouldn't sit on this case.  It doesn't mean you are a

24   bad person, and it doesn't mean you could not be fair

25   in this case.  It only means you shouldn't sit on this

1      case.  We all walk in here, we have an emotional side

2      and intellectual side.  I'm looking for twelve

3      intellects to make a judgment.  I can't ask you to

4      check your emotions at the door.  I can ask you, do you

5      have an emotional side and saw some of the jurors, the

6      prospective jurors who excused themselves because their

7      emotions interfered and they knew their emotions would

8      interfere with their intellects.

9             Everyone has prejudices of some kind.  It may

10     be you have a prejudice that emotional factors can

11     interfere.  We're talking about the -- let me give you

12     a couple of emotional factors.  I'm not saying they do,

13     but they may.  We're talking about a six-year old

14     claiming she was licked by the defendant.  That

15     obviously can create an emotional factor.

16            We're talking about the defendant who is

17     Hispanic, would anybody disagree there could be people

18     who are prejudiced against Hispanics?

19            Mr. McDonough, would you agree people could

20     be prejudiced against Hispanics?

21                 PROSPECTIVE JUROR:  Yes.

22                 MR. BERGER:  Are you?

23                 PROSPECTIVE JUROR:  No.

24                 MR. BERGER:  Does anyone else feel Hispanics

25     are more inclined to commit crimes, or anything like

Proceedings                    118

1       that?

2              Those are emotional factors, if they come up

3       during the questioning here, let us know.  We can go up

4       to the bench and talk about it privately.

5              You heard the judge say that the People, the

6       prosecution have the burden of proving guilt here.  I

7       don't have to prove anything.  The point is that only

8       the prosecution have to convince you beyond a

9       reasonable doubt, to your satisfaction, the charges of

10      the indictment.

11             Does anybody here have an expectation that I

12      have to prove something; Ms. Wisselman?

13             PROSPECTIVE JUROR:  No.

14             MR. BERGER:  If I did not call one witness,

15      would that mean you would have to vote guilty?

16             PROSPECTIVE JUROR:  No.

17             MR. BERGER:  Why would that be?

18             PROSPECTIVE JUROR:  It's the burden of the

19      district attorney to prove.

20             MR. BERGER:  Does anybody disagree with her

21      answer?  You know, has anybody, Mr. Mastino, did

22      anybody ever accuse you of something you didn't do in

23      your lifetime?

24             PROSPECTIVE JUROR:  Absolutely.

25             MR. BERGER:  You could respond to it or walk

kmm

1      away.   You have either one or two choices in that

2      situation.   Just because somebody accuses you of

3      something, Mr. Allen, it doesn't mean you have to

4      respond.   You could walk away, correct?

5                  PROSPECTIVE JUROR:   Absolutely.

6                  MR. BERGER:   Any two ways to deal with that.

7                  You are going to be asked to evaluate the

8      witness's in this particular case, Ms. Volpe.   I know

9      the prosecutor asked you before what you would use as a

10     criteria to evaluate if a person is telling the truth.

11     Do you know what -- you can't articulate that very

12     well.   You say a different story, some of the obvious

13     things.   Has anybody lied to you in lifetime?

14                 PROSPECTIVE JUROR:   Yes.

15                 MR. BERGER:   They didn't tell you I'm lying

16     to you.   Nobody is getting on the witness stand, there

17     was once a prejudice, I could tell if they were lying.

18     If the witness said he was wearing a green hat, and I

19     saw he was wearing a red hat, then I know they weren't

20     being truthful.   It wouldn't be that obvious.

21                 In other words, when I asked Ms. Volpe if

22     anybody ever lied to her, she said, yes.   The remaining

23     thirteen feel you don't possess that ability.   There

24     are jurors who do feel they don't have the ability to

25     evaluate witnesses to see if they are being truthful.

Proceedings                    120

1    Does everyone feel you have that skill, correct?  I'm

2    not asking you to articulate what you use, you know

3    what the criteria are, you are living in this world,

4    you understand?

5              Ms. Aragona, has anybody ever lied to you?

6              PROSPECTIVE JUROR:  Yeah.

7              MR. BERGER:  You will be asked to evaluate

8    credibility of witnesses?

9              Mr. Danen, do you think a civilian has ever

10   gotten on the witness stand and lied?

11             PROSPECTIVE JUROR:  Of course.

12             MR. BERGER:  Sworn to tell the truth and

13   lied?

14             PROSPECTIVE JUROR:  Of course.

15             MR. BERGER:  Does anybody disagree with that

16   answer?

17             Mr. Brottenberg, do you think a police

18   officer has gotten on the witness stand and lied?

19             PROSPECTIVE JUROR:  Absolutely.

20             MR. BERGER:  You did tell us before you hold

21   the police officers in the highest regard?

22             PROSPECTIVE JUROR:  I do.

23             MR. BERGER:  A higher regard than civilians?

24             PROSPECTIVE JUROR:  Yeah, because they take

25   an oath.

1          MR. BERGER:  Police officers don't get

2      greater credibility than civilians.

3          PROSPECTIVE JUROR:  I understand.  That's my

4      personal opinion.

5          MR. BERGER:  My concern is you would take

6      that personal opinion in evaluating the case here,

7      there will be testimony from police officers and

8      detectives, detectives who claim that the defendant

9      made a confession in this case, he put his name on a

10     piece of paper and that piece of paper says all kinds

11     of bad things.  Do you think detectives have done that

12     and lied about it?

13         PROSPECTIVE JUROR:  I'm sure there's

14     exceptions to every rule.

15         MR. BERGER:  If you will give them an edge

16     that is contrary to what the Judge instructed before --

17     my question to you is:  If you were sitting there and a

18     police officer testified against you -- you are someone

19     who wants a juror who says the police officer is in a

20     higher regard than civilians, correct?

21         PROSPECTIVE JUROR:  I understand.

22         MR. BERGER:  Does that mean you shouldn't sit

23     on this jury?

24         PROSPECTIVE JUROR:  Maybe I shouldn't.

25         MR. BERGER:  That's an honest answer.  It has

kmm

```
1    nothing to do with character.  It only has to do with

2    your attitude and what they are right now, or whether

3    you should sit here in this case, or a civil case.  I

4    appreciate your answer.

5            Mr. Valin, you are a former police officer.

6    You heard the questions I asked Mr. Brottenberg.  Do

7    you think detectives have gotten on the witness stand

8    and lied?

9            PROSPECTIVE JUROR:  Yes.

10           MR. BERGER:  You would hold them -- would you

11   give them an edge in their testimony?

12           PROSPECTIVE JUROR:  No.

13           MR. BERGER:  What I'll be asking you to do,

14   all of you, I'll be asking you if somebody gets on the

15   witness stand and swears to tell the truth -- we don't

16   know how many people in the courtroom will tell the

17   truth.  We don't know how many may not.  I'm asking you

18   as a juror to start at point zero and be just as ready

19   to disbelieve as to believe; can you do that?

20           PROSPECTIVE JUROR:  Yes, I can.

21           MR. BERGER:  How about you?

22           PROSPECTIVE JUROR:  I was just sitting here

23   thinking.  I'm not sure.

24           MR. BERGER:  Because you would give an edge

25   to a police officer?
```

kmm

1                    PROSPECTIVE JUROR:  I think I might.

2                    MR. BERGER:  Thank you for that honest

3          answer.

4                    Anybody else feel that, Ms. Volpe or

5          Mr. Brottenberg, does anybody feel they will give a

6          police officer an edge.

7                    By the way, Ms. Kubinski, you said to us

8          before you have seen it all.  Have you seen that

9          children sometimes make claims that haven't been true?

10                   PROSPECTIVE JUROR:  Yes.

11                   MR. BERGER:  Would you all agree just because

12         a six-year old makes a claim doesn't mean it's true,

13         Mr. Danen?

14                   PROSPECTIVE JUROR:  Of course.

15                   MR. BERGER:  Ms. Taxier, how about you?

16                   PROSPECTIVE JUROR:  I believe that's true.  I

17         also think the emotional aspect of this case might be

18         too much for me.

19                   MR. BERGER:  Thank you so much for your

20         candor.  See how late it has come up, the Judge asked

21         questions, the prosecutor asked questions and now even

22         at this late time when you rethink these things,

23         Ms. Taxier's honest and strong enough character to tell

24         us she shouldn't be sitting here because it's too

25         emotional for her.  Does anybody else feel that way

1        now?

2               PROSPECTIVE JUROR:  I'm not sure why a

3        six-year old would have a motive to lie about something

4        like that.  That's the only issue I have.

5               MR. BERGER:  That's a very interesting

6        question.  What was the nature of the case?

7               PROSPECTIVE JUROR:  Also a criminal case.

8               MR. BERGER:  The charge?

9               PROSPECTIVE JUROR:  Similar kind of.  It was

10       many years ago.  I don't remember the exact specifics.

11       It involved a child and sexual abuse.

12              MR. BERGER:  Mr. Mastino raised a very

13       interesting question.  I'll pick on Mr. McDonough for

14       this, but I'm applying it to all of you.  You

15       understand that you don't have to figure out the motive

16       that a person has to live.  That's not required.  All

17       you have to figure out is whether or not that person is

18       telling the truth.  If you can only figure if that

19       person is telling the truth, not why he or she may not

20       be telling the truth.  Nobody is expecting you to be

21       psychologists or psychiatrists.  You are not expected

22       to analyze the witness.  You will see them for a very

23       brief period of time here.  All you have to figure out

24       is if they are being truthful, not why they are not

25       being truthful.  Does everybody understand that?  If

1     you don't believe them, you don't believe them.  Don't
2     say to yourself, if I can't figure out why they lied,
3     then they must be telling the truth.  You are not
4     expected to figure that out.  Does anybody understand
5     that; Mr. Fuentes?
6                    PROSPECTIVE JUROR:  Yes.
7                    MR. BERGER:  Are you an FBI agent?
8                    PROSPECTIVE JUROR:  Electronics technician.
9                    MR. BERGER:  You have a kinship to the
10    prosecution because you work for the FBI?
11                   PROSPECTIVE JUROR:  Yes.
12                   MR. BERGER:  FBI agents have lied on the
13    witness stand.
14                   PROSPECTIVE JUROR:  You are sure.
15                   MR. BERGER:  You will keep open mind?
16                   PROSPECTIVE JUROR:  Yes.
17                   MR. BERGER:  Everybody with the exception of
18    Mr. Brottenberg and Ms. Volpe will agree with that?
19                   Mr. Danen, let's assume you have no idea
20    whether the defendant is guilty or not guilty at this
21    point in time, that's why we have a trial.
22                   PROSPECTIVE JUROR:  Correct.
23                   MR. BERGER:  You may have belief that
24    seventy-two percent of the time people are charged with
25    crimes, they are guilty.  Let's say you have belief,

Proceedings                    126

1    you read newspapers, seen articles.  I'm not saying you

2    considered that, but let's say you did.  But you don't

3    know whether or not this is seventy-two percent or the

4    twenty-eight percent, correct?

5              PROSPECTIVE JUROR:  Correct.

6              MR. BERGER:  That's why we don't decide cases

7    based on percentage.  As you sit here as jurors, you

8    don't decide, well, you know what, 95 percent of the

9    time I think witnesses tell the truth.  Maybe that's

10   true or not.  I don't know if studies were done.  If

11   they had been, we don't know witnesses are in the fifth

12   percent or 95th percent.

13             PROSPECTIVE JUROR:  Correct.

14             MR. BERGER:  That's why we don't decide cases

15   based on percentage.  We decide individual cases,

16   evaluate each individual witness, evaluate the cases.

17   That's why we have individual juries make individual

18   judgments on individual cases.  Does everybody

19   understand that?

20             PROSPECTIVE JUROR:  Yes.

21             MR. BERGER:  Mr. Clarke?

22             PROSPECTIVE JUROR:  Yes.

23             MR. BERGER:  Does anybody understand -- you

24   all understand you don't decide things based on

25   percentages?

1          If somebody, not sitting here, if there is

2     smoke, there is fire.  If a person is accused of a

3     crime, they must be guilty.  Do any of the rest of you

4     feel that way now?  Does anyone have the slightest

5     feeling, he must be guilty, he wouldn't be sitting

6     here?  Does anybody think that?

7               PROSPECTIVE JUROR:  No.

8               MR. BERGER:  Ms. Wisselman, are you just as

9     prepared to vote not guilty?  Right now you are

10    prepared to vote guilty or not guilty based upon the

11    evidence and law that the Judge gives you.  Are you

12    just as prepared to vote not guilty if it was a simple

13    trespass case, it wasn't the sexual abuse of a child?

14    Does the seriousness of this case make you feel you

15    need to bend over backwards for the prosecution?

16              PROSPECTIVE JUROR:  No.

17              MR. BERGER:  Does anybody feel that way?

18              I'm asking this question now, Mr. Clarke, you

19    think because a six-year old is making a claim here,

20    the defendant did something to her sexually, it must be

21    true?

22              PROSPECTIVE JUROR:  No.

23              MR. BERGER:  Would you be upset with me if I

24    have to vigorously cross-examine a six-year old when

25    she takes the witness stand?

1            PROSPECTIVE JUROR:  No.

2            MR. BERGER:  Would you expect me to do that?

3            PROSPECTIVE JUROR:  Yes.

4            MR. BERGER:  Would you expect me to do that?

5            PROSPECTIVE JUROR:  It's your job.

6            MR. BERGER:  If I was representing you, would

7    want me to do that and you evaluate witnesses?

8            Mr. Mastino, you mentioned before about the

9    motive.  I made a point about a motive have occurred;

10   you are of that belief at this point?

11           PROSPECTIVE JUROR:  I still have some doubt.

12           MR. BERGER:  You need motive even though

13   nobody tells juries they have to figure out the motive?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  Let me step in on that.  Just so

16   I understand, are you saying you cannot be a fair and

17   impartial juror unless you are given a motive because

18   motive never plays a part in a criminal case.  That's

19   the law.  I'm giving you the law.  Is that something

20   you could follow and get past?

21           PROSPECTIVE JUROR:  I'm not sure if I could.

22           THE COURT:  Thank you.

23           MR. BERGER:  Do you think that a police

24   detective or officer has ever tricked or coerced

25   somebody into signing a statement which is against

Proceedings                    · 129

1       their interest?

2                    PROSPECTIVE JUROR:  Yes.

3                    MR. BERGER:  Does anybody disagree with that

4       answer?

5                    Let's say you are listening to the evidence

6       in this case, you hear something that the prosecution

7       puts forward that seems to be terrific evidence, could

8       you assure me you wouldn't say to yourself, that's it,

9       I heard enough, he's guilty.  What I'm asking you to do

10      is, just remember what you heard, wait until the end of

11      the case, wait until the arguments of counsel, and then

12      see what it all means.

13                   PROSPECTIVE JUROR:  I think so.  When you

14      say, terrific evidence for me, I mean --

15                   MR. BERGER:  Compelling, something you think

16      is compelling for the prosecution.  You think, all

17      right, he is guilty, that kind of thing.

18                   PROSPECTIVE JUROR:  Listen to everything

19      until the duration of the trial?

20                   MR. BERGER:  Correct.

21                   THE COURT:  Let me step in on that.  In fact,

22      I'll be giving you instructions that say you cannot

23      deliberate or make decisions in this case until the

24      case is over because until you hear the law from me,

25      you have no idea of the value of the evidence you are

1      hearing.  You have to hear it, and you have to remember

2      it, and you have to evaluate it.  Until you get the

3      law, it's impossible for you to make a decision.  You

4      must all give me an assurance you will keep an open

5      mind throughout this entire process until we get to the

6      end.  If you are someone that cannot keep an open mind

7      until the end of the case, let Mr. Berger know now.

8               MR. BERGER:  I ask that notwithstanding the

9      Judge's instructions, some people come to a conclusion

10     and their mind is closed.  I ask you to keep an open

11     mind throughout.  You have now had a whole bunch of

12     time to consider some of the things I said and some of

13     the things Mr. Perri said, and the Judge, with respect

14     to being neutral and fair minded.  I ask you this

15     individually, not collectively.

16              If you were the defendant sitting there and

17     there were twelve Mr. Collins in your frame of mind

18     judging, would you be satisfied with the twelve

19     Mr. Collins judging you?  Are you so fair minded at

20     this point in time you would believe twelve

21     Mr. Collins?

22              PROSPECTIVE JUROR:  Yes.

23              MR. BERGER:  How about you, Mr. Valin?

24              PROSPECTIVE JUROR:  Yeah, but I have a

25     problem.  My problem is this:  How can you say to a

1    prosecution, let a six-year old testify.  Has that

2    happened before?  Is that common?

3              THE COURT:  I'm going to step in on that.

4    That is not a question that at this point either side

5    is going to answer.  What I'm going to tell you is

6    this, sir, we have a system of law here in New York.

7    It requires certain things to happen and the People to

8    prove their case in a certain way, and what the People

9    need to do to prove their case is what will happen.

10   You don't have to agree or like how the cases come

11   through the system.  I just need to know you will

12   follow the law I will give to you and you will evaluate

13   the evidence as it comes before you here in this

14   courtroom.  So if you do not feel, sir, you can fairly

15   evaluate the evidence and apply the law that I give,

16   then we need to know that now, and if you can, then

17   that's fine.  There will not be an answer to that

18   question as that doesn't have a place within this jury

19   selection process; do you understand, sir?

20             PROSPECTIVE JUROR:  Yes.  If the Court allows

21   a six-year old to testify, I have no problem with that.

22             THE COURT:  Fair enough.  Thank you.  Go

23   ahead, Mr. Berger.  You can continue.

24             MR. BERGER:  If you were sitting where

25   Mr. Ramos is, would you be satisfied with twelve

kmm

1          Mr. Valin's sitting in judgment with you?

2                    PROSPECTIVE JUROR:  Yes.

3                    MR. BERGER:  Are you fair minded?

4                    PROSPECTIVE JUROR:  Yes.

5                    MR. BERGER:  Just as prepared to vote guilty

6     or not guilty?

7                    PROSPECTIVE JUROR:  Yes.

8                    MR. BERGER:  You would be satisfied with

9     twelve of you, Mr. Allen?

10                   PROSPECTIVE JUROR:  Yes.

11                   MR. BERGER:  Ms. Aragona, are you that fair

12    minded?

13                   PROSPECTIVE JUROR:  Yes.

14                   MR. BERGER:  Ms. Tesler, are you that fair

15    minded?

16                   PROSPECTIVE JUROR:  Yes.

17                   MR. BERGER:  Ms. Volpe, you indicated that

18    you are?

19                   PROSPECTIVE JUROR:  Yes, not too sure.

20                   MR. BERGER:  Ms. Wisselman?

21                   PROSPECTIVE JUROR:  Yes.

22                   MR. BERGER:  Mr. Danen?

23                   PROSPECTIVE JUROR:  Yes.

24                   MR. BERGER:  Mr. Brottenberg, you indicated

25    you couldn't be?

Proceedings                    133

1              PROSPECTIVE JUROR:  Yes.  No.

2              MR. BERGER:  And you too, Mr. McDonough,

3      would you be satisfied with twelve Mr. McDonough if you

4      were the defendant in this case?

5              PROSPECTIVE JUROR:  Yes.

6              MR. BERGER:  No trouble?

7              PROSPECTIVE JUROR:  Yes.

8              MR. BERGER:  How about you, Mr. Mastino?

9              PROSPECTIVE JUROR:  Yes.

10             MR. BERGER:  And Mr. Clarke?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Your twenty minutes are up.  Do

13     you need more time?

14             MR. BERGER:  A little more time.  If you

15     would just tell me, I'm near the end.

16             I'll start with Mr. Collins.  What newspapers

17     and magazines do you read?

18             PROSPECTIVE JUROR:  Newsday.  That's about it

19     lately.

20             MR. BERGER:  You said you have your nephew's

21     wife is an ADA?

22             PROSPECTIVE JUROR:  Assistant DA in

23     Manhattan.

24             MR. BERGER:  Do you owe her any explanation?

25             PROSPECTIVE JUROR:  No.

Proceedings                134

1              MR. BERGER:  Mr. Valin, how about you,

2      newspapers, magazines?

3              PROSPECTIVE JUROR:  Very rare.  I get all of

4      the information from the Internet.

5              MR. BERGER:  New day in age.

6              Mr. Allen.

7              PROSPECTIVE JUROR:  Generally, I don't read

8      the papers.  I get my information off the Internet as

9      well, as well as night news, news channels.

10             MR. BERGER:  Ms. Aragona?

11             PROSPECTIVE JUROR:  I read the newspapers.  I

12     go by News 12.  I don't read the newspaper.

13             MR. BERGER:  Ms. Tesler?

14             PROSPECTIVE JUROR:  I read the New York

15     Times.  News most from the radio and television and

16     Time Magazine.

17             MR. BERGER:  Ms. Volpe?

18             PROSPECTIVE JUROR:  Mostly from television

19     news and Internet and radio.

20             MR. BERGER:  Mr. Danen?

21             PROSPECTIVE JUROR:  BBC, Internet or TV.  No

22     local news.  I prefer international.

23             MR. BERGER:  Mr. McDonough, newspapers

24     magazines?

25             PROSPECTIVE JUROR:  Newsday and reading the

kmm

Proceedings                          135

1       newspapers on-line, New York Times.

2                   MR. BERGER:  Ms. Kubinski?

3                   PROSPECTIVE JUROR:  Newsday and radio and

4       someone mentioned BBC.

5                   MR. BERGER:  Mr. Clarke?

6                   PROSPECTIVE JUROR:  Mostly on-line.  Once in

7       a while newspapers.

8                   MR. BERGER:  You told us your father was a

9       New York City police officer?

10                  PROSPECTIVE JUROR:  Yes.

11                  MR. BERGER:  You have relatives and friends

12      who are also officers?

13                  PROSPECTIVE JUROR:  Yes.

14                  MR. BERGER:  There will be police officers

15      testifying here for the prosecution in this case.

16      Should I be concerned about that?

17                  PROSPECTIVE JUROR:  No.

18                  MR. BERGER:  You don't owe them any

19      explanation?

20                  PROSPECTIVE JUROR:  No.

21                  MR. BERGER:  Your father may have been the

22      straightest man you ever met, but you wouldn't put his

23      -- place that on the people who testified here, would

24      you?

25                  PROSPECTIVE JUROR:  No.

Proceedings                    136

1           MR. BERGER:  You would agree police officers

2     have lied on the witness stand?

3           PROSPECTIVE JUROR:  I'm sure they have.

4           MR. BERGER:  It's just an opinion, you

5     wouldn't know.

6           PROSPECTIVE JUROR:  Everybody has.

7           MR. BERGER:  Finally, if you would tell me if

8     you have bumper stickers on your car.  I'm not

9     interested in politics; Mr. Collins.

10          PROSPECTIVE JUROR:  Just I would rather be at

11    a Neil Diamond concert.

12          MR. BERGER:  We were in the same class in

13    junior high school.

14          Mr. Valin?

15          PROSPECTIVE JUROR:  FOP sticker.  Term of the

16    police and national rifle association.

17          MR. BERGER:  Mr. Allen?

18          PROSPECTIVE JUROR:  None.

19          MR. BERGER:  Ms. Aragona?

20          PROSPECTIVE JUROR:  Marine sticker and a

21    Giants windshield sticker.

22          MR. BERGER:  Are you talking military

23    Marines?

24          PROSPECTIVE JUROR:  One of my good friends.

25          MR. BERGER:  Ms. Tesler?

Proceedings                    137

1           PROSPECTIVE JUROR:  NBR sticker.

2           MR. BERGER:  Ms. Volpe?

3           PROSPECTIVE JUROR:  No sticker.

4           MR. BERGER:  Mr. Danen?

5           PROSPECTIVE JUROR:  None.

6           MR. BERGER:  Mr. McDonough?

7           PROSPECTIVE JUROR:  No.

8           MR. BERGER:  Mr. Kubinski?

9           PROSPECTIVE JUROR:  No.

10          MR. BERGER:  Mr. Clarke?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  We have a little bit of business

13   we need to conduct.  This is the part you will step out

14   and we'll discuss who will be chosen as jurors, if

15   anyone.  I'll ask everyone in the front to step out.  I

16   also need everyone in the back to step out.  We'll take

17   approximately five to ten minutes.  Don't go too far.

18          (Whereupon, the jury panel exited the

19   courtroom.)

20          THE COURT:  Are both sides ready to proceed?

21          MR. PERRI:  Yes, your Honor.

22          MR. BERGER:  Yes.

23          THE COURT:  For cause.  People, jurors one

24   through twelve for cause.

25          MR. PERRI:  Juror number six, I ask her to be

Proceedings                138

1    excused for cause.  She was equivocal as to whether or

2    not she would be able to put police to the same

3    standard as civilian witnesses and she said she could

4    give them an edge.

5                    THE COURT:  On consent?

6                    MR. BERGER:  Yes.

7                    THE COURT:  Number six is excused for cause.

8                    Anyone else, People, one through twelve for

9    cause?

10                   MR. PERRI:  Juror number eleven, Ms. Taxier.

11                   MR. BERGER:  On consent.

12                   THE COURT:  Anyone else, cause, People?  One

13   through twelve.

14                   MR. PERRI:  Juror number thirteen.

15                   THE COURT:  Only one through twelve.

16                   MR. PERRI:  I'm sorry.

17                   Juror number twelve, your Honor, that he was

18   also equivocal.

19                   MR. BERGER:  Consent.

20                   THE COURT:  Juror six, eleven and twelve

21   excused for cause at this time.

22                   Mr. Berger, any of those remaining jurors,

23   one through twelve for cause?

24                   MR. BERGER:  No, your Honor.

25                   THE COURT:  People, any perempts, the jurors

kmm

1       remaining between one and twelve?  Any perempt

2       challenges, People?

3                   MR. PERRI:  Your Honor, the People would

4       exercise a perempt challenge to juror number one, juror

5       number five, and juror number -- I'm assuming one

6       through twelve?

7                   THE COURT:  Correct.

8                   MR. PERRI:  Juror number nine, your Honor.

9                   THE COURT:  People have a perempt for juror

10      one, juror five, juror nine, having used three

11      perempts.

12                  Mr. Berger, any perempt for the defense,

13      jurors two, three, four, seven, eight, or ten?

14                  MR. BERGER:  Two.

15                  THE COURT:  Any perempts?

16                  MR. BERGER:  Yes.  Four, eight.

17                  THE COURT:  Just going up to twelve.

18                  MR. BERGER:  That's it.

19                  THE COURT:  Juror number one will be Ronald

20      Cratzer, who is seated in seat three.  Juror number two

21      will be Linda Wisselman who is seated in seat seven,

22      juror number three will be Michael McDonough, who is

23      sitting in seat number ten.

24                  MR. PERRI:  Yes, your Honor.

25                  MR. BERGER:  Yes, your Honor.

1              THE COURT:  People, cause challenges thirteen

2      or fourteen.

3              MR. PERRI:  People exercise -- I ask the

4      Court to dismiss juror number thirteen.

5              MR. BERGER:  Consent.

6              THE COURT:  Juror number thirteen is excused

7      for cause.  People, perempt on juror number fourteen?

8              MR. PERRI:  Yes, your Honor.

9              THE COURT:  We have three jurors that will

10     become seated.  We'll bring them in and swear them in

11     and excuse them until Monday, agreed, People?

12             MR. PERRI:  Yes, your Honor.

13             THE COURT:  Agreed, defense?

14             MR. BERGER:  Yes, your Honor.

15             (Whereupon, the jury panel entered the

16     courtroom.)

17             THE COURT:  If the jurors in the front would

18     give their attention to the clerk.

19             THE CLERK:  Do both sides stipulate to the

20     presence and properly seated jurors?

21             MR. PERRI:  Yes, your Honor.

22             MR. BERGER:  Yes.

23             THE CLERK:  If your name is called, remain

24     seated.  You are selected as a juror for this trial.

25     Juror number one will be Ronald Cratzer, juror number

 1      number two is Linda Wisselman, and juror number three
 2      will be Michael McDonough.  If your name has not been
 3      called, follow the direction of the officer and step
 4      out and you are released with the thanks of the Court.
 5              THE COURT:  Thank you, everyone.  Enjoy the
 6      rest of your day.
 7              THE CLERK:  Are the remaining jurors
 8      satisfactory to the People?
 9              MR. PERRI:  Yes, your Honor.
10              MR. BERGER:  And to the defendant.
11              (Whereupon, the jurors were duly sworn by the
12      clerk of the court.)
13              THE COURT:  At this point the three of you
14      are going to be excused until Monday morning.
15              MR. BERGER:  Could we come up for a second?
16              THE COURT:  Sure.
17              (Whereupon, there was a sidebar discussion,
18      as follows:)
19              THE COURT:  Come up for a second, please,
20      Mr. McDonough.  I just want to privately talk to you.
21      I saw your reaction.  Are you going to be able to do
22      this?
23              JUROR:  I'm fine.  I don't want to be on a
24      jury.  That's my personal, nothing about the case
25      itself.

1          THE COURT:  You can be fair?

2          JUROR:  I'm busy with work.  I was hoping not

3     to be picked.  It has nothing to do with the case

4     itself.

5          THE COURT:  You can give us your undivided

6     attention and you will?

7          JUROR:  I have to work from five to midnight

8     or one afterwards.

9          THE COURT:  Mr. McDonough, do you think it

10    will interfere with your ability to focus here?

11         JUROR:  I don't think so.  I'll be honest.  I

12    couldn't tell you.

13         THE COURT:  What is your employment?

14         JUROR:  I'm a computer programmer.  I'm

15    working on a project, which is a lot bigger than me.

16         THE COURT:  Are there other people on the

17    project?

18         JUROR:  Yes, there's many people.

19         THE COURT:  I don't want to get into a

20    situation where in a week from now you are falling

21    asleep in the chair.

22         JUROR:  I'll be okay.  I can't give you one

23    hundred percent certainty about something that hasn't

24    happened.  I'll be okay.

25         THE COURT:  We haven't crossed that bridge,

Proceedings                143

1    but I want to make sure we don't get to that bridge.

2    You will be able to pay attention here?  You can give

3    us your undivided attention and if you realize it's two

4    in the morning and you are still up working, that is

5    bad for us.  I need your attention here.  You will be

6    able to do that?

7                JUROR:  Yes.

8                THE COURT:  You are a young strapping guy?

9                PROSPECTIVE JUROR:  I'm not that young.

10               THE COURT:  Thank you.

11               (Whereupon, the proceedings resumed as

12   follows:)

13               THE COURT:  I'm excusing the three of you

14   until Monday.  I'll ask you to report here at 9:30

15   Monday morning and you will have different seats

16   because you are jurors one, and two, and three.  You

17   will take the first three seats in the front row when

18   you come back here on Monday.

19               Before you leave let me remind you, you must

20   keep an open mind throughout this process.  Please do

21   not discuss the case amongst yourselves or with anyone

22   else during this trial.  Do not permit anyone to

23   discuss the case in your presence.  Do not talk to the

24   lawyers, witnesses or the defendant about anything

25   during this trial, and do not view or visit the place

Proceedings                144

1     where the charged crime was allegedly committed or any

2     other place involved in the case.

3              If there is new coverage of this case, do not

4     read, view, or listen to any accounts or discussions of

5     the case reported by the news media, and do not attempt

6     to research any fact, issue, or law related to this

7     case whether by discussion with others by research in

8     the library, or on the Internet, or by any other means

9     or source.

10             Enjoy the rest of your week.  I'll see the

11    rest of you at 9:30 on Monday morning sharp.

12             (Whereupon, the selected jurors exited the

13    courtroom.)

14             THE COURT:  Please refill the box.

15             THE CLERK:  Seat number one, James Christie,

16    C-H-R-I-S-T-I-E.

17             Seat number two, Yang Park, Y-A-N-G, last

18    name P-A-R-K.

19             Seat number three, Joseph Guarino,

20    G-U-A-R-I-N-O.

21             Seat number four, Elizabeth Brown, B-R-O-W-N.

22             Seat number five, Edward McCaffrey,

23    M-C-C-A-F-F-R-E-Y.

24             Seat number six will be Toni Coleman,

25    T-O-N-I.  Last name C-O-L-E-M-A-N.

Proceedings                145

1        Seat number seven will be Maria Fusco,
2    F-U-S-C-O.
3        Seat number eight, Michael Pascucci,
4    P-A-S-C-U-C-C-I.
5        Seat number nine, Donald Moody, M-O-O-D-Y.
6        Seat number ten will be Linda DiNapoli,
7    D-I-N-A-P-O-L-I.
8        Seat number eleven will be Wendy Fernandez,
9    F-E-R-N-A-N-D-E-Z.
10        Seat number twelve will be Paul Aslav,
11    A-S-L-A-V.
12        Seat number thirteen will be Lucielle Cooper,
13    C-O-O-P-E-R.  First name L-U-C-I-E-L-L-E.
14        Seat number fourteen will be Symone Williams,
15    S-Y-M-O-N-E.  Last name W-I-L-L-I-A-M-S.
16        THE COURT:  Symone Williams.
17        No appearance from him.
18        THE CLERK:  Seat fourteen will be Jonathan
19    Cohen, C-O-H-E-N.
20        THE COURT:  Welcome everyone to the front of
21    the courtroom.  It took a little while, as we predicted
22    earlier, that you would eventually make it up here.
23    You heard everything going on.  This round usually
24    works quicker.  I give you the highlights to jog your
25    memory in case there's something you want to tell me.

kmm

1          Is anyone in the front of the courtroom now

2     having trouble with the English language?  You heard me

3     ask the other potential jurors about following the law

4     as I have given to you and accepting certain principles

5     of law.  Do you recall I asked you to accept one that

6     the defendant was presumed innocent.  Two, that the

7     People have the burden of proof, guilt beyond a

8     reasonable doubt.  And three, that the defendant, if

9     the defendant does not testify as a witness, that is

10    not a factor for which any inference unfavorable to the

11    defendant may be drawn.

12          Does anybody have a problem with following

13    those three concepts?  Raise your hand if you do.  No

14    hands have been raised.

15          If you are called, I asked the jurors this

16    morning, what I call type A personality, are you a

17    person that says, I'm right, I'm always right, it

18    doesn't matter what is right in front of your face

19    tells you what you believe is not accurate.  If that's

20    you and you won't be able to deliberate, we need people

21    who can listen and exchange ideas.  Raise your hand if

22    you are the type of person you believe can't deliberate

23    in this kind of situation.  No hands have been raised.

24          I asked everyone to give me assurance that

25    you will decide the case without fear, favor, sympathy,

1       bias, or prejudice for or against the People, the

2       defendant, or any of the witnesses, be it a police

3       officer or civilians.

4                Does anyone have a problem with that, that

5       they need to discuss it on the record now?  No hands

6       have been raised.

7                Do any of you know any of the attorneys in

8       the room, the defendant, any of my court staff, or

9       myself?  If you believe you know us or we look familiar

10      to you, raise your hand and let us know.  No hands were

11      raised.

12               I also read that list of witnesses earlier

13      today.  Do any of you believe you know any of the

14      witnesses, potential witnesses, or names of individuals

15      you might hear during this trial?  Raise your hand if

16      you think you know any of them.

17               Now, you heard me ask questions about health

18      issues.  Does anybody here have a health issue that you

19      believe prevents you from sitting as a juror in this

20      case?  That might include doctors appointments that

21      can't be switched, medication that makes it difficult

22      for you to concentrate, any health issues.

23               Ms. McCaffrey.

24               PROSPECTIVE JUROR:  I request to be excused

25      privately.

kmm

Proceedings                    148

1              THE COURT:  Step up.

2              (Whereupon, there was a sidebar discussion as

3       follows:)

4              PROSPECTIVE JUROR:  My wife broke her ankle

5       in three places.  She cannot walk, and I have an

6       eleven-year old daughter.  My wife's money for her job

7       runs out in three weeks and her insurance runs out in

8       three weeks.  I own my own landscaping business, 40

9       percent of which I lost with Hurricane Sandy and it was

10      never replaced by insurance.  I have twenty accounts

11      left that I do most myself.  By being here today --

12             THE COURT:  I understand.

13             MR. BERGER:  Consent.

14             MR. PERRI:  Yes.

15             THE COURT:  Thank you for your honesty.  You

16      are excused.

17             I believe we saw another hand.

18             Mr. Christie.

19             PROSPECTIVE JUROR:  I am Mr. Christie.  I

20      have something unscheduled.  I planned on scheduling a

21      surgery in June, early June.

22             THE COURT:  We're going to be done by that

23      time.  As long as we're done by June, you are good?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Mrs. Park.

Proceedings                    149

1                    PROSPECTIVE JUROR:  I cannot understand

2        English.

3                    THE COURT:  Any questions for Mrs. Park?

4                    MR. BERGER:  Consent.

5                    MR. PERRI:  Consent.

6                    THE COURT:  Does anyone else have a medical

7        -- she is excused her.

8                    Does anyone else have a medical or health

9        issue?

10                    THE CLERK:  I'll seat number two, Mary

11       Caputo, C-A-P-U-T-O.

12                    PROSPECTIVE JUROR:  I should put it right out

13       there.  I'm not -- I will not be a good juror.  I work

14       for little children.

15                    THE COURT:  Consent.

16                    MR. BERGER:  Consent.

17                    THE COURT:  You may stop speaking.  We'll

18       find another trial for you.

19                    PROSPECTIVE JUROR:  Okay.

20                    THE COURT:  Seat number two, Haing Com Yu.

21       First name H-A-I-N-G, middle name C-O-M, last name Y-U.

22                    PROSPECTIVE JUROR:  Sorry.  I don't

23       understand all.

24                    THE COURT:  Language issue?

25                    MR. PERRI:  Yes, your Honor.

                                                              kmm

Proceedings                    150

1              MR. BERGER:  Consent.

2              MR. PERRI:  Consent.

3              THE COURT:  Seat number two, Deidra

4    Rodriguez, R-O-D-R-I-G-U-E-Z.

5              Seat number five, Gertrude Pinkney,

6    P-I-N-K-N-E-Y.

7              PROSPECTIVE JUROR:  Judge, I'm not interested

8    in this case.

9              THE COURT:  All right.  Thank you for your

10   honesty, Ms. Pinkney.

11             MR. BERGER:  Consent.

12             MR. PERRI:  Yes, your Honor.

13             THE CLERK:  Seat number five, Doris

14   Hernandez, H-E-R-N-A-N-D-E-Z.

15             THE COURT:  Welcome, Ms. Rodriguez and Ms.

16   Hernandez.  Is there anything with regards to

17   everything I asked so far up to health, either of you,

18   Ms. Rodriguez?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  Ms. Hernandez?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  The next thing we discussed was

23   the length of the trial and dates you would be working.

24   Let me say them again so you have them and then I'll

25   take hands.  If you are picked today you will not be

kmm

1    expected to be back until Monday morning.  We'll work

2    Monday through Thursday of next week, which is May 11th

3    through May 14th.  We'll then work the following week,

4    the 19th, 20th and 21st, giving you the four-day

5    weekend for Memorial Day, and then we'll work the

6    following week, Tuesday through Friday.  If it's

7    needed, the 26th through the 29th, raise your hand if

8    that's an issue for you, as far as timing.  Keep those

9    hands up, please.

10             The first hand I saw was Mr. Guarino.

11             PROSPECTIVE JUROR:  I have a scheduled

12   vacation starting next Wednesday.

13             THE COURT:  Ms. Hernandez.

14             PROSPECTIVE JUROR:  I go to school three days

15   a week.

16             THE COURT:  School is not ending soon?

17             PROSPECTIVE JUROR:  It ends in June.

18             THE COURT:  Is that nighttime or daytime?

19             PROSPECTIVE JUROR:  I go in the afternoon

20   until the evening.

21             THE COURT:  Thank you.

22             Ms. Fusco.

23             PROSPECTIVE JUROR:  I have a twenty-week

24   sonogram on the 27th.  I have enough time to reschedule

25   it, but --

1          THE COURT:  Is that the only issue?

2          PROSPECTIVE JUROR:  Only thing.

3          THE COURT:  What time is it at?

4          PROSPECTIVE JUROR:  Nine a.m.

5          THE COURT:  I'll have you stick around.  It's

6     possible we could either start a little later on the

7     27th, or if you have the ability to maybe make another

8     appointment, and if you need a letter from the Court

9     that you need a letter to expedite that, we can assist

10     in that regard.

11          Mr. Moody.

12          PROSPECTIVE JUROR:  I'm planning a new

13     distribution for my company that we're supposed to move

14     into in early June.  We're setting up computers and

15     everything like that.

16          THE COURT:  That's not something else that

17     they can take on while you are here?

18          PROSPECTIVE JUROR:  I'm the regional

19     director.

20          THE COURT:  Thank you, sir.

21          Ms. Hernandez.

22          PROSPECTIVE JUROR:  I have school-age

23     children, Catholic school.  They do not have school

24     next Thursday.  I'm the sole caregiver, and I have

25     school on the 13th and 27th.

```
 1              THE COURT:  The school event, daytime or
 2    nighttime?
 3              PROSPECTIVE JUROR:  Daytime events, 1:30 in
 4    the afternoon and the other midday.
 5              THE COURT:  Thank you.
 6              Ms. Cooper.
 7              PROSPECTIVE JUROR:  I'm assistant principal
 8    with the Board of Education, New York City.  The 11th,
 9    12th and 13th we are at a luncheon in Westchester.  My
10    principal was scheduled -- she has a court case in
11    Brooklyn.  I'm designated to go there.
12              THE COURT:  What days?
13              PROSPECTIVE JUROR:  11th, 12th and 13th.
14              THE COURT:  And Ms. Williams?
15              PROSPECTIVE JUROR:  Scheduled vacation,
16    prepaid vacation the week of the 18th.  I have a sales
17    meeting I'm supposed to be leading the first two days
18    of next week.
19              THE COURT:  Thank you.
20              Do the attorneys want to inquire further of
21    either any of the jurors sitting in following seats,
22    three, seat five, seat nine, eleven, thirteen or
23    fourteen?
24              MR. PERRI:  No, your Honor.
25              MR. BERGER:  No.
```

Proceedings                    154

1              THE COURT:  Mr. Guarino, you are excused from
2     this case.  Ms. Hernandez, you are excused from this
3     case.  Mr. Moody, same thing.  Ms. Fernandez, this case
4     is probably too long for you.  Maybe another case will
5     be better.  Ms. Cooper, and Mr. Cohen.  Thank you all.
6              THE COURT OFFICER:  Come with me, please.
7     Three, five, nine, eleven thirteen and fourteen.
8              THE CLERK:  Seat number three, Robert
9     Finkelstein, F-I-N-K-E-L-S-T-E-I-N.
10             Seat number five, Stephan Andrey,
11    A-N-D-R-E-Y.
12             Seat number nine, William Dempsey,
13    D-E-M-P-S-E-Y.
14             Seat number eleven, Priscella Jergensen,
15    P-R-I-S-C-E-L-L-A.  Last name, J-E-R-G-E-N-S-E-N.
16             Seat number thirteen, Julia Bello, B-E-L-L-O.
17             Seat number fourteen, John Jathmann,
18    J-A-T-H-M-A-N-N.
19             THE COURT:  Welcome to the front of the
20    courtroom.  I know you all have been listening
21    intensively.  Do any of you have anything you need to
22    tell me regarding the issue we covered so far, the main
23    ones being at the moment, health, and timing, and of
24    course, whether or not you know any of us or have any
25    issues with the concept of law?

1              Let me go down the row.  Mr. Finkelstein.
2              PROSPECTIVE JUROR:  My partner will be out of
3    town from the 11th to the 18th.
4              THE COURT:  It's just the two of you?
5              PROSPECTIVE JUROR:  We have employees but
6    we're the only two we can open up.
7              THE COURT:  What time do you need to open up?
8              PROSPECTIVE JUROR:  7:00 a.m.
9              THE COURT:  Is it the kind of business where
10   you don't have to be there if you could check in at
11   lunchtime and go at the end of the day?
12             PROSPECTIVE JUROR:  I wish.
13             MR. BERGER:  Ms. Rodriguez.
14             PROSPECTIVE JUROR:  I have one question.  On
15   the 20th I know you said we would probably be dismissed
16   at 4:30, like no later, as long --
17             THE COURT:  Never later than 4:30.
18             PROSPECTIVE JUROR:  Okay.
19             THE COURT:  My Court staff will not allow it.
20   It will never be later than 4:30.
21             PROSPECTIVE JUROR:  Okay.
22             THE COURT:  Mr. Andrey.
23             PROSPECTIVE JUROR:  I'm an inspiring
24   professional boxer, and my fight is on the 21st of this
25   month, and I have another fight next week, Wednesday.

kmm

1      So, remember my name.

2              THE COURT:  I'll remember your name.

3      Seriously, I'm going to assume that involves a lot of

4      training?

5              PROSPECTIVE JUROR:  About three to four times

6      a day.

7              THE COURT:  Is it fair to state your mind

8      will not be with us?

9              PROSPECTIVE JUROR:  Yes, that is it.

10             MR. BERGER:  He might punch our lights out.

11             PROSPECTIVE JUROR:  I don't think I have that

12     much courage to do that.

13             THE COURT:  Mr. Dempsey is the next

14     individual to do that.

15             PROSPECTIVE JUROR:  My daughter's grade

16     situation is the 21st.

17             THE COURT:  What time?

18             PROSPECTIVE JUROR:  It starts in the morning

19     and goes through the morning to the afternoon.

20             THE COURT:  Here in Nassau or?

21             PROSPECTIVE JUROR:  Adelphi.

22             THE COURT:  Ms. Jergensen.

23             PROSPECTIVE JUROR:  I'm good.

24             THE COURT:  Ms. Bello.

25             PROSPECTIVE JUROR:  I have surgery Wednesday

1    at eleven o'clock.

2              THE COURT:  Thank you.

3              Mr. Jathmann.

4              PROSPECTIVE JUROR:  I have a cousin who was

5    an abused child.  It came out after the person died.

6              THE COURT:  Is the fact that something

7    happened to you, so close to you in this family, makes

8    you not good enough for you?

9              PROSPECTIVE JUROR:  She told my aunt at one

10   point.  Of course, it's a good Catholic family.  That

11   doesn't happen.

12             THE COURT:  Thank you, sir.

13             Counselors, any questions for the following

14   jurors, either number three, number five, number nine,

15   number thirteen, or number fourteen?

16             MR. BERGER:  No, your Honor.

17             MR. PERRI:  No, your Honor.

18             THE COURT:  Consent?

19             MR. PERRI:  Yes.

20             MR. BERGER:  Yes.

21             THE COURT:  Mr. Finkelstein, Mr. Andrey, good

22   luck to you.  I'll remember your name.  Mr. Dempsey,

23   enjoy the graduation.  Ms. Bello, good luck to you.

24   Mr. Jathmann, you are excused with the thanks of the

25   court.

Proceedings                    158

1           Let's refill.

2           THE CLERK:  Seat three, Jorge Niveyro,

3    N-I-V-E-Y-R-O, J-O-R-G-E.

4           Seat number five, Tommy Nieves, N-I-E-V-E-S.

5           Seat number nine, Carlos Ramirez,

6    R-A-M-I-R-E-Z.

7           Seat number thirteen, Diana Iorio, I-O-R-I-O.

8    First name Diana.

9           Seat number fourteen, Sima Moezinia,

10   M-O-E-Z-I-N-I-A.

11          I'm going to address each of you individually

12   to see if there is anything you need to tell me.

13          Mr. Nivegro, is there anything you need to

14   tell me?

15          PROSPECTIVE JUROR:  Yes, you know, I take

16   care of my patients.  Some of them suffer from suicide

17   tendency.  I assist them 24/7.  They have sessions with

18   me twice a week consistently, you know.  They face hard

19   personal situations.  They could have a suicide crisis

20   at any time.

21          THE COURT:  Is that during the day, sir, your

22   work is during the day and night?

23          PROSPECTIVE JUROR:  Yeah, yeah, yeah.

24          THE COURT:  Thank you.  I appreciate you

25   telling us.

Proceedings                    159

1             Mr. Nieves, is there anything you need to

2        share with me?

3             PROSPECTIVE JUROR:  It hits home my sister

4        was molested as a child.  I don't think that I would be

5        fair in this case.

6             THE COURT:  Thank you, sir.

7             Mr. Ramirez.

8             PROSPECTIVE JUROR:  I don't speak English

9        very well.

10            THE COURT:  Thank you, sir.

11            Ms. Iorio.

12            PROSPECTIVE JUROR:  Hi.

13            THE COURT:  Is there anything you need to

14       tell me?

15            PROSPECTIVE JUROR:  I'm fine.

16            THE COURT:  Ms. Moezinia.

17            PROSPECTIVE JUROR:  My English not so good.

18       I don't understand well.

19            THE COURT:  Attorneys, any questions for

20       Mr. Niveyro, Mr. Nieves, Mr. Ramirez, or

21       Ms. Moezinia?

22            MR. PERRI:  Consent.

23            MR. BERGER:  No, your Honor.  Consent.

24            THE COURT:  If you heard your name you are

25       excused.

Proceedings                    160

1                    THE CLERK:  Seat number three, Emitope Oyewo,

2          E-M-I-T-O-P-E, last name O-Y-E-W-O.

3                    THE COURT:  Welcome to the front of the

4          courtroom.  Last but not least.  I appreciate your

5          patience.  Is there anything you need to tell me?

6                    PROSPECTIVE JUROR:  It's about the timing.

7                    THE COURT:  The dates?

8                    PROSPECTIVE JUROR:  The time because I have

9          two jobs.  I won't be able to participate in coming to

10         the court with all those days.  And secondly, my

11         daughter is graduated the 28th of May.

12                   THE COURT:  Let's go to your job.  Do you get

13         paid for jury duty?  Do your jobs pay you?

14                   PROSPECTIVE JUROR:  My regular job, I know

15         they will pay me.  It's with the State of New York.  My

16         part-time job, my per diem job, I'm not sure.

17                   THE COURT:  Mr. Berger.

18                   MR. BERGER:  I would consent.

19                   MR. PERRI:  Consent.

20                   THE COURT:  I don't want you to have

21         financial hardship.  There's probably a shorter trial

22         that would be better for you.

23                   Let me go through some of the questions with

24         you.  You heard me ask about whether you or anyone

25         close to you has ever been the victim of a crime,

kmm

Proceedings                161

1   witness to a crime, convicted of a crime, or has a

2   pending criminal or civil case.  Raise your hand if any

3   of those categories apply to you.

4            THE COURT:  Ms. Rodriguez.

5            PROSPECTIVE JUROR:  I was a child, but we

6   were burglarized, and my husband is in a civil case

7   right now.

8            THE COURT:  A civil case here in Nassau

9   County?

10            PROSPECTIVE JUROR:  No, it's in the city.

11            THE COURT:  Is there anything about the fact

12   that years ago you were burglarized and your husband

13   has a civil case, will that get in the way of sitting

14   here as a fair and impartial juror?

15            PROSPECTIVE JUROR:  No.

16            THE COURT:  You appreciate and understand

17   this case has nothing do with the burglary you were

18   part of and a civil case and criminal case are

19   completely different sets of laws?

20            PROSPECTIVE JUROR:  Yes.

21            THE COURT:  Did I see Ms. Brown, your hand

22   up?

23            PROSPECTIVE JUROR:  Yes.

24            THE COURT:  Yes.

25            PROSPECTIVE JUROR:  I'm a victim of a crime.

1        I also work in Roosevelt on the weekend.

2              THE COURT:  As a victim of a crime, that was

3     here in Nassau County?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Was it recent?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Was it solved?  Was somebody

8     arrested?

9              PROSPECTIVE JUROR:  Kind of.

10             THE COURT:  How long ago was it?

11             PROSPECTIVE JUROR:  Twenty years.

12             THE COURT:  Anything about the fact that

13    twenty years ago you were a victim of a crime, will

14    that get in the way of being able to sit in this case

15    and fairly evaluate the evidence in this case?

16             PROSPECTIVE JUROR:  I don't think it has

17    anything to do with this case, the nature of this case.

18             THE COURT:  You said something about working

19    on the weekend.  Why is that a concern to you?

20             PROSPECTIVE JUROR:  You mentioned Roosevelt

21    Park.

22             THE COURT:  It's actually a street in

23    Roosevelt, Park Avenue.  Do you have any reason to be

24    near Park Avenue in Roosevelt?

25             PROSPECTIVE JUROR:  Yeah.  That's where I do

Proceedings                    163

1    my weekend job.

2              THE COURT:  Is the specific address, is it

3    124 Park Avenue, it's a private residence, do you have

4    any reason --

5              MR. PERRI:  It's partially a private

6    residence, partially a business.

7              THE COURT:  It's a mixed business and

8    residence.  Do you have any reason with your job to

9    have to go to 124 Park Avenue?

10             PROSPECTIVE JUROR:  It's off Park Avenue.

11             THE COURT:  Your job is off of Park Avenue?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  The reason we ask that question,

14   it's not fair if you have some sort of knowledge of a

15   location outside of the courtroom, it's not fair that

16   you might use that knowledge of that location where

17   nobody else has that same shared knowledge.  I need to

18   know from you, can you, even if you drive by 124 Park

19   Avenue on your way to work, can you give us an

20   assurance that you will not stop and start looking at

21   the location and figure out where things happened and

22   how it happened?  Can you give me that assurance if you

23   happen to drive by it, because that's how you have to

24   go to work.  I understand.  Maybe you can find a

25   different road to get to work and not have to pass 124

1     Park Avenue?

2              PROSPECTIVE JUROR:  That's the only road I

3     know.

4              THE COURT:  Where is that that you will work

5     on the weekend?

6              PROSPECTIVE JUROR:  560 Roosevelt Avenue.

7              THE COURT:  I'll have you sit there for a few

8     minutes.  I'm sure there will be additional questions

9     for you.

10             Ms. Coleman.

11             PROSPECTIVE JUROR:  I also live in Roosevelt.

12             THE COURT:  The fact that you live in

13    Roosevelt doesn't mean you can't sit on this jury.  Can

14    you give me assurance you will not go pitch a tent out

15    to 124 Park?

16             PROSPECTIVE JUROR:  Definitely.

17             THE COURT:  Ms. Fusco.

18             PROSPECTIVE JUROR:  My cousin was convicted

19    of a crime.  I have no idea it what it was.  I was too

20    young.

21             THE COURT:  It will not have an impact on you

22    sitting on this case; is that correct?

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  Was it here in Nassau?

25             PROSPECTIVE JUROR:  No, Florida.

Proceedings                165

1              THE COURT:  Mr. Pascucci, did you have your

2    hand up?

3              PROSPECTIVE JUROR:  Yes, I did.  I'm a

4    retired New York City police lieutenant.  I witnessed

5    many crimes.

6              THE COURT:  You heard in the first round we

7    had law enforcement on in the chairs.  I want to cut to

8    the chase, will you be able to sit here as a fair and

9    impartial juror as given your prior service?

10             PROSPECTIVE JUROR:  I could sit here and be

11   fair and impartial.

12             THE COURT:  Thank you very much.

13             Ms. DiNapoli, did you have your hand up?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  Ms. Jergensen?

16             PROSPECTIVE JUROR:  My brother was convicted

17   of a crime.

18             THE COURT:  Here in Nassau?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Recent?

21             PROSPECTIVE JUROR:  About ten years ago.

22             THE COURT:  Would you mind sharing what it

23   was?

24             PROSPECTIVE JUROR:  For a DWI and

25   manslaughter.

Proceedings                166

1          THE COURT:  Was there a trial?

2          PROSPECTIVE JUROR:  Yeah.

3          THE COURT:  Did you attend?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Is there anything about that

6     process that leaves a bad taste in your mouth whether

7     for the prosecution, defense?

8          PROSPECTIVE JUROR:  No, it was pretty cut and

9     dry.

10          THE COURT:  Do you feel he was treated fairly

11     by the system?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Is there anything about that fact

14     that impedes your ability to sit here in a completely

15     different case having nothing to do with what happened

16     to your family member and make a judgment in this case?

17          PROSPECTIVE JUROR:  Yeah, I should be fine.

18          THE COURT:  Ms. Aslav, was your hand up?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  Ms. Iorio?

21          PROSPECTIVE JUROR:  My brother's pending

22     criminal case, I think, in Queens.

23          THE COURT:  In Queens?

24          PROSPECTIVE JUROR:  I think so.  He had once

25     a year.  He also had cases here himself.

1              THE COURT:  Are they disposed of?  Did you,

2     yourself, ever attended any of those sessions?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Anything that happened with your

5     brother left a feeling in you that makes you feel you

6     can't be fair to either the defense or the prosecution?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Is there anything about those

9     facts that your brother had contact with the criminal

10    justice system that makes you believe that this simply

11    is not the case for you?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  You all heard a little bit about

14    the nature of the crimes charged in this matter.  We

15    all know it's uncomfortable.  We all know it's not

16    something we know -- nobody ever wants to sit on a

17    trial for any charge.  Is there anything about the

18    specifics of the charges in this case that makes any of

19    you believe you could not be fair and impartial?  Raise

20    your hand if that's your situation, please.

21             No hands have been raised by anybody here.

22             Will you give members of law enforcement a

23    leg up, so to speak, and not be able to evaluate their

24    testimony the way you would evaluate any other person's

25    testimony?  Raise your hand if you are going to seal

Proceedings                    168

1    off law enforcement, come in here and say if it's a

2    cop, he must be telling the truth.  That's it.  Raise

3    your hand if you feel that way.  No hands have been

4    raised.

5              You heard me speak with Ms. Brown about the

6    location.  Is there anyone else here, other than

7    Ms. Brown and Ms. Coleman that have any issues with the

8    location?  No hands have been raised.

9              Are there any religious beliefs that would

10   prevent you from sitting?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  Did anyone ever serve on a

13   criminal, or civil jury, or grand jury?  Raise your

14   hand for prior jury service.

15             Mr. Christie, was it civil or criminal?

16             PROSPECTIVE JUROR:  Criminal.

17             THE COURT:  Here in Nassau?

18             PROSPECTIVE JUROR:  It was.

19             THE COURT:  How long ago?

20             PROSPECTIVE JUROR:  I'd say about six years.

21             THE COURT:  Without telling me the verdict,

22   did you reach a verdict?

23             PROSPECTIVE JUROR:  We did.

24             THE COURT:  Ms. DiNapoli?

25             PROSPECTIVE JUROR:  Criminal.

kmm

Proceedings                      169

1               THE COURT:  Here in Nassau?

2               PROSPECTIVE JUROR:  Yes.

3               THE COURT:  How long ago?

4               PROSPECTIVE JUROR:  Last time I served, I

5       think six years.

6               THE COURT:  Without telling me the verdict,

7       did you reach a verdict?

8               PROSPECTIVE JUROR:  Yes.

9               THE COURT:  Ms. Aslav, it wasn't a jury?

10              No problem.

11              Does anyone here have family, friends or

12      yourselves, involved in law enforcement?  This includes

13      NYPD, any sort of police officer, it includes the

14      sheriff's department, FBI, attorneys, criminal

15      attorneys, civil attorneys.

16              Yes, Mr. Christie.

17              PROSPECTIVE JUROR:  Excuse me, how about out

18      of the country?

19              THE COURT:  Anywhere.

20              Yes, sir.

21              PROSPECTIVE JUROR:  A couple of friends.

22              THE COURT:  Is there anything about that

23      relationship that makes you believe you cannot sit here

24      as a fair and impartial juror?

25              PROSPECTIVE JUROR:  Absolutely not.

1           THE COURT:  You realize you can't call them

2       up and ask for their advice or tell them what is going

3       on?

4           PROSPECTIVE JUROR:  I don't talk to them on a

5       daily basis anyway.

6           THE COURT:  Fair enough.

7           Ms. Rodriguez.

8           PROSPECTIVE JUROR:  Sibling, my sister.

9           THE COURT:  Law enforcement?

10          PROSPECTIVE JUROR:  Lawyer.

11          THE COURT:  Criminal or civil?

12          PROSPECTIVE JUROR:  Civil.

13          THE COURT:  Can you give me assurance that

14      you will not call your sister and say, hey, can you

15      explain this to me because I just don't get it?  You

16      realize you can't do that?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  You will not do that during this?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Ms. Brown, who do you have?

21          PROSPECTIVE JUROR:  My sister is a police and

22      she is a lawyer.  I have a niece who is a lawyer and a

23      police officer, and a nephew who is a police officer.

24          THE COURT:  Is there anything about the fact

25      you have fellow members who are law enforcement, or

Proceedings                    171

1      attorneys make you believe you can't sit here and judge

2      other law enforcement officers?

3                  PROSPECTIVE JUROR:  No.

4                  THE COURT:  Will you be able to judge their

5      credibility like anyone else?

6                  PROSPECTIVE JUROR:  Anyone else.

7                  THE COURT:  Mr. Coleman?

8                  PROSPECTIVE JUROR:  No.

9                  THE COURT:  Ms. Fusco?

10                 PROSPECTIVE JUROR:  Two cousins in the NYPD,

11     and a couple of friends.

12                 THE COURT:  Same questions to you, anything

13     about that get in the way?

14                 PROSPECTIVE JUROR:  No.

15                 THE COURT:  Mr. Pascucci, I know, yourself.

16                 PROSPECTIVE JUROR:  Myself, my son are Nassau

17     County police officers, and I'm also an attorney.

18                 THE COURT:  Is there anything in that

19     background and it's a significant background with law

20     enforcement, anything in that background that gets in

21     the way of being fair and impartial in this case?

22                 PROSPECTIVE JUROR:  I could be fair and

23     impartial in this case.

24                 THE COURT:  Thank you very much.  I

25     appreciate that.

kmm

Proceedings                172

1              Ms. DiNapoli?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Ms. Jergensen?

4              PROSPECTIVE JUROR:  My dad was NYPD, and he

5    was a detective for the Queens DA.

6              THE COURT:  Same questions for you, anything

7    about those relationships get in the way?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Mr. Aslav?

10             PROSPECTIVE JUROR:  My uncle is a lawyer, his

11   two sons are lawyers, and I have a friend who is a cop

12   in Nassau County.

13             THE COURT:  Anything about those

14   relationships get in the way of you being fair and

15   impartial if you are picked here?

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  Ms. Iorio?

18             PROSPECTIVE JUROR:  Friends who are cops and

19   my aunt is a lawyer.

20             THE COURT:  Is there anything about that that

21   will get in your way?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  Let me go down the row to each of

24   you.  Mr. Christie, what town do you live in?

25             PROSPECTIVE JUROR:  Bethpage.

Proceedings                    173

1            THE COURT:  How long have you been there?

2            PROSPECTIVE JUROR:  About five years.

3            THE COURT:  Where were you before that?

4            PROSPECTIVE JUROR:  Garden City Park.

5            THE COURT:  How long are you there?

6            PROSPECTIVE JUROR:  Fifteen.

7            THE COURT:  What is the highest level of

8    education you have completed?

9            PROSPECTIVE JUROR:  Bachelor of fine arts.

10           THE COURT:  Do you work?

11           PROSPECTIVE JUROR:  I do.

12           THE COURT:  What do you?

13           PROSPECTIVE JUROR:  Senior systems engineer.

14           THE COURT:  Tell me that in English.

15           PROSPECTIVE JUROR:  Exactly.  I'm the IT guy.

16           THE COURT:  Are you married?

17           PROSPECTIVE JUROR:  I am.

18           THE COURT:  Does your spouse work?

19           PROSPECTIVE JUROR:  She does.

20           THE COURT:  What does she do?

21           PROSPECTIVE JUROR:  Project manager.

22           THE COURT:  Any children?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  How many?

25           PROSPECTIVE JUROR:  One child, a

kmm

Proceedings                    174

1          year-and-a-half.

2                    THE COURT:  Congratulations.

3                    What do you like to do in your spare time

4          other than take care of the one-and-a-half year old.

5                    PROSPECTIVE JUROR:  I'm not taking care of

6          him.  Sports; running, something of that nature.

7                    THE COURT:  You heard me talk to everyone

8          about social media.  Are you on social media?

9                    PROSPECTIVE JUROR:  I'm on social media.

10                   THE COURT:  Did you put the coffee cup up

11         this morning with a sad face?

12                   PROSPECTIVE JUROR:  I don't think I posted

13         anything in six months.

14                   THE COURT:  Can you give me your assurance

15         you won't do that if you are picked?

16                   PROSPECTIVE JUROR:  I have no intention of

17         posting anything here.

18                   THE COURT:  Ms. Rodriguez, town?

19                   PROSPECTIVE JUROR:  Garden City Park.

20                   THE COURT:  How long?

21                   PROSPECTIVE JUROR:  It's been two-and-a-half

22         years.

23                   THE COURT:  Where were you before that?

24                   PROSPECTIVE JUROR:  Louisville, Kentucky.

25         I'm from here.  I'm was from Garden City Park.

1           THE COURT:  Garden City was the only place

2       when you were here?

3           PROSPECTIVE JUROR:  No, I also lived in

4       Hempstead.

5           THE COURT:  What is the highest level of

6       school you completed?

7           PROSPECTIVE JUROR:  Bachelor's.

8           THE COURT:  Do you work?

9           PROSPECTIVE JUROR:  Yes.

10          THE COURT:  What do you do?

11          PROSPECTIVE JUROR:  Nurse.

12          THE COURT:  Married?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  What does your spouse do?

15          PROSPECTIVE JUROR:  Works for Verizon.

16          THE COURT:  Do you have any children?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  How many?

19          PROSPECTIVE JUROR:  Three.

20          THE COURT:  Grown or school age?

21          PROSPECTIVE JUROR:  School age.

22          THE COURT:  What do you like to do in your

23      spare time?

24          PROSPECTIVE JUROR:  Sleep.

25          THE COURT:  Are you an individual on social

kmm

Proceedings                    176

1          media?

2                    PROSPECTIVE JUROR:  Yes.

3                    THE COURT:  Ms. Brown?

4                    PROSPECTIVE JUROR:  Valley Stream.

5                    THE COURT:  For how long?

6                    PROSPECTIVE JUROR:  Five years.

7                    THE COURT:  Before that?

8                    PROSPECTIVE JUROR:  Jersey.

9                    THE COURT:  Welcome to New York.

10                   What is your highest level of school?

11                   PROSPECTIVE JUROR:  Twelfth grade.

12                   THE COURT:  Do you work?

13                   PROSPECTIVE JUROR:  Yes.

14                   THE COURT:  What do you do?

15                   PROSPECTIVE JUROR:  Certified nursing

16          assistant.

17                   THE COURT:  Are you married?

18                   PROSPECTIVE JUROR:  No.

19                   THE COURT:  Do you have any children?

20                   PROSPECTIVE JUROR:  Yes.

21                   THE COURT:  How many?

22                   PROSPECTIVE JUROR:  Three.

23                   THE COURT:  Grown or school age?

24                   PROSPECTIVE JUROR:  Grown.  Two children, a

25          boy, and a girl are teacher, and the one with the

Proceedings                    177

1       hotel.  He works at a hotel in Jamaica.

2                  THE COURT:  How do you like to spend your

3       spare time?

4                  PROSPECTIVE JUROR:  Suduko.  Play the puzzle.

5                  THE COURT:  Mr. Nieves?

6                  PROSPECTIVE JUROR:  Roosevelt for six years.

7                  THE COURT:  What is your highest level of

8       school?

9                  PROSPECTIVE JUROR:  Some college.

10                 THE COURT:  Do you work?

11                 PROSPECTIVE JUROR:  No.

12                 THE COURT:  Are you currently unemployed?

13                 PROSPECTIVE JUROR:  Yes.

14                 THE COURT:  What did you do when you worked?

15                 PROSPECTIVE JUROR:  Home health aide.

16                 THE COURT:  Are you married?

17                 PROSPECTIVE JUROR:  No.

18                 THE COURT:  Do you have any children?

19                 PROSPECTIVE JUROR:  No.

20                 THE COURT:  How do you like to spend your

21      spare time?

22                 PROSPECTIVE JUROR:  Artist, paint, draw,

23      sculp, blow glass.

24                 THE COURT:  Are you on social media?

25                 PROSPECTIVE JUROR:  No.

```
 1                    THE COURT:  Fair enough.

 2                    Ms. Fusco, what town do you live in?

 3                    PROSPECTIVE JUROR:  East Rockaway.

 4                    THE COURT:  For how long?

 5                    PROSPECTIVE JUROR:  My whole life.

 6                    THE COURT:  What is your highest level of

 7      school?

 8                    PROSPECTIVE JUROR:  Bachelor degree.

 9                    THE COURT:  Do you work?

10                    PROSPECTIVE JUROR:  Yes.

11                    THE COURT:  What do you do?

12                    PROSPECTIVE JUROR:  Sales director for a

13      fashion company.

14                    THE COURT:  Are you married?

15                    PROSPECTIVE JUROR:  Yes.

16                    THE COURT:  What does your spouse do?

17                    PROSPECTIVE JUROR:  Civil engineer.

18                    THE COURT:  Any children?

19                    PROSPECTIVE JUROR:  One, cooking.

20                    THE COURT:  No chance that will be ready

21      between now and the --

22                    PROSPECTIVE JUROR:  No, October.

23                    THE COURT:  How do you like to spend your

24      spare time?

25                    PROSPECTIVE JUROR:  Family.
```

Proceedings                    179

1              THE COURT:  Social media?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  Can you avoid talking about this

4    case?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Thank you.

7              Mr. Puscucci.

8              PROSPECTIVE JUROR:  Hicksville.

9              THE COURT:  How long?

10             PROSPECTIVE JUROR:  Ten years.

11             THE COURT:  What is your highest level of

12   school?

13             PROSPECTIVE JUROR:  JD.

14             THE COURT:  Do you work now?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Retired law enforcement?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Married?

19             PROSPECTIVE JUROR:  Divorced.

20             THE COURT:  What did your spouse do?

21             PROSPECTIVE JUROR:  Teacher.

22             THE COURT:  Any children?

23             PROSPECTIVE JUROR:  Two.

24             THE COURT:  Grown or school age?

25             PROSPECTIVE JUROR:  Grown.

Proceedings                    180

1                    THE COURT:  What do they do?

2                    PROSPECTIVE JUROR:  My son is a Nassau County

3       police officer, and my daughter is a teacher.

4                    THE COURT:  What do you like to do in your

5       spare time?

6                    PROSPECTIVE JUROR:  Sports.

7                    THE COURT:  Can you avoid social media if you

8       are on it?

9                    PROSPECTIVE JUROR:  I have no social media.

10                   THE COURT:  Ms. DiNapoli?

11                   PROSPECTIVE JUROR:  East Meadow.

12                   THE COURT:  How long?

13                   PROSPECTIVE JUROR:  Eighteen years.

14                   THE COURT:  What is your highest level of

15      school?

16                   PROSPECTIVE JUROR:  Associate's degree.

17                   THE COURT:  In what?

18                   PROSPECTIVE JUROR:  Science.

19                   THE COURT:  Do you work?

20                   PROSPECTIVE JUROR:  Marketing manager.

21                   THE COURT:  Are you married?

22                   PROSPECTIVE JUROR:  No.

23                   THE COURT:  Children?

24                   PROSPECTIVE JUROR:  No.

25                   THE COURT:  What do you like to do in your

Proceedings                    181

1       spare time?

2                    PROSPECTIVE JUROR:  Kayaking.

3                    THE COURT:  Social media?

4                    PROSPECTIVE JUROR:  I read only.  I don't

5       know how to do anything.

6                    THE COURT:  Ms. Jergensen, what town?

7                    PROSPECTIVE JUROR:  Hicksville.

8                    THE COURT:  How long?

9                    PROSPECTIVE JUROR:  Twenty years.

10                   THE COURT:  What is your highest level of

11      school?

12                   PROSPECTIVE JUROR:  Bachelor's.

13                   THE COURT:  Do you work?

14                   PROSPECTIVE JUROR:  Yes.

15                   THE COURT:  What do you do?

16                   PROSPECTIVE JUROR:  Insurance broker.

17                   THE COURT:  Are you married?

18                   PROSPECTIVE JUROR:  Yes.

19                   THE COURT:  What does your spouse do?

20                   PROSPECTIVE JUROR:  He's a director at MSG

21      network.

22                   THE COURT:  Do you have any children?

23                   PROSPECTIVE JUROR:  Yes, two school age.

24                   THE COURT:  How do you like to spend your

25      spare time?

Proceedings                    182

1                    PROSPECTIVE JUROR:  Kids and baking.

2                    THE COURT:  Could you avoid social media?

3                    PROSPECTIVE JUROR:  Yes.

4                    THE COURT:  Mr. Aslav, what town?

5                    PROSPECTIVE JUROR:  Oceanside.

6                    THE COURT:  For how long?

7                    PROSPECTIVE JUROR:  Ten years.

8                    THE COURT:  What is your highest level of

9      school?

10                   PROSPECTIVE JUROR:  High school.

11                   THE COURT:  Do you work?

12                   PROSPECTIVE JUROR:  Yes.

13                   THE COURT:  What do you do?

14                   PROSPECTIVE JUROR:  Sales rep for Nabisco.

15                   THE COURT:  Are you married?

16                   PROSPECTIVE JUROR:  Divorced.

17                   THE COURT:  What does your spouse do?

18                   PROSPECTIVE JUROR:  She was a doctor.

19                   THE COURT:  Any children?

20                   PROSPECTIVE JUROR:  I have a child who is in

21     college.

22                   THE COURT:  How do you like to spend your

23     spare time?

24                   PROSPECTIVE JUROR:  Sports.

25                   THE COURT:  Can you avoid social media for

                                                            kmm

Proceedings                    183

1       me?

2                       PROSPECTIVE JUROR:  Yes.

3                       THE COURT:  Ms. Iorio, what town?

4                       PROSPECTIVE JUROR:  Hicksville.

5                       THE COURT:  How long?

6                       PROSPECTIVE JUROR:  Six years.

7                       THE COURT:  Before that?

8                       PROSPECTIVE JUROR:  Queens.

9                       THE COURT:  This is the first time you have

10      been out to Long Island to live?

11                      PROSPECTIVE JUROR:  Yes.

12                      THE COURT:  What is your highest level of

13      school?

14                      PROSPECTIVE JUROR:  Twelfth grade, high

15      school.

16                      THE COURT:  Do you work?

17                      PROSPECTIVE JUROR:  Yes.

18                      THE COURT:  What do you do?

19                      PROSPECTIVE JUROR:  Insurance claims.

20                      THE COURT:  Are you married?

21                      PROSPECTIVE JUROR:  Separated.

22                      THE COURT:  What did your ex-spouse do?

23                      PROSPECTIVE JUROR:  Tow truck driver.

24                      THE COURT:  Do you have any children?

25                      PROSPECTIVE JUROR:  No.

Proceedings                    184

1              THE COURT:  How do you like to spend your

2        spare time?

3              PROSPECTIVE JUROR:  Reading, watching TV.

4              THE COURT:  Can you avoid social media?

5              Mr. Perri, we'll see if we can get this done

6        timely.  I don't know if we can.  You will start.

7              MR. PERRI:  My name is Assistant District

8        Attorney Anthony Perri.  I'm representing the People of

9        the State of New York, the government, in bringing this

10       case against the defendant.  Your Honor, defense

11       counsel.

12             As you already heard, this is a case where

13       there are going to be a variety of witnesses.  With the

14       last panel, about the fact it will be the People's

15       intention to call child witnesses in this matter.

16       Right off the bat, does anyone here have a problem with

17       the idea of sitting and listening to child witnesses?

18       Of course, it's not something that is comfortable, that

19       somebody wants to do.

20             Does anyone feel they would not be able to

21       sit in the case of alleged child abuse and listen

22       fairly and honestly to testimony from a child or

23       multiple children in the case?  Is there anyone who

24       does not feel they could be fair and impartial?

25             Ms. Fusco, could you be fair and impartial?

Proceedings                    185

1           PROSPECTIVE JUROR:  Yes.

2           MR. PERRI:  Mr. Christie?

3           PROSPECTIVE JUROR:  Yes.

4           MR. PERRI:  Mr. Pascucci?

5           PROSPECTIVE JUROR:  Yes.

6           MR. PERRI:  I also talked about with the last

7    panel the ability to listen to a child, listen to any

8    witness, the different factors that go into judging

9    credibility of a child, to asses anyone.  You are

10   listening to testimony during this case.  And, Mr.

11   Aslav, in judging the credibility, the believability of

12   a witness, would you listen for whether or not it is

13   consistent with other evidence in the case?

14          PROSPECTIVE JUROR:  Yes.

15          MR. PERRI:  Would you listen and try to

16   determine whether or not that person has a reason she

17   would lie or have a reason to give false testimony?

18          PROSPECTIVE JUROR:  No.

19          MR. PERRI:  Would you like to figure out

20   whether the person has anything to gain in their case?

21          THE COURT:  I need you to speak up so the

22   reporter can hear.  Are you saying you don't understand

23   the question, or I don't know?

24          PROSPECTIVE JUROR:  Repeat the question.

25          MR. PERRI:  When you are listening to someone

kmm

Proceedings                186

1    who is testifying giving their narrative of what

2    happened to them, what they know, would you try to

3    figure out whether or not that witness has something to

4    gain by telling you their version?

5              MR. BERGER:  I object.  You already indicated

6    motive is not a factor that has to be proved.  He seems

7    to be going to that at this point.

8              THE COURT:  What the attorneys are telling

9    you is not evidence of anything.  They're trying to

10   determine whether or not you could be fair and

11   impartial.  You heard me talk about motive.  I think

12   Mr. Perri is talking about evaluating credibility.  You

13   could continue questions of evaluating credibility.

14             MR. PERRI:  As far as you are trying to

15   figure out whether or not they are telling the truth,

16   what do you look for?

17             PROSPECTIVE JUROR:  I guess, listen to the

18   facts and --

19             MR. PERRI:  Do you look at the demeanor and

20   how they tell you?

21             PROSPECTIVE JUROR:  Right.

22             MR. PERRI:  Do you look at whether or not

23   they are consistent?

24             PROSPECTIVE JUROR:  Yes.

25             MR. PERRI:  And Ms. DiNapoli, do you believe

Proceedings                    187

1    everyone who recalls everything?  I'm sorry, when

2    someone is telling you what they remember, each time

3    they tell you that story, do they tell you the same

4    story each and every time?

5              PROSPECTIVE JUROR:  Most likely not.

6              MR. PERRI:  Does that mean they're lying?

7              THE COURT:  I don't think so.

8              MR. PERRI:  Does that mean the essential

9    facts of what they are saying happened is untrue?

10             PROSPECTIVE JUROR:  No.

11             MR. PERRI:  Do you agree with that,

12   Ms. Jergensen?

13             PROSPECTIVE JUROR:  I think people have

14   different interpretations sometimes.

15             MR. PERRI:  How would you try to figure out,

16   listen to multiple information?  What would you look

17   for in trying to decide what really happened?

18             PROSPECTIVE JUROR:  Listen for consistencies

19   in the story.  I like to look at the body language.

20             MR. PERRI:  Ms. Rodriguez, when you are

21   evaluating someone's credibility, is there any one

22   aspect how someone reacts to something you may think is

23   traumatic?  Would you assume they react the same way

24   you would react to something?

25             PROSPECTIVE JUROR:  No.

Proceedings                188

1               MR. PERRI:  No.  Do you think every

2     individual reacts in the same way to something?

3               Could we please approach?

4               THE COURT:  You can.

5               (Whereupon, there was a sidebar discussion as

6     follows:)

7               MR. PERRI:  I don't know if it's

8     unintentional, I'm asking if defense counsel could

9     please -- there's a variety of noise, sounds,

10    exasperations that comes out with every question I'm

11    asking.

12              MR. BERGER:  That's nonsense.  I don't know

13    what he is imagining here.

14              MR. PERRI:  If it's not true, I apologize.

15              MR. BERGER:  I accept your apology.  That

16    didn't happen.

17              THE COURT:  Both of you stop.  There is a lot

18    of noises within the courtroom.  I don't know where

19    they are coming from.  Some of it is the air condition,

20    some of it is the interpreter.  To do our job I ask we

21    all behave professionally.  I don't know who did what.

22    I don't care.  Everyone behave professionally.

23              Try to get the round done.  Each of you is

24    getting ten minutes.  I have to be done by 4:45.  If I

25    don't have to drag these people back for a second day,

Proceedings                189

1     I don't want to.  Let's discuss it now if you can't get

2     it done.  I'll do it in the morning.

3                MR. BERGER:  I'll ask you to do that.

4                (Whereupon, the proceedings resumed.)

5                THE COURT:  Ladies and gentlemen, I wanted to

6     get you through this process today.  It doesn't look

7     like that is a possibility.  Good news and bad news, I

8     guess.  The bad news is you are coming back tomorrow

9     morning for me.  The good news is if you are not picked

10    as a juror tomorrow, you are done.  So, there's always

11    a silver lining to everything that happens.

12                I ask you to please remember your seats.

13    Please be here tomorrow wherever the officer tells you

14    to go for 9:30.  I can't start until you are here.  The

15    closer to 9:30 we start, the faster we get done.  You

16    then get credit for a full day of jury service, and

17    it's supposed to be somewhat nice out tomorrow.  So,

18    you have most of the day to yourself once we finish the

19    process.

20                You must keep an open mind throughout this

21    procedure.  Do not discuss this case amongst yourselves

22    or with anyone else during overnight.  Do not permit

23    anyone to discuss the case in your presence.  Do not

24    talk to the lawyers, witnesses, or the defendant about

25    anything during the trial.

Proceedings                190

1              And do not visit or view the place where the

2        charged crime was allegedly committed, or any other

3        place involved in the case.  Should the two individuals

4        find themselves in Roosevelt, just keep driving if you

5        find yourself on that street for some reason.

6              If there is any news coverage of the case, do

7        not read, listen, or view, report it by the news media,

8        and do not attempt to research any fact, issue, or law

9        related to this case whether by discussion with others,

10        by research in the library, Internet, or any other

11        means or source.

12              Enjoy the evening.  See you all at 9:30

13        tomorrow morning.  Thank you.

14              (Whereupon, the jury panel exited the

15        courtroom.)

16              THE COURT:  Anything for the record before we

17        break?

18              MR. PERRI:  No, your Honor.

19              MR. BERGER:  The interpreter is sitting next

20        to you.  I was just sitting there listening to the

21        questions.

22              THE COURT:  No problem.  I'll see everyone

23        tomorrow morning.  I'll see you at 9:30.

24              (Whereupon, the trial was adjourned to May 6,

25        2015.)

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NASSAU : CRIMINAL TERM PART 43

 3   ------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,      :   Indictment
 4                                             :   No. 742N/14
              -against-                        :
 5                                             :
     DANIEL RAMOS,                             :
 6                                             :
                         Defendant.            :   Jury Trial
 7   ------------------------------------------X

 8                              May 6, 2015
                                262 Old Country Road
 9                              Mineola, New York

10
     B E F O R E:
11
          HONORABLE TERESA K. CORRIGAN,
12                  Acting Supreme Court Justice

13
     A P P E A R A N C E S:
14
     (As Previously Noted)
15

16              *      *      *      *      *

17

18              THE CLERK:  Case on trial continued,

19         Indictment 742N of 2014, People of the State of New

20         York vs. Daniel Ramos.

21              Let the record reflect all parties are

22         present.  The jury is not present at this time.

23              Are the People ready to proceed?

24              MR. PERRI:  Yes, your Honor.

25              THE COURT:  Defense counsel ready?
```

Proceedings                    192

1           MR. BERGER:  Yes, your Honor.

2           THE COURT:  Before I call the jurors back in,

3      is there anything for the record, People?

4           MR. PERRI:  No, your Honor.

5           MR. BERGER:  No.

6           THE INTERPRETER:  Yes, your Honor.  The

7      interpreter would like to place on the record the

8      interpreter is to remain neutral at all stages at the

9      proceeding, at no point does she become a witness to

10     anything that is happening in the courtroom.

11          THE COURT:  Fair enough.  That is my

12     understanding of your job also.  Everyone will respect

13     the interpreter's job and position as we proceed.

14     Thank you for letting us know.

15          THE INTERPRETER:  Thank you, your Honor.

16          THE COURT:  It's my understanding we may be

17     missing a juror from yesterday, at the moment, sitting

18     in seat number six, Ms. Coleman has not reported in.  I

19     need to know from both of you whether you want to

20     proceed at this point.  I told her 9:30.  It's two

21     minutes to ten.  Do we want to proceed with the other

22     nine individuals, or do you want me to give her a few

23     more minutes to get here?

24          MR. PERRI:  People are you ready to proceed.

25          MR. BERGER:  Let's proceed.  If she comes in

Proceedings                    193

1      in the next few minutes, perhaps, it will still be

2      appropriate to seat her.

3              THE COURT:  Absolutely, and I'll discuss that

4      with both of you, and it will be decided by what you

5      think would be fair with regards to that.

6              Let the record reflect that I have just been

7      advised that all of our jurors are here and being

8      brought into the courtroom.

9              (Whereupon, the jury panel entered the

10     courtroom.)

11             THE CLERK:  Do both sides stipulate that the

12     jurors are seated properly who were here yesterday?

13             MR. PERRI:  Yes, your Honor.

14             MR. BERGER:  Yes, your Honor.

15             THE COURT:  Welcome back everyone and good

16     morning.  The weather is not great at the moment, but

17     it will get better.  It's still a plus you are here

18     today.  We're going to get right into the questioning.

19             MR. PERRI:  Thank you, your Honor.

20             Good morning, ladies and gentlemen.  Thank

21     you again for coming back for the second day of jury

22     selection, and I want to first go over a couple of

23     specific questions with individual jurors about some

24     information we have offered.

25             Now, this is with Ms. Rodriguez, you

Proceedings                194

1       currently are working as a nurse?

2                   PROSPECTIVE JUROR:  Yes.

3                   MR. PERRI:  Where do you work?

4                   PROSPECTIVE JUROR:  New York Hospital,

5       Queens.

6                   MR. PERRI:  What department?

7                   PROSPECTIVE JUROR:  Nursing department.  It's

8       the ortho surgical floor.

9                   MR. PERRI:  How long have you worked in New

10      York Hospital, Queens?

11                  PROSPECTIVE JUROR:  Technically, eleven

12      years.

13                  MR. PERRI:  Ms. Coleman, did you -- I'm sorry

14      if I missed you.  Did you have any children?

15                  PROSPECTIVE JUROR:  No.

16                  MR. PERRI:  You say you also are an artist

17      and painted?

18                  PROSPECTIVE JUROR:  Yes.

19                  MR. PERRI:  You stated you have some college

20      in your background.  What did you study?

21                  PROSPECTIVE JUROR:  Paralegal.

22                  MR. PERRI:  Do you want to go back into home

23      healthcare work?

24                  PROSPECTIVE JUROR:  Yes.

25                  MR. PERRI:  Ms. Fusco, you stated that you

Proceedings                    195

1     had a cousin who was convicted of a crime a long time

2     ago.  Have you had any other dealings with police

3     officers for good or bad in recent history?

4                PROSPECTIVE JUROR:  No.

5                MR. PERRI:  Ms. Iorio, you said your brother

6     had several open matters in Queens and has had open

7     matters in the past in Nassau?

8                PROSPECTIVE JUROR:  Yes.

9                MR. PERRI:  What are your thoughts about how

10    you feel about police officers in light of your

11    brother's experience?

12               PROSPECTIVE JUROR:  I don't.  I don't have --

13    I mean, bias on them.  It's his own doing.  I don't

14    have good or bad experiences with police officers.

15               MR. PERRI:  Ms. Aslav, you have at least one

16    friend who is in the Nassau County Police Department?

17               PROSPECTIVE JUROR:  Yes.

18               MR. PERRI:  Currently in the Nassau County

19    Police Department?

20               PROSPECTIVE JUROR:  Yes.

21               MR. PERRI:  Where does he work?  Detective or

22    officer?

23               PROSPECTIVE JUROR:  He's an officer.

24               MR PERRI:  Do you know what precinct?

25               Do you often talk with him about his work?

kmm

Proceedings                    196

1              PROSPECTIVE JUROR:  No.

2              MR. PERRI:  Do you have an impression based

3        on your relationship with law enforcement in general?

4              PROSPECTIVE JUROR:  No.

5              MR. PERRI:  Ms. Jergensen, you stated that

6        unfortunately your brother was convicted of drunk

7        driving, a manslaughter charge, ten years ago?

8              PROSPECTIVE JUROR:  Yes.

9              MR. PERRI:  Do you feel you are able to put

10       aside any and all feelings or whatever happened in that

11       case when you are judging both a police officer and a

12       detective to testify?

13             PROSPECTIVE JUROR:  Yes.

14             MR. PERRI:  Is there anything about how that

15       case was handled that you would hold against the

16       district attorneys and the prosecutor in this matter?

17             PROSPECTIVE JUROR:  Not at all.

18             MR. PERRI:  Ms. DiNapoli, you served on a

19       criminal jury?

20             PROSPECTIVE JUROR:  Yes.

21             MR. PERRI:  Six years ago?

22             PROSPECTIVE JUROR:  Yes.

23             MR. PERRI:  Did you find being on the jury

24       process, after deliberating, after the trial, easy or

25       difficult for you?

1          PROSPECTIVE JUROR:  It was a little difficult

2     because of the case.  We did the whole thing.

3          MR. PERRI:  Aside from the facts of the case,

4     we don't want you to go into the process, what did you

5     find difficult about the process of deliberating?

6          PROSPECTIVE JUROR:  You have all these people

7     with all different opinions.  It took a long time for

8     us to reach a decision.  I don't think some of the

9     people, who at the end, agreed with us, did it

10    willingly.  I think they felt they had to.

11         MR. PERRI:  What did -- it seems from what

12    you are saying, you were in the majority?

13         PROSPECTIVE JUROR:  Yes.

14         MR. PERRI:  What did you do to convince other

15    people about the correctness of your individual

16    opinion?

17         PROSPECTIVE JUROR:  I don't remember.  It was

18    very stressful.

19         MR. PERRI:  Is there anything about that

20    experience serving as a juror in that case that makes

21    you not serve as a juror in this case?

22         PROSPECTIVE JUROR:  The foreperson.  I had to

23    announce the verdict.  That didn't go very well.  The

24    courtroom was crazy.  We had to be driven to the cars.

25    It wasn't pleasant.  I don't think --

Proceedings                          198

1           MR. PERRI:  You say I don't know.  The

2      important thing, yes or no, you are able to separate

3      yourself from past experience, you will not be in fear?

4      That's a different case.  Are you going to be able to

5      do that or not be able to do that?  Only you would know

6      the answer.

7           PROSPECTIVE JUROR:  Yes.

8           MR. PERRI:  That's fine.

9           Mr. Pascuci, you work as a lawyer?

10          PROSPECTIVE JUROR:  Yes.

11          MR. PERRI:  What kind of law?

12          PROSPECTIVE JUROR:  Real estate.

13          MR. PERRI:  You have expertise in law and law

14     enforcement.  Are you going to be able to separate

15     yourself and follow the direction of the judge and

16     evaluate the evidence in this case?

17          PROSPECTIVE JUROR:  I'll be able to follow

18     the instructions and separate myself.  I want to be

19     honest to you and Mr. Berger, I have a lot of

20     experience in -- I was a detective, and I was also a

21     lieutenant in charge of the detective squad.  I have a

22     lot of experience in interrogation and confessions, and

23     I also did work briefly in a sexual exploitation of

24     children squad with the FBI, which we investigated

25     pedophile crimes and stuff like that.  I think that I

Proceedings                    199

1    could definitely be fair and not make any judgments.

2    Just based on this case, I want you both to know I have

3    a lot of experience in what you are looking at in this

4    trial.

5              MR. PERRI:  Thank you for putting that forth.

6    When you say you think you could be fair and impartial,

7    are you saying even though you have this experience and

8    it's part of who you are and part of your background,

9    you would be able to judge this case on the evidence

10   and according to the law as the judge puts it to you?

11             PROSPECTIVE JUROR:  Yes.

12             MR. PERRI:  Now, one of the topics that has

13   been discussed with the jury in the last panel, a

14   little bit at the start of yesterday afternoon, was the

15   question of credibility and the question of

16   truthfulness and in examining the credibility of any

17   witness, whether it is a child or an adult, or police

18   officer.

19             Mr. Aslav, would you agree everyone is

20   capable of lying?

21             PROSPECTIVE JUROR:  Yes, people are capable

22   of lying.

23             MR. PERRI:  Whether it is a police officer or

24   a scientist, or a civilian?

25             PROSPECTIVE JUROR:  Yes.

1           MR. PERRI:  Does anyone disagree with that?

2    Even if they are a child, would you agree it is

3    possible and capable the child is capable of telling

4    the truth as well, Mr. Christie?

5           PROSPECTIVE JUROR:  Absolutely.

6           MR. PERRI:  Just because the individual is a

7    child, the witness, and the child is testifying before

8    you, that in and of itself is not a reason to discredit

9    their testimony.  Does anyone disagree?  Does anyone

10   think they can't trust anything coming from a child

11   witness?

12          Additionally, talking about judging the

13   credibility, they would want to look at the whole

14   picture.

15          Ms. Coleman, I would like to ask you, when

16   you are examining the evidence and deciding whether or

17   not the People reached their verdict, if you heard one

18   witness you didn't like, would you turn off and decide

19   you are not going to believe or listen to anything else

20   presented to you?

21          PROSPECTIVE JUROR:  No.

22          MR. PERRI:  Is there anyone else here, one

23   witness they don't like, one witness they don't agree,

24   one witness they don't find -- they will ignore the

25   rest of the evidence in the case?  That wouldn't -- I

1      mean, that wouldn't be fair.  That's what the case is

2      about and what the People hope to present before you is

3      collective evidence that all works and presented to you

4      as a whole picture.

5             And Ms. Brown, do you feel that you would

6      have a problem looking at all of the evidence together,

7      looking at each person's credibility, but then looking

8      at the evidence as a whole and seeing whether or not

9      what is needed in deciding what we have to prove beyond

10     a reasonable doubt?

11            PROSPECTIVE JUROR:  No.

12            MR. PERRI:  What the People hope to do, we

13     hope to put forth before you the case that proves this

14     case beyond a reasonable doubt, the defendant's guilt.

15            Presently, is anyone here uncomfortable with

16     having, as the Judge instructed to you, to put aside

17     any of the consequences of your decision?  It's a

18     natural human emotion, and as Mr. Berger said, we're

19     looking to have people who can separate their emotions

20     to some degree and look at the rationale and decide,

21     decide the facts of this case without any regard to

22     punishment that might be involved afterwards.

23            Ms. DiNapoli, could you separate yourself

24     from punishment?

25            PROSPECTIVE JUROR:  Yes.

kmm

Proceedings                    202

1          MR. PERRI:  Ms. Jergensen, you could decide

2     the case without sympathy or concern?

3          PROSPECTIVE JUROR:  Yes.

4          MR. PERRI:  Ms. Moezinia, that's the role of

5     the Judge and nothing to do with you if the People met

6     their burden.

7          PROSPECTIVE JUROR:  Yes.

8          MR. PERRI:  In discussing the evidence in the

9     case, how many people watch crime shows?  There's very

10    little sequence of -- a criminal attorney on the

11    defense has enjoyed those shows.  We are frustrated by

12    those shows.  Maybe more on our side it does present a

13    very neat clean picture where at the end everything

14    comes together, it's all one hundred percent clear and

15    very satisfying within the half hour, within an hour

16    show.

17          Ms. Fusco, do you understand this isn't

18    television?

19          PROSPECTIVE JUROR:  Yes.

20          MR. PERRI:  What is portrayed on television

21    about the law, police, about evidence, about how a

22    trial is put forth to a jury, that's different.

23          PROSPECTIVE JUROR:  I don't watch crime

24    shows.  I'm a reality girl.

25          MR. PERRI:  Is there anyone that thinks

                                                      kmm

1    because she watched a crime show scene, CSI with

2    hundreds of millions of dollars, scientific evidence in

3    every case, they will not be able to separate that from

4    their common sense and from reality how a criminal case

5    is put forth?

6              Mr. Aslav, would you be able to judge this

7    case without expecting the same quality as a Hollywood

8    movie?

9              PROSPECTIVE JUROR:  Yes.

10             MR. PERRI:  And in judging a person's

11   credibility, in judging whether or not they are to be

12   believed, Mr. Aslav, do you always know for one hundred

13   percent sure why you believe them or don't believe

14   them?

15             PROSPECTIVE JUROR:  Just the way they act.

16             MR. PERRI:  When you say how they act, you

17   mean how they appear to you?

18             PROSPECTIVE JUROR:  Yes.

19             MR. PERRI:  Whether they are consistent or

20   not?

21             PROSPECTIVE JUROR:  Yes.

22             MR. PERRI:  Just saying how someone acts is

23   how they are telling the truth.  It's a multifaceted

24   analysis and you may not know exactly why you believe

25   or disbelieve someone.  You understand it's a

Proceedings                    204

1    complicated process.  Do you believe that to be so,

2    Ms. Brown, in deciding whether or not someone is

3    telling the truth?

4              PROSPECTIVE JUROR:  Yes.

5              MR. PERRI:  Ms. Brown, has it been your

6    experience that you had people -- is it common in your

7    experience people have lied to you for absolutely no

8    reason, just for the fun of lying to you?

9              PROSPECTIVE JUROR:  Yes.

10             MR. PERRI:  When has that happened?

11             PROSPECTIVE JUROR:  Mostly all April Fools

12   Day.

13             MR. PERRI:  Outside of April Fools Day, when

14   it is a joke, trying to fool you, does it happen

15   without any reason?

16             PROSPECTIVE JUROR:  People lie.  It's likely

17   because of a reason.  I don't remember anybody who lied

18   to me without reason.

19             MR. PERRI:  Outside of April Fools Day or

20   something lighthearted or a white lie, people are

21   random for no apparent reason in lying.

22             What exactly -- do you have something to say,

23   Ms. Jergensen?

24             PROSPECTIVE JUROR:  Unfortunately, my brother

25   is the perfect liar.  He lies about everything.  It

Proceedings                    205

1    could be sunny, and he tells you it's raining for no

2    reason.

3              MR. PERRI:  That kind of experience with your

4    brother, it's not one thing.

5              PROSPECTIVE JUROR:  It's constantly.

6              MR. PERRI:  Even though the other facts are

7    right there in front of you, the objective facts,

8    outside of any profession, you know he is lying, you

9    look outside and see it's sunny.

10             PROSPECTIVE JUROR:  Right.

11             MR. PERRI:  Readily, parents in that case,

12   it's unfortunate that your brother is lying to you.

13   I'm sorry that's happening to you.

14             PROSPECTIVE JUROR:  I was going to say too,

15   when I first came in here, knowing what the case was

16   about, I automatically -- I have kids.  We know how to

17   close this out, if somebody was charged with it,

18   they're absolutely going away, or whatever.  The

19   mother, I think about it.  The mother, we absolutely

20   need to see where we're going with it because it would

21   hurt me to send somebody who is innocent to jail as

22   opposed to him doing something.

23             MR. PERRI:  That is absolutely true, in both

24   respects, that getting the verdict or deciding the

25   verdict, that both sides obviously want it to be

Proceedings                    206

1   accurate and will attempt to present to you, and it

2   will present you a case that doesn't meet their burden.

3   Even though you have concerns, as everybody should

4   have, being innocent, being wrongfully convicted, as

5   the Judge is concerned and both sides are concerned.

6   If the People present, beyond a reasonable doubt,

7   testimony, physical evidence, et cetera, all of that

8   comes to meet the Judge's definition to meet beyond a

9   reasonable doubt, would you feel comfortable in finding

10  the defendant guilty?

11          PROSPECTIVE JUROR:  Absolutely.  My brother

12  has served time for stuff he has done.  Unfortunately,

13  you have to remove the emotions away and look at the

14  facts, like you said.

15          MR. PERRI:  Do you feel comfortable if the

16  people reach their burden to return a verdict of

17  guilty?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  You have about two minutes.

20          MR. PERRI:  Ms. Coleman, if the People reach

21  their burden, would you be able to return a verdict of

22  guilty?

23          PROSPECTIVE JUROR:  Yes.

24          MR. PERRI:  Talking about common sense and

25  what reasonable doubt might be, that when we're asking

Proceedings                    207

1    you to go and deliberate, we're asking you to use your

2    common sense, to use your reason, it doesn't mean the

3    People are going to reach above and beyond any level of

4    doubt.  One of the classic examples, you could go to

5    bed, look outside the window and the lawn is dry and

6    the yard is dry.  You go to bed, wake up the next

7    morning, look out the window, plants are watered.  The

8    entire neighborhood, the streets are wet.  What would

9    you say is your belief about what happened while you

10   were asleep?

11              PROSPECTIVE JUROR:  It rained.

12              MR. PERRI:  Is it possible that the fire

13   department drove through the neighborhood and dowsed

14   everyone's lawn?

15              PROSPECTIVE JUROR:  It's possible.

16              MR. PERRI:  Would you say that's reasonable

17   to believe that, instead of that it just rained?

18              PROSPECTIVE JUROR:  No.

19              MR. PERRI:  And we're asking you to use your

20   life experiences in determining whether or not there is

21   a reasonable doubt, whether there is a reason you can

22   actually explain that hasn't been answered by the

23   evidence put before you, and if you are selected to be

24   a member of this jury, we hope you bring that common

25   sense and bring that entire person into that account.

                                                      kmm

Proceedings                    208

1              THE COURT:  Mr. Berger.

2              MR. BERGER:  Let me start with Mr. Christie.

3     You heard me make the point yesterday about there is

4     the emotional side and the intellectual side?

5              PROSPECTIVE JUROR:  Right.

6              MR. BERGER:  I can't ask you to check your

7     emotions at the door.  I can ask you to be aware of the

8     fact you might have some emotional factors that creep

9     in during the course of the trial.  You have to be able

10    to say to yourself, I have to watch that.  I have to

11    think to that intellectual level.  I have to analyze

12    the witness and evidence; can I do that?

13             PROSPECTIVE JUROR:  I can.

14             MR. BERGER:  You heard not only when the

15    Judge was questioning and Mr. Perri was questioning,

16    but as late as the time when I was questioning, people

17    all of sudden are raising their hands.

18             PROSPECTIVE JUROR:  I remember that.

19             MR. BERGER:  Do you think you shouldn't sit

20    because of the emotional factor?  There will be

21    intermittent discussions about sex that will happen

22    here, that offends some people for whatever reason.  It

23    is morale, personal reasons, whatever.  Then there will

24    be the allegation that something happened of a sexual

25    nature to a six-year old girl and that could raise

1    emotional factors as well.

2              The defendant is Hispanic.  Would you agree

3    that people are prejudice in this day and age?  Do you

4    think people are prejudice against Hispanic people?

5    All my questions are going to the rest of you even

6    though I'm directing them to Mr. Christie.  If you

7    disagree, you don't think in this day and age there are

8    prejudices against Hispanic people?  You considered it

9    all, you saw what happened, and you are fine as being a

10   juror here?

11             PROSPECTIVE JUROR:  Separating emotions and

12   intellect is not a problem for me.  As far as Hispanics

13   go, my wife is Columbian.

14             PROSPECTIVE JUROR:  I'm Puerto Rican.

15   Prejudice or not, it really depends upon the person.

16             MR. BERGER:  As I made the point yesterday, I

17   asked individual jurors to make individual judgments on

18   their -- about an individual case.

19             At this point, you don't feel, one, you are

20   prejudiced, or two, you have any emotional factor that

21   will interfere with the judgments to decide this case?

22             Yesterday, Ms. Rodriguez, I said I don't have

23   the burden to prove anything.  Do you understand that?

24   I don't have to prove anything.

25             PROSPECTIVE JUROR:  I don't remember that.

Proceedings                    210

1              MR. BERGER:  Suppose the prosecution presents

2       eight witnesses here and I don't present any, do you

3       have to vote guilty?

4              PROSPECTIVE JUROR:  Say that again.

5              MR. BERGER:  If the prosecutor presents eight

6       witnesses and I don't present one, would you have to

7       vote guilty?

8              PROSPECTIVE JUROR:  I would have to?  No.

9              MR. BERGER:  Why not?

10             PROSPECTIVE JUROR:  Just because you didn't

11      have a witness and the other one had a witness.

12             MR. BERGER:  They're presenting all kinds of

13      proof here, and the prosecutor is going to believe all

14      of that proof, or that testimony, or whatever it is,

15      and I'm asking, would you have to vote guilty if the

16      prosecutor was the only one who presented witnesses

17      here?

18             PROSPECTIVE JUROR:  No.

19             MR. BERGER:  Why not?

20             PROSPECTIVE JUROR:  Just because of the

21      evidence that was presented doesn't mean it was

22      factual.

23             MR. BERGER:  The point is, that the burden is

24      only on the prosecutor to present evidence to you

25      beyond a reasonable doubt that is so convincing to you,

Proceedings                    211

1   as the definition will be given to you by the Judge who

2   did it yesterday a little bit, but she explained to you

3   what the burden is, and if that burden is not met, then

4   you vote not guilty.  Has anybody ever accused you of

5   something you didn't do in your lifetime?

6           PROSPECTIVE JUROR:  Yes.

7           MR. BERGER:  Sometimes you respond, sometimes

8   you don't.  That will be a decision I'll make here in

9   this case.

10          Ms. Coleman, you understand I have no

11  obligation to prove anything here?

12          PROSPECTIVE JUROR:  Yes.

13          MR. BERGER:  Does anybody have trouble with

14  that?  Many, many, jurors raise their hand and say, you

15  know, if you are not going to do anything here, you are

16  not going to present anything here.  Does anybody feel

17  that way here?  I can assure you I won't remain silent

18  during the course of this trial.  I like practicing law

19  too much.

20          You will be asked, Ms. Fusco, too, this is to

21  everybody, all my questions are to everybody to

22  evaluate the credibility of a witness.  That's what you

23  do as jurors.  Do you think anybody has sworn to tell

24  the truth and lied, deliberately lied?

25          PROSPECTIVE JUROR:  Yes.

Proceedings                          212

1              THE COURT:  I need you to --

2              PROSPECTIVE JUROR:  Yes.

3              MR. BERGER:  Do you think civilians --

4              PROSPECTIVE JUROR:  Yes.

5              MR. BERGER:  Police officers?

6              PROSPECTIVE JUROR:  Yes.

7              MR. BERGER:  Do you understand police

8    officers don't get no extra edge?

9              PROSPECTIVE JUROR:  Yes.

10             MR. BERGER:  Mr. Pascucci, you are a

11   lieutenant or you were a lieutenant?

12             PROSPECTIVE JUROR:  Yes.

13             MR. BERGER:  Do you think police officers

14   have lied on the witness stand?

15             PROSPECTIVE JUROR:  Yes.

16             MR. BERGER:  Many have intentionally gotten

17   on the witness stand to deceive.

18             PROSPECTIVE JUROR:  I don't know about what

19   is intentionally.

20             MR. BERGER:  That's what lying is.  Lying is

21   an intent to deceive.  If you make a mistake, that's

22   one thing.  Do you think police officers are sworn to

23   tell the truth and intentionally -- intended to lie?

24             PROSPECTIVE JUROR:  I would say as a human

25   being with flaws, just that as a lawyer could lie, a

1    politician could lie, and a judge could lie, I would

2    say, yes, a police officer could lie.

3              MR. BERGER:  Not whether they could.  That's

4    the question that Mr. Perri asked you.  I'm asking you,

5    have they actually, in your opinion, lied on the

6    witness stand?

7              PROSPECTIVE JUROR:  Yes.

8              MR. BERGER:  Does anybody disagree with that,

9    anybody?  You heard the gentleman yesterday sitting in

10   the back talk about the -- puts them above everybody

11   else, gives them an edge.  That person isn't suitable

12   to be sitting.  We don't give police officers any

13   special edge.  Does everyone understand that?

14             PROSPECTIVE JUROR:  Yes.

15             MR. BERGER:  My question to all of you

16   collectively, not whether it's possible, not whether

17   it's in the realm of theory, has it actually happened

18   in your life experience, have you actually had life

19   experience where you believe -- I understand you are

20   not in the head of anybody on the witness stand, you

21   actually believe police officers have lied on the

22   witness stand.  Does anybody disagree with that?

23             PROSPECTIVE JUROR:  You had said in our life

24   experience.  I couldn't say in my life experience.  I

25   never experienced a policeman lying.

1           MR. BERGER:  You read newspapers, read

2     stories.  Based upon your life experience, are you --

3           PROSPECTIVE JUROR:  All right, then forget

4     it.

5           MR. BERGER:  I can only ask you your opinion.

6     That you see if you did not believe that police

7     officers lie, and I need to show you at the end of the

8     case that they did, I could never convince you, I could

9     never have the opportunity to show you that they didn't

10    tell the truth here.  So I need you to be able to say

11    to me, yes, I believe it happened, so --

12          PROSPECTIVE JUROR:  Now I have to say it,

13    even I questioned you.  Yes, I believe it happened.  I

14    don't know how convincing that is.  How do I question

15    you and then I turn around and give you the answer you

16    want.

17          MR. BERGER:  I don't want an answer.  There

18    are no wrong answers here.  If you told me you were

19    prejudiced against Hispanic people, that's an honest

20    answer.  It may be something you would all be proud of,

21    but it's an honest answer.  The honest answer is, I

22    don't think police officers intentionally have gotten

23    on the witness stand, sworn to tell the truth and lied.

24    That's an honest answer, if you believe your opinion.

25    You never had this happened; is that your opinion?

Proceedings                  215

1                   PROSPECTIVE JUROR:  I'm so confused.

2                   MR. BERGER:  Do you believe a police officer

3          has sworn to tell the truth and not been truthful on

4          the witness stand?

5                   PROSPECTIVE JUROR:  I'm sure it must have

6          happened.

7                   MR. BERGER:  Ms. Iorio, do you think police

8          officers have sworn to tell the truth and not told the

9          truth?

10                  PROSPECTIVE JUROR:  I'm sure it happened.  I

11         never experienced it.

12                  MR. BERGER:  If, at the end of the case that,

13         in fact, it happened, then I need you to have an open

14         mind about that.

15                  PROSPECTIVE JUROR:  Yes.

16                  MR. BERGER:  Does anybody not have an open

17         mind about that?

18                  What I'll be asking you to do, Ms. Jergensen,

19         start at point zero, be just ready.  Don't give an edge

20         simply because they are getting on the witness stand

21         and swearing to tell the truth.  I don't know how many

22         witnesses will be truthful or not truthful.  Remember,

23         I made a point yesterday.  We don't decide things based

24         upon percentage.  Don't assume because somebody is

25         getting on the witness stand, they are telling the

Proceedings                216

1    truth.  Be just as ready to believe or disbelieve.

2    That will go for my witnesses, as well as Mr. Perri's

3    witnesses.

4              Does everybody assure me they can do that?

5    There are people who think they can swear to tell the

6    truth, they have the obligation to.  All of those risks

7    involved, it doesn't mean it doesn't happen.  I can't

8    tell you what the percentage will be.  It may be

9    everybody will tell the truth.  It may be very few

10   will.  Keep an open mind about that.

11             Do you think a police officer can falsely

12   obtain a confession from an individual, Mr. Pascucci?

13             PROSPECTIVE JUROR:  Yes.

14             MR. BERGER:  Maybe tricked them or coerced

15   them in some way or another that they put a signature

16   on a piece of paper that wasn't true?

17             PROSPECTIVE JUROR:  Yes.

18             MR. BERGER:  Does anybody disagree with those

19   answers?

20             Mr. Perri was talking about motives to lie.

21   I told you yesterday, do you remember I asked you to

22   consider -- it's not your obligation to figure out why

23   somebody lied, only if they did, because as you, Ms.

24   Jergensen, your prior lies, you don't even know why.

25   You heard the gentleman yesterday in the panel before

Proceedings                217

1       you said if I can't figure out why he is lying, then he
2       must be telling the truth.  You are not to be expected
3       to be psychologists.  You are only expected to think if
4       that person lied or if that person told the truth or
5       not, not why they may not have told the truth.  Does
6       everybody understand?
7               PROSPECTIVE JUROR:  Yes.
8               MR. BERGER:  You heard the gentleman who said
9       yesterday, where there is smoke, there is fire.  In
10      fact, somebody said he wouldn't be sitting here if they
11      weren't guilty.  I know you all must of thought that.
12      When you heard the charges are sexual abuse of a
13      six-year old girl, putting his mouth on her vagina,
14      that must have just horrified you all and all of a
15      sudden you are ready to convict this man and send him
16      away.  What I'm saying to you is, you have to disabuse
17      of that belief, because innocent are accused of crimes;
18      would you agree with that, Ms. Aslav?
19              PROSPECTIVE JUROR:  Yes.
20              MR. BERGER:  That's why we have jury trials.
21              Ms. Aslav, this is a very serious case by the
22      nature of the charges.  You have told me from your
23      non-answers, so to speak, because you have agreed with
24      people, that you're just as prepared to vote not guilty
25      as guilty in this case?

kmm

Proceedings                    218

1              PROSPECTIVE JUROR:  Yes.

2              MR. BERGER:  Are you just as prepared to vote

3    not guilty in a case as serious as this as if you would

4    if this was simply a trespass case, if somebody walked

5    on somebody's property?  Does the seriousness of the

6    charges make you want to err on the side of conviction

7    in this case?

8              PROSPECTIVE JUROR:  I have to hear the

9    evidence.

10             MR. BERGER:  The seriousness of the charge,

11   do you have to err on the side of conviction because it

12   is such a serious charge?

13             PROSPECTIVE JUROR:  No.

14             MR. BERGER:  You are ready to vote not

15   guilty, as it is simply a trespass case.  Does

16   everybody agree with that answer; Ms. Brown?

17             PROSPECTIVE JUROR:  Yes.

18             MR. BERGER:  Ms. Coleman, would you be upset

19   with me if I vigorously question a seven-year old girl

20   now?

21             PROSPECTIVE JUROR:  No.

22             MR. BERGER:  Because our position is, this is

23   not a truthful accusation.  Does anybody have trouble

24   or would be upset with me because I have to do that?

25             PROSPECTIVE JUROR:  No.

1           MR. BERGER:  Does anybody feel they'll be

2   over sympathetic to a young girl who testifies of a

3   tender age, just as critical in jurors evaluating her

4   testimony; is that correct?

5           PROSPECTIVE JUROR:  Yes.

6           MR. BERGER:  Mr. Aslav, any problem with

7   that?

8           PROSPECTIVE JUROR:  No.

9           MR. BERGER:  Yesterday the Court, Ms. Iorio,

10  at the end of the case, if eleven people think there's

11  a guilty verdict and you are the only one that thinks

12  it's a not guilty verdict, would you give in simply

13  because of the numbers?

14          PROSPECTIVE JUROR:  No.

15          MR. BERGER:  Would you stay with your own

16  conviction?

17          PROSPECTIVE JUROR:  Yes.

18          MR. BERGER:  Would you stay with your own

19  principles?

20          PROSPECTIVE JUROR:  Yes.

21          MR. BERGER:  You are strong enough to be able

22  to do that.  If eleven people are looking at you, the

23  youngest person on the panel, what do you know, we have

24  more life experiences, who knows what the argument will

25  be.  The point is, you need twelve individual minds

1    making a judgment because if you gave in simply because

2    of the numbers, then it would be eleven making that

3    judgment, not twelve.  Does anybody feel not strong

4    enough to withstand such pressure?  Do all of you feel

5    you are your own person and can stand that pressure?

6              THE COURT:  About two more minutes.

7              MR. BERGER:  Mr. Christie, if you were the

8    defendant charged with these crimes, would you be

9    satisfied with twelve Mr. Christies judging you?

10             PROSPECTIVE JUROR:  I would believe twelve

11   individuals, I think that would be more fair, but I

12   think I could be fair in this case because I know

13   that's what you are asking.

14             MR. BERGER:  Only you know your frame of

15   mind.  I don't.  I have a very limited period of time

16   to ask questions and find out about you.  So, you know

17   how fair your frame of mind is at this point in time.

18   I don't.  I'm asking you a question.  If you were the

19   defendant, would you be satisfied with twelve people

20   with your present frame of mind judging?

21             PROSPECTIVE JUROR:  Absolutely.

22             MR. BERGER:  Are you that fair and just as

23   prepared?

24             PROSPECTIVE JUROR:  I'm prepared to divorce

25   the emotions from the logic of the case.

Proceedings                    221

1          MR. BERGER:  Ms. Rodriguez, would you be

2    satisfied judging?

3          PROSPECTIVE JUROR:  Yes.

4          MR. BERGER:  Ms. Brown?

5          PROSPECTIVE JUROR:  Yes.

6          MR. BERGER:  Ms. Coleman?

7          PROSPECTIVE JUROR:  Yes.

8          MR. BERGER:  Ms. Fusco?

9          PROSPECTIVE JUROR:  Yes.

10          MR. BERGER:  Ms. Iorio?

11          PROSPECTIVE JUROR:  Yes.

12          MR. BERGER:  Mr. Aslav?

13          PROSPECTIVE JUROR:  Yes.

14          MR. BERGER:  Ms. Jergensen?

15          PROSPECTIVE JUROR:  Absolutely.

16          MR. BERGER:  Ms. DiNapoli?

17          PROSPECTIVE JUROR:  Yes.

18          MR. BERGER:  Mr. Pascucci?

19          PROSPECTIVE JUROR:  Yes.

20          MR. BERGER:  What newspapers and magazines,

21    Mr. Christie?

22          PROSPECTIVE JUROR:  Unfortunately, I do not

23    follow many newspapers or magazines.  Magazines are

24    mostly sports magazines.  I don't get my news from

25    newspapers.

Proceedings                    222

1              MR. BERGER:  Do you have friends who are

2       police officers?

3              PROSPECTIVE JUROR:  Correct.

4              MR. BERGER:  Should I be concerned about

5       that?

6              PROSPECTIVE JUROR:  None of them are close.

7              MR. BERGER:  You wouldn't owe them any

8       explanation?

9              PROSPECTIVE JUROR:  This isn't their

10      business.

11             MR. BERGER:  You sat on a criminal case, what

12      was the charge?

13             PROSPECTIVE JUROR:  DUI.

14             MR. BERGER:  Before I get to Ms. Rodriguez,

15      you will all assure me, no matter what evidence you

16      hear during the course of the trial, keep an open mind

17      and wait until the end of the case, the arguments of

18      counsel and the charges by the judge before you

19      consider what it actually means.  Do you all understand

20      the importance of keeping that open?

21             Ms. Rodriguez, any newspapers, magazines?

22             PROSPECTIVE JUROR:  No.

23             MR. BERGER:  Ms. Brown, newspapers and

24      magazines?

25             PROSPECTIVE JUROR:  No.

1              MR. BERGER:  Your sister is a police officer?

2              PROSPECTIVE JUROR:  Yes.

3              MR. BERGER:  Do you talk to her often?

4              PROSPECTIVE JUROR:  No.

5              MR. BERGER:  Do you owe her any explanation

6       if your verdict was not guilty in this case?

7              PROSPECTIVE JUROR:  No.

8              MR. BERGER:  Mr. Coleman?

9              PROSPECTIVE JUROR:  Time Magazine and the New

10      Yorker.

11             MR. BERGER:  Ms. Fusco?

12             PROSPECTIVE JUROR:  Fashion magazine.

13             THE COURT:  Your two cousins are police

14      officers and friends as well are police officers?

15             PROSPECTIVE JUROR:  Yes.

16             MR. BERGER:  One, you were told by the Judge

17      not to talk about the case to anybody.  Would you think

18      you should be concerned you have friends and cousins

19      who are police officers?

20             PROSPECTIVE JUROR:  I don't talk to them

21      about that.

22             MR. BERGER:  You would make them up, you are

23      your own person?

24             PROSPECTIVE JUROR:  Yes.

25             MR. BERGER:  You wouldn't owe them any

1      explanation if your verdict was not guilty?

2              PROSPECTIVE JUROR:  No.

3              MR. BERGER:  Ms. Iorio?

4              PROSPECTIVE JUROR:  Newsday.  I read health

5      magazines, fashion magazines.

6              MR. BERGER:  You, too, have friends who are

7      police officers?

8              PROSPECTIVE JUROR:  Yes.

9              MR. BERGER:  Should I be concerned about

10     that?

11             PROSPECTIVE JUROR:  No.

12             MR. BERGER:  You wouldn't owe them an

13     explanation if your verdict is not guilty here?

14             PROSPECTIVE JUROR:  No.

15             MR. BERGER:  There will come a time you will

16     talk to people.  You will talk about your experience as

17     a juror?

18             PROSPECTIVE JUROR:  No.

19             MR. BERGER:  Mr. Aslav, newspapers,

20     magazines?

21             PROSPECTIVE JUROR:  The Post.  Mostly sports.

22             MR. BERGER:  You have friends who is a Nassau

23     County police officer?

24             PROSPECTIVE JUROR:  He's a relative of my

25     ex-wife.

Proceedings                    225

1              MR. BERGER:  Is that good or bad?  It's not a

2       factor?

3              PROSPECTIVE JUROR:  No.

4              MR. BERGER:  Ms. Jergensen?

5              PROSPECTIVE JUROR:  Not really.

6              MR. BERGER:  Your dad is or was a New York

7       retired detective.  Would you owe him an explanation if

8       your verdict should be not guilty?

9              PROSPECTIVE JUROR:  Not at all.  I don't talk

10      to him all of the time.

11             MR. BERGER:  And you all recognize sometimes

12      the charges that are brought are correct and sometimes

13      they're not and that's what we decide here?

14             PROSPECTIVE JUROR:  Yes.

15             MR. BERGER:  Ms. DiNapoli?

16             PROSPECTIVE JUROR:  Newsday and some trade

17      publications.  I'm in the freight business.  I read

18      industry publications.

19             MR. BERGER:  What was the charge in the

20      criminal case that you sat in a few years ago?

21             PROSPECTIVE JUROR:  Murder.

22             MR. BERGER:  Mr. Pascucci?

23             PROSPECTIVE JUROR:  Newsday, Daily News, Post

24      and Sports Illustrated.  And I have no friends and

25      nobody in law enforcement.

Proceedings                    226

1          MR. BERGER:  You work with children?

2          PROSPECTIVE JUROR:  In 1989, I was working in

3     the Bi-squad in Manhattan south.  They had a

4     subsection, NYPD detective, and two FBI agents that

5     worked on crimes, sexual exploitation of children, task

6     force.  It was called investigated crimes committed

7     against children.  Most of them were pedophilia related

8     crimes.  It was men and little boys.

9          MR. BERGER:  Did you ever see an occasion

10    where it was a false claim of pedophilia?

11         PROSPECTIVE JUROR:  No, not in my experience.

12    It was only for six months and that six month time

13    period I didn't come across a false claim.

14         MR. BERGER:  We're making that claim here.

15    Is that something I should be concerned about?

16         PROSPECTIVE JUROR:  No, you shouldn't be

17    concerned about it.

18         MR. BERGER:  Why not?

19         PROSPECTIVE JUROR:  I think Mr. Ramos

20    deserves a fair hearing and maybe he is innocent.  We

21    have to listen to the case to find out.

22         MR. BERGER:  Okay.

23         THE COURT:  Finish up, please.

24         MR. BERGER:  Bumper stickers, Mr. Christie.

25         PROSPECTIVE JUROR:  In your hopes, not your

Proceedings                    227

1      fears.

2                  MR. BERGER:  Ms. Rodriguez?

3                  PROSPECTIVE JUROR:  Nothing like pole peeled

4      bananas.

5                  MR. BERGER:  Mr. Nivegro?

6                  PROSPECTIVE JUROR:  No.

7                  MR. BERGER:  Ms. Brown?

8                  PROSPECTIVE JUROR:  No.

9                  MR. BERGER:  Mr. Nieves?

10                 PROSPECTIVE JUROR:  No.

11                 MR. BERGER:  Ms. Coleman?

12                 PROSPECTIVE JUROR:  No.

13                 MR. BERGER:  Ms. Fusco?

14                 PROSPECTIVE JUROR:  No.

15                 MR. BERGER:  Mr. Pascucci?

16                 PROSPECTIVE JUROR:  No.

17                 MR. BERGER:  Ms. DiNapoli?

18                 PROSPECTIVE JUROR:  No.

19                 MR. BERGER:  Ms. Jergensen?

20                 PROSPECTIVE JUROR:  No.

21                 MR. BERGER:  Mr. Aslav?

22                 PROSPECTIVE JUROR:  No.

23                 MR. BERGER:  Ms. Iorio?

24                 PROSPECTIVE JUROR:  No.

25                 THE COURT:  Before I ask you all to step out,

Proceedings                228

1        I want to direct my attention to Ms. Brown.  Yesterday

2     there was a concern about your job, if I recall

3     correctly, you have two jobs, ma'am.  Is that still a

4     concern for you, or have you worked out you would be

5     able to sit if you were picked?

6               PROSPECTIVE JUROR:  I worked it out.

7               THE COURT:  Very good.  I'll ask you to step

8     outside for ten minutes.  Don't discuss the case.

9     Don't go on the phones and look anything up.  Use the

10    facilities and we'll see you soon.

11              (Whereupon, the jury panel exited the

12    courtroom.)

13              THE CLERK:  Defense counsel ready?

14              MR. PERRI:  Yes.

15              MR. BERGER:  Yes.

16              THE CLERK:  The People have used four perempt

17    challenges.  The defense has used three.

18              Do the People have any challenge for cause,

19    jurors number one through twelve of those that are

20    remaining in those seats?

21              MR. PERRI:  No, your Honor.

22              THE CLERK:  Defense counsel, challenge for

23    cause?

24              MR. BERGER:  No.

25              THE CLERK:  People, do you wish to peremptory

kmm

Proceedings                    229

1        challenge in seats one through twelve?

2                    THE COURT:  People.

3                    MR. PERRI:  No, your Honor.

4                    THE CLERK:  Defense counsel, do you wish to

5        exercise a perempt challenge as to jurors one through

6        twelve?

7                    MR. BERGER:  Yes.

8                    THE COURT:  Number and name.

9                    MR. BERGER:  Number four, Ms. Brown, number

10       eight, Mr. Pascucci, number ten, Ms. DiNapoli, number

11       twelve, Mr. Aslav.

12                   THE COURT:  That's it.  We only went up to

13       twelve.

14                   THE CLERK:  James Christie will be juror

15       number four, Deidra Rodriguez will be will juror number

16       five, Toni Coleman will be juror number six, Maria

17       Fusco will be juror number seven, and Priscella

18       Jergensen will be juror number eight; agreed, People?

19                   MR. PERRI:  Yes, your Honor.

20                   THE CLERK:  Agreed, defense counsel?

21                   MR. BERGER:  Yes, your Honor.

22                   THE CLERK:  Do the People have a challenge

23       for cause for juror number thirteen?

24                   MR. PERRI:  No, your Honor.

25                   THE CLERK:  Defense counsel, do you wish to

1    cause juror number thirteen?

2            MR. BERGER:  No, your Honor.

3            THE CLERK:  People, do you wish to exercise a

4    perempt challenge for juror number thirteen?

5            MR. PERRI:  Yes, your Honor, People exercise

6    a perempt challenge.

7            (Whereupon, the jury entered the courtroom.)

8            THE CLERK:  May I have your attention,

9    please.  When I call your name, you have been selected

10   to serve on this jury and please remain seated.

11           Juror number four will be James Christie,

12   juror number five, Deidra Rodriguez, juror number six,

13   Toni Coleman, juror number seven, Maria Fusco, juror

14   number eight, Priscella Jergensen.  If I called your

15   name, please remain seated.

16           If I did not call your name, you are excused

17   from this panel with the thanks of this Court.  Please

18   gather your personal belongings and step out of the box

19   and the court officer will instruct you where to report

20   next if your name was not called.

21           Are the remaining jurors satisfactory to the

22   People?

23           MR. PERRI:  Yes, your Honor.

24           MR. BERGER:  And to the defendant?

25           THE CLERK:  Shall I swear them?

Proceedings          231

1              (Whereupon, the jurors were duly sworn by the
2       clerk of the court.)
3              THE COURT:  Welcome aboard, everyone.  As you
4       heard me say yesterday, I'm now going to excuse you for
5       the day.  The day is yours.  You are getting credit for
6       the entire day of jury service.  You do not have to be
7       back here until Monday morning at 9:30.  Realize we
8       won't be able to get started until everyone is here, so
9       try to get here as close to 9:30 as possible.
10             Also, you may have noticed parking is a real
11      problem around here, so you might want to get here a
12      little earlier to make sure you get a spot and there
13      will be room.  You will have to wait until we need you
14      in the courtroom.
15             Before I let you go, let me give you the
16      admonitions.  Keep an open mind throughout the process
17      and throughout the trial.  Do not discuss the case
18      among yourselves or with anyone else during the trial.
19      Do not permit anyone to discuss the case in your
20      presence.  Do not talk to lawyers, witnesses, or the
21      defendant about anything during your trial, and
22      remember, if you see us at any point in time in the
23      hallway, or at a local pizzeria, or establishment, do
24      not take it personally.  Do not visit or view the place
25      where the charged crime was allegedly committed or any

Proceedings                      232

1       other place mentioned in this case.

2                    If there is any news coverage of the case, do

3       not read, view or listen to any accounts or discussions

4       of the case if it is reported by the news media.

5                    Do not attempt to research any fact, issue,

6       or law related to the case, whether by discussion with

7       others or by research in the library, or on the

8       Internet, or by any other means or source.

9                    Have a great rest of the week.  Have a great

10      Mother's Day to those that celebrate.  See you Monday

11      morning.

12                   (Whereupon, the jurors exited the courtroom.)

13                   THE COURT:  Anything for the record?

14                   MR. PERRI:  No, your Honor.

15                   MR. BERGER:  No, your Honor.

16                   THE COURT:  Let's take a break.  We'll get

17      the next panel up.

18                   (Whereupon, a short recess was taken.)

19                   THE CLERK:  Case on trial continued,

20      Indictment 742N of 2014, People of the State of New

21      York vs. Daniel Ramos.

22                   All parties are present.  The jury is not

23      present at this time.

24                   People ready?

25                   MR. PERRI:  Yes, your Honor.

                                                            kmm

Proceedings                233

```
 1              THE CLERK:  Defense counsel ready?
 2              MR. BERGER:  Yes, your Honor.
 3              THE COURT:  We have another set of jurors
 4      ready to come in, so let's bring them in.
 5              (Whereupon, the jury panel entered the
 6      courtroom.)
 7              THE CLERK:  Supreme Court Part 43, before
 8      Honorable Teresa Corrigan.  I ask you to please rise,
 9      raise your right hand so I could swear you in.
10              (Whereupon, the jury panel was duly sworn by
11      the clerk of the court.)
12              THE COURT:  Welcome, everyone.  As you just
13      heard, this is Nassau County Supreme Court Part 43.  My
14      name is Teresa Corrigan.  I'll be the Judge in this
15      matter, and we're about to continue the process of
16      selecting a jury in a criminal case.  It's estimated
17      that the trial will take approximately two weeks, but
18      not all in a row.  There will be lots of days off in
19      between.  I will give you the schedule a little later
20      on as we go through this process.
21              Before I do explain the jury selection
22      process to you, I do want to thank you all for being
23      here.  I realize this is -- this could be an
24      inconvenience for many of you.  I'm sure you could
25      appreciate a trial by jury is and has been the
```

Proceedings                234

1    cornerstone of our justice system, yours and mine, for

2    more than two hundred years, and it's the best way to

3    resolve these matters.

4            The name of the case we're here for is the

5    People of State of New York against Daniel Ramos.  The

6    People of the State of New York in that title means the

7    government of the State of New York.  The government is

8    represented by the Acting District Attorney of Nassau

9    County, Madeline Singas.  In referring to the People of

10   the State of New York, that is in referring to the

11   government, we normally use the shorthand terminology

12   of the People, and that is what you will hear

13   throughout this trial.  That part of the title of this

14   case refers to the People of the State of New York.  It

15   does not mean that the People of this state want any

16   particular verdict.  The People of this state are

17   satisfied by the just verdict of a fair jury.

18           Mr. Ramos is often referred to as the

19   defendant in this matter, and he is charged with two

20   counts.  The first count he is charged with is the

21   crime of criminal sexual acts in the first degree, and

22   the second count is endangering the welfare of a child.

23           Now, we begin the trial by selecting a jury.

24   As you heard me say, we're continuing this.  We picked

25   some jurors.  We need to continue picking to get to a

1    total of twelve people.  In addition to the twelve

2    jurors, we're also going to select two alternate

3    jurors.  An alternate juror is one who may serve in

4    place of one of the twelve yours should an unforeseen

5    extraordinary emergency arise that makes it totally

6    impossible for one of the first twelve jurors to

7    complete the trial.  Juror number one has already been

8    picked and that person will be the foreperson for this

9    jury.

10             During the trial, the foreperson has the same

11   responsibilities as any other juror.  At the end of the

12   trial, however, during the jury's deliberations, we do

13   ask the foreperson to sign any written inquiry which

14   the jury sends to the Court, and also to announce the

15   jury's verdict, guilty or not guilty, here in this

16   courtroom.

17             The foreperson can, but does not have to

18   chair the jury's discussion during deliberations.  If

19   any of you have participated in jury selection in a

20   criminal case before, you may notice that method of

21   jury selection varies to some extent from judge to

22   judge.  But the essence of each procedure is the same.

23   It involves a combination of explanation of the law and

24   questions all designed to help each of you as well as

25   the attorneys decide whether you could at this time sit

Proceedings                236

1      as a juror in this case and be fair in judging whether

2      the defendant was guilty or not guilty of the charged

3      crimes.

4              My jury selection procedure is as follows:

5      First, I'm going to explain some of the basic law that

6      applies to this case and all criminal trials.  I do

7      this in part, if you are selected as a juror, you will

8      be required to follow the law, whether you agree with

9      it or not.  Later, I will be asking you whether you

10     understand the law that I have explained and whether

11     you can accept it and follow it.

12             Second, the clerk will call the random names

13     of fourteen jurors who will take a seat in the area on

14     my left, which is called the jury box.  I will then ask

15     the jurors in the jury box a series of questions that

16     you will respond to either by a show of hands or by

17     some verbal response if that is required.

18             Third, each lawyer will then be given an

19     opportunity to address those individuals who are

20     sitting in the box.

21             And finally, when the lawyers are finished,

22     all of the jurors will be excused for a few minutes and

23     it is during that time that the lawyers will be given

24     an opportunity, as required by our law, to excuse one

25     or more of the jurors in the jury box.  The jurors who

Proceedings                    237

1    are not excused become members of the jury, and we will

2    repeat that procedure until we have twelve sworn jurors

3    and two alternates.

4         Let me take a moment to introduce the parties

5    and the lawyers to you.  Later in the proceeding I'll

6    ask you if you know the defendant or any of the

7    attorneys.  Again, the defendant in this case is

8    Mr. Daniel Ramos, and he is represented by Michael

9    Berger.

10        MR. BERGER:  Good morning.

11        THE COURT:  In this case, the People are

12   represented by the Acting District Attorney of Nassau

13   County Madeline Singas.  Ms. Singas, in turn, is

14   represented by Assistant District Attorney Anthony

15   Perri.

16        The purpose of the trial is for the jury to

17   decide on the basis of evidence presented in a

18   courtroom whether a person who is accused of a crime by

19   the People is guilty or not guilty of that crime.

20        In a trial, it is the jury's responsibility

21   to evaluate fairly the testimony and other evidence

22   presented here in this courtroom and decide what the

23   believable and accurate facts are with respect to what,

24   if anything, took place at the time and place in

25   question.  The jury is, therefore, also known as the

1       finders of the facts.

2              After the jury has determined the facts, the

3       jury must apply to the facts the law, as I explained it

4       to you, regardless of whether the jury agrees with the

5       law and then without fear, favor, bias, prejudice,

6       sympathy, or consideration of a possible sentence or

7       punishment, you must render a decision known as a

8       verdict, stating whether the defendant is guilty or not

9       guilty of a charged crime or crimes.

10             To decide the facts of the case, the jury

11      must consider only the evidence presented in this case

12      in this courtroom.  It is important that you understand

13      then what evidence is, because that is what you base

14      your decision on, and it is equally important to

15      understand some things that you will hear about that

16      are not evidence, because you do not base your decision

17      on those matters.

18             So first, what is evidence?  There are three

19      basic types.  One, there is evidence that comes from a

20      stipulation of the parties.  A stipulation is

21      information both parties agree to present to the jury

22      as evidence without calling a witness to testify to

23      that information.

24             Second, there is evidence that comes from the

25      introduction into evidence of physical objects, such as

Proceedings                    239

1      a document, or photographs, clothing, or even a chart.

2      And namely, as you know, the not common form of

3      evidence, is the testimony of people based on questions

4      asked by the lawyers, and perhaps, by the Court, but

5      never by the jury.

6              So, then what is not evidence?  First, the

7      charges in this case are set forth in a document known

8      as an indictment.  The indictment is simply a piece of

9      paper that states the charges.  Neither the indictment

10     itself, nor the fact that an indictment has been filed,

11     constitutes evidence.  The defendant has pleaded not

12     guilty to the charges contained in the indictment, and

13     the trial is to decide whether the defendant is guilty

14     or not guilty.

15             Second, what the lawyers say at any time is

16     not evidence.  The lawyers are not witnesses.  What I

17     say is not evidence, because I am not a witness.

18             Third, a question of a witness by a lawyer or

19     by the Court, by itself is not evidence.  It is the

20     question with the answer that is the evidence.

21             So, you are not to conclude from a question

22     alone that anything assumed in the question to be true,

23     is true, no matter how detailed or specific the

24     question is.  Nor are you to draw any inference either

25     favorable or unfavorable to either side from the

kmm

Proceedings                240

1    content of a question alone.  You must consider the

2    question with the witness's answer and decide whether

3    you find the answer believable and accurate, because

4    again, it is the question with the answer that is the

5    evidence.

6              There are three fundamental principles of law

7    that service the foundation of criminal justice and

8    they apply in all criminal trials.  They are the

9    presumption of innocence, the burden of proof, and the

10   requirements of proof beyond a reasonable doubt.

11             Throughout these proceedings, the defendant

12   is presumed to be innocent.  As a result, you must find

13   the defendant not guilty, unless on the evidence

14   presented at this trial you conclude that the People

15   have proven the defendant guilty beyond a reasonable

16   doubt.  That a defendant does not testify as a witness,

17   is not a factor from which any inference unfavorable to

18   the defendant may be drawn.  The defendant is not

19   required to prove that he is not guilty.  In fact, the

20   defendant is not required to prove or disprove

21   anything.

22             To the contrary, the People have the burden

23   of proving the defendant guilty beyond a reasonable

24   doubt.  That means before you can find the defendant

25   guilty of a crime, the People must prove beyond a

1    reasonable doubt every element of the crime, including
2    that the defendant is the person who committed that
3    crime.

4              The burden of proof never shifts from the
5    People to the defendant.  If the People fail to satisfy
6    their burden of proof, you must find the defendant not
7    guilty.  If the People satisfy their burden of proof,
8    you must find the defendant guilty.  Just because the
9    defendant is sitting in that chair accused of and
10   charged with a crime, does not and cannot mean that he
11   starts this case with any sort of strike against him.
12   In your eyes he's presumed innocent.  You may not and
13   you must not begin your evaluation of this case by
14   assuming just because he is seated there, he must have
15   done something wrong.

16             You heard me use the term proof beyond a
17   reasonable doubt, and the law uses that term to tell
18   you how convincing the evidence of guilt must be to
19   permit a verdict of guilty.

20             The law recognizes in dealing with human
21   affairs there are very few things in this world we know
22   with absolute certainty.  Therefore, the law does not
23   require the People to prove a defendant guilty beyond
24   all possible doubt.  On the other hand, it is not
25   sufficient to prove that the defendant is probably

Proceedings                          242

1    guilty.

2              In a criminal case, the proof of guilt must

3    be stronger than that.  It must be beyond a reasonable

4    doubt.  A reasonable doubt is an honest doubt of the

5    defendant's guilt for which a reason exists based upon

6    the nature and quality of the evidence.  It is an

7    actual doubt, not an imaginary doubt.  It is a doubt

8    that a reasonable person acting in a matter of this

9    importance would be likely to entertain because of the

10   evidence that was presented or because of the lack of

11   convincing evidence.

12             Proof of guilt beyond a reasonable doubt is

13   proof that leaves you so firmly convinced that the

14   defendant's guilt, that you have no reasonable doubt of

15   the existence of any element of the crime or of the

16   defendant's identity as the person who committed that

17   crime.  If you are not convinced beyond a reasonable

18   doubt that the defendant is guilty of a charged crime,

19   you must find the defendant not guilty of that crime.

20             If you are convinced beyond a reasonable

21   doubt that the defendant is guilty of a charged crime,

22   you must find the defendant guilty of that crime.

23             Because this is a criminal case, the police

24   are involved and will be testifying at this trial.  We

25   treat police officers the same way as we do the

Proceedings                   243

1    civilian witnesses.  Police officers can tell the

2    truth, be mistaken or lie, just like anyone else.  You

3    must evaluate a police officer's testimony for

4    truthfulness and accuracy in the same way you would

5    evaluate the testimony of any other witness.

6              Some of you may have been the unfortunate

7    victim of a crime or know someone who has been a

8    victim.  Certainly, that was an unpleasant experience

9    for you if you had such an experience or know someone

10   who has.  You may not use this trial as the vehicle to

11   exact your revenge upon the person who perpetrated

12   crimes against you or your friend, or to try to right

13   or wrong done to someone in the past, having nothing at

14   all done with this defendant and this case.  As I'm

15   sure you can appreciate and realize this courtroom is

16   not the place for that.

17              During the trial you will hear me and perhaps

18   the lawyer will hear the term element of the crime.

19   What constitutes a crime is defined by the written law

20   of New York.  Each written definition normally contains

21   several parts, including the specifications of conduct

22   prohibited, the state of mind with respect to the

23   conduct must have been performed and some instances as

24   a result from that conduct.

25              Those parts of the written definition of a

Proceedings                244

1    charged crime, plus the identification of a person as

2    the person who committed the crime charged, is what is

3    meant by the term elements of the crime charged.

4           Let me talk to you about deliberations as the

5    jury's verdict, whether guilty or not guilty, it must

6    be unanimous.  That is each and every juror must agree

7    to the verdict.  Since twelve people seldom agree on

8    anything, to reach a verdict you must deliberate with

9    the other jurors.

10          What does it mean to deliberate?  It means

11   you should consult with each other, listen to each

12   other, give each other's views careful consideration

13   and reason together when considering the evidence, and

14   when you do deliberate, you should do so with a view

15   towards reaching an agreement, if that condition can be

16   done without surrendering individual judgment.

17          Each of you must decide the case for

18   yourself, but only after a fair and impartial

19   consideration of the evidence with the other jurors.

20   You should not surrender an honest view of the evidence

21   simply because you want the trial to end or you are

22   outvoted.  At the same time, you should not hesitate to

23   reexamine your views and change your opinions if you

24   become convinced that they were not correct.

25          At this time I'm going to ask the clerk to

1    call fourteen names at random.  You will then take a

2    seat in the jury box.  After you are seated, I'll ask

3    each of you in the jury box a series of questions, and

4    like I stated earlier, after I'm done with my

5    questions, each of the attorneys will be given an

6    opportunity to question you.

7              Please fill the box.

8              THE CLERK:  If your name is called, gather

9    your personal belongings and step up and follow the

10   instructions of the court officer.

11             Seat number one, Jill Kennedy, K-E-N-N-E-D-Y.

12             Seat number two, Carlos Tavora, T-A-V-O-R-A.

13             Seat number three, Paul McNamara,

14   M-C-N-A-M-A-R-A.

15             Seat number four, Beverly Campbell,

16   C-A-M-P-B-E-L-L.

17             Seat number five, Jose Morales,

18   M-O-R-A-L-E-S.

19             Seat number six, Dominique Garrett.  First

20   name D-O-M-I-N-I-Q-U-E.  Last name spelled

21   G-A-R-R-E-T-T.

22             Seat number seven, Richard Aquino,

23   A-Q-U-I-N-O.

24             Seat number eight, Kathryn Westbrooke,

25   K-A-T-H-R-Y-N.  Last name spelled W-E-S-T-B-R-O-O-K-E.

kmm

1                Seat number nine, Cynthia Woodhouse,

2      W-O-O-D-H-O-U-S-E.

3                Seat number ten, Patricia McLean,

4      M-C-L-E-A-N.

5                Seat number eleven, Carolyn J. Harvey,

6      H-A-R-V-E-Y.

7                Seat number twelve, Karrell Kallenberg.

8      First name spelled K-A-R-R-E-L-L.   Last name

9      K-A-L-L-E-N-B-E-R-G.

10               Seat number thirteen, Richard J. Michaels,

11     M-I-C-H-A-E-L-S.

12               Seat number fourteen, Kimberly R. Vargas,

13     V-A-R-G-A-S.

14               THE COURT:   Welcome everyone to the front of

15     the courtroom.   Let me say this to the people remaining

16     in the audience, I can pretty much guarantee you at

17     some point today you will find yourself up here in the

18     front of the courtroom, so if you would please continue

19     to listen to what I'm doing, because I don't want to

20     have to repeat all of my questions all over again when

21     you find yourself up here in the front.   Thank you

22     everyone in the back for continuing to listen.

23               Let me turn to those of you in the front.

24     The first thing I need to find out, does anybody up

25     here in the front have a problem with the English

Proceedings                    247

1    language?

2              Mr. Tavora, yes, sir, have you understood

3    everything that has gone on so far?

4              PROSPECTIVE JUROR:  I can't hear.  That's

5    all.  Not clear.

6              THE COURT:  People?

7              MR. BERGER:  Consent.

8              MR. PERRI:  Consent.

9              THE COURT:  Mr. Tavora, we'll find a

10   different case for you to have a better ability to hear

11   and understand.  Thank you.

12             THE CLERK:  Elizabeth Norton, N-O-R-T-O-N.

13   Please take seat number two.

14             THE COURT:  Welcome.  Any problem with the

15   English language?

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  Did anyone else have their hand

18   up for language?  Let the record reflect no other hands

19   have been raised.

20             First thing I want to do is ask each of you

21   if you will be able to follow those principles of law

22   that I gave you earlier.  You don't have to like them.

23   You don't even have to agree with them, but I need to

24   know you are going to follow them because that is the

25   law that is required if you sit as a member on the

Proceedings                      248

1      jury.

2               Let me remind you what those are.  One, the

3      defendant is presumed innocent.

4               Two, the People have the burden of proof, the

5      proof of guilt beyond a reasonable doubt.

6               And three, if the defendant does not testify

7      as a witness, that is not a fact from which any

8      inference unfavorable to the defendant may be drawn by

9      you.

10              Can each of you give me an assurance that you

11      will follow those principles of law?  If you cannot,

12      please raise your hand.  Let the record reflect no

13      hands have been raised.

14              Can each of you promise when it comes time to

15      deliberate at the end of the trial, in order to reach a

16      verdict of guilty or not guilty, that each of you will

17      discuss the evidence with your fellow jurors and each

18      of you will consider what your fellow jurors have to

19      say, all with a view towards reaching a unanimous

20      verdict, guilty or not guilty, it can be done without

21      surrendering individual judgment.

22              Let me explain why I say that.  I'm married

23      to someone I say has a type A personality.  He is right

24      no matter what.  It doesn't matter what you put in

25      front of his face, he's right.  The sky could be as

Proceedings                    249

1    blue as could be, he would call it pink.  That's okay.
2    I know that.  I'm married to him, so it's good to go.
3    That personality is not so good for a jury.  You want
4    to go into that jury room and be able to discuss, and
5    to listen, and to voice an opinion and to hear other
6    people speak.  There's nothing wrong with having a
7    personality like my husband has.  If that is you, this
8    is probably not the case for you.  I need you to raise
9    your hand if you are that type of personality.  You
10   know what, I can't do that.  I appreciate this honesty.
11            Mr. Aquino, you are it's my way or the
12   highway?
13            PROSPECTIVE JUROR:  Usually.  I think my wife
14   would agree with you.
15            THE COURT:  Now, my question to you is:  If I
16   tell you you have to put aside it's my way or the
17   highway and you have to be willing to listen to eleven
18   other people, can you give me your assurance you would
19   do that if you were picked as a juror?
20            PROSPECTIVE JUROR:  I would certainly try.
21            THE COURT:  I'll come back to you on the
22   trying.  That makes me a little nervous when we hear
23   trying.
24            Mr. Michaels, if I said to you, okay, I get
25   it, no problem with that, can you give me your

Proceedings                    250

1     assurance you will change your ways and when you get

2     into that room you will be able to listen to everyone

3     else and maybe even have your opinion changed based on

4     what other people say to you?  Do you think you could

5     do that?

6                    PROSPECTIVE JUROR:  No.

7                    THE COURT:  Fair enough.

8                    Do either of you want to ask Mr. Aquino any

9     questions?

10                   MR. BERGER:  You say you will try, will that

11    be difficult for you to do that?

12                   PROSPECTIVE JUROR:  I'm going to try.  I want

13    to be as fair as I can be.  I know what my personality

14    is.

15                   THE COURT:  People, do you have any

16    questions?

17                   MR. PERRI:  If the judge instructs you that

18    you have to listen to the other jurors during

19    deliberations, examine the evidence and make individual

20    determination based on those conversations about what

21    you believe, are you capable of doing that?

22                   PROSPECTIVE JUROR:  Of course, I am.

23                   MR. PERRI:  You are capable of being fair and

24    impartial even though you have strong ideas?  You will

25    deliberate and listen and be fair and impartial?

Proceedings                    251

1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  I'll leave you in that seat for a

3         little while, and there's a lot more questions.  We'll

4         develop that with you as we proceed.

5              Mr. Michaels, consent?

6              MR. BERGER:  Consent.

7              MR. PERRI:  Consent.

8              THE COURT:  Thank you, Mr. Michaels, for your

9         honesty.  We'll find a different case for you.

10             THE CLERK:  Gwendolyn House, H-O-U-S-E.

11             THE COURT:  Welcome.  You heard everything I

12        said so far?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Do you have anything you need to

15        tell me?

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  The next thing I need to ask of

18        all of you up front, can you each promise you will

19        decide this case without fear, favor, sympathy, bias,

20        or prejudice, for or against the People, the defendant,

21        or a witness that is called to testify, be that witness

22        is a police officer, or a civilian?  If you cannot give

23        me that assurance, can you please raise your hand.

24             No hands have been raised.

25             You heard me introduce the defendant,

1    Mr. Ramos, and his attorney, Mr. Berger, and the

2    People's attorney, Mr. Perri.  You heard my name is

3    Teresa Corrigan, and you have seen my court staff as

4    you come in and out of the courtroom.  Please let me

5    know by a show of hands if any of you believe you know

6    any of us or we look familiar to you from anywhere.

7            Let the record reflect no hands have been

8    raised.

9            THE COURT:  At this point, I'll read you a

10   list of names.  These are individuals who might be

11   witnesses whose names you simply might hear during the

12   trial.  It's important that we know whether or not any

13   of these individuals are known to you or are familiar

14   to you.  Please listen carefully.  At the end of

15   reading the names, I'll ask if any of you believe you

16   know these people.  Crystal Ramirez, Mya Feliciano

17   Ramirez, Sincere Feliciano Ramirez, Police Officer

18   Joseph Boccio, Police Officer Carl Wigand, Police

19   Officer Thomas Tedeschi, Detective Maurice Baran,

20   Detective Reinald Pacheco, Nurse Kathleen McAllister,

21   Christopher Chillseyzn, Christy Hernandez, Karl Reich,

22   Stephanie Ramos, or any supervisor at the NICE and NICE

23   Transportation Company.  Do any of you believe you know

24   any of those individuals that I just mentioned?

25           Let the record reflect --  I saw a hand in

1     the back.  If you make it up here to the front, make

2     sure you know that.  Those of you in the front, I did

3     not see any hands.  We'll continue moving on.

4            The next two questions, I need you to

5     seriously consider, they're usually the ones that allow

6     the Court to see most of you walk out the door, and I

7     don't want that to happen if it doesn't need to.

8            Health; I said the case will be about two

9     weeks.  I also said, just so you know, the way we work

10    it, usually you will be asked to come to court around

11    9:30 in the morning.  Hopefully, we'll have you in the

12    courtroom no later than ten o'clock, 9:45 is preferred.

13    We'll work to around 12:30 or so.  You get a lunch

14    break to around two and then we leave at 4:30.  After

15    about an hour's worth of sitting, you will get a break

16    to use the facility, stretch your legs, do all of the

17    things.

18            I need to know, with that in mind, do any of

19    you have any health issues that makes it completely

20    impossible for you to sit?  That would include doctors'

21    appointments you can't change, that would include any

22    sort of, maybe, surgeries, if you are on medication

23    that makes you drowsy, or you can't concentrate on any

24    medical issues.  Raise your hand, keep them up so I

25    could take it down and we'll discuss it individually.

kmm

1      Hands.

2              To the people in the back, just remember that

3      if you are called up to the front, to let me know you

4      have an issue.  Let's talk about the length of time of

5      the trial.  Listen carefully, if you are picked today

6      as a juror, you will not be back here until Monday, May

7      11th, so this is the only day you need to be here this

8      week if you are picked.  After that next week we will

9      work Monday, the 11th, Tuesday the 12th, Wednesday the

10     13th, and Thursday the 14th.  You will be off on the

11     15th to either go back to work or do whatever you need

12     to do to catch up on what you might have missed being

13     here Monday through Thursday.  The following week you

14     will only be asked to be here three days.  Tuesday the

15     19th, Wednesday the 20th, and Thursday the 21st.  You

16     are off for Memorial Day weekend.  You are off the

17     Friday.  You are off the Monday.  Does anyone have

18     plans Friday, Saturday, Monday?  You are good to go.

19     You will be off from court.  The next week we'll ask

20     you to be back here on Tuesday the 26th, and only if

21     it's necessary you will be here the 26th, 27th, 28th,

22     29th.  That's four days that week, Tuesday through

23     Friday.  We don't expect the case to go past the 29th

24     for any reason.  With that schedule in mind and those

25     days off, please raise your hand if you have an issue

Proceedings                    255

1    that makes it completely impossible for you to sit, not

2    that it's inconvenient, but that it's impossible for

3    you to sit.  Keep those hands up until I get you marked

4    down.

5              Let me start with you, Mr. McNamara.

6              PROSPECTIVE JUROR:  I'm subpoenaed for a

7    deposition on the 15th, which is the Friday, but on a

8    personal injury case.

9              THE COURT:  That is okay because you wouldn't

10   be here.  There might be other questions of you

11   regarding that matter, but as far as scheduling; is

12   that your only conflict?

13             PROSPECTIVE JUROR:  As far as I know.

14             THE COURT:  We'll keep you here.  We're not

15   going to be working on the 15th.

16             Mr. Aquino.

17             PROSPECTIVE JUROR:  I have several business

18   commitments for next week I haven't planned for.  I

19   didn't know if it was a day, or two, or several weeks.

20             THE COURT:  I'm going to assume they can't be

21   changed?

22             PROSPECTIVE JUROR:  Not really.

23             THE COURT:  Fair enough.

24             The next hand I saw was Westbrooke.

25             PROSPECTIVE JUROR:  Yes.

Proceedings                256

1           THE COURT:  Yes.

2           PROSPECTIVE JUROR:  Business commitments, as

3  well I have my own business and maybe times are

4  inconvenient and may not be able to make it because of

5  my income, so I would lose.

6           THE COURT:  The last part of what you said,

7  am I right in believing if you are not at work, you are

8  not getting paid?

9           PROSPECTIVE JUROR:  Correct.

10          PROSPECTIVE JUROR:  There's some flexibility,

11  there may be one or two days that may be a little

12  pressing.  I might get by the first week.

13          THE COURT:  After the first week you will be

14  concerned about work?

15          PROSPECTIVE JUROR:  Unless we have breaks and

16  go on-line and -- I don't know how it works.  I would

17  like to sit, but --

18          THE COURT:  Let me make sure.  I don't want

19  to get rid of you unnecessarily.  You heard what I

20  said.  You need to commit to the court that you can

21  give me your undivided attention and the attorneys your

22  undivided attention between 9:30 and 12:30 and then

23  from 2:00 to 4:30; can you do that?

24          PROSPECTIVE JUROR:  I believe I can.

25          THE COURT:  Then you need to be here all of

kmm

Proceedings                257

1        those days.  You can't call and say today is not a good

2        day.  I need you to commit to all of the days I

3        mentioned.

4                    PROSPECTIVE JUROR:  I did.

5                    THE COURT:  I'll leave you there for a little

6        while.  Thank you for letting us know.

7                    Ms. McLean.

8                    PROSPECTIVE JUROR:  Mine isn't something.

9        The 21st is difficult for me.

10                   THE COURT:  Do you have other plans for that

11       day?

12                   PROSPECTIVE JUROR:  My youngest daughter is

13       graduating college.

14                   THE COURT:  Thank you for letting me know.

15       Our kids do come first.  Graduation does count as

16       something.  You could let me know.

17                   Ms. House.

18                   PROSPECTIVE JUROR:  On the 13th and 14th I'm

19       on vacation.  Those two days my daughter has

20       appointments at Zucker Hillside, the 21st and 20th.

21       I'm on vacation until the 26th.  I'll be in Bermuda.

22                   THE COURT:  Coming back on Wednesday.

23                   PROSPECTIVE JUROR:  Coming back Wednesday,

24       and I should be at work the 28th.

25                   THE COURT:  Let me ask you with regards to --

1                    Mr. Garrett, yes, sir?

2                    PROSPECTIVE JUROR:  I'm not sure if my job

3          pays me for the days.

4                    THE COURT:  Where do you work?

5                    PROSPECTIVE JUROR:  Boston Market.  I'm not

6          sure if I get paid.

7                    THE COURT:  They probably only paying you for

8          a few days.  We're going to be taking a break in a half

9          hour.  I'm going to ask you to call over the lunch

10         break and report back to us at 2:15.  Mark it down as a

11         possibility.

12                   I'm sorry, Ms. Vargas.

13                   PROSPECTIVE JUROR:  Next Tuesday at twelve I

14         have a meeting at my daughter's school, and I don't

15         know if I could reschedule it.  I could do every other

16         day.  Just the 12th.

17                   THE COURT:  The 12th is the only day that is

18         bad for you?

19                   PROSPECTIVE JUROR:  Yes.

20                   THE COURT:  What time is the meeting?

21                   PROSPECTIVE JUROR:  1:15.

22                   THE COURT:  Do you know how long it will

23         last?

24                   PROSPECTIVE JUROR:  Maybe an hour or two.

25                   THE COURT:  You don't believe you could

1       reschedule it?

2                   PROSPECTIVE JUROR:  I don't think so.

3                   THE COURT:  Did I miss anyone else?

4                   Counselors, I'm looking at Mr. Aquino,

5       Ms. McLean, Ms. House, Ms. Vargas to start; consent?

6                   MR. PERRI:  Yes, your Honor.

7                   MR. BERGER:  Consent.

8                   THE COURT:  Mr. Aquino, Ms. McLean, who is in

9       seat ten, Ms. House and Ms. Vargas, you are excused

10      from this case with the thanks of the Court.  There may

11      be a shorter case more beneficial for all of you.  Step

12      out.

13                  THE CLERK:  Nicole Molly, M-O-L-L-Y, seat

14      number seven.

15                  Jeffery Miller, first name spelled

16      J-E-F-F-E-R-Y.  Last name spelled M-I-L-L-E-R, seat

17      number ten.

18                  Fatim Jaffer, J-A-F-F-E-R.  First name

19      spelled F-A-T-I-M, seat number thirteen.

20                  Joanne Klein, K-L-E-I-N, seat number

21      fourteen.

22                  THE COURT:  Welcome all of you who joined us.

23                  PROSPECTIVE JUROR:  I'm a service contract

24      worker in a medical facility.  I don't get paid if I

25      don't go to work.  There is no working on the Internet.

Proceedings                    260

1       I don't get paid at all.

2              THE COURT:  Do you know how many days?

3              PROSPECTIVE JUROR:  There's nothing.  I'm a

4       contract worker.

5              THE COURT:  Understood.  Thank you very much.

6              Mr. Miller, go ahead.

7              PROSPECTIVE JUROR:  When you mentioned the

8       NICE company, I have a lawsuit against them.

9              THE COURT:  Thank you for letting us know

10      that.  Any other issues, any medical issues?

11             PROSPECTIVE JUROR:  Yeah, my shoulder.  I

12      have chronic pain.

13             THE COURT:  Does that chronic pain prevent

14      you from concentrating for long periods of time?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  Ms. Jaffer.

17             PROSPECTIVE JUROR:  I recently moved to

18      Toronto, and I'm in the process of getting a PR card,

19      permanent residency.  I'm only here until the 19th.  I

20      came for my friends wedding, and I have jury duty.  I'm

21      going back on the 19th.

22             THE COURT:  And, Ms. Klein, anything?

23             PROSPECTIVE JUROR:  I will be away from next

24      Tuesday for three weeks.

25             THE COURT:  Any questions for those hot seats

Proceedings                261

1    not going to be filled in in a minute?

2              MR. PERRI:  No, your Honor.

3              MR. BERGER:  No, your Honor.

4              THE COURT:  Thank you, Ms. Molly, Mr. Miller,

5    Ms. Jaffer, and Ms. Klein.  We'll find something else

6    for you.

7              Let me say to everyone remaining in the

8    audience, because people are walking out of here it

9    doesn't mean they're going home.  They're going back to

10   central jury for another case.  What I would like to

11   tell people, be careful what is behind door number two.

12   You never know.

13             THE CLERK:  Linda S. Hayes, H-A-Y-E-S, seated

14   in number seven.

15             Seat number ten, Victor Pizzuto,

16   P-I-Z-Z-U-T-O.

17             Seat number thirteen, Maria Lopez, L-O-P-E-Z.

18             Warren T. Norman, N-O-R-M-A-N, seat number

19   fourteen.

20             THE COURT:  Come to the front of the

21   courtroom.  Let me see if there is anything you need.

22             Ms. Hayes, anything?

23             PROSPECTIVE JUROR:  Difficulty for long

24   periods, but I will try.  I have a collapsed vertebrae

25   in my back.

1          THE COURT:  What is a long period?

2          PROSPECTIVE JUROR:  More than an hour.  I

3     have to get up every hour.

4          THE COURT:  If you are chosen, we'll have to

5     deal with it.  We'll let you get up to stretch your

6     legs.  That's what we try to do.  Thank you for letting

7     me know that.  Any other issues?

8          PROSPECTIVE JUROR:  Health issues, no.

9          THE COURT:  The days are good?

10         PROSPECTIVE JUROR:  They're never good.

11         THE COURT:  Fair enough.

12         But you can be here, no plane tickets?

13         PROSPECTIVE JUROR:  I'm not leaving the

14    country.

15         THE COURT:  Are you in a position if you

16    don't work, you don't get paid?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  I appreciate it's inconvenient

19    for everyone.  If I let everybody go because it was

20    inconvenient, I would be talking to no one.  We need to

21    do this process.

22         Victor Pizzuto, anything you need to tell

23    me?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  Ms. Lopez?

Proceedings                263

1              PROSPECTIVE JUROR:  I don't think they pay me
2    for the week.
3              THE COURT:  Keep your voice up.  You don't
4    believe you get paid?
5              PROSPECTIVE JUROR:  No.
6              THE COURT:  Where do you work?
7              PROSPECTIVE JUROR:  For PC Home Health
8    Attendants.
9              PROSPECTIVE JUROR:  My English.
10             THE COURT:  You feel you have some issue with
11   English; is that what you are saying?
12             PROSPECTIVE JUROR:  I try.
13             THE COURT:  Thank you very much.
14             Ms. Norton, is there anything you need to
15   tell me?
16             PROSPECTIVE JUROR:  I'm retired NYPD.
17             THE COURT:  We'll get back to you on that.
18   The days are good?
19             PROSPECTIVE JUROR:  It's as good as it's
20   gonna get.
21             THE COURT:  Home health attendants don't get
22   paid.
23             MR. BERGER:  Consent.
24             MR. PERRI:  Consent.
25             THE COURT:  Ms. Lopez, you are excused at

1      this time.

2                     PROSPECTIVE JUROR:  Okay.

3                     THE CLERK:  Dana Kidderman,

4      K-I-D-D-E-R-M-A-N, seat number thirteen.

5                     THE COURT:  Welcome.  Is there anything you

6      need to tell me?

7                     PROSPECTIVE JUROR:  I don't think so.

8                     THE COURT:  Let me move on to the next set of

9      questions.  The next thing I need to know and you will

10     raise your hand.  Have you or a person close to you

11     ever been the victim of a crime or a witness to a

12     crime?  That could be family members, friends,

13     coworkers, yourselves, victim of a crime, or witnessed

14     a crime.  Please raise your hand if that is your

15     situation.  Keep the hands up for me, please. You may

16     put your hands down.

17                     The first hand I saw was Ms. McNamara.

18                     PROSPECTIVE JUROR:  My sister is a police

19     officer in the 115 Precinct, NYPD.  She has witnessed

20     many, many, many crimes.

21                     THE COURT:  Sir, is there anything about the

22     fact your sister is an NYPD officer and has witnessed

23     crimes going to get in the way of you sitting here as a

24     fair and impartial juror?

25                     PROSPECTIVE JUROR:  I would say I would have

1          a hard time misbelieving a police officer's testimony.

2                    THE COURT:   Thank you for your honesty.

3                    The next hand I saw was Mr. Morales.  Yes,

4          sir?

5                    PROSPECTIVE JUROR:  I've been robbed before.

6                    THE COURT:  That robbery, did it occur here

7          in Nassau County?

8                    PROSPECTIVE JUROR:  Queens.

9                    THE COURT:  Did the police respond?

10                   PROSPECTIVE JUROR:  I didn't report it.

11                   THE COURT:  Is there anything about that

12         incident that makes you believe that you could not sit

13         here and be fair and impartial?

14                   PROSPECTIVE JUROR:  No.

15                   THE COURT:  Do you understand that what

16         happened to you has nothing to do with what we're going

17         to do in this courtroom in this case?

18                   PROSPECTIVE JUROR:  I think this is a

19         different type of case.

20                   THE COURT:  Fair enough.  Do you have any

21         feelings about the fact that you weren't going to

22         report what happened to you?  Are those feelings going

23         to get in the way of you being fair and impartial here?

24                   PROSPECTIVE JUROR:  I don't think so.

25                   THE COURT:  I had a couple of people say I

1    don't think so to a few different answers, or I'm going

2    to try a few different answers.  Let me put it out

3    there.  There is no right or wrong answers here.  We

4    need as much honesty as we can get from all of you.

5    When you say, I will try, or I think so, it makes us

6    nervous.

7              Let me give you an example of why it makes us

8    nervous.  On that bucket list you put skydiving, and

9    you finally get up the courage and you go skydiving one

10   day, and do all of the preliminaries on the ground and

11   now it's time you are going up in the plane and with

12   the instructor, and the instructor says to you up in

13   the plane at 50,000 feet, however high you go, I have

14   no idea.  He said, the last thing we need to do is

15   check each other's packs.  Once we know each other's

16   packs are good to go, we'll jump out of the plane.  The

17   instructor says, you go first.  You look at the

18   instructor's pack, and you are like, tugging on the

19   strings and making sure everything is good to go and

20   you turn him around, thumbs up, you are good to go.  I

21   know, I looked at your pack, everything is great.

22             Then the instructor now, I'll check it out,

23   you try to see if the straps -- I will try and see if

24   this is all right, and then he turns around.  I think

25   you are okay.  Are you jumping out of that plane?  No

kmm

Proceedings                267

1    way, right?  That's kind of the anxious we all get in

2    the courtroom, when we, people, use words like try or,

3    I believe, those kinds of words.  We just need a little

4    bit more of an assurance.

5              Again, there is no right or wrong answers.

6    We need something more of an assurance, whether

7    positive or negative, when you give us answers.

8              Mr. Morales, when you say things like, I will

9    try, it makes us nervous.

10             PROSPECTIVE JUROR:  The defendant did nothing

11   to me, so I think I would be able to.  Yes.

12             THE COURT:  You will be able to listen to my

13   instructions?

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  I know it's hard.  You will be

16   able to listen to my instructions?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Will you follow the law whether

19   you like it or not?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  You will listen to the witnesses

22   who will come in and testify?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  You will evaluate whether or not

25   they are telling the truth?

1            PROSPECTIVE JUROR:  Yes.

2            THE COURT:  You will make a determination as

3    to whether the People have met their burden of proof?

4            PROSPECTIVE JUROR:  Yes.

5            THE COURT:  You will do that all fairly and

6    impartially?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Good to go.  The next hand I

9    believe I saw was Westbrooke.  Were you a victim of a

10   crime?

11           PROSPECTIVE JUROR:  My daughter was a victim.

12           THE COURT:  How long ago?

13           PROSPECTIVE JUROR:  Many years ago.  A young

14   child.

15           THE COURT:  In Nassau County?

16           PROSPECTIVE JUROR:  No.

17           THE COURT:  Were the police called for that

18   situation?

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  Were you satisfied with how that

21   situation was handled?

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  Is there anything about the fact

24   your daughter was a victim of a crime many years ago

25   going to get in the way of your ability to be fair and

Proceedings                    269

1    impartial in this matter?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Ms. Westbrooke, over the lunch

4    break you were supposed to check with your employer.

5    You said to me at one point, if I didn't work, I didn't

6    get paid.

7              PROSPECTIVE JUROR:  I'm self-employed.

8              THE COURT:  Is that going to be a problem as

9    a self-employed individual given the hours I told you

10   that you would be in the courtroom?

11             PROSPECTIVE JUROR:  It depends on how long

12   it's going to take.  I mean, you gave me the tests

13   dates.  I considered them.  I would like finally to get

14   it over with because I don't want them to call me

15   again.

16             THE COURT:  I appreciate your honesty.  The

17   next hand with regards to this question was

18   Ms. Kallenberg.

19             PROSPECTIVE JUROR:  My home was robbed in

20   Nassau County.

21             THE COURT:  How long ago, ma'am?

22             PROSPECTIVE JUROR:  About fifteen years ago.

23             THE COURT:  Were the police called?

24             PROSPECTIVE JUROR:  Yes, they were.

25             THE COURT:  Were you satisfied with how they

1     handled the situation?

2               PROSPECTIVE JUROR:  Yes.

3               THE COURT:  Was somebody caught?

4               PROSPECTIVE JUROR:  No.

5               THE COURT:  You did not have to go to court?

6               PROSPECTIVE JUROR:  Did not have to go to

7     court.

8               THE COURT:  Is there anything about that

9     matter, that fifteen years your house was burglarized,

10    anything about that that makes you believe you could

11    not be fair and impartial in this case?

12              PROSPECTIVE JUROR:  No, ma'am.

13              THE COURT:  Did I miss any hands on that?

14              Yes, ma'am, Ms. Norton.

15              PROSPECTIVE JUROR:  I never thought it would

16    have.  When I was a child our house was robbed two

17    times.  Once we were on vacation, and once I was away

18    in college.  Nobody got hurt.  Nobody was home.  I

19    don't know if the police were called.  I don't

20    remember.  I have no idea.  Nobody was caught.  My

21    parents are pretty sure they know who it was.  I don't

22    see how that would have any bearing.  I just wanted to

23    say, I don't want to lie by emotions or whatever it is.

24              THE COURT:  Thank you very much.  It was long

25    ago and it's not harping in your mind?

1              PROSPECTIVE JUROR:  That's something I don't

2      even think about.

3              THE COURT:  The next question I have for all

4      of you up front, has anyone close to you or yourself,

5      and close to you could be a friend, a family member,

6      ever convicted of a crime themselves, or a friend?

7      Keep your hands up for me, please.

8              I believe, Ms. Campbell.  Yes, ma'am.

9              PROSPECTIVE JUROR:  A family member.  I have

10     a brother incarcerated many years ago.

11             THE COURT:  What's the crime?

12             PROSPECTIVE JUROR:  I don't know, several.

13             THE COURT:  Was that here in Nassau County?

14             PROSPECTIVE JUROR:  No, that wasn't here

15     though.  Not here in this county or state.

16             THE COURT:  Did you attend any of the

17     proceedings?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  Do you feel that your brother was

20     treated fairly in those actions?

21             PROSPECTIVE JUROR:  I guess.  He's a

22     mischievous person all of his life.  I can't discount

23     if his behavior warranted a conviction.

24             THE COURT:  Is there anything about the fact

25     that your brother has been incarcerated and convicted,

Proceedings                272

1    is there anything about that that is going to get in

2    the way of you being a fair and impartial juror in this

3    case if you are chosen?

4              PROSPECTIVE JUROR:  No, no way.

5              THE COURT:  Thank you.  I appreciate you

6    letting us know.

7              PROSPECTIVE JUROR:  You said convicted, a few

8    friends.

9              THE COURT:  Those friends who have been

10   convicted, was that here in Nassau County?

11             PROSPECTIVE JUROR:  Yes, Queens.

12             THE COURT:  Did you attend any of the

13   proceedings?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  Were you a witness for them in

16   any of the proceedings?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Do you feel they were treated

19   fairly by both the defense and the prosecution and the

20   police?

21             PROSPECTIVE JUROR:  I wasn't there.

22             THE COURT:  Is there anything about that fact

23   that you have friends who were convicted, going to get

24   in the way of you being fair and impartial in this

25   case?

kmm

Proceedings                      273

1               PROSPECTIVE JUROR:  No.

2               THE COURT:  Thank you very much.

3               Mr. Garrett, yes, sir.

4               PROSPECTIVE JUROR:  Both parents.

5               THE COURT:  Here in Nassau County?

6               PROSPECTIVE JUROR:  Yes.

7               THE COURT:  Did you attend any of the

8     proceedings?

9               PROSPECTIVE JUROR:  No.

10              THE COURT:  Were you a witness for anything?

11              PROSPECTIVE JUROR:  No.

12              THE COURT:  Do you feel they were treated

13    fairly?

14              PROSPECTIVE JUROR:  Yes.

15              THE COURT:  Is there anything about the fact

16    you have family that has been convicted going to get in

17    the way of you being fair and impartial?

18              PROSPECTIVE JUROR:  No.

19              THE COURT:  Mr. Garrett, I wanted to let you

20    know when you call your employer, I know it's not a

21    lot, you get $40 a day to sit as a juror, just so you

22    know.  I don't know if that helps you at all.

23              The next hand, Ms. Woodhouse.  Yes, ma'am.

24              PROSPECTIVE JUROR:  My brother and my two

25    brothers-in-law.

Proceedings                    274

1           THE COURT:  Have been convicted?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  Here in Nassau County?

4           PROSPECTIVE JUROR:  No, one in upstate New

5      York and one in California.

6           THE COURT:  How long ago?

7           PROSPECTIVE JUROR:  Close to twenty-five

8      years now.

9           THE COURT:  Were you part of any of the

10     proceedings?

11          PROSPECTIVE JUROR:  No, not at all.

12          THE COURT:  Do you feel they were treated

13     fairly, if you know?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Do you have ill feelings towards

16     either the defense, or the prosecution, or the court

17     system because they were convicted?

18          PROSPECTIVE JUROR:  None at all.

19          THE COURT:  Will anything get in the way of

20     being fair and impartial?

21          PROSPECTIVE JUROR:  None at all.

22          THE COURT:  I believe it is Ms. Kallenberg.

23          PROSPECTIVE JUROR:  I have three cousins who

24     were convicted.

25          THE COURT:  Here in Nassau County?

Proceedings                    275

1              PROSPECTIVE JUROR:  No, in the city and down

2       south.

3              THE COURT:  How recently?

4              PROSPECTIVE JUROR:  Off and on for the last

5       ten years.

6              THE COURT:  Were you a part of any of the

7       proceedings?

8              PROSPECTIVE JUROR:  Not at all.

9              THE COURT:  Is there anything about that that

10      gives you ill feelings towards the defense, the

11      prosecution, or the Court?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Will it get in the way of you

14      being fair and impartial?

15             PROSPECTIVE JUROR:  No, it shouldn't.  It

16      will not.

17             THE COURT:  When you say, it shouldn't,

18      that's okay if that's your feeling, and I don't want

19      you to run away from that.  I want to get a better

20      answer.  There is no better answer.  You are saying to

21      me, it will not get in the way?

22             PROSPECTIVE JUROR:  It will not get in the

23      way.

24             THE COURT:  Ms. Kidderman.

25             PROSPECTIVE JUROR:  My father.

Proceedings                    276

1              THE COURT:  Here in Nassau County?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  How recently?

4              PROSPECTIVE JUROR:  1994.

5              THE COURT:  Were you part of the proceeding?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Do you feel he was treated

8      fairly?

9              PROSPECTIVE JUROR:  Yes and no.

10             THE COURT:  What is the no part and what is

11     the yes part?

12             PROSPECTIVE JUROR:  It involved a friend.  I

13     think, in general, the type of case it was, is this

14     type of case and I don't --

15             THE COURT:  Not from you?

16             PROSPECTIVE JUROR:  Yeah.

17             THE COURT:  Thank you for letting us know.

18             The type of case it is makes her not a good

19     juror for this.

20             MR. BERGER:  Okay.

21             THE COURT:  I saw Ms. Norton's hand.

22             PROSPECTIVE JUROR:  Same exact.

23             THE COURT:  You feel this case is not for you

24     because of that?

25             PROSPECTIVE JUROR:  Please.

Proceedings                    277

1                THE COURT:  Fair enough.

2                I'm sorry.

3                PROSPECTIVE JUROR:  Family members will not

4        affect me cause.

5                THE COURT:  Yes, family members.

6                PROSPECTIVE JUROR:  No, it will not.

7                THE COURT:  Affect you here in Nassau County?

8                PROSPECTIVE JUROR:  Yes.

9                THE COURT:  How long ago?

10               PROSPECTIVE JUROR:  Ten years ago.

11               THE COURT:  Step up.  Off the record.

12               (Whereupon, there was an off-the-record

13       discussion at the bench.)

14               (Whereupon, there was a sidebar discussion

15       with the Court, counsel and prospective juror number

16       eleven.)

17               THE COURT:  We're concerned about a couple of

18       things, one, your financial situation, and two, you had

19       mentioned your daughter was a victim.

20               PROSPECTIVE JUROR:  Sexual assault.

21               THE COURT:  Is this going to be the case for

22       you?  Are you going to be able to separate what

23       happened to her?

24               PROSPECTIVE JUROR:  Yes, I can.

25               THE COURT:  I don't want to keep you if your

kmm

Proceedings                278

1    mind isn't going to be with us.  I don't want to get

2    rid of you just to get rid of you.  Do you want to sit

3    on the jury right now?

4              PROSPECTIVE JUROR:  I can sit on the jury.

5              MR. BERGER:  You said your daughter was a

6    victim of sexual assault?

7              PROSPECTIVE JUROR:  By her cousin who was

8    also a child.

9              MR. BERGER:  This is a situation which a

10   six-year old is claiming to be a victim by this

11   defendant.

12             PROSPECTIVE JUROR:  I understand that.

13             MR. BERGER:  It wouldn't affect you at all?

14             PROSPECTIVE JUROR:  You want me to go by the

15   law and what is presented in front of me.  I understand

16   the difference between it.

17             MR. BERGER:  I know you understand.  You are

18   smart enough to understand.  There are lot of people

19   that understand and emotionally get affected by it.

20             PROSPECTIVE JUROR:  I understand I have to

21   detach.  You have to look at the law.  I understand.

22   It was a family member and another family member.  She

23   was three.  He was ten.

24             THE COURT:  Thank you for coming up.  We'll

25   keep you then.

1           (Whereupon, the proceedings resumed.)

2           THE COURT:  The following individuals are

3    excused from this case with the thanks of the Court.

4    Probably a different case is better for all of you.

5           Mr. McNamara, Ms. Kidderman, and Mr. Norman.

6    Thank you to the three of you.

7           Let's refill the seats.

8           THE CLERK:  John Sethna, S-E-T-H-N-A, seat

9    number three.

10          Barry W. Brown, B-R-O-W-N, seat number

11   thirteen.

12          Brian Lutwick, L-U-T-W-I-C-K, seat number

13   fourteen.

14          THE COURT:  Welcome to the front of the

15   courtroom, those of you who just joined us.

16          Mr. Sethna, is there anything you need to

17   tell me?

18          PROSPECTIVE JUROR:  I may not be appropriate

19   for this case.  My wife was molested.

20          THE COURT:  Let me ask you, sir, do you feel

21   you would be -- do you believe that you would be able

22   to put that aside and decide this case just based on

23   what is happening here, or do you feel too close?

24          PROSPECTIVE JUROR:  I would be more

25   appropriate for a murder case or something like that.

Proceedings                    280

1              THE COURT:  Fair enough.  Not many people say
2       that.  I don't have a bias against that.  Fair enough.
3       Very good.
4              Next person.  Mr. Brown.
5              PROSPECTIVE JUROR:  I had a family member who
6       was taken advantage of by a doctor.
7              THE COURT:  Was that here in Nassau County?
8              PROSPECTIVE JUROR:  Yes, it was.
9              THE COURT:  Was there an arrest?
10             PROSPECTIVE JUROR:  No, but the cops knew
11      about it.
12             THE COURT:  Is it still being investigated?
13             PROSPECTIVE JUROR:  It might be.  They came
14      back years later to my family, my cousin's family and
15      they came to investigate another person that reported
16      it, and when we -- when my cousin reported it they
17      didn't do anything about it.
18             THE COURT:  Is there anything about that fact
19      that makes you believe that it's going to get in the
20      way of you being fair and impartial here?
21             PROSPECTIVE JUROR:  It could.
22             THE COURT:  Thank you, Mr. Brown.  I
23      appreciate your honesty.
24             Mr. Lutwick, is there anything you need to
25      tell me?

Proceedings                281

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  Consent to the two individuals,

3     Sethna.  We will try to find you a murder trial, and

4     Mr. Brown, thank you for your being here today.

5              THE CLERK:  Jonathan O'Campo, O-C-A-M-P-O.

6     Seats number three.

7              Gina Maccio, M-A-C-C-I-O, seat number

8     thirteen.

9              THE COURT:  Welcome to those of you just

10    joined.  Mr. O'Campo, is there anything you need to

11    tell me?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Ms. Maccio?

14             PROSPECTIVE JUROR:  I'm actually a college

15    student.  I have finals.

16             THE COURT:  On consent?

17             MR. PERRI:  Yes, your Honor.

18             MR. BERGER:  Yes.

19             THE COURT:  Good luck.

20             MR. BERGER:  Another hand.

21             THE COURT:  Ms. Woodhouse.

22             PROSPECTIVE JUROR:  I've been sitting here

23    and reflecting.  It's facilitating, I taught a

24    multi-cultural program very, very close, and there was

25    a situation that I believe was very much like this

kmm

Proceedings                    282

1    trial.

2              THE COURT:  Is that going to get in the way

3    of you sitting?

4              PROSPECTIVE JUROR:  Yes.  It was devastating

5    to the program and students involved.

6              THE COURT:  Thank you, Ms. Woodhouse for

7    letting us know that.

8              On consent?

9              MR. PERRI:  Yes, your Honor.

10             MR. BERGER:  Yes.

11             THE CLERK:  Seat number nine, Vilma

12   Hernandez, H-E-R-N-A-N-D-E-Z.  Please take a seat.

13   First name was V-I-L-M-A.

14             Heather Manikas, M-A-N-I-K-A-S, seat number

15   thirteen.

16             THE COURT:  Welcome to the front of the

17   courtroom, Ms. Hernandez and is Manikas.

18             Ms. Hernandez, is there anything you need to

19   tell me?

20             PROSPECTIVE JUROR:  I have a sick mom.  I

21   have a sick mom, and I have appointments with her.  I

22   must take her.  She has dementia, diabetes, back

23   problems.

24             THE COURT:  You are her caregiver?

25             PROSPECTIVE JUROR:  Yes.

                                                     kmm

Proceedings                283

1              THE COURT:  Ms. Manikas.

2              MR. BERGER:  Consent.

3              THE COURT:  Ms. Manikas.

4              PROSPECTIVE JUROR:  One of my close friends

5      was molested as a child.

6              THE COURT:  Is there anything about that fact

7      that makes you believe that you can't be fair and

8      impartial in this case?

9              PROSPECTIVE JUROR:  I think it would be

10     difficult.

11             THE COURT:  Fair enough.  Consent on both?

12             MR. PERRI:  Yes.

13             MR. BERGER:  Yes.

14             THE COURT:  We'll try to file the two seats

15     before we break for lunch.

16             THE CLERK:  Sandra Healy, H-E-A-L-Y, seat

17     number nine.

18             Ann Crisci, C-R-I-S-C-I, seat number

19     thirteen.

20             THE COURT:  Welcome, Ms. Healy and

21     Ms. Crisci.

22             Ms. Healy, is there anything you need to tell

23     me?

24             PROSPECTIVE JUROR:  I work part time at

25     school.  If I don't work, I don't get paid.

Proceedings                284

1           THE COURT:  Ms. Crisci.

2           PROSPECTIVE JUROR:  I have been diagnosed

3   with IBS, and it does play havoc sometimes with --

4           THE COURT:  Understood.

5           MR. BERGER:  Consent.

6           THE COURT:  We now have two hot seats.  We'll

7   give it a couple more.  You are excused.

8           THE CLERK:  Iris J. Maldonado,

9   M-A-L-D-O-N-A-D-O, seat number nine.

10          Shirley Borden, B-O-R-D-E-N, seat number

11  thirteen.

12          THE COURT:  Welcome.  Ms. Maldonado, is there

13  anything you need to tell me?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Ms. Borden, anything you need to

16  tell me?

17          PROSPECTIVE JUROR:  I suffer from mold.  I

18  lived in a house with mold and I am hypersensitive to

19  it.  As long as the courtroom doesn't have fungus or

20  stain ceiling tiles, anything like that.

21          THE COURT:  How are you feeling so far?

22          PROSPECTIVE JUROR:  Hot.  Headaches, but you

23  know.

24          THE COURT:  No reaction?

25          PROSPECTIVE JUROR:  Not in this room, no.

kmm

Proceedings                285

1          THE COURT:  This is the room you are in.  If

2     you had no reaction, I'm going to go on the theory you

3     are good.  You have been sitting in here well over an

4     hour.

5          PROSPECTIVE JUROR:  One other thing, I

6     cleaned up the scene of an attempted murder.  It wasn't

7     in Nassau County.  It was about ten years ago.

8          THE COURT:  Is that part of your employment?

9          PROSPECTIVE JUROR:  No, no.

10          THE COURT:  It was a family member.  Somebody

11    tried to -- with regards to that, is there anything

12    about that fact that is going to get in the way of you

13    being fair and impartial here?  Obviously, this is not

14    a murder case.  That, I imagine, was pretty traumatic.

15          PROSPECTIVE JUROR:  It stemmed from something

16    sexual.

17          THE COURT:  Do you feel this is a case for

18    you?

19          PROSPECTIVE JUROR:  I could be impartial.

20          THE COURT:  You can be impartial?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  I will leave you there for now.

23    I'm sure there will be questions for you after lunch.

24          Ms. Hayes.

25          PROSPECTIVE JUROR:  Because I'm required to

                                                        kmm

Proceedings                286

1    report cases like this, I'm not sure whether I could be

2    impartial or --

3              THE COURT:   You are a mandatory reporter?

4              PROSPECTIVE JUROR:   Yes.

5              THE COURT:   We're going to note that and have

6    you come back after lunch, and I'm sure we'll laugh

7    more questions for you.   It's getting late.   I want

8    everyone to have sufficient time to grab something to

9    eat.   Let me give you all some admonitions as you walk

10   out of here for the lunch hour.

11             I need you all report back with wherever the

12   officers tell you to around 2:00 with the hope that we

13   will be back in this courtroom no later than 2:15.   I

14   can't start unless you are all here as close to 2:00 as

15   you can.   Be back here with the thought you will be

16   back in the room at 2:15.   When you leave here, please,

17   you don't know much about what is going on.   I have to

18   tell you to keep an open mind.   You don't know

19   anything.   Be willing to continue to listen when you

20   come back into the courtroom.

21             Don't discuss the case amongst yourselves or

22   with anyone else.   Don't permit anyone to discuss the

23   case in your presence.   Over the lunch break do not

24   talk to the lawyers, or the defendant, or anyone else

25   about this case and just so you know, if you run into

kmm

Proceedings                    287

1     any of us while out grabbing lunch, we'll ignore you.

2     Don't take it personally.  Don't visit.  You don't even

3     know where that is.  Yes, there's nothing you need to

4     worry about.  Don't get on the Internet and try to

5     start looking up what you want to know about this case.

6     That's not allowed.  The evidence has to come from the

7     courtroom, not from Google.  See you all at 2:00.

8     Thank you.

9              (Whereupon, the jury panel exited the

10    courtroom.)

11             THE COURT:  Anything for the record before we

12    break for lunch?

13             MR. PERRI:  No, your Honor.

14             THE COURT:  If you could all be back for

15    2:15.  I told them two in the hopes we'll be able to

16    start at 2:15.

17             MR. PERRI:  Yes, your Honor.

18             THE COURT:  We can't bring your clients up

19    unless you are here.  Can you come back between five

20    and ten after two.

21             (Whereupon, a luncheon recess was taken.)

22             *            *            *

23

24

25

kmm

1              A F T E R N O O N   S E S S I O N

2

3

4              THE CLERK:  Case on trial continued,

5    Indictment Number 742N of 2014, People of the State of

6    New York vs. Daniel Ramos.

7              Let the record reflect all parties are

8    present.  The jury is not present at this time.

9              People ready?

10             MR. PERRI:  Yes, your Honor.

11             MR. BERGER:  Yes, your Honor.

12             THE COURT:  Anything for the record before we

13   seat the jurors?

14             MR. BERGER:  I ask you to accord me about a

15   half hour on the first group.  You will notice the

16   second time I was much shorter, twenty minutes or so.

17   It's a brand new panel.  I ask the Court to consider

18   the seriousness of the case.

19             THE COURT:  I understand.  I'm not up to you

20   asking questions yet.  I have a few I have to do.  I

21   didn't cut you off yesterday.  I want you to keep it

22   moving along.  That's all.  Step up.

23             (Whereupon, there was an off-the-record

24   discussion at the bench.)

25             THE COURT:  I had a conference with the

Proceedings                    289

1      attorneys and they have agreed to substitute

2      Ms. Jergensen, juror number eight, with another juror.

3                  MR. BERGER:  Yes.

4                  MR. PERRI:  Yes, your Honor.

5                  THE CLERK:  Do both sides stipulate all

6      jurors are properly seated?

7                  MR. PERRI:  Yes.

8                  MR. BERGER:  Yes.

9                  THE COURT:  Before we get started with the

10     afternoon session, I know we had a couple of things

11     hanging out there at the lunch break.

12                 Mr. Garrett, did you have an opportunity to

13     call your employer?

14                 PROSPECTIVE JUROR:  Yes.  I will not get

15     paid.

16                 THE COURT:  All right.  Ms. Hayes, you had

17     just started to tell us you're a mandatory reporter.

18                 PROSPECTIVE JUROR:  Yes.

19                 I'm a registered nurse.

20                 THE COURT:  What do you do for a living?

21                 PROSPECTIVE JUROR:  Registered nurse.

22                 THE COURT:  Will that get in the way of you

23     being fair and impartial?

24                 PROSPECTIVE JUROR:  Absolutely.

25                 THE COURT:  With the consent of the

Proceedings                    290

1    attorneys, we'll replace seats six and seven.

2              MR. PERRI:  Yes.

3              MR. BERGER:  Yes.

4              THE COURT:  Thank you, Mr. Garret for

5    checking in.  Thank you, Ms. Hayes, for letting us

6    know.

7              THE CLERK:  Teddy Fried, F-R-I-E-D, seat

8    number six.

9              Doris Kason, K-A-S-O-N, seat number seven.

10             THE COURT:  Welcome, Mr. Fried and Ms. Kason.

11   Is there anything you need to tell me?

12             PROSPECTIVE JUROR:  No, ma'am.

13             THE COURT:  Ms. Kason?

14             PROSPECTIVE JUROR:  I'm a real estate agent.

15   I don't get paid unless I work.  This time of year I

16   work close to seven days a week.

17             THE COURT:  Consent?

18             MR. PERRI:  Yes.

19             THE COURT:  Thank you.

20             THE CLERK:  Steven Collins.  Steven with a V,

21   C-O-L-L-I-N-S.  Seat number seven.

22             THE COURT:  Welcome, Mr. Collins.  Is there

23   anything you need to tell me?

24             PROSPECTIVE JUROR:  My job, I don't get paid.

25             THE COURT:  What do you do?

kmm

Proceedings                    291

1              PROSPECTIVE JUROR:  Salesman.

2              THE COURT:  Consent?

3              MR. PERRI:  Yes.

4              MR. BERGER:  Yes.

5              THE CLERK:  You may step out.  You can return

6     to central jury.  Hand that in across the street where

7     you first started this morning.

8              Gisela Fabian.  First name spelled

9     G-I-S-E-L-A.  Last name spelled F-A-B-I-A-N, seat

10    number seven.

11             THE COURT:  Welcome.

12             PROSPECTIVE JUROR:  Hello.

13             THE COURT:  Is there anything you need to

14    tell me?

15             PROSPECTIVE JUROR:  I don't speak English.

16    Sorry.

17             THE COURT:  Language, People?

18             MR. PERRI:  Yes, your Honor.

19             MR. BERGER:  Thank you.

20             THE CLERK:  Christopher Soltana.  Nobody

21    appeared.

22             Christine Cavallaro, spelled

23    C-A-V-A-L-L-A-R-O.  Christine spelled with a C.

24             THE COURT:  Welcome, Ms. Cavallaro.  Is there

25    anything you need to tell me?

Proceedings                    292

1            PROSPECTIVE JUROR:  No.

2            THE COURT:  Thank you very much.  I will go

3    on to the next set of questions I have for all of you

4    in the front of the courtroom.

5            I need to know if you or anyone close to you,

6    be it a friend or family member, have any pending

7    criminal or civil cases, open cases, lawsuits, charges,

8    raise your hand if that's your situation.  No hands

9    have been raised.

10           You heard a little bit about the nature of

11   the charges here, and you heard people talk about they

12   didn't think this case would be good for them based on

13   the charges.  I need to know, is there anyone sitting

14   in the jury box now, other than it being uncomfortable.

15   Every trial has a level of uncomfortableness attached

16   to it.  Is there some reason you have not brought up

17   that based on the nature of the charges that would

18   prevent you from being fair and impartial in this

19   matter?  Raise your hand if that's your situation.

20           Let the record reflect no hands have been

21   raised.

22           You heard there are police officers

23   potentially testifying in this case, or at the very

24   least, you will hear about some of their actions.  As

25   you know, under our law, a police officer is no more or

kmm

Proceedings                293

1          less believable solely and simply because he or she is

2          a police officer.  I need to know if there is anyone

3          sitting here now who believes they cannot fairly

4          evaluate a police officer's testimony for truthfulness

5          and accuracy just as you would the testimony of

6          somebody else?  That means if you are sitting there,

7          going, if he's a cop, he must be telling the truth.  Or

8          the opposite, if he's a cop, he must be lying.  Is

9          there anybody sitting there thinking one of those two

10         ways?  Now would be the time to raise your hand and let

11         us know.

12                    PROSPECTIVE JUROR:  Could I tell you one

13         thing?  I worked at Nassau County jail for nine years,

14         and I also now I work in the hospital, Nassau

15         University Medical Center.  Would that make a

16         difference?

17                    MR. BERGER:  I didn't hear.

18                    THE COURT:  She's worked at the jail for

19         approximately nine years.  She is currently employed at

20         the Nassau County Medical Center.  She asked if it

21         would make a difference.  It only makes a difference if

22         you believe that your background makes you not capable

23         of being fair and impartial in this matter.  There's

24         absolutely nothing in that case that says you can't

25         sit.  Could you be fair and impartial?

Case 2:19-cv-01125-JS-AYS   Document 7-2   Filed 05/31/19   Page 294 of 844 PageID #: 703

Proceedings                294

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Thank you for letting us know.

3          The next thing I need to tell you jurors, you

4    are not allowed to visit or view the place where the

5    crime charged was allegedly committed.  Now, in this

6    case, that location is 124 Park Avenue in Roosevelt,

7    New York.  Is there anybody sitting here in the front

8    of the courtroom who knows they must drive by that

9    location, whether it's to go back and forth to home,

10   back and forth to work, or you are the type of person

11   that once you are told, don't go there, you will be

12   there at the end of the day.  Raise your hand if you

13   have any of those situations.

14         Ms. Kallenberg.

15         PROSPECTIVE JUROR:  I work for Roosevelt

16   School District.  I don't go by there.

17         THE COURT:  Fair enough.

18         Mr. Lutwick.

19         PROSPECTIVE JUROR:  I coach one day a week in

20   Roosevelt.  I don't know if I pass Park Avenue.

21         THE COURT:  The good news is you obviously

22   never paid attention to a street called Park Avenue.

23   Don't start now.  Fair enough?

24         PROSPECTIVE JUROR:  Okay.

25         THE COURT:  Does anybody in the front have a

1           religious belief that would prevent you from sitting in

2           judgment of a person and voting guilty or not guilty,

3           any religious beliefs?

4                   Let the record reflect no hands have been

5           raised.

6                   Next I need to know, has anyone ever served

7           on either a criminal jury before, a civil jury before,

8           or a grand jury?  Raise your hand if you have prior

9           jury service.  Keep those hands up for me, please.  All

10          right, you can put your hands down.

11                  Mr. Morales, civil, criminal, or grand jury?

12                  PROSPECTIVE JUROR:  Civil.

13                  THE COURT:  Here in Nassau County?

14                  PROSPECTIVE JUROR:  Sutphin Boulevard,

15          Queens.

16                  THE COURT:  How long ago, sir?

17                  PROSPECTIVE JUROR:  Long time ago.

18                  THE COURT:  Without telling us what the

19          verdict was, did you reach a verdict, or did it settle?

20                  PROSPECTIVE JUROR:  It settled.

21                  THE COURT:  Is there anything about that

22          experience that is going to get in the way of you

23          listening to my instructions, following the rules of

24          law, as I give them to you in evaluating testimony in

25          this case?

Proceedings                    296

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  Thank you very much,

3    Ms. Cavallaro.

4              PROSPECTIVE JUROR:  Grand jury.

5              THE COURT:  Here in Nassau County?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  How long ago?

8              PROSPECTIVE JUROR:  It has to be more than

9    eight years, ten years, maybe.

10             THE COURT:  Do you appreciate that the burden

11   of proof and the rules of law for a grand jury are very

12   different than for a trial; do you understand that?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  And will you be able to follow

15   the rules that I give you, even if you remember

16   something different from your grand jury days?  Can you

17   follow my instructions?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  Thank you for letting me know.

20             And lastly, before I go to each of you for

21   some limited information, I need to know if you have

22   not already told me.  Is anyone here that has friends,

23   family members, that are involved in law enforcement?

24   What I'm talking about is law enforcement, not just

25   police officers, but the sheriff's department, NYPD,

Proceedings                297

1      attorneys, court staff, maybe you know people that

2      worked in the sheriff's department, any sort of law

3      enforcement, or attorney background, the attorney

4      general's office would be included.  Raise your hand if

5      you are in that situation, friends or family members.

6      Keep the hands up.

7              Ms. Norton.

8              PROSPECTIVE JUROR:  A childhood friend.  I'm

9      still best friends, her husband is a State Trooper, but

10     on highway patrol.  I don't think there is any bearing.

11     And an ex-boyfriend, twelve years ago is in the

12     sheriff's department in South Carolina.  Again, in the

13     highway patrol.  It has nothing to do with this.

14             THE COURT:  Thank you very much.  From what

15     I'm hearing, it wouldn't get in the way of you being

16     fair and impartial?

17             PROSPECTIVE JUROR:  Not at all.

18             THE COURT:  Ms. Campbell?

19             PROSPECTIVE JUROR:  My daughter or

20     stepdaughter is an FBI agent.  She works not in FBI,

21     under security.

22             THE COURT:  Security details?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Do you speak to her often about

25     her work?

kmm

Proceedings                    298

1            PROSPECTIVE JUROR:  No.  I know she is there.

2            THE COURT:  Will you be able to avoid the

3    temptation of potentially calling her up after a long

4    day in court, say let me tell you what is going on?

5            PROSPECTIVE JUROR:  Our relationship is

6    estranged.

7            THE COURT:  Fair enough.  It wouldn't get in

8    the way, correct?

9            PROSPECTIVE JUROR:  Correct.

10           THE COURT:  Thank you so much.

11           Mr. Morales, yes, sir.

12           PROSPECTIVE JUROR:  A few friends in NYPD and

13   you are referring to attorneys too?

14           THE COURT:  Yes.

15           PROSPECTIVE JUROR:  My brother and

16   sister-in-law are lawyers.

17           THE COURT:  Your brother and sister-in-law

18   who are lawyers, are these lawyers in Nassau County?

19           PROSPECTIVE JUROR:  New York.

20           THE COURT:  New York City?

21           PROSPECTIVE JUROR:  New York City.

22           THE COURT:  Your friends who are on the NYPD,

23   how often do you speak with them?

24           PROSPECTIVE JUROR:  It depends, Memorial Day,

25   July 4th, BBQ.

kmm

Proceedings                    299

1          THE COURT:  Will you be able to give me an

2     assurance that you wouldn't call them up and start

3     asking them questions about this case if you are picked

4     as a juror?

5          PROSPECTIVE JUROR:  Ask that question again.

6          THE COURT:  Can you give me an assurance that

7     you will not call them up?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Is it going to get in the way of

10    you being fair and impartial?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  Thank you.

13         The next hand, Ms. Cavallaro, we understand

14    your relationship with everybody.

15         Ms. Westbrooke.

16         PROSPECTIVE JUROR:  I didn't know if it

17    applies.  My mother passed, but was director of

18    personnel services, director or nursing personnel

19    services.

20         THE COURT:  What county?

21         PROSPECTIVE JUROR:  New York City.

22         THE COURT:  Is there anything about that that

23    gets in the way of you being fair and impartial?

24         PROSPECTIVE JUROR:  No.  My former husband

25    was retired from the Department of Criminal Justice as

                                                    kmm

Proceedings                    300

1        a file clerk, and my best friend's daughter is an

2        attorney, but in Philadelphia.

3                THE COURT:  Same question to you, as I put to

4        everyone else.  Can you avoid calling the people up and

5        saying, hey, this is what is going on, I need advice?

6                PROSPECTIVE JUROR:  Yes, I can.  No problem.

7        I wouldn't do that.

8                THE COURT:  Thank you for letting me know.

9                Ms. Kallenberg.

10               PROSPECTIVE JUROR:  My uncle is a retired New

11       York City Police Officer.

12               THE COURT:  Same questions for you, is it

13       going to get in the way?

14               PROSPECTIVE JUROR:  Not at all.

15               THE COURT:  You will avoid calling him?

16               PROSPECTIVE JUROR:  Yes.

17               THE COURT:  Mrs. Gordon?

18               PROSPECTIVE JUROR:  My cousin teaches,

19       paralegal at Berkeley and Post LIU.

20               THE COURT:  Same questions.

21               PROSPECTIVE JUROR:  No problem.

22               THE COURT:  Mr. Lutwick.

23               PROSPECTIVE JUROR:  A number of family

24       members on my wife's side are cops, military, firemen.

25               THE COURT:  Same questions for you.

Proceedings                301

1           PROSPECTIVE JUROR:  Yeah, a number of my

2      friends are attorneys.

3           THE COURT:  If I give you the law in this

4      case, and you either don't like it or don't quite

5      understand it, can you give me assurance you will not

6      ask them to explain it to you, but you will follow the

7      rules of the court system and get the Court to explain

8      it?

9           PROSPECTIVE JUROR:  Yes.

10          THE COURT:  I'll start with juror number one.

11     A few more questions for each of you and then the

12     attorneys will stand up and talk with you.

13          Ms. Kennedy, what town do you reside in?

14          PROSPECTIVE JUROR:  Carle Place.

15          THE COURT:  How long?

16          PROSPECTIVE JUROR:  Four years.

17          THE COURT:  Where were you before that?

18          PROSPECTIVE JUROR:  Port Washington.

19          THE COURT:  How long there?

20          PROSPECTIVE JUROR:  About five years.

21          THE COURT:  Up to nine.  Where were you

22     before that?

23          PROSPECTIVE JUROR:  Manhasset.

24          THE COURT:  How long there?

25          PROSPECTIVE JUROR:  Since I was ten.

Proceedings                302

```
 1                    THE COURT:  Fair enough.  Highest grade you
 2        completed in school?
 3                    PROSPECTIVE JUROR:  Master.
 4                    THE COURT:  In what?
 5                    PROSPECTIVE JUROR:  Education.
 6                    THE COURT:  Do you work?
 7                    PROSPECTIVE JUROR:  Yes.
 8                    THE COURT:  What is it that you do?
 9                    PROSPECTIVE JUROR:  Teacher.
10                    THE COURT:  Are you married?
11                    PROSPECTIVE JUROR:  Yes.
12                    THE COURT:  What does your spouse do?
13                    PROSPECTIVE JUROR:  Teacher also.
14                    THE COURT:  Any children?
15                    PROSPECTIVE JUROR:  Yes.
16                    THE COURT:  How many?
17                    PROSPECTIVE JUROR:  Two.
18                    THE COURT:  Grown or school age?
19                    PROSPECTIVE JUROR:  School age.
20                    THE COURT:  How do you like to spend your
21        spare time?
22                    PROSPECTIVE JUROR:  With the kids, family.
23                    THE COURT:  Are you on social media?
24                    PROSPECTIVE JUROR:  Yes.
25                    THE COURT:  When you woke up this morning
```

Proceedings                303

1    knowing you were coming to the Mineola courthouse, did
2    you put a pin dot --
3              PROSPECTIVE JUROR:  I didn't.
4              THE COURT:  Very good.  Can you give me
5    assurance, and this will go for everyone, if you are on
6    social media, I need to know that you will not, during
7    the pendency of this case, post anything about being on
8    this jury.  You can't discuss your fellow jurors.  You
9    can't discuss the judge's hair color, nothing.  You
10   can't put anything on social media.  Can you give that
11   assurance?
12              Yes.  Do you blog?
13              PROSPECTIVE JUROR:  No.
14              THE COURT:  Is anyone a blogger?  No blogging
15   here.  Thank you, ma'am.
16              Ms. Norton, what town do you live in?
17              PROSPECTIVE JUROR:  Westbury.
18              THE COURT:  How long?
19              PROSPECTIVE JUROR:  Since December of 1998.
20              THE COURT:  What is your highest level of
21   school?
22              PROSPECTIVE JUROR:  Two associate's, degree
23   and I'm currently enrolled to get my BSN in nursing.
24   I'm already a registered nurse.
25              THE COURT:  Do you work?

Proceedings                    304

1                PROSPECTIVE JUROR:  Yes, Forest Hills

2       Hospital.

3                THE COURT:  Forest Hills Hospital?

4                PROSPECTIVE JUROR:  For North Shore.

5                THE COURT:  Are you married?

6                PROSPECTIVE JUROR:  Yes.

7                THE COURT:  Does your suppose work?

8                PROSPECTIVE JUROR:  Yes.

9                THE COURT:  What does he or she do?

10               PROSPECTIVE JUROR:  Works in the same place.

11      He does everything but surgery.  He cleans, moves

12      people around, gets things, nurse's assistant.  I

13      guess, they call it that.

14               THE COURT:  Do you have children?

15               PROSPECTIVE JUROR:  No.

16               THE COURT:  How do you like to spend your

17      spare time?

18               PROSPECTIVE JUROR:  I read.  I go shopping or

19      I talk with friends, or I spend a lot of time with

20      family, especially with nieces, single and not married

21      and young.  Mostly family and friends.

22               THE COURT:  Are you on social media?

23               PROSPECTIVE JUROR:  Yes.

24               THE COURT:  Can you avoid it if you were

25      picked?

Proceedings                    305

1          PROSPECTIVE JUROR:  I did already do it
2      today, but I wouldn't do it again.
3          THE COURT:  I found my person who posted that
4      they were here.  I can't have you doing that.
5          PROSPECTIVE JUROR:  I wouldn't.
6          THE COURT:  Mr. Campo, what town do you live
7      in?
8          PROSPECTIVE JUROR:  Elmont.
9          THE COURT:  How long?
10         PROSPECTIVE JUROR:  Since I was four.
11         THE COURT:  How long?
12         PROSPECTIVE JUROR:  Since I was a child.
13         THE COURT:  What is your highest level of
14     school?
15         PROSPECTIVE JUROR:  Associate's.
16         THE COURT:  In what?
17         PROSPECTIVE JUROR:  Applied science.
18         THE COURT:  Do you work?
19         PROSPECTIVE JUROR:  Yes.
20         THE COURT:  What do you do?
21         PROSPECTIVE JUROR:  Restore automobiles.
22         THE COURT:  Are you married?
23         PROSPECTIVE JUROR:  No.
24         THE COURT:  Do you have a significant other?
25         PROSPECTIVE JUROR:  Significant other.

Proceedings                    306

1              THE COURT:  What does he or she do?

2              PROSPECTIVE JUROR:  Stays home with the baby.

3              THE COURT:  You have a child?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  Just one?

6              PROSPECTIVE JUROR:  Just one.

7              THE COURT:  A little one?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  How do you like to spend your

10     spare time?

11             PROSPECTIVE JUROR:  When I'm not working I

12     spend time with the family.

13             THE COURT:  Do you go on social media?

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Can you avoid it?

16             PROSPECTIVE JUROR:  I do.

17             THE COURT:  Ms. Campbell, what town?

18             PROSPECTIVE JUROR:  Freeport.

19             THE COURT:  For how long?

20             PROSPECTIVE JUROR:  Since 1987.

21             THE COURT:  Do you work?

22             PROSPECTIVE JUROR:  Recently retired.

23             THE COURT:  What did you do before you

24     retired, and congratulations?

25             PROSPECTIVE JUROR:  Administrative teacher

Proceedings                    307

1       and supervisor of administration.

2                    THE COURT:  Are you married?

3                    PROSPECTIVE JUROR:  Widow.

4                    THE COURT:  Do you have any children?

5                    PROSPECTIVE JUROR:  Yes.

6                    THE COURT:  How many?

7                    PROSPECTIVE JUROR:  Three.

8                    THE COURT:  Grown or school age?

9                    PROSPECTIVE JUROR:  Grown.

10                   THE COURT:  What do they do?

11                   PROSPECTIVE JUROR:  Child develop, CDA

12      develop associates.  One is a massage therapist

13      esthetician, and my son does train truck driving and

14      other laborer's work.

15                   THE COURT:  How do you like to spend your

16      spare time?

17                   PROSPECTIVE JUROR:  Socialite.

18                   THE COURT:  Are you on social media?

19                   PROSPECTIVE JUROR:  No, I'm not.

20                   THE COURT:  Forgive me, I'm having a slight

21      reaction up here.

22                   Mr. Morales, what town?

23                   PROSPECTIVE JUROR:  Baldwin.

24                   THE COURT:  How long?

25                   PROSPECTIVE JUROR:  Seven years.

kmm

Proceedings                    308

1            THE COURT:  Where were you above that?

2            PROSPECTIVE JUROR:  East Rockaway.

3            THE COURT:  How long?

4            PROSPECTIVE JUROR:  Fourteen years.

5            THE COURT:  Do you work?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  What do you do?

8            PROSPECTIVE JUROR:  Technical support

9    specialist.

10           THE COURT:  What is your highest level of

11   school you completed?

12           PROSPECTIVE JUROR:  High school and some

13   technical school.

14           THE COURT:  Are you married?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Do you have a spouse?

17           PROSPECTIVE JUROR:  Homemaker.

18           THE COURT:  Hardest job in the world.  Any

19   children?

20           PROSPECTIVE JUROR:  Two.

21           THE COURT:  Grown or school age?

22           PROSPECTIVE JUROR:  Grown.

23           THE COURT:  What do they do?

24           PROSPECTIVE JUROR:  My son is currently

25   unemployed.  My daughter is a manager at Wendy's.

Proceedings                   309

1              THE COURT:  How do you like to spend your

2       spare time?

3              PROSPECTIVE JUROR:  Working on my honey-do

4       list.

5              THE COURT:  I do like the honey-do list.  Are

6       you on social media?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Mr. Fried, where do you live?

9              PROSPECTIVE JUROR:  North Woodmere.

10             THE COURT:  For how long?

11             PROSPECTIVE JUROR:  Six-and-a-half years.

12             THE COURT:  Where were you before that?

13             PROSPECTIVE JUROR:  Queens.

14             THE COURT:  What is your highest level of

15      school?

16             PROSPECTIVE JUROR:  Completed high school and

17      first year of college.

18             THE COURT:  Do you work, sir?

19             PROSPECTIVE JUROR:  Yes, self-employed.

20             THE COURT:  Is it going to be a problem for

21      you to sit here?

22             PROSPECTIVE JUROR:  Is it going to be a

23      problem?

24             THE COURT:  If you are self-employed, will

25      you get paid?

Proceedings                    310

1                    PROSPECTIVE JUROR:  Yes, I'll get paid.

2                    THE COURT:  What are you self-employed in

3           doing?

4                    PROSPECTIVE JUROR:  I own a couple of dry

5           cleaners.

6                    THE COURT:  Are you married?

7                    PROSPECTIVE JUROR:  Yes, Judge.

8                    THE COURT:  What does your spouse do?

9                    PROSPECTIVE JUROR:  She is a New York City

10          school teacher.

11                   THE COURT:  Do you have any children?

12                   PROSPECTIVE JUROR:  Nursery child.

13                   THE COURT:  How do you like to spend your

14          spare time?

15                   PROSPECTIVE JUROR:  Working on my bucket

16          list.

17                   THE COURT:  Do you have skydiving on it?

18                   PROSPECTIVE JUROR:  No.  That's a good idea.

19                   THE COURT:  Thank you very much.

20                   Ms. Cavallaro, what town?

21                   PROSPECTIVE JUROR:  East Meadow.

22                   THE COURT:  For how long?

23                   PROSPECTIVE JUROR:  1986.

24                   THE COURT:  What is your highest level of

25          school?

Proceedings                    311

1                    PROSPECTIVE JUROR:  Master's.

2                    THE COURT:  In?

3                    PROSPECTIVE JUROR:  Social work.

4                    THE COURT:  You are employed at the hospital

5      now?

6                    PROSPECTIVE JUROR:  Yes.

7                    THE COURT:  What do you do?

8                    PROSPECTIVE JUROR:  Therapist.

9                    THE COURT:  Are you married?

10                   PROSPECTIVE JUROR:  Yes.

11                   THE COURT:  Spouse?

12                   PROSPECTIVE JUROR:  Retired.

13                   THE COURT:  From what?

14                   PROSPECTIVE JUROR:  Works for the New York

15     Transit Authority.

16                   THE COURT:  Any children?

17                   PROSPECTIVE JUROR:  Two grown daughters.

18                   THE COURT:  What do they do?

19                   PROSPECTIVE JUROR:  One is a teacher.  One

20     works for a law firm, paralegal.

21                   THE COURT:  What do you do in your spare

22     time?

23                   PROSPECTIVE JUROR:  Friends, going to

24     Manhattan.

25                   THE COURT:  Are you on social media?

Proceedings                312

1                    PROSPECTIVE JUROR:  No.

2                    THE COURT:  Ms. Westbrooke, what town?

3                    PROSPECTIVE JUROR:  Roosevelt.

4                    THE COURT:  For how long?

5                    PROSPECTIVE JUROR:  Twenty-six, twenty-seven

6          years.

7                    THE COURT:  What is your highest level of

8          school?

9                    PROSPECTIVE JUROR:  Bachelor of arts.

10                   THE COURT:  Do you work?  We know you do.

11         What do you do?  What's the business?

12                   PROSPECTIVE JUROR:  Models.  I book talents

13         and make deals.

14                   THE COURT:  Are you married?

15                   PROSPECTIVE JUROR:  Divorced.

16                   THE COURT:  Any children?

17                   PROSPECTIVE JUROR:  Three.

18                   THE COURT:  Grown or school age?

19                   PROSPECTIVE JUROR:  Grown.

20                   THE COURT:  What do they do?

21                   PROSPECTIVE JUROR:  My older daughter is an

22         entrepreneur right now.  She is a manager in the south.

23                   THE COURT:  What about the other two?

24                   PROSPECTIVE JUROR:  Graduated.  The other

25         two, the second one is a designer, graduated FIT.  The

Proceedings                313

1        third one is still in college and works in Staples, IT.

2                    THE COURT:   How do you like to spend your

3        spare time?

4                    PROSPECTIVE JUROR:   Dog, and I like to

5        garden.

6                    THE COURT:   Are you on social media?

7                    PROSPECTIVE JUROR:   Yes, for what I do.   I'm

8        private for them.   I don't like to --

9                    THE COURT:   You wouldn't post about this if

10       you are chosen?

11                   PROSPECTIVE JUROR:   No.

12                   THE COURT:   Thank you.

13                   Ms. Maldinaldo, what town?

14                   PROSPECTIVE JUROR:   Uniondale.

15                   THE COURT:   How long?

16                   PROSPECTIVE JUROR:   Twenty-three years.

17                   THE COURT:   What is your highest level of

18       school?

19                   PROSPECTIVE JUROR:   Twelfth grade.

20                   THE COURT:   Do you work?

21                   PROSPECTIVE JUROR:   Yes.

22                   THE COURT:   What do you do?

23                   PROSPECTIVE JUROR:   Data entry.

24                   THE COURT:   Are you married?

25                   PROSPECTIVE JUROR:   No.

1           THE COURT:  Do you have a significant other?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  What does he or she do?

4           PROSPECTIVE JUROR:  Construction.

5           THE COURT:  Any children?

6           PROSPECTIVE JUROR:  Three.

7           THE COURT:  Grown or school age?

8           PROSPECTIVE JUROR:  No school yet.

9           THE COURT:  Little, little.

10          PROSPECTIVE JUROR:  Very little.

11          THE COURT:  How do you like to spend your

12  spare time?

13          PROSPECTIVE JUROR:  Family.

14          THE COURT:  Social media?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Thank you very much.

17          Mr. Pizzuto, what town?

18          PROSPECTIVE JUROR:  West Hempstead.

19          THE COURT:  For how long?

20          PROSPECTIVE JUROR:  Twenty years.

21          THE COURT:  What is your highest level of

22  school?

23          PROSPECTIVE JUROR:  High school.

24          THE COURT:  Do you work?

25          PROSPECTIVE JUROR:  Yes.

1                    THE COURT:  What do you do?

2                    PROSPECTIVE JUROR:  Baby-sitter and dance

3          instructor.

4                    THE COURT:  Are you married?

5                    PROSPECTIVE JUROR:  No.

6                    THE COURT:  Significant other?

7                    PROSPECTIVE JUROR:  Yes.

8                    THE COURT:  What does he or she do?

9                    PROSPECTIVE JUROR:  College student.

10                    THE COURT:  Do you have any children?

11                    PROSPECTIVE JUROR:  No.

12                    THE COURT:  How do you like to spend your

13          spare time?

14                    PROSPECTIVE JUROR:  Friends, family.

15                    THE COURT:  Are you on social media?

16                    PROSPECTIVE JUROR:  Yes.

17                    THE COURT:  Can you avoid blogging and/or

18          posting?

19                    PROSPECTIVE JUROR:  Yes.

20                    THE COURT:  Ms. Harvey, what town?

21                    PROSPECTIVE JUROR:  Hempstead.

22                    THE COURT:  For how long?

23                    PROSPECTIVE JUROR:  My whole life.

24                    THE COURT:  What is your highest level of

25          school?

Proceedings                    316

1                    PROSPECTIVE JUROR:  Some college.

2                    THE COURT:  Do you work?

3                    PROSPECTIVE JUROR:  I do.

4                    THE COURT:  What do you do?

5                    PROSPECTIVE JUROR:  I'm an executive

6       assistant for a CEO.  It is a steel company.

7                    THE COURT:  Are you married?

8                    PROSPECTIVE JUROR:  Happily divorced.

9                    THE COURT:  What did your other half do when

10      you were together?

11                   PROSPECTIVE JUROR:  Cause problems.

12      Salesman.

13                   THE COURT:  Do you have any children?

14                   PROSPECTIVE JUROR:  Two.

15                   THE COURT:  Grown or school age?

16                   PROSPECTIVE JUROR:  Grown.

17                   THE COURT:  What do they do?

18                   PROSPECTIVE JUROR:  One works for the

19      railroad, the other is in construction.

20                   THE COURT:  How do you like to spend your

21      spare time?

22                   PROSPECTIVE JUROR:  Socialite like her.

23                   THE COURT:  Any social media for you?

24                   PROSPECTIVE JUROR:  No.

25                   THE COURT:  Ms. Kallenberg.

Proceedings                          317

1                    PROSPECTIVE JUROR:  Hempstead since 1976.

2                    THE COURT:  What is your highest level of

3        school?

4                    PROSPECTIVE JUROR:  High school, graduated.

5                    THE COURT:  Do you work?

6                    PROSPECTIVE JUROR:  Roosevelt Union Free

7        School District.

8                    THE COURT:  Are you married?

9                    PROSPECTIVE JUROR:  No.

10                   THE COURT:  Significant other?

11                   PROSPECTIVE JUROR:  No, not at the moment.

12                   THE COURT:  Any children?

13                   PROSPECTIVE JUROR:  No.

14                   THE COURT:  How do you like to spend your

15       spare time?

16                   PROSPECTIVE JUROR:  Family, friends and

17       reading.

18                   THE COURT:  Social media?

19                   PROSPECTIVE JUROR:  No.

20                   THE COURT:  Gordon, what town?

21                   PROSPECTIVE JUROR:  Huntington.

22                   THE COURT:  How long?

23                   PROSPECTIVE JUROR:  Twelve years.

24                   THE COURT:  Huntington?

25                   PROSPECTIVE JUROR:  P.O. Box is Woodbury.

1              THE COURT:  What is the highest level of

2      school?

3              PROSPECTIVE JUROR:  Two years of college.

4              THE COURT:  Do you work?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  What do you do?

7              PROSPECTIVE JUROR:  I'm the gymnastic

8      coordinator for the Great Neck Park District.

9              THE COURT:  Are you married?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Significant other?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Do you have any children?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  What do you do in your spare

16     time?

17             PROSPECTIVE JUROR:  Hiking.

18             THE COURT:  Are you on social media?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Can you avoid --

21             PROSPECTIVE JUROR:  Yup.

22             THE COURT:  Mr. Lutwich, what town?

23             THE WITNESS:  Wantagh.

24             THE COURT:  How long have you been there?

25             PROSPECTIVE JUROR:  Seven years.

1                    THE COURT:  Before that?

2                    PROSPECTIVE JUROR:  Bellmore.

3                    THE COURT:  How long?

4                    PROSPECTIVE JUROR:  Since I was born.

5                    THE COURT:  What is the highest level of

6        school?

7                    PROSPECTIVE JUROR:  Bachelor.

8                    THE COURT:  Do you work?

9                    PROSPECTIVE JUROR:  Data sales analyst.

10                   THE COURT:  Are you married?

11                   PROSPECTIVE JUROR:  Yes.

12                   THE COURT:  Do you have a spouse?

13                   PROSPECTIVE JUROR:  Early childhood special

14       ed.

15                   THE COURT:  Do you have any children?

16                   PROSPECTIVE JUROR:  Two.

17                   THE COURT:  Grown or young?

18                   PROSPECTIVE JUROR:  Both under four.

19                   THE COURT:  How do you like to spend your

20       spare time?

21                   PROSPECTIVE JUROR:  Kids and sports.

22                   THE COURT:  Social media?

23                   PROSPECTIVE JUROR:  Yes.

24                   THE COURT:  Can you avoid it?

25                   PROSPECTIVE JUROR:  Yes.

Proceedings                320

1              THE COURT:  Can I see the attorneys for a

2       minute?

3              (Whereupon, there was an off-the-record

4       discussion at the bench.)

5              THE COURT:  Number thirteen, where are you

6       registered to vote?

7              PROSPECTIVE JUROR:  I'm not registered.

8              THE COURT:  It's a guess.  It's a nitch in

9       our lovely system.  You have a P.O. Box, but your

10      residence is Suffolk county, so I don't believe you are

11      actually eligible to sit on a jury in Nassau County

12      because you have to be a resident of Nassau County.  We

13      have to send you back across the street with some note

14      or indication on your card.  I don't know how they will

15      handle it.  I don't believe you can sit here.  Thank

16      you for being here all day.  I appreciate it.  You are

17      excused with the thanks of the Court.

18              At this time I'm going to turn this over to

19      the attorneys who will ask you all some questions.

20              Give your attention to the assistant district

21      attorney, please.

22              MR. PERRI:  Good afternoon, ladies and

23      gentlemen, your Honor, defense counsel.  My name is,

24      again, Assistant District Attorney Anthony Perri.

25              I've been selected by Madeline Singas, the

                                                          kmm

1      Acting District Attorney, to represent the government

2      in this case.  First, I would like to thank you for

3      your service, for your time, taking time out of your

4      lives and responding.  No one likes to get mail that

5      says you have to come down to Mineola.

6               As the judge has said, defense counsel will

7      say, I'll say it again here, the most important thing

8      is the answers you give are thorough, truthful,

9      forthcoming.  If there is something embarrassing and

10     you wish to speak in private about it, you think you

11     are not the right juror for this case, indicate that

12     and we can talk privately to the judge.  Most

13     importantly, this time, this interaction we are having

14     now is unique for the rest of the trial.  We won't be

15     able to speak back and forth.

16               Defense counsel said I want to find a jury

17     that fits this case that can be fair and impartial and

18     listen to the evidence and render a just verdict based

19     on the evidence at the end of the case.

20               You have heard the charges in this case and

21     the allegations, and they are allegations at this time.

22     It's always the People's burden.  The allegations are

23     serious.  It is a case of child sexual abuse.  Namely,

24     at this time we're alleging the defendant had oral

25     sexual contact, his mouth to the vulva and vagina of a

Proceedings                    322

1      then six-year-old victim.  Those allegations themselves

2      can be trouble to people and make them not fit, not to

3      be fair and impartial, not to be able to listen to the

4      evidence in this case.

5                  After hearing the allegations, do you still

6      feel you could be fair and impartial and listen to the

7      evidence in this case?

8                  PROSPECTIVE JUROR:  Yes.

9                  MR. PERRI:  Mr. Campo?

10                 PROSPECTIVE JUROR:  Yes.

11                 MR. PERRI:  Ms. Campbell?

12                 PROSPECTIVE JUROR:  Yes.

13                 MR. PERRI:  Ms. Kennedy?

14                 PROSPECTIVE JUROR:  Yes.

15                 MR. PERRI:  Does anyone else feel they can't

16     be fair and impartial based on the allegations?

17                 PROSPECTIVE JUROR:  Yes.

18                 MR. PERRI:  Ms. Maldinaldo, do you feel

19     because of the allegations you are not a good fit for

20     the trial?

21                 PROSPECTIVE JUROR:  Yes.

22                 MR. PERRI:  You would not be able to be fair

23     and impartial?

24                 PROSPECTIVE JUROR:  No.

25                 MR. PERRI:  Anyone else?  Sorry.

kmm

1          Mr. Morales, based on the allegations in this

2     case, could you be a fair and impartial juror?

3          PROSPECTIVE JUROR:  I'm pretty fair and

4     impartial, but I'd rather not.

5          MR. PERRI:  Could you explain why you would

6     rather not?

7          PROSPECTIVE JUROR:  That type of crime is

8     pretty low.

9          MR. PERRI:  Does anyone else feel they could

10    not serve on this jury based on the allegations?

11         As part of the case, the People intend to

12    call in this case, not only adult witnesses, civilians,

13    law enforcement, medical personnel, as well as any

14    scientists.  There will also be a child witness the

15    People intend on calling in this case.

16         Ms. Westbrooke, do you have a problem

17    evaluating or listening to the testimony of a child?

18         PROSPECTIVE JUROR:  No problem.

19         MR. PERRI:  Ms. Cavallaro, you worked as a

20    therapist in Nassau University Medical Center.  Do you

21    have any problem being able to listen to child

22    testimony?

23         PROSPECTIVE JUROR:  No.

24         MR. PERRI:  Mr. Fried, do you have a problem

25    listening to a child witness?

1          PROSPECTIVE JUROR:  I don't have any

2      problems, no.

3          MR. PERRI:  Every human being is capable of

4      telling the truth.  Every human being is capable of

5      lying.  Every person, when put under oath, is going to

6      tell the truth.

7          Ms. Pizzuto, would you say a child is capable

8      of telling the truth?

9          PROSPECTIVE JUROR:  Yes.

10         MR. PERRI:  A police officer is capable of

11     telling the truth?

12         PROSPECTIVE JUROR:  Yes.

13         MR. PERRI:  When you are judging the

14     credibility of a person, Ms. Pizzuto, what would you

15     look for in judging credibility, whether or not you

16     believe them?

17         PROSPECTIVE JUROR:  The details they'll talk

18     about, you know, what they see, and you have to -- they

19     will say what they have seen and what I'm going to

20     believe in what they say.

21         MR. PERRI:  What would you look for when you

22     decide whether or not you believe what a person is

23     telling you?

24         PROSPECTIVE JUROR:  Consistency.  If they say

25     the same thing more than once, it's possibly true, not

Proceedings                    325

1      that they will lie.

2            MR. PERRI:  When you say, consistency, that

3      is one of the factors you look for, or I look for in

4      judging individual's credibility.  Every time you are

5      telling something that happened to you, especially,

6      more than a year ago, did you tell it the exact same

7      way?

8            PROSPECTIVE JUROR:  You don't tell it the

9      exact same way.

10           MR. PERRI:  This is what happened, that's

11     what happened now.  That doesn't change.  The outcome,

12     whatever they say happened, happened.  They might

13     remember from something that they didn't remember last

14     time, or they might not say something this time that

15     they said last time.  The end result, the person is

16     dead.  I saw them dead on the ground, that's the end

17     result.  When I say, consistency, I mean the story has

18     to resemble each other, pretty much the same thing.  Do

19     you disagree, Ms. Kallenberg?

20           PROSPECTIVE JUROR:  Agree, I guess.

21     Children have their own body language.  Other than

22     adult, I would be watching for body language too.  I

23     work with children.

24           MR. PERRI:  Does every child react the same

25     way to situations?

Proceedings                    326

1              PROSPECTIVE JUROR:  Absolutely not.

2              MR. PERRI:  Does every person react the same?

3              PROSPECTIVE JUROR:  No, absolutely not.

4              MR. PERRI:  Is there anything specific

5      working with children, you are looking for anything

6      specific in the witnesses that if you don't see it, I'm

7      not leaving that?

8              PROSPECTIVE JUROR:  No.

9              MR. PERRI:  No?

10             PROSPECTIVE JUROR:  No, I wouldn't do that.

11     People constantly change too.

12             MR. PERRI:  Mr. Lutwick, you said you have

13     two children, correct?

14             PROSPECTIVE JUROR:  Yes.

15             MR. PERRI:  Would you agree children, not

16     every child reacts in the same way as an adult

17     especially would expect?

18             PROSPECTIVE JUROR:  Each time they will do it

19     differently.

20             MR. PERRI:  Do you have any problem having

21     children sitting in the witness box, being fair and

22     impartial and listening to child testimony?

23             PROSPECTIVE JUROR:  No.

24             MR. PERRI:  Now, no one is arguing or saying

25     that process of being a juror will be an easy one.  The

kmm

Proceedings                    327

1    juror requires a lot of attention, requires you to

2    judge the facts in the case.  It is your job and also

3    at the end it will require you to deliberate.

4              Mr. Campo, how do you feel about the process

5    of deliberating?  Are you agreeing to be able to

6    discuss the evidence to work with the jurors that are

7    impaneled for deliberations and arrive at a verdict?

8              PROSPECTIVE JUROR:  Yes.

9              MR. PERRI:  If you disagree with another

10   juror, what would you try to do to convince you what

11   you believe the verdict should be?

12             PROSPECTIVE JUROR:  I can only express what I

13   collected from any evidence or any testimony I heard,

14   just give them my opinion and what I take from it.

15             MR. PERRI:  Ms. Campbell, what would you do

16   in the deliberations?  Say you are the minority, that

17   if you want to convince more people of what you believe

18   is right, how would you do that?

19             PROSPECTIVE JUROR:  You have to stick to the

20   facts.  You have to stick to the evidence.  You can't

21   veer away from it.  If you are convinced of your

22   opinion, would you change your opinion to end the

23   process, to get out of here?

24             PROSPECTIVE JUROR:  Not to get out of here.

25   I might be that one absentia.

1         MR. PERRI:  If I told you there is no such

2    thing as abstaining in jury deliberations, that's not

3    an option, could you still deliberate fairly and

4    impartially even though you have to make decisions?

5         PROSPECTIVE JUROR:  As I stated earlier,

6    whether we agree or not agree, I have to go along with

7    the decision.

8         MR. PERRI:  Do you feel you are capable of

9    doing that, making a decision?

10        THE COURT:  Let me jump in, Ms. Campbell, to

11   make sure I understand you correctly, and you

12   understand your job, if you are picked.  If you are

13   picked as a juror, you have two options when you go

14   into the jury room.  You either believe the People have

15   proven their case beyond a reasonable doubt and you

16   find the defendant guilty, or you believe the People

17   have not proven their case beyond a reasonable doubt

18   and you find the defendant not guilty.  You can't say,

19   I don't feel like voting because I just don't want to.

20   But, you can, if you are the one person who says I'm

21   voting one way and everybody else is voting the other

22   way, you can stick to your guns if that's what you

23   believe the evidence shows.

24        PROSPECTIVE JUROR:  That's kind of the

25   individual I am.  I stick to what I believe.

kmm

Proceedings                      329

1                    THE COURT:  Go ahead.

2                    MR. PERRI:  Ms. Cavallar, do you agree with

3      testimony itself is evidence?

4                    PROSPECTIVE JUROR:  Yes.

5                    MR. PERRI:  Along with physical evidence,

6      photographs?

7                    PROSPECTIVE JUROR:  With everything else.

8                    MR. PERRI:  People telling their stories is

9      also evidence you have to consider.

10                   PROSPECTIVE JUROR:  Yes.

11                   MR. PERRI:  Would you be willing, based on

12     testimony, if you believe that testimony, if you

13     believe that person to be credible, believe them beyond

14     a reasonable doubt about what they say happened?  Would

15     you be able to rely on that and if that met the burden

16     of beyond a reasonable doubt, based on testimony alone,

17     would you be able to return a verdict of guilty?

18                   PROSPECTIVE JUROR:  I think I have to have

19     all of the evidence in front of me presented to me.

20                   MR. BERGER:  I didn't hear you.

21                   PROSPECTIVE JUROR:  I would have to have all

22     of the evidence that is available in front of me to

23     make a correct decision in my opinion.

24                   MR. PERRI:  Mr. Fried, would you agree with

25     Ms. Cavallaro, all of the evidence is together, it's

                                                        kmm

1    not just one person, it's not just one individual, it's

2    looking at the case as a whole, multifaceted,

3    multilayered, looking at everything together in trying

4    to decide whether or not there is a reasonable doubt;

5    would you agree with that?

6            PROSPECTIVE JUROR:  Absolutely.  I need to

7    look at the whole picture.

8            MR. PERRI:  Ms. Kallenberg, do you agree with

9    that?

10           PROSPECTIVE JUROR:  Yes.

11           MR. PERRI:  Some of the answers you gave

12   during her questioning as opposed to the group,

13   Ms. Campbell, when you were -- you said that,

14   unfortunately, you had a brother incarcerated?

15           PROSPECTIVE JUROR:  Yes.

16           MR. PERRI:  When the Judge asked you if he

17   was dealt with fairly in the process, you said you

18   don't know if he was treated fairly because you weren't

19   there.  Do you have --

20           PROSPECTIVE JUROR:  I said to that question I

21   wouldn't know.  He's 60 now.  He was a young adult

22   going from the detention center, being an adult and

23   going into -- doing recruit type of behavior.  Do I

24   know if he was guilty for those things he was committed

25   for?  I don't know that.

Proceedings                    331

1          MR. PERRI:  Do you have negative feelings

2      about the judicial process, the courts, police, DA's

3      office, because of your brother's experience?

4          PROSPECTIVE JUROR:  No.

5          MR. PERRI:  Just this is a very sad time in

6      many ways for certain members of law enforcement and

7      for the community they're supposed to be serving.  Can

8      everyone promise to divorce this case from what is

9      going on in the news, any coverage from law

10     enforcement, and generally, these detectives and

11     alleged victims based on the facts presented to you in

12     this case; Ms. Campbell?

13         PROSPECTIVE JUROR:  It's totally different I

14     in society.  It is totally different.

15         MR. PERRI:  I'm making sure everyone can

16     reasonably separate those two and not lump everyone

17     into one bucket.  Anyone here?

18         Mr. Campo, the Judge explained it's the

19     People's burden.  We have to prove our case beyond a

20     reasonable doubt.  We have to give you enough evidence

21     to get beyond any reasonable doubt.  Not all doubt.  Do

22     you accept those instructions and require the People to

23     get rid of every possible doubt you could have before

24     you are willing to give a verdict?

25         PROSPECTIVE JUROR:  Yes.

kmm

Proceedings                    332

1              MR. PERRI:  Do you require the People to

2       prove their case to a certainty, including every

3       possible doubt?

4              PROSPECTIVE JUROR:  I don't know that's

5       possible, so, no.

6              MR. PERRI:  Would you require the People to

7       have absolute certainty in their case?

8              PROSPECTIVE JUROR:  No.

9              MR. PERRI:  One example used earlier was you

10      go to bed at night, look out the front window, you look

11      outside, look in the garden, the front yard, the lawn,

12      the street and see everything is dry and wake up the

13      next morning, open the front door, go to work.  Your

14      yard, lawn, street, neighbors, et cetera, everything is

15      soaking wet.

16             Mr. Pizzuto, what might you assume happened

17      during that night?

18             PROSPECTIVE JUROR:  It rained.

19             MR. PERRI:  Is it possible the fire

20      department drove around at night and soaked the

21      neighborhood, watered everybody else's lawn; is that

22      possible?

23             PROSPECTIVE JUROR:  It's possible.

24             MR. PERRI:  Is it possible to say that is a

25      reasonable doubt in your mind as to whether or not it

kmm

1      rained the night before?

2                  PROSPECTIVE JUROR:  No.

3                  MR. PERRI:  Were you a teacher?

4                  PROSPECTIVE JUROR:  Yes.

5                  MR. PERRI:  What grade?

6                  PROSPECTIVE JUROR:  Fourth and fifth.

7                  MR. PERRI:  What grade did your husband

8      teach?

9                  PROSPECTIVE JUROR:  Three, four, five, gym.

10                 MR. PERRI:  What you units?

11                 PROSPECTIVE JUROR:  Primarily geriatrics.

12     Floor team.  I go all over the hospital.  We don't have

13     a pediatric unit in our hospital, in case you were

14     wondering.

15                 MR. PERRI:  Ms. Kallenberg, what do you do

16     for Roosevelt school district?

17                 PROSPECTIVE JUROR:  Special Ed. kids, K

18     through two.

19                 MR. PERRI:  Teacher's aide?

20                 PROSPECTIVE JUROR:  Yes.

21                 MR. PERRI:  You also, unfortunately, have

22     three cousins convicted of crimes, you said,

23     approximately ten years ago?

24                 PROSPECTIVE JUROR:  Off and on for the last

25     ten years.

Proceedings                    334

1              MR. PERRI:  They have been through the

2    judicial system a few times?

3              PROSPECTIVE JUROR:  Yes.

4              MR. PERRI:  Has any of that left you with an

5    impression positive or negative of police officers, the

6    courts, the district attorneys?

7              PROSPECTIVE JUROR:  No.

8              MR. PERRI:  Do you have any other impression

9    of the courts or the DA's office?

10             PROSPECTIVE JUROR:  No.

11             MR. PERRI:  Despite what happened, do you

12   feel you could be fair and impartial?

13             PROSPECTIVE JUROR:  Yes.

14             MR. PERRI:  You also said, unfortunately, you

15   did have family members.

16             PROSPECTIVE JUROR:  Yes.

17             MR. PERRI:  Has that left you with any

18   impressions, positive or negative, about the police?

19             PROSPECTIVE JUROR:  No.  About them?

20             MR. PERRI:  Did you feel you think they were

21   dealt with justly?

22             PROSPECTIVE JUROR:  Yes.

23             MR. PERRI:  Positive, negative impression of

24   the Court due to that?

25             PROSPECTIVE JUROR:  No.

1          MR. PERRI:  Thank you.

2          THE COURT:  Mr. Berger.  We're opening some

3     windows.  Keep the outside voices on.  It's harder to

4     hear.  Keep the voices up.

5          MR. BERGER:  Good afternoon.  My name is

6     Michael Berger.  I'm from Brooklyn, New York, currently

7     reside in Nassau County for the last 40 or so years.

8     Does anybody know me?  Okay.

9          I have many questions.  I'm going to be

10    asking much different than those of the DA.  Those in

11    the back, pay attention as well.  You may be here, and

12    you will have an idea where I'm going.  I'm going to be

13    -- while I'm talking to one person, I'm really

14    addressing the remaining thirteen.  If you have

15    something you think I should know, you will know what

16    I'm looking for.  Raise your hand.  Now, I'm talking to

17    all of you, even though I'm specifically talking to

18    one.

19          Mr. Campo, we all come to this courtroom with

20    an emotional side and an intellectual side, right?  I'm

21    going to say, when we all are at home or in the

22    courtroom, we'll appeal to our intellectual side.  I

23    can't ask you to check your emotions at the door.  I

24    can say to you, if you feel something emotional coming

25    up, as you are sitting in this case, put it aside.  I

Proceedings                    336

1      have to use my mind here, judgment, intellect.  Can you

2      do that?

3                  PROSPECTIVE JUROR:  Yes.

4                  MR. BERGER:  We had about 68 in the first

5      group.  We only got eight jurors.  Many of them, for

6      whatever reason, they couldn't sit on this case because

7      of the nature of the case or had other emotional

8      factors that they felt they couldn't sit here.  Do you

9      understand?  Let me point out -- let me name a couple

10     of emotional factors.

11                 The claim here is that the defendant licked

12     the vagina of a six-year old girl.  This case is

13     clearly about sex, a lot of discussion about sex, and

14     then the defendant is Hispanic and people can be

15     prejudiced against Hispanics.  Would you agree some

16     people are prejudiced against Hispanics?

17                 PROSPECTIVE JUROR:  I would agree some people

18     are prejudice.

19                 MR. BERGER:  Against Hispanics?

20                 PROSPECTIVE JUROR:  Yes, I believe so.

21                 MR. BERGER:  I'm only asking you.

22                 PROSPECTIVE JUROR:  Do I have an opinion?

23                 MR. BERGER:  Do you have a belief people are

24     prejudice against black people, Hispanics?

25                 PROSPECTIVE JUROR:  I believe that people

Proceedings                    337

1     have prejudice.

2                MR. BERGER:  Not everybody, but obviously, if

3     you had any prejudice against Hispanics you shouldn't

4     sit; would you agree with that?

5                PROSPECTIVE JUROR:  I would agree with that.

6                MR. BERGER:  Do you all agree people have

7     prejudices, and then my next question is:  Do any of

8     you have prejudices against Hispanic people?  Fine.

9                You heard me mention all of the emotions.

10    Some of it is emotional.  Would any of those factors

11    enter with your judgment in this case?

12               PROSPECTIVE JUROR:  No.

13               MR. BERGER:  That is collectively to the

14    remaining twelve.

15               PROSPECTIVE JUROR:  Yes.

16               MR. BERGER:  Ms. Maldinaldo.  Other than

17    Ms. Maldinaldo, the rest of you feel you can't sit on

18    this kind of case, and many people who excuse

19    themselves because of the nature.  So, there are no

20    wrong answers here.  You may have a prejudice, or

21    something may come up as they ask questions.  You may

22    not be proud and go up to the bench and talk about it.

23    The whole idea is to get a panel of twelve people who

24    could be fair and objective in this particular case.

25               You heard the Judge tell you, Mr. Pizzuto,

Proceedings                     338

1    that I don't have a burden to prove anything in this

2    case.  Did you hear the Judge say that?

3              PROSPECTIVE JUROR:  Yes.

4              MR. BERGER:  Ordinarily, in your lifetime, if

5    your friend comes up to you and says, do you know what

6    Mary did?  Tells you a story what Mary did.  Wait a

7    minute, I have to hear what Mary has to say.

8              PROSPECTIVE JUROR:  Right.

9              MR. BERGER:  A criminal case, there is no

10   burden on the defendant to prove anything, just the

11   prosecutor.  So, do you understand only the prosecutor

12   has the burden, you shouldn't be expecting me to prove

13   anything?

14             PROSPECTIVE JUROR:  Right.

15             MR. BERGER:  Is that okay with you?

16             PROSPECTIVE JUROR:  Yes.

17             MR. BERGER:  A lot of you are coming for the

18   first time.  It's not okay, they have to hear both

19   sides.  The point is, just the prosecutor has the

20   burden of proving guilt beyond a reasonable doubt.

21             Did I get the sense you shouldn't sit on this

22   kind of a case?

23             PROSPECTIVE JUROR:  I can do it, but I

24   wouldn't be comfortable.

25             MR. BERGER:  You will be asked to evaluate

kmm

1    testimony in this particular case.  Just because it's

2    evidence doesn't mean it is to be believed.

3              PROSPECTIVE JUROR:  Exactly.

4              MR. BERGER:  I wouldn't ask you what criteria

5    you use to see if somebody is telling you the truth.

6    You know what that is.  I'm not asking to you

7    verbalize.  Has anybody lied to you in your lifetime?

8              PROSPECTIVE JUROR:  Sure.

9              MR. BERGER:  They didn't come up to you and

10   say, I'm not going to tell you a lie.  If you are

11   telling me you will lie to me, then I'll know.  It's

12   not that obvious.  It could be subtle here.  You

13   believe you have the ability to -- the credibility to

14   evaluate the testimony and see if he or she is being

15   truthful?

16             PROSPECTIVE JUROR:  Yes.

17             MR. BERGER:  I'm not addressing -- does

18   anybody disagree with that?  Does anybody think they

19   don't have that ability?  They almost get up and swear

20   to tell the truth.  Do you think anybody has gotten on

21   the witness stand and sworn to tell the truth and lied?

22             PROSPECTIVE JUROR:  Yes.

23             MR. BERGER:  The fact is, you have an opinion

24   to that if I have to convince you that somebody lied in

25   this case, you would have an open mind?

Proceedings                    340

1              PROSPECTIVE JUROR:  Yes.

2              MR. BERGER:  Does anybody disagree with

3    Ms. Kennedy?  Does everybody agree that people have

4    gotten on the witness stand, sworn to tell the truth

5    and lied?

6              How about Mr. Fried, do you think police

7    officers have done that?

8              PROSPECTIVE JUROR:  I'm sure, yes.

9              MR. BERGER:  You heard the difference.  There

10   is no difference between a police officer's testimony.

11   I'm asking you your opinion.  We are not inside your

12   heads.  You don't sit in the courtrooms every day.  You

13   have a belief that police officers are sworn to tell

14   the truth and nothing but the truth, correct?

15             PROSPECTIVE JUROR:  Correct.

16             MR. BERGER:  In this case, you disagree with

17   that answer, Mr. Morales.  You have friends in the New

18   York City Police Department.  Do you think police

19   officers have gotten on the witness stand and lied?

20             PROSPECTIVE JUROR:  Sure.

21             MR. BERGER:  What I would be asking you to

22   do, Mr. Harvey, I would be asking you to start at point

23   zero and be as ready to believe, as to disbelieve, as

24   to believe.  Can you all assure me you would do that?

25   Don't give them an edge because they have sworn to tell

                                                      kmm

Proceedings                    341

1     the truth.  There's a critical evaluation you are to

2     critically evaluate the testimony.  Don't give anybody

3     an edge one way or another, which leads me to a very

4     important principle.  Let me ask Ms. Kallenberg.  You

5     may have a belief that in 72 percent of the cases, the

6     person who is charged is guilty.  Let's say you thought

7     about the criminal.  You wouldn't say everybody is

8     guilty if they are charged.  There was someone at a

9     different panel, he said where there is smoke, there is

10    fire.  We wouldn't be going through all of this if the

11    defendant were not guilty.  Lots of people have that

12    belief.  That's not the way it works.  Nobody believes

13    where there is smoke, there is fire.

14            Are you all accepting the fact this defendant

15    may be guilty, may be innocent?  We don't know at this

16    point.  You may have the belief 72 percent of the time

17    people are charged with a crime are guilty, but that

18    would mean 28 percent, they're not.  I don't want you

19    to make a judgment based on percentages.  If you go

20    back into the jury room, the odds are he's guilty

21    because I have the belief.

22            Let's say he studied the subject.  That's not

23    what happens here because you don't know whether it's

24    the 72 or 28.  That's why we have individual jurors

25    making the individual judgment in individual cases.

Proceedings          342

1      That's why you could believe that 91 percent of the

2      time witnesses are truthful.  You don't know 91 percent

3      or nine percent.  We don't make judgment.  That's why

4      you judge it as you see it here in this courtroom.

5                  Ms. Westbrooke, police officers, as well as

6      civilians, can tell a lie on the witness stand,

7      correct?

8                  PROSPECTIVE JUROR:  Sure.

9                  MR. BERGER:  You didn't raise your hand and

10     say, no, it doesn't happen?   .

11                 MR. BERGER:  Do you think a police officer,

12     detectives, coerce individuals in putting his name on a

13     piece of paper that he didn't make that statement?

14                 PROSPECTIVE JUROR:  Sure, that could be

15     possible.

16                 MR. BERGER:  Do you have an opinion as to

17     whether that happened?

18                 PROSPECTIVE JUROR:  Yes.

19                 MR. BERGER:  Does anybody disagree with that?

20     Mr. Lutwick, do you think police officers have taken

21     statements claiming they were by the subject and

22     weren't?

23                 PROSPECTIVE JUROR:  Has it ever happened,

24     yes.

25                 MR. BERGER:  If I were to urge that upon you,

Proceedings                         343

1    would you have an open mind, correct?

2            PROSPECTIVE JUROR:   Could this be a time,

3    yes.

4            MR. BERGER:   Again, we don't know percentage,

5    but you would keep an open mind?

6            PROSPECTIVE JUROR:   I work in percentages all

7    day long.

8            MR. BERGER:   For all this, but you guys use

9    percentages.   If you were evaluating your services,

10   looking at percentages of things you're getting done,

11   if you could eliminate from you the thought process of

12   wasting the odds of something happening versus not

13   happening.   There's a difference between weighing the

14   odds of something and critically evaluating testimony

15   and using your intellect to evaluate and see what it

16   means.   Am I to be concerned you think you might make a

17   judgment based upon percentage of how things normally

18   happen?

19           PROSPECTIVE JUROR:   I don't think so.

20           MR. BERGER:   But you are not sure?

21           How about you, Mr. Fried?   Do you understand

22   the point I'm making?

23           PROSPECTIVE JUROR:   I'm still with you.

24           THE COURT:   Let me step in for a moment.   You

25   cannot decide this case on odds.   You cannot decide

1        this case on percentages.  You have to decide this case

2        on the testimony you hear, how you evaluate it, whether

3        you find it credible and whether you believe the People

4        have met their burden with regards to the facts and

5        when you apply those facts to the law that I give to

6        you, what is the verdict you come out with.  If you

7        cannot do that, if you are sitting there going, you

8        know what, I prefer evaluating life on odds or prefer

9        evaluating life on something other than just evaluating

10       credibility, or testimony, please let Mr. Berger know

11       and Mr. Perri know because this is definitely not the

12       place for you if that is what you intend to do if you

13       are picked as a juror.

14              Mr. Berger, get another answer from

15       Mr. Lutwick with regards to that.

16              MR. BERGER:  Give me an answer.

17              PROSPECTIVE JUROR:  I can take the math out

18       of it.

19              MR. BERGER:  Thank you.  Ms. Cavallaro, we

20       had said yesterday, you know, you are asking me to

21       critically evaluate the testimony of a witness, and if

22       I can't figure out why they are lying, then they must

23       be telling the truth.  I'm saying to you, your function

24       as a juror is not to figure out why somebody lied, only

25       if they did, because people lie for the strangest

1    reasons.  They go to therapists to find out what most

2    devastates them.  You are not expected to know why they

3    lied, only if they did.  Something about the story may

4    not make sense to you.  You don't have to sit there and

5    figure out why.  Does everybody understand that?

6              PROSPECTIVE JUROR:  Yes.

7              MR. BERGER:  It's a very serious case.  I

8    think you can assume that from the nature of the

9    charges.  Are you just as prepared to vote not guilty

10   in this case even though it's that serious as -- let's

11   assume, for example, as you would in trespass.  You

12   take a trespass case, not as particularly serious.

13   It's criminal, but not particularly serious.  I want to

14   lean over to the prosecution because this is such a

15   serious case.  Would you think in those terms at all?

16             PROSPECTIVE JUROR:  I think I would base my

17   opinion at the end on the facts.  I have no problem

18   saying not guilty if I feel he is not guilty.  I know

19   it's serious based on all of the evidence that he.--

20             MR. BERGER:  I appreciate what you are

21   saying.  All I'm saying to you is, that I think people

22   might be more inclined hopefully to vote not guilty in

23   a trespass case as opposed to in this case, at the end

24   of this case.

25             PROSPECTIVE JUROR:  We're not talking about

Proceedings                    346

1    trespass.  This is a serious case.

2              MR. BERGER:  Are you more inclined to vote

3    guilty on this case because it is so serious as opposed

4    to a trespass case?

5              PROSPECTIVE JUROR:  I understand what you are

6    saying.  You are not talking a trespass case.  The

7    degrees of how bad the case is, we're talking about

8    this particular case.  I don't want to talk about --

9    it's a bad case, and I can vote not guilty as well as I

10   could vote guilty depending upon what I'm shown.

11             MR. BERGER:  I'm asking as to whether or not

12   the seriousness of the case would make you lean towards

13   voting guilty?

14             PROSPECTIVE JUROR:  My point is no.

15             MR. BERGER:  Ms. Kallenberg, how about you?

16             PROSPECTIVE JUROR:  No.

17             MR. BERGER:  It is serious, are you just as

18   likely to vote not guilty?

19             PROSPECTIVE JUROR:  Right.

20             MR. BERGER:  Would you be upset with me,

21   Mr. Fried, if I have to vigorously have to

22   cross-examine a six or seven-year old child in this

23   trial?

24             PROSPECTIVE JUROR:  I would be upset.

25             MR. BERGER:  With me, yes?

kmm

Proceedings                    347

1        THE COURT:  You understand that is his job?

2        PROSPECTIVE JUROR:  That's your job.  I

3   wouldn't be upset.  That's your job.

4        MR. BERGER:  My concern is --

5        PROSPECTIVE JUROR:  That's what you are up

6   here for.  Would I be upset?  No.  That's part of the

7   job.  It's part of the -- it's part of the way we find

8   out the information that is presented to us, guilty or

9   not.

10        MR. BERGER:  Ms. Cavallaro, how about you,

11   you would not?

12        PROSPECTIVE JUROR:  Yes, I would not.

13        MR. BERGER:  Anybody else?  Ms. Kennedy,

14   would you be upset if I vigorously have to

15   cross-examine?

16        PROSPECTIVE JUROR:  No.

17        MR. BERGER:  I'm representing Mr. Ramos here.

18   This is an attempt to get to the truth, and if it has

19   to be that way, then you will accept that.  You

20   wouldn't hold it against me or my client?

21        THE COURT:  Five more minutes.

22        MR. BERGER:  So far from all of my questions

23   I've asked with the exception of Ms. Maldinaldo and

24   maybe Mr. Morales, you all indicated to me that you are

25   fair and impartial and prepared -- just as prepared to

1    vote not guilty as guilty, correct?

2             Now, I'm going to ask you each individually.

3    If you were the defendant, sitting there, would you be

4    satisfied with twelve of Ms. Kennedy's judging you?  Is

5    your frame of mind so fair that you would be pleased to

6    have twelve Ms. Kennedy's judging you in this case?

7             PROSPECTIVE JUROR:  Yes, I think so.

8             MR. BERGER:  I'm not sure?

9             PROSPECTIVE JUROR:  Yes, I'm fair.

10            MR. BERGER:  Everybody likes to believe

11   they're fair.  I'm not discrediting what you said.

12   Everybody likes to think they could be fair.  It's

13   human nature.  Nobody is going to get up and say, I'm

14   an unfair person.  The best I could do is consider your

15   frame of mind right now.  That's the best I can do and

16   ask you whether or not your frame of mind is so fair

17   you would be with people judging you if you were

18   sitting there.

19            PROSPECTIVE JUROR:  Yes, it's the type of

20   question.  Yes.

21            MR. BERGER:  Only you know your frame of

22   mind.  You are the only one I could ask.

23            PROSPECTIVE JUROR:  Right.

24            MR. BERGER:  You don't sound so convinced.

25            PROSPECTIVE JUROR:  I know.  It's a strange

Proceedings                      349

1       concept.

2                   MR. BERGER:  Everybody else has time to think

3       about it.  Ms. Norton, how about you?

4                   PROSPECTIVE JUROR:  It's an excellent

5       question.  Knowing me, I'm very good at reasoning and

6       very reasonable, very good at critical thinking and

7       comparing.  If I had twelve of me sitting on a jury

8       against me, I would feel comfortable I would get a fair

9       verdict.  I think it's a great question.

10                  MR. BERGER:  Mr. Campo, you would be

11      satisfied with twelve of you judging you?

12                  PROSPECTIVE JUROR:  The difficulty is

13      variable that we don't know what we're discussing yet.

14      In general, we know what we're talking about, but I am

15      a clean slate and ready to evaluate what is presented

16      to me.

17                  MR. BERGER:  You don't know what is coming,

18      but you know your frame of mind?

19                  PROSPECTIVE JUROR:  Yes.

20                  MR. BERGER:  Ms. Campbell, how about you,

21      would you be satisfied with twelve of you judging you

22      if you were sitting there?

23                  PROSPECTIVE JUROR:  If I was sitting there --

24      if you are asking me to fill the position of the

25      defendant, specifically, everything is subject to

Proceedings                    350

1        question.  Do you know what I'm saying?  I don't get

2        what you are asking me.

3                 MR. BERGER:  You are telling me you are fair

4        and impartial, right?

5                 PROSPECTIVE JUROR:  Yes.

6                 MR. BERGER:  I'm asking you to think about

7        your frame of mind.  I'm asking you if your frame of

8        mind is so fair and impartial that if you were sitting

9        where Mr. Ramos is, you would be happy with twelve

10       Ms. Campbell on the jury?

11                PROSPECTIVE JUROR:  Yes, because I know my

12       frame of mind.

13                MR. BERGER:  That's my question, Mr. Morales.

14       I need twelve people to judge.  If you are the same

15       twelve people -- I'm asking for your frame of mind.

16       I'm not asking people -- of the same people, I'm asking

17       about your frame of mind, twelve people with your

18       present frame of mind judging you.

19                PROSPECTIVE JUROR:  Yes.  Why not?

20                MR. BERGER:  Mr. Fried?

21                PROSPECTIVE JUROR:  Yes.

22                MR. BERGER:  Ms. Cavallaro?

23                PROSPECTIVE JUROR:  Yes.

24                MR. BERGER:  Mr. Lutwick?

25                PROSPECTIVE JUROR:  Yes.

Proceedings                    351

1          MR. BERGER:  Mr. Kallenberg?

2          PROSPECTIVE JUROR:  Yes.

3          MR. BERGER:  Ms. Harvey?

4          PROSPECTIVE JUROR:  Yes.

5          MR. BERGER:  Mr. Pizzuto?

6          PROSPECTIVE JUROR:  Yes.

7          MR. BERGER:  Ms. Westbrooke?

8          PROSPECTIVE JUROR:  Yes.

9          MR. BERGER:  You can all assure me no matter

10   what piece of evidence you hear during the course of

11   this trial you won't say after, that's it, heard

12   enough, he's guilty.  Keep an open mind throughout the

13   entire trial.  Wait for the opening by counsel and then

14   consider.  Do you understand all of you have to keep an

15   open mind?

16          PROSPECTIVE JUROR:  Yes.

17          MR. BERGER:  Ms. Kennedy, back to the

18   question of the frame of mind.

19          PROSPECTIVE JUROR:  I did have more time.

20   Someone down there said something.  I was thinking I

21   wouldn't want twelve different people.  That was my --

22   I understand the frame of mind now.  That was the part

23   I didn't get.

24          THE COURT:  One minute.

25          MR. BERGER:  Newspapers and magazines.

kmm

Proceedings                    352

1            PROSPECTIVE JUROR:  Newsday, People.  That's

2       probably it.

3            MR. BERGER:  Ms. Norton?

4            PROSPECTIVE JUROR:  Channel news.

5            MR. BERGER:  Newspapers or magazines?

6            PROSPECTIVE JUROR:  Sometimes I read Newsday.

7       Magazines, it's mostly Good Housekeeping, simple, Shop

8       Smart, Nursing Journal.

9            MR. BERGER:  Mr. Campo?

10           PROSPECTIVE JUROR:  Newsday, Car & Driver.

11           MR. BERGER:  Ms. Campbell?

12           PROSPECTIVE JUROR:  No newspapers.  Anything

13       that's trendy.

14           MR. BERGER:  I've never heard anybody use the

15       word socialite.  What is a socialite?

16           PROSPECTIVE JUROR:  Community and child

17       advocate, involved in church, involved in

18       socialization.

19           MR. BERGER:  Mr. Morales?

20           PROSPECTIVE JUROR:  Daily News, Newsday,

21       Reader's Digest.  Whatever is in the dentist office.

22           MR. BERGER:  Ms. Cavallaro?

23           PROSPECTIVE JUROR:  I don't read magazines

24       that much.  I read the Times.  It takes about a

25       weekend.  It's good for a week.

Proceedings                    353

1              MR. BERGER:  Ms. Westbrooke?

2              PROSPECTIVE JUROR:  Newspapers here and

3    there.  Of course, the Star, Inquirer, Legal Brief.

4    Things with interest.

5              MR. BERGER:  Mr. Pizzuto?

6              PROSPECTIVE JUROR:  No magazines or

7    newspapers.

8              MR. BERGER:  Ms. Harvey?

9              PROSPECTIVE JUROR:  Newsday.  Wall Street

10   Journal.  I don't really do magazines.  Essence, I

11   kinda like.

12             MR. BERGER:  Ms. Maccio?

13             PROSPECTIVE JUROR:  Newsday, opera magazines.

14   The O.

15             MR. BERGER:  Unreal.  A retired New York City

16   Police Officer is something I would be concerned about.

17             PROSPECTIVE JUROR:  No, because I wouldn't

18   talk to him except to wish him a happy birthday.

19             MR. BERGER:  You owe him no explanation if

20   your verdict is not guilty?

21             PROSPECTIVE JUROR:  Correct.

22             MR. BERGER:  You are your own person?

23             PROSPECTIVE JUROR:  Yes.

24             MR. BERGER:  Mr. Lutwick?

25             PROSPECTIVE JUROR:  No newspapers.

Proceedings                    354

1              THE COURT:  Thank you.

2              MR. BERGER:  You have a family member on your

3    wife's side who is a police officer?

4              PROSPECTIVE JUROR:  Correct.

5              MR. BERGER:  Any concern about that?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  At this point we'll give you a

8    ten-minute break.  The lawyers will do what they need

9    to do legally to determine who will remain on the case

10   as jurors.

11             Listen to the instructions of the officers.

12   Remember your seats if you are in the front.

13             People in the back, a ten-minute break also.

14   Step out of the courtroom.  Be prepared to come back

15   in.  We'll get to all of you next.  Thank you.

16             (Whereupon, the jury panel exited the

17   courtroom.)

18             THE CLERK:  People, do you have a challenge

19   for cause, jurors one through four?

20             MR. PERRI:  No, your Honor.

21             THE CLERK:  Defense counsel?

22             MR. BERGER:  No, your Honor.

23             THE CLERK:  Any challenge for cause, defense

24   counsel?

25             MR. BERGER:  No.

Proceedings                355

1              THE CLERK:  People, do you wish to exercise a

2        peremptory challenge?

3              MR. PERRI:  Yes, perempt challenges on juror

4        number two, Norton, juror number four, Ms. Campbell.

5              THE CLERK:  Defense counsel, juror number one

6        or three, do you wish to exercise perempt challenges?

7              MR. BERGER:  Number three.

8              THE CLERK:  Jill Kennedy will`become juror

9        number nine.

10             MR. PERRI:  Yes.

11             THE CLERK:  Do you agree, defense counsel?

12             MR. BERGER:  Yes, your Honor.

13             THE CLERK:  Challenge for cause, five, six,

14       or seven?

15             MR. PERRI:  Yes, your Honor.  People

16       challenge for cause juror number five.

17             MR. BERGER:  Consent.

18             THE COURT:  Thank you.  Five is gone for

19       cause.

20             MR. PERRI:  That's all for cause, five, six,

21       seven.

22             THE CLERK:  Defense counsel, do you wish to

23       challenge for cause six or seven?

24             MR. BERGER:  No, your Honor.

25             THE CLERK:  People, do you wish to perempt

Proceedings                    356

1        challenge juror number six or seven?

2               MR. PERRI:  The People exercise a perempt

3        challenge for juror number seven.

4               THE CLERK:  Defense counsel, do you wish to

5        exercise a perempt challenge as to juror number six?

6               MR. BERGER:  Yes.

7               THE CLERK:  People, do you wish to challenge

8        for cause juror number eight, nine or ten?

9               MR. PERRI:  People challenge for cause jurors

10       number eight and nine.  With respect to juror number

11       eight, the juror, what's equivocal about being able to

12       become available on each and every day, she did state

13       she wished to be a juror.  She also explained that the

14       desire was based primarily -- she wanted to get this

15       over with so she wouldn't have to be on another case.

16       She was late in coming back, over ten minutes late in

17       coming back in following the Court's direction.  The

18       People ask her to be excused for cause.

19              MR. BERGER:  I oppose that.  The juror went

20       to the wrong building, which can happen.  She went to

21       the east wing instead of the west wing.

22              THE COURT:  It's denied.

23              Let's do cause for nine.

24              MR. BERGER:  Consent.

25              THE COURT:  People, wish to exercise a

Proceedings                    357

1        perempt challenge on eight or ten?

2                    MR. PERRI:  Your Honor, the People exercise a

3        perempt challenge to both jurors eight and ten, your

4        Honor.

5                    THE CLERK:  People wish to challenge for

6        cause juror number eleven, twelve or fourteen?

7                    MR. PERRI:  No, your Honor.

8                    THE CLERK:  Defense counsel, do you wish to

9        challenge for cause eleven, twelve or fourteen?

10                   MR. BERGER:  No, your Honor.

11                   THE CLERK:  Do the People wish to perempt

12       challenge eleven, twelve or fourteen?

13                   MR. PERRI:  The People exercise a perempt

14       challenge on juror number twelve.

15                   THE CLERK:  Does defense counsel wish to

16       perempt challenge as to juror number eleven or

17       fourteen?

18                   MR. BERGER:  Number fourteen.

19                   THE CLERK:  Carolyn Harvey will become juror

20       number ten.

21                   Agreed, People?

22                   MR. PERRI:  Yes.

23                   THE CLERK:  Agreed, defense counsel?

24                   MR. BERGER:  Yes.

25                   THE COURT:  Bring the jurors in.  Do the

Proceedings                    358

1      final session.  Take a short break so everyone can use

2      the facility and stretch, then refill the box.  See how

3      far we get.  Tomorrow morning, 9:30, we'll finish with

4      the People that are left in the office.  Let's bring in

5      the jury.

6                  (Whereupon, the jury panel entered the

7      courtroom.)

8                  THE CLERK:  Jurors in the box, may I have

9      your attention, please.  If I call your name, you have

10     been selected to serve on this jury.  Juror number nine

11     will be Jill Kennedy.  Juror number ten will be Carolyn

12     Harvey.  If I called your name, remain seated.

13                 If I did not call your name, you are excused

14     with the thanks of this Court from this panel.

15     Carefully step out of the box and follow the

16     instructions of the court officer.

17                 Are these jurors satisfactory to the People?

18                 MR. PERRI:  Yes, your Honor.

19                 MR. BERGER:  Yes, your Honor.

20                 (Whereupon, the jurors were duly sworn by the

21     clerk of the court.)

22                 THE COURT:  Welcome aboard to both of you.

23     As you know, I will not need you back here in court

24     until Monday morning at 9:30 sharp.  The officers will

25     tell you where to report at that time.  Between now and

Proceedings                    359

1      then, please remember to keep an open mind about this

2      whole process and the trial.

3              Do not discuss the case amongst yourselves or

4      with anyone else during the trial.  Do not permit

5      anyone to discuss the case in your presence.  Do not

6      talk to the lawyers, witnesses, or the defendant about

7      anything during the trial.

8              And again, if you happen to run into any of

9      us, we will ignore you.  Don't take it personally.

10     Don't go and visit the place where the charged crime

11     was committed, or any other place involved in the case.

12     Don't try to research the case over the weekend.  Don't

13     go to the library.  No Wikipedia, nothing.  Have a

14     great rest of the weekend.  See you Monday morning.

15     Step out of the box.

16             (Whereupon, the jurors exited the courtroom.)

17             THE COURT:  Let's refill the box, please.

18             THE CLERK:  Tine Graziosi.  First name

19     T-I-N-E.  Last name G-R-A-Z-I-O-S-I, seat number one.

20             Jacqueline Zozzaro, Z-O-Z-Z-A-R-O, seat

21     number two.

22             Thomas Plactere, P-L-A-C-T-E-R-E.  First name

23     Thomas.  Seat number three.

24             Seat number four, Sun Mi Joo.  First name

25     S-U-N.  Middle name M-I.  Last name J-O-O.

kmm

1          Pasquel Perrelli, P-E-R-R-E-L-L-I, seat

2     number five.

3          Amy Serwitz, S-E-R-W-I-T-Z, seat number six.

4          Gerhard Ramesberger.  First name spelled

5     G-E-R-H-A-R-D.  Last name R-A-M-E-S-B-E-R-G-E-R, seat

6     number seven.

7          Seat number eight, Itcel Rios.  I-T-C-E-L is

8     the first name.  Last name spelled, R-I-O-S.

9          Seat number nine, Margaret Cohen, C-O-H-E-N.

10          Seat number ten, Rosemary Olenick,

11     O-L-E-N-I-C-K.

12          Seat number eleven, Cynthia Canady,

13     C-A-N-A-D-Y.

14          Seat number twelve, Cathy J. Fernandez.

15     Cathy spelled with a C.  Last name F-E-R-N-A-N-D-E-Z.

16          Seat number thirteen, Stephanie Dorsaint,

17     D-O-R-S-A-I-N-T.

18          Seat number fourteen, pardon me, Sylvia

19     Candelo, C-A-N-D-E-L-O.

20          THE COURT:  Welcome everyone to the front of

21     the courtroom.  As we predicted, you would eventually

22     make it up here.  I want to thank you all for your

23     patience in this process.  Hopefully you have been

24     paying attention.  I will give you reminders about the

25     areas we covered.  If there is anything you need to

Proceedings                361

1    tell me, raise your hand and let me know.

2              Does everybody in the front understand the

3    English language and has been following the law?  Raise

4    your hand if you did not.

5              Ms. Joo, what language is it that you speak?

6              PROSPECTIVE JUROR:  Korean.

7              THE COURT:  How long have you been in the

8    country?

9              PROSPECTIVE JUROR:  Twelve years.

10             THE COURT:  Have you been able to follow the

11   law with everything that has been going on?

12             PROSPECTIVE JUROR:  It's pretty hard,

13   especially --

14             THE COURT:  You have to keep your voice up.

15             PROSPECTIVE JUROR:  I don't think I'm good

16   enough to understand all of the words.

17             THE COURT:  On consent?

18             MR. PERRI:  Yes, your Honor.

19             MR. BERGER:  Yes.

20             THE COURT:  You are excused from this case.

21   You need to go back to central jury.  They will find

22   another case for you.

23             Anyone else having difficulty with the

24   English language?

25             THE CLERK:  Shafaroon Rafeek, R-A-F-E-E-K.

kmm

Proceedings                    362

1          First name spelled S-H-A-F-A-R-O-O-N, seat number four.

2                    THE COURT:  Welcome, Ms. Rafeek.  Do you have

3     any problem with the English language?

4                    PROSPECTIVE JUROR:  No.

5                    THE COURT:  The next area I discussed with

6     everybody is your willingness and ability to follow the

7     law as I give it to you, including the fact that the

8     defendant is presumed innocent.  That the People have

9     the burden of proof of guilt beyond a reasonable doubt,

10    and that there is -- if the defendant does not testify

11    as a witness, that is not a factor from which any

12    inference unfavorable to the defendant may be drawn.

13                   Does anybody have an issue with those three

14    concepts and cannot follow them?  Raise your hand.  Let

15    the record reflect, Ms. Rafeek.

16                   PROSPECTIVE JUROR:  I don't like to judge

17    people.

18                   THE COURT:  Is that something that is

19    personal?

20                   PROSPECTIVE JUROR:  Personal, not religious.

21                   THE COURT:  If you were picked as a juror in

22    this matter, would you be able to get past that

23    personal feeling?

24                   PROSPECTIVE JUROR:  No.

25                   THE COURT:  Thank you for your honesty.

1                    On consent?

2                    MR. PERRI:  Yes.

3                    MR. BERGER:  Yes.

4                    THE COURT:  You are excused.

5                    THE CLERK:  Karen Yotso, Y-O-T-S-O, seat

6        number four.  Welcome.  Anything you need to tell me so

7        far?

8                    PROSPECTIVE JUROR:  I'm not going to get paid

9        for work.

10                    THE COURT:  If you don't work, you don't get

11        paid?

12                    PROSPECTIVE JUROR:  Yes.

13                    THE COURT:  Where do you work?

14                    PROSPECTIVE JUROR:  Investor relations

15        company.

16                    THE COURT:  Although, we weren't up to that.

17                    Consent?

18                    MR. BERGER:  Yes.

19                    MR. PERRI:  Yes.

20                    THE COURT:  You can leave.

21                    THE CLERK:  Abraham Raindlich,

22        R-A-I-N-D-L-I-C-H, seat number four.

23                    THE COURT:  Good afternoon.

24                    PROSPECTIVE JUROR:  Good afternoon.

25                    THE COURT:  Any problem with the English

Proceedings                    364

1    language or three concepts of law I've gone over so

2    far?

3              PROSPECTIVE JUROR:   No.

4              THE COURT:   Next area I talked with everyone

5    earlier, those type A personality that go into the jury

6    room and refuse to deliberate.   Is there anybody here

7    the type of person that is not going to be willing to

8    deliberate, your way is the only way and it's always

9    the right way?   Does anybody have that?

10             It's not a bad thing the way some people are.

11   Raise your hand if that's your personality.

12             We'll have you come join us, ma'am.   No need

13   to be left alone.

14             THE CLERK:   Jane Kornahren,

15   K-O-R-N-A-H-R-E-N.

16             THE COURT:   Welcome.   You heard everything I

17   said so far.   Is there anything you need to tell me?

18             PROSPECTIVE JUROR:   No.

19             THE COURT:   Each of you promise you will

20   decide the case without fear, favor, sympathy, bias, or

21   prejudice for or against the People, the defendant, or

22   any witness, be that witness a police officer or

23   civilian?

24             PROSPECTIVE JUROR:   I have a brother

25   incarcerated, a stepbrother incarcerated.

Proceedings                      365

1               THE COURT:   Do you feel that is going to get

2        in the way of your being fair and impartial in this

3        case?

4               PROSPECTIVE JUROR:   No, ma'am.

5               THE COURT:   That's Ms. Canady.

6               PROSPECTIVE JUROR:   Yes, ma'am.

7               THE COURT:   I think I saw another hand,

8        Mr. Ramesberger.

9               PROSPECTIVE JUROR:   My whole family is NYPD.

10       ESU, brother-in-law 105.

11              MR. BERGER:   Father and father-in-law

12       retired, brother-in-law ESU, and brother is 105.

13              THE COURT:   Is that going to prevent you from

14       being able to sit in judgment of law enforcement

15       officers?

16              PROSPECTIVE JUROR:   Probably.   Yes.   I'm

17       sorry.

18              THE COURT:   You don't need to be sorry.   Is

19       there anyone else that has anything they want to add

20       with regard to fear, sympathy, bias, or prejudice?

21              Ms. Kornahren.

22              PROSPECTIVE JUROR:   My former job I had an

23       altercation with a situation of a child abuse type

24       situation.   I don't know if it's going to have a great

25       impact.   It did have an emotional residue in my former

1      job.

2                    THE COURT:  What was your former job?

3                    PROSPECTIVE JUROR:  I was a hospital care

4      investigator.  I had to assess whether the particular

5      person, hospital bill, the child hospital bill, would

6      be paid by the Bureau of Child Services, or by

7      Medicaid.  I had to question the father, and it was an

8      unpleasant situation that resulted.

9                    THE COURT:  I do appreciate that would be an

10     unpleasant situation.  I appreciate this is not an easy

11     case and makes many of us uncomfortable, not just this

12     case, but any case where you are asked to be a juror

13     puts you in an uncomfortable position.  I need to know

14     whether or not, as you sit here today, that you are

15     going to somehow think about what happened in the past

16     and use it either for or against the People and the

17     defendant and not try this case just on the evidence

18     here.

19                    PROSPECTIVE JUROR:  I'm going to make a

20     conscious effort to remember it.  I had a problem with

21     my job at that point.  There was an altercation that

22     ensued between me and the person I interviewed.  It's

23     something that I remember.  I would try to do my best.

24     It's still something there.

25                    THE COURT:  Thank you very much for letting

Proceedings                    367

1    us know.  Anyone else with regards to this topic?

2              Ms. Dorsaint.

3              PROSPECTIVE JUROR:  My husband is NYPD and my

4    brother-in-law is NYPD, and brother-in-law is defense

5    counsel, Suffolk attorney.

6              THE COURT:  Any reason it would get in the

7    way of you being fair and impartial?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Can you tell me why that is.

10             PROSPECTIVE JUROR:  I'm married to someone

11   who tells me cases, and plus having a three-year old

12   and also expecting, it's not a good case for me at all.

13             THE COURT:  Very good.  Thank you.

14             Anyone else at this point, just on the topics

15   we covered so far.  Sit tight everyone.

16             Anybody in the box up front know any of the

17   attorneys, any of my court staff, and the defendant or

18   any of those people whose names were on the list?

19   Raise your hand if you believe you knew someone.

20             If anyone has a health issue that we need to

21   be concerned with that would prevent you from being

22   able to sit in this case, any health issues, raise your

23   hand.

24             Now, let's talk about those dates again.  As

25   you know, if you are picked as a juror, you don't have

kmm

1      to be back here until Monday and then we're working May

2      11th through May 14th, the following week only working

3      the 19th, 20th and 21st.  You will have Friday and

4      Monday for Memorial Day, and then we're working the

5      26th through the 29th.

6              Does anyone have any issues with the dates?

7      Keep your hand up with the issue with the dates.

8              THE COURT:  The first hand I saw,

9      Mr. Perrelli.

10             PROSPECTIVE JUROR:  My job only covers for

11     the first five days of jury duty.

12             THE COURT:  Thank you.  The next hand I saw

13     was Cohen.

14             PROSPECTIVE JUROR:  I have a commitment to be

15     in Maine this weekend.  I don't know if I'll be back on

16     Monday.

17             THE COURT:  The next hand and yell if I

18     missed you, Ms. Fernandez.

19             PROSPECTIVE JUROR:  I'm taking my mother for

20     surgery on the 13th and that's the only day that is a

21     conflict for me, but I don't know if it's morning yet

22     or afternoon.  I wouldn't know until the night before.

23             THE COURT:  I'm going to go out on a limb and

24     say the surgery.

25             PROSPECTIVE JUROR:  She already waited a

Proceedings                    369

1      month.

2                  THE COURT:  Thank you for letting me know.

3                  Ms. Dorsaint.

4                  PROSPECTIVE JUROR:  Doctors' appointments,

5      sonogram appointments, doctors' appointment next week,

6      also sonogram and often doctors' appointments.

7                  THE COURT:  Yes, Ms. Candelo.

8                  PROSPECTIVE JUROR:  I have a conference on

9      the 14th.  I'm required by my job, and also to continue

10     my license.  And I also have a doctor's appointment I

11     scheduled a month ago, which would be difficult on the

12     12th, which would be difficult to reschedule.

13                 THE COURT:  Can I see the attorneys at the

14     bench, please.

15                 (Whereupon, there was an off-the-record

16     discussion at the bench.)

17                 THE COURT:  The following people are excused

18     with the thanks of the Court from this case.  It

19     doesn't mean you are off the hook forever.  It means

20     this case is either the wrong type of case, or too long

21     for you.

22                 Listen to the instructions of the officer

23     once you leave.  The juror sitting in seat four,

24     Mr. Raindlich, you are excused.  Mr. Ramesberger, you

25     are excused.  Mr. Perrelli, seat five; Ms. Cohen, seat

Proceedings                    370

1     nine; Ms. Fernandez, in seat twelve; Ms. Dorsaint in
2     seat thirteen, and Ms. Kornahren in seat fifteen.
3     Thank you all.
4          Let's do a little more with the remainder of
5     you and give you instructions at the end of the day.
6          Now, I need to know if any of the remaining
7     jurors, I asked questions about victim of a crime,
8     witness of a crime, convicted of a crime, or has a
9     pending criminal or civil case, yourself, family
10    members or friends.  Raise your hand if you are in any
11    of those categories.
12         We also talked about your ability to be a
13    fair juror based on the nature of the crimes charged.
14    You heard a few people already say, I don't think this
15    is the right kind of case for me.  I understand it's
16    uncomfortable what we need to know.  The topic matter
17    alone, the topic matter will be such you cannot listen
18    to the testimony, evaluate the evidence and be fair and
19    impartial.  Raise your hand if that's a problem.  No
20    hands have been raised.
21         You heard me tell everyone police officers
22    don't get a leg up.  They come in here, they testify,
23    they get evaluated just like everyone else.  Does
24    anybody have a problem with doing that?  Raise your
25    hand if you do.  The record will reflect no hands have

Proceedings                371

1        been raised.

2              You know this crime allegedly occurred at 124

3        Park Avenue in Roosevelt, New York.

4              Did anybody go by that location, whether it

5        be to and from work, or to and from home?

6              Are there any religious beliefs that would

7        prevent you from sitting?  Let the record reflect no

8        hands have been raised.

9              Have any of you sat previously on a criminal

10       jury, civil jury, or a grand jury?  Raise your hand if

11       that's the situation.  Very good.

12             I'll ask you all some questions.

13             Ms. Graziosi, which town do you reside in?

14             PROSPECTIVE JUROR:  Glen Cove.

15             THE COURT:  For how long?

16             PROSPECTIVE JUROR:  Ten years.

17             THE COURT:  Do you work?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  What do you do?

20             PROSPECTIVE JUROR:  I work in the IT

21       department of --

22             THE COURT:  Of where?

23             PROSPECTIVE JUROR:  Optical Distributors.

24             THE COURT:  What is the highest level of

25       school?

Proceedings                372

```
 1              PROSPECTIVE JUROR:  Bachelor degree.

 2              THE COURT:  Are you married?

 3              PROSPECTIVE JUROR:  Yes.

 4              THE COURT:  Does your spouse work?

 5              PROSPECTIVE JUROR:  Yes.

 6              THE COURT:  What does he or she do?

 7              PROSPECTIVE JUROR:  Mason.

 8              THE COURT:  Do you have any children?

 9              PROSPECTIVE JUROR:  Yes, one grown daughter.

10              THE COURT:  What does she do?

11              PROSPECTIVE JUROR:  Digital marketing.

12              THE COURT:  How do you like to spend your

13   spare time?

14              PROSPECTIVE JUROR:  Knitting, hanging out

15   with friends.

16              THE COURT:  Social media?

17              PROSPECTIVE JUROR:  Yes.

18              THE COURT:  Did you put this morning, going

19   to Mineola courts?

20              PROSPECTIVE JUROR:  No.

21              THE COURT:  Can you give me assurance you

22   won't talk about this case on social media?

23              PROSPECTIVE JUROR:  No problem.

24              THE COURT:  Do you blog?

25              PROSPECTIVE JUROR:  No.
```

kmm

1          THE COURT:  Don't start blogging if you are

2     picked as a juror.  Thank you very much.

3          Ms. Zozzaro, what town do you reside in?

4          PROSPECTIVE JUROR:  Massapequa Park.  My

5     actual last name is Griffen.  That's my maiden name.

6          THE COURT:  Thank you very much.  How long

7     have you been in Massapequa Park?

8          PROSPECTIVE JUROR:  Nine years.

9          THE COURT:  Before that?

10         PROSPECTIVE JUROR:  Rockville Centre for

11    about five years and Valley Stream before that.

12         THE COURT:  What is the highest level you

13    completed in school?

14         PROSPECTIVE JUROR:  High school.

15         THE COURT:  Do you work?

16         PROSPECTIVE JUROR:  Yes.

17         THE COURT:  What do you do?

18         PROSPECTIVE JUROR:  Administration at Macy's.

19         THE COURT:  Married?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  What does your spouse do?

22         PROSPECTIVE JUROR:  He works for the TSA in

23    Islip Airport.

24         THE COURT:  Any children?

25         PROSPECTIVE JUROR:  No.

Proceedings                    374

1                    THE COURT:  How do you like to spend your

2         spare time?

3                    PROSPECTIVE JUROR:  With my husband, family.

4                    THE COURT:  Are you on social media?

5                    PROSPECTIVE JUROR:  I am.  I don't put my

6         life out there.

7                    THE COURT:  Thank you very much.  I

8         appreciate that.

9                    Mr. Plactere, what town?

10                   PROSPECTIVE JUROR:  Bayville, New York.

11                   THE COURT:  How long have you been there?

12                   PROSPECTIVE JUROR:  Fifty-something years.

13                   THE COURT:  Highest level of school?

14                   PROSPECTIVE JUROR:  High school.

15                   THE COURT:  Do you work?

16                   PROSPECTIVE JUROR:  Yes.

17                   THE COURT:  What do you do?

18                   PROSPECTIVE JUROR:  I'm a public safety

19        officer at Long Island University, CW Post Campus.

20                   THE COURT:  Are you married?

21                   PROSPECTIVE JUROR:  Yes.

22                   THE COURT:  Does your spouse work?

23                   PROSPECTIVE JUROR:  Yes.

24                   THE COURT:  What does he or she do?

25                   PROSPECTIVE JUROR:  Self-employed at county

Proceedings                    375

1        building, title examiner.

2                    THE COURT:  Do you have children?

3                    PROSPECTIVE JUROR:  Two boys.

4                    THE COURT:  Grown?

5                    PROSPECTIVE JUROR:  Grown.

6                    THE COURT:  What do they do?

7                    PROSPECTIVE JUROR:  One is a CPA, and the

8        other one is a computer programmer.

9                    THE COURT:  How do you like to spend your

10       spare time?

11                   PROSPECTIVE JUROR:  Friends and family.

12                   THE COURT:  Social media?

13                   PROSPECTIVE JUROR:  Yes.

14                   THE COURT:  Can you avoid it if picked as a

15       juror?

16                   PROSPECTIVE JUROR:  Yes.

17                   THE COURT:  Ms. Serwitz, what town?

18                   PROSPECTIVE JUROR:  Great Neck, New York.

19                   THE COURT:  For how long?

20                   PROSPECTIVE JUROR:  Twenty-six years.

21                   THE COURT:  Highest level of school?

22                   PROSPECTIVE JUROR:  Three years of college.

23                   THE COURT:  Do you work?

24                   PROSPECTIVE JUROR:  I'm a publicist for a

25       filming maker.

1              THE COURT:  Are you married?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Significant other?

4              PROSPECTIVE JUROR:  No, not now.

5              THE COURT:  Do you have any children?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  How do you like to spend your

8    spare time?

9              PROSPECTIVE JUROR:  Friends, family.

10             THE COURT:  Social media?

11             PROSPECTIVE JUROR:  No.

12             MR. BERGER:  I missed the spare time answer.

13             PROSPECTIVE JUROR:  Friends, family.

14             THE COURT:  Up to Ms. Rios, in which town do

15   you reside?

16             PROSPECTIVE JUROR:  Greenport.

17             THE COURT:  How long?

18             PROSPECTIVE JUROR:  Nineteen years.

19             THE COURT:  Highest level of school?

20             PROSPECTIVE JUROR:  Currently in college, but

21   I guess high school.

22             THE COURT:  Currently in college, getting in

23   the way of you taking classes?

24             PROSPECTIVE JUROR:  Last week after school.

25   Next week on Tuesday.  Tuesday at night.

1              THE COURT:  You go at night?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  You could go even if you are

4      picked as a juror?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Do you work in addition to going

7      to school?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  What do you do?

10             PROSPECTIVE JUROR:  Receptionist at a

11     commissary.

12             THE COURT:  Within the school?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Are you married?

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  Significant other?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Any children?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  How do you like to spend your

21     spare time, other than going to school and working?

22             PROSPECTIVE JUROR:  Studying.

23             THE COURT:  Social media?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Can you avoid it if you are

Proceedings                    378

1     picked?

2                PROSPECTIVE JUROR:  Yes.

3                THE COURT:  I want to be very clear and make

4     sure we're not getting in the way of what you need to

5     do.  You have no problem sitting here for the days I've

6     stated based on your school schedule?

7                PROSPECTIVE JUROR:  Yes.

8                THE COURT:  Ms. Olenick, what town?

9                PROSPECTIVE JUROR:  Oceanside.

10               THE COURT:  How long?

11               PROSPECTIVE JUROR:  Eleven years.

12               THE COURT:  Highest level of school?

13               PROSPECTIVE JUROR:  Bachelor's degree.

14               THE COURT:  In what?

15               PROSPECTIVE JUROR:  Business administration.

16               THE COURT:  Do you work?

17               PROSPECTIVE JUROR:  Yes.

18               THE COURT:  What do you do?

19               PROSPECTIVE JUROR:  HR manager for a wine

20    distributor system.

21               THE COURT:  Are you married?

22               PROSPECTIVE JUROR:  Yes.

23               THE COURT:  What does your spouse do?

24               PROSPECTIVE JUROR:  He works for Metro North

25    Railroad.

Proceedings                    379

1              THE COURT:  Any children?

2              PROSPECTIVE JUROR:  Yes, two.  One grown and

3       one school age.

4              THE COURT:  The one grown, what does he/she

5       do?

6              PROSPECTIVE JUROR:  Finishing up his college

7       education at the University of Buffalo.

8              THE COURT:  How do you like to spend your

9       spare time?

10             PROSPECTIVE JUROR:  Family, friends.

11             THE COURT:  Can you avoid social media?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Ms. Canady, what town?

14             PROSPECTIVE JUROR:  Hempstead.

15             THE COURT:  How long have you been there?

16             PROSPECTIVE JUROR:  Thirteen years.

17             THE COURT:  Highest level of school?

18             PROSPECTIVE JUROR:  Twelfth.

19             THE COURT:  Do you work, ma'am?

20             PROSPECTIVE JUROR:  Yes, ma'am.

21             THE COURT:  What do you do?

22             PROSPECTIVE JUROR:  Retail.

23             THE COURT:  Are you married?

24             PROSPECTIVE JUROR:  Yes, ma'am.

25             THE COURT:  What does your spouse do?

Proceedings                    380

```
 1                    PROSPECTIVE JUROR:  Right now, nothing.

 2                    THE COURT:  Any children?

 3                    PROSPECTIVE JUROR:  Three.

 4                    THE COURT:  Grown or school age?

 5                    PROSPECTIVE JUROR:  Grown and school age.  I

 6        have one graduating this year, one looking for work and

 7        one HHA, a home health aide.

 8                    THE COURT:  How do you like to spend your

 9        spare time?

10                    PROSPECTIVE JUROR:  Grand kids.

11                    THE COURT:  Social media?

12                    PROSPECTIVE JUROR:  No.

13                    THE COURT:  Ms. Candelo, what town?

14                    PROSPECTIVE JUROR:  Valley Stream.

15                    THE COURT:  How long?

16                    PROSPECTIVE JUROR:  Over thirteen years.

17                    THE COURT:  Highest level of school?

18                    PROSPECTIVE JUROR:  High school.

19                    THE COURT:  Do you work, ma'am?

20                    PROSPECTIVE JUROR:  Yes.

21                    THE COURT:  What do you do?

22                    PROSPECTIVE JUROR:  Registered dental

23        assistant.

24                    THE COURT:  Are you married?

25                    PROSPECTIVE JUROR:  Yes.
```

1          THE COURT:  Spouse work?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  What does he or she do?

4          PROSPECTIVE JUROR:  Aircraft technician for

5     American Airlines.

6          THE COURT:  Any children?

7          PROSPECTIVE JUROR:  I have four girls.

8          THE COURT:  Grown or school age?

9          PROSPECTIVE JUROR:  Different ages.

10          THE COURT:  The ones out of school, tell me.

11          PROSPECTIVE JUROR:  Twenty-one year old in

12     the Marines.  I have eleven, ten and a one-year old.

13          THE COURT:  Other than taking care of those

14     girls and you working, what else do you like to do with

15     your spare time?

16          PROSPECTIVE JUROR:  Spare time, soccer, Girl

17     Scouts because the children use up the spare time.

18          THE COURT:  Are you on social media?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Can you avoid it if you are

21     picked as a juror?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Here's what will happen now, as

24     you can see.  There are only a few left.  It is late in

25     the day.  What I'm about to tell you, think of maybe

Proceedings                            382

1    bad, but I like to say it's a blessing and a curse.

2    Here's the bad part, you have to be back here in the

3    courtroom tomorrow morning at 9:30.  That's the bad

4    part.  Here's the good part, once we're done with you

5    tomorrow, you are done for the day.  It's supposed to

6    be sunny and nice out.  You will get credit for a full

7    day of jury duty and probably only need you for about

8    an hour's time.  If you could all please make sure you

9    are here by 9:30, the latest.  I want to get started as

10   soon as you are all here.

11           The officer will tell you where to report as

12   early as you can and close to 9:30 as you can.  Parking

13   is really tough around here.  The earlier you get here,

14   the better.  Tomorrow morning when you do get here,

15   each of the attorneys will be given a chance to ask you

16   questions.  We'll go through that process.  You have

17   been patiently watching all day.  Then we'll figure out

18   if any of you will be picked as jurors.

19           When you leave here tonight, keep an open

20   mind throughout the process.  Don't discuss the case

21   amongst yourselves or with anyone else.  Don't permit

22   anyone to discuss the case in your presence.  If you

23   run into any of us, the lawyers, the court staff, the

24   defendant, between now and tomorrow, we'll ignore you.

25   Don't talk to us.  We won't talk to you.

Proceedings                    383

1              Don't go visit the place where the alleged
2       crime was allegedly committed.  Do not go Google to
3       research this case.  You are not allowed to do it.
4       Don't look it up.  You can only get the evidence from
5       the courtroom.
6              See you all tomorrow morning at 9:30.  I want
7       you to ask the officers first.  I'm sure they will be
8       able to answer your questions.  See you tomorrow
9       morning at 9:30 sharp, please.
10             I ask you to be here at 9:15.  You have to be
11      here before we bring up Mr. Ramos.  I do not want to
12      wait before 9:30 to do that.  I want to get as close to
13      9:30 as possible.  Be here before 9:15.
14             Mr. Perri, anything for the record?
15             MR. PERRI:  No, your Honor.
16             MR. BERGER:  No, your Honor.
17             (Whereupon, the trial was adjourned to May 7,
18      2015.)
19                   *              *              *
20
21
22
23
24
25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NASSAU : CRIMINAL TERM PART 43

 3   -------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,     :   Indictment
 4                                            :   No. 742N/14
                -against-                     :
 5                                            :
     DANIEL RAMOS,                            :
 6                                            :
                          Defendant.          :   Jury Trial
 7   -------------------------------------------X

 8                              May 7, 2015
                               262 Old Country Road
 9                             Mineola, New York

10
     B E F O R E:
11
            HONORABLE TERESA K. CORRIGAN,
12                    Acting Supreme Court Justice

13
     A P P E A R A N C E S:
14
     (As Previously Noted)
15

16                 *      *      *      *      *

17

18                 THE CLERK:  Case on trial continued,

19        Indictment Number 742N of 2014, People of the State of

20        New York vs. Daniel Ramos.  All parties are present.

21        The jury is not present at this time.

22                      People ready?

23                 MR. PERRI:  Yes, your Honor.

24                 THE CLERK:  Defense counsel ready?

25                 MR. BERGER:  I need to put something on the
```

kmm

Proceedings                    385

1     record at this time.

2                  THE COURT:  Go ahead.

3                  MR. BERGER:  I know from defense point of

4     view, for the trial, I have four more names to add to

5     the potential witness list I only learned of recently.

6                  THE COURT:  Go ahead.

7                  MR. BERGER:  M-A-R-C-E-L, Hernandez, David

8     Ramos, Junea Antonia Algueta, A-L-G-U-E-T-A.

9                  Judge, I notice that Mr. Perri said some

10    supervisor from the NICE company.  Is there a name?

11    Why can't a name be given here if you are asking for

12    names.

13                 THE COURT:  I imagine what happens is with

14    all of these large companies, they have a certain pool

15    of people that testify, depending what the day is.

16    They don't always send the same person.

17                 Mr. Perri, when you get a name, I'll ask you

18    to please disclose that as soon as they give you a

19    definitive name.

20                 MR. PERRI:  Yes, your Honor.

21                 THE COURT:  Similar to the phone company, you

22    don't know until they decide who they are shipping out.

23    As soon as you get the name, let us know.

24                 MR. PERRI:  Yes, your Honor.

25                 THE COURT:  Anything else for the record?

Proceedings                    386

1              MR. PERRI:  No, your Honor.

2              (Whereupon, the panel entered the courtroom.)

3              THE CLERK:  Do both sides stipulate the

4    jurors are seated properly in the box?

5              MR. PERRI:  Yes, your Honor.

6              MR. BERGER:  Yes, your Honor.

7              THE COURT:  Good morning.  Thank you for

8    being back here with us this morning.  We'll get right

9    into the questioning by the attorneys.  Let me remind

10   you nothing the attorneys say is evidence.  This is the

11   point in time where they will speak to you to determine

12   whether or not you are an appropriate juror for this

13   case.

14             MR. PERRI:  Thank you, your Honor.

15             Defense counsel, ladies and gentlemen, thank

16   you for coming back for day two.  I'm Anthony Perri,

17   assistant district attorney assigned to the case by the

18   Acting District Attorney Madeline Singas.  I'm

19   representing the government in the prosecution of this

20   case.  In addition to saying thank you, again, I want

21   to emphasize, defense counsel and the Judge have some

22   brief interactions.  This is the only point in the

23   trial we get to talk to each of you.  I get to ask you

24   questions and you get to voice your opinions.  If you

25   are selected on the jury, it's much more a one-way

kmm

Proceedings                    387

1     street to the very end.  If there is anything you feel

2     you need to bring out or explain to the Court in

3     relation to any question to any juror, please do so.

4                As it has been said, I'm sure you heard back

5     in the courtroom, this is a case about child sex abuse.

6     The allegations are oral sex upon a six-year old girl.

7     Is there anyone here, based on the allegation, finds

8     that experience too painful or too close to home?

9                Ms. Zozzaro.

10               PROSPECTIVE JUROR:  It's actually Griffen.

11               I have a cousin that went through what the

12    defendant did, in a case like this.

13               MR. PERRI:  Was that here in Nassau County?

14               PROSPECTIVE JUROR:  No, in Georgia, but he is

15    a first cousin.

16               MR. PERRI:  Do you feel having a family --

17    was he convicted?

18               PROSPECTIVE JUROR:  No, he wasn't, but it's

19    still --

20               MR. PERRI:  Would that affect your ability to

21    be fair and impartial?

22               PROSPECTIVE JUROR:  I don't think so, no.  I

23    didn't want to say I think.  I remember from yesterday.

24               MR. PERRI:  What were you trying to say

25    there?  What is --

kmm

Proceedings                         388

1           PROSPECTIVE JUROR:  It made more of emotions.

2    I was trying to keep my emotions out of it.  That's all

3    I can think about last night, was my cousin.  It went

4    in my mind, I got like anxiety over that.  It's not

5    that --

6           MR. PERRI:  Do you feel you would be able --

7    do you feel your cousin was dealt with fairly down in

8    Georgia?

9           PROSPECTIVE JUROR:  No.

10          MR. PERRI:  Will you be able to separate your

11   feelings?  When you say, he wasn't dealt with fairly,

12   was that by the prosecutor's office and the police down

13   in Georgia?

14          PROSPECTIVE JUROR:  Yes.

15          MR. PERRI:  Will you be able to separate your

16   feelings about what happened to your cousin in this

17   case?

18          PROSPECTIVE JUROR:  No.

19          MR. PERRI:  Anyone else?  Ms. Rios.

20          PROSPECTIVE JUROR:  Well, my sister, she

21   actually, she was in a case where I had to testify and

22   it was a similar case like this, and it happened in

23   Nassau County about five years ago.

24          MR. PERRI:  When you say, your sister was

25   involved in a case, was she the victim, the complainant

Proceedings                  389

1      in that case?

2                PROSPECTIVE JUROR:  Yes, she was the victim,

3      and my cousin was the defendant.

4                MR. PERRI:  He also had to testify?

5                PROSPECTIVE JUROR:  He.

6                MR. PERRI:  Is that experience of your sister

7      and yourself being a witness in that trial, did it go

8      to trial?

9                PROSPECTIVE JUROR:  Yes.

10               MR. PERRI:  Witness at that trial, do you

11     feel you will be able to separate that from dealing

12     with this case?

13               PROSPECTIVE JUROR:  I have had more time to

14     think about it and yes.

15               MR. PERRI:  Now, was there a verdict in that

16     case?

17               PROSPECTIVE JUROR:  Yes.

18               MR. PERRI:  Were you satisfied with the

19     conduct of the police department in that case?

20               PROSPECTIVE JUROR:  Yes.

21               MR. PERRI:  Were you satisfied with the

22     conduct of the district attorney's office in that case?

23               PROSPECTIVE JUROR:  Yes.

24               MR. PERRI:  Can I ask how long ago this was?

25               PROSPECTIVE JUROR:  About five years ago.

1                    MR. PERRI:  How old was your sister at that

2          time?

3                    PROSPECTIVE JUROR:  About 17.

4                    MR. PERRI:  Thank you.  Anyone else?

5                    Part of the case that the People are

6          intending to present to you is the fact there are going

7          to be a variety of witnesses.  We talked about this

8          before, but there will be a child witness that will be

9          called to testify.  It is the People's intention to put

10         them before you.  Does anyone have a problem with a

11         child witness testifying, listening to their testimony,

12         evaluate them like any other witness?

13                   Does anyone here believe that you can't trust

14         a child, just a matter of like a general rule, you

15         can't trust a child's testimony?

16                   Ms. Candelo, do you believe that a child is

17         capable of telling the truth?

18                   PROSPECTIVE JUROR:  Yes.

19                   MR. PERRI:  Do you think you could find your

20         child and testimony, use your common sense and credible

21         and believe their testimony?

22                   PROSPECTIVE JUROR:  Yes.

23                   MR. PERRI:  Ms. Serwitz?

24                   PROSPECTIVE JUROR:  Yes.

25                   MR. PERRI:  Do you believe that's possible?

                                                        kmm

Proceedings                391

1               PROSPECTIVE JUROR:  Yes.

2               MR. PERRI:  Mr. Plactere?

3               PROSPECTIVE JUROR:  Yes.

4               MR. PERRI:  In evaluating whether it's a

5      child or adult, in evaluating witnesses' testimony,

6      would you be examining their demeanor, how they present

7      themselves?

8               PROSPECTIVE JUROR:  Not the demeanor.

9      Whatever answers he or she gives out to the Court.

10              MR. PERRI:  And would you be looking for

11     consistency?

12              PROSPECTIVE JUROR:  Yes.

13              MR. PERRI:  Would you have to like a witness

14     in order to believe them?

15              PROSPECTIVE JUROR:  I can't judge a witness

16     on who the person might be, what he or she looks like.

17     Just by whatever answers he or she gives is what I have

18     to go by.

19              MR. PERRI:  Ms. Olenick, is likability

20     different than credibility for a person?

21              PROSPECTIVE JUROR:  Is likability different

22     than credibility?

23              MR. PERRI:  Do you have to like someone in

24     order to believe them?

25              PROSPECTIVE JUROR:  No.

Proceedings                    392

1           MR. PERRI:  Ms. Canady?

2           PROSPECTIVE JUROR:  No.

3           MR. PERRI:  As part of your role as jurors in

4     this case is that you will be called on to deliberate

5     and the process of deliberations is not an easy one.

6     As the triers of the facts, you have to come to an

7     agreement as to whether or not the People met their

8     burden.  The first step, the Judge will instruct you at

9     the end of the case.  It is the People's burden to

10    prove this case beyond a reasonable doubt.

11          Ms. Serwitz, are you comfortable?  Will you

12    accept and follow the Judge's instruction that the

13    People have to prove their case to a reasonable doubt?

14          PROSPECTIVE JUROR:  Yes.

15          MR. PERRI:  Would you require -- could you

16    get rid of any possible doubt you have in your mind?

17          MR. BERGER:  I object.  The standard is

18    reasonable doubt.  You will charge that.  Rather than

19    discuss the other, what it is not, all I ask is that

20    the jury follow what it is, what your instructions are.

21          THE COURT:  As I have said to you, nothing

22    that is said here is evidence.  You will get the rules

23    of law from me.  We had this line of questioning

24    throughout.  I'll allow you to continue.

25          PROSPECTIVE JUROR:  I don't understand your

kmm

1       question.

2                   MR. PERRI:  Would you require the People

3       prove their case to an absolute certainty?

4                   MR. BERGER:  I don't understand if you

5       sustained --

6                   THE COURT:  No, it's overruled.

7                   You may continue, People.

8                   MR. PERRI:  Would you require the People to

9       prove their case to an absolute certainty for you to

10      feel comfortable for finding a verdict in this case?

11                  PROSPECTIVE JUROR:  To be one hundred percent

12      sure, no doubt whatsoever.

13                  MR. PERRI:  Would you require that of the

14      People?

15                  PROSPECTIVE JUROR:  Yes.

16                  MR. PERRI:  Even if the Judge instructed you

17      that is not the standard that the People are held to?

18                  PROSPECTIVE JUROR:  I don't understand.

19                  THE COURT:  As I stated during my talk with

20      you, I have no doubt you might have forgotten it.

21      There is a burden of proof the People must meet in this

22      case and that burden of proof is proof beyond a

23      reasonable doubt, and let me read this to you:

24                  A reasonable doubt is an honest doubt of the

25      defendant's guilt for which it exists.  It is based

Proceedings                    394

1     upon the nature and quality of the evidence.  It's an

2     actual doubt, not an imaginary doubt.  It's a doubt

3     that a reasonable person acting in a matter of this

4     importance would be likely to entertain because of the

5     evidence that was presented or because of the lack of

6     convincing evidence.

7               I read that to you because of the following:

8     The law recognizes in dealing with human affairs there

9     are very few things in this world that we know with

10    absolute certainty.  Therefore, the law does not

11    require the People to prove a defendant guilty beyond

12    all possible doubt.  On the other hand, it is not

13    sufficient to prove that the defendant is probably

14    guilty in a criminal case.  The proof of guilt must be

15    stronger than that, meaning, probable.  It must be

16    beyond reasonable doubt.

17              MR. PERRI:  Would you be able to follow the

18    Judge's instructions?

19              PROSPECTIVE JUROR:  Yes.

20              MR. PERRI:  Ms. Candelo, would you be able to

21    follow the Judge?

22              PROSPECTIVE JUROR:  Yes.

23              MR. PERRI:  Ms. Canady?

24              PROSPECTIVE JUROR:  Yes.

25              MR. PERRI:  Ms. Olenick?

 1                PROSPECTIVE JUROR:  Yes.

 2                MR. PERRI:  Ms. Graziosi?

 3                PROSPECTIVE JUROR:  Yes.

 4                MR. PERRI:  Mr. Plactere?

 5                PROSPECTIVE JUROR:  Yes.

 6                MR. PERRI:  While in deliberations, one of

 7      the processes that has to go on, you will be discussing

 8      the case, discussing the evidence and at the same time,

 9      not just voting the majority rules and we'll go into

10      that and get you out of here.  You have to come to your

11      own individual determination as to whether or not the

12      People have proven the case beyond a reasonable doubt

13      and vote on your individual conscious.

14                Do you feel, Ms. Serwitz, you are capable of

15      deciding the case on your own, but still deliberating,

16      discussing the case?

17                PROSPECTIVE JUROR:  One hundred percent.

18                MR. PERRI:  If you were in the minority of

19      the jury panel, disagreed with the majority, what would

20      you do when interacting with the other jurors to argue

21      your side of the case?

22                PROSPECTIVE JUROR:  I would try to be.  I

23      would, and I am very analytical.  I think I would break

24      it down and explain to somebody exactly how I see and

25      what I see.  Perhaps, they're not seeing something I

Proceedings                    396

1    see, and that's the best I can do.

2              MR. PERRI:  Ms. Canady, if you were the

3    minority to convince other jurors of your position,

4    what would you do in that situation?

5              PROSPECTIVE JUROR:  Explain how I feel about

6    it and hope they go with it.

7              MR. PERRI:  Would you rely on the evidence in

8    the case?

9              PROSPECTIVE JUROR:  Yes.

10              MR. PERRI:  Would you, if you felt you wanted

11    to see a piece of evidence, would you ask to see it

12    again?

13              PROSPECTIVE JUROR:  Yes, if I had some

14    doubts, yes, I would.

15              MR. PERRI:  And Ms. Graziosi, would you

16    handle deliberations in a case?

17              PROSPECTIVE JUROR:  I would make sure I heard

18    every possible angle of the piece of evidence, or

19    whatever it was I had a doubt about so I could evaluate

20    my opinion.

21              MR. PERRI:  If deliberations went on for a

22    day, two days, would you, in the minority, vote for the

23    majority and go home?

24              PROSPECTIVE JUROR:  No, I would be

25    frustrated.

Proceedings                    397

1           MR. PERRI:  Being a juror is not easy sitting
2    through a criminal case, whether it is the judge or the
3    attorneys, it is not an easy process and takes a lot of
4    time.  I understand you would be willing to continue
5    forward rather than conceive whatever your --
6           PROSPECTIVE JUROR:  Yes, you have to.  That's
7    your responsibility too.
8           MR. PERRI:  Mr. Plactere, could you go
9    forward?
10          PROSPECTIVE JUROR:  Yes.
11          MR. PERRI:  Ms. Serwitz?
12          PROSPECTIVE JUROR:  Yes.
13          MR. PERRI:  Ms. Candelo?
14          PROSPECTIVE JUROR:  Yes.
15          MR. PERRI:  Ms. Canady?
16          PROSPECTIVE JUROR:  Yes.
17          MR. PERRI:  Ms. Olenick?
18          PROSPECTIVE JUROR:  Yes.
19          MR. PERRI:  A few other questions.  You
20   offered to the Judge, Ms. Canady, you work in retail
21   where?
22          PROSPECTIVE JUROR:  Toys-R-Us, Carle Place.
23          MR. PERRI:  How long?
24          PROSPECTIVE JUROR:  Two years.
25          MR. PERRI:  Before that, where did you work?

Proceedings                    398

1              PROSPECTIVE JUROR:  Lord & Taylor.

2              MR. PERRI:  Ms. Olenick, you work in HR for a

3    wine distributor?

4              PROSPECTIVE JUROR:  Yes.

5              MR. PERRI:  How long?

6              PROSPECTIVE JUROR:  Eleven years.

7              MR. PERRI:  Ms. Rios, you worked at a -- you

8    were a receptionist at a commissary?

9              PROSPECTIVE JUROR:  Yes.

10             MR. PERRI:  What does that mean?

11             PROSPECTIVE JUROR:  Commissary, where I take

12   orders from delis and food trucks, and I place the

13   orders and make invoices for them.

14             MR. PERRI:  It's a private company that

15   supplies other companies with food?

16             PROSPECTIVE JUROR:  Yes.

17             MR. PERRI:  I wasn't sure if it was military

18   or something like that.

19             How old is your child?  You have one child?

20             PROSPECTIVE JUROR:  Yes, 24.

21             MR. PERRI:  What does she do?

22             PROSPECTIVE JUROR:  Digital marketing.

23             MR. PERRI:  Ms. Serwitz, you are a publicist

24   for a filmmaker?

25             PROSPECTIVE JUROR:  Yes.

1          MR. PERRI:  What are your responsibilities of

2    the job?

3          PROSPECTIVE JUROR:  Casting, and I also reach

4    out to different organizations to share films.

5          MR. PERRI:  How long have you been doing

6    this?

7          PROSPECTIVE JUROR:  Five years.

8          MR. PERRI:  Ms. Candelo, how long do you work

9    as a dental assistant?

10          PROSPECTIVE JUROR:  Twelve years.

11          MR. PERRI:  One of the concepts I want to

12    talk about, that the case that the People intend to put

13    forward with you, we believe we'll meet the burden

14    beyond a reasonable doubt.  It is emphasized on the

15    facts, it is the whole case as the Judge instructed and

16    stated, again, here, that one of the most important

17    aspects of being a juror is keeping an open mind until

18    you heard all of the evidence.  And that, Ms. Olenick,

19    would you agree it's important not to solely focus on

20    any one witness or any one item of evidence that the

21    People put forth?

22          PROSPECTIVE JUROR:  Yes.

23          MR. PERRI:  Instead of it being any one

24    individual, any one item, any one factor, this case

25    would be a multi-facetted, multipart case; would you

1      agree with that?

2                  PROSPECTIVE JUROR:  Yes.

3                  MR. PERRI:  And Ms. Serwitz?

4                  PROSPECTIVE JUROR:  Yes.

5                  MR. PERRI:  Ms. Candelo, if you disagreed

6      with the credibility, would it be -- would it be over

7      for the People?  Would you still look at the rest of

8      the evidence that comes before and after?

9                  PROSPECTIVE JUROR:  I would look at the rest

10     of the evidence that comes before and after.

11                 MR. PERRI:  Mr. Plactere, one witness you

12     didn't find credible, you didn't believe them, would

13     you write off the entire case, or still look at

14     everything?

15                 PROSPECTIVE JUROR:  As a citizen, I have to

16     look at everything.  It's my duty to do that as a

17     juror.

18                 MR. PERRI:  Ms. Graziosi, when you remember

19     things, when any individual, in particular, you

20     remember things from the past, do you remember the

21     exact same way every single time?

22                 PROSPECTIVE JUROR:  The basics are there.  It

23     might be certain things left out.

24                 PROSPECTIVE JUROR:  Aside from the basics,

25     the essential facts, the actions of your memory, are

Proceedings                401

1        incidentals, other background information, stuff on

2        your peripheral that you might remember each time?

3                    PROSPECTIVE JUROR:  Maybe.

4                    MR. PERRI:  Your daughter is 24?

5                    PROSPECTIVE JUROR:  Yes.

6                    MR. PERRI:  Did she have her 16th birthday?

7                    PROSPECTIVE JUROR:  Yes.

8                    MR. PERRI:  Do you remember where the 16th

9        birthday was?

10                   PROSPECTIVE JUROR:  Yes.

11                   MR. PERRI:  Do you recall every single

12       person?

13                   PROSPECTIVE JUROR:  Mostly family and

14       friends, so yeah.

15                   MR. PERRI:  Sixteen for a girl is a bad

16       choice.  I didn't have a sweet sixteen.  You have a

17       sixteen, and now it is extremely special.  How about a

18       17th birthday?

19                   PROSPECTIVE JUROR:  No.

20                   MR. PERRI:  How about an 18th birthday?

21                   PROSPECTIVE JUROR:  No.

22                   MR. PERRI:  Did she have a 17th birthday?

23                   PROSPECTIVE JUROR:  Probably.  She didn't

24       have a party.

25                   MR. PERRI:  Did she have a birthday on the

                                                              kmm

Proceedings                    402

1        18th year?

2                    PROSPECTIVE JUROR:  Not a party.

3                    MR. PERRI:  Do you remember where she was?

4                    PROSPECTIVE JUROR:  In college.

5                    MR. PERRI:  Ms. Olenick, in remembering

6        something from your past, something over a year ago, do

7        you remember every single aspect of all of the

8        background information of what happened?

9                    PROSPECTIVE JUROR:  Not always.

10                   MR. PERRI:  But you still could have a memory

11       of an event and each time you are retelling the story

12       it could be slightly different?

13                   PROSPECTIVE JUROR:  A little bit, yeah.

14                   MR. PERRI:  Would that little bit being

15       different each time, when remembering and explaining to

16       the person, would that mean you are lying?

17                   PROSPECTIVE JUROR:  No.

18                   MR. PERRI:  Ms. Canady, would you agree?

19                   PROSPECTIVE JUROR:  Yes.

20                   MR. PERRI:  Ms. Candelo, would you agree?

21                   PROSPECTIVE JUROR:  Yes.

22                   MR. PERRI:  Ms. Serwitz?

23                   PROSPECTIVE JUROR:  If I remember

24       something -- I have a good memory.  I'm sure I remember

25       the way I told it the first time.  I don't think it

kmm

Proceedings                    403

1    would change.

2              MR. PERRI:  When you retell a story, there is

3    no deviation?

4              PROSPECTIVE JUROR:  No.

5              MR. PERRI:  I think most people operate that

6    same way.

7              PROSPECTIVE JUROR:  I don't know.

8              MR. PERRI:  In the same vain, the charges in

9    this case are jarring, they're traumatic, you will have

10   witnesses, civilians that will be testifying about

11   something that could be classified as traumatic events

12   that happened in their lives.  They have to sit in

13   front of you and talk to a group of strangers and

14   repeat this, their narrative of what happened to each

15   and every one of you.  Do you think, Mr. Plactere, does

16   everyone react in the same way?

17             PROSPECTIVE JUROR:  Not at all.

18             MR. PERRI:  Ms. Rios, do you think everyone

19   reacts in the same way?

20             PROSPECTIVE JUROR:  No.

21             MR. PERRI:  Do you think someone is being

22   untruthful because they don't react the same way you

23   do?

24             PROSPECTIVE JUROR:  No.

25             MR. PERRI:  Ms. Olenick, if someone reacts

Proceedings                    404

1    differently in a situation, it means they're not be

2    truthful?

3              PROSPECTIVE JUROR:  No.

4              MR. PERRI:  Ms. Canady?

5              PROSPECTIVE JUROR:  No.

6              MR. PERRI:  Ms. Serwitz?

7              PROSPECTIVE JUROR:  No.

8              MR. PERRI:  Ms. Candelo?

9              PROSPECTIVE JUROR:  No.

10             MR. PERRI: Does anyone here think it's easy

11   to testify?  Ms. Graziosi, do you think it's easy to

12   testify?

13             PROSPECTIVE JUROR:  No.

14             MR. PERRI:  Ms. Griffen, do you think it

15   would be easy to testify?

16             PROSPECTIVE JUROR:  No.

17             MR. PERRI:  Mr. Plactere?

18             PROSPECTIVE JUROR:  No.

19             MR. PERRI:  Ms. Serwitz?

20             PROSPECTIVE JUROR:  No.

21             MR. PERRI:  Thank you very much.

22             THE COURT:  Mr. Berger.

23             MR. BERGER:  You heard me ask my questions

24   yesterday.  I'm going to try to -- is there anything

25   you want to bring to my attention first?

kmm

Proceedings                    405

1          Ms. Graziosi, you heard the Judge explain the

2     burden is on the prosecution to prove anything, and you

3     heard about emotional factors involved.  Will they

4     affect you in any way, the possible emotional factors

5     that might happen in this case?

6          PROSPECTIVE JUROR:  No.

7          MR. BERGER:  I'm not sure I got from your

8     answer you feel you shouldn't sit here.

9          PROSPECTIVE JUROR:  Should not sit here.

10          MR. BERGER:  And Ms. Rios, you actually

11     participated in a case in which you obviously were

12     testifying for your sister?

13          PROSPECTIVE JUROR:  Yes.

14          MR. BERGER:  Based upon that experience, do

15     you think you should be sitting in this case?

16          PROSPECTIVE JUROR:  No.

17          MR. BERGER:  I didn't quite understand your

18     answer.  Thank you.

19          Do you think you have the ability to evaluate

20     the testimony of witnesses?

21          PROSPECTIVE JUROR:  That's the only way to do

22     it.

23          MR. BERGER:  Can you do it?

24          PROSPECTIVE JUROR:  Yes.

25          MR. BERGER:  I heard people say yesterday

Proceedings                    406

1     there's people that can't do it.  The rest of you all

2     feel you have the ability to critically evaluate

3     testimony of witnesses to do so?

4              PROSPECTIVE JUROR:  Yes.

5              MR. BERGER:  You have your own criteria,

6     Ms. Griffen?

7              Ms. Olenick, people have lied to you, have

8     they not?

9              PROSPECTIVE JUROR:  Yes.

10             MR. BERGER:  Mr. Perri wants you to say that

11    well, you tell a story differently.  It doesn't

12    necessarily mean they are lying.  You want to go

13    through all of that criteria.  Somebody tells a story

14    differently.  It could very well mean they're not

15    remembering what happened.  Somebody gave the answer,

16    the basics.  I'll remember.  Yes, I would tell the

17    story the same way if the story was significant and

18    traumatic, and indeed it is.  You will not remember the

19    details of something insignificant.  I'm not going ask

20    you to tell me you are going to believe or disbelieve

21    the witnesses right here and now.  We don't know what

22    is going to happen.  We all know what it looks like

23    when somebody is not being truthful.  Would you agree,

24    Ms. Candelo?

25             PROSPECTIVE JUROR:  Yes.

1             MR. BERGER:  Does anybody here feel they

2      don't have the ability to critically evaluate a witness

3      to see if he or she is being truthful?

4             Ms. Canady, no guarantee?  You are not

5      promising it is not going to be one hundred percent.

6      You looked at the people and heard them talk to you and

7      they haven't been truthful, correct?

8             PROSPECTIVE JUROR:  Yes.

9             MR. BERGER:  You feel you have that?

10            Ms. Griffen, if I don't ask you, it is just

11     to save some time.

12            PROSPECTIVE JUROR:  I understand.

13            MR. BERGER:  Do you recognize, Ms. Candelo,

14     it is the quality, not the quantity, correct?

15            PROSPECTIVE JUROR:  It depends.

16            MR. BERGER:  Ms. Rios?

17            PROSPECTIVE JUROR:  Quality against quantity,

18     it has to be reviewed.  I believe it would have to be

19     reviewed.

20            MR. BERGER:  When analyzing the evidence, do

21     you believe it's the quality of that substance that

22     counts not how many witnesses that are called, correct?

23            PROSPECTIVE JUROR:  In the evidence, the

24     quality between -- versus the quantity?

25            MR. BERGER:  Yes.

1           PROSPECTIVE JUROR:  I don't understand.

2           MR. BERGER:  Ms. Graziosi, do you understand

3    my question, that it's the quality of the evidence,

4    just because somebody testifies to something doesn't

5    mean it's true; would you agree?

6           PROSPECTIVE JUROR:  Yeah.

7           MR. BERGER:  It's the substance that counts,

8    not how many witnesses testify, or how long they

9    testify; would you agree?

10          PROSPECTIVE JUROR:  For the most part, yeah.

11          MR. BERGER:  Tell me why, the quantity as

12   opposed to the quality.

13          PROSPECTIVE JUROR:  Well, if you had a ton of

14   people testifying and trying to gang up on that person,

15   that is not fair either.  Maybe I'm not understanding

16   your question.

17          MR. BERGER:  You could have one person

18   testify in a very credible and believable way and ten

19   people testify to the opposite.  None of the ten may be

20   believable to you; one person might be credible, right?

21          PROSPECTIVE JUROR:  Maybe.

22          MR. BERGER:  You would be looking at the

23   substance of what they say, whether believable or not?

24          PROSPECTIVE JUROR:  It's so out of context.

25   I can't apply it without more.

Proceedings                    409

1              MR. BERGER:  How about you, Ms. Olenick, do

2      you understand my question about the quality, not the

3      quantity?

4              PROSPECTIVE JUROR:  There has to be quality

5      to it and substance to it.

6              MR. BERGER:  That's all I'm asking.  If there

7      is testimony that has no quality to it, it's

8      meaningless.

9              PROSPECTIVE JUROR:  I don't know that it

10     matters how many people testify.

11             MR. BERGER:  It's what I'm asking.  It's the

12     quality that counts; Ms. Canady?

13             PROSPECTIVE JUROR:  Yes.

14             MR. BERGER:  Ms. Serwitz?

15             PROSPECTIVE JUROR:  Yes.

16             MR. BERGER:  Do you understand now,

17     Ms. Candelo?

18             PROSPECTIVE JUROR:  Yes.

19             MR. BERGER:  Ms. Griffen?

20             PROSPECTIVE JUROR:  A little bit.

21             MR. BERGER:  Don't give me an answer you

22     think I want to hear.  If you don't -- don't agree.

23     So, have you -- how do you feel now about the quality

24     not the substance, not how many testify.

25             PROSPECTIVE JUROR:  That's true.  You hope

Proceedings                410

1        it's consistent throughout.

2                MR. BERGER:  You say you hope.  Remember, I

3        made the point yesterday, because somebody swears to

4        tell the truth doesn't mean they're telling the truth.

5                PROSPECTIVE JUROR:  Right.

6                MR. BERGER:  I ask you to start at point

7        zero, ready to believe as to disbelieve.

8                PROSPECTIVE JUROR:  Yes.

9                MR. BERGER:  When you hope they would be

10       truthful, you could hope, but that doesn't mean you

11       will get credible, believable testimony, right?

12               PROSPECTIVE JUROR:  Right.  Until you

13       evaluate the actual testimony you can't get the full

14       answer to that.

15               MR. BERGER:  When you are evaluating, you

16       know what, I believe that.  You know what, I don't

17       believe that.

18               PROSPECTIVE JUROR:  That's where the quantity

19       and then quality comes in, like you said before.

20               THE COURT:  One person can be more believable

21       than ten others, is what I'm saying.

22               PROSPECTIVE JUROR:  Yes.

23               MR. BERGER:  Do you think, Ms. Canady,

24       innocent people have been accused of crimes?

25               PROSPECTIVE JUROR:  Yes.

Proceedings                411

1          MR. BERGER:  You heard me give the example.

2     You hesitated for a minute.  Any hesitation at all,

3     innocent people are accused of crimes?

4          PROSPECTIVE JUROR:  No.  You hear about it

5     every day.

6          MR. BERGER:  Does anybody disagree with me

7     that you heard me make the point about percentages

8     yesterday?  You may think 72 percent of the time

9     somebody is charged with a crime is guilty.  That means

10    28 percent did not.  We make a decision not based on

11    percentage, but based upon individual cases.  You don't

12    know, 28 percent or 72 percent; does everybody disagree

13    with that?

14         Do you think a police officer ever lied,

15    Ms. Canady?

16         PROSPECTIVE JUROR:  No.

17         PROSPECTIVE JUROR:  Anybody could lie.

18         MR. BERGER:  It's not a matter of could.

19    What I'm doing here, I'm getting your opinions.  I'm

20    trying to find out what your experience, life

21    experience is.  I'm asking you whether you think

22    anybody has actually gotten on the witness stand and

23    lied.

24         PROSPECTIVE JUROR:  I have never witnessed

25    it, so I can't.

kmm

Proceedings                    412

1           MR. BERGER:  Ms. Canady, do you feel anybody

2     the People have gotten on the witness stand can lie?

3           PROSPECTIVE JUROR:  Yes.

4           MR. BERGER:  Do you think police officers

5     have?

6           PROSPECTIVE JUROR:  Yes.

7           MR. BERGER:  Do you think police officers are

8     less likely to lie on the witness stand than a

9     civilian?

10          PROSPECTIVE JUROR:  No.

11          MR. BERGER:  Ms. Olenick, how about you?

12          PROSPECTIVE JUROR:  No.

13          MR. BERGER:  You would agree police officers

14    have lied on the witness stand, Ms. Serwitz?

15          PROSPECTIVE JUROR:  I'm sure they have.

16          MR. BERGER:  They are just like anybody else?

17          PROSPECTIVE JUROR:  No, they don't get an

18    extra edge.

19          MR. BERGER:  Ms. Graziosi, you understand

20    that?

21          PROSPECTIVE JUROR:  Yes.

22          MR. BERGER:  Do you think, Mr. Plactere,

23    police officers have tricked or coerced somebody to

24    sign the statement when it wasn't their statement?

25          PROSPECTIVE JUROR:  Do I believe?

1                    MR. BERGER:  Does anybody disagree with that

2       answer, Ms. Graziosi?

3                    PROSPECTIVE JUROR:  I agree.

4                    MR. BERGER:  Ms. Candelo; do you agree?

5                    PROSPECTIVE JUROR:  I agree.

6                    MR. BERGER:  Do you understand as well,

7       Ms. Olenick, it's not important to determine why they

8       may have been untruthful, only if they are?

9                    PROSPECTIVE JUROR:  Yes.

10                    MR. BERGER:  Do you understand you are not

11      expected to be psychiatrists or psychologists, go into

12      the mindset of individuals?  Do you think that you are

13      going to give an edge to a six-year old or seven-year

14      old who testifies because she is so young when she

15      testifies here; would you give an edge to her?

16                    PROSPECTIVE JUROR:  No.

17                    MR. BERGER:  More sympathetic to her?

18                    PROSPECTIVE JUROR:  No.

19                    MR. BERGER:  Would you view her as a witness,

20      the six or seven-year old?  Would you be upset if I

21      vigorously cross-examined her?

22                    PROSPECTIVE JUROR:  No.  You have to do that.

23                    MR. BERGER:  Because as we sit here now, he's

24      not innocent or guilty -- he's presumed innocent.  You

25      don't know what the evidence is, correct?

1             PROSPECTIVE JUROR:  Correct.

2             MR. BERGER:  Do you agree?

3             If you were sitting where the defendant is

4      charged with this crime, would you be satisfied with

5      twelve people with your present frame of mind judging

6      you?  In other words, are you so fair as you sit here

7      now, that you don't care whether it will be a guilty

8      verdict or nothing?  You are just as prepared to vote

9      not guilty as, in your frame of mind, so fair, would

10     you be satisfied with twelve Ms. Graziosi's judging

11     you?

12            PROSPECTIVE JUROR:  Yes.

13            MR. BERGER:  Mr. Plactere, how about you?

14            PROSPECTIVE JUROR:  Yes.

15            MR. BERGER:  Ms. Serwitz?

16            PROSPECTIVE JUROR:  Yes.

17            MR. BERGER:  Ms. Candelo?

18            PROSPECTIVE JUROR:  Yes.

19            MR. BERGER:  Ms. Canady?

20            PROSPECTIVE JUROR:  Yes.

21            MR. BERGER:  Ms. Olenick?

22            PROSPECTIVE JUROR:  Yes.

23            MR. BERGER:  You heard me make a point

24     briefly, Ms. Canady, no matter what evidence you hear

25     that is presented by the prosecution, that you wouldn't

Proceedings                    415

1    say to yourself, I heard enough, the defendant is
2    guilty.  Rather, you will keep an open mind, remember
3    what was said, what you saw, and keep an open mind
4    until the evidence is presented, until counsel makes
5    arguments, until the judge gives you the charge and
6    then you start to consider what your --
7             PROSPECTIVE JUROR:  Yes.
8             MR. BERGER:  If you come to a quick
9    conclusion then everything you look at from that point
10   on will have that kind of slant.  I'm not saying you
11   will do that.
12            Ms. Graziosi, do you understand my point
13   there?
14            PROSPECTIVE JUROR:  Yes.
15            MR. BERGER:  Ms. Graziosi, would you tell me
16   what newspapers and magazines?
17            PROSPECTIVE JUROR:  New York Times.  That's
18   about it.
19            MR. BERGER:  Mr. Plactere?
20            PROSPECTIVE JUROR:  Post.
21            MR. BERGER:  Ms. Serwitz?
22            PROSPECTIVE JUROR:  I don't read newspapers.
23            MR. BERGER:  Ms. Candelo?
24            PROSPECTIVE JUROR:  Newsday.
25            MR. BERGER:  Ms. Canady?

Proceedings                416

1          PROSPECTIVE JUROR:  Newsday and Daily News.

2          MR. BERGER:  Ms. Olenick?

3          PROSPECTIVE JUROR:  I don't read the paper.

4          MR. BERGER:  Finally, tell me if you have

5     bumper stickers.  I'm not interested in politics.

6          Ms. Graziosi?

7          PROSPECTIVE JUROR:  No.

8          MR. BERGER:  Mr. Plactere?

9          PROSPECTIVE JUROR:  It's not a bumper

10    sticker, it's a side sticker, side window.

11         PROSPECTIVE JUROR:  Fordham University.

12         MR. BERGER:  Ms. Serwitz?

13         PROSPECTIVE JUROR:  No.

14         MR. BERGER:  Ms. Candelo?

15         PROSPECTIVE JUROR:  No.

16         MR. BERGER:  Ms. Canady?

17         PROSPECTIVE JUROR:  Just a magnet for my

18    children's school.  Kenny doesn't drive.

19         MR. BERGER:  Thank you very much.

20         THE COURT:  Thank you.

21         At this point I'm going to have you all step

22    out for a few minutes while the attorneys have a chance

23    to make a determination as to who, if any, of you

24    remain as jurors.  Listen to the instructions of the

25    officer.  See you within five to ten minutes.  Thank

Proceedings                    417

1     you.

2              (Whereupon, the jury panel exited the

3     courtroom.)

4              THE CLERK:  Challenge for cause, jurors

5     numbers one or two?

6              MR. PERRI:  People challenge juror number two

7     for cause.

8              MR. BERGER:  Consent.

9              THE COURT:  Granted.

10             THE CLERK:  Defense counsel, any challenge

11    for cause, juror number one?

12             MR. BERGER:  No.

13             THE CLERK:  Do the People wish to exercise

14    perempt challenge as to juror one?

15             MR. PERRI:  Yes, your Honor.

16             THE CLERK:  People, have any challenge for

17    cause for jurors in seats three or six?

18             MR. PERRI:  No, your Honor.

19             THE CLERK:  Defense counsel, do you wish to

20    challenge for cause jurors seated in number three or

21    six?

22             MR. BERGER:  No, your Honor.

23             THE CLERK:  Do the People wish to exercise a

24    perempt challenge as to juror three or six?

25             MR. PERRI:  People exercise perempt challenge

Proceedings                          418

1       to juror number six.

2                    THE CLERK:  Defense counsel, do you wish to

3       exercise a perempt challenge as to juror number three?

4                    MR. BERGER:  Yes.

5                    THE COURT:  Do the People have a challenge

6       for cause for jurors seated in number eight or ten?

7                    MR. PERRI:  No, your Honor.

8                    THE CLERK:  Defense counsel, any challenge

9       for cause for jurors eight or ten?

10                   MR. BERGER:  Yes, juror number eight.

11                   THE COURT:  She said at the very end, when

12      Mr. Berger asked, he wasn't clear whether or not she

13      should or should not sit on this case in light of the

14      fact she testified at her sister's trial.  She said she

15      should not be seated on this case.

16                   MR. PERRI:  The People won't consent to that

17      removal, that when asked, although, she did have

18      emotions and a reaction and connection to this case

19      because of her role with her sister, she did

20      unequivocally say she could separate that and be fair

21      and impartial, and that if the Court -- just her saying

22      she shouldn't, that's a determination for the Court,

23      and there should be further inquiry, your Honor.

24                   THE COURT:  I'll grant the cause request on

25      this.  I marked it on my papers at the moment she made

Proceedings                    419

1        that statement to Mr. Berger.

2                    THE CLERK:  Do the People wish to exercise a

3        perempt challenge to juror ten?

4                    MR. PERRI:  No, your Honor.

5                    THE CLERK:  Defense counsel, do you wish to

6        perempt challenge juror ten?

7                    MR. BERGER:  No perempt.

8                    THE CLERK:  Rosemary Olenick will be juror

9        number eleven, agreed, People?

10                   MR. PERRI:  Yes, your Honor.

11                   THE CLERK:  Agreed, defense counsel?

12                   MR. BERGER:  Yes.

13                   THE CLERK:  People challenge for cause, juror

14       number eleven?

15                   MR. PERRI:  No, your Honor.

16                   THE CLERK:  Defense counsel, challenge for

17       cause number eleven?

18                   MR. BERGER:  No, your Honor.

19                   THE CLERK:  People wish to perempt challenge

20       juror eleven?

21                   MR. PERRI:  Yes, we exercise a peremptory

22       challenge for number eleven.

23                   THE CLERK:  People, have a challenge for

24       cause for juror fourteen?

25                   MR. PERRI:  No, your Honor.

```
 1                    THE CLERK:  Defense counsel, as to juror
 2          fourteen?
 3                    MR. BERGER:  No, your Honor.
 4                    THE CLERK:  People, do you wish to exercise a
 5          perempt for juror fourteen?
 6                    MR. PERRI:  No, your Honor.
 7                    THE CLERK:  Defense counsel, do you wish to
 8          exercise a perempt challenge as to juror number
 9          fourteen?
10                    MR. BERGER:  Yes.
11                    THE COURT:  While we're waiting for the jury,
12          let me go on the record and let you know, yesterday, we
13          got a call from the clerk that the woman we swore in as
14          juror number seven, after being sworn in and leaving
15          here seemingly fine, she went back across the street
16          and expressed dismay in being a juror.  As of right now
17          she has been told by the court personnel that she needs
18          to be here on Monday.  She needs to report on Monday.
19          That's the end of it.  However, I'm now anticipating we
20          might be getting a letter, or some sort of a note or
21          whatever from this juror.  In light of that, we'll pick
22          three alternates.  I ask you each look at the first
23          alternate as someone that could potentially replace
24          juror number seven, if we need to get that far.  It
25          will not be my intention to declare a mistrial and
```

1       start all over.  We haven't done anything yet, so we

2       will make that call prior to my comments and your

3       opening statements.  Please keep that in mind when

4       picking.  We'll be picking three alternates.

5              (Whereupon the jury panel entered the

6       courtroom.)

7              THE CLERK:  Jurors, may I have your attention

8       please.  If I call your name, you have been selected to

9       serve on this jury.

10             Juror number eleven will be Rosemary Olenick.

11      The rest of you are excused with the thanks of the

12      Court.  Please be careful.  You will be directed where

13      to report and Ms. Olenick, please remain seated.

14             Is the remaining juror satisfactory to the

15      People?

16             MR. PERRI:  Yes, your Honor.

17             THE CLERK:  Is the remaining juror

18      satisfactory to the defense counsel?

19             MR. BERGER:  Yes, your Honor.

20             (Whereupon, the juror was duly sworn by the

21      clerk of the court.)

22             THE COURT:  As you know from what happened

23      yesterday, you will be excused now for today.  You have

24      the rest of the day to do whatever you like.  I do need

25      you back here in court Monday morning at 9:30 sharp.

Proceedings                422

1   The officers will tell you where to report.  Don't come

2   into the courtroom.

3           At this point I need to give admonitions

4   again.  Follow them from now until the end of this

5   case.  Keep an open mind throughout the trial.  Do not

6   discuss the case amongst yourselves when you see your

7   other jurors, or with anyone else during this trial.

8           Do not permit anyone to discuss the case in

9   your presence.  Do not talk to the lawyers, witnesses

10  or the defendant about anything during the trial.  And

11  remember, if we run into you anywhere, we're all going

12  to ignore you.  Please don't take it personally.

13          Do not visit the place where the charged

14  crime was allegedly committed or any other place

15  involved in this case.  If there is any news coverage

16  of this case, do not read, view, or listen to any

17  accounts, discussions of the case reported by the news

18  media.

19          Do not attempt to research any issue or law

20  related to this case whether by discussion with others,

21  by research in the library or Internet, or by any other

22  means or source.

23          Have a great weekend.  We'll see you Monday

24  morning.  Thank you.

25          (Whereupon, the selected juror exited the

kmm

1        courtroom.)

2                  THE COURT:   We called for another panel.

3        We're getting fifty jurors to come over.   That will

4        take a little while.   We get a short break for that.

5        Just so you know, I'm going to curtail my initial

6        comments to this new panel in light of the fact we're

7        picking one or three alternates.   They're going to get

8        basically the same information I've given the other two

9        panels, without all of the details in an effort to try

10       to move this along so we can get through these fifty

11       individuals today.

12                 MR. PERRI:   Yes, your Honor.

13                 THE COURT:   Any issue with that?

14                 MR. BERGER:   How long do you think?

15                 THE COURT:   Probably about twenty minutes or

16       so.

17                 MR. PERRI:   Thank you.

18                 (Whereupon, a short recess was taken.)

19                 THE CLERK:   Case on trial continued, 742N of

20       2014, the People of the State of New York vs. Daniel

21       Ramos.

22                 Let the record reflect all parties are

23       present.   The jury is not present at this time.   Are

24       the People ready to proceed?

25                 MR. PERRI:   Yes, your Honor.

                                                         kmm

Proceedings                    424

1          THE CLERK:  Defense counsel?

2          MR. BERGER:  Yes.

3          THE COURT:  We're going to bring in a new

4    panel.  Just so everyone is aware, I believe you have

5    one perempt left.  Mr. Berger, you have three perempts

6    left.  We're picking one more juror, juror number

7    twelve, and three more alternates.  Let's bring in the

8    jury, please.

9          What's the first name of the last witness you

10   added?

11         MR. BERGER:  Juana, J-U-A-N-A, Arquetta.

12         (Whereupon, the jury panel entered the

13   courtroom.)

14         THE CLERK:  Good morning.  Welcome to County

15   Court, Supreme Court, Part 43, before the Honorable

16   Teresa K. Corrigan.  At this time I ask you to stand

17   and raise your right hands so I may swear you in.

18         (Whereupon, the jury panel was duly sworn by

19   the clerk of the court.)

20         THE COURT:  Good morning, everyone.  Welcome,

21   again, to County Court complex.  This is Part 43.  As

22   you heard, my name is Teresa Corrigan.  I'll be the

23   judge in this matter today.  We're in the process of

24   picking a jury in a criminal case, and it's estimated

25   that this trial will take approximately two weeks

1        scattered over the next three weeks giving you days off

2        in between.  I will give you a more complete schedule

3        in a few moments.

4                I do want to just take a moment to thank you

5        all for being here.  I recognize and realize for many

6        of you it could be an inconvenience.  This is our

7        criminal justice system.  This is how we operate here,

8        and it really is the best system out there as far as

9        making a determination when someone is accused of a

10       crime.

11               The name of this case is called the People of

12       the State of New York vs. Daniel Ramos, and so you

13       know, the People of the State of New York means the

14       government of the State of New York, and in this case

15       the government is represented by the Acting District

16       Attorney of Nassau County, Madeline Singas.

17               In referring to the People of the State of

18       New York, that is in referring to the government, you

19       are going to hear us use the shorthand terminology of

20       the People.  That part of the title of the case refers

21       to the People of the State of New York.  It does not

22       mean that the People of this state want any particular

23       verdict.  The People of the state are satisfied about

24       the just verdict of a fair jury.

25               Mr. Ramos will be referred to often times as

 1    the defendant in this matter.  And so you know up

 2    front, he is charged with two crimes.  The first is

 3    criminal sexual act in the first degree, and the second

 4    is endangering the welfare of a child.

 5              Now, as I stated, we're in the middle of jury

 6    selection.  We already have eleven jurors picked.  That

 7    means from all of you, we're looking for one additional

 8    juror, plus three alternates.

 9              So you know, an alternate juror is one who

10    may serve in place of one of the first twelve jurors,

11    should presently an unforeseen extraordinary emergency

12    arise that makes it totally impossible for one of the

13    first twelve jurors to complete the trial.

14              Now, you may realize if you served on a jury

15    before, jury selection is different in each courtroom

16    you go into, so you have to understand my process and

17    my procedure.

18              The first thing I explain is the basic

19    principles of law to you that apply in all criminal

20    trials.  I do this in part if you are selected as a

21    juror, you will be required to follow the law, whether

22    you agree with it or not.

23              Second, I'm going to call fourteen, or the

24    clerk is going to call fourteen names at random.  You

25    will come up here and sit in the jury box, which is to

Proceedings                    427

1    my left and at that point I'll ask you each questions

2    that you respond to either by raising your hands or by

3    giving me a verbal response, and I'll guide you as to

4    what is needed.  When I'm done asking you questions,

5    each of the attorneys will have an opportunity to

6    question you also.

7            Let me introduce the parties to you.  Later

8    in the proceedings, I'll ask you if you believe you

9    know any of the individuals that I introduced.

10           Now, the defendant in this case, as you heard

11   me say, is Mr. Daniel Ramos.  He's represented by

12   Mr. Michael Berger.  In this case the People are

13   represented by the Acting DA of Nassau County, which is

14   Madeline Singas, and she is in turn represented by

15   Assistant District Attorney Anthony Perri.

16           Now, the purpose of the trial is for the jury

17   to decide on the basis of the evidence presented in the

18   courtroom, whether a person who is accused of a crime

19   by the People is guilty or not guilty of that crime.

20           So in a trial, it is the juries

21   responsibility to evaluate fairly the testimony and

22   other evidence presented here in the courtroom, and to

23   decide what the believable and accurate facts are with

24   respect to what, if anything, took place at the time

25   and place in question.  The jury is, therefore, also

Proceedings                    428

1    known as the finder of the facts.

2             After the chosen and sworn jury has

3    determined the facts, the jury must apply to those

4    facts the law as I explained it to you.  Regardless of

5    whether the jury agrees with the law, and then without

6    fear, favor, bias, prejudice, sympathy, or

7    consideration of a possible sentence or punishment,

8    render a decision known as a verdict, stating whether

9    the defendant is guilty or not guilty of a charged

10   crime.

11            You heard me say your job is to decide the

12   believable evidence in this case.  It's important for

13   you to know what the evidence is for you to do that

14   job.  There are three basic types of evidence.

15            First, there is evidence that comes from a

16   stipulation of the parties.  A stipulation is

17   information that both parties agree to present to the

18   jury as evidence, without calling a witness to testify

19   to the information.  There is also evidence that comes

20   from the introduction into evidence of physical

21   objects, such as documents, photographs, clothing, or

22   even a chart.

23            And finally, as you know, the most common

24   form of evidence is the testimony of people based on

25   questions primarily asked by the lawyers and sometimes

1    asked by the Court.

2             So, then what is not evidence?  First, the

3    charges in this case are set forth in a document known

4    as an indictment.  The indictment is simply a piece of

5    paper that states the charges.  Neither the indictment

6    itself, nor the fact that the indictment has been

7    filed, constitutes evidence.

8             The defendant has pleaded not guilty to the

9    charges contained in the indictment, and this trial is

10   to decide whether the defendant is guilty or not

11   guilty.

12            Second, what the lawyers and I say at any

13   point in time, is not evidence.  None of us are

14   witnesses.

15            And third, a question of a witness by a

16   lawyer or by the Court, is by itself not evidence.  It

17   is the question with the answer that is the evidence.

18   So therefore, you are not to conclude from a question

19   alone that anything assumed in the question to be true,

20   is true, no matter how detailed or specific the

21   question is.  Nor are you to draw any inference either

22   favorable or unfavorable to either side from the

23   content of a question alone.  You must consider the

24   question with the witness's answer and decide whether

25   you find the answer believable and accurate because,

kmm

Proceedings                    430

1    again, it is the question with the answer that is the

2    evidence.

3              Now, there are three fundamental principles

4    of law that you must agree to follow if you are chosen

5    as a juror in this matter, and they are as follows:

6              The presumption of innocence, the burden of

7    proof, and the requirement of proof beyond a reasonable

8    doubt.  Throughout these proceedings, the defendant is

9    presumed to be innocent.  As a result, you must find

10   the defendant not guilty unless on the evidence

11   presented at this trial, you conclude that the People

12   have proven the defendant guilty beyond a reasonable

13   doubt.  That a defendant does not testify as a witness

14   is not a factor from which any inference unfavorable to

15   the defendant may be drawn.  The defendant is not

16   required to prove that he is not guilty.  In fact, the

17   defendant is not required to prove or disprove

18   anything.

19             To the contrary, the People have the burden

20   of proving the defendant guilty beyond a reasonable

21   doubt.  That means, before you can find the defendant

22   guilty of a crime, the People must prove beyond a

23   reasonable doubt every element of the crime, including

24   that the defendant is the person who committed that

25   crime.

kmm

1            The burden of proof never shifts from the
2    People to the defendant.  If the People fail to satisfy
3    their burden of proof, you must find the defendant not
4    guilty.  If the People satisfy their burden of proof,
5    you must find the defendant guilty.

6            Now, the law uses the term proof beyond a
7    reasonable doubt to tell you how convincing the
8    evidence of guilt must be to permit a verdict of
9    guilty.  The law recognizes in dealing with human
10   affairs there are very few things in this world we know
11   with absolute certainty.  Therefore, the law does not
12   require the People to prove a defendant guilty beyond
13   all possible doubt.

14           On the other hand, it is sufficient to prove
15   that the defendant is probably guilty in a criminal
16   case.  The proof of guilt must be stronger than that.
17   It must be beyond a reasonable doubt.

18           A reasonable doubt is an honest doubt of the
19   defendant's guilt for which a reason exists based upon
20   the nature and quality of the evidence.  It is an
21   actual, not an imaginary doubt.  It's a doubt a
22   reasonable person acting in a matter of this importance
23   would be likely to entertain because of the evidence
24   presented or because of the lack of convincing
25   evidence.

1           Proof of guilt beyond a reasonable doubt is

2      proof that leaves you so firmly convinced of the

3      defendant's guilt that you have no reasonable doubt of

4      the existence of any element of crime, or of the

5      defendant's identity as the person who committed that

6      crime.

7           If you are not convinced beyond a reasonable

8      doubt that the defendant is guilty of a charged crime,

9      you must find the defendant not guilty of that crime.

10          If you are convinced beyond a reasonable

11     doubt that defendant is guilty of a charged crime, you

12     must find the defendant guilty of that crime.

13          Now, because this is a criminal case, the

14     police are involved and will be testifying at trial.

15     We treat police officers the same way as we do civilian

16     witnesses.  Police officers can tell the truth, be

17     mistaken, or lie just like anyone else.  You must

18     evaluate a police officer's testimony for truthfulness

19     and accuracy in the same way you would evaluate the

20     testimony of any other witness.

21          Let me talk to you briefly about

22     deliberations, the juries verdict, whether guilty or

23     not guilty, it must be unanimous.  Each and every juror

24     must agree to the verdict.  Since twelve people seldom

25     agree immediately on anything to reach a verdict, you

Proceedings                    433

1    must deliberate with the other jurors.

2              What does it mean to deliberate?  It means

3    you should consult with each other, listen to each

4    other, give each other's view careful consideration and

5    reason together when considering the evidence.  And

6    when you do deliberate, you should do so with the view

7    towards reaching an agreement, if that can be done

8    without surrendering individual judgment.

9              Each of you must decide the case yourself,

10   but only after a fair and impartial consideration of

11   the evidence with the other jurors.  You should not

12   surrender an honest view of the evidence simply because

13   you want the trial to end or you are outvoted.

14             At the same time, you should not hesitate to

15   reexamine your views and change your opinions, if you

16   become convinced that they were not direct.

17             At this time the clerk will call fourteen

18   names at random, have you come to the front of the

19   courtroom.

20             THE CLERK:  If your name is called, gather

21   your personal belongings.  Step up and follow the

22   instructions of the court officer.

23             Byron Ortega.  First name B-Y-R-O-N.  Last

24   name spelled O-R-T-E-G-A, seat number one.

25             Seat number two, Lauren Mastro, M-A-S-T-R-O.

kmm

Proceedings                434

1              Seat number three, Thomas F. Rubinic,
2    R-U-B-I-N-I-C.
3              Seat number four, Lawrence S. Fischer,
4    F-I-S-C-H-E-R.
5              Seat number five, Susan M. Philben,
6    P-H-I-L-B-E-N.
7              Seat number six, Charles M. Noble, N-O-B-L-E.
8              Neil J. Reilly, R-E-I-L-L-Y, seat number
9    seven.
10             Linda A. Grossi, G-R-O-S-S-I, seat number
11   eight.
12             Alantia Cardona, C-A-R-D-O-N-A, seat number
13   nine.
14             Ricardo Ruiz, R-U-I-Z, seat number ten.
15             Bradly Cammarano, C-A-M-M-A-R-A-N-O, seat
16   number eleven.
17             John C. Neal, N-E-A-L, seat number twelve.
18             Travis Whitenan, W-H-I-T-E-N-A-N, seat number
19   thirteen.
20             Virginia Tracy, T-R-A-C-Y, seat number
21   fourteen.
22             THE COURT:  Welcome to all of you.  You made
23   it to the front of the courtroom.  Let me address
24   myself to those of you in the back.  It's highly likely
25   at some point you will find yourself in the front of

                                                    kmm

1     the courtroom.  I do ask you to continue to pay

2     attention so I don't have to completely repeat myself

3     when it's your turn to come to the front.  Thank you.

4             Let me turn to those of you who made it to

5     the front of the courtroom at this time.  The first

6     thing I need to ask anybody in the first fourteen

7     seats, who does not understand the English language and

8     has been having trouble following everything that has

9     happened so far?  Let the record reflect no hands have

10    been raised.

11            The next thing I need to ask each of you, you

12    heard me talk about those principles of law.  I need to

13    know whether or not you can give me assurance you will

14    follow them.  You don't have to like them.  You don't

15    have to agree with them.  You have to give me assurance

16    you will follow them and let me remind you of what they

17    are.

18            One, that the defendant is presumed innocent.

19            Two, that the People have the burden of proof

20    of guilt beyond a reasonable doubt.

21            And three, that if the defendant does not

22    testify as a witness, that is not a factor from which

23    any inference unfavorable to the defendant may be drawn

24    by you.

25            Please raise your hand if you just simply

                                                        kmm

Proceedings                    436

1    cannot follow those principles of law.  Let the record
2    reflect no hands have been raised.

3            You heard me talk about what needs to happen
4    when you go and deliberate.  What I need to know, can
5    you each give me assurance when it comes time to
6    deliberate at the end of a trial, in order to reach a
7    verdict of guilty or not guilty, that each of you will
8    discuss the evidence with your fellow jurors and each
9    of you will consider what your fellow jurors have to
10   say all with a view towards reaching a unanimous
11   verdict, guilty or not guilty, and it can be done
12   without surrendering individual judgment.

13           So, I can break it down for you.  What I'm
14   asking you, are you the kind of person, it's okay if
15   you are, my husband is, are you the kind of person, I'm
16   right, I'm always right, it doesn't matter what you put
17   in front of me, I'm never changing my mind, and if you
18   are being picked as a juror, you will go back in the
19   jury room, cross your arms and say, I don't care what
20   you each have to say, I know I'm right.  It doesn't
21   make you bad.  I married bad.  It makes you not proper
22   of sitting on a jury of this magnitude.  Raise your
23   hand if you feel I know me, that's my personality, this
24   might not be good for me.  Let the record reflect no
25   hands have been raised.

Proceedings                    437

1          Can each of you give me assurance that you
2     will decide this case without fear, favor, sympathy,
3     bias, or prejudice for or against the People, the
4     defendant, or a witness in this case, be that witness
5     is a police officer or a civilian?  Can you give me
6     assurance you will be able to do that?  Raise your
7     hand.
8               PROSPECTIVE JUROR:  I'm a retired corrections
9     officer.  I might be prejudiced.
10              THE COURT:  I'm getting to all of that in a
11    second.  If you have law enforcement in your
12    background, I'll ask all of you that.  Most people do.
13    As soon as we get to that, you will let me know.
14              Is there anybody here, in general, who says
15    I'm so afraid or I'm so sympathetic, or to some
16    prejudice, there is no way I could sit here and be fair
17    and impartial?  Ms. Philben.
18              PROSPECTIVE JUROR:  I work with children
19    every day.  I just don't know if I could take it.  I
20    have young children myself.
21              THE COURT:  With regards to having young
22    children yourself, I know you heard a little bit about
23    the charges.  Every one of us either has a child, knows
24    a young person, is an aunt, a mother, a sister, a
25    whatever, a good parent.  We all interact with young

Proceedings                    438

1    children, and the fact that this case involves
2    endangering the welfare of a child and the other charge
3    is criminal sexual act in the first degree, that in and
4    of itself is uncomfortable for everybody.  That is not
5    in and of itself a reason not to sit on this jury.  The
6    question becomes whether or not you can sit as a fair
7    and impartial juror knowing that you might have
8    children, work with children, might know some children.
9    It's okay if you say to me, and I want honest answers,
10   I can't get past it.  I don't want fourteen people
11   raising their hands going, I really love my nephew, I
12   really love my niece, my kids.  I would never have
13   anybody sitting here.

14            Ms. Philben, do you feel you could get past
15   it?

16            PROSPECTIVE JUROR:  I have friends of mine
17   when I was a kid that was sexually assaulted.

18            THE COURT:  Thank you very much for your
19   honesty.

20            Is there anybody else in Philben's position
21   in the front?

22            PROSPECTIVE JUROR:  My two nieces have been
23   molested.

24            THE COURT:  Anyone else?  On consent?

25            MR. BERGER:  Yes.

Proceedings                439

1              MR. PERRI:  Yes.

2              THE COURT:  You will be excused from this

3         case.  It doesn't mean you are home free.  You will go

4         back to central jury and they will probably find a case

5         more suitable for both of you.

6              THE CLERK:  Edward Diaz, D-I-A-Z, seat number

7         five.

8              Martha Quinones, Q-U-I-N-O-N-E-S, seat number

9         seven.

10             THE COURT:  Welcome, Mr. Diaz and

11        Ms. Quinones.  Is there anything you need to tell me as

12        far as what you heard?

13             PROSPECTIVE JUROR:  No.

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  The next thing I need to know, if

16        you know any of the people I already introduced.  You

17        heard me mention Mr. Daniel Ramos, who is the

18        defendant, his attorney, Mr. Michael Berger, the

19        prosecutor in this case, Mr. Anthony Perri.  You know

20        my name is Teresa Corrigan.  You have seen some of my

21        court staff.  Do any of you believe you know any of us

22        or that we look familiar?

23             Next thing we'll do is read you the list of

24        names.  These are either names you will hear during the

25        trial or potential witnesses in this trial.  I need you

1    to listen carefully and let me know if any of the names

2    are familiar to you, or if you know any of these

3    people.  Crystal Ramirez, Mya Feliciano Ramirez,

4    Sincere Feliciano Ramirez, Police Officer Joseph

5    Boccio, Police Officer Carl Wigand, Police Officer

6    Thomas Tedeschi, Detective Maurice Baran, Detective

7    Reinaldo Pacheco, Nurse Kathleen McAllister,

8    Christopher Chillseyzn, Christy Hernandez, Karl Reich,

9    Stephanie Ramos, Marshal Hernandez, Max Hernandez,

10   David Ramos, or Juana Arquetta, a supervisor from the

11   NICE transportation company.  Raise your hand if you

12   believe you know any of those individuals.  Let the

13   record reflect no hands have been raised.

14          I need to know if there are any health

15   reasons why you might not be able to sit on this jury.

16   That includes surgery or doctors' appointments that

17   can't be rescheduled, medication that makes it

18   difficult for you to concentrate and pay attention, or

19   anything else you think is relevant and important that

20   will impact your ability to sit here as a juror.

21          Just so you know the way it works, if you are

22   picked, we usually do an hour's worth of work at a

23   time, an hour to an hour and-a-half, and then you are

24   given a chance to get up, take a break, use the

25   facilities, do whatever it is you need to do.  You will

1   get a break between 1:00 and 2:00 in the afternoon.  It

2   is usually longer than that for a lunch break, and we

3   will always break by 4:30.  With that understanding,

4   raise your hand if you have a medical issue that you

5   need to bring to my attention.  Let the record reflect

6   no medical attentions.

7           Let me talk to you about the timing of the

8   case if you are picked as a juror today.  You will not

9   be expected to report back here until Monday, May 11th,

10  so you would have the rest of today off, you would have

11  tomorrow off, and expected to return to court at 9:30

12  a.m. on Monday, May 11th.  Next week we're only working

13  four days.  We're working Monday, Tuesday, Wednesday

14  and Thursday, the 11th through the 14th.  You will have

15  Friday the 15th off for you to either go back to work

16  or catch up on whatever you need to catch up on with

17  other activities.  The following week we'll only work

18  three days, Tuesday the 19th, Wednesday the 20th, and

19  Thursday the 21st.  You will have off Friday before

20  Memorial Day and Monday, Memorial Day.  You do get a

21  four-day weekend for the holiday.  The following week,

22  if it is needed, we will be here Tuesday the 26th

23  through Friday the 29th.  You are only working four

24  days that week.  We do not anticipate this case going

25  any later than the 29th.

Proceedings                    442

1              With that schedule in mind, raise your hand
2      if there is any reason you cannot sit for those dates?
3              Yes, Ms. Mastro?
4              PROSPECTIVE JUROR:  I have my brother's
5      graduation from grade school on the 20th.
6              THE COURT:  What time is that at?  Is it
7      here?
8              PROSPECTIVE JUROR:  At Columbia.
9              THE COURT:  Thank you.
10             That's May 20th, you said?
11             PROSPECTIVE JUROR:  Yes.
12             THE COURT:  Anyone else have a conflict?
13             PROSPECTIVE JUROR:  My department has two
14     people, so it's kind of --
15             THE COURT:  Do you get paid for being here
16     that entire time?
17             PROSPECTIVE JUROR:  I do.
18             THE COURT:  What kind of department?
19             PROSPECTIVE JUROR:  Distribution department.
20             THE COURT:  Let's say you are forced to sit,
21     my question is this:  Will you be giving everyone here
22     your undivided attention, or will you be worried about
23     work?
24             PROSPECTIVE JUROR:  I'll be worried about
25     work.

Proceedings                443

1              THE COURT:  Anyone else?

2              Ms. Whitenan.

3              PROSPECTIVE JUROR:  I only get paid up to ten

4       business days at my job.

5              THE COURT:  Today counts as one?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  It's cutting it close.  Anyone

8       else?

9              Any questions for Ms. Mastro with the

10      graduation?

11             Ms. Grossi with her situation and

12      Mr. Whitenan, who if we go eleven days, we're in

13      trouble.  Any objection?

14             MR. BERGER:  No.

15             MR. PERRI:  No, your Honor.

16             THE COURT:  The three of you, I'll excuse

17      you.  There's probably a shorter in nature that will

18      work better for the three of you.  Thank you for being

19      here.  Number two, Mastro, number eight, Ms. Grossi and

20      number thirteen, Mr. White.

21             THE CLERK:  Rosalie Baez, B-A-E-Z, seat

22      number two.

23             Christopher Mero, M-E-R-O, seat number eight.

24             William J. Miley, M-I-L-E-Y, seat number

25      thirteen.

kmm

```
 1                THE COURT:  Welcome, Ms. Baez, Mr. Mero and
 2      Mr. Miley.  You heard everything going on so far.  Is
 3      there anything you need to tell us, Ms. Baez?
 4                PROSPECTIVE JUROR:  I'm sorry, no much
 5      English.
 6                MR. BERGER:  Consent.
 7                MR. PERRI:  Consent.
 8                THE COURT:  You are excused.  Thank you.
 9                THE CLERK:  Ada Carroll, C-A-R-R-O-L-L, seat
10      number two.
11                THE COURT:  Welcome Ms. Carroll, is there
12      anything you need to tell me so far?
13                PROSPECTIVE JUROR:  I have an appointment I
14      have to take my young son to on Monday.  It's at 4:20.
15                THE COURT:  Four in the afternoon?
16                PROSPECTIVE JUROR:  Yeah.
17                THE COURT:  An appointment that can be
18      changed if it needed to be?
19                PROSPECTIVE JUROR:  He broke his front
20      permanent teeth.  It's difficult for me to get this
21      appointment.
22                THE COURT:  Thank you.  Sit tight for a
23      moment.
24                Mr. Mero, anything you need to tell me?
25                PROSPECTIVE JUROR:  A couple of years ago I
```

1      was wrongly accused of domestic violence.  I'm paying

2      fines up to today.  I have little faith in the judicial

3      system, and I'm a veteran with a hearing problem.

4              THE COURT:  Mr. Miley, is there anything you

5      want to tell me?

6              PROSPECTIVE JUROR:  No, ma'am.

7              THE COURT:  On consent, Carroll.

8              MR. PERRI:  Yes.

9              MR. BERGER:  Yes.

10             THE COURT:  Let me say to everyone with

11     regards to when you come up here.  I have no problem

12     letting you go if you have a valid excuse.  This is

13     door number one, you have no idea what is behind door

14     number two.  Be careful when giving your excuses.

15             THE CLERK:  John E. McKnight,

16     M-C-K-N-I-G-H-T, seat number two.

17             Carmela Handel, H-A-N-D-E-L, seat number

18     eight.

19             THE COURT:  Welcome, Mr. McKnight, anything

20     you need to tell me?

21             PROSPECTIVE JUROR:  No.  I'm good.

22             THE COURT:  Mr. Handel, anything you need to

23     tell me?

24             PROSPECTIVE JUROR:  I have a nine-year old

25     daughter.  I don't know how I'm going to react to this.

Proceedings                    446

```
 1                THE COURT:  I appreciate that situation.
 2      Like I said earlier, a lot of individuals have young
 3      children or know young children.  What I need to know
 4      from you, are you of the mindset right now that
 5      regardless of whatever instructions I give you, that
 6      that tells you to put your emotions aside, just listen
 7      to the evidence here, evaluate the evidence here,
 8      listen to the law I give to you and make a decision
 9      until all of that is completed; could you do that?
10                PROSPECTIVE JUROR:  I'm not sure.
11                THE COURT:  Thank you very much for your
12      honesty.
13                MR. BERGER:  Consent.
14                MR. PERRI:  Consent.
15                THE COURT:  Thank you.
16                THE CLERK:  Carlos Rodriguez,
17      R-O-D-R-I-G-U-E-Z, seat number eight.
18                THE COURT:  Welcome, Mr. Rodriguez.  Is there
19      anything you need to tell me so far?
20                PROSPECTIVE JUROR:  I'm a diabetic.
21                THE COURT:  Is it controlled with medication?
22                PROSPECTIVE JUROR:  Yes.
23                THE COURT:  If there comes a point in time
24      where you need to grab a little snack, something to
25      eat, that won't be a problem.  You will be able to do
```

Proceedings                    447

1    it right here in the courtroom.  Additionally, we do

2    take a break every hour for about five minutes.  You

3    need to do whatever you need to regarding testing; is

4    that sufficient to keep your situation under control?

5                    PROSPECTIVE JUROR:  My sugar goes up and

6    down.

7                    THE COURT:  How do you test it, with the

8    prick?

9                    PROSPECTIVE JUROR:  Is that something you do

10   more than once an hour?

11                   PROSPECTIVE JUROR:  I have to do it four

12   times a day.

13                   THE COURT:  When is the normal time you do

14   it?

15                   PROSPECTIVE JUROR:  Normal, when you get up,

16   around lunchtime, before I eat and after I eat.

17                   THE COURT:  That shouldn't be a problem here

18   if you feel yourself getting lightheaded while sitting

19   here.  Let the officers know and we'll take whatever

20   break you need, and like I said, if you need to keep

21   some granola bars or something with you.  Anything

22   else?

23                   PROSPECTIVE JUROR:  I have family in law

24   enforcement.

25                   THE COURT:  We'll get to that.  I don't know

Proceedings                    448

1    a single friend who doesn't have a friend or family

2    that is in some form of lawyering or law enforcement.

3          Is there anyone else with regards to the days

4    of the trial.  There are no other issues with the days

5    that everyone needs to sit?  Let the record reflect no

6    hands have been raised.

7          The next thing I need to know, if these

8    categories affect you.  It's either you, yourself,

9    personally, a family member or close friend.  Does

10   anybody know victims of crimes, whether you have

11   witnessed a crime or know someone who has or know

12   someone who has testified in a courtroom, or has ever

13   been convicted of a crime?  So if you know anyone or

14   yourself has ever before been a victim of a crime or

15   convicted of a crime, raise your hand and keep your

16   hands up so I could put it down.

17          Mr. Miley.

18          PROSPECTIVE JUROR:  I'm a retired New York

19   City Police Department, twenty-five years retired, and

20   I had someone in my family convicted of a crime.

21          THE COURT:  A couple of questions for you.

22   Obviously, as a retired NYPD, you heard me mention

23   there will be some police officers who will testify.

24          PROSPECTIVE JUROR:  Correct.

25          THE COURT:  Under the law, they don't get

Proceedings                    449

1    special passes.  Police officers can tell the truth and

2    lie like everybody else.

3                   PROSPECTIVE JUROR:  I know that.

4                   THE COURT:  Will you be able to follow my

5    instructions regarding the law and evaluate the

6    testimony of law enforcement individuals without giving

7    a leg up just because they're law enforcement?

8                   PROSPECTIVE JUROR:  Absolutely.

9                   THE COURT:  Is there any issue with the fact

10   you know someone in your family convicted of a crime

11   that will get in the way of being fair and impartial

12   here?

13                  PROSPECTIVE JUROR:  No.

14                  THE COURT:  Do you know if the individual

15   convicted of a crime was dealt with properly?

16                  PROSPECTIVE JUROR:  Yes.

17                  THE COURT:  Any bad days with the defense

18   attorney, prosecutors, judges or --

19                  PROSPECTIVE JUROR:  A little bit of a bad

20   taste.  It's a long time ago too.  It's 2001, 2002.

21                  THE COURT:  Bad taste.  You have a little bit

22   of bad taste that will get in the way of being fair and

23   impartial?

24                  PROSPECTIVE JUROR:  No.

25                  THE COURT:  Does anyone else have that

kmm

1       situation?  No hands have been raised.

2               Do any of you or people close to you, be it

3       family or friends, have any pending actions within the

4       court system?  It could be pending criminal or pending

5       civil, any pending action?  Let the record reflect, no

6       hands have been raised.

7               You heard me mention the nature of the

8       charges a couple of times and heard a few jurors say,

9       you know what, I have a young child, that's not just

10      for me.  You had some time to think about it now.  Is

11      there anything about the nature of the crime charged,

12      that's all you know, the name of the crime charged, is

13      there anything about that and that alone that will

14      prevent you from being fair and impartial in this

15      matter if you are picked?  No hands have been raised.

16              You heard me state to Mr. Miley, under our

17      law a police officer is no more or less believable,

18      solely and simply because he or she is a police

19      officer.  Is there anyone here who cannot evaluate a

20      police officer's testimony for truthfulness and

21      accuracy just as you would testimony of anyone else?

22      That means you either love the cop so much, always

23      right, or hate the cop so much, always lying.  There's

24      nothing wrong with either.  It just doesn't make you

25      good for this case.  You would probably be better in a

1    civil case.  Does anyone have that feeling with regard

2    to law enforcement?  Let the record reflect no hands

3    have been raised.

4              If you are picked as a juror you are not

5    allowed to go where the crime charged allegedly was

6    committed.  That location in this case was 124 Park

7    Avenue, in Roosevelt, New York.  Is there anyone for

8    either work purposes, or traveling to and from home

9    that needs to go past that location on a daily basis?

10             Can you give me assurance that you won't run

11   out now and go visit that location because you are not

12   allowed?  Does anyone have that urge that they can't

13   put it aside?  You got to go check it out?

14             Do any of you have religious beliefs that

15   prevent you from sitting in judgment of someone and

16   voting guilty or not guilty?  Any religious beliefs?

17   Note hands have been raised.  You can all speak.  My

18   voice, I'm going to drink a little bit.  I'm thirsty.

19   As we sit at the desk, you can have a closed bottle of

20   water or something closed in front of you.  If you need

21   to take a sip, you can do that, so give me a moment.

22             Have any of you ever sat previously as a

23   juror in either a criminal case, a civil case, or the

24   grand jury?  Raise your hand if you have any prior

25   jurors here.  Number three.

kmm

1            PROSPECTIVE JUROR:  About seven years ago.  I

2      don't remember all of the details it had to do with.

3            THE COURT:  Don't tell me that.  Civil or

4      criminal?

5            PROSPECTIVE JUROR:  It was civil, I think.

6            THE COURT:  Here in Nassau County?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Without telling me the verdict,

9      did you reach a verdict?

10            PROSPECTIVE JUROR:  Yes.

11            THE COURT:  You reached a verdict?

12            PROSPECTIVE JUROR:  Yes.

13            THE COURT:  You believe it was civil?

14            PROSPECTIVE JUROR:  Yes.

15            THE COURT:  Is there anything about that

16      experience that makes you believe you would not be a

17      good juror for this case, you need to be fair and

18      impartial?

19            PROSPECTIVE JUROR:  No.

20            THE COURT:  No problem?

21            PROSPECTIVE JUROR:  No.

22            THE COURT:  Mr. Fischer, civil or criminal?

23            PROSPECTIVE JUROR:  Civil.

24            THE COURT:  How long ago?

25            PROSPECTIVE JUROR:  Thirty years ago.

```
 1                    THE COURT:  Here in Nassau?
 2                    PROSPECTIVE JUROR:  No.
 3                    THE COURT:  Without telling me the verdict,
 4      did you reach a verdict?
 5                    PROSPECTIVE JUROR:  Yes.
 6                    THE COURT:  Is there anything about that
 7      situation that makes you believe you could not be fair
 8      and impartial here?
 9                    PROSPECTIVE JUROR:  No.
10                    THE COURT:  Anyone else, Mr. Noble?
11                    PROSPECTIVE JUROR:  I had to testify in front
12      of the grand jury about twenty years ago in the city.
13                    THE COURT:  Mr. Noble, if I remember, you
14      stated you work for the sheriff's --
15                    PROSPECTIVE JUROR:  Corrections department.
16                    THE COURT:  You stated you don't know that
17      this is a good case for you; is that correct?
18                    PROSPECTIVE JUROR:  Right.
19                    THE COURT:  On consent for Mr. Noble?
20                    MR. PERRI:  Yes.
21                    MR. BERGER:  Yes.
22                    THE COURT:  We'll excuse you from this case.
23                    If we could refill seat six, please.
24                    THE CLERK:  Teresa Bowen, B-O-W-E-N, seat
25      number six.
```

Proceedings                    454

1            THE COURT:  Welcome, Ms. Bowen.  I hope you

2      have been paying attention.  Is there anything you need

3      to tell me?

4            PROSPECTIVE JUROR:  My only concern is the

5      length of the case.  I don't get paid if I don't work.

6            THE COURT:  Will that be a financial

7      hardship for you?

8            PROSPECTIVE JUROR:  For one bill, yes.  We

9      can make it work if I have to.  I appreciate a case a

10     little shorter.  But two, almost three weeks --

11           THE COURT:  You heard the dates, Friday off

12     and then three --

13           PROSPECTIVE JUROR:  The dates work, it's just

14     the length.

15           THE COURT:  I'm getting the sense you are

16     okay with staying.

17           PROSPECTIVE JUROR:  It's my civic duty.  I'll

18     do what I have to do.

19           THE COURT:  I'm very serious about this.

20     Let's say we're now in the third week, it's May 26th

21     and still sitting here.  What I need to know, is that

22     your mind will remain with us and not start wandering

23     if I wasn't sitting here, I would be able to pay that

24     bill.  This is a real problem.

25           PROSPECTIVE JUROR:  You always have a little

Proceedings                    455

1    savings to cover some bills.  I can't say I'm not

2    thinking about it.

3              THE COURT:  It will not get in the way of

4    paying attention?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Thank you very much.

7              Does anyone else have anything with regards

8    to jury service?  Ms. Quinones.

9              PROSPECTIVE JUROR:  Civil.

10             THE COURT:  How long ago?

11             PROSPECTIVE JUROR:  About twenty years ago.

12             THE COURT:  Here in Nassau County?

13             PROSPECTIVE JUROR:  No, Brooklyn.

14             THE COURT:  Without telling me the verdict,

15   did you reach a verdict?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Was there anything about that

18   experience that makes you think you cannot sit and be

19   fair and impartial if you are picked in this case?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  I'm expecting a lot of hands.  Do

22   any of you, yourselves, or family, or friends who are

23   part of law enforcement, that includes police officers,

24   corrections officer, court officers, attorney general's

25   office, it also includes attorneys, FBI, DEA, any sort

kmm

Proceedings                    456

1        of law enforcement or attorney background?  Hands up.
2        I have to mark it.
3                   Ms. Ortega, in your family or friends?
4                   PROSPECTIVE JUROR:  No.
5                   THE COURT:  Mr. McKnight?
6                   PROSPECTIVE JUROR:  My cousin is a lawyer.
7                   THE COURT:  What kind of lawyer, criminal?
8                   PROSPECTIVE JUROR:  Criminal.
9                   THE COURT:  Here in Nassau County?
10                  PROSPECTIVE JUROR:  Yes.
11                  THE COURT:  Defense or prosecution?
12                  PROSPECTIVE JUROR:  Defense.
13                  THE COURT:  Do you talk with your cousin
14       often?
15                  PROSPECTIVE JUROR:  Yes.
16                  THE COURT:  Do you discuss cases?
17                  PROSPECTIVE JUROR:  No.
18                  THE COURT:  Let me ask, is there anything
19       about the fact your cousin is a criminal defense
20       attorney that makes you believe you cannot be fair and
21       impartial in this case?
22                  PROSPECTIVE JUROR:  No.
23                  THE COURT:  Can you give me assurance that
24       when something happens in the courtroom, that you
25       either don't understand or you want to inquire about

                                                          kmm

Proceedings                      457

1     more?  You have to give me assurance you will not call

2     your cousin and say, hey, can you help me out with

3     this; can you give me that assurance?

4                 PROSPECTIVE JUROR:  Yes.

5                 THE COURT:  Mr. Rubinic.

6                 PROSPECTIVE JUROR:  A friend of mine was a

7     judge in Queens.  Retired now.  He is an attorney in

8     Nassau.

9                 THE COURT:  Do you know if he is an attorney

10    in civil or criminal?

11                PROSPECTIVE JUROR:  Civil.

12                THE COURT:  Same questions for you, is there

13    anything about that relationship that is going to get

14    in the way of you being fair and impartial?

15                PROSPECTIVE JUROR:  No.

16                THE COURT:  You can't go home tonight and say

17    listen, this judge had a coughing fit and had to step

18    off.  You can't start talking about this case if you

19    are picked, okay?

20                PROSPECTIVE JUROR:  Okay.

21                THE COURT:  You can give me that assurance

22    you won't do that?

23                PROSPECTIVE JUROR:  Yes.

24                THE COURT:  Mr. Fischer.

25                PROSPECTIVE JUROR:  My wife is an attorney,

Proceedings                458

```
1    my daughter is an attorney.  I have a number of friends
2    who are police officers, and well, one is a police
3    officer.  I have a client who is a police officer.  I
4    have a couple of close friends who are attorneys,
5    criminal attorneys.
6              THE COURT:  Obviously, your wife being an
7    attorney, you will talk to her every night, I hope,
8    when you get home?
9              PROSPECTIVE JUROR:  No.
10             THE COURT:  The same assurance.  Is there
11   anything about the fact you know so many people within
12   the legal profession and within law enforcement that
13   you will be able to separate that desire to want to
14   talk them about this case if you are chosen as a juror?
15             PROSPECTIVE JUROR:  Yes.
16             THE COURT:  Is there anything about those
17   relationships that makes you believe that you couldn't
18   be fair and impartial in this case because you want to
19   give one side or the other a little edge?
20             PROSPECTIVE JUROR:  No.
21             THE COURT:  Thank you.  Mr. Diaz.
22             PROSPECTIVE JUROR:  My wife's sister's
23   husband is a cop, NYPD, and her cousin's husband also
24   is NYPD.
25             THE COURT:  Same questions to you.  Is it
```

Proceedings                    459

1    going to get in the way of you doing this job?

2                 PROSPECTIVE JUROR:  I don't think so.  We

3    talk a lot.  He tells me stories and stuff.  I will

4    try.

5                 THE COURT:  A couple of things.  We get

6    nervous as the judge and attorneys.  We get nervous

7    when we hear people say, I will try, or I think so.  We

8    have to make sure we have a jury that is completely

9    fair and impartial.  I have people that will follow the

10   laws as I give it to them and evaluate witness

11   credibility as they come in.  When people say, I will

12   try, or I think so, we get nervous.

13                Let's say you all have that bucket list and

14   on the bucket list you have sky diving.  You have now

15   gotten up the courage to sky dive and done everything

16   you need to do on the ground.  Now you are on that

17   plane way up in the sky and ready to jump out and the

18   instructor says to you, the last thing we need to do

19   before we jump is check each other's packs to make sure

20   the parachute is good, the straps are good, everything

21   is tight, good to go.  Once we do that, we'll jump out

22   of the plane.  And the instructor says to you, you

23   check my pack first.  You, as the nonexpert, turn to

24   the instructor, you start checking the pack, the

25   straps, doing everything.  You turn him around and go

Proceedings                   460

1    thumbs up, you are good to go.  I know you are good to
2    go.  The instructor turns you around, checks your
3    straps, takes you and he goes, I tried to check.  I
4    think you are good.  Are you going to jump out of that
5    plane?  No.  So, it's kind of that theory.  Everyone
6    will try and everyone thinks they will, but in a jury
7    situation we need to know you can do it, not that you
8    will try to do it, and there is no wrong answer and if
9    you can't, that's okay.  I need to know for sure, this
10   relationship with law enforcement, will it get in the
11   way?
12             PROSPECTIVE JUROR:  No.
13             THE COURT:  Don't give me the answer because
14   you think I want to hear it.
15             PROSPECTIVE JUROR:  No, it won't.
16             THE COURT:  Ms. Bowen.
17             PROSPECTIVE JUROR:  Paralegal at a law firm.
18             THE COURT:  Civil or criminal?
19             PROSPECTIVE JUROR:  Immigration lawyers.
20             THE COURT:  Is there anything about the fact
21   you will have a set of knowledge, a skilled set others
22   might not have, do you appreciate and understand the
23   law has to come from me, however, it can't come from
24   your law firm where you work and it can't come from
25   your ability to go home and get on Lexus and research

Proceedings                          461

1       something; do you understand that?

2                   PROSPECTIVE JUROR:  Yes.

3                   THE COURT:  Can you give me assurance you

4       wouldn't do those things if you are picked?

5                   PROSPECTIVE JUROR:  Yes.

6                   THE COURT:  Ms. Quinones?

7                   PROSPECTIVE JUROR:  No.

8                   THE COURT:  Mr. Rodriguez, anyone?

9                   PROSPECTIVE JUROR:  My stepson is a

10      corrections officer, and my son-in-law is a prosecutor

11      for the DA's in Queens.

12                  THE COURT:  Again, to you, sir, is there

13      anything about the fact that you are close to people

14      that are in law enforcement and, in fact, close to

15      someone who is a prosecutor; is that going to get in

16      the way of you being fair and impartial to both sides

17      here?

18                  PROSPECTIVE JUROR:  Yes, I think so.

19                  THE COURT:  Thank you very much for your

20      honesty.  I appreciate that.

21                  Ms. Cardona.

22                  MR. BERGER:  Yes, it will get in the way.

23                  THE COURT:  Yes, it will get in the way.

24                  Ms. Cardona.

25                  PROSPECTIVE JUROR:  My mother is a defense

kmm

Proceedings                              462

1    attorney in Florida.  She passed away two years ago.

2                THE COURT:  Is there anything about that

3    relationship that is going to get in the way of you

4    being fair and impartial?

5                PROSPECTIVE JUROR:  No.

6                THE COURT:  Are you going to give either side

7    a leg up based on your mom's prior work?

8                PROSPECTIVE JUROR:  Leg up?

9                THE COURT:  Meaning you will say, hey, mom,

10   I'm a defense attorney, therefore, defense attorneys

11   are the best, or hey, for everyone else, my relative is

12   a prosecutor.  Therefore, prosecutors are better than

13   everyone else.  You will be able to evaluate the

14   evidence fairly?

15               PROSPECTIVE JUROR:  Yes.

16               THE COURT:  Mr. Ruiz?

17               PROSPECTIVE JUROR:  My brother-in-law is a

18   detective.

19               THE COURT:  Where at?

20               PROSPECTIVE JUROR:  Suffolk County.

21               THE COURT:  Is there anything about that

22   relationship that is going to get in the way of you

23   being fair and impartial?

24               PROSPECTIVE JUROR:  No.

25               THE COURT:  Will you be able to evaluate law

Proceedings                 463

1    enforcement that comes here the same way as you would
2    everybody else?
3                    PROSPECTIVE JUROR:  Yes.
4                    THE COURT:  Mr. Cammarano?
5                    PROSPECTIVE JUROR:  Yes, sir.  My uncle is
6    retired NYPD.
7                    THE COURT:  Same questions to you, sir.  Is
8    it going to get in the way?
9                    PROSPECTIVE JUROR:  No.
10                   THE COURT:  Mr. Neal, anything?
11                   PROSPECTIVE JUROR:  I have a child in Suffolk
12   County, a cop.
13                   THE COURT:  Still lives with you or no?
14                   PROSPECTIVE JUROR:  No.
15                   THE COURT:  Do you talk to him every day?
16                   PROSPECTIVE JUROR:  Yes.
17                   THE COURT:  Yes?
18                   PROSPECTIVE JUROR:  I do.
19                   THE COURT:  I need you to say yes or no.
20                   Are you going to be able to give me assurance
21   that you will not start talking to him about this case
22   when you speak to him each day?
23                   PROSPECTIVE JUROR:  I wouldn't talk to him.
24                   THE COURT:  You would not talk to him?
25                   PROSPECTIVE JUROR:  No.

Proceedings                    464

1              THE COURT:  Is the fact that your son is in

2    law enforcement going to get in the way of you being

3    fair and impartial in this case?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Thank you very much.

6              Mr. Miley, we heard from you.  Thank you.

7              Ms. Tracy, anything?

8              PROSPECTIVE JUROR:  My son was a cop in the

9    city for eight years.  He switched over to the fire and

10   on that for about seven years.

11             MR. BERGER:  Her --

12             THE COURT:  Son is a cop in the city and

13   switched over to the fire department.

14             Anything about that relationship that gets in

15   the way of you being fair and impartial?

16             PROSPECTIVE JUROR:  No.  I heard some horror

17   stories in the Bronx, but it didn't interfere.

18             THE COURT:  The horror stories you heard

19   about when he was in the Bronx, can I get assurance

20   from you that you will not start thinking about them

21   when you are sitting here on this case because

22   obviously, what happened in the Bronx has nothing to do

23   with the charges here?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Can I get assurance from you?

                                                      kmm

Proceedings                    465

1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  Can I get assurance from you that

3    you will not call your son up?  What do you think?

4    This is what is going on.

5              PROSPECTIVE JUROR:  No, I wouldn't do that.

6              THE COURT:  Let's excuse Mr. Rodriguez.  You

7    are excused on consent.

8              MR. PERRI:  Yes, your Honor.

9              MR. BERGER:  Yes, your Honor.

10             THE CLERK:  Grace Shin, S-H-I-N.

11             THE COURT:  Welcome, Ms. Shin.  I hope you

12   have been paying attention.  Is there anything you need

13   to tell me?

14             PROSPECTIVE JUROR:  I can't fully understand.

15   It's hard to listen.

16             MR. BERGER:  Consent.

17             MR. PERRI:  Yes, your Honor.

18             THE COURT:  Thank you.

19             THE CLERK:  Brendan J. Quinn, Q-U-I-N-N, seat

20   number eight.

21             THE COURT:  Welcome, Mr. Quinn, anything you

22   need to tell me so far?

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  Any family or friends in law

25   enforcement?

Proceedings                    466

1          PROSPECTIVE JUROR:  Well, maternal

2     grandfather.

3          THE COURT:  What did he do?

4          PROSPECTIVE JUROR:  I think he's a retired

5     police officer, but like back in the day, back in the

6     day.

7          THE COURT:  Will you be able to follow my

8     principles of law?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Any issue, do you know anyone or

11    you, yourself, ever a victim of a crime, witnessed a

12    crime, convicted of a crime, or have any pending

13    matters?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  And the days of the week are good

16    for you with regard to sitting?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  I'll go down the row to each of

19    you with some general questions.

20         Mr. Ortega, which town do you reside in?

21         PROSPECTIVE JUROR:  Nassau County, Long

22    Beach.

23         THE COURT:  How long have you been there,

24    sir?

25         PROSPECTIVE JUROR:  About twenty-five years.

Proceedings                    467

1                      THE COURT:  What is the highest level of

2          school you completed?

3                      PROSPECTIVE JUROR:  Kind of college, three

4          years.

5                      THE COURT:  Do you work, sir?

6                      PROSPECTIVE JUROR:  I do.

7                      THE COURT:  What do you do?

8                      PROSPECTIVE JUROR:  Doorman.

9                      THE COURT:  Married, sir?

10                     PROSPECTIVE JUROR:  Yes.

11                     THE COURT:  What does your spouse do?

12                     PROSPECTIVE JUROR:  She doesn't work.

13                     THE COURT:  Homemaker?

14                     PROSPECTIVE JUROR:  Yes.

15                     THE COURT:  Hardest job in the world.  Do you

16         have any children?

17                     PROSPECTIVE JUROR:  I do.  I have two,

18         twenty-five and twenty-three.

19                     THE COURT:  Twenty-three, what does she do?

20                     PROSPECTIVE JUROR:  Goes to school.

21                     THE COURT:  What was the age of the other

22         one?

23                     PROSPECTIVE JUROR:  Twenty-five.

24                     THE COURT:  What does that child do?

25                     PROSPECTIVE JUROR:  Also goes to school.

Proceedings                    468

1              THE COURT:  How do you like to spend your

2      spare time?

3              PROSPECTIVE JUROR:  Friends, with family,

4      beach.

5              THE COURT:  Sir, are you on social media?

6              PROSPECTIVE JUROR:  I'm sorry?

7              THE COURT:  Are you on social media,

8      Facebook?

9              PROSPECTIVE JUROR:  Not really, no.  Twitter.

10             THE COURT:  If you are chosen as a juror, you

11     will not sign up for a new Facebook account and get on

12     it?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  You cannot go on to social media

15     and discuss this case if you are chosen as a juror.

16     Can you give me your assurance you will not do that?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Mr. McKnight, what town do you

19     reside in?

20             PROSPECTIVE JUROR:  Massapequa Park.

21             THE COURT:  How long have you been there?

22             PROSPECTIVE JUROR:  Thirty-eight years.

23             THE COURT:  Highest level of school?

24             PROSPECTIVE JUROR:  College.

25             THE COURT:  Do you work?

Proceedings                    469

1               PROSPECTIVE JUROR:  Yes.

2               THE COURT:  What do you do?

3               PROSPECTIVE JUROR:  Carpentry.

4               THE COURT:  Married, sir?

5               PROSPECTIVE JUROR:  No.

6               THE COURT:  Significant other?

7               PROSPECTIVE JUROR:  Yes.

8               THE COURT:  What does he or she do?

9               PROSPECTIVE JUROR:  Homemaker.

10              THE COURT:  Any children?

11              PROSPECTIVE JUROR:  Yes.

12              THE COURT:  How many?

13              PROSPECTIVE JUROR:  One.

14              THE COURT:  Age?

15              PROSPECTIVE JUROR:  Six.

16              THE COURT:  Other than keeping busy with your

17   six-year old, how do you like to spend your spare time?

18              PROSPECTIVE JUROR:  Fishing, anything

19   outdoors.

20              THE COURT:  Social media?

21              PROSPECTIVE JUROR:  No, I'm not.

22              THE COURT:  You won't start now?

23              PROSPECTIVE JUROR:  No, I will not.

24              THE COURT:  Mr. Rubinic.

25              PROSPECTIVE JUROR:  New Hyde Park.

Proceedings                    470

1              THE COURT:  How long have you been there?

2              PROSPECTIVE JUROR:  Fifteen years.

3              THE COURT:  Highest level of school?

4              PROSPECTIVE JUROR:  College.

5              THE COURT:  Work, sir?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  What do you do?

8              PROSPECTIVE JUROR:  Sell commercial time for

9    radio stations.

10             THE COURT:  Married?

11             PROSPECTIVE JUROR:  Separated.

12             THE COURT:  What did your spouse do?

13             PROSPECTIVE JUROR:  She works for the Town of

14   North Hempstead for the district attorney.

15             THE COURT:  For the county attorney?

16             PROSPECTIVE JUROR:  County.

17             THE COURT:  In the Town of North Hempstead?

18             PROSPECTIVE JUROR:  Right.

19             THE COURT:  Children?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  School age or grown?

22             PROSPECTIVE JUROR:  All teach.

23             THE COURT:  How do you like to spend your

24   spare time.

25             PROSPECTIVE JUROR:  Hockey baseball.

kmm

Proceedings                    471

1              THE COURT:  Rangers or Islander.

2              PROSPECTIVE JUROR:  Rangers.

3              THE COURT:  Not looking too good for us.  Any

4      social media?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Let me go back to the Town of

7      North Hempstead.  Do I need to be concerned that you

8      will call up anyone from the Town of North Hempstead

9      and try to get a better understanding of what will go

10     on here?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  Mr. Fischer, what is the town

13     which you reside?

14             PROSPECTIVE JUROR:  Glen Cove.

15             THE COURT:  How long?

16             PROSPECTIVE JUROR:  Thirty-eight years.

17             THE COURT:  Highest level of school?

18             PROSPECTIVE JUROR:  Bachelor.

19             THE COURT:  Do you work?

20             PROSPECTIVE JUROR:  I'm a CPA.

21             THE COURT:  Married?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Spouse work?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  What does he or she do?

Proceedings                    472

1              PROSPECTIVE JUROR:  She is an attorney.

2              THE COURT:  Any children?

3              PROSPECTIVE JUROR:  One.

4              THE COURT:  School age or grown?

5              PROSPECTIVE JUROR:  Grown.

6              THE COURT:  What does he or she do?

7              PROSPECTIVE JUROR:  Attorney.

8              THE COURT:  You did tell me that.  I

9     apologize.  How do you like to spend your spare time?

10             PROSPECTIVE JUROR:  Golf, friends.

11             THE COURT:  Social media?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Don't start now.

14             PROSPECTIVE JUROR:  Mr. Diaz, what town?

15             PROSPECTIVE JUROR:  Elmont.

16             THE COURT:  How long have you been there?

17             PROSPECTIVE JUROR:  Five years.

18             THE COURT:  Where were you before that?

19             PROSPECTIVE JUROR:  Bayside.

20             THE COURT:  Queens?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  You were in Queens and then

23    Nassau County?

24             PROSPECTIVE JUROR:  No, I was here before

25    that.

kmm

Proceedings                    473

1              THE COURT:  Where were you when you were here
2        before?
3              PROSPECTIVE JUROR:  In Elmont.
4              THE COURT:  Highest level of school?
5              PROSPECTIVE JUROR:  One year of college.
6              THE COURT:  Do you work?
7              PROSPECTIVE JUROR:  Yes.
8              THE COURT:  What do you do?
9              PROSPECTIVE JUROR:  Retail supermarket.
10             THE COURT:  Married?
11             PROSPECTIVE JUROR:  Yes.
12             THE COURT:  What does your spouse do?
13             PROSPECTIVE JUROR:  Dental lab tech.
14             THE COURT:  Any children?
15             PROSPECTIVE JUROR:  Three.
16             THE COURT:  School age?
17             PROSPECTIVE JUROR:  School age.
18             THE COURT:  How do you like to spend your
19        spare time?
20             PROSPECTIVE JUROR:  Family, outdoor.
21             THE COURT:  Social media?
22             PROSPECTIVE JUROR:  No.
23             THE COURT:  Ms. Bowen, what town, ma'am?
24             PROSPECTIVE JUROR:  Massapequa Park.
25             THE COURT:  How long have you been there?

kmm

Proceedings                474

```
 1                    PROSPECTIVE JUROR:  Twelve years.

 2                    THE COURT:  Highest level of school?

 3                    PROSPECTIVE JUROR:  Bachelor's degree.

 4                    THE COURT:  Do you work?

 5                    PROSPECTIVE JUROR:  Part-time paralegal.

 6                    THE COURT:  Married?

 7                    PROSPECTIVE JUROR:  Yes.

 8                    THE COURT:  Spouse work?

 9                    PROSPECTIVE JUROR:  Yes.  He's an operating

10          engineer.

11                    THE COURT:  Any children?

12                    PROSPECTIVE JUROR:  Yes, two, eight and ten.

13                    THE COURT:  How do you like spend your spare

14          time?

15                    PROSPECTIVE JUROR:  Family, volunteering,

16          girl scouts, church functions.

17                    THE COURT:  Social media?

18                    PROSPECTIVE JUROR:  Yes, but not active.

19                    THE COURT:  Ms. Quinones, which town?

20                    PROSPECTIVE JUROR:  Franklin Square.

21                    THE COURT:  How long have you been there?

22                    PROSPECTIVE JUROR:  Twenty-five years.

23                    THE COURT:  Highest level of school?

24                    PROSPECTIVE JUROR:  Bachelor of science.

25                    THE COURT:  Work?
```

Proceedings                    475

1              PROSPECTIVE JUROR:  Part time.

2              THE COURT:  What do you do part time?

3              PROSPECTIVE JUROR:  Laboratory technologist.

4              THE COURT:  Married?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Significant other?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Any children?

9              PROSPECTIVE JUROR:  One.

10             THE COURT:  Grown or school age?

11             PROSPECTIVE JUROR:  Grown.

12             THE COURT:  What does she do?

13             PROSPECTIVE JUROR:  Business analyst.

14             THE COURT:  How do you like to spend your

15      spare time?

16             PROSPECTIVE JUROR:  Grand kids.

17             THE COURT:  Are you on social media?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  Mr. Quinn.

20             PROSPECTIVE JUROR:  Bethpage.

21             THE COURT:  How long?

22             PROSPECTIVE JUROR:  Twenty years.

23             THE COURT:  Highest level of school you

24      completed?

25             PROSPECTIVE JUROR:  High school.

1            THE COURT:  Do you work, sir?

2            PROSPECTIVE JUROR:  Can you --

3            THE COURT:  I'm having trouble hearing.  Can

4    everyone come up to the bench to hear?  I couldn't hear

5    you from over there.  I wanted to -- I just have a few

6    questions.  I want to make sure I heard you correctly.

7            Bethpage, twenty years, finished high school.

8            PROSPECTIVE JUROR:  Yes.

9            THE COURT:  What is it you do for your job?

10           PROSPECTIVE JUROR:  No.

11           THE COURT:  No employment?

12           PROSPECTIVE JUROR:  No.

13           THE COURT:  Married?

14           PROSPECTIVE JUROR:  No.

15           THE COURT:  Any children?

16           PROSPECTIVE JUROR:  No.

17           THE COURT:  How do you like to spend your

18   spare time?

19           PROSPECTIVE JUROR:  I mean, I like to, I like

20   to read.  I also like to research.

21           THE COURT:  Are you on social media?  Are you

22   on Facebook?

23           PROSPECTIVE JUROR:  Not active social media.

24           THE COURT:  Can you give me assurance if you

25   are picked as a juror you wouldn't go on Facebook and

Proceedings                477

1      talk about the case?

2                  PROSPECTIVE JUROR:  No, I got better things

3      to do.

4                  THE COURT:  Thank you.  I appreciate you

5      coming up.  I had trouble hearing you back there.

6                  Ms. Cardona, which town?

7                  PROSPECTIVE JUROR:  Baldwin.

8                  THE COURT:  How long?

9                  PROSPECTIVE JUROR:  Eighteen years.

10                 THE COURT:  Highest level of school?

11                 PROSPECTIVE JUROR:  Bachelor.

12                 THE COURT:  Do you work?

13                 PROSPECTIVE JUROR:  Yes.

14                 THE COURT:  What do you do?

15                 PROSPECTIVE JUROR:  Nassau County civil

16     service, commission personal specialist.

17                 THE COURT:  Are you married?

18                 PROSPECTIVE JUROR:  No.

19                 THE COURT:  Significant other?

20                 PROSPECTIVE JUROR:  No.

21                 THE COURT:  Children?

22                 PROSPECTIVE JUROR:  Yes.

23                 THE COURT:  How many?

24                 PROSPECTIVE JUROR:  Three.

25                 THE COURT:  Grown or school age?

Proceedings                478

1                    PROSPECTIVE JUROR:  Grown.

2                    THE COURT:  What do they do?

3                    PROSPECTIVE JUROR:  My son-in-law is a Nassau

4      County probation officer.

5                    THE COURT:  Thank you.

6                    What do the other two do?

7                    PROSPECTIVE JUROR:  One is a search plant

8      operator and my daughter is a student.

9                    THE COURT:  With regards to your son that is

10     the Nassau County probation officer, same questions for

11     you, is it going to get in the way of you being fair

12     and impartial if you are picked?

13                   PROSPECTIVE JUROR:  No.

14                   THE COURT:  Are you going to get the sense

15     that you need to call them up and say, hey, I don't

16     understand what is going on, can you explain it to me?

17                   PROSPECTIVE JUROR:  No.

18                   THE COURT:  Can you give me assurance you

19     will not try to reach out to them during the pendency

20     of this trial if you are picked as a juror?

21                   PROSPECTIVE JUROR:  Yes.

22                   THE COURT:  Other than to talk about the

23     family?

24                   PROSPECTIVE JUROR:  Yes.

25                   THE COURT:  Thank you.

Proceedings                479

```
 1                    Mr. Ruiz, what town?

 2          PROSPECTIVE JUROR:  Levittown.

 3          THE COURT:  How long have you been there?

 4          PROSPECTIVE JUROR:  Twenty-four years.

 5          THE COURT:  Highest level of school?

 6          PROSPECTIVE JUROR:  College.

 7          THE COURT:  Do you work?

 8          PROSPECTIVE JUROR:  Yes.

 9          THE COURT:  What do you do?

10          PROSPECTIVE JUROR:  Investor analyst.

11          THE COURT:  Married?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Significant other?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Children?

16          PROSPECTIVE JUROR:  Nope.

17          THE COURT:  How do you like to spend your

18     spare time?

19          PROSPECTIVE JUROR:  Work out.

20          THE COURT:  On social media?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Are you the kind of guy this

23     morning when you got up and realized you were coming to

24     jury duty, if I was on your Facebook page, if you have

25     that, would it say Mineola courts next to it?
```

Proceedings                   480

1            PROSPECTIVE JUROR:  No.

2            THE COURT:  What I'm getting at, being that

3    you are on social media, I need your assurance you will

4    not start posting about their case if you are chosen as

5    a juror; can you give me that assurance?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  Do you blog?

8            PROSPECTIVE JUROR:  No.

9            THE COURT:  I need you to not start blogging,

10   even if the spirit moved you if you were picked as a

11   juror.  I need to know you wouldn't do that.  Thank

12   you, sir.

13           Mr. Cammarano.

14           PROSPECTIVE JUROR:  Freeport.

15           THE COURT:  How long have you been there?

16           PROSPECTIVE JUROR:  I grew up there.  I've

17   been there for about a year.  I grew up there, moved

18   out, been there for a year.

19           THE COURT:  Highest level of school?

20           PROSPECTIVE JUROR:  Master's.

21           THE COURT:  In what?

22           PROSPECTIVE JUROR:  Education.

23           THE COURT:  Do you work?

24           PROSPECTIVE JUROR:  Yes.

25           THE COURT:  What do you do?

1          PROSPECTIVE JUROR:  Teacher.

2          THE COURT:  Are you married?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Significant other?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Children?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  How do you like to spend your
9      spare time?

10          PROSPECTIVE JUROR:  Sports, poker, family.

11          THE COURT:  Social media?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Can you give me that assurance
14      you wouldn't post about this case if you are chosen as
15      a juror?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Mr. Neal, what town?

18          PROSPECTIVE JUROR:  Levittown.

19          THE COURT:  How long have you been there?

20          PROSPECTIVE JUROR:  Fifty years.

21          THE COURT:  Highest level of school?

22          PROSPECTIVE JUROR:  High school.

23          THE COURT:  Do you work?

24          PROSPECTIVE JUROR:  I do.

25          THE COURT:  What do you do?

Proceedings                    482

1              PROSPECTIVE JUROR:  Automotive field.

2              THE COURT:  Are you married?

3              PROSPECTIVE JUROR:  I am.

4              THE COURT:  Does he or she work?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  What does he or she do?

7              PROSPECTIVE JUROR:  Clerical.

8              THE COURT:  Any children?

9              PROSPECTIVE JUROR:  Two.

10             THE COURT:  Grown or school age?

11             PROSPECTIVE JUROR:  Grown.

12             THE COURT:  What do they do?

13             PROSPECTIVE JUROR:  Cop, and my daughter is

14     clerical.

15             THE COURT:  How do you like to spend your

16     spare time?

17             PROSPECTIVE JUROR:  Yard work.

18             THE COURT:  Are you on social media?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  Mr. Miley, what town?

21             PROSPECTIVE JUROR:  East Meadow.

22             THE COURT:  How long have you been there?

23             PROSPECTIVE JUROR:  Twenty-two years.

24             THE COURT:  Highest level of school?

25             PROSPECTIVE JUROR:  Four years of college,

Proceedings                483

1        two-year degree.

2                    THE COURT:  I know you retired NYPD.

3                    PROSPECTIVE JUROR:  Correct.

4                    THE COURT:  Do you currently work?

5                    PROSPECTIVE JUROR:  Yes, I do.

6                    THE COURT:  What do you do?

7                    PROSPECTIVE JUROR:  Commercial blazing

8        company.

9                    THE COURT:  Are you married?

10                   PROSPECTIVE JUROR:  Yes.

11                   THE COURT:  Spouse work?

12                   PROSPECTIVE JUROR:  She.

13                   THE COURT:  What does she do?

14                   PROSPECTIVE JUROR:  Real estate.

15                   THE COURT:  I know you had children, just

16       remind me.

17                   PROSPECTIVE JUROR:  Four.

18                   THE COURT:  All grown?

19                   PROSPECTIVE JUROR:  Nope.

20                   THE COURT:  What do they do?

21                   PROSPECTIVE JUROR:  The one that is not

22       grown?

23                   THE COURT:  You have one.

24                   PROSPECTIVE JUROR:  I have three grown and

25       one fifteen-year old.

Proceedings                484

1              THE COURT:  Three grown, what do they do?

2              PROSPECTIVE JUROR:  One is a sanitation

3        supervisor, New York City.  My daughter is a registered

4        nurse, and my son, my other son is a union carpenter.

5              THE COURT:  How do you like to spend your

6        spare time?

7              PROSPECTIVE JUROR:  Usually wind up in the

8        fall coaching youth football, and basically, any time

9        after that I'm kind of like a couch potato.  That's

10       about it.

11             THE COURT:  Social media?

12             PROSPECTIVE JUROR:  Yes, I am.

13             THE COURT:  Can you give me your assurance

14       you will not post about this case?

15             PROSPECTIVE JUROR:  Absolutely.

16             THE COURT:  Ms. Tracy, what town?

17             PROSPECTIVE JUROR:  Hicksville.

18             THE COURT:  How long have you been there?

19             PROSPECTIVE JUROR:  Forty-five years.

20             THE COURT:  Highest level of school?

21             PROSPECTIVE JUROR:  High school.

22             THE COURT:  Do you work, ma'am?

23             PROSPECTIVE JUROR:  No, I'm retired.

24             THE COURT:  What did you do before you were

25       retired?

Proceedings                485

1               PROSPECTIVE JUROR:  Mostly I was a

2        stay-at-home mom and then part time in the Hicksville

3        school district and later in life I got my LPN license.

4               THE COURT:  Are you married now?

5               PROSPECTIVE JUROR:  Yes.

6               THE COURT:  Spouse work?

7               PROSPECTIVE JUROR:  No, retired.

8               THE COURT:  What did he do?

9               PROSPECTIVE JUROR:  Deputy FDNY, retired

10       chief.

11              THE COURT:  Any children?

12              PROSPECTIVE JUROR:  Three.

13              THE COURT:  Grown?

14              PROSPECTIVE JUROR:  Yes.

15              THE COURT:  What do they do?

16              PROSPECTIVE JUROR:  Older one was a cop

17       turned firemen.  My daughter is a nurse, and my younger

18       son works for the post office.

19              THE COURT:  How do you like to spend your

20       spare time?

21              PROSPECTIVE JUROR:  Shopping, watching my

22       grandchildren, walking.

23              THE COURT:  Social media?

24              PROSPECTIVE JUROR:  No.

25              THE COURT:  I just want to note the time for

Proceedings                    486

1    everybody.  It's getting a little late.  It's at a

2    point in time where the attorneys will be able to ask

3    you questions.  Rather than break that up, what we'll

4    do is break for lunch now.  I'm going to ask you to all

5    be back and the officers will tell you where to go.  Be

6    back at 2:00 sharp.  We will call you back into the

7    room at 2:00.  The attorneys will ask you questions and

8    see if any have been chosen as jurors.  Depending how

9    far we get to those of you in the audience, it will be

10   your turn to come up here in the box.  Enjoy your

11   lunch.  Let me give you some admonitions while you

12   leave and walk about.

13          Please keep an open mind throughout this

14   process.  Do not discuss anything that has happened so

15   far amongst yourselves or with anyone else during this

16   lunch break.  Do not permit anyone to discuss what

17   happened so far or try to talk to you about the case in

18   your presence.  Don't talk to the lawyers, witnesses,

19   or the defendant about anything during this break, and

20   if you see us out there at lunchtime, we're going to

21   ignore you.  Don't take it personally.

22          Don't go and visit or view the place where

23   this alleged crime was allegedly committed, or any

24   other place involved in the case, and please don't run

25   off to a library.  Nobody does that anymore, or more

Proceedings                 487

1    importantly, Google.  Don't Google anything about this

2    case.  If you believe there was news coverage, ignore

3    it and put it out of your mind.  You are not allowed to

4    research anything about this matter during your lunch

5    break.  See you all at 2:00.  Enjoy your lunch.

6              (Whereupon, the jury exited the courtroom.)

7              THE COURT:  Anything for the record?

8              MR. PERRI:  No, your Honor.

9              MR. BERGER:  No, your Honor.

10             (Whereupon, a luncheon recess was taken.)

11                  *              *              *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                A F T E R N O O N   S E S S I O N

3

4

5          THE CLERK:  Case on trial continued,

6    Indictment Number 742N of 2014, People of the State of

7    New York vs. Daniel Ramos.

8                Let the record reflect all parties are

9    present.  The jury is not present at this time.

10               We have a substitution of the Spanish

11   interpreter.  What is your appearance on the record?

12   We have had Carmen Knight.

13          THE INTERPRETER:  Carmen Simeonide,

14   S-I-M-E-O-N-I-D-E.

15          MR. PERRI:  Yes, your Honor.

16          MR. BERGER:  Yes, ready.

17          THE COURT:  Anything we need to put on the

18   record before we bring the jury in?

19          MR. PERRI:  Your Honor, there is one matter

20   with regard to Rosario.  It can be done with now or

21   after the jury.

22          THE COURT:  Let's do it after.

23               We'll get the jury done and go into it.

24               (Whereupon, the jury panel entered the

25   courtroom.)

kmm

Proceedings                    489

1              THE CLERK:  Do both sides stipulate the

2    jurors are seated in the jury box?

3              MR. PERRI:  Yes, your Honor.

4              MR. BERGER:  Yes.

5              THE COURT:  Welcome back, everyone.  I hope

6    you enjoyed your lunch.  Now the jurors will address

7    the jurors in the jury box.  The law does require that

8    the assistant district attorney speak first.  Remember

9    that what the lawyers say at any time is not evidence.

10   Thus, the questions they're about to ask you and the

11   answers you give are not evidence in this case.

12             MR. PERRI:  Thank you, your Honor.

13             Good afternoon, ladies and gentlemen.  Thank

14   you for coming back for the second half of your jury

15   service today on behalf of Madeline Singas, the Acting

16   District Attorney.  Thank you for service.  I'm sure

17   the Court and defense counsel do as well.  This time is

18   a limited amount of time, a unique part of the trial.

19   The fact is, it is the only time you and I are going to

20   be directly interacting with each other, the only time

21   I get to ask questions.  You get to give me answers.

22   You get to ask questions or raise issues.  The most

23   important thing for the defense and People in this case

24   is that each of you be honest, forthcoming, truthful,

25   and bring up anything you believe is relevant to

Proceedings                    490

1      anyone's consideration about whether or not you could

2      be fair and impartial, and take this entire process

3      seriously from the beginning of the trial all the way

4      through deliberations.

5              Now, you heard Judge Corrigan explain this is

6      a case that does involve child sexual abuse.  That as

7      part of that, it's the People's intention that we're

8      going to have to call child witnesses in this case.

9      We're going to have to.  I wanted to ask if anyone out

10     of this panel has a specific problem or issue with the

11     idea of the child testifying, and your role as a jury

12     is going to be to judge them on the credibility,

13     determine whether or not you believe the evidence they

14     provide in their testimony can be relied on by you in

15     deciding whether or not people reached their burden.

16             Ms. Tracy, do you have trouble with a child

17     testifying and listening to testimony?

18             PROSPECTIVE JUROR:  No.

19             MR. PERRI:  Do you believe a capable child is

20     capable of telling the truth?

21             PROSPECTIVE JUROR:  Yes.

22             MR. PERRI:  Do you believe a child could

23     testify to the truth of something, Mr. Miley?

24             PROSPECTIVE JUROR:  Yes.

25             MR. PERRI:  Mr. Neal, do you feel it would be

kmm

Proceedings                491

1    possible for a child to testify and rely on that

2    testimony of evidence?

3              PROSPECTIVE JUROR:  Depending on the age.

4              MR. PERRI:  If the Judge instructed you on

5    whether or not the child's testimony could basically be

6    credited and whether or not it could be sworn in at

7    this trial, would you follow the Judge's instructions?

8              PROSPECTIVE JUROR:  I would.

9              MR. PERRI:  Mr. Cammarano, do you have any

10   problems hearing a child testifying?

11             PROSPECTIVE JUROR:  No.

12             MR. PERRI:  Mr. Ruiz?

13             PROSPECTIVE JUROR:  No, I do not.

14             MR. PERRI:  Mr. Rubinic, do you have any

15   issues with child testimony and judging that along with

16   all of the other evidence the People present to you?

17             PROSPECTIVE JUROR:  No problem.

18             MR. PERRI:  Mr. Fischer?

19             PROSPECTIVE JUROR:  No.

20             MR. PERRI:  In the same vein, we are talking

21   about witnesses, if the People decide to have a

22   ten-year old child to take the stand, we do intend to

23   bring other civilians, expert, police officers,

24   detectives and medical personnel to testify in this

25   case.  And the case of the People is hope to put in

Proceedings                492

1    front of you to prove the defendant's guilt beyond a

2    reasonable doubt.  It isn't any one single facet to

3    rely on, but instead it is going to be a culmination of

4    multiple parts.

5         Ms. Bowen, would you be able to keep an open

6    mind, even if there is one piece of evidence you don't

7    agree with, you will weigh it to make a decision, and

8    as a whole case, you will wait until you hear all of

9    the evidence at the end of the case?

10        PROSPECTIVE JUROR:  I believe so.

11        MR. PERRI:  Would you agree there is a

12   difference between whether or not you give credit to

13   the witness's testimony, whether you find them

14   believable, truthful, accurate and whether you like

15   that person?

16        PROSPECTIVE JUROR:  I'm not sure.

17        MR. PERRI:  Do you have to like someone to

18   believe them?

19        PROSPECTIVE JUROR:  No.

20        MR. PERRI:  Mr. Diaz, do you have to like

21   someone to believe them?

22        PROSPECTIVE JUROR:  No.

23        MR. PERRI:  If we called a witness, in

24   particular, or didn't want to hang out with them after

25   the trial, at some point you could listen to them

1      fairly, honestly and possibly find them credible and

2      believe their testimony even if you didn't like them?

3                  PROSPECTIVE JUROR:  Yes.

4                  MR. PERRI:  Mr. Ortega, even if you don't

5      like a personality or how they carry themselves, could

6      you listen to them factually testifying to make a

7      determination as to whether or not you give them

8      credit?

9                  PROSPECTIVE JUROR:  Yes.

10                 MR. PERRI:  Mr. McKnight, how about you?

11                 PROSPECTIVE JUROR:  Yes.

12                 MR. PERRI:  Do you have issues with a child

13     testifying or whether they are telling the truth?

14                 PROSPECTIVE JUROR:  No.

15                 MR. PERRI:  Now, as part of the process of

16     determining the credibility of a witness, whether an

17     adult, a police officer, whether a child, there is no

18     magical solution to determine whether one person is

19     telling the truth or not.  That's what each of us does

20     every day in our lives, we try to understand if someone

21     is telling the truth to us or lying.

22                 Now, Ms. Quinones, when you are dealing with

23     someone trying to decide whether or not you trust them

24     and whether or not you believe they are telling the

25     truth, do you look at their body language when speaking

Proceedings                   494

1     to you?

2              PROSPECTIVE JUROR:  Yes.

3              MR. PERRI:  Do you look at when -- what they

4     are saying is consistent?

5              PROSPECTIVE JUROR:  Yes.

6              MR. PERRI:  Do you look and figure out

7     whether or not they have reason to deceive you?

8              PROSPECTIVE JUROR:  Yes.

9              MR. PERRI:  If someone had something to gain,

10    would that influence you to be telling you the truth or

11    not?

12             PROSPECTIVE JUROR:  No.  Repeat that again.

13             MR. PERRI:  If you realize someone has

14    something to gain by lying, would you be more skeptical

15    of what they are saying to you?

16             PROSPECTIVE JUROR:  Yes.

17             MR. PERRI:  If someone had something to gain

18    by lying, would you be skeptical?

19             PROSPECTIVE JUROR:  I think so.

20             MR. PERRI:  If the person had nothing to

21    gain, would you take that into consideration?  Would

22    you take that into consideration, Mr. Diaz?

23             PROSPECTIVE JUROR:  Yes.

24             MR. PERRI:  Mr. Rubinic?

25             PROSPECTIVE JUROR:  Yes.

Proceedings                495

1              MR. PERRI:  Mr. Fischer?

2              PROSPECTIVE JUROR:  Yes.

3              MR. PERRI:  And except for the child witness

4     the People intend to call, they will be testifying, the

5     alleged victim in this case is testifying, especially

6     as an adult, would you find that traumatic or

7     disturbing about the contents of what is being

8     discussed?

9              Does anyone disagree children react

10    differently than adults would; that we would think it

11    is very disturbing.  Does anyone think children would

12    react the same way adults do?

13             Ms. Cardona, does every child, you think,

14    react in the same way as every other child to something

15    traumatic?

16             PROSPECTIVE JUROR:  No.

17             MR. PERRI:  Does every adult, if they

18    observed that, would they think it is traumatic?

19             PROSPECTIVE JUROR:  No.

20             MR. PERRI:  Would you require whether a

21    witness, adult or child, react to something disturbing

22    or traumatic the same way you would react?

23             PROSPECTIVE JUROR:  No.

24             MR. PERRI:  You would treat each person as an

25    individual?

Proceedings                    496

1          PROSPECTIVE JUROR:  Yes.

2          MR. PERRI:  Mr. Quinn, when attempting to

3    judge a person's credibility, when you are trying to

4    figure out to trust them, what do you do in order to

5    figure that out?

6          PROSPECTIVE JUROR:  I look at -- I do look at

7    what they are trying to say, and I also look, I guess,

8    at their character about them, what they say and their

9    character.

10         MR. PERRI:  Mr. Ortega, when the judge is

11   going to give you instructions at the end of the trial

12   that is perfectly acceptable and doesn't break any

13   rules, and the People have prepped witnesses, met with

14   the witnesses beforehand, spoken with witnesses that

15   I'm going to call to the stand, that we worked with

16   them before the trial, would you hold that against the

17   People?  Would you hold that against me, the DA's

18   office, that we met with our witnesses and discussed

19   the case before we put them on the stand?

20         PROSPECTIVE JUROR:  No.

21         MR. PERRI:  Mr. Ortega, do you think it would

22   be strange, I would throw a bunch of random people on

23   the stand I have never spoken to?

24         PROSPECTIVE JUROR:  No.

25         MR. PERRI:  Mr. Rubinic, do you think it

1      would be strange if I didn't speak to them, would that

2      be strange too?

3              PROSPECTIVE JUROR:  Yes.

4              MR. PERRI:  Do you hold anything against me

5      that I intend to call at trial, before they get up on

6      the stand and speak in front of a bunch of people;

7      would you hold that against us?

8              PROSPECTIVE JUROR:  No.

9              MR. PERRI:  Is there anyone here, the Judge

10     has given the instruction on reasonable doubt and the

11     People's burden that we have and we're the only ones

12     that carry a burden.  We have to meet the defendant's

13     burden of proving the defendant's guilt beyond a

14     reasonable doubt.  Does anyone feel they could not

15     follow the Judge's instructions and require the People

16     to go somewhere beyond, beyond reasonable doubt?  We

17     have to get certainty.  Even though the Judge has

18     instructed people act in life as human beings.  We

19     rarely have absolute certainty about anything and yet

20     we still get on with our lives.

21              Is there anyone here who requires the

22     prosecution, the People in this case, to prove their

23     case to a certainty rather than beyond a reasonable

24     doubt?

25              Ms. Quinones, are you comfortable with the

1       burden being beyond a reasonable doubt?

2                   PROSPECTIVE JUROR:  Yes.

3                   MR. PERRI:  Ms. Cardona, would you follow the

4       instructions it is the People's burden of just beyond

5       reasonable doubt?

6                   PROSPECTIVE JUROR:  I don't see the

7       difference between.

8                   MR. PERRI:  The doubt has to be a real doubt,

9       there has to be a reason, something you can articulate.

10      It has to be something reasonable.  The example

11      commonly given, used a couple of times, you go to bed,

12      you go to bed, look out the window, look into the yard,

13      the neighbor's yard and everything is dry, everything

14      is normal, you go to sleep.  You wake up the next

15      morning, go to the front door, everything is soaking

16      wet in your yard, the street, the neighborhood.

17      Everything is soaking wet.  What would you say happened

18      while you were asleep?

19                  PROSPECTIVE JUROR:  It rained.

20                  MR. PERRI:  Is it possible the fire

21      department came and hosed down the flooding, shooting

22      water everywhere, covering the street, plants; could

23      that be possible?

24                  PROSPECTIVE JUROR:  Unlikely.

25                  MR. PERRI:  Is it reasonable to say that's

Proceedings                         499

1     what happened while you were asleep?

2            PROSPECTIVE JUROR:  No.

3            MR. PERRI:  That's what the difference is.

4     We're looking for individuals that can use their reason

5     and rely on the facts and instead of speculating or

6     guessing or imagining, dealing more in concrete

7     reality, if there is concrete reality, and you could

8     say a doubt, then there is a doubt.  If it isn't

9     something like more imaginary, then the People would

10    have met their burden.

11           Now, after the case has been put before you,

12    then in respects, most difficult, I've been paying

13    attention for the entire trial, the difficult part then

14    is deliberations.  Those of you who are selected to be

15    on the jury have to work with each other to come to a

16    unanimous verdict.  And as the Judge instructed, a

17    unanimous verdict isn't the majority rules, the

18    majority wins.  Each of you take an oath to be a juror,

19    has to promise that you will stand up for what you

20    believe in and that you wouldn't go along with the flow

21    in order to get out early.

22           Mr. Neal, if you were in the minority, when

23    you get back to deliberations, the majority goes

24    against you.  What would you do in the deliberations to

25    convince the other side you are correct?  Do you feel

Proceedings                    500

1    uncomfortable with the idea, you can't go with the

2    majority, you have to reason yourself and discuss it?

3              PROSPECTIVE JUROR:  I don't normally go with

4    what other people say if I don't believe in that.

5              MR. PERRI:  On the other hand, if you were --

6    would you be open though to if you were opposite of

7    what the majority was, would you be open to

8    reconsidering what you believe?

9              PROSPECTIVE JUROR:  I would.

10             MR. PERRI:  Even if the majority would listen

11   to them?

12             PROSPECTIVE JUROR:  I would.

13             MR. PERRI:  Would you listen equally as

14   members of the jury to someone you are back in

15   deliberations with?

16             PROSPECTIVE JUROR:  Yes.

17             MR. PERRI:  Now, the last thing I want to

18   talk about is the question or reality that everyone is

19   exposed to, police shows to some degree and the news to

20   some degree, and both at the present time painting very

21   different views of what it is like to be in a criminal

22   trial, what it is like to be part of the criminal

23   justice system and police officers generally.  How do

24   people watch something like NCIS, or Law & Order, or a

25   cop show or mystery show.  There are several hands

Proceedings                    501

1    here.

2              Mr. McKnight, do you understand that in a

3    criminal trial here it is very different than something

4    you see in Law & Order?

5              PROSPECTIVE JUROR:  Yes.

6              MR. PERRI:  You will follow the Judge's

7    instructions on how far the trial is conducted?

8              PROSPECTIVE JUROR:  I would.

9              MR. PERRI:  Does everyone realize it is not

10   pretty concise as it is on Law & Order and NCIS.  It is

11   a half hour, and there are thousands of discoveries

12   that are made, evidence comes in a complete package and

13   the entire story is covered in an hour; do you

14   understand that's different, Ms. Quinones?

15             PROSPECTIVE JUROR:  Yes.

16             MR. PERRI:  Mr. Fischer?

17             PROSPECTIVE JUROR:  Yes.

18             MR. PERRI:  A couple of questions about

19   individual answers that you gave.

20             Mr. Ortega, both your children are in

21   universities?

22             PROSPECTIVE JUROR:  Yes.

23             MR. PERRI:  Both in college?

24             PROSPECTIVE JUROR:  Both in college.

25             MR. PERRI:  Studying?

Proceedings                    502

1           PROSPECTIVE JUROR:  Accounting and one is

2      going for nursing.

3           MR. PERRI:  Mr. McKnight, how long are you

4      working as a carpenter?

5           PROSPECTIVE JUROR:  Eighteen years.

6           MR. PERRI:  Ms. Bowen, I'm not sure what kind

7      of law firm.

8           PROSPECTIVE JUROR:  Immigration.

9           MR. PERRI:  You did say that.

10          Thank you very much for your time.

11          THE COURT:  Mr. Berger.

12          MR. BERGER:  Good afternoon.

13          Good afternoon, members of the jury.  Let me

14     introduce myself.  My name is Michael Berger.  I live

15     in Brooklyn, New York.  I'm presently residing in Lake

16     Success.  I've been in Nassau County or Long Island for

17     some time.  Does anybody know me?  I have a lot more

18     questions to ask and they're different.

19          While a number of you have not disqualified

20     yourself during Mr. Perri's questions, there is a

21     difference after some of the questions I ask you, that

22     you may decide you shouldn't be sitting here.  That's

23     fine.  There are no wrong answers.  You could give an

24     answer which you might not be proud of.  I'll ask for

25     emotional factors, prejudice.  You might have

Proceedings                503

1    prejudice, as it would apply to this case and you might

2    not be proud of it.  At least, if you tell us, then

3    both of us, you have that and you shouldn't be sitting

4    here and should be sitting on another case.

5              Let me point -- to start out with,

6    Mr. Ortega, in particular, but I'm talking to all of

7    you.  If you have something you think you should add,

8    look, raise your hand and let me know.

9              Mr. Ortega, we all have an emotional side and

10   an intellectual side, correct?

11             PROSPECTIVE JUROR:  Yes.

12             MR. BERGER:  I'm asking the people on the

13   jury to use their intellect and judgment.  I'm asking

14   you to pay attention to the witnesses, listen to what

15   the charge of the Judge is and then make a judgment.

16   There are emotional factors in this case and many

17   people -- we only have eleven jurors.  We have gone

18   through well over one hundred people.  A good number of

19   them had emotional issues.  This is an allegation that

20   Mr. Ramos licked the vagina of a six-year old girl.

21   Mr. Ramos is Hispanic.  People have prejudices against

22   Hispanics; would you agree that exists?

23             PROSPECTIVE JUROR:  Yes.

24             MR. BERGER:  Now, I don't know if any of you

25   have those prejudices.  If you do, the slightest amount

kmm

Proceedings                504

1    and you want to talk about it up at the bench if you

2    are embarrassed not to do it publicly.  The important

3    thing is to be honest about it.  There are no wrong

4    answers.  If you have such a prejudice, tell me.

5              Now, what I'm asking you, I can't ask you to

6    check your emotions at the door.  What I can say to you

7    is to be conscious of the fact you have an emotional

8    side and something may creep up during the course of

9    the trial and trigger those emotions.  You have to

10   assure me you could put that aside, not let it

11   interfere with your intellect; could you do that?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  You have to keep your voices up

14   so the court reporter can take everything down, and the

15   air conditioning is going and it is hard to hear up

16   front.

17             MR. BERGER:  Mr. McKnight, would you do that?

18             PROSPECTIVE JUROR:  Yes, I could.

19             MR. BERGER:  When you say, you think you

20   could, you are not sure?

21             PROSPECTIVE JUROR:  Yes, I could.

22             MR. BERGER:  Is there anything you want to

23   hear, different testimony, Mr. McKnight?

24             PROSPECTIVE JUROR:  I'm not sure I'm

25   comfortable giving an opinion out loud.  Is there

kmm

1      something I could tell you?

2                   MR. BERGER:  You could say it privately.

3                   PROSPECTIVE JUROR:  My opinion on a

4      certain --

5                   THE COURT:  You are not sure you can sit

6      here?

7                   PROSPECTIVE JUROR:  I have an opinion about

8      something that I'm not comfortable sharing with

9      everyone.

10                  MR. BERGER:  If your opinion is by the nature

11     of the charge, you have to understand, that's what the

12     trial is about.  If that's what your concern is -- in

13     other words, there's a charge here.  It is a charge.

14     There is no proof.  Even if there's an indictment, all

15     that means is the judge said -- it's a piece of paper

16     making an accusation.  It doesn't mean it's true.

17     That's why we have trials.

18                  For example, Ms. Bowen, you may have a sense

19     that 75 percent of the cases that people are charged

20     with crimes, they're guilty, that would mean the other

21     25 percent are not, correct?

22                  PROSPECTIVE JUROR:  Okay.

23                  MR. BERGER:  I'm not saying you made this

24     study.  I'm not saying anything.  You could have an

25     opinion.  Some people, any time anybody gets arrested,

1    they're guilty.  We had a gentleman sitting in one of

2    the panels yesterday.  He said, where there's smoke,

3    there's fire.  If they charged him, and there's an

4    indictment, he's guilty.  That's kind of guilty.  We're

5    trying to eliminate that.  That gentleman couldn't sit

6    as a juror.  What I'm asking you to do here is to

7    recognize that -- well, in the first case, let me say,

8    Ms. Fischer, you may have an opinion 75 percent of the

9    cases brought, the person is guilty.  That would mean

10   25 they're not, correct?

11             PROSPECTIVE JUROR:  Yes.

12             MR. BERGER:  What I'm saying to you, we don't

13   decide cases based percentages.  We decide it based

14   upon the merits of a particular case because you don't

15   do it in 75 percent or 25 percent, and that's why we

16   have individual jurors making individual judgments in

17   individual cases.  That's why we are going into our

18   third day of a picking jury.  We have over one hundred

19   people.

20             So, Mr. Diaz, do you understand if you don't

21   make a decision based --

22             PROSPECTIVE JUROR:  I understand it might be

23   a little difficult.

24             MR. BERGER:  What would be difficult?

25             PROSPECTIVE JUROR:  Emotions might get into

1        it.

2                    MR. BERGER:  You are telling me emotions

3        might get in your way?

4                    PROSPECTIVE JUROR:  I have two girls.  It

5        might affect me.

6                    MR. BERGER:  You wouldn't be unique in

7        telling us that.

8                    PROSPECTIVE JUROR:  I know.  I'm not sure.

9                    MR. BERGER:  Would it be fair to say maybe

10       you shouldn't sit on this kind of a case?

11                   PROSPECTIVE JUROR:  Well --

12                   MR. BERGER:  It doesn't mean you are not

13       good.  It's not a flaw in your personality in any way.

14       You seem to have hesitation, correct?

15                   PROSPECTIVE JUROR:  Yes.  I didn't want to go

16       further in the line, it happens.  I don't want to go

17       further than it might happen later on.

18                   THE COURT:  Let me step in.  We're all human

19       beings.  We all have emotions, and there is no way for

20       you to completely check your emotions at the door.

21       What I need to know, what Mr. Berger needs to know,

22       what Mr. Perri needs to know, do you sit here now,

23       having the ability to understand that your decision

24       can't be based on an emotion?  Your decision has to be

25       based on the testimony and the evidence that you find

Proceedings                      508

1    credible and reliable.  It doesn't mean you have to sit

2    there like someone having no emotion with regards to

3    what happened.  Every case has emotions.  What we need

4    to know, and it's not just you, it's everyone.  We need

5    to know the emotion isn't going to take over for what

6    your job is if you are picked, which is to listen to

7    the testimony, look at the evidence, evaluate the

8    testimony, evaluate the evidence, decide if it's

9    credible, decide if the People have met their burden of

10   proof and then vote guilty or not guilty.  That's what

11   I need to know.

12         Do you believe you could do that, Mr. Diaz,

13   or do you believe, as you sit here now, your emotion

14   will take over and you will say, I don't care, I didn't

15   believe anybody?  This is a horrible case and my

16   emotions says vote a certain way.  Are you going to do

17   that, or follow my instructions?

18         PROSPECTIVE JUROR:  No, I could follow your

19   instructions.

20         THE COURT:  And could you decide the case

21   based on evaluation of credibility and not have your

22   emotions take over, because that's the concern?

23         PROSPECTIVE JUROR:  Yes.

24         MR. BERGER:  You don't know how you will

25   react?  You seem to have a hesitation here.  You

kmm

Proceedings                    509

1    wouldn't be the first one and you would be one of many,

2    many who excused themselves because the emotions, you

3    knew what the emotions were, this kind of case they

4    didn't want to sit.  Do you have any doubt at all in

5    your mind that you could do that or perhaps maybe this

6    is something -- would it be fair to me if you are

7    sitting here and you have this emotional reaction --

8             PROSPECTIVE JUROR:  I could do it.

9             MR. BERGER:  Ms. Bowen?

10            PROSPECTIVE JUROR:  I can't predict how I

11   would react.  I believe I would, but, being put -- I

12   can't answer it definitive yes or no.

13            MR. BERGER:  I can't ask how will you feel

14   three days from now.  A lot of people have already

15   known this kind of case, they shouldn't sit, it will

16   effect them.  They know it.  I'm not asking you to tell

17   me how you feel a few days from now, or next week, or

18   two weeks.

19            How about Ms. Quinones, with the emotional

20   nature, would the emotional factor affect you?

21            PROSPECTIVE JUROR:  I think so.

22            MR. BERGER:  It might.  Maybe you shouldn't

23   sit here.

24            PROSPECTIVE JUROR:  Yes.

25            MR. BERGER:  Who else feels the same way?

Proceedings                510

1          PROSPECTIVE JUROR:  I do.

2          PROSPECTIVE JUROR:  I don't think it would be

3    fair to you or your client.

4          MR. BERGER:  That's the kind of honest answer

5    I'm looking for.  I appreciate what you are saying.

6    That's what we look for.  Mr. Perri has his other

7    answers.  We look --

8          THE COURT:  Let me just step in.  I've said

9    it many times, I'll say it again.  No one is looking

10   for a particular answer.  Everyone is looking for an

11   honest answer so that we can determine whether or not

12   this is an appropriate case for you to sit on as a

13   juror.  There is no right answer, there is no wrong

14   answer.  There's only honest answers.  Thank you.

15         MR. BERGER:  Does anybody else want to raise

16   their hand at this point and add their names to what

17   Mr. Neal has said and what Ms. Quinones said?

18         PROSPECTIVE JUROR:  You know, I'm trying to

19   put my emotions aside.  I know it's a hard case to have

20   to listen to a six-year old girl, that kind of

21   experience.  I'm going to try.

22         MR. BERGER:  You are making an assumption

23   that it's true.  That's what we have juries for.

24   Nevertheless, still, the nature of the case is

25   something that troubles you?

Proceedings                 511

1          PROSPECTIVE JUROR:  Not really.  I am going

2     to try to put the emotions aside.

3          THE COURT:  Again, let me step in, the

4     concept of emotions is very difficult when picking a

5     jury.  Everyone has emotions.  No one is going to come

6     in here and be a robot.  If you are a robot, we

7     wouldn't need you.  We would sit twelve robots and

8     twelve robots without emotion would make a decision.

9     That's not how it works in our system of justice.

10         Again, I'm not asking, nor is Mr. Berger

11    asking, or Mr. Perri asking that you check your

12    emotions at the door.  What we are asking is whether or

13    not you will be able to decide the case based on your

14    evaluation of the testimony and the evidence, and apply

15    it to the law that I give to you and not sit there and

16    say, you know what, I don't know if that person was

17    credible or not, but my gut and my emotion has me so

18    overwhelmed this is what I'm going to say.  That's what

19    we have to make sure doesn't happen.  It could and

20    there's nothing wrong with saying that that is the

21    position you think you will be in.  I don't want you to

22    all sit here because you have an emotional side, and

23    say you can't sit as a juror.  Every juror has

24    emotions.

25         My question is, Mr. Ortega, do you want to

Proceedings                    512

1      sit on this case or not?

2                  PROSPECTIVE JUROR:  Yes.

3                  MR. BERGER:  All of you will be asked to

4      evaluate the testimony of witnesses.

5                  Mr. Rubinic, you will be asked to sit and

6      listen to a witness who swears to tell the truth.  Do

7      you think everybody swears to tell the truth, tells the

8      truth?

9                  PROSPECTIVE JUROR:  No.

10                 MR. BERGER:  Do you have opinion people have

11     gotten on the witness stand and lied?

12                 PROSPECTIVE JUROR:  On the witness stand?

13     I've only been on one jury.  Can they, yeah.

14                 MR. BERGER:  Do you have an opinion, based

15     upon your life experience, people have gotten on the

16     witness stand, sworn to tell the truth and lied?

17                 PROSPECTIVE JUROR:  I would say, in my

18     opinion, it is, yes.

19                 MR. BERGER:  You seem reluctant about that.

20                 PROSPECTIVE JUROR:  I don't have the

21     experience of being in court.  Do I feel that people

22     have?  Yes.

23                 MR. BERGER:  How about police officers?

24                 PROSPECTIVE JUROR:  Yes.

25                 MR. BERGER:  Mr. Miley, you are a retired

Proceedings                  513

1        police officer?

2                PROSPECTIVE JUROR:  Yes.

3                MR. BERGER:  Do you think police officers

4        have gotten on the witness stand, sworn to tell the

5        truth and lied?

6                PROSPECTIVE JUROR:  I'm sure they have.

7                MR. BERGER:  If I convince you police

8        officers in this particular case didn't tell the truth

9        and actually falsely testified, I could convince you

10       because you believe it's happened, correct?

11               PROSPECTIVE JUROR:  Yes.

12               MR. BERGER:  Does anybody disagree with

13       Mr. Miley's answer?  Does anybody here think police

14       officers can get on the witness stand and lie?  I know

15       some of you have a connection with friends.  I'll get

16       to that later.  If yes -- were you going to raise your

17       hand?

18               PROSPECTIVE JUROR:  No.

19               MR. BERGER:  Mr. Ruiz, do you remember

20       Mr. Perri started asking about people who didn't tell

21       the truth and you started to think about whether they

22       had any interest in their testimony, anything to gain;

23       do you remember?  Do you understand that you, as a

24       juror, are only asked to consider if somebody didn't

25       tell the truth, not why they didn't.  You are not

kmm

Proceedings                514

1      expected to be a psychologist or psychiatrist.  People
2      go to therapists all their lives to find out what
3      motivates them.  Sometimes people lie for the strangest
4      reasons.  You are not expected to figure out why.  It
5      would be improper for you to say to yourself, I can't
6      figure out why the person is lying; would you agree
7      with what I'm saying?
8              In this case they have to figure out motive.
9      Mr. Cardona, do you think you have to figure out motive
10     as to why somebody lied?
11             PROSPECTIVE JUROR:  No.
12             MR. BERGER:  Has anybody lied to you in a
13     lifetime?
14             PROSPECTIVE JUROR:  Yes.
15             MR. BERGER:  They didn't come up and say, I'm
16     going to tell you a lie.
17             PROSPECTIVE JUROR:  No.
18             MR. BERGER:  You have senses, body language,
19     look at what they say, specifically all of these little
20     things, whatever it is, and you can use that so it
21     wouldn't have to be obvious.  Nobody is getting on the
22     witness stand and saying, I'm not going to tell you a
23     lie.  Who does not feel they don't have the ability to
24     evaluate the testimony of a witness to see if he or she
25     is telling the truth?  Does anybody feel they cannot do

1        it?

2                    Mr. McKnight, could you do that?

3                    PROSPECTIVE JUROR:  Yes.

4                    MR. BERGER:  Is what I'm asking you to do,

5        Ms. Bowen, is to start at point zero, and be just as

6        ready to disbelieve as to believe when a witness

7        testifies.  You may believe, for example, or everybody

8        should tell the truth.  I had many people tell me that.

9        Yes, they should, and it's a crime if they don't.  You

10       already acknowledged that people have not told the

11       truth deliberately on the witness stand.

12                   PROSPECTIVE JUROR:  Yes.

13                   MR. BERGER:  I'm asking you to start at point

14       zero, disbelieve as to believe.  Now, you might believe

15       ninety percent of the time witnesses tell the truth,

16       ten percent they don't.  Again, we're not deciding on

17       percentage.  You may have a ton of witnesses who

18       testify here to fit in the ten percent.  You have a

19       have ton of witnesses who fit in 90 percent; do you

20       understand?

21                   PROSPECTIVE JUROR:  Yes.

22                   MR. BERGER:  That's why we judge each

23       individual witness on its own.  Does anybody disagree

24       with Ms. Bowen's answer?

25                   Would you agree, Mr. Rubinic, people make

Proceedings                516

1     false accusations against other people?

2          PROSPECTIVE JUROR:  Yes.

3          MR. BERGER:  Sometimes true accusations?

4          PROSPECTIVE JUROR:  Right.

5          MR. BERGER:  We don't know which one fits in

6     here, do we?  That's what this case is about.  Do you

7     feel as if this is a serious case, you know that, the

8     nature of the charge.  Are you prepared, as you sit

9     here now, to vote not guilty if they don't prove the

10    case?

11         PROSPECTIVE JUROR:  Yes.

12         MR. BERGER:  Are you prepared if they do

13    prove the case beyond a reasonable doubt --

14         PROSPECTIVE JUROR:  Yes.

15         MR. BERGER:  Now, would you -- are you more

16    likely to vote guilty because this is such a serious

17    case then, let's say, a trespass case, something as

18    simple as a trespass case?  Would you lean over

19    backwards to convict because of the serious charge more

20    so than in a simple trespass case?

21         PROSPECTIVE JUROR:  Most likely.

22         MR. BERGER:  That's not the law.  You have to

23    treat every case the same.  The burden in the case is

24    beyond a reasonable doubt.  I'm just concerned you

25    might be more inclined to vote guilty here because the

kmm

1      charges are so serious.  Do you understand what I'm

2      saying?

3                      PROSPECTIVE JUROR:  If they prove he is not,

4      that I feel he is not guilty, or the evidence --

5                      MR. BERGER:  If they don't prove.

6                      PROSPECTIVE JUROR:  Yes.

7                      MR. BERGER:  Mr. Cammarano?

8                      PROSPECTIVE JUROR:  Yes.

9                      MR. BERGER:  Do you understand it is the

10     quality of the evidence that counts, not the quantity?

11                     PROSPECTIVE JUROR:  Yes.

12                     MR. BERGER:  It doesn't matter how many

13     witnesses they call.  It's a matter of whether the

14     substance of the evidence that is produced, because

15     just as -- even though the judge allows the evidence,

16     allows people to testify, doesn't mean it has any

17     merit, right?

18                     PROSPECTIVE JUROR:  Right.

19                     MR. BERGER:  We have to separate out the weak

20     from the choir, so to speak, that's what your job would

21     be.  Ms. Cardona, do you understand that?

22                     PROSPECTIVE JUROR:  Yes.

23                     MR. BERGER:  It's the quality of the

24     evidence, not the quantity.  Does everybody agree with

25     that?

Proceedings                     518

1            Ms. Cardona, do you think a police officer
2    has ever tricked, forced, coerced somebody to sign this
3    piece of paper, a statement, which they didn't say?   In
4    other words, a false confession; do you?
5            PROSPECTIVE JUROR:  In life, yes.  Not to me
6    personally.
7            MR. BERGER:  Do you think that has happened?
8            PROSPECTIVE JUROR:  Yes.
9            MR. BERGER:  If I have to urge that upon you
10   at the end of the case and you say that never happens,
11   I couldn't persuade you of that, correct?
12           PROSPECTIVE JUROR:  Yes.
13           MR. BERGER:  How about you, Mr. Ortega, do
14   you think that has happened?
15           PROSPECTIVE JUROR:  Yes.
16           MR. BERGER:  Does anybody disagree with
17   Ms. Cardona's answers?  Let me ask you this:
18   Mr. Ortega, and actually, all of you, you see Mr. Ramos
19   sitting here.  If you were charged with this crime,
20   would you be satisfied with twelve people, with your
21   present frame of mind, judging you?  In other words, as
22   you sit here now, is your frame of mind so fair that
23   you would want twelve Mr. Ortega's judging you if you
24   were sitting where Mr. Ramos was?
25           PROSPECTIVE JUROR:  Yes, I would.

kmm

Proceedings                519

1               MR. BERGER:  You are sure?

2               PROSPECTIVE JUROR:  Yes.

3               MR. BERGER:  Mr. McKnight, would you be

4    satisfied with twelve Mr. McKnight with your frame of

5    mind, judging you, if you were where the defendant is?

6               PROSPECTIVE JUROR:  Yes.

7               MR. BERGER:  Mr. Rubinic?

8               PROSPECTIVE JUROR:  Yes.

9               MR. BERGER:  Mr. Fischer?

10              PROSPECTIVE JUROR:  Yes.

11              MR. BERGER:  Mr. Diaz?

12              PROSPECTIVE JUROR:  Yes.

13              MR. BERGER:  Ms. Bowen?

14              PROSPECTIVE JUROR:  Yes.

15              MR. BERGER:  Is there something still you

16   want to tell the judge privately?

17              PROSPECTIVE JUROR:  No, I'm okay.

18              MR. BERGER:  If you were me, or Mr. Ramos,

19   you are comfortable, Ms. Bowen, when sitting in and

20   judging, correct?

21              PROSPECTIVE JUROR:  Yes.

22              MR. BERGER:  Ms. Quinones, you indicated you

23   should not sit.  I appreciate your answer.

24              PROSPECTIVE JUROR:  I'm sorry.  I feel I'm

25   distracted.  That's all.  I know it doesn't seem fair

kmm

Proceedings                    520

1    and impartial.  I'm not looking to --

2              THE COURT:  Come up at sidebar.

3              (Whereupon, there was a sidebar discussion

4    with the Court, counsel and the prospective juror, as

5    follows:)

6              PROSPECTIVE JUROR:  With that one question, I

7    still have the length of this case.  The distraction,

8    what I need to do to is take care of my children, if I

9    have to be home 4:30.  What I did today to do that --

10             THE COURT:  Understood.

11             MR. BERGER:  Too much stress.

12             PROSPECTIVE JUROR:  I get anxious to begin

13   with.

14             THE COURT:  Don't worry.

15             No need to ask anymore questions of

16   Ms. Bowen.  She'll be excused for cause.

17             PROSPECTIVE JUROR:  Okay.

18             THE COURT:  Thank you for letting us know.

19             (Whereupon, the proceedings resumed.)

20             MR. BERGER:  Ms. Tracy, would you be

21   satisfied with twelve Ms. Tracy judging you if you were

22   sitting where Mr. Ramos was?

23             PROSPECTIVE JUROR:  Yes.

24             MR. BERGER:  Your mind is so fair?

25             PROSPECTIVE JUROR:  I see how you

Proceedings                     521

1    interrogate.  You really get down with everybody.  You

2    are making sure if they have any doubts, as it really

3    surfaces.  I feel I would be fair.

4              MR. BERGER:  You would feel comfortable with

5    twelve Ms. Tracy's judging you if you were sitting

6    there?

7              PROSPECTIVE JUROR:  Yes.

8              MR. BERGER:  Even though you have a son who

9    is a police officer, was a police officer, and now the

10   fire department?

11             PROSPECTIVE JUROR:  Yes.

12             MR. BERGER:  We all have admiration and

13   respect for police officers and firefighters.  The

14   question is, in life sometimes police officers don't do

15   the right thing, correct?

16             PROSPECTIVE JUROR:  Yes.

17             MR. BERGER:  Mr. Miley, would you be

18   satisfied with twelve of you judging you if you were

19   the defendant?

20             PROSPECTIVE JUROR:  Yes, I would.

21             MR. BERGER:  Ms. Cammarano, how about you?

22             PROSPECTIVE JUROR:  Yes.

23             MR. BERGER:  Mr. Ruiz, Ms. Cammarano, in

24   addressing all of you, would you be upset if I have to

25   vigorously cross-examine a six or seven-year old on the

1    witness stand?

2              PROSPECTIVE JUROR:  Would I be upset at that?

3    No.

4              MR. BERGER:  Do you expect it?

5              PROSPECTIVE JUROR:  That's your job.

6              MR. BERGER:  Thank you.  Mr. Ruiz, would you

7    be satisfied with twelve Mr. Ruiz if you were the

8    defendant sitting in this case?

9              PROSPECTIVE JUROR:  Yes.

10             MR. BERGER:  You told me your brother-in-law

11   is a Suffolk detective?

12             PROSPECTIVE JUROR:  Yes.

13             MR. BERGER:  So, do you think detectives do

14   the wrong thing sometimes and take them unlawfully,

15   when really it wasn't, and it was coerced in some way?

16             PROSPECTIVE JUROR:  It's possible.

17             MR. BERGER:  Do you think it has happened?

18             PROSPECTIVE JUROR:  It's happened.

19             MR. BERGER:  You don't want to acknowledge

20   that or, I mean, you first said it's possible.  Then

21   you said it happened.  I'm wondering if your frame of

22   mind is such that you really don't want to accept that

23   as a fact of life, and I understand.  You could believe

24   it happens 92 percent.  Maybe it doesn't.  Maybe it

25   happens one percent.  You don't know whether it is one

Proceedings                523

1   percent or 99 percent.  I understand.  You are

2   acknowledging it has happened.

3           PROSPECTIVE JUROR:  Yes.

4           MR. BERGER:  Mr. Cardona, would you be

5   satisfied with twelve of you judging you if you were

6   the defendant?

7           PROSPECTIVE JUROR:  Yes.

8           MR. BERGER:  Your frame of mind is fair?

9           PROSPECTIVE JUROR:  Yes.

10          MR. BERGER:  How about you, Mr. Quinn?

11          PROSPECTIVE JUROR:  Yes.

12          MR. BERGER:  Ms. Cammarano, it's extremely

13  important.  During the course of the trial, the

14  prosecution presents a piece of evidence.  That's it,

15  the man is guilty, I don't have to hear anything else.

16  Do you understand that would be the wrong thing to do,

17  you have to listen to all of the evidence presented,

18  the arguments of counsel, the charge by the Judge, and

19  then start to consider?  Because if you don't do that,

20  then everything you hear from that moment, or that

21  particular piece of evidence, will skew your judgment

22  in everything you hear and the idea is to remain

23  totally objective and neutral throughout the entire

24  case until such time the Judge gives you the case to

25  consider.  Does everybody understand that, Mr. Ortega?

Proceedings                        524

1              PROSPECTIVE JUROR:  Yes.

2              MR. BERGER:  Mr. McKnight?

3              PROSPECTIVE JUROR:  Yes.

4              MR. BERGER:  Tell me what newspapers and

5      magazines you read and bumper stickers on your car.

6      I'm not interested in politics with respect to bumper

7      stickers.

8              Mr. Ortega?

9              PROSPECTIVE JUROR:  D'Ario, a Spanish

10     newspaper.  New York Times.

11             MR. BERGER:  You said you went to college?

12             PROSPECTIVE JUROR:  Yeah.  I did two years

13     back in my country.

14             MR. BERGER:  Where is that?

15             PROSPECTIVE JUROR:  Guatemala.

16             MR. BERGER:  Bumper stickers on your car?

17             PROSPECTIVE JUROR:  No.

18             MR. BERGER:  Mr. McKnight?

19             PROSPECTIVE JUROR:  Post.

20             MR. BERGER:  Magazines?

21             PROSPECTIVE JUROR:  Fisherman.

22             MR. BERGER:  Bumper stickers?

23             PROSPECTIVE JUROR:  No.

24             MR. BERGER:  You told us you have a six-year

25     old child, a girl?

kmm

Proceedings                    525

1           PROSPECTIVE JUROR:  Yes.

2           MR. BERGER:  This is what is alleged here.

3           PROSPECTIVE JUROR:  Correct.

4           MR. BERGER:  Is that too close to you,

5      putting the face of your daughter on the one who

6      testifies here and be sympathetic towards that witness?

7      Do you think that is a concern you will have?

8           PROSPECTIVE JUROR:  I don't think so.

9           MR. BERGER:  Should I have?

10          PROSPECTIVE JUROR:  No.

11          MR. BERGER:  Mr. Rubinic?

12          PROSPECTIVE JUROR:  Daily News and New York

13     Post.

14          MR. BERGER:  Any bumper stickers?

15          PROSPECTIVE JUROR:  No.

16          MR. BERGER:  Mr. Fischer?

17          PROSPECTIVE JUROR:  New York Times, New York

18     Magazine.  No bumper stickers.

19          MR. BERGER:  What's your handicap?

20          PROSPECTIVE JUROR:  Golf.

21          MR. BERGER:  Mr. Diaz?

22          PROSPECTIVE JUROR:  Cycle World and Motor

23     Friend.

24          MR. BERGER:  Bumper stickers?

25          PROSPECTIVE JUROR:  No.

Proceedings                526

1              MR. BERGER:  Ms. Tracy?

2              PROSPECTIVE JUROR:  Magazines, Women's Day.

3    I have a bumper sticker, pray to rosaries every day.

4              MR. BERGER:  Mr. Miley?

5              PROSPECTIVE JUROR:  No bumper stickers.  I

6    used to read Newsday.  I don't read any papers anymore.

7              MR. BERGER:  Mr. Cammarano?

8              PROSPECTIVE JUROR:  ESPN, Sports Illustrated.

9    I used to read Newsday until they started bashing

10   teachers.

11             MR. BERGER:  Mr. Ruiz?

12             PROSPECTIVE JUROR:  Wall Street Journal.  No

13   bumper stickers.

14             MR. BERGER:  Ms. Cardona?

15             PROSPECTIVE JUROR:  Newsday, no bumper

16   stickers.

17             MR. BERGER:  Thank you very much.

18             THE COURT:  Thank you, Mr. Berger.

19             All right, at this time I'll ask you to step

20   outside for five to ten minutes.  Give the attorneys a

21   chance to see if any of you will be chosen as jurors in

22   this case.  Please don't talk about the case while you

23   are outside.

24             (Whereupon, the jury exited the courtroom.)

25             THE CLERK:  People, challenge for cause juror

kmm

1    number one?

2              MR. PERRI:  No, your Honor.

3              THE CLERK:  Defense counsel, challenge for

4    cause, juror number one?

5              MR. BERGER:  No.

6              THE CLERK:  People, do you wish to exercise a

7    perempt challenge as to juror number one?

8              MR. PERRI:  No, your Honor.

9              THE CLERK:  Defense counsel, do you wish to

10   exercise a perempt challenge as to juror number one?

11             MR. BERGER:  I do not.

12             THE COURT:  Byron Ortega will become juror

13   number twelve, agreed?

14             MR. PERRI:  Yes, your Honor.

15             THE COURT:  Agreed, defense counsel?

16             MR. BERGER:  Yes.

17             THE CLERK:  Alternate seat number one, any

18   challenge for cause, juror number two?

19             MR. PERRI:  No, your Honor.

20             MR. BERGER:  No, your Honor.

21             THE CLERK:  Not for cause, correct, for two?

22             MR. BERGER:  Not for cause.

23             THE CLERK:  Do the People wish to exercise a

24   perempt challenge as to juror number two for alternate

25   seat number one?

Proceedings                528

1              MR. PERRI:  No, your Honor.

2              MR. BERGER:  Yes, I wish to exercise a

3    perempt challenge.

4              THE CLERK:  Let the clerk get out the entire

5    question so the record is clean, as opposed to everyone

6    jumping in.  She asked the question to the defense

7    attorney.

8              People, do you wish to challenge for cause,

9    juror number three?

10             MR. PERRI:  No, your Honor.

11             THE CLERK:  Defense counsel, do you wish to

12   challenge for cause juror number three?

13             MR. BERGER:  No, your Honor.

14             THE CLERK:  People, do you wish to exercise a

15   perempt challenge as to juror number three?

16             MR. PERRI:  No, your Honor.

17             THE CLERK:  Defense counsel, do you wish to

18   exercise a perempt challenge as to juror three?

19             MR. BERGER:  Yes.

20             THE CLERK:  Do the People have any challenge

21   for cause for juror number four?

22             MR. PERRI:  No, your Honor.

23             THE CLERK:  Defense counsel, challenge for

24   cause for juror number four?

25             MR. BERGER:  No, your Honor.

Proceedings                    529

1            THE CLERK:  People, do you wish to perempt

2       challenge as to juror number four?

3            MR. PERRI:  No, your Honor.

4            THE CLERK:  Defense counsel, do you have a

5       challenge?

6            MR. BERGER:  No.

7            THE CLERK:  Lawrence Fischer will be

8       alternate number one.  Agreed, People?

9            MR. PERRI:  Agreed.

10           THE CLERK:  Agreed, defense counsel?

11           MR. PERRI:  Yes.

12           MR. BERGER:  Yes.

13           THE CLERK:  Alternate number two, challenge

14      for cause, juror number five?

15           MR. PERRI:  No, your Honor.

16           THE COURT:  Defense counsel, juror number

17      five, challenge for cause?

18           MR. BERGER:  I think it's close.  I don't

19      think his answers were straight forward enough.  I

20      realize it wasn't as assertive as some of the other

21      jurors who definitely didn't want to sit.  I detected

22      some hesitation with Mr. Diaz.  It would warrant, in

23      this particular case, to err on the side of excusing

24      him rather than keeping him.

25           MR. PERRI:  The People would disagree with

Proceedings                    530

1    defense counsel's assessment of Mr. Diaz.  When your

2    Honor spoke to him, he clearly and directly answered

3    your questions.  He said you could do -- he said, I

4    could do also in response to some of defense counsel's

5    questions and defense counselor used terms like

6    hesitant and injecting that into the juror's answer.

7              THE COURT:  I do have noted here the quote, I

8    can do it, after being asked again whether or not he

9    could sit as fair and impartial in this matter.  I'm

10   going to deny the cause.

11             THE CLERK:  People, do you wish to exercise a

12   peremptory challenge as to juror number five?

13             MR. PERRI:  No, your Honor.

14             THE CLERK:  Defense counsel, do you wish to

15   peremptory challenge as to juror five?

16             MR. BERGER:  Yes, your Honor.

17             THE CLERK:  People, do you have a challenge

18   for cause as to juror six?

19             MR. PERRI:  Yes, your Honor.

20             MR. BERGER:  Consent.

21             THE CLERK:  People, do yo have a challenge

22   for cause as to juror seven?

23             MR. PERRI:  Yes, your Honor.

24             MR. BERGER:  Consent.

25             THE COURT:  On consent.

Proceedings                    531

1           THE CLERK:  People, challenge for cause as to

2     juror eight?

3           THE COURT:  The Court will remove juror eight

4     based on the interaction we had with him at the bench.

5     We do not believe he would have the ability to properly

6     deliberate.

7           Do you have an objection to that, Mr. Berger?

8           MR. PERRI:  No, your Honor.

9           MR. BERGER:  No, your Honor.

10          THE CLERK:  Challenge to cause, juror number

11    nine?

12          MR. PERRI:  No.

13          THE CLERK:  Defense counsel, challenge for

14    cause, juror nine?

15          MR. BERGER:  No.

16          THE CLERK:  People, perempt challenge juror

17    number nine?

18          MR. PERRI:  Yes, your Honor.

19          THE CLERK:  People, challenge for cause,

20    juror number ten?

21          MR. PERRI:  No, your Honor.

22          THE CLERK:  Defense counsel, juror number

23    ten?

24          MR. BERGER:  No, your Honor.

25          THE CLERK:  People, do you wish to exercise a

Proceedings                    532

1       perempt challenge for juror ten?

2                   MR. PERRI:  No, your Honor.

3                   THE CLERK:  Defense counsel, perempt

4       challenge, as to juror ten?

5                   MR. BERGER:  Yes, your Honor.

6                   THE CLERK:  People, have a challenge for

7       cause as to juror number eleven?

8                   MR. PERRI:  No, your Honor.

9                   THE CLERK:  Defense counsel, challenge for

10      cause, juror number eleven?

11                  MR. BERGER:  No, your Honor.

12                  THE CLERK:  People, do you wish to exercise a

13      perempt challenge?

14                  MR. PERRI:  No, your Honor.

15                  THE CLERK:  Defense counsel, perempt

16      challenge for juror number eleven?

17                  MR. BERGER:  No.

18                  THE CLERK:  Bradly Cammarano will become

19      alternate number two, agreed, People?

20                  MR. PERRI:  Yes, your Honor.

21                  THE CLERK:  Agreed, defense counsel?

22                  MR. BERGER:  Yes.

23                  THE CLERK:  People, challenge for cause,

24      juror number twelve?

25                  MR. BERGER:  Consent.

Proceedings                533

1                  THE COURT:  I do have listed emotional,
2        completely affects me.
3                  MR. PERRI:  People consent.
4                  THE COURT:  Granted for cause.
5                  THE CLERK:  People, challenge for cause,
6        juror number thirteen?
7                  MR. PERRI:  No, your Honor.
8                  THE CLERK:  Defense counsel, as to juror
9        number thirteen?
10                  MR. BERGER:  No, your Honor.
11                  THE CLERK:  People, do you wish to exercise a
12        perempt challenge for juror number thirteen?
13                  MR. PERRI:  No, your Honor.
14                  THE CLERK:  Defense counsel, do you wish to
15        perempt challenge as to juror number thirteen?
16                  MR. BERGER:  Yes, your Honor.
17                  THE CLERK:  People, have a challenge for
18        cause for juror fourteen?
19                  MR. PERRI:  No, your Honor.
20                  THE CLERK:  Defense, challenge for cause
21        fourteen?
22                  MR. BERGER:  No, your Honor.
23                  THE CLERK:  People, do you wish to exercise a
24        perempt challenge as to juror fourteen?
25                  MR. PERRI:  No, your Honor.

Proceedings                    534

1              THE CLERK:  Defense counsel perempt challenge

2       for juror fourteen?

3              MR. BERGER:  No, your Honor.

4              THE CLERK:  Virginia Tracy will be alternate

5       number three, agreed, People?

6              MR. PERRI:  Yes, your Honor.

7              MR. BERGER:  Agreed, defense.

8              THE CLERK:  Agreed, defense counsel?

9              MR. BERGER:  Yes, your Honor.

10             (Whereupon, the jury panel entered the

11      courtroom.)

12             THE CLERK:  Jurors in the box, may I have

13      your attention, please.  If I call your name, you have

14      been selected to serve on this jury and please remain

15      seated.

16             Juror number twelve will be Byron Ortega.

17      Alternate number one is Lawrence Fischer.  Alternate

18      number two is Bradly Cammarano.  Alternate number three

19      is Virginia Tracy.  If I called your name, remain

20      seated.  If I did not call your name, you are excused

21      from this panel with the thanks of this Court.  Please

22      be careful stepping out of the box.  The court officers

23      will tell you where to report next.

24             Are these remaining jurors satisfactory to

25      the People?

Proceedings                    535

1            MR. PERRI:  Yes, your Honor.

2            THE CLERK:  Satisfactory to defense counsel?

3            MR. BERGER:  They are.

4            (Whereupon, the jurors were duly sworn by the

5       clerk of the court.)

6            THE COURT:  Welcome aboard everyone.  You are

7       officially part of this sworn jury.  If you recall, you

8       do not have to be back here in court until Monday

9       morning at 9:30.  The officers will tell you where to

10      report.  Please do not come into the courtroom until

11      you are instructed to come in by a court officer.

12            Before I let you go, now that you are sworn

13      members of the jury, it's important that you continue

14      the admonitions that you heard me give previously.

15            One, you must keep an open mind throughout

16      the trial.

17            Two, do not discuss the case amongst

18      yourselves or with anyone else during the trial.  Do

19      not permit anyone to discuss this case in your

20      presence.  Do not talk to the lawyers, witnesses or the

21      defendant about anything during the trial.  And

22      remember, if any of us run into you out on the street,

23      we'll ignore you.  Please do not take it personally.

24            Do not visit or view the place where the

25      charged crime was allegedly committed, or any other

kmm

Proceedings                    536

1    place involved in this case.  And if there is news

2    coverage of the case, do not read, view, or listen to

3    any accounts or discussions of the case reported by

4    news media, and do not attempt to research any fact,

5    issue, or law related to this case whether by

6    discussion with others, by research in a library, or on

7    the Internet, or by any other means or source.

8            Enjoy the rest of your day.  Have a great

9    weekend.  Happy Mother's Day to those celebrating.

10   I'll see you all Monday morning.

11           (Whereupon, the jurors exited the courtroom.)

12           THE COURT:  To the rest of you in the

13   audience, you are also free to go at this point.  You

14   will have to report back to central jury.  The officers

15   will give you your cards on the way out.  Let me thank

16   you all for your patience and sitting here so

17   attentively.  I'm sorry you didn't have a chance to get

18   into the box, but we no longer need your services.

19   Have a great rest of the day.  Have a wonderful weekend

20   and Happy Mother's Day to all of you that celebrate.

21           (Whereupon, the jury panel exited the

22   courtroom.)

23           THE COURT:  Mr. Perri, something for the

24   record?

25           MR. PERRI:  The People are turning over to

kmm

Proceedings                537

1    the Court and defense counsel a two-page document.  It
2    is notes that Officer Boccio, who the People intend to
3    call, created himself, derived directly from other
4    documents that the People already turned over,
5    including the hearing minutes and other police
6    paperwork.  We're turning it over to the Court and
7    defense counsel as additional Rosario.
8              MR. BERGER:  Are these from Officer Boccio?
9              THE COURT:  That's what was said.  Do you
10   acknowledge receipt, Mr. Berger?
11             MR. BERGER:  Yes, your Honor.
12             THE COURT:  Anything else, People?
13             MR. PERRI:  No, your Honor.
14             THE COURT:  Anything else, Mr. Berger?
15             MR. BERGER:  No, your Honor.
16             THE COURT:  Let me give you a quick rundown
17   what will happen on Monday; my preliminary to the jury
18   before you all stand up to give your openings, is
19   pretty lengthy.  It takes about 40 minutes to go
20   through my opening comments.  Normally, after I do my
21   opening comments, depending how everyone is looking, I
22   will give them a break at that point or go through the
23   first opening and then give a break.
24             Mr. Perri, I'm not holding you to it.  Do you
25   have an idea approximately how long your opening will

Proceedings                538

1    be?  If you don't, that's okay.

2             MR. PERRI:  Approximately, 30 minutes.

3             THE COURT:  Mr. Berger, any idea

4    approximately how long your opening will be, if you are

5    making an opening?

6             MR. BERGER:  I'm making an opening.  It won't

7    be terribly long.  If it was five to ten minutes, that

8    would be longer than I expect.  I'm not sure yet.  It's

9    usually brief.

10            MR. PERRI:  Thirty would be the outer.

11            THE COURT:  You should have witnesses

12   prepared to go on for the morning because we will get

13   to them.  Let me see if I talk about what we need to

14   discuss.

15            MR. BERGER:  It depends upon what Mr. Perri

16   says in his opening.

17            THE COURT:  I do not allow jurors to take

18   notes, Mr. Berger.  Do you have a strong opposition to

19   that?

20            MR. BERGER:  No.

21            THE COURT:  I don't have anything else in

22   advance of Monday.

23            MR. PERRI:  As far as scheduling, the People

24   would have three civilians prepared to testify on

25   Monday.  I would assume that would take up the whole

kmm

Proceedings                    539

1    day.

2              THE COURT:  If it doesn't, then it doesn't.

3              MR. PERRI:  Thank you, your Honor.

4              MR. BERGER:  With respect to the Rosario

5    material provided to me, we had a hearing, I believe,

6    in which Officer Boccio testified.

7              THE COURT:  Okay.

8              MR. BERGER:  Those were not turned over to

9    me.

10              MR. PERRI:  They were created by Officer

11   Boccio in reviewing his own materials, police

12   paperwork, grand jury minutes, created by him sua

13   sponte.

14              MR. BERGER:  He wrote these notes out today

15   after looking at the documents, the other documents.

16              THE COURT:  I imagine in anticipation of

17   getting ready to testify.  Do I have that accurate?

18              MR. PERRI:  Yes.  He was not instructed to do

19   so, but he did so.  He wasn't instructed to do so, but

20   he did so.

21              MR. BERGER:  The notes obtained there --

22              THE COURT:  You can cross-examine him about

23   it.

24              MR. BERGER:  Are they going to provide it to

25   me?

kmm

Proceedings                    540

 1              THE COURT:  Take it.

 2              MR. PERRI:  All of the materials that Officer

 3    Boccio was examining in preparation for testimony that

 4    he used today to make that list of information, those

 5    notes, those two pages that the People have turned over

 6    have already been turned over.  They're included in the

 7    Rosario packet and turned over, I believe, every single

 8    one prior to the hearing that Officer Boccio looked at

 9    it today except for the hearing minutes, which both

10    sides have a copy of.

11              THE COURT:  Thank you.  Anything else?

12              See you all Monday.

13              (Whereupon, the trial was adjourned to May

14    11, 2015.)

15                   *              *              *

16

17

18

19

20

21

22

23

24

25

                                                      kmm

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NASSAU : CRIMINAL TERM PART 43

 3   -------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,      :   Indictment
 4                                             :   No. 742N/14
             -against-                         :
 5                                             :
     DANIEL RAMOS,                             :
 6                                             :
                         Defendant.           :   Jury Trial
 7   -------------------------------------------X

 8                             May 11, 2015
                               262 Old Country Road
 9                             Mineola, New York

10
     B E F O R E:
11
         HONORABLE TERESA K. CORRIGAN,
12                   Acting Supreme Court Justice

13
     A P P E A R A N C E S:
14
     (As Previously Noted)
15

16              *       *       *       *       *

17

18

19              THE CLERK:   Case on trial continued,

20   Indictment Number 742N of 2014, People of the State of

21   New York vs. Daniel Ramos.

22              Let the record reflect all parties are

23   present.  The jury is not present at this time.

24              Are the People ready?

25              MR. PERRI:  Yes, your Honor.
```

Proceedings                        542

1              THE CLERK:  Defense counsel?

2              MR. BERGER:  I'm not sure.  I've just been

3    handed a note from my client.  Yes, I'm ready.

4              THE COURT:  The first order of business, the

5    Court received a note.  It's been marked Court Exhibit

6    Number IV.

7              It reads as follows:  Dear Judge Corrigan,

8    I'm writing this letter to request to be excused from

9    jury duty because of the condition of my pregnancy at

10   this time.  I thought I would be strong enough to serve

11   as a juror on this case, but since Thursday, May 7th, I

12   have been experiencing stomach pains due to my

13   ulcerates colitis that has been controlled for the past

14   eight months until last week.  Since this could be a

15   serious complication of pregnancy, my doctors and

16   myself cannot believe I can be a juror on a criminal

17   trial at this time in my life.  I hope you understand

18   my situation.  Thank you.

19             It is signed by juror number seven.  Her name

20   and address is on the letter that is part of the Court

21   Exhibit.

22             You have reviewed it?

23             MR. PERRI:  Yes, your Honor.

24             THE COURT:  Did you review it, Mr. Berger?

25             MR. BERGER:  I did.

1           THE COURT:  It's the matter where that --
2    wherein I told you it was highly likely that who was
3    sworn in as juror number seven would likely be seeking
4    to get off for medical reasons.  We picked three
5    alternates for that reason.
6           At this time, Mr. Berger, are you willing to
7    substitute alternate number one for juror number seven?
8           MR. BERGER:  I am.
9           MR. PERRI:  Yes.
10          THE COURT:  Do you see any reason why the
11   juror needs to be called in and questioned further?
12          MR. BERGER:  No, your Honor.
13          THE COURT:  People?
14          MR. PERRI:  No, your Honor.
15          THE COURT:  I don't see a reason to bring her
16   in here.  We were fully aware.  Both parties are
17   satisfied with the information provided to them.  We'll
18   substitute juror number seven with alternate number
19   one.  Please thank juror number seven for her time and
20   service here.  If she has questions and wants to come
21   in, I'll hear from her now before we bring in the rest,
22   otherwise, the officer can just do the substitution.
23          Anything for the record, People, before we
24   bring the jury in?
25          MR. PERRI:  Prior to the openings, the People

1    have two evidentiary issues they would like to bring to

2    the Court's attention to ensure it's proper to discuss

3    them in the opening.

4              The first, your Honor, we have involves the

5    medical records the People intend to introduce into

6    evidence, as well as the testimony of the sexual

7    assault nurse examiner, Nurse McAllister, of Nassau

8    University Medical Center.  That during the SANE exam

9    that Mya Ramirez received at the medical center after

10   the alleged incident took place, the first step of that

11   examination is to take a history from the patient.

12   Nurse McAllister took a history from Mya, separate from

13   her mother, and in order to understand and to guide the

14   treatment and diagnosis and how to conduct the

15   examination for sexual assault, the nurse asked what

16   happened to you, to Mya Ramirez.  Mya Ramirez's

17   response was noted in the medical records.

18             And also, according to Nurse McAllister's

19   testimony and preparation, was that she stated that

20   Danny licked my coochie.  She then asked Mya what she

21   meant by a coochie and Mya Ramirez pointed at her

22   vaginal area.

23             In People vs. Ortega, Court of Appeals case,

24   15 NY3d 610, 2010, the Court of Appeals found that not

25   only does the business record exception apply in

1      criminal trials with respect to hospital records, but

2      the Court noted that upholding that the identities

3      disclosed in medical records can be relevant and

4      properly admitted as evidence at a criminal trial, when

5      that identity of the alleged assailant is connected to

6      a discharge plan for requirements for safety plan.

7              The Court of Appeals specifically in Ortega,

8      although, the Ortega was a domestic violence case, in

9      coming to its decision noted that in cases that

10     involved either domestic violence or child sexual

11     abuse, or child physical abuse, that the identity of

12     the assailant became relevant to the fact whether or

13     not and how the patient may be discharged, and whether

14     or not the patient would require additional psychiatric

15     treatment.

16             The People intend to also call as a witness

17     Crystal Ramirez, who will testify that Daniel Ramos did

18     have repeated contact with the children, and, in fact,

19     had babysat and watched the children on several

20     occasions.

21             It's the People's position, not only is the

22     factual allegation that someone licked Mya Ramirez's

23     vagina area is relevant to the germane diagnosis and

24     treatment, and therefore, it is admissible, but also

25     the identity of Daniel Ramirez, as Danny, according to

Proceedings                   546

1     Mya, would be relevant as it would have affected
2     whether or not the hospital would be able to discharge
3     Mya back into the care of her family.
4              The holding on Ortega has been completely
5     applied, so I'll hand up People vs. Pham, P-H-A-M,
6     2014, Third Department case, 180 AD3d.  In that case,
7     which involved sexual abuse, that any information that
8     was given related to diagnosis and treatment of
9     patients noted again to be admissible except when it
10    related to safety plan or discharge plan.  That case
11    also noted that there was no confrontation cause issue,
12    that this was non-testimonial evidence to be received
13    by the Court.
14             And secondarily, with the specific factual
15    allegation of that Mya Ramirez was licked, that in
16    People vs. Bailey, 252 AD2d, the Appellate Division of
17    the Third Department factually, in a similar case,
18    allowed on the specific issue, allowed for the medical
19    records to contain the fact that the victim had been
20    sucked on her neck, noting that it was germane to the
21    treatment and diagnosis during the sexual assault
22    evidence collection and treatment by the hospital that
23    was conducted by the nurse examiner, your Honor.
24             That's the first application by the People to
25    be allowed to reference that testimony in their

Proceedings          547

1       opening, and if a proper foundation be laid at trial to

2       have that evidence admitted, your Honor.

3                   THE COURT:  Mr. Berger.

4                   MR. BERGER:  Is the prosecutor representing

5       to the Court that this Nurse McAllister is going to be

6       coming in to testify?

7                   MR. PERRI:  Yes, your Honor.

8                   MR. BERGER:  If the case is cited to allow

9       the identity, apparently, because they're going to

10      require additional psychiatric treatment, I have not

11      heard a representation from the prosecutor that, in

12      fact, if she received any psychiatric treatment.

13                  THE COURT:  It's not limited to psychiatric

14      treatment, as I read the case.

15                  MR. BERGER:  Well, the basis of why Mr. Perri

16      is offering it to the Court.

17                  THE COURT:  I believe I heard a release plan

18      and safety plan.

19                  MR. PERRI:  Yes, your Honor, that was one of

20      the considerations which makes it germane to the

21      treatment, is that it answers the question for the

22      healthcare professional of whether or not additional

23      treatment, such as psychiatric and psychological

24      treatment would be required, not that it necessarily

25      had to be provided.

1          THE COURT:  I understand.

2          MR. BERGER:  Judge, I have nothing further.

3          THE COURT:  People, the first application to

4     be allowed to reference SANE in your opening statement,

5     based on case law provided, and the law, as I

6     understand it, is granted at this time.

7          Next application.

8          MR. PERRI:  The next application is with

9     respect to testimony the People intend to elicit from

10    Crystal Ramirez regarding excited utterances and

11    outcries by her daughter, Mya Ramirez.

12          As it is the People's intention to call

13    Crystal Ramirez, as she will testify that she entered

14    the kitchen of her apartment and immediately upon

15    entering the kitchen of her apartment, found her

16    daughter Mya Ramirez standing directly in front of the

17    defendant with her pants and underwear down at her

18    feet.  That, Ms. Ramirez, the mother screamed, and

19    yelled what is going on here?  Words to that effect.

20    And that Mya immediately, in response to that, while

21    the defendant was still present in the kitchen, before

22    the mother grabbed her child, pointed at the defendant

23    and said, he licked my coochie, and the People intend

24    to ask both -- ask Crystal Ramirez questions eliciting

25    that testimony.

1              In support of that application, the People
2       have handed up People vs. Carfora, C-A-R-F-O-R-A, 59
3       AD3d, 751, 2010, a Second Department case; where it
4       noted that prompt outcry testimony was proper in child
5       abuse cases.  The witness in that case was the mother
6       of multiple victims.

7              It is also noted in that case it was the
8       People's intention, although not in the opening, to ask
9       Ms. Ramirez, to the effect that it was proper, for the
10      mother to testify about behavioral changes they noted
11      in their child after the alleged incident.

12             The People also handed up People vs. Sheldon,
13      also a Court of Appeals case, 8081 NY3d 614, from 2004,
14      with the Court of Appeals found that prompt outcry
15      applied even when there was a much longer delay between
16      an elderly mother and adult daughter overnight when the
17      facts and circumstances tended to support that finding.

18             In People vs. Knapp, a Fourth Department
19      case, 139 AD2d, 931, although it's another department,
20      it's directly on point, and I found no controverted law
21      in the Second Department where the sexually abused
22      children excited utterances to their mother were found
23      to be admissible at trial, that these excited
24      utterances describing their abuse, even though the
25      mother did ask questions, were found admissible.

Proceedings                550

1          The Court referenced the youth of the

2     individuals and the proximity to the time and of the

3     abuse, and it noted that it did not matter whether or

4     not the child was found to be swearable.

5          Thank you, your Honor.

6          THE COURT:  Thank you, Mr. Berger.

7          MR. BERGER:  I don't have a disagreement with

8     the law cited by Mr. Perri.  I do wish to bring the

9     following to the attention to the Court.  It seems to

10    present a much larger issue than whether or not

11    Mr. Perri can make these comments in the opening

12    remarks.

13         I have been provided, I believe, by Mr. Perri

14    with all of the Rosario material that is required to be

15    turned over to me.  What I want to point out to the

16    Court is, other than these comments by the mother,

17    there is not one interview of Mya Ramirez, where notes

18    were provided to me, which leads me to believe nobody

19    interviewed her.

20         Now, I assume, Mr. Perri did.  I have

21    received no notes from him.  I could, therefore, infer

22    that maybe he didn't interview her, no detectives

23    interviewed her.  Nothing in this -- in the information

24    provided me so far reflects any interview conducted of

25    Mya Ramirez except that the mother has led this child

1      to say from the very inception -- you heard the

2      hearing.  You heard what happened when Police Officer

3      Boccio came to the scene.  The girl is standing or

4      sitting right next to the mother and the mother tells

5      the police officer, what supposedly happened to Mya,

6      and she is sitting there because her mother had just

7      said this.  She's a six-year-old girl.

8               I know the People will ask you to allow her

9      to be sworn.  Not only do I don't think she shouldn't

10     be sworn, she's not nine years old.  I don't think -- I

11     don't think she should be allowed to testify here.

12     There are limits as to what somebody can testify in a

13     court of law when you have consequences as great as

14     this.  When the defendant is facing a charge that

15     carries twenty-five years, he's never been arrested

16     before in his life, and this girl makes this claim

17     based upon the mother seeing something that she thought

18     was outrageous and now influenced this girl into saying

19     these things, and a year-and-a-half has gone by and no

20     interviews, no statements, and if there were

21     interviews, maybe the detectives didn't make notes, but

22     that's not what is really the protocol these days for

23     interviewing children.

24               I have reason to believe I have a case older

25     than this one, where they take the children and

kmm

Proceedings                552

1     interview them on tape with a questioner who knows
2     something about questioning children in these kinds of
3     cases, so there's a neutral individual and no bias
4     occurring interviewing a child that can be easily
5     misled.

6          We know about the McMartin case in
7     California, which set off an extreme of change of
8     protocol with respect to children in these sex cases.

9          THE COURT:  Can you stay on point and respond
10    whether or not the excited utterance and outcry should
11    be allowed in.

12         MR. BERGER:  I said I had no argument with
13    the principle of law that Mr. Perri is citing.  What
14    I'm asking the Court to do is consider that while he is
15    assuming there was, in fact, such excited utterance,
16    I'm making the Court aware of the fact this is the
17    situation.  I don't know that this girl ever said this
18    without being influenced by her mother in everything
19    she has done here.  This is quite frightening to my
20    client, and I would ask the Court to consider whether
21    or not he is even going to allow Mya to testify in this
22    case.  Thank you.

23         THE COURT:  I'm sticking with the application
24    that the People made.  Mr. Perri, your witness will be
25    allowed to testify to excited utterances and/or outcry.

Proceedings                553

1      However, if you want to describe it, assuming the

2      questions are proper, proper foundation is laid, if

3      there needs to be a foundation laid, and assuming all

4      of the other rules of evidence are followed, I'm not

5      going to disqualify that testimony at this time.

6               With regards to whether or not this child is

7      swearable, that is a bridge we're going to cross after

8      we get to opening statements.  I had a jury that

9      actually showed up ten minutes early for their start

10     time today.  They were all here by twenty after nine

11     because the Court advised we were going to start as

12     soon as possible after they were all here for the 9:30

13     start time, and we couldn't start unless they were all

14     here.  Unfortunately, we were the only ones that

15     prevented this case from not going forward at 9:30 when

16     this jury was all actually here and ready to go.  I can

17     only imagine we wouldn't have the same response

18     tomorrow, when they get here on time, they wait for an

19     hour before they come to the courtroom.

20              Unless there is anything else, I would like

21     to get to my opening remarks to them, and I would like

22     to get to opening statements.  Anything further?

23              MR. PERRI:  No, your Honor.

24              THE COURT:  Mr. Berger.

25              MR. BERGER:  There are other issues.  I think

kmm

1        they can wait until --

2                    THE COURT:  Do they impact on your opening?

3                    MR. BERGER:  No.

4                    THE COURT:  Fair enough.

5                    (Whereupon, the jury entered the courtroom.)

6                    THE CLERK:  Both sides stipulate all sworn

7        jurors are present and alternate number one has

8        replaced juror number seven, and alternates two and

9        three have moved up into seats alternate one and two,

10       People?

11                   MR. PERRI:  Yes, your Honor.

12                   THE CLERK:  Defense?

13                   MR. BERGER:  Yes, your Honor.

14                   THE COURT:  Good morning, everyone.  I hope

15       those of you who celebrated Mother's Day had a very

16       nice day yesterday.  The sun did shine, so it

17       cooperated, so I'm glad for everyone that it did that.

18                   Let me apologize for the delay in getting

19       started today.  You will see throughout the trial

20       process there are details that can't be avoided.  This

21       morning I had some matters I needed to attend to.  I

22       apologize for keeping you waiting, keeping the

23       attorneys waiting.

24                   Members of the jury, we're about to continue

25       with the trial of the case of the People vs. Daniel

1    Ramos.  Before continuing with the trial, I'm going to
2    take about thirty minutes to explain to you various
3    stages of the trial and what you may expect to see and
4    hear during the trial so that you may better understand
5    what is taking place.

6             I'll also remind you of some basic principles
7    of law that apply to this and all criminal trials.  At
8    the conclusion of the case, I'll remind you of the laws
9    that apply to the case, to define the crimes charged,
10   explain the law to the charged crimes, and list for you
11   the elements of each charged crime that the People must
12   prove beyond a reasonable doubt.

13            Remember, during jury selection I explained
14   the terms, the elements of a charged crime refers to
15   the various parts of our laws after the ^^^/KREUT and
16   charged crime, plus the identification of the person as
17   the person who committed that crime.

18            As you can see, a court reporter is writing
19   in shorthand everything that is being said.  What she
20   takes down is called the record of the trial.
21   Sometimes, you will see a witness use his or her hands
22   to illustrate something.

23            For example, a witness may say that an object
24   was this long, using his hands the way I did just then.
25   Normally, you would then hear the lawyer or the Court

1        say something like, let the record indicate, that the
2        witness is saying about one foot.  We do that because
3        sometimes it becomes necessary to have the court
4        reporter read back what a witness says and what the
5        witness was indicating.  If someone does not state
6        orally for the record what a witness is indicating
7        silently with his or her hands, when that portion of
8        the record is read back, we will not know what the
9        witness was indicating.  You, of course, will be able
10        to see what the witness is indicating and make your
11        judgment accordingly.

12              The trial formally begins with what the law
13        calls an opening statement by the assistant district
14        attorney.  The law requires the assistant district
15        attorney to make an opening statement to set forth the
16        evidence that he expects to prove the crimes charged
17        beyond a reasonable doubt.

18              After the opening by the assistant district
19        attorney, the lawyer for the defendant will make an
20        opening statement.  After the completion of the opening
21        statement, the assistant district attorney will proceed
22        with the presentation of evidence.

23              Remember, the indictment is not evidence.  It
24        is simply a piece of paper stating the charges.  The
25        defendant has pled not guilty to those charges, and the

1    trial is to decide whether or not the defendant is

2    guilty.

3              Remember, also, what the lawyers say at any

4    time is not evidence.  The lawyers are not witnesses.

5    What I say is not evidence.  I am not a witness.

6              Let us remember that you must decide the case

7    on the evidence.  You heard me say this before, but it

8    is worth repeating.  Evidence is testimony of

9    witnesses, the stipulations agreed to by the parties,

10   and physical objects received in evidence.  Testimony

11   is, of course, the most common form of evidence and

12   comes from the questioning of a witness by the lawyers

13   and sometimes by the Court.

14             Remember, a question by itself is not

15   evidence.  It is the question with the answer that is

16   the evidence.  So, you are not to conclude from a

17   question alone that anything I assumed in the question

18   to be true is true no matter how detailed or specific

19   the question is; nor are you to draw any inference

20   either favorable or unfavorable to either side from the

21   content of a question alone.

22             You must consider the question with the

23   witness's answer and decide whether you find the answer

24   believable and accurate, because again, it is the

25   question with the answer that is the evidence.

Judge's opening                    558

1        Next, evidence may come in the form of a
2    stipulation.  A stipulation is information which both
3    parties agree to present to the jury as evidence
4    without calling a witness to testify to the
5    information.
6        And lastly, evidence may come in the form of
7    physical objects, such as documents, photographs,
8    clothing, or even a chart.  When a lawyer is
9    questioning a witness, and in a question refers to a
10   physical object for the first time, the object is
11   normally marked with a number or letter of the alphabet
12   so we can more easily identify the object and refer to
13   it.  That procedure is very helpful in keeping track of
14   physical objects.  It's the responsibility of the court
15   reporter to physically write an exhibit number or
16   letter on the object, or on a label that is then
17   attached to the object.
18       Sometimes, depending on the type of physical
19   object, it may be too difficult or inconvenient to mark
20   the object, and the object is deemed marked, rather
21   than actually marked.  It is the responsibility of
22   court personnel to keep an accurate listing of the
23   exhibits.
24       Normally, when the object is first referred
25   to, a lawyer will ask the Court to have the object

1     marked for identification.  If the People make the

2     request and the Court grants the request, the object is

3     deemed or marked with a number.

4             If the defendant makes the request and the

5     Court grants the request, the object is deemed or

6     marked with a letter of the alphabet.  That just helps

7     us to remember who introduced the exhibit.

8             Sometimes to save time during the trial I

9     have certain physical objects deemed or marked for

10    identification before the trial begins, and you will

11    then only hear the lawyer refer to the object by its

12    number or letter.

13            An item deemed or marked for identification

14    is not evidence, and it is, therefore, not available

15    for your inspection and consideration.  Sometimes a

16    lawyer will ask the Court to receive the object in

17    evidence.  When a lawyer does that, the other lawyer is

18    at that moment permitted to ask the witness questions,

19    designed to determine whether the object can, under the

20    law, be admitted in evidence.  If I grant the request

21    to admit the object in evidence, then the object

22    becomes evidence, and it is available for your

23    inspection and consideration.

24            If, at the time a physical object is received

25    in evidence, it is too small for all of the jurors to

Judge's opening                    560

1    see, at a convenient moment, I'll have the court

2    officers show the object to you.

3              Further, if during your deliberations you

4    wish to see an object received in evidence, you may do

5    so by simply asking the Court to see the object.

6              Under our law, a witness may review documents

7    and other materials pertaining to the case before the

8    witness testifies here at the trial.

9              Also, under our law, a lawyer or an

10   investigator for a party may speak to a witness about

11   the case before the witness testifies here at the trial

12   and may ask the witness the questions that will be

13   asked at the trial.  As such, there is nothing legally

14   improper about the pretrial review of documents or

15   talking to lawyers.

16             After the People have completed the

17   introduction of their evidence, the defendant may, but

18   is not required, to present evidence.  I remind you

19   throughout these proceedings, the defendant is presumed

20   to be innocent.  As a result, you must find the

21   defendant not guilty unless when the evidence presented

22   at this trial you conclude that the People have proven

23   the defendant guilty beyond a reasonable doubt.  That a

24   defendant does not testify as a witness is not a factor

25   from which any inference unfavorable to the defendant

Judge's opening                    561

1    may be drawn.  The defendant is not required to prove

2    that he is not guilty.  In fact, the defendant is not

3    required to prove or disprove anything.  To the

4    contrary, the People have the burden of proving the

5    defendant guilty beyond a reasonable doubt.

6              That means, before you can find the defendant

7    guilty of a crime, the People must prove beyond a

8    reasonable doubt every element of the crime, including

9    that the defendant is the person who committed that

10   crime.

11             The burden of proof never shifts from the

12   People to the defendant.  If the People fail to satisfy

13   their burden of proof, you must find the defendant not

14   guilty.  If the People satisfy their burden of proof,

15   you must find the defendant guilty.

16             Now, what does our law mean when it requires

17   proof of guilt beyond a reasonable doubt?  The law uses

18   the term proof beyond a reasonable doubt to tell you

19   how convincing the evidence of guilt must be to permit

20   a verdict of guilty.

21             The law recognizes in dealing with human

22   affairs there are very few things in this world that we

23   know with absolute certainty.  Therefore, the law does

24   not require the People to prove a defendant guilty

25   beyond all possible doubt.  On the other hand, it is

1       not sufficient to prove that the defendant is probably

2       guilty.

3               In a criminal case, the proof of guilt must

4       be stronger than that.  It must be beyond a reasonable

5       doubt.  A reasonable doubt is an honest doubt of the

6       defendant's guilt for which a reason exists, based upon

7       the nature and the quality of the evidence.  It is an

8       actual doubt, not an imaginary doubt.  It's a doubt

9       that a reasonable person acting in a matter of this

10      importance would be likely to entertain because of the

11      evidence presented, or because of the lack of

12      convincing evidence.

13              Proof of guilt beyond a reasonable doubt is

14      proof that leaves you so firmly convinced of the

15      defendant's guilt that you have no reasonable doubt of

16      the existence of any element of the crime, or of the

17      defendant's identity as the person who committed the

18      crime.

19              In determining whether or not the People have

20      proven the defendant's guilt beyond a reasonable doubt,

21      you should be guided solely by a full and fair

22      evaluation of the evidence.  After carefully evaluating

23      the evidence, each of you must decide whether or not

24      that evidence convinces you beyond a reasonable doubt

25      of the defendant's guilt.  Whatever your verdict may

1      be, it must not rest upon baseless speculations.  Nor

2      may it be influenced in any way by your bias,

3      prejudice, sympathy, or by a desire to bring an end to

4      your deliberations or to avoid an unpleasant duty.

5                 If you are not convinced beyond a reasonable

6      doubt that the defendant is guilty of a charged crime,

7      you must find the defendant not guilty of that crime.

8      If you are convinced beyond a reasonable doubt that the

9      defendant is guilty of a charged crime, you must find

10     the defendant guilty of that crime.

11                Now, each witness, by whomever is called, is

12     first examined, that is, asked questions by the lawyer

13     who calls the witness to testify.  That is called

14     direct examination.  When the direct examination is

15     completed, the other lawyer is permitted to ask

16     questions of that witness.  That is called

17     cross-examination.  You may then have redirect

18     examination and recross examination, but under our law,

19     the scope of such additional examination is limited on

20     the theory that the lawyers had sufficient opportunity

21     on their original direct or cross to ask what they

22     wanted to.

23                The lawyers are responsible for questioning

24     the witnesses.  The Court may, at times, ask a witness

25     a question, but you, as jurors, may never ask questions

1    of the witnesses.

2            Additionally, you, as jurors, will not be

3    allowed to take notes during this trial.  Let me tell

4    you the reason why.

5            One:  It is often difficult to take notes and

6    at the same time to look at the witness and fully

7    comprehend and appreciate what the witness is saying

8    and how the witness is saying it.  Since you are the

9    finders of the facts who are responsible for evaluating

10   the believability and accuracy of a witness's

11   testimony, it is important that you be able to both

12   fully comprehend what a witness is saying and how the

13   witness is saying it without the distraction of taking

14   notes.

15           Two:  There is no real need for notes since

16   every word of each witness is recorded by the court

17   reporter, and during deliberations upon your request,

18   the testimony can be read back to you.

19           The lawyers or the Court may take notes.  The

20   difference is this:  The lawyers and the Court are not

21   the finders of the facts.  They are not responsible for

22   evaluating the witnesses in order to come to a verdict

23   of guilty or not guilty.  The lawyers and the Court

24   have other functions for which some note taking may be

25   helpful.  You are not to attach any importance to the

1     lawyers or the Court taking or not taking notes.  You

2     must decide this case solely on the evidence and the

3     law as I give it to you.

4              Now, as the Judge of the facts, you, alone,

5     determine the truthfulness and accuracy of the

6     testimony of each witness.  You must decide whether a

7     witness told the truth and was accurate or instead

8     testified falsely or was mistaken.  You must also

9     decide what importance to give to the testimony you

10    accept as truthful and accurate.  It is the quality of

11    the testimony that is controlling, not the number of

12    witnesses who testify.  There is no particular formula

13    for evaluating the truthfulness and accuracy of another

14    person's statement or testimony.

15             As I have said, you bring to this process,

16    all of your varied experiences.  If you thought about

17    what I have said, I'm sure you now agree with me in

18    life you frequently decide the truthfulness and

19    accuracy of statements made to you by other people.

20    The same factor used to make those decisions should be

21    used in this case when evaluating the testimony.  At

22    the end of the trial, I will give you some examples of

23    those factors that you may consider during your

24    deliberations.

25             Now, there are and I'm sure you appreciate,

kmm

1    rulings for all stages of a trial.  The rules for the

2    presentation of evidence stage range from how a

3    question may be asked to whether a question may be

4    asked, to whether the answer to a question is properly

5    responsive and from how evidence may be introduced to

6    when evidence may be introduced.  Part of my job is to

7    enforce those rules.  Some of these rules you may

8    understand when you hear the ruling, but some of them

9    you may not understand unless you have studied the law.

10   The rules have been carefully developed over hundreds

11   of years for the sole purpose of guaranteeing a fair

12   and orderly trial.

13        In other words, the rules are not designed to

14   determine whether the evidence you hear and see is true

15   or false, accurate or inaccurate.  It's for you, not

16   me, to evaluate the evidence and make that decision.

17   The rules are designed to ensure that the evidence you

18   hear and see is relevant and in a form that permits you

19   to evaluate it fairly.

20        For example, often a lawyer will ask the

21   Court to receive in evidence items such as a

22   photograph.  You are, under our law, to have your

23   photograph admitted into evidence.  It must be shown

24   that the photograph is a fair and accurate depiction of

25   the area in question at the time in question.  If that

1        is done, it does not matter on the question of

2        receiving the photograph in evidence, who took the

3        photograph, or when it was done.  Sometimes with a

4        photograph taken a long time after the time in

5        question, a witness will testify that some of the items

6        depicted in the photograph were not present at the

7        scene at the time in question, unless those items would

8        disport a fair representation of the area at the time

9        in question.  The photograph may still be received in

10       evidence with, of course, the understanding that

11       certain items in the photograph were not at the scene

12       at the time in question.

13              Now, during the presentation of evidence, the

14       lawyers for the parties will in turn, be asking

15       questions of the witness.  During the questioning, a

16       lawyer is not permitted to make comments on a witness's

17       answer or on the case.  Although, that always happens

18       in TV shows and movies because they only have a short

19       period of time to convey the story.  It doesn't happen

20       here.  In real trials it's not allowed.  In a real

21       trial it is at the end of the case that lawyers are

22       permitted to address the jurors in what is called a

23       summation, and it is then that the lawyers make

24       comments on the witnesses, the testimony, and the other

25       evidence.

Judge's opening                          568

1           During the questioning of a witness, if a

2      lawyer believes a question or some other presentation

3      of evidence is not in accord with the rules of law,

4      that lawyer will object.  That objection creates a

5      question of law which under the law of the court, as

6      the judge of the law, I will decide whether the rules

7      permit the question or evidence objected to.

8           Also, at times a lawyer will make an

9      application concerning evidence or law, and the Court

10      will decide that matter also.

11          Making objections or applications is a

12      lawyer's duty.  Please do not be concerned or annoyed

13      by them, or draw any unfavorable inference because of

14      them.  They take place at every trial.  An example of

15      why it would be improper to draw unfavorable inference

16      from objections is as follows:

17          Remember, I explained for a photograph to be

18      introduced into evidence that there must be testimony

19      that the photograph is a fair and accurate depiction of

20      the scene at the time in question.  If there is no such

21      testimony, a lawyer has the right to object to the

22      introduction of that photograph.  After all, a

23      photograph that does not fairly and accurately depict

24      the scene at the time in question, would be of no value

25      to you, the jury.  In one way or another, all objects

1    address similar issues as to whether the matter

2    objected to presents relevant and fair evidence in a

3    form that permits you to evaluate it fairly.

4          At the same time you are not to read into

5    anything a lawyer not objecting to the introduction of

6    evidence.  A lack of objection to the introduction of

7    proposed evidence is simply an expression of an

8    understanding that the law permits the proposed

9    evidence to be presented to the jury.  When an

10   objection is made to a question, if I overrule the

11   objection, the answer will be evidence.  If I sustain

12   the objection, there is no answer, and therefore, no

13   evidence.  Because, remember, a question alone is not

14   evidence.

15         Sometimes when I sustain an objection, an

16   answer may have been inadvertently given anyway.  In

17   that case, whether or not I formally say that the

18   question and answer is stricken from the record, you

19   must disregard it.  I tell you now, that question and

20   answer is stricken.  You must disregard it as if it

21   were never said.

22         Also, as we have discussed and you may

23   appreciate the Court has an obligation under the laws

24   of New York to make sure that certain fundamental rules

25   of law are followed even if one of the lawyers does not

1      voice an objection.  So, on occasion, you may hear the

2      Court say sustained, or words to that effect, even

3      though the lawyer has not voiced an objection.

4              Needless to say, any ruling by the Court on

5      an objection of counsel or otherwise, is based on the

6      law and expresses no opinion about the facts of the

7      case, or whether the defendant is guilty or not guilty.

8      Remember, you are responsible for those decisions.

9              From time to time during the course of the

10     trial, there will be conferences at the bench with

11     counsel, and if they become prolonged, it may be

12     necessary for the Court to excuse the jury to the jury

13     room.  These conferences deal with questions and

14     matters of law or scheduling of the trial that are my

15     responsibility.  When the occasion does arise, when

16     there are conferences at the bench or outside your

17     presence, I do ask your indulgence and ask you to be

18     patient and tolerant while the conferences are

19     conducted.

20             Let me talk to you quickly about summations

21     and charge.  Upon completion of the introduction of

22     evidence, the lawyers will address you in a closing

23     statement of what the law calls a summation.

24             Under our law, the defendant's lawyer must

25     sum up first, and the assistant district attorney must

1   sum up last.  What a lawyer says in summation is not

2   evidence.  The summations, however, provide each lawyer

3   an opportunity to review the evidence presented and

4   submit for your consideration the facts, inferences,

5   and conclusions which they contend maybe properly drawn

6   from the evidence presented.

7         If you find that the evidence is summed up

8   and analyzed by a lawyer is accurate, and if you find

9   the inferences and conclusions that you are asked to

10  draw from such evidence is reasonable and logical, and

11  consistent with the evidence, you may adopt such

12  inference and conclusion.

13        After summations conclude, I'll instruct you

14  on the rules of law applicable to the case.  Those are

15  the rules you must accept and follow.  You will then

16  retire for your deliberations.

17        During your deliberations, your function as

18  jurors will be to decide what the facts are and to

19  apply to the facts, the rules of law that I set out.

20  You will determine what the facts are from all of the

21  testimony that you hear, the exhibits that are

22  submitted, and any stipulations the parties have agreed

23  to.  Or in other words, you will decide the case on the

24  evidence.  The conclusion you reach from determining

25  the facts and applying the law will be your verdict of

Judge's opening                    572

1    guilty or not guilty.

2              Now, as I have said, under our law, the first

3    juror selected is known as the foreperson.  During the

4    trial the foreperson has the same responsibility as any

5    other juror.  At the end of the trial, during the

6    jury's deliberations, we ask the foreperson to sign any

7    written note that comes from the jury.  The foreperson

8    can, but does not have to chair the jury's

9    deliberations during that time.

10             When the jury has reached a verdict, guilty

11   or not guilty, the entire jury will be asked to come to

12   court.  The foreperson will be asked whether the jury

13   has reached a verdict.  If that foreperson says yes,

14   the foreperson then will be asked what the verdict is

15   for each charged crime considered in accordance with my

16   instructions and that entire jury will be asked whether

17   that is their verdict and each juror will answer yes or

18   no.

19             After that each juror may be asked

20   individually whether the announced verdict is the

21   verdict of that particular juror, and then upon being

22   asked, each particular juror individually will answer

23   yes or no.

24             Thus, in some of the stages of a criminal

25   trial there are the openings of the assistant district

1    attorney, followed by the defense attorney, the
2    presentation of evidence, the summations of each
3    lawyer, the final instructions from the Court to the
4    jury on the law and deliberations of the jury and the
5    verdict.

6         I've been giving you admonitions throughout
7    this process, each time you left the courtroom and have
8    gone home for the day.  I'll remind you of my
9    admonitions.  Please remember to keep an open mind
10   throughout the trial.  You heard the attorneys explain
11   why this is important.  You need to hear all of the
12   testimony before you start to consider what, if any,
13   verdict you should reach.

14        Additionally, you need to hear the law before
15   you should make that consideration.  Please keep an
16   open mind throughout the trial.  Do not discuss the
17   case amongst yourselves, or with anyone else during the
18   trial.  The law does not allow you to do that.  You are
19   only allowed to start discussing this case at the close
20   of the case, after all of the evidence is in,
21   summations are given, you hear the instructions on the
22   law, and the Court then tells you to deliberate.  To do
23   so in advance, it may cause you to reach a premature
24   conclusion that is improper.  The law does not allow
25   that.

1        Please do not discuss the case amongst

2    yourselves or with anyone else during the trial.   Do

3    not permit anyone to discuss the case in your presence.

4    The reason for the rule, it is somewhat self-evident.

5    You need to get the evidence from this courtroom alone,

6    someone discussing this case in your presence, not

7    within this courtroom, may give you improper

8    information.   You cannot leave your decision on that

9    information.   Your decision can only come from the

10   evidence.   Do not talk to the lawyers, witnesses, or

11   the defendant about anything during the trial.

12        Remember, if anybody sees you outside,

13   they're going to ignore you.   Do not take it

14   personally.   You may not visit or view the place where

15   the charged crime was allegedly committed, or any other

16   place involved in this case.

17        First, the reason for that you cannot be sure

18   the place is in the same condition as it was on the day

19   in question.

20        And second, even if it was in the same

21   condition, once you go to the place discussed in the

22   testimony to evaluate the evidence, in light of what

23   you see, you are no longer a juror.   You have become a

24   witness, a witness to the scene.   As a witness, you may

25   now have erroneous views of the scene that is not

1    subject to correction by either lawyer.  That would not

2    be fair.  You have promised to be fair.  Please do not

3    visit the scene.

4             Additionally, any news coverage of the case,

5    do not read, view, listen for any accounts or

6    discussions of the case reported by the news media.

7             Do not attempt to research any fact, issue,

8    or law related to this case whether by discussion by

9    others, by research of the library, or by any other

10   means or source.

11            Your decision must be based solely on the

12   firsthand accounts of the evidence presented to you in

13   this courtroom.  It may not be based on some reporter's

14   view or opinion, or upon your own independent research.

15   I trust you understand and appreciate the importance by

16   abiding all of these rules in accord with your oath and

17   promise to me you will do so.

18            So, a little bit of a delay today.  Those

19   will happen from time to time.  Hopefully, they will

20   never be as long as today's delay.  I do ask you to

21   bring a book or magazine, or something with you to take

22   up your time when we do have these unforeseen delays.

23            Additionally, as you all know and you will

24   all break this morning.  We can't start until you are

25   all here.  You were all here early today.  Thank you

1    for that.  Please try to keep it up.  We'll try to get
2    you into the courtroom as soon as we can once all of
3    the jurors are present; even one of you missing will
4    delay us from being able to start the proceedings.

5              A word to the alternates.  You are both
6    expected to pay the same close attention to the case as
7    the first twelve jurors.  The only difference between
8    the alternate juror and one of the twelve is that the
9    alternate does not know at this point whether the
10   juror, whether that juror will be called at some point
11   during the trial to substitute for one of the first
12   twelve.  Just so everyone knows, that substitution can
13   only take place if some presently unforeseen
14   extraordinary emergency arises that makes it totally
15   impossible for one of the first twelve jurors to
16   complete the trial.

17             Our law does expect from this point forward
18   that first twelve jurors who begin the trial will be
19   the twelve jurors at the end of the trial.  It will
20   take an extraordinary emergency for one of the two of
21   you to become a substitute.  Should that occur, we'll
22   substitute you and we expect you to pay the same close
23   attention as everyone else.

24             That concludes my instructions to you at this
25   time.

kmm

1          Mr. Perri, you may begin your opening

2     statement.

3          MR. PERRI:  Thank you.

4          Good morning, ladies and gentlemen of the

5     jury.  The evidence in this case, the facts it will

6     prove, the narrative I will outline for you, it won't

7     be complicated.

8          What the evidence will prove, beyond all

9     reasonable doubt, that may be disturbing.  It may be

10    disconcerting.  It might even be painful, disgust and

11    difficult to consider, but it won't be complicated.  It

12    might be painful because this case is about sexual

13    abuse.  The allegations involve a then 53 year-old man

14    having oral contact with a then six-year old girl.  It

15    may be painful.

16         You will have a nearly eight, Mya Ramirez,

17    testify about this defendant pulling her pajama pants

18    down, pulling her underwear down, and then placing his

19    mouth on what she called then her coochie.

20         Painful, because the defendant was not a

21    stranger to Mya, wasn't a stranger to her mother.  He

22    was a friend, somebody who babysat her.

23         Painful, because it happened where Mya should

24    have been safe.  It happened inside her home, in the

25    kitchen.

1          Painful, because in the statement, the

2     arresting officer, you will hear how this defendant

3     acted like it was no big deal, and said she will tell

4     you I raped her daughter.  It was stupid.  I only

5     licked her once.  It is painful because this defendant

6     later admitted in a written statement, a statement

7     taken after Miranda warnings, his words, he tickled.

8     He tickled Mya, a six-year old girl.  He tickled her

9     pussy with his mouth.

10          Ladies and gentlemen, this may be painful,

11     but not because it's complicated, not because it's a

12     mystery.  It's painful because the evidence will show

13     it happened.  The evidence will prove that this

14     defendant, on October 16, 2013, at 124 Park Avenue, in

15     Roosevelt, Nassau County, New York State, placed his

16     mouth on the vulva and/or vagina of Mya Feliciano

17     Ramirez, who at that time, was just six years old.

18          When you hear testimony from Mya's mother,

19     Crystal Ramirez, a single mother of two -- Mya has an

20     older brother, Sincere.  Crystal lives with her

21     children in a one bedroom apartment, first floor, next

22     to a deli.  The apartment has a porch that opens up to

23     what would normally have been a living room.  It's

24     where Crystal sleeps because she gave the one bedroom

25     to the children.

1          From the living room there is a door directly

2     into the kitchen and then off the kitchen is her

3     children's room and a bathroom.  It's simple.  It's

4     their home.

5          The Ramirez family, on the morning of October

6     16, 2013, like any other, Crystal will tell you she

7     made sure the children dressed in a uniform and on the

8     bus that day for school.

9          Later that morning she got some bad news.  A

10    family friend, a man she had grown up with, who was

11    like a brother to her, he had died unexpectedly.

12    Understandably, Crystal was upset, and it was just

13    after she found out that information that the defendant

14    happened to stop by.  Crystal had known the defendant

15    for years before October 16, 2013.  The father of her

16    children, who's friends with the defendant's own son.

17    They were friends.  He even helped them move once.

18         Crystal and the defendant hung out socially

19    in the months and year leading up to the alleged

20    incident in her home, and he watched her kids on

21    several occasions.

22         You will also learn from the evidence that

23    Crystal, her son, Sincere, and daughter Mya, do not

24    speak Spanish.  They only speak English.  During the

25    years she was friends with the defendant, she conversed

1     only in English with him.

2           That October day, the defendant pulled up on
3     the street near her apartment in a Nassau intercounty
4     express bus, or NICE bus, that he drove for a living.
5     He worked for years as a bus driver.  Seeing Crystal
6     was upset, he asked, what was wrong.  He gave her a
7     cigarette, and said, I will come back later after he
8     dropped the bus off.  The defendant did come back later
9     that same day.  He came back with a pack of cigarettes
10    and Long Island ice teas, hung out together in the
11    enclosed porch, both drinking and talked.

12           A few hours later, the children, Mya and
13    Sincere came home, went inside, they changed out of
14    uniforms.  Mya put on a pair of pajama pants.  He went
15    and played video games, PS3 Station while the sister
16    played with toys throughout the apartment.

17           Outside, while the defendant and Crystal were
18    on the porch, another person from the neighborhood
19    named Prince stopped by.  Crystal stepped out onto the
20    steps and had a cigarette with him.  During that time
21    the defendant went inside.  Sincere will tell you the
22    defendant came into the living room.  At that time Mya
23    was there as well.  Mya complained of a toothache, and
24    the defendant offered to take a look at her.  He then
25    took Mya into the kitchen and closed the door behind

kmm

1    him.   Then Mya herself will tell you, the defendant

2    didn't look at her tooth.   He didn't help her with his

3    homework.   He didn't fix her a snack.   The defendant,

4    instead, lowered the pajama pants, pulled down the

5    underwear and put his mouth on her privates, on her

6    vagina.

7              As this was happening, Crystal will tell you

8    that Prince left.   He started to wonder where the

9    defendant was.   She went inside.   No defendant.   She

10   went into the living room, saw her son Sincere playing

11   video games.   No defendant, no Mya.   She figured the

12   defendant had gone to the bathroom and had to go

13   through the kitchen to get there.   She walked without

14   thinking anything into the kitchen, opening the door.

15             When Crystal opened that door to the kitchen,

16   instead, she found her daughter standing there,

17   standing there directly in front of the defendant with

18   her pants and underwear down to her legs and Crystal

19   yelled, what is the F going on in here?   And the

20   defendant turned around and ashamed, rubbing his

21   forehead.   Immediately, Mya pointed at the defendant

22   and stated to her mother, he licked my coochie.

23             From the living room, as soon as Crystal --

24   he heard his mother scream.   He immediately started to

25   yell, what's going on?   Sincere got up, looked over

1        into the kitchen and observed what his mother saw.  His
2        sister was standing there with her pants down about her
3        feet.  Crystal and Sincere, even Mya will tell you her
4        mother did what any woman would expect.  She grabbed
5        her daughter, grabbed her daughter, left the room and
6        went back into the living room, pulled up her pants,
7        pulled up her underwear to try to get away from the
8        defendant.  Just get out, she said to the defendant.
9        The defendant pled to Crystal.  He said, don't believe
10       Mya.  It wasn't what it appeared to be.  He begged her
11       not to call the police.

12            As soon as he left the apartment, she locked
13       the door.  She called the police and reported to them
14       what her daughter told her happened.  The Nassau County
15       police did respond.

16            Police Officer Boccio will testify to
17       arriving with his partner, Officer Wiggan and speaking
18       to Crystal and Mya.  The defendant was still there in
19       the parking lot of the building, leaning on his car.

20            Officer Boccio approached the defendant,
21       approached with the gun in their holster, not drawn.
22       He approached with handcuffs on his belt, approached
23       him alone.  He walked over and part of the initial
24       investigation, asked the defendant in English, what is
25       going on here?  The defendant responded in English.

1      She is going to say, I raped her daughter.  Officer
2      Boccio responded, he was going to need more than just
3      that.  The defendant then said words that knocked
4      Officer Boccio over.  It was stupid.  I licked her once
5      in the bedroom.  Understandably, the defendant was
6      taken into custody.  He followed the police direction
7      without any problems, eventually placed in a marked
8      police vehicle.

9          Detective Baron and Special Victims Squad,
10     who was notified about what was going on at 124 Park
11     Avenue and Officers Boccio and Wiggan took the
12     defendant to the special victims squad located in
13     Bethpage.  They took them there for further
14     questioning.

15         Around the same time, an ambulance brought
16     Crystal, Mya, and Sincere to Nassau County Medical
17     Center.  Once at the hospital they met with Detective
18     Baron.  They meet with him separately.  They also,
19     during the time at the hospital, met with Nurse Cathy
20     McAllister, who is a sexual assault nurse examiner, who
21     was on-call that evening.

22         As you read in the medical records and you
23     will hear in Nurse McAllister's testimony, she first
24     took a history from Mya before she conducted her exam,
25     and during that interview, Mya had been separated from

People's opening                    584

1    her mother, reported to her that Danny licked my

2    coochie.  Nurse McAllister questioned what she meant by

3    coochie, and Mya then pointed down to the vagina.

4              The exam continued.  They took off her

5    clothes and put on a gown.  Nurse McAllister took

6    custody of her pajama pants and her underwear that she

7    was wearing when she got changed.  The same ones, the

8    evidence will prove, the defendant took down before

9    placing his mouth on her genitalia.

10             Nurse McAllister will explain how with the

11   evidence collection kit she swabbed Mya multiple times

12   in various locations for many areas of her body,

13   various locations so as to collect any dried secretions

14   and possible genetic evidence that might have been left

15   on her by her assailant.

16             Most importantly, you will hear that she

17   swabbed Mya's vulva.  Each swab is dried, sealed in an

18   envelope to prevent contamination from evidence.  Mya's

19   underwear was sealed in a separate envelope.  All of

20   the envelopes were together again, sealed inside of an

21   evidence collection box.

22             Ms. McAllister turned over the box to

23   Detective Baran.  Detective Baran invoiced that

24   evidence under a case number and returned it to the

25   special victims squad.  When Detective Baran returned

kmm

1      to the special victims squad that night, the defendant
2      was already there and was alone in the restroom,
3      looking at the computer table, chair.  Officer Boccio
4      was outside and observed the defendant through the
5      glass, opening the door.

6                You will hear the defendant was offered food,
7      brought pizza, given water, used the laboratory during
8      this time, and later Detective Baran was convening in
9      English.

10               You will also come to know, although, the
11     defendant does speak and comprehend in the English
12     native language, Spanish, you will hear from Detective
13     Pacheco how the defendant was given his rights, warned
14     of his rights in Spanish.  Detective Pacheco, by
15     reading the technical language of the Miranda warnings
16     to the defendant, you will view the card that was used
17     to read those warnings to the defendant and you will
18     see in response to the question in Spanish whether or
19     not he understood those rights.  The defendant wrote
20     out the word si, S-I, meaning, yes, and signed his
21     name.  In response to the question in Spanish, do you
22     want to answer the questions?  Again, the defendant
23     wrote out the word si.  S-I, saying yes.

24               You will see how the defendant signed a
25     rights card a third time after reading the declaration

1     that he freely and voluntarily is waiving his right to
2     be silent, waiving the right to have an attorney
3     present, and he wanted to talk with the police.  You
4     will see the signature of Detective Baran, Detective
5     Pacheco witnessing the defendant's action.  The
6     defendant met with a Detective Baran, spoke with him in
7     English.

8             The carrying detective on the case, Detective
9     Baran, nevertheless gave the defendant the option to
10    give the statement to Detective Baran in English or to
11    give the statement in Spanish.  You will hear the
12    defendant chose to try to get a statement in length
13    with Detective Baran.  As he gave the statement,
14    Detective Baran will testify to you that he had no
15    problems communicating with the defendant in English.
16    He was prepared to bring in Detective Pacheco if any
17    such problems arose.  He explained the process.  He
18    used typing down the defendant's words to compose a
19    written version of the statement printed out.  He had
20    given it back to the defendant who read it out loud,
21    the first paragraph, in front of Detective Baran, and
22    then read the rest to himself.

23            You will see where the defendant himself
24    pointed out the Social Security number in English in a
25    sentence, it was incorrect, and had the changes made by

1      himself and then initialed it.

2              You will see the defendant himself pointed

3      out to Detective Baran that Detective Baran, a typo,

4      and missed, a girl, after the word little in a sentence

5      three-quarters of the way down.

6              A handwritten correction was entered, and the

7      defendant initialed that location as well.  Although,

8      the evidence will show that this defendant, in Nassau

9      County, the bus driver understood the English version

10     of his statement, but Detective Baran was to come back

11     into the arrest room, to come back in and translate the

12     statement in its entirety, to read it entirely out loud

13     to the defendant so he was given a full and fair

14     opportunity to understand and appreciate his statement

15     before he signed and adopted it is true.

16             Detective Pacheco will come, and he will

17     testify he translated it.  He translated it in its

18     entirety through each of the corrections the defendant

19     made on that page.  The evidence will show beyond a

20     reasonable doubt the defendant signed that statement,

21     signed it freely.  He did so after knowingly and

22     voluntarily waiving his rights and understood in both

23     English and Spanish.  The defendant, he was not

24     coerced, threatened.  He wasn't tricked or promised

25     anything in order to get that statement.

People's opening                588

1           Detective Baran will read you that statement.
2     In it the defendant acknowledges he notes it is
3     Crystal, what he calls her husband.  He was missed
4     coming off the hill on October 16, 2013.  He
5     acknowledges that while he was there, children came
6     from school.  He does include self disparaging comments
7     like bad mother or clarifies her.  He explains how he
8     helps the children with homework and he's worried
9     they're being exposed to cigarette smoke.
10          Then he states on October 16th he did go
11    inside to use the bathroom, and on his way he
12    encountered Mya, and then the defendant claims in a
13    statement Mya was there when he came out of the
14    bathroom and told her, I'm going to tickle you.  The
15    defendant's statement goes on to explain after saying
16    that to her, he pulled down her pants and pulled down
17    her underwear and tickled her pussy with his mouth.
18          After the statement was read to the
19    defendant, including all of those words in entirety by
20    Detective Pacheco, in Spanish, the defendant signed
21    that statement.  Detective Pacheco signed that
22    statement.  Detective Baran signed that statement.
23    Now, no amount of regret can undue this conduct.
24          Once called, the evidence will show the
25    defendant did have -- someone asked the defendant if he

kmm

1    would write an apology letter to Crystal and Mya.  The
2    defendant had agreed to do it.  He wrote out an apology
3    letter in Spanish, in his own hand.  Although, no one
4    translated the questions or directed Detective Baran
5    about writing out the apology letter, and you will see
6    that letter and Detective Pacheco will translate that
7    letter for you in sum and substance.  It says the
8    defendant is sorry.  He's asking for pardon.  He never
9    intended to do any harm to any of them, especially the
10   kids.  He hopes she will drop the charges against him
11   after reading the letter, never meant to do any harm.
12   He hopes she does drop the charges.  Just like the
13   letter, the defendant's own statement, the written
14   statement, acknowledges he made a big mistake and is
15   sorry.

16        Ladies and gentlemen, the evidence will prove
17   beyond a reasonable doubt that placing his mouth on a
18   sick-year old girl's genitals is something much more
19   than stupid, much more than a mistake, beyond a
20   reasonable doubt, it's criminal.

21        And long after, separate and part from what
22   Mya said, what Crystal said, and what the defendant was
23   alleged to have said to Officer Boccio and Detective
24   Baran, you will also hear about how Mya's underwear and
25   vulva swab taken by Nurse McAllister became extremely

1       relevant after the defendant agreed to give a DNA

2       sample to Detective Baran.  That's what is called a

3       buccal swab.  You can swab inside his mouth to collect

4       DNA, that along with the sex test, the box was put

5       together by Nurse McAllister, submitted to Nassau

6       County office, and it was sent there for forensic

7       genetics to be examined and tested, all of the

8       evidence.

9              The experts in this field, he will explain to

10      you full DNA profile of Mya and of the defendant.

11      Mr. Chillseyzn will testify then the first finding he

12      was able to make was a test of the vulva swab taken by

13      Mya Ramirez indicated on October 16, 2013.  There was

14      saliva present on Mya's vulva, and additionally, on

15      that swab.  Mr. Chillseyzn found male genetic material.

16      Although, not enough present in that particular swab to

17      generate a DNA profile.  The evidence will clearly show

18      along the male DNA from a male, cells was present on

19      Mya's vulva.

20             Now, next Mr. Chillseyzn will explain the

21      turned his attention to Mya's underwear, explaining and

22      examining her underwear, he found two saliva stains.

23      He found it on the inside of the material and in

24      explaining, he found on the clothing area within, it

25      was mostly Mya's DNA.

1           Mr. Chillseyzn will explain since the

2    clothing is in contact with Mya's own body, her skin,

3    it was reasonable to expect the majority of DNA comes

4    from Mya's own skin cells, whether or not saliva is

5    also deposited on that same cloth, but along with Mya's

6    DNA in that second saliva stain examined, there was

7    additional DNA.  Again, it was male DNA.

8           Through various forms of testing, you will

9    hear Mr. Chillseyzn was able to determine what the

10   major donor of that male DNA was, DNA profile

11   consistent with the defendant.  Let me explain that to

12   you.

13          There is one statistical analysis done by the

14   Nassau County Medical Examiner's Office.  They will

15   testify that after they performed that analysis, they

16   were able to determine it was a one in 175 million

17   chance that it is anyone else other than this

18   defendant, who was a major donor of that male DNA found

19   inside the saliva, found inside Mya's underwear.  The

20   evidence will show there were not 175 people in the

21   kitchen at 124 Park Avenue, Roosevelt.

22          You will note that when Crystal opened the

23   door and Sincere heard his mother scream, the evidence

24   will show there were not 175 million men that were

25   found standing in front of Mya and her pants and

                                                      kmm

People's opening                    592

1    underwear down, as she pointed and said she, he licked

2    my coochie.

3              The evidence will show there was one man

4    there, this defendant, the one man Sincere saw take his

5    sister into the kitchen and close the door.  This

6    defendant, whom the evidence will show, admitted that

7    he did it.  He admitted that he licked Mya to Officer

8    Boccio, and again, freely, voluntarily, and after

9    having been read his rights, to Detectives Baran and

10   Pacheco.  He tickled her pussy with his mouth.  There

11   was one man there, this defendant, the man who

12   apologized, who after he had been caught, said he meant

13   no harm.

14             At the close of the trial, I will come back

15   to you.  I'll ask you to follow all of the evidence, to

16   look at it as a whole, to listen to the testimony of

17   Mya, Crystal, Sincere, to consider the physical

18   evidence explained by Christopher Chillseyzn, to read

19   and hear the defendant's own statements of admission

20   and written statements of law enforcement.  I'll ask

21   you to return a verdict of guilty, guilty of criminal

22   sexual act in the first degree and guilty of

23   endangering the welfare of a child.  I'll ask you to

24   return a verdict of guilty because the evidence demands

25   it beyond all doubt.  I'll ask you to return a verdict

kmm

Defense's opening                    593

1        of guilty because it's not complicated.  Thank you.

2                    THE COURT:  Thank you, Mr. Perri.

3                    Mr. Berger.

4                    MR. BERGER:  Judge Corrigan, Mr. Perri,

5        Mr. Foreman, members of the jury.  Everything that the

6        district attorney has just told you is not evidence.

7        It's what he hopes to establish here at this trial.  He

8        likes to think it's simple, not complicated, and if you

9        believe his story, then it's not complicated at all.

10       But, you will find that his story is a house of cards.

11       It will not establish what he claims to you.

12                   Now, he will establish -- I know when you got

13       your jury notice, I'm sure you -- a lot of you groaned

14       and said, I can't do this now.  I'm not meant to

15       participate in it, I'll do it another time.  You have

16       other important things to do, but you are here and I

17       believe you will not be sorry.  You will find your

18       experience here at this trial both interesting and

19       educational.  You will learn not only how criminal

20       trials proceed, but there are things you will hear in

21       this trial, in this courtroom, in the next few weeks

22       that will amaze you.  You will not believe they will go

23       on in court at all.  You would not believe that they

24       would go on in our justice system in this day and age

25       in Nassau County.  I'm not going to prejudice you now

1    by telling you these things, but I will point them out

2    at the end of the case when I sum up.

3          Members of the jury, you know how serious

4    these charges are, and these next few days are the most

5    important days in the life of Daniel Ramos.  It is,

6    therefore, very important that you pay attention not

7    only to the direct examination given to you by the

8    prosecutor, but to the cross-examination of the

9    witnesses that are presented as well.  What I'm asking

10   you to do is a very difficult thing, being a juror in a

11   criminal case.  I'm asking you to pay attention to not

12   only what is said, but how it is said.

13         You did hear the judge allude to this in her

14   opening statement before, because how a witness

15   testifies can be sometimes even more important than

16   what the witness says.  I asked you before, if during

17   the jury selection process if anybody ever lied to you

18   before, and they didn't come up to you and say to you,

19   I'm going to tell you a lie now.  You have a sense of

20   evaluating people as to just whether or not they have

21   been truthful with you, and I'm asking you to use that

22   as well, since that, you have.

23         The judge told you, and it is true, of

24   course, the reporter is taking everything that is said.

25   And the court reporter can read it back if you should

1    request.  But the court reporter can't take down how

2    something is said and that's why it is important for

3    you to try to remember how a witness testifies, not

4    just what they say.

5          The prosecution would have you believe just

6    from the opening statement that Daniel Ramos is a

7    pedophile; that he sexually abused Mya Ramirez.

8          Daniel Ramirez, you will learn, is a

9    fifty-four year old U.S. citizen, never been arrested

10    before in his life, who came to this country in the

11    early 90's, who's married, devoted religious man, kind

12    man, raised two children.

13          MR. PERRI:  Objection.  May we approach?

14          THE COURT:  Step up.

15          (Whereupon, there was a sidebar discussion as

16    follows:)

17          THE COURT:  There's been an objection.

18    Normally, I would overrule any objection because this

19    is not evidence, but I just want to make sure I

20    understand the nature.

21          MR. PERRI:  It mischaracterizes the People

22    are requesting to find him to be a pedophile and then

23    the litany of facts that are solely there to ask for

24    sympathy --

25          THE COURT:  The objection is going to be

kmm

1        overruled.  It is an opening statement.  I'll remind

2        them at the close of your statement neither opening is

3        evidence and give them a break, and then we'll start

4        the trial thereafter.

5                    MR. PERRI:  Yes, your Honor.

6                    (Whereupon, the proceedings resumed.)

7                    MR. BERGER:  As I was saying with a devote

8        religious man, married, raised two children, worked his

9        way up when he got here working in a plastics company

10       to become a commercial driver, were among his many

11       driving jobs, provided services to the disabled.  He's

12       a man who worked very hard, providing for his family

13       and now finds himself facing an outrageous charge that

14       threatens his freedom and his reputation.

15                   I ask you to carefully scrutinize all

16       witnesses that come before you at this trial.  Keep an

17       open mind no matter what the piece of evidence you

18       hear.  Wait until the evidence is concluded.  Wait

19       until you hear the arguments of counsel.  Wait until

20       the Judge gives you the charge, then try to start to

21       consider what it all means.  You will see that this is

22       a very simple, uncomplicated case.  That the

23       prosecution wants you to believe this is not as

24       Mr. Perri has portrayed it to you.

25                   I'm confident if you analyze the evidence in

1    this case carefully, listen to the charges by the

2    judge, that the only correct verdict in this case will

3    be that of not guilty.  Thank you.

4              THE COURT:  Thank you, Mr. Berger.

5              All right, just a reminder to all of the

6    jurors.  What you just heard from both attorneys is

7    their opening statements, and as I told you, what the

8    lawyers say and what I say is not evidence.  We'll

9    start with the evidence portion of this case in a few

10   moments.  It has been about an hour since you have been

11   here.  I've given my word, I would allow you to stretch

12   your legs and take a break after an hour of activity

13   within the courtroom.  I'll keep my promise to you.

14   I'll keep a short break this time.  I have a few legal

15   issues to go over.

16             Keep an open mind throughout the trial.  Do

17   not discuss the case amongst yourselves or with anyone

18   else during the trial.  Do not permit anyone to discuss

19   the case in your presence.  Do not talk to lawyers,

20   witnesses, about anything during the trial and don't

21   use the short opportunity to get on your phones and

22   start looking up news accounts.  You are not allowed to

23   do that.  Please do not.  Enjoy your break.  We'll see

24   you shortly.

25             (Whereupon, the jury exited the courtroom.)

1           THE COURT:   There are other matters you need
2      to put on the record before we proceed and then I do
3      need to do a swearability too with the young child
4      request if you are going with her first.

5           MR. PERRI:   It is the People's intension with
6      regard to scheduling, to have Crystal Ramirez, Sincere
7      Ramirez, the arresting officer, and then tomorrow
8      morning so you could schedule with the jury to have the
9      child first and then the swearability determination and
10     then testimony from the child.

11          THE COURT:   That's perfect.

12          What do we need to put on the record now
13     before we can continue with the testimony?

14          MR. BERGER:   A few things.

15          MR. PERRI:   Can I put the disclosure on the
16     record.   Your Honor, on Friday, the People did disclose
17     to defense counsel that in the process of preparing
18     Crystal Ramirez, in discussing whether or not she had
19     prior encounters with law enforcement, in doing our due
20     diligence and questioning whether she had been
21     convicted of a crime, she disclosed to us there was
22     something in her past when she was eighteen, and then
23     previously I had run her NYSID, and there was nothing
24     on her NYSID.

25          We were able then to determine by bringing

1     her to the district courthouse on Friday afternoon that

2     she did have a youthful offender on an attempted petit

3     larceny.  We faxed the certificate of disposition over

4     to defense counsel.  She was originally arrested in

5     that case for a robbery, aided by another.  The factual

6     background that she disclosed to me with regard to

7     that, is that in 2002, she got into a physical

8     altercation with another girl, that she hit that girl

9     with an open hand.  They hit each other and then her

10    friend who she was with grabbed her beach bag at Long

11    Beach train station and left with it.  That she was

12    eventually given youthful offender status with

13    probation and time served, and that we disclosed the

14    certificate of disposition to defense counsel on

15    Friday.  We would like to be heard later about whether

16    or not she could be cross-examined on that or the

17    underlying facts, et cetera.

18                Additionally, this morning, Crystal Ramirez,

19    not someone beyond high school education and behind the

20    understanding of the criminal justice system, is

21    limited.  She believes we can find no corroboration of

22    it.  When she was 14 or 15, she was arrested and

23    brought to Family Court and this is -- we're just

24    disclosing this now.  I learned this morning for

25    stealing change out of a car in Long Beach and because

1   her much older boyfriend had pills on him.  She does

2   not know what she was charged with.  She does not think

3   she was adjudicated a juvenile delinquent in Family

4   Court, and she has no further information about that

5   alleged testimony, 14 or 15.  Your Honor, that was not

6   reflected in her NYSID in any way.

7          THE COURT:  I'll hear from you, Mr. Berger.

8          MR. BERGER:  Judge, while Mr. Perri considers

9   having done due diligence on Friday, after we picked a

10  jury, I'm saying I'm entitled to have the felony

11  complaint in the original case that was a robbery,

12  second degree aided by another.  I think that since the

13  People have notified me of this in such a late date,

14  and the witnesses scheduled to testify today, they

15  should provide me with the felony complaint.  And I

16  could rely on what Mr. Perri says to this Court, but I

17  think I should have the felony complaint because I

18  don't know I'm necessarily bound by what Mr. Perri has

19  represented here.  All I'm saying is that I'm asking

20  the Court direct that I be provided with the felony

21  complaint so I could question Ms. Ramirez with respect

22  to that incident.

23          THE COURT:  I imagine it's sealed if it even

24  exists.

25          MR. PERRI:  Yes, your Honor.  It would be

1    sealed.   The People do not have physical custody.   I do

2    not have physical custody of even the district

3    attorney's file.   I have ordered it.

4         But with respect to the youthful offender

5    conviction, your Honor, the People under Second

6    Department case Lucius, 289, AD2d 963, would argue the

7    defense should be precluded from questioning about the

8    actual finding she was a youthful offender.   There was

9    no criminal conviction for an '80 petit larceny.   The

10   arrest itself is not proof of -- does not go to her

11   credibility.

12        And additionally, under Lucius and also under

13   Lemery, which is a Fourth Department case in 2013, 107

14   AD3d, 1593, it was noted that although in accordance

15   with the holding in Lucius, the underlying facts of

16   youthful offender are at the discretion of the Court.

17   It does need to make a determination as to whether or

18   not a conviction or adjudication from such a long time

19   period before is more probative than it is prejudicial

20   with respect to the credibility of a witness.

21        Specifically, in Lemery it is noted that the

22   juvenile delinquent can be wholly excluded from

23   cross-examination of the prosecution witness, and that

24   the underlying immoral acts that constituted the

25   youthful offender at the discretion of Court, and we

Proceedings                602

1    would ask the Court preclude defense counsel from -- on

2    the youthful offender as well as the possible juvenile

3    delinquent that she has disclosed.

4            MR. BERGER:   The prosecutor has acknowledged

5    noticed that Ms. Ramirez has said that she was arrested

6    for stealing change from a car in Long Beach.   Those

7    facts I certainly can ask her about and I'm not

8    claiming I could ask her about a youthful offender

9    adjudication.   I'm asking about the underlying acts.

10   That's why I wanted the felony complaint in order to do

11   that.   And it seems to me to tell me on Friday

12   afternoon for a witness that is coming in on Monday

13   morning or some time on Monday to testify, I should --

14   the district attorney can't claim that they --

15   Mr. Perri cannot claim he does not have the felony

16   complaint.   He has constructive possession of a felony

17   complaint.   It's a district attorney's document.   No

18   matter what the findings were, no matter what the

19   judicial determination was, they have this document

20   which shows the underlying acts.   I should be provided

21   that, so I could ask her about the underlying acts.

22           THE COURT:   All right.   With regards to the

23   action or the acts of Ms. Ramirez, that she believes

24   brought her to Family Court at a point in time when she

25   was 14 years old, that is completely excluded.   Defense

kmm

1    will not be allowed to ask any questions regarding that

2    matter, unless, of course, the door is somehow opened

3    and she brings it up, then it is fair game for you,

4    Mr. Berger.

5           With regards to the action when Ms. Ramirez

6    was 18, and received a youthful offender adjudication,

7    obviously, Mr. Berger, you cannot inquire into the

8    youthful offender matter.

9           The Court will allow you to go into the

10   underlying facts from that incident.  I don't know of a

11   requirement that the People need to then go and unseal

12   every file that is a part of adjudication that is

13   noncriminal in nature, unless you can present me with

14   something that says it is required.  I'm not going to

15   force the People to get an unsealing order to attempt

16   to locate this complaint.  But, Mr. Berger, you can, of

17   course, inquire about whatever facts are initially

18   brought to your attention, obviously, by Ms. Ramirez,

19   Ms. Ramirez's testimony, and I will give you leeway to

20   make inquiry with regards to those facts in light of

21   the fact I appreciate you don't have something to

22   compare it to.  I understand that position.  So, you

23   can do cross-examination of that.  I won't require the

24   People to turn it over.  If you have it, however, turn

25   it over.

Proceedings                        604

1           MR. PERRI:  At this time I do not have

2    physical possession of that file.

3           THE COURT:  Do you know if it's sealed?

4           MR. PERRI:  It could have been sealed as a

5    matter of law since the inception when she was

6    adjudicated a youthful offender.

7           MR. BERGER:  Sometimes pleas require a

8    waiving of sealing rights.  I don't know whether that

9    was sealed or not.

10          MR. PERRI:  As it appears nowhere on her

11   NYSID, there is no evidence that was part of

12   adjudication, and it does not state there -- as there

13   was a waiver of sealing rights on the certificate of

14   disposition.

15          MR. BERGER:  For the record, could I have

16   Mr. Perri recite what he understands the facts of that

17   case to be?

18          THE COURT:  Absolutely.

19          MR. PERRI:  Yes, your Honor.  It's my

20   understanding that in the summer of 2002 --

21          MR. BERGER:  Do we have date?

22          MR. PERRI:  There was a date on the

23   certificate of disposition.

24          MR. BERGER:  The date of occurrence.

25          MR. PERRI:  Other than the date of arrest, I

                                                      kmm

1      do not have a specific date of occurrence.

2               THE COURT:   Other than the summer of 2002.

3               MR. PERRI:   The summer of 2002.  Your Honor,

4      that Crystal Ramirez was with another female friend.

5      She got into a physical altercation at the Long Beach

6      train station with a girl she had ongoing problems

7      with, who was similar in age to her.   She struck that

8      woman, that girl, with an open hand.   The beach bag

9      possessed by that women was on the ground during the

10     physical fight and the friend of Crystal Ramirez

11     grabbed that bag and they both fled after the fight.

12              MR. BERGER:   I'm sorry, Crystal Ramirez.

13              MR. PERRI:   A friend or associate of Crystal

14     Ramirez, grabbed the bag, she grabbed the actual

15     property, the beach bag, and left the scene, your

16     Honor.

17              MR. BERGER:   They both left the scene?

18              MR. PERRI:   Yes.

19              THE COURT:   Do you have that for your notes?

20              MR. BERGER:   I do.

21              THE COURT:   Is there anything else before the

22     Court takes a two-minute break and then we get started

23     with testimony?

24              MR. PERRI:   No, your Honor.  I ask to speak

25     to the witness about your rulings.

Proceedings                606

1              THE COURT:  Absolutely.

2              Mr. Berger, anything else?

3              MR. BERGER:  No.

4              THE COURT:  There is a court interpreter that

5    continues to be part of this case.  Put your name on

6    the record.

7              THE INTERPRETER:  Carmen Knight, New York

8    State interpreter.

9              THE COURT:  Five-minute break for the Court

10   and parties.

11             (Whereupon, a short recess was taken.)

12             THE CLERK:  Case on trial continued,

13   Indictment 742N of 2014.  People of the State of New

14   York vs. Daniel Ramos.

15             Let the record reflect all parties are

16   present.  The jury is not present at this time.

17             People ready?

18             MR. PERRI:  Yes, your Honor.

19             THE CLERK:  Defense counsel ready?

20             MR. BERGER:  Yes, your Honor.

21             THE COURT:  Before I bring in the jury,

22   anything for the record, Mr. Berger?

23             MR. BERGER:  No, ma'am.

24             THE COURT:  People, anything for the record?

25             MR. PERRI:  One matter.  The People are not

1    allowing any of their witnesses to be present for the
2    testimony of any of their witnesses throughout this
3    trial.  We want to inquire whether that is a policy of
4    the Court upon information and belief.  It's possible
5    some of the parties were names cited by defense
6    counsel, and if they are to be called as witnesses, we
7    ask them to be excluded from the proceeding.
8              THE COURT:  It's my practice to exclude both
9    prosecution and defense witnesses from this courtroom
10   should they potentially be called as witnesses.  Do you
11   have anybody here or potential witnesses?
12             MR. BERGER:  They are -- they are family
13   members.  I ask in this particular case you make an
14   exception.  They're not going to be talking about
15   anything that is adduced by the prosecution in its case
16   at this trial.  I ask you to allow the family members
17   to remain.
18             THE COURT:  They're more character than
19   factual?
20             MR. BERGER:  They will not be factual, yes.
21             THE COURT:  If you allow them to remain, just
22   so you are on notice, the People are going to be given
23   to cross-examine them with regards to the fact they
24   were sitting in the courtroom the entire time hearing
25   all of the testimony, if that's the appropriate

1     question for cross-examination.

2               MR. BERGER:  If it is and you rule that way,

3     we'll abide by that.

4               THE COURT:  In light of the fact they are

5     family members, can you tell me who?

6               MR. BERGER:  Son and daughter-in-law.

7               THE COURT:  Are those the individuals in this

8     courtroom that are your potential witnesses?

9               MR. BERGER:  Yes.

10              THE COURT:  I will not allow anyone else

11    other than a blood family member.  At this time, the

12    son, only the son and daughter-in-law may remain in the

13    courtroom.

14              People, you may be able to cross-examine

15    accordingly.

16              MR. PERRI:  People reserve their right to ask

17    for defense counsel show cause as to the witnesses, as

18    they would be appropriate for this case.

19              THE COURT:  We'll cross that bridge when we

20    get there.  NOTE!!! NOTE!!!.

21              (Whereupon, the jury entered the courtroom.)

22              THE CLERK:  Do both side stipulate all sworn

23    jurors are properly seated?

24              MR. PERRI:  Yes, your Honor.

25              MR. BERGER:  Yes, your Honor.

1                THE COURT:  We'll get started right away.

2        Call your first witness.

3                MR. PERRI:  The People call Crystal Ramirez.

4    C R Y S T A L    R A M I R E Z, called on behalf of the

5        People, having been duly sworn, took the witness stand

6        and testified as follows:

7                THE CLERK:  State your full name, spell your

8        first and last name, and give your county of residence.

9                THE WITNESS:  Crystal Ramirez, C-R-Y-S-T-A-L,

10       R-A-M-I-R-E-Z.  Nassau County.

11               THE COURT:  Good morning, Ms. Ramirez.

12               My name is Teresa Corrigan.  I'm the judge in

13       this matter.  Keep your voice up, speak slowly,

14       clearly, loudly so everyone in the courtroom can hear

15       you.  Wait for an entire question to be asked before

16       you start your answer because the court reporter can

17       only take down one person speaking at a time, and if

18       you hear the word objection, I need you to stop

19       speaking.  Give me a chance to make a ruling, and I'll

20       let you know whether or not you should answer the

21       question.

22               Do you understand?

23               THE WITNESS:  Yes.

24               THE COURT:  You may inquire.

25   DIRECT EXAMINATION

kmm

1    BY MR. PERRI:

2        Q.    Good morning, Crystal.

3        A.    Good morning.

4        Q.    On October 16, 2013, where were you living?

5        A.    124 Park Avenue in Roosevelt.

6        Q.    Where do you live currently?

7        A.    124 Park Avenue in Roosevelt.

8        Q.    Is that a single-family home or apartment?

9        A.    It's an apartment.

10       Q.    How many bedrooms does your apartment have?

11       A.    One.

12       Q.    What floor is it on?

13       A.    The first.

14       Q.    What else is located on the first floor of that

15   building?

16       A.    Apartments and a deli.

17       Q.    Could you describe the layout of your apartment?

18       A.    It's an enclosed porch.  When you walk in there's

19   the enclosed porch.  The porch -- there's the living room

20   also.  I made it into my bedroom also, and after that room

21   is the kitchen, and after the kitchen is my kids' room, and

22   after my kids' room is the bathroom.

23       Q.    Now, who do you live with?

24       A.    My two children.

25       Q.    What are your two children's names?

1    A.   Sincere Feliciano Ramirez, Mya Feliciano Ramirez.

2    Q.   Starting with Mya, how old is Mya?

3    A.   Seven.

4    Q.   What is Mya's age?

5    A.   6/1/07.

6    Q.   Who is Mya's father?

7    A.   Christian Feliciano Ramirez.

8    Q.   How old was Mya on October 16, 2013?

9    A.   Six.

10   Q.   Does she currently go to school?

11   A.   Yes.

12   Q.   Where does she currently go to school?

13   A.   Central Avenue Elementary.

14   Q.   Was she going to school in October of 2013?

15   A.   Yes.

16   Q.   What grade was she in in October of 2013?

17   A.   First.

18   Q.   You said you also have a son, Sincere.  How old is

19   he?

20   A.   Eleven.

21   Q.   Who is Sincere's father?

22   A.   Christian Feliciano.

23   Q.   What's Sincere's date of birth?

24   A.   9/22/03.

25   Q.   How old is Sincere today?

1     A.   Eleven.

2     Q.   Does he go to school?

3     A.   Yes.

4     Q.   Where does he go to school?

5     A.   Washington Rose Elementary.

6     Q.   Were both of your children living with you at 124

7   Park Avenue on October 16, 2013?

8     A.   Yes.

9     Q.   I would like to draw your attention before either

10   children were born in the summer of 2002, did you get into a

11   fight that summer with another girl?

12     A.   Yes.

13     Q.   Who was she?

14     A.   A female that my sister knew, my younger sister

15   knew.

16     Q.   What was her name?

17     A.   Sarah.

18     Q.   Did you hit her?

19     A.   Yeah, I open handed smacked her.

20     Q.   Were you with anyone else?

21     A.   Yes.

22     Q.   Who were you with?

23     A.   She was my best friend at the time.

24     Q.   What, if anything, did she do during that

25   incident?

1      A.    She took Sara's beach bag that was on the ground.

2      Q.    How old were you back then?

3      A.    18.

4      Q.    Drawing your attention back to the present, do you

5    know an individual named Daniel Ramos?

6      A.    Yes.

7      Q.    How do you know him?

8      A.    He's my children's -- my children's father

9    friend's father.

10     Q.    How long have you known him?

11     A.    About 13 years, 14 years.

12     Q.    Do you see him presently in the courtroom?

13     A.    Yes.

14     Q.    Can you identify him by pointing to him and naming

15   an article of clothing he is wearing?

16     A.    Wearing a white sweater.

17           MR. PERRI:  I ask that the record reflect

18     that she identified the defendant.

19           THE COURT:  So indicate.

20     Q.    Were you friends with the defendant before October

21   16, 2013?

22     A.    Yes.

23     Q.    How long were you friendly with him?

24     A.    From like the winter right before.

25     Q.    I'm sorry.  And did you have any major problems or

C. Ramirez - People - Direct       614

1    disagreements with him before October 16, 2013?

2         A.   No.

3         Q.   Did you ever date Daniel Ramos, the defendant?

4         A.   No.

5         Q.   Were you ever romantically involved with the

6    defendant?

7         A.   No.

8         Q.   Prior to October 16, 2013, to your knowledge, was

9    the defendant employed?

10        A.   Yes.

11        Q.   What was he working as?

12        A.   A bus driver.

13        Q.   Who was he a bus driver for?

14        A.   It's called the NICE bus now, but MTA before.

15        Q.   Ms. Ramirez, do you speak Spanish?

16        A.   No.

17        Q.   When you communicated with the defendant during

18   the years you've known him, what language did you use?

19        A.   English.

20        Q.   Have you been able to have a conversation with the

21   defendant in English?

22        A.   Yes.

23        Q.   Do your children speak Spanish?

24        A.   No.

25        Q.   Have you observed the defendant speak with the

1   children?

2        A.   Yes.

3        Q.   What language did they use?

4        A.   English.

5        Q.   Has the defendant ever babysat or watched your

6   children?

7        A.   Yes.

8        Q.   Approximately, how many times before October 16,

9   2013, did the defendant do that?

10       A.   About four or five.

11       Q.   Drawing your attention to October 16, 2013, were

12   you at home around midday that day?

13       A.   Yes.

14       Q.   Could you describe your emotional state on that

15   day?

16       A.   I was very upset.

17       Q.   Why were you upset?

18       A.   Because someone called my brother who I considered

19   family, who I grew up with and lived at my home many years

20   on and off, passed away.

21       Q.   What was his name?

22       A.   Dave Jackson.

23       Q.   When was the last time before October 16, 2013,

24   when you got that news that you had seen him?

25       A.   Two days prior.

1      Q.    Did there come a time that day when you saw the

2   defendant after you learned that your friend you grew up

3   with died?

4      A.    Yes.

5      Q.    Where did you see him?

6      A.    He was driving a bus down my block.

7      Q.    What kind of bus was that?

8      A.    The NICE, like a handicap bus, a NICE bus.

9      Q.    Approximately what time did you see the defendant?

10     A.    I don't know.

11     Q.    What was -- without going into the substance of

12  any conversation you may have had, did you speak with him at

13  that time?

14     A.    Yes.

15     Q.    Did there come a time later that day when the --

16  when the defendant came back to your apartment?

17     A.    Yes.

18     Q.    Were your children home when the defendant arrived

19  at your house?

20     A.    No.

21     Q.    Where were they?

22     A.    School.

23     Q.    Now, during that day, during that afternoon, was

24  anyone drinking?

25     A.    Yes.

1     Q.    Were you drinking?

2     A.    Yes.

3     Q.    Was the defendant drinking?

4     A.    Yes.

5     Q.    Who brought the alcohol?

6     A.    Danny.

7     Q.    When you say, Danny, do you mean the defendant?

8     A.    Yes.

9     Q.    What alcohol did the defendant bring?

10    A.    Long Island Ice Tea.

11    Q.    Approximately how many drinks did you have that

12    afternoon?

13    A.    About three.

14    Q.    What was your first drink?

15    A.    Like around 11:30.

16    Q.    Did you finish that last drink?

17    A.    No, I did not.

18    Q.    Why didn't you finish that last drink?

19    A.    Because --

20              MR. BERGER:   Objection.

21    Q.    Why didn't you?

22    A.    Because I found I had to call the police.  I found

23    him in the kitchen with my daughter.

24    Q.    When you say him in that sentence, were you

25    indicating the defendant?

kmm

1       A.    Yes.

2       Q.    Going back a little from there, did there come a

3   time your children came home that day?

4       A.    Yes.

5       Q.    Approximately what time did they come home?

6       A.    That day my daughter usually would come home

7   between like 2:20 and 2:25, but for some reason that day my

8   son came home first and my daughter came home at 2:45.

9       Q.    Where were you when they came home?

10      A.    On the porch.

11      Q.    Who was at your apartment when your children came

12  home?

13      A.    Danny.

14      Q.    What were your children wearing when they came

15  home?

16      A.    Uniforms for school.

17      Q.    Where did the children go?

18      A.    To their room.

19      Q.    Where were you when they went inside their room?

20      A.    On the porch.

21      Q.    Did there come a time that afternoon, after your

22  children came home from school, that anyone else came to

23  your apartment other than the defendant?

24      A.    Yes.

25      Q.    Who was that?

1      A.    An acquaintance I know from around the

2   neighborhood named Prince.

3      Q.    What, if anything, did you do with Prince?

4      A.    I spoke to him, smoked a cigarette outside with

5   him.

6      Q.    When you say, outside, outside on the porch?

7      A.    Yes.

8      Q.    Did there come a time while Prince was outside on

9   the porch with you that the defendant no longer was on the

10  porch?

11     A.    Yes.

12     Q.    Where, to your knowledge, did the defendant go?

13     A.    I'm sorry?

14     Q.    What did you say -- where did the defendant go?

15     A.    Into the apartment.

16     Q.    Did he explain where he was going or why he was

17  going inside?

18     A.    No.

19     Q.    How long was the defendant gone?

20     A.    About ten minutes.

21     Q.    And what, if anything, happened while the

22  defendant was gone while you were outside in the front?

23     A.    What do you mean, what happened?

24     Q.    Did an individual that you named as Prince, did he

25  stay on the porch in front of the apartment?

1       A.    He smoked a cigarette and left.

2       Q.    After Prince left, what did you do?

3       A.    Went inside.

4       Q.    When you went inside the apartment, what room did

5    you enter?

6       A.    The porch.

7       Q.    Was the defendant on the porch?

8       A.    No.

9       Q.    After going to the porch, what did you do next?

10      A.    Walked into the living room, which is also my

11   bedroom.

12      Q.    When you entered the living room that you also

13   used as a bedroom, was anyone in there?

14      A.    Yes.

15      Q.    Who was in there?

16      A.    My son.

17      Q.    Was that Sincere?

18      A.    Yes.

19      Q.    What, if anything, was Sincere doing?

20      A.    He was playing PS III, sitting on my bed.

21      Q.    And then where did you go next?

22      A.    Into the kitchen.

23      Q.    When you entered the kitchen -- do you have a

24   kitchen door?

25      A.    Yes.

1      Q.   Was the kitchen door open or closed?

2      A.   Closed.

3      Q.   When you opened the kitchen door, what, if

4    anything, did you see?

5      A.   I saw Mya with her pants and panties around one

6    ankle, and I saw Danny standing behind her.

7      Q.   When you say, around one ankle, up or down?

8      A.   Down.

9      Q.   Where was the defendant, could you please describe

10   where was the defendant in relation to Mya?

11     A.   Directly behind her.

12     Q.   What, if anything, was he doing?

13     A.   When I walked in?

14     Q.   When you walked in.

15     A.   He had his hand on his -- as if like he had a cup

16   like this, it was on top of the frig, holding the cup, and

17   his elbow resting on the freezer and going like this.

18     Q.   Could you describe the defendant's demeanor, how

19   he appeared to you when you walked into the kitchen?

20     A.   Like caught, ashamed, embarrassed.

21     Q.   When you walked into the kitchen, you found the

22   defendant directly in front of Mya in the kitchen.  What, if

23   anything, did you say when you walked in?

24     A.   He wasn't in front of Mya.

25     Q.   I'm sorry, directly behind Mya; what did you say?

kmm

1      A.    What the F is going on.

2      Q.    When you said that, what, if anything, did Mya say

3    in response?

4      A.    She went like this and said he licked my coochie.

5      Q.    To whom was she pointing?

6      A.    Danny.

7      Q.    When she made this statement to you, were her

8    pants, her underwear up or down?

9      A.    Down.

10     Q.    What, if anything, did you do next after she made

11   that statement?

12     A.    I picked her up and put her on the bed and started

13   putting her clothes on her.

14     Q.    Put on her the bed.  Did you leave the room?

15     A.    Leave what room?

16     Q.    The kitchen.

17     A.    Yes.

18     Q.    What, if anything, were you saying as you grabbed

19   your daughter and went into the living room?

20     A.    I said, get the F out.

21     Q.    Did the defendant remain in the kitchen?

22     A.    No, he started walking towards the door.

23     Q.    What, if anything, did the defendant say?

24     A.    He said, don't believe her.  She is lying.

25     Q.    Once the defendant was outside, what, if anything,

1    did you do?

2         A.    Locked the door.

3         Q.    After locking the door, what did you do next?

4         A.    I called the police.

5         Q.    How did you call the police?

6         A.    I dialed 911.

7         Q.    And after dialing 911, did there come a time that

8    Nassau County Police Department arrived at your residence?

9         A.    Yes.

10        Q.    Did more than one officer respond?

11        A.    Yes.

12        Q.    Do you remember specifically what officer you met

13   with that day?

14        A.    No.

15        Q.    Do you know specifically what order the officers

16   that arrived at your apartment, they came in?

17        A.    No.

18        Q.    Did you speak with the police when they came to

19   your apartment?

20        A.    Yes.

21        Q.    And without going into the substance of any of the

22   conversation, did Mya speak with the police when they came?

23        A.    Yes.

24        Q.    Did you see the defendant outside of your

25   apartment?

1      A.   Yes.

2      Q.   Where was he?

3      A.   With the police officers.

4      Q.   Did you observe the defendant actually being

5    arrested?

6      A.   No.

7      Q.   Did you observe the defendant being placed in a

8    police car?

9      A.   No.

10     Q.   Did there come a time that day when you, Sincere,

11   and Mya left your residence?

12     A.   Yes.

13     Q.   How did you leave?

14     A.   In an ambulance.

15     Q.   Where did that ambulance go?

16     A.   To the Nassau County University Medical Center.

17     Q.   Once at the Nassau County University Medical

18   Center was Mya seen by employees at the hospital?

19     A.   Yes.

20     Q.   Was she seen by a nurse examiner?

21     A.   Yes.

22     Q.   Were you present during that examination?

23     A.   Yes.

24     Q.   Could you describe what part of the examination

25   you saw?  What was the nurse doing?

1        A.      They had her take her pants and panties off.  She

2    was laying on a table or bed, whatever you like to call it

3    and had her spread her legs and she had swabs.

4        Q.      What, if anything, was taken from Mya at the

5    hospital?

6        A.      Her pajama pants and panties.

7        Q.      Did you ever get that clothing back?

8        A.      No.

9                MR. PERRI:   I ask these two items be marked

10            for identification as People's 1 and 2.

11               THE COURT:   They can be marked.

12               (People's Exhibits 1 and 2 were marked for

13            identification.)

14               MR. PERRI:   I ask the witness be shown what

15            was marked as People's Exhibit 1.

16               (Whereupon, People's Exhibit 1 was handed to

17            the witness.)

18        Q.      Since you have the gloves on, I ask you to take

19    out the contents of People's 1 and take a look at it.  Do

20    you recognize what is inside the bag marked People's 1?

21        A.      Yes.

22        Q.      What do you recognize that to be?

23        A.      My daughter's pajama pants.

24        Q.      Were those the pajama pants Mya was wearing on

25    October 16, 2013?

C. Ramirez - People - Direct          626

1      A.   Yes.

2      Q.   Were those the pajama pants the nurse at the

3   hospital took from your daughter?

4      A.   Yes.

5      Q.   Are they in the same or substantially the

6   condition when they were taken from your daughter?

7      A.   Yes.

8           MR. BERGER:  No objection.

9           THE COURT:  Let's mark it into evidence,

10      People's 1.

11           (People's Exhibit 1, previously marked for

12      identification, was marked and received in evidence.)

13           MR. PERRI:  I ask the witness be shown

14      People's 2 for identification.

15           (Whereupon, People's Exhibit 2 was handed to

16      the witness.)

17      Q.   I ask you to look inside and take out the contents

18   of the envelope marked People's 2; do you recognize that

19   object?

20      A.   Yes.

21      Q.   What do you recognize it to be?

22      A.   My daughter's underwear.

23      Q.   Is it in the same condition as -- I'm sorry, is

24   that the same underwear from October 16, 2013?

25      A.   Yes.

kmm

1     Q.    And was that the same underwear taken from her by
2     the nurse examiner?
3     A.    Yes.
4     Q.    Crystal, can I ask you, is it the same condition,
5     look the same as when your daughter was wearing it on
6     October 16, 2013?
7     A.    No.
8     Q.    How is it different?
9     A.    There's some type of writing on it and the coochie
10    is cut out.
11    Q.    Is that an area of the underwear?
12    A.    Yes.
13    Q.    Are you saying that has been cut out?
14    A.    Yes.
15              MR. PERRI:   I ask People's 2 be marked into
16          evidence.
17              THE COURT:   Any objection?
18              MR. BERGER:   Marked it into evidence as
19          People's 2.
20              (People's Exhibit 2, previously marked for
21          identification, was marked and received in evidence.)
22    Q.    Ms. Ramirez, while at the hospital, did there
23    come a time when you met an individual named Detective
24    Baran?
25    A.    Yes.

kmm

 1       Q.    Did you speak with Detective Baran?

 2       A.    Yes.

 3       Q.    When you spoke with Detective Baran, was Mya

 4    present.

 5       A.    No.

 6       Q.    Did you observe Detective Baran speaking with Mya

 7    at the hospital?

 8       A.    No.

 9       Q.    What happened after you spoke with Detective Baran

10    and after you and Mya were with the nurse examiner?

11       A.    We went home.

12       Q.    After October 16, 2013, did you notice -- what, if

13    anything, did you notice about Mya's behavior and how it was

14    different after this incident?

15       A.    She was very -- can I give like an example?

16       Q.    Sure, yes.

17       A.    She was acting different.  There's only one

18    bathroom in my apartment.  She would take a shower, or she

19    was going to change from her school uniform to other

20    clothing.  When she came home from school she would, for

21    instance, if she was changing her clothes and I had to go to

22    the bathroom, she would go like this and cover herself

23    instead of finishing getting dressed.

24       Q.    To be clear, for the record, were you indicating

25    she was covering her private areas?

1        A.    Yes.

2        Q.    Was she behaving this way before October 16, 2013?

3        A.    No.

4              MR. PERRI:   Nothing further, your Honor.

5              THE COURT:   Cross-examination.

6    CROSS-EXAMINATION

7    BY MR. BERGER:

8        Q.    Ms. Ramirez, you indicated that you knew the

9    defendant for about 13, 14 years?

10       A.    Yes.

11       Q.    And you had been to his house before?

12       A.    Yes.

13       Q.    And you have been to his house with your kids

14   before?

15       A.    Yes.

16       Q.    Daniel Ramos, those are your children from the

17   time they were born?

18       A.    I don't think he met them when they were born, but

19   he knew them since they were little, yes.

20       Q.    Are you married?

21       A.    No.

22       Q.    Were you ever married?

23       A.    No.

24       Q.    So, the father you said was Christian, you never

25   married him?

1       A.    No.

2       Q.    That's correct, you didn't -- you have not married

3    him?

4       A.    I have not married him.

5       Q.    In October of 2013, was Christian living at that

6    residence with you?

7       A.    No.

8       Q.    And you described Daniel Ramirez as a family

9    friend; is that correct?

10      A.    Daniel Ramirez.

11      Q.    I'm sorry, Daniel Ramos?

12      A.    A family friend.

13      Q.    Yes.

14      A.    Yes.

15      Q.    During the time that you knew Daniel, did he drive

16   you various places?

17      A.    Yes.

18      Q.    You did not own a car, I take it?

19      A.    No.

20      Q.    No, that's correct?

21      A.    No, that's correct, I did not own a vehicle.

22      Q.    It was Daniel who you asked to drive you various

23   places, correct?

24      A.    Correct.

25      Q.    Did he take you to places like the supermarket?

1       A.   Yes.

2       Q.   Did he take you to the beach with the kids?

3       A.   Yes, and other friends also.

4       Q.   I'm sorry?

5       A.   And other friends.

6       Q.   What do you mean, other friends?

7       A.   My other friends, Nancy.  I have other friends

8   that went with us.

9       Q.   He would take you, your friends, and the kids to

10  various places?

11      A.   Yeah, or he would drop us off.

12      Q.   Or drop you off?

13      A.   Correct.

14      Q.   You have been to the beach with Daniel and the

15  kids?

16      A.   Correct.

17      Q.   And to a pool?

18      A.   No.

19      Q.   Lindenhurst pool?

20      A.   I never went to a pool with Danny.

21      Q.   You never went to the Lindenhurst pool?

22      A.   No.

23      Q.   You have never been there?

24      A.   I've never been to a pool in Lindenhurst.

25      Q.   Did he take you to your cousin's home?

1      A.   Yes, he did.

2      Q.   In Long Beach, that is?

3      A.   Yes.

4      Q.   Has he taken you to the laundromat?

5      A.   No.

6      Q.   He helped you run errands by driving you various

7   places?

8      A.   Yes.

9      Q.   Did he take you to doctors' appointments?

10     A.   No.

11     Q.   Did you ever ask Daniel to pick up the kids at

12   your cousin's home in Long Beach and take them to where they

13   wanted to go?

14     A.   No, I asked them to pick up my children from Long

15   Beach and to bring them to me because I was at my friend's

16   house in Lindenhurst.

17     Q.   And he did that?

18     A.   He did that one time.

19     Q.   Did he ever take them out for food for dinner?

20     A.   He took them to Taco Bell.

21     Q.   And other fast food places as well?

22     A.   When I was there, but only one time did he pick

23   the children up by himself and take them to Taco Bell.

24     Q.   By himself?

25     A.   Correct.

C. Ramirez - People - Cross        633

1       Q.    Now, was it your testimony that you became more

2    involved with Daniel from the winter of 2012, 2013; is that

3    what you said?

4       A.    That's when he originally started helping me with

5    rides.

6       Q.    He was helping you for approximately nine months

7    or so?

8       A.    Yes, on and off.  Yeah.

9       Q.    Now, did there come a time when Daniel would bring

10   you to Lindenhurst and you would stay there and he had --

11   you had the kids with you and staying in Lindenhurst until

12   midnight and then he drove you home?

13      A.    Yes.

14      Q.    And when in Lindenhurst, you were at a friends, I

15   would assume?

16      A.    Yes.

17      Q.    Did he also take you to his bus races?

18      A.    He brought me and my children, yes.

19      Q.    And there was a BBQ, and he brought your children

20   there?

21      A.    At the race?

22      Q.    At the bus races?

23      A.    Yes.

24      Q.    Did he also drive you to 91 Lombardo Avenue in

25   Freeport?

kmm

1      A.    Yes.

2      Q.    That's the South Shore Guidance Center, correct?

3      A.    Correct.

4      Q.    And he took your kids there to get therapy,

5    correct?

6                  MR. PERRI:  Objection.

7                  THE COURT:  Sustained.

8      Q.    Weren't your kids going to the South Shore Child

9    Guidance Center for therapy?

10                 MR. PERRI:  Objection.

11                 THE COURT:  Sustained.

12                 MR. BERGER:  Can we come up?

13                 THE COURT:  Step up.  The witness will step

14        down.

15                 (Whereupon, there was a sidebar discussion as

16        follows:)

17                 MR. PERRI:  Relevance, and the question of

18        the privilege of whether they go to a doctor's

19        appointment or not.

20                 MR. BERGER:  I didn't hear.

21                 THE COURT:  Relevance, is the first argument,

22        and the reason I actually sustained the initial

23        objection and then, quite frankly, that children are in

24        therapy, has no bearing on this unless you tell me

25        otherwise.

1           MR. BERGER:  It does.  In the first place,

2    Mr. Perri -- maybe we should excuse the jury, this

3    could be lengthy.

4           THE COURT:  Okay.

5           Ladies and gentlemen, this is one of those

6    times when some legal matters we have to attend to,

7    rather than keeping you seated there, while we discuss

8    it at the bench, given the hour, I will give you an

9    early break for lunch.  I'll ask you to please be back

10   in the jury room at 2:00 so we can start as close after

11   two as possible when you are all back here.  The

12   realistic time is around ten after two, 2:15.  I need

13   you back before we can even get ready to start.

14          Remember, parking is not easy.  So those of

15   you who get back closer to two, will be all of those

16   who straggle back in, so keep that in your mind.  Keep

17   an open mind throughout this trial.  Do not discuss the

18   case amongst yourselves or with anyone else during the

19   trial.

20          Do not permit anyone to discuss the case in

21   your presence.  Do not talk to lawyers, witnesses about

22   anything during the trial, and do not use the lunch

23   hour to go and view the place where the charged crime

24   was allegedly committed, or any other place involved in

25   the case.

1            If there is any news coverage about the case,
2    discussions of the case reported by the news media, and
3    do not attempt to research any fact, issue or law
4    related to this case whether by discussion with others
5    by research in the library and/or by any other means or
6    source.

7            Have a great lunch and we'll see you at 2:00.
8            (Whereupon, the jury exited the courtroom.)
9            THE COURT:  Yes, Mr. Berger.

10           MR. BERGER:  The prosecution opened the door
11   when he asked the witness if her behavior had changed
12   since this incident to establish that there was a
13   trauma that occurred here, and by opening the door we
14   believe we have the right to establish that, in fact,
15   the children were going to therapy before this
16   incident.  The defendant took her kids to that child
17   guidance -- to that South Shore Child Guidance Center a
18   number of times.  Mr. Ramirez admitted that, and we
19   know, based upon information provided to me, that they
20   were going there for therapy.

21           Once he opened the door to make it seem as if
22   there's trauma that has occurred to Mya, at this point,
23   we should be able to pursue it.  I have prepared, in
24   fact, a subpoena for these records which I urge the
25   Court to so order so we can have these documents as

1      soon as possible.

2               THE COURT:  People.

3               MR. PERRI:  The People would oppose that

4      application, simply stating that the child started to

5      act in a manner to cover up her private areas after

6      this incident, which directly alleges contact between a

7      defendant and the vaginal area does not open the door

8      to any and all therapy this family may or may not have

9      received throughout the course of their lives.  That

10     there is no connection specifically alleged by defense

11     counsel, and there's -- it's the People's position it

12     is a fishing expedition to get more information and

13     violate their privacy rights.

14              MR. BERGER:  I'll make an offer to the Court

15     it's not a fishing expedition.  I have information that

16     has been provided to me, that, in fact, Ms. Ramirez

17     watched pornography in front of her children and the

18     fact that Mya had at least by six, maybe earlier,

19     watched pornography in her home, has created a

20     situation in which this child cannot distinguish

21     between reality and what she saw in the pornographic

22     films.  This is why they were going to see therapy, and

23     Ms. Ramirez has, in fact, made that statement.

24              Judge, if this is a fiction charge here, the

25     fiction created by the girl, and that is our position

Proceedings                638

1    here at this trial, and based upon the fact that they

2    were going for counseling, I suggest compels the Court

3    to issue the subpoena and take a look at these records

4    and make a determination as to whether or not it is

5    relevant to the defense in this particular case.

6              THE COURT:  All right.  The application is

7    denied.  There is nothing with regards to what I heard

8    in these applications that makes therapy prior to this

9    incident relevant at this time.  I will not allow these

10   questions.  The objection will be sustained when the

11   jury comes back and we'll continue at 2:00 sharp.

12             MR. BERGER:  I want to know what you are

13   saying is that a six-year old seeing pornography is not

14   a relevant consideration as to whether or not she has

15   dealings with what is fictional and what is real.

16   And now, the People have introduced evidence that she

17   has changed, as if she were traumatized, is not

18   something we could rebut by introducing these records,

19   at least for the Court to examine them, at least to see

20   why they were there, to see whether or not it would

21   affect -- I can't imagine it not affecting a six-year

22   old girl or maybe younger.

23             THE COURT:  People, how do you feel about the

24   Court looking at records in camera with there being no

25   additional questioning of this witness at this time

kmm

1        with regards to why her children went to therapy?

2                    MR. PERRI:  Your Honor, the People would

3        still oppose defense counsel's application as the mere

4        allegation that the mother of the child, with no

5        citation or the basis of this information and belief,

6        except possibly the defendant stating just that the

7        mother watched pornography opens the door to all the

8        therapy records.  The People don't believe there is or

9        that -- what basis defense counsel's says that is the

10       reason they were going to therapy for years before this

11       incident.  The People still would oppose, but in the

12       alternative, an in camera review.

13                    MR. BERGER:  Judge, as an officer of the

14       court, I'm making a representation to this Court that

15       the reason the children were going to therapy was

16       because they were watching pornography.

17                    THE COURT:  Says your client.

18                    MR. BERGER:  That's giving the source of it,

19       but I am basing it on -- no, says Crystal Ramirez,

20       actually.

21                    THE COURT:  Application is denied.  However,

22       I will sign the subpoena or an in camera inspection of

23       these records assuming they come in a timely fashion.

24       I'm not delaying this trial for this.  I find it to be

25       quite the fishing expedition.  I don't think it's

1       relevant.  The People did not open the door to what
2       comes before by stating that after this incident there
3       was one change in behavior, and it was extremely
4       limited testimony, but I will look at those records in
5       camera, and I'll sign that subpoena when you present it
6       to me for an in camera inspection, and we'll see if it
7       goes anywhere.  If it does, you will be allowed to have
8       the witness recalled to the stand and the testimony can
9       continue, but it will not continue this afternoon with
10      your line of questioning regarding therapy.

11              MR. BERGER:  If the child --

12              THE COURT:  Mr. Berger, that is my ruling.
13      I'll sign a subpoena.  I will look at the records in
14      camera.  If they are relevant to what you are saying,
15      the witness will be recalled and you will be able to do
16      what you need to do with those records.  If they are
17      not relevant, then the matter is done.  You will not be
18      allowed to ask her questions any further this afternoon
19      about the reasons for those children being in therapy
20      prior to this incident.

21              MR. BERGER:  I can't ask her if she made such
22      statements?

23              THE COURT:  I have absolutely no reason --
24      you know what, Mr. Berger, I'm not going to rule on
25      something before you do it.  You ask whatever questions

1    you want to ask, and I'll make the ruling.

2            I will see you all 2:00.  We can't bring your

3    client up until you are here, Mr. Berger.  I would like

4    to get started with this jury as close to 2:15 as

5    possible.

6            (Whereupon, a luncheon recess was taken.)

7            *              *              *

8

9            A F T E R N O O N   S E S S I O N

10

11

12           THE CLERK:  Case on trial continued,

13   indictment 724N of 2014, People of the State of New

14   York vs. Daniel Ramos.  All parties are present.  The

15   jury is not present at this time.

16           Let the record reflect we have a change of

17   interpreters.  Could you please put your appearance on

18   the record?

19           THE INTERPRETER:  Rudolfo Escalente.

20           THE CLERK:  People ready?

21           MR. PERRI:  Yes, your Honor.

22           MR. BERGER:  Yes, your Honor.

23           THE COURT:  Anything for the record before we

24   bring the witness in?

25           MR. PERRI:  With respect to your ruling and

1    regarding the subpoena, we want to bring to the Court's
2    attention as we were aware, prior to an unrelated -- to
3    this incident, the mother of the complainant, Crystal
4    Ramirez, was the victim of domestic violence where the
5    arrest was made of the father of the children, a
6    Christian Feliciano, that case was an arrest of assault
7    in the third degree and endangering the welfare of both
8    children.  This occurred in 2012.

9              Prior to that, additionally, your Honor, this
10   family, and I believe this is the source, additionally,
11   why there may be therapy in the background.  Also, it
12   is the People's position it is irrelevant to this
13   proceeding, that the son, Sincere Feliciano Ramirez,
14   was the victim of an attempted criminal sexual act in
15   the first degree, by his biological uncle, the brother
16   of his father.  It is not the same victim in this case.
17   It has nothing to do with the defendant, but as part of
18   both of those cases, it's the People's belief that the
19   children in the family were recommended to therapy.
20   That does prove to be true.  There is no relevant
21   information and none of those cases should be brought
22   up in this proceeding.

23             THE COURT:  I'm going to still get the
24   records, and I'm going to inspect them in camera.  If
25   in fact that is what the records reveal, then under the

kmm

1       case law, they would not be shared with either party,

2       and it would not be a proper basis of cross-examination

3       under the case law, and I did some quick research over

4       the lunch break.  The only way those records will

5       become admissible, for lack of a better way to use it,

6       and sometimes the records themselves have to become

7       actually admissible, is if what is within those records

8       shows that the treatment has a bearing on the witness's

9       capacity to perceive events accurately and to recall

10      events accurately.  But for that, the records would not

11      be admissible, nor anything related to the records

12      would be disclosed.  So I can't cross a bridge until I

13      get to it when the records come in.  After I review

14      them in camera, I'll advise both of you if there is

15      anything within them that relates to the witness's

16      ability to perceive and recall, and if there is not,

17      that will close out that issue.

18              MR. BERGER:  For the record, it's not a

19      matter of perceiving accurately.  It's a matter of

20      confusing reality from fiction.

21              THE COURT:  Absolutely.  I don't disagree.

22              MR. BERGER:  This is the no perceiving things

23      accurately.  The thing is our position is this never

24      happened.  This girl is making this up.  We want to be

25      able to show that she has a difficulty in making a

1    distinction between what is claimed here and what she

2    viewed in pornography, and not only that the prosecutor

3    is attempting, he brought -- he, himself, brought out

4    from Crystal the behavior of the child, Mya has changed

5    as a result.  Well, why was it necessary to take them

6    to therapy then if their behavior was so good before?

7    The implication left for this jury is that this was a

8    fine normal child before and now all of a sudden as

9    this traumatic experience, now she modified her

10   behavior.  Now we find out from the prosecutor, who

11   acknowledged there were other incidents that occurred

12   in the house that should be brought out as well.

13            THE COURT:  You are the only one that brought

14   up therapy.  I certainly didn't hear a question out of

15   the People's direct that asked this woman if her

16   children were in therapy.  You brought it up, not the

17   People.

18            MR. BERGER:  Therapy.

19            THE COURT:  You are making -- you are the one

20   who has put before this jury the potential that these

21   children are now in therapy because of this event.  The

22   People didn't ask that question.

23            MR. BERGER:  They may not use the word

24   therapy.  What do you think it was when he asked

25   whether or not her behavior changed?

kmm

1              THE COURT:  So what.  That's her behavior
2    changed.

3              MR. BERGER:  No.  What he is trying to say is
4    this is a traumatic experience that caused this child's
5    behavior to change.  That's not -- we have a right to
6    challenge that.  He brought that up, not I.  He's the
7    one trying to suggest to this jury that this experience
8    so traumatized this girl, and that she now modified her
9    behavior.  That is indeed now what we find out not to
10   be true, that it is acknowledged that the children were
11   in therapy before.

12             So, it is really the prosecutor who laid this
13   out.  Had he not asked that question, different story,
14   but the fact of the matter is, our position is this
15   never happened, that this girl has -- she's six years
16   old, Judge.  We're talking about a six-year old girl.
17   If she was exposed to pornography, that is significant.
18   If the Court doesn't think so, well, you and I differ,
19   but that is very significant.  If that happened here
20   and that's the basis, and this is a sex type charge,
21   Judge.  You are looking at pornography, and the Court
22   doesn't see a connection looking at pornography and
23   making a claim that you were sexually abused?  That to
24   me, the connection is really obvious.  It seems to me
25   when the district attorney brings it up -- he is the

1       one that brought it up, not I, and I was trying to get

2       to the heart of the matter to show in our position

3       there's a confusion between what this child is going to

4       perhaps testify to here in court and what really

5       happened.

6                       THE COURT:   Anything else for the record?

7                       MR. PERRI:   Your Honor, the People oppose,

8       and we would like to state defense counsel is

9       mischaracterizing the People's questioning and what

10      they brought up on direct, and the degree to which the

11      final question about behavior touched on anything

12      whether the children were well-behaved beforehand or

13      afterwards, the question simply was about -- an answer

14      was simply about one change in behavior, not whether

15      she was well-behaved before, in therapy before, or

16      afterwards, just that she was covering up her private

17      areas afterwards.

18                      MR. BERGER:   Let's have the district attorney

19      make a representation to the Court as to why he asked

20      that question.   Let's see if there is any good faith

21      there as to why he asked that question.

22                      THE COURT:   And Counsel, why don't you sit

23      down and I'm bringing over the jury and go over the

24      records when they get here.   That's the end of this

25      conversation.

C. Ramirez - People - Cross          647

1                    Bring in the jury.

2                    (Whereupon, the jury entered the courtroom.)

3                    THE CLERK:  Do both sides stipulate all sworn

4       jurors are present and seated properly?

5                    MR. PERRI:  Yes, your Honor.

6                    THE CLERK:  Defense counsel?

7                    MR. BERGER:  Yes, your Honor.

8                    THE COURT:  Welcome back.  We'll get started

9       right away.

10                   THE CLERK:  Ms. Ramirez, you are reminded you

11      are still under oath.

12      CROSS-EXAMINATION

13      BY MR. BERGER: (Continuing)

14          Q.   Ms. Ramirez, have you ever watched pornography in

15      your house?

16                   MR. PERRI:  Objection.

17                   THE COURT:  Sustained.

18          Q.   Ms. Ramirez, you made a 911 call; did you not?

19          A.   Yes.

20          Q.   Do you remember telling the 911 operator my

21      daughter is claiming that a family friend tried to eat her

22      out?

23          A.   I don't remember if those were my exact words.

24          Q.   Did you use that phrase, my family friend tried to

25      eat her out?

kmm

1                  MR. PERRI:  Objection.

2                  THE COURT:  Sustained.

3         Q.   You don't remember if those are the exact words;

4    is that what you are saying?

5                  MR. PERRI:  Objection.

6                  THE COURT:  Sustained.

7                  MR. BERGER:  May we approach?

8                  THE COURT:  You may.

9                  (Whereupon, there was a sidebar discussion at

10        the bench, as follows:)

11                 MR. PERRI:  He's setting up the audio/visual

12        equipment in the courtroom.  I anticipate he is going

13        to intend to play the 911 tape.  It's hearsay.  There's

14        no foundation.  Additionally, prior inconsistent

15        statement.  The only purpose defense counsel is seeking

16        in playing the 911 tape is an attempt to embarrass the

17        witness to use the words to describe the incident.

18        Although, possibly describing as crass are accurate.

19                 THE COURT:  Under what theory do you have all

20        the right to play 911 tape?

21                 MR. BERGER:  The prosecutor is saying we

22        don't introduce 911 calls.  This is a witness who made

23        the statement.

24                 THE COURT:  It's a hearsay statement.  Under

25        what theory is it coming in?

1            MR. BERGER:   She is saying she doesn't
2   remember.   We're going to refresh her recollection.
3            THE COURT:   How is it relevant?
4            MR. BERGER:   Judge, it's relevant.   You
5   didn't allow me to ask about pornography.   How could
6   you stop me from asking about pornography when you are
7   making a representation to the Court the question is
8   inappropriate here.   It has nothing to do with therapy
9   before.
10           THE COURT:   Counsel, if you did any research,
11   you would know that even if this Court found in the
12   records something that made it possible that the
13   children have an inability to perceive reality, the
14   reason behind it is never relevant.
15           MR. BERGER:   Really?
16           THE COURT:   Really.   You need to read the
17   cases.   So the fact of the matter is, how this witness
18   chooses to live her life in this case is irrelevant to
19   the actions that the People --
20           MR. BERGER:   It's laying a foundation here.
21   A foundation that this witness, the complainant saw
22   these things.   She made that statement.
23           THE COURT:   Okay.   And how is it not hearsay?
24   How is it not an out-of-court statement offered for the
25   truth under absolutely no exception to hearsay rule

Case 2:19-cv-01125-JS-AYS Document 7-2 Filed 05/31/19 Page 650 of 844 PageID #: 1059

1    other than a prior?  I don't know what it is, a prior

2    what?

3                 MR. BERGER:  It's going to inconsistent

4    statement uttered by the complainant.  Theoretically,

5    in this case.  I don't know.  Let's find out what the

6    complainant said.  Why are we protecting this witness?

7                 THE COURT:  I'm trying to follow the rule of

8    law here.  I want to know from you under what theory it

9    is permissible for this to come in.

10                MR. BERGER:  Res gestae, excited utterance,

11   whatever it is.  It's all coming in.  For a prosecutor

12   that asked 911 tapes can't come in, have you ever heard

13   that before?  I have never had a prosecutor not

14   introducing 911 calls.  It's all of the time.

15                MR. PERRI:  You have to lay a foundation.

16                MR. BERGER:  Excited utterance, res gestae.

17   This witness didn't rule those were her exact words.  I

18   was going to refresh her recollection.

19                MR. PERRI:  Even if it was, if you were

20   refreshing her recollection, it should not be played in

21   court and not played in front of the jury.

22                THE COURT:  Fair enough.  You can play it for

23   her and then we can see what happens.

24                You would like an opportunity to refresh the

25   witness's recollection with words she may have used to

1       the 911 operator?

2                   MR. BERGER:  Yes, I would.

3                   THE COURT:  You are given another break.  See

4       you all in five minutes.  Don't talk about the case.

5                   (Whereupon, the jury exited the courtroom.)

6                   (Whereupon, the 911 tape was played for the

7       witness.)

8       Q.   Did you hear that?

9       A.   Yes.

10      Q.   Does that fresh your recollection of what you

11   said?

12      A.   Yes.

13                  THE COURT:  We'll bring the jury back in and

14      you can ask that question.

15                  MR. PERRI:  Before the jury comes back in,

16      the People still objecting to the whole line of

17      questioning.  There is nothing consistent shown between

18      what the witness just said in comparison to the tape

19      that was played to refresh her recollection.

20                  THE COURT:  All right.  I'll wait for a

21      question to be asked.

22                  MR. PERRI:  Yes, your Honor.

23                  (Whereupon, the jury entered the courtroom.)

24                  THE CLERK:  Do both sides stipulate all sworn

25      jurors are present and seated properly?

C. Ramirez - People - Cross          652

1          MR. PERRI:  Yes, your Honor.

2          THE CLERK:  Defense counsel?

3          MR. BERGER:  Yes.

4          THE CLERK:  You are reminded you are under

5     oath.

6          THE COURT:  You may.

7   CROSS-EXAMINATION

8   BY MR. BERGER:  (Continuing)

9      Q.   Did you have opportunity to hear the 911 call?

10     A.   Yes.

11     Q.   Just a moment ago without the presence of the

12   jury?

13     A.   Yes.

14     Q.   And does that refresh your recollection as to what

15   you said?

16     A.   Yes.

17     Q.   Did you say to the 911 operator, my daughter is

18   claiming a family friend tried to eat her out?

19     A.   Yes.

20     Q.   Did you also say to the 911 operator, quote, she

21   said, he ate her coochie; did you say that?

22     A.   Yes.

23     Q.   What does it mean, to eat, Ms. Ramirez?

24          MR. PERRI:  Objection.

25          THE COURT:  Overruled.  Do you understand the

kmm

C. Ramirez - People - Cross        653

1       question?

2                   THE WITNESS:   Yes.

3                   THE COURT:   You can answer it.

4       Q.   What does it mean to eat?

5       A.   It's another terminology as putting your mouth on

6    someone's vagina.

7       Q.   It's an oral sex phrase; is it not?

8       A.   Yes.

9       Q.   And so, you said your daughter said that to you,

10   where did your daughter learn that word to eat in sexual

11   context?

12                  MR. PERRI:   Objection.

13                  THE COURT:   Sustained.

14      Q.   Do you use that term in your house?

15                  MR. PERRI:   Objection.

16                  THE COURT:   Sustained.

17      Q.   Nevertheless, your daughter made that statement to

18   you, correct?

19      A.   Not in those exact words.

20      Q.   Didn't you tell the 911 operator she said he ate

21   her coochie?

22      A.   Yes.

23      Q.   You were quoting your daughter; were you not?

24      A.   Yeah.

25      Q.   Now, when you came into the kitchen and you said

 1    what the F is going on, did you use the word F?

 2                    MR. PERRI:  Objection.

 3        Q.   Or did you say the F word?

 4                    THE COURT:  Overruled.

 5        A.   I said the F word.

 6        Q.   And you said that in front of your daughter?

 7        A.   Yes.

 8        Q.   Do you use the word to eat in your everyday

 9    language in front of your kids?

10                    MR. PERRI:  Objection.

11                    THE COURT:  Sustained.

12        Q.   Did you tell Daniel you were going to call the

13    police?

14        A.   Yes.

15        Q.   Now, you told us before that you were in the

16    kitchen, you went to Mya, pulled up her pants, correct?

17        A.   No.

18        Q.   Did you tell us that?

19        A.   No.

20        Q.   What did you tell us?

21        A.   I said, I picked her up and put her on my bed and

22    trying to put her clothes back on her.

23        Q.   And you put her clothes back on, correct?

24        A.   Correct.

25        Q.   Now, was your daughter interviewed by the police?

1      A.   Yes.

2      Q.   Who did that?

3      A.   I don't remember the officer's name.

4      Q.   Interviewed by the police at your home or

5  somewhere else?

6      A.   I honestly don't remember.

7      Q.   Do you remember she was interviewed by the police,

8  but you don't remember where it happened?

9      A.   Yes, because there was police, detectives,

10  ambulance workers.  There was a lot of enforcement.

11      Q.   I'm not asking you to tell me the name.  I'm

12  asking you to tell me where it happened.

13      A.   I think they talked to her at my home and in the

14  hospital, but I don't remember if it was the officers, or if

15  it was the detectives.  There was a lot of people there.

16      Q.   All I'm asking you is:  You have to have been

17  present if you are telling us she was interviewed by the

18  police, correct?

19      A.   No, they had us separated at all times after the

20  police showed up.

21      Q.   Then you don't know if she was interviewed by the

22  police, correct?

23      A.   Okay, no.

24      Q.   Is it correct either she was or wasn't?

25      A.   Then I don't know.

1      Q.    Now, in the summer of 2002, you and a girlfriend

2   physically accosted another girl and robbed her of her

3   purse, correct?

4      A.    I did not rob her.  I did not rob her.

5      Q.    You and your girlfriend, who you were with, took

6   her purse, correct?

7      A.    No.

8      Q.    Who took her purse?

9      A.    My friend at the time.

10     Q.    And you got into a fight with this girl, correct?

11     A.    Yes.

12     Q.    And the both of you ran away after the fight?

13     A.    I didn't run away.  My friend left.

14     Q.    Didn't you say you ran away?

15     A.    I did not say I ran away.

16     Q.    You answered Mr. Perri before, you said your

17  friend grabbed the bag and you both left the scene; do you

18  remember saying that?

19     A.    Yeah, I went home.

20     Q.    But you ran away from the incident?

21     A.    I did not run away.

22     Q.    What did you do?

23     A.    I just smacked her and then I left.  I went home.

24     Q.    But you saw the girl take your friend take her

25  purse, correct?

1    A.    No, that's what the police told me when I was

2  arrested.

3    Q.    So when you told Mr. Perri before that your friend

4  grabbed her purse, was that true?

5    A.    It wasn't a purse, it was a beach bag and that is

6  what I was told by the officers.

7    Q.    You answered Mr. Perri before, you didn't say I

8  was told that her beach bag was taken, you said the friend

9  grabbed the bag and you both left the scene; do you remember

10 saying that to him?

11   A.    I don't remember saying that word for word.

12   Q.    In substance, didn't you say that to Mr. Perri

13 before?

14   A.    Yes, she took the girl's beach bag.

15   Q.    Part of it was as an assault that you inflicted

16 upon that girl, correct?

17   A.    Yes.

18   Q.    You told us on the day in question, somebody named

19 Prince came to your house?

20   A.    To my apartment, yes.

21   Q.    And all he came for was to smoke a cigarette?

22   A.    No, he saw me in the deli, and I was upset over my

23 brother passing away.

24   Q.    And he came to your house?

25   A.    He walked with me back to my apartment, yes.

1       Q.    When you went back to your apartment, did you just

2   smoke a cigarette with him?

3       A.    Yes.

4       Q.    And then he left?

5       A.    Yes.  He was standing there talking and because he

6   was on his way going somewhere else.

7       Q.    Was Daniel Ramos with you at the time?

8       A.    Yes.

9       Q.    Where was he?

10      A.    He was sitting on the porch.

11      Q.    If I understand, you came, you left the deli, you

12  met Prince there, right?

13      A.    Yes.

14      Q.    And where was Mr. Ramos when you were at the deli?

15      A.    He was walking with me.  He was with me.

16      Q.    He was at the deli as well?

17      A.    Yes.

18      Q.    And where was -- before you went to the deli,

19  where were you?

20      A.    Excuse me?

21      Q.    Where were you before you walked to the deli?

22      A.    Before I walked in the deli, I was at my

23  apartment.

24      Q.    At your apartment?

25      A.    Yes.

1     Q.    You asked Mr. Ramos to come with you?

2     A.    I said, I'm going to go to the deli.  Do you want

3  to go with me, and he came with me.

4     Q.    And when was this, at what time?

5     A.    I don't know the time.

6     Q.    And when you are there, you met Prince?

7     A.    Prince was in the deli.

8     Q.    And then you came back to your apartment?

9     A.    Yes, he was walking with me and talking with me.

10    Q.    And so was Mr. Ramos; is that right?

11    A.    Yes.

12    Q.    Can you tell us what behavior Mya exhibited prior

13  to going to the South Shore Child Guidance Center?

14              MR. PERRI:  Objection.

15              THE COURT:  Sustained.

16    Q.    Did you go to the child guidance center with

17  Sincere and Mya?

18              MR. PERRI:  Objection.

19              THE COURT:  Sustained.

20    Q.    When Daniel drove you there, were both Mya and

21  Sincere in the car?

22              MR. PERRI:  Objection.

23              THE COURT:  I'll take an answer to that.

24         When you drove to this location, were the children in

25         the car with you?

kmm

C. Ramirez - People - Cross        660

1                    THE WITNESS:  Yes.

2        Q.   Was he driving you and the children there because

3   you requested him to do so, correct?

4        A.   Yes, I asked him.

5        Q.   And he did that quite a few times for you; did he

6   not?

7        A.   Yes, he did.

8        Q.   And did he ask you why you were going there?

9                    MR. PERRI:  Objection.

10                   THE COURT:  I'll take a yes or a no.

11       A.   He knew.

12       Q.   Did he ask you why you were going there with the

13  children?

14       A.   No.

15       Q.   He knew because you told him, correct?

16       A.   Yes.

17       Q.   You never saw Daniel lick your daughter's vagina,

18  did you?

19       A.   No.

20       Q.   And you were drinking, I think you said, three --

21  you were on your third Long Island Ice Tea?

22       A.   Yeah.

23       Q.   Ms. Ramirez, did you ever watch pornography with

24  your daughter in the room?

25                   MR. PERRI:  Objection.

1              THE COURT:  Sustained.

2              MR. BERGER:  I have nothing further.  Thank

3      you.

4              THE COURT:  Any redirect?

5              MR. PERRI:  No, your Honor.

6              THE COURT:  Thank you, Ms. Ramirez.  You may

7      step down.  Please be careful.

8              You will call your next witness.

9              MR. PERRI:  People call Sincere Feliciano

10     Ramirez.

11             THE COURT:  I'll have everybody sit tight.

12             Mr. Perri, go into the back and make a phone

13     call.

14             As you could see, the logistics are sometimes

15     difficult.  We're away from the main area.  I'm going

16     to excuse you for a few minutes while the next witness

17     travels over to the building.

18             Please remember, don't talk about the case

19     when you are walking back and forth.  Don't get on your

20     phones and do research.  Don't let anyone talk to you

21     about this case in your presence.  Enjoy your short

22     break.

23             (Whereupon, the jury exited the courtroom.)

24             THE COURT:  I understand there's something

25     for the record before we have the next witness.

kmm

1      MR. BERGER:  I'm moving for a mistrial in

2  this case.  You have made it impossible for me to

3  defend this case with your rulings here.  You are

4  bending over backwards to protect Crystal and the

5  entire prosecution case.  We already had testimony from

6  Crystal.  Her daughter said, he ate her coochie.

7  Where does a six-year old come up with language like

8  that?

9      Clearly, the representation I made to the

10  Court that they, or at least my inquiry with respect to

11  the finding out if she watched pornography in front of

12  her kids, you refused to allow me to go into it.  I'm

13  representing to the Court my client has told me that

14  Crystal Ramirez told him that they watched

15  pornography -- not Daniel, but that Mya and her son,

16  with Crystal, watch pornography in her house.  You

17  won't allow me to explore that?  I hope that she would

18  tell the truth.  If she doesn't, fine.  You are not

19  even allowing me to go into these areas.  It's just

20  cutting me off where I cannot explain it to this jury.

21  I should be able to explain to this jury where this

22  comes from, where this claim comes from.

23      There's a six-year old using the phrase ate

24  her coochie.  I mean, that has to have come from the

25  mother from watching pornography, and you are not

Proceedings                663

1    allowing me to pursue it.  You should be allowing me to

2    pursue it because I can't defend the case properly

3    unless you let me challenge these witnesses, and the

4    witnesses are protected by the Court's rulings here.

5    Not to allow me to ask her if she ever watched

6    pornography, how is that not permitted?  You are going

7    to say relevance.  How about giving the defendant and

8    the cross-examiner a little bit of leeway in this area

9    because after she admits that she watches pornography,

10   then I will go into the area where she watched it with

11   her daughter and her son, but you cut it off.

12            I have the right to show she is an inadequate

13   parent that allows something like that.  We know

14   already from her testimony that her daughter used that

15   language.  Six-year olds don't use that language, not

16   unless there's a basis to have to know it; either being

17   told that or watching pornography.  If there is some

18   other explanation, then let Ms. Ramirez explain it.

19   The Court is just cutting the defense off in all areas

20   here, and I think it's inappropriate.  I'm moving for a

21   mistrial.

22            THE COURT:  People, do you want to be heard?

23            MR. PERRI:  The People would oppose defense

24   counsel's application.  There's been no circumstances

25   requiring a mistrial.

1          Additionally, your Honor, the People would

2     like to ask the Court if its recollection differs, to

3     examine the record, because the witness testified that

4     although she used the term ate my coochie on the 911

5     call and acknowledged that she used that term, when

6     asked is that what her daughter said, not those exact

7     words, and on direct she said, my daughter said, he

8     licked my coochie.

9          Regardless, your Honor, defense counsel

10    revealed the real purpose as to why he wants to ask the

11    questions before the jury, and he has the right to

12    argue she is inadequate as a guardian.  And that the

13    purpose of defense counsel's argument, rather than

14    challenge the actual credibility of the witness, or

15    factually challenge anything she is saying with regard

16    to what her daughter reported or what she observed in

17    the room is simply to portray her as a bad mother, and

18    therefore, to be her attempts to call the police and

19    every action she did afterward, should be ignored.

20          It's not probative, it's no relevant, and the

21    People oppose that testimony and oppose a mistrial,

22    your Honor.

23          MR. BERGER:  According to the prosecution,

24    nothing the defense does is probative or relevant.  It

25    seems to me, that first of all, Mr. Perri is wrongfully

1       quoting what happened here.  Not what she said on

2       direct, but what she said on cross-examination.  Of

3       course, she tried to get away with saying those are not

4       my words.  When I played the tape for her, those were

5       her words.  Not only that she attributed her daughter

6       making statements, he ate my coochie.  I don't know

7       what he is hearing in the courtroom.  It's clear to me

8       what was said, and it is clear to me what was on the

9       tape.

10              The point is, you cannot cut off the defense

11      from exercising its right to cross-examine and confront

12      witnesses with things that are very relevant here.  If

13      she is a bad parent, which is part of what I might

14      argue, that's all part of having your child watch

15      pornography and then make this claim.  I mean, she

16      knows this defendant for years.  She allowed him to be

17      with the kids and baby-sit the kids.  Never once, ever

18      -- now all of a sudden I can't challenge this

19      outrageous claim by this six-year-old girl?  The Court

20      is not allowing me to pursue the defense that I need to

21      pursue.  There has to be the right to press the witness

22      and cross-examine witnesses and to make a case even if

23      I'm making the case through the prosecution witness.

24              THE COURT:  With regards to the request for

25      mistrial, that request is denied.

1          Mr. Berger, as I stated to you earlier today,
2    I will be looking at these records in camera.  It's
3    within these records that you have put forth
4    information regarding there being some watching of
5    pornography that makes the child incapable of telling
6    the difference between reality and fantasy, and that
7    through the therapy, that is how the Court will learn,
8    because I will be doing it in camera that this witness,
9    the young child, should not be found credible, should
10   not be swearable and possibly should not be allowed to
11   testify.  That was your request of the Court.

12          I told you, I would like the records in
13   camera.  I then advised you if there was anything
14   within the records that supported your position, I
15   would give you the opportunity to have this witness
16   recalled.  I'm still going to give you that
17   opportunity, should it become relevant and necessary.
18   I'm not going to allow some fishing expedition or some
19   series of questions that you want to ask simply because
20   you want to ask them.  This is a court of law.  I
21   appreciate that you want to put on a defense, but there
22   are rules and there are laws that dictate how cases of
23   this matter are tried and are handled, and I will not
24   change my rulings just because you want it to be
25   different than that.  Your motion for a mistrial is

Proceedings          667

1    denied.

2              MR. BERGER:   The answer is not -- the issue

3    is not whether or not there was therapy based upon

4    seeing the pornography.   The defense is she saw the

5    pornography; whether or not it required therapy to deal

6    with that issue is a side issue.   Maybe that is true

7    and maybe it is not accurate.   I'm not sure what the

8    therapist -- how far the therapist got and whether he

9    reached that.

10             But still, it becomes relevant just to

11   discover whether or not this child watched pornography.

12   If you don't think that that becomes relevant in a

13   claim which this girl makes this claim out of the blue

14   after knowing the defendant for years and having the

15   mother who had no such inkling that the defendant would

16   even do something like this.   If you don't think that's

17   relevant in this kind of a case -- Judge, we have a

18   serious disagreement, but as somebody who has tried

19   these kinds of cases before, I can't think of something

20   more relevant than a six-year old using language, he

21   ate my coochie, and you wouldn't even let me get into

22   where she learned that language.   You wouldn't even let

23   me ask her, Ms. Ramirez, where her child comes up with

24   that language.   She tried to sanitize things by saying,

25   I said to him, what the F is going on here.   She didn't

1    use the word F.  She used the F word.  Mr. Perri wants
2    to sanitize everything Ms. Ramirez comes in before this
3    Court so this jury thinks, oh, she is quite the mother.
4    I didn't use the F word.  It turns out she did.  What
5    the F is going on here?  It seems to me when the
6    prosecutor is trying to sanitize things, the Court
7    should be aware of that.

8              I don't know if there is any harm to
9    Ms. Ramirez, if you allow me to ask her these questions
10   presumably, she will tell the truth, that she's watched
11   pornography.  Whether or not she acknowledges that she
12   watched it with her daughter, that's something else, we
13   won't know until you let me ask it.  I think it's
14   relevant, and I understand the Court doesn't think so.
15             THE COURT:  With that being said, my ruling
16   is my ruling.
17             People, are we ready for the jury?
18             MR. PERRI:  Yes, I believe so.
19             THE COURT:  Mr. Berger, are we ready for the
20   jury?
21             MR. BERGER:  Yes.
22             (Whereupon, the jury entered the courtroom.)
23             THE CLERK:  Do both sides stipulate all sworn
24   jurors are present and seated properly?
25             MR. PERRI:  Yes, your Honor.

S. Ramirez - People - Direct        669

1              THE CLERK:  Defense counsel?

2              MR. BERGER:  Yes.

3              MR. PERRI:  People call Sincere Feliciano

4        Ramirez.

5    S I N C E R E   F E L I C I A N O   R A M I R E Z, called on

6        behalf of the People, having been duly sworn, took the

7        witness stand and testified as follows:

8              THE CLERK:  State your name and spell your

9        name for the record.

10             THE WITNESS:  My name is Sincere Feliciano

11       Ramirez.  S-I-N-C-E-R-E, F-E-L-I-C-I-A-N-O,

12       R-A-M-I-R-E-Z.

13             THE CLERK:  What county do you live in?

14             THE WITNESS:  Nassau.

15             THE COURT:  Mr. Ramirez, my name is Teresa

16       Corrigan.  I'm the judge in this matter today.  I know

17       you know you will be asked some questions.  I need you

18       to do a few things for me.  I need you to keep your

19       voice up, so use the microphone if you need it.  Wait

20       for the entire question to be asked before you start to

21       speak because the young lady sitting in front of you is

22       taking down everything that is being said, and she can

23       only take down one person talking at a time; do you

24       understand?

25             THE WITNESS:  Yes.

kmm

```
 1                  THE COURT:  If you don't understand a
 2       question, let me know and we'll make sure it's asked
 3       again so you understand, okay?
 4                  THE WITNESS:  All right.
 5       DIRECT EXAMINATION BY
 6       MR. PERRI:
 7            Q.   Good afternoon, Sincere.
 8            A.   Good afternoon.
 9            Q.   You have to speak into the microphone.
10            A.   Good afternoon.  I'm sorry.
11            Q.   Sincere, how old are you?
12            A.   Eleven.
13            Q.   What is your birthday?
14            A.   September 22nd.
15            Q.   And what year were you born?
16            A.   2003.
17            Q.   How old are you today?
18            A.   Eleven.
19            Q.   Where do you currently live?
20            A.   Roosevelt.
21            Q.   What is your street address?
22            A.   124 Park Avenue.
23            Q.   Were you living there on October 16, 2013?
24            A.   Yes.
25            Q.   Who do you live there with?
```

1      A.    My mom and my sister Mya.

2      Q.    What is your mother's name?

3      A.    Crystal Ramirez.

4      Q.    What is your sister's name?

5      A.    Mya Feliciano.

6      Q.    How old is your sister?

7      A.    Seven.

8      Q.    Is that how old she is today?

9      A.    Yes.

10     Q.    Could you describe the layout of your apartment?

11     A.    First there is a porch, then there is the living

12   room, my mom's room to be exact, then there is the closet

13   which she has in her room, and then there is a kitchen, my

14   room, me and my sister's room and the bathroom.

15     Q.    Now, do you have a video game system?

16     A.    Yes.

17     Q.    Where do you normally keep the video game system?

18     A.    In my room, my mom's room.

19     Q.    Do you ever play in your mother's room?

20     A.    Yes.

21     Q.    Why do you sometimes play in your mother's room?

22     A.    It has a great look onto the TV.  The TV is

23   better.

24     Q.    Sincere, do you go to school?

25     A.    Yes.

S. Ramirez - People - Direct     672

1     Q.    What school do you go to?

2     A.    Washington Rose.

3     Q.    What grade are you in?

4     A.    Sixth.

5     Q.    Do you have one teacher or multiple teachers?

6     A.    Multiple.

7     Q.    Who?

8     A.    Younglin, Ms. Jackson and Mr. Torres.

9     Q.    Do you know a man named Daniel Ramos?

10    A.    Yes.

11    Q.    How do you know him?  Who is he to you?

12    A.    Well, he used to be a family member and a friend

13    but not anymore.

14    Q.    Has he been to your apartment?

15    A.    Yes.

16    Q.    Has he been there more than once?

17    A.    Yes.

18    Q.    Do you see him in the courtroom today?

19    A.    Yes.

20    Q.    Could you point to him and identify him by saying

21    a color of an item of clothing that he is wearing?

22    A.    He's wearing a white shirt and glasses and --

23          MR. PERRI:  May the record reflect the

24    witness identified the defendant.

25          THE COURT:  It will so reflect.

kmm

1      Q.    Sincere, I want to draw your attention, I want you

2   to think about October 16, 2013; do you remember that day?

3      A.    Yes.

4      Q.    What grade were you in on October 16, 2013?

5      A.    I don't know.

6      Q.    If you go back -- if you go back to just this past

7   October of this school year, what grade were you in?

8      A.    Fifth grade.

9      Q.    And when you were in fifth grade, who was your

10  teacher?

11     A.    Ms. Rodriguez and Ms. Jackson.

12     Q.    In October of 2013, were you living at 124 Park

13  Avenue?

14     A.    Yes.

15     Q.    And Mya and mother were living with you at that

16  same apartment?

17     A.    Yes.

18     Q.    On that date did you go to school?

19     A.    Yes.

20     Q.    Did you come home from school?

21     A.    Yes.

22     Q.    When you came home from school, was there anyone

23  at your apartment?

24     A.    Mom, Mya and Danny.

25     Q.    And when you say, Danny, is that the defendant,

1    Daniel Ramos?

2         A.    Yes.

3         Q.    When you came home from school, where did you go?

4         A.    Went to my room, did my homework and got the Play

5    Station III and played it in my mom's room.

6         Q.    Was your sister inside with you?

7         A.    Yes.

8         Q.    What was she doing?

9         A.    She was playing with her toys and then she was

10   just all over the place.

11        Q.    On October 16, 2013, that afternoon after you came

12   home from school, once you were playing video games in your

13   mother's room, did there come a time when the defendant

14   came inside of your apartment?

15        A.    Yes.

16        Q.    And did you see the defendant?

17        A.    Yes.

18        Q.    Did you see him while you were in the living room?

19        A.    Yes.

20        Q.    What, if anything, did you observe happen between

21   the defendant and your sister Mya while you were in the

22   living room?

23        A.    Mya said that her tooth was hurting and Danny

24   said, let me take care of it, let me handle it, and then the

25   kitchen door was open and Mya and Danny went to the kitchen.

kmm

Case 2:19-cv-01125-JS-AYS  Document 7-2  Filed 05/31/19  Page 675 of 844 PageID #: 1084

1    He closed the door, and yeah.

2         Q.    And what did you continue to do after the

3    defendant went into the kitchen with Mya and closed the

4    door?

5         A.    Just played video games and thinking he is going

6    to do something with the tooth.

7                   MR. BERGER:  I did not hear the answer.

8         Could the reporter please read it back.

9                   (Whereupon, the record was read back.)

10                  THE COURT:  Next question.

11        Q.    Did there come a time when your mother, Crystal,

12   came into the apartment?

13        A.    Yes.

14        Q.    Did she come into the living room?

15        A.    Yes.

16        Q.    And did she stay there in that first living room

17   with you?

18        A.    Yes.  No, no.

19        Q.    And what did you do after coming into the living

20   room?

21        A.    She was about to go into the kitchen, get

22   something and then when she opened the door, she found Danny

23   and Mya.

24                  MR. BERGER:  Objection.

25                  THE COURT:  I'm sorry.

1              MR. BERGER:  I object.  I didn't hear the
2      question.
3              THE COURT:  The last answer was, went into
4      the kitchen and found Danny and Mya.  Are you
5      objecting?
6              MR. BERGER:  No, no.
7      Q.  Could you describe what, if anything, your mother
8      said when she opened the door and walked into the kitchen?
9              MR. BERGER:  Objection.
10             THE COURT:  Overruled.
11     A.  She said what -- the, you know, she said what the
12     F is going on.  What are you doing?  She just started
13     yelling and screaming.
14     Q.  And what did you do after you heard your mother
15     yelling and screaming?
16     A.  I immediately turned off the game.
17             MR. BERGER:  I can't hear the answer.
18     A.  I immediately turned off the game.
19     Q.  Did there come a time when you looked into the
20     kitchen?
21     A.  Yes.
22     Q.  What, if anything, did you see when you looked
23     into the kitchen?
24     A.  I saw Mya's pants on the ground, only saw like a
25     slight piece of it.  Yes.

1              MR. BERGER:  I can't hear.

2              THE COURT:  Sit as close as you can.  Read it

3         back.

4              (Whereupon, the record was read back.)

5         Q.   Now, Sincere, after you saw Mya's pants on the

6    ground, what, if anything, did you see happen next in the

7    kitchen?

8         A.   I just saw -- I just -- she was just yelling,

9    screaming, and then mom put Mya on the bed and she started

10   to get Danny out of the house, out of the apartment and then

11   locked the door and started asking Mya questions.

12        Q.   What, if anything, did the defendant say during

13   all of this?

14        A.   He said don't believe Mya.  Mya is lying, stuff

15   like that.

16        Q.   And once the defendant left the house, did he say

17   anything else?

18        A.   He kept on saying the same thing over and over

19   again.  And then like around fifteen, twenty seconds later

20   he said he admitted.

21        Q.   Did he admit that he did it?

22        A.   Yes.

23        Q.   Did anyone call 911?

24        A.   Yes.

25        Q.   Who was that?

S. Ramirez - People - Direct      678

1       A.   Mom.

2       Q.   Did the police, in fact, respond to your

3   apartment?

4       A.   Yes.

5       Q.   Did more than one police officer come to the

6   apartment?

7       A.   Like three vehicles came, yes.

8       Q.   Was the defendant outside your apartment when the

9   police arrived?

10      A.   Yes.

11      Q.   Did there come a time when you left your apartment

12  that afternoon in the early evening?

13      A.   Yes.

14      Q.   And what type of vehicle did you leave in?

15      A.   In an ambulance.

16      Q.   And where did that ambulance go?

17      A.   We went to the hospital.

18      Q.   Once you were done or after the hospital, where

19  did you guys eventually go?

20      A.   Home.

21              MR. PERRI:   Nothing further, your Honor.

22              THE COURT:   Thank you.   Cross-examination.

23              MR. BERGER:   Can we come up for a second?

24              THE COURT:   You can.

25              (Whereupon, there was a sidebar discussion at

1     the bench, as follows:)

2              MR. BERGER:  I want to be clear here.  I have

3     no Rosario material from this young man; is that

4     correct?

5              MR. PERRI:  Yes.

6              MR. BERGER:  You never took any notes when

7     you talked to him?

8              MR. PERRI:  No, I did not.

9              MR. BERGER:  You just learned of this

10    supposed admission now.  Do you know the content of the

11    admission?

12             THE COURT:  I don't understand the basis of

13    your question at this point in time at the trial.

14             MR. BERGER:  I want to make sure there are no

15    Rosario materials.  He's not told this to any of the

16    police officers?

17             MR. PERRI:  I'm not capable of answering that

18    question, but there are no Rosario materials.

19             THE COURT:  Whether or not he said it is not

20    the same as whether or not there is Rosario material.

21             MR. BERGER:  I understand.  Okay.

22             (Whereupon, the proceedings resumed.)

23    CROSS-EXAMINATION

24    BY MR. BERGER:

25         Q.   Did you talk to anybody before testifying here

S. Ramirez - People - Cross            680

1    today?

2        A.    Yes.

3        Q.    Who did you talk to?

4        A.    I talked to -- I've talked to mom.  I talked to

5    mom and I talked to --

6        Q.    I'm sorry?

7        A.    I talked to my mom and then I talked to --

8              THE COURT:  If you don't remember, it's okay.

9    Just tell us who the person was.

10       A.    I can't remember her name.

11       Q.    You talked to your mother about this case?

12       A.    Yes.

13       Q.    Now, you say your mother was yelling and

14   screaming, right?

15       A.    Yes.

16       Q.    And she told Daniel to get out of the house?

17       A.    Yes.

18       Q.    Do you remember that?

19       A.    Yes.

20       Q.    And you say that Daniel -- where was Daniel when

21   you say he admitted it?

22       A.    He was outside.

23       Q.    What did he say?

24       A.    He said, don't believe Mya, she is lying, she's

25   not telling the truth.  Stuff like that.

1      Q.   Okay.  Is that what he said?

2      A.   Yes.

3      Q.   Anything else?

4      A.   No.

5      Q.   He didn't admit, did he?

6      A.   No, he did admit it.

7      Q.   You just told us he didn't say anything else?

8      A.   I forgot about that.

9      Q.   You forgot about what?

10     A.   That he admitted it.

11     Q.   You didn't forget when Mr. Perri asked you a few

12   minutes ago.

13              MR. PERRI:  Objection.

14              THE COURT:  Overruled.

15              You can answer the question.

16     Q.   You didn't forget when Mr. Perri asked you before,

17   did you?

18              THE COURT:  I need you to answer.  Did you

19        remember when Mr. Perri asked you?

20     A.   Yes.  Well, to be honest, a little bit, but then I

21   started to forget about it.

22              MR. BERGER:  I'm sorry, could the reporter

23        read that again?

24              THE COURT:  Read it back.

25              (Whereupon, the record was read back.)

kmm

1      Q.   What did he admit?

2      A.   That I did it.

3      Q.   Did what?

4      A.   What he did to Mya.

5      Q.   You didn't see what he did -- if he did anything

6   to Mya, did you?

7      A.   No.

8      Q.   Did you?

9      A.   The door was closed.

10     Q.   The answer is yes or no; which is it?

11     A.   No.

12     Q.   Now, my question to you is:  What words did you

13  hear Daniel say when you say he admitted it?

14     A.   Okay, I did do it to Mya.

15     Q.   He did do what?

16          THE COURT:  Do you remember the words?  I

17      need you to tell us if you remember the words that you

18      heard.

19     A.   No.  Only I heard that he did do it, and he also

20  said something else that I can't remember.

21     Q.   You remember him saying I didn't do it?

22     A.   No, I did do it.

23     Q.   And did he say that in response to what?

24     A.   That he did, that he, um, that he did, um,

25  something to Mya.  That he, um --

kmm

```
 1              THE COURT:  Can you close your eyes for me
 2       and just think back and listen to the question and see
 3       if you can give an answer to the question.  You can
 4       keep your eyes closed if you want.  Go ahead and ask
 5       the question again.  See if you can get an answer.
 6       Q.    You heard Daniel say he didn't do it, correct?
 7       A.    Yes.
 8       Q.    And you heard him say that immediately, didn't
 9  you, right away?
10       A.    Yes.
11       Q.    So, what was said after by Daniel, anything?
12       A.    He just said that I admit it.
13       Q.    He used the word, I admit it; is that what you are
14  saying he said?
15       A.    Yes.
16       Q.    Did you have a discussion with your mother before
17  testifying about this?
18       A.    That, um, she told me that, I know that I can do
19  it.
20       Q.    Did you tell anybody else that Daniel said he did
21  it?
22              THE COURT:  Did you tell anybody else?
23       A.    I can't remember.
24       Q.    So is today the first day you are saying that
25  Daniel said he did it?
```

kmm

1                    THE COURT:  Do you understand the question?

2                    THE WITNESS:  No.

3                    THE COURT:  Ask it a different way,

4        Mr. Berger.

5            Q.   Sincere, you know you took an oath before.  Did

6    you take an oath?

7                    THE COURT:  Use a different word.

8            Q.   Do you remember swearing before?

9            A.   Yes.

10           Q.   What did you swear to do?

11           A.   I swear to tell the truth.

12           Q.   Tell the truth.  So my question to you is:  Did

13   you ever tell anybody prior to today that Daniel said he

14   admitted it?

15           A.   Yes.

16           Q.   Who did you tell?

17           A.   Mr. Perri.

18           Q.   When did you tell that to Mr. Perri?

19           A.   A few hours ago.

20           Q.   That's the first time you ever told anybody about

21   it?

22           A.   Um, yeah, I think.  Yes.

23           Q.   A few hours ago you told that to Mr. Perri and

24   that's the first time you ever said that to anybody?

25           A.   I said that to Mr. Perri the last time that we

1    were here.

2        Q.    When were you here last time?

3        A.    I think it was Friday or Thursday last week.

4        Q.    Of last week?

5        A.    Yes.

6        Q.    You realized we're about a year-and-a-half after

7    October 16th of 2013, right?

8        A.    Yes.

9        Q.    You didn't tell anybody about this on that day,

10   did you?

11              THE COURT:   You have to --

12       A.    No.

13       Q.    You didn't tell it to anybody that day or any

14   police because you were in the presence of police, weren't

15   you?

16              THE COURT:   You don't understand the

17   question?

18              THE WITNESS:   No.

19       Q.    You saw police on October 16, 2013, didn't you?

20       A.    Yes.

21       Q.    You didn't tell them that, did you?

22       A.    They didn't talk to me.

23       Q.    They never talked to you?

24       A.    They only talked to my mom.

25       Q.    So, but, when you saw Mr. Perri last week,

1    Thursday or Friday, that's the first time you ever said
2    anything about Daniel admitting this?
3         A.    I can't remember to be honest.
4         Q.    You say Daniel -- what were the words he used?
5               MR. PERRI:  Objection.
6               THE COURT:  If you remember.  Do you remember
7         the words that Daniel used, the exact words?  If you
8         don't, that's okay.  Just tell us one way or the other.
9         You need to say yes or no.
10              THE WITNESS:  No.
11        Q.    Does that mean you do not remember the words
12   Daniel used; is that correct?
13              THE COURT:  Do you remember the words that
14        were used?
15              Let's do this.  Approach.
16              (Whereupon, there was a sidebar discussion at
17        the bench, as follows:)
18              THE COURT:  I'm not sure if he doesn't
19        remember the words, or he is embarrassed to say the
20        words.  I don't know.  I want to excuse the jury for a
21        couple of minutes.  Unless you tell me he doesn't know
22        the words, he is sitting here looking to me.  He is
23        embarrassed to say the words, and I don't want to ask
24        those questions.  It's your cross-examination.
25              MR. PERRI:  I understand defense counsel has

1      the right to cross-examine.  He has asked -- he has

2      asked what did the defendant allegedly say and words

3      did he say, and the witness testified he said, I did

4      it.  That has been testified to.

5                  THE COURT:  What he asked, what it was.  We

6      don't really have an answer.

7                  MR. PERRI:  He may not.  We're not alleging

8      he was present to see what was going on, or that he, as

9      a child, that he fully understands.

10                 MR. BERGER:  I can't hear you.

11                 THE COURT:  I will allow you to keep going

12     with your cross-examination.  You can ask a few more

13     questions.  I'll take any appropriate objections.  You

14     have the right to cross a little bit to see if you can

15     get an answer.  You let me know if you want to keep

16     asking questions.

17                 (Whereupon, the proceedings resumed.)

18     CROSS-EXAMINATION

19     BY MR. BERGER:  (Continuing)

20         Q.  You heard Daniel say many times he did not do it;

21     do you remember that?

22         A.  Yes.

23         Q.  How many times did you say that he said that?

24         A.  Like four or five times.

25         Q.  And after he said that four or five times, what is

S. Ramirez - People - Cross        688

1    the next thing you heard him say?

2         A.   I heard him say, um.  He said, I did, um.  He

3    said, I did lick Mya's, um, coochie.

4                   MR. BERGER:  I can't hear.

5                   THE COURT:  Let's have the reporter read it

6         back.

7                   (Whereupon, the record was read back.)

8         Q.   So, he says it four, five times, I didn't do it,

9    then right after that he says, I licked Mya's coochie?

10        A.   Yes.

11        Q.   You heard that?

12        A.   Yes.

13        Q.   Where were you when this was said?

14        A.   On the porch.

15        Q.   Where was he?

16        A.   Outside.

17        Q.   Where was Mya?

18        A.   On the porch.

19        Q.   Where was your mother?

20        A.   On the porch.  All of us were on the porch.

21        Q.   All of you heard this, right, all of you were on

22   the porch?

23        A.   Yes.

24        Q.   But the first time you ever said this to anybody

25   was last week to Mr. Perri, correct?

kmm

1      A.   Yes.  I think so, yes.

2      Q.   You told us that the TV in your mother's room is

3  better, right?  Do you ever watch movies on that TV?

4      A.   Yes.

5      Q.   Do you ever watch movies of people without their

6  clothes on on that TV?

7              MR. PERRI:  Objection.

8              THE COURT:  Yes or no.

9      A.   No.

10     Q.   Sincere, you are sure you never watched people

11  without any clothes on on the TV?

12             MR. PERRI:  Objection.

13             THE COURT:  Asked and answered.

14             MR. BERGER:  That's the basis, just asked and

15     answered?

16             THE COURT:  Sustained.

17             MR. BERGER:  Let the record reflect the

18     witness is hanging his head down.  He seems to be

19     upset.

20             THE COURT:  Yes.  The record should reflect

21     the witness is crying.  Can you continue to answer some

22     questions for us?  Do you need a break?

23             THE WITNESS:  (Nodding)

24             THE COURT:  Let's take a five-minute break.

25     Please don't discuss the case amongst yourselves or

1    with anyone else during this break.  Don't get on your

2    phones and look anything up.  See you all in about five

3    minutes.  Thank you.

4              (Whereupon, the jury exited the courtroom.)

5              THE COURT:  See if the witness needs to use

6    the bathroom.  You cannot ask Mr. Perri any questions

7    about testifying, okay?  He's going to help you and see

8    if you need to use the restroom.  You cannot ask him

9    about anything that is happening in the courtroom; do

10   you understand?

11             THE WITNESS:  Yes.

12             (Whereupon, a short recess was taken.)

13             (Whereupon, the jury entered the courtroom.)

14             THE CLERK:  Do both sides stipulate all sworn

15   jurors are present and seated properly?

16             MR. PERRI:  Yes, your Honor.

17             THE CLERK:  Defense?

18             MR. BERGER:  Yes.

19             THE CLERK:  Mr. Ramirez, you are reminded you

20   are still under oath.

21             THE WITNESS:  Correct.

22   CROSS-EXAMINATION

23   BY MR. BERGER: (Continuing)

24   Q.   Do you know what an oath is, Sincere?

25             MR. PERRI:  Objection.  Asked and answered.

1          THE COURT:  Overruled.  I'll take an answer.

2     Q.   Do you know what an oath is?  Was that a no?  I

3     didn't hear you.

4     A.   I swear to the truth, that is what an oath is.

5     Q.   What happens when you take an oath and you don't

6     tell the truth?

7          MR. PERRI:  Objection.

8          THE COURT:  Overruled.

9          What happens if you don't tell the truth.

10    A.   You, um, you, um, you would not, um, be out of

11    here as soon as possible.

12    Q.   You would what?

13         THE COURT:  You will not be out of here as

14    soon as possible if you do not tell the truth.

15    Q.   What does that mean?  Sincere, if you don't know

16    the answer, you can say that.  Do you know what an oath is,

17    yes or no?

18         MR. PERRI:  Objection.

19         THE COURT:  Sustained.

20    A.   I don't know.

21    Q.   Did you say, I don't know?

22         MR. PERRI:  Your Honor, you sustained the

23    objection.

24         THE COURT:  The objection is sustained.

25         MR. BERGER:  If I ask him what an oath is,

S. Ramirez - People - Cross          692

1        Judge?

2                THE COURT:  Mr. Berger, you have asked the

3        question three times.

4                MR. BERGER:  I haven't gotten an answer.

5                THE COURT:  I believe you have, sir, and we

6        will check the record when we need to, outside the

7        presence of the jury.

8                MR. BERGER:  Pressing a witness is what

9        cross-examination is about.  I'm trying to be as easy

10       as possible with this man -- with this boy, rather.  He

11       should be able to explain what it means if he doesn't

12       honor the oath.

13               THE COURT:  The objection is sustained.  Next

14       question.

15       Q.    Sincere, did you say before that you did not know

16       what an oath is?

17               MR. PERRI:  Objection.

18               THE COURT:  Objection sustained.

19               MR. BERGER:  Nothing further.

20               THE COURT:  Any redirect?

21               MR. PERRI:  No, your Honor.

22               THE COURT:  Thank you can step down.  Be

23       careful.

24               People, call your next witness.

25               MR. PERRI:  The People call Officer Boccio.

1  J O S E P H   B O C C I O, Police Officer, called on behalf
2       of the People, having been duly sworn, took the witness
3       stand and testified as follows:
4              THE CLERK:  Officer, please state your name,
5       spell your last name, give your shield and your
6       command.
7              THE WITNESS:  Officer Joseph A. Boccio,
8       B-O-C-C-I-O.  First Precinct.  Nassau County, Shield
9       3462.
10 DIRECT EXAMINATION
11 BY MR. PERRI:
12      Q.   Good afternoon, Officer Boccio.  Who are you
13 currently employed by?
14      A.   Nassau County Police Department.
15      Q.   How long have you been a police officer with
16 Nassau County?
17      A.   A little over seven years.
18      Q.   Did you work in law enforcement before Nassau
19 County?
20      A.   Yes.
21      Q.   Who did you work for?
22      A.   New York City Police Department.
23      Q.   How long were you an officer with the New York
24 City Police Department?
25      A.   A little short of four years.

1      Q.   What is your current assignment with the Nassau
2   County Police Department?

3      A.   Police officer patrol.

4      Q.   What precinct are you assigned to?

5      A.   First.

6      Q.   What area does the First Precinct cover?

7      A.   It covers Roosevelt, Uniondale, Baldwin, South
8   Hempstead, East Meadow, North Bellmore and North Merrick and
9   a tiny smidgen of the Wantagh.

10     Q.   Directing your attention to October 16, 2013, were
11  you working that day?

12     A.   Yes.

13     Q.   Were you working a day tour or night tour?

14     A.   Day tour.

15     Q.   What are the hours?

16     A.   7:00 a.m. to 7:00 p.m.

17     Q.   Were you working in uniform or plainclothes?

18     A.   Uniform.

19     Q.   Alone or with a partner?

20     A.   With a partner.

21     Q.   Who was your partner?

22     A.   Officer Thomas Wiggan.

23     Q.   What kind of police car were you driving that day?

24     A.   A marked car.

25     Q.   At approximately 5:21 p.m. that day, did you

P.O. Boccio - People - Direct          695

1    receive a radio assignment?

2         A.   Yes, I did.

3         Q.   What did you do in response to receiving that

4    radio assignment?

5         A.   I responded to 124 Park Avenue in Roosevelt.

6         Q.   When you arrived at that location, did there come

7    a time when you encountered a woman you later learned to be

8    Crystal Ramirez?

9         A.   Yes, I did.

10        Q.   Where was she?

11        A.   Standing in the doorway by the steps.

12        Q.   Was she alone?

13        A.   No.

14        Q.   Who was she with?

15        A.   She was with a little girl, Mya Ramirez.

16        Q.   Can you describe Mya Ramirez?

17        A.   A young girl under the age of ten.

18        Q.   Without going into the substance of anything

19   Crystal or Mya said, did you speak with them?

20        A.   Yes, I did.

21        Q.   At the time during the initial response, did you

22   take Mya away from her mother?

23        A.   I did not.

24        Q.   Is there an individual you learned to be Daniel

25   Ramos also present at the scene at the same time?

kmm

1      A.   Yes, he was.

2      Q.   Do you see the person in the courtroom today?

3      A.   Yes, I do.

4      Q.   Point to him and identify him by an article of

5  clothing.

6      A.   Sitting right there wearing a long piece of

7  clothing, white sweater.

8           MR. PERRI:  I ask the record to reflect the

9      witness identified the defendant.

10          THE COURT:  So indicated.

11     Q.   Where was the defendant when you saw him that day?

12     A.   Standing in the parking Lot B, twenty feet away

13  from Crystal, he was leaning up against the car.

14     Q.   Did there come a time when you approached him?

15     A.   Yes, I did.

16     Q.   Did you approach him alone or with your partner?

17     A.   Alone.

18     Q.   Where was your partner while approaching the

19  defendant?

20     A.   Still with Crystal Ramirez.

21     Q.   When you approached the defendant, did you

22  identify yourself as a police officer?

23     A.   Yes, I did.

24     Q.   Where was your gun as you approached the

25  defendant?

1       A.    In my holster.

2       Q.    Where were your handcuffs?

3       A.    On the gun belt.

4       Q.    Did there come a time when you spoke with the
5    defendant?

6       A.    Yes, I did.

7       Q.    What language did you use to speak to the
8    defendant?

9       A.    English.

10      Q.    Did you have any problem communicating with the
11   defendant in English?

12      A.    Not at all.

13      Q.    What language did he speak to you?

14      A.    English.

15      Q.    Did the defendant's response to your questions
16   make sense?

17      A.    Yes, they did.

18      Q.    During the conversation that you had with the
19   defendant, was he in handcuffs?

20      A.    No, he was not.

21      Q.    What, if anything, did you say to the defendant
22   when you approached him?

23      A.    I asked him what is going on?  Why am I here?

24      Q.    What, if anything, did the defendant say in
25   response to that question?

kmm

Case 2:19-cv-01125-JS-AYS  Document 7-2  Filed 05/31/19  Page 698 of 844 PageID #: 1107

1      A.    He said, she said, I raped her daughter.  Please
2   arrest me, or arrest me.

3      Q.    And what, if anything, did you say after he said
4   -- after he said -- what, if anything, did you say after the
5   defendant said, she says, I raped her daughter, arrest me?

6      A.    I said, I'm going to need a little more than that.

7      Q.    What, if anything, did the defendant say after you
8   said, I'll need a little more than that?

9      A.    He said, it was stupid, I licked her once in the
10  bedroom.

11     Q.    After the defendant said it was stupid, I licked
12  her once in the bedroom, what, if anything, did you do next?

13     A.    I placed him under arrest.

14     Q.    When you placed him under arrest, did you give the
15  defendant instructions?

16     A.    Yes.

17     Q.    What instructions did you give him?

18     A.    To place his hands behind his back.

19     Q.    When you said that to him, what did he do?

20     A.    Turned around and put his hands behind his back.

21     Q.    Were you speaking English at that time?

22     A.    Yes, I was.

23     Q.    And where did you eventually place the defendant?

24     A.    In the back of my marked police car.

25     Q.    Approximately how long was the defendant in the

1   back of the police car?

2        A.   Approximately 30 minutes.

3        Q.   Did you or any other police officer speak with him

4   while he was in the back of the police car?

5        A.   No.

6        Q.   Were there supervisors called to the scene?

7        A.   Yes.

8        Q.   Did there come a time when the defendant left the

9   scene in your custody?

10       A.   Yes.

11       Q.   Where was the defendant transported?

12       A.   Special victims squad.

13       Q.   Did you actually transport the defendant?

14       A.   Yes, I did.

15       Q.   At approximately what time did you transport the

16  defendant to the special victims squad?

17       A.   Approximately 6:28 p.m.

18       Q.   Did you and your partner speak with the defendant

19  while transporting to the special victims squad?

20       A.   No.

21       Q.   Where is the special victims squad located?

22       A.   Bethpage, New York.

23       Q.   Were you with the defendant while he was at the

24  special victims squad?

25       A.   Most of the time.

kmm

1          Q.    And did you remain at the special victims squad

2    until the defendant was later transported to detention?

3          A.    Yes, I did.

4          Q.    Where was the defendant while he was at the

5    special victims squad?

6          A.    He was placed in a room with a large glass window.

7          Q.    And did you speak with him while at the special

8    victims squad?

9          A.    Just once.

10         Q.    Was he seen by other members of law enforcement?

11         A.    Yes, he was.

12         Q.    Who was he seen by while there?

13         A.    Detective Baran and Detective Pacheco.

14         Q.    Did there come a time when the defendant left the

15   arrest room, but remained in the special victims squad?

16         A.    Yes.

17         Q.    Can you explain what happened when that occurred?

18         A.    Me and my partner took him to the bathroom.

19         Q.    What, if anything, was the defendant offered while

20   at the special victims squad?

21         A.    He was offered a slice of pizza.

22         Q.    Did he actually get that piece of pizza?

23         A.    Yes.

24         Q.    Did there come a time that night when he left the

25   special victims squad?

1    A.    Yes.

2    Q.    Where did the defendant eventually go?

3    A.    Transported to 1490 Franklin Avenue in Mineola.

4    Q.    What's located there?

5    A.    Defense facility.

6    Q.    Officer, did you, or to your knowledge, or any

7    other member of law enforcement, ever make any promises to

8    the defendant before you spoke to him at the scene?

9    A.    No.

10   Q.    Did you, or to your knowledge, any other members

11   of law enforcement ever make any promises to the defendant

12   at or before the defendant was brought to the special

13   victims squad?

14   A.    No.

15   Q.    At any point from the time you arrived at 124 Park

16   Avenue until the defendant was brought to the detention, did

17   you, yourself, threaten the defendant in any way?

18   A.    No.

19   Q.    Did you ever observe any other member of law

20   enforcement threaten the defendant during that same time

21   frame?

22   A.    No.

23   Q.    Did you observe any other members mistreat the

24   defendant in any way?

25   A.    No, not at all.

1      Q.   Before October 16, 2013, did you know the

2  defendant?

3      A.   No.

4      Q.   Before October 16, 2013, did you know Crystal or

5  Mya Ramirez?

6      A.   No.

7           MR. PERRI:  Nothing further, your Honor.

8           THE COURT:  Thank you.  Cross-examination.

9  CROSS-EXAMINATION

10  BY MR. BERGER:

11      Q.   Officer Boccio, the testimony you have given here

12  is based upon your own recollection of what you say happened

13  back in October of 2013, correct?

14      A.   Some of it, yes.

15      Q.   Did you tell me that all of it was based upon your

16  own independent recollection when we had a hearing?

17      A.   No, it was not.

18      Q.   You didn't tell me that?

19      A.   At the hearing or today?

20      Q.   At the hearing, did you tell me all or what you

21  testified to?

22      A.   No, not everything.

23      Q.   You testified at the hearing back on September 25,

24  2014?

25      A.   I believe that was the date.  I'm not sure.

1      Q.    I'm telling you that's what the minutes reflect.

2      A.    Okay.

3      Q.    Were you under oath at the time?

4      A.    Yes, I was.

5      Q.    And were you asked this question and did you give

6    this answer?

7            MR. PERRI:   Could I ask for a page?

8      Q.    Page 13, line 18.

9            "QUESTION:   So everything you testified to

10   here has been based upon your own recollection?

11           "ANSWER:   Yes."

12           Did you make that answer to that question?

13     A.    If I review the minutes -- I don't recall saying

14   that, what I said at the minutes.  If I could review the

15   minutes.

16     Q.    Do you want to look at this?

17     A.    Sure.

18     Q.    Look at line 18.

19           (Handing to the witness.)

20     A.    Okay.

21     Q.    Did you make that answer to that question?

22     A.    I did at that point.

23     Q.    When you did that, was it the truth?

24     A.    Yes.

25     Q.    Is it the truth today?

P.O. Boccio - People - Cross          704

1      A.    Yes.

2      Q.    Now, I ask you, is everything you testified to in

3   connection with this case based upon your own independent

4   recollection?

5      A.    Yes.  But that line was in the middle of our

6   hearing, it wasn't at the end of it.  There was stuff I had

7   to recall based on my notes.

8      Q.    What was it that you had to recall based upon your

9   notes?

10     A.    I believe it was the arrest time.

11     Q.    You mean your memo book?

12     A.    I don't recall if it was the memo book or the

13  arrest summary.

14     Q.    Other than the arrest time, is there anything else

15  that you looked at your notes to help you out?

16     A.    I don't remember on that day if anything else was

17  used for my notes.  It may have been the time I transported

18  him to special victims.

19     Q.    Other than the time of the arrest, the time you

20  transported him, I'm talking to you about what you did on

21  the day you went to 124 Park?

22     A.    Okay.

23     Q.    You testified to here today about certain things

24  that happened, certain conversations that were said, right?

25     A.    Correct.

1      Q.    That's based upon your own independent

2  recollection; is it not?

3      A.    Yes.

4      Q.    Now, you arrived at the scene and you saw Crystal

5  Ramirez and her daughter outside of the apartment, correct?

6      A.    Correct.

7      Q.    And you heard Crystal when you asked her what

8  happened, she said to you, the defendant?

9            MR. PERRI:  Objection.

10           THE COURT:  Sustained just as to form.

11     Q.    Did Crystal say to you when you asked her what

12  happened that the defendant licked her daughter's coochie?

13     A.    Correct.

14     Q.    And that was said in the presence of Mya, correct?

15     A.    Yes.

16     Q.    You asked her whether Crystal saw it and she told

17  you no?

18           MR. PERRI:  Objection.

19           THE COURT:  Overruled.

20     Q.    Correct?

21     A.    I don't recall if I actually said that.

22     Q.    Let me ask you, if you remember -- by the way, at

23  that hearing you were under oath, yes?

24     A.    Yes.

25     Q.    And at page twenty, line eight, did you make the

1   following answers to the following questions?

2                   "QUESTION:  Did you ask her if she saw that?

3                   And you said, I did.

4                   "QUESTION:  What did she say?

5                   "ANSWER:  No, she did not see it."

6       A.    Okay.

7       Q.    Did you make those answers to those questions?

8       A.    If they're in there, then yes, I did.  I don't

9   recall independently if that's what I said that day.

10      Q.    You don't recall independently what you said at

11  that hearing, correct?

12      A.    I don't remember that specific line at the

13  hearing.

14      Q.    That hearing was about eight, nine months ago?

15      A.    Okay.

16      Q.    You're testifying at a hearing in September of

17  2014, about things that supposedly were said to you almost a

18  year ago, correct?

19      A.    Correct.

20      Q.    All based upon your own independent recollection,

21  right?

22      A.    Mostly.

23      Q.    Except for the notes when arrested him and except

24  when you transported him?

25      A.    Correct.

1    Q.    Let's say with all of these supposed statements

2    that were made to you at the scene, you were remembering

3    them almost a year later, correct?

4    A.    Correct.

5    Q.    Without having written any notes or memorandum in

6    connection with what was said?

7    A.    Correct.

8    Q.    Now, you are telling us nine months later from

9    what you testified to under oath at the hearing, that you

10   don't remember saying that she said she didn't see it,

11   correct?

12   A.    I don't recall if I said it that day.

13   Q.    Right.  That's only nine months ago, right?

14   A.    Correct.

15   Q.    You are testifying to what you remembered eleven

16   months prior to that, right?

17   A.    Correct.

18   Q.    So Crystal Ramirez gave you this answer to what

19   happened in front of her daughter, who was right next to

20   her, correct?

21   A.    Correct.

22   Q.    Did you make a note?  Did you ask Mya a question

23   then?

24   A.    Yes.

25   Q.    Did you make a note of what Mya -- did you ask Mya

1   what happened?

2        A.    I did.

3        Q.    And you asked her that in front of her mother?

4        A.    I did.

5        Q.    And Mya said what?

6        A.    I don't recall Mya's statement to me specifically.

7        Q.    So, as you sit here now, you don't remember what

8   Mya said to you happened, correct?

9        A.    Not specifically.

10       Q.    In sum and substance?

11       A.    That he licked her coochie.

12       Q.    That's what you remember her saying?

13       A.    Yes, something like that.

14       Q.    After you had asked that of her mother, correct?

15       A.    Correct.

16       Q.    And then just moments after that you asked that of

17  Mya, right?

18       A.    Correct.

19       Q.    Where was the defendant, Mr. Ramos, when you went

20  over to Crystal and Mya?

21       A.    He was standing in the parking lot leaning up

22  against the car about twenty feet away.

23       Q.    How long had you arrived at the scene when you got

24  the radio call?

25       A.    Repeat the question.

1    Q.   You received the radio transmission requesting you
2  to go to 124 Park?
3    A.   Correct.
4    Q.   How long did it take you to get there?
5    A.   A couple of minutes.
6    Q.   So, did you ever take Mya aside and privately talk
7  to her?
8    A.   No.
9    Q.   Let me finish the question.
10    A.   Okay.
11    Q.   And privately talk to her out of the presence of
12  her mother?
13    A.   No.
14    Q.   Did you see anybody else take Mya aside and talk
15  to her privately out of the presence of her mother?
16    A.   I did not personally.
17    Q.   Was a statement taken from Mya, as far as you
18  know?
19    A.   Um, I'm unaware if one was taken from Mya
20  directly.
21    Q.   You are unaware, as far as you know, no statement
22  was taken from Mya by any police officer at the scene; is
23  that correct?
24    A.   Not at the scene, no.
25    Q.   At any other time?

kmm

1      A.    I didn't go to the hospital with her and the

2   mother.

3      Q.    All I'm asking is what you know at the scene.

4      A.    No, not at the scene.

5      Q.    Now, when you asked Mya what happened, there was a

6   delay, wasn't there?

7      A.    Yes.

8      Q.    Now, I take it you had the opportunity to read the

9   minutes of your testimony prior to testifying here today?

10     A.    I did.

11     Q.    Did you go over the testimony with anybody prior

12  to testifying?

13     A.    I did.

14     Q.    Who was that?

15     A.    The district attorney, Anthony Perri.

16     Q.    Did you discuss with him some of the things that

17  you said at the hearing?

18     A.    I believe so, yes.

19     Q.    When you asked Mya what happened, did it take a

20  minute-and-a-half to two minutes before she answered you?

21     A.    Correct.

22     Q.    Did you ever ask Mya who did it?

23     A.    I did not.

24     Q.    Did Mya ever say to you the name of the person

25  who, as you say, licked her coochie?

P.O. Boccio - People - Cross          711

1        A.    No, she did not.

2        Q.    So, you asked her about what happened, it took her

3    about a minute-and-a-half to two minutes before she answered

4    your question, correct?

5        A.    Correct.

6        Q.    And you never asked Mya who did that to her,

7    correct?

8        A.    No, I did not.

9        Q.    And it was Crystal who gave you the name of the

10   defendant, not Mya; is that correct?

11       A.    Correct.

12       Q.    Now, you testified here, Officer Boccio, that the

13   defendant said to you, she is saying I raped her daughter,

14   correct?

15       A.    Correct.

16       Q.    Did you write that down anywhere?

17       A.    No, not at the scene.

18       Q.    You didn't write it down anywhere, did you?

19       A.    Except on my notes after when I read my minutes.

20       Q.    You mean the minutes of the hearing?

21       A.    Correct.

22       Q.    The hearing, we established was eleven months

23   after the incident, correct?

24       A.    Correct.

25       Q.    You claim you were referring at that hearing that

1    the defendant said, I raped -- arrest me, she is saying I

2    raped her daughter.

3         A.   Correct.

4         Q.   So that was based upon the hearing minutes you

5    were saying and the reporter was writing it down, correct?

6         A.   I'm sorry repeat the question.

7         Q.   The reporter was writing down what you said at the

8    hearing, correct?

9         A.   Okay.

10        Q.   Those are not your notes, that's what you

11   testified to, correct?

12        A.   Correct.  That's correct.

13        Q.   When I asked you then, did you ever write down

14   that the defendant said arrest me, she says, I raped her

15   daughter.  You never wrote that down?

16        A.   I did write that down.

17        Q.   Where did you write that down?

18        A.   On a piece of paper that shows details, notes that

19   I prepared for the -- after reviewing the case.

20        Q.   You just wrote those down recently, didn't you?

21        A.   I didn't say when I wrote them down.  I wrote them

22   down.

23        Q.   Fine.  You wrote them down.  Now, a year

24   and-a-half after, and this is what you are claiming you are

25   writing in your notes?

1      A.    Yes.

2      Q.    I'm asking whether or not you contemporaneously or

3  within the same day wrote this down?

4      A.    No, I did not.

5      Q.    Based upon your own independent recollection, you

6  are claiming last September, that you remembered he said

7  that, right?

8      A.    Correct.

9      Q.    Without having the benefit of having written that

10  down prior to that time, correct?

11      A.    Correct.

12      Q.    Now, did you ever write down that the defendant

13  said, I licked her in the bedroom?

14      A.    I did write it down on this note.  You have to

15  specify the time frame.

16      Q.    You wrote it down a few days ago, right?

17      A.    Correct.

18      Q.    I'm asking you whether you contemporaneously wrote

19  down, I licked her once in the bedroom.  It was foolish,

20  something like that?

21      A.    I never wrote that down.

22      Q.    You never wrote that down?

23      A.    Correct.

24      Q.    You testified in September of 2014, saying that's

25  what he said to you?

1          A.    Correct.

2          Q.    That's based upon your own independent

3     recollection?

4          A.    Yes.

5          Q.    Even though you had trouble remembering before

6     something you testified to here, which was only nine months

7     after the hearing?

8          A.    Correct.

9          Q.    Was Officer Wiggan, was he in the same patrol car

10    you arrived in?

11         A.    Yes.

12         Q.    Was he with you when you went over to talk to

13    Mr. Ramos?

14         A.    No.

15         Q.    Did it ever occur to you to enter in your memo

16    book these statements that you say the defendant made

17    specifically, arrest me.  She says, I raped her daughter and

18    I was foolish.  I licked her once in the bedroom.  Did it

19    ever occur to you to write that down in your memo book?

20         A.    No.

21         Q.    Now, you have testified that after Crystal said to

22    you out loud, in front of Mya, who was a few feet away from

23    her, that the defendant licked my daughter's coochie.  You

24    say you went to talk to Mya after that, correct?

25         A.    Yes.

1        Q.    Now, isn't it correct that after you were told

2   that by Crystal Ramirez, you went directly to talk to the

3   defendant?

4        A.    No.

5        Q.    Didn't Crystal say to you that the defendant --

6   and she pointed to Mr. Ramos, licked her daughter's coochie?

7        A.    Yes, she said that.

8        Q.    So Crystal was pointing to the person who she said

9   did that?

10       A.    Correct.

11       Q.    Because he was in the parking lot?

12       A.    Yes.

13       Q.    Let me ask you if you made this answer to this

14   question back at that hearing.  This was on direct

15   examination by Mr. Perri at page 9, line 12.

16            "QUESTION:  Officer, after Crystal Ramirez

17       identified the defendant as the person who allegedly

18       licked her daughter's vagina, what, if anything, did

19       you do next?

20            "ANSWER:  Went to speak to Daniel Ramos while

21       my partner stayed with Crystal."

22       A.    That's correct.

23       Q.    Didn't you testify to before you went to talk to

24   Mya and you asked Mya what happened, it took her a

25   minute-and-a-half to two minutes to tell you anything?

kmm

1     A.   Yes.

2     Q.   Which is it?  Did you go to talk to Mya, or did

3  you go immediately to talk to the defendant?

4     A.   I spoke to Crystal first, then I spoke to Mya,

5  then I spoke to Crystal again, and then I went over to the

6  defendant.

7     Q.   And you spoke to Crystal again for what purpose?

8     A.   To just say, was that him.  She is pointing to

9  him.

10    Q.   Didn't she tell you who it was before in her first

11 statement to you?

12    A.   She did.

13    Q.   But you went back to Crystal to make sure it was

14 Daniel Ramos standing there by his car?

15    A.   Correct.

16    Q.   Because you didn't believe her the first time?

17         MR. PERRI:  Objection.

18         THE COURT:  Sustained.

19    Q.   And the purpose to going back?

20         MR. PERRI:  Objection.

21         THE COURT:  Overruled.  You can answer.

22    A.   The purpose was to make sure that was who she was

23 referring to.

24    Q.   The first time you were not sure?

25    A.   It's not that I wasn't sure, I just asked her

kmm

1    again.

2        Q.   I asked you why you did that if you were sure the

3    first time, why did you ask her again?

4        A.   I'm making sure that's the person she was talking

5    to.

6        Q.   Did you have doubts the first time when she said

7    that?

8        A.   No.

9        Q.   But you went anyway?

10       A.   Yes.

11       Q.   Is there a parking lot near the house?

12       A.   Yes.

13       Q.   That's where the defendant was with his car?

14       A.   Correct, well, with a car.

15       Q.   I'm sorry.

16       A.   I don't know if it's his car.

17       Q.   With any car?

18       A.   Correct.

19       Q.   You said you were at the special victims squad for

20   nearly the entire time, you actually transported him to

21   headquarters, correct?

22       A.   I didn't transport him to headquarters, no.

23       Q.   You were with him until such time he was taken

24   from the special victims squad to headquarters?

25       A.   Correct.

kmm

1    Q.    And you said that you saw the defendant that was

2    seen by other people, Detective Baran, Detective Pacheco?

3    A.    Correct.

4    Q.    And were they in the room with him during this

5    time?

6    A.    Not the entire time.

7    Q.    Well, how much time was it that you saw the

8    defendant in this room?

9    A.    The defendant?

10   Q.    Yes.

11   A.    He was in the room the entire night except for

12   when I took him to the bathroom.

13   Q.    Give us a ballpark figure how much time that was.

14   A.    He was in the room probably eight, nine hours.

15   Q.    And during that time, how much time would you say

16   he was with Detective Baran and Detective Pacheco?

17   A.    I'm not sure.  I didn't have a clear sight of him

18   every time.

19   Q.    Why were you outside this room?

20   A.    I wasn't inside the room when --

21   Q.    I said, outside?

22   A.    Why was I outside?  To watch him when he was

23   alone.

24   Q.    So for the eight or nine hours he was not alone,

25   correct?

kmm

1        A.    No, not the entire time.

2        Q.    How much time was he, if you could tell us, how

3    much time was he with Detective Baran?

4        A.    I'm not sure.

5        Q.    Was it hours?

6        A.    No, it was not hours.

7        Q.    One hour?

8        A.    Possibly.  I wasn't the only one watching him the

9    entire time.

10       Q.    Who else was watching him?

11       A.    Officer Wiggan, my partner, Officer Wiggan.

12       Q.    Between you and Officer Wiggan, you were watching

13   the defendant the entire time?

14       A.    On and off, yes.  And not when the detectives were

15   in there.

16       Q.    And you saw Pacheco there as well, did you not?

17       A.    I did.

18       Q.    In the room with the defendant?

19       A.    I did.

20       Q.    Would you say that Pacheco was there more than

21   Detective Baran, equally or less?

22       A.    I'm unsure how long he was in there for.  I saw

23   him in the room.  I didn't see him enter the room or exit

24   the room.  I just saw him in the room.  I wasn't watching

25   the entire time.

1    Q.   For the time you were watching, could you give us
2  a ball park figure how long Pacheco was in the room?
3    A.   I'm unsure.  I looked in the window and I saw him,
4  just like I see the people walking, and I walked away.  I
5  don't know how long he was in there for.
6            THE COURT:  Mr. Berger, find a good place to
7        break.  You can keep going for a little bit.
8            MR. BERGER:  I'm almost finished.
9    Q.   Mr. Perri asked you whether or not any threats
10  were made to the defendant, correct?
11    A.   Correct.
12    Q.   Of course, if any threats were made by a police
13  officer, it could cause them to lose their job?
14    A.   Of course.
15    Q.   That's true of any police officer?
16    A.   Sure.
17            MR. BERGER:  Thank you, officer.  I have
18        nothing further.
19            MR. PERRI:  Very briefly, your Honor.
20  REDIRECT EXAMINATION
21  BY MR. PERRI:
22    Q.   Officer Boccio, on the date of the incident,
23  October 16, 2013, did you tell anyone else about the
24  statements that you heard the defendant make?
25    A.   Yes.

1        Q.    And did you tell the members of the special

2   victims squad?

3        A.    Yes.

4        Q.    And on that day, were those statements recorded?

5                    MR. BERGER:  Objection.

6                    THE COURT:  Overruled.

7        Q.    On that day --

8                    MR. BERGER:  That he told.  It's all hearsay.

9                    THE COURT:  Overruled.  Please ask the next

10       question.

11       Q.    Officer, were these statements that you gave,

12   about what the defendant said to you, were they recorded by

13   another member, written down by another member, typed by

14   another member of the Nassau County Police Department?

15       A.    Yes, they were.

16       Q.    Who was that?

17       A.    Detective Baran.

18                   MR. PERRI:  Thank you, your Honor.

19                   THE COURT:  Recross on that limited area.

20   RECROSS-EXAMINATION

21   BY MR. BERGER:

22       Q.    Did you see Detective Baran write it down?

23       A.    I did not.

24       Q.    You don't know if he wrote it down or not?

25       A.    I do know he entered it into his notes.

P.O. Boccio - People - Recross          722

1     Q.   You know what he may have told you, but you didn't
2  see him write it down?
3     A.   I did not see him write it down personally.
4     Q.   When you told him -- when you say you told him
5  this, did you see him write anything down at that point?
6     A.   No.
7              MR. BERGER:  Thank you.  Nothing further.
8              THE COURT:  Redirect.
9              MR. PERRI:  Extremely limited, your Honor.
10  REDIRECT EXAMINATION
11  BY MR. PERRI:
12     Q.   Did the statements that you heard the defendant
13  say, did they appear in a typed written document after you
14  told Detective Baran?
15     A.   Yes, they did.
16     Q.   What document is that?
17              MR. BERGER:  Objection.
18              THE COURT:  I'll take what the document is.
19     A.   I'm not sure of the exact document name.
20     Q.   Could you describe the document?
21     A.   Police officers' testimonials, and it shows what
22  statements were made, what each officer did at the scene.
23  I'm not sure of the name of the form.
24              MR. PERRI:  Thank you.
25              THE COURT:  Recross on that.

kmm

1    RECROSS-EXAMINATION

2    BY MR. BERGER:

3        Q.    You did not see, whoever you told it to, to write

4    it down, correct?

5        A.    Correct.

6        Q.    You had not even written it down in your memo book

7    or any piece of paper what was said, when it was said, when

8    you say it was said by Mr. Ramos, correct?

9        A.    Correct.

10                MR. BERGER:  Nothing further.

11                THE COURT:  Thank you.  Be careful stepping

12        down.

13                (Whereupon, the witness exited the

14        courtroom.)

15                THE COURT:  This is a good time for us to

16        break for today.  I'm going to ask that you all be here

17        tomorrow morning at 10:00 a.m.  The beauty of 10:00

18        a.m., it's a little later for you.  The bad news of

19        10:00 a.m., the parking will be difficult.  React

20        accordingly, adjust accordingly.  If you come earlier,

21        there will be a place for you.  I don't expect you to

22        gather in the room until 10:00 a.m.

23                Keep an open mind throughout the trial.  Do

24        not discuss the case amongst yourself or with anyone

25        else during the trial.  Do not permit anyone to discuss

Proceedings                          724

1    the case in your presence.  Do not talk to the lawyer,

2    witness, the defendant.  And remember, if you run into

3    any of us at any point, we'll ignore you.  Please do

4    not take it personally.

5              Do not visit or view the place where the

6    charged crime was committed or any other place involved

7    in the case.  If there is any news coverage of the

8    case, do not read, view, or listen for any accounts or

9    discussions of the case reported by the news media.

10             Do not attempt to research any fact, issue,

11   or law related to this case, whether by discussion with

12   others by research in the library or on the Internet,

13   or by any other means or source.  Have a great evening.

14   See you all tomorrow morning.

15             (Whereupon, the jury exited the courtroom.)

16             THE COURT:  Anything for the record,

17   Mr. Berger?

18             MR. BERGER:  Yes, Judge.  I tried to ask

19   Sincere, the young man, if he understood what an oath

20   meant, and what would happen if he didn't tell the

21   truth.  He gave an answer at one point that he did not.

22   I mean, this person you allowed to swear under oath

23   doesn't even know what an oath is, and you say it's in

24   the record, and we'll worry about it at that point.

25             It seems to me you are preventing me from

kmm

1    properly cross-examining and discrediting a witness

2    here when he doesn't understand what an oath means.

3    His testimony shouldn't be accepted at all, yet you

4    protected him when he was on the witness stand.  He may

5    have been upset.  Why?  We don't know exactly.  If he

6    doesn't understand what an oath is and doesn't

7    understand what will happen if he doesn't tell the

8    truth, that's serious.  He shouldn't be allowed to

9    testify.  And the prosecution is going to ask you to

10   allow Mya to come in tomorrow and testify?  My position

11   is she shouldn't be allowed to testify under oath and

12   shouldn't be allowed to testify at all.  Look at what

13   we got from an eleven-year old here who could not

14   answer those questions?

15              THE COURT:  I would have to beg to differ

16   with you, Mr. Berger.  You asked him if he understood

17   what an oath meant.  He said, it means I have to swear

18   to tell the truth.  You asked him what would happen if

19   he didn't tell the truth.  He said, you won't get out

20   of here as soon as possible.  He very much understood

21   what an oath was.

22              MR. BERGER:  That's an answer?

23              THE COURT:  He very much understood exactly

24   what would happen if he didn't tell the truth because

25   he would keep being asked questions if he was not

1    telling the truth.  That is the understanding of an

2    eleven-year old.  He said on more than one occasion to

3    your questions that he was here to tell the truth.

4           You can continue to say I'm protecting the

5    world, Mr. Berger.  My rulings are my rulings.  If your

6    client should be found guilty, you have an appeal

7    process.

8           Anything else for the record?

9           MR. BERGER:  The Court has to be a little bit

10   more mindful of being neutral in letting me

11   do the cross-examination that I should be doing.

12          THE COURT:  Mr. Berger, I imagine if there

13   was a rape victim on the stand, you would want to

14   question her about the 27 boyfriends she had prior to

15   the rape.  It's not allowed.  It is not appropriate for

16   this kind of case.  I am aware of that.  I know you are

17   aware of that.  I'm not going to allow you to go down a

18   road asking questions of these witnesses that have

19   absolutely nothing to do with their testimony here at

20   trial.  There are ways to attack people's credibility.

21   You know what those ways are when it comes to cases of

22   this matter.  I'm asking you to abide by those rules of

23   law.

24          MR. BERGER:  I'm not making any challenge to

25   the rape shield law.  I know what that is about.

kmm

1    That's not what this is about.  This is about

2    challenging credibility of these witnesses.  Asked and

3    answered, after I asked the question once?  That's

4    letting me press a witness?  That's not what

5    cross-examining under the constitution means.

6              THE COURT:  If your client is convicted, you

7    have got, right now, if I'm counting, probably about

8    twelve things you think the Court had done wrong.

9    Maybe I have, maybe I haven't.  On your appeal you can

10   certainly lay them out to the Appellate Division.

11             MR. BERGER:  It's regrettable that's your

12   attitude.  It seems to me --

13             THE COURT:  Mr. Berger, you know why it's my

14   attitude?  Every decision I make, you question.  I am

15   not going to sit here and have you question everything

16   I make.  You want to bring me a case that tells me I've

17   done it wrong, you want to show me a statute that I've

18   done it wrong, bring it.  Until you do that, stop

19   questioning every decision I make.

20             MR. BERGER:  That's a misstatement.  I don't

21   question every decision you make.  I question the ones

22   I disagree with.  That's my function as a lawyer, to

23   disagree and point out the law to you.

24             Now, asked and answered, let's read

25   Richardson.  It tells you --

1              THE COURT:  Mr. Berger, enough.  I'm not
2    going to sit here and have a lesson with you on asked
3    and answered.  You asked the question.  You didn't like
4    the answer.  You got what you got.  I don't have to
5    allow you to ask the question fifteen times.  It's
6    within my discretion.  You have this child on the
7    stand.  You were allowed to ask this child whatever
8    question you wanted to that I felt were relevant and
9    proper.  You got your answers to those questions.
10   Done.  I don't have to sit here and allow you to
11   question a child-witness time and time and time again.
12   It's not required.  You had your ability to press him.
13   You have your answers.  You have how he reacted.  You
14   have him say on more than one occasion, I don't know,
15   in addition to saying, swear to tell the truth.  Use it
16   as you see fit.  I don't have to allow the child to
17   stay on the stand ad nauseam for you to ask the
18   question over and over.  If I do, I'm sure the
19   Appellate Division will let me know.
20             MR. BERGER:  When I asked him about what it
21   means if he doesn't tell the truth, you were satisfied
22   with the answer that made no sense.
23             THE COURT:  It made perfect sense.
24             MR. BERGER:  He needs to get out of here
25   faster.  That wouldn't mean that he wouldn't have to

answer anymore questions. That's what it means when you don't tell the truth? I'm sorry, Judge, that's not what it means, and that's not what any of these cases show when you question a witness as to whether or not he or she should get on the witness stand and testify. You have to find out a lot more than that, than merely, I'll get out of here faster. That's meaningless. That's not an answer.

THE COURT: Are you done? Anything else for the record?

MR. BERGER: No.

THE COURT: People, anything for the record?

MR. PERRI: No, your Honor.

THE COURT: All right, see you all tomorrow. I need both of you at 9:30. We have to deal with the child witness. I want the attorneys here at 9:30.

(Whereupon, the trial was adjourned to May 12, 2015.)

* * *



730

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU : CRIMINAL TERM PART 43
 2   -----------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,     :   Indictment
 3                                            :   No. 742N/14
             -against-                        :
 4                                            :
     DANIEL RAMOS,                            :   VOL. II
 5                                            :
                             Defendant.       :   Jury Trial
 6   -----------------------------------------X

 7                                 May 12, 2015
                                   262 Old Country Road
 8                                 Mineola, New York

 9   B E F O R E:

10        HONORABLE TERESA K. CORRIGAN,
                     Acting Supreme Court Justice
11

12   (Appearances remain the same.)

13                    *          *          *

14

15                             KAREN M. MASLER
                               Senior Court Reporter
16

17             *             *               *

18

19             THE CLERK:   Case on trial continued,

20   Indictment Number 742N of 2014, People of the State of

21   New York vs. Daniel Ramos.

22             Let the record reflect all parties are

23   present, the jury is not present at this time.

24             Madam interpreter, can I have your appearance

25   for the record.
```

kmm

1              THE INTERPRETER:  Interpreter Carmen Knight,

2       K-N-I-G-H-T.

3              THE CLERK:  People ready?

4              MR. PERRI:  Yes, your Honor.

5              MR. BERGER:  Yes, your Honor.  I have an

6       application, if I may, Judge.

7              THE COURT:  Sure.

8              MR. BERGER:  I'm making a motion for a

9       mistrial in this case based upon what I believe is the

10      Court's bias against me and/or my client.  It seems

11      that the Court is hellbent on having the Second

12      Department see this case and review the record, and I

13      must put on the record now a few things that are not

14      contained on the record.

15             At the end of the Court's day yesterday, the

16      Court felt it necessary to yell at me and make what I

17      thought was a silly comment about my ignoring the rape

18      shield law, but if I could ignore the rape shield law,

19      I would do it in this case.  That is not applicable.  I

20      never said this case is about the rape shield law.  Why

21      it was necessary for you to yell -- I don't conduct

22      myself that way with the Court, and yet the record

23      won't reflect you kind of losing it and making a

24      comment about me ignoring the rape shield law.

25             Secondly, setting forth an argument as to why

Proceedings                 732

1       I thought it should be appropriate for me to ask
2       Crystal Ramirez if she and her children watch
3       pornography at home.  I made a representation to the
4       Court, in a good faith basis, I had information that
5       led me to believe that, in fact, they did in fact watch
6       pornography in the house, that she did with her
7       children.  And the Court's comment to me was, where did
8       you get that from, the defendant, in a sarcastic tone.
9       The sarcastic tone is not reflected on the record, but
10      I'm pointing that out now.  The sarcastic tone suggests
11      to me you are not going to believe anything the
12      defendant has to say, because how could that -- how
13      could I believe that?  How could we believe that?  He's
14      a defendant charged with a sex crime here.  The fact of
15      the matter is, the defendant has no record.  Crystal
16      Ramirez, if you accept what she told to Mr. Perri, she
17      has stolen property out of a car, was engaged in a
18      robbery, second degree, although she pled guilty to
19      attempted petit larceny and got youthful offender.  If
20      there is anybody who seemed to have credibility, it
21      would be the defendant, and yet the Court's skepticism
22      about did I get that information from the defendant, as
23      if he couldn't possibly tell the truth.
24              And then, Judge, I asked the Court for a
25      subpoena to the South Shore Child Guidance Center

kmm

Proceedings                    733

1    because I had known, and it was admitted on the record,

2    that Mr. Ramirez and her two children went there for

3    therapy.  You were not going to let me get into the

4    therapy issue.  I pointed out on the record yesterday

5    the therapy wasn't the issue, but watching the

6    pornography was the issue.  And yet, only when I made

7    the suggestion that you take a look at the records in

8    camera to view whether or not anything contained in the

9    records would be beneficial to the defense, you then

10   accepted that because, after all, who is going to

11   challenge whatever your findings will be when you read

12   it?  I personally have no confidence that even if there

13   was something in those records that would be helpful to

14   the defense, you would make it available to me because

15   I think your view point is somewhat skewed against the

16   defense in this case.

17           And then, in addition, I provided your law

18   secretary with a subpoena to the police department in

19   which I asked for the protocol and procedures with

20   respect to interviewing children in alleged sex offense

21   cases.  The protocols are important because if they're

22   not followed, then it becomes a question of whether the

23   police did their job properly in this case, and we know

24   that there are protocols that are required in these

25   cases.

Proceedings                734

1          We also know that the police didn't

2     interview -- didn't interview the complainant.  I can

3     assume that because there are no Rosario materials

4     turned over to me.  And one of the police protocol, I

5     know if they interview a witness, they take a statement

6     or make notes about the interview.  I received no

7     Rosario material, which I think is rather remarkable in

8     this case that this young girl hasn't been interviewed.

9          And so, I think I'm entitled to the protocol

10    and without explanation, without acting in a lawyerlike

11    fashion, all I know from your law secretary was, you

12    will not sign the subpoena which had to be so ordered

13    and required your signature.

14          So, I mean, you have done everything to

15    stifle me in this case, in my perspective, and I find

16    it rather sad that a case of this importance, your

17    instincts are contrary to what I consider to be the

18    actions of a neutral judge in a case.  I've been trying

19    cases for nearly fifty years; forty-three plus years

20    with the Legal Aid Society.  I know instinctively when

21    I'm getting a fair shot from a judge.  Sometimes I do

22    and sometimes I don't.  Your instincts are contrary to

23    what I consider a neutral position.

24          When we came up yesterday and I wanted to try

25    to show -- play the 911 tape for Ms. Ramirez, your

kmm

1        instincts were not to allow it to happen.

2                   THE COURT:  Not in an open courtroom.  Not in

3        front of a jury.

4                   MR. BERGER:  I had to give you an explanation

5        as to why she should hear it.  The district attorney,

6        they end up playing 911 calls every time.  This was the

7        first time I can remember -- I'm not saying it hasn't

8        happened, but this is the first time I can remember a

9        prosecutor not wanting to put in a 911 call, but he

10       didn't do it this time, and here I wanted to do it.  I

11       pointed out, how about refreshing your recollection as

12       to what she said, and ultimately, you did.  But

13       instinctively, I couldn't ask any questions about

14       whether Crystal Ramirez had ever seen pornography.  And

15       the fact I asked a question as to how it is that her

16       daughter could use the term eat her coochie, how a

17       six-year old knows of that, it becomes important in

18       this case.

19                   You instinctively are protecting the

20       complainant, and a mother in this case.  It's nothing

21       that necessarily will appear, although, I think there

22       are some flagrant things on the record already, but

23       there are things that I know instinctively, as a trial

24       attorney, and all of the cases I tried as to whether or

25       not the judge is being neutral in the case.  I don't

kmm

Proceedings                         736

1     think you are.  You may think you are, and I

2     understand, I don't attribute any bad motives to you,

3     but you may think you are, but you are not.  You are

4     still, from my perspective, have a prosecutor's bent

5     here to protect the complainant, or the whole

6     complainant's case, the mother, the brother.  I mean, I

7     don't think it's fair to the defendant and that's what

8     is really important to you.  And the important thing is

9     to make sure this defendant gets a fair trial.  I don't

10    think you are doing it.  I'm hoping that you will

11    engage in some self-examination and make the

12    determination that you know, maybe, I am not looking at

13    it in a neutral position.  But if you are not, Judge, I

14    think at this time a mistrial is appropriate, or at the

15    very least, you should recuse yourself and have

16    somebody else come in and sit for the rest of this

17    case.

18              THE COURT:  All right.  Thank you.

19              People, would you like to be heard?

20              MR. PERRI:  The People oppose the application

21    and don't find any basis in the record to support it.

22              THE COURT:  With regards to the application

23    for a mistrial, the Court is denying that application.

24    The Court will note that with regards to signing

25    subpoenas.  The Court doesn't have to actually give an

Proceedings                737

1    educational reason as to why something is or is not

2    signed for, rather the Court needs to follow the law

3    and that's what this Court is doing with regards to the

4    signing of subpoenas.

5              With regards to the records that were

6    received by the Court this morning from the counseling

7    center, I have reviewed the first set of records which

8    are the records of Mya Ramirez Feliciano, and I am

9    handing to the attorneys one page each from those

10   records that the Court found directly relevant to this

11   case.

12             At this time, there was nothing else within

13   those records that the Court determined to be relevant

14   in that there was nothing within those records that

15   showed the Court that Mya Ramirez Feliciano has any

16   difficulty distinguishing between reality and fantasy,

17   nor does she have any difficulty understanding truth

18   telling or what happens when there is no truth telling.

19   Everything else within those records is completely

20   confidential and as put forth by the People yesterday.

21             The Court will share only this about the

22   record.  The basis, the therapy is not what was put

23   forth yesterday by Mr. Berger when he made his initial

24   argument, which was that the children were in therapy

25   because they watched pornography with their mother.  In

Proceedings                          738

1       fact, the children are in therapy based on a history of

2       domestic violence within the family and some

3       disciplinary issues or behavioral issues that have

4       happened to the children, some of which were due to

5       issues at the time of birth.

6              So, I've turned over the page that is

7       relevant.  Like I said, I did get through Mya's

8       records.  I've not yet gotten through Sincere's

9       records.  If, after going through Sincere's records,

10      there is something in there that needs to be disclosed,

11      and if the two of you advise me it has impact on either

12      your direct or cross-examination of him, I certainly

13      will allow either one of you to call him again to the

14      stand, should that be legally proper to do.

15             MR. BERGER:  The record should reflect what

16      you turned over to me is a page subsequent to the

17      alleged incident here.  My position was that these

18      children were being taken to therapy by the defendant

19      prior to that time.  And the fact that you say to -- on

20      the record that there is a domestic violence history

21      there, but that nothing else is relevant to the point

22      that I was making, I mean, we have to rely on your

23      viewing that.

24             In addition, to the fact that the

25      defendant -- I mean, the prosecutor brought out the

Proceedings                739

1     fact there was a change in her behavior subsequent to

2     this alleged incident and we want to show that in fact

3     whatever trouble behavior she had, if she did, was as a

4     result of -- prior to this incident, having nothing to

5     do with this incident.  But you stopped me there.

6                Now, when the Court says to me, that they're

7     not going to give me an explanation for why it's

8     refusing a subpoena, that's not really how the lawyers

9     should work.  You can say, I don't have to give you an

10    explanation.  I don't have to tell you why I'm not

11    signing the subpoena.  I suppose from a purely legal

12    point of view, maybe you are right, but it seems to me

13    if you really are interested in obtaining justice here,

14    you have to be able to say to me my request is totally

15    irrelevant and let's talk about the law, that knowing

16    the protocol for the police department with respect to

17    interviewing alleged victims of sex cases, is not a

18    relevant factor in this trial.  Seriously, are you

19    taking that position, just to hide behind the fact I'm

20    the judge, and I don't have to give you any

21    explanation?  That's not really how County Court should

22    work.

23               THE COURT:  Counselor, you had every

24    opportunity to provide me with caselaw along with your

25    application and a request for subpoena.  Many attorneys

1      have done that.  You have not provided me with anything

2      that shows me why it would be legally proper, but

3      that's the only thing I'm determining, why it would be

4      legally proper for you to get protocol of a process

5      within the police department that may or may not exist.

6                   I have actually read numerous cases with

7      regards to when the Court needs to sign subpoenas, and

8      there is not a single case that requires that the Court

9      sign off on every subpoena just because it is simply

10     asked for.  In fact, that which you have sought, if you

11     look at cases such as Gissendanner 48 NY2d, 543, a

12     Court of Appeals case from 1979.  In fact, that does

13     give the Court great guidance when it should or should

14     not sign subpoenas related to the police department and

15     records contained therein.  And, in fact, that is the

16     case that gives this Court guidance in denying your

17     request for that subpoena to be signed off on and

18     issued.  If you can find a case that tells me

19     Gissendanner should not be followed, I'll be more than

20     happy to read and look at it, and, of course, I would

21     change my position if that was legally required and

22     proper, but until that time occurs, my decision is my

23     decision, based on the legalities of this state as I

24     understand them.  Of course, I could be mistaken.  It

25     is your right and privilege to point that out to me in

Proceedings                741

1          an application to renew and reargue, and I will gladly

2          await that application from you.

3                    Anything else for the record?

4                    MR. BERGER:  Judge, not every situation has a

5          case on point.  I mean, you have to be in the system to

6          know that you want me to find you a case that says you

7          must turn over the police protocol in an alleged sex?

8          First of all, I don't know that it ever got to that

9          point.  The law is not an --

10                   THE COURT:  I'm sorry to interrupt you.  I

11         really am.  Let me just ask you this:  You have advised

12         me you have been trying cases for forty-three years

13         here in Nassau County with the Legal Aid Society.  How

14         many years have you been trying sexual offenses?  Has

15         it been most of those forty-three years?

16                   MR. BERGER:  Probably.

17                   THE COURT:  I imagine you tried other cases

18         where the victims were children?

19                   MR. BERGER:  Probably.

20                   THE COURT:  How many of those cases received

21         the protocol from Nassau County via subpoena?

22                   MR. BERGER:  The protocol?

23                   THE COURT:  Just answer my question,

24         counselor.  How many times have you received protocol

25         via subpoena from the Nassau County Police Department

1    in those other cases in which a child was the victim of

2    a sex crime?

3              MR. BERGER:  Not once.

4              THE COURT:  Thank you.  Go ahead.  You may

5    continue.

6              MR. BERGER:  That's not an answer, because

7    every case is different, and the protocol developed

8    starting with the case -- the McMartin case out in

9    California, all of a sudden the state started to

10   realize the way you question children becomes extremely

11   important in these cases and here you don't think it's

12   unusual they didn't question this child at all?  No

13   Rosario material, nothing.  And now the child will come

14   in and say whatever she has to say, if you allow her to

15   testify.  I mean, really.  You are not -- I'm not going

16   to be able to provide you with a case in the Second

17   Department or Appellate Department or Court of Appeals,

18   says, oh, you didn't turn over the protocol from the

19   police department.  I doubt that has ever come up in a

20   situation.

21             THE COURT:  It must be something it could be

22   compared to, counselor.  It deals with what police

23   didn't record throughout the entire decision, so I

24   obviously, I don't need something that says protocol.

25   I have a case that talks about the records and what is

                                                        kmm

1    contained within the police department.  That's what

2    I'm following.  I'm sure there must be something out

3    there.  I might be missing it.  I'll be more than happy

4    to read it.

5              MR. BERGER:  I'm not asking for specific

6    records or specific cases.  I'm asking for the general

7    protocol.  They have a victim's unit now, okay?  They

8    are now videotaping children in their interviews.  I

9    know they are providing officers who are supposed to be

10   trained and skilled in interviewing children in a

11   neutral unbiased way.  Now, we see this going on.  I'm

12   asking for a general rule about the protocol, for

13   example, the protocol when the police interview people,

14   when they're supposed to take a statement.  They're

15   supposed to have them sign it.  There are rules and

16   police regulations that defense counsel should be able

17   to use to show that they did not engage in those

18   protocols because as, your Honor knows, the absence of

19   proof by the prosecution can create reasonable doubt.

20   They didn't do what they were supposed to do, and if

21   you don't think that my knowing the protocol so I could

22   point that out when cross-examining witnesses, if you

23   don't think that is important -- this is the bias that

24   I'm talking about, Judge.

25              THE COURT:  I never said you couldn't

Proceedings                    744

1    question a witness about it, counselor.  I simply said

2    I wasn't signing the subpoena.

3              MR. BERGER:  I understand that.  It seems to

4    me if you give me the subpoena, I'm asking questions

5    from a much more knowledgeable point of view instead of

6    having to do it by instinct.  This is what I'm talking

7    about, about the bias, your instincts are for the

8    prosecution to protect the police, to protect the

9    witnesses.  It's something you know when you try cases.

10   It's something you know, and for you to ask me how many

11   cases I ever asked police protocol, that ends the

12   issue.

13             THE COURT:  It doesn't end the issue because

14   I was curious and then there would have been a judge

15   that I could have called and said, please explain to me

16   how it is you handled this issue, and this matter, but

17   you are telling me it never occurred.  Again, I did

18   research.  I don't have a case on point, and now I

19   don't have another judge I can call.  You have been

20   doing this for forty-three years.  It's no secret.

21   I've been on the bench since 2012.  It is no secret to

22   anybody.  It is no secret to anybody that I came from

23   the prosecutor's office.  But what is also not a secret

24   to anybody, I'm not afraid to call people and say, how

25   do you do this?  I'm not afraid to pick up a book and

Proceedings                ·    745

1     do a little research.  I want to get it right.  At the

2     end of the day, someone at your level of experience, I

3     was seeking some guidance to see if there was some

4     other judge that you may have dealt with that had this

5     issue that could have guided me.  That's the only

6     reason I asked the question.

7              Is there anything else, counsel, before we

8     get started?  I have a jury waiting.

9              MR. BERGER:  There are certainly more

10    important things than worrying about whether the jury

11    is waiting or not.  This is an important motion.

12             THE COURT:  We have gone over it now,

13    yesterday, for quite some time.  Today we have now been

14    talking about it for quite some time.  At the end of

15    the day, here's the problem, if you don't like my

16    decision, you want to keep talking and you want to keep

17    arguing.  You don't have to like my decision.  Your

18    record is made.  I know you don't like the decision.  I

19    appreciate it and understand that you disagree with the

20    decision.  Not like it, or don't like it, you legally

21    disagree with it.  You feel the Court made a legal

22    error.  I understand that.  I get it.  That's my

23    decision, and all of the talking in the world right now

24    is not going to change it.  I would like to move

25    forward with this trial.

Proceedings                    746

1      MR. BERGER:  Judge, there are certain things
2   that I know instinctively.  You must know instinctively
3   that to give me the protocol is something counsel
4   should have, just like if the prosecution asked for
5   protocol if that indeed was important.  You would do
6   it.  It seems to me you instinctively know that I
7   should know what the protocols are, and if they are not
8   in accordance with what I believe them to be, fine,
9   then I can't use them, but not to give them to me?  Who
10  is being harmed?  The police department, by providing
11  you protocols?  To hide behind the fact you don't have
12  a case is silly, in my view.  What you should do is
13  take a look and say, you know what, nobody is being
14  harmed, issue a subpoena.  I'm sure they have it
15  written done somewhere.  Just provide it to defense
16  counsel.
17      THE COURT:  All right, thank you.
18      People, do you want to be heard again?
19      MR. PERRI:  There's one other item but it is
20  not related to this.
21      THE COURT:  Go ahead.
22      MR. PERRI:  This morning in preparing the
23  second witness, the People intend to call the nurse
24  examiner, Kathleen McAllister from Nassau County
25  Medical Center.  Although, we turned entirety of her

kmm

Proceedings                    747

1     notes, and she made know making any physical findings

2     with respect to the child she did disclose, as was

3     reflected in the medical records notes she did take

4     photographs of the child while she examined her.  The

5     People have no intention to place the photographs into

6     evidence.  They were noted in the medical records to

7     existed at the hospital, did not turn those photographs

8     over to the People pursuant to the subpoena that we

9     have.

10            If the Court and defense counsel wish, I can

11    attempt Nurse McAllister to obtain them today, but the

12    People are not looking to introduce them.  There are no

13    physical findings such as perforation that normally a

14    photograph or any injuries that the People are alleging

15    there are any injuries internal or external to the

16    child that would possibly be reflected in those

17    photographs.

18            MR. BERGER:  I'm not interested in the

19    photographs.  I just want to be clear that I've been

20    provided with new health documents and is this the

21    document that Nurse McAllister is going to be

22    testifying to?

23            MR. PERRI:  The certified copy of the medical

24    records that were obtained by the People were turned

25    over in the Rosario materials.  The People previously

1    turned over to defense counsel the sexual assault

2    nurse, the sexual assault examination medical records

3    that the People had and once we had obtained a

4    certified copy which does contain additional documents

5    we did turn them over in their entirety to the defense,

6    your Honor.

7              THE COURT:  What Mr. Berger is discussing now

8    was previously turned over or turned over today.

9              MR. PERRI:  Yes, that certified copy, the

10   medical records was turned over in its entirety as part

11   of Rosario materials.

12             MR. BERGER:  That was yesterday.

13             MR. PERRI:  Your Honor, those materials were

14   turned over with the Rosario packet.  A second

15   subsequent copy was provided to defense counsel

16   yesterday.  A copy was faxed to him when he stated he

17   did not have his copy.  As soon as he called, it was

18   faxed over.  I offered to have additional copies

19   provided that day that he requested it at the DA's

20   office prepared to help him.  He told me on the phone

21   not to do that and bring it to him in court on Monday.

22   The sexual assault nurse examiner exam papers were

23   previously provided prior to the hearing in this case

24   and were turned over to defense counsel.

25             MR. BERGER:  Mr. Perri is referring to two

Proceedings                    749

1    separate documents.  I'm only aware of one, or at least
2    he could explain what the second one is so we can talk
3    about it.
4              THE COURT:  You need some time to go over
5    your materials before we get started today, I will give
6    you that time.
7              MR. BERGER:  I want to know, other than what
8    was turned over yesterday, new health and was faxed to
9    me on Friday, what other document is he referring to in
10   the Rosario material?
11             MR. PERRI:  The defense.
12             THE COURT:  Is it medical records?
13             MR. PERRI:  Yes, the sexual assault.
14             MR. BERGER:  Give the number of the page.
15             MR. PERRI:  Page 112, page 106.  Letter HH
16   medical records offer Mya Ramirez and these records
17   were turned over at the hearing as well, your Honor.
18             THE COURT:  Can we take care of the young
19   witness to see if she will be swearable title.
20             MR. PERRI:  No, we did intend to call her
21   first.  She's been waiting a long time in the hallway.
22   Can I check?
23             (Whereupon, a short recess was taken.)
24             THE CLERK:  Indictment Number 742N of 2014,
25   People of the State of New York vs. Daniel Ramos.

kmm

1              All parties are present and the jury is not
2        present at this time.
3              People ready?
4              MR. PERRI:  Yes, your Honor.
5              THE CLERK:  Defense counsel ready?
6              MR. BERGER:  Yes.
7              THE COURT:  At this point we need to conduct
8        a swearability hearing with respect to the next
9        witness, Mya Feliciano Ramirez.
10             MR. PERRI:  I believe the child's name is
11       Mya Feliciano Ramirez.
12             THE COURT:  She is outside.
13             MR. PERRI:  Yes, she is.
14             THE COURT:  Can you say your name for me?
15             THE WITNESS:  Mya.
16             THE COURT:  Last name.
17             THE WITNESS:  Feliciano Ramirez.
18             THE COURT:  Ms. Ramirez, my name is Teresa
19       Corrigan.  I'm going to be the Judge today in this
20       case, alright?
21             THE WITNESS:  Okay.
22             THE COURT:  Do you know why you are here
23       today?
24             THE WITNESS:  Yes, because Danny.
25             THE COURT:  Because of Danny.

kmm

1        When you come in later on, if you come in,

2    there's going to be a whole bunch of people sitting in

3    those chairs over there.  The clerk, the woman who

4    spoke to you, she will ask you to raise your hand and

5    to take an oath, to swear to the truth; do you know

6    what that means?

7            THE COURT:  What does it mean to have to tell

8    the truth?  What does it mean to tell the truth?  Talk

9    into the microphone.

10           THE WITNESS:  You have to tell the truth.

11           THE COURT:  What happens if you don't tell

12   the truth?

13           THE WITNESS:  You lie.

14           THE COURT:  What happens if you lie when you

15   promise to tell the truth?

16           THE WITNESS:  If you lie, you get punished.

17           THE COURT:  What kind of -- withdrawn.  If I

18   said to you I was wearing -- see what I'm wearing here.

19   If I said to you this was purple, would that be the

20   truth or a lie?

21           THE WITNESS:  A lie.

22           THE COURT:  Why is that a lie?

23           THE WITNESS:  Because you are not wearing

24   purple, you are wearing black.

25           THE COURT:  And you promised to tell the

Proceedings                752

1        truth at a time when it's really important to tell the
2        truth and you don't, do you realize that the Court can
3        get you in trouble too, the Court can find that you did
4        something wrong; do you understand that?
5                   You have to say yes or no to that.
6                   THE WITNESS:  Yes.
7                   THE COURT:  What happens at home when you
8        don't tell the truth?
9                   THE WITNESS:  That means you are lying.
10                  THE COURT:  What happens if you lie at home?
11                  THE WITNESS:  You get punished.
12                  THE COURT:  What kind of punishment?
13                  THE WITNESS:  A lie punish.
14                  THE COURT:  Lie punishment; do you get a time
15       out?
16                  THE WITNESS:  Yes.
17                  THE COURT:  Do you have things taken away
18       from you, like your toys?
19                  THE WITNESS:  Yes.
20                  THE COURT:  How old are you, Mya?
21                  THE WITNESS:  Seven.
22                  THE COURT:  Are you in school?
23                  THE WITNESS:  Yes.
24                  THE COURT:  What grade are you in?
25                  THE WITNESS:  Second grade.

kmm

Proceedings                753

1              THE COURT:  Mya, did you celebrate Easter
2       this year?
3              THE WITNESS:  No.
4              THE COURT:  Did you celebrate Christmas that
5       passed?
6              THE WITNESS:  Yes.
7              THE COURT:  What did you do for Christmas?
8              THE WITNESS:  Just dance around.
9              THE COURT:  Danced around?
10             THE WITNESS:  Yes.
11             THE COURT:  Did you have any friends or
12      family over for Christmas?
13             THE WITNESS:  Only a little bit of friends.
14             THE COURT:  A little bit of friends?
15             THE WITNESS:  Nodding.
16             THE COURT:  Mya, what do you like to do when
17      you are not in school?
18             THE WITNESS:  Go to the park.
19             THE COURT:  Does anybody go to the park with
20      you?
21             THE WITNESS:  My brother.
22             THE COURT:  Mya, you heard me say the word --
23      can you tell the Court what does it mean to take an
24      oath in this courtroom?  Do you understand what that
25      means?

Proceedings                    754

1                    THE WITNESS:  I don't.

2                    THE COURT:  Do you know that word?

3                    THE WITNESS:  Oath?

4                    THE COURT:  You don't know the word oath?

5                    PROSPECTIVE JUROR:  No.

6                    THE COURT:  What does it mean to tell the

7        truth, can you tell me one more time?

8                    THE WITNESS:  You raise your hand and that

9        means you are telling the truth.

10                   THE COURT:  Telling the truth about what,

11       something that happened?

12                   THE WITNESS:  Yes.

13                   THE COURT:  And Mya, if I said to you, let me

14       ask you, Mya, what color is that stuffed animal that is

15       with you today?

16                   THE WITNESS:  Blue.

17                   THE COURT:  If I said to you, no, I think

18       it's green, what does that mean if I say it's green?

19                   THE WITNESS:  That is a lie.

20                   THE COURT:  That I'm lying.

21                   Thank you.  Stay there one minute.

22                   Off the record.

23                   (Whereupon, there was an off-the-record

24       discussion.)

25                   THE COURT:  Mr. Berger, any other area you

kmm

Proceedings                    755

1    want me to cover?

2                MR. BERGER:  Yes.  I want you to ask her

3    whether or not she talked about this with Mr. Perri

4    before.  Did they give her answers or her mother or

5    anybody else.

6                THE COURT:  That doesn't go to her being able

7    to be sworn.  That is something you can cross-examine.

8    That doesn't go to whether or not --

9                MR. BERGER:  You fed her answers here.

10   Anybody, any child you can program to say you tell a

11   lie.  That's bad.  You are supposed to tell the truth.

12   If you raise your hand, it means you are telling the

13   truth.  That is not true.  I don't think she knows --

14   doesn't --

15               THE COURT:  She doesn't know what --

16   understand what the word oath means, but she certainly

17   knew the difference between the truth and a lie and

18   what happens if you tell a lie.  Just because you are

19   swearable doesn't mean you will be found credible.

20   There is swearable and credible.  I feel the jury will

21   have to make the determination on credibility, not

22   swearability.

23               MR. BERGER:  Let's take a look at what

24   happened in this courtroom.

25               THE COURT:  One minute.  Mr. Perri.

Proceedings                    756

1        MR. PERRI:  Your Honor, in guiding the Court,

2   People vs. Mendoza, a Second Department case that the

3   standard articulated the examination of the child

4   revealed that she knew the difference between telling

5   the truth and lie.  Promise to tell the truth indicated

6   she would be punished by the family by God.  The Second

7   Department found that enough for the child to be found

8   swearable and did not find the Court abused its

9   discretion in finding the child swearable.  It's not

10  required that she know.

11       THE COURT:  Back on the record with the

12  Court.

13       Mya, what will happen if you tell a lie in

14  this courtroom today?

15       THE WITNESS:  You will be taken away.

16       THE COURT:  Will you be taken away?

17       THE WITNESS:  No.

18       THE COURT:  What did you just say?  I didn't

19  here what you said.

20       THE WITNESS:  You will be taken away.

21       THE COURT:  You are telling me that's not

22  going to happen to you?

23       THE WITNESS:  No.

24       THE COURT:  Step up.  Off the record.

25       (Whereupon, there was a discussion held off

kmm

Proceedings                    757

1        the record.)

2                    THE COURT:  Based on the answers that I have

3        been given, although, I find the witness probably a

4        little younger than her years developmentally, she was

5        able to articulate the difference between the truth and

6        a lie.  She was able to advise the Court as to what

7        would happen to her if she told a lie.  I did a couple

8        of examples of what could be a lie.  She was able to

9        identify both.

10                   Again, I think this is going to be a question

11       of credibility vs. swearability.

12                   Mr. Berger, you will be allowed to ask

13       questions regarding credibility and those questions you

14       ask this Court to ask of her are certainly proper and

15       appropriate for cross-examination, but the question of

16       swearability lies with the Court, and I'm going to find

17       that the witness is swearable at this time.

18                   Again, although, I do find she is younger

19       than her years.

20                   MR. BERGER:  The statute says age nine,

21       Judge.  Even yesterday, when Sincere testified, his

22       demeanor was so poor as a witness that even he

23       shouldn't have been allowed to have been sworn.

24                   THE COURT:  That's not how it will work under

25       the law, Mr. Berger, because the Court tells us in

1    criminal cases, unless you bring -- unless something is

2    brought to the Court's attention that shows somebody

3    has an inability to understand the difference between

4    the truth and a lie at the age of nine, they are

5    swearable.  That doesn't mean that they're credible.

6    There's a difference between swearability and

7    credibility, and the argument isn't for the jury that

8    they are not swearable.  The argument is whether or not

9    they could be found credible.

10           At this point I find the child swearable and

11   it will be up to the attorneys to make the arguments to

12   the jury as to whether or not they're credible.  Again,

13   there being a distinction in the law.

14           MR. BERGER:  There's a reason why the

15   legislature said age nine.  I would say to the Court if

16   you had somebody with a 70 IQ, and they were an adult,

17   they probably shouldn't be sworn either because there's

18   a limit.  You are telling me, this girl --

19           MR. PERRI:  The argument is going to

20   continue.  I ask the child to be excused to the

21   hallway.

22           THE COURT:  I appreciate that you disagree

23   with my decision, Mr. Berger, and I'm going to note

24   your exception for the record so the record is

25   protected.  That is my decision at this time.  That is

Proceedings                    759

1   where we're going to head.  Why don't we have the young

2   lady step out.

3           Bring in the jury unless both sides agree to

4   leave her sitting here.  I leave that up to the two of

5   you.  The Court, it doesn't matter.

6           MR. PERRI:  She can step outside.  That's

7   fine.

8           MR. BERGER:  I say, for the record, the

9   answers were purely rehearsed.  You take the case

10  Mr. Perri cited and can teach a seven-year old or

11  five-year old to give answers to those questions.

12          THE COURT:  Which you will test her

13  credibility and not her swearability.

14          MR. PERRI:  Like the child for the five-year

15  old in Mendoza.

16          MR. BERGER:  Before she gets called in, I

17  have something else to put on the record based upon the

18  documents you provided me here with today.

19          THE COURT:  Let's have the young lady step

20  out.  We'll call you back in a few minutes.

21          (Whereupon, Mya Feliciano Ramirez exited the

22  courtroom.)

23          THE COURT:  Yes, Mr. Berger.

24          MR. BERGER:  You have just ruled that this

25  seven-year old, notwithstanding the appearance that she

kmm

1    appears younger is going to be allowed to take an oath

2    and testify.  I would like to point out to the Court

3    that Mr. Perri, in making a Molineaux application, made

4    a representation to the Court that this girl claimed

5    that this incident happened once before, approximately

6    two months earlier and you denied that application as

7    you know our defense in this case is that this never

8    happened and that this girl is not credible.  The

9    documents you just provided to me, which is dated

10   October 21, 2013, has this girl saying to the therapist

11   that it happened five times before.

12           Now, if this doesn't raise questions in your

13   mind as to the appropriateness of having this, she

14   shouldn't be allowed to testify in my position.  We

15   already know that Mr. Perri represented something to

16   the Court we now know is not true, at least from the

17   words of Mya.  She has made up either to Mr. Perri,

18   that it happened once before, or she made up to the

19   therapist that it happened five times before, and we

20   are seriously going to allow this girl to be sworn and

21   give testimony in this case?  Judge, if this doesn't

22   raise flags in your mind, nothing will.

23           THE COURT:  All right.  As I stated at the

24   bench, there is a difference between swearability and

25   credibility.  Mr. Berger, you are free to cross-examine

kmm

1    this child about the one time before, five times
2    before, no times before, as you see fit.  The Court
3    simply handed that document over because it was
4    relevant to this case.  The Court is not the trier of
5    facts.  I'm not going to speculate as to what it means
6    that this child has revealed to the therapist that this
7    behavior has occurred five times prior, but only
8    revealed to the assistant district attorney that it
9    occurred one time prior.  You will have a fair
10    cross-examination, if you choose, to go down that road.
11         That's my ruling with regards to this matter.
12    The child will be allowed to testify and be sworn.  She
13    is a child.  Credibility versus swearability are very
14    different things.
15         MR. BERGER:  Why did the legislature say the
16    age of nine is where you could swear somebody and this
17    girl is seven?
18         THE COURT:  You will have to ask the
19    legislature.
20         MR. BERGER:  I thought we were following the
21    law.
22         THE COURT:  I am.  I followed the bench book
23    for trial Judges, 2014 Edition.  All the /TOERBGS
24    /TKWREGS as Supreme Court of the State of New York,
25    Section 6.2 under witness's testimonial capacity.  The

kmm

Proceedings                    762

1    case law is in there if anybody needs to see it.  Thank

2    you.  Are we ready for the jury?

3              MR. PERRI:  Yes, your Honor.

4              THE COURT:  Ready for the jury, Mr. Berger?

5              We have some notes.  We received two notes

6    from the jury.  The first note has been marked Court

7    Exhibit V.

8              It reads as follows:  I suffer from panic

9    attacks, totally under control, but I have issues of

10   not being able to get out.  I'm far in, in regards to

11   seating.  I'm just asking to move to an end by the

12   door.  Thanks for your consideration, and that is

13   signed by juror number nine.

14             The second note, which is Court Exhibit VI

15   reads as follows:  Trying to schedule an appointment

16   for shoulder evalve, W slash ortho, May 19th, 12:45,

17   dot, dot, dot.  Can we work in a lunch break close to

18   that time, or would it cause issues and that is signed.

19   The juror gave his name, juror number four.

20             So with regards to juror number nine, who

21   would like to move to the end of the row?  Mr. Berger,

22   I'll hear you with regard to that request.

23             MR. BERGER:  No objection.

24             MR. PERRI:  No objection.

25             THE COURT:  We'll move juror number nine to

kmm

Proceedings                    763

1     seat fourteen, and shift everybody else down one with

2     the understanding that the person sitting in seat

3     fourteen and will remain juror number nine.

4              With regard to the medical appointment for

5     the 19th, it will be my intention at one of the breaks

6     this morning to remind the jurors that we are not

7     working on either the 18th or the 22nd of that week.

8     Additionally, we're not working the 15th of this week,

9     and to see if potentially that juror can make an

10    appointment on one of those days.  If not, the jury

11    should write another note and then we'll deal with it

12    if there is no other appointments that can be made.

13             Acceptable, Mr. Berger?

14             MR. BERGER:  Yes.

15             THE COURT:  People?

16             MR. PERRI:  Yes, your Honor.

17             THE COURT:  Anything else before we call in

18    the jury?

19             MR. BERGER:  I note it's a little late.

20    Would the Court allow me to question Mya with respect

21    to her ability to be sworn?

22             THE COURT:  The law does not allow for that.

23    I will not.  Like I said at the bench, any questions

24    regarding credibility are fair game.

25             (Whereupon, the jury entered the courtroom.)

kmm

M. Ramirez - People - Direct          764

1                    THE CLERK:  Both sides stipulate all sworn
2         jurors are present and the seating has been changed.
3         Juror number nine is now at the end and all of the
4         other jurors have been moved over one seat, agreed?
5                    MR. PERRI:  Yes, your Honor.
6                    MR. BERGER:  Yes.
7                    THE COURT:  Good morning.  Welcome back.
8         We're getting started a little late.
9                    Call your next witness.
10                   MR. PERRI:  The People call Mya Feliciano
11        Ramirez.
12                   May I step outside?
13                   THE COURT:  You may.
14   M Y A   F E L I C I A N O   R A M I R E Z, called on behalf
15        of the People, having been duly sworn, took the witness
16        stand and testified as follows:
17                   THE CLERK:  State your name for the record.
18                   THE WITNESS:  Mya.
19                   THE CLERK:  Your last name?
20                   THE WITNESS:  Feliciano Ramirez.
21                   THE COURT:  You may inquire.
22   DIRECT EXAMINATION BY
23   MR. PERRI:
24        Q.   Good morning, Mya.
25        A.   Good morning, Mr. Perri.

kmm

1       Q.    How old are you?

2       A.    Seven.

3       Q.    When is your birthday?

4       A.    June 1st.

5       Q.    Who do you live with?

6       A.    Mom and my brother.

7       Q.    What is your mother's name?

8       A.    Crystal.

9       Q.    What is your brother's name?

10      A.    Sincere.

11      Q.    Where do you live?

12      A.    Roosevelt.

13      Q.    Now, how old is your brother?

14      A.    Eleven.

15      Q.    And do you have your own room at where you live?

16      A.    No.

17      Q.    Who do you share the room with?

18      A.    I have to share the room with my brother.

19      Q.    Do you go to school?

20      A.    On Monday.

21      Q.    Normally, you went to school on Monday, Mya?

22      A.    Yes.

23      Q.    What grade are you in?

24      A.    Second grade.

25      Q.    Who are your teachers?

```
 1        A.    Ms. Benjamin and Ms. Williams.

 2        Q.    Can you read, Mya?

 3        A.    Yes.

 4        Q.    What are the books that you like?

 5        A.    Dr. Suess.

 6        Q.    Mya, I need to ask you, do boys and girls have

 7   private parts?

 8        A.    Yes.

 9        Q.    On the girl, what is the name of a girl's private

10   part?

11        A.    Coochie.

12        Q.    Could you explain where the coochie is?

13        A.    Between your legs.

14        Q.    Do you know a man named Daniel Ramos?

15        A.    Yes.

16        Q.    Who was he?

17        A.    My mom's friend.

18        Q.    Has he been to your apartment?

19        A.    Yes.

20        Q.    Has he driven you and your family places?

21        A.    Yes.

22        Q.    Has he watched or baby-sat you?

23        A.    Yes.

24        Q.    Do you see him in the courtroom today?

25        A.    Yes.
```

1      Q.    Could you point at him and tell me what color

2  shirt he is wearing?

3      A.    White.

4      Q.    Could you point at him?

5            (The witness complied.)

6            MR. PERRI:  May the record reflect the

7      witness identified the defendant.

8            THE COURT:  It will so reflect.

9      Q.    Mya, I want to talk to you about something that

10 happened over a year ago, the last school year.

11     A.    Yes.

12     Q.    I want to talk to you about something that

13 happened instead of being in second grade, you were in first

14 grade.  In first grade, who were your teachers?

15           THE COURT:  The name of the first grade

16     teacher.

17     A.    Rabbinel and Ms. Bloomfeld.

18     Q.    They were your teachers last year?

19     A.    Yes.

20     Q.    When you were in first grade, about a month after

21 you met Ms. Rabbinal and Ms. Bloomfeld, did you have to ride

22 in an ambulance?

23     A.    Yes.

24     Q.    Did you have to go to the hospital?

25     A.    Yes.

1      Q.   On that same day you rode in the ambulance and

2   went to the hospital; did the police come to your house?

3      A.   Yes.

4      Q.   Why did the police come to your house that day?

5      A.   Because Danny licked my coochie.

6      Q.   What room were you in when Danny licked your

7   coochie?

8      A.   In the kitchen.

9      Q.   What were you wearing that day?

10      A.   Pajamas.

11      Q.   Were you wearing underwear?

12      A.   Yes.

13      Q.   What, if anything, did Danny do to your underwear

14   and pajamas?

15      A.   He take my pants off, take my underwear off and

16   lick my coochie.

17      Q.   When you say, he licked your coochie, did he put

18   his mouth on your coochie?

19      A.   Yes.

20      Q.   Did there come a time when your mom came into the

21   kitchen?

22      A.   Yes.  Got mad, grabbed Danny and kicked him out.

23      Q.   Did Danny actually leave the house?

24      A.   Yes.

25      Q.   After Danny left the house, what did your mom do?

kmm

1       A.   Called the police.

2       Q.   Did the police actually come to your house that

3    day?

4       A.   Yes.

5       Q.   And after the police came to your house, did you

6    have to get into the ambulance?

7       A.   Yes.

8       Q.   After that, did you go to the hospital?

9       A.   Yes.

10       Q.   When you were at the hospital, did you meet a

11   woman who was a nurse?

12       A.   Yes.

13       Q.   What did you have to do when you met this nurse?

14       A.   I forgot.

15       Q.   Did the nurse do anything?

16            MR. BERGER:   Objection.

17            THE COURT:   Let me hear the whole question.

18            MR. BERGER:   How about leading?

19            THE COURT:   Let me hear the question

20       first.

21       Q.   What, if anything, did the nurse do to you when

22   you were at the hospital?

23       A.   She put Q-Tips in my coochie, so if I was bad or

24   good.

25       Q.   Did you keep your clothes on or take your clothes

M. Ramirez - People - Cross          770

1    off?

2         A.    Take my clothes off.

3                MR. PERRI:  Nothing further, your Honor.

4                THE COURT:  Cross-examination, Mr. Berger.

5    CROSS-EXAMINATION

6    BY MR. BERGER:

7         Q.    Good morning, Mya.

8         A.    Good morning.

9         Q.    My name is Michael.

10        A.    Hello Michael.

11        Q.    Do you know anybody else named Michael?

12        A.    No.

13        Q.    I'm going to ask you a few questions, okay?

14        A.    Okay.

15        Q.    You told us some things here this morning?

16        A.    Yeah.

17        Q.    Who is this person?

18        A.    Perri.

19        Q.    Perri?

20        A.    Yes.

21        Q.    Have you talked to him before?

22        A.    Yes.

23        Q.    How many times before?

24        A.    Hmmm, I forgot.

25        Q.    Well, you do remember talking to him before,

1    correct?

2         A.    Yes.

3         Q.    And you don't remember whether it was once or

4    twice, or three, or more times?

5         A.    More times.

6         Q.    How many?

7         A.    More times.

8         Q.    Five times, six times, more than that?

9         A.    Six times.

10        Q.    At least six times?

11        A.    Yes, I think.

12        Q.    You could count, right?

13        A.    Yes.

14        Q.    So you know what six means, don't you?

15        A.    Yes.

16        Q.    So did you meet with Perri in his office?

17        A.    Yes.

18        Q.    And anywhere else?

19        A.    No.

20        Q.    You came to Perri's office at least or about six

21    times?

22        A.    Yes.

23        Q.    And he asked you questions?

24        A.    Yes.

25        Q.    And you knew what he was going to ask you this

kmm

1    morning, didn't you?

2         A.    Yes.

3         Q.    We never met before, have we?

4         A.    No.

5         Q.    So, when you met with Perri, he asked you all of

6    the questions that he asked you today, correct?

7         A.    Yes.

8         Q.    You knew the questions you were going to be asked,

9    correct?

10        A.    Correct.

11        Q.    Now, when you saw Daniel that day, the day that

12   you went to the hospital?

13        A.    You mean Danny?

14        Q.    Danny, yes.  He was Danny to you?

15        A.    What?

16        Q.    You called him Danny?

17        A.    Yes.

18        Q.    He took you lots of places?

19        A.    Yes.

20        Q.    He took you to the beach?

21        A.    Yes.

22        Q.    He took you to eat at various fast food places,

23   right?

24        A.    Yes.

25        Q.    He took you to the South Shore Guidance?  Do you

1    know where South Shore Guidance is?

2         A.   No.

3         Q.   Did you go with your brother to talk to people at

4    South Shore Guidance?

5         A.   I don't remember.

6         Q.   Do you know somebody named Georgina?

7         A.   Georgina.

8         Q.   Yes.

9              MR. PERRI:   May we approach?

10        A.   I don't know.

11             THE COURT:   You may approach.

12             (Whereupon, there was a sidebar discussion as

13        follows:)

14             MR. PERRI:   I don't know how far defense

15        counsel intends to go into the fact that she was in

16        counseling on this day with Georgina.  If he wants to

17        explore this topic, the People's position is it opens

18        the door why she was there, and this happened multiple

19        times as opposed to one incident.

20             THE COURT:   The door hasn't opened yet.

21             MR. BERGER:   You haven't -- she said to you

22        it happened one time before.

23             THE COURT:   You can ask whatever questions

24        you want to ask.  I'll take objections as they come up.

25        No door opened at this time clearly.  So at this point,

1        if there is an objection, it's overruled, and I'll just

2        take the questions as they come up and take objections

3        as they come up.  There's been no door opened at this

4        point.

5                    MR. PERRI:  Understood.

6                    (Whereupon, the proceedings resumed.)

7                    MR. BERGER:  Could this be marked for

8        identification?

9                    (Defendant's Exhibit A was marked for

10       identification.)

11                   MR. BERGER:  Show to the witness, please.

12                   (Whereupon, Defendant's Exhibit A was handed

13       to the witness.)

14       Q.   Do you recognize that picture, that building?  Do

15   you recognize that building?

16       A.   Yes.

17       Q.   Didn't Danny take you there with your brother and

18   your mother?

19       A.   Yes.

20       Q.   And when you go there you talk to people?

21       A.   Yes.

22       Q.   Did one of the people you talk to, somebody named

23   Georgina?

24                   MR. PERRI:  Objection, relevance.

25                   THE COURT:  Overruled at this point.  You may

kmm

1       answer.

2       A.   Yes.

3       Q.   Do you know who Georgina is, don't you?

4       A.   No.  I mean, no.

5       Q.   I asked you if you knew who Georgina is.  Did you

6   mean to say yes?

7       A.   Yes.

8       Q.   So you do know who Georgina is?

9       A.   Yes.  Yes.

10      Q.   You talked to Georgina, haven't you?

11      A.   Yes.  Sometimes I forget.

12      Q.   You forget what?

13      A.   About Georgina.

14      Q.   Now you remember, right?

15      A.   Yes.

16      Q.   You don't have to look at the picture now.  I'll

17   take it back.

18           Let's go back to that day, when your mother called

19   the police, okay?

20      A.   Okay.

21      Q.   And where did you see Daniel for the first time,

22   what part of your house?

23      A.   I forgot again.

24      Q.   You forgot?

25      A.   Yes.

1      Q.   Well, you said that you told Perri before that you
2   were in the kitchen?

3      A.   Yes.

4      Q.   And is that the first time, the first place you
5   were when you saw Danny?

6      A.   Yes.

7      Q.   Where was Danny?  What was he doing?

8      A.   Danny was in the kitchen with me.  Then he take my
9   pants off, take my panties off, then lick my coochie with
10  his mouth.

11     Q.   And have you told that to Mr. Perri a lot of
12  times?

13     A.   Yes.

14     Q.   Now, how long did he do that?  For how long did he
15  lick your coochie with his mouth and tongue?

16     A.   Two times.

17     Q.   Two times?

18     A.   Yes.

19     Q.   How long -- how many -- do you know what a second
20  is?

21     A.   No.

22     Q.   Can you count to five?

23     A.   One, two, three, four, five.

24     Q.   Did he do that to you for that length of time?

25     A.   Yes.

kmm

1       Q.   Was it more than five, or did he do it for about

2    ten?

3       A.   Five.

4       Q.   He did it to five?

5       A.   Yes.

6       Q.   Did he say anything to you before that happened?

7       A.   I don't know.

8       Q.   Was he standing up when he did this?

9       A.   Yes.

10      Q.   And were you standing up?

11      A.   Yes.

12      Q.   So he was -- he didn't bend down?

13      A.   Yes, he did bend down.

14      Q.   How?

15      A.   By doing like this.

16           MR. PERRI:  May the record reflect --

17           THE COURT:  Let the record reflect.

18      A.   I don't know.

19           THE COURT:  Let the record reflect that the

20   child leaned over to her left, bending at the waist,

21   leaning to the side.  Go ahead.

22      Q.   Did he bend like this at the waist and do it?

23      A.   Yes.

24      Q.   And so when we bent down at the waist, you were

25   standing up?

kmm

1      A.   Yes.

2      Q.   And that's when he licked your coochie?

3      A.   Yes.

4      Q.   When he was standing, bending over at the waist,

5   right?

6      A.   Yes.

7      Q.   How many times did he do it that day in the

8   kitchen?

9      A.   One.

10      Q.   Just one?

11      A.   Yes.

12      Q.   And did you say, did he say anything to you before

13   he did it?

14      A.   No.

15      Q.   Did you say anything to him before he did it?

16      A.   No.

17      Q.   You say he pulled down your pajamas?

18      A.   Yes.

19      Q.   And did he tell you why he was doing that?

20      A.   I don't know why he did that.  I don't know why.

21      Q.   He didn't say anything to you?

22      A.   No.

23      Q.   So Mya, when he bent over at the waist, like what

24   I'm doing now?

25      A.   Yes.

```
1      Q.   You were standing up, right?

2      A.   What?

3      Q.   You were standing?

4      A.   Yes.

5      Q.   Was he holding you?

6      A.   No.

7      Q.   He wasn't touching you in any other way; is that

8  right?

9      A.   That's right.

10     Q.   You see me bending over now, right?

11     A.   Yes.

12     Q.   That's how he did it and you were standing up?

13     A.   Yes.

14     Q.   Mya, you took -- you swore before to the clerk; do

15 you remember swearing?

16     A.   Yes.

17     Q.   What does that mean?

18     A.   That means swearing, that means like, I promise I

19 will tell the truth.

20     Q.   What happens if you don't?

21     A.   You lie.

22     Q.   What happens to you?

23     A.   You will be taken away and your mom will go to

24 jail.

25     Q.   Did you go over those questions with Perri before
```

kmm

1    you testified here?

2         A.    Yes.

3         Q.    How many times did you do that?

4         A.    Like three or two.

5         Q.    Did you ever say to anybody that this has happened

6    to you five times before?

7         A.    Yes.

8         Q.    Was that true?

9         A.    I mean, no.

10        Q.    It wasn't true?

11        A.    No, because sometimes I always forget and

12   sometimes I don't.

13        Q.    Have you ever lied?

14        A.    Huh?

15        Q.    Did you ever lie?

16        A.    No.

17        Q.    You never lied?

18        A.    No, I never lie.

19        Q.    So, when you told somebody that this happened five

20   times before, that was a lie or you forgot?

21        A.    I forgot again.

22        Q.    I'm asking you now, Mya, did this happen five

23   times before?

24        A.    Yes.

25        Q.    Did you tell Mr. Perri it happened only one time

1    before?

2         A.    Hmmm, forgot.

3         Q.    Did you tell Mr. Perri this happened once

4    before?

5         A.    Yes.

6         Q.    Was that true?

7         A.    Yes.

8         Q.    Did you tell Georgina it happened five times

9    before?

10        A.    Yes.

11        Q.    Which is true?

12        A.    Five.

13        Q.    Five is true?

14        A.    Yes.

15        Q.    Where did these five times happen?

16        A.    In the room with Danny.

17        Q.    In what room?

18        A.    In my mom's room.

19        Q.    When did this happen, how much time before, were

20   you still in the first grade or before that?

21        A.    Still first grade.

22        Q.    Did you tell anybody that this happened when you

23   did these other five times?

24        A.    Not in my class.

25        Q.    Did you tell your mother?

kmm

M. Ramirez - People - Cross          782

1      A.   Hmmm, I don't know.

2      Q.   When this happened before, you don't remember if

3  you told your mother?

4      A.   No.

5      Q.   Did you tell Georgina that it happened five times

6  before?

7      A.   Yes.

8      Q.   Was that true?

9      A.   Yes.

10      Q.   So when this happened, and the other five times

11  were all in your mother's bedroom?

12      A.   No, it was two times.  I always forget.  Ughhh.

13      Q.   When I asked you before if it was five times, were

14  you telling the truth?

15      A.   No.  I always forget.

16      Q.   What do you mean you always forget?

17      A.   About that because I always freeze my memories

18  about that.

19      Q.   Did you talk to Mr. Perri about that?

20      A.   Yes.

21      Q.   Did he tell you to say that?

22      A.   Hmmm, I don't know.

23      Q.   When you say this happened before five times

24  before, was your mother home?

25      A.   My mom was home.

1      Q.   Did you tell her afterwards?

2      A.   No.

3      Q.   Why not?

4      A.   Because she knows she could whoop me.

5      Q.   She could what?

6      A.   She could whoop me.

7      Q.   Did you tell Mr. Perri it happened only one time

8   before?

9      A.   Yes.

10      Q.'  Was that true?

11      A.   No.

12      Q.   So you lied to Mr. Perri?

13      A.   No, I was always forget.

14      Q.   You told Mr. Perri it happened one time before,

15   right?

16      A.   Yes.

17      Q.   And I asked you if that was true and you said no;

18   is that right?

19      A.   Yes.

20      Q.   You didn't tell Mr. Perri the truth?

21              THE COURT:   Take a short break.

22              Let's take a five-minute break.   Don't

23   discuss this case while you are out of the room.   Don't

24   let anyone discuss the case in your presence.   Don't

25   get on your phones and try to do any research.   See you

                                                         kmm

1        in five minutes.

2                     (Whereupon, the jury exited the courtroom.)

3                     THE COURT:  Mr. Perri, escort the child out.

4                     MR. PERRI:  I will not discuss any of the

5        child's testimony with her.

6                     (Whereupon, a short recess was taken.)

7                     THE CLERK:  Case on trial continued,

8        Indictment 742N of 2014, People of the State of New

9        York vs. Daniel Ramos.  All parties are present.  The

10       jury is not present at this time.

11                    People ready?

12                    MR. PERRI:  Yes, your Honor.

13                    THE CLERK:  Defense counsel?

14                    MR. BERGER:  Yes, your Honor.

15                    THE COURT:  Anything for the record before I

16       bring the jury back in?

17                    MR. PERRI:  No, your Honor.

18                    MR. BERGER:  No, your Honor.

19                    (Whereupon, the jury entered the courtroom.)

20                    THE CLERK:  Do both sides stipulate all sworn

21       jurors are present and seated as noted on the record

22       before?

23                    MR. PERRI:  Yes.

24                    MR. BERGER:  Yes.

25                    THE COURT:  You may continue.

1           THE CLERK:  Mya, you are still telling the
2      truth, right?
3           THE WITNESS:  Yes.
4  CROSS-EXAMINATION
5  BY MR. BERGER:  (Continuing)
6      Q.   Mya, I think where we took a break, you had said
7  to me you were -- you told Perri that it happened one time
8  before?
9      A.   Yes.
10     Q.   And that wasn't true, was it?
11     A.   No.
12     Q.   So you didn't tell Mr. Perri the truth, correct?
13     A.   Correct.  Sorry.
14     Q.   You told Georgina that it happened five times
15  before?
16     A.   Yes, five times.
17     Q.   And you told that to Georgina after this incident
18  where you went to the hospital, correct?
19     A.   Correct.
20     Q.   You had never told that to anybody at the center,
21  Georgina, or anybody else, that it ever happened before,
22  correct?
23     A.   Correct.
24     Q.   So when you went to the center on the 21st of
25  October of 2013, and you told this to Georgina, did you tell

1    her when it happened five times before?

2    A.   Yes.

3    Q.   What did you tell her?

4              MR. PERRI:  May we approach?

5              THE COURT:  You may.

6              (Whereupon, there was a sidebar discussion at

7    the bench as follows:)

8              MR. PERRI:  The People object to this line of

9    questioning.  He's asking for privileged communication

10   between the therapist and her patient.

11             THE COURT:  I'm going to allow it, but the

12   door is completely opened to however you want to ask

13   this witness about what other prior acts may or may not

14   have happened.

15             MR. PERRI:  Okay.  Thank you, your Honor.

16             (Whereupon, the proceedings resumed.)

17             THE COURT:  Ask the question again, please.

18   Q.   What did you tell Georgina as to when this

19   happened, when you said it happened five times before?

20   A.   I forgot.

21   Q.   Mya, that didn't happen, it didn't happen five

22   times before, did it?

23   A.   Yes.

24   Q.   You remember it did?

25   A.   Yes.

1      Q.    Tell when it happened, tell me what you said to

2   Georgina.

3      A.    I forgot.

4      Q.    Now, when you say this happened before, you said

5   that it happened in your mother's bedroom?

6      A.    Yes.

7      Q.    And were you standing up again, the same way?

8      A.    Yes.

9      Q.    And Danny was standing up the same way?

10     A.    Yes.

11     Q.    And were you wearing pajamas again the same way?

12     A.    Yes.

13     Q.    All of the other times, correct?

14     A.    Correct.

15     Q.    And you are standing up in your mother's bedroom,

16   and he is standing up and again, just like on this day, he

17   is bent over?

18     A.    Yes, he is bent over.

19     Q.    And what did he do?

20     A.    Licked my coochie.

21     Q.    He bent over at his hips, correct, just the way

22   I'm doing now?

23     A.    Yes.

24              MR. BERGER:  Let the record reflect I did

25          bend over at the waist.

                                                          kmm

1            THE COURT:  The record will so reflect.

2       Q.   And your mother was in the house those times?

3       A.   Yes.

4       Q.   Where was she?

5       A.   In the porch.

6       Q.   Always on the porch, all those other five times?

7       A.   Yes.

8       Q.   And was it during the day, was it at night?

9       A.   Yes.  It was at nighttime then.

10      Q.   I'm sorry?

11      A.   And then Danny, then Danny takes my pants off and

12  put his --

13      Q.   And did what?

14      A.   Put his pecker in my butt.

15      Q.   Pecker?

16      A.   Yes.

17      Q.   What is a pecker?

18      A.   Between your legs.

19      Q.   What is a pecker?

20      A.   Between your legs.

21      Q.   You mean a man's --

22      A.   Yes.

23      Q.   And did he put it inside your butt?

24      A.   Yes.

25      Q.   Did it hurt?

1      A.   Yes.

2      Q.   Did you say anything to anybody?

3      A.   No.

4      Q.   Why not?

5      A.   I mean, yes.

6      Q.   Who did you tell?

7      A.   My mom.

8      Q.   You told your mom this happened when he put his

9  pecker in your butt?

10     A.   Yes, or I don't know.

11     Q.   Or what?

12     A.   Or I don't know.

13     Q.   What do you mean, or you don't know?  When you

14  just said that Danny put his pecker in your butt, was that

15  the truth?

16     A.   Yes.

17     Q.   That's the truth?

18     A.   Yes.

19     Q.   So how long before this incident when you went to

20  the hospital, did that happen?  How many days, or weeks, or

21  months before did that happen?

22     A.   I forgot.

23     Q.   Well, was it summertime?  Was it in the fall?  You

24  know what seasons are, don't you?

25     A.   Yes.

kmm

1        Q.   Was it in the summer, or the fall, or the spring,

2    or the winter?

3        A.   I don't know.

4        Q.   When you say he put his pecker, where did you

5    learn the expression pecker?

6        A.   My brain told me.

7        Q.   Who?

8        A.   My brain.

9        Q.   Your brain?

10       A.   Yes.

11       Q.   And your butt, where did you learn the expression

12   butt?

13       A.   Mom.

14       Q.   Your mother?

15       A.   Yes.

16       Q.   Does your mother ever use the expression to eat?

17       A.   No.  I mean, no.

18       Q.   You never heard her use the expression eat my

19   coochie or something like that?

20       A.   No.

21       Q.   That's the truth?

22       A.   The truth.

23       Q.   Did you hear your mother make the call to the

24   police on that day?

25       A.   Yes.

1    Q.   You were with her when she made the call?

2    A.   Yes.

3    Q.   Right near her?

4    A.   Yes.

5    Q.   Did you hear her say to the police --

6    A.   No.

7    Q.   Did you hear her say to the police, my daughter

8  says he ate her coochie?

9    A.   Not ate.

10    Q.   You didn't hear that?

11    A.   No.

12    Q.   You were right next to your mother?

13    A.   Yes.

14    Q.   And you didn't hear her say that?

15    A.   She didn't say ate, like.

16    Q.   She said, like, not ate, is that what you are

17  saying?

18    A.   Yes.

19    Q.   If I tell you your mother testified --

20         MR. PERRI:  Objection.

21         THE COURT:  Sustained.

22         MR. BERGER:  Can I get out the question?

23         THE COURT:  It's not going to be a proper

24    question, so sustained.

25         MR. BERGER:  I respectfully disagree.

M. Ramirez - People - Cross          792

1              THE COURT:   Your exception is noted.

2       Q.   If I tell you your mother testified here in

3  court --

4              MR. PERRI:   Objection.

5              THE COURT:   Sustained.

6              MR. BERGER:   I didn't finish the question.

7              THE COURT:   Counselor, the question is not

8   going to be proper, so it's sustained.   I'm noting your

9   exception to my ruling for the record.

10             Next question, please.

11      Q.   So when you say he put his pecker in your butt,

12  did you bleed?

13      A.   Yes.

14      Q.   Did you tell your mother that?

15      A.   I don't know.

16      Q.   Well, you said it hurt, right?

17      A.   Yes.

18      Q.   And when you have a hurt, don't you tell your

19  mother about your hurts?

20      A.   Sometimes and some don't.

21      Q.   And this time did you tell her when you were

22  bleeding?

23      A.   Yes, when my guinea pig bite me.

24      Q.   I'm sorry?

25      A.   When my guinea pig bite me, I bleed.

1      Q.   You say you were bleeding when he put his pecker

2   in your butt?

3      A.   No.

4      Q.   Did you tell me before you were bleeding?

5      A.   No.

6      Q.   I asked you before if it hurt.  What did you say?

7      A.   I said that.  I didn't say bleeding.

8      Q.   Okay.  Did you say that it hurt?

9      A.   Yes.

10      Q.   Now, I'm asking you if in that time, when that

11   happened, did you tell your mother?

12      A.   I don't know.

13      Q.   You said before that if you did tell your mother,

14   your mother would whoop you?

15      A.   Yes.

16      Q.   What does that mean, whoop you?

17      A.   She would whoop me with the belt.

18      Q.   Has she ever done that before?

19           MR. PERRI:  Objection.

20           THE COURT:  Overruled.

21      A.   Yes.

22      Q.   She's done that to you before?

23      A.   She always do that when I be bad.

24      Q.   When you are bad, she whips you with a belt?

25      A.   Yes.

1      Q.    Does that hurt?

2      A.    Yes.

3            MR. PERRI:   Objection.

4            THE COURT:   Overruled.

5      Q.    How many times would you say your mother whipped

6   you with a belt?

7            MR. PERRI:   Objection.

8            THE COURT:   Sustained now.

9      Q.    Now, you spoke to Mr. Perri a number of times you

10  told us, correct?

11     A.    Yes.

12     Q.    And did he tell you that you were going to put

13  these things out of your mind?

14     A.    No.

15     Q.    Where did you get that from?

16     A.    From my brain.

17     Q.    Did you ever tell your brother that these things

18  happened?

19     A.    With what?

20     Q.    You say Danny did this to you five times before,

21  did you ever tell your brother?

22     A.    No.

23     Q.    Why not?

24     A.    I don't know.

25     Q.    Do you sleep in the same room with your brother,

kmm

```
 1    correct?

 2         A.    Correct.

 3         Q.    You never told him this was going on before?

 4         A.    No.

 5         Q.    And why not?

 6         A.    I don't know.

 7         Q.    Now, have you ever watched movies in your house?

 8         A.    Yes.

 9         Q.    Ever watch movies of people who don't have their

10    clothes on?

11         A.    No.

12         Q.    Were you told that you might be asked that

13    question by Mr. Perri?

14              MR. PERRI:   Objection.

15              THE COURT:   Sustained.

16         Q.    Could you remember any of the other incidents of

17    the other five that you say happened before?

18         A.    Danny licked my coochie.

19         Q.    How many times did he do that?

20         A.    Two.

21         Q.    Two.   And what about the other two, you say he

22    licked your coochie twice, he put his pecker in your butt,

23    right?

24         A.    Yes.

25         Q.    What else did he do?
```

1    A.   Kiss me.

2    Q.   He kissed you?

3    A.   Yes.

4    Q.   Where?

5    A.   On my lips.

6    Q.   Kissed you on your lips?

7    A.   Yes.

8              MR. PERRI:  Your Honor, may we approach?

9              THE COURT:  You may.

10             (Whereupon, there was a sidebar discussion at

11   the bench as follows:)

12             MR. PERRI:  I understand that every

13   courtroom's rules are different.  The defense counsel

14   is receiving notes from the audience.

15             THE COURT:  I wasn't watching that.

16             MR. PERRI:  Is that allowed?

17             THE COURT:  I will keep my eye open.

18             MR. BERGER:  It's not prohibited.

19             THE COURT:  Normally there is a bar that

20   separates the audience from coming up to the attorneys.

21   They would not be allowed to walk to the bar from him.

22             MR. BERGER:  I could walk to the back of the

23   courtroom.

24             THE COURT:  Do it with respect.

25             MR. BERGER:  I don't think there is lack of

1      respect.

2                THE COURT:  I didn't see it happen.  I'm not

3      opposed to it happening.  I will pay attention to it to

4      make sure it's done in a way that doesn't interrupt the

5      proceedings.  I don't think it has at this point, so

6      it's not a problem.

7                (Whereupon, the proceedings resumed.)

8      Q.   Mya, how many times did you say Danny put his

9      pecker in your butt?

10     A.   Three.

11     Q.   I'm sorry?

12     A.   Three.

13     Q.   Three separate times?

14     A.   Yes.

15     Q.   And it hurt every time?

16     A.   Yes.

17     Q.   And this happened in your mother's room or

18     somewhere else?

19     A.   It happened in my mother's room.

20     Q.   And your mother was in the house at the time?

21     A.   No, not at nighttime.  She went out.

22     Q.   She went out?

23     A.   Yes, always in the nighttime.

24     Q.   How many times did it happen at night?

25     A.   Three.

1      Q.   Three times he put his pecker in your butt at

2   night?

3      A.   Yes.

4      Q.   And your brother was home?

5      A.   Yes.

6      Q.   And your brother was up at the time?

7      A.   No.

8      Q.   Where was he?

9      A.   In his room.

10      Q.   And you were where?

11      A.   In mom's bed.

12      Q.   And do you remember what time at night this

13   happened?

14      A.   No.

15      Q.   And how long was his pecker in your butt when this

16   happened?

17      A.   I don't know.

18      Q.   A minute, a second, five minutes, ten minutes, any

19   idea?

20      A.   No.

21      Q.   Did it hurt?

22      A.   Yes.

23      Q.   What happened after it stopped?  What happened?

24      A.   Mom comes home.

25      Q.   There came a time when he took his pecker out of

1    your butt, right?

2         A.    Yes.

3         Q.    Did you see anywhere you were bleeding, any liquid

4    at all from your butt?

5         A.    No.

6         Q.    No blood, right?

7         A.    Right.

8         Q.    No other liquids, correct?

9         A.    Correct.

10        Q.    And were you crying?

11        A.    No.

12        Q.    So you never told these things to Georgina, did

13   you, until after this incident when you went to the

14   hospital?

15        A.    Yes.

16        Q.    That's what you told me before, correct?

17        A.    Correct.

18        Q.    Were you up when your mother came home?

19        A.    Yes.

20              THE COURT:   At what time, counsel?

21        Q.    You say your mother came home at night?

22        A.    Yes.

23        Q.    And did you tell your mother what had happened

24   when she came home?

25        A.    No.

1     Q.   Why not?

2     A.   I don't know.

3     Q.   Didn't you tell me before that the other five

4  times that it happened, your mother was on the porch and you

5  were inside her bedroom?

6     A.   Yes.

7     Q.   So when you said that to me, was that true?

8     A.   True.  She was in the porch in the daytime.

9     Q.   Didn't you tell me when I asked you before, about

10  the five times that it happened, and I asked you where your

11  mother was, you said those five times she was outside on the

12  porch; do you remember saying that?

13    A.   Yes, but in the daytime.

14    Q.   So it happened more than five times?

15    A.   Huh?

16    Q.   If it happened five times in the daytime, did it

17  happen more than five times?

18    A.   That's it.

19    Q.   That's it?

20    A.   Yes.

21    Q.   Let me ask you again, when?  Did you tell me

22  before that the five times that it happened, your mother was

23  on the porch?

24    A.   No.  In the daytime -- not in the daytime, in the

25  nighttime.

kmm

1    Q.   All right.  You didn't tell me the five times your

2    mother was on the porch?

3    A.   I did.

4    Q.   You did tell me that, right?

5    A.   Yes.

6    Q.   When you said that to me, was that true?

7    A.   Yes.

8    Q.   So, it didn't happen then at nighttime?

9    A.   It did happen at nighttime, except for daytime.

10   Q.   Mya, just so I understand, when I asked you before

11   where your mother was, when these other five times occurred,

12   you told me she was on the porch; do you remember saying

13   that to me?

14   A.   Yes.

15   Q.   When you said that to me, was that true?

16   A.   Yes.

17   Q.   So now, are you saying that it happened more than

18   five times and that it happened at nighttime as well?

19   A.   No, not in the daytime.

20   Q.   What does that mean, I'm sorry?

21   A.   Not in the daytime.

22   Q.   What do you mean?  What are you saying?

23            MR. PERRI:  Objection.

24            THE COURT:  Sustained as to the form of the

25   question.

1       Q.    Where did you learn about pecker in the butt?

2             MR. PERRI:   Objection.

3             THE COURT:   Sustained.

4       Q.    Did you ever hear anybody talk about those things?

5       A.    No.

6       Q.    So, you just -- where did you learn about the word

7    pecker?

8             MR. PERRI:   Objection.

9             THE COURT:   Sustained.

10      A.    My brain.

11      Q.    You never heard anybody use that expression?

12      A.    No.

13            THE COURT:   Overruled.

14            You can answer.

15            MR. PERRI:   Objection.

16      Q.    So you never heard that word, that expression,

17   pecker used in your house?

18            MR. PERRI:   Objection.

19            THE COURT:   Sustained.

20      A.    No.

21            THE COURT:   I'll withdraw the sustained of

22      the objection since the answer was given.

23            MR. BERGER:   Is that an answer on the record?

24            THE COURT:   It is.

25      Q.    Do you remember when you were in Mr. Perri's

M. Ramirez - People - Cross          803

1    office and you told him this happened once before?

2         A.   Yes.

3         Q.   Do you remember how long ago that was?

4    Approximately, do you know what month we're in now?

5         A.   May.

6         Q.   Do you remember talking to Mr. Perri in April?

7         A.   No.

8         Q.   You talked to him only in the month of May?

9         A.   I mean, yes, in April.

10        Q.   Did you tell him in April that this happened only

11   once before?

12        A.   No.

13        Q.   When did you tell Mr. Perri this happened only

14   once before?

15        A.   I don't know.

16        Q.   But you did tell him that?

17        A.   Yes.

18        Q.   And you were in his office?

19        A.   Yes.

20        Q.   When you told him that, that wasn't true, was it?

21             MR. BERGER:   Mr. Perri, you don't have to

22        shake your head.

23             MR. PERRI:   I apologize, your Honor.

24             THE COURT:   Let the record reflect there's

25        colloquy between the attorneys.  I'll remind the

1       members of the jury nothing that the attorneys say or

2       do is evidence in this case.  The evidence comes from

3       the stand.

4               You may continue, Mr. Berger.

5       Q.   When you told that to Mr. Berger, that wasn't

6  true, was it?

7       A.   It was.

8       Q.   So it happened only once before?

9       A.   Yes.

10      Q.   Not five times before?

11      A.   Yes.

12      Q.   Yes, what?

13      A.   Yes, it happened five times.

14      Q.   But you told Mr. Perri it happened only once

15  before, did you not?

16              MR. PERRI:  Objection.

17              THE COURT:  Sustained.

18      A.   Yes, I did.

19      Q.   Was that true?

20              MR. PERRI:  Objection.

21      A.   I'm just confused.

22              THE COURT:  You can stop talking.  Let's try

23      to move on to another topic.  You asked these questions

24      a sufficient amount of times, Mr. Berger.

25      Q.   When you say these things happened, did Daniel

1    ever talk to you while it was going on?

2         A.   I don't know.

3         Q.   Well, you remember these things happening?

4         A.   Yes.

5         Q.   You are sure?

6         A.   Yes.

7              MR. PERRI:  Objection.

8              THE COURT:  You are sure?

9              THE WITNESS:  Yes.

10        Q.   These things didn't happen, did they, Mya?

11        A.   With what?

12        Q.   He never put his pecker in your butt, and he never

13   licked your coochie?

14        A.   Yes.

15        Q.   You are saying this, it happened?

16        A.   Yes.

17        Q.   So, when these things happened, did Daniel ever

18   speak to you and say anything?

19        A.   No.

20        Q.   He never gave you orders, directions?

21        A.   I mean, yes.  I always forget.

22        Q.   Well, you are saying these things happened,

23   correct?

24        A.   Correct.

25        Q.   You remember these things, that you say happened?

kmm

1       A.   Yes.

2       Q.   So, do you remember him speaking to you and saying

3  anything to you?

4       A.   Clean up your room.

5       Q.   I'm sorry?

6       A.   Clean up your room.

7       Q.   He said, clean up the room?  He said, clean up

8  your room?

9       A.   Yes.

10       Q.   Didn't he help you with homework?

11       A.   No.

12       Q.   He never helped you with homework?

13       A.   No.

14       Q.   When you say he did these things to you, pecker in

15  the butt, licked your coochie, did he give you any

16  directions as to take off your clothes or anything like

17  that?

18       A.   No.

19       Q.   So, were you always wearing pajamas when these

20  things happened?

21       A.   Yes.

22       Q.   Always pajamas?

23       A.   Yes.

24       Q.   Even during the daytime?

25       A.   Yes.

M. Ramirez - People - Redirect        807

1              MR. BERGER:  Nothing further.  Thank you.

2              THE COURT:  Redirect.

3    REDIRECT EXAMINATION

4    BY MR. PERRI:

5        Q.   Mya, after the day when you went in the ambulance,

6    that day where the police came to your apartment, did you

7    talk to your mom about what Danny was doing?

8        A.   Yes.

9        Q.   Did you tell her?

10             MR. BERGER:  Objection.

11             THE COURT:  I don't have a full question yet.

12             MR. BERGER:  That didn't apply when I asked

13       mine, Judge.

14             MR. PERRI:  Your Honor.

15             THE COURT:  All right, Mr. Berger, your

16       exception to my rulings are noted for the record.  You

17       may continue, and I'll take an objection at the point

18       in time that the question is completed.

19       Q.   Did you tell your mom that day that this had

20   happened before?

21             MR. BERGER:  Objection.

22             THE COURT:  Sustained.

23       A.   Yes.

24       Q.   What, if anything, did you tell your mom?

25             MR. BERGER:  Objection.

1           THE COURT:  Overruled.  The door is open.

2      A.   I told my mom that Danny licked my coochie.

3      Q.   Now, Mya, you testified about this happened more

4  than one time before.  Do you know the exact number of times

5  Danny licked your coochie or touched you with his pecker;

6  could you count to the exact number?

7      A.   Five.

8      Q.   Do you know the exact dates that it happened on,

9  like what day, April 15th, January 3rd, do you know the

10 exact dates of when these things happened?

11     A.   (Nodding)

12     Q.   You have to say yes or no.

13     A.   No.

14     Q.   Were you told before when you came to court today

15 that unless you got permission you couldn't talk about the

16 past instances?

17          MR. BERGER:  Objection.

18          THE COURT:  Overruled.

19     Q.   Were you told unless you were given permission you

20 couldn't talk about stuff that happened before the day the

21 ambulance came?

22     A.   I don't know.

23     Q.   Mya, you said it happened at nighttime except for

24 the daytime.  What did you mean by that, it happened both at

25 night and during the day?

                                                      kmm

1                    MR. BERGER:  Objection.

2                    THE COURT:  One second.  Just ask the

3         question again.  Objection is sustained as to form

4         only.

5                    Wait Mya for another question.

6         Q.   What did you mean when you said it happened at

7    nighttime except for the daytime?

8         A.   I don't know.

9                    MR. PERRI:  Nothing further.

10                   THE COURT:  Recross, Mr. Berger.

11   RECROSS-EXAMINATION

12   BY MR. BERGER:

13        Q.   Did you ever talk to the police about this?

14        A.   Yes.

15        Q.   When?

16        A.   I don't know.

17        Q.   Do you remember who you spoke to?

18        A.   The police.

19        Q.   Do you remember which person, what his name was or

20   her name?

21        A.   I don't know.

22        Q.   Do you remember when this was?

23        A.   No.

24        Q.   Was it shortly after you went to the hospital?

25        A.   Yes.

1       Q.   And you spoke to the police.  Did you tell them

2   that this happened five times?

3       A.   No, only -- I asked the police, Danny licked my

4   coochie.

5       Q.   That's all you told them?

6       A.   Yes.

7       Q.   So you left out all these other times?

8            MR. PERRI:  Objection.  Beyond the scope of

9            redirect, your Honor.

10           THE COURT:  Sustained.

11           MR. BERGER:  Mr. Perri asked about whether or

12           not she could talk about prior past instances, that she

13           wasn't allowed to.  He asked her.

14           THE COURT:  Let's see if the child

15           understands about having left something out.  Ask the

16           question again.

17      Q.   The police asked you about Danny, didn't they?

18      A.   Yes.

19      Q.   They asked you what he did to you; did they ask

20   you that?

21      A.   Yes.

22      Q.   Did you tell them about the five other instances?

23      A.   I tell him about -- I told the police that Danny

24   licked my coochie.

25      Q.   And you left out the other instances?

M. Ramirez - People - Recross        811

1    A.   Yes.

2    Q.   Why?

3              MR. PERRI:  Objection.

4              THE COURT:  Sustained.

5              MR. BERGER:  On what basis?

6              THE COURT:  Because I ruled.  Sustained.

7    Q.   You left out that these things happened?

8              MR. PERRI:  Objection.

9              THE COURT:  Sustained.

10   A.   Yes.

11   Q.   And did the police write down what you told them?

12             MR. PERRI:  Objection.

13             THE COURT:  Sustained.

14   A.   Yes.

15   Q.   When you talked to them, the police, they were

16   writing?

17             MR. PERRI:  Objection.

18             THE COURT:  Sustained.

19             Don't answer the question.

20   A.   Yes.

21             MR. BERGER:  How is that objectionable?

22             THE COURT:  We're outside the scope of the

23   redirect of the People.

24             MR. BERGER:  That's the basis outside the

25   scope.

1        THE COURT:  I'll excuse the jury at this

2   time.  Give us five minutes, please.  Don't talk about

3   the case.

4              (Whereupon, the jury exited the courtroom.)

5        THE COURT:  Take the young lady into the

6   hallway.

7              (Whereupon, the witness exited the

8   courtroom.)

9        THE COURT:  If you question my ruling again

10   in front of the jury, I won't excuse them the next

11   time, and I won't keep my patience.  I'm not going to

12   be questioned in front of the jury.  I told you that

13   time and again.  Don't do it again, counselor.  Don't

14   do it again, counselor.

15        MR. BERGER:  I'll act for my client.  I will

16   defend him as I should.  You say it's outside the

17   scope.  The prosecutor asked, were you told not to talk

18   about these past instances.  She says, I don't know.

19   Then I asked her whether or not she talked to the

20   police, she said, yes.  I asked her whether or not they

21   wrote anything down, and she said, yes.  You sustained

22   the objection.  Where is your fairness?

23        THE COURT:  You are fully aware of the fact

24   that this child via a Molineaux application of the

25   People, had another incident to discuss.  I ruled that

1     that was not to come in.  It had no place in this

2     hearing.  This witness was instructed, as you well

3     know, that she was not to talk about any of the other

4     instances, or at that point, incident, because I was

5     only aware of one.

6              Now, you are trying to make it into something

7     more than it is.  When Mr. Perri asked that question,

8     anyone reading the record will know he was asking about

9     the instructions the People were required to give to

10    her to follow this Court's ruling with regards to

11    Molineaux.  That is it.  This is not going to be

12    confused and conflated to something it is not.  Do not

13    question me in front of the jury.  If you want to take

14    exception to my rulings, you are more than welcome to

15    do so.  You can speak on the record as long as I don't

16    have a jury waiting, for as long as you want, but you

17    will not question my rulings like you have just done in

18    front of this jury.  And if you continue to do it

19    again, I won't excuse the jury.  I'll do what I need to

20    do with regards to what I need to be said right in

21    front of them and let the chips fall where they may.

22    I'm attempting to give your client a fair trial, as he

23    is entitled to, but you need to follow the rules of

24    this Court and you need to follow the law.

25              MR. BERGER:  Nobody is conflating anything

1        the witness said.  The fact of the matter is she said

2        she talked to the police and they were writing

3        something down and --

4                THE COURT:  Let me play this out for you.

5        This will be the last comment on this.  I imagine what

6        will happen is the jury should believe this little girl

7        when she talked about the police writing something down

8        in their notes, but don't believe her about anything

9        else.  That's a comment you can make to the jury when

10       doing the summation.

11               MR. BERGER:  You are not trying the case.  I

12       don't need to deal with two prosecutors.  This is

13       unfair.  You are not trying the case.  I'm not

14       conflating anything.

15               THE COURT:  Bring in the jury, please.

16               MR. BERGER:  The question propounded by

17       Mr. Perri was, were you told you couldn't talk about

18       past instances, plural.  Mr. Perri represented to this

19       Court that there was only one prior instance.  So, I

20       had no idea that we were talking about there were

21       limitations with respect to five.  Now, somebody is

22       playing fast and loose here.  Either they knew about

23       the five and misrepresented it to the Court, or they

24       didn't.  In either case, Mr. Perri asked about, were

25       you not permitted to talk about instances.  So I assume

Proceedings                    815

1        we were talking about the five, not the one that

2        Mr. Perri represented to the Court.

3                MR. PERRI:  Your Honor, the People gave

4        instructions to the witness in abundance of caution

5        that she was not to speak about anything that happened

6        before the day in question with regards to her and the

7        defendant, that she was not supposed to, unless given

8        permission to talk about any prior occasions.  We were

9        aware of one occasion she specifically and repeatedly

10       disclosed to us.  I was not aware of the other one.

11       She did not disclose them.

12               However, to follow your Honor's ruling to

13       ensure that the defendant was provided a fair trial,

14       according to your Molineaux ruling, I instructed her

15       not to speak about anything, as she is a child, and I

16       would be concerned that she wouldn't constrain herself

17       or understand that one meant all of them in the

18       Molineaux ruling that we hadn't gotten permission from

19       the Court for her to testify about those.

20               THE COURT:  Thank you both for your

21       positions.  They are noted for the record.

22               (Whereupon, the witness resumed the stand.)

23               (Whereupon, the jury entered the courtroom.)

24               THE CLERK:  Both sides stipulate all sworn

25       jurors are present, People?

kmm

Proceedings                    816

1          MR. PERRI:  Yes, your Honor.

2          THE CLERK:  Defense?

3          MR. BERGER:  Yes.

4          THE COURT:  You may continue.

5          MR. BERGER:  No further questions.

6          THE COURT:  Mr. Perri?

7          MR. PERRI:  No, your Honor.

8          THE COURT:  All right.  Miss Ramirez, you can

9     step down.  Be careful.  We don't need you to come back

10    anymore.  Thank you.

11         Ladies and gentlemen, this will be a good

12    time for a break.  Let me give you admonitions over

13    this break.

14         Please remember you must keep an open mind

15    throughout this entire trial.  Do not discuss this case

16    amongst yourselves or with anyone else during the

17    trial.  Do not permit anyone to discuss the case in

18    your presence.  Do not talk to the lawyers, witnesses

19    or the defendant about anything during the trial.

20         Remember, if you see any of us during the

21    lunch break, we will ignore you.  Do not take it

22    personally.

23         Do not visit or go to the place where it was

24    allegedly committed, or any other place involved in the

25    case.

Proceedings                817

1            If there is any news coverage of the case, do

2       not read, view or listen to any accounts or discussions

3       of the case reported by the news media.

4            Do not attempt to research any fact, issue or

5       law related to this case whether by discussion with the

6       others on the Internet, or by any other means or

7       source.

8            Have a great lunch.  See you all back here at

9       2:00.  Hopefully we'll start by 2:15.  Let me say this

10      to the jury before I let you go with regards to

11      appointments you might all need to make.  I want to

12      remind everyone that we are not working this Friday,

13      which is the 15th.  We are not working the 18th, 22nd,

14      or the 25th.  If you can get appointments on those

15      days, great.  If you can't, send us a note.  If it is

16      an appointment you must make for a day we're on trial,

17      just send us another note and we'll try to work around

18      your schedules.  If possible, if there are any matters

19      you need to attend to, if you could do it on those

20      dates we're not working, I would appreciate that.

21              (Whereupon, the jury exited the courtroom.)

22              THE COURT:  Anything for the record before we

23      break?

24              MR. BERGER:  No, your Honor.

25              MR. PERRI:  No, your Honor.

Proceedings                    818

1              THE COURT:  Have a great lunch.  See everyone
2      at two.
3              (Whereupon, a luncheon recess was taken.)
4              *              *              *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

kmm

1                    A F T E R N O O N   S E S S I O N

2

3

4                    THE CLERK:  Case on trial continued,

5       Indictment 742N of 2014, People of the State of New

6       York vs. Daniel Ramos.

7                    Appearances previously noted on the record.

8       The jurors are not present.

9                    Both sides ready?

10                   MR. PERRI:  Yes.

11                   MR. BERGER:  Yes.

12                   THE CLERK:  Any applications?

13                   MR. PERRI:  No.

14                   MR. BERGER:  No.

15                   THE COURT:  Let's bring in the jury.

16                   (People's Exhibits 3-7 were marked for

17       identification.)

18                   (Whereupon, the jury entered the courtroom.)

19                   THE CLERK:  Do both sides stipulate to the

20       presence and properly seat jury?

21                   MR. PERRI:  Yes, your Honor.

22                   MR. BERGER:  Yes, your Honor.

23                   THE COURT:  I hope you enjoyed your lunch

24       break.

25                   Call your next witness.

kmm

K. McAllister - People - Direct      820

1          MR. PERRI:  Prior to calling my next witness,

2     I do have an application to move into evidence the

3     certified copies of the medical records of Mya Ramirez.

4     The documents are signed and certified by the custodian

5     records of the Nassau University Health System, and I

6     ask them be received into evidence.

7          MR. PERRI:  It was marked for identification

8     as People's 3.

9          MR. BERGER:  No objection.

10          THE COURT:  Let's have it marked into

11     evidence as People's 3.

12          (People's Exhibit 3, previously marked for

13     identification, was marked and received in evidence.)

14     Measuring mark three in evidence.

15          MR. PERRI:  The People now would like to call

16     Nurse Kathleen McAllister, your Honor.

17  K A T H L E E N   M C A L L I S T E R, Nurse, called on

18     behalf of the People, having been duly sworn, took the

19     witness stand and testified as follows:

20          THE CLERK:  State your name, spell your first

21     name and last name and give your county of residence.

22          THE WITNESS:  Kathleen McAllister,

23     K-A-T-H-L-E-E-N   F.   M-C-A-L-L-I-S-T-E-R.

24  DIRECT EXAMINATION

25  BY MR. PERRI:

1       Q.   Ms. McAllister, are you currently employed?

2       A.   Yes.

3       Q.   Who are you employed by?

4       A.   Nassau University Medical Center.

5       Q.   What are you employed as at the Nassau County

6    Medical Center?

7       A.   Registered nurse.

8       Q.   Do you have your degree in nursing?

9       A.   Yes.

10      Q.   Where did you get your degree in nursing?

11      A.   Jewish Hospital and Medical Center in Brooklyn.

12      Q.   What department do you currently work for at

13   Nassau County Medical Center?

14      A.   I work in the quality management department.

15      Q.   How long have you worked at Nassau County Medical

16   Center?

17      A.   Thirty-four years.

18      Q.   Outside the quality management department, have

19   you worked in other departments at the Nassau County Medical

20   Center?

21      A.   Yes.

22      Q.   What other departments have you worked for?

23      A.   In the emergency room for twenty-eight years.

24      Q.   Aside from current responsibilities at the quality

25   management department, do you have any other

K. McAllister - People - Direct        822

1    responsibilities right now at the medical center?

2         A.   I take calls as a sexual assault nurse examiner.

3         Q.   And as a nurse, do you have a certification?

4         A.   I am advanced cardiac life support certified and

5    pediatric life support certified.

6         Q.   What does it mean to be a sexual assault examiner?

7         A.   Sexual assault examiner is a registered nurse who

8    has additional training in history taking, examination and

9    collection of evidence.

10        Q.   And what kind of additional training is required

11   to become a sexual assault nurse examiner?

12        A.   I took a 40-hour course at the Academy of Medicine

13   in New York City.

14        Q.   And is there any additional training other than

15   the 40-hour course?

16        A.   There's a one-year preceptorship.

17        Q.   Explain what the one-year preceptorship is?

18        A.   It is where a preceptor or my director supervises

19   my cases for a year.

20        Q.   Did you complete the preceptorship program?

21        A.   Yes.

22        Q.   Did you complete it successfully?

23        A.   Yes.

24        Q.   How many sexual assault examinations have you

25   conducted?

kmm

1      A.    Sixteen.

2      Q.    Prior to becoming a sexual assault nurse examiner,

3   did you ever assist in treating or examining victims of

4   sexual assault before becoming a nurse examiner?

5      A.    Yes.

6      Q.    Explain how that happened.

7      A.    So, before I guess there were SANE programs as a

8   nurse, it was part of our responsibility working in the

9   emergency room to assist the physician in the exam.

10      Q.    Could you explain to the jury what a sexual

11   assault SANE exam, what that entails?  What is that?

12      A.    A SANE exam is an exam that includes a detailed

13   history of full examination and a collection of evidence.

14      Q.    And are SANE exams conducted at the Nassau County

15   Medical Center?

16      A.    Yes.

17      Q.    Where in the medical center are those exams

18   conducted?

19      A.    We have a special sexual assault exam room.

20      Q.    And as part of conducting a SANE exam, do you use

21   a sexual offense examination collection kit?

22      A.    Yes.

23      Q.    Is that what is commonly referred to as a rape

24   kit?

25      A.    Yes.

kmm

1        Q.    Now, directing your attention to October 16, 2013,

2    were you working at Nassau County Medical Center that day?

3        A.    Yes.

4        Q.    Were you also on call at some point that day as a

5    SANE nurse?

6        A.    Yes.

7        Q.    Did there come a time when you received an on-call

8    assignment?

9        A.    Yes.

10       Q.    And what did you do in response to receiving that

11   on-call assignment?

12       A.    I came into the hospital and met the patient in

13   the pediatric emergency room.

14       Q.    Did you learn the identity of that patient to be

15   Mya Ramirez?

16       A.    Yes.

17       Q.    Did there come a time when you actually conducted

18   a SANE exam of Mya Ramirez.

19       A.    Yes.

20             MR. PERRI:  May I ask the witness be shown

21        People's 3 in evidence.

22             THE COURT:  She may.

23       Q.    Please look at People's 3 in evidence.  I would

24   like to ask you, do you recognize -- what do you recognize

25   People's 3 to be?

kmm

1      A.   It's the patient's medical record.

2      Q.   And directing your attention to the section of the

3   medical records labeled sexual assault examination section,

4   can I ask you who made the entries in that section of the

5   medical records of Mya Ramirez?

6      A.   I did.

7      Q.   And did you make those entries into that section

8   of the medical records at or about the time you examined Mya

9   Ramirez?

10     A.   Yes.

11     Q.   Now, drawing your attention to October 16, 2013,

12   what was the first portion of the SANE exam you completed

13   with Mya Ramirez?

14     A.   The first portion would be to get a detailed

15   history and ask her why she was there.

16          MR. BERGER:   I'm sorry, I didn't hear the

17          last part of the phrase.

18     A.   And ask her why she was there.

19     Q.   Did you, in fact, take a history?

20     A.   Yes.

21     Q.   And what does it mean to take a history from a

22   patient in this context?

23     A.   It is a very detailed history and you want to

24   start from the beginning and try to find out as much

25   information as possible, and attempt to get who was

kmm

1     involved, or where it was, or it is just a detailed -- if

2     they are hurt, what body parts are involved, just a detailed

3     history involving the events that are told.

4               THE COURT:  Mr. Perri, I'll stop you for one

5          moment.  I'll ask you to sit tight for one moment.  I

6          just need to step off the bench.

7               (Whereupon, a there was a pause in the

8          proceedings.)

9               THE COURT:  Thank you.  Thank you.  I

10         apologize for that.  You may continue.

11              MR. PERRI:  Thank you, your Honor.

12    Q.   Ms. McAllister, is obtaining a history from the

13    sexual assault victim an important step in that patient's

14    medical treatment and diagnosis?

15    A.   Yes.  The history guides the exam.

16    Q.   And is identifying the assailant relevant in

17    treatment discharged in the safety plan when questioning a

18    child sex abuse victim?

19    A.   Yes.

20    Q.   What, if anything, did Mya say to you during the

21    taking of the history?

22    A.   Patient states Daniel licked my coochie.

23    Q.   After Mya made that statement to you, what, if

24    anything, did you ask her?

25    A.   I asked her to point to what she meant by coochie.

                                                          kmm

K. McAllister - People - Direct      827

1      Q.   What, if anything, did she say or do in response

2   to you asking her that question about what a coochie was?

3      A.   She pointed to her front genital area.

4      Q.   So after taking the history, what was the next

5   step in your exam of Mya Ramirez?

6      A.   I explained the exam and obtained a consent for

7   evidence collection, and then I asked Mya to get undressed,

8   put her on the exam table and began a full visual

9   examination from head to toe.  And then I began an evidence

10  collection using a sexual assault evidence collection kit.

11             MR. PERRI:  I ask the witness be shown what

12        was pre-marked as People's exhibit 4 for

13        identification.

14             THE COURT:  She may.

15             MR. PERRI:  Thank you, your Honor.

16      Q.   Nurse McAllister, do you recognize what was marked

17  for identification as People's 4?

18      A.   Yes.

19      Q.   What do you recognize it to be?

20      A.   It's the kit, the evidence kit that was used.

21      Q.   And was this the evidence kit used for examination

22  of Mya Ramirez?

23      A.   Yes.

24      Q.   And how do you recognize it to be that specific

25  evidence kit?

kmm

1        A.    My name is on it.

2        Q.    Are there any other markings that you recognize?

3        A.    Yes.

4        Q.    What are other markings; do you recognize?

5        A.    There is an orange evidence police seal.

6        Q.    Now, is that kit in the same or substantially the

7   same condition as when you last had custody of it?

8        A.    No.

9        Q.    What differences do you note?

10       A.    There's all different colored tape on it, and my

11  seal is broken and it looks open.

12       Q.    When you last had custody of that kit, was it

13  sealed?

14       A.    Yes.

15       Q.    Ms. McAllister, I ask you to please open People's

16  4 and look inside.  Do you recognize what is contained

17  inside?

18       A.    Yes.

19       Q.    Could you go through what is contained -- what do

20  you recognize the contents of the box to be?

21       A.    Right now there are envelopes.

22       Q.    And were those envelopes present when you sealed

23  that box?

24       A.    Yes.

25       Q.    And are they in the same condition as when you

1    sealed that box, or are they different?

2         A.    They're different.

3         Q.    How are those envelopes different?

4         A.    There's red tape on it now and they're opened.

5         Q.    And the markings on each of the envelopes, who

6    placed the markings in the front of the envelope?

7         A.    I did.

8         Q.    When you placed the envelopes in the box, were

9    they opened or sealed?

10        A.    Sealed.

11              MR. PERRI: May I ask People's 4 be received

12        into evidence.

13              THE COURT:  Mr. Berger.

14              MR. BERGER:  I'll take a look, please.

15              THE COURT:  Certainly.

16              MR. BERGER:  No objection.

17              THE COURT:  Let's have it marked into

18        evidence as People's 4, please.

19              (People's Exhibit 4, previously marked for

20        identification, was marked and received in evidence.)

21              MR. PERRI:  I ask you to give it back to the

22        witness.

23              (People's Exhibit 4 was handed to the

24        witness.)

25        Q.    Nurse McAllister, go through each of the envelopes

kmm

1   in order, inside of that box and explain what each of them

2   are.

3       A.   Inside the box come instructions and envelopes.

4   They're labeled step, step one, step two.  Step one is oral

5   swabs and smear.  Step two is a buccal specimen.  Step three

6   is trace evidence.  Step five is underwear, step six is

7   debris collection, step seven is dried secretions and/or

8   bite marks.  Step eight is fingernail scrapings.  Step nine

9   is pulled head hairs.  Step ten is pubic hair combings.

10  Step eleven is pubic hairs.  Step twelve is perianal and

11  anal swabs and smear.  Step fourteen is vaginal swabs and

12  smear, and step fifteen is cervical swabs and smear.

13      Q.   In addition to the envelopes contained in that box

14  presently, was there an additional envelope that was there

15  when you sealed it?

16      A.   Yes.

17      Q.   What envelope was additionally there?

18      A.   Step 13 vulva swab.

19      Q.   Did you, in fact, complete the vulva swab?

20      A.   Yes.

21      Q.   When you completed the vulva swab, did you seal

22  the envelope?

23      A.   Yes.

24      Q.   Did you complete each and every single one of the

25  steps you listed of the envelopes in that box?

1    A.   No.

2    Q.   Could you go over with the jury what steps you did

3 to conduct evidence collection with Mya Ramirez?

4    A.   I collected step one, oral swabs and smear.  I

5 collected step two, buccal specimen.

6    Q.   I'll stop you right there.  Buccal swab and

7 specimen, what is a buccal swab?

8    A.   Inside this envelope is like a Q'tip, but the end

9 is almost like a toothbrush with teeth.  What we do put

10 inside the patient's mouth and vigorously rub it for a few

11 seconds.  I believe it is a controlled sample.

12    Q.   Did you in fact do what you just described to Mya

13 Ramirez?

14    A.   Yes.

15    Q.   After receiving that buccal swab, what did you do

16 with it?

17    A.   So, it gets put into the swab dryer because it

18 needs to air dry.  Once dried, inside the envelope is a box.

19 The swab goes inside the box, inside the envelope and the

20 envelope gets sealed.

21    Q.   Thank you.  You can continue with the next step.

22    A.   What step was I up to?  Step three, I did not

23 collect trace evidence.  Step five is underwear, I

24 collected.

25    Q.   Nurse McAllister, if you could, could you please

1    take out the envelope and there are gloves in front of you.

2    Could you look inside of the envelope and ask if you

3    recognize what is contained in the envelope?

4         A.   Take them out?

5         Q.   Yes.

6         A.   Underwear.

7         Q.   Is that underwear in the same condition as when

8    you took custody of it, or is there anything different?

9         A.   I don't recall.

10        Q.   Place it back in the envelope.

11             (Complying)

12        Q.   Did you make any cuts from the underwear you

13   received before placing it in the envelope?

14        A.   No.

15        Q.   Did you make any markings on the underwear and

16   before you read it and placed it in the envelope?

17        A.   Oh, no.

18        Q.   Did you receive underwear from Mya Ramirez during

19   your exam, and did you place it in the envelope?

20        A.   Yes.

21        Q.   And then after receiving underwear, what did you

22   do with the envelope?

23        A.   Put it in the kit.

24        Q.   You sealed the envelope?

25        A.   I sealed the envelope, put it in the kit.

kmm

K. McAllister - People - Direct      833

1     Q.   Go to the next step.  Thank you.

2     A.   Step six was debris collection.  No, I did not

3   collect that.  Step seven, dried secretions, I collected.

4   Step eight, fingernail scrapings, no.  Pulled head hairs,

5   step nine, no.  Step ten, pubic hairs, pubic hair combings,

6   no.  Step eleven, pulled pubic hairs, no.  Step twelve,

7   perianal and anal swabs and smear, yes.

8     Q.   I would like to draw your attention back to -- you

9   stated you also collected in addition to the envelope a

10   vulva swab; could you explain to the jury what it means to

11   take a vulva swab?

12     A.   So, a vulva is an outside area of the vagina.  It

13   would include the outside lip or the labia majora, and the

14   inside lip, labia minora.  And so, what you do with the swab

15   is in the envelope, I take the swabs with glove, hands

16   moistened with water.  Starting at the top of that area with

17   the rolling motion, you roll down and swab that area and

18   then I believe there is a slide in the kit.  I would rub the

19   Q'tip on a slide.  Again, put it in the specimen dryer, wait

20   for it to dry, put the swabs in a box in the envelope, put

21   the box in the envelope, seal the envelope and put it in the

22   kit.

23     Q.   Did you, in fact, do that as part of your

24   examination of Mya Ramirez?

25     A.   Yes.

kmm

K. McAllister - People - Direct        834

1        Q.    After you completed the steps, the relevant steps

2    of the sex offense evidence kit, after you finished the

3    relevant steps, what did you do next?

4        A.    Once the evidence collection is complete, all of

5    the envelopes get put in this box.  The box gets closed, an

6    orange seal that I put on the opening and initial it so that

7    it can't be opened unless the tape is broken.

8        Q.    And did the hospital keep custody, did you keep

9    the sex offense evidence kit?

10        A.    So it remains in my custody until I hand it to a

11    detective.

12        Q.    Did you, in fact, hand this sex offense evidence

13    collection kit to be handed to the detective?

14        A.    Yes.

15        Q.    Who did you hand it to?

16        A.    Detective Baran.

17        Q.    Is he of the Nassau County Police Department?

18        A.    Yes.

19              MR. PERRI:   I ask People's 4 be taken from

20        the witness.

21        Q.    Nurse McAllister, did you collect any other

22    evidence from Mya Ramirez during your examination?

23        A.    Yes.

24        Q.    What other evidence did you collect?

25        A.    Pajama bottoms.

kmm

1.      Q.    What did you do with those pajama bottoms after

2  you collected them from Mya Ramirez?

3       A.    Put them in a brown paper bag labeled and sealed

4  and gave it to the police as well.

5             MR. PERRI:  I ask the witness be shown what

6        was what is in evidence as People's 1.

7             (People's Exhibit 1 was handed to the

8        witness.)

9       Q.    Did you recognize what is presented to you as

10  People's 1?

11      A.    Yes.

12      Q.    What do you recognize it to be?

13      A.    Pajama bottoms.

14      Q.    What markings on that bag indicates to you where

15  this bag came from or whose pajamas bottoms they are?

16      A.    The hospital, as a hospital label and that label

17  is on this bag.

18            MR. PERRI:  One moment.

19            THE COURT:  Take your time.

20      Q.    Have you ever testified before, Nurse McAllister?

21      A.    Once about twenty years ago.

22      Q.    According to the hospital records, was Mya Ramirez

23  discharged that night?

24      A.    Yes.

25      Q.    And who accompanied Mya Ramirez from her family?

K. McAllister - People - Direct        836

1      A.   Her mother.

2               MR. PERRI:   Thank you, your Honor.   Nothing

3      further.

4               THE COURT:   Thank you.

5   CROSS-EXAMINATION

6   MR. BERGER:

7      Q.   Nurse McAllister, you indicated that part of being

8   a SANE nurse was to obtain a history from the patient,

9   correct?

10     A.   That's correct.

11     Q.   Because as you said before, the history tells you

12  how to go about treating a patient, correct?

13     A.   Not treating.   The history guides my exam.

14     Q.   Guides your exam?

15     A.   Correct.

16     Q.   And it's important, therefore, I think you said to

17  get extensive and detailed history, correct?

18     A.   Correct.

19     Q.   Now, when you first met Mya, was she with her

20  mother?

21     A.   Yes.

22     Q.   And when you asked what happened, was it her

23  mother who gave you an answer?

24     A.   No.

25     Q.   Her mother is with her daughter, correct?

kmm

Case 2:19-cv-01125-JS-AYS   Document 7-2   Filed 05/31/19   Page 837 of 844 PageID #: 1246

1      A.   Correct.

2      Q.   By the way, did you ever learn any protocol with

3  respect to interviewing children of the alleged sexual

4  abuse?

5      A.   I don't understand the question.

6      Q.   You said you took a 40-hour course and that course

7  was for what?

8      A.   It was for a sexual assault nurse examiner course.

9      Q.   So, you are a nurse examiner and don't they -- did

10  they not teach you in that course that when you are

11  interviewing a child, that you should be interviewing the

12  child apart from anyone else?

13      A.   No.

14      Q.   So, when you went in and asked, who did you ask,

15  the mother, ask the daughter?  Who did you ask when you went

16  in and asked?

17      A.   I obtained a history.

18      Q.   How?

19      A.   I obtained a history and Mya's medical history

20  from the mother, spoke with the mother first and then I

21  spoke with Mya.

22      Q.   Mya was there at the time, correct?

23      A.   Correct.

24      Q.   What did the mother say to you with respect to the

25  history of Mya?

K. McAllister - People - Direct        838

1          A.    Mom says she entered a room where a known family

2    friend was found with a patient, patient's pants were down.

3    That's what mom said to me.

4          Q.    That was the entire history?

5          A.    No, sir, this is a brief narrative.

6          Q.    All right.  Where is the extensive narrative?  Is

7    there one?

8          A.    From the mother?

9          Q.    From the mother, from the child?

10         A.    I don't recall.

11         Q.    Pardon?

12         A.    I don't recall.

13         Q.    What is it that you don't recall?

14         A.    I recall the brief narrative from the mother due

15   to the medical record.

16         Q.    Are you saying that you obtained other information

17   from the mother and from Mya?

18         A.    Sure.  I would ask the mother is Mya allergic to

19   any medications?  Does Mya have a pediatrician?  Does this

20   person live in Mya's home?  Does Mya, you know, a detailed

21   -- tons of information.

22         Q.    You wrote down on your report, possible sexual

23   assault, correct?

24         A.    I didn't write that, no.

25         Q.    Who wrote that down; do you know?

1        A.    I don't know where you are referring to.

2        Q.    Look at the clinical impression section.  Do you

3   know where that section would be in the report?

4        A.    Yes, I do but that is not me.

5        Q.    Somebody wrote down possible sexual assault,

6   correct?

7        A.    That's what it says, yes.

8        Q.    But you didn't write that?

9        A.    No.

10       Q.    My question now is:  Did you ask Mya if she had

11   ever been abused before?

12       A.    I don't recall.

13       Q.    Wouldn't that be important to know when you are

14   obtaining an extensive detailed history with a possible

15   sexual assault victim?

16       A.    Yes.

17       Q.    And as you sit here now, you don't know whether

18   you asked her that or not?

19       A.    I don't from my notes, no.

20       Q.    Is there any way you could remember -- in other

21   words, your notes don't reflect that?

22       A.    That's correct.

23       Q.    Would it be your practice as a sexual assault

24   nurse to ask whether or not there was any other previous

25   history of sexual assault?

K. McAllister - People - Direct        840

1        A.   I have asked it.

2        Q.   Isn't that the appropriate thing to ask?

3             MR. PERRI:  Objection.

4             THE COURT:  Overruled.  Do you understand the

5   question?

6        A.   Is it the appropriate --

7        Q.   Yes.

8        A.   One could ask that question, yes.  One would want

9   to know, yes.

10       Q.   Wouldn't you want to know if she was ever abused

11   in any other way, other than the claim of licking her

12   vagina?

13       A.   Yes, that would be a question.

14       Q.   And you would want to know whether or not she was

15   ever anally abused or have been vaginally abused?

16       A.   Correct.

17       Q.   Did you do that here?

18       A.   I examined Mya's complete body, yes.

19       Q.   Did you find any findings with respect to her

20   vagina?

21       A.   No.

22       Q.   How about her anus?

23       A.   No.

24       Q.   There were no findings with respect to her vagina

25   or anus, correct?

K. McAllister - People - Direct      841

1      A.   Correct.

2      Q.   But as you sit here now --

3           MR. PERRI:   Withdrawn.

4      Q.   You have indicated that it would be appropriate to

5  ask the child if she had ever been abused prior to the date

6  in question, that you are there, correct?

7      A.   Correct.

8      Q.   And as you sit here now, if she had told you that

9  she had been abused earlier, you would have made a note of

10 that, wouldn't you?

11     A.   Yes.

12     Q.   So there are no notes at all in this report about

13 any prior abuse, correct?

14     A.   No.

15     Q.   That is correct.   I'm asking you, Nurse

16 McAllister; that is correct?

17     A.   Can you repeat the question?

18     Q.   There are no notes in your report of any prior

19 sexual abuse; is that correct?

20     A.   That is correct.

21     Q.   And you would have made that note if she had said

22 there was?

23     A.   It would have been pertinent.   It would have been

24 a finding, yes.

25     Q.   If she said she had been abused in any other way,

1   or in additional instances, you would have made a note of

2   that?

3        A.   Yes.

4        Q.   Am I correct in my assumption, in all of the time

5   that you were with Mya, her mother was present?

6        A.   Yes.

7        Q.   In the course of your taking that 40-hour course,

8   did you ever learn that when interviewing the child, a

9   possible sexual abuse victim, that you should take that

10  child away from any other person, that you just interview

11  them by yourself?

12       A.   No.

13       Q.   Did you learn in that course that there are ways

14  in which to question a child so that you are neutral in your

15  questioning and not suggesting answers?

16       A.   My questions and exams are always neutral.

17       Q.   They're supposed to be neutral?

18       A.   Correct.

19       Q.   I know that's what the intention is, right?

20       A.   Yes.

21       Q.   In the course of your taking that course to become

22  a sexual assault nurse, did you ever learn of any New York

23  State protocol with respect to interviewing children?

24            MR. PERRI:   Objection.

25            THE COURT:   I'll take an answer if you

K. McAllister - People - Direct        843

1        learned any.

2        A.    No.

3        Q.    Did you make a notation on this medical report

4    that Mya was playful, alert, talkative, follows direction,

5    answers questions; did you make that notation?

6        A.    Yes.

7        Q.    Did you make a notation saying that Mya should

8    follow-up for a SCAN appointment?

9        A.    What page is that?

10       Q.    What page?

11       A.    Yes.

12       Q.    It says emergency department, patient discharge

13   instructions?

14       A.    No.

15       Q.    But it does mention your name thereafter that;

16   does it not?

17       A.    That's correct.

18       Q.    So you didn't write that, but did you say she

19   should follow-up for a SCAN appointment?

20       A.    Yes.  I discharged her with a pediatric SCAN

21   clinic appointment.

22       Q.    And did they ever come back?

23       A.    I don't know.

24             MR. BERGER:  Thank you.  I have nothing

25       further.

kmm

K. McAllister - People - Redirect        844

1           THE COURT:  Any redirect?

2           MR. PERRI:  Just a little bit, your Honor.

3    REDIRECT EXAMINATION

4    BY MR. PERRI:

5       Q.   Nurse McAllister, what does SCAN stand for?

6       A.   Supposed child abuse and neglect.

7       Q.   And what was the appointment that you had

8    recommended to Mya and her mother?

9       A.   It's a clinic we refer children to as a follow-up,

10   because she is in the emergency room.  This is an emergent

11   exam, so the follow-up is for a specialty clinic.

12      Q.   When you first spoke with Mya, did you say

13   anything to her before asking her what happened?

14      A.   No.

15      Q.   Did you say anything to Mya about what exactly you

16   were looking for to find out from her?

17      A.   No.

18           MR. BERGER:  Objection.  This is not proper

19      redirect.

20           MR. PERRI:  It goes to whether or not her

21      exam was suggestive.

22           THE COURT:  I will allow it.

23           You may answer.

24      A.   Could you repeat it?

25      Q.   In speaking with Mya, did you tell her anything