1    about or say to her anything with regard to what you were

2    trying to figure out?

3        A.   No.

4        Q.   And you testified about not finding vaginal

5    findings or anal findings on Mya; could you explain what

6    findings would be?

7        A.   Findings would be injuries.

8            MR. PERRI:   Thank you, your Honor.

9            THE COURT:   Anything on that, Mr. Berger?

10   RECROSS-EXAMINATION

11   BY MR. BERGER:

12       Q.   If you found any injuries to the anus, you would

13   have ordered a colposcope or something like that?

14       A.   A colposcope doesn't need an order.   It would be

15   documented in my findings.

16       Q.   And there were no indications for a colposcope,

17   correct?

18       A.   A colposcope is a camera.   You can use one or not.

19       Q.   Right.   In this case you didn't direct one, did

20   you?

21       A.   I didn't use one, no.

22       Q.   Because no anal findings on your part?

23       A.   Okay; correct.

24           MR. BERGER:   Thank you.   Nothing further.

25           THE COURT:   Anything else?

Chillseyzn - People - Direct          846

1          MR. PERRI:  No, your Honor.

2          THE COURT:  Please be careful stepping down.

3          Call your next witness.

4          MR. PERRI:  People call Chris Chillseyzn.

5    C H R I S T O P H E R   C H I L L S E Y Z N, called on

6        behalf of the People, having been duly sworn, took the

7        witness stand and testified as follows:

8          THE CLERK:  State your name, spell first

9        name, last name, and county of residence.

10          THE WITNESS:  Christopher,

11        C-H-R-I-S-T-O-P-H-E-R, C-H-I-L-L-S-E-Y-Z-N.  I live in

12        Nassau County.

13          THE COURT:  You may inquire.

14    DIRECT EXAMINATION

15    BY MR. PERRI:

16        Q.   Mr. Chillseyzn, you are currently employed?

17        A.   Yes, sir.

18        Q.   Who are you employed by?

19        A.   I work for Nassau County Medical Examiner's Office

20    Division of Forensic Services in the biology section.

21        Q.   Where is the Medical Examiner's office located?

22        A.   East Meadow, Nassau County.

23        Q.   What is your title within the Medical Examiner's

24    Office?

25        A.   I'm forensic geneticist one.

1    Q.   And how long have you been employed by the Nassau
2    County Medical Examiner's office?

3    A.   A little over eight years.  I started in March of
4    2007.

5    Q.   And what are your responsibilities as a forensic
6    geneticist?

7    A.   Basically, members of my laboratory, we receive
8    evidence pertaining to criminal cases.  We examine for the
9    presence of biological materials, try to determine what that
10   material may be, whether it is blood, semen, salvia what
11   have you.  We try to develop DNA profile from that, issue a
12   report as to our findings and testify when required.

13   Q.   Were you employed prior to working for the Nassau
14   County Medical Center Examiner's office in forensic
15   geneticist?

16   A.   Yes.

17   Q.   Where were you employed by?

18   A.   I started in September of 2000 with New York City
19   Office of the Chief Medical Examiner in their Department of
20   Forensic Science, in the Forensic Biology Department.
21   That's their DNA lab in the city.  I did that for two years,
22   until September of 2002.  I went to the New Jersey State
23   Police and worked in the DNA laboratory there.

24   Q.   And were your duties at those two places of
25   employment comparable for what you do for the Nassau County

1    Medical Examiner's office?

2         A.    Yes.

3         Q.    What is your educational background?

4         A.    Bachelor degree in biology.

5         Q.    Now, as part of your work at the Nassau County

6    Medical Examiner's office, do you take competency exams?

7         A.    Yes.

8         Q.    What does it mean to take a competency exam being

9    at the medical center?

10        A.    Competency exams refer to your initial competence.

11   Basically, when you start the job at a forensic laboratory,

12   you are demonstrated all of the techniques and procedures

13   that you will be doing.  You are then required to perform

14   all of those techniques and procedures while being observed

15   by a competent analyst.  After which point you are given

16   unknown samples you have to perform all of the procedures

17   on.  That's the competency test to deem you are competent in

18   those procedures.

19        Q.    And did you take that competency examination?

20        A.    I did.

21        Q.    Have you passed those competency examinations?

22        A.    I did.

23        Q.    Do you also take proficiency exams?

24        A.    Yes.

25        Q.    And what is a proficiency exam?

1        A.    Proficiency exams are through the proficient still

2    in the procedures.  They're given every six months, twice a

3    year, and basically, it's just unknown samples from outside

4    agencies that are given to us.  We have to examine them as

5    casework and, you know, produce results that are then

6    reviewed by that outside agency and they determine if you

7    correctly performed all of the analysis and then are

8    proficient.

9        Q.    Are you currently deemed proficient?

10       A.    I am.

11       Q.    Have you ever been deemed un-proficient?

12       A.    No.

13       Q.    Do you engage in continuing education in your

14   field?

15       A.    Yes, we're required to.

16       Q.    Can you summarize what the requirements are?

17       A.    Eight hours a year minimum requirement, usually

18   involves things like extra statistical training, or classes

19   given somewhere throughout the state generally.

20       Q.    Have you completed your requirement in continuing

21   education for this year?

22       A.    I have this year, yes.

23       Q.    During your career as a forensic geneticist,

24   approximately how many evidentiary exams have you conducted?

25       A.    Thousands.

kmm

Chillseyzn - People - Direct        850

1      Q.   As part of your work in the medical examiner's

2   office, have you worked to develop DNA profiles?

3      A.   Yes.

4      Q.   Approximately, how many times have you done that

5   over your career?

6      A.   Profiles, again, thousands.

7      Q.   Have you ever testified before regarding those

8   results of DNA analysis?

9      A.   I have.

10      Q.   In those instances, when you testified, were you

11   qualified as an expert in forensic geneticist and/or DNA

12   analysis?

13      A.   I was.

14      Q.   Which jurisdiction have you testified?

15      A.   New Jersey State Supreme Court, here in Nassau

16   County, grand jury and trial and civil trial in Nassau

17   County, and grand jury in Suffolk County.

18      Q.   Has there ever been a time when a Court has not

19   deemed you to be an expert?

20      A.   No.

21      Q.   Is the medical examiner's office, for who you

22   work, is the medical examiner's office an accredited

23   laboratory?

24      A.   The DNA lab is an accredited lab.

25      Q.   Can you explain to the jury what an accredited lab

Chillseyzn - People - Direct          851

1    is?

2        A.    We're accredited by a body called ASCLD lab, it's

3    the American Society of Crime Lab Director Laboratory

4    accreditation board, and they're a national agency that

5    basically, when they come into your lab, they run an audit

6    of it, check your policies and procedures, how they are

7    written, go over the personnel, the employment, records.

8    They go over your recordkeeping practices and look at the

9    work you are doing.  Basically, they're there to make sure

10   that your policy procedures follow nationally mandated

11   guidelines that you are doing, what you say you are doing,

12   and that you are recordkeeping practices demonstrate that

13   you are doing what you are doing and can prove it and that

14   your personnel are all up to the guidelines they issue.

15       Q.    Are there processes in place at the medical

16   examiner's office to ensure evidence does not get

17   contaminated?

18       A.    Oh, yes.  We have a lot of quality assurance and

19   quality control procedures, they're called.  They start out

20   with things, personal protective gear, gloves and masks to

21   make sure we're not contaminating evidence with our own DNA,

22   but cross contamination is really more of a concern.  We do

23   things like cleaning the equipment and benchtop between each

24   examination, using disposable equipment whenever possible.

25   And never running known and unknown samples together at any

1    time you examine them together.  Procedures like that to

2    ensure the integrity of the evidence is always paramount.

3              MR. PERRI:  Your Honor, I ask at this time

4         the witness be deemed an expert in forensic genetics

5         and DNA analysis.

6              THE COURT:  Mr. Berger, would you like to

7         inquire?

8              MR. BERGER:  No.

9              THE COURT:  Give me the title again.

10             MR. PERRI:  Forensic geneticist and DNA

11        analysis.

12             THE COURT:  This witness is being declared an

13        expert in forensic genetics and DNA analysis without

14        objection; is that correct, Mr. Berger?

15             MR. BERGER:  Yes, your Honor.

16             THE COURT:  Thank you.

17   Q.    Explain to the jury what DNA is.

18   A.    Sure.  DNA stands for deoxyribonucleic acid.  It's

19   really just a long double chain molecule that we find in

20   almost every cell of our body.  It works like a genetic

21   blueprint.  It determines things such as hair color, eye

22   color.  Some important things to remember about DNA are you

23   get half from your mother and half from your father.  They

24   remain the same throughout your lifetime so if we compare

25   DNA from now to ten years ago, from the same individual, it

kmm

Chillseyzn - People - Direct          853

1    will be the same, and it's the same throughout your body.

2    So DNA from your saliva, or from your blood, or skin cells,

3    from the same individual, will be the same.

4        Q.    And what factors can lead to DNA being found on

5    clothing?

6        A.    I mean, it has to be deposited.  Like I said, the

7    DNA is found in cells of the body, so any cells that get

8    deposited on clothing, just by wearing clothes you deposit

9    skin cells by also other biological fluids, sweating, saliva

10   blood, any of those carry DNA.

11       Q.    Can you explain how saliva is contained in DNA?

12       A.    Sure.  It basically just has cells from in the

13   salivary glands and ducts themselves, when it is produced

14   epithelial cells, or skin cells are put in there, but also

15   cells from inside your mouth are swabbed off continuously

16   and will always be in your saliva.

17       Q.    Can you explain what else is in your saliva?

18       A.    It's mostly water.  It's secretion produced by the

19   saliva gland.  The important part of it, as far as bodies

20   are concerned, an enzyme called Amylase that starts to break

21   down carbohydrates while the food is still in your mouth.

22       Q.    What is the purpose of doing DNA analysis?

23       A.    Well, DNA, it's a tool we use to identify an

24   individual that may have left behind biological fluid.  It's

25   very discriminating.  Like I said, DNA is very long

kmm

1    molecule.  It's about three billion base pairs long.

2    Between all of us, 99 percent of our DNA is exactly the

3    same.  That's what the determines makes a human body.  It

4    has to be the same.  That less than one percent that is

5    different from each person.  We're able to look at small

6    sections of the DNA in those differences and we're able to

7    determine what alleles or variations a person may have at

8    those sections.  By looking at several different sections of

9    DNA, we're able to develop a profile, and those profiles are

10   very characteristic of the individual that the DNA came

11   from.  With the exception, of identical twins, everyone's

12   DNA profile is going to be different, and that's a very

13   powerful tool for us to individualize, or to say who

14   contributed DNA that might be found on evidence.

15        Q.   Can you clarify what you mean by the word allele?

16        A.   I'm sorry, allele is just the word we use to name

17   the different variants that are available at any location.

18   So, for example, if you are looking at simplistically the

19   part of DNA that gives people eye color, the gene that gives

20   blue eyes, is one allele, the brown-eyed gene would be

21   another allele.  It's another word for the variable.

22        Q.   Outside of identical twins, can DNA be the same

23   for any two people?

24        A.   No.

25        Q.   What does it mean to be a contributor of DNA?

kmm

Chillseyzn - People - Direct        855

1       A.    That just refers to the person who contributed the

2   DNA to the evidence.  Sometimes DNA may be a single source,

3   from one person contributing DNA to the stain, or it could

4   be a mixture where more than one person contributed DNA to

5   certain pieces of evidence we're examining, and they're both

6   considered contributors to that mixture.

7       Q.    What processes do you use to analyze DNA?

8       A.    Our analysis involves a four-step process.  After

9   we identify the biological fluid and try to determine what

10  it may be, it goes into the first step, which is the

11  extraction.  We take a small cutting of whatever we're

12  looking at, the swab or a stain, and we put it into a tube,

13  add some chemicals and heat and it breaks open the cells,

14  and releases the DNA into the solution.

15           Now that we got the DNA in the solution, we need

16  to know how much is there, and if it is actually amplifiable

17  human DNA.

18           So the second step is quantitation.  That just

19  tells us how much DNA we have in the solution there.

20           The third step is amplification.  Without it we

21  know how much DNA we have in the solution.  We need to make

22  it usable to us.  So, we amplify those small sections in the

23  DNA that we're concerned with through a process called PCR,

24  preliminary chain reaction.  It's like the legend to the

25  Xerox machine.  We take that double chain, DNA, add heat and

kmm

1    it splits apart and chemicals comes through and just makes

2    copies of two strands.

3           Now, you have one strand of DNA.  You could have

4    two reliable copies for that same DNA.  We do this for

5    twenty-eight cycles.  So we have maybe hundreds of copies of

6    DNA that were available in the original stain.  We now have

7    millions of copies of those small sections that we're

8    concerned with.

9           At the same time the multiplication is happening,

10   we're tagging the new strands of DNA with dye, reflective

11   dye.  That's for the last step that is the analysis.

12          Basically, we take all of those copied sections of

13   DNA, put it in a tube at one end and under an electrical

14   current they are dragged through what is called a capillary.

15   It's a tube about thirty-six centimeters long, only about

16   the width of a human hair, but hollow inside.

17          As DNA gets dragged through the tube by

18   electricity, it gets slowed down by the inside of the tube

19   and poly that is inside.  And basically, it separates out

20   that DNA by size.  The shorter strand of DNA are able to

21   travel more quickly through the tube than the longer strands

22   are.

23          So the type of DNA that we're actually looking at

24   is the small section that is called STR.  That is short for

25   tandem repeat.  It's basically just a repeat of -- when I

1    say DNA long chain, it's a chain of base pairs.  Those are

2    molecules all linked together, three billion for the whole

3    thing.  We're looking at anywhere between two-fifty base

4    pair section, and each of those sections has the short

5    tandem repeats, which are four base pairs, linked together

6    in a repetitive fashion.  So at one location we're

7    looking -- for example, from your mother you might have

8    gotten twelve repeats of the same base pairs, and from your

9    father you might have gotten fifteen repeat.  So at that

10   location, we just say that person is a twelve fifteen, but

11   this is number of repeats makes those sections of DNA vary

12   by size.  That's what allows us when we do the analysis,

13   because they're different sizes that travels through the

14   tube at different speeds, and we can bounce a laser off that

15   dye we put on during the amplification that tells us exactly

16   how long it took a strand to go through the tube, which

17   tells us exactly how long it is, which tells us how many

18   repeats are present, and that allows us to know that at this

19   location there is this many repeats.  We look at fifteen

20   different locations over the whole genome, plus one sex

21   determining location, which tells us X or Y, male or female.

22   If you put all of those numbers together, that's what we

23   consider a profile and that comparing those numbers to

24   someone's known profile allows you to say either they're the

25   same or not the same.

Chillseyzn - People - Direct          858

1        Q.    As a DNA analyst, are you required to keep any

2    records when you conduct an examination?

3        A.    Yes.

4        Q.    What kind of records do you have to keep?

5        A.    We keep all the notes that are taken during the

6    examination of the evidence, any photographs that are taken

7    during the examination of the evidence, any results of all

8    of the steps of the analysis, plus our conclusions and

9    report.

10            Along, with that there is administrative paperwork

11   such as case contacts, chain of custody, those type things.

12            MR. PERRI:   I ask the witness be shown what

13       was pre-marked People's 5 and 6 for identification.

14            THE COURT:   Please show it to the witness.

15            (Whereupon, People's Exhibits 5 and 6 were

16       handed to the witness.)

17       Q.    Do you recognize what was marked as People's 5 and

18   6?

19       A.    Yes, I do.

20       Q.    What do you recognize them to be?

21       A.    People's 5 is a copy of the case file and report

22   issued for our laboratory number FG130411, which is the case

23   pertaining to case report number 2013CR238372.  People's

24   Exhibit 6 is a copy of the case report and file associated

25   with our laboratory number FG13S081, which is the same case

kmm

1    report number as the evidence case.

2        Q.   And how are you familiar with these files?

3        A.   These are, like I said, copies of case files that

4    I compiled and issued the report for regarding that case

5    number.

6        Q.   Now, are the records contained in both of those

7    files made in the ordinary course of business of your

8    laboratory?

9        A.   They are.

10       Q.   Is it the ordinary course of business of your lab

11   to make such records?

12       A.   Yes.

13       Q.   Were those records made by a person under a

14   business duty to keep them and make them accurately?

15       A.   Yes.

16       Q.   Were those records made on or about at the same

17   time the procedures and events reported therein?

18       A.   Yes, they are.

19       Q.   Were you custodian of those records?

20       A.   Yes.

21            MR. PERRI:  I ask that both of those items,

22       People's 5 and 6 be received into evidence.

23            THE COURT:  Do you need to see them?

24            MR. BERGER:  I do.  Could we step up?

25            THE COURT:  You may.

Chillseyzn - People - Direct          860

1          (Whereupon, there was a sidebar discussion at
2     the bench, as follows:)
3          MR. BERGER:  Judge, this doesn't come in as a
4     business record.  It was prepared for litigation.
5     Business records are kept in the ordinary course of
6     business when they're not being prepared for
7     litigation.
8          THE COURT:  Mr. Perri.
9          MR. PERRI:  The medical examiner's office is
10    not part of the police department.  It's a separate
11    body that these -- the examination is in the ordinary
12    course of the division of the county government, and
13    the analysis contained therein is a record that the
14    proper foundation has been laid for as the business of
15    the medical examiner's office.
16         MR. BERGER:  I can't hear you.
17         MR. PERRI:  To conduct this kind of testing
18    to make records of that test.  In the same way as the
19    SANE nurse exam, it is very relevant in the
20    prosecution, that does not -- just because it was the
21    University Medical Center, which is also part of the
22    county government, doesn't deem it to be directly part
23    of law enforcement or to be prepared specifically for
24    litigation.
25         MR. BERGER:  The nursing exam is a separate

Chillseyzn - People - Direct          861

1    exception with respect to children and hospital

2    records.

3                THE COURT:  I don't think it's the children

4    part of it that makes it separate.

5                MR. PERRI:  That we don't have to lay a

6    foundation for our certified copy of hospital records.

7    It's the only difference between business records and

8    containing a hospital exam and any other business

9    record.

10               MR. BERGER:  This business record that you

11   call it, is a document prepared for litigation.  It is

12   specifically taken in order to send to the medical

13   examiner's office for the litigation in this lawsuit.

14               MR. PERRI:  This is not a lawsuit.

15               MR. BERGER:  Yes, it is.  It's a criminal

16   action.  It's a lawsuit.

17               THE COURT:  As I understand the law, as I sit

18   here right now, I do believe that these records, DNA

19   records, can come into evidence, and I'm going to allow

20   them into evidence, but I don't want them shown to the

21   jury at this point.

22               I'm just going to confirm overnight.  As I

23   sit here now, I do believe that the DNA records are

24   allowed to come into evidence as a business record.

25   I'm going to allow it, but again, I'll confirm it

Chillseyzn - People - Direct       862

1      overnight.  Just don't share them with the jury.

2                  MR. PERRI:  Yes, your Honor.

3                  (Whereupon, the proceedings resumed.)

4                  THE COURT:  Let's have five and six marked

5        into evidence.

6                  (People's Exhibits 5 and 6, previously marked

7        for identification, was marked and received in

8        evidence.)

9                  MR. PERRI:  I ask them be returned to the

10        witness.

11                  THE COURT:  They may.

12                  (Whereupon, People's Exhibit 5 and 6 were

13        handed to the witness.)

14      Q.    Mr. Chillseyzn, did the Nassau County Medical

15    Examiner's office under the case report number that you

16    previously testified about, did you receive evidence related

17    to an individual named Daniel Ramos, and a second individual

18    named Mya Ramirez?

19      A.    We did.

20      Q.    And what items of evidence did you receive?

21      A.    We received one sexual offense evidence collection

22    kit taken from Mya Ramirez.

23      Q.    And what other evidence did you receive, or what

24    other items did you receive with respect to Daniel Ramirez?

25      A.    A buccal swab, a known swab from inside of the

kmm

1   cheek that's a known example from the individual.   We

2   received one taken from Daniel Ramos.

3              MR. PERRI:   I ask the witness be shown

4        People's 4 in evidence.

5              (Whereupon, People's Exhibit 4 was handed to

6        the witness.)

7        Q.    Do you recognize what was marked in evidence as

8   People's 4?

9        A.    I do.

10       Q.    What do you recognize that box to be?

11       A.    This is the sexual offense evidence collection kit

12   I referred to receiving in this case.

13       Q.    How do you know that is the same sexual offense

14   evidence kit you received in connection to this case?

15       A.    My initials, case number, and the date I examined

16   it are written in my handwriting on the back.

17       Q.    When you received this item under case report

18   number that you discussed, could you describe whether or not

19   it's in the same condition as it presently is before you?

20       A.    It is not.   It was sealed just with the tape and

21   the evidence sealing label.   These labels I put on it to

22   seal it after.   I was done with my examination, and there

23   was seal.   Now it is open.

24       Q.    Could you please open the kit?

25       A.    Sure.

kmm

1      Q.    Look inside, and I ask you if you recognize what

2   is inside this kit?

3      A.    I do.

4      Q.    Do you recognize what is -- what the envelopes

5   inside are?

6      A.    Yes.

7      Q.    What do you recognize them to be?

8      A.    These are the envelopes that you typically find in

9   a sexual offense evidence collection kit.  In this case

10  there are the ones that are relevant to this case were --

11  and were used are the evidence, oral swabs and smear.  A

12  smear is after they take a swab, they make a glass slide out

13  of it for examination.

14         There's the buccal specimen taken from the victim,

15  Mya Ramirez.  One that contained underwear taken from the

16  victim.  One for dried secretions, which are just secretions

17  that may have been on the body that the nurse examiner

18  identifies in some way and tries to swab them off and that

19  looks like it.

20     Q.    In addition to those envelopes?

21     A.    There's perianal swabs also.

22     Q.    In addition to that last envelope and the other

23  envelope you just got when you opened that box, is there

24  additional envelopes inside?

25     A.    Yes, there's one for the vulva swabs.

kmm

1      Q.   With respect to all of envelopes contained in that

2  box, when you received them, were they in a different

3  condition than they are now?

4      A.   They were sealed with tape on this side, bottom

5  not open.  I made these cuts and resealed them after the

6  examination.

7      Q.   What, if any, other markings on the envelopes did

8  you recognize?

9      A.   You can see the case number, the date and

10  initials, and the item number that's in my handwriting.

11           THE COURT:  Mr. Perri, we have been going for

12       a little bit more than hour now.  I promised the jury

13       to get that break after an hour's worth of testimony.

14       Let me keep my word to them.

15           Members of the jury, do not discuss this case

16       during this break.  Don't get on your phone and look

17       anything up.  Don't talk to anybody in the hallways.

18       Keep an open mind.

19           See you all in about ten minutes.  Thank you.

20           (Whereupon, the jury exited the courtroom.)

21           THE COURT:  We'll take a five-minute break.

22       I just want the record to reflect I had an opportunity

23       to quickly look at some material that are on my desk

24       with regards to DNA reports, which is five and six in

25       evidence.  And I just want to note for the record that

1    these reports, which I have had marked into evidence,

2    can now be shared as the People see fit.  The evidence

3    and reports are admissible at trial.  The Court has

4    determined an adequate foundation has been laid for

5    admissibility.  I found it has been made, so they can

6    now be utilized.

7              MR. PERRI:  Thank you, your Honor.

8              THE COURT:  See you all in ten minutes.

9              MR. BERGER:  I don't think I heard you.  What

10   was the basis for it coming in?

11             THE COURT:  Actual basis is the Bench Book

12   for Trial Judges, which talks about DNA evidence.  As

13   long as the proper foundation has been laid by the

14   People, DNA evidence is admissible at trial and can

15   come in, and it says the Court should not include a

16   determination on the truthfulness of the evidence.  I'm

17   imagining you both would have told me if that was in

18   there and that would have been excluded, but the

19   reports are, but so they can now be shown to the jury

20   if the People choose to do that.

21             MR. PERRI:  Yes, your Honor.

22             (Whereupon, a short recess was taken.)

23             (Whereupon, the jury entered the courtroom.)

24             THE CLERK:  Both sides stipulate to the

25   present and properly seated jury.

1                    MR. PERRI:  Yes, your Honor.

2                    THE CLERK:  Both sides are ready?

3                    MR. BERGER:  Yes.

4                    THE COURT:  You may continue.

5                    MR. PERRI:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MR. PERRI:    (Continuing)

8         Q.   I ask you to direct your attention to the envelope

9    marked underwear.

10        A.   I have it.

11        Q.   Do you recognize that specific envelope?

12        A.   I do.

13        Q.   And what condition was that envelope in when you

14   first received it?

15        A.   It was sealed.

16        Q.   I ask you to take a look inside and ask you if you

17   recognize what the contents are and if you could take them

18   out?

19        A.   I do.   These are the underwear I examined for this

20   case and itemized as item number 1-A.

21        Q.   How do you know that they are the same pair of

22   underwear you examined for this case?

23        A.   You could see initials, the date number, and it is

24   in my handwriting.

25        Q.   When you received that pair of underwear, were

kmm

Chillseyzn - People - Direct          868

1    they in the same condition as they are now?

2         A.    No.   There's a couple of stains were removed by me

3    from these underwear.   They were one whole garment when I

4    received them.

5              MR. PERRI:   I ask you to put it back into the

6         envelope.   Thank you.

7         Q.    I would like to turn to the testing you conducted

8    regarding the sexual assault evidence kit.   Did you perform

9    any testing with respect to the contents of that kit?

10        A.    I did.

11        Q.    First I would like to ask you about the buccal

12   swab that was distributed to Mya Ramirez; inside that kit,

13   did you do any testing with regard to that buccal swab?

14        A.    It was removed from the kit and retained in our

15   laboratory when it was decided that evidence would be sent

16   for testing.   It was sent to try to obtain a profile of Mya

17   Ramirez.

18        Q.    Were you, in fact, able to develop a DNA profile

19   of Mya Ramirez?

20        A.    We were.

21        Q.    Where is the swab -- to clarify where was the swab

22   located?

23        A.    It's retained in our laboratory.   Anything we end

24   up doing testing on, we retain in the lab.

25        Q.    Did you perform any other tests with respect to

Chillseyzn - People - Direct          869

1    the other swabs that you received in the evidence collection

2    kit?

3          A.    I did.

4          Q.    Can you explain what other testing you did?

5          A.    May I refer to my notes?

6                THE COURT:    You may.

7          A.    The relevant swabs in this kit that we obtained

8    were oral swabs taken from the victim, vulva swabs taken

9    from the victim, perianal swabs, and dried secretion swabs.

10   All of those orifice swabs are oral and perianal and valva

11   came with a smear as well.  I examined that smear after

12   staining for presence.  I did not see any sperm cells on any

13   of those.  So all of those -- cutting of all those swabs

14   were sent for what is called P30 testing, a testing for

15   protein found in semen.  They all tested negative for the

16   presence of semen.  They were all then sent for testing for

17   the presence of the saliva.  We test specifically for that

18   enzyme Amylase, that I mentioned earlier.

19               The vulva swab, it was indicated there was saliva

20   on the vulva swab.  The oral swab doesn't get tested for

21   saliva.  You could expect the victim's own saliva to be

22   there and perianal was negative for presence of saliva.

23         Q.    Directing your attention to the vulva swab, what,

24   if any, other testing, after it tested positive, indicating

25   saliva?

Chillseyzn - People - Direct        870

1         A.    We sent it for the four-step processes I said

2    earlier, and obtained DNA profile of any contributor of DNA

3    to the swab.

4         Q.    Explain the result of your testing analysis.

5         A.    Sure.  At the quantitation phase, that second step

6    where we determine how much DNA is present in the solution,

7    we're actually doing two quantitations right there.  We test

8    for the presence of what we call, autosomal DNA.  That's the

9    DNA that I was describing earlier that you get from your

10   mother and from your father.  You have from each.  We test

11   another type of DNA which is called YSTR.  It's the exact

12   same type of STR's.  It's examined in the exact same way as

13   the autosomal STR's.  The difference is they are only found

14   on the Y chromosome, which only men have.  We do this for a

15   couple of reasons.

16         A.   We're able to look in smaller amounts of DNA,

17   but in a case like this, where the swab is taken from the

18   body of a female victim, for example.  If we're going to

19   find anything, but the female victim on there, specifically

20   a male, by looking at the YSTR DNA, we're eliminating, we're

21   not amplifying the female DNA.  We're only amplifying the

22   YSTR that may be present for the male.

23         During the quantitation stage, the second stage,

24   we're actually quantitating how much autosomal DNA is

25   present, and how much male specific YSTR DNA is present.

kmm

1    When we have quantitated the vulva swab, it was indicated

2    that male DNA was present.  It was sent over for the rest of

3    analysis.

4         Q.   After finding there was male DNA present on the

5    vulva swab received for Mya Ramirez, what, if any, other

6    testing or results did you have from that swab?

7         A.   We developed a profile, but it was a single source

8    profile, there were no DNA alleles formed for the victim.

9    It was the profile of the victim.

10              THE COURT:  Let's have the question re-asked

11         and you answer.

12         Q.   Were there any further results with respect to

13    that swab?

14         A.   When we develop the profile from the profile,

15    there was a single source matching the profile of Mya

16    Ramirez.  There was no DNA formed for the victim obtained

17    from the vulva swab.

18         Q.   You said there was male genetic material found on

19    the vulva swab of Mya Ramirez; were you able to develop a

20    profile from that male DNA?

21         A.   We tried amplifying YSTR DNA, but there were peeks

22    detected that didn't meet our laboratory's criteria for

23    being assigned as tall peeks, so no, we weren't able to

24    develop a Y profile from it.

25         Q.   What, if anything, were you able to determine with

1    respect to underwear?

2         A.   I examined the underwear under an alternate

3    source, a very bright light that when looked at with the

4    proper goggles, causes any kind of biological material to

5    fluoresce.  You can see it identified two stains on the

6    underwear.  I identified it as one A-1 and one A-2.  They

7    were tested for presence of semen and tested negative for

8    presence of semen.

9              I then went to the salivary testing and presence

10   of saliva was indicated on both of those stains.

11        Q.   With respect to stain one A-1, what other testing

12   did you conduct on that stain?

13        A.   We tested for autosomal.  We went through the

14   whole process that I described earlier.  For the autosomal,

15   the mother and the father DNA that everyone has, we again

16   did not find any DNA formed to the victim.  It was a clean

17   profile that matched Mya Ramirez.  We then did YSTR

18   analysis, and we got a single source full YSTR profile of an

19   unknown male.

20        Q.   With respect to stain one A-2, what were you able

21   to determine?

22        A.   Again, we sent it through the process.  When

23   looking at the autosomal DNA, it was a mixture.  That means

24   that, again, more than one person can contribute DNA to this

25   particular stain.

1        Now, in mixtures you are able to, a lot of times,

2   if one person contributes a lot of DNA and another person

3   contributes a portion of DNA, as that DNA goes through the

4   analysis, that ratio stays the same.  So when we get the

5   results at the end, just because it's a mixture, and you

6   could tell it's a mixture, it's more than two alleles or a

7   variance at each location.  You know each person can only

8   have two, one from your mother and one from your father.  If

9   you see more than two, more than one contributor, you can

10  associate any allele or variance that's up at one level, as

11  coming from one contributor, who we call a major

12  contributor.  And the alleles that are down lower in all

13  relative to each other, are what we call a minor

14  contributor.  In this case, the major contributor to the

15  mixture was the same as Mya Ramirez, the victim.  The minor

16  contributor came from the unknown male.

17      Q.    What further testing were you able to do with

18  respect to one A-2 with regard to the minor contributor?

19      A.    We also put it through YSTR testing to amplify

20  only the YSTR and the male contributor.  We did get YSTR

21  results that was a mixture of at least two male individuals

22  that were found in the same stain.

23        Again, in this case, there was a major

24  contributor, and the profile of the major male contributor

25  in that YSTR on the stain was consistent with the same

Chillseyzn - People - Direct        874

1   unknown males found in stain one A-1.

2        Q.   As part of the evidence that you received -- I'm

3   sorry, as part of the items you received in this case, did

4   you receive a buccal swab from Daniel Ramos?

5        A.   Yes, we did.

6             MR. PERRI:  I ask what was marked as People's

7        7 for identification be shown to the witness.

8             THE COURT:  It may.

9             (Whereupon, People's Exhibit 7 was handed to

10       the witness.)

11       Q.   Do you recognize what was contained in the

12   envelope of People's 7?

13       A.   I do.

14       Q.   What do you recognize that to be?

15       A.   The outer package of the buccal swab I received

16   from -- taken from Daniel Ramos.  I recognize it because the

17   case number, the initials and date, and the time I analyzed

18   it, or had written it in my handwriting on the back.

19       Q.   When you received that envelope containing the

20   buccal swab, was it in the same state as it is presently?

21       A.   No, it was sealed, closed here.  I made the

22   cutting here to remove the swabs and then sealed it back up

23   when I was done.

24       Q.   And other than that, is it in the same or

25   substantially the same condition?

kmm

Chillseyzn - People - Direct          875

1      A.    Yes.

2      Q.    Where are the actual swabs contained therein?

3      A.    The swabs are contained in our laboratory.

4            MR. PERRI:  I ask People's 7 be received in

5      evidence.

6            THE COURT:  Mr. Berger, would you like to see

7      it?

8            MR. BERGER:  Please.

9            Voir dire, please, Judge.

10           THE COURT:  You may.

11     VOIR DIRE EXAMINATION

12     BY MR. BERGER:

13     Q.    What is it that is contained here if the buccal

14     swab is retained in your lab?

15     A.    It's just packaging.

16           MR. BERGER:  Oh, just packaging.  No problem.

17     No objection.

18           THE COURT:  Let's have it marked as People's

19     7 in evidence.

20           (People's Exhibit 7, previously marked for

21     identification, was marked and received in evidence.)

22           MR. PERRI:  I ask it be returned to the

23     witness.

24           (Whereupon, People's Exhibit 7 was handed to

25     the witness.)

1    DIRECT EXAMINATION

2    BY MR. PERRI:   (Continuing)

3        Q.    Once you removed the buccal swab delivered to you

4    in that envelope, you have testified it was sealed.   Once

5    you removed the buccal swab from the envelope, what, if any,

6    testing did you conduct on the swab?

7        A.    A cutting of the swab was sent for the same

8    analysis that I described earlier as the four-step process.

9    We were able to develop a DNA profile for Daniel Ramos.

10       Q.    Did you compare the profiles that you developed

11   from stain one A-1 and one A-2 that you testified were

12   consistent with one another, did you compare those profiles

13   with the profiles you developed from the buccal swab?

14       A.    I did.

15       Q.    What was the result of that comparison?

16       A.    Pertaining to the underwear stain, one A-1 where

17   we had the YSTR profile, the YSTR DNA profile, Daniel Ramos,

18   obtained from underwear one A-1.   Meaning that, Daniel Ramos

19   and all patrilineal male relatives, cannot be excluded as

20   being the source of that DNA.

21            That is one of the drawbacks of Y DNA analysis.

22   You are going to have the same Y DNA profile as all

23   patrilineal male relatives, meaning your father, any

24   brothers, cousins, uncles on that side, male children,

25   because you are not getting half of that DNA from your

1   mother.  There is no cross over.  It's not individualized.

2   It's the same DNA as you and all of your male patrilineal

3   relatives.

4           As pertaining to stain one A-2, we had an

5   autosomal profile.  That profile was consistent with the DNA

6   profile of Daniel Ramos and the YSTR DNA profile obtained

7   stain one A-2, was consistent with YSTR DNA profile of

8   Daniel Ramos.

9       Q.    Now, did there come a time when you conducted a

10  statistical analysis of all of your findings from the

11  genetic materials found on the two stains?

12      A.    I did.

13      Q.    Could you please explain what the results of that

14  statistical analysis was?

15      A.    Sure.  The combination of YSTR DNA alleles found

16  on stain one A-1, where the full single source YSTR DNA

17  profile was expected to be found in approximately one and

18  1,171 individuals.

19          For the stain one A-2, with the autosomal and the

20  YSTR DNA profile available, you expect to find that

21  particular combination of alleles present in the evidence in

22  approximately one and 175 million individuals.

23      Q.    Is the statistical analysis that you performed

24  accepted in the scientific community?

25      A.    It is.

Chillseyzn - People - Cross        878

1        Q.    Is the DNA analysis you performed at all stages on

2   the underwear, of the buccal swab, both buccal swabs, DNA

3   analysis that you conducted, is that accepted by the

4   scientific community?

5        A.    Yes.

6              MR. PERRI:   Thank you.   Nothing further.

7              THE COURT:   Cross-examination, please.

8   CROSS-EXAMINATION

9   BY MR. BERGER:

10       Q.    Mr. Chillseyzn, is that how you say your name?

11       A.    Yes, that will do.   Sure.

12       Q.    It's just spelled differently?

13       A.    Very differently, yes.

14       Q.    Did I hear you say that you have a bachelor's

15   degree in biology?

16       A.    Yes, sir.

17       Q.    Is that the extent of your formal education?

18       A.    Yes.

19       Q.    Are you a member of any professional

20   organizations?

21       A.    Not at the present time, no.

22       Q.    Now, did you say that you had to be tested every

23   six months or so in order to see if you were complying with

24   the appropriate procedures?

25       A.    It's to prove we're still proficient in the

kmm

1    procedures we use for the testing.

2        Q.    So, I assume that the times when you are tested --

3    not just you tested, your colleague, you are not proficient?

4        A.    To my knowledge, it's never happened to anyone in

5    my laboratory.

6        Q.    In your lab?

7        A.    Right.

8        Q.    Now, what is ASCLD?

9        A.    ASCLD stands for American Society of Crime Lab

10   Directors.  That's the accrediting agency that accredits our

11   laboratory.

12       Q.    Where did they get their authority from to make

13   them an accredited laboratory?

14       A.    I'm not really sure.  I know that they're a

15   national foundation.  They're considered the accrediting

16   body for DNA laboratory, at least that you want to hold your

17   accreditation from.  Every five years they do a major audit.

18   We recently passed ours last year, and there are yearly, I

19   guess, update checks.  However, we're audited by other

20   agencies on a biyearly basis and have to do an internal

21   audit on intervening years.

22       Q.    Why is it necessary to be audited by other

23   agencies if you have ASCLD?

24            MR. PERRI:  Objection.

25            THE COURT:  If you know.

kmm

Chillseyzn - People - Cross        880

1        A.    ASCLD audits are only done every five years.

2    Requirements are that you have an outside agency audit the

3    laboratory every other year.

4        Q.    That's to see if the procedures are in accordance

5    to where they should be?

6        A.    Yes, to make sure that our policy procedures

7    follow national mandated guidelines, and to ensure that

8    we're following those procedures with our recordkeeping

9    practices and personnel.

10       Q.    Who pays ASCLD?

11             MR. PERRI:   Objection.

12             THE COURT:   Sustained.

13       Q.    Does your lab pay ASCLD for the testing?

14       A.    I wouldn't know, sir.   I'm sorry.

15       Q.    It is true that there's DNA evidence on those --

16   on the stains one A-1 and one A-2, from at least two

17   contributors, correct?

18       A.    There was a mixture of DNA on stain one A-2.

19       Q.    Right.   And the mixture could be consistent of

20   saliva or epithelial cells, correct?

21       A.    It's a mixture of DNA.   I really can't speak about

22   what source cells they came from.

23       Q.    Because you cannot separate them, you cannot

24   separate DNA whether it be saliva or epithelial cells?

25       A.    I'm not sure I understand your question.   I

1    believe what you are saying is correct.  Yes, we can say the

2    presence of saliva was indicated on the stain.  Once it

3    comes down to breaking open the cells, and everything, you

4    can't say what cell that DNA came from.

5         Q.   Right.  You cannot say whether it's saliva or

6    epithelial cells?

7         A.   No, sir.  That's correct.

8         Q.   You did tell us there were two male contributors

9    to the stain, correct?

10        A.   Yes.  The YSTR indicated two males present on

11   stain one A-2.

12        Q.   Did you test the non-stained portion of the

13   underwear?

14        A.   No, sir, I didn't.

15        Q.   Just so the record is clear, you tested what you

16   were -- what you saw were two stains, you cut them out, you

17   tested them?

18        A.   It sounds correct.

19        Q.   But you didn't test the non-stained portion of the

20   underwear, correct?

21        A.   Right.  When we examined the item --

22        Q.   Just answer yes or no.  Is that correct?

23        A.   I did not test the unstained portion of the

24   underwear.

25             MR. BERGER:  Thank you.  I have nothing

kmm

1      further.

2                  THE COURT:  Any redirect?

3                  MR. PERRI:  Very briefly.

4   REDIRECT-EXAMINATION

5   BY MR. PERRI:

6      Q.   Just to clarify, Mr. Chillseyzn, with respect to

7   stain one A-1, was there a mixture of more than one male DNA

8   profile on stain one A-1?

9      A.   No, that was a single source male YSTR DNA profile

10  on DNA.

11     Q.   And was the single source YSTR DNA profile you

12  developed on stain one A-1, was that consistent with the DNA

13  profile that you developed from the buccal swab of Daniel

14  Ramos?

15     A.   They were the same profile.

16     Q.   With respect to one A-2, you did say there were

17  two profiles, YSTR, the major contributor of the YSTR DNA --

18                 MR. BERGER:  Objection.  Not proper redirect.

19                 THE COURT:  Overruled.

20     Q.   The major contributor of the DNA -- YSTR DNA

21  contained on stain one A-2, was that consistent with the DNA

22  profile of Daniel Ramos?

23     A.   The major male contributor found YSTR DNA profile

24  was consistent with the YSTR DNA profile of Daniel Ramos.

25                 MR. PERRI:  Thank you, your Honor.  Nothing

Proceedings                    883

1      further.

2                  THE COURT:  Any recross?

3                  MR. BERGER:  No, your Honor.

4                  THE COURT:  Given the hour, we'll stop here

5      for today.  I'll ask you be back here tomorrow at ten

6      a.m., and we'll get started as soon as everybody

7      gathers up.

8                  Remember to keep an open mind throughout the

9      trial.  Do not discuss the case amongst yourselves or

10     with anyone else during the trial.  Do not permit

11     anyone to discuss the case in your presence.  Do not

12     talk to the lawyers, witnesses, or the defendant about

13     anything during the trial, and remember, if you run

14     into any of us, we'll ignore you.  Do not take it

15     personally.

16                 Do not visit or view the place where it was

17     allegedly committed, or any other place involved in

18     this case.

19                 And any news coverage of the case, do not

20     read, view or listen to any accounts or discussions of

21     the case reported by the news media, and do not attempt

22     to research any facts, issue or law related to this

23     case, whether by discussion with others, by research in

24     the library, on the Internet, or by any other means or

25     source.  Have a greet evening.  See you all tomorrow at

kmm

Proceedings          884

1          ten a.m.

2                    (Whereupon, the jury exited the courtroom.)

3                    THE COURT:  Anything for the record,

4          Mr. Berger?

5                    MR. BERGER:  No, your Honor.

6                    THE COURT:  Anything for the record, People?

7                    MR. PERRI:  No, your Honor.

8                    THE COURT:  See you tomorrow at 10:00 a.m.

9                    (Whereupon, the trial was adjourned to May

10          13, 2015.)

11                    *                    *                    *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

kmm



885

```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    COUNTY OF NASSAU : CRIMINAL TERM PART 43

 3    -------------------------------------------X
      THE PEOPLE OF THE STATE OF NEW YORK,     :   Indictment
 4                                             :   No. 742N/14
               -against-                       :
 5                                             :
      DANIEL RAMOS,                            :
 6                                             :
                          Defendant.           :   Jury Trial
 7    -------------------------------------------X

 8                                 May 13, 2015
                                   262 Old Country Road
 9                                 Mineola, New York

10
      B E F O R E:
11
          HONORABLE TERESA K. CORRIGAN,
12                    Acting Supreme Court Justice

13
      A P P E A R A N C E S:
14
      (As Previously Noted)
15

16                 *      *      *    *       *

17

18                 THE CLERK: Case on trial continued,

19        Indictment 742N of 2014.  People of the State of New

20        York vs. Daniel Ramos.

21                 Let the record reflect, all parties are

22        present.  The jury is not present at this time.

23                 Are the People ready?

24                 MR. PERRI:  Yes, your Honor.

25                 THE CLERK:  Defense counsel ready?
```

Proceedings                    886

1          MR. BERGER:  Yes, but there will be an

2     application that I have.  I know you have other matters

3     you want to bring to our attention first.

4          THE COURT:  Let's take care of what we have

5     been advised of earlier this morning.  My law secretary

6     got a call from juror number seven, Mr. Lawrence

7     Fischer, advising her that his father passed away

8     suddenly yesterday and that he was on his way out of

9     town and needed to quote/unquote get off the jury.

10          In light of that information that has been

11     brought to my attention, it's the Court's intention to

12     replace juror number seven with the current alternate

13     number one, Bradly Cammarano.

14          Mr. Berger, I'll hear you on that.

15          MR. BERGER:  I understand, I assume he's not

16     intending to come back any time soon and --

17          THE COURT:  That is my understanding that he

18     couldn't come in today.  We asked him if he could come

19     here this morning so we could speak to him on the

20     record and have a colloquy on the record, and he

21     advised my law secretary he was already heading out of

22     state and was not able to come, and again, quote,

23     needed to get off the jury.

24          So, I have no reason to believe that he is

25     coming back any time soon.  I will do this, he did

kmm

Proceedings                887

1      leave a cell phone number.  I could have my staff call

2      and just confirm that when he said, get off the jury,

3      that was because his travels out of state would prevent

4      him from coming back in a reasonable amount of time.  I

5      would have no problem losing one day, but then losing

6      tomorrow and potentially losing days next week, I would

7      not be willing to do.

8                  MR. BERGER:  That would interfere with -- I

9      have issues with respect to that as well.

10                 THE COURT:  Do you want my staff to make a

11     follow-up call to confirm that out of town meant he's

12     not available to come back, or are we looking to --

13                 MR. BERGER:  I have no reason to disbelieve

14     somebody made a statement like this.  If you do, I

15     don't mind if you call, but I --

16                 MR. PERRY:  People have no opposition?

17                 THE COURT:  I don't have any reason to

18     disbelieve it.  It seems like it was a sudden event and

19     some level of shock to the gentleman.  We're going to

20     replace juror number seven with current alternate

21     number one.

22                 That being taken care of, any application for

23     the Court before we bring in the jury and continue with

24     today's testimony?

25                 MR. PERRI:  Your Honor, just to explain the

kmm

Proceedings                 888

1    next witness the People intend to call, we received the

2    name from the NICE bus company of the person yesterday.

3    I spoke with defense counsel, and he happened to call

4    another issue and inform him of the Court.  Her name

5    was Diane Iallenti.

6             MR. BERGER:  Spell, that please.

7             MR. PERRI:  I-A-L-L-E-N-T-I, that she would

8    be who would be provided from the parent company of

9    NICE bus.  The actual operating company is called

10   Transdev, T-R-A-N-S-D-E-V.  It's the current form of

11   what previously was the Violi Transportation Company

12   that took over the operation of public bus system in

13   Nassau County from MTA.  She brought with her today

14   documents related to the requirements of the

15   defendant's employment with the bus company,

16   specifically germane to his ability to speak English.

17   That is the sole purpose of the People calling this

18   witness.  We are not seeking any, of course, prohibited

19   character evidence about how he performed his duties

20   and that the documents that the People would be seeking

21   for her to use and ask as business records to be

22   entered into evidence if the Court finds the foundation

23   is properly laid are simply related to his ability to

24   speak English, your Honor.

25             THE COURT:  Mr. Berger, would you like to be

1    heard on that?

2              MR. BERGER:  I don't know that's an issue

3    with this trial.  Nobody has ever disputed he couldn't

4    speak English, but to bring in -- and Mr. Perri has

5    provided me with what are the so-called requirements,

6    but I don't think this witness would know to what level

7    he speaks English and that he or she could testify to

8    that.  I don't think it's relevant at this point.  Why

9    is this necessary to this trial?

10             THE COURT:  People.

11             MR. PERRI:  Your Honor, if you recall from

12   the hearing at this trial, that was the bulk of defense

13   counsel's arguments as to why the statement taken from

14   the defendant, which was taken in English originally,

15   after his rights were read in Spanish to him, that was

16   the bulk of defense counsel's arguments as to why the

17   statement could not be properly attributed to the

18   defendant as he could not be fully aware of what he was

19   reading.

20             Additionally, the defendant does have, as his

21   right, a Spanish language translator in the courtroom

22   and the fact that the statements given is taken in

23   English, the issue is before the jury.  It's very

24   limited testimony.  It has nothing to do with anything

25   other than his ability to speak English.  If defense

Proceedings                    890

1    counsel were in the alternative to enter into a

2    stipulation of the defendant was able to read and speak

3    English at a level where he would be capable of

4    comprehending the statement that the People are

5    offering through Detective Baran, that would alleviate

6    the need to call the witness, but the People believe

7    the issue is both, has been presented previously by

8    defense counsel and it is before the jury in some form,

9    is the defendant using a translator in front of the

10   jury, your Honor.

11             MR. BERGER:  Detective Baran can testify that

12   he speaks English.  There's nothing that Mr. Perri

13   offered to the Court, he was offering this witness that

14   shows the witness speaks English.  We don't dispute he

15   speaks some English.  But, Mr. Perri, threw in the word

16   we, English as well, and this witness will not be able

17   to testify as to whether he reads English.  And

18   certainly, the witness has no personal knowledge one

19   way or the other about the extensive ability to speak

20   it clearly or to read it at all.  If the offer is that

21   he speaks English, we can stipulate that he speaks some

22   English, but not to what level he is going to speak it.

23             THE COURT:  People, let me ask you this:

24   This witness has no personal interaction with the

25   defendant?

kmm

Proceedings                891

1           MR. PERRI:  This witness, your Honor, this

2      witness does have personal interaction with a letter,

3      and the People are not introducing it, as we do not

4      seek to introduce that letter.  The defendant wrote a

5      letter from the jail to his -- to the bus company in

6      English asking for the rights and control of his 401(k)

7      to be transferred to his family members.  Although,

8      this witness doesn't have, other than that personal

9      knowledge of the defendant's ability, he was employed

10     by the company, multiple years by this company, and the

11     witness will testify the job requirements, he presented

12     English themselves.  He stated he had to have the

13     ability to read and understand and interpret the

14     transit system and operation rules, regulations, policy

15     phases and routes, and that these documents

16     specifically, the regulations, the policies of the

17     condition were written in English.

18           Additionally, as part of the defendant's

19     personnel file, his acceptance offer for his acceptance

20     for the offer of his employment, which he signed was in

21     English and acknowledgments, various other

22     acknowledgments, including a form I-9, are also in

23     length, which he submitted, which also including a

24     photocopy of his ID.

25           THE COURT:  People, how is this not more

Proceedings                892

1    appropriate maybe in a rebuttal setting?  The fact that

2    Mr. Berger brought something up at a hearing is not

3    true positive that's the same arguments that is going

4    to be made at a trial.  So, I don't know if it's maybe

5    the timing, the situation.  I'm sitting here thinking

6    this is more of a potential rebuttal issue depending on

7    what comes out in cross-examination of these witnesses.

8    I don't see it as completely relevant yet.

9             MR. PERRI:  Sure, if that's the Court's

10   position, I could inquire of the witnesses if they are

11   available to come back, either tomorrow or this

12   afternoon, after the People call the two detectives to

13   testify and that we could call them then if it becomes

14   an issue through defense counsel's cross-examination.

15            MR. BERGER:  Could I talk to my client for a

16   second?

17            THE COURT:  Yes.

18            MR. BERGER:  Just so the record is clear, I

19   just inquired of my client with respect to the 401

20   letter.  Somebody wrote it for him in the jail, which I

21   expected.  In fact, as I look at the form Mr. Perri

22   provided to me, the I-9 form he refers to, you can see

23   that there's a signature by Mr. Ramos, but the

24   handwriting, as far as the address, it is clearly not

25   his.  So, he could have taken the form home, signed it,

Proceedings                    893

 1    had it been read to him by family members.  He's

 2    looking to get a job.  He's been at the job since 2007.

 3    They're very happy with his work there.

 4              I would suggest to the Court this is a straw

 5    man that if they're looking to question.  I mean,

 6    listen, you have testimony from the detectives at the

 7    hearing itself in which they asked him, would he want

 8    to have rights read to him in English and Spanish and

 9    he said Spanish.  There's clearly a language issue

10    here, and we're going to get into the degree of skill

11    in speaking, in reading, in writing.  I don't think

12    that's where we want to go, Judge.

13              MR. PERRI:  As defense counsel just said,

14    he's going to get into the cross-examination, the

15    degree to which the defendant is able to speak Spanish

16    and speak English, and that is going to be part of his

17    cross-examination.  If defense counsel makes that

18    representation, then his testimony, that part of his

19    job responsibilities were that he could read and speak

20    English is relevant to the statement being accurate.

21              THE COURT:  All right.  At this point, I

22    don't want to cross a bridge before we get there.  I

23    appreciate, People, what you said, what Mr. Berger just

24    said.  I did hear him.  Again, that which we think

25    we're going to do, that which versus what actually

Proceedings                    894

1    happens in the trial is not always the same thing.  I

2    see this testimony at this point as potential rebuttal

3    only.  I'm not saying it absolutely is.  I don't see it

4    as relevant for the People's direct case in light of

5    the fact that this witness can only talk about

6    potential policy and not her personal interaction with

7    the defendant regarding these issues.  I'm not going to

8    allow it in on your direct at this time.

9         Again, I will rehear arguments if you believe

10   it is appropriate potential rebuttal or possibly just

11   appropriate to have the witness called in a different

12   order.

13             MR. PERRI:  Yes, your Honor.

14             THE COURT:  What are the People intending on

15   doing today?

16             MR. PERRI:  Can I inquire of the witness?  I

17   know they have conflicts this afternoon, just to make

18   sure if they're available tomorrow morning.

19             THE COURT:  Absolutely.  If they are not

20   available until next week, I'll work around both sides'

21   schedules with witnesses.

22             Anything else for the record before I bring

23   the jury?

24             (Whereupon, there was a pause in the

25   proceedings.)

1          MR. BERGER:  It's now come to my attention,

2     as a result of what I learned yesterday in the

3     courtroom, that the application I'm making is to recall

4     Sincere to this witness stand because I have now

5     learned something, I think the DA would know, or that

6     Sincere, in fact, was abused sexually when he was a

7     boy.  Had I known this yesterday, I think that

8     information would have directly affected the perception

9     of him as a witness.

10          Now, it's not really my desire necessarily,

11     if I have to, yes, bring him back.  Alternatively, we

12     could have Crystal come back and she could testify

13     about the fact that he was abused sexually as a boy by

14     his uncle, the father.  In other words, the brother of

15     the father of Sincere and Mya.  This, I believe, is

16     very likely possibly the basis for them going to child

17     guidance, South Shore Guidance Center.  I don't know if

18     you have the records they provided them and you looked

19     at them.  This becomes extremely important in this

20     case.  It explains the behavior of the family.  It

21     explains the family dynamics.  We now know Crystal has

22     had one son, one child who was abused by another man,

23     and this is part of the family dynamics.

24          We also know from Mya's testimony yesterday

25     that this is a woman who beat her child with a belt.

kmm

1    This is a very slim, small, frail child.  This is a

2    troublesome family.  I think now, I understand, and

3    learned clearly, what the dynamics here is at this

4    trial.

5              Judge, I would rather not have to call them.

6    I think it could be resolved through stipulation.  But,

7    it seems to me, based upon what I now learned, it

8    becomes really important as a basis in this trial to

9    understand the entire family dynamics of what was going

10   on there.  It explains the manner in which Sincere

11   testified yesterday, which was in some ways more

12   pathetic -- it was more pathetic than Mya's testimony.

13   He had a very difficult time looking at anybody.  He

14   paused at length before giving answers.  It also

15   explains his testimony in which he claims that there

16   was oral admission by the defendant.

17             Judge, this is a factor.  Had I known this, I

18   think it changes the entire scope and dynamics of the

19   people who testified here, and it becomes -- if the DA

20   won't stipulate, then -- and all he needs to do is

21   stipulate to the fact that, in fact, Sincere was

22   abused.  I believe it was at least seven years ago and

23   it kind of explains his behavior on the witness stand

24   yesterday, and the answers that he gave and the upset

25   that he experienced, because I did not really know at

1       that time when I was cross-examining him that, in fact,

2       he suffered exactly what his claim to have been done

3       here.  Our position is this was never done by the

4       defendant ever.  Now we have testimony by the young

5       man, which had I known this or I could have asked

6       Crystal this as well.

7               Rather than bring them back, I think that a

8       reasonable way to resolve this is to have a stipulation

9       to that effect.  I would ask you, since you have the

10      records from the child guidance center, if that, in

11      fact, is the basis for both kids going to counseling

12      there.  And I would suggest that you take a look at

13      those records, if you haven't read them completely yet,

14      and I know they were rather a large volume of paper.  I

15      don't know how much is substance and how much of it is

16      printed forms that you might have with the paper.  But,

17      Judge, this becomes extremely significant, and it seems

18      to me I'm offering the Court, rather than bring back

19      the witness, another way to resolve the issue.

20              THE COURT:  People.

21              MR. PERRI:  The People oppose defense

22      counsel's application.  Firstly, when defense counsel

23      requested this Court to obtain the therapy records of

24      this family, the People stated on the record it was our

25      belief that one of the reasons for the children being

1          engaged in therapy was the fact that Sincere, the older

2          brother, was a victim of a sex abuse case in which his

3          uncle -- which we stated on the record, was convicted

4          and sentenced to upstate sentence for an attempted

5          sexual abuse in the first degree.

6                    Defense counsel cited no case law whatsoever

7          as to why even if he did try to bring this up at the

8          time, this would be admissible evidence in this trial

9          or proper basis for cross-examination, that this is not

10         a conviction against the child and also happened seven

11         years ago to a different child, not the direct, not the

12         actual victim in this case, and that as it was found,

13         as there was a conviction, a plea of guilty to upstate

14         sentence in that case, there is no basis to allege, or

15         assume, or try to state that did not actually happen,

16         and in any of the parties, the child, the mother or any

17         member of his family has made false statements based

18         upon the actual conviction of a prior perpetrator that

19         is not at issue in this case.

20                   Defense counsel was aware of this while

21         Sincere was on the stand.  Even then it would not have

22         been proper cross of that child or the mother of that

23         child.

24                   THE COURT:  I did have an opportunity to

25         finish reviewing all of the records from the guidance

Proceedings                    899

1    center, and the Court will be returning the records to

2    the guidance under seal, as they are private and

3    confidential records.  I will not disclose to either

4    party what the Court learned within those records

5    unless it is relevant to this case and this trial,

6    which is why you all received one piece of paper from

7    those records related to Mya Feliciano Ramirez and the

8    action here.  There's nothing within the records of

9    Sincere that, again, makes them properly discoverable

10   by either party in that the law requires that the

11   records show detailed, delineates a witness's inability

12   to distinguish between truth and reality, a witness's

13   inability to recall events, a witness's inability to

14   understand the difference between the truth and a lie.

15   None of that exists in those records, so I will not be

16   turning over any other portion of those records.

17           Additionally, with regards to Mr. Berger's

18   application, one, I do recall it being stated on the

19   record, at the point in time that Mr. Berger said the

20   records may contain information related to the children

21   watching porn with the mother, thereby needing to have

22   therapy, the People placing on the record that the

23   reason for the therapy was related to domestic violence

24   and prior sexual abuse.

25           That being said, this Court does not know of

kmm

1    any legally proper reason why Sincere would have even

2    been allowed to be questioned about something that

3    happened to him completely distant and irrelevant to

4    this case while on the stand, by either the People or

5    the defense.

6            As such, I am denying Mr. Berger's

7    application to recall the witness.  I'm denying any

8    requests to have there be a stipulation that discusses

9    Sincere's potential -- not potential.  Sincere admitted

10   to victimization several years ago by an individual who

11   is now --

12           MR. PERRI:  He's on parole at this point.

13           THE COURT:  He's now still finishing out a

14   sentence for that action.  That, in no way, in this

15   Court's mind, would impact his ability to recall, to

16   distinguish between truth and fantasy, to tell the

17   truth, or to be swearable.  As such, the application is

18   denied.

19           Would you like to note your exception for the

20   record?

21           MR. BERGER:  I'm also asking for Crystal to

22   be called back.  What has happened here, Crystal had a

23   reaction when she observed -- when she says the pants

24   and pajamas and underwear of her daughter were down

25   around her ankles, and she had an immediate reaction

Proceedings                    901

1    that her child was being abused just like her older one

2    was.  I should be able to explain her reaction here,

3    Judge.  So her knowledge of that becomes very

4    important.  It doesn't have to be Sincere.  I said to

5    the Court in my application, my preference is not to

6    call Sincere.  My preference would be to call Crystal.

7    We're still on the People's direct case.

8              Now, that this is a fact that I am aware of,

9    and I see it affects this case directly from either

10   perspective.  We're saying this never happened.  We're

11   saying that Crystal jumped to a conclusion, and

12   influenced her six-year old girl into making a

13   statement that wasn't true.  This is so intuitively

14   obvious to any observer that you have a mother who has

15   one child already abused by a family member, and now

16   she sees a daughter in a situation which is ambiguous,

17   and she comes to a similar conclusion, that is

18   something the jury should know.  They should know that

19   because not only that -- I'm assuming, although, I

20   don't know the factual allegation, that there may have

21   been anal intercourse and you have a six-year old girl,

22   now seven, testifying about a pecker in the butt.  She

23   sleeps in the same room with her brother.  They both

24   know they're coming to testify in connection with this

25   case.  This explains exactly where this girl Mya is

1    getting this information.  The jury should know that.

2    I should be able to argue that to the jury, Judge.

3    It's not a hardship to recall Crystal.

4           In fact, you did indicate, Judge, if things

5    came out during the course of the trial which would

6    require you to reexamine your ruling with respect to

7    the records from the South Shore Guidance Child Center,

8    you would allow recall of witnesses.  It seems to me,

9    whether it comes from that or not -- believe me, Judge,

10   you quoted what I said that the child's inability to

11   know the difference between a truth and a lie.  That's

12   only one of many aspects of the witness.  There are

13   other aspects of the witness, what motivated them to do

14   what they did, I'm presenting to the Court, but it's to

15   me, an obvious situation in which we know what

16   motivated Crystal to do what she did.  I'm giving a way

17   out.  You don't want to bring her in unless we

18   stipulate to this.  The DA knows it's a fact to argue.

19   It's not a fact that applies in this particular case,

20   is to really close your eyes to reality.  This is a

21   dysfunctional family.  This is a woman who beats her

22   child with a belt if she does something wrong.  This is

23   a woman who probably should have the kids taken away

24   from her, and we saw how Sincere acts on the witness

25   stand, and we see the various different stories that

1    Mya is telling.  The Court is -- is it any harm to

2    anybody if we recall Crystal and ask her this question?

3    I think if the Court denies this application, then you

4    are saying that the defendant can't put in what is an

5    obvious defense here.

6              THE COURT:  Counselor, I need to know, again,

7    what if you have at this point and if you don't, I will

8    give you a chance to bring it in.  Do you have any

9    legal authority for this position about recalling

10   witnesses?  I told you I would consider allowing you to

11   recall witnesses, or the People to recall witnesses, if

12   it was determined to be necessary.  Do you have legal

13   authority for recalling the witnesses for what this

14   Court believes is extraneous and not legally proper for

15   this case to discuss something that happened to an ear

16   witness and partial eyewitness because the only thing

17   Sincere said he saw was a little bit of a young girl's

18   underpants and pajamas down around her ankle and hears

19   a statement.

20              You have a partial eyewitness and ear witness

21   discussing a current fact, and you are looking to

22   question the mother and/or that witness about a

23   completely unrelated incident that happened years ago,

24   having nothing to do with this action.  How is it not

25   getting to collateral matters?  How is that not going

1    beyond that which is legally permissible direct and

2    cross-examination?  You don't have to answer me at this

3    point.  My ruling is it's denied, but it's denied with

4    the understanding if I'm given any sort of authority on

5    this, I'll certainly look at it.  I don't believe that

6    this is proper testimony to come out before this jury.

7         MR. BERGER:  The only authority.  There's not

8    going to be a case.  When you have a trial going on,

9    the Court must make many determinations as to

10   relevancy.

11        THE COURT:  And I have.

12        MR. BERGER:  You think it's not relevant that

13   this witness and this mother has a child -- you called

14   Sincere an ear witness.  It didn't have to be Sincere.

15   We all know it's a fact.  We all know that Sincere was

16   abused by his uncle, the father's brother, and the

17   mother knows that and the mother knows her son was

18   abused, and you don't think the mindset of this mother

19   when she enters the kitchen becomes a really relevant

20   factor as to what is going on, that she jumped to a

21   conclusion in this particular case that her daughter

22   was being abused, and oh my God, this is the second

23   time, my second child and that this is not something

24   where I can give you a case to that point.

25        In a trial, there are, I'd say one hundred

1    times relevancy issues than a legal issue, a hundred

2    times more than a legal issue.  This is not one of

3    those situations where I could provide you with legal

4    case in point.

5              THE COURT:  Relevance is a legal concept.

6              MR. BERGER:  You think I'm going to find a

7    case just like this in which --

8              THE COURT:  It doesn't have to be just like

9    this, counselor.  I'm sure there must be cases where

10   people's psychiatric backgrounds are either allowed in

11   or not allowed in.

12             MR. BERGER:  Psychiatric?

13             THE COURT:  Psychological.  You are talking

14   about that.  You are talking about the fact that

15   because you learned through therapy that somebody

16   became -- was placed into therapy because of a prior

17   sexual incident.

18             MR. BERGER:  Forget the therapy.  Excuse me,

19   Judge.  I don't want to waste anymore time.  Forget the

20   therapy.  All I'm talking about is the mindset of

21   another mother.  I don't care if the kids went to

22   therapy or didn't.  All I wanted you to do, if you

23   looked at that and saw it was actually one of the

24   reasons why he was in therapy.  You kind of suggested,

25   I don't know what the facts are.  You talked about

1    somebody being abused.  I don't know if it was physical

2    or sexual or what.  My guess is it's sexual because

3    somebody, because the brother of the father went away

4    for seven years as Mr. Perri just said.  But, what I'm

5    talking about, I'm not asking you to divulge anything

6    that was revealed in therapy, if you think it's --

7    unless you think it's extremely relevant to this case.

8    Forget that.  I have a right.  It seems to me, what the

9    mother knew at the time of this incident, is critical.

10   What her mindset was, was critical.  She reacts in a

11   way in which she yells, what the fuck is going on.

12   That is pretty stark for a six-year old to hear, and

13   this is what her mindset was.  She doesn't deny that

14   she said that.

15            So, what I'm saying to you is, we should be

16   able to explain why this woman reacted that way.

17   What's obvious, I had -- heaven forbid one child was

18   abused, now it might appear it might be a second.  It

19   can't get anymore obvious than that, Judge, that this

20   woman's mindset is so critical to what?  Because, if

21   not for this woman, this would have never happened.  He

22   never gets arrested, but she jumped to a conclusion and

23   she did it because the defense seems --  because the

24   defense should be able to -- should be able to show her

25   motivation as to why she reacted in this way.

kmm

Proceedings                907

1        We know that the cases are legend in people

2    jumping to conclusions and here I have the perfect

3    opportunity to explain to this jury why this woman

4    jumped to this conclusion.  It's right there before us,

5    admitted by Mr. Perri on the record that her son was

6    abused by a family member, an uncle.  I mean --

7        THE COURT:  I understand your position.  I

8    understand the People's position.  My ruling at this

9    time, I will not allow Ms. Ramirez to be recalled to be

10   questioned about what happened to her son years ago,

11   Ms. Crystal Ramirez.

12       I do not agree with you, Mr. Berger, she

13   reacted in a way that was based upon what happened

14   previously.

15       MR. BERGER:  That's not your function.

16       THE COURT:  I understand that, but I have to

17   make a legal ruling, counselor, and I have to determine

18   if she is relevant or not relevant.  I appreciate you

19   said there is no harm.  I don't make decisions based on

20   harm.  I make decisions on legalities, and I make

21   decisions based on rules of evidence, and I make

22   decisions based on law.  There's nothing before me that

23   makes this testimony relevant or legally proper, and I

24   will not allow it at this time.

25       Your exception is noted.

1                    MR. BERGER:  Is your ruling that's the

2        motivation of Crystal Ramirez as to what her mindset

3        was at the time is irrelevant?

4                    THE COURT:  You have my ruling, counselor.

5                    Anything else for the record?

6                    MR. PERRI:  There's one more application by

7        the People.

8                    With respect to Detective Baran, who is the

9        next witness that we anticipate calling in this case,

10       he will be testifying primarily about evidence

11       collection.  He's the carrying detective, as well as

12       getting a statement from the defendant, a written

13       statement at the special victim quad.

14                    However, in addition to that, Detective Baran

15       did speak with Crystal Ramirez and Mya Ramirez, and as

16       was testified to at the hearing, and now the People

17       believe specifically both relevant and admissible in

18       questioning Mya at the Nassau University Medical

19       Center, he did ask Mya whether or not something like

20       this had happened before after she had indicated that

21       the defendant had licked her coochie.

22                    Defense counsel, in cross-examination of Mya

23       Ramirez, through cross-examination, portrayed her

24       disclosure of prior sexual acts by the defendant

25       against her as being a recent fabrication.  That has

kmm

Proceedings                    909

1     not been disclosed until far after the initial

2     disclosure about the original oral sexual contact

3     between the defendant and this then six-year old

4     victim.   The People believe, as a rebuttal to that and

5     handing up to defense and to the Court, People vs.

6     Ludwig, a Court of Appeals case, that noted that in a

7     child sexual abuse case, that when it is alleged that

8     the child is now fabricating sexual abuse and

9     additional sexual abuse, that outcries are or also

10    outcries of prior rebuttal of that abuse is proper

11    testimony, as well as completing a narrative and

12    explaining procedures is relevant to revisiting the

13    credibility of the victim when she was given an

14    opportunity with a member of law enforcement in a

15    secure location.

16          She did disclose that the defendant had

17    previously abused her.   The People were not allowed,

18    and it was not proper for the People to on direct to

19    have raised that evidence unless the defense had opened

20    the door, and the People's position is that they have.

21          MR. BERGER:   I need to read the case.   I

22    would point out before we even start with Detective

23    Baran, Detective Baran had -- had never made a notation

24    about this at all.   So, you have had this because no

25    Rosario material was turned over to me about any

Proceedings                  910

1    statement Mya made to him.

2              MR. PERRI:  That is incorrect.

3              MR. BERGER:  Mr. Perri, you point out where

4    you have provided me with that.

5              MR. PERRI:  Although, there has not been

6    Rosario material turned over to that effect, provide me

7    one moment to find it in the hearing minutes.  Defense

8    counsel brought this out on cross-examination of

9    Detective Baran.

10             MR. BERGER:  I have to read the case before

11   we proceed.

12             THE COURT:  Why don't you do that.  We have a

13   jury waiting now.

14             MR. BERGER:  Would you also note, we heard

15   from a neutral witness yesterday, the nurse, in which

16   she was presumably a skilled questioner.  She was a

17   nurse, a sexual assault nurse, in which it was

18   established that if she had been told that by the

19   child, and she was the one who was more of a neutral

20   person than Detective Baran, that she would have made a

21   notation of it, and there was no notation at all, and

22   she was required to get an extensive history.

23             Now, Mr. Perri is seriously suggesting that

24   something Detective Baran said eleven months after the

25   incident, after this conversation where he didn't write

kmm

Proceedings                911

1    it down at all anywhere, if this doesn't, if this

2    doesn't encourage fabrication by anyone, police

3    officers, especially, then I don't know.  We can't

4    count this kind of behavior.

5              THE COURT:  Read the case.  I want to note,

6    Mr. Berger, why it is you think the door hasn't been

7    thrown wide up open with regards to this type of

8    testimony based on your cross-examination yesterday.

9    The Court was willing to have it all kept out.  I told

10   you as much, and the People instructed as much, and

11   it's not a problem.  You will try your case the way you

12   want to try your case.  It appears to me that the door

13   has been opened wide with regards to this.

14             MR. BERGER:  To hearsay, Judge?

15             THE COURT:  With regards to any statements

16   related to there having been prior abuse.

17             Now, with regards to whether or not Detective

18   Baran can continue to testify to this, I'll wait to you

19   read the case and then I will take your motion with

20   regards to that.

21             Do you have other testimony you could take

22   from Detective Baran excluding this portion so we can

23   at least get started and then everyone can read it over

24   the lunch hour?  We're only going to work for about an

25   hour today.  If you can't, that's fine.

Proceedings                912

1           MR. PERRI:  Your Honor, it's part of the

2    narrative.

3           THE COURT:  Okay.

4           MR. PERRI:  I would be able to call Detective

5    Pacheco, who did the rights card, the People called for

6    the purpose of the rights card, as well as translation

7    of the apology letter.  The only factor about the

8    apology letter would be moved in subject to connection

9    for Detective Baran to authenticate that as he

10   testified at the hearing, that the defendant wrote that

11   in his own hand.  But that if the Court is accepting of

12   that, assuming it is proper foundation, then Detective

13   Pacheco can be called out of order.

14          THE COURT:  I'm always accepting of items

15   going into evidence subject to connection as long as

16   they are not shown to the jury until after it was

17   connected.

18          MR. PERRI:  The problem is, the detective

19   translated it because it's written in Spanish.

20          THE COURT:  Let's go with the proper order.

21          MR. PERRI:  I'm sorry, your Honor.

22          THE COURT:  Mr. Perri, are you looking to

23   have this testimony come in for the non-hearsay purpose

24   of the sequence of events in the investigation, or are

25   you looking to do it for the truth of the matter?

1          MR. PERRI:  It's not for the truth of the

2    matter.  It is for -- as rebuttal to the allegation

3    that it is recent fabrication that the child reported

4    additional abuse, that the child made a statement that

5    she indicated to Detective Baran that this had happened

6    before, and that, although, it is also theoretically an

7    outcry and for the narrative of the investigation, the

8    specific reason the People now find to be overwhelming

9    probative, the defense accused child victim of failing

10   to report this and now suddenly is coming up with and

11   she reported it to Detective Baran as soon as she was

12   in the hospital and in a safe environment.

13          MR. BERGER:  I'm still reading here,

14   Judge.  It was disclosed to me yesterday through the

15   document you provided to me that she made this claim a

16   week or so after this alleged incident and that it

17   happened five times.

18          What was brought in was the fact that the

19   girl said to Mr. Perri, it happened, the girl said to

20   Mr. Perri a couple of weeks ago, it happened a month or

21   so earlier of the trial, once.  And now she is saying

22   to Georgina, that it happened five times.  It was

23   brought in solely to show the inconsistency of the

24   number of times she claims this happened in order to

25   show it didn't happen at all.  As you charge a jury on

1    credibility and inconsistency, is important and

2    inconsistency is a reflection of lack of credibility.

3                THE COURT:  If you turn to page eight of the

4    printed decision that I have before me, it lays out

5    exactly how the Court needs to behave and react.  It

6    shows in this particular case that I'm reading, Ludwig,

7    from the Court of Appeals, 2014, it is the defense that

8    initially brought out testimony related to incidents of

9    sexual abuse, and it says here, since the defense

10   claimed that the complainant has made up these

11   allegations, the circumstances of her disclosure of

12   these circumstances are relevant to her credibility and

13   it goes on to talk about how the Court, New York Courts

14   have routinely recognized that nonspecific testimony

15   about a child victims' report of sexual abuse does not

16   constitute improperly bolstering when offered for the

17   relevant non-hearsay purpose of doing several things.

18   And here it talks about explaining the investigative

19   process, completing the narrative of the offense led to

20   the defendant's arrest, and when not offered for its

21   truth, but for the narrow purpose of explaining these

22   matters, it is allowed.  It goes on to say --

23                MR. BERGER:  I haven't read the case.  I

24   can't even --

25                THE COURT:  The bottom line is I appreciate

                                                        kmm

Proceedings                    915

1    you haven't read the case, and the Court has read the

2    case.  The Court believes from reading the case this

3    would be appropriate testimony from this officer.

4    Again --

5              MR. BERGER:  The door was opened wide

6    yesterday by the cross-examination of a child victim in

7    this case.  The revelation that it happened before,

8    it's not part of the indictment.  There's one incident

9    that is charged in the indictment, one incident.  It's

10   all about credibility.  That's all it is.  There's one

11   incident in the indictment.

12             THE COURT:  There was a Molineaux application

13   with regards to this.  I denied the Molineaux

14   application.  I put everybody on notice that depending

15   upon what happened during this trial, that this

16   information regarding prior incident may be allowed to

17   come in.  I cautioned the People to make sure it did

18   not come in inadvertently in any way, shape or form.

19             Mr. Berger, it was you, and you alone in

20   cross-examining the witness that brought this

21   information to light to the jury, and, in fact, you are

22   arguing that not only did this current incident not

23   happen, but none of the incidents of prior sexual abuse

24   happened in light of that.  You have opened the door.

25   I believe that that is appropriate testimony now in

Proceedings                          916

1      that you're appearing to have put forth some sort of a

2      lack of fabrication, lack of credibility of the

3      witness.  This appears to be a proper response to that.

4                  The Court will allow this testimony, and I

5      will note your exception to my ruling, for the record.

6                  MR. BERGER:  Will you allow me to read the

7      case so I could make appropriate argument?  Now you are

8      cutting me off.

9                  THE COURT:  Mr. Berger, I have sat here, read

10     this case before, reread the case now.  I don't, quite

11     frankly, need you to interpret the case for me.  I've

12     read the case.  I understand it's legal precedent and

13     it's ruling.  I'm making this legal determination, as

14     is my job and my right to do, and although, I can give

15     you both the opportunity to make arguments, it's not

16     required that I stop a trial for, let's see, it's going

17     on 11:25.  We were supposed to start at 10:00.  So, we

18     now have been discussing various matters for 90

19     minutes.  I made my legal ruling, noted your exception

20     for the record.

21                 Is there anything else.

22                 MR. BERGER:  Time constraints are irrelevant

23     or less important.  I would -- isn't irrelevant less

24     important consideration than getting it right?  Judge,

25     your perspective with respect to allowing this and at

Proceedings                    917

1    the same time denying me the opportunity to recall a

2    witness, I mean, Judge, it's just -- do you not see the

3    lack of objectivity by the Court to not allow me to

4    bring in what the defense feels is a very relevant

5    consideration?  At the same time, to allow Mr. Perri to

6    bring this in without giving me the opportunity to

7    finish reading the case and make a legal argument

8    against it -- you may have read it before.  That

9    doesn't mean you read it an interpreted correctly.

10   That's why you have defense counsel have the

11   opportunity to read testimony and present arguments

12   against it.

13             THE COURT:  How long will you need?  Maybe we

14   can call the jury in, they can leave and come back at

15   2:30 when you are good and ready to proceed.  Would you

16   like until 2:30, counselor?  Let's bring in the jury

17   and we will excuse them until 2:30.

18             Before the jury comes in, I'll see both of

19   you at 2:00.  From 2:00 to 2:30, at the end of oral

20   arguments, we'll call the jury in at 2:30 and start

21   whether you are ready or not.  I'm denying a second

22   past 2:30.

23             MR. PERRI:  Yes, your Honor.

24             THE COURT:  The record should reflect it's

25   11:25.  The defense is given until 2:00 to come back to

kmm

Proceedings                918

1    court with whatever legal arguments he would like to

2    make to the Court.  The People are also welcome to

3    provide other materials, if they so chose.  I will ask

4    that if there is any cases that either side wants me to

5    read, that it is brought to this Court as soon as you

6    have obtained it so I do not have to delay in reading

7    any additional cases, should I choose to read those

8    additional cases.

9                   MR. PERRI:  Yes, your Honor.

10                  (Whereupon, the jury entered the courtroom.)

11                  THE CLERK:  Do both sides stipulate all sworn

12   jurors are present, that juror number seven has been

13   replaced with the original alternate number two, who

14   was moved up to alternate number one, is now in seat

15   number seven, and the others have moved forward one

16   seat; agreed?

17                  MR. PERRI:  Yes.

18                  THE CLERK:  Agreed, defense?

19                  MR. BERGER:  Yes.

20                  THE COURT:  As I told you previously, there

21   comes a time when the Court has to attend to other

22   matters that sometimes my judgment of the time it takes

23   to do that goes askew.  So I have personally misjudged

24   an issue that I need to deal with unrelated to this

25   case that's taking up a good portion of my morning and

Proceedings                919

1    rather keeping you sitting in the small jury room
2    wondering what is going on, I brought you in here now
3    at 11:30 to advise you that you will have a nice long
4    lunch.
5              I'll expect you to all be back in the jury
6    room at 2:15 sharp.  We will start testimony, we'll
7    restart testimony in this case today at 2:30 sharp.
8    Please be back in the jury room by 2:15 so I have you
9    all in this courtroom by 2:30 sharp.
10             Please remember to keep an open mind
11   throughout the trial.  Do not discuss the case amongst
12   yourselves or with anyone else during the trial.  Do
13   not permit anyone to discuss the case in your presence.
14   Do not talk to the lawyers, witnesses or the defendant
15   about anything during the trial.  And remember, if you
16   see us, we will ignore you.  Do not take it personally.
17             Do not visit or view the place where the
18   charged crime was allegedly committed, or any other
19   place involved in the case.
20             And if there is any news coverage of the
21   case, do not read, view, listen to any accounts or
22   discussions of the case reported by the news media.
23             Do not attempt to research any fact, issue,
24   or law related to this case, whether by discussion with
25   others, by research in the library, or Internet, or by

Proceedings                    920

1        any other means or source.

2                 Hopefully you all have a few errands you can

3        run.   I'll see you at 2:30.

4                 (Whereupon, the jury exited the courtroom.)

5                 THE COURT:   See you all at two o'clock.

6                 (Whereupon, a luncheon recess was taken.)

7                 *              *              *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

kmm

1                    A F T E R N O O N   S E S S I O N

2

3                    (Whereupon, People's Exhibits 8, 9, 10, and

4          11 were marked for identification.)

5                    THE CLERK:  Case on trial continued,

6          Indictment Number 742N of 2014, People of the State of

7          New York vs. Daniel Ramos.

8                    All parties are present.  The jury is not

9          present at this time.

10                   People ready?

11                   MR. PERRI:  Yes, your Honor.

12                   MR. BERGER:  Yes, your Honor.

13                   THE COURT:  I've given both parties the

14         opportunity to use the last couple of hours to look at

15         any case law they wanted to or do any research they

16         wanted to with regards to the People's most recent

17         application, seeking to allow Detective Baran to

18         testify to statements he obtained from the child, Mya

19         Ramirez, while in the hospital, on the day in question,

20         related to a prior act of sexual contact by the

21         defendant.  The People's request, as I understood it,

22         came as a recent fabrication request, and the People

23         handed up the case of Ludwig from the Court of Appeals.

24                   Counselor, I have given you an opportunity to

25         read the Ludwig case and any other case you felt was

Proceedings                    922

1      appropriate in the Court's determination as to whether

2      or not this should be allowed, and I'll hear from you

3      now, Mr. Berger.

4                  MR. BERGER:  The statement I'll make should

5      circuit this entire matter.  Mr. Perri made

6      representations to the Court, that just wasn't

7      accurate.  There is no statement in the hearing minutes

8      that Mya told Detective Baran anything.  Detective

9      Baran testified that he learned this from a statement

10     taken by Office Tedeschi that was given to Officer

11     Tedeschi by Crystal Ramirez.  If there's another

12     section in the minutes he says he spoke to Mya, then

13     let him give me the page.  But the page I have, which

14     is page 98 of the hearing minutes, he said he got that

15     from a statement that was provided to him by Officer

16     Tedeschi that he took from Crystal.  It's almost triple

17     hearsay.

18                  THE COURT:  On that point, let me hear the

19     People if there is some other page.  If not, read the

20     minutes of the hearing over the break.

21                  MR. PERRI:  One of the places on page 138 of

22     the hearing minutes where the defendant's

23     cross-examination of Detective Baran.

24                  "QUESTION:  Did you have a conversation with

25     Mya?

Proceedings                923

1           "ANSWER:  Yes.

2           "QUESTION:  And what did she say to you and

3     what did you say to her?

4           "ANSWER:  I said, what happened today?  And

5     she said, Danny ate my coochie, and she said, or she

6     said, he ate my coochie.  And I said, who?  And she

7     said, Danny.  I asked her, has this ever happened

8     before?  And she had said, yes.  And I said, okay,

9     we'll talk later.

10          MR. BERGER:  We should have a hearing, what

11    is depicted on the page.  It's contrary to what he just

12    said and what he --

13          THE COURT:  Contrary to what was just said?

14          MR. BERGER:  Contrary to what Mr. Perri just

15    read, what he said was he learned there from a

16    statement given by -- that he read that Officer

17    Tedeschi took from Crystal.

18          THE COURT:  What page are you referring to?

19          MR. BERGER:  Page 98.

20          THE COURT:  Page 98 and 138 are nowhere near

21    each other.

22          MR. PERRI:  The People aren't saying there

23    are not multiple reports, that what Officer Tedeschi

24    gained from Crystal was that Crystal reported that Mya

25    also told her when she questioned her, has this ever

Proceedings                924

1    happened before, that her daughter told her, yes, it

2    had, and Officer Tedeschi included that in his

3    supporting deposition of Crystal Ramirez.  Detective

4    Baran became aware through Officer Tedeschi and Crystal

5    Ramirez and did ask Mya herself.

6              THE COURT:  The only thing I would allow, if

7    I'm going to allow it, that which Detective Baran

8    learned directly from the child and not that which

9    Detective Baran may have learned from Crystal or from

10   any other officer.

11             So, with the understanding that page 138 of

12   the hearing minutes has a very simple answer to a

13   simple question about has this happened before, I will

14   hear from you again, Mr. Berger, with regards to

15   whether the Court should allow that very limited

16   statement to be elicited from Detective Baran.

17             MR. BERGER:  You are assuming we got past the

18   previous hurdle.  Let me point out to the Court, the

19   Ludwig case that the Court cites is totally irrelevant

20   with a cap to it.

21             THE COURT:  You don't need to because I will

22   say upon a further reading of Ludwig, I don't find that

23   to be a controlling case for recent fabrication at the

24   People's request.  You and I would be in agreement with

25   that.

kmm

Proceedings                    925

1          However, I did find two cases that are

2     directly on point for the People's request of recent

3     fabrication, those cases being People of the State of

4     New York vs. Nathaniel McClean, M-C-C-L-E-A-N, Court of

5     Appeals 69 NY2d, 426, from 1987, followed by a Second

6     Department case, People vs. Tilipman, T-I-L-I-P-M-A-N,

7     at 144 AD2d, 602.

8          It is, in fact, those cases that guide the

9     Court with regards to when testimony should be allowed

10    in based on recent fabrication, and the Court has to

11    take a couple of steps before we even get there.

12         The first thing I have to determine is

13    whether or not a cross-examination that has, in fact,

14    opened up.  Let me back up.  The first thing I have to

15    determine is whether the cross-examination, whether, in

16    fact, or through -- whether, in fact, or through

17    inference, has, in fact, put forth testimony of that

18    which can be seen as a recent fabrication.

19         And then, if, in fact, the Court gets to that

20    first portion, then the testimony can come from someone

21    other than the actual witness who said it, and that

22    case is People vs. Dobransky, 89 AD2d, 250.  So you can

23    call a separate witness to talk about it, but that

24    testimony does not come in to prove or disprove any of

25    the facts in issue, but rather to aid and establishing

1    the credibility of the witness.  That's what I need to
2    do.  That's the evaluation I need to make before I can
3    make a determination as to whether Detective Baran can
4    either testify to this.

5         MR. BERGER:  I have the McClean case.  The
6    McClean case supports my position here.  The People
7    haven't established when the so-called recent
8    fabrication exists.  The cases I cited, given to the
9    law secretary, simply say it is rare, it's a rare
10   occurrence whenever there is a recent fabrication.
11   What happened here, the People say a recent
12   fabrication.  We're saying it's a fabrication from the
13   time of the arrest.  We're saying that she made it up
14   at that point.  Now you have to find -- the People have
15   to establish that it's, in other words, it's subsequent
16   to that, that she changed her story in order to
17   counteract.  For whatever reason, she had motive for
18   recent fabrication.  The People haven't establish that.
19   If you look at the case I cited --

20        THE COURT:  Counsel, let me say this for the
21   record.  I asked you all to bring me cases if you had
22   it.  You brought me cites.  I don't have to sit here
23   now and start printing out the cases.  I prefer you
24   actually brought the cases to me so they could have
25   been read.  I have to sit here -- you have seven

Proceedings                   927

1    minutes because I'm bringing the jury in at 2:30 to

2    talk about these cases that I don't have them in front

3    of me, because you did not bring me copies of them.

4            MR. BERGER:  The basic premise, if you look

5    at McClean and the other cases, it is clear you can

6    never bolster.  You can never bolster, never bring in a

7    prior consistent statement.

8            THE COURT:  I'm fully aware of that.  I'm

9    aware of McClean, and I'm aware of what I stated to

10   you.  I know what the analysis of what I need to do.

11   Is it your position the People have not met their

12   burden with regards to the fabrication?

13           People.

14           MR. PERRI:  During the cross-examination of

15   the complainant, the victim, the alleged victim, Mya

16   Ramirez, defense counsel made multiple arguments about

17   how Mya Ramirez was presently lying and fabricating the

18   alleged earlier assaults that had taken place against

19   her by the defendant to which defense counsel opened

20   the door in his cross-examination.  He made statements

21   suggesting that she made them up to her counselor, it

22   was subsequent to the date of arrest when she attended

23   counseling with Gabriella, I believe was her name, in

24   the Freeport Counseling Center.  Separate from that, he

25   made reference to her disclosing to the DA's office, to

1       myself, and insisting only after -- not at the time of

2       the arrest, not when this first happened, but only

3       later did she suddenly come up with the prior alleged

4       instances of abuse.

5               The People's position would be that such

6       inferences, and allegations, and arguments of defense

7       counsel that Mya Ramirez was lying and fabricated both,

8       whether or not the original statement, as well as the

9       later allegations, but that these fabrications and her

10      testimony on the stand itself was a fabrication to fit

11      the requisite of the rules of the case and that the

12      fact that the fabrication under People vs. Singer, 300

13      NY 120, cited in Richardson, is defined as making up a

14      false story after the events in order to fit the

15      exigencies of the case that the allegations she was

16      doing that on the stand, as well to her counselor, and

17      as well in meeting with me, fulfills the initial step.

18      The Court must take as to whether or not

19      cross-examination will raise the issue, your Honor.

20              MR. BERGER:  That cite doesn't at all

21      disprove anything that I said to the Court.  Mr. Perri

22      has to establish that there was a reason for her recent

23      fabrication.  What we're seeing is any fabrication that

24      occurred, occurred at the time they arrested the

25      defendant.  She had motive to fabricate then and she

Proceedings                    929

1        continues to motive to fabrication.

2             The fabricate -- imagine a situation, Judge,

3        in which a witness, victim one says the defendant

4        committed this crime against me, and then goes on to

5        say, not only did he commit this crime against me, but

6        he did all kinds of other things to me, and he or she

7        keeps repeating these things on and on and on.  You

8        say, I couldn't bring out the inconsistencies between

9        the original claim of a crime and these additional

10       attempts to bolster her allegations.  Mr. Perri has

11       failed to establish the motivation for a recent

12       fabrication.  What we're saying, knowing recent

13       fabrication occurred way back when this arrest was

14       made, and she's made inconsistent statements subsequent

15       to that.  Those are inconsistent, Judge, which I'm

16       allowed to bring out.  Any time a witness, who is a

17       complainant in a case, makes inconsistent statements

18       with what was originally said, and in this case that it

19       happened once before, that it happened five times

20       before, that it didn't happen, because when your Honor

21       heard the nurse testify yesterday, we have cases that

22       show, that I cited the Boyden case, the Bishop case to

23       your law secretary, in which she was asked by Nurse

24       Kathleen, whoever testified yesterday, and she said

25       nothing to her about it, and omissions in telling the

Proceedings          930

1    story also constitute an inconsistent statement.  And
2    so, there are times when she said it didn't happen at
3    all, in any other instance, that it didn't happen, that
4    it happened once when she told Mr. Perri a few weeks
5    before trial, and that it happened five times when she
6    saw the therapist or the counselor at South Child
7    Guidance Center.

8         These are all inconsistent statements with
9    what she is saying happened.  The fact I bring out
10   those, I can't be precluded from bringing out the
11   inconsistencies.  Mr. Perri has to show there was a
12   motive on her part.

13        THE COURT:  Where were you getting that he
14   has to show a motive?

15        MR. BERGER:  That's what recent fabrication
16   requires.  That's the whole idea, is that it is recent.
17   The language --

18        THE COURT:  I understand the whole point
19   behind motive, counselor.  I understand from the cases
20   very well, that the Court is to look at whether or not
21   the witness at the time of the events has the same
22   motivation to say X, as the witness did at the time
23   they took the statement.

24        For example, if the person is a
25   co-conspirator, their motive to say something favorable

kmm

Proceedings                    931

1    to them at the time of arrest is exactly the same as it

2    is at the time they take the stand.  However, that is

3    distinguished from someone who could be seen as a

4    cooperator, who was not facing the same charges as the

5    individual against who he is cooperating against.

6         I completely understand what you are saying,

7    that as I understand the cross-examination that

8    occurred, you went through great detail with this child

9    about talking to Perri, as he was referred to by the

10   child and then adopted by you in your

11   cross-examination, because that's what she was calling

12   him.  Mr. Perri, she called Perri.  You went through

13   great details getting out from her exactly when it was

14   in the very recent past that she, for the first time,

15   came up with this testimony and evidence about having

16   been abused before.  That, in and of itself, from your

17   cross-examination, appears to fit the criteria that the

18   Court needs to find and evaluate in determining whether

19   the very limited statement of Detective Baran, which

20   would go to credibility only, would be allowed to be

21   elicited by the People.

22        MR. BERGER:  She said it a week after, five

23   times that it happened.  She is claiming it happened

24   five times.  With Mr. Perri, she says once.  It's a

25   fabrication.  If it's still an inconsistency with

1    respect to the time of the incident, maybe a week or so

2    after the incident.  The point is, you have to

3    demonstrate that there was a motive for the child to

4    lie and what I'm saying, to change the testimony and

5    make it a lie -- what I'm saying is all of her

6    statements are inconsistent.  That's all.

7              THE COURT:  I understand your position.

8              MR. BERGER:  When you look at the recent

9    fabrication cases, you have to determine when there was

10   a point where there was a motive to lie.  That's what

11   the Court must do, and what I'm saying, nothing

12   changed.  Our position is that motive to lie occurred

13   at the time of the arrest.  She perpetuated that with

14   the counselor at the South Child Guidance Center and

15   perpetuated with Mr. Perri, only they're different

16   statements.  You can't bring in anything consistent

17   that you know -- you cannot bring in anything

18   consistent unless you come up with the point in time

19   where there is a recent fabrication.  It's not

20   sufficient for Mr. Perri to argue.  She said it to me a

21   couple of weeks before the trial.  That's recent?  No,

22   she is merely perpetuating, and there is no motive at

23   that point except for anything to continue the

24   fabrication, and I'm pointing out the inconsistency and

25   that's all.

Proceedings                933

1           THE COURT:  You are the only individual that

2      brought it out.  Mr. Perri didn't bring out anything.

3      You are the only individual who brought out these

4      facts, and I understand you are now arguing that this

5      was nothing more than an inconsistent statement.

6           MR. BERGER:  Yes.

7           THE COURT:  However, I don't see it that way

8      based on my reading of these cases.

9           MR. BERGER:  That's what defense counsel

10     does, or any counsel when you are cross-examining and

11     statements differ from what the witness has said, you

12     bring them out as inconsistent statements.

13          THE COURT:  Let me read to you the only part

14     of Ludwig that I find have any sort of credence and now

15     I've gone past 2:30, and this will be the end of the

16     discussion.

17          There is a concurrence in Ludwig that is

18     obviously informative to all of the parties.  I suggest

19     you read it when you have the time.  In the main

20     opinion, the following statement is really very

21     appropriate for this case, and this comes at a point --

22     I'll just read it.  Of course, if the complainant

23     disclosure was offered for the truth of the matter

24     asserted, that the abuse actually happened, her own

25     testimony fell outside any hearsay exception.  The

Proceedings                    934

1    defendant did not object to the complainant's

2    testimony, though.  The hearsay that he complains about

3    was, therefore, already admitted.  The defendant's real

4    grievance is that other witnesses repeated the hearsay,

5    but since the defendant claimed that the complainant

6    had made up the allegations, the circumstances goes of

7    her disclosure were relevant to her credibility, not to

8    the truth of the matter asserted, to her credibility.

9          MR. BERGER:  What the Ludwig case is simply

10   about, let me cite to you --

11         THE COURT:  No, you are not.  I told this

12   jury they are coming in at 2:30 sharp.

13         MR. BERGER:  We have to get it right.

14         THE COURT:  Counselor, I have to make a

15   decision, whether I get it right or wrong, the decision

16   on the law belongs to the Court.  I have given you all

17   more explanation than I even need to.  I've given you

18   the cases I relied upon for that explanation.  I'm

19   instructing Mr. Perri and giving an instruction to the

20   jury if you would like me to, that that very limited

21   testimony that does not describe the nature of the

22   prior contact and conduct, but simply says it occurred,

23   may come out.  It's for credibility purposes only,

24   based on my reading and my understanding of the caselaw

25   that I found over this lunch break.  That is my ruling.

Proceedings                935

1            Would you like to note an exception?

2            MR. BERGER:  For credibility purposes.

3            THE COURT:  That's the only thing it can be

4       for, counselor.  When you read the cases, you will see

5       that.

6            (Whereupon, the jury entered the courtroom.)

7            THE CLERK:  Do both sides stipulate all sworn

8       jurors are present?

9            MR. PERRI:  Yes, your Honor.

10           MR. BERGER:  Yes.

11           THE COURT:  Welcome back, everyone.  I hope

12      you enjoyed your extended break today.

13           MR. PERRI:  People call Detective Maurice

14      Baran.

15           THE CLERK:  Detective, please state your full

16      name, spell last name, shield and command.

17           THE WITNESS:  Maurice Baran, B-A-R-A-N,

18      Shield 571, Special Victims Squad.  Nassau County

19      police.

20           THE COURT:  You may inquire.

21  DIRECT EXAMINATION

22  BY MR. PERRI:

23      Q.   Detective Baran, you stated that you were a

24  detective with the Nassau County Special Victims Squad.  How

25  long have you been a detective?

1      A.    I'm coming on twenty years at the end of the

2   month.

3      Q.    How long have you been a member of the special

4   victims squad?

5      A.    A total of seven years.

6      Q.    How long have you been a member of law

7   enforcement?

8      A.    I'm coming on thirty years at the end of the

9   month.

10      Q.    What are your responsibilities with the special

11   victims squad?

12      A.    We investigate sex crimes against both adults and

13   children, and serious physical injury against children.

14      Q.    On October 16, 2013, were you working on that day?

15      A.    Yes.

16      Q.    Were you working a day tour or night tour?

17      A.    I was working from four p.m. to one a.m. in the

18   morning.

19      Q.    Did there come a time where you became involved in

20   an investigation concerning the subject Daniel Ramirez and

21   an alleged victim, Mya Feliciano Ramirez?

22      A.    Yes, I did.

23      Q.    How did you become involved in that investigation?

24      A.    I was notified by one of my partners, Detective

25   Pacheco, P-A-C-H-E-C-O, that a Sergeant Sacks, S, as in

Det. Baran - People - Direct          937

1    sugar, A-C-K-S.  From the First Precinct called to say that

2    uniformed officers were there.

3                    MR. BERGER:  Objection.

4                    THE COURT:  Sustained.

5        Q.    Without going into sum and substance of those

6    conversations, did there come a time you responded to the

7    scene in Roosevelt that afternoon?

8        A.    No.

9        Q.    What did you do next in response to the calls you

10   got reporting the alleged incident?

11       A.    I called Sergeant Sacks back and asked him to --

12                   MR. BERGER:  Objection.

13                   THE COURT:  Sustained.

14       Q.    Did there come a time where you encountered an

15   individual named Daniel Ramos?

16       A.    Yes, I did.

17       Q.    Where did you encounter Daniel Ramirez?

18       A.    I first saw him when he was brought into special

19   victims squad in Bethpage under arrest by a uniformed

20   officer.

21       Q.    What officers were with you?

22       A.    Wiggan and Boccio.

23       Q.    And do you see the individual that you learned to

24   be Daniel Ramos in the courtroom today?

25       A.    Yes, I do.

Det. Baran - People - Direct          938

1     Q.    Could you please identify him by pointing at him

2     and citing the color of the article of clothing he is

3     wearing?

4     A.    Wearing a white pullover sweatshirt.

5          MR. PERRI:  May the record reflect all the

6          witness identified the defendant.

7          THE COURT:  It will so indicate.

8     Q.    Did there come a time after you saw the defendant

9     at the special victims squad that you reported to the Nassau

10    Community Medical Center?

11    A.    Yes.

12    Q.    When you were at the Nassau Community Medical

13    Center, did there come a time when you met an individual

14    named Mya Ramirez?

15    A.    Yes.

16    Q.    And did there come a time when you learned who the

17    mother of Mya Ramirez was?

18    A.    Yes.

19    Q.    Who was that?

20    A.    Crystal Ramirez.

21    Q.    Could you describe Mya Ramirez, how she appeared

22    to you?

23    A.    She was a short six-year old, she smiled when I

24    walked in the room, and she was thin with straight hair.

25    Q.    Detective, did there come a time that you spoke

Det. Baran - People - Direct          939

1    with Crystal Ramirez about what happened to Mya?

2         A.    Yes, I did.

3         Q.    Without going into the sum and substance, anything

4    she said to you, was Mya with her when you spoke to Crystal?

5         A.    No, she was not.

6         Q.    Did there come a time you spoke with Mya?

7         A.    Yes, I did.

8         Q.    Where in Nassau County Medical Center was Mya when

9    you spoke to her?

10        A.    In a treatment room in the pediatric ER.

11        Q.    Why was she there?

12               MR. BERGER:  Objection.

13               THE COURT:  Overruled.

14        A.    She had been brought to the hospital for an

15   examination by a SANE nurse.

16        Q.    Did there come a time when you spoke with Mya

17   Ramirez about what happened to her?

18        A.    Yes.

19        Q.    What, if anything, did you say to her?

20               MR. BERGER:  Objection.

21               THE COURT:  Overruled.

22        A.    I asked her what happened today.

23        Q.    What, if anything, did she say in response?

24        A.    She said he ate my coochie.

25        Q.    What, if anything, did you say in response to what

1    she said?

2         A.    I said, who?

3         Q.    What, if anything, did she say?

4         A.    She said, Danny or Daniel.  I think it was Danny

5    though.

6         Q.    After she said Danny, what, if anything, did you

7    say next?

8         A.    I asked her if he had done this before.

9         Q.    What, if anything --

10                  MR. BERGER:  Objection.

11                  THE COURT:  Overruled.

12        Q.    What, if anything, did Mya say in response to your

13   question had he ever done this before?

14        A.    She didn't say anything, but she nodded her head

15   up and down.

16        Q.    Did you meet an individual that day by the name

17   Cathy McAllister?

18        A.    Yes, I did.

19        Q.    Who is Cathy McAllister?

20        A.    A sexual assault nurse examiner who works at the

21   medical center.

22        Q.    Did you see Nurse McAllister during your initial

23   trip to the medical center?

24        A.    Yes, I did.

25        Q.    And did there come a time later that same day

Det. Baran - People - Direct        941

1   where you recovered physical evidence from the medical

2   center from Nurse McAllister?

3        A.   Yes.

4        Q.   And what evidence did you collect from Nurse

5   McAllister?

6        A.   I collected a sexual offense evidence collection

7   kit, which is otherwise known as a rape kit, and I collected

8   a pair of pajama bottoms that Mya had been wearing that

9   McAllister had put into a paper bag and held for me.

10       Q.   I ask the witness be shown what is in evidence as

11  People's 1.

12            THE COURT:   You may.

13       Q.   Do you recognize what is already in evidence as

14  People's 1?

15       A.   Can I take it out?

16       Q.   Yes.

17       A.   Yes, I do.

18       Q.   What do you recognize it to be?

19       A.   The pajama bottoms that were given to me by Cathy

20  McAllister at the medical center.

21       Q.   What, if any, markings do you recognize on the

22  paper bag?

23       A.   The paper bag has a patient tag in the name of Mya

24  Feliciano Ramirez, and it has a piece of evidence tape that

25  I put over the bag and initialed prior to submitting the bag

1    with the pajamas to the evidence management unit in the

2    police department.

3              MR. PERRI:  I ask People's 1 be taken from

4         the witness.

5              I ask if People's 4 be shown to the witness.

6              THE COURT:  It may.

7              (Whereupon, People's Exhibit 4 was handed to

8         the witness.)

9         Q.   Detective, do you recognize People's 4 already in

10   evidence?

11        A.   Yes, I do.

12        Q.   What do you recognize it to be?

13        A.   It is the sexual offense evidence collection kit

14   that was given to me by Cathleen McAllister at the medical

15   center after she had examined Mya.

16        Q.   Could you describe, is that sexual offense

17   collection kit, is it in the same state as when you first

18   received it from Nurse McAllister?

19        A.   It has -- no, it's not.

20        Q.   Could you describe how it appears differently now?

21        A.   It has numerous other stickers and labels on it

22   and some writing on it that was not present when it was

23   first given to me.

24        Q.   Drawing your attention to the orange seal label on

25   the top of the box, was that still intact when you received

Det. Baran - People - Direct          943

1    that box?

2         A.    Yes.

3              MR. PERRI:   I ask People's 4 be taken from

4         the witness.

5         Q.    Detective, what did you do with these items

6    eventually when you returned them to the special victims

7    squad?

8         A.    I completed some paperwork to have them submit it

9    to the evidence management unit of the police department.

10        Q.    Is there a number assigned to this case?

11        A.    Yes, there is.  A case number, you mean?

12        Q.    Yes.

13        A.    Yes.

14        Q.    What is the case number?

15        A.    2013CR 338372.

16        Q.    And were these items submitted under that case

17   number?

18        A.    Yes, they were.

19        Q.    After speaking to Mya Ramirez and Crystal Ramirez,

20   did there come a time you left the medical center?

21        A.    Yes.

22        Q.    After collecting the evidence and speaking to Mya

23   and Crystal, where did you go?

24        A.    I returned to the special victims squad in

25   Bethpage.

1       Q.     You already testified before you had gone to the

2   medical center originally, you had already seen the

3   defendant, Daniel Ramirez.  When you first saw Daniel

4   Ramirez at the special victims squad, where was he?

5       A.     He was being led into the office and then into an

6   arrest room which is part of the larger office.

7       Q.     Was he in custody at that time?

8       A.     Yes, he was.

9       Q.     Was the defendant handcuffed?

10      A.     Yes, he was.

11      Q.     And where was he being held when he was retained

12  at the special victims squad?

13      A.     We have an arrest room that is devoted to people

14  who are under arrest and that's where he was.

15      Q.     Could you describe the arrest room?

16      A.     It's a room about eight by eight.  It has a desk

17  in it with a desktop computer on top, a chair next to the

18  desk, which is used to seat the defendant.  Next to that

19  chair is a handcuff ring which comes out from the desk, and

20  a handcuff is usually hanging from that ring.  There's

21  another chair in the middle of the desk.  There's a monitor,

22  a mouse, keyboard, sometimes a telephone.  There's a window,

23  a large window that takes up most of the wall from the

24  hallway and next to that window is a door.

25      Q.     When you returned to the special victims squad

1   that night after the hospital, was the defendant still

2   there?

3        A.   Yes, he was.

4        Q.   Where was he when you returned?

5        A.   He was sitting in the chair next to the desk.  He

6   had one hand cuffed into the handcuff ring, coming from the

7   desk.

8        Q.   Were Officers Wigand and Boccio still at the

9   special victims squad?

10       A.   Yes, they were.

11       Q.   2013, at the time and on the day that this

12  defendant was present in the special victims squad, was any

13  arrest room equipped with a video or audio recording

14  equipment?

15       A.   No, it was not.

16       Q.   Are the arrest rooms currently equipped with that?

17       A.   Yes, they are.

18       Q.   When did that happen?

19       A.   We moved into new offices in November or December

20  of 2014.

21       Q.   Did there come a time when you had a conversation

22  with the defendant on the night of October 16th?

23       A.   Yes, I did.

24       Q.   2013?

25       A.   Yes, I did.

Det. Baran - People - Direct        946

1      Q.    Approximately when you started to speak with the
2   defendant, was he handcuffed while he spoke with you?
3      A.    He was initially handcuffed when I walked behind
4   and I removed the handcuff from him.
5      Q.    When you initially spoke with the defendant, were
6   you alone in the room?
7      A.    Initially, I was.
8      Q.    Did you remain alone with the defendant in the
9   room?
10     A.    No, I did not.
11     Q.    Were you armed?
12     A.    No, I was not.
13     Q.    Who joined you in that room during the interview?
14     A.    My partner, Detective Reinaldo Pacheco,
15   P-A-C-H-E-C-O.
16     Q.    Was Detective Pacheco armed?
17     A.    Not that I could see.
18     Q.    Did Detective Pacheco remain for the entire
19   interview?
20     A.    No, he did not.
21     Q.    Now, when you -- what, if anything, did you say to
22   the defendant or do when you first prepared to speak with
23   him concerning the incident?
24     A.    When I first walked in I asked him if he needed
25   anything to eat or drink, use the bathroom, any medical

Case 2:19-cv-01125-JS-AYS   Document 7-3   Filed 05/31/19   Page 103 of 800 PageID #: 1356

1   situations I needed to be aware of.  And then I said, I

2   would -- I don't remember if he took a glass of water or

3   not, but after that was taken care of, I told him I was

4   going to want to talk to him about what happened, and then I

5   needed to read his rights to him first.

6        Q.   Before going into reading the defendant his

7   rights, the questions about food and drink, bathroom,

8   medical needs, what language were you speaking to the

9   district attorney?

10       A.   English.

11       Q.   What language was the defendant speaking in

12  response to questions?

13       A.   English.

14       Q.   Did you have any problems communicating with the

15  defendant about the topics?

16       A.   No, I did not.

17       Q.   Did the answer to the questions make sense?

18       A.   Yes.

19       Q.   What, if any, accent did you note the defendant

20  had?

21       A.   I thought he had a Spanish accent.

22       Q.   So, detective, you referenced this, did there come

23  a time when the defendant was advised of his constitutional

24  rights?

25       A.   Yes, he was.

1      Q.   At what time was the defendant so advised of his

2  rights?

3      A.   I think it was 11:40 that evening.

4      Q.   Could you please explain to the jury the process

5  of how you had the defendant advised of his constitutional

6  rights?

7      A.   In this particular case, I was going to read his

8  rights from the card that has English on one side, Spanish

9  on the other, and before I began to read I asked him, would

10  he rather the rights be read in Spanish.

11      Q.   Why did you offer the defendant an option of the

12  rights read to him in Spanish?

13      A.   As a courtesy, and the rights card is a card with

14  technical language, and I wasn't sure at that point if he

15  would prefer to have English or Spanish, so I offered it in

16  Spanish and he accepted.

17      Q.   So how did you go about having the defendant read

18  his rights in Spanish?

19      A.   I called out to Detective Pacheco and asked him to

20  or called out.  He was nearby and asked him if he would read

21  the rights card for me in Spanish.

22      Q.   You said Pacheco is a member of the special

23  victims squad?

24      A.   Yes, he is.

25      Q.   And what, if anything, did Detective Pacheco use

1   to read the defendant his rights?

2         A.   He held up a rights card in front of him, his face

3   and read from it.

4               MR. PERRI:  I ask the witness be shown what

5         was marked as People's Exhibit number 9 for

6         identification.

7               THE COURT:  Show it to him.

8               MR. PERRI:  There was an item premarked as

9         eight.

10              THE COURT:  Let's show People's 9.

11              (Whereupon, People's Exhibit 9 was handed to

12        the witness.)

13        Q.   With respect to People's 9 to be marked for

14   identification; do you recognize People's 9?

15        A.   Yes, I do.

16        Q.   What do you recognize it to be?

17        A.   The rights card Detective Pacheco read from when

18   he was giving the defendant his Miranda rights.

19        Q.   And what markings do you recognize on that card

20   that support your conclusion it's the same rights card that

21   was read to the defendant on that night?

22        A.   First and foremost, it has my signature and shield

23   number, Detective Pacheco and shield number, and the time he

24   dated it.  The defendant wrote CSI on two places and signed

25   his name and signed his name on a third spot.

1        Q.    Who retained custody of that document after those

2   markings were placed on that document?

3        A.    I did.

4        Q.    Has there been any substantial change or is it in

5   substantially the same condition as on the day it was

6   signed?

7        A.    It's in the same condition.

8              MR. PERRI:  I ask People's 9 be moved into

9        evidence.

10             THE COURT:  Mr. Berger, would you like to see

11       it first?

12             MR. BERGER:  No objection.

13             THE COURT:  Let's marked into evidence as

14       People's 9.

15             (People's Exhibit 9, previously marked for

16       identification, was marked and received in evidence.)

17             THE COURT OFFICER:  Marked in evidence nine.

18             (Whereupon, People's Exhibit 8 was handed to

19       the witness.)

20       Q.    Could you please explain what, if anything, the

21   defendant said or did during the process of Detective

22   Pacheco advising him of his rights?

23       A.    There came a point in time where he said to

24   Detective Pacheco and Detective Pacheco handed the defendant

25   the card.  The defendant wrote the word si and then signed

1    his name next to it.  Detective Pacheco continued reading

2    from the card and a short time later the defendant said si

3    again, signed his name next to the word si.  Detective

4    Pacheco continued reading from the card, and there came a

5    point where the defendant signed his name at the bottom of

6    the card after the writing or underneath the last line of

7    the writing.

8         Q.    After the defendant made that final signature on

9    the card, what, if anything, did you do?

10        A.    I wrote my name on one margin after Detective

11   Pacheco had written his name on the other margin.

12        Q.    Did you continue to speak to the defendant after

13   he signed and after signing the arrest card as a witness?

14        A.    Yes, I did.

15        Q.    What language were you speaking to him?

16        A.    English.

17        Q.    Did you offer to let him speak in Spanish?

18        A.    Yes, I did.

19        Q.    And what, if anything, was the defendant's

20   response to your offer?

21        A.    He said, he would try in English.

22        Q.    Were you prepared to have the defendant give a

23   statement in Spanish, if necessary?

24        A.    Yes.

25        Q.    Did you have any difficulty speaking with the

Det. Baran - People - Direct        952

1    defendant in English?

2         A.    No.

3         Q.    Was he able to discuss the incident with you?

4         A.    Yes.

5         Q.    Were you able to understand him clearly?

6         A.    Yes.

7         Q.    What was the initial question that you asked him

8    to start your discussion of the incident?

9         A.    I asked him to tell me what happened today with

10   Mya.

11        Q.    What was his response?

12        A.    He began telling me how he went to the house

13   earlier and hung out with Mya's mom and went into the house

14   to help with homework, and there came a point in time later

15   when he went to the bathroom, Mya who he called a little

16   girl, was following him all around the apartment and that he

17   came out of the bathroom and played a tickle game with her.

18   I asked him something about what did he mean by the tickle

19   game, and he said he tickled her pussy.

20        Q.    What, if anything, else did you say after that?

21   I'm sorry, what did you do next after the defendant made

22   that statement?

23        A.    I asked him if he would like to have me type up

24   that statement for him, and we could include it in any

25   paperwork going to court, and he said that would be fine.  I

kmm

Det. Baran - People - Direct          953

1   opened up the Microsoft Word program and started him again

2   from the beginning of the day and as he spoke, I typed.

3        Q.   Did there come a time -- was Detective Pacheco

4   present for the taking of the formal statement?

5        A.   No, he was not.

6        Q.   What, if any, instructions did you give the

7   defendant --

8             MR. PERRI:  Withdrawn.

9        Q.   Could you please explain the process by which you

10  typed up the statement, how it became to be typed up?

11       A.   I asked questions of the defendant regarding where

12  he lives, his Social Security number.  He gave those and

13  then I said, tell me again from the beginning what happened

14  and he began to tell me he finished work, went to the house.

15  I was typing as close as I could in his words what the story

16  was.

17       Q.   Did you type straight through the entire time you

18  were with the defendant?

19       A.   No.  There came some point in time I needed him to

20  clarify something I was unclear about or explain something

21  to me that I didn't understand.

22       Q.   Approximately, what time did you start typing the

23  statement?

24       A.   At about 11:45 that night.

25       Q.   Approximately, how long did it take you to finish

kmm

1   THE full draft of the defendant's statement?

2       A.   The estimate, it took about 45 minutes to finish

3   it.

4       Q.   Were you talking to the defendant as you typed?

5       A.   Yes.

6       Q.   After the defendant finished telling you his

7   version of the incident, what did you do next?

8       A.   I printed the statement.  I retrieved it from the

9   printer.  I handed it to the defendant.  He had told me

10  already he could read English.  I gave him a statement.

11  Then I asked him to read the first paragraph out loud to me

12  so I could be sure he could read English.

13           MR. PERRI:  I ask the witness be shown

14      People's 10 for ID.

15           THE COURT:  You may.

16           (Whereupon, People's Exhibit 10 was handed to

17      the witness.)

18      Q.   Do you recognize what is marked as People's 10?

19      A.   Yes, I do.

20      Q.   What do you recognize it to be?

21      A.   The statement that I had prepared on Microsoft

22  Word while speaking to the defendant in the special victims

23  squad.

24      Q.   Is that the original statement?

25      A.   Yes, it is.

kmm

Det. Baran - People - Direct          955

1    Q.    And has it been altered in any way?

2    A.    No, it has not.

3    Q.    What, if anything, do you recognize about that

4  document that shows it's the original statement?

5    A.    It has my signature on the bottom of the first

6  page and the bottom of the second page.  It has Detective

7  Pacheco underneath mine on those two places, and the

8  defendant's signature on the bottom of the first page and a

9  signature and address on the bottom of the second page.

10   Q.    Since that document was signed, who retained

11 custody of that document?

12   A.    I did.

13   Q.    Was it in the same or substantially the same

14 condition as when it was signed?

15   A.    Yes.

16              MR. PERRI:  I ask People's 10 be marked in

17        evidence.

18              THE COURT:  Let's show it to Mr. Berger,

19        please.

20              MR. BERGER:  Without waiving any other

21        objection previously.  I have no objection here now.

22              THE COURT:  Thank you.  Let's have it marked

23        into evidence as People's 10.

24              (People's Exhibit 10, previously marked for

25        identification, was marked and received in evidence.)

1          MR. PERRI:  I ask it be returned to the

2     witness.

3          (Whereupon, People's Exhibit 10 was handed to

4     the witness.)

5     Q.    Detective, you stated that you testified that the

6     defendant read the first paragraph out loud.  Did he read

7     that paragraph accurately?

8     A.    Yes, he did.

9     Q.    And was the defendant given an opportunity to read

10     the entire document before signing it?

11     A.    Yes, after he finished the first paragraph, I

12     interrupted him and said you can read the rest out loud or

13     to yourself, whichever you prefer.

14     Q.    What, in fact, did the defendant do?

15     A.    He read it to himself, or he read it out loud in

16     an undertone or to himself with a little bit of sounding of

17     out loud reading.

18     Q.    Was the defendant looking at the document the

19     entire time?

20     A.    Yes.

21     Q.    Was the defendant given an opportunity to make

22     changes to the document?

23     A.    Yes, he was.

24     Q.    Can you explain that process?

25     A.    When he first read -- when he read the first

1    paragraph, he noticed that I had typed the Social Security

2    number incorrectly.  The original document repeated the

3    sequence of numbers, it repeated 5/8 twice.  He noticed

4    that.  He said that's not the right number.  So I gave him a

5    pen and asked him to line out the incorrect number and to

6    write the correct number underneath it, and to initial the

7    correction, which he did.

8         Q.   And that interaction, that conversation with the

9    defendant, was that in Spanish or English?

10        A.   English.

11        Q.   Could you explain how three quarters of the way

12   down the page the handwritten word girl appears; can you

13   explain how that appeared?

14        A.   While he was reading, he stopped and looked up and

15   pointed out to me that I had omitted the word girl from one

16   sentence.  So the document read, the little was following

17   me.  He said it should be little girl.  So I either gave him

18   back the pen or he had the pen and I asked him to the make

19   the correction and to initial it.

20        Q.   Did he do that?

21        A.   Yes, he did.

22        Q.   Did there come a time anyone else read the

23   document to the defendant before he signed it?

24        A.   Yes.

25        Q.   Who was that?

1      A.    Detective Pacheco.

2      Q.    In what language did Detective Pacheco read the

3   document to the defendant?

4      A.    In Spanish.

5      Q.    How did it come to happen Detective Pacheco came

6   in and read the statement in Spanish to the defendant?

7      A.    When the defendant finished reading the document,

8   then he looked up and said, okay.  I asked him, would you

9   also like Detective Pacheco to read it to you in Spanish?

10   And he said, yes, he would, or okay, or indicated he would

11   like that.

12      Q.    Did Detective Pacheco in fact return?

13      A.    Yes, he did.

14      Q.    To your knowledge, did Detective Pacheco read that

15   document to the defendant in Spanish in your presence?

16              MR. BERGER:  Objection, your Honor, to his

17         knowledge?

18              THE COURT:  Overruled.  You may answer.

19      A.    Yes, he did.

20      Q.    Was Detective Pacheco looking at this document,

21   People's 10, while he was speaking what you believed to be

22   in Spanish to the defendant?

23      A.    Yes.

24      Q.    Did it appear the defendant was paying attention?

25      A.    Yes.

1      Q.    If you had to estimate, how long did it take

2   Detective Pacheco to read that document?

3      A.    I'd say about ten to fourteen minutes, ten to

4   thirteen minutes.

5      Q.    Did the defendant give you any indication after

6   you typed the statement in English, he did not understand

7   the English language version?

8      A.    No, he did not.

9      Q.    Did he have any trouble communicating with you in

10   English during the time you were taking the statement now?

11      A.    No, he did not.

12      Q.    Why did you have Detective Pacheco translate the

13   statement?

14            MR. BERGER:   Objection.

15      Q.    For the defendant?

16            THE COURT:   Overruled.

17      A.    I wanted to defend against him saying later that

18   he didn't understand English, and didn't understand what he

19   was signing.

20      Q.    Drawing your attention to the markings, the

21   letters DR on the first page of People's 10, could you

22   explain to the jury who made those markings?

23      A.    The DR were made by the defendant when I asked him

24   to make the correction on the document and then sign his

25   initials.

1      Q.   Drawing your attention to the RP on the first page

2   of the document, could you explain to the jury who made

3   those markings?

4      A.   Detective Pacheco did.

5      Q.   Why were those markings made by Detective Pacheco?

6      A.   As he was reading the document to the defendant in

7   Spanish, he would stop at the point of a correction and

8   initial his initials RP, Reinaldo Pacheco, to indicate he

9   read the correction.

10     Q.   Did there come a time when the defendant signed

11   the statement?

12     A.   Yes.

13     Q.   Was that after Detective Pacheco read it to him in

14   Spanish?

15     A.   Yes.

16     Q.   Who was present when the defendant signed the

17   statement?

18     A.   Myself, Detective Pacheco, and the defendant was

19   present.

20     Q.   What, if any, markings did you make when the

21   defendant signed the statement?

22     A.   I signed my name on the first page and on the

23   second page.

24     Q.   What, if any, markings did Detective Pacheco make

25   when the defendant signed the statement?

Det. Baran - People - Direct        961

1        A.    He also signed the first and second page.

2        Q.    Do you recognize your signature on that page?

3        A.    Yes.

4        Q.    Do you recognize Detective Pacheco's signature on

5    those pages?

6        A.    Yes.

7        Q.    Do you recognize the defendant's signature?

8        A.    Yes.

9        Q.    Detective, I ask you now to please read the

10   statement into the record for the jury.

11             THE COURT:  Please read it slowly.

12       A.    Case number 1013CR338372.  Other number SVS.

13   5042013.  2344 10/16/2013.  Statement of Daniel Ramos.  My

14   name is Daniel Ramos.  I live at 781 Coleridge Road,

15   C-O-L-E-R-I-D-G-E, Road in Uniondale.  My wife, J-U-A-M-A,

16   lives there with me with my son Carlo, age 31, and my other

17   son, David Ramos, who is twenty-three.  I worked for NICE,

18   N-I-C-E, in Nassau County as a bus driver.  My Social

19   Security number is 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.  I have been told by the

20   detective that I have the right to remain silent and that

21   any statements I make may be used against me in court.  I

22   have been told that I have the right to talk with a lawyer

23   before answering any questions or to have a lawyer present

24   at any time.

25             Further, I have been advised that if I cannot

1   afford to hire a lawyer, one will be provided to me, and I

2   have the right to keep silent until I have had the chance to

3   talk to a lawyer.  I understand my rights and make the

4   following statement freely and voluntarily.  I'm willing to

5   give this statement without talking with a lawyer or having

6   one present.

7          Today, Wednesday, October 16, 2013, I am normally

8   off from work, but have put my name on the list for extra

9   work, and I got five hours today.  I work from about 6:30

10  a.m. until about 11:30 a.m.  when I was finishing work

11  today, I got a call from my friend, Crystal Ramirez.  I know

12  her husband Scoobie.  That's spelled S-C-O-O-B-I-E.  Crystal

13  told me to come to her house today after work and hang out

14  and have a few drinks with her.  I forgot what street she

15  lives on, but she lives in the back of the deli.  I bought a

16  twenty dollar bottle of Long Island ice tea because she

17  asked me to bring some liquor so we could drink.  I also

18  bought her a her a pack of Newport one hundreds.  Crystal

19  drinks every day and smokes a lot too.  I encourage her to

20  keep the door closed so the smoke doesn't go into the house

21  and hurt the kids.

22          I got to her house and we went onto the porch and

23  started drinking and she started smoking.  After a short

24  time, a black guy came by and joined us on the porch.  He

25  was there a little bit and then he left.  I stayed with

kmm

1    Crystal drinking after he left.  I was still there when the
2    kids came home and they went inside the house to make their
3    homework.  I helped them today to do their homework.  I told
4    Crystal to help them, and she told me to help them.  So I
5    went inside the house and helped them.  When they finished
6    their homework, I went back outside to drink with Crystal.

7              After a while, I told Crystal I needed to use the
8    bathroom and she said go ahead and use the bathroom.  So I
9    went inside the house and the little girl was following me
10   all around.  So I went to the bathroom.  I told her to stay
11   out of the bathroom and I went in.  When I came out of the
12   bathroom, she was still there waiting for me in the kitchen.
13   I told her I was going to tickle her and I pulled down her
14   pants and underwear and tickled her pussy with my mouth.  I
15   then told her to pull her pants up and just then Crystal
16   came into the kitchen and saw the little girl with her pants
17   down and said to me, quote, what are you doing?  Unquote.  I
18   said, I wasn't doing nothing.  She then asked the little
19   girl what was I doing.  And she said, I was licking her
20   pussy.  I said to Mya, that I was quote, playing with you,
21   unquote.  But she said no, he was licking my pussy.  The
22   little girl was scared of her mother.  Crystal then told me
23   to get out and I did.

24             I made a big mistake and I'm very sorry for what I
25   did.  I'm presently in the special victims squad, the

kmm

1    detective's office where I am giving this statement to

2    Detective Baran who has typed it for me and Detective

3    Pacheco has read it to me in Spanish and it's correct and

4    true.

5         Q.   Detective, the term pussy appears in this document

6    a few places, two places.  Why is that term in the document?

7         A.   That was his word.

8         Q.   Now, did you or any other member of law

9    enforcement make the defendant any promises before he gave

10   that statement or signed that statement?  Did you offer him

11   a deal?

12        A.   No.

13        Q.   Did you, or to your knowledge, any other members

14   of law enforcement threaten the defendant in any way in

15   order to get him to sign the statement?

16        A.   No.

17        Q.   Detective, what, if anything, else happened

18   between you and the defendant after he signed the statement?

19        A.   I asked him if he would like to write a letter to

20   Crystal and Mya apologizing for what happened.

21        Q.   And when you made that request of the defendant,

22   was that in Spanish or English?

23        A.   English.

24        Q.   What, if anything, happened after you made that,

25   after you asked that question?

kmm

 1      A.    He indicated he would.  I gave him a pad of paper

 2    and a pen.

 3                 MR. PERRI:  I ask the witness be shown

 4           People's 11 for identification.

 5                 (Whereupon, People's Exhibit 11 was handed to

 6           the witness.)

 7      Q.    Detective, do you recognize what is marked as

 8    People's 11?

 9      A.    Yes, I do.

10      Q.    What do you recognize People's 11 to be?

11      A.    It's the page from the pad that the defendant

12    wrote on after he indicated he would like to write a letter

13    apologizing.

14      Q.    Did you observe the defendant actually write on

15    that piece of paper?

16      A.    Yes, I did.

17      Q.    What happened after the defendant finished writing

18    on it?

19      A.    I took it, and I put it into my folder.

20      Q.    Is that in the same or substantially the same

21    condition as it was when the defendant finished writing it?

22      A.    It is, with the exception I stapled it with red

23    ink, confidential sex crime victim.

24      Q.    Other than that, have there been any other

25    alterations to that document?

1     A.    No.

2                  MR. PERRI:   I ask People's 11 be moved into

3     evidence.

4                  THE COURT:   Show it to Mr. Berger, please.

5                  MR. BERGER:   No objection.

6                  THE COURT:   Let's have it marked into

7     evidence as People's 11.

8                  (People's Exhibit 11, previously marked for

9     identification, was marked and received in evidence.)

10     Q.    Did you or any other members of law enforcement,

11    to your knowledge, make the defendant any promises in order

12    to get him to write that letter?

13     A.    No.

14     Q.    Did you, detective, or any other members of law

15    enforcement, threaten the defendant in any way to get him to

16    write that letter?

17     A.    No.

18     Q.    What did you do with that letter after the

19    defendant finished writing it?

20     A.    I photocopied it to include in the arrest

21    paperwork, but then I put the original back in my folder.

22     Q.    Did there come a time where you shared that letter

23    with Detective Pacheco?

24     A.    Yes.

25     Q.    Detective, after the defendant wrote the letter,

1  and you took custody of the letter, what happened next that

2  night with respect to the defendant?

3       A.   I left the room.  I began to do some arrest .

4  processing on the computer, and then I went back into the

5  arrest room and asked the defendant if he would provide a

6  DNA sample.

7       Q.   And after when you asked the defendant to provide

8  a DNA sample, what was his response?

9       A.   He indicated he would.

10      Q.   And did you ask the defendant that question in

11  English?

12      A.   Yes.

13      Q.   Did he respond in English?

14      A.   Yes.

15      Q.   Did you in fact collect a DNA sample?

16      A.   Yes, I did.

17      Q.   During the processing, collecting a DNA sample,

18  did you have to give him instructions or a direction?

19      A.   Yes.

20      Q.   He was able to follow your instructions and

21  directions?

22      A.   Yes.

23      Q.   After the defendant said, yes, he would submit to

24  the collection of a DNA sample, what, if anything, did you

25  do?

1       A.   I left the room and retrieved a buccal swab kit.

2    I sealed the buccal from our supply shelf.

3            MR. PERRI:  I ask the witness be shown what

4       was marked as People's 7 in evidence.

5            THE COURT:  It could be shown to him.

6       Q.   I ask you to take a look at People's 7 in

7    evidence; do you recognize People's 7?

8       A.   Yes, I do.

9       Q.   What do you recognize it to be?

10      A.   It's the buccal swab kit that I used to collect

11   DNA from the defendant on the 17th of October.

12      Q.   What markings do you recognize on that envelope

13   and it's contents that shows it is the same buccal swab you

14   used on October 17, 2013?

15      A.   The out envelope SCS504103, and my writing.  I put

16   evidence tape on two flaps and signed my name on the

17   evidence tape on both flaps.

18      Q.   Could you please open the inner envelope.

19           What, if any, more markings on the inner envelope

20   do you recognize from October 17, 2013?

21      A.   The inner envelope has my name, the case number,

22   and the subject's name on the first line of the chain of

23   evidence.  And it has a piece of evidence tape on the back

24   on the flap that I initialed.

25      Q.   Were those envelopes, were they opened or sealed

Case 2:19-cv-01125-JS-AYS  Document 7-3  Filed 05/31/19  Page 125 of 800 PageID #: 1378

1    after you collected the DNA sample?

2          A.    They were sealed.

3          Q.    Did you seal the envelope after you collected the

4    DNA evidence?

5          A.    Yes, I did.

6          Q.    Was the envelope sealed when it was later

7    submitted to the property?

8          A.    To the evidence management unit it was.

9          Q.    And, detective, could you explain the process of

10   taking -- how you took the buccal swab sample from the

11   defendant?

12         A.    Inside there are two Q'tip-like cotton swabs on a

13   long wooden stick.  I asked the defendant to open his mouth.

14   I rubbed one of those cotton swabs inside of one cheek and

15   the other cotton swab on the inside of his other cheek.  I

16   let them dry, and I put them back into an envelope and put

17   the envelope into a plastic bag, put the plastic bag in the

18   inner envelope, I put the inner envelope into the outer

19   envelope, and I submitted it to the evidence management.

20         Q.    And did you use a fresh buccal swab kit?

21         A.    Yes, I did.

22         Q.    Was the buccal swab kit also submitted in the same

23   case number that you already testified about?

24         A.    Yes, it was.

25         Q.    After you took the buccal swab from the defendant,

1    what happened next?

2         A.    I continued processing the arrest and later on

3    that morning brought over the sexual offense evidence

4    collection kit, the pajamas and buccal swab and left --

5    deposited them in a locker in headquarters to be picked up

6    by the evidence management unit.

7         Q.    When you deposited those items in the locker, were

8    they opened or sealed?

9         A.    They were sealed.

10               MR. PERRI:   Thank you.  Nothing further, your

11          Honor.

12               THE COURT:   All right.  I think what we'll

13          do, we will start cross-examination because it's not

14          quite the hour, but close enough.  We'll take our short

15          break now and let everyone stretch their legs and then

16          we'll come back and finish the day with

17          cross-examination.  See you all in five minutes.

18               (Whereupon, the jury exited the courtroom.)

19               THE COURT:   Anything for the record?

20               MR. PERRI:   No, your Honor.

21               THE COURT:   Anything for the record, defense?

22               MR. BERGER:   No, your Honor.

23               (Whereupon, a short recess was taken.)

24               (Whereupon, the jury entered the courtroom.)

25               THE CLERK:   Do both sides stipulate all sworn

1        jurors are present and properly seated; People?

2                    MR. PERRI:  Yes, your Honor.

3                    THE CLERK:  Defense counsel?

4                    MR. BERGER:  Yes, your Honor.

5                    THE COURT:  Detective, you are reminded you

6        are still under oath.

7                    You may inquire.

8    CROSS-EXAMINATION

9    BY MR. BERGER:

10       Q.   Did you make any notes or memorandum when you

11   spoke to Crystal Ramirez and Mya at the hospital?

12       A.   No, I did not.

13       Q.   So what you are testifying to is based upon your

14   own independent recollection of your meeting them at the

15   hospital?

16       A.   Yes, it is.

17       Q.   Did you talk to Mr. Perri prior to you testifying

18   here at this trial in the last few days?

19       A.   Yes, I did.

20       Q.   Where did that happen?

21       A.   In his office.

22       Q.   Who else was present?

23       A.   Nobody.

24       Q.   Did you talk to Mr. Perri about --

25                   MR. BERGER:  Withdrawn.

1      Q.   You are the carrying detective here, correct?

2      A.   That's correct.

3      Q.   That means you are in charge of this case, right?

4      A.   Yes.

5      Q.   So, did you talk to Mr. Perri about what has gone

6   on in the course of this trial with respect to the witnesses

7   that were called?

8      A.   Yes.

9      Q.   Did you talk to him about Mya and her testimony

10   here?

11      A.   Not her testimony.

12      Q.   What about Mya did you talk about?

13      A.   He told me that she was crying on the stand.

14      Q.   That's it?

15      A.   Yes.

16      Q.   And you didn't make an inquiry about it?

17      A.   No.

18      Q.   Did you talk to Detective Pacheco before

19   testifying here at this trial?

20      A.   You mean about the trial?

21      Q.   Yes, about this case.  Yes.

22      A.   We had talked.

23      Q.   When?

24      A.   Back when we had the hearings several months ago.

25      Q.   Well, do you remember how long ago that was?

1     A.    I forget.  I thought it was a couple of months

2   ago.

3     Q.    By a couple, do you mean two or three?

4     A.    Two or three.

5     Q.    And would you dispute, disagree with the fact the

6   hearings occurred in September of 2014?

7     A.    It seems two or three months ago, but I don't have

8   a strong feeling either way.

9     Q.    But your best recollection was two or three months

10   ago, but you wouldn't dispute now that I tell you it was

11   back in September of 2014, would you?

12     A.    I wouldn't dispute it.

13     Q.    Did you talk to Detective Pacheco after the

14   hearing before, but before the trial?

15     A.    No, not about any details or particulars.

16     Q.    I didn't ask about details.  Did you talk to him

17   about this case at any time after the hearing but before

18   your testimony here today?

19     A.    No.

20     Q.    But you did talk to Detective Pacheco about this

21   case prior to the hearing, correct?

22     A.    That's correct.

23     Q.    And you spoke to Mr. Perri about your involvement

24   in this case in Mr. Perri's office, correct?

25     A.    That's correct.

Det. Baran - People - Cross          974

1    Q.    Prior to the hearing?

2    A.    Yes, that's correct too.

3    Q.    And Detective Pacheco was there, was he not?

4    A.    I don't recall if he was in the office or not,

5    when I spoke to Mr. Perri.

6    Q.    Let me ask you:  Do you remember testifying at a

7    hearing back in September of 2014?

8    A.    Yes.

9    Q.    Were you under oath at the time?

10    A.    Yes.

11    Q.    Did you make the following answers to the

12    following questions, page 123.

13              THE COURT:  Line, please.

14              MR. BERGER:  I'll start at the top.

15              THE COURT:  Line one?  I'm just asking.

16              MR. BERGER:  Yes.

17    Q.        "QUESTION:  You spoke with the district

18        attorney and when you did that, Detective Pacheco was

19        present?

20              "ANSWER:  Yes, he was.

21              "QUESTION:  And you were in a room and it was

22        in his office, I assume?

23              "ANSWER:  Yes.

24              "QUESTION:  So you heard Detective Pacheco

25        talk to the district attorney as well?

kmm

1                "ANSWER:  Yes.

2                "QUESTION:  So you could hear what he was

3       saying?

4                "ANSWER:  Yes.

5                "QUESTION:  And he was sitting next to you

6       and near you when you were talking to Mr. Perri?

7                "ANSWER:  Yes."

8       Q.   Did you make those answers to those questions?

9                MR. PERRI:  Objection.  Your Honor, there has

10      been no inconsistency that has been brought out.  If

11      he's asking to refresh the witness's recollection, he

12      may do so.

13               THE COURT:  Overruled.  You can answer the

14      question.  Do you remember giving those answers to

15      those questions?

16      A.   Yes.

17      Q.   And were they true when you gave them?

18      A.   Yes.

19      Q.   And are they true today?

20      A.   Yes.

21      Q.   My question to you then is:  Then Detective

22      Pacheco was with you in the room with you when you spoke to

23      Mr. Perri, correct?

24      A.   I guess he was, yes.

25      Q.   When you say, I guess he was, does that refresh

kmm

1    your recollection, or do you still dispute that?

2         A.    I'm not disputing it.  I just don't have any

3    direct memory of him being in the room while we discussed

4    it.

5         Q.    Your memory was better then than it is today?

6         A.    Yes, it is.  Yes, it was.

7         Q.    Did you discuss with Mr. Perri in Detective

8    Pacheco's presence the circumstances of the taking of the

9    statement of Mr. Ramos?

10        A.    Are you referring before the hearing or before the

11   trial?

12        Q.    Yes.  You told me you didn't talk to Detective

13   Pacheco prior to the trial, correct?

14        A.    Correct.

15        Q.    I could only be referring to the hearing, and I'm

16   asking prior to the hearing, did you discuss with Detective

17   Pacheco the circumstances of the taking of the statement;

18   did you not?

19        A.    Yes.

20        Q.    When you spoke to Crystal Ramirez, she never told

21   you she observed any alleged sexual abuse, correct?

22        A.    Correct.

23        Q.    You have told us here today that Mya told you that

24   this happened before, correct?

25        A.    Yes.

1      Q.    That's what you just testified to, correct?

2      A.    Yes.

3      Q.    But she didn't tell you -- you say she nodded her

4    head, correct?

5      A.    Correct.

6      Q.    You had to interpret her head nodding your own

7    way, correct?

8      A.    That's correct.

9      Q.    Did you make a note about even asking her that

10   question and her nodding her head?

11     A.    No.

12     Q.    Did you ask her any details about how that prior

13   happenings occurred?

14     A.    No.

15     Q.    So you asked no follow-up questions after you say

16   she nodded her head, correct?

17     A.    Correct.

18     Q.    Well, now, detective, it could make a difference

19   as to what charges you were going to charge the defendant

20   with, if any, if she gives you details about the

21   circumstances of other instances and the length of time over

22   which they occurred, correct?

23     A.    That's correct.

24     Q.    But you didn't bother to do that in this case?

25     A.    I did not do that in this case because we were

Det. Baran - People - Cross      978

 1    going to do it later.

 2         Q.   You have an answer, you say, from a girl, a

 3    six-year old, and you didn't do it later, did you?

 4         A.   There came a point where we did not do it later,

 5    correct, or there did not come a point where we did it

 6    later.

 7         Q.   You told Crystal Ramirez at the hospital, what the

 8    protocol was going to be in this particular case, correct?

 9         A.   That's correct.

10         Q.   And you told her that Mya was going to be examined

11    by a professional, a nurse professional, right, a

12    professional nurse examiner, correct?

13         A.   Yes.

14         Q.   And you said to her, that you are going to be

15    returning later and after the completion of the exam, you

16    are going to take the family back to the office of special

17    victims unit in Bethpage so we can conduct a videotape

18    interview of Mya, correct?

19         A.   That's correct.

20         Q.   You told that to Crystal Ramirez, correct?

21         A.   Correct.

22         Q.   And you didn't do it, did you?

23         A.   Correct.

24         Q.   You never did it, did you?

25         A.   Correct.

kmm

1      Q.    And the protocol requires that the interview be

2  conducted by somebody skilled in interviewing child alleged

3  victims of sexual abuse, correct?

4      A.    Correct.

5      Q.    And there are such people at the special victims

6  unit, aren't there?

7      A.    Yes, there are.

8      Q.    And that has been done before where the children

9  are interviewed and videotaped, correct?

10     A.    Every day.

11     Q.    Every day?

12     A.    Uh-huh.

13     Q.    But it wasn't done here?

14     A.    Correct.

15     Q.    Now, what time did you say that rights were given

16  to Mr. Ramos?

17     A.    I said at 11:40 p.m.

18     Q.    And when did you attempt to start taking the

19  statement?

20     A.    Immediately after the rights were given.

21     Q.    Within a few minutes after the rights?

22     A.    No immediately after.

23     Q.    Immediately.

24     A.    Correct.

25     Q.    When was the statement completed?

kmm

 1        A.    About 12:30.

 2        Q.    Did you make a notation about the time of the

 3   completion?

 4        A.    No.

 5        Q.    How do you know 12:30?

 6        A.    I think you asked me at the hearing about how long

 7   did it take to do the statement, and I think I said about 45

 8   minutes.

 9        Q.    I asked you when the time of completion was, you

10   said you didn't know.

11        A.    And I think I estimated about 45 minutes after we

12   begin.

13        Q.    So you're approximating?

14        A.    Yes, sir.

15        Q.    That's based upon your own independent

16   recollection?

17        A.    My recollection at the time of the hearing.

18        Q.    Right.  You didn't say at the time of the hearing

19   it was 12:30.  You said -- what you said was you didn't know

20   what time you completed it?

21        A.    You are correct, I did not note the time we

22   finished.

23        Q.    And your recollection, we established, was better

24   at the hearing than it is here today, correct?

25        A.    Probably.

1      · Q.    What you are telling us with respect to the

2    statement, People's 10 in evidence, is that the defendant

3    read the first paragraph aloud, you said; is that what you

4    said to us before?

5        A.    Yes.

6        Q.    And by the first paragraph, do I take it to mean

7    the one that says my name is Daniel Ramos, I live at 781

8    Coleridge Road in Uniondale?

9        A.    Yes.

10       Q.    And he read what his Social Security number was

11   and he corrected that?

12       A.    I don't think he read it.  He looked at it and

13   said that's not my social, or that's not my correct social.

14       Q.    I'm a little confused about that.  Did you say he

15   read aloud the first paragraph?

16       A.    That's correct.

17       Q.    Does the first paragraph contain the Social

18   Security number?

19       A.    It does.

20       Q.    Did he make the correction at that point?

21       A.    I'm sorry.  Yes, he made the correction at that

22   point.

23       Q.    At that point?

24       A.    Yes.

25       Q.    Then he didn't read anymore of it; is that

1    correct?

2        A.    Well, he finished whatever few words that came

3    after the social, and then he began to read in an undertone.

4        Q.    What does that mean, undertone?

5        A.    That means he is speaking audibly, but not loud

6    enough so I could actually make out the words.

7        Q.    Audibly, but not loud enough so that you could not

8    make out the words?

9        A.    Correct.

10       Q.    Now, there was -- did you make an audiotape or

11   videotape of this entire interview process where you say the

12   rights were given and the statement was given?

13       A.    No, I did not.

14       Q.    But such equipment exists, doesn't it?

15       A.    Yes, it does.

16       Q.    But you chose not to do that in this case,

17   correct?

18       A.    There was no equipment available.  There was no

19   choice.

20       Q.    What do you mean no equipment?  In a sex crimes

21   unit there is no equipment available?

22       A.    That's correct.

23       Q.    Have you ever taken an audio and video statement

24   from a subject before?

25       A.    Before the arrest of the defendant?

1    Q.    No, at any time.

2    A.    Yes.

3    Q.    And you are saying that the equipment didn't exist

4    in the sex crimes unit or --

5    A.    That's correct.  When I answered yes, that I have

6    taken video statements, that is not in a sex crimes unit.

7    Q.    You said it went into effect in November of 2014?

8    A.    Yes.

9    Q.    Are you familiar with the Ivan Filobos case?

10   A.    No.

11             MR. PERRI:  Objection.

12             THE COURT:  Overruled.

13             Are you familiar with it?

14             THE DEFENDANT:  No.

15   Q.    When you say the audio and videotapes, Nassau

16   County has audio and video equipment, does it not?

17   A.    You were talking about the whole county or the

18   police department?

19   Q.    Yes.

20   A.    I'm not aware of the county's equipment resources,

21   but the police department has two locations where at that

22   point it had two locations where the defendants could be

23   videotaped.  We're now the third, but there are only two at

24   that point.

25   Q.    Is People's 10, the statement, a verbatim

1    statement from the defendant?

2        A.    I believe it is, yes.

3        Q.    Before you read him his -- you are --

4              MR. BERGER:   Withdrawn.

5        Q.    You are aware of the fact that the defendant did

6    tell Crystal that he didn't do anything to Mya, correct?

7        A.    That's correct.

8        Q.    And when did you learn that?

9        A.    When I read her statement when I returned to the

10   medical center for the second time.

11       Q.    You learned it at the medical center, correct?

12       A.    Correct.

13       Q.    Before you went to interview Daniel Ramos,

14   correct?

15       A.    Correct.

16       Q.    So when you discussed the rights card, was

17   Detective Pacheco in the room?

18       A.    No, he was not.

19       Q.    Now, you meet the defendant in this eight by eight

20   room, correct, for the first time?

21       A.    Yes.

22       Q.    You go into the room, you are the only one there

23   with the defendant, correct?

24       A.    Yes.

25       Q.    What is the first thing you said to him?

kmm

Case 2:19-cv-01125-JS-AYS   Document 7-3   Filed 05/31/19   Page 141 of 800 PageID #: 1394

```
 1        A.    I don't remember the first thing I said to him.
 2   It might have been hello, I'm Detective Baran.
 3        Q.    Besides introducing yourself, what was the first
 4   thing that was said?
 5        A.    I asked him if he needed anything to eat or drink
 6   or use the bathroom, any medical issues that I need to be
 7   aware of.
 8        Q.    And then after that?
 9        A.    I want to talk to you about what happened, but I
10   need to read you your rights first.
11        Q.    Did you tell him what he was being charged with?
12        A.    No.
13        Q.    So he said to you, he felt more comfortable
14   getting his rights in Spanish?
15        A.    He preferred Spanish.
16        Q.    And you could tell that he was Hispanic; could you
17   not?
18        A.    Yes.
19        Q.    English was his second language, you could tell
20   that?
21        A.    I'm not a linguist.  I don't know how many
22   languages he speaks and where English falls in that order.
23        Q.    But he told you he is more comfortable having his
24   rights in Spanish, correct?
25        A.    Yes, that's correct.
```

1      Q.    And your words before were, it's very technical,

2    the rights card, right?

3      A.    There's technical language.  I don't think I said

4    very.

5      Q.    What does that mean there's technical language?

6      A.    It means we're reading a card that apparently was

7    written by attorneys or the Court, by somebody other than

8    the words that the defendant might use themselves on a daily

9    basis.

10     Q.    In other words, there's legal language there that

11   you might have to be a lawyer to understand, correct?

12     A.    I don't know if you need to be a lawyer to

13   understand it, but certainly you might feel more comfortable

14   in your native language getting that.

15     Q.    You know Spanish is a native language, right?

16     A.    I assumed it was.

17     Q.    You assumed it because of his accent?

18     A.    Yes, and his name.

19     Q.    And you wanted to be sure that he got his rights

20   in the language that he understood, correct?

21     A.    That's correct.

22     Q.    Because you knew he would understand Spanish,

23   right?

24     A.    I assumed he would understand Spanish.  That's why

25   I made the offer.

1      Q.    And if you gave him his rights without telling him

2    the charges, correct?

3      A.    That's correct.

4      Q.    So you had Detective Pacheco come in and read him

5    his rights in Spanish, correct?

6      A.    Yes.

7      Q.    Except you don't know what Detective Pacheco read

8    him because you don't speak Spanish, do you?

9      A.    No, I don't, and yes, I don't know what he read to

10   him.

11     Q.    But you told Mr. Perri he read him his rights in

12   Spanish before?

13     A.    Yes.

14     Q.    But that wasn't accurate, was it?

15     A.    I thought Mr. Perri phrased the question that

16   appeared he was reading the rights from the card in Spanish.

17   To the best of my knowledge, that's what he did.

18     Q.    To the best of your knowledge, you mean you are

19   guessing at that point?  You don't know?

20     A.    Since I don't understand Spanish, I had no direct

21   knowledge of what was being read to him.

22     Q.    Right.  And it may be you may have even heard

23   Detective Pacheco speaking in what sounded to you like the

24   Spanish language, but you don't know what the content of

25   what he said was, do you?

1      A.    That's correct.

2      Q.    So you knew his primary language was Spanish and

3  you wanted to understand the rights, so you had it read to

4  him in Spanish, didn't you have Pacheco try interviewing in

5  Spanish?

6      A.    I would have been prepared to do that if the

7  defendant had indicated he did not want to try to talk to me

8  in English.

9      Q.    He said he would try to talk to you in English,

10  correct?

11      A.    Correct.

12      Q.    But it was unsuccessful, wasn't it?

13      A.    I don't think so.

14      Q.    Did you even attempt, since you recognized that

15  Spanish was his primary language, to get a Spanish-speaking

16  detective to interview him?

17      A.    The word attempt is a mischaracterization.  I gave

18  him the option, and he said he would try in English.

19      Q.    You made an effort to get him the rights card to

20  be read by a Spanish-speaking detective?

21      A.    I gave him that option too, and he preferred

22  Spanish for the rights card, and he said he would try

23  English for the statement.

24      Q.    My question is:  He already told you he was more

25  comfortable getting his rights in Spanish, did you even

kmm

1   attempt to get a Spanish-speaking detective to come in and

2   interview him?

3                  MR. PERRI:   Objection.

4                  THE COURT:   Overruled.   Do you understand the

5        question?

6   A.   Yes.

7   Q.   You did?

8   A.   Yes.

9   Q.   What attempts did you make?

10  A.   Detective Pacheco was standing right there next to

11  me, and I gave the defendant the option to speak in English

12  or go with Detective Pacheco in Spanish.

13  Q.   Let me ask you:   If you made this statement to

14  this answer to this question back at the hearing in

15  September of 2014, page 150, line 14.

16                  By the way, you were under oath at the time?

17  A.   Yes.

18  Q.       "QUESTION:   Now, he had already told you he

19       was more comfortable in getting his rights in Spanish.

20       Did you attempt to get a Spanish-speaking detective to

21       come in and interview him?

22                  "ANSWER:   No."

23  Q.   Did you make that answer to that question?

24  A.   Yes, I did.

25  Q.   Was that true then?

Det. Baran - People - Cross          990

1       A.   Yes.

2       Q.   Well, you just told us a moment ago you did

3   attempt to get a Spanish-speaking detective, so which answer

4   is correct?

5       A.   I told you the word attempt is a

6   mischaracterization both at the hearing and today.  The way

7   things happen is Detective Pacheco had just finished reading

8   his rights.  He was available.  I gave the defendant the

9   option.  For the rights he preferred Spanish, but for the

10  statement, he preferred English, but there was no attempt --

11  I can't force the defendant to choose Detective Pacheco over

12  me.  I gave him the option.

13      Q.   I just asked you before you read from the hearing,

14  did you attempt to get a Spanish-speaking detective and you

15  said yes?

16      A.   I told you that the word attempt is a

17  mischaracterization.

18      Q.   You used it.  You answered the question.

19           MR. PERRI:  Objection.

20           THE COURT:  Sustained.

21      Q.   How is attempt a mischaracterization?

22           MR. PERRI:  Objection.

23           THE COURT:  I'll let you answer that.

24      A.   It implies that he was trying unsuccessfully.

25  That's not the case.  I had a Spanish-speaking detective

kmm

1    right there.

2         Q.    Attempting is trying unsuccessful?

3         A.    Trying to --

4         Q.    Go ahead, detective.

5         A.    It implies I was trying to do something, or maybe

6    I didn't try to do something, but that's not the case.

7         Q.    The question is:  Did you try to do something?

8         A.    It's not a relevant question because the detective

9    was right there with me.  The only thing I attempted to do

10   was give the defendant the option of what he was more

11   comfortable with.

12        Q.    He wasn't in the room with you, next to you, was

13   he, Detective Pacheco?

14        A.    Yes, he was.

15        Q.    Detective Pacheco was there when you say you asked

16   the defendant if he wanted to speak to you in English or

17   Spanish?

18        A.    I didn't ask the defendant if he wanted to speak

19   to me in Spanish.  I said, we're going to -- something along

20   the lines, I'll take your statement now.  Do you want to try

21   English, or do it in Spanish, and he said, I will try

22   English.

23        Q.    You told him you were going to take a statement

24   now and you still haven't told him what it is you are

25   charging him with?

1       A.   It wasn't an appropriate time to tell him.  If he

2   would have asked me, I would have told him, but it just

3   didn't come out of that conversation at that time.

4       Q.   That wasn't an appropriate time to tell him what

5   he was charged with?

6       A.   It's not.  That's correct.  It's not the

7   appropriate time.

8       Q.   Shouldn't you be telling him what he is charged

9   with before you will read him his rights or at the very

10  least before you will take a statement from him?

11              MR. PERRI:  Objection.

12              THE COURT:  Overruled.  I'm not aware of any

13       legal requirement that I do that, and I'm not aware of

14       any moral or ethical requirement if he asked me.  He

15       apparently thought he knew or he didn't care.

16      Q.   You say if he asked you, you would have told him.

17      A.   Yes.  I say, I would have.

18      Q.   When you gave him the pad and paper to write an

19  apology letter, he did that in Spanish?

20      A.   Yes.

21      Q.   That was the language he was comfortable with,

22  correct?

23              MR. PERRI:  Objection.

24              THE COURT:  Overruled.  Do you understand the

25       question?

kmm

1       A.   I assume he was more comfortable, but as far as I

2  could tell, he was completely fluent in English.  Maybe he

3  just wanted to write in Spanish, for some other reason other

4  than comfort.

5       Q.   Did you ever ask the defendant directly if he

6  licked Mya's vagina?

7       A.   I never asked him directly if he licked her

8  vagina, not that I recall anyway right now.

9       Q.   And you never told him that is what he was being

10 charged with, correct?

11      A.   Well, that's not the case.  There came a point

12 later when he was told what he was charged with but not

13 before the statement.

14      Q.   You mean, not before he put his signature on the

15 statement?

16      A.   Correct.  Or at least he wasn't told by me.  He

17 might have been told by Detective Pacheco or the cops but he

18 wasn't told by me.

19      Q.   Whatever you may have told him, you told him after

20 he put his signature on what is now People's 10?

21      A.   I never told him at all even after the signature,

22 but I believe he was told by the sergeant at some point in

23 time.

24      Q.   I thought you told us you told him afterwards?

25      A.   No, I just said he was told.

1    Q.    You were present when he was told?

2    A.    No, I wasn't.

3    Q.    How do you know he was told?

4    A.    I don't have direct knowledge.

5    Q.    So you are guessing?

6    A.    Well, there's usually a protocol.  I can't say it

7    was followed at that night.

8    Q.    You made up the answer just now about him being

9    told?

10                   MR. PERRI:  Objection.

11                   THE COURT:  Sustained.

12   Q.    So if I ask you the question directly, was he

13   told?

14   A.    Not by me.

15   Q.    And nobody in your presence?

16   A.    Correct.

17   Q.    Did you witness -- did you put your signature on

18   People's 9, which is called the rights card?

19   A.    Yes.

20   Q.    Now, when you put your signature there, were you a

21   witness to the defendant waiving his rights?

22   A.    I was just -- since I don't speak Spanish, and

23   although I do recognize the word si, and I did hear him say

24   si, I wasn't putting my name on the card as witnessing his

25   waiving of his right as much as I was putting my name on the

1   card, signing the card in three places and writing si in two

2   of those places.

3       Q.   You just witnessed putting his signature on the

4   card?

5       A.   That's the way I saw it at that time.

6       Q.   Not the actual waiving of the rights?

7       A.   That's the way I saw it at that time.

8       Q.   That's the way what?

9       A.   I saw it at that time.

10      Q.   By the way, did Detective Pacheco engage in any

11  colloquy even if it was in Spanish between the defendant

12  after you say he read something in Spanish?

13      A.   I wouldn't know, since I don't speak Spanish.

14      Q.   Right.  Did Detective Pacheco, just in your

15  observation, just read straight from the card, and although

16  you don't know what he was reading, did he stop at any time

17  and have a question and answer in Spanish with the

18  defendant?

19      A.   I don't remember.

20      Q.   Did the defendant ask any questions after the card

21  was read?

22      A.   I don't remember either way.

23      Q.   He might have, he might not have, you just don't

24  recall?

25      A.   I just don't recall.

1        Q.    And is it Detective Pacheco remained in the room

2    while you were going to question -- attempting to question

3    him?

4        A.    Yes.

5        Q.    How long did you ask the defendant in English

6    about which language he wanted to speak to you to be

7    interviewed in?

8        A.    As long as it takes to ask one question.

9        Q.    Which was?

10       A.    Something along the lines of, do you want to talk

11   to me in English, or do you want Detective Pacheco to talk

12   to you in Spanish?

13       Q.    And Detective Pacheco was there when you said

14   that?

15       A.    Yes.

16       Q.    And the defendant, according to your testimony,

17   said he would try to talk to you in English?

18       A.    He said, I would try English.

19       Q.    How long after you got that answer was Detective

20   Pacheco in the room?

21       A.    Not more than a few minutes.

22       Q.    Did you engage in any questions of the defendant

23   while Detective Pacheco was still there?

24       A.    I think I said to him, well, yes, I did engage in

25   questions, and the first question was, tell me what happened

1    with Mya.

2         Q.    And Detective Pacheco was there?

3         A.    Yes.

4         Q.    And what did the defendant say?

5         A.    He began to tell me the story of how he was

6    working that day, but he was off that day and it became a

7    little confusing about being off, but working and that he

8    went over to Mya's house, and he had something to drink.

9    And at that point, I think I was confident or satisfied he

10   was fluent in English and might have given Detective Pacheco

11   a look or a nod, and he quietly leaves the room.

12        Q.    You gave him a nod suggesting he could leave?

13        A.    Or a look.

14        Q.    Now, you said the defendant gave you a whole

15   narrative that is contained in People's 10; is that right?

16        A.    Yes.

17        Q.    You are not saying that the defendant read -- you

18   already told us the defendant didn't read People's 10 aloud,

19   so you could hear him uttering the words; is that correct?

20        A.    Yes, that's correct.

21        Q.    The only part you say he did was the first part

22   where the name and address are and Social Security number,

23   right?

24        A.    Yes.

25        Q.    Now, at some point in time you decided to have

1   Detective Pacheco come in and read People's 10 to him in

2   Spanish?

3       A.   Yes.

4       Q.   But you don't know that Detective Pacheco read the

5   entire statement to him, do you?

6       A.   No, I don't.

7       Q.   You know he read something to the defendant, but

8   not what the content was?

9       A.   Correct.

10      Q.   Now, you say that the defendant gave you that

11  entire statement in English and you were taking it down

12  verbatim, right?

13      A.   I try to take down as much as I can verbatim.

14  There just comes a point in time where I can't help myself

15  and just clean up some of the grammar and semantics and make

16  it a coherent statement.  He told me, for instance, he was

17  off that day and when he finished work he went to Crystal's

18  house.  If I took that down verbatim, it would make no

19  sense.

20      Q.   You told me before when I asked you if this

21  statement was verbatim and you answered yes.

22      A.   I did say yes, and I thought you would ask me if

23  it was mostly verbatim, or did I try to take it verbatim.

24  It would be inaccurate to say it was a verbatim statement.

25  I try as much as possible to keep as close to the words and

1    the phrases that he uses, but sometimes it's in the interest

2    of making it coherent.  I clean it up a little bit.

3         Q.   Did you tell me that at the hearing?

4         A.   I don't remember what I told you at the hearing.

5         Q.   Let me read to you then page 147, line 23, and

6    reminding, the questions, you were under oath at that

7    hearing?

8         A.   Yes.

9         Q.   Did you make the following answer to the following

10   question in what is contained on People's 5, that was the

11   exhibit statement then a verbatim statement of what he said

12   and your answer was, it is.  Was that true?  First of all,

13   did you make that statement?

14        A.   Yes, I did.

15        Q.   Was it true?

16        A.   It was true, as I understood the question, but as

17   you are explaining it here to me, I did not understand the

18   question properly at that time.  I tried to give a true

19   answer to the statement to the question as I understood it.

20        Q.   The question was -- I'll read it again.  Is what

21   is contained on People's 5 a verbatim statement of what he

22   said; is that too complicated a question?

23             MR. PERRI:  Objection.

24             THE COURT:  Sustained.

25        Q.   Detective, what about that question didn't you

Det. Baran - People - Cross          1000

1   understand?

2        A.   I read into the question.

3        Q.   What do you mean you read into it?

4        A.   I read into it, and I just assumed you knew it, it

5   would not be a verbatim statement considering some of the

6   terminology and the grammar.

7        Q.   You assumed I knew it was not verbatim?

8        A.   And I also testified when he was talking, I would

9   redirect him and keep him on track and exclude tangents that

10  he might have gone on in order to keep the sum and substance

11  of what he said, but to keep it in a well understood

12  statement.

13       Q.   Detective, I'm sure there were plenty of tangents

14  that were not relevant to whatever you are asking him.   I

15  assume you left them out.  My question is:  What was

16  contained on exhibit 5, now exhibit 10, I asked you if that

17  was verbatim, his words and you said yes?

18       A.   Yes.

19       Q.   Is that true?

20       A.   That's not true.

21       Q.   You testified incorrectly at a hearing which you

22  were under oath, correct?

23       A.   That's correct.

24       Q.   So that page 148, line four, I'm sorry, line one.

25  Did you make the following answer to the following question?

1            "QUESTION:  So you may have asked various

2        questions.  You wrote down or typed down, typed

3        verbatim what he was saying to you?

4            "ANSWER:  Yes.  I might have asked him to

5        explain something to me, but when he explained it, I

6        typed what he said.

7            "QUESTION:  Exactly word for word?

8            "ANSWER:  Yes."

9        Did you make those answers to those

10       questions?

11    A.  Yes, I did.

12    Q.  Those answers aren't correct either, is it?

13    A.  Not as I understand the word verbatim now.

14    Q.  What did you understand the word verbatim to be

15    before now?

16    A.  Mostly in sum and substance.

17    Q.  You know there's a difference between sum and

18    substance and verbatim, did you not?

19            MR. PERRI:  Objection.

20            THE COURT:  Sustained.

21    Q.  Sum and substance is the direct opposite of

22    verbatim, isn't that right, detective?

23            THE COURT:  Do you understand the question?

24    A.  I'm not sure they are directly opposite.  I think

25    they share and consent and circle.

1      Q.   Verbatim means word for word; you understand that?

2      A.   Now I do.

3      Q.   You only understood that now, you didn't

4    understand before today?

5      A.   Correct.  I'm not sure how I understood it back in

6    September.

7      Q.   So, you are saying the defendant told you

8    verbatim, not verbatim, I told her I was going to tickle

9    her, and I pulled down her pants and underwear and tickled

10   her pussy with my mouth; is that a verbatim statement?

11     A.   I'm very confident that's a verbatim statement.

12   To say the entire statement for the two pages is verbatim, I

13   think it would be a mischaracterization as I understand it,

14   as I understand the word verbatim today.

15     Q.   You mean what the word of verbatim is today?

16     A.   Yes.  I'm paraphrasing, yes.

17     Q.   I'm sorry?

18     A.   Yes, I have.

19     Q.   Now, you said -- how long did you testify before

20   that it took Detective Pacheco to read People's 10 in

21   Spanish?

22     A.   I thought it took between ten, ten minutes,

23   twelve, thirteen.  That's my feeling about how long it took.

24     Q.   Did you ever estimate it took between two and

25   twelve minutes?

1      A.   Yes.

2      Q.   So is that accurate?

3      A.   It is really probably closer to ten to twelve or

4   ten to thirteen.

5      Q.   Is that because Detective Pacheco Spanish --

6           MR. BERGER:   Withdrawn.

7      Q.   Did the defendant interrupt Detective Pacheco at

8   any time while he was reading that statement to him in

9   Spanish?

10     A.   I don't recall him doing so, or I don't recall him

11  doing so.

12     Q.   Now, you asked Mr. Ramos to initial certain parts

13  of the statement?

14     A.   That's correct.

15     Q.   Even though you don't know if he knew what the

16  meaning of those parts were, do you?

17           MR. PERRI:   Objection.

18           THE COURT:   Sustained as to form.  Ask it

19     again.

20     Q.   You told us before that only part of this

21  statement that he read allowed, that you could decipher, was

22  the first paragraph, correct?

23     A.   That's correct.

24     Q.   Everything else was, as you put it, was in an

25  undertone?

kmm

1      A.   That's correct.

2      Q.   Kind of like muttering, making sounds, but you

3   couldn't tell what he was saying, right?

4      A.   Yes.

5      Q.   So you don't know if he actually read the body of

6   this statement, do you?

7      A.   I do because on one particular place he made the

8   correction.  He pointed out to me there was a correction to

9   be made.

10     Q.   What correction did he point out to you?

11     A.   Little girl.

12     Q.   When did he do that?

13     A.   Sometime after he began to read or look at the

14  statement and mutter or mumble or whisper.

15     Q.   Was anybody in the room with you when you say that

16  happened?

17     A.   No.

18          THE COURT:   Find a good place to break.   You

19      can go a little further but find a good place to break.

20     Q.   Did you ever ask him to initial the part of the

21  statement where it says, I told her I was going to tickle

22  her, and I pulled down her pants and underwear and I tickled

23  her pussy with my mouth; did you ever ask him to initial any

24  part there?

25     A.   No, only corrections.

kmm

1          MR. BERGER:  This would be a good time.

2          THE COURT:  Have I good.  Thank you.

3          Detective, you can step down.  See you

4    tomorrow morning.

5          Ladies and gentlemen, before I let you go for

6    the night, let me give you the admonitions again.  Keep

7    an open mind throughout the trial.  Do not discuss the

8    case amongst yourselves or with anyone else during the

9    trial.  Do not permit anyone to discuss the case in

10   your presence.  Do not talk to the lawyers, witnesses

11   or the defendant about anything during the trial.

12         Do not visit or view the place where the

13   charged crime was allegedly committed or any other

14   place involved in the case.

15         If there is any news coverage of the case, do

16   not read or listen to any accounts or discussions of

17   the case reported by the news media.

18         Do not attempt to research any fact, issue or

19   law related to this case or by discussion with others,

20   by research in a library or on the internet or by any

21   other means or source.

22         Have a greet evening.  See you all back here

23   at 10:00 a.m., please.  Thank you.

24         (Whereupon, the jury exited the courtroom and

25   the trial was adjourned to May 14, 2015.)

1006

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NASSAU : CRIMINAL TERM PART 43

3    -------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,      :    Indictment
4                                              :    No. 742N/14
              -against-                        :
5                                              :
     DANIEL RAMOS,                             :
6                                              :
                        Defendant.             :    Jury Trial
7    -------------------------------------------X

8                           May 14, 2015
                            262 Old Country Road
9                           Mineola, New York

10
     B E F O R E:
11
         HONORABLE TERESA K. CORRIGAN,
12                   Acting Supreme Court Justice

13
     A P P E A R A N C E S:
14
     (As Previously Noted)
15

16                *       *       *       *       *

17

18              THE CLERK:  Case on trial continued,

19    Indictment Number 742N of 2014, People of the state New

20    York vs. Daniel Ramos.

21              All parties are present.  The Spanish

22    interpreter, Carmen Knight, is present.

23              Are the People ready to proceed?

24              MR. PERRI:  Yes, your Honor.

25              MR. BERGER:  Yes.

kmm

1          THE CLERK:  The jury is not present at this

2     time.  They're on their way.

3          THE COURT:  Anything for the record before we

4     bring in the jury?

5          MR. PERRI:  No, your Honor.

6          MR. BERGER:  No, your Honor.

7          (Whereupon, the jury entered the courtroom.)

8  M A U R I C E   B A R A N, Detective, called on behalf of

9     the People, having been previously sworn, took the

10    witness stand and testified as follows:

11         THE CLERK:  Do both sides stipulate all sworn

12    jurors are present?

13         MR. PERRI:  Yes, your Honor.

14         MR. BERGER:  Yes, your Honor.

15         THE CLERK:  Detective, you are reminded you

16    are still under oath.

17         THE WITNESS:  Yes.

18         THE COURT:  Good morning.  I hope you had a

19    nice evening.

20         Mr. Berger, you may inquire.

21  CROSS-EXAMINATION

22  BY MR. BERGER:  (Continuing)

23    Q.   Detective, drawing your attention to that point

24  where shortly after you say that Detective Pacheco read the

25  rights to the defendant and signed a card, did you then,

Det. Baran - People - Cross          1008

1  after that happened, within a minute or two give the signal

2  to Detective Pacheco to leave?

3      A.   Yes.

4      Q.   And he left?

5      A.   Yes, it wasn't so much a signal to leave, in my

6  mind, it was a signal I have it under control.  He could

7  still leave whenever he wished.

8      Q.   Did you give him a word or a signal and then he

9  left?

10     A.   I gave him a look, I believe.

11     Q.   Something to indicate it's okay for him to leave,

12  correct?

13     A.   Something to indicate I had it under control, that

14  the defendant was speaking in perfect English, and I didn't

15  need Detective Pacheco to be there for a translation.

16     Q.   Okay.  Now, drawing your attention to that point

17  in time where you said that you asked Mya if this ever had

18  been and you say she nodded her head; did you ask her when

19  this had happened before?

20     A.   No, I did not.

21     Q.   You asked when you first saw Mya, you were in the

22  hospital, correct?

23     A.   Yes.

24     Q.   She was with her mother?

25     A.   No.

kmm

1    Q.   She was not with her mother?

2    A.   No.

3    Q.   Where was she?

4    A.   In an examination room.

5    Q.   By herself?

6    A.   There was somebody else with her from the

7  hospital.

8    Q.   The nurse examiner?

9    A.   No.

10   Q.   So was she lying down or standing when this

11 happened?

12   A.   She was on a bed.

13   Q.   And you say that she nodded her head, correct?

14   A.   Yes.

15   Q.   Did you ask her, for example, what kind of abuse

16 happened before?

17   A.   No.

18   Q.   Did you ask her where it happened before?

19   A.   No.

20   Q.   Did you ask her how many times it happened before?

21   A.   No.

22   Q.   And I think you told us that you never made a

23 notation or memo about this conversation you had; is that

24 correct?

25     A.   That's correct.

Det. Baran - People - Cross          1010

1      Q.    Did you ask her what preceded the so-called eating

2  her coochie?  Did you ask her what preceded that?

3      A.    Well, I asked her what happened today, with Daniel

4  and she -- what happened today.  And she responded he ate my

5  coochie.  It wasn't a specific question what happened before

6  that.  It was a general question, what happened today.

7      Q.    You asked her -- you never met her before,

8  correct?

9      A.    Correct.

10     Q.    You walk into the room and you say what happened

11 today?

12     A.    Yes.

13     Q.    And she says he ate my coochie?

14     A.    Yes.

15     Q.    That's it?

16     A.    Yes.

17     Q.    And you didn't ask any questions as to how it

18 happened?

19     A.    Correct.

20     Q.    Did you ever ask Mr. Ramos why he tickled her

21 pussy with his mouth?

22     A.    No.

23     Q.    Did you ask him whether he did it for sexual

24 gratification?

25     A.    No.

Det. Baran - People - Cross          1011

1    Q.   Did you ask him if he ever done that before?

2    A.   I don't remember if I did or didn't.

3    Q.   Do you think you may have asked him?

4    A.   I don't remember asking him if he had done that

5    before.

6    Q.   You never asked that question?

7    A.   I don't believe I did.

8    Q.   There came a time when you offered the defendant

9    to have the statement read to him in Spanish, you say,

10   correct?

11   A.   Correct.

12   Q.   You didn't read it to him in English, did you?

13   A.   No, I did not.

14   Q.   You say he was speaking such clear English,

15   understood it perfectly and yet you didn't read the

16   statement back to him in English?

17   A.   Correct.

18   Q.   Instead you asked Detective Pacheco to come in and

19   read the statement in Spanish?

20   A.   After he asked me to have it read back to him in

21   Spanish that's what I did.

22   Q.   He asked you to have it read in Spanish?

23   A.   Yes.

24   Q.   Did he tell you why he wanted it read back in

25   Spanish?

kmm

Det. Baran - People - Cross          1012

1      A.    I made the offer and he accepted the offer.

2      Q.    He wanted it to be read in Spanish?

3      A.    I made the offer initially and he accepted the

4   offer.

5      Q.    And you didn't ask him why he needed it to be read

6   in Spanish?  According to you, he had just given the

7   statement in English.

8      A.    I don't know if it needed to be read in Spanish.

9   I asked him if he would like Detective Pacheco to read it in

10  Spanish and he said yes.

11     Q.    Why did you ask Detective Pacheco?  Why did you

12  even give that option to the defendant?

13     A.    Because I thought there was a possibility there

14  might come a point in time where he is going to come to

15  court and say I don't understand any English.

16     Q.    Why would you think that when you are talking and

17  totally you are having this exchange with him and it's all

18  in English?

19     A.    I experienced it before with Spanish speaking

20  defendants.

21     Q.    You knew, in fact, that the defendant did not give

22  you this statement in English, correct?

23     A.    He gave me the statement in English.

24     Q.    You knew if he read that statement in English he

25  would see that sentence in there that said he pulled down

1    her pajamas and licked her pussy, right?

2        A.   He did say that.

3        Q.   That's what you say he said.  I understand if you

4    gave him that statement to read, if he could read English,

5    you didn't want him to see that statement, did you?

6        A.   I don't understand the question.

7        Q.   Because he never said that to you, right,

8    detective?

9             THE COURT:  There's a question.  You can

10           answer.

11       Q.   He never said that to you?

12       A.   Yeah, he said that.

13       Q.   Now, you have Pacheco come in and you don't know

14   what Pacheco is reading because you don't understand

15   Spanish, right?

16       A.   Correct.

17       Q.   And Pacheco knows enough not to read a sentence in

18   Spanish to him because he might then deny, right?

19            MR. PERRI:  Objection.

20            THE COURT:  Sustained, as to what this

21           detective knows Detective Pacheco knows.

22       Q.   You knew in this case because you are claiming you

23   had other clients, not clients, other suspects before who

24   claimed that they didn't understand English and you just had

25   and an inkling that the defendant might say that, right?

kmm

1      A.    I usually do that with all my defendants that

2   speak Spanish and English.

3      Q.    If preferred language is Spanish, shouldn't that

4   have been the language in which he was interviewed?

5            MR. PERRI:  Objection.

6            THE COURT:  Sustained as to form.

7      Q.    He told you, according to you, he wanted it read

8   to him in Spanish, correct?

9      A.    I don't know that he wanted to.  When I made the

10  offer, he accepted it.  He never expressed a desire to have

11  it read to him before I made the offer.

12     Q.    You say you made an offer to him, right,

13  detective?

14     A.    Yes.

15     Q.    Going back to the time where you say that you

16  wanted Detective Pacheco to come in and give him his rights,

17  because you told us that the rights card contained technical

18  legal language; do you remember saying that yesterday?

19     A.    Yes.

20     Q.    But the defendant doesn't know it's technical

21  legal language, you didn't tell him that ahead of time, did

22  you?

23     A.    I asked him if he would prefer it, to have the

24  rights card read in English and Spanish and he said,

25  Spanish, please.

Det. Baran - People - Cross          1015

1      Q.    The defendant doesn't know that technical legal
2   language, he doesn't even know what the rights are?
3               MR. PERRI:   Objection.
4               THE COURT:   Sustained.
5      Q.    Did you ask the defendant if he knows his rights?
6      A.    No, I did not.
7      Q.    This is the first time he has ever been arrested
8   in his life, correct?
9               MR. PERRI:   Objection.
10              THE COURT:   If you know.
11     A.    At that point I had not known.
12     Q.    You never bothered to see if he had previously
13  been arrested before?
14     A.    At that point in time I had not done a criminal
15  history check on him.
16     Q.    You say it was technical legal language and you
17  wanted it to be read to him in Spanish, correct?
18     A.    No, I gave him the option.  I didn't care either
19  way.
20     Q.    What does he know about technical legal language?
21  Did you tell him the technical legal language?
22              MR. PERRI:   Objection.
23              THE COURT:   As to form.
24     Q.    Did you tell him technical legal language was
25  involved with respect to the rights card?

kmm

1    A.    I asked him if he wanted rights read to him in

2    Spanish or English.

3    Q.    That's not the question.  Did you tell him

4    technical legal language is about to be read to you, would

5    you rather to have it in English or Spanish?

6    A.    I didn't say those words.

7    Q.    Did you ever tell Detective Pacheco why it was you

8    were asking him to read the statement to him in Spanish?

9    A.    I might have.  I don't recall.

10   Q.    Let me ask you if you made this answer to this

11   question back in September at the hearing.  You were under

12   oath, correct, detective?  Were you under oath at the time?

13   A.    Yes.

14   Q.    Page 201, line six.

15                "QUESTION:  Did you tell him why you were

16       asking him to read it?

17                "ANSWER:  No, I did not."

18                Did you make that answer to that question?

19   A.    Yes, I did.

20   Q.    Was that true then?

21   A.    Yes.

22   Q.    Is it true today?

23   A.    It's true today.

24   Q.    You didn't tell Detective Pacheco why it was you

25   were asking him to read the statement in Spanish; is that

1    correct?

2        A.   I guess not.

3        Q.   During the time that, detective, you say Detective

4    Pacheco was reading the statement in Spanish, did the

5    defendant ever interrupt him and ask him any questions?

6        A.   I don't know.

7        Q.   You say you asked the defendant if you wanted to

8    write a letter to them in Spanish, correct?

9        A.   No.

10       Q.   You say you asked the defendant if he wanted to

11   write an apology letter to Crystal and Mya; is that right?

12       A.   Yes.

13       Q.   And you asked him to do that for what purpose?

14       A.   To gather additional evidence.

15       Q.   Additional evidence.  You had not been satisfied

16   with the statement you had?

17              MR. PERRI:  Objection.

18              THE COURT:  Sustained.

19       Q.   How would that be additional evidence, detective?

20       A.   I thought of it as an admission, an additional

21   admission in addition to what I had taken from him in

22   writing.

23       Q.   And the admission in which he says, I pulled down

24   her pants, I told her I was going to tickle her, so I pulled

25   down her pants and underwear and I tickled her pussy with my

kmm

1    mouth; that wasn't a sufficient admission?

2              MR. PERRI:  Objection.

3              THE COURT:  Sustained.

4    Q.   Was that not a satisfactory admission to you,

5    detective?

6              MR. PERRI:  Objection.

7              THE COURT:  Sustained.

8    Q.   What other admission did you expect to get?

9    A.   As many admissions from him that I could.

10   Q.   You didn't ask him any details how it came about,

11   how many times he had done it before, you didn't ask any of

12   those questions, did you?

13   A.   He told me how it came about.

14   Q.   He told you what preceded this supposedly, you

15   didn't ask him if he had done this before?

16   A.   I don't recall asking him if he done this before.

17   Q.   You didn't ask him if he had done it before?

18   A.   I don't recall if I had asked him if he had done

19   it before.

20   Q.   Didn't I ask you a moment ago whether you asked

21   him that question and you told me you didn't?

22   A.   I think I said I didn't recall and then, if I

23   didn't recall, I'm assuming the answer is no, I didn't.

24   Q.   Detective, you are the carrying detective.  You

25   are investigating sex crimes, correct?

1      A.   Correct.

2      Q.   It's important to know the history, isn't it, of

3   the defendant?

4      A.   It was of no consequence at that point in time to

5   me.

6      Q.   No consequence?

7      A.   No.

8      Q.   You didn't know if he had ever done this before or

9   done it to other children before, you didn't want to know

10   that?

11     A.   I was only concerned with Mya at that point in

12   time.

13     Q.   You weren't concerned with any other potential

14   children that might have been violated?

15     A.   I was only concerned with Mya at that time.

16     Q.   The answer is what, detective, you were not --

17     A.   No.

18     Q.   You were not concerned with other children?

19     A.   No.

20              MR. PERRI:   Objection.

21              THE COURT:   Sustained.

22     Q.   You weren't concerned whether or not this had been

23   done to other children before by this man?

24              MR. PERRI:   Objection.

25              THE COURT:   That is sustained.

1      Q.   If you were concerned with Mya, didn't you want to

2  find out if it had happened to her before?

3      A.   I would, but not from the defendant.

4      Q.   Not from the defendant?

5      A.   Correct.

6      Q.   And you wouldn't want to know what the defendant

7  did to Mya before in other instances?

8      A.   I would, but I would like to hear it first from

9  Mya.

10     Q.   Why didn't you ask her?

11     A.   It was not the appropriate location to interview a

12  six-year old.

13     Q.   Did you go and interview her that night in the

14  interview room where you planned to do that?

15     A.   That's correct.

16     Q.   You didn't do it?

17     A.   No.

18     Q.   You had interviewed quickly at the sex crimes

19  unit, didn't you?

20     A.   No.

21     Q.   Where were you going to do that?

22     A.   Do what?

23     Q.   The interview?

24     A.   With Mya?

25     Q.   Yes.

1      A.    In the safe center.

2      Q.    Wherever that was, there was a place where you

3   could take her and interview her?

4      A.    Yes.

5      Q.    And you didn't do it?

6      A.    Correct.

7      Q.    Where is the safe center?

8      A.    It's located in the same building as the special

9   victims squad.

10     Q.    Same building, right?

11     A.    Correct.

12     Q.    You could have taken the defendant into that room

13   and interviewed him in this room, couldn't you have?

14     A.    No.

15     Q.    Why not?

16     A.    No, the defendant is not allowed in the safe

17   center.

18     Q.    Not allowed, why not?

19     A.    That's the rules of the safe center.

20     Q.    It's video equipment, correct?

21     A.    They're not allowed in the safe center.

22     Q.    Did you bother to get maybe a little tape recorder

23   to interview and have it on audio?

24     A.    No.

25     Q.    You didn't do that?

Det. Baran - People - Cross          1022

1    A.   No.

2    Q.   Do you have a smart phone?

3    A.   Yes.

4    Q.   They take videos, don't they?

5    A.   Yes.

6    Q.   You could have taken a video of the defendant

7    saying I pulled down her pants and tickled her pussy with my

8    mouth, you didn't do that, did you?

9    A.   No, I did not.

10   Q.   So you asked him to the write the apology letter

11   because you wanted more evidence, you said?

12   A.   I offered him if he would like to in order to

13   acquire more evidence.

14   Q.   Didn't you say you wanted more evidence?

15   A.   Yes, I did.

16   Q.   You could have asked him more questions and gotten

17   more evidence, correct?

18   A.   No, I thought the apology letter would be stronger

19   than more words on a statement that he already admitted to.

20   Q.   But it wasn't, was it?

21        MR. PERRI:   Objection.

22   A.   I think it was.

23        THE COURT:   Do you still have your objection?

24   The objection is overruled.

25   A.   I think it was.

kmm

Det. Baran - People - Cross          1023

1      Q.    You think it was.  Did he say in the apology

2  letter that he licked her vagina?

3      A.    I don't know.

4      Q.    How could you think it was, if you don't know?

5      A.    How do I think it was what?

6      Q.    You said you thought the apology letter was a good

7  piece of evidence?

8      A.    In the apology letter it would be a good piece of

9  evidence.

10     Q.    You said you thought the apology letter in this

11  case was in fact a good piece of evidence?

12     A.    No, I didn't.

13     Q.    You didn't say that?

14     A.    No, sir.

15     Q.    You obtained at the time a statement in order to

16  get evidence in the case, correct?

17     A.    Yes.

18     Q.    And you felt you wanted him to write an apology

19  letter to get more evidence in the case, correct?

20     A.    Yes.

21     Q.    And that's because, detective, he never told you

22  what is contained in People's 10, insofar as this business

23  about pulling down her pants and licking her pussy with his

24  tongue?

25     A.    Those are his exact words.

Det. Baran - People - Cross          1024

1    Q.   He never told you that, did he?

2    A.   Those are his exact words.

3    Q.   And you were hoping because he didn't tell you

4    that, he would write an apology letter which he would admit

5    that he did that, correct?

6    A.   No.

7    Q.   What were you hoping he would do if he wrote an

8    apology that you wanted more evidence?

9    A.   Admit on another document that he licked her pussy

10   or vagina.

11   Q.   That didn't happen, did it?

12   A.   I don't know.

13   Q.   So you wanted another document to say that he

14   licked her vagina because you had not been satisfied with

15   what is People's 10 in evidence here?

16              MR. PERRI:   Objection.

17              THE COURT:   Sustained.

18   Q.   So you wanted him to write a letter to Crystal and

19   Mya and you did it in Spanish, right?

20   A.   Yes.

21   Q.   Didn't you tell us Crystal and Mya don't read

22   Spanish?

23   A.   I didn't tell you that.  I don't know what

24   language --

25   Q.   Did they ever speak to you in Spanish?

1     A.    I don't know what language Crystal speaks or
2     reads.

3     Q.    You had them write a letter in Spanish not knowing
4     whether or not they even read Spanish, correct?

5     A.    No.

6     Q.    No, what?

7     A.    No, I didn't have him write a letter in Spanish.
8     I offered him a pen and pad to write a letter.

9     Q.    Why not have him write it or you write it for him
10    in English, have him sign it and give it to Crystal and Mya
11    because they speak English; why didn't you do that?

12    A.    Because it's stronger if he writes it in his own
13    hand straight than if I write it.

14    Q.    Even if they can't read it?

15    A.    I don't know that he can't read it.

16          MR. PERRI:  Objection.

17          THE COURT:  Overruled.  He already answered.

18    Q.    You don't know they could read it?

19    A.    Well, Mya was six.  I sincerely doubt she could
20    read English or Spanish.

21    Q.    How about Crystal?

22    A.    I don't know.

23    Q.    She spoke to you in an English voice, correct?

24    A.    Yes, but so did the defendant.

25    Q.    I know.  Equally, right?  They were speaking

1  equally?

2      A.    The defendant has a stronger accent.  I don't know

3  what kind of accent Crystal has.

4      Q.    She doesn't have an American accent.

5      A.    I don't know what kind of accent it is, and her

6  name is Ramirez.  I thought maybe she is Latino also.

7      Q.    Based on her name, but you spoke to her, you say?

8      A.    That's correct.

9      Q.    You know she has an American accent, right?

10     A.    I said, she has an accent.  I can't identify what

11  kind of accent, whether it is a foreign accent or an accent

12  from Brooklyn or another part of the United States or

13  another country.

14     Q.    Now, you said there are other -- there are parts

15  of Nassau County where it's equipped to interview people who

16  are arrested, correct?

17     A.    Yes.

18     Q.    So, you could have taken the defendant to one of

19  those places and interviewed him on an audio or video,

20  couldn't you?

21     A.    They have to be available, they have to be manned,

22  and it's not my call to make that decision.

23     Q.    If you wanted, did you ask anybody to do that?

24     A.    When I briefed my supervisor it's his call whether

25  or not we're going to move the defendant and try to move him

1    to a place to videotape him.

2        Q.    Did you ask anybody if you could do that?

3        A.    Specifically, did I ask anybody?

4        Q.    Yes.

5        A.    No.

6        Q.    Specifically, you didn't ask your supervisor?

7        A.    Specifically, no.

8        Q.    And that's because you didn't want whatever

9    interview you conducted with Mr. Ramos to be on video; isn't

10   that correct?

11       A.    No, I preferred him being on video.

12       Q.    Yes, so would I.  So you never asked the

13   supervisor, anybody else, you never even called the

14   facilities where the equipment exists, did you?

15       A.    I didn't, no.

16       Q.    Did anybody?

17       A.    I don't know.  It's possible Detective Sergeant

18   M-A-T-E-R-D-E-R-O, made a call, but I'm not aware of it.

19       Q.    You didn't even ask him to do that, did you?

20       A.    I didn't specifically ask him.

21       Q.    You didn't specifically ask anybody, did you?

22       A.    It's either him or nobody.

23       Q.    You didn't ask him, did you?

24       A.    I didn't specifically ask him.  When I briefed him

25   on the case, his responsibility was to make that

Det. Baran - People - Cross          1028

1    determination.

2         Q.   You didn't ask to have him --

3         A.   Yes.  I said that.  I didn't specifically ask him.

4    It's not exactly my call either.

5         Q.   But if you had asked, maybe he would grant your

6    request?

7                    MR. PERRI:  Objection.

8                    THE COURT:  Sustained.

9                    MR. BERGER:  What was your ruling?

10                   THE COURT:  Sustained.

11                   We're not going to get into speculation,

12        counselor.

13        Q.   Detective, isn't it correct, that when you met Mya

14   at the hospital, you say you asked her what happened and she

15   said to you, he ate my coochie and that was the entire

16   conversation you had?  You never asked her if this had

17   happened before, did you?

18        A.   I asked her.  That was not the entire

19   conversation.

20        Q.   And what do you mean?  You mean you asked her if

21   it had happened before?

22        A.   No.

23        Q.   You didn't ask her?

24        A.   No.

25        Q.   Didn't you testify here in direct examination, and

1    now on cross, that after she said he ate my coochie, that

2    asked her if this had ever happened before?

3        A.   No.

4        Q.   Did you testify that she told you or nodded her

5    head that this happened before?

6        A.   Yes, but she didn't respond.  I asked, the

7    conversation was, that I asked her what happened.  She said,

8    Daniel ate my coochie.  I said, has he ever done it before?

9    She nodded, and -- I'm sorry.  He ate my coochie.  Who?

10   Daniel or Danny.  And I said, has he ever done it before?

11   She said, yes or nodded in an up and down motion, but I

12   didn't ask her what happened and did it happen before, in

13   that order.  First I asked her who is the he that she

14   referred to.

15       Q.   Let me ask you, you were under oath at a hearing

16   back in September?

17       A.   Yes.

18       Q.   Page 139, did you make the following answer to the

19   following question?

20            "QUESTION:  At line question eight, you asked

21       her what happened, correct?

22            "ANSWER.  Yes.

23            "QUESTION:  Did she say to you, ate my

24       coochie?

25            "ANSWER:  He ate my coochie.

kmm

Det. Baran - People - Cross          1030

1          "QUESTION:  So she used the word he?

2          "ANSWER.  Yes.

3          "QUESTION:  And that was the entire

4     conversation that you can recall?

5          "ANSWER:  That was the entire conversation."

6          Did you make those answers to those questions?

7     A.   Yes.

8     Q.   Were they true when you made them?

9     A.   Yes.

10    Q.   Is it true today?

11    A.   It seems to me today I asked him who he is and she

12    said Daniel.  I think I forgot about it at the time of the

13    hearing.

14    Q.   Did you forget also asking her whether this

15    happened before?

16              MR. PERRI:  Objection.

17              THE COURT:  Sustained.

18              MR. PERRI:  May we approach.

19              THE COURT:  You may.

20              (Whereupon, there was a sidebar discussion

21    with the Court and counsel, as follows:)

22              MR. PERRI:   Defense counsel is

23    misrepresenting the grand jury testimony.  Although, in

24    application under those questions he did not include

25    the other section in another time when defense counsel

1   in the same questioning asked him about the

2   conversations, the witness responded by saying the

3   final part of the nodding and the questioning of that

4   it ever happened before.

5        THE COURT:   You can handle as you see fight

6   on redirect of this witness.

7        MR. PERRI:   That's fine.

8        MR. BERGER:   May I make my point.   It's

9   Hornbook Law, basic.   You cannot bring in prior

10  inconsistent statements just because he made

11  inconsistent statement before.

12       THE COURT:   You can when it mischaracterizes

13  the integrity of the testimony.   That's my ruling.   You

14  don't have to like it, counselor.

15       (Whereupon, the proceedings resumed.)

16  Q.   Now, there were other parts.   There were other

17  times where you made the statement that she nodded her head

18  as you did today, when you testified at the hearing; is that

19  correct?

20  A.   I don't understand the question.

21  Q.   During the time of the hearing, did you testify

22  that you asked her that question, if it happened before and

23  she nodded her head or not?

24  A.   I believe so, yes.

25  Q.   Well, then I asked you at a later time the part I

1    just read to you if that was the entire conversation and you

2    answered that it was the entire conversation, correct?

3        A.    I answered just now, yes.

4        Q.    So when I asked you those questions back at the

5    hearing, were you trying to think back as to what happened

6    back on October 16th of 2013, when I was asking you the

7    question in September of 2014, you were trying to think back

8    and do your best?

9        A.    Correct.

10       Q.    So, you said different things during the course of

11   that hearing on this issue as to whether or not that was the

12   entire conversation or whether or not you had asked her if

13   this happened before, correct?

14       A.    I need to refresh my memory of the transcript.   I

15   answered the question as you asked me to the best of my

16   recollection at that time.

17       Q.    Let me ask if you made these answers to these

18   questions on 178 at line one.

19              "QUESTION:  Drawing your attention back to

20        the hospital for a moment, I believe you told us last

21        week that you had asked Mya if this ever happened

22        before; do you remember testifying to that?

23              "ANSWER:  Yes.

24              "QUESTION:  What did she say?

25              "ANSWER:  She indicated that it had.

1          "QUESTION:  Well, what do you mean she

2     indicated?  What did she say?

3          "ANSWER:  I don't recall her words.  She may

4     have nodded.  She may have said yes.  I don't recall.

5     Did you make those answers to those questions?"

6          THE WITNESS:  Your Honor, I would feel

7     uncomfortable testifying without the document.

8          THE COURT:  Would you like to see it to

9     refresh your recollection?

10          THE WITNESS:  Yes.

11          THE COURT:  Show it to the witness, please.

12     Q.   Page 178 of the document.

13     A.   What is the question?

14     Q.   Did you read that?

15     A.   Yes.

16     Q.   Didn't I just read that accurately to you?

17     A.   Yes.

18     Q.   May I have it back, please.

19          Did you make those answers to those questions?

20     A.   Yes, I did.

21     Q.   And were they true?

22     A.   Yes.

23     Q.   So, which is it, did she say yes, did she nod?

24     A.   At that point in September, I wasn't sure, but as

25     I was reading the transcript over in preparation for today,

1    I felt that that statement is no longer accurate, that she

2    did in fact nod and not say yes.

3         Q.   Didn't we establish yesterday, detective, your

4    memory was better back in September than it was today?

5         A.   In general.

6         Q.   Now, as you reread the transcript, which says she

7    may have nodded, may have said yes, you are telling us now,

8    you are clearer she said that she nodded?

9         A.   I am sorry, she nodded.

10        Q.   That section I read to you before that I asked you

11   if that was the entire conversation in which you admitted

12   you said that and which omitted my question about whether it

13   ever happened before; is that true also?

14        A.   Could I see the page that you are referring to?

15        Q.   For the record, starting at approximately from the

16   top of page 139 of the hearing.  Read it to yourself,

17   please.

18        A.   I would want to turn back to page 138 since you

19   are referencing a previous --

20        Q.   Fine.  Turn back.

21        A.   I'm sorry, what is the question?

22        Q.   Have you read it?

23        A.   Yes.

24        Q.   So, when I read that to you before, that was

25   accurate; was it not?  When I read the transcript to you

1   before, did I read it accurately?

2        A.   Yes.

3        Q.   When you said that the entire conversation, that

4   is you asked her who ate her coochie and Danny, and that was

5   it, no mention about asking her if it happened before, that

6   was the entire conversation at least at that part of the

7   transcript, correct?

8        A.   Yes.

9        Q.   And so I asked you before if that was true when

10  you said it?

11       A.   Well, I'm sorry, if what was true, that there was

12  no other conversation?

13       Q.   Yes.

14       A.   That was inaccurate.

15       Q.   Did you read the transcript before testifying for

16  this trial?

17       A.   Yes.

18       Q.   Did you tell anybody, Mr. Perri or anybody else,

19  that you had testified inaccurately on that point?

20       A.   No.

21                 MR. PERRI:   Objection.

22                 THE COURT:   Sustained.

23                 MR. BERGER:   That is sustained, Judge?

24                 THE COURT:   Yes, it is.

25                 MR. BERGER:   I have nothing further.

1        THE COURT:  Redirect, People?

2        MR. PERRI:  Yes, your Honor.

3   REDIRECT EXAMINATION

4   MR. PERRI:

5        Q.    Good morning, detective.

6        A.    Good morning.

7        Q.    Do you recall just immediately prior to my

8   standing up when defense counsel directed your attention to

9   page 138 and 139, more specifically, he directed your

10  attention to page 139 of the hearing transcript; do you

11  recall that?

12       A.    Yes.

13       Q.    I'm going to ask you to direct your attention to a

14  little bit before that, I'll ask if you recall being given

15  questions by defense counsel by Mr. Berger at the hearing

16  and giving these answers?

17            MR. BERGER:  I object.  May we come up?

18            (Whereupon, there was a sidebar discussion

19       with the Court and counsel, as follows:)

20            MR. BERGER:  I gave him the transcripts to

21       read.

22            MR. PERRI:  I referenced the page after and

23       didn't go back to where the witness, when asked by

24       defense counsel, 138, line two.  And did you have a

25       conversation with Mya, answer, yes.  And what did she

1    say to you and what did you say to her?  Answer, I

2    said, what happened today.  I said, Danny ate my

3    coochie.  And I said, who?  She said, Danny.  And so I

4    asked her, has it ever happened before, and she said,

5    yes.  Then I said okay, we'll talk later.

6                   THE COURT:  What is the objection to this?

7                   MR. BERGER:  I gave him this to read.  He

8    read back --

9                   THE COURT:  It doesn't -- you gave it to him

10   to read.

11                  MR. BERGER:  He already elicited the fact he

12   said at the other times that he had first nodded at one

13   point, yes at another point, and then when I asked him

14   if that was the entire conversation, he said, yes, it

15   was.

16                  THE COURT:  My ruling is this:  You have

17   asked the questions in attack of his credibility, which

18   you are allowed to do, and it is perfectly proper on

19   redirect.  It's perfectly proper for the People to now

20   bring out that which shows here the statement in

21   context, or a clarity of the situation as it goes

22   towards credibility, so I will allow it.

23                  MR. BERGER:  If you take a look at the

24   context, what I read to him was not out of context to

25   page 139.  I'm not disputing the fact that he made

Det. Baran - People - Redirect      1038

1    other statements.

2              THE COURT:  Fair enough.  I understand.

3              MR. BERGER:  I'm not taking anything out of

4    context when I'm quoting page 139.  That's the question

5    asked.  I asked him what the conversation was.  He said

6    that was the entire conversation.

7              THE COURT:  I understand your position.  You

8    have my ruling.  You may continue.

9              (Whereupon, the proceedings resumed.)

10   Q.   Detective, again, on the page immediately prior to

11   that selected by defense counsel, do you recall giving these

12   questions by defense at the hearing and giving these

13   answers?  Page 138.

14             "QUESTION:  Did you have a conversation with

15   Mya?

16             "ANSWER:  Yes.

17             "QUESTION:  And what did she say to you and

18   what did you say to her?

19             "ANSWER:  I said what happened today and she

20   said, Danny, ate my coochie, or she said he ate my

21   coochie, and I said, who?  And she said, Danny.  And so

22   I asked her, has this ever happened before and she

23   said, yes.  And I said, okay, we'll talk later."

24             Detective, do you recall giving those answers

25   to those questions at the hearing?

kmm

1    A.   Yes.

2    Q.   Detective, on cross-examination, you testified

3  about meeting Mya or meeting Mya and Crystal at Nassau

4  University Medical Center; had you ever met them before that

5  day?

6    A.   No, I had not.

7    Q.   And, detective, Mr. Berger pointed out that when

8  you testified, that Mya indicated or reported to you that

9  the defendant molested her on prior occasions, you had to

10  interpret her head movements; could you describe how Mya

11  moved her head that day?

12    A.   She moved her head up and down.

13    Q.   What did you take that to mean?

14    A.   I took it as a yes.

15    Q.   Detective, defense counsel asked you about the

16  special victims squad protocol related to interviewing Mya.

17  Did you ask Crystal, Mya's mother, to be interviewed on a

18  video on October 16, 2013?

19    A.   Yes, I did.

20    Q.   Why wasn't Mya --

21        THE COURT:  Finish the question.

22    Q.   Why wasn't Mya put on video or interviewed further

23  at the special victims squad on October 16, 2013?

24        THE COURT:  You have an objection to that,

25    counselor?

kmm

1          MR. BERGER:  No.

2          THE COURT:  Because by the --

3      A.   Because by the time she finished with her medical

4  examination, it was eleven o'clock at night and her mother

5  begged me not to bring Mya, who was sick at the time, to

6  Bethpage to conduct a video interview that would probably

7  last perhaps until one, two in the morning.

8      Q.   Defense counsel also asked you on

9  cross-examination whether obtaining more specific details

10  about prior occasions of abuse would have effected the

11  charges.  Detective, did not having that information detract

12  in any way, about an earlier alleged incident, detract in

13  any way from the charges and crimes that you charged against

14  the defendant for October 16, 2013?

15          MR. BERGER:  Objection.

16          THE COURT:  If you know.

17      A.   I'm sorry.  You are you asking if the charge was

18  charged on October 16th would have been amended if I had

19  more information?

20      Q.   Would anything had been taken away from charging

21  that crime?

22      A.   No additional charges would have been added.

23      Q.   And, detective, according to the protocol and the

24  rules of the Nassau County Police Department, were you

25  permitted to bring in outside video equipment to the arrest

1    room?

2        A.    No.

3        Q.    And?

4        A.    I'm sorry, I didn't answer that.  I thought

5    Mr. Berger was objecting.

6              Absolutely not.  It's specifically prohibited.

7        Q.    Defense counsel asked you about why the defendant

8    was not interviewed at the safe center.  Could you describe

9    what the safe center is?

10       A.    The safe center, first of all, we are located in

11   our building which had been formally occupied by Grumman.

12   We're on the Grumman Campus.  There are several buildings

13   that still remain there.  Being at the police department,

14   child protective services, the coalition against child abuse

15   and child abuse against domestic violence, and their

16   satellite groups that deal with human trafficking and

17   counseling were allocated at one building, it's a U shape

18   building.  We have one end of the U and when we bring in

19   victims, they can certainly -- are able to move within the

20   building itself to seek services from either domestic

21   violence or coalition against child abuse.  It is absolutely

22   prohibited as per memorandum of the agreement between the

23   commissioner of the police and director of the safe center

24   that nobody who is a suspect and certainly not a defendant

25   under arrest is allowed past the police department facility

Det. Baran - People - Redirect          1042

1  into the safe center where the videotaping equipment had

2  been located at that time.

3      Q.   And the videotaping equipment in the safe center

4  portion of that building, what is that set up for?

5      A.   That's set up for interviewing with the kid,

6  friendly room with lots of stuffed animals, color pictures

7  and crayons and color books.

8      Q.   Is there a handcuff restraint in that room?

9      A.   No, there is not.

10     Q.   Defense counsel asked you several times about not

11 telling the defendant the charges he was facing prior to

12 interviewing him; is it fair to say he did this to make sure

13 your interview wasn't suggestive?

14             MR. BERGER:  Objection.

15             THE COURT:  Sustained as to form.

16             MR. BERGER:  How come leading?  How about

17     giving the answer, Judge.  It's clearly leading.

18             THE COURT:  All right, remember nothing what

19     the attorneys say is evidence, and I'm up here making

20     the legal rulings, so sustained as to the form.  You

21     may rephrase the question.

22     Q.   Why didn't you inform the defendant of what he was

23 charged with prior to interviewing the defendant?

24             MR. PERRI:  Objection.

25             THE COURT:  Overruled.

kmm

1    A.    He didn't ask me and that is always significant in
2    my experience when people feel they did nothing wrong, they
3    it didn't legally.  Why am I being arrested?  Why am I?  And
4    he didn't do that.  I was waiting to see if he did do that,
5    first of all.  He never asked me, so I didn't volunteer the
6    information.

7          Secondly, I found that telling people what they're
8    charged with can sometimes have a shutdown effect on them.
9    They decide what they did is, in fact, much more serious
10   than they thought it was, and I don't want to encourage that
11   shutdown if she was talking freely and voluntarily.

12   Q.    Defense counsel asked you also several questions
13   about to what degree the statement that is People's 10, was
14   verbatim.  Where did all of the facts contained in People's
15   10 come from?

16   A.    From the defendant.

17   Q.    Did you add any other additional information or
18   facts to that statement?

19   A.    No, I would not have had those facts to add.

20   Q.    Defense counsel also asked you whether or not the
21   defendant initialed the actual sentence where he admitted to
22   tickling, in his words, Mya's pussy with his mouth.  Did you
23   have the defendant initial every sentence in that statement?

24   A.    No, I did not.

25   Q.    When did you have the defendant initial the

Det. Baran - People - Redirect        1044

1    statement?

2         A.    When he read over the statement that either he

3    noticed a mistake or I noticed a mistake because I was

4    reading the statement over again on the monitor while he was

5    reading it to himself.

6         Q.    Did the defendant sign the page where the

7    statement that he had tickled Mya's pussy with his mouth

8    appears?

9         A.    Yes.   I have him sign the bottom so nothing could

10   be added afterwards or adjusted.

11        Q.    In 2013, were the two other locations at the

12   Nassau County Police Department had, for interviewing

13   defendants and suspects, were they located on Grumman

14   Campus?

15        A.    No, they were not.

16        Q.    Where were those two locations?

17        A.    One was in headquarters homicide squad, which

18   works until midnight, and the other was at the robbery squad

19   which is in Bellmore, and I believe they also work until

20   midnight.

21        Q.    Where is police headquarters?

22        A.    Police headquarters is 1490 Franklin Avenue in

23   Mineola.

24             MR. PERRI:   Nothing further.

25             THE COURT:   Thank you.

kmm

Det. Baran - People - Redirect        1045

1   RECROSS-EXAMINATION

2   BY MR. BERGER:

3        Q.   You said that the reason you didn't interview Mya

4   was on video was because it was late at night and the mother

5   asked you and you figured it was late and in the early

6   morning hours?

7        A.   I didn't.

8        Q.   Did you tell us the reason you didn't interview

9   her on the video was because the mother asked you to let her

10  go home, it was late at night?

11       A.   I think she begged me.  She begged me not to bring

12  Mya back to Bethpage to conduct an interview, it would take

13  some time.

14       Q.   Is part of the procedure to interview children,

15  isn't it?

16       A.   Under normal conditions, yes.

17       Q.   How about the next day?

18       A.   The next day we had discussed it, and I believe I

19  contacted the DA's office and was advised to hold off on

20  that.

21       Q.   Who in the DA's office advised you not to

22  interview her?

23             MR. PERRI:  Objection.

24             THE COURT:  Overruled.

25       A.   I don't remember who I spoke to.  I'm sorry.

1      Q.    You had it written down somewhere?

2      A.    No, I don't.

3      Q.    Is it at any time part of protocol to interview

4    the child on video?

5      A.    After the arrest is made, the investigation at

6    that point are protocol to be directed by the DA's office.

7      Q.    Really.  You intended to interview that night,

8    didn't you?

9      A.    Yeah, I did.

10     Q.    That's part of the procedures, isn't it?

11     A.    Yes.

12     Q.    Part of the protocol you talked about?

13     A.    Yes, under normal circumstances.

14     Q.    What is not normal, there's another day?

15              MR. PERRI:  Objection.

16              THE COURT:  Sustained as to form.

17     Q.    There's another day to do it, correct?

18     A.    Under the direction of the DA's office, yes.

19     Q.    You are telling me the DA's directed you not to

20   interview her on videotape?

21     A.    I'm telling you two things at first.  We don't

22   continue the investigations after an arrest is made unless

23   directed by the DA's office.  And second one, I made the

24   call the next day and was advised to hold off a little bit.

25     Q.    Detective, you always continue investigation after

kmm

1   an arrest is made, don't you, isn't that part of police

2   work?

3        A.   No.

4        Q.   It's not?  If you had additional evidence

5   involving this case, wouldn't you pursue it?

6        A.   If I had additional evidence, I would try to

7   pursue that before making the arrest.

8        Q.   You mean after you made the arrest, you don't

9   pursue additional evidence?

10       A.   Unless directed by the DA's office.

11       Q.   If the DA's office doesn't direct you to continue

12   investigation, you don't?

13       A.   Generally, no.

14       Q.   This is part of the police directives?

15            MR. PERRI:  Objection.

16            THE COURT:  Sustained as to form.

17       Q.   That's part of your understanding of what your

18   police duties are?

19       A.   That's what I was taught, yes.

20       Q.   I'm sorry?

21       A.   Yes.  That's what I was taught.

22       Q.   And you are claiming that somebody in the police

23   department was in the DA's office, told you not to pursue

24   the video of Mya?

25       A.   That's my general recollection.

Det. Baran - People - Redirect        1048

1       Q.    That's your general recollection.  Do you have a

2   specific recollection of that?

3       A.    No.

4       Q.    Because that didn't happen, did it, detective?

5       A.    It happened.

6       Q.    You are the carrying detective in this case, you

7   are supposed to take notes when things happen, involved with

8   the case, aren't you?

9       A.    No.

10      Q.    Does that help you refresh your recollection?

11            MR. PERRI:  Objection.

12            THE COURT:  Overruled.

13      A.    Well, if I was knew I was going to a trial a

14  year-and-a-half later, I probably would have.  But at the

15  time of the arrest, and arrest processing, I didn't need

16  notes because it was very clear in my head.

17      Q.    It was clear in your head what?

18      A.    What Mya said to me in terms of her short comment

19  in the hospital, what the defendant had said to me in the

20  statement and when the officers said to me when we made the

21  arrest.

22      Q.    It was clear to you, what, you were not going to

23  trial?

24      A.    A good case for criminal sexual act in the first

25  degree.

kmm

1      Q.    You are not a jury, you don't determine those

2  things, right?

3      A.    Yes.

4      Q.    So, you have many, many cases, don't you?

5      A.    Yes.

6      Q.    You write things down that happen for the various

7  cases so you could remember what you did with each case,

8  right?

9      A.    No, not always.

10     Q.    No, you keep it stored in your memory?

11     A.    Yes.

12     Q.    Your memory which was faulty, from what you said,

13 but don't remember specifically from what happened nine

14 months ago in September, and even in September when you

15 testified your memory wasn't that good also, correct?

16     A.    That's not true.  I think you were splitting hairs

17 in terms of minor details after asking the same question

18 five or six times and getting a smaller, a slightly

19 different response, but I think otherwise my memory was

20 pretty good.

21     Q.    Didn't you acknowledge yesterday your memory

22 wasn't as good today as it was from last September?

23     A.    That's normal.  I would expect my memory to be

24 weaker nine months later.

25     Q.    Wouldn't you expect your memory to fade as times

1    goes on?

2         A.   Yes.

3         Q.   Wouldn't it be helpful that you write notes down

4    as to what happened so you could refer to it so you know you

5    made a note contemporaneously with when it happened?

6         A.   In hindsight it would have been.

7         Q.   How many years are you a detective?

8         A.   19.

9         Q.   Now, you are discovering 19 years later in

10   hindsight it would have been good?

11             MR. PERRI:   Objection.

12             THE COURT:   Sustained as to form.

13        Q.   You are now realizing for the first time in

14   hindsight it would have been better to takes notes about

15   what happened?

16        A.   No.

17        Q.   No, what?

18        A.   No, I'm not realizing for the first time.

19        Q.   I just said in hindsight, it would have been?

20        A.   In this particular case, since the question was

21   whether she nodded, or said Danny or he, in hindsight, it

22   would have been better to have written that down.  I didn't

23   think it was important at the time, and I don't think it's

24   important right now what she said, he licked my coochie or

25   Danny licked my coochie.

1      Q.    And you didn't think it was important to ask

2    follow-up questions whether it happened before to other

3    children or to this child, right?

4      A.    Is that a question?

5      Q.    That's a question.

6      A.    Not regarding other children at that time, but I

7    should have asked him how many times he did it.

8      Q.    If it happened to other children, don't you think

9    those parents should be told about that?

10                   MR. PERRI:    Objection.

11                   THE COURT:    Sustained.

12     Q.    Now, if Mr. Perri asked you about if you had

13   further questions with respect to other instances, there

14   would be additional charges, correct?  You know that?

15     A.    If they could be substantiated and corroborated.

16     Q.    Yeah.  So first you find out about them and it was

17   a perfect source except for the defendant, to find out if he

18   had done this before, right, detective?

19                   MR. PERRI:    Objection.

20                   THE COURT:    Sustained.

21                   MR. BERGER:    I didn't hear you.

22                   THE COURT:    Sustained.  I thought you heard

23         me.

24     Q.    So, detective, let me understand.  When you

25   investigate somebody, and you are interviewing them, you

1    don't bother to ask them if they engaged in this behavior

2    before, whether it was a robbery case or sex case, you don't

3    ask them about that?

4         A.    I do if the victim of a sex case articulated that

5    it happened before and provides dates and times and

6    something for me to go on.

7         Q.    A six-year old is going to do that for you?

8         A.    No.

9               MR. PERRI:  Objection.

10              THE COURT:  Overruled.  He answered.

11        Q.    If the six-year old can't do it for you, isn't it

12   better to get it from the defendant?

13              MR. PERRI:  Objection.

14              THE COURT:  Sustained.

15        Q.    If there were additional charges, wouldn't you as

16   a detective be expected to obtain them and make the charges?

17              MR. PERRI:  Objection.

18              THE COURT:  Sustained.

19              MR. BERGER:  Mr. Perri asked this on

20         redirect, Judge, about additional charges.  He gave an

21         answer.

22              THE COURT:  Approach, please.

23              (Whereupon, there was a sidebar discussion

24         with the Court and counsel, as follows:)

25              THE COURT:  All right, so I have specific

Det. Baran - People - Redirect        1053

1    question from Mr. Perri related to whether or not if he

2    had had additional information, would it have detracted

3    from this particular charge.  The answer was no.  There

4    would have been additional charges added.  That was in

5    response to an extensive cross regarding this

6    speculation of other charges and other crimes that I

7    don't know if counsel is trying to say did occur or

8    didn't occur.  The bottom line is, I've allowed enough

9    cross and re-cross regarding speculative actions.  They

10   play no part in this particular criminal action that we

11   are trying.  It has been explored in this Court's

12   opinion to a reasonable and sufficient degree, and I

13   will no longer take any questions on speculative

14   charges that could have, should have, or would have

15   been added if other information could have, should

16   have, or would have been known.  You are going to try

17   the charges that are before the Court.

18            MR. PERRI:  Yes, your Honor.

19            MR. BERGER:  Are you seriously suggesting I

20   can't challenge the way in which this detective did his

21   job this day, and that if he --

22            MR. PERRI:  I ask defense counsel to lower

23   his voice.  I ask the jury be excused.

24            THE COURT:  Whisper a bit.

25            MR. BERGER:  I'm not trying to -- are you

1    suggesting that I couldn't challenge this detective on

2    the way he did his job in this particular case, and if

3    he could have obtained additional charges, he was not

4    remiss if he failed to do that.

5          THE COURT:  Counselor, I have allowed you to

6    question this witness with regards to how he conducted

7    his investigation to quite an extent, and, in fact, you

8    have gotten extensive answers with regards to that.

9    No, it is not my belief that I have to allow you to ask

10   questions about other charges.  We're not trying other

11   charges.  We're trying this charge.  There is no place

12   any further to discuss continued speculation.  You have

13   developed that line of questioning.  You have been

14   allowed to develop that line of questioning.  I have

15   now said it is -- it is enough.  We have gone far

16   afield enough, and now we're going to stick to the

17   charges that are before the Court.

18         MR. BERGER:  I'm sticking to the charges.  If

19   the detective doesn't do his job properly, that is

20   something for the jury to consider, and I'm asking

21   questions that relate to this particular case, this

22   particular interview of the defendant, and it seems to

23   me that if I can show that efforts fell short, I should

24   be able to establish that.

25         THE COURT:  I have stated that I have allowed

kmm

1      you to do that, whether or not you are going to

2      continue to do that, I don't have to allow it.  You

3      continue to ask the same series of questions over and

4      over again.  You have asked them.  You have been given

5      an opportunity to develop that portion of your

6      cross-examination for whatever reason you see it to be

7      fit to develop that line of questioning.  I don't have

8      to allow it to continue ad nauseam.  We're not going

9      down a speculative road any further.

10             MR. BERGER:  Mr. Perri asked whether or the

11     not additional charges would have detracted from the

12     present charge.

13             THE COURT:  No, he asked based on your

14     extensive cross in this area.  Again, an area that I

15     probably should have shut down immediately because it's

16     purely speculative.  He asked one question whether it

17     would have impacted this charge.  I then allowed you to

18     ask additional questions about it.

19             Here's my ruling:  You are not asking anymore

20     questions.  Note your exception for the record.  Move

21     on.

22             MR. BERGER:  I want to place on the record

23     something else.

24             THE COURT:  Go ahead.

25             MR. BERGER:  I asked the Court to sign a

Det. Baran - People - Redirect        1056

1    subpoena duces tecum to have the police procedures with

2    respect to the sex offense cases honored.   The Court

3    refused to sign the subpoena, yet the Court allows this

4    detective to give us speculative, non-verifiable

5    answers as to what happens with procedures.   You

6    absolutely cut off my legs in effort to discredit this

7    kind of testimony.   You allowed the prosecutor to ask

8    this witness, give speculative answers as to why he

9    would do this, and why he would testify about what the

10   procedures are.   I don't know what they are.   You

11   didn't allow me to get ahold of them.   You refused to

12   sign that subpoena.   I'm putting that on the record.

13            THE COURT:   I believe the questions by the DA

14   were on redirect and not on direct.   It was proper

15   redirect based on cross-examination, but your exception

16   to my ruling is noted for the record.

17            (Whereupon, the proceedings resumed.)

18   RECROSS EXAMINATION

19   BY MR. BERGER: (Continuing)

20       Q.   What protocol and where did they exist that says

21   you cannot bring in a tape recorder or a hand held video

22   camera to interview the defendant?

23            MR. PERRI:   Objection.

24            THE COURT:   Overruled.

25       A.   I don't know that protocols are in writing.

kmm

1    That's what we were taught in various classes, refresher

2    courses.

3        Q.   If it's not in writing, anybody can say that, give

4    that as an answer, right?

5                  MR. PERRI:  Objection.

6                  THE COURT:  You can answer.  It's overruled.

7        A.   I got that information from my bosses, but I was

8    told that everything used in the police department has to be

9    anything used to, for instance, an electronic equipment or

10   machinery has to be requisitioned through the police

11   department?

12       Q.   You claim he made this statement --

13                 MR. PERRI:  Objection.

14                 THE COURT:  I haven't heard a question yet.

15       Q.   You claim he made this statement, correct,

16   People's 10, you are claiming that the defendant made that

17   statement?

18                 MR. PERRI:  Objection.  Beyond the scope.

19                 MR. BERGER:  I'm laying a foundation.

20       Q.   You claim he made this statement to you about

21   pulling down her pants and tickling her?

22       A.   Yes, he did.

23       Q.   Right.

24       A.   Yes.

25       Q.   What better evidence if you have it on video,

Det. Baran - People - Redirect          1058

1   right?

2              MR. PERRI:  Objection.

3              THE COURT:  Overruled.

4        A.    Agreed.

5        Q.    So you made no effort to even attempt to get it on

6   video, did you?

7        A.    I think no effort saying I made no effort is a

8   mischaracterization.  There was nothing available to me at

9   the time, and after I briefed my boss the way the chain of

10  command works, it's his decision to call around.  I'm not

11  finished.  It's his decision to call around various other

12  commands, or the DA's office to see about the availability

13  of other equipment.

14       Q.    Didn't you tell me you didn't ask your supervisor

15  before, didn't you tell me?

16       A.    I did not ask him, right.

17       Q.    I'm sorry?

18       A.    I did not ask him, that's correct.

19              THE COURT:  I hate to do this to you.  I have

20       the jury sitting about hour and ten minutes.  I don't

21       want to cut you off unnecessarily and cut your recross

22       short.  I'm going to give all of you that break I

23       promised.  We all got about an hours worth of work.

24       Stretch your legs.  Don't talk about the case.  Don't

25       get on your phones.  Thank you.

Det. Baran - People - Redirect        1059

1              Be careful stepping down.

2              (Whereupon, the jury exited the courtroom.)

3              (Whereupon, a short recess was taken.)

4              THE CLERK:  Case on trial continues,

5      Indictment Number 742N of 2014, People of the State of

6      New York vs. Daniel Ramos.

7              Let the record reflect all parties are

8      present.  The jury is not present at this time.

9              Are the People ready?

10             MR. PERRI:  Yes, your Honor.

11             THE CLERK:  Defense counsel?

12             MR. BERGER:  I am.  I have an application.

13             THE COURT:  Go ahead.

14             MR. BERGER:  Before this trial began, I

15     served upon the Court, subpoena duces tecum asking the

16     protocol with respect to the sex crimes unit.  I

17     thought it was relevant.  I was quite right the

18     detective now has now mentioned the protocol, some of

19     which I think he made out of whole cloth.  I should

20     have been provided with that.  The Court refused to

21     sign my subpoena, why, I don't know.  And I'm now

22     renewing my application for that subpoena duces tecum

23     to be honored.

24             THE COURT:  Do you want to be heard?

25             MR. PERRI:  The only reason it was brought up

kmm

1    in this case is because defense counsel asked questions

2    about it on cross-examination.  Just because he brings

3    that up doesn't provide a proper basis for the Court to

4    reconsider its previous ruling that they were not

5    discoverable or the proper subject of a subpoena.

6              MR. BERGER:  Except the prosecution asked on

7    redirect questions about protocol and try to rebut the

8    cross-examination by using that, so he doesn't have

9    unclean hands.  And the fact of the matter is, how

10   could it not be relevant?  How could you not provide

11   defense counsel with protocols where I'm left in the

12   dark, and I don't know what they are, but this

13   detective can come up on the witness stand and make

14   them up and I can't challenge him on it.  We know this

15   detective made up things on the witness stand or has

16   already agreed to things he said under oath weren't

17   true.  You heard the equivocation.  I do not put it

18   past this detective who made up the protocol, and at

19   the very least, defense counsel should have it.

20             THE COURT:  Your application is denied.

21   Anything else before for the record before I re-seat

22   the witness?

23             MR. PERRI:  No, your Honor.

24             MR. BERGER:  No, your Honor.

25             (Whereupon, the jury entered the courtroom.)

Det. Baran - People - Redirect        1061

1          THE CLERK:  Do both sides stipulate all sworn

2      jurors are present.

3          MR. PERRI:  Yes, your Honor.

4          MR. BERGER:  Yes, your Honor.

5          THE CLERK:  Detective, you are reminded you

6      are still under oath.

7          THE COURT:  You may continue.

8  CROSS-EXAMINATION

9  BY MR. BERGER: (Continuing)

10      Q.    Was it your testimony a few moments ago that once

11  there is an arrest, you call up the DA's office to see how

12  you should proceed?

13      A.    No.

14          MR. PERRI:  Objection.

15      Q.    So, you told us that you called the DA's office

16  the following day and they told you not to put the girl on a

17  videotape interview?

18      A.    They said hold off.

19      Q.    Who was it?

20      A.    I don't remember.

21      Q.    You have to answer for the record.

22      A.    I don't remember.

23      Q.    Was it somebody in the sex crimes unit?

24      A.    Yes.

25      Q.    Was it a supervisor?

1       A.    I don't remember.

2       Q.    You mean you would have asked somebody who wasn't

3  a supervisor if you should proceed with an interview?

4       A.    Yes.

5       Q.    Even if it wasn't the supervisor, you would have

6  gotten the answer, right?

7                  MR. PERRI:  Objection.

8                  THE COURT:  Overruled.  You can answer.

9       A.    I would have asked them, and whatever answer they

10  gave me, I would have been guided by it.

11       Q.    Is that what you do in every case, you make an

12  arrest, you call up the district attorney's office the next

13  day and ask her how to proceed?

14                  MR. PERRI:  Objection.

15                  THE COURT:  Sustained.

16       Q.    Is that what you did in this case?

17       A.    That's what I did in this case because it was such

18  a missing part to the investigation.

19       Q.    Such a missing part?

20       A.    Yes.

21       Q.    What does that mean, it was a missing part?

22       A.    It's important to interview the victim of a sex

23  crime, normally before you make an arrest.  In this case the

24  uniformed officers made a summary arrest, and the fact that

25  I did not have a videotaped interview from the victim, I

1   thought it was important enough to call the DA's office and

2   ask them if they thought I should continue or let them

3   handle the interview from that point on.

4        Q.   You have conducted interviews of child victims,

5   haven't you, in the sex crimes unit?

6        A.   Yes.

7        Q.   Even after an arrest or before an arrest, correct?

8        A.   Usually before an arrest.

9        Q.   You have done it after an arrest too?

10       A.   Yes.

11       Q.   Nobody stopped you from doing that, did they?

12       A.   No, but it's never happened that an interview did

13   not take place on the same day as an arrest.

14       Q.   Really, the fact that there is a day difference

15   makes all of the difference in the world to you?

16       A.   Yes, it does.

17       Q.   Why does that day make a difference?

18       A.   Because he had already been arraigned or most

19   likely he would have been arraigned.

20       Q.   He hadn't been arraigned?  He hadn't been

21   arraigned?

22            MR. PERRI:  Objection.

23            THE COURT:  Sustained.

24       Q.   Do you know that he hadn't been arraigned?

25       A.   I didn't say whether he had been arraigned.

1    Q.    Do you know whether he was arraigned that night?

2    A.    I know he was arraigned on the 17th.

3    Q.    Do you know that that is the difference as to

4    whether or not you interviewed the girl?

5                 MR. PERRI:  Objection.

6                 THE COURT:  Overruled.

7                 You may answer.

8    A.    I decided to let the district attorney's office

9    make that decision because he had been to arraignments

10   already, or would have been to arraignments by the time I

11   interviewed her.

12   Q.    Now, the protocols you talked about didn't prevent

13   you from taking the defendant to another place in Nassau

14   County for an interview, did it?

15                MR. PERRI:  Objection, beyond the scope.

16                THE COURT:  Sustained.

17                MR. BERGER:  This is what was testified to on

18       redirect, Judge.

19                THE COURT:  I'll let you ask the question one

20       more time.  We'll get another series of answers and

21       then we'll move on.  Go ahead.

22   Q.    You made a claim before that you were not allowed

23   to conduct an interview in a safe center, correct?

24   A.    With the defendant.

25   Q.    This was what time at night that you were

1    interviewing him?

2         A.    It would have been 11:45 at night.

3         Q.    Were there any other sex crime victims in that

4    safe center at that time?

5         A.    Nope.

6         Q.    So the video equipment was there for the use, was

7    it?

8         A.    Yes.

9         Q.    So, you didn't bother to attempt -- by the way,

10   you said there were two other places in Nassau County that

11   had the equipment for the interviews, correct?

12        A.    Yes.

13        Q.    Police headquarters, they're open all night,

14   aren't they?

15        A.    Not the homicide squad.

16        Q.    Police headquarters is open all night, isn't it?

17        A.    The building is open, one of the offices is not.

18   I didn't -- when I say, the office, I mean the office where

19   the interview room for the prisoner that has the videotape

20   is located.

21        Q.    And you couldn't get permission to use it?

22        A.    We have been denied in the past, and I didn't ask

23   permission.

24        Q.    How about trying this night?

25        A.    I did not personally try.

1    Q.   No, you didn't.  How about the one in Bellmore

2  where the robbery squad is?

3    A.   It's the same thing, I didn't personally try it.

4    Q.   You didn't make an effort to do it?

5    A.   No.

6    Q.   And you said I don't bother telling suspects

7  sometimes the charges because they might clam up; do you

8  remember saying something like that?

9    A.   No, I didn't use the word bother, and I believe I

10  said sometimes they shut down.

11    Q.   They shut down?

12    A.   In the conversation, but I never said the word

13  bother.

14    Q.   You are attempting to get a statement from him,

15  right?

16    A.   Yes.

17    Q.   And you are concerned if you tell him what he is

18  charged with, maybe he will not answer your questions?

19    A.   That was secondarily, the fact -- I was also

20  awaiting to see if he would ask me, or if he knew already

21  what he had done wrong.

22    Q.   Do you think he knows the Penal Law?

23         MR. PERRI:  Objection.

24         THE COURT:  Sustained.

25    Q.   You were waiting for him to ask you, you said,

kmm

1   right?

2       A.   Yes.

3       Q.   Do you think he knows the Penal Law to ask you?

4            MR. PERRI:   Objection.

5            THE COURT:   Sustained.

6       Q.   So aren't you concerned if you tell him the

7   charges, he may not talk to you?

8       A.   I really don't know whether he would or wouldn't.

9       Q.   That's right I know that.

10           MR. PERRI:   May the witness answer, your

11      Honor.

12           THE COURT:   The witness may continue to

13      answer.

14      A.   I don't know whether I would or wouldn't, but it's

15  significant to us what his behavior is at the time of the

16  arrest.

17      Q.   What is his behavior?   What does that mean,

18  detective?

19      A.   It means whether or not he is incredulous that he

20  was arrested, and he didn't do anything wrong.

21      Q.   If he tells you he didn't do anything wrong, isn't

22  that okay?

23      A.   That's significant.

24      Q.   Because you are supposed to advise him he has the

25  right to an attorney, right?

Det. Baran - People - Redirect     1068

1            MR. PERRI:  Objection.

2            THE COURT:  We're a little far afield.  I'll

3       allow the answer to that question and then we'll move

4       on.  He was advised he was allowed access to an

5       attorney.

6       Q.   That's what you say because Pacheco read in

7  Spanish?

8            MR. PERRI:  Objection.

9            THE COURT:  Sustained.

10      Q.   You don't know he was advised of that, do you,

11  detective?

12           THE COURT:  Sustained.

13           MR. BERGER:  I didn't hear an objection,

14      Judge.

15           THE COURT:  Now it's my turn to step in

16      because we're on the second round of cross, now we're

17      going to follow the Court's rules.

18           Sustained.  Next question.

19      Q.   Didn't you want to be fair to him, detective?

20           MR. PERRI:  Objection.

21           THE COURT:  Overruled.

22      A.   I don't understand, how you mean fair.

23      Q.   Well, aren't you looking for a voluntary

24  statement?

25           MR. PERRI:  Objection.

1               THE COURT:  Sustained.  We're far afield now,

2        counselor.

3        Q.   You said you didn't want him to shut down; do you

4    remember saying that?

5        A.   Yes, I did.

6        Q.   Which means you wanted to get a statement from

7    him, right?

8        A.   I wanted to.  Yes, I want to keep talking to him

9    and keep the lines of communication open to ultimately get a

10   statement.

11       Q.   You want, what you consider, evidence from your

12   perspective, right?

13       A.   That's correct.

14       Q.   But you also wanted to give a willing, intelligent

15   voluntary statement, correct?

16               MR. PERRI:  Objection.

17               THE COURT:  Sustained.

18       Q.   Was it a willing, intelligent, and voluntary

19   statement?

20               MR. PERRI:  Objection.

21               THE COURT:  Sustained.

22       Q.   You were concerned that the defendant might say to

23   you, if you told him the charges that they're not true?

24       A.   No.

25       Q.   You are not at all --

kmm

1      A.    No, I wasn't concerned about that.

2      Q.    If he said, they weren't from you, maybe he

3   wouldn't give a statement, right?

4              MR. PERRI:  Objection.

5              THE COURT:  If you understand it.  You can

6         answer it.

7      A.    I don't feel comfortable trying to speculate what

8   the defendant may or may not have been thinking after he

9   would say something to him.

10     Q.    You questioned people before, correct?

11     A.    Correct.

12     Q.    Sometimes they tell you they didn't do it,

13  sometimes they tell you they did?

14             MR. PERRI:  Objection.

15             THE COURT:  Sustained.

16     Q.    You wanted to get a voluntary statement from him;

17  isn't that right, detective?

18             MR. PERRI:  Objection.

19             THE COURT:  Sustained.

20     Q.    You don't know what the defendant read with

21  respect to People's 10; isn't that correct?

22             MR. PERRI:  Objection.

23             THE COURT:  Sustained.

24             MR. BERGER:  This was asked on redirect.  He

25        claimed he read the statement.

kmm

Det. Baran - People - Redirect          1071

1          MR. PERRI:  No, you were --

2          MR. BERGER:  Look at the transcript.

3          THE COURT:  I'll look at my notes, counselor,

4     but thank you for the suggestion.

5          Ask your question again with regards to

6     People's 10 and let me hear it.

7     Q.   With respect to People's 10, you don't know what

8     he read of People's 10 other than the very first paragraph

9     with his name and address?

10         THE COURT:  I'll let you answer that.

11    A.   You mean the defendant, when you say, he, not

12    Detective Pacheco?

13    Q.   Right.

14    A.   Yes.  He was reading the statement because he

15    pointed out an error and made the correction.

16    Q.   You claim he pointed out an error, you don't know

17    whether he read part of that statement, do you?

18    A.   No.  He might have zeroed in on that one error.

19         MR. BERGER:  I have nothing further.

20         THE COURT:  Any last round, any redirect?

21         MR. PERRI:  Just one question.

22    RE-REDIRECT EXAMINATION

23    BY MR. PERRI:

24    Q.   Detective, to your knowledge, is it legally

25    required to interview a child/victim an allegation of sexual

kmm

1    abuse, before making an arrest and proceeding?

2         A.    No.

3                   THE COURT:  Anything on that?

4                   MR. BERGER:  One question.

5    RE-RECROSS-EXAMINATION

6    BY MR. BERGER:

7         Q.    Is it your practice and protocol because you

8    indicated you were claiming on doing that, correct?

9         A.    Yes.

10        Q.    You intended to do it that night?

11        A.    Under another circumstances and conditions.

12        Q.    You told Crystal you were going to do that that

13   night, didn't you?

14        A.    Yes.

15                  MR. BERGER:  Nothing further.

16                  THE COURT:  Thank you.

17                  You may step down.  Please be careful.  Call

18        your next witness.

19                  MR. PERRI:  May we approach.

20                  THE COURT:  Yes.

21                  (Whereupon, there was a sidebar discussion

22        with the Court and counsel, as follows:)

23                  MR. PERRI:  You reserved decision about

24        whether or not the People would be allowed to call

25        representatives of the NICE bus company until hearing

1    defense counsel cross-examination of the People's

2    witness with regard to the statement.  At this time we

3    renew their application to be allowed to call the

4    witness, as defense counsel put the issue, to what

5    extent the defendant is able to comprehend both English

6    and/or Spanish.

7              THE COURT:  My inclination is to not allow it

8    based on what you previously said.  If my understanding

9    is correct, the witness you called to testify would

10   simply testify about a procedure in which a form is

11   given to the defendant in English that advises him he

12   was speaking and understanding English and that he

13   takes it with him and it's signed and brought back.

14             MR. PERRI:  It's not merely that, your Honor.

15   It would also be that the defendant was employed by

16   both the MTA and the NICE bus company since 2006 and

17   one of the -- there were responsibilities of his

18   employment, requirements that he be able to read and

19   write and that he be familiar with and know a variety

20   of rules and regulations and the documents of the NICE

21   bus company that were all in English.

22             THE COURT:  I'm not going to allow it.  I

23   find it to be too collateral with regards to this

24   because at the end of the day, those rules and

25   regulations that are in written in English would have

Proceedings                    1074

1    been read in Spanish.  This witness has no direct

2    contact with the individual.  So, based on that, I'm

3    going to deny your application.

4              Now, I understand it is twelve o'clock now

5    and we anticipated calling that other witness, and

6    again, that application just having been denied, do you

7    have your other detective ready?

8              MR. PERRI:  Yes.

9              MR. BERGER:  Before we get to the other

10   detective, we have some matter of great importance we

11   have to handle in chambers.

12             THE COURT:  I can excuse the jury.

13             MR. BERGER:  I think it will take a half

14   hour.

15             THE COURT:  Can you give me an idea just in

16   case I have to do some research or Kristin has to do

17   some research?

18             MR. BERGER:  It's not.  It's not that.  I

19   mean, you may have to look at the civil rights act.

20             THE COURT:  Just say it.

21             MR. BERGER:  We have to bring to the Court's

22   attention certain things we have access to and learned,

23   and we need to consult with you.  We have to put it on

24   the record afterwards.  I thought we should bring it up

25   in an informal atmosphere.

```
 1                    THE COURT:   Based on a civil rights
 2          violation?
 3                    MR. BERGER:   We can explain it at length.
 4                    THE COURT:   I'll excuse the jury until 2:00.
 5                    (Whereupon, the proceedings resumed.)
 6                    THE COURT:   Being it's such a beautiful day,
 7          I will give you a little extended lunch break.   I
 8          expect you to be back here at 2:00.   Keep an open mind
 9          throughout the trial.   Do not the discuss the case
10          amongst yourselves or with anyone else during the
11          trial.   Do not permit anyone to discuss the case in
12          your presence.   Do not talk to the lawyers, witnesses,
13          or defendant during the trial.
14                    And do not visit or view the place where the
15          charged crime is allegedly committed, or any other
16          place involved in the case.
17                    And if there is any news coverage of the
18          case, do not read, view or listen to any accounts or
19          discussions of the case reported by the news media, and
20          do not attempt to research any fact issue or law
21          related to this case, whether by discussion with
22          others, by research in the library or Internet, or by
23          any other means or source.   Have a great lunch.   See
24          you all at 2:00.
25                    (Whereupon, the jury exited the courtroom.)
```

Proceedings                 1076

1          THE COURT:  Do you want to start on the

2     record or off the record?

3          MR. BERGER:  I think we should start off the

4     record.  Mr. Elman is familiar, more familiar with new

5     answers of this issue, and I ask we go back in the

6     chambers with you to discuss this issue.

7          (Whereupon, a luncheon recess was taken.)

8              *              *              *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1077

1       (Whereupon, pages 1077-1104 were sealed.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1078

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1079

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1080

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1081

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1082

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1083

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1084

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1085

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1086

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1087

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

kmm

1088

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

kmm

1089

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1090

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1091

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1092

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1093

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1094

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1095

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1096

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1097

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1098

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1099

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1101

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1102

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1103

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

kmm

1104

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Det. Pacheco - People - Direct        1105

 1              THE COURT:  Welcome back.  Sorry about the
 2       delay.  Call your next witness.
 3              MR. PERRI:  The People call Detective
 4       Reinaldo Pacheco.
 5  R E I N A L D O   P A C H E C O, Detective, called on behalf
 6       of the People, having been duly sworn, took the witness
 7       stand and testified as follows:
 8              THE CLERK:  State your full name, spell your
 9       last name, give your shield and command.
10              THE WITNESS:  First name is Reinaldo
11       R-E-I-N-A-L-D-O, last name P-A-C-H-E-C-O.  Shield
12       number 1179.  I work in the special victims.
13              THE COURT:  You may inquire.
14              MR. PERRI:  Thank you.
15  DIRECT EXAMINATION
16  BY MR. PERRI:
17       Q.   Good afternoon, detective.
18       A.   Good afternoon.
19       Q.   How long have you been a member of law
20  enforcement?
21       A.   In Nassau County I've been here for fifteen years.
22  In the city I was an officer for about seven and-a-half
23  years.
24       Q.   How long have you been a detective?
25       A.   About five years now.

1    Q.    How long have you been assigned to the special

2  victims squad?

3    A.    Five years, about five years.

4    Q.    Are you able to read and speak Spanish?

5    A.    Yes.

6    Q.    Where is your family from?

7    A.    Puerto Rico.

8    Q.    Where were you born?

9    A.    Puerto Rico.

10   Q.    What was your first language that you learned

11 growing up?

12   A.    Spanish.

13   Q.    At what point did you learn English?

14   A.    In school.

15   Q.    How often do you read and/or speak Spanish?

16   A.    Every day.

17   Q.    Drawing your attention to October 16, 2013, were

18 you working on that date?

19   A.    Yes.

20   Q.    Were you working a day tour or night tour?

21   A.    Night tour.

22   Q.    At some point did you become involved in an

23 investigation into a matter involving Mya Ramirez and Daniel

24 Ramirez?

25   A.    Yes.

Det. Pacheco - People - Direct          1107

1    Q.   Were you the carrying detective on that case?

2    A.   No, I was not.

3    Q.   Whose case was it?

4    A.   That's Detective Baran's case.

5    Q.   Did there come a time when you met Daniel Ramos?

6    A.   Yes.

7    Q.   Where were you when you first saw Daniel Ramos?

8    A.   Where was I?

9    Q.   Yes.

10   A.   In the special victims squad.

11   Q.   Where was Daniel Ramos?

12   A.   In the interview room.

13   Q.   Do you see that individual you learned who was

14   named Daniel Ramos in the court today?

15   A.   Yes.

16   Q.   Identify him by pointing at him and naming the

17   color of an article of clothing.

18   A.   White shirt right there.

19        MR. PERRI:  Let the record reflect the

20   witness identified the defendant.

21        THE COURT:  It will so reflect.

22        MR. PERRI:  Thank you, your Honor.

23   Q.   When the defendant first arrived in the special

24   victims squad, were you involved in the investigation?

25   A.   No.

1    Q.    How did you become involved in the investigation

2    incident involving the defendant?

3    A.    Through Detective Baran.

4    Q.    What was your primary role in the case?

5    A.    Basically, I read the rights and read back a

6    statement.

7    Q.    Were you working on another matter that night?

8    A.    I was.

9    Q.    What was the first thing you translated as being

10   part of Detective Baran's investigation?

11   A.    The rights card.

12   Q.    Where was the defendant when his rights were read

13   to him?

14   A.    In the interview room.

15   Q.    Was he standing or seated?

16   A.    He was seated.

17   Q.    To your knowledge, was he cuffed?

18   A.    I don't recall.

19   Q.    Who else was present in the room when the rights

20   were read to him?

21   A.    Detective Baran.

22   Q.    And did you, in fact, read the defendant his

23   rights?

24   A.    I did.

25   Q.    What language did you use?

kmm

1    A.    Spanish.

2    Q.    How did you read the defendant his rights?

3    A.    Off the card.

4              MR. PERRI:  I ask what was moved into

5    evidence as People's 9 be shown to the witness.

6              THE COURT:  It may.

7              (Whereupon, People's Exhibit 9 was handed to

8    the witness.)

9    Q.    Detective, do you recognize what is in evidence as

10   People's 9?

11   A.    Yes.

12   Q.    What do you recognize it to be?

13   A.    The rights card.

14   Q.    How do you recognize it to be -- I'm sorry,

15   withdrawn.  When you say the rights card, is that the rights

16   card you used with the defendant, Daniel Ramos?

17   A.    Yes.

18   Q.    How do you recognize it to be the same card?

19   A.    It has his signature on it, and my name and

20   signature on it, and Detective Baran's signature on it.

21   Q.    You notice the 2340 written there; can you explain

22   what that signifies?

23   A.    2340 is the time they were read to him.

24   Q.    Looking at People's 9, detective, could you

25   describe what appears on both sides of that document?

kmm

1      A.    There's a Spanish version and English version.

2      Q.    And have you read both sides of that document

3  before reading it to the defendant?

4      A.    Have I read it in the past?

5      Q.    In the past.

6      A.    Yes.

7      Q.    Is the Spanish language side a complete and

8  accurate translation of the English side?

9      A.    Yes.

10      Q.    October 16, 2013, did you read the defendant his

11  rights on the Spanish side of that card?

12      A.    I did.

13      Q.    Could you please demonstrate for the jury reading

14  the English side for the card, how you read the rights?

15      A.    Sure.

16            THE COURT:  Slowly, please.

17      A.    Police department, County of Nassau, New York.

18  Notification of rights prior to custodial interrogation.

19  Before asking you any questions, you understand you have the

20  right to remain silent.  Any statements you make may be used

21  against you in court.

22            Also, you have the right to talk to a lawyer

23  before answering any questions or to have a lawyer present

24  at any time.  If you cannot afford a lawyer, one will be

25  furnished for you if you wish.  And you have the right to

1    keep silent until you had a chance to talk to a lawyer.  Do

2    you understand?

3         Q.   After you read that --

4              MR. PERRI:  Withdrawn.

5              Did you read that section in Spanish?

6         A.   In Spanish?

7         Q.   After reading the section in Spanish, what

8    happened next?

9         A.   He signed.  He put si, and signed his name to it.

10        Q.   What does the word S-I mean?

11        A.   Yes.

12        Q.   When you say, he, is that the defendant?

13        A.   That's correct.

14        Q.   After the defendant wrote si, S-I, and signed his

15    name, what happened next?

16        A.   Now that I advised you of your rights, are you

17    willing to answer questions.

18        Q.   What, if anything, happened after you read that

19    sentence?

20        A.   He signed the card also.

21        Q.   Did you make any other markings?

22        A.   He wrote si and signed his name to the card.

23        Q.   When you read that sentence that you just read,

24    did you read in Spanish or English?

25        A.   We read in Spanish.

Det. Pacheco - People - Direct          1112

1    Q.    After that section was read out loud by you to the
2    defendant, what happened next?
3    A.    I had him read the bottom portion of the card.
4    Q.    And could you please read into the record what
5    appears in the bottom portion of the card?
6    A.    The same thing as the top, you are saying you
7    understand your rights and you make the following statements
8    freely and voluntarily, and you are willing to give a
9    statement without talking to a lawyer or having the lawyer
10   present.
11   Q.    Why do you believe the defendant was reading that
12   second section of the card?
13              MR. BERGER:  Objection.
14              THE COURT:  Sustained as to form.
15   Q.    What, if anything, did the defendant do after you
16   instructed him to read that section of the card?
17   A.    He signed the bottom of the card.
18   Q.    Prior to signing the bottom of the card, was he
19   looking at the card?
20   A.    Yes.
21   Q.    Detective, how many times does the defendant's
22   signature appear on that card?
23   A.    Three times.
24   Q.    And who else was present as you read the defendant
25   his rights from that card?

Det. Pacheco - People - Direct       1113

1     A.    Detective Baran.

2     Q.    After the detective signed the rights card, the

3   third time, what, if anything, else did you do, or what did

4   you do next?

5     A.    I left.

6     Q.    Who is left in the room with the defendant?

7     A.    Detective Baran.

8     Q.    Before you left the room, were Detective Baran and

9   the defendant speaking?

10    A.    Yes.

11    Q.    What language was the defendant and Detective

12  Baran speaking?

13    A.    English.

14    Q.    Did you observe the defendant having any apparent

15  difficulty communicating with Detective Baran in English?

16    A.    No.

17    Q.    Where did you go?

18    A.    I left and went back to my desk.

19    Q.    Did you remain in the special victims squad?

20    A.    Yes, I did.

21    Q.    Were you working on other cases?

22    A.    That's correct.

23    Q.    Did there come a time when you returned to the

24  interview room?

25    A.    Yes.

1      Q.    And could you explain to the Court and jury how it

2   came that you returned to the interview room?  Why did you

3   go back?

4      A.    Detective Baran asked me to go back and read the

5   statement he took from the defendant and read it back to him

6   in Spanish.

7            MR. PERRI:  I ask People's 10 in evidence be

8       shown to the witness and People's 9 be taken away.

9            THE COURT:  It may.

10           (Whereupon, People's Exhibit 10 was handed to

11      the witness.)

12      Q.    Detective, do you recognize People's 10?

13      A.    Yes.

14      Q.    What do you recognize it to be?

15      A.    The statement that was taken by Detective Baran.

16      Q.    And when you returned to the interview room, what,

17   if anything, did you do with that statement?

18      A.    Read it back to the defendant.

19      Q.    And what language did you read it back to him in?

20      A.    Spanish.

21      Q.    Did you translate the entire document to the

22   defendant?

23      A.    That's correct.

24      Q.    Did you read it out loud?

25      A.    That's correct.

1       Q.   Could you explain -- sorry, withdrawn.

2            Did there come a time -- do you see markings of

3    the letters R and P in both location on that paper?

4       A.   Yes.

5       Q.   Explain to the jury and the Court how the markings

6    RP came to be on that page?

7       A.   These markings came about after those corrections

8    made on the statement.  I marked them as I told him what it

9    was, the changes that were made on the statements

10   themselves.

11      Q.   When you say, him, are you talking about the

12   defendant?

13      A.   That's correct.

14      Q.   When you are explaining to him the markings, in

15   Spanish?

16      A.   Yes.

17      Q.   Were the handwritten corrections present on that

18   page?  Were they there prior to your translating the

19   documents to the defendant?

20      A.   That's correct.

21      Q.   Did you translate the corrections as well to the

22   defendant?

23      A.   I did.

24      Q.   Drawing your attention to the word, to the term --

25   to the word pussy that appears in that document, did you

kmm

Det. Pacheco - People - Direct        1116

1    translate that word to the defendant?

2         A.   I did.

3         Q.   How did you translate that word?

4         A.   It translates to vagina, which is vahina.

5         Q.   What, if anything, did the defendant do after you

6    finished translating the statement?

7         A.   He signed the bottom.

8         Q.   What did you do?

9         A.   Signed the bottom.

10        Q.   What did Detective Baran do?

11        A.   Signed the bottom also.

12        Q.   Did you sign one page or multiple pages?  You may

13   take it.

14        A.   Two pages.

15        Q.   Did the defendant sign both pages?

16        A.   Yes, he did.

17        Q.   Did Detective Baran sign both pages?

18        A.   Yes, he did.

19        Q.   Approximately, how long did this process of

20   translating the statement and have the defendant sign off on

21   it take?

22        A.   About ten minutes.

23             MR. PERRI:  I ask People's 10 be taken from

24        the witness.  People's 11 in evidence could be shown to

25        the witness.

Det. Pacheco - People - Direct        1117

1              THE COURT:  It may.

2              (Whereupon, People's Exhibit 11 was handed to

3        the witness.)

4         Q.    Detective, do you recognize People's 11 in

5    evidence?

6         A.    Yes.

7         Q.    What do you recognize it to be?

8         A.    An apology letter by the defendant.

9         Q.    Were you present when this letter was written?

10        A.    No, I was not.

11        Q.    How did you first come to see this letter?

12        A.    From Detective Baran.

13        Q.    And where did he show you this letter?

14        A.    In the office.

15        Q.    And what did you do for Detective Baran when he

16   showed you this letter?

17        A.    I told him what it said.

18        Q.    Detective, were you able to translate that letter?

19        A.    Yes.

20        Q.    What language does it appear in?

21        A.    Spanish.

22        Q.    Please translate it into the record in English.

23        A.    Sure.  To Crystal and Mya, I'm writing this letter

24   asking for a million pardons.  The truth is, that I'm very

25   remorse for what happened, and I never meant to harm you, or

                                                          kmm

1    any of you's, let alone the children.  I hope, Crystal, that

2    you read this letter and that take into conscious and

3    retract the charges against me.  I never meant to hurt.

4    Please, I ask you to retract the charges against me.  Daniel

5    Ramos.

6              MR. PERRI:  I ask that People's 11 be taken

7         from the witness.

8         Q.   Detective, were you or Detective Baran armed when

9    you were with the defendant in the interview room?

10        A.   No.

11        Q.   And while you were with the defendant in the

12   interview room, did you make any promises to the defendant

13   or offer any leniency?

14        A.   No.

15        Q.   Did you hear, observe any other members of law

16   enforcement make such offers or make any threats against the

17   defendant?

18        A.   No.

19        Q.   While you were with the defendant in the interview

20   room, did you, yourself, threaten the defendant in any way?

21        A.   No.

22        Q.   Detective, do you know -- apart from?

23              MR. PERRI:  Withdrawn.

24        Q.   Prior to this case, did you know an individual

25   named Daniel Ramos?

1     A.   No.

2     Q.   Did you know Crystal Ramirez?

3     A.   No.

4     Q.   Did you know Mya Ramirez?

5     A.   No.

6          MR. PERRI:   Thank you, your Honor.   Nothing

7     further.

8          THE COURT:   Cross-examination.

9  CROSS-EXAMINATION

10  BY MR. BERGER:

11     Q.   Detective Pacheco, you testified here about

12  various things this afternoon, correct?

13     A.   That's correct.

14     Q.   Did you make any notes or memorandum about

15  anything you testified to?

16     A.   I did not.

17     Q.   So, what you are testifying to is based upon your

18  independent recollection?

19     A.   That's correct.

20     Q.   Did you talk with Detective Baran about what your

21  role was in connection with this case?

22     A.   Yes.

23     Q.   And he talked to you about his role, as well, as

24  far as taking the statement, correct?

25     A.   About us taking a statement, no.

1        Q.    I'm sorry?

2        A.    About taking the statement?

3        Q.    Yes.

4        A.    No.

5        Q.    Well, you testified a moment ago that you heard

6    the defendant speaking English with Detective Baran?

7        A.    That's correct.

8        Q.    For how long were you listening to him speaking?

9        A.    As soon as I finished with the rights card, I left

10    the room, but they were talking to each other.

11        Q.    When you say, you finished with the rights card,

12    you left the room?

13        A.    That's correct.

14        Q.    How did you hear them talking in English?

15        A.    Because they were still talking.  They were

16    talking.  He signed the card.  I signed the card, and they

17    were having conversation.  As far as what the conversation

18    was, I don't recall.

19        Q.    I thought you said that the minute you finished

20    the rights card, you left the room?

21        A.    Yes.  They had a conversation.  I didn't have a

22    conversation.

23        Q.    Weren't you there witnessing the rights card?

24        A.    I was.

25        Q.    So after you put your signature on the rights

Det. Pacheco - People - Cross        1121

1   card, you left the room, correct?

2       A.   That's correct, but as I was leaving, they were

3   talking.

4       Q.   So, was it a matter of seconds?

5       A.   Could be, but they were talking.

6       Q.   You say could be.  You are the one that was there?

7            MR. PERRI:  Objection.

8            THE COURT:  Sustained.

9       Q.   You were there, right?

10      A.   That's right.

11      Q.   How long was it you heard them talking in English?

12      A.   It could have been seconds.

13      Q.   You don't have a specific recollection of that?

14      A.   They were talking, yes, English.

15      Q.   And you are saying it could be seconds or was

16  seconds?

17      A.   It was seconds.

18      Q.   Now, you say you read back the English, the

19  statement that is in English in Spanish to the defendant; is

20  that right?

21      A.   That's correct.

22      Q.   Did you read it to him with the same proficiency

23  that you exhibited today when you just read from People's

24  11?

25           MR. PERRI:  Objection.

kmm

1              THE COURT:  Overruled.  Do you understand the

2      question?

3      A.    No, could you rephrase that?

4      Q.    When you just read People's 11, you had a few

5      hesitations in the translation, right?

6      A.    Yes.

7      Q.    And is that the way you read the English statement

8      to him?

9      A.    You have to understand something, it's not always

10     -- it doesn't translate exactly the same.  You would have to

11     kind of take your time to read that.  Not everything that

12     you read in Spanish translates exactly like English, or when

13     you are doing it the other way around, it doesn't translate

14     the same.

15     Q.    Let me ask you something:  There are many words in

16     the English language that refer to the female genitalia;

17     aren't there?

18     A.    That's correct.

19     Q.    And are there many in Spanish that do the same?

20     A.    That's correct.

21     Q.    So, is there a word in Spanish that is the word

22     for vagina?

23     A.    There's several words.

24     Q.    So, you wouldn't say vagina is the same as pussy,

25     would you?

1   A.   Yes, I would.

2   Q.   That's what it means, but as far as words go?

3   A.   That's what it is.  That's what people -- when

4   they are talking about, that's what it means.

5   Q.   I know what it means, detective.  You said there

6   were many words that can mean vagina in Spanish, right?

7   A.   That's correct.

8   Q.   Some are slang, some are derogatory, correct?

9   A.   That's correct.

10   Q.   Where would you put the word pussy in the English

11   language in that regard?

12        MR. PERRI:  Objection.

13        THE COURT:  Sustained.

14        Where would he put that word in the English

15   language?  Sustained.  Ask another question.

16   Q.   Did you talk to Mr. Perri about your involvement

17   in the taking of the statement and the rights card prior to

18   the hearing?

19   A.   Taking of the statement?  I didn't take the

20   statement.

21   Q.   Well, you were part of the process, correct, that

22   you also say you read the statement to him in Spanish,

23   didn't you?

24   A.   Yes.

25   Q.   That's part of it, isn't it?

Det. Pacheco - People - Cross          1124

1    A.   Okay.

2    Q.   Is it, detective, or not?

3    A.   Yes, it is.

4    Q.   And you read that to him, you say, before he

5  signed it, right?

6    A.   Yes, I did.

7    Q.   Wouldn't that be part of the process of taking the

8  statement?

9    A.   I didn't take the statement.

10            THE COURT:  The answer will stand.

11            MR. PERRI:  Yes, your Honor.

12   Q.   You were part of the process, you say which

13  involved the defendant putting his signature on that piece

14  of paper, correct?

15   A.   That's correct.

16   Q.   Isn't that taking a statement or not?

17   A.   It's not.

18            MR. PERRI:  Objection.

19            THE COURT:  The objection is going to be

20  sustained.  Next question.

21   Q.   You were involved in the process, correct?

22   A.   That's correct.

23   Q.   Did you talk to Mr. Perri about your involvement

24  in the process of having the defendant's signature being put

25  on the piece of paper?

kmm

Det. Pacheco - People - Cross        1125

1      A.   Yes.

2      Q.   You were in Mr. Perri's office and Detective Baran

3  was there as well, right?

4      A.   Yes.

5      Q.   And so you heard what he said happened, correct?

6      A.   What who?

7      Q.   Detective Baran.

8      A.   What he said happened?

9      Q.   Detective Baran told Mr. Perri what happened, how

10 they took the statement, you were there?

11     A.   I wasn't listening to what they were saying.

12     Q.   You were sitting right next to them?

13     A.   I was not paying attention.

14          MR. PERRI:  Objection.

15          THE COURT:  Overruled.

16     Q.   You were just sitting in the chair not paying

17 attention; is that right?

18     A.   That's correct.

19     Q.   Do you recall if you heard Detective Baran talking

20 to Mr. Perri about the process of taking a statement?

21     A.   I did not.

22     Q.   You didn't hear it?

23     A.   The process of taking a statement?

24     Q.   When Detective Baran was talking to Mr. Perri.

25     A.   Correct.

1      Q.    About the taking of the statement, you were

2   sitting next to him, correct?

3      A.    That's correct.

4      Q.    You knew that's what he was talking about, didn't

5   you?

6      A.    I did not.  I could say I wasn't paying attention

7   to them.

8      Q.    You could say it.  I don't know if --

9             MR. PERRI:  Objection.

10            THE COURT:  Sustained.

11            Next question.

12      Q.    You knew you were there in Mr. Perri's office to

13   talk about the taking of the statement, you were there for a

14   hearing; isn't that right?

15            MR. PERRI:  Objection, your Honor.

16            THE COURT:  Overruled.  We're talking about

17   the hearing now.

18      Q.    Yes.  You knew in Mr. Perri's office you were

19   there testifying in connection with the hearing, correct, in

20   connection with taking the statement?

21      A.    Taking the statement?  I didn't take a statement.

22      Q.    In connection with the process of taking a

23   statement, you knew you were there for that; did you not?

24      A.    I was there for reading it back.

25      Q.    You testified that's what you did, I'm asking you?

1              MR. PERRI:  Objection.

2       Q.   I'm asking you whether or not you knew you were

3    there to testify concerning the process of your involvement

4    in taking of the statement?

5              THE COURT:  I'll allow the question.  You can

6       answer.

7       A.   My involvement was to read it back.

8       Q.   You knew you were in Mr. Perri's office to talk

9    about that, correct?

10      A.   He was going to ask me what I did.

11      Q.   Yes.  You knew you were there for that purpose

12   that day, didn't you?

13      A.   For what I did?

14      Q.   That's a question.

15      A.   Yes, for what I did.

16      Q.   Did you know that Detective Baran was there also

17   to tell his involvement in the process of taking a

18   statement?

19      A.   I don't know what -- I guess he's going to speak

20   about his part of the investigation.  I have no idea what he

21   said.

22      Q.   Did you ever discuss this case with Detective

23   Baran prior to you testifying at the hearing?

24      A.   Yes.

25      Q.   How many times did you do that?

1      A.    I believe it was just twice.

2      Q.    And the subject matter that you talked to him

3  about was your role in reading of the statement to

4  Mr. Ramos, correct?

5      A.    That's correct.

6      Q.    And your role, you're supposedly giving the rights

7  to Mr. Ramos, correct?

8      A.    That's correct.

9      Q.    And you discussed that at least one of those two

10  times approximately a week before the hearing; is that

11  right?

12      A.    That's correct.

13      Q.    One of the things you talked about with him was

14  the fact that the defendant speaks Spanish, but the

15  statement is in English, correct?

16      A.    Did I speak to him about that?

17      Q.    Yes.

18      A.    No.

19      Q.    Let me ask you if you made these answers to these

20  questions at the hearing back in September of 2014.  By the

21  way, you did testify at the hearing, correct?

22      A.    That's correct.

23      Q.    You were under oath; were you not?

24      A.    That's correct.

25      Q.    Page 235, line 14.

1           "QUESTION:  And did the subject matter that

2      you and Detective Baran talked about include the fact

3      that the defendant speaks Spanish, but that the

4      statement is in English?

5           "ANSWER:  Yes."

6           Did you make that answer to that question?

7      A.   Yes.

8      Q.   And was that true?

9      A.   I guess it was.

10     Q.   And is it true today?

11     A.   Yes.

12     Q.   And did you also include in your conversations

13  with Detective Baran the fact that what you and Detective

14  Baran did with Mr. Ramos in the interrogation room?

15     A.   What we did?

16     Q.   Yes, when you discussed with Detective Baran, did

17  it also include what went on in the interrogation room with

18  the defendant?

19     A.   As far as what, reading the rights?

20     Q.   Whatever went on, did you talk to Detective Baran

21  about that?

22     A.   Only about reading the rights and what I did, read

23  the statement.

24     Q.   My question to you was:  Did your conversation

25  with Detective Baran before coming in to court to testify at

Det. Pacheco - People - Cross       1130

1  the hearing, include what you did and what he did with the

2  defendant in the interrogation room?

3      A.   I wasn't in the interrogation room with him, only

4  to read the rights.

5      Q.   Listen, listen, to my question, please.  I'm

6  asking you whether or not your conversations with Detective

7  Baran, prior to going in to testify, you said you had a

8  conversation with him at least one week before and then

9  there was a second; do you remember saying that?

10     A.   Yes.

11     Q.   Did the subject matter of those conversations

12 include what you and Detective Baran did with the defendant

13 in that interrogation room?

14     A.   We didn't do anything.  Yes, it's just my part was

15 read the rights, and read back the statement.  There was no

16 we in the interrogation room as far as interrogating the

17 defendant.

18     Q.   Let me ask then if you made this answer to the

19 question at the hearing.  Line 3, page 237.

20          "QUESTION:  Did your conversations with

21     Detective Baran before coming to court include what you

22     and he did with the defendant in the interrogation

23     room?

24          "ANSWER:  Yes."

25          Did you make that answer to that question?

kmm

1       A.   Yes.

2       Q.   Was it true?

3       A.   Yes.

4       Q.   Is it true today?

5       A.   Yes, it is.  But it's just for the statement and

6    the rights card.

7       Q.   I understand what you are saying.  I'm asking you

8    if you discussed that with him and the answer is yes?

9       A.   Okay, yes.

10      Q.   And you each talked about your own individual

11   involvement in that room with the defendant, didn't you?

12      A.   No.  My involvement, was, again, the rights card

13   and the statement.

14      Q.   Let me ask you again if you made this answer to

15   this question.  Page 237, line seven.

16           "QUESTION:  And you told him your involvement

17       and he told you his involvement, correct?

18           "ANSWER:  That's correct."

19      A.   Yes, I did, my involvement --

20      Q.   Was that true?

21      A.   Yes, and it stands true now, but my involvement,

22   again, was the statement.

23      Q.   Just answer my question.

24           MR. PERRI:  Your Honor, the witness is trying

25       to answer the question.  May he please finish the

kmm

1    answer.

2              THE COURT:  Let me step in.  I want to remind

3    everybody that the reporter can only take down one

4    person speaking at a time.  It's very important that we

5    let a full question be asked and a full answer be

6    given.

7              Mr. Berger, please ask your next question.

8         Q.   Did Detective Baran ask you to go into the

9    interrogation room in case he didn't understand, or there

10   was a problem and he is referring to Mr. Ramos; did he ask

11   you that?

12        A.   That's correct.

13        Q.   And Detective Baran told you that he wanted you

14   there because you spoke Spanish, right?

15        A.   He didn't tell me because I spoke Spanish, he

16   asked me to come in.

17        Q.   Let me ask you if you made these answers to these

18   questions:  Page 241, line two.

19              "QUESTION:  Did you say to him why do you

20        need me to go be with you?

21              "ANSWER:  I don't recall if that is exactly

22        the words I used.

23              "QUESTION:  I understand.  But in sum and

24        substance, did you say to Detective Baran, why do you

25        need me?

Det. Pacheco - People - Cross        1133

1                    "ANSWER:  I might have.

2                    "QUESTION:  And did he explain it to you?

3                    "ANSWER:  Yes.

4                    "QUESTION:  What?  That there is a language

5        issue?

6                    "ANSWER:  Because he speaks Spanish.

7                    "QUESTION:  Pardon?

8                    "ANSWER:  Because he speaks Spanish.

9                    "QUESTION:  He wanted you there because he

10       told you the defendant spoke Spanish, right?

11                   "ANSWER:  That's correct."

12                   Did he tell you that?

13       A.    Yes, it was kind of confusing the way you asked.

14       Q.    Do you understand what I read, don't you?

15       A.    Yes.

16       Q.    You happen to have read the minutes before

17       testifying here today?

18       A.    Somewhat.

19       Q.    Somewhat?

20       A.    I went through them, yes.

21       Q.    But you say you went through them, you read them,

22       didn't you?

23       A.    Yes.

24       Q.    Now, the defendant wanted his rights in Spanish?

25       A.    That's correct.

Det. Pacheco - People - Cross        1134

1     Q.   How did that come about?

2     A.   He was asked.

3     Q.   Were you there when he was asked?

4     A.   Yes.

5     Q.   Asked by Detective Baran?

6     A.   I don't know if it was by Detective Baran or by

7  me.

8     Q.   You don't remember?

9     A.   I do not, but it was asked.

10    Q.   Did you know that the defendant had not ever been

11  arrested before this date?

12              MR. PERRI:  Objection.

13              MR. BERGER:  If you know.

14              THE COURT:  I will allow it, if you know.

15    Q.   If you know.

16    A.   No.

17    Q.   Let me ask you this:  Did you tell him, did you

18  just read the rights straight there?

19    A.   What do you mean?

20    Q.   Did you stop after each right and explain what

21  each one meant?

22    A.   I did not.

23    Q.   You just read it straight through?

24    A.   That's correct.

25    Q.   Did you explain to him what it means that you have

kmm

Det. Pacheco - People - Cross          1135

1    the right to remain silent and that anything you say could

2    be used against you in court?

3         A.    I did not.

4         Q.    Did you take an audio or video of him being given

5    his rights?

6         A.    I did not.

7         Q.    Did you ever advise the defendant what he was

8    going to be asked about?

9         A.    I did not.

10        Q.    Did anyone ask you to leave the room after you

11   read him the rights?

12        A.    Did anyone ask me to leave?

13        Q.    Yes.

14        A.    No.

15        Q.    You didn't get a signal from Detective Baran?

16        A.    Not that I recall or remember.

17        Q.    So that might have happened, you just don't

18   remember; is that right?

19        A.    I don't recall.

20        Q.    I'm asking you whether or not at that point in

21   time, Detective Baran gave you a signal to leave the room?

22              MR. PERRI:   Objection.

23              THE COURT:   Overruled.

24        A.    I don't recall.

25        Q.    Let me ask you if you made this answer to this

kmm

1    question back at the hearing.  Page 249, line 17.

2                    "QUESTION:  Did he give you any kind of

3          signal to leave the room?

4                    "ANSWER:  No."

5                    Did you make that answer to that question?

6        A.    That's correct.

7        Q.    Was it true then?

8        A.    Yes, it is.

9        Q.    Is it true now?

10       A.    Yes, it is.

11       Q.    Now you recall?

12       A.    I'm saying that's what I said.  I said I didn't

13   recall.

14       Q.    I know, now you recall.  Recalling is not a yes or

15   no answer.

16       A.    It's no, I don't recall.

17       Q.    Was it true then when you said he did not?

18       A.    Yes.  Yes, I don't recall.

19       Q.    Baran asked you to read the statement to Mr. Ramos

20   in Spanish, correct?

21       A.    That's correct.

22       Q.    And we only have your word for the fact that you

23   read the entire statement to him, correct?

24       A.    That's correct.

25       Q.    Because there was nobody else in the room that

kmm

1    speaks Spanish, correct?

2        A.    That's correct.

3        Q.    And no video or audio machine, correct?

4        A.    That's correct.

5        Q.    Did you see the defendant put his initials on the

6    statement?

7        A.    I did not.

8        Q.    So you don't know how his initials got on that

9    statement?

10       A.    I do not.

11       Q.    And you don't know who changed the words on the

12   statement, do you?

13       A.    I do not know.  I do not.  I wasn't there.

14       Q.    But you put your initials on the statement even

15   though you didn't witness the changes?

16       A.    That's correct.

17       Q.    So what do your initials mean if you didn't see

18   him do it?

19       A.    Okay, the reason why my initials are there, is

20   because basically, when I read it back to him, that's to

21   assure him, that yes, I read the changes that he made.  So,

22   I initialed next to it so he can't say you never read them

23   back, so that's why the initials are on there.

24       Q.    Your initials are that you are claiming --  your

25   initials on that statement are to show that you read the

Det. Pacheco - People - Cross          1138

1    changes that were there even though you didn't witness it?

2          A.   That's correct, because I read them back to him.

3          Q.   But you didn't witness the changes being made?

4          A.   I did not, but I read them back.

5          Q.   So your initials are not that you witnessed the

6    changes being made, just that you say you read them?

7          A.   That's correct.

8          Q.   Did you ask the defendant to read the statement in

9    English?

10         A.   Did I ask him to read it?

11         Q.   In English?

12         A.   No.

13         Q.   When you say you read the statement to the

14   defendant, was he seated across from you as you read it to

15   him?

16         A.   He was sitting across from me.

17         Q.   And you never witnessed the defendant read that

18   statement in English, did you?

19         A.   I did not.

20         Q.   Did you see the defendant sign the statement?

21         A.   I did.

22         Q.   So, in this case, your signature on it means you

23   did witness him signing it; is that right?

24         A.   That I read it back to him.

25         Q.   You don't know whether or not the defendant read

kmm

1    this statement to Detective Baran, do you?

2         A.   I do not.

3         Q.   Were you there when the defendant wrote People's

4    11, the so-called apology letter?

5         A.   I was not.

6         Q.   The translation you read with respect to People's

7    11, is there any language in there that says that he put his

8    mouth or tongue on the vagina of Mya?

9         A.   It does not.

10        Q.   Is there any language in there he sexually abused

11   Mya?

12        A.   It does not.

13        Q.   Did the defendant read the rights card to you?

14        A.   The bottom half.

15        Q.   He read it aloud?

16        A.   Yes, he did.

17        Q.   In Spanish?

18        A.   Yes, he did.

19        Q.   And was Detective Baran there as well?

20        A.   Yes, he was.

21        Q.   Did you talk to Detective Baran in the hallway

22   today when we took a break about this case?

23        A.   No.

24        Q.   You didn't talk about protocol and requirements of

25   the detectives with respect to sex crime cases?

kmm

Det. Pacheco - People - Cross          1140

1      A.    Protocol?  I don't know what you are talking
2  about.

3      Q.    You don't know what the word protocol is?

4      A.    I don't know what you are talking about.

5      Q.    You know what protocols are, don't you?

6      A.    Yes.

7      Q.    Did you talk to Detective Baran outside in the
8  hallway today?

9      A.    Uh-huh.

10     Q.    Is that a yes?

11     A.    As far as protocols on what?  Protocols on what?
12  You are not explaining yourself.

13     Q.    On procedures in --

14     A.    No.

15            THE COURT:  Wait for an entire question to be
16      asked.  I just had asked him to wait for an entire
17      question to be asked.

18     Q.    Did you talk to him about procedure with respect
19  to investigation of sex cases?

20     A.    No.

21     Q.    You did talk to him today in the hallway, didn't
22  you?

23     A.    Yes.

24     Q.    After he had gotten off the witness stand or at
25  least at a time when there was a break, right?

1    A.   Yes.

2    Q.   And it didn't include anything about this case?

3    A.   No.

4    Q.   So your testimony before to Mr. Perri was, the

5    defendant had no problem understanding English based upon

6    your hearing a couple of seconds of exchange between

7    Detective Baran and the defendant?

8    A.   That's correct.

9    Q.   That's what you based your conclusion on?

10   A.   Yes, that he spoke English.

11   Q.   Your answer was, Mr. Perri, was it not, the

12   defendant had no problem understanding English?

13   A.   They were saying words to each other.  I would

14   imagine they understood each other.

15   Q.   You are imagining, correct?

16   A.   No, I heard.

17   Q.   You just said, I imagine they understood each

18   other?

19   A.   That's a use of words, but I heard them speaking

20   to each other in English.

21   Q.   For a couple of seconds?

22   A.   Yes.

23   Q.   And it's just a few seconds you could hear both of

24   them talk to each other and exchange words in a few seconds?

25   A.   Yes, because I was walking out.

Proceedings                    1142

1      Q.    Walking in or out?

2      A.    Walking out.

3      Q.    So, based upon a few seconds, you testified that

4    the defendant, Mr. Ramos, had no problem understanding

5    English; is that your testimony?

6      A.    Yes.

7               MR. BERGER:  Thank you.  Nothing further.

8               THE COURT:  Redirect.

9               MR. PERRI:  Nothing further, your Honor.

10              THE COURT:  You may step down.  Thank you

11    very much.

12              People, call your next witness.

13              MR. PERRI:  The People rest.

14              THE COURT:  Thank you.  At this time, ladies

15    and gentlemen, at the conclusion of the People's case

16    there are some legal matters that the Court must attend

17    to.  Before we proceed, given the hour, its ten to

18    four.  What we'll do is break for the day.  You now

19    have a nice long weekend to yourselves.  You may have

20    to go to your old jobs, but you don't have to come

21    here.  I will not see you tomorrow, nor will I see you

22    Monday, but I will see all of you bright and early on

23    Tuesday, May 19th.  Please be in the jury room by 10:00

24    a.m. so that we can get started as soon thereafter as

25    everyone gathers up.  Remember to bring a magazine or

kmm

Proceedings                    1143

1     something with you because sometimes I'm not so good at

2     telling time.  Keep yourselves occupied.

3               Over this break it is really important that

4     you keep an open mind throughout the trial.  Do not

5     discuss the case amongst yourselves or with anyone else

6     during the trial.  Do not permit anyone to discuss the

7     case in your presence.  Do not talk to the lawyers,

8     witnesses, or the defendant about anything during the

9     trial, and remember, if you were run into us anywhere

10    else over the next four days, we're going to ignore

11    you.  Do not take it personally.  Please do not visit

12    or view the place where the charged crime was allegedly

13    committed, or any other place involved in the case.

14               If there is any news coverage of the case, do

15    not read, view or listen to any accounts or discussions

16    of the case reported by the news media.  Do not attempt

17    to research any fact, issue, or law related to this

18    case, whether by discussion with others, by research in

19    the library or Internet, or by any other means or

20    source.

21               Have a great four days.  Enjoy the weather.

22    Stay safe.  I'll see you all Tuesday morning, 10:00

23    a.m.  Thank you.

24               (Whereupon, the jury exited the courtroom.)

25               MR. BERGER:  Could I reserve my right to make

                                                    kmm

Proceedings                    1144

1    my application at this time, or give me a minute to

2    call my office and I'll decide.

3              (Whereupon, a short recess was taken.)

4              MR. BERGER:  I move for a trial order of

5    dismissal.  The People have failed to establish a prima

6    facie case.

7              THE COURT:  People.

8              MR. PERRI:  Yes, your Honor.  The People

9    provided more than a prima facie case at this time.

10   The People provided testimony of Crystal Ramirez,

11   placing the defendant at the scene of the incident.

12   That she states observing him in the room with the

13   child, her daughter, Mya, who she testified to being

14   six years of age at the time of the incident.  The

15   defendant was seen in the room with a child -- with the

16   child's pants and underwear down at the ground.  At

17   that moment, when Crystal exclaimed what the F is going

18   on.  The child responded, he licked my coochie,

19   pointing at the defendant.  Both Crystal Ramirez and

20   her daughter, who was found swearable, and testified in

21   Court, identified the defendant.

22             Mya described in more detail, when she

23   testified, that the defendant placed his mouth on her

24   coochie, which she identified to both the nurse and in

25   Court as her front genital area.

                                                    kmm

1          Additionally, to that, your Honor, the People

2      have statements of admission by the defendant at the

3      time of his arrest.  He admitted to Officer Boccio in

4      statements that Officer Boccio testified to both

5      stating that he licked Mya Ramirez at the medical

6      center where she wasn't transported to.  She repeated

7      the allegation to the nurse examiner stating Danny

8      licked my coochie.  She identified to the nurse

9      examiner it was the front genital area.

10          Her underwear was taken into custody by the

11      nurse examiner, turned over to the Nassau County Police

12      Department, a buccal swab, a DNA sample was obtained by

13      the defendant by Detective Baran.  All of the items in

14      evidence tested by the medical examiner's office and

15      found that on the vulva of Mya Ramirez there was an

16      indication there was saliva present, along with a male

17      YSTR DNA.

18          In addition to that, on the inside of Mya's

19      underwear in the front area there were two stains that

20      tested positive for the presence of saliva.  Within one

21      of the stains there was a full YSTR match to the

22      defendant; making it either the defendant's DNA or

23      patrilineal relative of the defendant.  In the other

24      stain a partial autosomal chromosome matched with STR

25      matches made it one out of 175 million changes that it

1       was any other individual, other than the defendant's

2       DNA when those files were compared with the defendant's

3       DNA profile developed from the buccal swab.

4                   In addition to that, the present evidence of

5       a full written statement made to Detective Baran, given

6       in English, after rights were given.

7                   There is no evidence in the record of any

8       trickery, any threats, any promises, or anything that

9       would interfere with that statement being freely,

10      voluntarily given as a waiver of the defendant's

11      constitutional rights.  The statement of admission, the

12      DNA and testimony of live witnesses, including the

13      actual victim identifying the defendant in Court as a

14      perpetrator of the oral sexual conduct upon her

15      genital, on her vulva and/or vagina substantiates more

16      than a prima facie case, and the People should be able

17      to go forward.

18                  THE COURT:  Based on the testimony received

19      during the trial, the defense's application for trial

20      order of dismissal is denied.

21                  Mr. Berger, will you be presenting a case?

22                  MR. BERGER:  I am, Judge.  I do not have

23      exhibit number eight.

24                  MR. PERRI:  It was a pre-marked exhibit in

25      relation to the testimony the People anticipated

Proceedings                    1147

1    calling from the NICE bus company, and denied to call

2    the witness.  It was never marked for identification,

3    and not in evidence.

4              THE COURT:  It will not be presented to the

5    jury.

6              MR. BERGER:  I didn't know what it was.

7              THE COURT:  It is from the NICE bus company.

8    It doesn't matter.  I didn't allow that testimony.

9    Whatever it is, it's not relevant in any way, shape, or

10   form.

11             Mr. Berger, how many witnesses will you have

12   for the 19th?  I want to fill the entire day.  I need

13   to know if there is any application we need to handle

14   with regards to if they are in fact witnesses, or

15   character witnesses, or something else.  How many are

16   you going to have for the 19th?

17             MR. BERGER:  You know, Judge, I anticipate

18   four, but it's as much as I can say right now.  I'm

19   still working out the details.

20             THE COURT:  How many witnesses in total in

21   your case are you going to have, if you know?

22             MR. BERGER:  It's still possibly fluid.  I

23   would say maybe there will be one to three more beyond

24   that.

25             THE COURT:  Just be prepared to fill the

kmm

Proceedings                    1148

1      entire day on Tuesday, the 19th, with testimony.

2             Now, are they witnesses in which there could

3      potentially be an application from the People for an

4      offer of proof because I want to be able to go straight

5      into this Tuesday morning.

6             MR. BERGER:  I'm not making an offer right

7      now.  I don't think I have to do that.  I'm going to

8      put on a case.  If the People object when I put my

9      witness on, let them do that.  I don't have the burden

10     to do anything.  I might change my mind at this point

11     in time.  I intend to put a case on.  I'm not going to

12     make any offer at this point.

13            THE COURT:  Who are the people -- who are the

14     people you are calling for Tuesday, please, or you hope

15     to call for Tuesday?

16            MR. BERGER:  Pardon?

17            THE COURT:  Who are the people you hope to

18     have for Tuesday?

19            MR. BERGER:  Christy Hernandez, David Ramos,

20     Stephanie Ramos, Carl Reich, R-E-I-C-H.

21            MR. PERRI:  The People, at this time, ask for

22     an offer of proof with respect to each and every

23     witness they are to present to testify to any of the

24     facts at issue in this case.  The defendant has not

25     testified and put his honesty at issue.  The People ask

Proceedings                    1149

1   for an offer of proof as to what these witnesses will

2   be testifying to.

3            THE COURT:  That's a fair request.

4            Mr. Berger, I need to know in general.  I

5   don't need to know exactly what they will say.  I need

6   to know what type of witnesses they are.

7            MR. BERGER:  I don't know why this is

8   necessary at this time.  I could tell you that some are

9   character witnesses.

10           THE COURT:  Okay.

11           MR. PERRI:  With respect to that, the People

12   would oppose character witness testimony.  There is no

13   character trait at issue in the present case, and I

14   would ask defense counsel to, at the very least, or

15   make an application based upon requesting the Court to

16   define what character trait is at issue in this case.

17           THE COURT:  Under character evidence, the

18   Court is guided that it should allow any sort of

19   character evidence related to an individual's

20   reputation in the community for the truth and for the

21   veracity, and it has to be related and/or related to a

22   character for the crime at issue.

23           So, Mr. Berger, without saying what they're

24   going to say, could you give me an understanding of the

25   character trait?

Proceedings                    1150

1          MR. BERGER:  With all due respect, I

2     understand the law and we fulfill that requirement.  I

3     don't believe the People are entitled to know that.

4          THE COURT:  We'll let the record stand at

5     that point and take the objection as they come and then

6     we'll keep excusing the jury next week until the Court

7     has what it needs to make its decisions because I'm not

8     going to sit here and pull teeth.

9          Have a good night everyone.

10         Make sure you fill the whole day.

11         MR. BERGER:  I can't promise anything.

12         THE COURT:  Fill the entire day.  I'm not

13    going to waste all next week with one witness here and

14    one witness there.  Fill the day.

15         MR. BERGER:  I can't guarantee anything, let

16    the record reflect.

17         (Whereupon, the trial was adjourned to May

18    19, 2015.)

19              *                  *                  *

20

21

22

23

24

25

```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    COUNTY OF NASSAU : CRIMINAL TERM PART 43

 3    -------------------------------------------X
      THE PEOPLE OF THE STATE OF NEW YORK,      :  Indictment
 4                                              :  No. 742N/14
               -against-                        :
 5                                              :
      DANIEL RAMOS,                             :
 6                                              :
                         Defendant.             :  Jury Trial
 7    -------------------------------------------X

 8                              May 19, 2015
                               262 Old Country Road
 9                              Mineola, New York

10
      B E F O R E:
11
           HONORABLE TERESA K. CORRIGAN,
12                         Acting Supreme Court Justice

13
      A P P E A R A N C E S:
14
      (As Previously Noted)
15

16               *       *       *       *       *

17

18               THE CLERK:  Case on trial continued,

19    Indictment 742N of 2014, People of the State of New

20    York vs. Daniel Ramos.

21               All parties are present.  The jury is not

22    present at this time.

23               Madam interpreter, put your appearance on the

24    record.

25               MR. BERGER:  Charlene Perez D'Kline.  Good
```

kmm

Proceedings                    1152

1      morning.

2                  THE COURT:   Good morning.

3                  THE CLERK:   People ready?

4            MR. PERRI:   Yes, your Honor.

5            MR. BERGER:   Yes, your Honor.

6                  THE COURT:   I understand there are a couple

7      of applications.   Who would want to go first?

8                  MR. BERGER:   I don't know if I made this --

9      in fact, I don't think I made this in my motion for a

10     mistrial, even though I'm going to say I said it

11     before.   I guess, for the record, I want to quickly

12     make this application.

13           Last week when we learned that the Uncle

14     Sincere was caught by Crystal at night engaging in

15     improperly sexual activity with her three-year old son,

16     we wanted to call her back so that I could

17     cross-examine her on that issue.   Your Honor denied the

18     application, citing, among other things, the fact that

19     there was DNA evidence, and a statement of admission by

20     the defendant in evidence.   I cannot understand how

21     those things could have been relevant in the Court's

22     determination since we are contesting the accuracy and

23     creditability of the DNA evidence, and we're contesting

24     the accuracy and creditability of the police officers.

25           If the Court credits it, it means you are

kmm

Proceedings                    1153

1   valuing that testimony, and I'm not sure how the Court

2   could value that testimony when it is contested.   In

3   other words, I don't think the Court should be making a

4   determination as to its accuracy when rendering a

5   decision on a matter that is extremely important.

6            Now, we -- our position was that Crystal

7   Ramirez was not being truthful, and, in addition, we

8   wanted to demonstrate her state of mind, that is the

9   state of mind, whom had gotten out of control, having

10  once experienced this traumatic situation, actually

11  visually seeing the abuse by her father's brother, the

12  uncle of the boy, and she, therefore, assumed the worst

13  when she came into the kitchen, even though she didn't

14  visually see any abuse going on.

15           So, it was that testimony which we thought

16  was critical to evaluate the credibility of Crystal

17  Ramirez and also why what happened in the kitchen that

18  day.

19           Now, the only argument I think that the Court

20  put forth that, other than the DNA, and the statement

21  was that it was remote in time.   From my figuring, this

22  was approximately six years ago, when approximately six

23  years ago, because this was an incident that occurred

24  in October of 2013, and I think it was Sincere was

25  either six, maybe seven, at the time.   I did make the

Proceedings                    1154

1   point that if it's a trauma, that could last for years,

2   and I don't necessarily agree with your decision about

3   remoteness, but I understand that is the basis you put

4   in there.  It seemed to me, in addition to remoteness

5   arguments, you were citing, again, the DNA, and the

6   statement, and I thought that was inappropriate.

7          THE COURT:  Thank you.  Let me just clarify

8   so that there is no question as to why I denied the

9   application.  There were four main parts to my denial

10  of the application.  The primary reason being the

11  remoteness in time that there was nothing before this

12  Court to show that after six years of passage of time

13  that the events that occurred back with the child

14  Sincere in any way impacts on the state of mind of

15  Crystal Ramirez today.

16         Additionally, I pointed out to counsel that

17  her testimony did not, in fact, provide direct evidence

18  of the action that happened in that she testified that

19  she did not see what your client did to the child.  She

20  only saw the child's pajama pants and underwear down

21  around her ankle.  Additionally, the child was not born

22  yet.  That was the subject of this case at the time

23  that the incident happened, six years prior to the

24  allegations here.  It's more like seven-and-a-half from

25  the point of the trial, but six years from the time of

kmm

Proceedings                1155

1   the allegation.

2           Then, additionally, I had absolutely did

3   mention DNA evidence and your client's statement, but

4   understand, counselor, I'm not the trier of the facts

5   in this regard, so it's going to be up to the jury what

6   they do, or do not believe with regards to that, and

7   that is not the pivotal nor even an important part of

8   my denial of your application.  It really is the

9   remoteness factor that is the main reason behind my

10  denial, in addition to everything else.  All of the

11  other evidence that has come before me so far.  So, I

12  thank you for making the record and giving me an

13  opportunity to clarify my ruling in that regard.

14          Your application, I know you said you had not

15  made it within a context of a mistrial.  If, in fact,

16  if this is in context of a mistrial, that application

17  at this time is denied.

18          I understand we're ready to proceed to

19  Mr. Berger with your case; is that correct?

20          MR. BERGER:  That's correct.

21          THE COURT:  I did receive caselaw from both

22  the People and from Mr. Berger with regards to these

23  character witnesses.  I've gone through all of the

24  caselaw.  In fact, I'm fully aware family and friends

25  could constitute an appropriate relevant community with

kmm

Proceedings                1156

1    regards to reputation, so that is not an issue in any

2    way, shape, or form, and based on the case provided to

3    me by Mr. Berger from the Third Department, even though

4    it's not a Second Department case, I do find it to be

5    somewhat relevant that from 688 AD3d 1131, People vs.

6    O'Neil, there is something to be said for reputation

7    evidence for an individual charged with endangering the

8    welfare of a child as to that person's reputation in

9    dealing with children.

10        I read all of the People's cases, and I

11   likewise understand and appreciate that truthfulness

12   and veracity are not the elements that are really

13   appropriate in the charges before this Court.  I agree

14   with that also, but there is a reputation out there

15   that could be relevant in this circumstance.  I'm going

16   to let defense have his opportunity to develop that

17   through reputation evidence.  I know everyone is fully

18   aware that they can't go into specific acts, but rather

19   just general reputation within the community.  I

20   anticipate everyone will follow that accordingly.

21        So, Mr. Berger, you will be able to present

22   your case starting today.

23        On a scheduling note, it is my intention,

24   depending how far we get today and then what else you

25   tell me is left to do, Mr. Berger, if there is a

kmm

Proceedings                    1157

1    rebuttal case, I don't know, People, will you tell me,
2    but assuming we're at a point where tomorrow we are
3    faced with ending until next week or summing and
4    charging tomorrow afternoon, it's my intension to have
5    the jurors each be given a single small piece of paper
6    without writing their names or numbers on it, asking
7    them, are you available to be here Friday.  If they put
8    a yes, we're going to work, we'll sum and charge and be
9    here Friday.  If even one juror writes a no, that ends
10   the discussion because I did advise them when we were
11   picking a jury they could have a four-day weekend.
12   They may have made plans, they might not have.  If they
13   are available, we'll make ourselves available, if it
14   seems appropriate.  What I'm not going to do is sum and
15   charge on Friday.  If we work through Thursday that
16   day, then we'll go to Tuesday for sum and charge.
17            Mr. Berger, do you want to be heard on my
18   intention of inquiring of the jurors?
19            MR. BERGER:  No, that's fine.
20            THE COURT:  People?
21            MR. PERRI:  Your Honor, I had a question
22   about your ruling with respect to the reputation
23   evidence.  That in People v. O'Neil, that case where it
24   did involve a coach, allegations that he sexually
25   abused students at least in his charge.  The reputation

Proceedings                                1158

1    or character trait found to be at issue was specific to

2    that case, that the character trait at issue, your

3    Honor, was that he was professional and highly respects

4    the reputation in dealing with young, at least.

5            What defense counsel is suggesting is the

6    character trait at issue in this case is just a general

7    kindness and towards children, and just a vague general

8    sense.  I don't believe in an allegation where there is

9    no aspects to the charge of violence of depravation, of

10   causing actual physical harm or being unkind to a

11   child, that that character at any rate is at issue.  In

12   fact, the vast majority of cases in which these

13   allegations are made, the process, the Court is well

14   aware of grooming, of enticing the child of making it

15   seem like it's okay.

16           Turning to the defendant's own statement in

17   this case, it says, a tickle game.  He's going to

18   tickle her with his mouth, that the idea that just

19   general kindness is actually at issue with the

20   appearance of kindness is at issue.  The People would

21   dispute that the trait at issue is much more narrow as

22   it was in O'Neil, confining to the facts and

23   circumstances of the case, your Honor.  And we would

24   ask the Court to rule appropriately.

25           THE COURT:  So I understand what you are

kmm

Proceedings                    1159

1   saying, People, I am confident that Mr. Berger

2   understands the parameters that he needs to put forth

3   in keeping with proper questioning for character

4   evidence.  I will certainly take any objections as they

5   come up, and if either of you need to approach in order

6   to explain your objection to the Court, I never denied

7   either of you the ability to do that, so you could

8   certainly approach.

9            I'm going to allow Mr. Berger to go forward

10   with his witnesses, and we will see what they bring

11   forth before the jury and, obviously, People, you will

12   be entitled to your appropriate cross-examination of

13   those individuals.

14            MR. PERRI:  Yes, your Honor.

15            THE COURT:  Anything else?

16            Your exception to my ruling is noted for the

17   record.

18            MR. PERRI:  Thank you.

19            THE COURT:  Anything else before we bring in

20   the jury and start with the witness?

21            People, anything else?

22            MR. PERRI:  No, your Honor.

23            MR. BERGER:  No, your Honor.

24            THE COURT:  You are ready to proceed?

25            MR. BERGER:  We are.

David Ramos - Defense - Direct        1160

1              (Whereupon, the jury entered the courtroom.)

2              THE CLERK:  Do both sides stipulate all sworn

3      jurors are present?

4              People?

5              MR. PERRI:  Yes, your Honor.

6              MR. BERGER:  Yes, your Honor.

7              THE COURT:  Good morning, everyone.  Welcome

8      back.  I hope you enjoyed your break here from the

9      courtroom, but we do want to get started right away, so

10     we turn to Mr. Berger.

11             Please call your first witness.

12             MR. BERGER:  David Ramos.

13     D A V I D  R A M O S, called on behalf of the Defendant,

14     having been duly sworn, took the witness stand and

15     testified as follows:

16             THE CLERK:  State your full name, spell your

17     last name, give your county of residence.

18             THE WITNESS:  David Ramos, D-A-V-I-D.

19     R-A-M-O-S.

20             THE CLERK:  County of residence time.

21             THE WITNESS:  Onslow County.

22             THE COURT:  Good morning, Mr. Ramos.  My name

23     is Teresa Corrigan.  I'm the judge in this matter.  A

24     couple of rules you need to follow.  Please make sure

25     you speak slowly, loudly, clearly.  Use the microphone

David Ramos - Defense - Direct          1161

1      if you need to.  Wait for an entire question to be

2      asked before you give an answer.  If you hear the word

3      objection, I need you to stop speaking until I had a

4      chance to rule.  The court reporter can only take down

5      one person speaking at a time.  If you hear someone

6      else talking, I need you to not be talking, okay?

7           Go ahead.

8  DIRECT EXAMINATION

9  BY MR. BERGER:

10      Q.   Do you know the defendant in this case, Daniel

11  Ramos?

12      A.   Yes, sir, he's my father.

13      Q.   And are you presently in the military?

14      A.   Yes, I am.

15      Q.   What branch?

16      A.   United States Marine Corps.

17      Q.   For how long have you been there?

18      A.   Six years.

19      Q.   Are you an officer?

20      A.   I'm a non-commission officer.  I'm a sergeant.

21      Q.   Did you grow up in a household with Daniel Ramos?

22      A.   Yes, I did.

23      Q.   And in the course of your growing up, are you

24  aware of the reputation of your father with respect to his

25  kindness and gentleness towards children?

David Ramos - Defense - Direct      1162

1            MR. PERRI:  Objection.

2            THE COURT:  Overruled.

3            You may answer.

4      A.   Yes, I am.

5      Q.   And how are you aware of that?

6      A.   Family members always talking about him, friends

7  and all of that.

8      Q.   Give us an example, tell us how it is you know of

9  his reputation and gentleness towards children.

10     A.   Yes.  I told my mother that my wife is pregnant.

11  My mother was telling me how much --

12           MR. PERRI:  Objection.

13           THE COURT:  Sustained.

14     Q.   Tell us what you heard with respect to his

15  reputation.

16     A.   How he is always so kind, he's gentle, he's fair,

17  he's firm, and discipline-wise, and basically, he's just

18  kind of gentle.  That's always everything they tell me about

19  my father and how funny he is.

20     Q.   Are you aware of his gentleness and kindness?

21     A.   Of course, I am.

22     Q.   Let me ask you this:  Are there other occurrences

23  in which you heard of people talk about his reputation for

24  kindness and gentleness towards children?

25     A.   Yes, many times.

1      Q.   Could you tell us those other instances, if you
2    can recall?

3      A.   Yes.  When I used to live in my old apartment,
4    downstairs, who are now my Godparents, they have two
5    daughters and a son, and they always mentioned how nice my
6    father is with their kids.

7               MR. PERRI:  Objection.

8               THE COURT:  Sustained as to what they said.

9      A.   How he is with kids --

10              THE COURT:  Sustained.  You can't answer.

11     Q.   Just tell us about what you heard them say with
12   respect to his reputation.

13     A.   He's always funny, caring, gentle, and a great dad
14   from seeing everything.

15     Q.   Are there other instances in which you recall
16   other people talking about his reputation?

17     A.   Yes, and another one is an old family friend, they
18   say the same thing no matter.  He's always a great gentle
19   guy, he's never been bad to any kids or anything.

20     Q.   Have you ever heard any negative reputation with
21   respect to his kindness and gentleness towards children?

22     A.   No, never.

23              MR. BERGER:  Nothing further.  Thank you.

24              THE COURT:  Cross-examination.

25   CROSS-EXAMINATION

David Ramos - Defense - Cross          1164

1    BY MR. PERRI:

2         Q.    Mr. Ramos, you testified you currently live in

3    Onslow County?

4         A.    Yes.

5         Q.    Where is Onslow located?

6         A.    Jacksonville, North Carolina.

7         Q.    How long have you lived in North Carolina?

8         A.    Four about four years.

9         Q.    Before living in North Carolina for the past four

10   years, where else have you lived?

11        A.    I've been in and out of different stations.

12   Before that I lived in my parent's house.

13        Q.    When was that, when you lived at your parent's

14   house?

15        A.    From eighteen years and younger.

16        Q.    How old are you now?

17        A.    Twenty-four.

18        Q.    That was approximately six years ago you lived at

19   your parent's house?

20        A.    Yes.

21        Q.    Is it fair to say you don't have daily

22   interactions with your father or his community where he

23   lives currently?

24        A.    I speak to him every time on the phone, calling

25   home, talking to my mom and dad before.

kmm

1    Q.   Besides from speaking to your mother and your

2  father, being the defendant living down in North Carolina,

3  you don't have regular interactions with the members of

4  community where you grew up, correct?

5    A.   No.

6              THE COURT:  I didn't hear your answer.

7              THE WITNESS:  I said, no.

8    Q.   So all of the reputations that you are discussing

9  and talking about with respect to your father's reputation,

10  is that based on statements and meetings that occurred in

11  the past?

12    A.   Besides the one with my mother saying not that

13  long ago.

14    Q.   That was a conversation you had with your mother

15  about your father's reputation?

16    A.   Yes.

17    Q.   Were all of the people you were talking about that

18  have an opinion about your father's reputation for the

19  kindness and gentleness with children, were all of those

20  members of your family?

21    A.   Family friends.

22    Q.   Were there any people you were talking about that

23  aren't friends and family of your father?

24    A.   No, no family friends.

25    Q.   Approximately, how many people are you talking

1   about?

2        A.   I would say, four in total.

3        Q.   So, the reputation that you are discussing and

4   presenting before the jury, is the reputation your father

5   has amongst four people who are friends and family?

6        A.   There is many more.  I can keep going on.

7        Q.   As far as what you testified to before the jury,

8   you are talking about conversations about four people who

9   are friends and family of your father?

10       A.   Yes.

11       Q.   ·You love your father?

12       A.   Love him to death.

13       Q.   You would do anything for him?

14       A.   Yes, I would.

15            MR. PERRI:   Nothing, further, your Honor.

16            THE COURT:   Thank you.

17            Anything on redirect?

18            MR. BERGER:   No, your Honor.

19            THE COURT:   Thank you very much.  You may

20       step down.

21            Please call your next witness.

22            MR. BERGER:   Stephany Ramos.

23   S T E P H A N Y   F I G U E R O A   R A M O S, called on

24       behalf of the Defendant, having been duly sworn, took

25       the witness stand and testified as follows:

1                    THE CLERK:  Please state your name, spell

2      your last name, and give your county of residence.

3                    THE WITNESS:  Stephany Figueroa Ramos,

4      Jacksonville, North Carolina.  S-T-E-P-H-A-N-Y,

5      F-I-G-U-E-R-O-A, R-A-M-O-S.

6                    THE COURT:  Ms. Figueroa Ramos, my name is

7      Teresa Corrigan, and I'm the judge in this matter.  I

8      have a couple of instructions for you.  One, please

9      speak slowly, clearly, loudly.  Use the microphone if

10     you need to.  Two, it's important you wait for an

11     entire question to be asked before you give your

12     answer.  If you hear the word objection, I need you to

13     stop speaking and give me a chance to rule.

14                    It's important to remember the court reporter

15     can only take down one person speaking at a time.  If

16     you hear someone speaking, I need you to not be

17     talking.

18                    You may inquire.

19     DIRECT EXAMINATION

20     BY MR. BERGER:

21         Q.    Ms. Ramos, do you know David Ramos?

22         A.    I do.

23         Q.    How do you know him?

24         A.    He's my husband.

25         Q.    So Daniel Ramos is your father-in-law?

1     A.    Yes.

2          Q.    And are you in the military?

3     A.    I am.

4          Q.    Where are you stationed?

5     A.    North Carolina.

6          Q.    What part of the military?

7     A.    United States Army Reserve.

8          Q.    Did you recently have a child?

9     A.    I did.

10         Q.    Are you aware of the reputation of the defendant,

11    Daniel Ramos, for kindness and gentleness towards children?

12         A.    I am most certainly.

13         Q.    Could you tell us how you are aware of that

14    reputation?

15         A.    I was first aware of it back when I first met his

16    son and we started dating.  It was around Christmastime.  I

17    remember the Christmas tree being up.  We were at the family

18    gathering.  I was going to meet his family for the first

19    time officially, and it was his aunt, uncles, cousin, his

20    little cousin and a few family friends gathered around.

21    They started talking about his father, his mom as well.

22    What came up was the --

23         Q.    When you say, his father, you are referring to?

24         A.    Daniel Ramos.

25         Q.    Go ahead.

 1          A.    The reason it came up, David was playing with his
 2    little cousin and kind of telling me how David was, but then
 3    he said he gets all of his character traits from his dad,
 4    which to you, if you meet his father, gentle kind, great
 5    with kids.  What do you see in him?  He's funny, and later
 6    that evening I met his dad.  Exactly, what they told me.
 7    Honestly, very few people I have seen like that.
 8                    MR. PERRI:  Objection.
 9                    THE COURT:  Overruled.  We'll let it stand.
10          Q.    Were there any other instances in which you heard
11    of his reputation with respect to kindness and gentleness
12    towards children?
13          A.    Yeah.  I could think of another.  It was one time
14    we were out playing soccer, right, with the family.  We
15    always go out together, to go to soccer at the field by the
16    high school.  We were all there, a couple of family friends.
17    Other friends were there as well, and kind of mentioned how
18    good he was teaching the kids there how to play soccer, play
19    together as a team, obedience behind the game.  How to rely
20    and trust each other, and that was pretty much when they
21    told me, once again, they compared him and his dad and how
22    they are with kids and looking forward to that because, you
23    know, that is something I want my daughter to be brought up
24    in, with a good husband and someone who cares and good
25    traits from my father-in-law.

1              MR. PERRI:   Objection.

2              THE COURT:   Sustained.   Just the last part of

3        that is stricken.   Just the very last phrase is

4        stricken from the record.

5              MR. BERGER:   Okay.

6        Q.   Ms. Ramos, anything else that you can recall at

7   this time other than those two instances?

8        A.   I can think of moments where I heard it.   I'm just

9   trying to recall the exact places.

10       Q.   You can't recall it now?

11       A.   It was a family dinner.   It was during the summer

12  of last year.   It was right when I was pregnant.   Once

13  again, we were talking about traits, that we hoped she would

14  have and who she would get it from.   That's where

15  Mr. Daniel, my father-in-law's name was brought, funny guy,

16  extremely funny, sweet person, you know.   Very kind.   They

17  were just kind of talking in reference to how he would be

18  with her.   Well, then I found out I was having a little

19  girl, how he would be with her, and how they would get along

20  and how compatible, I guess, and that is probably the

21  instance.

22       Q.   So, it's fair to say, during the past six years

23  that David has been in the military, you have had occasions

24  where you are spending time with the family within the last

25  six years?

S. Ramos - Defense - Cross          1171

1      A.    Well, I've been with David for the last three

2   years, going on four years, so I wasn't there for David's

3   entire military career.   For the part I've been in there,

4   yes.   I've been included ever since then.   Even though it's

5   a long distance relationship, I'm very close with his

6   family.

7                    THE COURT:   Cross-examination, please.

8                    MR. PERRI:   One moment, your Honor.

9                    THE COURT:   Take your time.

10   CROSS-EXAMINATION

11   BY MR. PERRI:

12      Q.    What rank are you?   What is your current rank?

13      A.    Private first class.

14      Q.    You said currently you live in Jacksonville, North

15   Carolina?

16      A.    Yes.

17      Q.    How long of have you lived in Jacksonville, North

18   Carolina?

19      A.    About two years.

20      Q.    Before Jacksonville, where did you live?

21      A.    Long Island, New York.   Valley Stream.

22      Q.    When did you meet your husband?

23      A.    In 2011.

24      Q.    And did you know him before then?

25      A.    No.

1    Q.   Did you know the defendant before 2011?

2    A.   No.

3    Q.   You have known the defendant for approximately

4  three to four years?

5    A.   Correct.

6    Q.   You testified about when you first met his family

7  at Christmas, the family gathering, and there was a

8  discussion about the defendant's reputation at that

9  gathering.  You testified that there was aunt and uncles,

10 and a couple of family friends.  Was that the approximate

11 number of adults at the family gathering other than your --

12   A.   Not at the gathering itself.  I was mentioning the

13 surroundings on that couch.

14   Q.   Were those the people you were talking with?

15   A.   Yes, on the couch.

16   Q.   So, the conversation about the reputation of the

17 defendant involved approximately four people?

18   A.   Including David, five.

19   Q.   And there were other family or friends, correct?

20   A.   Family and friends, yes.

21   Q.   And you testified about a second incident at a

22 soccer game; where was that soccer practice?

23   A.   It was a soccer gathering between family and

24 friends.

25   Q.   Where was that?

kmm

S. Ramos - Defense - Cross          1173

1       A.   At Uniondale High School, back park.

2       Q.   How many people were there?

3       A.   The team was probably going to be eleven, eleven,

4    usually.  We usually combined family and friends.  It's a

5    big family.

6       Q.   Were those your friends or David's friends.

7       A.   Both.

8       Q.   How many people were involved in the conversation

9    about whether or not the defendant had reputation for

10   kindness and gentleness towards children at the soccer game?

11      A.   I'm going to say about seven.

12      Q.   And were these members of the defendant's family?

13      A.   Some.

14      Q.   And were they friends of the defendant?

15      A.   They're family, so, yes.

16      Q.   You also testified about a family dinner when you

17   were pregnant where the conversation of whether or not the

18   defendant was kind and gentle towards children came up;

19   where was that family dinner?

20      A.   At the defendant's house.

21      Q.   And who was present at that dinner?

22      A.   It was his wife, his son, family friend, Jose,

23   aunt from upstairs, and his little cousin Chris.

24      Q.   So the conversation about the reputation of the

25   defendant, again, here comprised of you, your husband, the

kmm

S. Ramos - Defense - Cross          1174

1    defendant's wife, family friend and aunt?

2         A.   Yes, and a little cousin.

3         Q.   How old is the cousin?

4         A.   He just turned eight, actually.

5         Q.   What year did this happen in?

6         A.   Last year, the summer of last year.

7         Q.   You don't live in Nassau County, correct?

8         A.   No, Jacksonville.

9         Q.   You don't have daily interactions with anyone that

10   sees -- you don't have daily interactions in person with

11   anyone interacting with the defendant, correct?

12        A.   I'm sorry?

13        Q.   Do you, on a daily basis, interact with people the

14   defendant is interacting with; I'm talking about in person,

15   both of you?

16        A.   No, we only come to visit when we have a leave.

17        Q.   How often do you have a leave?

18        A.   Recently, since the baby, it hasn't been often.

19   Maybe once, twice a year.

20        Q.   The reputation you are discussing is predominantly

21   based on visits to New York, that has happened one or two --

22   twice a year?

23        A.   Within the last year that I've been away from New

24   York.

25        Q.   Before these last two visits, how long has it been

kmm

S. Ramos - Defense - Redirect        1175

1    since you have been back to New York?

2        A.    The last two visits were this year, twice last

3    year, and the year before that I was still here.

4        Q.    Ms. Ramos, you and your husband have been both in

5    court here during trial?

6        A.    Correct.

7        Q.    You have been here in support of the defendant?

8        A.    Correct.

9            MR. PERRI:  Nothing further, your Honor.

10   Thank you.

11           THE COURT:  Any redirect?

12           MR. BERGER:  One question.

13   REDIRECT EXAMINATION

14   BY MR. BERGER:

15       Q.    Have you ever heard any negative reputation with

16   respect to the defendant being kindness and gentleness

17   towards children?

18           MR. PERRI:  Objection.

19           THE COURT:  There's an objection?

20           MR. PERRI:  Yes.

21           THE COURT:  Objection sustained.  Outside the

22       scope.

23           MR. BERGER:  Nothing further.

24           THE COURT:  You may step down.  Please be

25       careful.  It's two steps.  Thank you.

kmm

C. Hernandes - Defense - Direct        1176

1           Please call your next witness.

2           MR. BERGER:  Christy Hernandez.

3  C H R I S T Y   H E R N A N D E S, called on behalf of the

4      Defendant, having been duly sworn, took the witness

5      stand and testified as follows:

6           THE CLERK:  In a loud, clear voice, state

7      your name, spelling your full name, and give your

8      county of residence.

9           THE WITNESS:  Christy Hernandes,

10     C-H-R-I-S-T-Y, H-E-R-N-A-N-D-E-S.  Nassau County.

11          THE COURT:  Good morning.  My name is Teresa

12     Corrigan, and I'm the judge in this matter.  Just a

13     couple of rules for you.  First, I need to make sure

14     you speak slowly, loudly, clearly, use the mic, if you

15     need to.  Wait for an entire question to be asked

16     before you give your answer.  If you hear the word

17     objection, I need you to stop speaking and give me a

18     chance to rule, and just remember, the court reporter

19     can only take down one person speaking at a time.  If

20     you hear anyone else speaking, I need you to not be

21     speaking, okay.

22          You may inquire.

23 DIRECT EXAMINATION

24 BY MR. BERGER:

25     Q.   Ms. Hernandes, do you live in the County of

kmm

C. Hernandes - Defense - Direct          1177

1   Nassau?

2        A.   Yes.

3        Q.   Are you employed?

4        A.   Yes.

5        Q.   What do you do?

6        A.   Medical billing.

7        Q.   I'm sorry?

8        A.   Medical billing.

9        Q.   Where do you do that?

10       A.   Bay Orthopedic in Westbury.

11       Q.   Do you know Daniel Ramos?

12       A.   I do.

13       Q.   Do you know his family?

14       A.   I do.

15       Q.   How long have you known them?

16       A.   Since about 2008.

17       Q.   So, approximately, about seven years or something?

18       A.   Yes.

19       Q.   Have you spent time with the family residence?

20       A.   Not recently, but I have.

21       Q.   Are you aware of the reputation from the defendant

22   with respect to his kindness and gentleness towards

23   children?

24       A.   Yes.  Yes.

25       Q.   How are you so aware?

C. Hernandes - Defense - Direct      1178

1      A.   Well, I lived in his house for about two years,

2   and I have my own children that spend time with him and his

3   family.

4      Q.   And what is that reputation with respect to

5   kindness and gentleness towards children?

6           MR. PERRI:  Objection.  May we approach?

7           (Whereupon, there was a sidebar discussion

8       with counsel and the Court, as follows:)

9           MR. PERRI:  The foundation that this witness

10      has laid is based on her personal experience of having

11      lived in the house and having left her children in care

12      of the defendant.  Although, personal experiences and

13      opinions must go under the federal rules of evidence,

14      it is not admissible in New York State.  I object to

15      the witness.

16          MR. BERGER:  I agree with everything he said.

17      I'm going to ask her, has she heard of the reputation,

18      not her own personal experience.

19          THE COURT:  I will give you a chance to

20      develop that.

21          MR. PERRI:  Thank you.

22          (Whereupon, the proceedings resumed.)

23      Q.   You say you are aware of the reputation of the

24   defendant with respect to kindness and gentleness towards

25   children?

C. Hernandes - Defense - Direct          1179

1    A.    Yes.

2    Q.    How are you aware of that?

3    A.    I lived at his house for about two years, so

4    myself and my children spend time with him.

5    Q.    And did you hear other people talk about his

6    reputation with respect to kindness and gentleness towards

7    children?

8    A.    Yes.

9    Q.    Give us an example of what you heard.

10   A.    Sometimes at our family gatherings we all get

11   together and his sister-in-law speaks of kindness about him

12   with children because she has a son that spends a lot of

13   time --

14              MR. PERRI:  Objection.

15              THE COURT:  Overruled.  I'll let her complete

16        the answer.  Finish.

17   A.    So they would all spend time together.  So, the

18   sister-in-law's son would spend time with Mr. Ramos as well.

19   So, they would always speak good things about him.

20   Q.    They would talk about his reputation?

21   A.    Correct, with the kids.

22   Q.    So, can you recall anything else?

23   A.    My children would sometimes speak good things

24   about him as well.

25              MR. PERRI:  Objection.

C. Hernandes - Defense - Cross        1180

1          THE COURT:  Sustained.

2     Q.   Not so much the good things, okay.  I'm asking

3  about what you heard other people say with respect to his

4  reputation.

5     A.   That he was kind and gentle with children.

6     Q.   And you heard that?

7     A.   Yes.

8          MR. BERGER:  Thank you.

9     Q.   Have you ever heard anything negative about his

10  reputation as to kindness and gentleness with children?

11     A.   No.

12          MR. BERGER:  Thank you.

13          THE COURT:  Cross-examination.

14          MR. PERRI:  Thank you, your Honor.

15  CROSS-EXAMINATION

16  BY MR. PERRI:

17     Q.   Ms. Hernandes, how do you know the defendant?

18     A.   I dated his son.

19     Q.   And is that David?

20     A.   Carlos.

21     Q.   When did you date Carlos?

22     A.   In 2008.

23     Q.   Are you still close with the defendant and his

24  family?

25     A.   No.

C. Hernandes - Defense - Cross        1181

1    Q.    Have you recently been to the residence where the

2    family lives?

3    A.    About, maybe, two or three months ago.

4    Q.    If you are not close, why were you at the home two

5    or three months ago?

6    A.    Ms. Ramos's wife called me, wanted to speak to me.

7    Q.    She wanted to speak to you about the case?

8    A.    Yes.

9    Q.    She wanted to speak to you about testifying on

10   behalf of the lawyer, defendant?

11   A.    She asked me to call the lawyer, Mr. Berger, give

12   him a call.

13   Q.    Before that visit over two, three months ago,

14   specifically to discuss the case, when was the last time you

15   were over the Ramos household?

16   A.    About 2011.

17   Q.    Approximately, four years ago?

18   A.    Yes.

19   Q.    Since 2011, did you interact with the defendant or

20   his family on a regular basis?

21   A.    Ms. Ramos's wife, I call her for her birthday or

22   send her a Mother's Day text.

23   Q.    Other than birthday or Mother's Day text, do you

24   interact with them on a daily basis?

25   A.    No.

C. Hernandes - Defense - Cross      1182

1      Q.    Do you hang out with their friends or associates

2    on a daily basis?

3      A.    No.

4      Q.    And you testified that other people talk about the

5    defendant's kindness and gentleness towards children.   Do

6    you know where any of those -- when, specifically, any of

7    those discussions took place?

8      A.    I can't give you specific dates, because this was

9    between 2008 and 2011, but I know it was in the house.

10     Q.    Do you know who was present?

11     A.    It was Mr. Ramos's wife, Mr. Ramos's

12   sister-in-law, the children, and I believe that's it.

13     Q.    So, the people that we're discussing the

14   defendant's reputation were yourself, the defendant's wife

15   and his sister-in-law?

16     A.    Yes.

17            MR. PERRI:  Nothing further, your Honor.

18            THE COURT:  Any redirect?

19            MR. BERGER:  No, your Honor.

20            THE COURT:  You may step down.  Be careful.

21   It's two steps.

22            Approach.  Off the record.

23            (Whereupon, there was a discussion held

24       off-the-record.)

25            THE COURT:  All right, ladies and gentlemen,

kmm

Proceedings                    1183

1    you are going to get a little bit of a break today.

2    It's a short day.  We're not finished yet with what

3    needs to be presented to you.  I do need you all back

4    here tomorrow morning at 10:00 a.m. sharp.

5            Please remember to keep an open mind

6    throughout the trial.  Do not discuss the case amongst

7    yourselves or with anyone else during the trial.  Do

8    not permit anyone to discuss the case in your presence.

9    Do not talk to the lawyers, witnesses, or about the

10   defendant, about anything during at trial.

11           Do not visit or view the alleged area or any

12   other place involved in the case, and if there is any

13   news coverage of the case, do not read, view, or listen

14   to any accounts or discussions of the case reported by

15   the news media.

16           Do not attempt to research any fact, issue or

17   law related to this case, whether by discussion with

18   others, by research in the library, or on the Internet,

19   or any other means or source.

20           Enjoy the rest of your day.  The sun is

21   supposed to shine the rest of the afternoon so try to

22   enjoy it.

23           See you tomorrow morning at 9:00 a.m.

24           (Whereupon, the jury exited the courtroom.)

25           THE COURT:  I do want to do the charge

Proceedings                1184

1       conference with the attorneys.   Please go in the back

2       to speak to Kristin.   Depending how long it takes,

3       we'll either go back on the record with the charge

4       conference this morning, so we can have the proper

5       record made or do it this afternoon when you are both

6       in agreement.

7                   Anything for the record before we shut it out

8       for the day?

9                   MR. BERGER:   No.

10                  THE COURT:   Thank you very much.

11                  (Whereupon, the trial was adjourned to May

12      20, 2015.)

13                  *              *              *

14

15

16

17

18

19

20

21

22

23

24

25

kmm

1185

```
1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NASSAU : CRIMINAL TERM PART 43

3    ------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,      :  Indictment
4                                              :  No. 742N/14
             -against-                         :
5                                              :
     DANIEL RAMOS,                             :
6                                              :
                           Defendant.          :  Jury Trial
7    ------------------------------------------X

8                                May 20, 2015
                                 262 Old Country Road
9                                Mineola, New York

10
     B E F O R E:
11
         HONORABLE TERESA K. CORRIGAN,
12                Acting Supreme Court Justice

13
     A P P E A R A N C E S:
14
     (As Previously Noted)
15

16                   *      *      *      *      *
17

18

19               THE CLERK:  Case on trial continued,

20    Indictment Number 742N of 2014, People of the State of

21    New York vs. Daniel Ramos.

22               Let the record reflect all parties are

23    present.  The jury is not present at this time.

24               Spanish interpreter present.

25               Please put your appearances on the record.
```

kmm

Proceedings                    1186

```
 1              THE INTERPRETER:  Carmen Knight.
 2              THE COURT:  People, ready to proceed?
 3              MR. PERRI:  Yes.
 4              THE CLERK:  Defense counsel ready?
 5              MR. BERGER:  Yes.
 6              THE COURT:  Anything for the record?
 7              MR. PERRI:  People have an application to
 8      allow their expert witness, Christopher Chillseyzn to
 9      be present in the courtroom during the testimony of the
10      defendant's expert.  The People believe this is
11      necessary to allow him to aid in advising the
12      prosecution with respect to the cross-examination of
13      this expert witness, and we feel were it necessary and
14      appropriate for us to recall him or a member of his
15      office as a rebuttal witness, this would expedite the
16      process.
17              THE COURT:  Do you want to be heard?
18              MR. BERGER:  I object to that.  We ordered
19      the testimony of Dr. Chillseyzn.  We provided that to
20      our expert.  The People can do the same thing.
21              THE COURT:  The application is going to be
22      granted.  I will allow him to sit in at this time.
23      It's allowed by caselaw.  It's allowed within the Court
24      rules, so I will allow it.
25              Anything else, for the record?
```

1              MR. PERRI:  No, your Honor.

2              THE COURT:  Mr. Berger, anything for the

3         record?

4              MR. BERGER:  No, your Honor.

5              With respect to the previous application, if

6         Mr. Chillseyzn is going to be called as a rebuttal, we

7         ask it be taken out of order because our witness will

8         not be here after today, and he will not be able to sit

9         and listen to what Mr. Chillseyzn has to say, if

10        anything.

11             THE COURT:  All right.  We'll cross that

12        bridge when we get to it.  I don't think that will be a

13        problem.  Let's worry about it if I allow the rebuttal.

14             MR. BERGER:  Fine.

15             THE COURT:  With regards to what I said

16        yesterday, it was going to be the Court's request of

17        the jury as to their availability for Friday.  Several

18        members of the jury are not available Friday.  I will

19        not sum and charge Thursday, correct.  So that means

20        sum and charge at this time looks to be happening next

21        Tuesday.

22             MR. PERRI:  Yes, your Honor.  Thank you.

23             (Whereupon, the jury entered the courtroom.)

24             THE CLERK:  Do both sides stipulate all sworn

25        jurors are present?

1                MR. PERRI:  Yes, your Honor.

2                THE CLERK:  Defense counsel?

3                MR. BERGER:  Yes, your Honor.

4                THE COURT:  Good morning, everyone.  Welcome

5        back.  I hope you enjoyed your evening and afternoon

6        yesterday.  We'll get started.

7                Mr. Berger, please call your next witness.

8                MR. BERGER:  I call Dr. Karl Reich.

9    K A R L   R E I C H, Doctor, called on behalf of the

10       Defendant, having been duly sworn, took the witness

11       stand and testified as follows:

12               THE CLERK:  In a loud, clear voice, state

13       your name, spell your first and last name and give

14       your county of residence.

15               THE WITNESS:  Karl Reich, R-E-I-C-H, K-A-R-L.

16       Middle initial A, and I live in Cook County, Illinois.

17               THE COURT:  Doctor, just a couple of rules

18       for you.  My name is Teresa Corrigan.  I am the judge

19       in this matter.  Please make sure when you testify you

20       speak slowly, loudly, clearly.  Use the mic if you need

21       to.  Wait for an entire question to be asked before you

22       give your answer.  If you hear somebody say the word

23       objection, stop speaking and give me a chance to rule

24       and then you will know whether or not you could answer

25       the question.

kmm

Dr. Reich - Defense - Direct          1189

1          Remember, the court reporter can only take

2     down one person at a time.  If you hear someone else

3     speaking, I would ask you not to speak at the same

4     time.

5          THE WITNESS:  Thank you.

6  DIRECT EXAMINATION

7  BY MR. BERGER:

8     Q.    Dr. Reich, what is your occupation?

9     A.    I'm a scientist, and I work at a small independent

10 forensic laboratory.

11    Q.    And that laboratory, what does it do?

12    A.    We do forensic analysis, but only for DNA.  There

13 are number of different fields in forensics, but we only

14 study or work with the DNA part.  We don't do ballistics.  I

15 don't do arson.  We don't document.  We don't do

16 fingerprints.  We just do DNA.

17    Q.    Does your lab have anything to do with the

18 development of testing with respect to saliva?

19    A.    Yes.  So our laboratory does a variety of things

20 related to forensic DNA, and one of the things we have done

21 is develop a series of tests which other forensic labs use,

22 and one of those tests is specifically a test for saliva.

23    Q.    Is one of the labs that uses your test in Nassau

24 County?

25    A.    I believe the medical examiner in Nassau County is

1    one of the forensic labs that orders our test and uses them

2    to examine evidence.

3         Q.   Doctor, what is your education?

4         A.   I have an undergraduate degree in chemistry from

5    Cornell, and then I have a graduate degree in molecular

6    biology from UCLA.

7         Q.   And any other education?

8         A.   I've done two post doctoral fellowships.  That's

9    research projects after you get your doctorate.  I have one

10   of those from the Institute Pester in Paris, and another one

11   from Stanford.

12        Q.   What is your professional experience?

13        A.   Well, I was trained as a chemist, as an

14   undergraduate, and then I study molecular biology as a

15   graduate student.  And professionally, I worked with

16   molecular biology, which is the study of very small things

17   that are biology for twenty-five or thirty years, depending

18   upon how you want to count it.

19        Q.   And could you tell us your professional experience

20   with respect to your work in biosciences?

21        A.   So, one of the places I worked was Abbot

22   Laboratory, and specifically, I worked in their

23   pharmaceutical division.  And when I left Abbot there were a

24   couple of physicians who wanted to try and develop a drug,

25   and so they hired me to help them do that.  It was a very

1    interesting project.  It was a virtual pharmaceutical

2    company.  We outsourced all of the work that used to be done

3    at Abbot, and we outsourced them all to try them help

4    develop a drug.

5        Q.    Can you tell us what you have done with Integrated

6    Genomics?

7        A.    Integrated genomics was a biotech in the Chicago

8    area, and they were very interested in trying to use

9    computers and sequence analysis to understand the genetics

10   of microorganisms, and how those microorganisms made things

11   of commercial interest.  So it turns out that many of the

12   things that we buy and sell and use come from small

13   microorganisms, and they were interested in trying to expand

14   that.  So all the antibiotics, for example, come from

15   microorganisms, and they were trying to rationalize that

16   production.

17       Q.    Were you involved in attempting to develop new

18   antibiotics as well?

19       A.    Yes.  So my work at Abbot was actually involved in

20   resistance, which is what happens when you -- when the

21   antibiotics no longer work.  Absolutely, they were very

22   interested in that.

23       Q.    Is that the same work you did on DNA at Integrated

24   Genomics Institute in Chicago?

25       A.    No, that was another biotech I worked with.  That

1    was my first introduction to using molecular biology for

2    human genetics, and the DNA and DNA Genomics Institute was

3    biotech downtown that used the early techniques for forensic

4    DNA, and I started working there just after I left

5    Integrated Genomics.

6        Q.   You were involved in the early stages of the

7    development of DNA testing?

8        A.   Yes.  So the modern or more recent methods, which

9    I'm sure you will hear about today, they didn't develop sort

10   of out of nothing.  They came from earlier techniques and at

11   that time that's all that there was, so I worked with those

12   early methods.

13       Q.   Could you tell us what you did with respect to

14   Abbot Labs as far as DNA genetics is concerned?

15       A.   It was all, in fact, related to the genetics.  So,

16   Abbot had a program called the genomics program, and they

17   hired a group of us to try and make use of sequence data,

18   and to develop projects related to that, and so I was

19   working with microorganisms and resistance mostly to try and

20   overcome resistance.

21       Q.   Could you tell us what you did with respect to the

22   Stanford University School of Medicine?

23       A.   Certainly, I worked for the Chief of Infectiosus

24   Diseases for a number of years, I think six, and I was

25   interested -- he had me work on what happens to disease

1  causing organisms when they are not in people.  So, some

2  organisms only live in people and so they can't survive

3  outside of us, but there are many disease causing organisms

4  that live naturally in the environment.  And so, my boss at

5  the time was very interested in how those organisms survived

6  outside of people and that was one of the things I worked

7  on.

8      Q.   Did you do a post-doctoral fellowship in the

9  laboratory of Dr. Scholnick?

10     A.   Yes.  Dr. Scholnick was the Chief of Infectious

11 Disease at Stanford, and I worked for him for six years.

12 He was a physician, not technically a research scientist,

13 and I was one of the few research scientists in his group.

14     Q.   You were involved at the Institute of Louis

15 Pastor?

16     A.   Yes.  So I spent two years at the Institute Pastor

17 in Paris, and there I worked on another group of organisms

18 that contaminated food, and it is still a problem.  I still

19 read about those organisms in the paper from time to time,

20 and so I worked on several of those organisms.

21     Q.   Could you tell us what you did at UCLA in Los

22 Angeles in the Department of Biological Chemistry?

23     A.   I was lab technician for two-and-a-half years, and

24 there I worked on the chemistry of the DNA.  Dr. Sigmond was

25 my boss there, and he had discovered a very unusual

1    chemistry that was related to DNA, and I studied that
2    reaction.

3         Q.   That was back in the -- do you remember the years
4    of that?

5         A.   It must have been 1979 to 1982, I believe.

6         Q.   Could you tell us what you did with respect to
7    Harvard Medical School?

8         A.   So, for two years, going back, I worked as a
9    technician in the Department of Neurobiology there, and
10   there I studied, I helped the lab study the vision of cats.
11   So cats have very sharp eyesight and scientists there wanted
12   to figure out how cats could see.  It was very interesting.

13        Q.   Have you been published?

14        A.   Yes.  So I have been able to public Peer reviewed
15   articles, as it is called, in a number of different fields,
16   and I have published, I don't know, maybe 30 papers or
17   something.

18        Q.   Have you published with respect to DNA and DNA
19   analysis?

20        A.   Yes.  So that's, of course, more recent works.  It
21   has to do with my working in a forensic lab now.  We have
22   published papers on all of the tests we have developed in
23   our own laboratory.

24        Q.   And how many publications have you had with
25   respect to DNA in related areas?

1    A.    Maybe six or seven.  I don't recall, six, seven or

2    eight.  Something like that.

3    Q.    And have you engaged in training individuals with

4    respect to DNA?

5    A.    Yes.  So, as I mentioned earlier, we developed

6    some new tests for forensic laboratories, in particular, and

7    so we have been asked, maybe seven or eight times, to run

8    workshops for other forensic labs for law enforcement who

9    work in the field, about how to use these tests, how to make

10   the best use of them, how to handle evidence, how to make

11   extracts to run our tests with.  There must be six or seven

12   of those, maybe, that I have done workshops for at forensic

13   meetings.  That's typically when we have them, and so, there

14   are analysts from labs and law enforcement who attend.

15   Q.    And so you have taught law enforcement about DNA

16   and techniques to be used?

17   A.    Correct, as related to our products, that's right.

18   Q.    Doctor, have you been qualified as an expert on

19   DNA in other jurisdictions as well as New York?

20   A.    I have.

21   Q.    Do you remember them all or --

22   A.    I could try and list them.  Certainly, Illinois,

23   in a number of different counties.  Wisconsin,

24   Massachusetts, New York, Indiana, Michigan, I think South

25   Dakota might be a more recent one, and that's both in State

1    Court and in Federal Court, and as well as on civil matters

2    and criminal cases.

3        Q.   How about Florida?

4        A.   Yes, excuse me, Florida.

5        Q.   Missouri, Maryland?

6        A.   Missouri, St. Louis.

7        Q.   New Mexico?

8        A.   New Mexico multiple times.

9        Q.   New York?

10       A.   New York, Albany, at least once, anyway.

11       Q.   Ohio?

12       A.   Yes.  I forgot about that.

13       Q.   Washington DC?

14       A.   Cleveland.  Washington DC is Federal Court.  Yes.

15       Q.   How about Dublin, Ireland?

16       A.   I was even involved in an international case.  I

17   had to go to Ireland to testify.

18            MR. BERGER:  I ask the Court to recognize

19       Dr. Reich as an expert.

20            THE COURT:  What field are you looking for,

21       counselor?

22            MR. BERGER:  The field of DNA analysis.

23            THE COURT:  Do the People want to be heard?

24            MR. PERRI:  No, your Honor.

25            THE COURT:  You are declared an expert in the

Dr. Reich - Defense - Direct          1197

1      field of DNA analysis.  You may continue.

2           THE WITNESS:  Thank you, your Honor.

3      Q.   Doctor, what documents did you read prior to your

4   testimony here today?

5      A.   For this case I was provided a fairly complete

6   case file and that includes all of the laboratory reports

7   issued by the medical examiner.  There's also a fairly thick

8   pile of supporting materials that detail the lab work that

9   was performed and that includes worksheets, bench notes,

10  electropherogram, chain of custody documentation; more

11  worksheets, documents that describe the lot numbers of all

12  of the materials that are used.  That's pretty much what is

13  in what is called the discovery packet that is provided by

14  the laboratory.

15     Q.   Let me show you what was marked People's 5 and

16  People's 6.  I ask you if you have been provided copies of

17  those documents?

18     A.   Of course, I comb through this pile of paper, but

19  it looks exactly like the case file I was provided and I

20  brought with me; and that's People's Exhibit 5.  And

21  People's Exhibit 6, is more of that similar documentation,

22  so I'm going to assume that it is essentially the same

23  material I was provided.

24     Q.   Doctor, did you also have occasion to read

25  testimony of Mr. Chillseyzn, who testified with respect to

kmm

1    DNA in this courtroom?

2         A.   Yes, your Honor's office provided me with a trial

3    transcript of the state's analysis.  The state's analysis,

4    pardon me, when he testified in this case.

5         Q.   Take a look at what was marked as People's 4 in

6    evidence.  They'll give you some gloves to put on.

7         A.   Certainly.

8         Q.   I will --

9         A.   I will be honest, I don't like handling evidence

10   that is not in the laboratory.  I know what happens in

11   courtrooms, but I will do so.  This is not how evidence is

12   handled in the laboratory, but in the courtrooms, this is

13   what we do.  Do you wish me to open the box?

14        Q.   Take a look at what you see there.  I believe you

15   will see a pair of underwear.

16        A.   The box has a number of evidence envelopes, many

17   of which are sealed with tampered evidence tape.  Some of

18   the envelopes are open.  Is there one, in particular, you

19   want me to search for?

20        Q.   One of the envelopes should be labeled underwear.

21        A.   This is oral.  This is underwear.

22        Q.   Take a look at that.

23        A.   So the envelope has been sealed on two sides, but

24   there is one side that is open.  This is an item of

25   evidence.  There is a magic marker writing on the inside

1    with the case number, and as we can see, a large section of

2    the underwear has been cut off, cut out.  I assume this

3    matches the bench notes of the material that was tested for

4    it.

5         Q.   I wanted you to take a look at that, examine it

6    for whatever you may need it for.  When you are finished,

7    put it back, please.

8              Dr. Reich, you had an opportunity to look at the

9    summary report, have you not?

10        A.   Yes.  So the laboratory reports that are generated

11   by forensic laboratories, generally have a short description

12   of the work that was done and then a summary or series of

13   conclusions that the lab wishes to draw.

14        Q.   What is an electropherogram?

15        A.   An electropherogram is basically a screen shot

16   from a piece of software that analyzes the final steps of

17   obtaining a DNA profile, and it is a piece of paper which

18   has peaks and spikes on it which allows an analyst to try

19   and determine what the DNA results are from something they

20   have analyzed and put through the laboratory.

21        Q.   Is it something similar to an EKG, when you get a

22   read out and the peaks tell you they observe something?

23        A.   Yes.  If we will call it that, we can say it's

24   read out.  That lets an analyst figure out what is on it.

25   An EKG measures electrical outputs and this measures from a

1    machine but similar.

2        Q.    And there is a software that goes in to create an

3    electropherogram?

4        A.    Absolutely.   There are several pieces of software

5    that have to be used.

6        Q.    You had an opportunity to look at the summary

7    report in this case, have you not?

8        A.    Yes, I have.

9        Q.    And based upon your observance of the summary

10   report and all of the other bench notes, how many areas

11   involve -- deal with saliva?

12       A.    There are two exhibits, two items of evidence

13   which appear to have saliva on them.   They would be actually

14   three items have had saliva.   There are two cuttings,

15   regions of the underwear, which you saw missing from the

16   garment I took out of the box and the vulva swabs.

17       Q.    With a reasonable degree of scientific certainty,

18   do the physical findings reflect that a male licked the skin

19   or vagina of any female?

20       A.    They do not in my opinion.

21       Q.    Would you explain the reasons?

22       A.    The background is important to know is that salvia

23   is an extremely rich source of DNA and this can be shown

24   many ways.   Forensic laboratories, ours included, regularly

25   examine bottles, cans, and water glasses for DNA, and if we

Dr. Reich - Defense - Direct        1201

1   swab the rim of a water glass I had been drinking today,

2   that is more than enough saliva to give a full profile

3   easily in the laboratory.  So, it doesn't take very much

4   saliva to get a robust DNA signal.  This case, there is a

5   good indication of saliva because of the test they used, but

6   the amount of male DNA is extremely small, and that's not

7   consistent with it being saliva.

8          There's a second item that I find inconsistent in

9   that the direct swab of the female, which was tested, the

10  valva swab, did not give a male DNA profile, and having

11  reviewed many, many sexual assault cases where the assailant

12  would have licked the victim, those swabs almost always

13  return a robust male DNA profile, and that is not evident on

14  the samples that the lab tested.

15      Q.   The lab report referring now to the vulva swab,

16  notes the other stains, the lab report reflects saliva with

17  respect to the findings there, correct?

18      A.   That is correct.

19      Q.   And if that had been from a male, what would you

20  have expected to find?

21      A.   I would have expected to find when they processed

22  that sample for DNA, a full or almost full DNA profile from

23  that contributor, from the male who left, supposedly saliva,

24  behind.

25      Q.   What is it about the nature of saliva that tells

Dr. Reich - Defense - Direct          1202

1   you that it would be leaving a robust sample of DNA?

2       A.   Well, the fact that we have tested hundreds of

3   saliva samples, the fact we developed a test specifically

4   for the forensic identification of saliva and can relate the

5   sensitivity of that test to the final result for DNA

6   profiling, and it's just known, it's been tested hundreds

7   and hundreds of times how much DNA is in saliva.  So, we

8   know how much rich a source of DNA it is.

9       Q.   Does the viscous quality of the saliva contribute

10  in some way to the amount of DNA that might be left?

11      A.   The viscous part specifically, no, but it does

12  contribute to how long lasting a saliva stain is

13  particularly on skin, because it is a sticky -- it is hard

14  to rinse off or wash off.  We all have experienced this.

15  And so, once it's deposited on the skin, if you swab that

16  area, you are going to pick it up, and if you pick it up and

17  process it through the laboratory for DNA, you will see the

18  DNA from that saliva.

19      Q.   So, is there any indication the examination of the

20  bench notes and the lab summary report, that reflects any

21  male DNA or male saliva on the vulva swab?

22      A.   There is no credible or reliable evidence of male

23  DNA on the vulva swabs.  There is a very robust signal from

24  the female on the vulva swabs, and there is a test

25  indicating saliva, so the obvious conclusion is that the DNA

kmm

Dr. Reich - Defense - Direct          1203

1    result that they do have from that sample comes from the

2    female.

3        Q.   Is it correct to say that the largest amount of

4    DNA on the vulva swab, the 1-A sample, the 2-A sample, comes

5    from who?

6        A.   The largest contributor of the DNA on the three

7    samples, the 1-F vulva, the 1-A-1.  That is one of the

8    stains on the underwear and 1-A-2, the other stain all come

9    from the female.  There is no dispute.

10       Q.   Now, you read Mr. Chillseyzn's testimony with

11   respect to a trace of male DNA from the vulva swab; do you

12   recall that?

13       A.   I do.

14       Q.   Is that contained in a summary report?

15       A.   It is not.

16       Q.   Are there jurisdictions that precluded the trace

17   elements that cannot be specifically identified from being

18   included in a summary report?

19            MR. PERRI:  Objection.

20            THE COURT:  Sustained.

21       Q.   Could you explain to us the significance, if any,

22   of the testimony with respect to trace male DNA?

23       A.   At one level the laboratory may just be reporting

24   everything they saw.  But, in fact, the material they saw

25   did not reach the level that the laboratory considers

Dr. Reich - Defense - Direct          1204

1    reliable or sufficient for reporting.  They state that in

2    their report, and the report has a section where they write

3    down the results of the DNA, and there is no reporting of

4    DNA male results from that sample.

5         Q.   Go ahead, I'm sorry.

6         A.   So that tells a reviewer that whatever they found

7    did not meet the test of robustness, reliability or

8    sureness, and they didn't include it in their report.  So,

9    results that you don't believe, or that are maybe, or

10   perhaps, you cannot draw any conclusions from them because

11   they are maybe, perhaps, we don't know what they are.

12        Q.   So, the conclusion drawn by Mr. Chillseyzn, in

13   this particular case, isn't justified by the evidence that

14   you examined here?

15        A.   In my opinion, it is not sufficiently justified

16   from the results that they obtained at the time.

17        Q.   Now, could they have evaluated -- withdrawn.

18             Did you examine the specific area where they might

19   have drawn this conclusion from as far as the

20   electropherogram?

21        A.   Yes.  The hard copy documentation of that

22   so-called trace sample was provided.

23             MR. BERGER:  Judge, without undoing the

24        exhibit, can we use the copy that the doctor has with

25        respect to his identifying that page?

kmm

Dr. Reich - Defense - Direct         1205

1        THE COURT:  Show it to Mr. Perri.  If you
2    both agree, I don't mind.
3        Q.   Can you find that in your materials, can you find
4    that particular electropherogram?
5        A.   I could try.  You are referring to the trace
6    analysis of the vulva swab?
7        Q.   Yes.
8        A.   Please give me a minute.
9        MR. BERGER:  Can we mark that, please.
10       THE COURT:  Mark it for ID first, show it to
11   Mr. Perri and see if it's the exact copy.  I have no
12   problem with it with being used.
13       (Defendant's Exhibit B was marked for
14   identification.)
15       MR. PERRI:  Okay, your Honor.
16       THE COURT:  We can use that document.  Let's
17   mark it into evidence.
18       (Defendant's Exhibit B, previously marked for
19   identification, was marked and received in evidence.)
20       Q.   Doctor, there is a peak or at least they indicated
21   in the summary report there was not sufficient -- there's
22   language in the summary report for the February 27th report
23   that said these peaks are not reported; do you remember that
24   language?
25       A.   Yes, I do.

kmm

1        Q.    Now, are you looking at one of those peaks?

2        A.    I am.

3        Q.    Is there a reason they're not reported?

4        A.    Yes.    There are several reasons why the laboratory

5    would not have reported these data.    The electropherogram is

6    a screen shot of the software that performs the analysis and

7    there are peaks.    There are needle-like shapes on the

8    electropherogram which indicate how much DNA there was in

9    the original sample.    The way this system works, although

10   it's very sensitive, you do need some DNA.    You have to have

11   something to start with.    You can't just have nothing in

12   your tube and get a DNA profile.    So, there is a minimum

13   amount that you have to have, and if you don't reach that

14   minimum amount, you don't get a good enough result to tell

15   that result from noise, you don't know if it's really

16   re-produceable.    Is it background?    Is it possible

17   contamination?    Is it just noise in the system that day, and

18   the results from technically FG 13411?    That's the

19   laboratory case number, sample 1-F, which is the vulva

20   swabs, are at that very low noise background level and the

21   laboratory has a procedure, a standard operating procedure,

22   which says if the data don't reach this threshold, we can't

23   report it, and that's what this electropherogram

24   demonstrates.

25        Q.    What does noise mean?

1      A.    Noise is just the inherent background inaccuracy

2  in a measurement.  So there is always noise.  There's always

3  inaccuracy in any measurement.  There is no avoiding it

4  because there's a fair number of steps that go into this

5  process and the machine that does the final analysis is a

6  complicated instrument, which has lasers, and detectors, and

7  lots of electrical components.  There's always noise and you

8  must get your signal well above the noise for you to believe

9  it's a real signal versus just noise.

10      Q.    So, in this particular case, the level of the peak

11  doesn't exceed the noise level; would that be correct?

12      A.    According to the laboratory, that is correct.

13      Q.    Could you just circle --

14          MR. PERRI:  Objection.  The answer was

15      nonresponsive.  The question was, in his opinion, was

16      it above the noise level.

17          THE COURT:  Let's get the question re-asked

18      and see what your answer is.

19      Q.    With a reasonable degree of scientific certainty,

20  as you examined this electropherogram, does it reach the

21  level beyond noise?

22      A.    It does not for the laboratory or for myself.

23      Q.    There are a number of peaks on that page, I take

24  it; is that correct?

25      A.    Yes, there are.

Dr. Reich - Defense - Direct          1208

1      Q.    Could you just take a pen, if you would and just

2    circle the particular one you are referring to.

3      A.    I can give an example, if you want, certainly.

4      Q.    What do you mean?

5      A.    There are several examples where the peaks are too

6    low, many examples.

7      Q.    Circle the one.  All right, there are other areas

8    where the peaks aren't?

9      A.    There are two regions where the peaks were

10   identified, but there are one, two, three, four, five, six,

11   seven, eight, nine, ten, eleven, twelve, thirteen, fourteen

12   which are not.

13     Q.    Which are not.  The one that -- so could you tell

14   whether or not the one that Mr. Chillseyzn was referring to,

15   specifically, on that one, on that page, could you tell

16   which one he was referring to?

17     A.    Probably.

18     Q.    Just put an N next to that to indicate noise.

19   Just that one.

20               (The witness complied.)

21     Q.    You have labeled T.  What does lost mean?

22     A.    So those are -- that refers to a region of the

23   test where there is no data whatsoever.

24     Q.    I see.  So this is the page that would refer you

25   to what Mr. Chillseyzn referred to as trace DNA?

kmm

Dr. Reich - Defense - Direct          1209

1      A.    That's correct.

2            MR. BERGER:  Can I put this on the presenter?

3            THE COURT:  You may.

4            MR. BERGER:  I ask the doctor to step down.

5            THE COURT:  He may.  Be careful.  It's two

6      steps.

7      A.    So I apologize, there is a lot going on in this

8      electropherogram.  You can see there are one, two, three,

9      four, large rectangles in the system.  Each rectangle is the

10     different dye, and on the screen the middle peaks here and

11     all of the noise would be in blue, green, yellow, although

12     the software shows it was black.  The yellow doesn't show up

13     on the screen and red.  This is a black and white color,

14     which is what we usually get.

15            There are 15, or 16, depending on how you count

16     it, regions in this electropherogram, that are examined by

17     this technique.  This is a Y-STR method.  I think we'll have

18     a chance to talk about both methods of DNA and the regions

19     that are tested, although, they are very hard to see on the

20     screen are named in these rectangular boxes here.

21            The actual electropherogram is contained within

22     this rectangle.  There are two scales that are used by this

23     software.  There is the peak height scale, which is along

24     the vertical axis on the left-hand side, and it varies with

25     each dye.  So in the blue dye, the scale is from zero to

1   240, and that's the peak height.  That's how big these

2   needle spikes might be, and then the size of the amplified

3   fragment is given on the scale across the top, one hundred,

4   one-fifty, two hundred and so forth.

5        You will notice there are two peaks, two spikes

6   which have been identified by the software, and they have a

7   little box underneath them.  There are three pieces of

8   information that the software puts in that box that the

9   analyst tells the software to put in.

10        The first number is the allele call of the peak,

11   the second number is the peak size, according to the scale

12   across the top, and the third number is the peak height

13   according to the scale here.

14        So, there is a number of things happening in the

15   electropherogram, but only two peaks have reached the level

16   where the software says, I see something.  All of the rest

17   of the stuff that you see and there they are certainly

18   visible.  No one is arguing with that.  They do not reach

19   that first threshold.  So the software says, I don't see

20   them.  Then you will notice that there are at least one,

21   two, three, regions where there is essentially nothing, no

22   data whatsoever of significance.  So there is so little DNA

23   of the male that you can't get any signal from at least

24   three or four.  You only get some signal from two and the

25   rest of them you don't know whether that is a peak that is

1  real, is that noise like this?  You just don't have enough

2  material, and so the laboratory has a criteria that says if

3  we don't get enough data, we can't report it, and that's

4  what this shows.

5              MR. BERGER:  Thank you.

6       Q.   So, doctor, in your opinion, there's not enough

7  data to make the determination of what that male -- it

8  means, what that male finding means?

9       A.   That is my opinion.  It's also the opinion of the

10  laboratory because they also did not report it.

11       Q.   So, the laboratory didn't report it and that means

12  they're in agreement with your analysis here?

13              MR. PERRI:  Objection.

14              THE COURT:  Sustained.

15       Q.   Well, you have seen, have you not, from the

16  reports that the lab didn't report it, correct?

17       A.   That is correct.

18       Q.   Only Mr. Chillseyzn did?

19       A.   He spoke of it.

20       Q.   He spoke of it?

21       A.   He spoke of it at testimony.  I don't know whether

22  that is reporting.

23       Q.   But he spoke of it.  Is his inference justified

24  based upon your scientific evaluation of this

25  electropherogram?

Dr. Reich - Defense - Direct          1212

1      A.    I don't believe so.  He needs more data.

2      Q.    Could there have been a test to obtain more data?

3      A.    Yes.  So there are steps that the laboratory could

4   have taken to try and improve the data or get more data and

5   then know definitively whether we got out of the maybe or

6   the perhaps world for this.

7      Q.    That was not done in this case, to your knowledge?

8      A.    To my knowledge, if all of the results were

9   presented in the discovery packet, that work was not done.

10  If it was done elsewhere, I don't have the documentation for

11  it.

12     Q.    How do you know, in your opinion, with a

13  reasonable degree of scientific certainty, that no male

14  saliva was found in the vulva swab?

15     A.    The results demonstrate that the vast majority of

16  the DNA from sample 1-F, the vulva swabs, come from the

17  female.  That's without dispute.  So, if we suppose male

18  saliva was deposited and collected, it has to show up on the

19  electropherogram done for the DNA and it does not.  So we

20  have a test for saliva that is positive.  We have a large

21  amount of DNA that is female.  We have maybe a hint of male,

22  perhaps.  The conclusion is that the saliva is female.

23     Q.    So, is your conclusion from examining all of the

24  reports, including the vulva swab, electropherogram, 1-A1

25  and 1-A2, that any saliva came from the female?

kmm

Dr. Reich - Defense - Direct          1213

1     A.   The most logical and simplest conclusion is that

2   the saliva that was detected, using a saliva test, came from

3   the female on samples 1-A1, one part of the underwear, 1-A2,

4   the second part of the underwear, and 1-F, the vulva swabs.

5     Q.   How does saliva from a female get on the vulva

6   underwear?  How does that happen?

7     A.   Well, my understanding is that the female in this

8   case is --

9          MR. PERRI:  Objection.

10         THE COURT:  Sustained.

11    Q.   Doctor, have you observed studies about -- are you

12  familiar with studies with respect to saliva and how it is

13  transferred?

14    A.   Yes.  So there have been a number of academic

15  studies by forensic labs trying to understand how DNA is

16  spread and transferred, and interestingly, saliva is a body

17  fluid that is transferred easily, and all of the time we

18  touch our face and our lips often.  If you use your fingers

19  to just turn pages like I did to make it easier, that is

20  more than sufficient saliva for a full profile, and I've

21  just transferred it onto three other items just by moving it

22  around, and it turns out we do that a lot.

23    Q.   And how else is saliva transferred, through

24  sneezing?

25    A.   So, technically, that would be a mixture of mucous

kmm

Dr. Reich - Defense - Direct          1214

1   and saliva, but yes, if you cough or sneeze into your hands,

2   you obviously have saliva there.  You reach for something or

3   touch something, your saliva will be transferred to that

4   item.  That's how it works.

5       Q.   When you go to the bathroom, could you transfer it

6   from your hands or whatever to other areas of your body?

7       A.   Certainly.  You don't even have to necessarily go

8   to the bathroom.  You just have to touch yourself in order

9   to perform the transfer.

10       Q.   What is touched DNA?

11       A.   So touch DNA is the fairly recent name given to

12   leading DNA behind from handling objects.  So it's a very

13   active area for forensic labs to analyze, and so we're

14   talking about door handles, hammer handles, screwdriver

15   handles, zipper pulls, buttons on your shirt, things you

16   have handled with your fingers or hands and you have left

17   some of your DNA behind by simply touching an item or

18   touching it repeatedly.

19       Q.   So if underwear were touched by someone, would

20   they possibly leave their DNA there?

21       A.   Certainly.

22       Q.   Through touch DNA?

23       A.   Absolutely.

24       Q.   So let's turn to stain 1-A1.

25       A.   Okay.

kmm

1    Q.    The report reflects -- tell us what you learned

2    from the report with respect to stain 1A-1.

3    A.    May I refer to the actual report?

4    Q.    Sure.

5    A.    So I'm referring to two reports from the Office of

6    the Medical Examiner, County of Nassau, and they are dated

7    February 27, 2014, and February 28, 2014, and they describe

8    the summary of the results that the laboratory obtained.

9    So, in the analysis of stain 1-A on the underwear, the first

10   analysis using the regular code, the STR, the report states

11   that PCR DNA typing was done on stain 1-A1 from the

12   underwear and vulva swabs.  No DNA alleles foreign to the

13   victim were detected.

14        So all of the DNA that they found on stain 1A-1,

15   using the coded type DNA were from the female.

16   Q.    Does part of that analysis with respect to in the

17   summary report with 1A-1 say anything about a male?

18   A.    It does not.

19   Q.    Doctor, you are you looking at February 27th?

20   A.    I am.

21   Q.    Y-STR DNA typing was done, DNA profile; do you see

22   that second sentence there?

23   A.    Yes.  So, another type of DNA testing was

24   performed called Y-STR testing, and that was done on that

25   sample.  And so on that sample they did identify a male

Dr. Reich - Defense - Direct          1216

1    contributor using the Y-STR method.

2        Q.    The first one was the other method you used which

3    did not detect any male?

4        A.    Correct.  I did not use that method, but the

5    laboratory did.  There are two kinds of chromosomes that

6    people have.  That is the way people are built.  Other

7    organisms are made differently, but people have two kinds of

8    chromosomes.  They have what is called somatic chromosomes

9    and sex chromosomes.  It's just the way we are built.

10       Somatic chromosomes are numbered one through

11   twenty-two.  The largest being number one and the smallest

12   being twenty-two.

13       There are two sex chromosomes, the X and the Y

14   chromosome.  They're different in terms of how we inherit

15   them.  They're all made up of DNA, but you inherit the

16   somatic chromosome in a different way than we all inherit

17   the sex chromosome.  The Y-STR, I'm sure you heard about,

18   are those data, only come from the Y sex chromosomes.  Only

19   males have Y chromosomes.  And so, if you test the genetics

20   of the Y, all you see is the genetics of the male in that

21   sample, even if you have much more female DNA in there.  If

22   you have the Y in there, you can see it.

23       Q.    So even though you have testified that there is

24   the most amount of DNA in all three items, the vulva swab,

25   1A-1, 1A-2, came from the female?

Dr. Reich - Defense - Direct          1217

1        A.    That's correct.

2        Q.    But in testing with the Y-STR, you could determine

3   that there was a male DNA there?

4        A.    Correct.

5        Q.    With a reasonable degree of scientific certainty,

6   is that male DNA from saliva?

7        A.    There is no way to know, but it's not the amount

8   of male DNA is not consistent with it being saliva.

9        Q.    So there is no way to say with a scientific degree

10  of certainty that there is male saliva there?

11       A.    That's correct.

12       Q.    And is the reason you set forth that it is most

13  likely not male saliva is because most of the DNA contained

14  in stain 1A-1 is from the female?

15       A.    That is correct.  The vast majority of the DNA

16  comes from a female.  That's very clear and without dispute.

17  There is definitely some male DNA in that sample, but it's

18  at a much, much lower level, and so, we have to explain

19  where it might come from, what the source might be.  We know

20  there is saliva from the test.  We know most of the DNA, by

21  far, is female.  That's the most logical source of the DNA.

22       Q.    And would a conclusion with a reasonable degree of

23  scientific certainty suggest that the male DNA came from

24  touch DNA?

25       A.    It might have.  We don't know, but it's much less

kmm

Dr. Reich - Defense - Direct          1218

1   and certainly at the level you would expect for handled

2   objects.

3        Q.    Let me ask you about the difference between major

4   and minor contributor?

5        A.    Okay.

6        Q.    Is that significant?

7        A.    It's only important when you analyze the

8   electropherogram.  These are technical terms, even though

9   they are simple and they refer to the comparison of how much

10  DNA the two contributors gave.  So we have electropherogram

11  with -- where we have two people.  There's two DNA profiles

12  mixed in and sometimes, if there is much more DNA from one

13  person than the other, that's reflected in the peaks and

14  that can be shown on the electropherogram.

15             So major means more DNA, minor means less.  You

16  should draw no conclusions as to importance, time of

17  addition, what was going on when they did the addition.

18  It's just more DNA versus less.

19       Q.    You also noticed in your report that when they

20  swabbed and obtained dried secretions; do you recall that?

21       A.    Yes, that's listed in one of the documents.

22       Q.    What was the conclusion with respect to the dried

23  secretions?

24       A.    The conclusion was it was not saliva.

25       Q.    So what does that tell you with respect to the

1   overall discussion of the stains with 1A-1, 1A-2, and the

2   swab?

3        A.    I think we can draw at least two conclusions.  One

4   is that the processing of the evidence was thorough, and

5   that the examination of the female was thorough, and they

6   tried to look for regions that would have saliva on them.

7   And that even areas which they thought might have saliva,

8   because they looked like it, because they are dried, did

9   not.  So, there is not a lot of saliva on this sample, and

10  those secretions were not saliva.

11       Q.    When you say not a lot of saliva on the sample,

12  are we talking about all of the samples, the vulva swab, the

13  underwear, 1A-1 and 1A-2?

14       A.    We are.

15       Q.    What you are saying is the fact that the dried

16  secretions did not reveal saliva, means there wasn't a lot

17  of saliva?

18       A.    I think that's a reasonable conclusion from the

19  results they presented.

20            THE COURT:  Mr. Berger, find a good place to

21       break.  We have been going a little bit more than an

22       hour.

23            MR. BERGER:  You can do that now.

24            THE COURT:  Very good.  Ladies and gentlemen,

25       this is your break after the hour's worth of work.  Use

Dr. Reich - Defense - Direct          1220

1    the facilities if you need to.

2              Do not talk about the case with each other.

3    Don't let anyone talk to you about the case, as you are

4    coming to and from the courtroom.  Don't get on the

5    phones to do any research.  See you all in ten minutes.

6              (Whereupon, the jury exited the courtroom.)

7              (Whereupon, a short recess was taken.)

8              (Whereupon, the jury entered the courtroom.)

9              THE CLERK:  Do both sides stipulate all sworn

10   jurors are present?

11             MR. PERRI:  Yes, your Honor.

12             THE CLERK:  Defense?

13             MR. BERGER:  Yes.

14             THE CLERK:  You are reminded you are still

15   under oath.

16             THE COURT:  Welcome back everyone.

17             Mr. Berger, you may continue.

18   DIRECT EXAMINATION

19   BY MR. BERGER:  (Continuing)

20       Q.   Let me draw your attention to something you

21   mentioned before where you pointed out that saliva could be

22   transferred to the crouch area or the underwear area.  Do

23   you need to touch, if you sneeze, or you cough and saliva

24   gets on your hands, do you need to touch those areas

25   immediately after that happens in order to transfer the DNA

1    saliva to the crouch or the vulva vagina area?

2        A.   No, you don't.  It's easier and you get more

3    transfer if the body fluid is still wet, but even you can

4    certainly get transfer after the body fluid has dried.

5        Q.   Can you, by the way, quantify the amount of saliva

6    contained in the stains of 1A-1 and 1A-2?

7        A.   No, you cannot.  There is no test which can

8    measure the amount of saliva in a stain.  The test is a

9    positive or negative one.  It's either yes or no.  It does

10   not tell you how much.

11       Q.   Still though, in your analysis, of all of the

12   three areas, the vulva swab, 1A-1, 1A-2, the saliva that --

13   the DNA that is there is mostly from the female, correct?

14       A.   The vast majority of the DNA that is identified on

15   those three exhibits definitely comes from the female.

16       Q.   Let me draw your attention to stain 1-A2.

17       A.   Okay.

18       Q.   What did the bench notes and the report tell you

19   with respect to stain 1A-2?

20       A.   If I could read from the relevant report, which is

21   February 27, 2014.  The report mentions that the presence of

22   saliva was indicated on stain 1A-2, and that PCRD typing was

23   performed.  A minimum of two individuals were identified.

24   You get the information from the electropherogram, and that

25   is using the somatic testing that we talked about earlier.

Dr. Reich - Defense - Direct          1222

1        Then the report goes on to say that the Y-STR

2   testing was done.  That's the same kind of testing I just

3   walked you through a minute ago, and that they found two

4   male contributors by examining the Y-STR analysis.

5        Q.   Now, one of the male contributors is consistent

6   with the defendant, Mr. Ramos, correct?

7        A.   That is correct.

8        Q.   But the other one is unknown, correct?

9        A.   There are two.  There's a minimum, but most likely

10  just two male who have left their DNA on stain 1A-2.  One of

11  the Y-STR haplotype, that's a technical term for the DNA

12  profile, is consistent with Mr. Ramos.  The other Y-STR

13  haplotype, there is no reference standard, there is no

14  comparison swab that we have, so that individual is unknown.

15       Q.   So, when you say there is no reference swab, no

16  attempt was made to determine the identity of the second

17  male; am I correct?

18       A.   I'm not aware of any other samples in this case

19  that could have been used for comparison.

20       Q.   Could you find the electropherogram that refers to

21  both males appearing on the Y-STR testing?

22       A.   I could try.  It might take me a minute.

23       Q.   Go ahead, please.

24       A.   So, I actually have two electropherograms.  I have

25  one which has the somatic DNA, and one that has the Y-STR, I

Dr. Reich - Defense - Direct          1223

1    believe.

2         Q.    Well, if it was a somatic, then we would only have

3    one male, correct?

4         A.    You can only observe one male on that sample, that

5    is correct.

6         Q.    I'm asking you, if you could find the Y-STR which

7    would reflect the two?

8         A.    I'm trying to find that, Mr. Berger.  Okay, I

9    believe I have the two sheets that are relevant.

10              MR. BERGER:  Could we have them marked

11        please, C and D.

12              THE COURT:  They will be marked C and D.

13        Show them to Mr. Perri like the last one and see if

14        they can be used.

15              MR. BERGER:  Before we mark them, let me show

16        it to him.

17              MR. PERRI:  No objection.  They are exact

18        copies.

19              THE COURT:  They are Defendant's C and D in

20        evidence.

21              (Defendant's Exhibits C and D, previously

22        marked for identification, was marked and received in

23        evidence.)

24        Q.    Take a look at those documents, doctor.

25        A.    Yes.

1        Q.    Can you observe on those exhibits, C and D, the

2    parts of the electropherogram that reflect two males, two

3    different males?

4        A.    Certainly.

5        Q.    And could you just put the number one next to one

6    and number two next to the other?

7        A.    Okay.

8        Q.    On each one of them, if the two are on both.

9                   (The witness complied)

10                  MR. PERRI:  May we approach?

11                  THE COURT:  You may.

12                  (Whereupon, there was a sidebar discussion

13             with the Court and counsel, as follows:)

14                  MR. PERRI:  I have an objection to the fact

15             that the witness is utilizing some stack of papers and

16             making -- transferring the notes.

17                  THE COURT:  The Court will let the record

18             reflect the Court notes that before the marking that

19             you are asking for, the witness is referring to and

20             utilizing some other piece of paper.  It's not a

21             problem.  You will be asking whatever that is when you

22             stand up.  It's probably his notes.

23                  MR. BERGER:  It's the bench notes.

24                  (Whereupon, the proceedings resumed.)

25        Q.    May I have it, please?

kmm

1      A.    (Handing)

2      Q.    Doctor, I see nothing has been marked on exhibit

3  C; was that because they were not there?

4      A.    Sometimes it's not easy to tell who was number one

5  and number two.

6      Q.    Right, but you could tell there are two males?

7      A.    Correct.   Correct from the summary of the data.

8      Q.    Put next to on C, the letter M next to both

9  markings that indicate male.

10                  (The witness complied.)

11     Q.    I take it, doctor, that from your reading of the

12  report and from your examination of the peaks in both of

13  these exhibits, there's a sufficient amount to indicate it

14  passes the threshold, and you could make an identification

15  of a male, correct?

16     A.    If I could make it more precise?

17     Q.    Go ahead.

18     A.    The quality of the data, the size of the peaks are

19  such that the laboratory was able to make many more

20  assignments, and the assignments are much more sure, and

21  it's clear that there are two males in the sample.   That's

22  minimum, without dispute, and in some cases it's easy to

23  separate the two and the others perhaps not so much.

24     Q.    Can you tell, according to what you marked in

25  exhibit D, where you put numbers, which one is consistent

Dr. Reich - Defense - Direct          1226

1    with Mr. Ramos and which is not?

2         A.   Yes, you could do that by comparing the standard

3    for Mr. Ramos to the evidentiary sample.

4         Q.   Does it matter if one of the male contributors is,

5    as you say, the major and one the minor -- withdrawn.

6              To ascribe one of them as the major and one the

7    minor, does that mean anything more than just more DNA that

8    comes up?

9         A.   It does not.

10        Q.   That's all it means?

11        A.   It means simply that one set of peaks is larger in

12   the electropherogram than the other.  In this example the

13   difference is small between major and minor, so they are

14   roughly the same.  Although, one set of peaks is larger.

15        Q.   If they are roughly the same, but one is slightly

16   more than the other, they say that is the major and the

17   other one is the minor?

18        A.   That is correct.

19        Q.   Doctor, what should have been done here with

20   respect to the non-stain area of the underwear?

21             MR. PERRI:  Let me rephrase that.

22             THE COURT:  Sustained as to form.

23        Q.   Is it significant that no DNA testing was done on

24   the non-stain area of the underwear?

25        A.   In my opinion, it is.  So, throughout --

1      Q.    Explain.

2      A.    Throughout the procedure for doing DNA, the

3    laboratory introduces a number of controls.  Those are

4    samples which the lab knows something about.  Technically,

5    there are two kinds of controls.  There are negative

6    controls, which should come up blank.  You should get no DNA

7    from those, and there are positive controls from which the

8    laboratory should get results from which they know, because

9    they know what the sample is.  When an article is examined,

10   you need a control for that item itself.  On underwear, or

11   shirt, or blouse, you would take a region of fabric that has

12   no stain, no visible stain, and you would test that along

13   with the stain.  That's called the sub-straight control, and

14   it controls for the fact that that fabric might have DNA on

15   it, just at some level, everywhere, because we shed DNA and

16   it's possible that that item of underwear just has some DNA

17   on all parts of it.  There is no way to know that unless you

18   take a sub-straight control and that, from what I can

19   observe, was not done in this case.

20     Q.    If they had done that and found the defendant's

21   DNA on the non-stained area, what would that tell you?

22     A.    Then the conclusion you would reach thinking that

23   the DNA of Mr. Ramos was associated with a stain would be

24   incorrect, so if his DNA is just distributed on the fabric

25   because of a number of reasons, and you excise the stain and

1    find his DNA, his DNA is then not associated with the stain.

2    It means his DNA is on the item for some other reason.

3                   MR. BERGER:   Thank you very much, doctor.

4                   MR. PERRI:   May we approach?

5                   THE COURT:   Yes.   Off the record.

6                   (Whereupon, there was an off-the-record

7         discussion.)

8                   THE COURT:   All right, I'm going to send you

9         out for an early lunch.   Please be back in the jury

10        room as close to 2:00 as possible.   We're going to have

11        a full afternoon.   I want to get as much testimony in

12        as we can today.

13                  Please remember to keep an open mind

14        throughout this trial.   Do not discuss the case amongst

15        yourselves or with anyone else during the trial.   Do

16        not permit anyone to discuss the case in your presence.

17        Do not talk to the lawyer, witness, or the defendant

18        about anything during the trial.

19                  Do not visit or view the place where the

20        charged crime was allegedly committed, or any other

21        place involved in this case.

22                  If there is any news coverage of the case, do

23        not read, view or listen to any accounts or discussions

24        of the case reported by the news media, and do not

25        attempt to research any fact, issue or law related to

Dr. Reich - Defense - Direct          1229

1    this case, whether by discussion with others, by

2    research in the library, or on the Internet, or by any

3    other means or source.

4              Have a great lunch.  Looks like the sun is

5    trying to peek through.  See you all at 2:00 sharp.

6              (Whereupon, the jury exited the courtroom.)

7              THE COURT:  Be careful stepping down.  I need

8    you back here at 2:00.  I want to get started as

9    quickly as we can.

10             Anything for the record, People?

11             MR. PERRI:  No.

12             THE COURT:  Mr. Berger?

13             MR. BERGER:  No, your Honor.

14             (Whereupon, a luncheon recess was taken.)

15             *                *                *

16

17

18

19

20

21

22

23

24

25

1230

```
 1              A F T E R N O O N   S E S S I O N

 2

 3              THE CLERK:  Case on trial continues,

 4   Indictment Number 742N of 2014.  People of the State of

 5   New York vs. Daniel Ramos.

 6              All parties present.  The jury is not

 7   present.

 8              People ready?

 9              MR. PERRI:  Yes.

10              THE CLERK:  Defense counsel?

11              MR. BERGER:  Yes, your Honor.

12              THE COURT:  Anything for the record before I

13   bring in the jury and reseat the witness?

14              MR. PERRI:  No, your Honor.

15              MR. BERGER:  No, your Honor.

16              (Whereupon, the jury entered the courtroom.)

17              THE CLERK:  Do both sides stipulate all sworn

18   jurors are present and properly seated, People?

19              MR. PERRI:  Yes, your Honor.

20              THE CLERK:  Defense counsel?

21              MR. BERGER:  Yes.

22              THE CLERK:  Doctor, you are reminded you are

23   still under oath.

24              THE COURT:  Welcome back.  I hope you enjoyed

25   your lunch.
```

kmm

Dr. Reich - Defense - Cross          1231

1              People, you may cross-examine.

2              MR. PERRI:  Thank you, your Honor.

3    CROSS-EXAMINATION

4    BY MR. PERRI:

5         Q.   Good afternoon, doctor.

6         A.   Good afternoon.

7         Q.   Doctor, on direct Mr. Berger had you outline your

8    research, experience and credentials, had you go through

9    various products you worked on, including pharmaceuticals,

10   bacteria, the vision of cats, other passages, working in

11   drug lab, but in the range of your experience, your entrance

12   over the course of your career, your entrance as a forensic

13   genetics is relatively recent; is it not?

14        A.   Thirteen, fourteen years.

15        Q.   And you also described that you worked for a small

16   little lab; is that correct?

17        A.   That is correct.

18        Q.   And your website for your lab, which is called

19   Independent Forensics, on the website for the lab you are

20   opening up a facility that will handle tens of thousands of

21   samples per year; is that not correct?

22        A.   I don't believe that's on our most recent website,

23   but we can handle many samples.  We don't have that many

24   samples, but it is possible.

25        Q.   And also on the investor section of your website

Dr. Reich - Defense - Cross          1232

1    it notes you're not currently certified as a forensic lab?

2         A.    That is incorrect.  We're certified.  We have

3    three certifications.

4         Q.    It also notes on your investor's page of your

5    website that your business plans seek to obtain a lucrative

6    contract, taking over work of government lab, noting that in

7    Illinois you could stand to get a substantial portion of the

8    200 million dollar of DNA testing that is being done in

9    local government labs in Illinois?

10        A.    That's no longer on our website and hasn't been

11   for many years.  We do not have outsourced contracts and

12   have never had an outsourced contract.

13        Q.    Now, part of what your company website states is

14   that you provide expert testimony; is that correct?

15        A.    That is correct.

16        Q.    And your company is a profit company, correct?

17        A.    Yes.

18        Q.    And you are being paid for your testimony,

19   correct?

20        A.    I am not.  The laboratory will invoice for my

21   time, but I'm on salary.  I don't make any more or less

22   whether I testify or not.

23        Q.    Doctor, you are the chief scientific officer of

24   the laboratory; is that correct?

25        A.    That is correct.

kmm

Dr. Reich - Defense - Cross          1233

1    Q.    And you are one of the founding partners?

2    A.    That is also correct.

3    Q.    If your laboratory does make more money each year,

4    you stand to make more money as one of the partners of the

5    laboratory, correct?

6    A.    Incorrect.  My salary is fixed.  I do not make

7    more or less depending on how the business does on that

8    scale.

9    Q.    You are provided no other compensation?

10   A.    I have salary.  My expenses are paid.  I buy my

11   own healthcare.  We don't have vision or dental.  I have a

12   salary.

13   Q.    Are you part owner of the business?

14   A.    I am.

15   Q.    So as an owner of the business that is being paid

16   by the defense counsel, the business that you own is being

17   compensated for your testimony?

18   A.    That is correct.

19   Q.    How much is the business being compensated?

20   A.    Our rate sheet is clear.  We charge $2,500 for

21   testimony and $250 an hour for consultation.

22   Q.    For the $2,500, is that per day?

23   A.    Yes, it is.

24   Q.    And $250, is that per hour?

25   A.    It is.

kmm

Dr. Reich - Defense - Cross          1234

1    Q.    How many hours did you work on this case?

2    A.    I would have to go to look that up, but I'm going

3    to guess, so far, probably six to eight maybe.  I make

4    notes, and then I give it to the office and they prepare the

5    final invoices.

6    Q.    You traveled here from Chicago, correct?

7    A.    I did.

8    Q.    And your travel was paid for, correct?

9    A.    My expenses are covered by whoever hires me.

10   Q.    And that includes your meals, correct?

11   A.    Yes, that would include my meal.

12   Q.    And your hotel stay?

13   A.    Yes, it would.

14   Q.    Did you generate any reports as part of your work

15   for the defense?

16   A.    For this case?

17   Q.    Yes.

18   A.    No.

19   Q.    Did you write any E-mails to defense counsel?

20   A.    No, Mr. Berger does not have E-mail.  There were

21   no E-mails in this case.

22   Q.    And, doctor, you didn't conduct any actual test

23   with regard to the evidence in this case?

24   A.    Absolutely.  We received no evidence in this case.

25   Our laboratory performed no testing on items of evidence or

kmm

1    reference samples in this case.

2         Q.    And you haven't been to the medical examiner's

3    office, correct?

4         A.    I've never visited the Office of the Medical

5    Examiner, County of Nassau Laboratory.

6         Q.    You didn't review their standard operating

7    procedure before testifying?

8         A.    I was not provided with those, and I was not able

9    to review them.

10        Q.    And so, you don't actually know why or why not

11   something was done or what motivation rules and procedures

12   of the laboratory are, correct?

13        A.    I certainly don't know the motivations.   I

14   certainly can make an educated guess as to the scientific

15   and the procedural reasons.   I have seen SOP's from dozens

16   of laboratories.

17        Q.    So that's what you did, you made an educated

18   guess?

19        A.    Yes.

20        Q.    And you talked about publishing papers as part of

21   your work for Independent Forensic, and the papers that you

22   have recently published regarding DNA forensic, they are

23   about products your company sells, correct?

24        A.    Yes, they are.

25        Q.    You testified on direct that there was saliva

1    present on the vulva swabs, and both stains 1A-1 and 1A-2 in

2    the underwear tested by the medical examiner's office,

3    correct?

4         A.   I believe, I said the test for saliva was

5    positive.

6         Q.   And now, you are talking about saliva is mostly

7    water and the enzyme amylase, correct?

8         A.   No, that is not correct.

9         Q.   What is saliva then?

10        A.   Saliva does compose of water.  It also composes

11   all of the loose epithelial cells that are inside the mouth.

12   There's mucous in it as well, there's also, in addition,

13   amylase and all of the contaminated microorganisms

14   themselves that are inside the mouth.  All of that takes

15   part in saliva.

16        Q.   Is saliva mostly water, doctor?

17        A.   I don't think the four compositions known, but we

18   are mostly water as human beings, so I'm going to say saliva

19   is mostly water.

20        Q.   The DNA present in saliva, it's not present in

21   amylase, correct?

22        A.   That's correct, amylase is an enzyme and has no

23   DNA.

24        Q.   The DNA in the saliva doesn't come from -- the DNA

25   in the saliva comes from the epithelial cells contained in

kmm

1   the saliva, correct?

2        A.   That's the thought, although, there are two kinds

3   of DNA, probably.  There's cellular DNA.  That's the DNA

4   inside cells, and then there is DNA outside cells called

5   extracellular.

6        Q.   Now, epithelial cells are skin cells, correct?

7        A.   They are.

8        Q.   And their skin cells inside of a person's mouth

9   and outside on their body on their skin, correct?

10       A.   Correct.  They're not the same, but the source of

11  the cells is eventually the same.

12       Q.   So on the vulva swab taken from the victim in this

13  case, there were epithelial cells present on the vulva swab

14  of the victim taken in this case that was also positive for

15  saliva, correct?

16       A.   Most likely.  That wasn't demonstrated, but that's

17  an excellent assumption.

18       Q.   And for the fact that there was a large amount of

19  DNA from the victim on a swab that was rubbed on her vulva,

20  that's to be expected, correct?

21       A.   Absolutely.

22       Q.   It would also be expected that clothing, interior

23  clothing that is in direct contact of an individual, whether

24  it's the victim or anyone else, that clothing in direct

25  contact with a person would contain a substantial amount of

Dr. Reich - Defense - Cross          1238

1   their DNA?

2        A.   It would have some.  I'm not sure if the word

3   substantial is the word I would use, but definitely, if you

4   wear clothing your DNA is going to get on it.

5        Q.   It would be expected that the victim's DNA would

6   be on the inside of her underwear, correct?

7        A.   It would be.

8        Q.   You also testified that according to the test that

9   your company sells and the medical examiner's office uses,

10  there is no indication how much saliva was present either on

11  the vulva of the victim or in the underwear of the victim,

12  correct?

13       A.   It's not just our test.  There is no way to

14  determine the quantity of the body fluid that is tested.

15       Q.   So it's fair to say your test and no test would be

16  a quantitative test, correct?

17       A.   No, there are tests which can measure things, but

18  the body fluid tests are not quantitative.

19       Q.   The test that your company sells is sensitive?

20       A.   Yes, very sensitive.

21       Q.   It's able to detect extremely small amounts of

22  saliva, correct?

23       A.   Absolutely.

24       Q.   Now, the less saliva that would be present on a

25  person would necessarily lead to their being less DNA

Dr. Reich - Defense - Cross          1239

1    deposited from the saliva, correct?

2         A.    They're roughly proportional.

3         Q.    Is it fair to say, if there is only a little bit

4    of saliva left on a person, there would also only be a small

5    amount of DNA?

6         A.    I think you might mean left on a person.

7         Q.    Yes.

8         A.    And the answer is, that's correct, but I think we

9    need to provide some context about how little we are talking

10   about.

11        Q.    Now, doctor, I'm going to ask you to take a look

12   at what was marked as Defendant's Exhibit B, as in boy.

13        A.    Okay.

14        Q.    And, doctor, was that the sheet that you used to

15   testify regarding the peaks and the question of noise on the

16   vulva swab sample?

17        A.    I believe it was.

18             MR. PERRI:   Could I have it back.

19        Q.    Sorry, the markings on the page, those were the

20   markings you made?

21        A.    I believe that's the same piece of paper.

22        Q.    Now, doctor, was there any testing done in this

23   case with regard to a handgun?

24        A.    Not to my knowledge.

25        Q.    I ask you to take a look at Defendant's B again

                                                              kmm

Dr. Reich - Defense - Cross          1240

1   and look at the second, third and fourth section of that

2   page that are all pertaining to the test of arms and a

3   handgun.

4        A.   Correct.  So the top -- you are correct.  The top

5   part of this is from a case, and the other three appear to

6   be from another one.

7        Q.   So, when you testified that that was evidence of

8   how their are peaks and noise, and the vulva swab didn't

9   have DNA, you weren't using the correct sheet?

10       A.   I was using one of the correct sheets.  The top

11  part is indeed from this case, correct.

12       Q.   And the other three out of four are --

13       A.   Are not.

14       Q.   You made markings on the three?

15       A.   At the time, I did, that's correct.

16       Q.   As examples, where there were peaks, according to

17  you, to locate the male DNA?

18       A.   Correct.  The top one still has a lost locus as

19  well as three others.

20            THE COURT:  Only one person can speak at a

21       time.  Wait for a question to be asked, doctor, before

22       you give answer, and let the witness complete his

23       answer.  And if you have a request of the Court

24       regarding that answer, I'll certainly entertain it.

25            MR. PERRI:  Thank you, your Honor.

Dr. Reich - Defense - Cross          1241

1          MR. BERGER:  Can we approach?

2          THE COURT:  Yes.

3          (Whereupon, there was a sidebar discussion as

4     follows:)

5          MR. BERGER:  I would like a stipulation to be

6     made now to this jury that the fact that the prosecutor

7     presented as material that relates to this case having

8     related to a handgun case is misleading and improper,

9     and we are relying on the documents provided to us by

10    the prosecutor that this were the bench notes taken

11    from the analysis of this case.

12          The fact that they have, through DNA, DNA

13    records from another case, should be noted and told to

14    the jury.  That's totally improper and it's misleading.

15    We had every right to assume that these documents

16    provided to us related only to this case, not to any

17    other case.

18          MR. PERRI:  Your Honor, the sheet is clearly

19    marked with the file numbers, the FG numbers from the

20    laboratory.  The sheet also specifically says these

21    three out of four boxes pertain to arm and handgun.

22    Defense counsel put it into evidence with his witness.

23          THE COURT:  I'm not going to, at this point,

24    I'm not giving any instruction to the jury.  Both sides

25    had ample opportunity to carefully read these documents

kmm

Dr. Reich - Defense - Cross          1242

1    and do with them what they choose to do with them.

2    There's not going to be an instruction given at this

3    point.  I'll entertain it further, if it needs to be

4    entertained further at the close of this witness's

5    testimony, but at this point in time, this is an

6    expert.  He's expected to know how to read.  You are

7    both attorneys.  You are both expected to know how to

8    read.  I'm not going to give any instruction with

9    regards to that particular document at this time.

10          MR. BERGER:  It's an attempt to mislead.

11   This is bad faith on the part of the prosecutor.  It's

12   an attempt to sandbag the defense.  I couldn't read

13   those sheets.  I wouldn't know what they meant.

14          THE COURT:  Your expert should be able to

15   read the sheets, that's why he is the expert.

16          MR. BERGER:  He's assuming the sheets apply

17   to only the DNA analysis with respect to this case.  To

18   throw in something else out of left field is totally

19   bad faith on the prosecutor.  He should have corrected

20   it if he knew it.  He obviously does it now when he is

21   asking questions.  He should have gone up to the Court

22   and said, we gave the defense documents from another

23   case having nothing to do with this, and we -- I

24   wouldn't say necessarily bad faith, but good faith,

25   would have required them to make the representation to

kmm

1    the Court and say we made a mistake here, and not use

2    that as an attempt to cross-examine the doctor as if he

3    was mistaken in his analysis.

4         THE COURT:   The problem I have, counselor, is

5    you are the individual who pointed out at the time

6    specifics on that document.  I haven't seen that page

7    yet.  As I understand what has been said to me, it

8    distinguishes its section by case number.  There's only

9    one case number that is at issue here in this case, and

10   in this trial.  It is incumbent on everyone to read

11   carefully that which they are provided.  I don't know

12   whether or not when the medical examiner's office

13   produces records it starts to parse out that which

14   appears on the page.  There is no testimony regarding

15   that, so I'm certainly not going to make an assumption

16   that at the point in time these records were made,

17   there was some knowledge on the part of the medical

18   examiner's office that someone may come in and use this

19   particular page to make an argument at a trial.

20        MR. BERGER:   Mr. Perri is doing it now.  He

21   should have come up to the Court before

22   cross-examination began and say, you know our office,

23   the medical examiner, made a mistake including

24   documents from another case.  I want to point it out to

25   the defense and not attempt to sandbag the doctor by

1    introducing this here.  This is bad faith on the

2    prosecutor.  Mistakes are made as part of humanity.  We

3    all make them.  This can't be accepted as a legitimate

4    basis in a trial as important to this to sandbag a

5    doctor by pointing out, by the way, you used a

6    document --

7              THE COURT:  We're going to stop now.  This

8    Court doesn't see it as sandbagging the doctor, and you

9    had the full and fair opportunity to review these

10   records.  In fact, yesterday we were here for 40

11   minutes after the trial.  Everybody had the weekend,

12   all day yesterday, and then this morning to do whatever

13   they needed to do with these documents.  You chose to

14   highlight that page.  The People now get to

15   cross-examine on the page.  You chose to highlight it

16   and put it into evidence.  I'm not giving that

17   instruction to the jury.

18              (Whereupon, the proceedings resumed.)

19   CROSS-EXAMINATION

20   BY MR. PERRI: (Continuing)

21        Q.   Doctor, you testified on direct that the Y-STR

22   levels that were found on the vulva swab in testing the

23   vulva swab, there was noise; is that correct?

24        A.   I said that there was noise there, and they were

25   below the threshold level for the laboratory, that is

1   correct.

2        Q.   So the peaks that were found in the testing of the

3   Y-STR levels of the vulva swab, they weren't necessarily

4   noise?

5        A.   No.  I think I was pretty clear from the data you

6   couldn't tell, and that's why the laboratory did not report

7   them in their allele summary.  That's the end of the report

8   where they put the DNA results, and from the actual report

9   they just mentioned they were there at a level that they

10  couldn't interpret.

11       Q.   Doctor, when you say that's why they did it,

12  that's your conclusion as to why they did it?

13       A.   That's correct.  It's a good conclusion.

14            THE COURT:  Let me instruct everyone.

15       Doctor, I need you to answer the question that is given

16       to you, please.

17            And, People, I need you to let the witness

18       finish the answer.  Don't try to add, don't try to cut

19       off.  The reporter can only take down one person at a

20       time.

21            I'll have the question re-asked.

22            THE WITNESS:  Thank you, your Honor.

23       Q.   So that when you say, when you explain why the lab

24  did or did not do or what conclusions the lab made, that's

25  your conclusion and your assumption, correct?

1     A.   It's their conclusion because it's written on
2   their report, but it's my assumption as to why they wrote
3   that.

4     Q.   Now, when you say written on their report, in
5   their report, and in the bench notes, and the records of the
6   testing, it does note that Y-STR male DNA was found,
7   according to the testing of the vulva swab?

8     A.   The bench notes do mention that, but the report is
9   different, and there are no allele data in that report.

10    Q.   And, doctor, when you say there's no allele data,
11  that would be whether or not a profile is generated,
12  correct?

13    A.   No, that would be whether there are alleles that
14  met the laboratory standards for reporting.

15    Q.   And when you say, that's below the threshold, the
16  threshold is approximately three times the noise level,
17  correct?

18    A.   The threshold, there are actually a number of
19  thresholds, so, one threshold that's used by analytical
20  chemistry is three times the noise.  There is a threshold
21  of where the software identifies the peaks, and then there
22  is an additional threshold if there is a mixture.  There is
23  a number of thresholds that have to be met.

24    Q.   So, doctor, is your testimony that the
25  electropherogram that you examined were consistent with no

Dr. Reich - Defense - Cross        1247

1   male DNA being present on the vulva swab?

2        A.   I was -- I thought clear that it wasn't clear that

3   there was a maybe, or a perhaps, there is an STR profile

4   from that particular sample and that the laboratory did not

5   report allele data, although they mentioned there might be

6   trace amounts.

7        Q.   With respect to the Y-STR, the male DNA found on

8   the vulva swab, they actually do two phases of testing on

9   that DNA, correct?

10       A.   It's my understanding they did both sematic

11  testing and Y-STR testing.

12       Q.   With respect to the Y-STR testing that they also

13  did quantitative testing with regard to the Y-STR; is that

14  correct?

15       A.   Not the way you phrased it.

16       Q.   What would be the second test of the testing on

17  the Y-STR on DNA?

18       A.   In the process of taking a sample of item of

19  evidence through DNA, one of the steps is that the lab

20  measures the amount of DNA that is recovered, and in that

21  test the lab gets two pieces of information.  It gets the

22  total amount of DNA, roughly, that is recovered, and it gets

23  an estimate of how much male DNA is recovered in that same

24  sample.

25       Q.   According to the testing done by the medical

Dr. Reich - Defense - Cross          1248

1    examiner's office, they were able to determine an amount of

2    male DNA present on the vulva swab, correct?

3         A.   There was a value reported, that's correct.

4         Q.   A value of male DNA found on the vulva swab,

5    correct?

6         A.   It was a number.

7         Q.   And that number was an amount, correct, doctor?

8         A.   It's an amount.

9         Q.   Whether or not there was an amount sufficient to

10   develop an allele and develop a full profile, is different

11   from DNA being nonexistent, correct?

12        A.   It is, but that's not relevant for the

13   measurement, but that is correct.

14             MR. PERRI:  Your Honor, this is taken from

15        the DNA reports.  It's page 89.  I will show it to

16        counsel before the witness.

17             THE COURT:  Show it to counsel first, please.

18             MR. PERRI:  People's 12, I ask be marked.  It

19        is a subset of the DNA report already in evidence.

20             THE COURT:  Mr. Berger, is there any issue

21        with it going directly into evidence?  It's already in

22        evidence as a larger packet.

23             MR. BERGER:  Correct.  No problem.

24             THE COURT:  We'll put it into evidence as

25        People's 12.

kmm

Dr. Reich - Defense - Cross        1249

1           (People's Exhibit 12 was marked and received

2       in evidence.)

3           MR. PERRI:  I ask it be shown.

4       Q.    Doctor, do you recognize what was marked as

5   People's 12?

6       A.    I do.

7       Q.    And what do you recognize it to be?

8       A.    This is an electropherogram, and it is marked

9   2711-neg, which means negative.  There's a date 11/14/2013,

10   and it's the panel, which is the type of testing, Wii file

11   letter two, and this is a negative control run with the

12   samples, at least in theory, and it should provide one of

13   the controls for running a STR result.

14       Q.    Doctor, would that electropherograph, is that

15   consistent with being no DNA present?

16       A.    Yes, I would say this is a good negative control.

17   It also has one, two, three, four obvious peaks on it.

18       Q.    The four peaks you talked about, doctor, those

19   peaks, would they be classified as artifacts?

20       A.    Most likely.

21       Q.    And what is an artifact, doctor?

22       A.    An artifact is a type of noise that the system

23   makes, but is not an authentic result from DNA.

24       Q.    Doctor, you testified the vast majority of DNA

25   obtained from the vulva swab from the two stains, that was

1  the DNA of the victim in this case, Mya Ramirez?

2       A.   I believe I said it was a female, that's correct.

3  That's where most of the DNA is from.

4       Q.   Every time you said female, did you mean the

5  victim, Mya Ramirez, or who in the medical examiner's report

6  was classified as the victim, Mya Ramirez?

7       A.   Yes, the alleged victim, however, it is supposed

8  to be said.

9       Q.   That was also the finding of the medical

10  examiner's office, correct?

11            MR. BERGER:   I object to the form of the

12       question.

13            THE COURT:   Sustained as to form.

14       Q.   The fact that the vast majority of DNA recovered

15  from the vulva swabs and two stains in Mya's underwear were

16  from the female victim in this case, that was also at the

17  conclusion of the medical examiner's office, correct?

18       A.   The medical examiner did not explicitly make that

19  conclusion in the laboratory reports, to my knowledge, but

20  from the quantification, which you mentioned earlier, which

21  was performed, that would have been the conclusion if they

22  had written that in their report.

23       Q.   From what you just said that the quantification,

24  the measurement, that the medical examiner's office did

25  measure the amount of DNA they found, correct?

1      A.    They measured the amount of DNA that is recovered.

2      Q.    And that their measurement showed, just as your

3  conclusion, that the vast majority of the DNA was Mya?

4      A.    That's where I got my conclusion from, that's

5  right.

6      Q.    Doctor, if I licked someone's hand and hours later

7  you swabbed that area for DNA, would the owner of the hand

8  be the major -- would it be consistent that the major

9  contributor of the DNA in that swab would be the owner of

10  the hand?

11      A.    Maybe.  It would depend how much saliva you put on

12  there, whether you got it all up, how hard you rubbed the

13  swab.  It could be.

14      Q.    And just from what you just testified to, it would

15  appear that lots of activity after saliva is deposited, it

16  could have an effect on what is recovered from swabbing that

17  same area?

18      A.    That's a fair statement.

19      Q.    So, would urinating after saliva has been

20  deposited, would that effect the recovery of the saliva of

21  that area for a vulva swab?

22      A.    Thank you.  You were talking about hands for a

23  second.

24      Q.    I apologize.

25      A.    It could, although, technically urination would

kmm

1    itself not be relevant.  Maybe wiping afterwards, assuming

2    that was done thoroughly.

3        Q.   If you thoroughly wiped afterwards, would that

4    remove DNA and saliva from the area?

5        A.   DNA, perhaps, not but the saliva.  It's possible.

6        Q.   So perhaps, it's possible that they both could be

7    removed or they both could remain?

8        A.   I think that's fair.

9        Q.   Would the duration of contact, especially oral

10   sexual contact, effect the amount of saliva that is

11   deposited?

12       A.   I think the length of time and how much saliva is

13   deposited is important.

14       Q.   So would the longer you have oral sexual contact

15   deposit more saliva?

16       A.   That's a good assumption.

17       Q.   If it was very brief sexual contact, would you

18   deposit less saliva?

19       A.   Likely.

20       Q.   So that if someone was interrupted, only momentary

21   contact occurred, that would deposit less saliva and less

22   DNA?

23       A.   Possible.

24       Q.   Just talking about the transfer of DNA, more

25   generally, doctor, it's true DNA doesn't actually penetrate

1    layers of clothing, correct, under normal circumstances?

2        A.   I'm not quite sure I understand the question.

3        Q.   You testified about coughing transferring DNA.  If

4    I were to be within a few feet of you, or right up close to

5    you and you coughed on me, would the DNA transfer from your

6    coughing, would that get through my jacket and my shirt,

7    down to my undershirt and my underwear?

8        A.   Probably not through all of those layers, but

9    small particles go through fabric which is not uniform.  It

10   has holes in it, it has a weave, but through multiple

11   layers, probably unlikely.

12       Q.   Doctor, just some points to go over from your

13   testimony.  Now, it was your testimony that the defendant's

14   DNA profile was a match for the Y-STR profile found in stain

15   1-A1; is that correct?

16       A.   Forensic scientists don't like the word match, and

17   the DNA profile is not complete, but the identification of

18   Mr. Ramos is not in dispute.  Certainly, the results are

19   consistent with the haplotype from Mr. Ramos.

20       Q.   With respect to the stain 1-A2, your testimony was

21   that the DNA of the major Y-STR contributor, minor,

22   autosomal contributor of stain 1-A2 was the defendant,

23   correct?

24       A.   It's consistent with Mr. Ramos's profile.  That's

25   correct.

Dr. Reich - Defense - Cross          1254

1        Q.    So you agree with respect to the conclusion the

2    medical examiner's office made regarding the profiles and

3    the matches developed for stains 1-A1 and 1-A2?

4                     MR. BERGER:  Objection, specificity.  That's

5         too general a question.

6                     THE COURT:  You can rephrase it.

7        Q.    With respect to stain 1-A1, do you agree with the

8    conclusion that the medical examiner's office made in

9    matching or comparing the profile of the defendant to the

10   Y-STR profile developed from the stain?

11       A.    I believe, the medical examiner's DNA results in

12   terms of genetic identity, that Mr. Ramos is consistent with

13   the results they obtained.

14       Q.    And with respect to stain 1-A2, I ask you the same

15   question about agreeing with the medical examiner's

16   determination with matching the Y-STR major contributor and

17   the minor on the autosomal contributor, both of those to the

18   defendant?

19       A.    It's called comparing.  We don't use the word

20   match, but if, in fact, if you compared it, the haplotypes,

21   Mr. Ramos is not excluded.

22       Q.    And you agree there was a positive indication for

23   the presence of saliva on the vulva swab on stain 1-A1 and

24   1-A2?

25       A.    The laboratory report states that the test for

kmm

1    saliva was positive.

2         Q.   So, apart from your testimony about the

3    sub-straight control, you found no other problems with how

4    the evidence was handled and tested by the medical

5    examiner's office, correct?

6         A.   Problems.   It was unusual that the size of the

7    underwear exhibit was the size of the area that was excised

8    is unusual.   I'm not sure it's a problem.   It's a very large

9    area of the underwear.   Usually stains are much smaller.

10   They're the size of a dime or a quarter, maybe a fifty cent

11   piece.   This is a very large area that was dissected and

12   analyzed.   It's unusual.   A problem, probably not.

13        Q.   And you didn't see any problems with the equipment

14   noted in the records that you examined?

15        A.   I was not provided with the official documentation

16   for that, but there was no reason to think there was a

17   problem with the instrumentation.

18        Q.   Did you notice any problem in the execution of the

19   test, according to the records you examined?

20        A.   I did not.

21        Q.   Now, your lab would have been capable of doing the

22   sub-straight control test, correct?

23        A.   Any lab is capable of performing the sub-straight

24   control.

25        Q.   Your lab would be capable, correct?

Dr. Reich - Defense - Cross        1256

1    A.   Yes, absolutely.

2    Q.   Was your lab -- did you conduct a sub-straight

3  control test?

4    A.   We did not receive any items of evidence in this

5  case, as I stated earlier, nor did we do any testing in this

6  case.

7    Q.   Did you recommend to defense counsel to conduct a

8  sub-straight control test?

9    A.   I did not.  I was not asked to provide that

10  information, and the testing had already been performed.

11    Q.   And did defense counsel request of you to conduct

12  what you deemed a critical test to be done?

13    A.   Certainly not.

14    Q.   So with respect to the concerns you voiced, did

15  you remember during your testimony about some of the

16  conclusions that were made, your concern is that it's a

17  coincidence that the defendant's DNA profile was found in

18  Mya Ramirez's underwear along with saliva?

19    A.   No, I did not say that.

20    Q.   And as the DNA found in the saliva stains comes

21  from epithelial cells, you cannot state to a scientific

22  certainty what the origin of the surrounding saliva is,

23  correct?

24    A.   I'm sorry, I did not understand that question.

25    Q.   You cannot identify definitively the source of any

Dr. Reich - Defense - Redirect          1257

1    of the saliva in this case, correct?

2         A.   Nobody can.  It's not possible using the

3    techniques that are available to forensic labs, no.

4         Q.   You cannot identify whether it was male or female

5    saliva, correct?

6         A.   No.  We can only make an inference from the

7    quantity of the DNA that was identified.

8         Q.   Other than that inference, you don't have any

9    scientifically definitive result?

10        A.   No more than what was presented in the laboratory

11   reports.

12             MR. PERRI:  Nothing further, your Honor.

13             THE COURT:  Thank you.  Redirect.

14   REDIRECT EXAMINATION

15   BY MR. BERGER:

16        Q.   Dr. Reich, you were asked before about having made

17   an educated guess about something; what was that about?

18        A.   I believe I was asked as to why the laboratory,

19   the office of the medical examiner, County of Nassau

20   Laboratories, made its conclusions on the trace amounts of

21   DNA identified on the vulva swab using Y-STR.  I'm sorry for

22   the length of that answer.

23        Q.   In other words, you made an educated guess why

24   they would say it was male DNA on the supposed trace

25   materials?

kmm

1      A.    That's correct.

2      Q.    Even though you told us on direct examination that

3 the trace materials were insufficient and weren't put in the

4 report?

5      A.    They were, because they're not in the report.

6 That's not an educated guess, that's just what is in the

7 reports.

8      Q.    When you gave us your opinions, when you gave me

9 your opinions this morning, you were doing that based upon

10 the documents provided to you through me, received from the

11 district attorney's office, correct?

12     A.    From you.   That's all I can say.

13     Q.    Right, okay.   And have any of the opinions you

14 gave before on direct examination changed as a result of the

15 questions that were propounded to you by Mr. Perri?

16     A.    No.

17     Q.    With the exception of the fact that with respect

18 to exhibit B, you had assumed they were all in connection

19 with this case?

20     A.    I made an error when I was asked to write on that.

21 At the last moment the documentation that was provided has

22 the results from multiple cases, and I scribbled too quickly

23 and that was my error.

24     Q.    With respect to the section of that page that you

25 scribbled accurately, does that change any of your answers?

kmm

1    A.   No.  If I could go back and look at the other part

2  of the page, which had the rest of the data, it would be the

3  same conclusion.

4    Q.   Now, Mr. Perri asked you about how you came to the

5  conclusion with respect to the Y-STR testing and you

6  referred to the allele summary at the end; do you remember

7  that?

8    A.   Okay.

9    Q.   Could you find that in the exhibit before you?

10   A.   I could find the laboratory reports.

11   Q.   Where you were referring to the allele summary at

12  the end.

13   A.   Certainly.  Do you want me to turn to them?

14   Q.   Yes, please.  Can you identify -- is there a page

15  number there?

16   A.   So, there are two laboratory reports, one dated

17  February 27, 2014, and one dated February 28, 2014.

18  Laboratory reports are often in this format where there is a

19  summary of results and interpretation, which is words and

20  then later on, there are these tables.  I know you can't see

21  them, but there is a summary of the actual allele results

22  that the laboratory obtained.  You recall from the

23  electropherogram I showed you, some of those peaks had

24  little boxes underneath them and some of the boxes had

25  numbers.  Those numbers end up on this table.  So this is

Dr. Reich - Defense - Redirect        1260

1    called an allele summary.  Both of the reports have allele

2    summaries.  Some of the data between the reports are shared,

3    some of them are new, depending upon the report, and those

4    are the allele data.

5        Q.    So the allele summary you were referring to before

6    with Mr. Perri, which document was that, the 27th or the

7    28th?

8        A.    In this case it would be either because neither

9    report has the Y-STR results that were below the laboratory

10   interpretation guidelines for sample 1-F, the vulva swabs.

11       Q.    So, when you look at the allele summary, neither

12   one of them has the so-called trace male DNA there, does it?

13       A.    Correct.  Those results, which the lab did not

14   wish to interpret, are not in the allele summaries.

15       Q.    And the allele summaries are obtained how, doctor?

16       A.    They are made by the laboratory, and they are a

17   summary of the results that they wish to report.

18       Q.    So, the conclusion by Mr. Chillseyzn about male

19   DNA being on the vulva swab, is not contained in the allele

20   summary, correct?

21       A.    That is correct.

22       Q.    Would a scientist taking a look at those allele

23   summaries set forth what Mr. Chillseyzn did with respect to

24   claiming there was male DNA there?

25           MR. PERRI:  Objection.

Dr. Reich - Defense - Redirect          1261

1     THE COURT:  Sustained as to form.

2     Q.   Doctor, would you with a reasonable degree of

3   scientific certainty, ever make a claim that there was male

4   DNA there based upon the allele summary you see?

5     A.   Our interpretation guidelines are, I wouldn't say

6   more strict, but they're more strict, and if we do not feel

7   the results are interpretable, we would not report them.

8     Q.   So both of those alleles, those summaries, in both

9   reports, do not reflect any male DNA from the Y-STR testing,

10   correct?

11     A.   From that particular sample, that is correct.

12   Other samples did have a Y, as we talked about earlier, but

13   that sample did not.

14     Q.   That one that refers to the vulva swab?

15     A.   The 1-F.

16     Q.   Mr. Perri asked you about ascribing a number for

17   the Y-STR on the vulva swab?

18     A.   Correct.

19     Q.   Does it mean anything to put a number on it?

20     A.   There is a number that the lab generates when they

21   quantify.  That's the term, the amount of DNA they recover.

22   That number is useful for the laboratory to determine how

23   much to put in to the reaction to generate the profile, but

24   the technical reasons about how to interpret that number are

25   complicated.

Dr. Reich - Defense - Redirect          1262

1    Q.    So, even if there is a number, there is still
2  standards by which you determine if the number sufficient to
3  even make, or draw a conclusion?
4    A.    Correct.  Most laboratories do not use the
5  quantitation number for interpreting in their final report.
6  It's used as a step in the laboratory.
7    Q.    So it's a step?
8    A.    It's a step.
9    Q.    Doctor, how long, if you sneezed, or you coughed,
10  or you put your fingers in your mouth, how long could saliva
11  remain on your hand, or your arm, or whatever?
12    A.    If you don't wash it, a long time.
13    Q.    And by a long time?
14    A.    Many hours.
15    Q.    And many hours, could that be ten hours?
16    A.    There is no good studies, but there are many
17  examples of sexual assaults where the alleged victim is
18  swabbed many hours after the alleged incident; licking, for
19  example, and they can identify saliva and identify DNA.  So,
20  it can be many hours.
21    Q.    And if someone didn't urinate, then it might be
22  longer.  You indicated that might cleanse the area in some
23  way?
24    A.    I tried to be specific.  I think the actual fact
25  of urination because the female anatomy doesn't necessarily

Dr. Reich - Defense - Redirect          1263

1   rinse the outer layers of the skin, but if you wiped after

2   urination, then that would remove some of the DNA and more

3   of the saliva that would remove more of the DNA.

4        Q.   Could you tell what you saw with respect to the

5   analysis of the vulva swab and the two other stains, how

6   could a touch DNA, even though you testified that you

7   couldn't -- it doesn't pass the test, how could touch DNA

8   get on the vulva area and swab area?

9               MR. PERRI:   Objection.

10              THE COURT:   Sustained.

11       Q.   Assume what the prosecution's witness,

12   Mr. Chillseyzn, said that there was male DNA on the vulva

13   area, how might that get there if it was touch DNA with a

14   reasonable degree of scientific certainty?

15              MR. PERRI:   Objection.

16              THE COURT:   Sustained.

17              Come up.   Off the record.

18              (Whereupon, there was an off-the-record

19        discussion.)

20       Q.   If some male handled or touched the underwear in

21   this case, I think from your testimony you might expect some

22   DNA to be there from that male, correct?

23       A.   That would not be unexpected.

24       Q.   Not be unexpected?

25       A.   Right.

1    Q.    How would that DNA get to the vulva swab, if at

2    all?

3    A.    Well, we can imagine at least one scenario where

4    the DNA of Mr. Ramos ends up on the underwear because he's

5    handled it.  We already talked about how that is possible,

6    and then if you pull the underwear on, then you are rubbing

7    the fabric against the skin of the person who is wearing the

8    underwear and the DNA can transfer.

9    Q.    You were asked by Mr. Perri with respect to

10   drawing an inference from the quantity of the saliva and the

11   tests there, and you made an inference that the saliva on

12   the vulva swab was from the female, correct?

13   A.    Almost.

14   Q.    Go ahead.

15   A.    I was asked whether you could measure the amount

16   of saliva and you can't.  There are many reasons you can't

17   do that, but the inference was the quantity of the male DNA

18   on the various samples versus the inference that it was male

19   saliva versus female saliva.  And I still hold because the

20   test is, in fact, extremely sensitive, and it's easy to get

21   DNA profiles from very small amounts of saliva, that the

22   majority of DNA is female, we all agree and that is the most

23   likely source of the saliva.

24                MR. BERGER:  Thank you, doctor.  Nothing

25         further.

1          THE COURT:  Any recross?

2          MR. PERRI:  Yes, your Honor.

3    RECROSS-EXAMINATION

4    BY MR. PERRI:

5        Q.   Doctor, in the report that you read from on

6    redirect, noting the section that had the allele summary in

7    it, in that same report, on page 2, does it not note that

8    Y-STR typing was done on the vulva swab, that peaks were

9    detected, no, they did not meet the laboratory criteria for

10   identification, and therefore, they were not reported.  Does

11   that not appear in the same documents that you read from?

12       A.   I'm going to confirm that, if I might.  I believe,

13   you are referring to the February 27, 2014 report?

14       Q.   Yes.

15       A.   The page you are referring to is the second page

16   of seven.

17       Q.   Yes.

18       A.   So it absolutely states that the presence of

19   saliva was indicated on the vulva swab obtained from the

20   victim and Y-STR typing was done.  Peaks were detected,

21   which did not meet the laboratory criteria for allele

22   identification.  Therefore, these peaks are not reported.

23       Q.   Doctor, you also testified most laboratories do

24   not use the quantification number, but you didn't say there

25   wasn't anything wrong with using the quantification number?

1    A.    I did not say that.  That's not true.  All
2  laboratories use the quantification number but they don't
3  necessarily use it to draw conclusions in the final report.
4  It's used during the processing steps of the sample.
5    Q.    You didn't say that there was anything wrong with
6  using the quantitative number?
7    A.    It's not wrong, but there is a reason laboratories
8  are reluctant to use that, and that number is plus or minus
9  two or three-fold for the total amount of DNA.  That may
10  sound like a big range, but it is so much better than the
11  method we had seven years ago, and the number you get for
12  the Y is not as good as that.  It's technical why that is.
13  We use it for the processing.  I don't believe I have ever
14  seen a conclusion in a lab report based on the
15  quantification data alone.
16    Q.    Doctor, in supporting your inference about your
17  inference that the saliva was from the female victim, you
18  noted that the test was exquisite, that is the test that you
19  sell, correct?
20    A.    It's the test we develop and we also sell it.  We
21  produce it as well.
22          MR. PERRI:  Nothing further.
23          THE COURT:  All right.  Thank you very much,
24    doctor.  You may step down.  Please be very careful.
25    It's two steps.

Proceedings                    1267

1          Let me see the attorneys at the bench for a

2     moment.

3          We have been working about an hour, ladies

4     and gentlemen.  Rather than have a conversation with

5     the attorneys at the bench, let me give you this

6     opportunity to stretch your legs and move around a

7     little bit, use the facilities if you need to.

8          Please remember not to talk about the case

9     during the short break.  Don't let anyone else talk to

10    you about it.  Don't get on your phone and research.

11    See you in five to ten minutes.  Thank you.

12          (Whereupon, the jury exited the courtroom.)

13          THE COURT:  Are you going to have anymore

14    witnesses, Mr. Berger?

15          MR. BERGER:  I will.

16          THE COURT:  People, Mr. Berger made a request

17    of the Court to allow for rebuttal, if you were looking

18    to have rebuttal to go in out of order.  Is it your

19    intention to have a rebuttal witness on this DNA issue?

20          MR. PERRI:  Could I have five minutes to

21    discuss that?

22          THE COURT:  You certainly can.

23          MR. PERRI:  Then let me know and we'll talk

24    about it before the jury comes back.

25          (Whereupon, a short recess was taken.)

kmm

Proceedings                    1268

1          THE CLERK:  Case on trial continued,

2    Indictment 742N of 2014, People of the State of New

3    York vs. Daniel Ramirez.

4          Let the record reflect all parties present,

5    and the jury is not present at this time.

6          Are the People ready?

7          MR. PERRI:  Yes, your Honor.

8          MR. BERGER:  Yes, ready.

9          THE COURT:  When we broke I asked you if you

10   had intended on making an application to the Court for

11   a rebuttal witness.

12         MR. PERRI:  Yes, the People would ask the

13   Court to allow Mr. Christopher Chillseyzn to testify to

14   two specific issues that were raised by the defense

15   about the case.  Specifically, the question of the

16   peaks versus the noise in the Y-STR, typing done on the

17   vulva swab, and the People's conclusion based on that

18   as to why there was male DNA there.

19         And in the second point with respect to

20   saliva to rebut the argument by defense counsel's

21   expert that a conclusion could be made that the saliva

22   came from the female, that it would be for those two

23   points, your Honor.

24         THE COURT:  To say the saliva came from the

25   female?

kmm

Proceedings          1269

1        MR. PERRI:  The defense expert testified it
2   was saliva and was able to be identified as from the
3   female source.
4        THE COURT:  And you want to counter that?
5        MR. PERRI:  Yes, your Honor.
6        THE COURT:  I'll hear from you on whether you
7   think it's proper.
8        MR. BERGER:  Are you evaluating whether you
9   want to allow --
10        THE COURT:  Correct, I haven't said I will
11   allow the rebuttal witness yet.
12        MR. BERGER:  From Mr. Chillseyzn's own words,
13   his testimony on his direct examination as part of the
14   People's case acknowledged that the saliva came from
15   the complainant in this particular case.  I'm sorry I
16   forgot Mr. Perri's first argument, which was to cover
17   -- which point was that?  The second one I understand.
18        THE COURT:  The first is peaks versus noise
19   and the vulva swab, and why they could say it was male
20   DNA.
21        MR. PERRI:  Specifically, that defense
22   counsel's expert's conclusion about the peaks versus
23   noise is incorrect.
24        MR. BERGER:  I'm not sure it's proper
25   rebuttal.  That I have no response to.  I do know he

kmm

1   has acknowledged in his own direct exam that the vulva
2   swab had the saliva of the complainant.

3            MR. PERRI:   That is not the People's
4   recollection of the testimony, that at no point did the
5   People's expert identify the source of the saliva.
6   They only said there was saliva indicated on the vulva
7   swab taken from the complainant/the victim, in this
8   case, and that there was indication of male DNA, of
9   Y-STR present on that same saliva.  He did not make any
10  conclusion with regard to the origin of the Y-STR DNA,
11  or the saliva contained on that swab, your Honor.

12           MR. BERGER:   Judge, my recollection was that
13  he said saliva -- he used the word victim.  I don't
14  think that was the appropriate word.  He did use that
15  word and to be expected, my recollection is his
16  language was it was saliva from the victim and it was
17  to be expected.

18           THE COURT:   The use of rebuttal testimony, as
19  you know, is at the discretion of the Court, and there
20  has to be very specific areas that need to be rebutted,
21  so there is contradicting witnesses, corroborating
22  rebutting parties, witness after attack, denying
23  affirmative facts attempted to be proved by an adverse
24  party.   Even if I find some appropriate rebuttal area
25  has been laid out, it doesn't necessarily mean that the

1     Court has to grant calling a rebuttal witness based on

2     the testimony before the Court, should the Court feel

3     it's going to go so far afield that it would be

4     inappropriate.  Also, there is no right to repeat any

5     evidence.

6              So the Court's ruling with regards to the

7     People's application to call a rebuttal witness in this

8     matter, in the two areas put forth at this time, is

9     denied.

10             People, do you want to make your record

11    noting your exception to the ruling?

12             MR. PERRI:  Your Honor, the People would just

13    note that these are absolutely central facts at issue

14    in this case that were not directly addressed by the

15    People's witness on the original testimony.  The

16    People's expert did not testify as to the

17    identification of the saliva, and defense counsel's

18    expert claimed he is able to identify the origin of

19    saliva.

20             Additionally, defense counsel raised for the

21    first time the question of the Y-STR, the methodology

22    exactly of the quantification of the Y-STR DNA.  This

23    was not testified to in the People's original case.

24             The People would employ the Court to

25    reconsider their ruling.

1    MR. BERGER:  I respectfully disagree and

2    suggest that the recollection by Mr. Perri is

3    inaccurate.

4        THE COURT:  All right.  I appreciate both

5    sides request and positions with regard to this matter.

6    I still don't feel a rebuttal is appropriate at this

7    time, so I will note your exception to my ruling for

8    the record, but your request is denied.

9        MR. PERRI:  Yes, your Honor.

10        MR. BERGER:  May we step up?

11        THE COURT:  Yes, and then we'll call the jury

12    in and get started on your next witness.

13        (Whereupon, there was an off-the-record

14    discussion.)

15        (Whereupon, the jury entered the courtroom.)

16        THE CLERK:  Do both sides stipulate all sworn

17    jurors are present?

18        MR. PERRI:  Yes, your Honor.

19        THE CLERK:  Defense counsel?

20        MR. BERGER:  Yes, your Honor.

21        THE COURT:  Welcome back everyone.  We're

22    going to continue right along.

23        Mr. Berger, for the record, call your next

24    witness.

25        MR. BERGER:  Daniel Ramos.

D. Ramos - Defense - Direct        1273

1   D A N I E L   R A M O S, the defendant, called on behalf of

2        the Defendant, having been duly sworn, took the witness

3        stand and testified as follows:

4              THE CLERK:  Mr. Ramos, please state your full

5        name and spell your last name for the court record.

6              THE WITNESS:  Daniel Ramos, R-A-M-O-S.

7              THE COURT:  You may inquire.

8   DIRECT EXAMINATION

9   BY MR. BERGER:

10       Q.   Mr. Ramos, are you an American citizen?

11       A.   Yes.

12       Q.   When did you arrive in this country?

13       A.   In 1989.

14       Q.   And when you arrived here, did you obtain

15   employment?

16       A.   No.  I spent a few months with work.

17       Q.   At some point in time, did you start working?

18       A.   Yes.

19       Q.   What kind of work did you do?

20       A.   I was working sweeping floors at a factory.

21       Q.   And after that?

22              THE INTERPRETER:  The interpreter needs

23        qualification.

24       A.   I came after that.  I got my license, and I went

25   to work at a place where they make cakes, things like that.

kmm

1    Q.   And after that?

2    A.   First I got my license and then I first got a

3    regular driver's license, and then I got my commercial

4    driver's license, and I went to work for a company named

5    Helicas in Hempstead.

6    Q.   How long have you had your driver's license?

7    A.   Maybe from 2000 up to now.

8    Q.   When did you marry?

9    A.   I don't remember for sure, but maybe in 2004,

10   2005.

11   Q.   Mr. Ramos, do you have children?

12   A.   I have two.

13   Q.   And you have two with what woman?

14   A.   I have two with Juna Antonia Argueta.

15             THE INTERPRETER:   A-R-G-U-E-T-A.

16   Q.   She is still your wife?

17   A.   Yes.

18   Q.   Did you say you married her in 2004, or was that

19   before that?

20   A.   I'm not too sure.  I don't remember.  Maybe 2003.

21   I don't remember.

22   Q.   Now, did both you and your wife raise your two

23   boys?

24   A.   Exactly.

25   Q.   And you worked from the time, with the exception

D. Ramos - Defense - Direct          1275

1   of a few months, from the time you arrived here until

2   October of 2013, to support your family and your boys?

3       A.    Exactly.

4       Q.    When did you meet your wife?

5       A.    We met, I actually met her in 1991 -- 1981, in the

6   middle of 1981.

7       Q.    You have known her all of these years up until

8   now, correct?

9       A.    Exactly.

10      Q.    Now, when you worked with your commercial license,

11  did you ever drive children?

12      A.    Yeah, I work for a few months, four to six months

13  with a company that is here in Hempstead called Atlantic

14  Express -- in Oceanside.

15      Q.    Who did you drive when you drove these commercial

16  buses?  Were you ever driving children?

17      A.    Yes, I remember that.

18      Q.    And how long was it that you drove children?

19      A.    Including the one on Atlantic Avenue total -- no,

20  no, not Atlantic Avenue, Atlantic Express.

21      Q.    For how long?

22            THE INTERPRETER:  The interpreter needs

23      clarification.

24      A.    I don't remember exactly.  I would say about two

25  or three months.  Two months.

D. Ramos - Defense - Direct          1276

1    Q.    Two months, and you drove children in what

2    circumstance?

3    A.    My company required for us to pick up the children

4    for school.

5    Q.    And was that for just two or three months, or was

6    it for a longer period of time?

7    A.    I'm not too sure.  I think it was about two or

8    three months, and then I changed to another company.

9    Q.    And what did you do with that other company?

10   A.    The same, transporting children to go to school.

11   Q.    So, I'm not asking you, I'm asking you in total,

12   without regard to how many companies you worked for, in

13   total how many years, or months, or years did you drive

14   children?

15   A.    Like I said before, I worked for Atlantic Express

16   transporting children, and then I also worked for Acme, also

17   for transporting children to go to school, and then I left

18   Acme and I went to MTA.

19   Q.    And for MTA, did you drive children, or was it

20   different?

21   A.    With MTA I worked for Able Ride, and those I was

22   working with handicap people.

23   Q.    You were driving handicapped people with that

24   company?

25   A.    Yes.

kmm

D. Ramos - Defense - Direct          1277

1    Q.   Did you ever receive any awards or accommodations
2  from your bus company?
3              MR. PERRI:   Objection.
4              THE COURT:   Sustained.
5    Q.   Mr. Ramos, prior to October of 2013, had you ever
6  been arrested before?
7    A.   Never.
8    Q.   Mr. Ramos, you do speak some English, or you did,
9  rather, in October of 2013; did you not?
10   A.   Basic, yes.
11   Q.   Were you able to read English?
12   A.   Not really.
13   Q.   You are more comfortable speaking and
14  understanding Spanish?
15   A.   Correct.
16   Q.   You have been incarcerated since October of 2013;
17  is that correct?
18   A.   Correct.
19   Q.   You lived in a house, did you not, in October of
20  2013?
21   A.   Could you repeat the question?  I did not
22  understand the question.
23   Q.   Were you living in an apartment or a house in
24  October of 2013?
25   A.   A house.

D. Ramos - Defense - Direct          1278

1    Q.   With your wife?

2    A.   Yes.

3    Q.   And were any of your sons there?

4    A.   One, yes.

5    Q.   Carlos?

6    A.   Yes.

7    Q.   Now, when did you move -- what is the address of

8  that house?

9    A.   781 Coolidge Road, Uniondale, New York 11553.

10   Q.   And during the course -- when did you move in

11  there, by the way?

12   A.   I don't remember the exact date, but I believe it

13  was between 2004 and 2005.

14   Q.   During the course of that time, did you ever have

15  people, not your sons, but people with children living in

16  your house?

17             MR. PERRI:   Objection.

18             THE COURT:   Objection overruled.

19   A.   My sister-in-law has one child.

20   Q.   Anyone else?

21   A.   No.

22   Q.   Did you know Christy Hernandez?

23   A.   Oh, yes.

24   Q.   Did she reside in your house?

25   A.   With my son because --

D. Ramos - Defense - Direct          1279

1      THE INTERPRETER:  The interpreter needs

2  clarification, your Honor.

3      A.    Yes, I know her.  She got together with my son for

4  about two years, but I did not have that much contact with

5  them, because I did not want to get into my children's

6  problems.

7      Q.    But her children were residing in the house?

8      A.    Yes.

9      Q.    Do you remember approximately how old they were?

10     A.    I am not too sure exactly, but I believe one was

11  between ten and eleven, and the other was between eight and

12  nine.

13     Q.    Mr. Ramos, do you know Crystal Ramirez?

14     A.    Yes.

15     Q.    And do you know her children?

16     A.    Yes.

17     Q.    Were there times when Crystal would be over at

18  your house?

19     A.    She almost go once in a while when her ex-husband

20  was at the house, playing with my son Nintendo.

21     Q.    Who was playing Nintendo with your son?

22     A.    Christian Feliciano.

23     Q.    Christian was a friend of your son Carlos?

24     A.    They were friends since they were in school, since

25  they were children.

D. Ramos - Defense - Direct          1280

1    Q.    Now, within a year or so, prior to October of

2    2013, Crystal was not living with Christian; is that

3    correct?

4    A.    No.

5    Q.    That is right?

6    A.    Yes.

7    Q.    So, does Crystal own a car?

8    A.    No.

9    Q.    So would Crystal call you up to drive her places?

10   A.    Yes.  She would call me when she needed me, my

11   help, yes.

12   Q.    And did that happen often?

13   A.    Yes, it would happen frequently.

14   Q.    Did you ever lend Crystal money?

15   A.    Yes.

16   Q.    Did she pay you back?

17   A.    No.

18   Q.    Did you used to buy things for Crystal and her

19   kids?

20   A.    When she would ask me, yes.  And if I could, I

21   would buy it.

22   Q.    Did you take Mya and Sincere to restaurants to

23   eat?

24   A.    Yes.

25   Q.    Was Crystal there all of the time or just some of

kmm

D. Ramos - Defense - Direct          1281

1    the time?

2         A.    Sometimes.

3         Q.    Sometimes it was just you taking the kids out for

4    dinner or food?

5         A.    Yes, with her permission.

6         Q.    And were there times that you would be asked by

7    Crystal to drive her to different places?

8         A.    Yes.

9         Q.    Could you tell us some of those situations?

10        A.    I did not understand that question.

11        Q.    Crystal asked you to drive her different places,

12   correct?

13        A.    Yes.

14        Q.    And did she ask you to take her to cousins or

15   friends' homes?

16             MR. PERRI:  Objection.  May we approach?

17             THE COURT:  Yes.

18             (Whereupon, there was a sidebar discussion as

19        follows:)

20             MR. PERRI:  Objection to the amount of

21        leading.  This is his witness's direct.  If he wants to

22        describe, he can describe.  He does not need to be

23        spoon fed every action he has done for Crystal Ramirez.

24             On a second level, I just don't know where

25        this line of questioning with driving her places is

1    going. If we're going back to the whole question of
2    counseling, I want to address it now before it comes
3    up. There should not be testimony about children going
4    to counseling or what the substance of what that
5    counseling was.

6         THE COURT: With regards to the leading,
7    which is before me now, try not to lead. I understand
8    that situation, but I'll take objections to that, and I
9    understand that's what the basis would be. You are on
10   notice.

11        With regards to questions related to
12   counseling, I'm not going to allow leading on that, but
13   I don't have a question before me yet, and I don't have
14   an objection before me yet, so I'll entertain it at the
15   appropriate time.

16        MR. BERGER: I'm just laying a foundation as
17   to the relationship.

18        THE COURT: I understand.

19        MR. BERGER: As far as the counseling is
20   concerned, it's already in evidence, Crystal already
21   answered the question.

22        MR. PERRI: With the eliciting of the way
23   they know each other is through the father of the
24   children, is the brother of the younger son's
25   assailant, that's my concern, that we're not going down

1    that road.

2             MR. BERGER:  I didn't hear you.

3             THE COURT:  With regards to asking or getting

4    this witness to respond to non-leading questions about

5    driving to counseling, I don't have necessarily a

6    problem with it.  His understanding of why they are in

7    counseling is not going to be touched because it's not

8    relevant.  His understanding of what they are doing

9    there is not relevant.

10            MR. BERGER:  I'm not asking about his

11   understanding.  I'm asking about the conversation he

12   had with Crystal, just for the purpose of it being

13   said.

14            THE COURT:  One at a time.

15            MR. BERGER:  It's not coming in for

16   truthfulness, it's coming in for what was said.  You

17   already ruled with respect to the records.  I'm not

18   going to countermand that.  I do have something related

19   to put on the record with respect to that.  I'm not

20   going to ignore your ruling on that point.

21            THE COURT:  Let's try to have a little less

22   leading.  When the questions come up in this situation,

23   I'll allow you to normally -- I wouldn't normally allow

24   you to cut a witness off, but if you, Mr. Berger, if

25   you think the question will do something improper with

1   regards to conversation, you'll react the way you need

2   to react and you will react the way you need to.  I'll

3   rule, but I won't cross the bridge before I get it.

4           MR. PERRI:  The relevancy of whether or not

5   Crystal reported that her younger son was molested when

6   he, in fact, was and he pled guilty.

7           THE COURT:  I understand.  I don't think it's

8   the proper question.  I don't have the question before

9   me to rule on.  I would agree there is a lack of

10  relevancy as to Crystal Ramirez's statement as to why

11  the children are in counseling.  That, I don't see that

12  being proper, but I don't know the way in which it has

13  been asked.  I don't have the background that might

14  lead to it.  It might change that opinion.  In general,

15  I agree that would not be proper.

16          MR. BERGER:  If you recall on this point, if

17  you recall, Crystal Ramirez was asked that question and

18  she said, he knows, referring to Daniel Ramos.  I asked

19  it, does Daniel know why the kids were in counseling,

20  and she said, he knows.

21          THE COURT:  The fact that she said he knows

22  doesn't necessarily mean it becomes relevant as to what

23  it is he believes he knows.  I don't see it necessarily

24  playing a part in this case.  Again, it's not before me

25  now, but I don't necessarily see that it's relevance.

1    I don't know how you will develop your line of

2    questioning with this witness.

3              MR. BERGER:   Okay.

4              (Whereupon, the proceedings resumed.)

5              THE COURT:   You can re-ask your last

6        question.

7    DIRECT EXAMINATION

8    BY MR. BERGER: (Continuing)

9        Q.   Mr. Ramos, when I asked you a question, respond to

10   the person who is asking the question, me.  So, speak up

11   louder, okay?  Do you understand?

12       A.   In Spanish?

13       Q.   Of course.

14       A.   Okay.

15       Q.   Speak up.  Mr. Ramos, do you remember driving

16   Crystal to various friends and relatives' houses?

17       A.   Yes, of course.

18       Q.   And did you do that because she asked you to?

19       A.   Yes, she would ask me to.

20       Q.   And sometimes she would ask you to leave her there

21   and you would be with the kids?

22       A.   Sometimes, but not all of the time.

23       Q.   There were times when she would ask you to

24   baby-sit for the kids because she was going out.

25       A.   A few times.

1      Q.   During those times, did you have an occasion where

2   she wanted you to go someplace and leave the kids in the

3   house?

4                THE INTERPRETER:   Your Honor, can the

5          interpreter have the question?

6                MR. PERRI:   Objection.

7                THE COURT:   I'll sustain the objection as to

8          form.   Let's ask the question in a different way.

9      Q.   Do you recall when she asked you to go to Long

10   Beach?

11     A.   Yes.

12     Q.   What were those circumstances?

13     A.   It was one time that she asked me to go pick up

14   the children by a cousin in Long Beach.

15     Q.   And what happened?

16     A.   I told her that I didn't feel like going because

17   it was too far and because she also asked me to take them to

18   Lindenhurst where she was.

19     Q.   Go on.

20     A.   I told her I did not want to go and she told me,

21   don't be a faggot, go get them and bring them to me.

22     Q.   What did you do?

23     A.   I told her, okay.   I'll go ahead and pick them up

24   in Long Beach and I will call you when I have the kids.

25     Q.   And what happened after that?

1     A.   I went to the cousin.  She gave me the address for

2   the cousin.  I went to the cousin, and I told her that she

3   told me to come and pick up the kids.

4     Q.   And did you?

5     A.   I went and picked them up, we called her, and I

6   asked her where she wanted me to take them, to the house or

7   to where she was at the time.

8     Q.   And what happened?

9     A.   And she told me to take them to Lindenhurst where

10   she was with a friend, and then I took them and that was at

11   night.  And I took them, and when I got to Lindenhurst I

12   told them, here are the children, and she was drinking

13   because she likes to drink.

14               MR. PERRI:  Objection.

15     A.   And I told her, what are you going to do, are you

16   going to stay here with the children?

17               THE COURT:  There's an objection.  The

18          objection is sustained.  Please ask your next question.

19     Q.   Mr. Ramos, was there ever a time -- you have been

20   to Crystal's house before, have you not?

21     A.   Several times, yes.

22     Q.   Did she ever ask you to drive her someplace from

23   her house?

24     A.   There were times that she asked me to take her to

25   do laundry, to buy things, to the clinic, to buy food for

kmm

1    the children.  Um, many places, many, many places, like

2    restaurants to buy food for the children, but different

3    days.

4         Q.    Right.  Did you buy the food for the children?

5         A.    Me or her?

6         Q.    Did you buy the food for the children?

7         A.    Sometimes I would buy the food for the children

8    and for her too.

9         Q.    Did she ever repay you?

10        A.    No, never.

11        Q.    Did she ever ask you to drive her someplace and to

12   leave the kids in the house?

13             MR. PERRI:  Objection.

14             THE COURT:  Sustained as to form.

15        Q.    In those times that you drove her places, did she

16   ever leave the children in the house?

17             MR. PERRI:  Objection.

18             THE COURT:  Approach.

19             (Whereupon, there was a sidebar discussion,

20        as follows:)

21             MR. PERRI:  My objection is based on

22        relevance.  This has gone far afield.  The question has

23        gone far afield from the relationship between Crystal

24        and the defendant.  We're now discussing whether or not

25        Crystal is a good mother.  It's not a relevant issue

                                                            kmm

1   before the jury.

2           THE COURT:  I'll allow counsel to develop a

3       little more.  You will be able to cross-examine as to

4       how you see fit.  I'll tell you now, because I do see

5       where we are going down the road.  Don't try to elicit

6       any information about why those children are in

7       therapy.

8           MR. BERGER:  I'm not.  I'm not going there,

9       Judge.

10          (Whereupon, the proceedings resumed.)

11          THE COURT:  He can answer.

12  A.   What was the question?  I'm sorry, again?

13  Q.   Was there ever a time when Crystal wanted you to

14  drive her someplace and leave the children in the house?

15  A.   It was only one time when she asked me, and she

16  said she just wanted to go out for a while and have a good

17  time at a nightclub.  And she asked me to take her to a

18  friend, a female friend's house, and she left the children

19  alone at home.

20          MR. PERRI:  Objection.

21  A.   And I told her it was not good to leave the

22  children at home.

23          THE COURT:  Objection to the last part of

24      that statement.  It is sustained.  The last part of

25      that answer is stricken.  Next question.

1      Q.    She wanted you to take her to a nightclub,

2  correct?

3                  MR. PERRI:  Objection.

4                  THE COURT:  Sustained as to leading.

5      Q.    Tell us what happened after she asked you to take

6  her to the nightclub.

7      A.    When she left the children alone at home, I told

8  her she could not leave the children alone at home because

9  it was too dangerous to leave them at home alone.  She told

10 me to take her to the nightclub because it was only going to

11 be about ten, fifteen minutes that they were going to be

12 alone.  I did not want to take them because I did not want

13 the children to be alone because it's too dangerous.

14                 MR. PERRI:  Objection.

15                 THE COURT:  Objection sustained to the last

16      portion of that answer, and that last answer is

17      stricken.

18     Q.    After you told Crystal not to leave the children

19 alone, what did she say?

20                 MR. PERRI:  Objection.

21                 THE COURT:  Sustained.

22     Q.    Did you end up leaving the children alone?

23     A.    Yes, because she asked me to.

24     Q.    Would you go back to the house to baby-sit

25 afterwards?

1    A.    A few hours, yes.

2    Q.    So the children were left alone for a few hours?

3              MR. PERRI:   Objection.

4              THE COURT:   Sustained as to leading.

5              You can rephrase it, counselor.

6    Q.    So you told us she said it would only be fifteen

7    minutes; do you remember saying that before?

8    A.    Yes.

9    Q.    How long was it actually that they were left

10   alone?

11   A.    Approximately, twenty to twenty-five minutes.

12   Q.    And after that -- who came back to the house after

13   twenty to twenty-five minutes?

14   A.    She gave me the keys to the house and told me to

15   stay a few hours with the children while she would come back

16   from the bar.

17             THE COURT:   Mr. Berger, you don't have to

18        stop yet.  Find a good place to break when appropriate

19        in your questioning.

20             MR. BERGER:   This is fine.

21             THE COURT:   All right, ladies and gentlemen,

22        let me give you those admonitions that you probably

23        know by heart.

24             Please remember to keep an open mind

25        throughout the trial.  Do not discuss the case amongst

kmm

Proceedings                1292

1    yourselves or with anyone else during the trial.  Do

2    not permit anyone to discuss the case in your presence.

3    Do not talk to the lawyers, witnesses, or the defendant

4    about anything during the trial, and do not visit or

5    view the place where the charged crime was allegedly

6    committed, or any other place involved in the case.

7              If there is any news coverage of the case, do

8    not read, view, or listen to any accounts or

9    discussions of the case reported by the news media.

10             Do not attempt to research any of the facts,

11   issues, or law related to this case, whether by

12   discussion of others, by research in the library, or on

13   the Internet, or any other means or source.

14             Have a great night.  See you all tomorrow

15   morning at 10:00 a.m.  Thank you.

16             (Whereupon, the jury exited the courtroom.)

17             THE COURT:  You may take your seat,

18   Mr. Ramos.

19             Anything for the record before we break for

20   the day?

21             MR. PERRI:  As far as scheduling?

22             MR. BERGER:  I see Mr. Perri is objecting to

23   questions that I'm going to try to elicit from the

24   witness to explain the relationship between the

25   defendant and the children and Crystal.  I understand

1     that Crystal Ramirez is making -- is part of the

2     People's case in which they are trying to make the

3     defendant out to be somebody that did something

4     terrible to Mya Ramirez.

5              I'm trying to paint a more accurate picture

6     of what the relationship was about, that, in fact, it

7     was Mr. Ramos who was good to these children and that

8     it was Crystal Ramirez who was irresponsible.  We have

9     endeavored to convince the Court that Mya -- I mean,

10    Crystal Ramirez acted the way she did on October 16,

11    2013, because of a previous experience with her older

12    son.  Your Honor has ruled that we can't go into that,

13    among other things, your reasons were that previous

14    allegations, and the previous instance with her son was

15    too remote.  I think the period was approximately six

16    years.

17             I considered what you said yesterday when I

18    made the application, and I'm suggesting to the Court

19    to reconsider because it's not too remote.  In fact,

20    these kids are in therapy based upon the fact that her

21    son was in fact abused by his uncle.  I'm sure there

22    are other reasons, as well, but it's not remote because

23    as of October 16, 2013, these kids were still in

24    therapy.  Mya was as well.  It doesn't really matter

25    that Mr. Perri points out that Mya wasn't even born

1     when the abuse to Sincere occurred.  Something is going

2     on in this family that makes this family, from my

3     perspective, a very dysfunctional family that causes

4     Crystal to act the way she did on October 16th, and you

5     had the records and had the opportunity to look at

6     those records.  I still think it's a relevant

7     consideration as to whether or not this is a

8     disfunctional family or not, and I would respectfully

9     urge the Court to consider that it is not remote, that,

10    in fact, it's right up until that very day of the

11    incident these kids were going to therapy.

12             If your Honor denies the application to bring

13    back Crystal for me to cross-examine her with respect

14    to her son, I would ask the Court to make a Court

15    Exhibit of the records that were subpoenaed by the

16    child -- South Shore Child Guidance Center, and they be

17    made part of the record so that if there is an appeal,

18    the Appellate Court could take a look at those records

19    and see whether or not there is any merit to my

20    application at all.  Thank you, Judge.

21             THE COURT:  People.

22             MR. PERRI:  Your Honor previously ruled on

23    this multiple times, and just for the record, your

24    Honor put on the record the reasons, the various

25    reasons the children were in therapy.  They were not

Proceedings                          1295

1      necessarily connected to the alleged sexual abuse.  The

2      People stated it was our belief there were reasons why

3      the children were in therapy.  You inspected the

4      records.  The test is not whether or not they would be

5      useful to a -- the family and say they are

6      disfunctional, but whether or not they contain

7      information that would go to the heart of the ability

8      of any one of these family members to actually

9      appreciate the truth, be able to recall history, and go

10     to their innate credibility in their psychiatric and

11     psychological history.

12            Your Honor made a finding there was no such

13     evidence in the record, and the People ask your Honor

14     to abide by your ruling.

15            THE COURT:  All right, my ruling stands.  I

16     will not change it and allow Ms. Ramirez to be recalled

17     to the stand.

18            Additionally, the records have been returned,

19     under seal, to the establishment from which they came.

20     I will not have them made any part of the court record

21     at this time.

22            Anything else for the record?

23            MR. BERGER:  I would ask you to subpoena them

24     back, get them back here and at least let them, in some

25     way, be made part of the court record, if this matter

Proceedings          1296

1    should have to go on appeal.  I understand you returned

2    them, but it's just as easy to get them back, and I

3    wish there could be some way which the Court would make

4    it so it could be part of the record in this case so if

5    the Appellate Court wishes to review this, should it

6    get that far.

7              THE COURT:  How about we cross that bridge if

8    we need to at the conclusion of this case.  So I'm not

9    closing that entirely, but I'm not going to do it at

10   this time.

11             MR. BERGER:  Fine.

12             THE COURT:  Anything else for the record?

13             MR. PERRI:  No, your Honor.

14             THE COURT:  The record is closed.

15             (Whereupon, the trial was adjourned to May

16   21, 2015.)

17             *              *              *

18

19

20

21

22

23

24

25

1297

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NASSAU : CRIMINAL TERM PART 43

3    ------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,        :   Indictment
4                                                :   No. 742N/14
              -against-                          :
5                                                :
     DANIEL RAMOS,                               :
6                                                :
                             Defendant.          :   Jury Trial
7    ------------------------------------------X

8                                     May 21, 2015
                                      262 Old Country Road
9                                     Mineola, New York

10
     B E F O R E:
11
            HONORABLE TERESA K. CORRIGAN,
12                      Acting Supreme Court Justice

13
     A P P E A R A N C E S:
14
     (As Previously Noted)
15

16              *       *       *       *       *

17

18

19

20              THE CLERK:  Case on trial continues,

21    Indictment Number 742N of 2014, People of the State of

22    New York v. Daniel Ramos.

23              Let the record reflect, all parties are

24    present.  The jury is not present at this time.

25              Are the People ready?

kmm

Daniel Ramos - Defense - Direct      1298

1             MR. PERRI:  Yes, your Honor.

2             THE CLERK:  Defense?

3             MR. BERGER:  Yes, your Honor.

4             THE COURT:  Anything for the record before we

5       bring the jury back in?

6             MR. PERRI:  No, your Honor.

7             MR. BERGER:  Nothing.

8             (Whereupon, the jury entered the courtroom.)

9             THE CLERK:  The defendant is on the stand.

10            Do both sides stipulate all sworn jurors are

11      present and properly seated?

12            MR. PERRI:  Yes, your Honor.

13            MR. BERGER:  Yes, your Honor.

14            THE CLERK:  Mr. Ramos, you are reminded that

15      you are sill under oath, okay?

16            THE DEFENDANT:  Yes.

17  D A N I E L  R A M O S, called on behalf of the Defendant,

18      having been previously sworn, took the witness stand

19      and testified as follows:

20            THE COURT:  Good morning, everyone.  I hope

21      you had a nice evening.  We'll get started right away.

22            Mr. Berger, you may inquire.

23  DIRECT EXAMINATION

24  BY MR. BERGER: (Continuing)

25      Q.   Mr. Ramos, when did you meet your wife?

                                                    kmm

D. Ramos - Defense - Direct       1299

1       A.    In 1980.

2       Q.    Have you been with her ever since?

3       A.    Yes.

4       Q.    And how many years were you working for different

5    bus companies where you were transporting children?

6       A.    Twelve, almost thirteen because in 2013 I was

7    arrested.

8       Q.    Let me draw your attention to October 16, 2013;

9    did you have occasion to talk with Crystal Ramirez?

10      A.    I didn't understand the question.

11      Q.    On October 16, 2013, which is the date of this

12   incident that you are charged with, do you understand that's

13   the date we're talking about, Mr. Ramos?

14      A.    Yes.  Yes, that was the date of the incident.

15      Q.    Now, there came a time when you spoke with Crystal

16   Ramirez, correct?

17      A.    Yes, I spoke to her.  She called me at my job.

18      Q.    Tell us what the conversation was.

19            MR. PERRI:  Objection.

20            THE COURT:  I'll allow it for some

21      background.  He may answer.

22      A.    She called me at work and asked me to stop by her

23   house, and I told her I was feeling tired and that maybe I

24   could go.  And when I left work, I went straight home.

25      Q.    And then what happened?

kmm

D. Ramos - Defense - Direct          1300

1      A.    I was at home, and I got -- made myself

2  comfortable and started watching TV.

3      Q.    Go on.

4      A.    And she gave me -- and she called me about twice

5  and asking me so that we can -- could go have a good time.

6      Q.    Go on.

7      A.    I told her that I did not feel like going but she

8  insisted calling.

9      Q.    What did she want you to do?

10     A.    She wanted me to buy her first Long Island ice

11  tea, and a hero with turkey, tomato and Swiss cheese.

12     Q.    Anything else?

13     A.    She asked me to buy her a pack of Newport 100's.

14     Q.    Did you do those things?

15     A.    Yes.

16     Q.    And what did you do after you purchased them?

17     A.    Oh, went and bought them.  She called me and asked

18  me if I already had the things, so I could go over there.

19  And when I left, I was nearby the house.  I was almost -- I

20  was close to arriving at her home, and she called me again

21  asking me where was I.

22     Q.    Go on.

23     A.    And I told her I'm close to your house.

24     Q.    What did you do?

25     A.    When I got to her house, I gave her the things and

kmm

D. Ramos - Defense - Direct          1301

1   we sat at the porch, and she wanted to get some glasses and

2   she poured the drink.  We started drinking.  I don't drink,

3   but I was there to keep her company.  She likes to smoke a

4   lot and then she started smoking right there.

5       Q.   Go on.

6       A.   And time went by and like three, 3:15, the

7   children arrived.

8       Q.   Continue, please.

9       A.   And when they got there, Sincere, the boy, he went

10  straight and started his homework, and the little girl was

11  in the yard, and she saw me and she wanted me like to go

12  ahead and play with her and the mother said, you know, she

13  is hiding from you.

14           Another thing, I said that she wanted me to go

15  ahead and play with her, but I did not pay attention to her.

16  And the mom, her mom told me that she was hiding so that I

17  could go ahead and get her and bring her, and then I told

18  her to come back in and go do her homework.

19      Q.   Go on.

20      A.   And when she was smoking out there, I told her to

21  close the door because I was concerned.  I did not like for

22  the children to absorb the smoke.

23      Q.   And what happened?

24      A.   And then I told Crystal to go help the children

25  with the homework.

kmm

1    Q.    What did she say?

2    A.    And she told me why don't you go.

3    Q.    And did you?

4    A.    I asked the girl, because I asked Sincere, and

5    Sincere told me he did not need any help, so I helped the

6    little girl, the younger one.

7    Q.    You helped her with her homework, Mya?

8    A.    Yes, I helped her.

9    Q.    And then what happened?

10    A.    And when she finished with her homework and I

11    helped her, I went back outside.  And I continue speaking

12    with Crystal, drinking the liquor, and a few minutes later a

13    male arrived and a friend of Crystal's, but he was not there

14    a long time.  It was only a little bit.  She only gave him a

15    cigarette and then he left.

16    Q.    And then what happened?

17    A.    And then I asked Crystal permission because I

18    needed -- I wanted to go to the bathroom.

19    Q.    And did she give it to you?

20    A.    Yes.

21    Q.    And what happened then?

22    A.    When I went to the bathroom, I saw the girl there.

23    I think she was going to change her clothes because she had

24    just came from school, and she did not have any clothes on;

25    not totally.  She had a shirt on.  She had on a shirt.

1       Q.    Okay.  So she was not clothed from the waist down;
2    is that what you are saying?

3       A.    No.

4       Q.    No, that's correct, or no, that she didn't have
5    any clothes?

6       A.    No, she did not have her clothes on.  She had her
7    clothes in her hand.

8       Q.    Okay.  And then what did you do?

9       A.    Then she followed me, and I told her to stay
10   because I was going to use the bathroom.

11      Q.    You walked towards the bathroom; is that correct?

12      A.    I went in.  I closed the door.

13      Q.    Before you went in, did you say anything to Mya?

14      A.    I told her to put on her clothes.

15      Q.    Did she try to follow you into the bathroom?

16      A.    Yes.

17      Q.    And what did you tell her?

18      A.    No, for her to wait for me outside.

19      Q.    So you went into the bathroom, correct?

20      A.    Yes.

21      Q.    Mya did not go in?

22      A.    No.

23      Q.    You did what you had to do and then you left the
24   bathroom?

25      A.    Yes.

D. Ramos - Defense - Direct        1304

1     Q.   And what did you see when you opened the door and
2    left the bathroom?

3     A.   She was still without clothes.

4     Q.   And where were the clothes?

5     A.   Her little hands, and I took it from her.

6     Q.   What did you say to her?

7     A.   That, to put on her clothes because she was naked
8    and that her mom was going to punish her.

9     Q.   And what did you do?

10    A.   We went to the kitchen.  I took the clothes from
11   her and I told her come, and I sat her on the floor, and I
12   put on her panties, and a pajamas button, I think it was.

13    Q.   Did you pull them all the way up?

14         MR. PERRI:   Objection.

15         THE COURT:   Reason.

16         MR. PERRI:   It's leading, your Honor.

17         THE COURT:   Try not to lead, Mr. Berger.  Ask
18    your next question.

19    Q.   Where did you put the panties and the pajamas?

20    A.   I was putting it on her.  I was dressing her up.

21    Q.   What part of her body did you put the panties and
22   the pajamas?

23    A.   She was sitting on the floor.  I put on her
24   panties first.

25    Q.   Go ahead.

kmm

1    A.   And then I put on her pajamas, I believe it was.

2    Q.   And then what happened?

3    A.   Then I stood her up and I put on her -- to put on

4  her shorts because I didn't want to touch her anymore

5  because of her mom.

6    Q.   So you stood her up.  When you stood her up, where

7  were her panties and pajamas?

8    A.   Like around the knees.

9    Q.   And when you stood her up and her panties were

10  around her knees, what happened?

11    A.   I told her to put on her pants before her mom --

12  her little pants before her mom came in.

13    Q.   And what happened?

14    A.   When she bent to bring up her little pants, her

15  mother walked in at that time.

16    Q.   What did she say?

17    A.   She said in English, what the fuck.  What is going

18  on here?

19    Q.   What did she say after that?

20    A.   She asked the little girl if he was -- if I was

21  eating her coochie, and the little girl said, yes, because

22  she was afraid that Crystal would punish her.

23              MR. PERRI:  Objection.

24              THE COURT:  Sustained to the last part of the

25      answer.  That is stricken.  Wait for a question.

1     Q.   After she asked Mya if you had eaten her coochie

2   and after she said, yes, what did you say to Crystal, if

3   anything?

4     A.   I told her that I did not do anything.

5     Q.   After that what happened?

6     A.   They told me to leave the house immediately if I

7   did not want her to call the police.

8     Q.   And did you leave?

9     A.   Immediately I left because I didn't want any

10  troubles with her.

11    Q.   Okay.  Was Crystal angry when she said these

12  things when she walked into the kitchen?

13    A.   Super angry, I would say.

14    Q.   Daniel, did you at any time ever put your mouth or

15  tongue on Mya's vagina?

16    A.   No, never.

17    Q.   Did you ever put your penis inside her anus?

18    A.   No, never.

19    Q.   Now, you went outside, and did you remain there?

20    A.   Yes, I went to my car.

21    Q.   Did you have a conversation with anybody prior to

22  the time that the police came?  Did you have a conversation

23  with anybody?

24    A.   No.  With the exception of Mya, who I saw at the

25  window.

1   Q.   What conversation did you have?

2            MR. PERRI:  Objection.  It's hearsay, your

3   Honor.

4            MR. BERGER:  What?

5            THE COURT:  Come up.

6            (Whereupon, there was a sidebar discussion,

7   as follows:)

8            THE COURT:  The objection is hearsay.

9   Agreed.  I was trying to quickly go through my mind --

10           MR. BERGER:  It's part of a transaction and

11  it should only come in that it was said, not that it is

12  true.  If you hear the content of it, if you think it's

13  hearsay, after that then I agree you can sustain it.

14  When you hear what the conversation is you will see

15  it's not hearsay.  It's not coming in for the truth of

16  it.

17           MR. PERRI:  This is after he exited the

18  house.  The door is locked.  He is shouting into the

19  home.  He is speaking into the home.

20           THE COURT:  If it's coming in for the truth

21  of the matter, it's hearsay.  I was trying to go

22  through my mind if there is a hearsay exception to this

23  potential answer that is about to come out.  I'll hear

24  the answer.  If you have a continued objection, you

25  will let me know, and if it needs to be stricken.  I'll

1    take that application for now.  I'll allow it to come

2    in.

3              MR. BERGER:  It's not hearsay, because

4    hearsay has to come in for the truth.  This is reciting

5    a conversation that is not hearsay, if it's reciting a

6    conversation.

7              THE COURT:  I will give the jury an

8    instruction right now that the next answer is not

9    coming in for the truth of the matter.  At the end of

10   the day, hearsay is hearsay, and it's just whether

11   there is an exception.  Anything said outside of the

12   transaction, any conversation is hearsay.

13             MR. BERGER:  No, it's only coming in for the

14   truthfulness of it, Judge.  That's the important thing,

15   it has to be coming in for the truthfulness of the

16   content, not that there was a conversation.  That

17   always comes in.

18             THE COURT:  But then you could simply say,

19   did you have a conversation and you don't get the

20   content of the conversation out.

21             MR. BERGER:  But you do.  It's not coming in

22   for the truthfulness of it.  The content of the

23   conversation has to be coming in for its truthfulness.

24   All we are doing is saying, this is coming in for the

25   fact that it was said, period.

1           MR. PERRI:  If it's not coming in for the

2      truthful fact in the case, then what is the relevancy

3      of it?

4           MR. BERGER:  It's very relevant.

5           THE COURT:  It only becomes relevant if it's

6      for its truth, otherwise you can simply say, was there

7      a conversation.

8           MR. BERGER:  Mya testified in this courtroom.

9           MR. PERRI:  So it is a prior inconsistent

10     statement.

11          MR. BERGER:  Yes, it will be inconsistent

12     with what she said.

13          MR. PERRI:  Then there might be an exception.

14          THE COURT:  I'll let him answer.

15          MR. PERRI:  Then it's for the truth.

16          (Whereupon, the proceedings resumed.)

17          THE COURT:  You may answer.

18     Q.   What was the conversation you had with Mya?

19     A.   I asked her if her mom was going to call the

20     police, if she called the police because she told me she was

21     going to call the police.

22     Q.   What else did you say?

23     A.   Mya answer me, you know, my mom, you know how she

24     is.

25     Q.   Did you stay and remain there?

1       A.    Yes, waiting for Crystal to come out so we could

2    fix this issue, and she never came out.

3       Q.    And when you say, fix the issue, what did you mean

4    by that?

5       A.    The bad thoughts that she was having.

6       Q.    She, being who?

7       A.    The reason why she told me she was going to call

8    the police.

9       Q.    When you say, she, who are you referring to?

10      A.    Crystal Ramirez.

11      Q.    There came a time when the police arrived?

12      A.    When I was talking to Mya and waiting for Crystal,

13   I saw the police and the ambulance that were coming.

14      Q.    How much time elapsed, how much time went by from

15   the time you walked out of the house until you saw a police

16   car?

17      A.    About five, ten minutes.

18      Q.    Okay.  Now, you heard Sincere testify in court; do

19   you remember?

20      A.    Yes, of course.

21      Q.    And you heard Sincere say that you said you didn't

22   do anything?

23      A.    Exactly.

24      Q.    But then you heard him say -- but then you said, I

25   did it.  Did that happen?

1      A.    He said it because somebody told him to say that

2   because he doesn't know anything.

3                  MR. PERRI:  Objection.

4                  THE COURT:  Sustained to the last part of the

5           answer.  It is stricken.  Mr. Berger, you can ask the

6           question again, but that answer is stricken.

7      Q.    Mr. Ramos, listen to the question.  Did you say to

8   anyone there at the house that you did this, that you did

9   it?

10     A.    To no one.

11     Q.    Now, drawing your attention to the time when the

12  police officer came to the house; do you recall that?

13     A.    Yes.

14     Q.    Did you hear Officer Boccio testify about certain

15  things he says that you said?

16     A.    I don't remember specifically.

17     Q.    Let me ask you this:  Did you say to Officer

18  Boccio, arrest me, she says I raped her daughter?

19     A.    No.  That was not what I said.

20     Q.    Did you say to Officer Boccio, I made a mistake, I

21  licked her once in the bedroom; did you say that?

22                  THE INTERPRETER:  Can I have that repeated?

23                  THE COURT:  Read it back.

24                  (Whereupon, the record was read back.)

25     A.    I never said that.

1     Q.   Okay, now, there came a time when you were

2    arrested?

3     A.   Yes.

4     Q.   And you were taken to, you were transported to

5    another building?

6     A.   Yes.

7     Q.   And in that other building is where you met

8    Detectives Baran and Pacheco, correct?

9     A.   First it was a detective that took my statement.

10   I think it is Baran.

11    Q.   And, I show you People's 9 in evidence, referred

12   to as a rights card; do you see that, Mr. Ramos?

13    A.   Yes.

14    Q.   Is your signature on that card?

15    A.   Yes.

16    Q.   And did you write the word C on that card?

17    A.   Yes.

18    Q.   Why did you sign that card?

19    A.   Because they told me to sign it.

20    Q.   Did they ever tell you before they even questioned

21   you that you had the right to remain silent?

22    A.   No.

23    Q.   That anything you said could be used against you

24   in court, that you have a right to an attorney, and if you

25   couldn't afford an attorney, one would be provided to you?

kmm

D. Ramos - Defense - Direct        1313

1   Did they ever read that to you before you were questioned?

2        A.   No.

3        Q.   Did you know what you were signing when you signed

4   People's 9 in evidence?

5        A.   I did not know what I was signing, but they did.

6        Q.   But at that time when you signed it, you did not

7   know what you were signing?

8        A.   No, they only told me to sign it.

9        Q.   I show you what has been marked People's 10 in

10  evidence.

11       A.   I see my signature there, and my Social Security

12  number.

13       Q.   Did you sign that document?

14       A.   Yes.

15       Q.   Were there places where you put your initials on

16  that document?

17       A.   They told me to put it.

18       Q.   Why did you sign that document?

19       A.   Because they told me to sign it.

20            MR. BERGER:   Thank you.   May I have that

21       document back.

22       Q.   Mr. Ramos, at any time while you were in the room

23  with either Detective Baran, or Detective Pacheco, did you

24  ever say I told her I was going to tickle her, and I pulled

25  down her pants and underwear, and I tickled her pussy with

1    my mouth?

2         A.   Never.

3         Q.   Do you know what the word pussy means?

4         A.   Yes.  I know it, but I do not use those kinds of

5    words.

6         Q.   You don't use the word pussy?

7         A.   No.

8         Q.   Did you tell either Detective Baran or Detective

9    Pacheco your address, that you live at 781 Coleridge Road in

10   Uniondale.

11        A.   Yes, because they asked me.

12        Q.   Did you tell either one of the detectives, my wife

13   Juana lives there with me with my son Carlos, age 31?

14        A.   Yes.

15        Q.   And my other son, David Ramos, who is

16   twenty-three?

17        A.   Yes.

18        Q.   Did you say to them, I work for NICE or NICE in

19   Nassau County as a bus driver?

20        A.   Yes.

21        Q.   And you told them your Social Security number?

22        A.   Yes.

23        Q.   You told us yesterday that you didn't read English

24   too well, correct?

25        A.   During that time I did not read it that much, but

1   now I have taken good use of that time while I have been

2   detained.

3       Q.   You mean for the last 19 months you have improved

4   your ability to read English?

5       A.   Yes.

6       Q.   But did you ever read this statement back on the

7   16th of October, 2013?

8       A.   I tried to read it, but I did not understand it

9   too well.

10      Q.   Okay.  Did Detective Baran, or Detective Pacheco,

11  or any other police officer, ever say to you, that you had

12  said I told her I was going to tickle her, and I pulled down

13  her pants and underwear and I tickled her pussy with my

14  mouth?

15              MR. PERRI:  Objection.

16              THE COURT:  Overruled.  If you understand the

17      question, you may answer.

18      A.   Can you say that question again?

19      Q.   Did Detective Pacheco or Detective Baran ever read

20  to you that you said I told her I was going to tickle her,

21  and I pulled down her pants and underwear and tickled her

22  pussy with my mouth?

23      A.   No.

24      Q.   Did you tell Detectives Baran or Pacheco,

25  Wednesday, October 16, 2013, I am normally off from work,

1  but I put my name on the list for extra work, and I got five

2  hours today?

3      A.   Yes.  I told him that.

4      Q.   Did you tell them I work from about 6:30 a.m.

5  until about 11:30 a.m.?

6      A.   Yes.

7      Q.   Did you tell them when I was finishing work today

8  I got a call from my friend, Crystal Ramirez?

9      A.   Yes.

10     Q.   Did you tell her I know her husband Scooby?

11     A.   Yes.

12     Q.   Did you tell them Crystal told me to come to her

13  house today?

14     A.   Yes.

15     Q.   After work, and hanging out there and have a few

16  drinks with her?

17     A.   Yes.

18     Q.   Did you at the time tell them I forgot what

19  streets she lives on, but she lives in the back of the deli?

20     A.   Yes.

21     Q.   Did you tell them I bought a twenty dollar bottle

22  of Long Island Ice Tea because she asked me to bring some

23  liquor so we could drink?

24     A.   Yes.

25     Q.   Did you tell them I also bought her a pack of

D. Ramos - Defense - Direct          1317

1    Newport 100's?

2         A.   Yes.

3         Q.   Did you tell them that Crystal drinks every day

4    and smokes a lot too?

5         A.   Yes.

6         Q.   Did you tell them I encourage her to keep the door

7    closed so the smoke doesn't go into the house and hurt the

8    kids?

9         A.   Yes, I told her that.  Yes, I told her that.

10        Q.   Did you tell them I had got to her house and went

11   to the porch and started drinking and she started smoking?

12        A.   Yes.

13        Q.   Did you tell them after a short time, a black guy

14   came by and joined us on the porch?

15        A.   Yes.

16        Q.   Did you tell them that he was there a little bit

17   and then he left?

18        A.   Yes.

19        Q.   Did you tell them I stayed with Crystal drinking

20   after he left?

21        A.   Yes.

22        Q.   Did you tell them I was still there when the kids

23   came home?

24        A.   Yes.

25        Q.   And did you tell them that and they went inside

1    the house to make their homework?

2         A.    Yes.

3         Q.    Did you tell them I helped them today to do their

4    homework?

5         A.    Yes.

6         Q.    Did you tell them I told Crystal to help them and

7    she told me to help them?

8         A.    Yes.

9         Q.    Did you tell them, so I went inside the house and

10   helped them?  Did you tell them when they finished their

11   homework, I went back outside to drink with Crystal?

12        A.    Yes.

13        Q.    Did you tell them after awhile, I told Crystal I

14   needed to use the bathroom?

15        A.    Yes.

16        Q.    And did you tell them and she said go ahead and

17   use the bathroom?

18        A.    Yes.

19        Q.    And did you tell them, so I went inside to the

20   house, and the little girl was following me all around?

21        A.    Yes.

22        Q.    And did you tell them, so I went into the

23   bathroom?

24        A.    Yes.

25        Q.    Did you tell them that I told her to stay out of

1  the bathroom and I went in?

2      A.   Yes.

3      Q.   Did you tell them when they came out of the

4  bathroom she was still there waiting for me in the kitchen?

5      A.   Yes.

6      Q.   Did you tell them I told her I was going to tickle

7  her and pulled down her pants and underwear and tickled her

8  pussy with my mouth?

9      A.   No.

10     Q.   Did you tell them that I followed her to pull her

11 pants up and just then Crystal came into the kitchen?

12     A.   Could you say that question again?

13     Q.   Did you tell them, I then told her to pull her

14 pants up?

15     A.   Yes.

16     Q.   And did you tell them and just then Crystal came

17 into the kitchen?

18     A.   Yes.

19     Q.   And did you tell them you saw the little girl with

20 the pants down, and she said to me, what are you doing?

21     A.   No, she didn't say what are you doing.

22              THE INTERPRETER:  The interpreter needs

23         clarification.

24     A.   She asked the little girl, if I was eating her

25 coochie.

kmm

D. Ramos - Defense - Direct       1320

1      Q.   And did you say to them, I said I wasn't doing

2   nothing?

3      A.   I told them, yes.

4      Q.   Did you tell them that she then asked the little

5   girl what I was doing, and she said, I was licking her

6   pussy?

7      A.   Could you say it again?

8      Q.   Did you say to the police, she asked the little

9   girl what I was doing, and she said, I was licking her

10   pussy?

11      A.   Yes.  When her mother asked her, she said, yes.

12      Q.   Right, okay.  Did you say to them, I said to Mya,

13   I was playing with you, but she said, no, he was licking my

14   pussy.  Did you say that?

15               THE INTERPRETER:  Can I have that repeated?

16               THE COURT:  You may.

17               (Whereupon, the record was read back.)

18      A.   I didn't use those words.  I didn't say those

19   words.

20      Q.   Did you say to the police, the little girl was

21   scared of her mother?

22      A.   A lot, yes.

23      Q.   Mr. Ramos, is that something that you observed

24   over the time of your being with Crystal and the kids?

25               MR. PERRI:  Objection.

kmm

 1              THE COURT:  Sustained.

 2        Q.   Did you observe the interaction between Mya and

 3   her mother during the course of your relationship?

 4        A.   I do not understand that question.

 5        Q.   During the course of your relationship with

 6   Crystal and Mya, were you able to observe the relationship

 7   between Crystal and Mya?

 8        A.   Yes.

 9        Q.   And when you told the police the little girl was

10   scared of her mother, is that something you observed in

11   observing the relationship between the two?

12        A.   Yes.  Of course, the child looked like she was

13   very intimidated by her mother.

14        Q.   Did you tell the police, Crystal then told me to

15   get out and I did?

16        A.   Yes.

17        Q.   Did you say to the police, I made a big mistake,

18   and I'm very sorry for what I did?

19        A.   No.

20        Q.   Did you say to the police, I am presently in the

21   special victims squad detective office, where I am giving

22   this statement to Detective Baran?  Did you say that to

23   them?

24        A.   No.

25        Q.   Did you say to them, who has typed it for me, and

D. Ramos - Defense - Direct     1322

1  Detective Pacheco has read it to me in Spanish, and it is

2  correct and true; did you say that?

3      A.    I don't remember.

4      Q.    Did Detective Pacheco ever read to you in Spanish,

5  the following:  I told her I was going to tickle her, and I

6  pulled down her pants and underwear, and I tickled her pussy

7  with my mouth?

8      A.    No.

9      Q.    There came a time when, I don't know, was it

10 Detective Baran or Detective Pacheco who asked you to write

11 a letter to Crystal and Mya?

12     A.    Detective Baran said to write a letter, said to

13 Detective Pacheco to write a letter in Spanish saying that,

14 saying that the interpreter needs clarification.

15             THE COURT:  Go right ahead.

16     A.    Saying sorry.

17     Q.    And did you write what is in evidence as People's

18 11; did you write that?

19     A.    Yes.

20     Q.    And why did you write that?

21     A.    Because they told me to write it.

22     Q.    They told you to write the letter.  What did they

23 tell you to write, specifically?

24     A.    To write an apology letter.

25     Q.    And why did you write this?

1    A.    Because they told me to write it.

2    Q.    Okay.  Let me show you People's 11.

3    A.    Yes, that's my handwriting and that's my name.

4    Q.    Did you say in that letter, I was sorry for

5    licking Mya's vagina?

6    A.    That letter doesn't say anything in regards to

7    that.

8    Q.    But you asked -- why did you say what you said in

9    that letter?

10   A.    Because of the way that she was acting.  She was

11   very angry with me, and I do not like to offend people and

12   that's why I wrote that letter.

13   Q.    So you felt she was offended by your actions?

14              MR. PERRI:  Objection, leading.

15              THE COURT:  Sustained.

16   Q.    You saw that she was angry, correct?

17              MR. PERRI:  Objection, leading.

18              THE COURT:  Put a timing on it.

19   Q.    Back when you were in the kitchen, you saw that

20   Crystal was angry, correct?

21   A.    Super, super angry, and I was also very scared.

22   Q.    And what were you apologizing for when you wrote

23   People's 11?

24   A.    The way she was acting.

25   Q.    So you were apologizing for her actions?

D. Ramos - Defense - Direct     1324

1     A.   Because of how she was feeling.

2     Q.   Mr. Ramos, in all of the times that you were with

3  Mya, did you ever touch her in any sexual way?

4     A.   Never.

5     Q.   Did you ever put your mouth or your tongue on her

6  vagina?

7     A.   Never.   It never crossed my mind.

8     Q.   Did you ever put your penis in her anus?

9     A.   No.

10     Q.   Did that ever cross your mind?

11               MR. PERRI:   Objection.

12               THE COURT:   Overruled.

13     A.   Never.

14     Q.   Has that ever crossed your mind with respect to

15  any child?

16     A.   Never.

17               MR. BERGER:   Thank you.   Nothing further.

18               THE COURT:   We have been working about an

19        hour, so before we allow the People to conduct their

20        cross-examination, if they choose to, let me give you a

21        short break to stretch your legs and use the facility.

22               Don't talk about the case with each other.

23        Don't let other people talk to you about the case.

24        Don't let anyone talk about the case in your presence.

25        Don't get on your phones and start to research

D. Ramos - Defense - Direct        1325

1    anything.  Enjoy your short break.  See you all in ten
2    minutes.
3               (Whereupon, the jury exited the courtroom.)
4               THE COURT:  Yesterday, Mr. Berger, you made a
5    request of the Court to photocopy the records I had
6    looked at with regards to the child center, the
7    Psychiatric Counseling Center.  I advised you we
8    returned the records.  In fact, I was mistaken.  We had
9    not yet returned the records.  We have them.  I'll make
10   a complete copy of them.  They will be under seal, and
11   if it's required under the case that they become part
12   of the Court's file, I will do that.  If it's not
13   required, depending on the jury's verdict, I will not,
14   but we have them, and an exact copy will be made.
15               (Whereupon, a short recess was taken.)
16               (Whereupon, the jury entered the courtroom.)
17               THE CLERK:  Do both sides stipulate all sworn
18   jurors are present, People?
19               MR. PERRI:  Yes, your Honor.
20               THE CLERK:  Defense counsel?
21               MR. BERGER:  Yes, your Honor.
22               THE CLERK:  Mr. Ramos, you are reminded you
23   are still under oath.
24               THE DEFENDANT:  Yes.
25               THE COURT:  Welcome back.

D. Ramos - Defense - Cross        1326

1                    People, you may cross-examine.

2     CROSS-EXAMINATION

3     BY MR. PERRI:

4         Q.    Mr. Ramos, you began your testimony here

5     yesterday, correct?

6         A.    Yes.

7         Q.    And yesterday when you were asked on direct when

8     you and your wife were married, you couldn't remember

9     yesterday, correct?

10        A.    Yes.

11        Q.    And when you were asked yesterday whether or not

12    -- sorry, withdrawn.

13               When you were asked yesterday how long you lived

14    at your home, you didn't know the answer to that question

15    either, correct?

16        A.    Yes.

17        Q.    And then when you were asked today when you

18    married to your wife you had the answer right away, correct?

19               MR. BERGER:  Objection.  That's not what was

20         asked.

21               THE COURT:  Sustained.  With regards to that

22         particular objection.

23        Q.    When you were asked today when you married your

24    wife, you were able to respond?

25               MR. BERGER:  Objection.  That's not what was

kmm

D. Ramos - Defense - Cross          1327

1    asked.

2              THE COURT:   Sustained.

3    Q.   What happened in 1980 between you and your wife?

4    A.   I met her.

5    Q.   And you had that answer right away today, correct?

6    A.   Yes.

7    Q.   And yesterday when you were questioned about how

8    much time you spent bussing and working with children, you

9    didn't have an exact answer, correct?

10   A.   Yes.

11   Q.   And then today when you were asked the same

12   question, you say said twelve or thirteen years, correct?

13   A.   Correct.

14   Q.   Did you work on your testimony last night, sir?

15             MR. BERGER:   Objection to the form of the

16   question.

17             THE COURT:   You can answer if you understand

18   the question.

19   A.   Could you say that question again?

20   Q.   Did you work on your testimony last night, sir?

21   A.   Mentally, yes.   I was reviewing it, because I was

22   not expecting those questions.

23   Q.   Were you expecting the questions you were asked

24   today?

25   A.   Yes.

D. Ramos - Defense - Cross          1328

1       Q.    Did you go over those questions?

2       A.    Mentally, yes.

3       Q.    And you didn't discuss those questions with anyone

4    else, just mentally?

5       A.    No.

6       Q.    But you were able then to somehow to expect those

7    questions today?

8       A.    Those and a lot more.

9       Q.    So it was part of your work experience in the

10   United States you worked for the MTA, correct?

11      A.    Yes, for the MTA in Nassau and then NICE came in

12   and replaced MTA.

13      Q.    While you were working for the MTA, there were

14   forms, correct?

15      A.    What do you mean by forms?

16      Q.    Papers.  Did you have to log each day of your

17   work?

18      A.    Yes.

19      Q.    And did you have -- when you accepted your job,

20   did you get a description of your position?

21      A.    Yes.

22      Q.    And when you were working for the MTA and for the

23   NICE bus, you had to interact with customers, correct?

24      A.    Correct.

25      Q.    You had to answer their questions?

kmm

1       A.    If I knew them, yes.  If I did not, no.

2       Q.    All of that, the forms, papers, job offers, that

3   was all in English, correct?

4       A.    Yes.

5       Q.    You said you have known Crystal Ramirez for over

6   ten years, correct?

7       A.    Yes.

8       Q.    Just to be clear, your relationship to Crystal

9   Ramirez and to her children, is that you are the father of

10  her -- the father of her children's friend?

11            THE INTERPRETER:  Could I have the question

12        read back?

13            THE COURT:  How about you rephrase the

14        question.

15      Q.    Your relationship, your connection to Crystal

16  Ramirez, is that you are the father of a friend of the

17  father of her children?

18      A.    I do not understand that question.

19      Q.    How did you meet Crystal Ramirez?

20      A.    Through the father of the children.

21      Q.    Was the father of the children a friend of your

22  son?

23      A.    Yes.

24      Q.    You are not dating Crystal Ramirez, correct?

25      A.    No.

D. Ramos - Defense - Cross          1330

1     Q.    You are not romantically involved with her at all,

2  correct?

3     A.    No.

4     Q.    You are just very kind to her and her children,

5  correct?

6     A.    Exactly.

7     Q.    And you described how for this former girlfriend

8  of your son's friend, you would drive her anywhere pretty

9  much she wanted to go, correct?

10     A.    I do not understand that question.  Could you make

11  it clear, please?

12     Q.    You would drive Crystal Ramirez anywhere she

13  wanted to go, pretty much, correct?

14                MR. BERGER:  Objection, Judge.  The form of

15           the question, pretty much.

16                THE COURT:  Sustained as to form.

17     Q.    You drove Crystal Ramirez many places, correct?

18     A.    Yes.

19     Q.    And you drove her children many places, correct?

20     A.    Yes.

21     Q.    And they didn't pay you anything for that,

22  correct?

23     A.    No.

24     Q.    And you bought them meals, correct?

25     A.    Sometimes.

 1      Q.   And you paid for those meals sometimes, correct?

 2      A.   Correct.

 3      Q.   You're paying for these meals of someone you

 4   weren't dating, correct?

 5      A.   Correct.

 6      Q.   And you were babysitting for Crystal's children,

 7   correct?

 8      A.   Um, sometimes when she will ask me.

 9      Q.   And were you paid for babysitting, correct?

10      A.   No.

11      Q.   And at this time when you were babysitting the

12   children, driving Crystal many places, sometimes with her

13   family, you had a full-time job, correct?

14      A.   Um, sometimes yes, sometimes no.

15      Q.   When were the times that you weren't employed in

16   the last three years?

17            MR. BERGER:   The last three years, are we

18        talking the last --

19            THE COURT:   That objection is sustained as to

20        form.  Please clarify the timeframe.  Wait for a new

21        question.

22      Q.   In the three years before October 16th of 2013,

23   when were you unemployed?

24      A.   I've always been working.

25      Q.   You have had a full-time job during the same time

D. Ramos - Defense - Cross          1332

1    you were babysitting and transporting the Ramirez family?

2          A.    Yes.

3          Q.    And at that time, when you were transporting them

4    and babysitting for the children, you had your own home,

5    correct?

6          A.    Yes.

7          Q.    And you had your own family, correct?

8          A.    Yes.

9          Q.    And you have your own children?

10         A.    Correct.

11         Q.    And you had a wife?

12         A.    Correct.

13         Q.    During the same time you were hanging out with

14   Crystal Ramirez on multiple occasions?

15         A.    Not as a couple, but as friends.

16         Q.    And as friends, you would go out to dinner,

17   correct?

18         A.    When she would tell me, yes.

19         Q.    Whenever Crystal Ramirez told you, you would pick

20   her up and drop her off, correct?

21         A.    Correct.

22         Q.    You even drove her into Suffolk County at least

23   one time, correct?

24         A.    More than once.

25         Q.    And you were never paid for any of that, correct?

D. Ramos - Defense - Cross        1333

1    A.    No.

2    Q.    And you have been to Crystal's house several

3  times; is that correct?

4    A.    When she called me, yes.

5    Q.    So whenever Crystal Ramirez called you, you

6  dropped everything in your life, and you did whatever she

7  needed, correct?

8         MR. BERGER:  Objection to form of the

9    question.

10        THE COURT:  You may answer it.

11   A.    I did not understand.  Can you say that question

12  again?

13   Q.    Whenever Crystal called and made a request, even

14  though sometimes you didn't want to, you did what she said?

15   A.    Sometimes, yes, because she would say fag, come do

16  this.

17   Q.    And so you stayed friends with Crystal even though

18  she was saying those things to you?

19   A.    Well, she was not saying in an offensive way, at

20  least I did not take it that way.

21   Q.    When she called you a fag, you didn't take that as

22  offensive?

23   A.    No.

24   Q.    So regarding October 16, 2013, you testified your

25  concern about how much Crystal drinks, correct?

D. Ramos - Defense - Cross        1334

1        A.    Yes.

2        Q.    And you also said you are concerned about how much

3  Crystal smokes, correct?

4        A.    Yes.

5        Q.    And on October 16th, you purchased the alcohol

6  that was being drank at Crystal's home, correct?

7        A.    Correct.

8        Q.    And you purchased the cigarettes for her, correct?

9        A.    Correct.

10        Q.    And she didn't pay you for any of that, correct?

11        A.    Correct.

12        Q.    And so all of the way up to October 16th of 2013,

13  you never did anything negative to Crystal Ramirez?

14        A.    Yes.

15        Q.    And you had no huge argument with Crystal Ramirez,

16  correct?

17        A.    Never.

18        Q.    And you got along with her children, correct?

19        A.    With her, with the children, and with the father.

20        Q.    And you liked being around the children, correct?

21        A.    All of them.

22        Q.    Specifically, the children, you liked being around

23  the children, correct?

24        A.    Not just them, the friends, the people that I knew

25  in the family.

kmm

1      Q.   When you babysat the children, you were alone with

2  them, correct?

3      A.   With them, yes.

4      Q.   And that was more than once, correct?

5      A.   Once or twice, but with her permission, with the

6  permission of the mother.

7      Q.   But the mother wasn't there, Crystal wasn't there,

8  correct?

9      A.   Sometimes, no.  Sometimes she was nearby.

10      Q.   And sometimes you babysat at night, you testified

11  to that?

12      A.   Yes.

13      Q.   And those times at night would have been just you,

14  Sincere, and Mya, correct?

15      A.   Yes.

16      Q.   Now, in your statement to the police, and the

17  written statement that you looked at on the stand --

18           MR. BERGER:  Objection to the phrase, his

19      statement to the police, that is disputed, Judge.

20           THE COURT:  Sustained.  Identify it by

21      evidence.

22      Q.   In the document you signed with the police, I

23  believe as People's 10, and then also in your testimony, you

24  said you helped the children with their homework, correct,

25  on October 16, 2013?

1       MR. BERGER:  Judge, I object to the form of

2   the question.  If he wants to ask what happened on the

3   16th, fine.

4       THE COURT:  Objection overruled.  It's

5   cross-examination.

6       You may answer.

7   A.   Yes.

8   Q.   And so you helped the children with their homework

9   many times, correct?

10  A.   No, only that time.

11  Q.   And that time, the homework that you are helping

12  them with, what language was it in?

13  A.   In English, because they do not speak Spanish.

14  Q.   That's correct.  The children don't speak Spanish

15  and Crystal doesn't speak Spanish, correct?

16  A.   Of course not.

17  Q.   So you were able to read their homework, correct?

18  A.   A child's homework is very easy.

19  Q.   That wasn't the question, sir.  Were you able to

20  read the homework?

21  A.   Yes.  After, yes.

22  Q.   What was Mya's homework that you helped her out

23  with that day?

24  A.   Pictures and questions, like pictures and

25  questions with like father/mother table.

1    Q.    And you said on direct you testified that you had

2   to ask her permission to use the bathroom that day?

3    A.    Yes, that's it.

4    Q.    And when you are in Crystal's house, do you always

5   ask permission to use the bathroom?

6    A.    Of course, yes.

7    Q.    It was your testimony that when Mya -- when you

8   say Mya wasn't wearing her underwear or her pants, you had

9   her sit on the floor in order for you to be able to put her

10  underwear and her pants on; is that correct?

11   A.    Correct.

12   Q.    So to make it easier to put her pants on, you had

13  her sit down on the floor?

14   A.    What was the question?

15   Q.    To make it easier, you had her sit down on the

16  floor to put her own pants on?

17          MR. BERGER:  Objection to the form of the

18       question.

19          THE COURT:  Overruled.

20          You may answer.

21   A.    For me it was easier to put her clothes on there

22  because it is easier for me.

23   Q.    Do you sit down on the ground when you put your

24  pants on?

25   A.    When I'm going to play soccer, football, yes.

D. Ramos - Defense - Cross          1338

1      Q.    Mr. Ramos, you were sitting here yesterday,
2    correct?
3      A.    Correct.
4      Q.    And you heard the testimony from your expert,
5    correct?
6      A.    Which expert?
7      Q.    The expert that you called, that your case called
8    with respect to DNA.
9      A.    The doctor that was sitting here?
10     Q.    Yes.
11     A.    Yes, I heard him, but he his very professional,
12   and I'm not that professional to understand those words.
13     Q.    Did you hear him talking about touching underwear?
14     A.    Yes, that I understood.
15     Q.    You understood the part about touching underwear
16   and transferring DNA, correct?
17     A.    Yes.
18     Q.    And you heard that before you testified here
19   today, correct?
20     A.    Could you repeat the question?
21     Q.    And you heard that testimony before you testified
22   here today, correct?
23     A.    Correct.
24     Q.    Because in the document that you signed, that is
25   People's 10, you never said anything about touching Mya's

kmm

1   clothing, correct?

2       A.    Before, yes, I said.

3       Q.    When did you say that?

4       A.    When Detective Baran interviewed me, but he didn't

5   write it.

6       Q.    Let's go back to the interview, actually, before

7   the interview.  So after Crystal walked in and you left the

8   house, within five minutes you testified Officer Boccio,

9   police officer, or a police officer arrived at the scene; is

10  that correct?

11      A.    I do not understand your question.

12      Q.    After you left the house, did the police arrive

13  within five to ten minutes?

14      A.    Correct.

15      Q.    And you spoke with one of those police officers,

16  correct?

17      A.    When I saw that he came, yes.

18      Q.    And that police officer was the one that put

19  handcuffs on you, correct?

20      A.    Correct.

21      Q.    And have you ever met that police officer before?

22      A.    No.

23      Q.    And he didn't know you, correct?

24            MR. BERGER:   Objection.

25            THE COURT:   Sustained as to form.

D. Ramos - Defense - Cross          1340

1      Q.   You never met him before that day, correct?

2      A.   No.

3      Q.   Once you came to the special victims squad, you

4   were placed in a small room, correct?

5      A.   Correct.

6      Q.   And at some point, while you were there that

7   night, you were given food, correct?

8      A.   They gave me a slice of pizza with some water or

9   soda.  I'm not too sure.

10     Q.   And you were allowed to use the restroom, correct?

11     A.   I don't remember.

12     Q.   And there did come a time where you spoke with

13  Detective Baran, correct?

14     A.   Correct.

15              MR. PERRI:  I would like him to be shown

16      People's 9.

17     Q.   Mr. Ramos, you were shown that on October 16,

18  2013, after you were arrested, correct?

19     A.   They told me to sign it.

20     Q.   That's not the question, sir.  Were you shown that

21  document?

22     A.   Yes.

23     Q.   And you can see it now?

24     A.   Yes.

25     Q.   And you recognize your signature three times,

kmm

1    correct?

2         A.    Twice.   Twice.   No, no, three times.

3         Q.    And you recognize where you have written si, S-I

4    twice, correct?

5         A.    Yes.

6         Q.    What is the title of that document, what's the

7    first two lines in bold?

8         A.    It says, notification of your rights before being

9    questioned.

10        Q.    And that's exactly how that card appeared when

11   were you given it, correct?

12        A.    Yes, but I did not read it.

13        Q.    But you looked at it, correct?

14        A.    Yes, I saw it.

15        Q.    So you looked at it and there are words on that

16   page, correct?

17        A.    Yes.

18        Q.    But you didn't read the words that you saw on that

19   page that are in Spanish?

20        A.    No.

21        Q.    And you understood that you were under arrest at

22   that time, correct?

23        A.    Yes, from the moment the agent arrested me I knew

24   I was under arrest.

25        Q.    And you understood this was very serious, correct?

 1                    MR. BERGER:  Objection.

 2                    THE COURT:  Overruled.

 3                    You may answer.

 4         A.    Could you repeat?

 5         Q.    Did you understand it was serious, your situation?

 6         A.    No.

 7         Q.    So it's your testimony that you were given that

 8    card, you had been in custody for hours at that point, that

 9    Crystal had accused you of having oral sex with her

10    daughter, called the police, but it wasn't serious?

11                    MR. BERGER:  Such a compound question.  The

12              question is improper.

13                    THE COURT:  You can answer if you understand

14              the question.

15         A.    I did not know all that.

16         Q.    You didn't know that Crystal believed that you had

17    sexual contact with her daughter; is that what you are

18    saying?

19                    MR. BERGER:  Judge, I object.  He's asking

20              him what Crystal believed.

21                    THE COURT:  Sustained as to form.

22         Q.    On direct Mr. Berger asked you what Crystal said

23    and you testified that Crystal said, in your presence, did

24    he eat your coochie to Mya.  Mya said, yes, according to

25    you, and then Crystal became extremely angry and said, get

1   out of the house, I'm going to call the police?

2            MR. BERGER:   Judge, it's a compound question.

3       It mixes a lot of facts up.   I ask him to ask it one at

4       a time instead of lumping them altogether.

5            THE COURT:   Overruled.

6            You may answer the question.

7   Q.   Was that your testimony?

8   A.   Could you say the question again?

9   Q.   Did you not testify that you say that Crystal,

10  when she walked into the kitchen and found you with Mya,

11  asked Mya, did he eat your coochie?

12  A.   Crystal asked Mya if I ate her coochie and Mya

13  answered her, yes, because she was fearful of --

14            MR. PERRI:   I ask the last part be stricken.

15            THE COURT:   The last part after the because

16       is stricken.   The rest of the answer stands.

17  Q.   After that, it was your testimony that Crystal

18  told you to get out of the apartment and she was going to

19  call the police, correct?

20  A.   Yes.   She yelled at me telling me to leave the

21  house immediately.   I'm sorry, I forgot what I was saying.

22  Q.   Did she also tell you she was going to call the

23  police?

24  A.   Yes.   She yelled at me, screamed at me and told me

25  to leave the house.   If not, she was going to call the

1   police, but she called them anyway.

2       Q.   In fact, you asked Mya, according to your

3   testimony, whether her mother called the police, correct?

4       A.   Yep.  When I saw her by the window and I came

5   close to the window, and I asked her before the police came,

6   I asked her.

7       Q.   So Mya was doing that when she was six-years old,

8   correct?

9       A.   Correct.

10      Q.   So she came to the window to talk to you

11  afterwards?

12      A.   I saw her sitting at the window looking at me.

13      Q.   The first question you asked her, did your mom

14  call the police?

15      A.   No, the question was, why did your mother call the

16  police.

17      Q.   And then the six-year old girl's response to you,

18  according to you, was you know how my mom is?

19      A.   Correct.

20      Q.   And knowing all that, and being in custody for

21  hours with the police, it's your testimony that you didn't

22  think it was serious?

23              MR. BERGER:   Judge, objection to the form of

24         the question.

25              THE COURT:   Overruled.

D. Ramos - Defense - Cross      1345

1       A.    When I asked the little girl, the police had not

2    arrived yet.

3             MR. PERRI:   I'm asking the witness be

4        directed to answer the question.

5             THE COURT:   All right.  Why don't you ask the

6        question again.

7        Q.    Knowing everything that we have just gone over,

8    Mr. Ramos, everything that you testified to, are you still

9    saying that when you were at the special victims squad in

10   the arrest room, that you didn't know this was serious?

11       A.    No, because I did not know.  I did not know

12   absolutely anything.

13       Q.    And so when the police placed the document in

14   front of you, you just signed it?

15       A.    Because they told me, because they told me so.

16   That was the first thing.

17       Q.    Detective Pacheco didn't read you the top two

18   paragraphs in Spanish?

19             MR. BERGER:   Specifically, just direct his

20       attention to the paragraph he is referring to.

21             MR. PERRI:   The top two paragraphs.

22             THE COURT:   Is the document before the

23       witness?

24             MR. BERGER:   The rights card.

25             THE COURT:   Given all of the colloquy, ask

1       the question again.

2           Q.   With respect to the rights card, the document that

3       you signed three times, are you saying Detective Pacheco did

4       not read the top two paragraphs to you in Spanish?

5           A.   No.

6           Q.   Detective Pacheco was there, correct?

7           A.   The other detective called him.

8           Q.   And so Detective Pacheco was present?

9           A.   Yes.

10          Q.   Detective Baran called in Detective Pacheco and

11      all he did was direct you to sign that card?

12          A.   Correct.

13          Q.   Could you please read the final paragraph on that

14      card, the third paragraph?

15               THE COURT:   I'm going to ask you to read it

16          slowly.

17          Q.   I'll point it out for you.  I'm asking you to read

18      this final paragraph.

19          A.   Everything?

20          Q.   Yes.

21               THE INTERPRETER:   The interpreter asks him to

22          read it slowly.

23               THE COURT:   Yes, read it slowly.

24          A.   I'm going to read it up to the dot, the period.  I

25      have been informed by the detective, the police agent, that

1   I have the right to remain silent, and that anything that I

2   say, it could be used against me in court.  They have

3   informed me that I have the right to speak to an attorney

4   before answering any questions or to have an attorney

5   present at any time.  They also informed me that if I cannot

6   pay an attorney, that they can assign me one, and I still

7   have the right to remain silent until I have had the time to

8   speak with an attorney.

9        Q.   And then your signature appears directly below

10  that paragraph, correct?

11       A.   Correct.

12            MR. PERRI:  I ask that be taken from the

13            witness, your Honor.

14            THE COURT:  You may.

15       Q.   Mr. Ramos, after you signed that card, you spoke

16  with Detective Baran, correct?

17       A.   Talking about what?

18       Q.   You talked about the incident with Mya, correct?

19       A.   The supposed incident that happened?

20       Q.   Yes.

21       A.   Yes.  He asked me some questions.

22       Q.   That was after you signed the card, correct?

23       A.   Yes.

24       Q.   And as you were -- and he was speaking what

25  language to you?

1     A.    The one that does not speak Spanish, was speaking

2     to me in English.

3     Q.    And you were able to under understand his

4     questions, correct?

5     A.    The ones that I could, yes, some questions.

6     Q.    And you answered those questions, correct?

7     A.    Some questions.

8     Q.    And at some point while you were talking to

9     Detective Baran, he started typing, correct?

10    A.    He was writing by hand.

11    Q.    Did there come a time where he started typing?

12    A.    He took the information on a piece of paper and

13    went to another office.

14    Q.    There was a computer in that room, correct?

15    A.    I don't remember.

16          MR. PERRI:   I ask the witness be shown

17    People's 10.

18    Q.    Mr. Ramos, do you recognize People's 10, correct?

19    A.    Yes.

20    Q.    That's the paper that you signed on both pages,

21    correct?

22    A.    Correct.

23    Q.    And that's the page where you also made

24    corrections on that page, correct?

25    A.    Supposedly some corrections, yes.

D. Ramos - Defense - Cross          1349

1      Q.    And your initials appear on it multiple times

2    also, correct?

3      A.    Correct.

4      Q.    And at the very top of the page it says statement

5    of Daniel Ramos, correct?

6      A.    Correct.

7      Q.    And so, when you saw this document on October

8    16th, it appeared the same as it appears now, correct?

9      A.    I would have to read it to see if it's the same

10   one.

11     Q.    Take your time.  Look at it.

12     A.    I'm now able to read more English than before, but

13   I prefer to read it in Spanish if it's in Spanish.

14     Q.    If you read English now, go ahead.

15     A.    I'm going to take my time, and I'm going to go

16   slowly.  This way it is the same way I read in Spanish.

17           THE COURT:  Are you asking he read it out

18        loud?

19           MR. PERRI:  Your Honor, the only thing the

20        People are asking him to do is look at the document and

21        see if this appears to be the same when he last saw it.

22           THE COURT:  Do you understand what is being

23        asked of you?  Just a yes or no.

24           THE WITNESS:  No.

25           THE COURT:  Ask it again.

D. Ramos - Defense - Cross          1350

1      Q.    Has that document been altered in any way since
2   you signed it?
3      A.    Like I said before, I would have to read it
4   again.
5           THE COURT:   With the Court's permission, sit
6      there quietly, sir, and read it to yourself.
7           MR. BERGER:   Judge, I object.   How could he
8      know if it's altered if he couldn't read English back
9      then very well.
10           THE COURT:   Counselor, you will be able to do
11      it if you need to on redirect.   The witness said he
12      needs to look it over.   I'm giving him an opportunity
13      to look it over.
14      A.    There are certain words that I do not understand,
15   that I did not say.   There are some words there that I did
16   not say.
17      Q.    I understand that's your position, sir, but aside
18   from those words that you say weren't there when you signed
19   the document --
20           MR. BERGER:   Objection, Judge.
21           THE COURT:   Sustained.
22      Q.    Aside from the words that you say you were unaware
23   of when you signed the document, are there any other
24   alterations to that document?
25           MR. BERGER:   I don't understand the question

1     and how it is relevant.

2               THE COURT:   Overruled.

3               You may answer.

4        A.     The last correction here where it says, linina,

5     girl, when it says -- that's the last correction there

6     because when he said, I went back into the house, he did not

7     put little girl and that's the correction I made.

8        Q.     So you made that correction, correct?

9        A.     That was the last one, yes.

10       Q.     And you pointed out in English that sentence was

11    missing the word girl, correct?

12       A.     Yes.   At that time I told him that the word girl,

13    little girl is not there.

14       Q.     So, you were able to read that sentence, correct?

15       A.     Of course.   It's a very common word.

16       Q.     And that is approximately two lines above where it

17    says, I told her I was going to tickle her, and I pulled

18    down her pants and underwear, and I tickled her pussy with

19    my tongue?

20       A.     I don't see those words there.

21       Q.     But you made your initials next to that

22    correction, correct?

23               MR. BERGER:   Objection.

24               Which correction?

25               MR. PERRI:   The only correction we are

D. Ramos - Defense - Cross      1352

1    discussing, your Honor.

2              THE COURT:  Objection overruled.

3    A.   Yes.

4              THE COURT:  I hate to do this to you, but we

5    need to break.  Ladies and gentlemen of the jury, it's

6    that time for you to enjoy your lunch.

7              Please remember to keep an open mind

8    throughout the trial.  Do not discuss the case amongst

9    yourselves or with anyone else during the trial.  Do

10   not permit anyone to discuss the case in your presence.

11   Do not talk to lawyers, witnesses, or the defendant

12   about anything during the trial.

13             Over the lunch hour, do not visit the place

14   where the crime was allegedly committed, or any other

15   place involved in the case.

16             If there is any news media coverage, ignore

17   it.  Don't get on your phones and try to research it.

18             Enjoy your lunch.  See you at 2:00.

19             (Whereupon, the jury exited the courtroom.)

20             THE COURT:  Anything for the record,

21   Mr. Berger?

22             MR. BERGER:  No, your Honor.

23             THE COURT:  People?

24             MR. PERRI:  No, your Honor.

25             THE COURT:  See you at 2:00.

D. Ramos - Defense - Cross        1353

1              MR. PERRI:   The People ask that the Court

2       admonish defense counsel not to discuss the testimony

3       in this case with his client.   He's in the middle of

4       cross-examination and it's entirely inappropriate.

5              MR. BERGER:   I did not discuss the testimony.

6       I understand the application, and I will honor it.

7              THE COURT:   Thank you very much.

8              (Whereupon, a luncheon recess was taken.)

9                    *              *              *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

kmm

```
 1                    A F T E R N O O N   S E S S I O N

 2

 3

 4              THE CLERK:  Case on trial continued,

 5   Indictment Number 742N of 2014.  People of the State of

 6   New York vs. Daniel Ramos.

 7              Let the record reflect all parties are

 8   present.  The jury is not present at this time.

 9              Are the People ready?

10              MR. PERRI:  Yes, your Honor.

11              THE CLERK:  Defense counsel ready?

12              MR. BERGER:  Yes, your Honor.

13              (Whereupon, the jury entered the courtroom.)

14              THE CLERK:  Do both sides stipulate all sworn

15   jurors are present, People?

16              MR. PERRI:  Yes, your Honor.

17              MR. BERGER:  Yes.

18              THE CLERK:  Mr. Ramos, you are reminded you

19   are still under oath.

20              THE DEFENDANT:  Yes.

21              THE COURT:  Welcome back.  I hope you enjoyed

22   your lunch.

23              People, you may continue.

24              MR. PERRI:  Thank you, your Honor.  I ask the

25   defendant be given back People's 10.
```

D. Ramos - Defense - Cross          1355

1    CROSS-EXAMINATION

2    BY MR. PERRI: (Continuing)

3        Q.    Mr. Ramos, we left off talking about you placing

4    your initials on that document; do you remember that?

5        A.    Yes.

6        Q.    And you put your initials next to the correction

7    where you instructed the detective to add the word girl,

8    correct?

9                    MR. BERGER:  Objection.

10                   THE COURT:  Overruled.

11       A.    I did not understand the question.

12       Q.    Did you place your initials next to the word girl?

13       A.    Yes, because they told me to write it.  They told

14   me to put it.

15       Q.    You pointed out the word girl was missing from

16   that sentence?

17                   MR. BERGER:  Objection, time and place.

18                   THE COURT:  Overruled.  If he understands.

19       A.    Could you say it again?

20       Q.    Mr. Ramos, you noticed the word girl was missing

21   from that sentence, correct?

22                   MR. BERGER:  Objection.  When?  Time and

23           place.

24                   MR. PERRI:  May we approach?

25                   THE COURT:  You may.

1                    Objection overruled.

2                    (Whereupon, there was a sidebar discussion,

3          as follows:)

4                    MR. PERRI:   The entire line of questioning

5          started -- we left off talking about putting your

6          initials on the document, the time and place, is that

7          the time and place of when this document was created?

8                    THE COURT:   You go back and just say every

9          question however you want to say it how it is related

10         to when you were in the precinct.

11                   MR. BERGER:   My objection is ambiguous and

12         deceptive. If you want to ask, did he tell the

13         detective to put the word girl in there at the time,

14         fine, you could ask him that question.   Don't talk

15         about it as if it's ambiguous, which as to whether or

16         not he is looking at it today, or had it way back when

17         on October 16th.   I'm asking the question be fair, not

18         ambiguous, so that it's kind of a trick question and

19         unfair to the defendant.

20                   THE COURT:   All right.   It is

21         cross-examination.   I'm not going to tell either of you

22         how to formulate your questions.   I'll continue to take

23         objections if they arise.

24                   This objection is overruled.

25                   You can read it back.

D. Ramos - Defense - Cross          1357

1      MR. PERRI:  I ask it be read back.

2      (Whereupon, the proceedings resumed.)

3      THE COURT:  Read back the question.

4      (Whereupon, the record was read back.)

5      Q.   And at the top of the page, the first correction

6   where you initialed next to the correction, that's your

7   Social Security number, correct?

8      A.   It is corrected and my initials are there because

9   someone told me to write my initials there.

10     Q.   And the correct Social Security number is written

11   down next to your initials, correct?

12     A.   Yes.  It's written by hand, yes.  But the one

13   written, the one that is typed, is incorrect.

14     Q.   And the reason the typed one was changed, the

15   handwritten one, is because you told Detective Baran your

16   Social Security number was typed incorrectly?

17     A.   That is correct.  Exactly.

18     Q.   So Mr. Ramos, you were given an opportunity to

19   review this document with Detective Baran, correct?

20     A.   Yes.

21     Q.   And that was before you signed the document,

22   correct?

23     A.   I don't remember.

24     Q.   At some point after you reviewed the document with

25   Detective Baran, Detective Pacheco returned, correct?

kmm

D. Ramos - Defense - Cross        1358

1    A.    Can you repeat the question?

2              MR. PERRI:  I ask it be read back, your

3    Honor.

4              THE COURT:  You may.

5              (Whereupon, the record was read back.)

6    Q.    And Detective Pacheco spoke Spanish, correct?

7    A.    Yes.

8    Q.    And you were able to communicate with Detective

9    Pacheco in Spanish?

10   A.    Detective Baran will tell him what he had to say

11   to me.

12   Q.    And were you able to understand Detective Pacheco?

13   A.    A little, yes.

14   Q.    He was speaking Spanish, correct?

15   A.    He speaks Spanish, but not that clearly.

16   Q.    And there came a time where he read you the -- or

17   he appeared to read you the document?

18   A.    Um, I don't remember.

19   Q.    Did he speak in Spanish to you?

20   A.    What he had to tell me in regards to what

21   Detective Baran will tell him, yes.

22   Q.    Was he looking at People's 10 while he was

23   speaking to you in Spanish?

24   A.    Which one, this one?

25   Q.    Yes.

1      A.    Could you say that question again?

2      Q.    Was he looking at that document while he was

3  speaking to you in Spanish?

4      A.    No, he would only tell me what I had to do, but

5  when Detective Baran will tell him so.

6      Q.    Did he make those markings of RP next to your

7  initials?

8      A.    Which ones?

9      Q.    The letters RP?

10     A.    Which ones.  I do not see them.

11     Q.    The two initials next to your initials, the

12  letters R and P?

13     A.    That's not RP.

14           MR. PERRI:  I ask the document be taken from

15     the witness.

16     Q.    So it's your testimony that next to the letters

17  DR, near the word girl, the letters RP do not appear?

18     A.    Show me.  I don't see it.

19           MR. PERRI:  I ask it be taken from the

20     witness.

21           I ask the defendant be shown People's 11.

22     Q.    Mr. Ramirez, you testified you wrote that letter,

23  correct?

24     A.    Yes.

25     Q.    And you wrote that as a letter to Crystal,

1    correct?

2        A.    Correct.

3        Q.    It's addressed to Crystal and Mya, correct?

4        A.    For the family, yes.

5        Q.    But it says on the letter, addressed to Crystal

6    and Mya, correct?

7        A.    Yes, that's what I wrote, but it's for the family.

8        Q.    And that's your signature at the bottom, correct?

9        A.    That's my name, not my signature.

10       Q.    But your signature did appear on the rights card

11   and on the document that was written by Detective Baran,

12   correct?

13       A.    Yes, those signatures are there.

14       Q.    And those are your signatures?

15       A.    Yes, those are my signatures.

16       Q.    So your testimony is you wrote this letter to

17   Crystal to apologize for Crystal being upset, correct?

18       A.    Exactly.

19       Q.    But it never says that anywhere in that letter,

20   correct?

21       A.    Which letter?

22       Q.    The letter in front of you.

23       A.    It did not say what.

24       Q.    However, did it -- does it say you are asking for

25   a thousand pardon, correct?

D. Ramos - Defense - Cross      1361

 1      A.    A thousand pardons, yes, of course.

 2      Q.    It says that you are very sorry for what happened?

 3      A.    Yes, that's what it says.

 4      Q.    It says you never intended to do any harm to

 5  anyone, let alone the kids?

 6      A.    That is correct.

 7      Q.    You asked multiple times for Crystal to drop the

 8  charges?

 9      A.    Exactly.  Perfectly.

10      Q.    You never said you are sorry, that you were upset,

11  correct?

12      A.    That is not what is written in the letter, but

13  that's what the letter is intended for.

14      Q.    While you were in police custody, you were never

15  injured, correct?

16      A.    Never, because I went voluntarily.

17      Q.    When you say, you went voluntarily, you went in

18  handcuffs, correct?

19      A.    Yes.

20      Q.    And no one ever threatened you, correct?

21      A.    Not that I know of.

22      Q.    And no one put a gun to your head?

23      A.    No, never.

24      Q.    But you signed all of these documents without

25  reading them, according to you?

1      A.    Um, yes.

2      Q.    Before October 16th of 2013, you had never met

3   Detective Baran, correct?

4      A.    Never.

5      Q.    And before October 16th of 2013, you never met

6   Detective Pacheco?

7      A.    Never.

8      Q.    And before that date you never met Officer Boccio?

9      A.    Never.

10      Q.    Before October 16th of 2013, you were on very good

11   terms with Crystal Ramirez, correct?

12      A.    What do you mean in good terms with Crystal?

13      Q.    You didn't have any major problems with Crystal?

14      A.    Never.

15      Q.    And you got along with her children?

16      A.    With her, with the children, and with the father

17   of the children.

18      Q.    Sincere liked you?

19      A.    Of course.

20      Q.    Mya liked you?

21      A.    Of course.

22      Q.    And Crystal liked you?

23           THE INTERPRETER:  The interpreter needs

24      clarification.  Can you repeat the question?

25      Q.    And you didn't have any problems with Crystal

D. Ramos - Defense - Redirect          1363

1   either?

2       A.   No.

3       Q.   Then after October 16th everything changed?

4       A.   Yes.

5            MR. PERRI:  Nothing further.

6            THE COURT:  Redirect.

7   REDIRECT EXAMINATION

8   BY MR. BERGER:

9       Q.   Mr. Ramos, we met approximately nineteen months

10  ago?

11      A.   Yes.

12      Q.   I asked you questions, you answered that?

13           MR. PERRI:  Objection.

14           THE COURT:  Overruled.

15      Q.   Did you tell me the conversation you had handled

16  her underwear in attempting to put them on?

17           MR. PERRI:  Objection.

18           THE COURT:  Sustained.

19           Approach, please.

20           (Whereupon, there was a sidebar discussion,

21      as follows:)

22           THE COURT:  I want to make sure the reason

23      for sustaining is what you're thinking, and I need to

24      understand your reason of the question before you make

25      yourself a witness to this case.

D. Ramos - Defense - Redirect        1364

1          MR. PERRI:  Hearsay.

2          THE COURT:  I'll hear you.

3          MR. BERGER:  If you recall

4    cross-examination was, you heard the doctor testify

5    yesterday about handling underwear, so he made the

6    questioning was about, oh, you just came up with this

7    answer today with respect to handling underwear in

8    order to deal with the DNA that was offered yesterday,

9    and I'm making an offer this was -- this was said long

10   before that Dr. Reich's testimony yesterday.  This is a

11   classic example of recent fabrication, and therefore, I

12   have a right.

13         THE COURT:  Okay.

14         MR. PERRI:  He is making himself a witness

15   now.

16         MR. BERGER:  I'm asking him to tell me if he

17   said it before.

18         THE COURT:  I'll let it go for now.  I'll

19   allow the question to be asked.  I'll entertain

20   whatever arguments you make after the fact.  It's

21   clearly coming in for the truth of the matter.

22         MR. PERRI:  When you say, coming in, that's

23   for the credibility.

24         THE COURT:  Yes, with regards to recent

25   fabrication.  That's fine.  If it goes to far afield,

kmm

D. Ramos - Defense - Redirect        1365

1      I'll hear whatever you want to say.  There is no

2      problem right now.

3              (Whereupon, the proceedings resumed.)

4              THE COURT:  Re-ask the question.

5      Q.    You heard Dr. Reich testify yesterday about DNA

6   coming from the hands?

7      A.    Yes, I heard him.

8      Q.    And then you heard Mr. Perri ask you today if you

9   had heard Dr. Reich's testimony?

10     A.    Yes.

11     Q.    So I'm asking you, prior to Dr. Reich's testimony,

12  when I would meet you at the jail and we spoke, did you tell

13  me prior to Dr. Reich's testimony that you had helped Mya

14  put her underwear on her feet?

15     A.    Yes.

16     Q.    Now, you told me before that you did not read

17  People's 10 in evidence; do you remember saying you did not

18  read this on October 16, 2013?

19     A.    Yes.

20     Q.    So, when the word girl was written, did you write

21  girl, or did somebody else write girl?

22     A.    They told me to write it.

23     Q.    So you didn't -- did you write it because you

24  noticed it was missing?

25              MR. PERRI:  Objection.

D. Ramos - Defense - Redirect        1366

1      Q.    Or did you write it -- or did you write it because
2   they told you to write it?
3            THE COURT:  Objection overruled.
4      A.    They told me to write it.
5            MR. BERGER:  Thank you.
6      Q.    Did Detective Baran -- you testified in response
7   to Mr. Perri before that you didn't know how serious the
8   charges were?
9      A.    Nobody told me about the charges.  I didn't know
10   anything about the charges.  I didn't read anything about
11   the charges either.
12      Q.    So you are saying neither Detective Baran or
13   Detective Pacheco told you about the charges, correct?
14      A.    Not one of them.
15      Q.    Did they tell you how many -- what the sentence
16   would be for this charge?
17            MR. PERRI:  Objection.
18            THE COURT:  I'll take a yes or a no.
19      A.    Repeat that question for me again.
20      Q.    Did either detective tell you what the sentence
21   would be if you were convicted of this charge?
22      A.    No.
23      Q.    Now, that you know what the rights card says, this
24   card, you read it before in Spanish; do you remember?
25      A.    Here, yes.

kmm

1      Q.    Now, prior to October 16, 2013, had you ever been

2    arrested before?

3                    MR. PERRI:   Objection.

4                    THE COURT:   Sustained.

5      Q.    Had you ever seen that card, the contents of it

6    before that day?

7      A.    Never.

8      Q.    Mr. Perri asked you to read from the bottom part

9    of the rights card, People's 9 in evidence, in the

10   courtroom; do you recall?

11     A.    Which one?

12     Q.    Mr. Perri asked you to read in Spanish a paragraph

13   from this; do you recall?

14     A.    Yes.

15     Q.    Did you read it at all on October 16, 2013?

16     A.    Not that I can remember.

17     Q.    Did you say before to Mr. Perri, that your

18   initials were placed on People's 10, correct?

19     A.    Say the question again.

20     Q.    Your initials were placed on People's 10 in some

21   places, correct?

22     A.    In some places, yes, correct.

23     Q.    And why were they placed there?

24     A.    Because they told me to put it there.

25     Q.    Mr. Perri asked you before if you had signed the

D. Ramos - Defense - Redirect          1368

1    document without reading them back on October 16, 2013; do

2    you recall?

3        A.   Repeat that.  How is the question?  Repeat the

4    question.

5        Q.   Mr. Perri asked you before if you signed the

6    document without reading them on October 16, 2013?

7        A.   You want me to remember if I signed it without

8    reading it?  Yes.

9        Q.   I'm asking you back on October 16, 2013, did you

10   tell me that you signed this without reading it, on October

11   16th?

12       A.   Yes.

13       Q.   But another document is People's 11, this one,

14   right?

15       A.   Yes.

16       Q.   This one you wrote, correct?

17       A.   Because they told me to write it.

18       Q.   But you wrote this paper?

19       A.   Yes.

20           MR. BERGER:  Thank you.  Nothing further.

21           THE COURT:  Recross.

22           MR. PERRI:  May we approach?

23           THE COURT:  You may.

24           (Whereupon, there was a sidebar discussion,

25    as follows:)

Proceedings                    1369

1           MR. PERRI:  As defense counsel and the

2      defendant waived the privilege, I ask for any documents

3      of noting the defendant's statement made back 19 months

4      ago.

5           THE COURT:  All right, I'll deny that

6      application at this time.

7           MR. PERRI:  Yes, your Honor.

8           THE COURT:  Anything else?

9           MR. PERRI:  No redirect.

10          THE COURT:  All right.

11          (Whereupon, the proceedings resumed.)

12          THE COURT:  Mr. Perri, any recross on that

13     limited redirect?

14          MR. PERRI:  No, your Honor.

15          THE COURT:  This is a good point for you to

16     take your break this afternoon.  I know we have only

17     been working a few minutes.  There are a couple of

18     things I need to take care of.  Take a five-minute

19     break.

20          Don't talk about the case.  Don't let anyone

21     talk to you about it.  Don't get on your phones.

22          (Whereupon, the jury exited the courtroom.)

23          THE COURT:  Let's have the defendant return

24     to his seat, please.

25          Do you have an application?

Proceedings          1370

1          MR. BERGER:  I do, Judge.

2          Before I rest, I'm making another application

3     for you to reconsider not calling Crystal Ramirez.

4     I've presented this in a memorandum form.  I have a

5     copy for the district attorney.  Please present this to

6     the Court.  Read it, please, and just consider what I

7     have written as an application to recall Crystal

8     Ramirez for cross-examination.

9          THE COURT:  People, when you are ready, do

10    you want to be heard?

11         MR. PERRI:  This is the same application

12    defense has made multiple times throughout this trial.

13    Your Honor has already ruled on this multiple times

14    throughout this trial.  This memorandum or what is

15    labeled a memorandum by defense for consideration has

16    no citation to any other caselaw that counts as to

17    anything the Court has cited, or the People have cited

18    in support of denying defense counsel's application,

19    and the People reiterate again their opposition.

20         THE COURT:  I'm going to mark this as a Court

21    Exhibit so it will be part of the file.  I do want to

22    make clear that they -- that this memo refers to the

23    Court's reason for denying.  For denying, it's too

24    remote in time is one of the reasons, but not the sole

25    reason.  We had numerous conversations with regards to

Proceedings                    1371

1      why I denied this application in the past, and I will

2      continue to deny the application.

3               Although, again, this will be marked Court

4      Exhibit Number VII.

5               Anything else for the record, Mr. Berger,

6      before I ask you if you are going to rest?

7               MR. BERGER:  Nothing for the record.  We will

8      rest.

9               THE COURT:  Before we have the jury out, why

10     don't we handle whether there is a rebuttal witness now

11     so we don't have to send them out again to take that

12     application.

13               Will you have a rebuttal?

14               MR. PERRI:  We ask to call one rebuttal

15     witness, Joshua Hanson.  Joshua Hanson is the director

16     of the safe center.  We asked him to be called to

17     testify as a rebuttal to the defendant's character

18     witness, as they made his character for kindness and

19     gentleness towards children, and the issue in this case

20     and defense counsel is presently likely to argue the

21     fact that multiple witnesses testified to the defendant

22     being kind and gentle to children, is incapable with

23     the crimes alleged in this case, the experts, the

24     sexual abuse of children, the clinically sexual

25     predators, as characteristics of sexual predators would

kmm

Proceedings                1372

1   be called to testify to limited areas of the character

2   and nature of a sexual predator, specifically,

3   grooming, which is the appearance of being kind and

4   gentle and inviting towards children and how that

5   characteristic is not incapable with being a sexual

6   predator.

7           MR. BERGER:  This is totally inappropriate.

8   You know, it's come to my experience, that when the

9   children make an immediate outcry, the People present

10   witnesses that suggest that is what a person who is

11   abused does.  When they don't make an immediate outcry,

12   they bring in an expert to say when they get abused,

13   they don't want to.  Heads, I win, tails you lose, and

14   that is totally -- it's just rigging the game in this

15   particular case to bring in a witness to say, that if

16   you abuse a child, you can't be a gentleman and kind,

17   that's the issue here.

18           The issue is whether or not he did this.

19   It's not like -- I mean, it's just bizarre the People

20   would consider in bringing in a witness to say that

21   when you abuse children, you could be kind and

22   gentleman to children.  It's, again, one of these

23   things, heads I win, tails you lose.  And this is not

24   proper rebuttal in any case, Judge.  I suggest to the

25   Court this would be beyond appropriate here and totally

kmm

1       unfair to the defendant.

2                MR. PERRI:  Your Honor, in this very

3       jurisdiction before the Honorable Tammy Robbins in the

4       case People v. Tores, this exact form of testimony was

5       permitted by the Court when the defense put forth

6       character witnesses that testified to the defendant's

7       gentle nature and his kindness towards children, almost

8       word for word in the same manner in that case the Court

9       allowed it there.  It is allowed here, that the

10      question of character traits, meaning it is not, in

11      fact, counter intuitive and instructive to the jury to

12      hear this expert testimony.

13               MR. BERGER:  The only rebuttal testimony that

14      is proper in this case is to bring in witnesses to

15      testify about his negative reputation with respect to

16      kindness and gentleness to children.  That's the only

17      rebuttal testimony that should be allowed here.

18      Period.  If they had witnesses to say he hasn't been

19      kind and gentle, fine.  That's the only proper rebuttal

20      testimony, not some general statement about you could

21      be kind and gentle to children and abuse them because

22      if you are also kind and gentle to children, you may

23      not abuse them.  That doesn't tell the jury anything.

24      It's really improper rebuttal.

25               THE COURT:  It's the Court's intention, based

                                                      kmm

Proceedings                    1374

1    on my understanding of rebuttal evidence, and the

2    caselaw I've previously reviewed, to allow this

3    particular rebuttal witness.  I do believe this is

4    relevant.  The People will be allowed to call this

5    witness.  Is this witness ready today?

6              MR. PERRI:  Yes, your Honor.

7              THE COURT:  Anything for the record before I

8    give you a five-minute break?

9              MR. PERRI:  No.

10             MR. BERGER:  No.

11             (Whereupon, a short recess was taken.)

12             THE CLERK:  Case on trial continued, People

13   of the State of New York vs. Daniel Ramos.

14             All parties are present.  The jurors are not

15   present at this time.

16             People ready?

17             MR. PERRI:  Yes, your Honor.

18             THE CLERK:  Defense counsel ready?

19             MR. BERGER:  Yes, your Honor.

20             (Whereupon, the jury entered the courtroom.)

21             THE CLERK:  Do both sides stipulate that all

22   sworn jurors are present?

23             MR. PERRI:  Yes, your Honor.

24             MR. BERGER:  Yes, your Honor.

25             THE COURT:  Any other witness?

Case 2:19-cv-01125-JS-AYS  Document 7-3  Filed 05/31/19  Page 531 of 800 PageID #: 1784

1        MR. BERGER:  Defense rests.

2        THE COURT:  Thank you.

3        People, do you have a rebuttal case?

4        MR. PERRI:  Yes, your Honor.

5        THE COURT:  Call your first witness.

6        MR. PERRI:  Joshua Hanson, your Honor.

7   J O S H U A    H A N S O N, called on behalf of the People,

8        having been duly sworn, took the witness stand and

9        testified as follows:

10       HE CLERK:  In a loud clear voice, please

11       state your name, spell your last name and give your

12       county of residence.

13       THE WITNESS:  My name is Joshua Hanson,

14       J-O-S-H-U-A, H-A-N-S-O-N.  My county of residence is

15       Kings County, New York.

16       THE COURT:  Good afternoon, Mr. Hanson.  My

17       name is Teresa Corrigan.  I'm the judge in this matter.

18       A couple of rules for you, sir.  Please speak clearly,

19       loudly, clearly.  Use the microphone if you need to.

20       Wait for an entire question to be asked before you give

21       an answer.  If you hear the word objection, I need you

22       to stop speaking.  Give me a chance to rule.  If you

23       don't understand the question, just let everybody know

24       that.  Do you understand?

25       THE WITNESS:  Understood.

Case 2:19-cv-01125-JS-AYS Document 7-3 Filed 05/31/19 Page 532 of 800 PageID #: 1785

1    DIRECT EXAMINATION

2    BY MR. PERRI:

3        Q.    Good afternoon, Mr. Hanson.

4        A.    Good afternoon.

5        Q.    Are you currently employed?

6        A.    Yes.

7        Q.    Where are you currently employed?

8        A.    Director of the Nassau County Child Advocacy

9    Center at the safe center.

10        Q.    Could you please explain what that position

11    entails?

12        A.    My job is to facilitate multidisciplinary team

13    response.    The multidisciplinary team is made up of the

14    Nassau County Police Special Victims Squad, Nassau County

15    Child Protective Services, sex abuse in severe physical

16    abuse units, the district attorney's office, the County

17    Attorney's Office Representatives and Nassau County Medical

18    Center and the safe center.

19        Q.    What was your last position before

20    becoming a director to CAC?

21        A.    I was a forensic interviewer at the Brooklyn Child

22    Advocacy Center.

23        Q.    Could you describe your duties at the Brooklyn

24    Advocacy Center?

25        A.    My job was to conduct forensic interviews for the

1    Brooklyn Special Victims Squad, and the Brooklyn -- well,

2    the administration for children services sex abuse unit

3    pursuant to allegations of child sex abuse or severe

4    physical abuse.

5         Q.    Before coming to Brooklyn, where were you working?

6         A.    I was a clinician outside of Boston, Massachusetts

7    with South Bay Mental Health.

8         Q.    What do you do at South Bay Mental Health?

9         A.    I was a trauma clinician.   I work with children

10   with reported history of trauma.

11        Q.    Could you please go through your educational

12   background?

13        A.    I have a master's degree in mental health

14   counseling from Leslie University and bachelor's degree in

15   business management from Bentley University.

16        Q.    Have you undergone any specialized training during

17   your career?

18        A.    Yes.

19        Q.    Could you please go through what specialized

20   licensed training you have had?

21        A.    I attended at this point more than a dozen

22   training on forensic interviewing, including the National

23   Child Advocacy Center Forensic Interviewing Training and

24   Advanced Forensic Interviewing Training.   I attended the New

25   York State Forensic Interviewing Best Practices Training,

1    and a number of additional trainings, conferences and

2    symposium.

3        Q.   How many years have you been working with child

4    sexual abuse?

5        A.   For about eleven years now.

6        Q.   And do you have any specialized training in

7    specifically child sexual abuse?

8        A.   Yes.  As part of the master's degree there was

9    course work focused on child sexual abuse, and in addition,

10   since I graduated work with children over the years, I

11   sought additional training.  It's always a component of

12   forensic interview trainings to include child sex abuse

13   dynamics, perpetrator dynamics.

14       Q.   Have you, in fact, taken those courses in child

15   sexual abuse dynamics and sexual perpetrator dynamics?

16       A.   Yes.

17       Q.   How many child sexual abuse cases and

18   investigation have you handled during your career?

19       A.   At this point it would be more than 2000.

20       Q.   And have you partnered with any other outside

21   government groups other than Brooklyn and Nassau County?

22       A.   Yes.  Both in Brooklyn and in Nassau County I was

23   contacted to conduct the forensic interviews for Homeland

24   Security, NICE, the FBI, and the postal inspector regarding

25   child sex abuse concerns.

1      Q.   And if you had to estimate how many children you

2   interviewed as part of these investigation; could you please

3   do that?

4      A.   I would estimate at this point it's more than

5   fifteen hundred interviews I conducted.

6      Q.   Have you ever taught any courses or provided

7   trainings regarding child sexual abuse?

8      A.   I provide a training to the team as part of the

9   course of new members joining the team, or free training and

10   then retraining, as necessary.  So, whether it is a special

11   topic for forensic interviewing; things like interviewing a

12   child who might have a developmental disability, dealing

13   with children who have difficulty engaging in forensic

14   processes, things like that.  I provide training to the team

15   and to other agencies.

16      Q.   Have you ever testified in court as an expert

17   witness?

18      A.   Yes, I have.

19      Q.   And have you testified as an expert in child

20   sexual abuse and sexual perpetration?

21      A.   Yes.

22      Q.   And where have you testified as an expert?

23      A.   I testified in Nassau County Criminal Court, in

24   Brooklyn and Queens Family Court.

25            MR. PERRI:  I ask Mr. Hanson be deemed an

kmm

1      expert in the field of child sexual abuse and sexual

2      perpetration.

3                  THE COURT:  Were you ever denied expert

4      status in those cases which you testified?

5                  THE WITNESS:  I was not.

6                  THE COURT:  What is the title that you are

7      looking for, counselor, a child abuse --

8                  MR. PERRI:  Child sexual abuse and sexual

9      perpetration.

10                 THE COURT:  Would you like to be heard?

11                 MR. BERGER:  Yes.

12                 How many times have you testified in Court,

13     sir?

14                 THE WITNESS:  At this point about a dozen.

15                 MR. BERGER:  Always for the prosecution?

16                 THE WITNESS:  Yes.

17                 MR. BERGER:  I would challenge the expertise.

18                 THE COURT:  All right, the Court will declare

19     you an expert in the category of -- say it one more

20     time for the record.

21                 MR. PERRI:  Child sexual abuse and sexual

22     perpetration.

23                 THE COURT:  In the area of child sexual abuse

24     and sexual perpetration.

25     DIRECT EXAMINATION

1  BY MR. PERRI: (Continuing)

2     Q.   Mr. Hanson, could you explain what a pedophile is?

3     A.   So, a pedophile is a term used both colloquially

4  and clinically.  Usually when people use it colloquially,

5  they mean someone who is a sex offender against children.

6  Clinically, the term means someone who is either primarily

7  or solely sexually attracted to minors, generally under the

8  preputial minors or children under the age of eleven.

9     Q.   What is the difference of the clinical definition

10  of pedophile and the term sexual perpetrator?

11     A.   So, pedophilia is rarer than people tend to think.

12  Someone doesn't necessarily need to be a pedophile to offend

13  against children.  The majority of individuals who offend

14  are actually -- have a sexual attraction to both adults and

15  to minors.

16               THE COURT:  If you could turn your seat a

17          little bit so your voice goes towards the wall, that

18          would be appreciated.

19     Q.   Just on that last question, Mr. Hanson, does the

20  sexual perpetrator have to be solely attracted to children?

21     A.   No.

22     Q.   Could you explain that again?

23     A.   So, pedophilia is rarer than most people tend to

24  assume.  The reality is that most individuals who offend

25  against children are attracted to both adults and to minors.

1       Q.    Now, do sexual perpetrators always act on their

2    impulses with every child they come into contact with?

3       A.    No, generally, there is a process of selection.

4    In the field we would refer to as grooming, but predators

5    themselves refer to it as seduction.

6       Q.    Could you please explain this process of grooming

7    or seduction?

8             MR. BERGER:   Could we come up for a minute,

9       please?

10            THE COURT:   You may.

11            (Whereupon, there was a sidebar discussion

12       with the Court and counsel, as follows:)

13            MR. BERGER:   The offer made by Mr. Perri was

14       to show that if somebody is kind and gentle to children

15       doesn't mean they couldn't abuse a child.

16            THE COURT:   Understood.

17            MR. BERGER:   That's where we should be going

18       here.  All these other things are extraneous.

19            MR. PERRI:   I have three more questions.

20       Grooming, connected in appearance, and gentle and kind

21       to children.

22            THE COURT:   I will give you a little way to

23       develop.  You won't be allowed to go much longer.

24            MR. PERRI:   I Understand.

25            (Whereupon, the proceedings resumed.)

1    Q.    Mr. Hanson, same question, again, could you
2    explain the process what you just referred to as grooming or
3    seduction?

4    A.    Generally, there is a process of assessment in
5    which a perpetrator assesses a child for vulnerability.  The
6    process of grooming generally, as thought of to be in a
7    staged process.  The first process is ingratiating one self
8    with both the child in the family, so demonstrating they're
9    someone that the child would like or someone that is safe.

10        The next process is, to some extent, to isolate
11   the child, get time alone with the child, and generally, at
12   that point the perpetrator sexualizes the relationship.

13   Q.    Would it be inconsistent with being a perpetrator
14   to appear to be kind and gentle with children?

15   A.    No.  In fact, that would be a strategy that is
16   often applied.  Perpetrators themselves talk about how they
17   employ prosocial behaviors, things like spending times with
18   kids, giving them gifts, demonstrating that they are someone
19   who is trustworthy.  It allows them access to the child.

20   Q.    How do perpetrators appear in society?  Do they
21   stand out?

22   A.    So, the idea -- we like the idea that we can pick
23   perpetrators out of a crowd, but the reality is they have a
24   significant incentive to blend with the crowd, to look a
25   whole lot to look like everybody else and even to be seen as

1   people who would be someone that we would want our child to

2   be around.

3            MR. PERRI:  Nothing further, your Honor.

4            THE COURT:  Thank you.  Cross-examination.

5   CROSS-EXAMINATION

6   BY MR. BERGER:

7       Q.   Mr. Hanson, have you ever met Daniel Ramos?

8       A.   I don't believe I have, no.

9       Q.   Have you ever met Mya Ramirez?

10      A.   I don't believe I have, no.

11      Q.   So let me ask you something:  If a teacher is good

12  to children, does that mean she could be a pedophile also?

13      A.   Not necessarily, no.

14      Q.   And anybody else, parents who are good to their

15  children, does that mean they're necessarily a pedophile?

16      A.   No.

17      Q.   So, there are plenty of people in society who are

18  kind and gentle to children, aren't they?

19      A.   Yes.

20      Q.   And as you said, pedophilia is very rare, isn't

21  it?

22      A.   It is.

23      Q.   So, in your world, is everybody who kind and

24  gentle to children, a pedophile or risk at being a

25  pedophile?

kmm

Hanson - People - Rebuttal-Redirect     1385

1      A.   Not at all.

2      Q.   It's extremely rare, isn't it?

3      A.   Pedophilia is extremely rare.

4      Q.   And people who are kind and gentle to children are

5   just that, kind and gentle to children, correct?

6      A.   Some individuals are, yes.

7      Q.   Wouldn't you say most?

8      A.   I would say most people who spend time with

9   children and who are kind to children are not pedophiles,

10  yes.

11              MR. BERGER:  Nothing further.

12              THE COURT:  Any redirect?

13              MR. PERRI:  Very limited, your Honor.

14       Redirect.

15  REDIRECT EXAMINATION

16  BY MR. PERRI:

17     Q.   Mr. Hanson, Mr. Berger asked you about pedophilia

18  being very rare.  You also discussed that pedophilia was

19  different from being a sexual perpetrator, correct?

20     A.   Yes.

21     Q.   And in comparison, more in common to a sexual

22  perpetrator than a pedophile?

23     A.   Yes.

24              MR. PERRI:  Thank you, your Honor.

25              THE COURT:  Anything on that point?

kmm

1    RECROSS-EXAMINATION

2    BY MR. BERGER:

3        Q.    So, all of the teachers who are kind to children

4    and anybody else who are kind to children, they might be

5    sexual perpetrators as well, correct?

6                    MR. PERRI:  Objection.

7                    THE COURT:  Overruled.  You can answer.

8        A.    I wouldn't define them as predators, but certainly

9    I wouldn't screen them out if an allegation was made.  I

10   wouldn't screen them out or assign any weight to the fact

11   that they were kind to children.

12       Q.    But you wouldn't assume just because they are kind

13   and gentle to children, that they are potentially offenders,

14   sexual offenders?

15                   MR. PERRI:  Objection.

16                   THE COURT:  Sustained.

17       Q.    You said you wouldn't screen them out?

18       A.    Yes.

19       Q.    But the people who are kind and gentle to

20   children, you wouldn't consider them suspect, would you?

21                   MR. PERRI:  Objection.

22                   THE COURT:  Sustained as to form.

23       Q.    Just because as you put it, a sexual perpetrator

24   is more common than a pedophile, doesn't mean all of the

25   people in our society who are kind and gentle to children

Case 2:19-cv-01125-JS-AYS   Document 7-3   Filed 05/31/19   Page 543 of 800 PageID #: 1796

1    would even remotely fit into that category?

2         A.    Would fit into which category?

3         Q.    Of people who are kind and gentle to children,

4    wouldn't fit into the category of a sexual perpetrator?

5         A.    No.

6                   MR. BERGER:   Thank you.   Nothing further.

7                   THE COURT:   Anything further?

8                   MR. PERRI:   No, your Honor.

9                   THE COURT:   Thank you.   You may step down.

10   There's two steps.

11                  Do you have anymore witnesses?

12                  MR. PERRI:   No, your Honor.

13                  THE COURT:   Do you rest on your entire case?

14                  MR. PERRI:   Yes, your Honor.

15                  THE COURT:   All right.

16                  Off the record.

17                  (Whereupon, there was a discussion held off

18   the record.)

19                  THE COURT:   Ladies and gentlemen, we're at

20   the point where you have finished hearing all of the

21   evidence in this case.   We are approaching the four day

22   holiday weekend that we talked about during jury

23   selection.   I'm going to give you a four-day holiday

24   weekend, as I said I would.   I ask you all be back here

25   bright and early on Tuesday morning at 10:00 a.m., at

Proceedings                    1388

1     which point you will hear summations from the attorney

2     and then you will get the law from the Court and then

3     you will be asked to start your deliberations.

4           It's very important between now and then you

5     follow these admonitions that you know by heart, and I

6     know we do chuckle about them when I read them.   It's

7     extremely important at this point, as it has been

8     throughout this entire case, that you follow the

9     admonitions over the next few days.

10          Keep an open mind throughout this case.   Do

11    not discuss the case amongst yourselves or with anyone

12    else.   Do not permit anyone to discuss the case in your

13    presence.   Do not talk to the lawyers, witnesses, or

14    the defendant about anything during this break.

15          Do not visit or view the place where the

16    charged crime was allegedly committed or any other

17    place involved in this case, and if there is any news

18    coverage of the case, do not read, view or listen to

19    any accounts or discussions of the case reported by the

20    news media.

21          Do not attempt to research any fact, issue or

22    law related to this case whether by discussion with

23    others, by research in the library, or Internet, or any

24    other means or source.

25          Have a great holiday weekend.   Stay safe.

kmm

Proceedings                    1389

1        For those of you whom served our country.  We will see

2        you all on Tuesday.

3                    (Whereupon, the jury exited the courtroom.)

4                    THE COURT:  Anything for the record before we

5        break?

6                    MR. PERRI:  No, your Honor.

7                    THE COURT:  Mr. Berger, anything for the

8        record?

9                    MR. BERGER:  No, your Honor.

10                    THE COURT:  See you on Tuesday morning.

11                    (Whereupon, the trial was adjourned to May

12        26, 2015.)

13                        *                *                *

14

15

16

17

18

19

20

21

22

23

24

25

kmm



1390

```
 1    SUPREME COURT OF THE STATE OF NEW YORK

 2    COUNTY OF NASSAU : CRIMINAL TERM PART 43

 3    --------------------------------------------X
      THE PEOPLE OF THE STATE OF NEW YORK,      :   Indictment
 4                                              :   No. 742N/14
                   -against-                    :
 5                                              :   VOL. III
      DANIEL RAMOS,                             :
 6                                              :
                             Defendant.         :   Jury Trial
 7    --------------------------------------------X

 8                             May 26, 2015
                               262 Old Country Road
 9                             Mineola, New York

10
      B E F O R E:
11
              HONORABLE TERESA K. CORRIGAN,
12                     Acting Supreme Court Justice

13
      A P P E A R A N C E S:
14
      (As Previously Noted)
15

16              *       *       *       *       *

17

18

19              THE CLERK:  Case on trial continued,

20      742N of 2014, People of the State of New York vs.

21      Daniel Ramos.

22              Let the record reflect all parties are

23      present.  The jury is not present at this time.

24              Are the People ready to proceed?

25              MR. PERRI:  Yes, your Honor.
```

kmm

Proceedings                    1391

1          THE CLERK:   Defense counsel, ready?

2          MR. BERGER:   Yes, your Honor.

3          THE CLERK:   Let the record reflect Carmen

4     Knight is the Spanish interpreter.

5          THE COURT:   I understand there is an

6     application for the record.

7          MR. BERGER:   I ask you mark this Court

8     Exhibit VIII.   I think the last one was VII.   I don't

9     know if there is another exhibit.   Could you make that

10    part of the record?

11         THE COURT:   It will not be VIII.   It will end

12    up being X, Court Exhibit Number X.

13         Do you want to be heard on this, Mr. Berger?

14         MR. BERGER:   I've given a copy of this

15    application to the prosecutor.   I don't know there's

16    anything further to add at this point.

17         THE COURT:   Do you want to --

18         MR. PERRI:   The People oppose its entirety.

19    It's the same application made several times with the

20    additional request that the People not be allowed to

21    make the logical arguments that Crystal Ramirez didn't

22    have a motive to lie.   There is no citation of caselaw.

23    The People oppose.

24         THE COURT:   I read it over.   The application

25    is denied.   It's now marked as Court Exhibit X.

                                                      kmm

Proceedings                    1392

1    Additionally, so everyone knows, Court

2    Exhibit VIII is the verdict sheet, which you were both

3    shown this morning, which you both placed your initials

4    on, and Court Exhibit IX, is going to be the verdict

5    sheet that actually goes back to the jury, minus

6    everyone's initials.

7         Anything else for the record?

8         MR. BERGER:  Judge, by your decision, are you

9    addressing the fact that the new part of this motion

10   was not to allow the prosecutor to argue?  It seems in

11   bad faith that this was suddenly out of the blue when

12   this Crystal Ramirez makes this claim, or he'll make an

13   argument that this came out of left field since there

14   was no reason for her to have even suspected anything

15   like this when we know the history here is contrary to

16   that.

17        All I'm saying, you made a ruling which you

18   denied my application to recall her, but certainly, I

19   think the Court should preclude the prosecutor from

20   making arguments which he can't be making in good

21   faith.

22        THE COURT:  That application is denied.

23        Are we ready for the jury?

24        (Whereupon, the jury entered the courtroom.)

25        THE CLERK:  Do both sides stipulate all sworn

Proceedings                    1393

1      jurors are present?

2                  MR. PERRI:  Yes, your Honor.

3                  MR. BERGER:  Yes, your Honor.

4                  THE COURT:  Good morning, everyone.  Welcome

5      back.  I hope you all enjoyed your long weekend.

6                  Members of the jury, you will now hear the

7      summations of the lawyers.  Following the summations, I

8      will instruct you on the law and then you will begin

9      your deliberations.

10                 Under our law, defense counsel must sum up

11     first and the prosecutor must follow.  The lawyers may

12     not speak to you after that.

13                 Summations provide each lawyer an opportunity

14     to review the evidence and submit for your

15     consideration the facts, inferences and conclusions

16     that they contend may properly be drawn from the

17     evidence.  If you find that a lawyer has accurately

18     summarized and analyzed the evidence, and if you find

19     that the inferences and conclusions the lawyer asks you

20     to draw from that evidence are reasonable, logical, and

21     consistent with the evidence, then you may adopt those

22     inferences and conclusions.

23                 Members of the jury, bear in mind the

24     following point:

25                 First, you are the finders of fact, and it is

Proceedings                    1394

1      for you and you alone to determine the facts from the

2      evidence that you find to be truthful and accurate.

3      Therefore, the lawyers summations are not evidence.

4      What they say is simply argument submitted for your

5      consideration.

6              You have heard the evidence and must decide

7      this case on the evidence, as you find it, and the law

8      as I explain it.

9              Second, during the summations, one lawyer's

10     recollection of the evidence may in good faith differ

11     from the recollection of the other lawyer or from your

12     own recollection.  And the lawyers will undoubtedly

13     differ with each other on the conclusions to be drawn

14     from the evidence.  It is your own recollection,

15     understanding and evaluation of the evidence, however,

16     that controls regardless of what the lawyers have said

17     or will say about the evidence.  You and you alone are

18     the judges of the facts in this case.

19             Third, remember, under our law, I am

20     responsible for explaining the law to you, not the

21     attorneys.

22             Fourth, if, during the summations, I sustain

23     or overrule an objection to a comment of a lawyer, that

24     is simply my ruling based on the law.  My ruling is not

25     to be considered as an opinion by me as to what your

                                                          kmm

Defense summation          1395

1    verdict should be.

2          Remember, under our law, you and you alone

3    judge what facts, if any, are proven and whether the

4    defendant is guilty or not guilty, not I, and not the

5    other attorneys.  We now turn to the summations.

6          Mr. Berger, you may proceed.

7          MR. BERGER:  Thank you, your Honor.

8          Mr. Ramos's family, Judge Corrigan,

9    Mr. Perri, Mr. Foreman, members of the jury.  First, I

10   want to thank you for the careful attention you gave

11   during this trial.  It has been long, lots of

12   witnesses, and I could see you were paying attention,

13   and that's extremely important because what I'm going

14   to say to you in my remarks this morning, now, I am

15   going to be commenting on the evidence and significance

16   at this trial.

17          What I say is not evidence, nor is what

18   Mr. Perri says afterwards evidence.  It's your

19   recollection that counts.  You have a right to have the

20   reporter read back some testimony if your recollection

21   should fail, but bear in mind, as you listen to the

22   reporter read back the testimony, try to recall, and I

23   asked you this in my opening remarks, try to recall how

24   the witness testified, how often.  How a witness

25   testifies can be significant, if not more so than what

1    the witness actually said.

2            Members of the jury, the ultimate question to

3    be answered by you when you go back in the jury room

4    later today, has the prosecutor proved its case beyond

5    a reasonable doubt?

6            One, reasonable doubt.  If you have one

7    reasonable doubt about the prosecution's case, then

8    your verdict must be not guilty.  The Judge will tell

9    you that.  I intend to show many reasonable doubts, not

10   just one.

11           Now, I may be omitting some things in my

12   argument here this morning.  It's not because they

13   aren't significant, it's because your collective

14   recollection will be better than mine and your

15   collective wisdom and analysis may be better than mine,

16   as well.  If I make arguments to you this morning that

17   you think are speech-ous, devoid of logic without mere

18   right, I invite you now to disregard them.

19           But I ask you, as well, if the prosecutor

20   does the same, do the same, disregard his arguments,

21   and I will assure you he will make arguments to you

22   that have no merit.  The prosecutor goes last.  I won't

23   be able to respond to what he says, as I would like to

24   be able to.  Those are the rules, but consider whether

25   or not the arguments I make to you this morning

1   actually answer his point and whether there is actually

2   other evidence in this case that answers his point as

3   well.

4           Now, members of the jury, you are considered

5   to be the fact finders.  What that means is, your

6   province is the facts, and the Judge's province is the

7   law.  Being fact finders doesn't mean you have to come

8   up with an exact scenario.  It only means that your

9   area that you are covering -- it may be that the proof

10  is insufficient to satisfy you beyond a reasonable

11  doubt.  It is insufficient to paint a clear picture as

12  to what happened here, in which case there would be a

13  reasonable doubt, if you listen to the charges by the

14  Judge.

15          The Judge will tell you that the presence of

16  certain facts, or the absence of convincing evidence,

17  can lead you to have a reasonable doubt.  That absence

18  of proof is very important here.  There are plenty of

19  things that have been demonstrated here with the

20  presence of certain facts that shows the defendant not

21  guilty, but the absence of certain proof can be just as

22  significant.  And see whether or not the presence of

23  certain facts, or the absence of convincing proof

24  leaves your mind in a state of uncertainty so you have

25  an actual doubt and that's a reasonable doubt.

1            I don't intend any theatrics or history on

2      anything here this morning.  I don't know what the

3      prosecutor will do in that regard.  Keep in mind, as a

4      juror, I ask you to use your intellect, not your

5      emotions.  I will not make any emotional appeal.  I

6      don't intend to make any emotional appeal, but if the

7      prosecutor does, recognize it for what it is and

8      disregard it.

9            Daniel Ramos is charged with one level below

10      the C charge of murder in the State of New York.

11            MR. PERRI:  Objection.

12            THE COURT:  Sustained.

13            MR. BERGER:  Analyze the evidence and use

14      your intellects.  I'll help you to do that with you

15      now.

16            What is the prosecution's case all about?

17      Crystal Ramirez walks into her kitchen and sees her

18      daughter without any clothes on her body.  It's an

19      ambiguous situation.  She doesn't see anything that

20      happens before that.  That's clear.  And according to

21      the prosecution's witnesses, Mya said, he ate my

22      coochie.

23            And then you have the prosecution presenting

24      a so-called confession by Daniel Ramos that he pulled

25      down her pants, he was going to tickle her pussy with

1    his mouth, and he somehow touched her pussy, her

2    vagina, with his mouth.

3              The third prior evidence that they had DNA

4    evidence showing that Daniel Ramos's DNA was on her

5    underwear, and the underwear has saliva on it.

6              Now, according Mr. Perri in his opening

7    remarks to you, he said this is a very simple case.  We

8    have got this case, no question about it.  Nothing to

9    concern yourself about, very obvious.  I suggest to you

10   if you take a superficial look at the evidence here,

11   you might agree with Mr. Perri, but I ask you to take

12   an in-depth look, not a superficial look and see that

13   the prosecutor's case, as presented to you these last

14   couple of weeks, has no merit at all and certainly not

15   proving guilt beyond a reasonable doubt.

16             Let's start with what happened in the

17   kitchen.  Crystal sees her daughter in a situation that

18   she is not happy with.  Her daughter is exposed.  It's

19   either one or two possibilities.  Either Mya is

20   correct, or Daniel Ramos would testify that he was

21   helping her get dressed is correct.

22             But Crystal Ramirez sees it one way and jumps

23   to a conclusion by yelling, what the F.  Only she

24   doesn't say F.  She uses the word, and she yells it in

25   such a loud way as something bad had happened, and yes,

Defense summation                    1400

1    that's Crystal's conclusion.  Why she makes that

2    conclusion, I can't say it, but she does.

3           So, the key in this case, is not the

4    so-called confession, or even the DNA, because I will

5    demonstrate to you, I hope later on, that the

6    confession evidence is absurd, and the DNA evidence

7    isn't significant for the prosecution, except to

8    exonerate the defendant, except to prove he is not

9    guilty of this crime.

10           The key here is Mya -- let me start by

11    saying, talking about Mya.  First, Mya, is adorable,

12    but being adorable doesn't mean she is truthful or

13    accurate.  Don't let your concern for this adorable

14    girl affect your emotions and overcome your intellect

15    in evaluating this case.  I realize you may have

16    imagined Mya being sexually abused orally and anally,

17    or both, and been disgusted by that thought.  So would

18    I be disgusted if that indeed happened and that is the

19    issue here.

20           I do feel sorry for her, but not because she

21    was sexually abused, which I suggest to you she was

22    not, but because of her situation at home, having to

23    live under the control of Crystal, who created an

24    environment for her children that I suggest to you was

25    not healthy for them.  What do I mean?  Consider, that

kmm

Defense summation                        1401

1    a six-year old girl uses the expression ate my coochie.

2    This has been confirmed by Crystal, confirmed by

3    Detective Baran.  You will remember the 911 tape.

4    Although, you didn't hear it, you were asked to leave.

5    It was played for Crystal.

6            MR. PERRI:  Objection.

7            THE COURT:  Sustained.

8            MR. BERGER:  It's in evidence.  You were

9    asked to -- you were asked to leave.  Crystal said she

10   didn't use that language.  We played the 911 tape for

11   her.  Now that you heard the 911 tape, did you make

12   those statements to the police?  She acknowledged she

13   did.

14           So, where did the six-year old learn this

15   expression?  Then Mya uses the expression pecker in the

16   butt.  The concept of pecker in the butt for a six-year

17   old is mind-boggling.  How does she even know to say

18   something like this, and then the language itself.  How

19   many six-year olds even use that kind of language, and

20   then the same six-year old gets whooped with a belt.

21   This frail adorable girl, who can't be weighing very

22   much, has to be whooped with a belt.  You need a belt

23   to discipline a young child like that.

24           Now, she and her brother go to counseling

25   with her brother, prior to the October 16th, 2013

Defense summation                    1402

1       incident, that is alleged to have occurred here today.

2               And consider Sincere, her brother, his

3       actions on the witness stand were very troubling.  He's

4       obviously a troubled youngster who answered questions

5       in a manner like an eleven-year old whose head was

6       down, had ums, pauses in his answers, who didn't answer

7       questions directly.  This is not the demeanor of what

8       you expect from an eleven-year old boy.

9               So, consider now that Crystal comes into the

10      kitchen and yells, what the F.  Mya knows she is angry.

11      So Mya gets very scared.  She knows her mother is

12      unhappy about the fact that her pants are down and that

13      she will get whooped if she is bad.  Having her pants

14      down and being undressed is something she knows is bad.

15      And Crystal says to her, did he eat your coochie?  And

16      she says, yes.  This was her excuse to avoid being

17      whooped.  Did Crystal tell the truth here, or did she

18      really leave Mya to say, after, there's my defense.

19      Maybe Mya came up with the idea on her own.  Ate my

20      coochie is an expression she knows somehow.  Whether

21      Mya said it, or Crystal put the idea in her head, she

22      knows she will deflect any wrongdoing from her and put

23      it on Daniel Ramos.  Either way, when she puts it on

24      Daniel Ramos, she knows she is safe.

25              Now, we all know children make things up.

kmm

1    It's the nature of the child.  They make things up to

2    be accepted by their parents.  They want to be

3    approved.  They want approval from their parents.  No

4    child even likes being disciplined even for the

5    slightest things, but for something as serious as being

6    undressed, she knows a real whooping will ensue.

7              Crystal puts Daniel Ramos out of the house

8    without even asking Daniel Ramos what happened.  Daniel

9    Ramos does say Mya is lying, but Crystal is so enraged

10   that she wouldn't even try to find out from Daniel

11   Ramos what happened, a man who has only been good to

12   her and her kids.  Excuse me.

13             One key thing here that tells you that Mya

14   made this up occurred when Officer Boccio came to the

15   scene.  Officer Boccio says to Crystal, what happened?

16   And Crystal says, he ate my daughter's coochie in front

17   of Mya.

18             Now, while Boccio, Police Officer Boccio,

19   should have taken Mya aside and privately talked to

20   her, he asked Mya, what happened in front of Crystal,

21   and the key thing from Officer Boccio is it took Mya a

22   minute and-a-half to two minutes to give an answer if

23   it really happened.  Would it take anything more than a

24   split second?  She doesn't want to lie to the police

25   officer, but she also doesn't want to cross her mother.

1          And after a minute and-a-half to two minutes,

2     she decides she is better off not crossing her mother,

3     and she says, what she says to Officer Boccio.  Mya is

4     conflicted between saying something that is not true,

5     but at the same time not crossing her mother.

6          Now, we really want to examine the testimony

7     of Mya, a seven-year old, when she testifies almost at

8     eight, and she tells us so many inconsistent things on

9     the witness stand here in front of you, that she should

10    not be believed.  As adorable as she is, she is just a

11    child.  Please, do not make excuses for her.  The only

12    one on trial here is Daniel Ramos.  I ask you to use

13    the same critical evaluation of Mya as you would for

14    any witness who testified here in this courtroom for

15    the prosecution or defense witnesses, be as critical of

16    Mya.  Don't make excuses for her because she is a

17    child.

18         Bear in mind, as you consider her testimony,

19    that Mr. Perri tried to sanitize her and prepare her

20    for a trial by speaking to her five to six times before

21    coming to court and still, still, her testimony was

22    filled with inconsistencies in some many ways.

23         Remember, in the jury selection process in

24    voir dire Mr. Perri said, could you agree that somebody

25    might tell a story in so many different ways, as if to

1    excuse the inconsistencies that he knew might occur

2    with Mya.

3              The Court will tell you in evaluating

4    witnesses you consider whether or not the statements

5    are consistent or inconsistent.  Obviously, the

6    consistency suggests a truthful statement.  The

7    prosecutor may ask you to disregard the

8    inconsistencies.  So, either his arguments, it's heads,

9    he wins, and tails we lose.  Because if it's consistent

10    --  if it's inconsistent, disregard it.

11              So how could you tell whether or not it was

12    being truthful?  The law recognizes if you are

13    inconsistent, that's a significant fact in evaluating

14    testimony.

15              Let's talk about how the oral sex supposedly

16    happened.  I demonstrated in front of you, you remember

17    this, I asked, what did he do?  And I was bending at

18    the waist like this.  She said, yes, that's how it

19    happened.  He was bending at the waist.  Mya is

20    standing.  Physically, then his mouth doesn't get

21    anywhere near a vagina.  That's the way she says it

22    happened.  That's what somebody says when they are

23    making something up.  If you are not making something

24    up, you are recreating exactly what happened and all

25    five times bending at the waist like this.  Mya is a

 1     child.  His mouth is nowhere near her vagina, but this

 2     is what she says happened, because all she knows is she

 3     is supposed to say, he ate my coochie, because she must

 4     stick to that script.  She can't give you any details

 5     about what happened, the circumstances, if anything was

 6     said.  So that all she knows, if she sticks to that

 7     script, then she is covering herself, and she is not

 8     going back on what she told her mother way back when.

 9            Now, I am going to now give you somewhere

10     between ten, fifteen inconsistencies that Mya gave you

11     that were significant.  You may come up with others.

12            First, Mya said all five times it happened

13     that way, that is with Daniel bending over like that.

14     But then she says, five oral sex actions become two or

15     three pecker in the butt times.  If it's five, now it

16     becomes two or three pecker in the butt.  She said that

17     at all times it happened during the day.  Then she says

18     it happened sometimes at night.  She said when it

19     happened five times during the day, her mother was

20     home, but then she said at other times her mother was

21     not.

22            Mya says to you, she has never lied.  Every

23     child lies, little ones or big ones.  Every child lies.

24     Mya has to portray herself to you as somebody who

25     didn't lie, who has never lied.

1          Then she tells the prosecutor just a few

2     weeks before the trial here, 2015, that this happened

3     one time before, but one week after the incident she

4     says to the counselor at South Shore Child Guidance

5     Center, Georgina Devine, that it happened five times

6     before.  In other words, she is saying in October of

7     2013, that it happened five times, in addition to this

8     alleged one time on October 16, 2013.

9          Now, she needs to keep herself as a victim in

10    order to avoid her mother's raft.  So, five days later,

11    she exaggerates her victimized by saying it happened

12    five times, as kids do, kids exaggerate.  Obviously,

13    Georgina -- the counselor knew something had happened

14    and she asked her about it, and she says, it happened

15    five times before.  Mya gets sympathy by being believed

16    and being believed she is a victim.  Mya simply makes

17    herself more of a victim by saying to her, oh, it

18    happened five times before.

19         When she sees Mr. Perri some eighteen months

20    later, on the eve of trial, she says to Mr. Perri, she

21    forgets the five times.  Then she says, oh, it happened

22    once before and for her to come up in this day and age,

23    rather at this late stage, with pecker in the butt, is

24    so out of left field.  It's clear it's only from her

25    brain, which she says or her imagination or from

1    something she has heard in her house before in the

2    interim, but it's not real.  Another inconsistency.  In

3    fact, Mya has actually given three instances, three

4    different numbers.

5            She told Mr. Perri it happened once before.

6    She told Georgina Devine it happened five times before,

7    and the third number, is zero, it never happened

8    before.  And who did she tell that to?  Cathleen

9    McAllister, the nurse.  The only objective witness on

10   this point, presented by the prosecution.  She is the

11   professional nurse dealing with sexual assaults.  Three

12   separate times Mr. Perri asked Ms. McAllister, what her

13   job was, and three separate times Ms. McAllister said

14   my job is to get a detailed history and to get as much

15   information as possible.  That's her job.  She knows

16   how to deal with questioning children in these types of

17   cases.  That's her job.  If Mya said it happened

18   before, it would have been written down by McAllister.

19   Nurse McAllister said that to you.  If that would have

20   been told to her, that would have been on that report,

21   which is in evidence.  Her failing to write it means

22   that Mya never said to Nurse McAllister, the

23   professional who knows how to see if it happened

24   before, and Mya is not in the presence of her mother.

25   She is alone with her, which is the way it should be.

1          Now, Nurse McAllister also checked Mya's

2     anus.  All was normal.  You will see that on the report

3     as well.  Do you think that an erect penis going into a

4     six-year-old's anus doesn't do damage?  Of course, it

5     does, and this is an objective exam by Nurse

6     McAllister.

7          Then Mya said she doesn't know if she told

8     her mother.  She was asked, did you tell your mother?

9     This was the pecker in the butt.  She says, I don't

10    know.  Do you think, that if a man put his penis in her

11    anus, and that it hurt, she would not tell her mother?

12    Of course, she would.

13          And then when -- there were times when I

14    asked her if it happened five times before, was that

15    the truth?  And the answer was, no.  When I asked you

16    before, was it five times, were you telling the truth?

17    No, I always forget, she says.

18          Then I asked her, when she told Mr. Perri it

19    happened one time before, her answer was no.  She did

20    that two separate times during her testimony.  When I

21    asked her, if she told her mother about pecker in the

22    butt, her answer was, yes, or I don't know.  If, yes,

23    Crystal does something about this, obviously, and now,

24    it's because it never happened.  She said she never

25    heard her mother use the expression to eat.  Meaning,

1    eat the coochie.  Even though she was standing next to

2    her mother when her mother made the phone call to the

3    police.

4            Both Crystal and Detective Baran acknowledged

5    Crystal uses the word ate, ate her coochie.  Mya at one

6    point in her testimony said she bled when the pecker

7    went in her butt.

8            MR. PERRI:  Objection.

9            THE COURT:  Overruled.  Nothing that is being

10   said is evidence, it's just arguments, and you will be

11   the ultimate decider of the facts.

12           You may continue.

13           MR. BERGER:  So when you say he put his

14   pecker in your butt, did you bleed?  Answer, yes.  She

15   said it.  You can hear it if you don't recall it.  She

16   said it, but then she said later on in her testimony

17   that she didn't bleed, that she didn't say she bled.

18   Here it was within moments later, in the same testimony

19   in -- at one point she said she bled and at another

20   point she said she didn't bleed.  Mya has no idea why

21   she didn't tell her mother.  The answer is simple,

22   because it never happened.

23           Now, if some man's penis went into her anus,

24   don't you think there would have been discomfort?

25   Don't you think her mother would have noticed some

1    discomfort and the change in Mya's behavior?

2           And then Mya says all of the times that it

3    happened, Mya was always in her pajamas when this

4    happened, even in the daytime.

5           Now, we know in this instance, toward the

6    later part of the day, she is in her pajamas, but

7    always?  And this is the story of somebody who never,

8    who is making something up.  Rather than deviate from

9    the facts -- she is only seven now.  She says, I'm

10   always in my pajamas because she has to repeat the same

11   story she has been asked to tell.  Clearly, Mya is

12   making these things up as she goes.  These

13   inconsistencies by Mya are some that were there at the

14   time of her testimony.  Please don't make excuses for

15   her because she was seven and a cute girl.  Consider

16   her as you would any other witness.  Start at point

17   zero, as I asked you in voir dire, and be ready to

18   disbelieve as to believe.  Remember, only the defendant

19   is on trial here, Mya is not.

20          Finally, I point out to you Mya was pretty

21   together for someone who had been sexually abused five

22   times or even one time because the hospital report says

23   she was alert, attentive, playful, talkative, follows

24   direction and answers questions.  Is that behavior of a

25   girl sodomized two or three times, anally or orally, or

1    orally abused two to five times?  Clearly, no.

2              Let me turn to the so-called confession.  The

3    prosecutor would have you believe that Daniel Ramos

4    gave People's 10 in evidence in English even though he

5    speaks Spanish as his main language.  He does speak

6    some English.  He doesn't read it very well at all.

7    Why give him his rights in Spanish if his English is so

8    good, which is what the prosecution and Detective Baran

9    would have you believe.  It's an old detective's trick.

10   District attorney, the prosecutor here, will argue that

11   the facts in People's 10 came from Daniel Ramos, and

12   because a lot of the facts did come from Daniel Ramos,

13   therefore, all the statements in People's 10 came from

14   Daniel Ramos.  That doesn't make sense.  Yes, we talked

15   to them.  Yes, he thought they were -- he talked to

16   them in Spanish, by the way, which I'll get to in a

17   moment.  Yes, he talked to them and gave them facts,

18   which are in the statement that clearly came from

19   Daniel Ramos.

20             Let me suggest to you the following with the

21   so-called confession.  That because Daniel Ramos would

22   not admit to them, that he put his mouth on her vagina,

23   they had a problem.  How to get Mr. Ramos to sign the

24   piece of paper because what they're going to argue to

25   you is he signed this piece of paper, therefore, he

 1    said it.  He signed People's 10, and therefore, he said

 2    it.  Not, of course, legally the truth.  Don't follow

 3    that because you signed a piece of paper, you said

 4    something.  You have to know what is in the paper.

 5    They knew that if he was given a statement in Spanish,

 6    a statement in Spanish that said, I pulled down her

 7    panties and pajamas and told her I was going to tickle

 8    her with my mouth, and I tickled her pussy with my

 9    mouth.  They know if that is a statement in Spanish, he

10    could see that.  He's the one that signed that

11    statement.

12           There are other sentences in there too that

13    he didn't say, but that's the key one as far as this

14    case is concerned.  I'll deal more with those other

15    sentences later.  They knew that if he was given a

16    statement in English, which and he cannot read it, that

17    he would sign it because now Detective Pacheco would

18    never read them those offending sentences, and that

19    particular offending sentence that he tickled her

20    vagina with his mouth or tickled her pussy with his

21    mouth.

22           Just say, the People's case was he read it to

23    him, but he didn't read that sentence.  In other words,

24    they believed they could make Daniel Ramos believe that

25    he wasn't signing anything that wasn't true, and I

1     suggest to you that Daniel Ramos would not admit

2     anything to him about putting his mouth on her vagina

3     and this was their problem, how to overcome it.  And

4     this is the key fact here that tells you to disregard

5     the offending sentences in the statement.

6           Why do you think Detective Baran never asked

7     Daniel Ramos, have you done this before?  Did you do

8     this for sexual gratification?  Have you done it to

9     others?  If Mya had told Detective Baran it happened

10    one time before, and if Daniel Ramos was so

11    cooperative, just telling everything he knew, why not

12    ask about this one time before?  Why not ask when it

13    happened, how this happened, where it happened.  And

14    what he did, he didn't ask that.  Because this is not

15    Daniel Ramos's statement as far as these offending

16    sentences are concerned.  He didn't ask those questions

17    because Daniel Ramos never admitted to doing anything

18    like that.

19          If Detective Baran, as a real pedophile here,

20    you must ask these questions.  If you are a sex crimes

21    detective, you must ask who else Daniel Ramos did this

22    to.  Any other times with respect to Mya, that's what

23    you ask, that's what you do as a sex crimes detective.

24    Clearly, Daniel Ramos never admitted doing this to Mya.

25    I suggest to you that Detective Baran knew he needed a

1    confession because Detective Baran had very little

2    confidence it happened at all to Mya.  Without a

3    confession, the case relies on Mya alone.  This is a

4    child.  There is no other evidence at the time.  He

5    didn't even know there was DNA, but the DNA is not

6    compelling.  In fact, it is exonerated.  It doesn't

7    even help the People's case.  More on that later.

8         So, Detective Baran recognizes he has this

9    problem, because obviously, Daniel Ramos is not

10   spilling his guts out and admitting anything here.  So,

11   he doesn't follow the protocol here.  He doesn't follow

12   the protocol when he failed to interview Mya at the sex

13   crimes unit where you would be interviewed by a trained

14   professional, not Detective Baran, but a trained

15   professional about the incident, a trained professional

16   who is skilled and neutral.

17         MR. PERRI:  Objection.

18         THE COURT:  Overruled.  Again, it's not

19   evidence.

20         MR. BERGER:  And who would put a child at

21   ease with toys in a room and a comfortable atmosphere.

22   It stands to reason that's what you do with a child as

23   young as this if you are going to try to get the child

24   to open up and be truthful.

25         He says, well, the mother said the kid is too

Defense summation                    1416

1       tired.  It's very late.  Let's do it the next day.  Not

2       an unreasonable request by Crystal Ramirez.  What about

3       the next day?  Detective Baran says he called the

4       district attorney's office and told him not to

5       interview her.  They didn't.  He didn't make one note

6       about that.  Of course, he doesn't know who he spoke

7       to.

8               And do you believe somebody in the district

9       attorney's office would ignore the protocol and not

10      interview Mya, when that is what should be done?  They

11      have a whole room set up to interview children now.

12      That is what the protocol is.  That's what Detective

13      Baran told you, he is the sex crimes detective, but he

14      didn't do it, even though they had the room available

15      to do it.  Wouldn't you, the jury, want to see what

16      this six-year old said back then?

17              MR. PERRI:  Objection.

18              MR. BERGER:  Now said to you now some

19      nineteen months later.

20              THE COURT:  Objection overruled.  Again,

21      nothing that is being said is evidence.  It's just

22      arguments.  It's your recollection that controls.

23              You may continue.

24              MR. BERGER:  You want to see what happened

25      back in October of 2013, not nineteen months later

Defense summation                    1417

1    after having been prepared by Mr. Perri to try to have

2    her appear credible, try to have her -- to sanitize her

3    as a witness to you.  You don't know Mya.  You only

4    know what you saw with the very few minutes that she

5    testified.  You only know what the prosecutor wants you

6    to know.

7              Baran said he didn't even try to get the

8    defendant's statement on a video.  He never asked the

9    supervisor.  Let me ask you, if Detective Baran or any

10   sex crimes detective called the supervisor and said to

11   the supervisor, I think we have a real pedophile here,

12   a sexual abuser of children, and he's admitting it, and

13   I need to get him on tape.  Do you think the supervisor

14   would say, nah, don't do it?  Don't you think the

15   supervisor, if according to Detective Baran, they only

16   have two places, headquarters and the one in Bellmore,

17   let's go open up those offices.  Let's get access to

18   the video machine.  Let's get Daniel Ramos on tape.

19   You move heaven and earth to get that done if you

20   really have a cooperating person who he is admitting he

21   sexually abused a girl.

22             How about taking out his smart phone, his

23   cell phone.  Just have him say it on his cell phone.

24   Yes, I pulled down her pants, tickled her pussy with my

25   mouth.  How long does that take and some other

Defense summation                    1418

1    incriminating statement?  He has her on the smart

2    phone -- everybody has smart phones, even me.  He has a

3    smart phone.  He has one.  He didn't do it.  Now, that

4    would be the end of the case if he had Mr. Ramos saying

5    this on tape.  There's nothing else for you to

6    consider.  And the answer is, he doesn't have it on his

7    cell phone.  He doesn't have it on anything because

8    Daniel Ramos never admitted doing this.

9              In this day and age, when most police cars

10   have cameras, and in this day and age when the police

11   department is all over the country providing body

12   cameras to police officers, why are they doing that?

13   Because a public does not have confidence that the

14   police are dealing with the public properly.

15             MR. PERRI:  Objection.

16             THE COURT:  Sustained.

17             MR. BERGER:  You know that.  You would cry.

18   You know from reading the papers and seeing the news.

19             MR. PERRI:  Objection.

20             THE COURT:  Sustained.

21             MR. BERGER:  The public has no confidence in

22   what the police are doing all of the time are proper.

23             MR. PERRI:  Objection.

24             THE COURT:  Sustained.

25             MR. BERGER:  Members of the jury, for

1    confessions, it's a necessity.  When we catch police

2    officers doing more things, civilians using their cell

3    phones and doing the wrong thing.  Not all police

4    officers, not at all.  Some have it on tape.  No issue.

5              A word about taking notes.  I asked the

6    questions of the police officer because it stands to

7    reason what police officers do in their line of work,

8    they should be making notes contemporaneously, that is

9    at the same time they do what they do.  It can be a few

10   minutes later, whatever.  Taking notes is important

11   because it helps you remember.  Relying on memory is a

12   recipe for mistake and false testimony.  If you write

13   it down, you are able to recollect better.

14             Officer Boccio never wrote down what he said,

15   what he says Daniel Ramos said.  He says, I got to the

16   scene and Daniel Ramos said, arrest me, I raped her

17   daughter.  That can't be true, nobody ever said that.

18   How could Mr. Ramos said, arrest me, I raped her

19   daughter when Crystal or anybody claimed he raped her

20   daughter.

21             Then the second sentence was, I made a

22   mistake, I licked her once in the bedroom.  Of course,

23   that's not correct here.  The allegation is something

24   happened in the kitchen.  He never wrote any of those

25   statements down.  He comes in -- he's wrong in what he

1    testified to.  I'm not saying he's consciously lying.

2    He is just wrong, and he comes in nineteen months later

3    to tell you what he says he remembers being said.

4              Now, for those of you at your jobs, it

5    depends upon the kind of job, aren't you told to make

6    notes, memorandum, data.  You are not expected to

7    memorize things, and everybody knows it's helpful to

8    write things down so you can recall.  Baran and Pacheco

9    made no notes at all.  Really, it means they are free

10   to say whatever they want to say to you.  Will you be

11   fooled by them?  Will you believe them because they are

12   police officers?  The prosecutor is counting on that.

13             A few other factors here with respect to

14   Detective Baran.  Only now in court does he understand

15   what the word verbatim means.  I mean, really.  Does he

16   think you are stupid?  Do you think you only discovered

17   it now and verbatim for a detective who is taking

18   statements when you ask the detective about a

19   statement, and I asked him if it was verbatim, that

20   becomes important.  He is claiming every word in there

21   was used by Mr. Ramirez, and he knows there is a

22   problem with him saying it's verbatim.

23             And you will see when you look at the

24   statement, for example, Mr. Ramos doesn't use the word

25   pussy.  Mya never used the word pussy.  That's what the

1   claim is, what he said in there.  Mya was supposed to

2   use the word pussy.  He realizes now nineteen months

3   later after the rules of tricking into signing a piece

4   of paper, we have a problem now.  Only now he

5   understands verbatim.  When he asked the question back

6   at here, he didn't understand what it meant.  He now

7   realizes the ethicality of taking notes because he took

8   no notes.

9            And then, he said, so interestingly, he did

10  not tell Daniel Ramos what he was charged with because

11  he was afraid Daniel Ramos would shut down.  So,

12  therefore, he wanted a statement, come hell or high

13  water, wasn't interested in being fair.  What happened

14  to the, you have the right to remain silent.  That's

15  the very first right on the rights card.  You have the

16  right to remain silent, but he didn't want him to

17  remain silent.  He was afraid he was going to shut

18  down.  If you are supposed to, according to Supreme

19  Court, tell people you have the right to remain silent,

20  then honor that, but he was afraid he was going to shut

21  down because he wanted a statement.

22            So, is that justification?  He said, this is

23  what he said, he wasn't legally or morally required to

24  tell him what he was charged with.  But you understand

25  why he didn't, because he didn't want him to shut down.

1    Wouldn't you, if any one of you were charged with a

2    crime, say to a police officer, what did I do?

3            Very simply, you are driving your car and the

4    traffic officer comes to stop you.  What did I do

5    officer?  It's the first thing you ask.  You want to

6    know what he is charging you with.  Detective Baran

7    decided he is -- he didn't want to tell us.  He didn't

8    want him to shut down.  How about being fair?  You see,

9    by not telling Mr. Ramos what he is charged with, he

10   doesn't have to deal with the denial that he will get,

11   I didn't do it, because then they have to kind of

12   explain how is it he told you he didn't do it, and now

13   he is admitting that he did.  What did you do in the

14   interim to convince he should now admit to you that he

15   did it.

16           The give away also, Baran and Pacheco told,

17   spoke to each other about the circumstances of taking a

18   statement prior to the hearing, prior to the hearing

19   back in last September they spoke about the

20   circumstances of taking the statement.  They wanted to

21   avoid any inconsistencies that may arise from the rules

22   in getting Daniel Ramos to put his signature on a piece

23   of paper.  Detective Baran claims he read the

24   statement, but only in an undertone, but whatever that

25   means.  What he was saying, he couldn't hear him read

1   it.  He has to insist he had in English, which we know

2   he wouldn't do.  Daniel Ramos never read the factual

3   part of the statement.  He couldn't read.  Baran said

4   the rights were given in Spanish.  He wanted to be sure

5   he got it in a language he understood.  So, even

6   Detective Baran, he knew Daniel Ramos might not

7   understand English very well.  He's out of his own

8   words.  He wanted him to have the rights in Spanish.

9   That's why he called Pacheco in.

10          So, now, Baran asks Daniel Ramos if he wants

11   to write an apology letter.  Why?  I asked him.  Why

12   did you ask him to write an apology letter?  To get as

13   much evidence as I could acquire.  How stupid does he

14   think you people are?  If he needed more evidence than

15   what is contained in People's 10, ask the defendant.

16   This defendant is supposedly a fully cooperative person

17   under investigation who has already admitted that he

18   licked the pussy of Mya.  If he has already admitted

19   that, wouldn't Baran have asked him for how long did

20   you lick her vagina?  Was it sexually gratifying?  Did

21   you do it before?  Where?  When and how?  Did you do it

22   to other people?  This is what you want to know if you

23   are a sex crimes detective.  Just ask the person right

24   in front of you who supposedly admitted to doing this

25   to Mya.  You don't need anymore.  You don't need to ask

1   him to write an apology letter.  Just ask him, by the
2   way, did he videotape it so he's admitting everything
3   on the video so we have no issue?  He knew he needed
4   more.  He knew the statement was ridiculous.  That a
5   Spanish speaking man is signing a statement in English,
6   which you can't read.

7          Now he is typing.  He writes an apology
8   letter.  His signature is on People's 10.  They
9   basically told him to sign this and he did.  He hoped
10  that Daniel Ramos, in writing the apology letter to
11  Crystal, would admit a real sex act.  That he would
12  really admit to doing something to Mya, but Daniel
13  Ramos never did.  You heard what he said about that.
14  The apology letter says nothing about licking the
15  vagina of Mya.  He clearly hoped to trick him into an
16  admission by saying something to Crystal.

17          He asked him to write a letter to Crystal,
18  which is interesting because Crystal doesn't read
19  Spanish.  He only writes in Spanish.  You will see
20  People's 11 in evidence, a so-called apology letter.
21  Why was that written to Crystal and she doesn't read
22  it?  If he really wanted to write an apology letter to
23  Crystal, type it in English for her to read.  This
24  trick by Detective Baran didn't work either.  This is
25  not a fair detective, or an honest detective.  The

Defense summation                    1425

1       so-called apology letter also shows that Daniel Ramos

2       did not commit the crime.  If he was apologizing,

3       seriously apologizing, he would actually say it in the

4       letter.  He apologized for hurting Crystal's feelings.

5       He was upset that Crystal was upset.  He explained that

6       to you when he testified.  That's what that apology

7       letter meant.

8                 Finally, I ask you to remember the demeanor

9       of Detective Baran.  All of the feasible excuses when

10      confronted with his prior inconsistent testimony, the

11      /TKPWEURPL something and discomfort.  Did you have

12      confidence this man was being honest and truthful as a

13      witness?  I suggest not.  Very often, the district

14      attorney likes to argue, why would a police officer

15      lie?  It could be lots of reasons.  You know they do

16      it.  It could be that he lacked like an effective

17      detective, if he gets a confession in a case when you

18      have a six-year old as a complainant.  It looks good on

19      his record if he gets a conviction, and there may be

20      many, so many other reasons.  I don't need to show you

21      why.  We talked about that in voir dire.  I only need

22      to demonstrate to you if he lied, and I suggest to you

23      he was not a reliable witness.

24                What happened in the interrogation room?

25      Daniel Ramos spoke to Pacheco in Spanish, not Detective

kmm

1   Baran in English, and Pacheco gave those facts to

2   Baran, who typed it in English.

3         I think Officer Boccio -- Daniel Ramos was in

4   that room for eight to nine hours, according to Boccio.

5   Clearly, Daniel Ramos could talk to Pacheco, not Baran.

6   Daniel Ramos told you when he testified on the witness

7   stand that Detective Pacheco's Spanish wasn't that

8   good.  So Daniel Ramos knows that because of talking to

9   Pacheco at length.

10        Now, if you remember what the prosecution's

11  testimony was here, all they did was call in Pacheco to

12  give him his rights.  Pacheco read from the rights

13  card.  He told him to sign.  He signed si, and signed

14  his name and went out.  How does he know Daniel Ramos

15  Spanish was not that good?  In fact, you know Pacheco's

16  Spanish is not that good.  When he attempted to read

17  People's 11, the so-called apology letter, he didn't do

18  it very well or very smoothly.

19        Let me turn to Pacheco.  Detective Pacheco is

20  so afraid that he will be exposed to collaborate Baran

21  to show that they screamed to get Daniel Ramos's

22  signature on People's 10.  He can't deny he was in

23  Mr. Perri's office with Detective Baran.  So, he claims

24  he wasn't paying attention to what Detective Baran was

25  saying to Mr. Perri prior to the hearing.  He had to

1    admit that Baran talked about their involvement in

2    taking of the statement and the rights card.  And they

3    can get together on their own and concocted their

4    story.  He had to admit it because Baran admitted it.

5           If you are an honest witness, you tell what

6    you know to the prosecutor or the defense lawyer.  That

7    is perfectly proper to the lawyers to question the

8    witness for the -- to get two witnesses in a room

9    together with both of the witnesses together, both of

10.   whom were involved in so-called taking of the

11   statements.  That's wrong because it allows

12   coordination of their testimony, which I suggest to you

13   occurred here.

14           The key is, they both admit it.  They talk

15   about the fact that the defendant speaks Spanish, but

16   the statement is in English.  They talked about that

17   fact, as they had to get together and figure out how

18   can we sell it to a jury that this man, who speaks

19   Spanish, some English, signs a statement in English

20   that you can't read.  So they came up with the scenario

21   of the statement was written, Pacheco read it in

22   Spanish.  That assumes Pacheco read every single

23   sentence in that statement, which I suggest to you he

24   did not.

25           In addition to Pacheco's awkward demeanor on

Defense summation                    1428

1    the stand, which suggests to you reflected a lack of

2    credibility, some of the things Detective Pacheco said

3    were ridiculous.  After the rights card, he said he

4    left the room.  It took just seconds for him to leave

5    the room, but he said under oath, he could tell that

6    Daniel Ramos had no trouble understanding English.

7         Well, you tell me how a couple of seconds you

8    could understand if somebody doesn't have any problem

9    understanding English.  Then to him, the word pussy is

10   the same as the word vagina.  Even though one is slang

11   and one is a real word, and he says Pacheco is not

12   asked to leave the room.  They had to get together

13   where they were not in a room together.  That's their

14   story.  They did not want to have to testify about the

15   circumstances of how People's 10 got on the written

16   page.  They did not want to have to testify, which

17   would result in inconsistencies because when you are

18   making up stories, there are plenty of inconsistencies.

19        Again, if Daniel Ramos gave this statement to

20   Pacheco, then it should have been written in Spanish.

21   And Daniel Ramos would see the offending sentences in

22   there and he would sign it.

23        The prosecution argues that Baran and Pacheco

24   would lie and take such a risk for their career.  The

25   answer is, police do lie.  Everyone acknowledged that

kmm

1      when we had the voir dire in the jury selection, false
2      confessions occur.  You all know that.  We asked that
3      too.  They just don't think they will get caught.  No
4      police officer thinks he will get caught.  Look how the
5      active police misconduct occur if you are alive and
6      awake.
7                    MR. PERRI:  Objection.
8                    THE COURT:  Sustained.
9                    MR. BERGER:  And you read the paper.
10                   MR. PERRI:  Objection.
11                   THE COURT:  Sustained.
12                   MR. BERGER:  I don't know if the prosecutor
13     will argue the police never do anything wrong.  If he
14     argues that, fine.  We all know, and I had to ask you
15     in voir dire, because if you didn't have an open mind
16     about police not being truthful, you have to keep an
17     open mind as you open up the possibility of
18     truthfulness and untruthfulness.
19                   Then continue to the police department, Baran
20     and Pacheco knew they were safe.  So, while, we don't
21     have a video of what they did here, the answers that
22     they gave you at this trial gives them a way as not
23     being truthful.
24                   Could we at this time take a break?
25                   THE COURT:  How much longer do you need,

1    Mr. Berger?

2                MR. BERGER:  I know it's been over an hour.

3                THE COURT:  You can keep going.  I don't want

4    you to break in your summation.  You could finish

5    rather than have it broken up.

6                MR. BERGER:  Could we come up to the bench

7    for a minute?

8                THE COURT:  Sure.

9                (Whereupon, there was a sidebar discussion

10   with the Court and counsel, as follows:)

11               MR. BERGER:  Number one, I need a break.  I

12   think the jurors also need a break.  I can tell from

13   some of their reactions.

14               THE COURT:  All right.  That's fine.

15               (Whereupon, the proceedings resumed.)

16               THE COURT:  I will give you a five-minute

17   break.  Don't discuss the case amongst yourselves or

18   with anyone else.  See you all in five minutes.

19               (Whereupon, the jury exited the courtroom.)

20               (Whereupon, a short recess was taken.)

21               (Whereupon, the jury entered the courtroom.)

22               THE CLERK:  Both sides stipulate all sworn

23   jurors are present.

24               MR. PERRI:  Yes, your Honor.

25               THE CLERK:  Defense counsel?

Defense summation                    1431

1              MR. BERGER:  Yes, your Honor.

2              THE COURT:  Welcome back.  You can continue,

3      Mr. Berger.

4              MR. BERGER:  Let me suggest to you calling

5      Sincere was an act of desperation by the prosecution.

6      I suppose he was called to tell you that Daniel Ramos,

7      after saying many times at the house, I didn't do

8      anything, I didn't do anything, suddenly and with no

9      explanation says, I did something.  He says he heard

10     this while he was standing on the porch even though Mya

11     and Crystal are standing on the porch, and they never

12     heard Daniel Ramos say anything like that, and he said

13     it to Mr. Perri for the first time on the eve of trial.

14     I suggest to you that it was never said, I guess,

15     because maybe he thinks, well, you wouldn't believe the

16     police officers' statement, you might believe Sincere's

17     statement.

18              Also, he also said that Mya said her tooth

19     was hurting, and that Daniel Ramos said, let me handle

20     it.  Neither Mr. Ramos nor Mya said anything about

21     having a bad tooth.  I don't know where this scenario

22     came up.  It's a reflection of lack of credibility.  I

23     cannot explain to you why he testified the way he did.

24     You saw he was a troubled youngster, and I suggest that

25     he cannot be credited by you at all.

kmm

1        A brief word about Crystal.  You remember

2    where Mr. Perri said to you in voir dire, do you have

3    to like somebody in order to believe them?  Was he

4    referring to Crystal?  I don't know.  Maybe.  I'm

5    suggesting to you that he was.  After all, how good a

6    parent is she?  She smokes with the kids in the house.

7    She uses language inappropriate for children.  She

8    beats Mya with a belt.  I don't know what she did with

9    Sincere.

10       What about her character when she is eighteen

11   years old.  She has participated in a robbery of a

12   beach bag with a friend of hers.  She says she only

13   smacked a girl, but the other person who she was with

14   took her bag and ran away.  Crystal ran away with her.

15       So, I would suggest a guilty mind of Crystal,

16   of just smacking her or participating in a robbery, we

17   don't really know.  Compare that to Daniel Ramos who

18   when told Crystal will call the police, he stayed and

19   didn't run away and attempted to and expected he would

20   be able to explain what happened to the police, but

21   Crystal should not be believed for another reason.  She

22   said on a call to the police, my daughter claims a

23   family friend tried to eat her out, and secondly, he

24   ate her coochie.

25       When she testified, I asked her about those

Defense summation                    1433

1   questions.  She disputed she used such language like

2   that.  She wanted to appear much more civilized and not

3   as crude.  She then listened to the tape and she

4   admitted she did make those statements.  She wanted to

5   appear more credible to you.  She wasn't being truthful

6   to you then until she was confronted with her own

7   words.

8              In a statement she says to the police, a

9   family friend tried to eat her out.  Does that mean it

10  didn't happen?  Does tried mean it wasn't successful?

11             Let me talk about Officer Boccio.  He, too,

12  never took notes about what he -- what happened when he

13  went to the scene back in 2013.  He admitted when I

14  questioned him about it at the hearing.  When I asked

15  him about that at the trial he said, yes, he made notes

16  and proceeded to take notes out of his pocket.  He

17  realized how the situation can't -- how failure to take

18  notes was.  The problem is, the notes he had taken, he

19  had written before the trial.  He thought he wrote down

20  what happened nineteen months ago.  If he did it

21  recently before the trial, therefore, he could say he

22  made notes.  He fails to understand the point of taking

23  notes contemporaneously at the same time as the

24  incident becomes significant as far as his memory is

25  concerned.  Writing nineteen months later doesn't cure

1    his problem.  That's what he thought by writing the

2    notes nineteen months later, that was okay.

3         When you evaluate the testimony of Crystal,

4    Mya, Sincere, Detective Pacheco, Police Officer Boccio,

5    I suggest there is much flowed in their testimony and

6    their demeanor, the manner in which they testified here

7    at trial.  Compare that to Mr. Chillseyzn and Nurse

8    McAllister.  Their demeanor on the stand was

9    fair-minded, objective witness.  They'll tell you what

10   they knew, and what they did.  I am confident they were

11   trying to be truthful and fair.  It's not what you get

12   from the other witnesses presented by Mr. Perri.

13        The prosecution has put forth many, many

14   witnesses here, but the bottom line is the following:

15   And this is the story that Mr. Perri wants you to

16   believe.  This has got to be his theory.  A

17   fifty-four-year old man, with an unblemished record is

18   secretly a pedophile or sexual abuser, who having been

19   with children all his entire life in the United States

20   from the 1990's on, never acted on it.  The love he got

21   from the children and their parents didn't mean a thing

22   because he secretly had his eye on a six-year-old girl

23   so he could, in the kitchen, lick her vagina, and he

24   did that and with other people around with Crystal,

25   right nearby, and on the porch and with Sincere in the

1   next room watching video games and all of that, he did

2   to satisfy his lust for this six-year old girl.  Or his

3   theory will be, Mr. Perri's theory will be he was

4   really doing it five other times with Mya, including

5   anal sex two to three times.  A grown man putting his

6   penis in the anus of a six-year old knowing it would

7   hurt and/or cause bleeding, not caring if the child

8   told her mother.  He would take that risk.  You thought

9   that Daniel Ramos, having this lust for a six-year-old

10  girl would think she wouldn't tell her mother if she

11  bled or if it hurt?  Do you think that, and Mr. Perri

12  has to argue Daniel Ramos would count on this girl not

13  telling her mother so he could continue the lust for

14  this six-year-old girl.  It's a disgusting thought, but

15  that's what Mr. Perri expects you to believe from his

16  witness.  That's what his witness has said, or

17  Mr. Perri said to you.  She is not being truthful about

18  the anal sex, if he is arguing that, than he is telling

19  you he wasn't telling the truth to you here in this

20  courtroom.

21          Nurse McAllister examined her.  There is no

22  damage to the anus.  We know that Mya didn't tell the

23  truth here.  One, you know that, how can you rely on

24  her to convict a man of this crime beyond a reasonable

25  doubt?

1        Now, the defendant called five witnesses

2   here.  We gave you the full picture in this case, not

3   the distorted picture presented by the prosecution, I

4   would say so.  When you learned of the charges here,

5   take a look at Daniel Ramos and you saw a pedophile or

6   a child abuser.  I understand how some people might

7   think you are seeing a stranger for the first time in

8   your lives, but the fact that we presented our

9   character witnesses tells you the reputation of Daniel

10  Ramos's kindness and gentleness towards children.  You

11  are getting the picture of a real person here.

12       Now, Crystal does admit that Daniel Ramos did

13  many things for her and her children.  But you also

14  heard from David Ramos, the son, a Marine of six years.

15  He can't tell you because the rules don't allow --

16            MR. PERRI:  Objection.

17            THE COURT:  Sustained.

18            MR. BERGER:  He can't tell you about the

19  defendant's --

20            MR. PERRI:  Objection.

21            THE COURT:  Sustained.

22       If the rules don't allow it, he can't say it,

23  counselor.

24            MR. BERGER:  He did not say to you what his

25  personal feelings were about his father.  He can't say

1   that, but he did tell you what he heard other people

2   talk about his father saying, that he was a kind and

3   gentle person to children.  This is what he heard other

4   people say.

5            Then you heard from Stephany Ramos, David's

6   wife.  Before she was a member of the family, she never

7   met Daniel Ramos before.  She heard as she was about

8   to, and she was comforted by the fact she heard other

9   people talking about his reputation for being kind and

10  gentle to children because she believed if that's who

11  the father is, then that is the man she will probably

12  marry, and she did marry, and she heard it not just

13  that one time before she was going to meet Daniel, but

14  of other times of other people talking about Daniel's

15  reputation.

16           Now, Mr. Perri attempted to cross-examine

17  those people, you haven't been with them a lot for the

18  last few years because they're in the service.  Yeah,

19  that's true.  But that's not what this is about,

20  because people don't talk about other people's

21  reputation every day.  Life doesn't happen that way.

22  They give you instances which they heard about other

23  people talking about his reputation.

24           So, people talk about that sporadically and

25  they told you what they heard at different instances.

1    Mr. Perri might say to you when he gets up here, and
2    remember, I can't respond to whatever he says.  You
3    can't believe David Ramos, or Stephany Ramos, or Daniel
4    Ramos because they are bias and they have interest in
5    this case.  You know what my answer to that is?  He's
6    absolutely right.  They do have an interest in this
7    case, but that doesn't disqualify them as witnesses,
8    and it doesn't mean they didn't tell you the truth.
9    Wouldn't you, if you were charged with a crime that you
10   did not commit, and you got on the witness stand to
11   tell your side of the story, wouldn't you want to have
12   the opportunity to be believed and not have a
13   prosecutor say you can't believe that person?  I can't
14   believe you, because you have an interest in the case.
15   Every defendant in a criminal case has an interest in
16   the case.  That doesn't mean they all lie.  Some tell
17   the truth, some don't.  I'm asking you to recognize if
18   Daniel Ramos told the truth.
19           I'm asking you to evaluate them as I asked
20   you to evaluate all of the prosecution witnesses.  I
21   submit to you they were forthright, had an honest
22   demeanor on the witness stand and should be credited by
23   you.
24           I also called Christy Hernandez, a woman with
25   young children who spent two years living in-house of

kmm

Defense summation                    1439

1    Daniel Ramos a number of years ago.  She is not related

2    to them.  In fact, she hasn't really had much contact

3    with the family in the last few years.  She, too, told

4    you about her reputation.  She heard of Daniel Ramos

5    being kind and gentle to the children, and she had two

6    children living in the house as well.

7            Now, in the statement, to counteract the

8    reputation of evidence, the prosecution called Joshua

9    Hanson to say that being kind and gentle to children is

10   the starting point for grooming them for eventual

11   sexual abuse.  So, with that approach, members of the

12   jury, all teachers who give special attention to

13   children, they're suspect.  Foster parents who take in

14   to provide a home for children, they're all suspect.

15   Personnel, or whoever works in group homes, they're all

16   suspect.  Charity employees, who work to help children,

17   they're all suspect.  All pediatricians.  The list goes

18   on, and on, and on.

19           That's not how it works.  With all of those

20   people, are we going to suggest they're pedophiles,

21   sexual offenders.  Mr. Perri would ask you to believe

22   that that is Daniel Ramos.  Even though working as a

23   bus driver for thirteen years there was never, never, a

24   complaint by any parent about any improper action with

25   a child.  So Mr. Perri would have you believe with that

kmm

Defense summation                    1440

1    reputation, carefully developed by Mr. Ramos, he was

2    developing a good reputation so he could, one day,

3    abuse and lick the vagina of a six-year-old girl.

4         His witness testified that the approach taken

5    by a child abuser is to groom them so they could be

6    alone with the child deceptively getting the confidence

7    of those in charge of the child, normally parents, or

8    whoever else is in charge of the child.  But Mya wasn't

9    alone.  Crystal was in a nearby room.  Sincere was also

10   in a nearby room.  So, the offer by Mr. Hanson about

11   getting these children alone so he could abuse them,

12   didn't happen here.  The people were in the house.

13   Besides, if Daniel Ramos was trying to groom Mya so he

14   could abuse her, he would have been making all of the

15   calls to Crystal to be nearer to Mya, but that's not

16   the testimony here.  The testimony was, it was Crystal

17   who called Daniel Ramos to come over, not Daniel Ramos

18   calling Crystal.

19        So, if Mr. Perri makes that argument about

20   Daniel Ramos grooming so he could abuse Mya, see it for

21   what it is.  It's a desperate move to support his case,

22   which is really a house of cards.  That is, there is no

23   substance to his arguments or his case.

24        Let me turn to the DNA evidence and Dr. Karl

25   Reich.  You will recall the opening of Mr. Perri, he

1    triumphantly pointed out to you we have DNA evidence in

2    this case, and there was one in 175 million chance that

3    DNA in the underwear of Mya was Daniel Ramos.  Well,

4    that's fine, and it might be fine if our position was

5    that wasn't Daniel Ramos DNA, but it was his DNA.  At

6    least I can't be excluded.  We don't contest that.

7              The problem is, if you take a superficial

8    look at DNA, just like the rest of the case of

9    Mr. Perri, he wants the superficial look.  I'm asking

10   you to take an analytical in-depth look.  We see that

11   the forensic report failed to reveal that the fact that

12   Daniel Ramos's DNA was in her underwear, is of no

13   moment to this case.  The forensic report actually

14   exonerates, and I told you this before, exonerates

15   Daniel Ramos.  That's why the prosecutor wants you to

16   take a superficial look at the case.

17             We gave you a complete picture about what the

18   lab analysis means.  The prosecution wants you to jump

19   to a conclusion because the DNA is in the underwear,

20   and that there is saliva that he never licked her

21   vagina.

22             But you learned quite a few things from

23   Dr. Reich and the real expert with incredible

24   credentials who explained to you that the lab report

25   and the test do not support that Daniel Ramos licked

Defense summation                    1442

1    Mya's vagina.  Daniel Ramos is a -- I mean, Dr. Reich
2    is a scientist, a neutral scientist with no ax to grind
3    with either the defense or the prosecution.  In fact,
4    law enforcement hires Dr. Reich to teach them.
5              MR. PERRI:  Objection.
6              THE COURT:  Sustained.
7              MR. BERGER:  You heard the testimony.  You
8    heard the testimony Dr. Reich told you he has taught
9    DNA and testing to law enforcement.  If I'm wrong and
10   you want to hear it back, and it's not there, then I'm
11   wrong.  He said it.  He taught law enforcement and DNA,
12   DNA testing, and the methods used in DNA testing.  They
13   think so highly of him that they --
14             MR. PERRI:  Objection.
15             THE COURT:  Sustained, again.  Nothing they
16   say is evidence, and it's your recollection of the
17   testimony that will control in this matter.  Go ahead.
18             MR. BERGER:  He was hired by them.  He told
19   you he was.  We can have it read back.  I'll now
20   discuss what he found in his case.  There are two lab
21   reports.  One on February -- dated February 27th and
22   one on February 28th, and the rest of the material is
23   in evidence that is what we call the bench notes, and
24   the electropherographs, and that's the software showing
25   what grafts you will see in all of that documentation.

kmm

1     The lab reports are the conclusions given by the lab
2     technician in this case, Mr. Chillseyzn.

3            Now, there are three key testing places that
4     are significant here at this trial, one the vulva swab,
5     two, stain 1-A1, and three, stain 1-A2.  There are two
6     stains in the underwear.  The fourth, the analysis of
7     the dried secretions also plays a part for the smaller
8     one.

9            The first key area is the vulva swab.  Those
10    are the swabs taken directly from the vulva and vagina
11    of Mya.  This test actually exonerates the defendant,
12    and this was the very first question, one of the first
13    questions I asked her with respect to the lab report.
14    Does the lab report and the electropherographs support
15    the conclusion that Daniel Ramos licked Mya's vagina?
16    The answer was no.  While the vulva -- while there was
17    life was found on the vulva swab, no DNA of Daniel
18    Ramos was there.

19           And Dr. Reich's opinion, that saliva was that
20    of Mya, because Mya's DNA was the most DNA of all of
21    the DNA on the vulva swab, 1-A1 and 1-A2.  Most of the
22    DNA was Mya's.  By far, he said, not even close.  No
23    male DNA was found on the vulva swab.  Although,
24    Dr. Chillseyzn testified as to male genetic material
25    found on the vulva swab, no DNA profile could be made.

1      Dr. Reich disputed the fact there was any

2   male genetic material on the vulva swab.  I pointed out

3   that the peaks were insufficient.  If it was male

4   genetic material, or noise -- in other words, the peaks

5   were insufficient to tell whether it was male genetic

6   material or noise.  The peaks were also insufficient in

7   the report.

8      The February 27th report, and I suggest if

9   you are going to look at these things, look at 2/27,

10   2/28, the first two pages of the 27th report is the

11   summary, one page.  On the 28th report, there is a

12   summary.  Look at those things.  The key was, YSTR

13   typing was done.  The YSTR was that related to the

14   males, only males show up on YSTR typing.  Peaks were

15   depicted, which did not meet laboratory criteria for

16   allele identification.  Therefore, the peaks are not

17   reported.  That's in the report.

18      So, if the peaks were not reported, and yet,

19   Mr. Chillseyzn comes in and suggests to you male

20   genetic material, there's nothing in the reports

21   talking about male genetic materials on the vulva

22   swabs.  This is the last ditch effort to try to help a

23   case that can't be helped.

24      So Chillseyzn's report, in the reports the

25   peaks were insufficient to report the peaks reflected

Defense summation                    1445

1    male genetic materials.  The peaks were insufficient

2    and it says nothing about the male genetic material and

3    he never at least came to that.

4         Dr. Reich pointed out that Mr. Chillseyzn's

5    trial testimony was not justified.  Could not justify

6    it, and he looked at all of those pages in there with

7    the electropherographs, all of the software testing

8    done on the material involved.  Dr. Reich looked at it

9    and said it could not be justified, and Mr. Chillseyzn

10   was, in fact, wrong.  Of course, Dr. Reich was

11   diplomatic about it.  He didn't disparage

12   Mr. Chillseyzn in any way, but this man with his

13   expertise and qualifications came to that conclusion.

14   The height of the peaks were so low, a conclusion about

15   being male genetic material is just a desperate

16   maneuver by the prosecution.

17        Now, Mr. Perri cross-examined Dr. Reich on

18   the fact that three of the rows related to a gun case.

19   Dr. Reich admitted he made a mistake that parts of the

20   electropherographs that did apply to this case showed

21   the peaks too low and didn't change anything he said

22   before when he referred to the electropherographs that

23   do apply to this case, didn't change his opinion at

24   all.  I suggest to you that Mr. Chillseyzn's testimony

25   here about male genetic material was a desperate move

Defense summation                    1446

1      by the prosecution, which is not justified by science.

2              Now, for the prosecution to cross-examine

3      Dr. Reich that he was reading from a gun case on some

4      of the electropherographs there was, I suggest, dirty

5      pooling.

6              MR. PERRI:  Objection.

7              THE COURT:  Sustained.

8              MR. BERGER:  You can evaluate what he did

9      here.

10             MR. PERRI:  Objection.

11             THE COURT:  Overruled on that last statement.

12             MR. BERGER:  You could evaluate what he did

13     here.  This is what I suggest, an attempt, a gotcha

14     moment.

15             MR. PERRI:  Objection.

16             THE COURT:  That's sustained.

17             MR. BERGER:  Anyone can make a mistake, and

18     not see the mistake, but bear this in mind, these

19     documents were provided to defense by the prosecution.

20     The document that Dr. Reich looked at were provided to

21     him by me when I got these documents from the

22     prosecution, and represented as documents for this

23     case.  They gave us documents that were not part of

24     this case.  So either, the lab didn't see it or they

25     were being deliberately deceptive and the prosecutor

kmm

1       didn't read it either.

2                   MR. PERRI:  Objection.

3                   THE COURT:  Sustained.

4                   MR. BERGER:  The prosecutor, is he

5       acknowledging he turned over the documents?

6                   MR. PERRI:  Objection.

7                   THE COURT:  Sustain.

8                   MR. BERGER:  He turned --

9                   THE COURT:  Counselor, sustained.  Please

10      move on.

11                  MR. BERGER:  The documents provided to you

12      were provided by the prosecution.  The prosecution

13      presumably read them.  If he didn't read them, then he

14      turned over documents he shouldn't have because they

15      were not part of this case.

16                  MR. PERRI:  Objection.

17                  THE COURT:  Sustained.

18                  MR. BERGER:  Did the prosecution ever say, by

19      the way --

20                  MR. PERRI:  Objection.

21                  THE COURT:  Counselor, these are all

22      sustained.  Please move on.  Talk about the evidence.

23                  MR. BERGER:  I am commenting on the evidence,

24      Judge.  Those electropherographs, referring to the gun

25      case, were not part of the case, but given to me by the

1    prosecution.  Mr. Perri's approach to criticize

2    Dr. Reich, giving me the electropherographs that don't

3    apply to this case, but to a gun case, is like the son

4    that kills his parents.

5                    MR. PERRI:  Objection.

6                    THE COURT:  Sustained.

7                    MR. BERGER:  And then asks for mercy because

8    he is an orphan.

9                    THE COURT:  Sustained.  The last two

10   sentences are stricken from the summation.

11                   Please move on, counselor.

12                   MR. BERGER:  If it's not evidence, what

13   difference does it make?

14                   THE COURT:  Counselor, you have my ruling.

15   Please move on.

16                   MR. BERGER:  Mistakes can be made.  The lab

17   made it first.  When they turned over some of the

18   documents, that doesn't apply to this case.  That

19   doesn't change the conclusion by Dr. Reich.  Even the

20   lab agrees that peaks were detected that didn't meet

21   laboratory criteria for allele identification.  I read

22   that to you before from the report.

23                   Now, I mentioned that Mya's DNA was on the

24   vulva swab, and it what was her saliva on the vulva

25   swab.  No male genetic material was found on the vulva

1    swab, notwithstanding what Mr. Chillseyzn said.

2              Dr. Reich said that if a male licked the

3    vagina, you would expect to see a large amount of DNA.

4    Saliva is a rich source of DNA, he said.  It's sticky

5    and would remain for hours.  Especially, if the

6    underwear is pulled up the right way, as Crystal said

7    she did pull up the underwear of her daughter, but

8    there is no male saliva, no male salvia on the vulva

9    swab.  In fact, even Mr. Chillseyzn said that the

10   vulva -- in Mr. Chillseyzn testimony it was indicated

11   there was some saliva on the vulva swab.  Oral swab

12   doesn't get tested for saliva.  You could expect the

13   victims own saliva to be there.  That's what

14   Mr. Chillseyzn said.  You could expect the saliva from

15   Mya to be there.  Both experts agree the saliva on the

16   vulva swab was Mya's.

17              Those of you who wonder how a child's saliva

18   can get on her private area and underwear, Dr. Reich

19   pointed out how.  He said the child's hygiene is not as

20   careful as an adult.  You put your fingers in the

21   mouth, you touch your body, cough, sneeze, that's

22   saliva.  Remember, Mya took her clothes off, according

23   to Mr. Ramos, so she had to touch her underwear and

24   herself, and this is very small material.  You can't

25   even see it.  So, it's easily transferred, and again,

1   both experts agree that it was Mya's saliva.  No one

2   says it was the defendant's saliva.

3        Dr. Reich pointed out that the amount of

4   saliva is small because if there were a lot, the dried

5   secretions would also show saliva and it did not.  So

6   all things considered, there would have been a lot more

7   DNA and male DNA if Daniel Ramos had licked Mya's

8   vagina.

9        There are two other stains on the vulva swab.

10  I suggest to you it shows beyond a reasonable doubt

11  that the defendant is innocent.

12       Let me deal with the two stains as well.  The

13  summary shows 1-A1 stain, 1-A1 as Daniel Ramos's DNA,

14  and we can see that Daniel Ramos's DNA is there.  But

15  stain 1-A2, has two male DNA there.  Not one, but two.

16  The prosecution never attempted to determine whose DNA

17  that is.  Obviously, the DNA is the touch DNA, but

18  shouldn't the prosecution have investigated who the

19  second male is?  Again, absence of proof by them.  Why

20  not?  Why didn't they do that?  If someone did

21  something improper to Mya, why isn't the second male a

22  suspect also?  And as I said, the absence of proof can

23  create a reasonable doubt.  If the prosecution argues

24  that the saliva on the two stains could be from a male,

25  then why isn't the second male a suspect here?

Defense summation                    1451

1        There is no test, and I know this is very
2   confusing to you.  You haven't probably known -- have
3   you ever dealt with DNA?  There is no test to
4   differentiate the contributor to the saliva from the
5   touch DNA.  In other words, on that stain you have
6   Mya's DNA, Daniel Ramos's DNA, and a second male DNA,
7   but there is no test to tell you whose DNA, saliva and
8   whose DNA is touch DNA.  You can't touch it.  You just
9   know the DNA is there.
10        The opinion of Dr. Reich, based upon his
11   analysis of all of the stains on the vulva swab and the
12   two stains and the lack of DNA on the vulva swab of any
13   male genetic material or male DNA was it was all Mya
14   and even Mr. Chillseyzn agrees it was Mya's saliva on
15   the vulva swab.
16        The prosecution's failure to determine who
17   the second male is reflects a lack of will to present
18   all of the facts to you.  You, the jury, should feel
19   confident they did all they could to present truth to
20   you, by not doing so it reflects a lack of integrity on
21   the part of the prosecution and to have all of the
22   evidence presented to Daniel Ramos and not a real
23   search for the truth.
24        Dr. Reich, who said there is a minor
25   contributor and a minor contributor of the two males is

kmm

1       not significant.  All that means is there's more DNA

2       for one male than the other, and he put in the charts,

3       exhibits C and D in evidence from the defense, when he

4       said pretty close anyway, the amount of DNA from both

5       males.  Still, he said since you can't quantify the

6       amount of saliva on the two stains, it's very small.

7       We're talking about very small material here, but

8       because of no saliva in the dried secretions, there is

9       not a lot of saliva on the vulva swabs or the two

10      stains at all.  And again, if there is a male licking

11      the vagina of a six-year old, you would have expected a

12      lot more DNA, and there was none on the part of the

13      defendant.

14              Another failure by the prosecution here, in

15      the absence of proof, which can create a reasonable

16      doubt, is that they did not test the non-stained area

17      of the underwear.  In other words, they took an area

18      that the two stains had saliva in it, but if you test

19      the non-stain area, and you find Ramos's DNA, then you

20      know that is touch DNA.  They didn't do that.  That's

21      part of a scientific method.  It's called sub-straight

22      control.  Those technical languages used by Dr. Reich,

23      sub-straight control, is a necessary tool for trying to

24      evaluate the evidence.  The lab didn't do it here.

25      They should have cut out another part of Mya's

1   underwear and for sure since Mr. Ramos had handled the

2   underwear, his DNA would be on it.  This is another

3   failure by the prosecution that they did not do it.

4           You heard from Daniel Ramos.  You heard him

5   testify here at this trial.  I told you that he went up

6   and asked permission from Crystal to go to the

7   bathroom.  When he went to the bathroom area, he saw

8   Mya outside with no clothes on her bottom and clothes

9   in her hand.  She wanted to follow him into the

10  bathroom.  He said, no, no, you stay out.  He then went

11  to the bathroom, came out, and there was Mya still

12  without her clothes on.  He knew that if Crystal saw

13  her roaming around the house without any clothes on her

14  bottom, she would be upset.  What he did was attempted

15  to help her put her clothes on, and he put her legs in

16  both of the underwear opening and pajama openings.  He

17  did not want to pull up the pants because he didn't

18  want to touch her in an area that would be

19  inappropriate.  He told her get up, pull up your pants.

20  Before that could happen, Crystal walked into the room.

21  I suggest to you that Mr. Ramos' demeanor, and his

22  answers reflect the truthful person.  His testimony

23  shows you he is concerned about both children here.

24  He's concerned by the smoking by Crystal and the

25  effects on the children.  Crystal, herself, knew how

1   good Daniel Ramos was with the kids, otherwise, she

2   would have never allowed him to play with them and be

3   alone with them and baby-sit.

4          She knew he was the nice kind of person that

5   other people have testified to here before, as far as

6   his reputation is concerned.  Crystal asked him to tend

7   to the kids' homework while she was drinking out on the

8   porch Long Island ice teas.  She is not the best mother

9   in the world by far, but she was not going to let a

10  person be with her children if she had the slightest

11  inkling that he was a child abuser.

12         This man, who had a reputation of being kind

13  to children, a reputation not too many of us have, is a

14  special person.  Critical to me, and I hope important

15  to you, are the comments by two of the three character

16  witnesses about Daniel Ramos being a funny man, someone

17  who is funny, enjoys entertaining people, making them

18  laugh.  Quite the opposite of a sexual abuser who has

19  to be dark and devious in an effort to deceive parents

20  to get the children alone.

21         Daniel Ramos didn't run when he knew Crystal

22  was calling the police, but in this day and age, when

23  the police come and there's an accusation by a child

24  that something happened to them in a sexual manner,

25  that the police arrest, they have no choice.  But we do

1   have professionals who know how to interview, but they

2   didn't do that here.  So, Daniel Ramos sits in jail for

3   nineteen months.  Had Mya been interviewed by a

4   professional, I feel confident --

5           MR. PERRI:  Objection.

6           THE COURT:  Sustained.

7           MR. BERGER:  Mya was not interviewed by a

8   professional.  Never has been.  All we have is her

9   testimony between Mr. Perri and the girl presented to

10  you here supposedly in a sanitized way to help make you

11  believe her.  I already demonstrated before as to why

12  you should not.

13          Daniel Ramos worked hard all of his life.

14  Met his wife in 1980, been with her since.  He raised

15  two boys.  He opened his home up to relatives and

16  strangers.  He used the nineteen months in jail to

17  improve his English, both speaking and reading.  He was

18  a trusting soul on October 16, 2013.  The police told

19  him to sign documents and he did.  He never suspected

20  he was being duped into signing a paper admitting to

21  something he never did.  He never said to anyone, I was

22  going to tickle her and pull -- I pulled down her pants

23  and tickled her pussy with my mouth, nor did he say I

24  was playing with you.  And she said, no, he was licking

25  my pussy.  We know he didn't say that.  And a pussy, he

1   didn't use that word pussy and neither does Mya.  She

2   used the word coochie.  According to the statement,

3   she, Mya, used the word pussy twice.  Nor did Crystal

4   ever say that Mya used the word pussy.  Again, the only

5   way we know what was said and what happened is if there

6   was video here.  A signature on a piece of paper is

7   supposed to mean that sinner of the paper adopts the

8   statements that are in it.  But if you don't know what

9   is in the statement, you think you are being dealt with

10   fairly.  If you sign it, you are not adopting the

11   statement, and Mr. Ramos never adopted the statement,

12   number ten.  Nor did he really understand what the

13   signature on the rights card meant.

14        Mr. Ramos was a good friend.  When Crystal

15   asked, he offered.  Although, not always, but he tried

16   to accommodate her.  She had no car.  He had a car.  He

17   drove her to the supermarket, doctors' appointments,

18   drove the children to South Shore Guidance Center, did

19   a lot of things for Crystal.  This was not the daily or

20   weekly thing.  Crystal said it didn't happen, but when

21   it did, Mr. Ramos tried to oblige.

22        Daniel Ramos was that good a person, with no

23   ulterior motives.  Daniel Ramos loaned Crystal money,

24   bought things for her and her kids, often not getting

25   reimbursed.  He liked doing kind and generous things,

Defense summation                        1457

1   and was okay with not being paid.  He's not a rich man.

2   Few bus drivers are, but the small financial benefits

3   that he gave to Crystal, and specifically, the

4   children, were reward enough for him.  If Mr. Perri

5   tries to turn that around and make Ramos out to be a

6   sexual offender, then see it for what it is, a

7   desperate claim to win the case.

8         The evidence here tells you Ramos is not

9   guilty of the charges.  Bear in mind, as you consider

10  the case in the jury room, it's not your function to

11  determine how the prosecutor could be right, only if

12  the prosecutor proved its case so convincing and beyond

13  a reasonable doubt.  Not guilty doesn't mean that the

14  police lied or anybody lied, because they're not on

15  trial here.  Although, I suggest to you Baran and

16  Pacheco didn't tell the truth.  It only means you have

17  a reasonable doubt about the guilt of the defendant.

18  And the sufficiency of the evidence here, you all

19  agree to hold the defendant innocent and presume the

20  defendant innocent, and to hold the prosecution of

21  proving guilt beyond a reasonable doubt.

22        Probably is not good enough.  If there

23  somebody in there that says I think he probably did it,

24  not good enough.  I suggest to you the DNA and

25  everything else shows innocent.  Probably guilty is not

1    good enough at the character evidence.  The judge will
2    tell you that could create a reasonable doubt, if you
3    have, but then the character evidence comes up the
4    reputation evidence that itself alone can create a
5    reasonable doubt.

6              The prosecution may argue to you I did not
7    have to prove guilt beyond a reasonable doubt.  I don't
8    know what all doubt means.  I wouldn't even attempt to
9    define what all doubt means.  I wouldn't attempt to
10   define what certainty means, but I ask you to listen
11   carefully to what reasonable doubt is, not what it is
12   not.  If I were to ask you to define a giraffe, you
13   wouldn't say it is -- it's not a snake.  It's not an
14   elephant, not an otter.  By knowing what it is not,
15   doesn't tell you it's elongated, brown, with a long
16   enough neck.  I'm only ask you to consider what
17   reasonable doubt is, not what it is not.

18             Consider whether or not after you are
19   considering all of the evidence you have an actual
20   doubt or lack of convincing evidence that creates an
21   actual doubt for you.  It's always gratifying to talk
22   to jurors afterwards when they understand the consent
23   of doubt.  That's the cornerstone of democracy seen.
24   It keeps the government announcing the things we didn't
25   do.  What it means is, twelve neutral people have

                                                        kmm

1    decided there is a reasonable doubt and we don't

2    convict for that.   That protects all of us.   That's why

3    it's important for you to understand this concept.

4            You may hear language that a few things in

5    life are certain.   I don't know if that's accurate as

6    it applies to this case.

7            MR. PERRI:  Objection.

8            THE COURT:  Sustained.

9            MR. BERGER:  I don't know if it is accurate

10   if it applies to this case.

11           MR. PERRI:  Objection.

12           MR. BERGER:  If there were a video of

13   Mr. Ramos admitting this, that's pretty certain.

14   Daniel Ramos on the vulva swab, that would be pretty

15   convincing and certain.   Those emotions here only show

16   the defendant did not confess, and he did not lick the

17   vagina of Mya.   At the very least, they must create at

18   least one reasonable doubt.

19           Members of the jury, I've spoken a long time.

20   To give me -- if what I stated to you is obvious -- I

21   never take juries for granted.   I have no idea what you

22   are thinking.   You are hearing the same thing.   I don't

23   know what is in your mind.   So, because I don't know

24   that, I've tried to cover all of the points that I

25   thought were essential.   Nineteen months ago, false

1    accusations by a six-year old cost Daniel Ramos

2    nineteen months in the steamer.

3              MR. PERRI:  Objection.

4              THE COURT:  Sustained.

5              MR. BERGER:  Nothing happened to Mya.  I ask

6    you, based on the evidence here to give Daniel Ramos

7    back his freedom because the evidence here demonstrate

8    that the defendant is not guilty.  Thank you.

9              THE COURT:  All right, ladies and gentlemen,

10   given the hour of the day, this will be a good time for

11   you to break for your lunches.  Please remember to keep

12   an open mind throughout this trial.

13             Do not discuss the case amongst yourself or

14   with anyone else during the trial.  Do not permit

15   anyone to discuss it in your presence.

16             Do not talk to the lawyers, witnesses or the

17   defendant about anything during the trial.  Do not

18   visit the area of the charged crime, or any other place

19   involved in the case.

20             And if there is any news coverage of the

21   case, do not read, view or listen to any accounts or

22   discussions of the case reported by the news media.

23             Do not attempt to research any fact, issue or

24   law related to this case, whether by discussion with

25   others, by research in the library, or Internet, or any

Defense summation                1461

1    other means or source.  Have a great lunch.  See you

2    all at two o'clock sharp.

3                (Whereupon, the jury exited the courtroom.)

4                THE COURT:  Anything for the record?

5                MR. PERRI:  No, your Honor.

6                MR. BERGER:  No, your Honor.

7                (Whereupon, a luncheon recess was taken.)

8                    *            *            *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

kmm

1462

1    A F T E R N O O N   S E S S I O N

2

3        THE CLERK:  Case on trial continued,

4    Indictment Number 742N of 2014.  People of the State of

5    New York vs. Daniel Ramos.

6        Let the record reflect, all parties are

7    present.  The jury is not present at this time.

8        People ready?

9        MR. PERRI:  Yes, your Honor.

10       THE CLERK:  Defense ready?

11       MR. BERGER:  Yes, your Honor.

12       THE COURT:  Anything for the record, People?

13       MR. PERRI:  No, your Honor.

14       THE COURT:  Defense?

15       MR. BERGER:  No.

16       THE COURT:  Given the hour of the day and the

17   fact I'm walk-in, it is likely I will charge them

18   tomorrow morning because my charge is about an hour.

19   If your summation runs a little more than hour, they're

20   not going to have but five to ten minutes to deliberate

21   today.  That would make no sense.  After your

22   summation, Mr. Perri, I will release the jury for the

23   day and we will charge them in the morning.

24       MR. PERRI:  Yes, your Honor.

25       (Whereupon, the jury entered the courtroom.)

kmm

People's summation                    1463

1              THE CLERK:  Do both sides stipulate all sworn

2       jurors are present; People?

3              MR. PERRI:  Yes, your Honor.

4              THE CLERK:  Defense counsel?

5              MR. BERGER:  Yes, your Honor.

6              THE COURT:  Good afternoon, everyone.

7       Welcome back.  I hope you enjoyed your lunch.

8              MR. PERRI:  Good afternoon.  Before starting

9       my actual summation, there's one grievous

10      misrepresentation of the record defense counsel made

11      toward the close of his summation that has to be

12      addressed now and you should consider in evaluating all

13      of the arguments defense counsel asked you to follow to

14      abide by during your deliberations.

15             Defense counsel stated Mr. Chillseyzn agreed

16      with his expert that the DNA, that the saliva, rather

17      was Mya's.  That is patently false.  That did not

18      happen.  That was never stated by Mr. Chillseyzn, and

19      when defense counsel represented -- was reading to you

20      from the record, he mischaracterized that testimony,

21      and he excerpted that testimony on page 141, in lines

22      14 through 17 to read as follows:

23             Mr. Chillseyzn, answering a question about

24      what was done with all of the swabs.  The vulva swab

25      was indicated there was saliva of the vulva swab.  The

1    oral swab doesn't get tested for saliva.  You could

2    expect the victim's own saliva to be there, on the oral

3    swab, not on the vulva swab.  It was an oral swab of

4    Mya, not her vulva or an oral swab from her own mouth.

5    Of course, Mr. Chillseyzn there would coincide that is

6    going to have her DNA, her saliva, and it could be

7    assumed to be from her.  That isn't what was in the

8    testimony, and defense counsel, what he stated to you

9    simply was false.

10          Now, ladies and gentlemen, I stood before you

11   approximately three to four weeks ago and I told you

12   that this case was painful, but it was simple.  After

13   you looked at all of the evidence and you sat here

14   through a lot, I come back before you and say the

15   answer hasn't changed.  It is painful and simple.

16          Defense counsel argued you can't credit any

17   of the People's testimony.  You have to ignore all of

18   the physical evidence put before you in this case, but

19   to agree with defense counsel's position, what we

20   really need to do is shut down and ignore your common

21   sense.  You need to ignore all of the levels of

22   separate and independent evidence that corroborates,

23   that backs up what Mya Ramirez said before all of you

24   when she sat there, a seven-year old on the stand.

25          She sat there alone.  She, in fact, sat there

kmm

1   in front of the defendant, her abuser.  She sat in
2   front of an audience of strangers, of adults and told
3   you what happened to her.  She told you that the
4   defendant, this defendant, whom she named, whom she
5   pointed out in front of all of you, that he had oral
6   sexual contact with her vulva or vagina.  The
7   defendant, in her words, licked her coochie, is what
8   she said on the stand, and she has not waivered about
9   what happened on October 16, 2013.  She hasn't
10  equivocated.  She has not changed her story about that
11  day in any meaningful way over the last nineteen
12  months.

13          You cannot ignore just because she is a
14  child, as defense counsel urges.  You cannot ignore
15  Crystal because she is crude, as defense counsel urges.
16  You can't ignore Sincere because he cried and broke
17  down on the stand.  Most importantly, ladies and
18  gentlemen, you cannot ignore all of the other separate
19  and independent evidence apart from the Ramirez family
20  that tells you what Mya said before all of you, what
21  Sincere said before all of you, what Crystal said
22  before all of you, is true.

23          You cannot ignore the defendant's own
24  admission to Officer Boccio that he licked her, his
25  written confession to Detective Baran and Pacheco that

kmm

People's summation                1466

1    he was playing a tickle game with his mouth, and the

2    uncontroverted one in 175 million match with the

3    defendant's DNA of the profile inside the front of

4    Mya's underwear in a saliva stain.

5            You can't ignore all of that, ladies and

6    gentlemen, because when you took an oath as juror, you

7    promised not to ignore your common sense.  According to

8    the defense, you can't rely on any of this

9    corroboration.  It's a series of coincidences.  Though,

10   at no point did they ever put forth a credible reason

11   why the detective, why Officer Boccio, why they would

12   lie about a man they never met for a family they only

13   met that day.  Defense wants you to ignore and discount

14   the defense's multiple statements of admission.

15           The defense would have you take the

16   defendant's word that he didn't do it.  The defendant,

17   the most arguably interested witness in the entire

18   case, the most interested in the outcome of your

19   decision, just take his word as gospel.

20           The evidence simply does not support that

21   leap of faith.  There's nothing on the other side of

22   that jump.  There's the defendant's empty promises,

23   illogical inferences of a paid expert and character

24   witness who don't know the defendant or is too close to

25   him to actually admit what he has done.  It's not

1   really a leap of faith at all.  In fact, what the

2   defense is asking you to do, is cliff dive into rocky

3   shallows.

4          According to them, nothing really happened.

5   Just some convenient, very convenient, innocent

6   contact between the defendant and Mya's underwear on

7   October 16, 2014.  Contact that Mya is either covering

8   up as part of a conspiracy, by defense counsel, with

9   the help of her brother, Sincere, or contact that

10  occurred when Mya's suddenly inexplicably running

11  around half naked from the waist down in a three-room

12  apartment when only the defendant saw her in that state

13  of undress.

14         The defense, although they have no burden,

15  wants you to believe nothing went on in that kitchen

16  between the defendant and six-year-old Mya Ramirez,

17  except he was trying to help her, which is what the

18  evidence has continuously and repeatedly told us.  He

19  always seems to do that, just help the Ramirez's over

20  and over again.

21         This time, instead of giving them a ride, he

22  was trying to get Mya's underwear and pants back on

23  her, coincidentally right at the moment when Crystal

24  happened to open the door into the kitchen.

25         Defense would have you believe that because

1    he is so helpful, you should ignore that.

2              Even their own expert concedes that the DNA

3    profile inside of this little girl's underwear is a

4    match for the defendant.  And because he is so great

5    with kids, not only is it incorrect to draw any

6    conclusions from the measurable amount of male YSTR DNA

7    that was recovered from Mya's vulva swab, we should all

8    close our eyes, close our eyes, ignore, pretend it

9    doesn't exist, that the medical examiner's office, they

10   didn't find the actual amount that they could number,

11   but it does exist and it was there.

12             Finally, defense would ask you on account of

13   the defendant being so generous, so kind, so gentle

14   with children, you should shut your ears as well,

15   ignore Josh Hanson's testimony that those qualities are

16   part and parcel of a sexual perpetrator scheme to groom

17   a victim and their family to insinuate themselves into

18   their life to gain access, to gain trust, to gain

19   opportunity to commit heinous crimes against children.

20             Defense would have you believe it's all a

21   bunch lies and the most coincidence they add, the

22   coincidence that I characterize, as a house of cards,

23   when you add up all of the coincidences, when you see

24   how many have to happen, some of them has a name and

25   it's called guilty.

1      You can't ignore what the defense asked you

2    to do because you took an oath to carefully consider

3    all of the evidence, to follow logical conclusions, to

4    assess each and every witnesses' credibility, including

5    the defendant.  You cannot close your eyes, shut your

6    ears.  You must look at the sad simple reality of this

7    case.  I'm going to stare at you squarely in the eyes

8    and convict him.

9      After going through all of the problems, the

10   holes and incongruences of the defense's case, we will

11   then go back over the People's case and how it

12   nevertheless proves the defendant's guilt beyond a

13   reasonable doubt through separate and independent

14   corroboration of credible testimony.

15      Looking at the defense's case, the defense

16   has no burden, no obligation to put any witnesses, but

17   they chose to do so.  They didn't have to, but they

18   did, and therefore, you have to scrutinize and examine

19   all of their witnesses.  You must scrutinize, including

20   and especially, the defendant and evaluate the

21   credibility just like you would any of the People's

22   witnesses.

23      The evidence in this case shows you should

24   give no weight first to the character witnesses the

25   defense presented to you.  Instead of hinting

1    reasonable doubt, the character witnesses in this case

2    either don't prove anything or prove a character trait

3    that should stand for opposite of what the defense

4    wants you to take it to mean.

5         The defense presented to you with three

6    witnesses, the defendant's own son, his

7    daughter-in-law, and onetime family friend who used to

8    date his other son.  As far as the defendant's own son,

9    he loves his father and he testified as you would

10   expect.

11        The other two witnesses only have incidental

12   contact, at best, with the defendant and the community

13   in which he lives.  They admitted on cross they don't

14   have any basis to have an opinion of the defendant's

15   character, son and daughter-in-law currently live in

16   North Carolina, lived out of the state for nearly a

17   decade.

18        A third witness used to be in no regular

19   contact with the family for years, except for text

20   messages to the defendant's wife on Mother's Day,

21   except for the defendant's daughter-in-law's first

22   Christmas with the family where she is meeting

23   everyone.  It's not time you air out the skeletons in

24   the closets, except for that meeting, no dates, no

25   details, no specifics about any of these conversations

1    defense puts before you.

2            And even when you think about those

3    conversations, if you assume they happened, what was

4    community, that was discussing the defendant's

5    character, four to seven adults, the majority of whom

6    was family and the rest were all his friends.

7            Now, we come to character traits itself,

8    kindness and gentleness towards children.  Even if you

9    were to assume the defendant possessed such a trait or

10   had such a reputation, the evidence you heard later

11   showed that it proves nothing.  It proves nothing at

12   all, or the exact opposite of what the defense wants

13   you to take it to mean.

14           As Josh Hanson testified, you look to sexual

15   perpetrators, being creepy, not having jobs where we

16   have contact with them.  That's not reality of how this

17   works.  Sexual perpetrators appear upstanding.  They

18   are affable, trustworthy.  They are kind and gentle to

19   children on the outside.  They need opportunities to

20   victimize, and as Mr. Hanson testified to, sexual

21   perpetrators take jobs that give them access to

22   children.  Why?  Because they want to be left alone and

23   trusted with children.  So, therefore, it is actually

24   noteworthy that this defense repeatedly referenced the

25   fact that the defendant worked as a bus driver for

kmm

1     nearly a dozen years with handicapped children as an

2     Able Ride bus driver for handicapped children.

3          Having such a reputation, building such a

4     reputation, however, despite defense counsel's

5     misrepresentation of Mr. Hanson's testimony, it was

6     never said by him that just having that reputation

7     makes a sexual perpetrator.  Mr. Hanson never said, as

8     defense counsel tried to have you go along with, every

9     teacher, pediatrician, everyone in CPS workers, they're

10    all suspect of being sexual perpetrators.

11         Instead, what Mr. Hanson testified to was

12    that the character trait of kindness doesn't exclude

13    you.  Because you say I'm nice to kids doesn't mean you

14    are not a sexual perpetrator, which is what the defense

15    wants you to believe.

16         After the character witnesses, the defense

17    went on to a DNA expert.  There was testimony from

18    Dr. Reich, a decorated man with a long resume.  The

19    majority of his work that he listed for you was outside

20    the forensic genetics.  He worked on vision of cats,

21    pathogens living outside of the human body, virtual

22    drug labs, and a variety of pharmaceutical companies,

23    and then he stated forensic genetics.  He started a

24    business in forensic genetics, a business of chief

25    scientific officer, a head and leading partner of that

1   business, what he called a small little lab, a small

2   little lab that hopes to handle tens of thousands of

3   samples.

4           He might, as defense counsel wants you to

5   believe, be a scientist, and that's also true.  He's

6   also a businessman.  I want you to be aware of the

7   interest, the skin and game Dr. Reich has.  Dr. Reich

8   is not neutral.  For these factors, the evidence shows

9   that his overall believability, trustworthiness, and

10  why you should not give part of his testimony any such

11  serious weight is up for grabs and has to go to the

12  analysis of why he is -- recall how difficult he was

13  acknowledging being paid for the testimony.  At first

14  he said he was being paid, then his company said he was

15  being compensated, then on cross-examination he had to

16  acknowledge he was the owner of that company.  He was

17  bold to say in front of all of you that were his

18  business, were his laboratory to make more money one

19  year to the next.  He didn't stand to gain anymore

20  money or business being more profitable.  If that is

21  true, it's a very bad business model for such a smart

22  man.  He is being paid $2,500 for testimony, meals,

23  lodging, all in addition to that, and $250 for eight to

24  ten hours.  Consultation is possibly another $2,500 for

25  two days of work.  If you have five days in a work

People's summation                    1474

1    week, assume you work somewhere around forty weeks out

2    of fifty-two weeks.  That adds up to $5,000.  That's

3    not a bad business.

4            He never ran a test in this case.  Never

5    examined a piece of evidence until he got on the stand.

6    Never been to the examiner's office.  He felt free to

7    tell each one of you why they did what they did and why

8    whatever decision made meant.  There was not a local

9    expert from Stonybrook, Cold Spring Harbor, the DNA,

10   but a for-profit firm out of Cook County, Illinois.

11           The evidence shows that Dr. Reich definitely

12   has an interest, a monetary interest, a dollar sign

13   interest, and you should weigh that in evaluating his

14   inferences, educated guesses, and scientifically

15   certain conclusions.

16           As I say, remember, recall how Dr. Reich used

17   those three different terms interchangeably, common

18   sense would tell you that is not very scientific in and

19   of itself.

20           So second, about the DNA expert.  Almost

21   everything that Dr. Reich testified to agreed with and

22   substantiated Mr. Chillseyzn's work, and the conclusion

23   of the medical examiner's office here in Nassau County.

24           About the defendant's DNA being in Mya's

25   underwear stain 1-A1, the sole male contributor to that

1   stain on page 526 of the record, Dr. Reich states the

2   identification of Mr. Ramos is not in dispute.

3   Certainly, the results are consistent with the

4   haplotype of Mr. Ramos' stain.  It was agreed that the

5   major YSTR DNA, and also the minor autosomal DNA

6   contributor in the second stain, that they were also

7   consistent with Mr. Ramos' profile.  That it was a

8   correct statement to say that he was the contributor.

9   He agreed that the defendant's DNA is in there.

10          Dr. Reich also agreed there was positive

11   indication of saliva on the swab and on both of the

12   stains.  He didn't say there were any problems.  He

13   found no problems with the way the DNA lab in Nassau

14   County executed all of the tests and found no notes

15   indicating any problems with the equipment.

16          But when he went beyond those concurrent,

17   when their expert chose to disagree with the medical

18   examiner's office, the evidence shows conclusion as

19   inferences and the times he called educated guesses

20   have logical flaws that required you, ladies and

21   gentlemen, to reject them.

22          The Judge will instruct you on expert

23   witnesses' opinions, and statements.  They're not

24   sacrosanct.  You don't have to accept them.  You,

25   ladies and gentlemen, you are the ultimate finders of

1   the facts.  You have to examine the facts and the other

2   circumstances upon which Dr. Reich made his opinions.

3   The inaccuracy of any assumed facts he used, the

4   reasons given for Dr. Reich's opinion and whether his

5   opinions were consistent or inconsistent with all of

6   the other evidence you have seen in this case.

7         So, when we go to the first inference,

8   examine what does the factor, the majority of DNA on

9   all of the samples, what does that actually mean?

10        Now, their expert witness, their expert

11  witness inferences that the saliva had to come from

12  Mya.  It's not based on an actual test.  Their expert

13  conceded, his testimony attributed the saliva to Mya

14  based solely upon the fact that she was the majority

15  contributor of all of the DNA and stains and swab.

16        It's first important to note on

17  cross-examination on page 529 of the record, Dr. Reich

18  backed off the certainty and finally acknowledged that

19  this expert testimony was just inference and not a

20  scientific conclusion that the saliva was Mya's in his

21  opinion.

22        Dr. Reich also acknowledged on cross that,

23  quote, nobody can definitively say where saliva comes

24  from.  As he stated on cross on that same page, quote,

25  it's not possible using the technique that are

People's summation                1477

1    available to forensic labs, no, all we can do is make

2    an inference.

3            The next concession defense's expert made of

4    import is that the laboratory's saliva tests with the

5    medical examiner used doesn't quantify the amount of

6    saliva found on the object.  Why is that important?  It

7    means unknown, unknown how much saliva was either on

8    the swab on Mya's vulva or either of the stains.  All

9    we know is that saliva was indicated to be present in

10   all of those locations.  Add to it that both the

11   People's expert, Mr. Chillseyzn, and the defense's

12   expert, testified that under normal circumstances DNA

13   is constantly being deposited by our body on the

14   interior of our clothing.  Logically, then Mya would

15   have naturally been depositing her genetic material

16   into her underwear she was wearing that day.

17           Recall my hypothetical to the doctor about

18   licking someone's hand and swabbing it hours later.  He

19   conceded it would be consistent with such a scenario

20   with the major contributor of the swab of the hand,

21   hours later even though somebody else licked it it

22   would be the owner of the hand and not the person who

23   licked the hand.

24           On page 523 and 525 of the record, the expert

25   also conceded when applied to a vulva, urinating and

1    wiping can also substantially reduce the amount of

2    saliva in a saliva born DNA that would be present

3    there.

4            The doctor conceded oral sexual contact, the

5    less saliva would be present and deposited.  The less

6    DNA would be found on the location where the licking

7    occurred.

8            All of this testimony is critical for you,

9    whether or not the defense expert was aware of it, the

10   medical records of Mya Ramirez tells you and they are

11   in evidence, ladies and gentlemen, and it informs you

12   of the following two facts.  You can look at them.  See

13   them on the projector right here.  Mya's exam took

14   place at approximately 8:15 p.m.  That's not minutes

15   after the door was opened and Crystal screamed.  That

16   is not even an hour.  That's approximately three hours

17   later when her exam started and then eventually she was

18   swabbed.

19           In addition, it's noted in the medical

20   records that prior to the exam, but after the assault,

21   Mya actually did urinate.  She used the bathroom and

22   common sense tells you she wiped.  It's noted in the

23   medical records she used the bathroom before she was

24   ever swabbed.

25           MR. BERGER:  Objection.  Total speculation.

kmm

1        THE COURT:  All right.  The objection is

2   overruled, but just remember, this is argument.  You're

3   going to make those determinations.  Nothing that the

4   People say is evidence in this case.

5        You may continue.

6        MR. PERRI:  Thank you, your Honor.

7        Additionally, there is no testimony,

8   thankfully, that this incident on October 16, 2013, was

9   something that was prolonged.  It was interrupted,

10  short.  Sincere and Mya testified it happened in a

11  matter of minutes, not hours after the defendant closed

12  the door behind himself and Mya when he went into the

13  kitchen.  The evidence proves it's thankfully short.

14       Even the defendant's statements of admission

15  suggest it was momentary contact.  Officer Boccio, he

16  licked her once, and the written statement with

17  Detective Baran, it was a tickle game with his mouth,

18  and then Crystal walked right in as it happened.

19       Because of the amount of saliva originally

20  present on either Mya's vulva, because of the

21  considerable time that elapsed between the incident and

22  the swabbing at NUMC during which time Mya urinated and

23  likely wiped herself, because it is consistent with the

24  allegations that the evidence that Mya would provide,

25  the majority of the genetic material on a swab of her

1    own vulva, and from cuttings from the underwear that

2    she was wearing that day.

3            And finally, the incident itself was short in

4    duration, you should conclude, based on all of the

5    evidence that Dr. Reich's inference that just because

6    Mya was the major contributor, it is her saliva, it

7    just doesn't make logical sense, and therefore, you

8    should disregard it.  It is her clothing.  It's her

9    body.  The fact that it's mostly DNA doesn't prove it's

10   saliva.

11           Now, about the second inference, the evidence

12   shows that their expert was wholly incorrect and may

13   have attempted to materially mislead the jury as to the

14   presence of male DNA on the vulva swab.  The DNA

15   testing in this case and defense counsel's urges, it

16   does not exonerate the defendant.

17           The People have never put forth a witness

18   that says that there was typing identification, or

19   further scientific conclusions made from the YSTR of

20   the vulva swab.

21           The defense's expert attempted to discredit

22   his simple assertion that male DNA, some small amount

23   of it was there on the vulva swab from Mya's genitals,

24   male DNA.

25           First he attempted to suggested that the

1    peaks present in the YSTR testing were noise or

2    indistinguishable from the noise, the background, the

3    feed and should be ignored.

4              On cross, defense's counsel expert had to

5    concede that the threshold, the point at which there is

6    no longer noise, where you can actually have allele

7    typing, is a multiple of noise.  It's not just a noise

8    level, but a multiple of it and the standards and

9    common multiple, three times larger than noise.

10             Defense's expert also identified for you,

11   what actual noise looks like.  Defense counsel's

12   expert, People's 12, noted that this, this test run,

13   that this is what electropherogram of noise actually

14   looks like.  It was a good test, he said.  This is what

15   noise looks like.  When you take page 87 from People's

16   10, along with the one section that was relevant from

17   Defendant's B, and put them next to each other, you can

18   see the marked difference between the two.  This is

19   pure noise.

20             Here, ladies and gentlemen, this is what came

21   back from the vulva swab of Mya when they were

22   searching for male DNA.  It's not just noise.  There

23   are noted and even with untrained eye you can see the

24   noticeable peaks that were present.  No one, not

25   Mr. Chillseyzn, none of the People's witnesses said

1    they were able to identify who the source was, but just

2    that some small amount of DNA was there, and

3    Mr. Chillseyzn, and the defense's expert had to concede

4    on cross-examination that there is a difference.

5    There's a difference between actually being able to set

6    up the chart of being able to identify someone and

7    being able to say there is DNA there.  And even their

8    own expert conceded in the bench notes an amount was

9    quantified.  It was measured.  It was there.  There was

10   male DNA on Mya's vulva swab that was taken by the

11   nurse on the date of the incident.

12        With respect to defense counsel's attempts to

13   milline the prosecution, in all of the documents of the

14   exact same documents that the People possessed related

15   to the DNA testing in this case.  Every square is

16   clearly labeled with the file name and what is being

17   tested, whether it is stain 1-A1, the vulva swabs, or

18   if defense counsel's expert, a scientist in his field

19   was using arms, handgun and a different number for

20   every other one.

21        Additionally, there was no bad faith in

22   providing these documents.  They're exactly as they

23   came from the medical examiner's office and every

24   relevant section throughout the entire packet is even

25   highlighted.  Whether it's the noise, whether it is the

1   vulva swab, and whether it is the stain.  No one was

2   misled, but you expect a paid expert to be able to

3   read.

4           Finally, there is the issue what is in the

5   report according to their expert.  Defense counsel's

6   expert made a big deal on page 7 of February 27, 2013,

7   report there was no mention of YSTR findings.  On

8   cross-examination he had to concede yet again that it

9   was mentioned, that what he said wasn't the whole

10  truth.  That on page 2 of the same report, YSTR typing

11  was explained, and he had to concede that as just

12  Mr. Chillseyzn testified to, it was there, but it could

13  not be used to identify who deposited it there.

14          So much like the character witnesses, all of

15  the defense's experts, the testimony fails to question

16  any evidence.  His inference that Mya was the source of

17  the saliva doesn't stand up to your own logic and the

18  facts YSTR DNA was present, was measured, was found,

19  and he conceded that there was an amount determined,

20  not just identified on her vulva, corroborates what Mya

21  told you and shows that her testimony is to be

22  believed.

23          Next you have the defendant.  The defendant

24  has no burden, didn't have to take the stand.  If he

25  didn't, you can't use it against him.  But he did.  So,

1    I ask you to use it against him.  Use every word he
2    said to you against him.  He chose to testify.  He had
3    the right to remain silent.  He waived it here just as
4    he did in dealing with the detectives on October 16,
5    2013.
6         The judge will instruct you and I will
7    reiterate it again.  As a matter of law, the defendant
8    who testifies is a person who has an interest in the
9    outcome of this case.  You have to be conscious of that
10   reality when you examine and weigh the defendant's
11   credibility, the reasonableness or the not
12   reasonableness of what the defendant says to you.  Do
13   you believe it?  Is it consistent with the rest of the
14   testimony and evidence before you?
15        Let's examine three relevant portions of the
16   defendant's testimony.  First, the defendant's
17   background, his previous relationship with Crystal.
18   Second, the defendant's version of what happened on
19   October 16th.  And finally, the defendant's version
20   about what happened afterwards while he was in police
21   custody.
22        Looking at the background information about
23   Crystal.  A family man, working full time, working all
24   of the time, picking up extra shifts, he's an American
25   citizen.  Defense counsel elicited in starting the

People's summation                1485

1    examination of the defendant, he became an American

2    citizen, not a permanent resident.  He became an

3    American citizen.  Common sense and basic civic

4    knowledge dictates that this entailed him taking the

5    naturalization test which commonly is known.

6            MR. BERGER:  Objection.  This is such

7    speculation, not anything near what the evidence in

8    this case is about.

9            THE COURT:  All right.  Again, nothing that

10   either attorney says is evidence in this case.  I'm

11   going to allow this at the moment and see if it goes

12   too far.

13           MR. PERRI:  Yes, your Honor.

14           Common sense and basic civic knowledge

15   dictates that this entailed him taking the

16   naturalization test which has basic civic portion and

17   basic English literacy test.  He was an MTA employee, a

18   NICE bus operator.  On cross he told you that he

19   received a written job offer in English.  He filled out

20   a log each day in English.  That he forms and other

21   papers at his job, all in English, and yet, interacted

22   with his customers in English.  Whether or not more

23   comfortable in Spanish, is a not relevant question for

24   you, but the evidence definitely shows that this

25   defendant read and spoke English both today and before

kmm

People's summation                    1486

1    he was incarcerated.  The defendant even corrected the

2    interpreter while he was testifying about the accuracy

3    of her interpreting of what he said.  This isn't a

4    language -- English isn't a language he picked up and

5    brushed up on while he was incarcerated.

6            Now, about his relationship with Crystal.

7    He's not her father, he's not her uncle, he's not her

8    cousin, not her brother, not even her stepbrother.

9    He's the father of her ex-boyfriend's father of the

10   children's friend.  That's not exactly family.  It's

11   not normally a close relationship that you have.  Would

12   you do everything that he says he was doing for the

13   Ramirez's if that was your only connection with them.

14   I don't think so.  It's not reasonable for you to

15   believe that he was doing so.

16           According, to the defendant, he and Crystal

17   were not sleeping together.  They weren't dating, and

18   he provided unlimited transportation for them.  He

19   would take them anywhere they needed to go.  He would

20   provide free babysitting services whenever Crystal

21   wanted it.  He would pick them up, drop them off, do

22   whatever they needed.

23           He was also concerned about Crystal's

24   smoking, concerned about her drinking and thinks she is

25   a bad parent.  He never called 911.  He didn't tell you

1    he called CPS.  What, according to him, did he do in

2    response to those concerns?  He brings over liquor.  He

3    brings her cigarettes.  He brings them to her and

4    provides her an opportunity so she can stay out at

5    night so he could stay home and watch her kids.  He

6    acknowledges that night at Crystal's her kids do not

7    speak Spanish, always interacted in English.  He claims

8    he did their homework in English.  He's just a nice

9    guy.  Someone has to do their homework, because as he

10   would have you believe, Crystal is just drinking the

11   alcohol he provides and smoking the cigarettes he

12   brings over, instead of caring for her own kids.

13        Don't think too hard about it, ladies and

14   gentlemen, then would you have questions.  Just go

15   along with what the defendant says to you, because the

16   evidence shows the defendant's description of his

17   relationship with Crystal, it just doesn't make any

18   sense that this is how he was living his life.  It

19   screams for you to ask what was he getting out of this.

20        His role as what he would tell you is

21   Crystal's doormat.  Crystal, according to the

22   defendant, according to him, is a selfish person that

23   takes advantage, but he keeps coming back.  What does

24   he keep coming back for?  The evidence gives you the

25   answer.  He keeps coming back for access to Mya.  He's

People's summation                    1488

1      not helping them.  He's helping himself to a

2      six-year-old girl who wouldn't tell, who couldn't fight

3      back, whose mother would otherwise be occupied because

4      he let her go out at night when he could be alone with

5      him.

6              Then he admits he gets time alone with the

7      children.  On more than one occasion he corroborates

8      both Mya and Crystal's testimony that that was going

9      on.  And according to the defendant, there was no bad

10     blood between them whatsoever, not at all, nothing bad

11     before October 16, 2013.  They got along.  She depended

12     upon him.  He liked the kids.  The kids liked him, and

13     this evidence is that this defendant offered you on

14     direct and cross-examination just further goes to show

15     that Crystal, Mya, Sincere, they have no motive to lie.

16     They have no reason to make this up.  No ax to grind,

17     no vendetta, and through that lens, the evidence

18     demands you use, examine the defendant's version of

19     October 16, 2013, the date of the incident itself.

20             What did he tell you happened that day?  The

21     evidence shows that the defendant's own version of the

22     incident is incredible and unreasonable.  An

23     interesting point to note is that the defendant just

24     asked in his written statement to Detective Baran,

25     repeatedly on the stand, used the term a little girl,

1    instead of Mya's actual name.  Just like in the

2    statement, he doesn't call her Mya, he calls her little

3    girl.

4          The defendant's version of October 16th

5    starts on direct with a rather bizarre exchange.  He

6    claims Mya is in the yard trying to get him to play

7    with her, page 574, he has to go inside to do her

8    homework.

9          According to the defendant, he then takes a

10   break from drinking with Crystal and then goes back to

11   drinking, which is weird, because according to him he

12   doesn't drink, but he was drinking that day.

13         On page 575, suddenly Mya is naked or wearing

14   a shirt.  The defendant seems confused and describes he

15   goes back and forth between the two.  First she had a

16   shirt on.  Then when questioned by defense counsel on

17   page 576 of the record, she did not have her clothes

18   on.  She was holding her clothes in her hand.

19         Please note, the defendant on page 576

20   provided the next details of his story, not on his own,

21   but only after defense counsel reminded him of them

22   with leading questions one after the next.

23         Question, you walked into the bathroom; is

24   that correct?

25         Answer, I went in.  I closed the door.

1          Question, before you went in, did you say

2    anything to Mya?

3          Answer, I told her to put on her clothes.

4          Question, did she try to follow you into the

5    bathroom?

6          Answer, yes.

7          Now, these two pages of testimony are central

8    to the defense.  Yet, there is no flow, no fluidity,

9    and there's no recall unless the defendant prompted to

10   give me the information as the defense attorney is

11   asking for true leading questions.  He's not a child.

12   He's an adult.  He's a United States citizen, a

13   unionized bus driver.  The evidence suggests and the

14   testimony that comes out the way the defendant provided

15   for you there has to be spoon fed to you through him.

16   The details only come out through questions, that's not

17   credible.  That's not natural.  That's not how people

18   recall events if they are true.

19          Then the defendant's version becomes even

20   more peculiar.  When he comes out of the bathroom,

21   according to the defendant, from his perspective, the

22   child, she is just there.  She is just naked, waiting

23   for him.  He sees it.  It is page 577 of the record, he

24   says, she is there, standing in the kitchen with her

25   clothes in her little hands.

Case 2:19-cv-01125-JS-AYS   Document 7-3   Filed 05/31/19   Page 647 of 800 PageID #: 1900

1        First, I want to remind you Sincere never saw

2    Mya naked.  He was with Mya.  Mya was playing in the

3    house, running all around, playing outside, going

4    inside, but Sincere never saw her naked.  Suddenly she

5    is naked, along with the defendant.

6        It's a three-room apartment.  According to

7    Sincere she already had her pajamas on when the

8    defendant took her into the kitchen and closed the

9    door.  She didn't have to put her pajamas on, as the

10   defendant is telling you she did.

11       Then I think it's beyond the pale, it's

12   unreasonable that when he sees Mya, according to him,

13   standing there naked, holding her clothes and looking

14   up at him trying to force her way into the bathroom

15   with him.

16       That in that situation, instead of going

17   outside, instead of getting Crystal, instead of finding

18   the child's mother, the defendant instead, does what?

19   He takes the clothes out of her hand, has her get onto

20   the floor of the kitchen so that he can then get down

21   with her and put her underwear and her pants on

22   himself.

23       He's not her father.  He's not even her

24   uncle, he's not her cousin.  This man, who is just

25   inexplicably involved in their family decides the

1    reasonable thing to do in this situation is to get down

2    there with her, the naked child, on the floor of the

3    kitchen and dress her himself.  There's an awkwardness

4    about his testimony, all about this whole situation.

5            The manner in which only the defendant was

6    able to describe putting on the pajama pants.  Puts

7    them onto Mya and then the underwear, led through every

8    detail, step by step.

9            Further evidence, the defendant is not

10   credible.  Then suddenly, on page 577, asked an open

11   ended question, what happened next?

12           The defendant then says, he stood up to put

13   on her shorts, clothes, no one ever saw Mya wearing,

14   and then Mya had to stand up because I did not want to

15   touch her anymore because of her mom.

16           Even in his own version, he stops just short

17   of a criminal act, not because he felt this was awkward

18   or unwanted to be there naked, be there with a naked

19   six-year old.

20           The defendant confesses that he was mostly

21   worried about getting caught by Crystal all throughout

22   the process.

23           Now, according to the defendant's version, he

24   is down on the floor, Mya is standing up, getting her

25   pants and underwear up at the same time.  Not,

People's summation                    1493

1    underwear first, then pants.  I don't know about you,

2    as the defendant described it, she first gets through

3    his help her underwear to her knees.  Then he gets her

4    pajamas pants to her knees, and then she is supposed to

5    get the pants and the underwear up together at the end.

6    That's when he let her take the reigns, and do it

7    herself.  It's not a reasonable way that you, yourself,

8    would get dressed.

9          The defendant then added the fact that he

10   stood up and he moved away, that's how Crystal found

11   him.  It's just coincidence.  This one more level of

12   coincidence that Crystal happen to open the door just

13   as Mya, according to the defendant, was left with her

14   clothes at her knees, about to pull them up, and he is

15   standing one step behind her.

16         But even Crystal, even Sincere said the

17   clothes weren't at her knees.  Both of them testified

18   to you that the pants and underwear were down on the

19   ground.  No one was dressing Mya that day.  Someone was

20   undressing her.

21         After all the coincidences, the defendant

22   adds the par-for-the-course endnote, once he was chased

23   out of the apartment, you should consider in finding

24   him credible or not.

25         Mya, according to him, was silent throughout

kmm

1    the whole process in the kitchen, just a naked silent

2    child, whom he had to dress on the floor.

3         Mya opened up a window after the defendant

4    fled outside.  She opened a window and she was talking

5    with him.  The defendant got out of there, who told you

6    she is deathly afraid, she is so scared, that

7    everything exploded inside the house.  He does

8    describe her scared.  He didn't tell you she is freaked

9    out, she's crying, or worried at all.

10        And his first words to her are just, did your

11   mom call the police?  Then he gives you what he says is

12   her response.  It's not how a six-year old talks.  It's

13   not how a child refers to her parents.  The defendant's

14   version, with the very mature comment, you know my mom,

15   you know how she is.  She was a six-year old then.

16        The defendant may believe this helps him.

17   Common sense tells you that it is not a response of

18   what a six-year old would do.  According to him, stuck

19   in the middle of an intense volatile situation where

20   she was the focus of her mother's anger.

21        Ladies and gentleman, the Judge will instruct

22   you, if you find any witness, including the defendant,

23   has intentionally falsely testified as a material fact,

24   you can disregard all of that witness's testimony.

25        The evidence shows the defendant's narrative

1    is disjointed and haphazardly attempts to cobble

2    together an innocent excuse as to why the defendant's

3    DNA got into Mya's underwear, because he had to touch

4    her to dress her.

5              I would hardly call the defendant that sat

6    there and told you -- I wouldn't call that completely

7    innocent, even on its face.

8              A father of a friend of the ex-boyfriend's

9    father of the children just doesn't take it upon

10   himself to put clothes on a naked female first grader.

11   She wasn't a baby.  She wasn't even a toddler.  Mya was

12   six years old.  A male teacher of her would never do

13   what this defendant says he felt he just had to do in

14   that situation.

15             And also, remember, this all happened behind

16   closed doors.  The kitchen door is closed.  Crystal

17   herself had to open the door to walk in.  It just

18   happened to be a closed door.  She just happened to be

19   in there alone.  She just happens to have all of her

20   clothes off.  Coincidence, after coincidence, that

21   don't scan.

22             Secondly, the whole process the defendant

23   describes takes too long.  The defendant's version is

24   tortured, and none of the references in fearing of

25   getting caught with Mya naked makes sense unless he is

1   worried what he was doing was wrong.

2           Third, it does not explain how any of the

3   saliva got into Mya's underwear onto her vulva.  There

4   is no testimony in the record of Mya or the defendant

5   drooling.  There is no testimony that either of them

6   are spitting, licking their hands, sneezing, or

7   coughing, as defense counsel invites you to speculate.

8   Yet there is saliva in the six-year old girl's

9   underwear and on her vulva.

10          And the defendant's story is not finally

11  corroborated by Sincere.  It is much simpler, rational,

12  less-prompted testimony than this adult's testimony.

13  That Mya complained of a toothache.  She was fully

14  clothed in her pajama pants, and the defendant took her

15  into the kitchen and closed the door.

16          The defendant's version of the incident,

17  according to the totality of the evidence, is not

18  credible and should be disregarded in its entirety.

19          After this, the defendant moves on to talking

20  about what happens with the statements of admission.

21  They claimed that he did not say anything to Officer

22  Boccio.  He corroborated that he spoke with Officer

23  Boccio, but never threatened, the defendant was never

24  coerced, never promised anything and never met Officer

25  Boccio before that day.  They never admitted to saying

 1    anything to Officer Boccio about licking Mya and

 2    offered no explanation as to how Officer Boccio could

 3    then be so confused, or why he would decide to

 4    completely testify falsely about their interactions.

 5           The defendant is, therefore, requiring you to

 6    trust the defendant and find Officer Boccio lied on the

 7    stand, to get the defendant, and a man he doesn't know.

 8    Common sense tells you that is not reasonable.

 9           But in scrutinizing the defendant's

10    testimony, realize that the defendant cannot admit to

11    you what he said to Officer Boccio, because that then

12    ties him to the saliva.

13           The saliva indicated to be present on Mya's

14    vulva, in her underwear, and when the defendant's

15    tortured version of events tries to give you excuses as

16    to why it is there, since they can't explain it, they

17    need you to ignore it and just move on.

18           The next phase of the defendant's portion of

19    testimony relates to how he dealt with Detectives Baran

20    and Pacheco.

21           Before you take any stock of the defendant's

22    credibility when testifying about the detectives,

23    please recall that, according to his own words on

24    cross-examination, the defendant thought he'd go to the

25    special victims squad, there in the arrest room, in

People's summation                    1498

1    custody for hours, this was no big deal.  It wasn't

2    serious, according to the defendant, and he came

3    willingly to the special victims squad.  But by

4    willingly, he quickly had to admit on cross that

5    willingly, he was immediately in handcuffs in the back

6    of the police car.  Other than the concession, the

7    defendant did not budge on it being no big deal.  He

8    did not think it was a big deal.  It was not serious

9    when he was in the arrest room.  He was cuffed, in

10   custody for hours, accused by Crystal of having oral

11   sex with a six-year-old girl, and he believed it wasn't

12   serious.

13            Ladies and gentlemen, maybe that's actually

14   true.  Maybe that is what he believes.  The evidence,

15   after all of the facts shows, he thought he could just

16   maybe say, I'm sorry, and Crystal would drop the

17   charges.  Maybe he thought it was okay.  Maybe he

18   thought this wasn't a big deal.

19            That being said, let's talk about the rights

20   card that happened immediately during this whole not

21   serious interaction with the police.

22            The rights card, the document in Spanish with

23   which the defendant testified to, that he recognized

24   it.  He saw it, the signatures, the words he wrote, and

25   he proved on the stand that he was able to read it.  He

1       read it in Spanish, in his native language.  He

2       testified to it being placed in front of him, and he

3       would have you believe that, although, he looked at in

4       Spanish, he never read a word on it.

5               According to the defendant, he was ordered to

6       sign it, and that's what he does, he signs whatever is

7       put in front of him.  He wrote the word si, and yes

8       twice, and signed it three times.  He acknowledged the

9       signature, but claims no one ever read him any part to

10      him, and he didn't read any part of it either.  He had

11      no idea, according to him, what the card meant, but

12      acknowledged.  And you can see it, that in bold, at the

13      very top of the card in Spanish, it says that the

14      notification about his rights prior to interrogation.

15      Translation is on the back.  You can look at it

16      yourself.  They're right by where he wrote the word si.

17      It says, comprende.  Do you understand?  He signs his

18      name, not once, not twice, but three times.

19              All over the card, while it's in his

20      possession, he says he looked at it, but the letters

21      didn't become words and the word didn't mean anything

22      to him.  That's what he wants you to believe happened

23      when he was given the rights card.

24              It is common sense and human experience tells

25      you that is not even possible.  That when you see

People's summation                1500

1   letters, you form words.  Once you know how to do that,

2   you are able to read, you see words, you can look at

3   words and never process, that just doesn't make sense.

4         On page 633 of the record, the defendant

5   acknowledges -- once again, that he's not being

6   threatened, he was never coerced, never promised

7   anything.  And yet, he does just this because they ask.

8   Because they say sign it and write the word si.  He

9   does this while in custody, after having being accused

10  of having sex with a six-year old.  He wasn't intimated

11  because it wasn't a big deal.

12        And the pattern of unreasonableness by the

13  defendant continues in the statement.

14        The defendant acknowledges on page 620 of the

15  record, Detective Baran's questioning didn't start

16  until after he signed this card, which is weird.

17  Because if, according to the defendant, all of the

18  detectives are lying all of the time, he then

19  acknowledges, although, they lie, they all still do

20  everything in the right order.  They have the rights

21  card signed first and then speak with him, but the

22  defendant wants you to believe he has no idea what the

23  document meant.  Although, all of the conversation

24  about this case didn't occur until after he signed it.

25        The defendant on direct testified that with

1   the statement he continued to signing it.  He signs it

2   multiple times, just like the rights card, and he has

3   no explanation as to why he did it.  Defense counsel

4   when he gave you his closing statement, didn't give any

5   further light to that.  There was no reason given why

6   this defendant just gets told to sign something when he

7   is in police custody and just does it.

8        The defendant doesn't tell you he kept

9   signing because he was scared, or he thought they let

10  him go if he signed it.  There is no evidence in the

11  record of threats, or tricks, or promises.  He just

12  signs page after page, document after document for no

13  reason at all.

14       On direct on page 586 of the record this

15  defendant claims he had no idea what People's 10, the

16  statement of admission, he had no idea what this

17  document was when he signed it.

18       Still on direct the defendant hedges his bets

19  at the direction, once again, after more leading

20  questions.

21       On page 587, question, you told us yesterday

22  that you didn't read English too well, correct?

23       Answer, during that time I did not read it

24  that much, but now I have taken good use of that time

25  while I have been detained.

1          Question, you mean for the last nineteen
2     months you have improved your ability to read English?
3               Answer, yes.
4               Question, but did you ever read the statement
5     back on the 16th of October, 2013?
6               Answer, I tried to read it, is the answer,
7     but I did not understand it too well.
8               Originally, he had no idea what it was
9     whatsoever, because by the time he led through it, now
10    he's hedging his bets that he tried.
11              Then on cross on page 621, the defendant is
12    forced to acknowledge that on the very top of the
13    statement, the written statement of Daniel Ramos, it
14    was not hidden from him what this document was that was
15    put in front of him.  Right below that title of the
16    document is the correction that he made, that he told
17    Detective Baran about.  That his Social Security number
18    was wrong, and where -- and in many other places he
19    initialed the corrections that he asked Detective
20    Baran, who does not speak Spanish, who took the
21    statement in English, that he initialed after telling
22    that correction to Detective Baran; right before the
23    title, the statement of Daniel Ramos.
24              The defendant says he has no idea what the
25    document was.  He acknowledged that he put his initials

People's summation                1503

1    not just there, but also next to the other correction

2    that he made on this document.  Down, towards the

3    bottom of the document, you can examine when you are

4    deliberating directly, the defendant noted that the

5    English sentence didn't make sense.  He said this on

6    cross-examination.  It corroborates what Detective

7    Baran said, the defendant pointed this out himself,

8    that this sentence was missing the noun girl.  I went

9    inside the house and missing the word girl, added by

10   the direction of the defendant.  It was initialed by

11   the defendant, was following me as I went into the

12   bathroom.  This is less than an inch.  It's almost just

13   a half an inch from the one sentence of that that the

14   defendant says he didn't know was on that page.

15        We know that he read at least to hear in

16   English, he noted this word was missing.  But then

17   somehow, although he signs just below the same section,

18   somehow, the one sentence where he pulls down her pants

19   and tickled her pussy with his mouth, that is one

20   sentence he missed in this entire document.  He

21   initialed the correction before it, he signed it

22   immediately after it, but that's the one sentence,

23   although, everything else before it was correct, and

24   that's the one sentence he never saw.

25        The defendant would have you believe

1    Detective Pacheco never translated not one bit of this

2    document or that he translated the document and then

3    missed that one section.  It was part of a conspiracy.

4    Although, the only evidence of that before that is his

5    own testimony.

6         Detective Pacheco wasn't even assigned to

7    this case.  He went out of the room and went back to

8    his own room.  He never met Daniel Ramos before that

9    day.  He didn't know Crystal, or Mya, or Sincere.  He

10   doesn't know these people.  It's not his case.  So why

11   would he risk his entire career?  You have to ask that

12   question.  Although, defense counsel keeps saying

13   don't.  Why would he risk it all for not even his own

14   case?  He would just happen to walk in, translate, walk

15   out, now he will fabricate all of this testimony.  The

16   defendant never actually gives you an answer from the

17   evidence to those relevant questions.  The negative

18   assumptions that the defense keeps asking you to make

19   about the detectives' credibility is unreal.

20        Finally, we have the apology letter.  The

21   defendant testified that he wrote the apology letter to

22   Crystal apologizing to her for her actions and for her

23   feelings, how she felt.

24        Page 632 on cross-examination the defendant

25   acknowledges he does not say that at all anywhere in

1      this document.  In this handwritten apology letter,

2      there's nothing in there about, I'm sorry, you are

3      upset Crystal, or I'm sorry, you kicked me out of the

4      house, or I'm sorry, you did anything.  Instead, what

5      is in there, he asks for a thousand pardons.  He says

6      he is sorry for what happened.  That he never intended

7      to harm anyone, let alone the kids.  That he never, and

8      then he repeatedly asked Crystal to drop the charges.

9      The defendant agreed this translation, the translation

10     by Detective Pacheco was accurate.  That was the

11     substance of his letter that is addressed to Crystal

12     and Mya.  That's what is addressed to, not the entire

13     family, but to Crystal and Mya, the mother and the

14     victim.

15            What are we left with?  The defendant is not

16     even curious about what he is signing.  He just signed

17     because it was there, ignores the titles of every

18     document, and he tells you unrealistic reasons why he

19     wrote other things, the apology letter specifically

20     right here.

21            Nowhere in there does he claim he was

22     innocent.  Nowhere in that letter does he say that it

23     was no big deal.  He asked for a thousand pardons.

24     Again, here, as with all of the defendant's version of

25     events surrounding admissions, the evidence shows that

1    his testimony is irrational, it is disjointed, and it

2    cannot be reconciled with all of the other evidence and

3    testimony in this case.

4         Although, I tried to work in a lot of my

5    criticisms of the defense's case by my arguments about

6    why the People independently have met our burden,

7    because that burden is our burden and ours alone.  I

8    want now to go back over the People's case and fill in

9    the other gaps we haven't gone over yet and explain to

10   you why the evidence present in this case corroborates

11   that testimony and shows you why the defendant is

12   guilty beyond a reasonable doubt.

13        First, there is the Ramirez family testimony.

14   Then initially think about what the evidence has shown

15   you about Crystal, Sincere, Mya's group, nothing to

16   gain about their testimony, they had no opportunity to

17   fabricate the moment Crystal walked into that room, the

18   moment after she heard her daughter say he licked my

19   coochie, she is on the phone giving the same consistent

20   testimony as she did here.  She is saying the same

21   thing that her daughter told her that it happened.

22        The testimony is factually specific and

23   limited.  Their effects, the way they have their

24   demeanor, their emotional state.  I tell you they are

25   real and appropriate where each of them is and what age

People's summation                1507

1    they are and where they come from.

2           First Crystal, then herself corroborates most

3    of the sum and substance, everything you learned from

4    her about their relationship and none of it supports

5    finding the defendant not guilty.

6           Instead, he collectively tells you he had

7    repeated access, ample opportunity to commit the crime,

8    and he was intimately involved in this family's life.

9           On direct and cross you learned the defendant

10   made himself indispensable, a single mother, raising

11   two kids on her own, who doesn't have a car.  Neither

12   side disputes that he took her to the beach, took them

13   to a BBQ, took them out to the bus races, out to run

14   errands and drove her all over Nassau County and into

15   Suffolk.

16          The entire record of this trial, the People

17   and defense's case contains no evidence.  No evidence

18   of anything negative taking place between the defendant

19   and Crystal before October 16th.  There was no falling

20   out, there is no argument, there is no motive for her

21   to lie or to jump to a conclusion defense counsel wants

22   you to believe.

23          The defendant provided her with essential

24   services, babysitting, transportation.  In all that

25   happened by her following through on this case, on her

1   calling 911, on her backing up the daughter, she lost

2   out on all of that.  Her life is more difficult because

3   she followed through on this case.

4           If Crystal had not seen what she saw on

5   October 16th, 2013, if Mya had not said what she said,

6   that the defendant had licked her coochie and pointed

7   at him there, there would have been no reason for

8   Crystal to invent this story against a man who had been

9   nothing but too nice to her throughout their entire

10  relationship.

11          Defense counsel, during cross of Crystal, of

12  both of the children, he stood here in front of you and

13  gave a summation to make Crystal to seem crass, to make

14  Crystal to seem uneducated.  So I say to that, so what.

15  Even if she is, so what.  She is not on trial.  Defense

16  counsel actually said himself multiple times, the

17  People's witnesses are not on trial, the defendant is.

18  Defense counsel wants you instead to focus on the words

19  she used, like eat, coochie, pecker, and whether she

20  uses corporal punishment on Mya, claims she's a bad

21  mother and ignore all of evidence of guilt, whether you

22  like it or not, whether you agree with disciplining her

23  child with a belt.

24          Remember the reason we are here.  We're here

25  today, in this courtroom, because the evidence shows

1       that on October 16th, 2013, for all her faults, her

2       limitations, when she opened that door, when Crystal

3       saw her daughter, she first and foremost was her

4       child's mom, a protector, a defender.

5               Defense counsel portrays and the evidence

6       clearly shows it was an appropriate reaction.  She

7       found her daughter alone with this defendant in the

8       kitchen, alone with her pants and underwear down on the

9       floor.  She didn't ignore it.  She wasn't oblivious to

10      it.  She didn't try to explain it away so she could

11      keep accepting the defendant's favors and benefits that

12      her friendship with the defendant brought her life, but

13      even then she didn't irrationally then fly off the

14      handle.  She didn't commit any act of violence.  She

15      didn't do anything violent, in fact, at all.  She

16      understandably shouted what the F is going on here.

17      She didn't use the F word.  That gut reaction, the

18      evidence in itself that she was genuinely disturbed by

19      what she saw.

20              Not until her daughter pointed at this

21      defendant, pointed at him like she did in the

22      courtroom, pointed him out and told her that he licked

23      her coochie, that's when she grabbed her child,

24      screamed at the defendant to get out and locked him out

25      of her home.  Before there was a moment to fabricate,

1    before Crystal could come up with a story, before she

2    could invent a story, before she could concoct lies,

3    she immediately called the police and called 911 and

4    told them factually what had happened, nothing more,

5    nothing less.  Her daughter told her the defendant had

6    oral sex with her.  Whether you believe Crystal said

7    licked or ate to the 911 operator, it is still

8    consistent.  It means the same thing.  It shows, again,

9    Crystal, acting in that moment.  She wasn't thinking

10   how it will look nineteen months later at trial to get

11   the police to her home as soon as she could.  Whatever

12   words she used, her concern was getting the defendant

13   away from her daughter who was guilty of molesting her.

14        The defense would like you to believe Crystal

15   made this up, that she would tell the police a lie, she

16   would drag her daughter to the hospital, have her

17   undergo a rape exam, as a six-year old or Mya's words

18   to Nurse McAllister, put Q-tips into her coochie to see

19   if it was good or bad, to keep the lie going, to keep

20   her jumping to conclusions going.

21        Crystal then recruited both her daughter and

22   her son to testify here in front of all of you, in

23   front of an audience, and she would allow her children

24   to be cross-examined all for nothing, except to get

25   back at this defendant.  The evidence tells you this

1   does not make sense.  It does not make sense unless

2   Crystal saw what she saw, and then did what he did, he

3   placed his mouth on Mya's vagina.

4        If we were even to assume defense counsel's

5   position, what he wants you to belive, Crystal is

6   making it up, assuming the words, can't tell truth from

7   fiction or whatever, wouldn't Crystal make her

8   testimony a little more damaging?  Wouldn't she make it

9   worse if she could make it up?  Wouldn't she have come

10  in here and really tried to get the defendant to come

11  in here and told you, exaggerating it, fudging it,

12  helping the case, and come in here and say, I walked

13  into the room with the defendant's face between my

14  daughter's legs.  She didn't do that.  She didn't

15  exaggerate.  She didn't make things up.  Why not say

16  she walked in on the act itself?  Would it make things

17  worse for the defendant?  Instead, she testified to

18  what she knew, and saw, and she didn't speculate.  She

19  didn't testify in a manner that shows -- it showed

20  anything but honest, according to all of the evidence

21  submitted to you.

22       She saw the defendant was alone in the

23  kitchen with her daughter.  She saw the defendant

24  standing behind her daughter looking guilty, caught in

25  the act, rubbing the brow of his head.  She saw the

People's summation                1512

1    defendant immediately adjacent to Mya's underwear and

2    pants that were down on the ground.  This defendant,

3    whom her daughter pointed to and said he licked my

4    coochie.  The defendant offered to you nothing but

5    speculation, you should not credit Crystal's testimony

6    and not depend on just that.

7            He's an imperfect human being, like all of

8    us.  The evidence shows on October 16th, she was her

9    kid's mom, she did the right thing, and you should

10   credit her testimony.  It's internally consistent and

11   it is limited and, most importantly, it corroborates.

12           Next, Sincere, her older child, her only son,

13   Mya's brother, a fifth grader who understood the oath,

14   that it was a promise to tell the truth.  Who knew if

15   he did not tell the truth, he was not going to leave

16   here.

17           On October 16th, 2013, he came home from

18   school to find the defendant already in the house with

19   his mom, Mya, his sister home also, in her pajamas.

20   Sincere was playing his Playstation 3 in his mom's room

21   between the porch and the kitchen, and Mya was all over

22   the apartment playing with her toys, not naked.

23           Then Sincere saw the defendant come into the

24   living room, take his little sister, Mya, complaining

25   of a toothache, took her into the kitchen and closed

kmm

Case 2:19-cv-01125-JS-AYS   Document 7-3   Filed 05/31/19   Page 669 of 800 PageID #: 1922

1   the door.

2            The evidence shows in Sincere's testimony on

3   direct and cross-examination it corroborates his

4   mother's and Mya's testimony, but it corroborates it

5   from an eleven-year old perspective.  He explained to

6   you his mom came in from the porch, that she went from

7   the first room into the second room, into the kitchen,

8   that the kitchen door was closed, because the defendant

9   closed that door.

10           Sincere explained to you how his mom found

11  the defendant in there alone.  Sincere heard his mother

12  scream and yell, what the F is going on?  Then he saw

13  his sister Mya in the kitchen with her pants on the

14  ground.  He heard his mother continue to scream, she

15  grabbed Mya and moved to a bed just as Crystal told

16  you.  He watched as his mother got the defendant out of

17  the apartment, locked the door, called the police and

18  asked Mya about what happened.

19           But Sincere is the boy that no one seemed to

20  notice that day or bothered with at the scene, with

21  whom no police officer, detective, spoke to that day.

22  He remembered something separate from everyone else, he

23  heard the defendant admit he did it.  Sincere

24  acknowledges the defendant repeatedly denied doing it

25  as Crystal told him to get out of the apartment.

1    You also heard the defendant tell, Mya's

2    lying, Crystal recalled as well.  No one is disputing

3    that was also said.  You also heard the defendant

4    saying, it wasn't what it seemed to be.

5         Back on October 16th, 2013, as Crystal was

6    talking to Mya, as she calling the police, as she was

7    distracted, more so then Sincere, he heard something

8    else.  He heard the defendant change tactics possibly

9    out of desperation.  Sincere heard the defendant admit

10   that he did it.  On cross the defense pushed Sincere on

11   this point and Sincere never faltered it, but it didn't

12   matter that he heard what he heard.  The evidence shows

13   he was being truthful, just like Crystal, he

14   acknowledged to the defense, he did not see the

15   defendant do what he did to Mya.  He even noted to

16   defense counsel, how could I if the door was closed?

17   He also acknowledged he did not tell the police.  No

18   one even asked him, no one spoke with him about it; a

19   fact that it is corroborated by every other witness

20   testified at this trial.

21        Remember, Sincere is eleven years old, fifth

22   grade.  You evaluate how his testimony came out.  The

23   evidence shows that it wasn't rehearsed, it wasn't

24   sanitized.  Defense counsel keeps trying to say about

25   the children.  It wasn't vengeful either.  What it was,

People's summation                 1515

1    it was painful.  It was painful to watch and it was

2    painful for Sincere to go through; talk about his

3    sister's genitals, and this defendant had oral sexual

4    contact with his little sister.

5              You have a child taking an oath, standing up,

6    promising to tell the truth here, still in a foreign

7    adult place, speaking about very adult topics and being

8    questioned.  Would you expect Sincere or Mya to

9    understand why they get questioned the same question

10   over and over and over again by defense counsel?  If

11   Sincere was able to answer the vast majority of the

12   questions, despite the pain and sometimes it was

13   awkward when he was up there.  He was able to do it up

14   until the moment when defense counsel finally pushed

15   him too far and pushed him to tears.

16             This youngster, defense counsel called him,

17   he was pushed to tears not being questioned on what

18   happened on October 16th, 2013, not on the statement he

19   heard from the defendant.  When did Sincere break down?

20   When did he shut down?  He shut down on a line of

21   questioning unrelated to what the defendant did, or

22   what he saw on October 16th.

23             The defense broke Sincere only when they

24   moved suddenly from asking specific details about that

25   day his sister -- whether she was molested to whether

1    Sincere ever watched pornography, movies with naked

2    people in it.  That's when Sincere shut down.

3            Defense counsel asked irrelevant questions in

4    front of all of you in public, while Sincere sat there

5    on the stand and that's why he cried.  He cried,

6    because unlike the defendant, he knows this is all

7    extremely serious.  All of this is horrifying and

8    mortifying, and all of this is confusing also.  After

9    answering dozens of pointed questions, after answering

10   them consistently, to the best of his young ability,

11   defense counsel shifts gears and asks the

12   eleven-year-old boy whether or not he had been watching

13   naked movies on his mother's television in her room.

14   The evidence shows you Sincere, it shows internal

15   consistency and that should be credited, and his

16   testimony only adds further clarity to the simple

17   painful reality that his sister was victimized in their

18   home, there in Nassau County, on October 16, 2013.

19           Finally, we have Mya.  About Mya, defense

20   counsel made a point of asking Mya about the fact they

21   never met before, they never went through the questions

22   he was going to ask her.

23           The arguments you wanted to make from that,

24   her answers to his questions were going to be more

25   genuine, more credible than mine, because they were

1    spontaneous and the evidence shows you the answers on

2    cross-examination were actually more credible.   They

3    were even more spontaneous because defense counsel

4    brought out and put before you the whole sad story of

5    Mya's ongoing victimization by this defendant.

6         Defense counsel chose and put before you the

7    history behind October 16th.   You should weigh it

8    appropriately in determining the defendant's guilt

9    beyond a reasonable doubt about that day.   That

10   information about the past is useful, completes the

11   narrative, helps you understand the defendant's motive

12   to put all of this conduct in momentary contact.

13        Remember, the law only requires the People

14   prove beyond a reasonable doubt one incident, the one

15   day, the one with which the defendant is charged, oral

16   sexual contact with Mya on October 16th of 2013, in her

17   kitchen.   You were selected to judge what happened on

18   that day, that is the day it all ended, finally.   That

19   is the day an adult walked in on it, and that's the day

20   Mya pointed, explained what the defendant was doing to

21   her.   That's the day we recovered saliva and DNA that

22   matched the defendant's profile from her underwear.

23        What did Mya say?   Remember, although she was

24   young, she was able to swear to tell the truth.   Not

25   only was she going to be punished if she lied to you,

1      but her mother was going to jail.

2              October 16th, the last time the defendant

3      victimized her, when it finally all stopped, Mya was

4      clear on that day and on direct, the defendant did it

5      one time that day in the kitchen.  Mya doesn't know why

6      the defendant did it to her.  She states she was

7      standing up and he was bending over.

8              Defense counsel did make a big deal about the

9      fact when he asked those questions, he was bending

10     over.  First of all, Mya, is seven.  That's not an

11     excuse.  That's just a fact you have to take into

12     consideration when you are weighing her testimony.

13             Second, defense counsel did not, according to

14     the record, explain in her own words exactly how it

15     happened and she demonstrated the defendant was bent at

16     the waist like that.  That was the defense attorney

17     doing that, that he bent over, demonstrated the general

18     concept of bending.  Whether he bent at the waist and

19     whether the defendant bent at the waist or bent at the

20     knees, got down on the floor.  Mya closed her eyes

21     during the actual contact.

22             You know just not based on her words that

23     this defendant's mouth and tongue were there,

24     regardless of the exact mechanism that the defense

25     wants to distract you with.  He admitted his mouth was

People's summation                1519

1     there to Officer Boccio, Detectives Baran, Pacheco.

2     The defendant's DNA is in her underwear, male DNA on

3     her vulva from her on that date, and saliva is

4     indicated to be in both places.

5              Defense counsel questioned repeatedly how

6     many times the defendant molested Mya.  Mya agreed that

7     she told her counselor Georgina that it happened five

8     times.  She testified it didn't happen a dozen of

9     times, but approximately five.

10             She told the district attorney's about one

11    prior time.  She apologizes for not telling the full

12    story.  The evidence shows that she is not trying to

13    mislead the jury, and that she knows people should tell

14    the truth in court.

15             She explained she didn't tell anyone because

16    she was scared of her mom, she was scared her mom would

17    whoop her.  Mya was five or six while this was all

18    going on.  In her child-like way, she knew what was

19    happening to her was wrong.  Common sense allows us to

20    understand, as a child, she probably thought to do

21    something wrong, you get punished.  Her explanation is

22    reasonable.  It makes sense.  Understandably, Mya said

23    she wanted to put all of this out of her mind, freeze

24    it or erase it out.  The pain in her eyes, as she said

25    that, I want to erase it, freeze it out.  A seven-year

1    old can't fake that, can't rehearse that, can't
2    sanitize it in order to get them to do that.

3         The events she was describing, defense
4    counsel pushed her further and further were those
5    events, rushing events, that she doesn't like to think
6    about, what she plays and goes to school with those and
7    hangs out with her friends.  You saw them in her eyes.

8         We were told by defense counsel that it
9    didn't happen.  She doesn't change her testimony to fit
10   a question.  She did not change her answer to please
11   him, the Judge, please me.

12        And then without prompting, not related to
13   any previous question, without anything to suggest the
14   answer to her, no one else alleging it or even
15   discussing it at this trial, Mya reveals she knows
16   information that could only come from experience.  She
17   knows and she testified spontaneously to the fact that
18   a man's penis can be or at least can attempt to be
19   placed in a little girl's anus.  In her words, that a
20   pecker could go into a butt the way she said it.  You
21   know Mya, she explains to you it hurts.  She doesn't
22   just allege it is possible.  She didn't testify it was
23   funny or embarrassing.  She told you it happened to
24   her, that this defendant tried to do that to her, and
25   you, ladies and gentlemen, know it has because Mya

1    knows it hurts.  Even on this Mya didn't exaggerate.

2    She did not agree with defense counsel there was blood.

3    Although, when he first asked about it, there is back

4    and forth later clarified when he was talking about

5    blood and pain, it related to when she was bitten by a

6    guinea pig.  She didn't agree with defense counsel on

7    other liquids.  She said, no, there weren't.  She said,

8    Danny, the defendant, put his pecker in her butt and it

9    hurt her, and it hurt.  She remembered that pain.

10   Think about it through her testimony.  Mya never became

11   imaginative, never claimed anything elaborate.  The

12   molestation didn't go on forever.  She limited it,

13   saying it was approximately the time she was in the

14   first grade.

15             The one additional detail she does add is the

16   defendant kissed her.  That seems perfectly reasonable,

17   according to the evidence.  She explained, as best as a

18   seven-year old could, the anal sexual contact occurred

19   at night when her mother was not home in her mother's

20   bed, and the other incidents, she explained happened in

21   the day.

22             Mya described, according to the defendant's

23   testimony, according to what he said everything she

24   told you was possible, he did have access during those

25   times.  He was there at night, he was there during the

People's summation                1522

1    day.  He was alone with her and alone with Sincere.

2              The defendant and the defense ends with

3    trying to get her to say the molestation never

4    happened, or it happened more than five times, but she

5    remains consistent, it did happen, and it was five

6    times.

7              She sat here and told us, all of you what

8    happened to her, what has been happening to her.  She

9    told you in the manner appropriate for a child.  She

10   didn't remember the exact number of times, places, the

11   exact dates, that this all happened.  Defense counsel

12   should put it together.  She did have to get excused

13   off the stand.  She was crying.  She had to put it

14   together and that's a fair term.  If she had it at her

15   fingertips what she had, the dates that it happened,

16   every time it happened, and rattled those off for you,

17   that would be unfair and rehearsed and false testimony,

18   and not what you saw there from her.  She was

19   consistent because the evidence proved she wasn't

20   making up a fantasy that she could freely change it

21   each time she told it.  No, instead she was hearing the

22   nightmare that was her life.  She doesn't fully

23   comprehend.  That's because she is a child.

24             She sat here and pointed at the defendant,

25   named it, called him Danny on her vagina, Danny on her

kmm

1    coochie.  That day the police came to her house.  That
2    day she had to tell you when they arrived in the
3    ambulance, she told you it happened in the kitchen,
4    that day.  It was oral sexual contact.  The evidence
5    supports and corroborates the painful reality.  She is
6    telling the truth.  The defendant is guilty and her
7    nightmare is finally over.

8          The defense would have you believe instead,
9    this is actually -- argue that this is actually part of
10   a scheme, part of a conspiracy, Mya doesn't want to be
11   in trouble for being naked.  That is high crime,
12   according to the defendant, in the Ramirez' household,
13   to get out of nineteen months, allegedly being naked in
14   her house, Mya is continuing this lie to this day, went
15   through the rape exam, testified on the stand, gone
16   through all through this, all just because supposedly
17   serious to be undressed in her house.

18         Defense counsel needs to keep her a victim,
19   looking for sympathy.  She told you she doesn't want to
20   remember, doesn't want to think about this.  She is not
21   looking for sympathy.  She's just a child.  She wishes
22   it didn't happen to her, and with regard to whatever
23   was said, not said to Nurse McAllister, there is no
24   testimony in this trial that she ever asked Mya if it
25   ever happened before.  There is no testimony in the

1    trial inquired of that, dealing with Mya.  And when she
2    was alone with Detective Baran, why Mya did, when asked
3    finally, by Detective Baran, she did say something
4    happened.

5         Now, although Mya's testimony, her tears,
6    along with her mother's testimony, her brother's
7    testimony, all that gets us beyond a reasonable doubt.
8    October 16th is a day, you, ladies and gentlemen of the
9    jury, you don't need to depend on any one actual
10   witness.  You have all of them.  And you have all of
11   them, you actually have a separate interview
12   corroboration of everything they told you.

13        October 16th is the day you have the
14   defendant's statement to Officer Boccio, Mya's rape kit
15   and DNA evidence consistent with the evidence recovered
16   from the underwear, a written statement of admission
17   from the defendant that was based on English words and
18   read back to him in Spanish.

19        October 16th is the day you have separate
20   independent evidence corroborating the defendant's
21   guilt beyond a reasonable doubt.  With these, the
22   process of the arrest date, Officer Boccio, the Judge
23   will instruct you on New York law, you are not required
24   to give the defendant Miranda warnings for you to find
25   them to be voluntary.  Those statements to Officer

1    Boccio, on the scene in minutes.  Officer Boccio -- the

2    defendant is still there.  It was a simple

3    conversation.  Officer Boccio testified to it.  What is

4    going on, the officer is asking.  The defendant says in

5    response, she is going to tell you that I raped her

6    daughter.  Officer Boccio followed with a question, I'm

7    going to need more than that.  The defendant's

8    statement, it was stupid, I only licked her once in the

9    bedroom.

10         How do you know what Officer Boccio told you

11   is true?  First and foremost, the evidence shows, as I

12   have said over and over and over, he has no motive to

13   lie.  He's not interested in the outcome of the case,

14   never met Crystal, Mya, or the defendant before October

15   16th.

16         Secondly, because the exact nature of the

17   admission, licking her, is corroborated by the DNA, by

18   the saliva that was found, that he could not have had

19   any idea existed at this moment.  It was found in Mya's

20   underwear and vulva, just as his confession told to

21   Officer Boccio stated.  And that testing wasn't done

22   for months after the arrest, and Officer Boccio had no

23   idea one out of 175 million match was even there.

24         About the question of notice, now, defense

25   counsel here, again, misled you about notice and

1       writing things down, and recording what happened on

2       that day.  If you recall, defense counsel didn't get

3       the statement of admission correct about Officer

4       Boccio's testimony that the defendant didn't say that I

5       raped her daughter.  No, the defendant said that

6       Crystal was going to accuse him of that.  But Officer

7       Boccio didn't invent his admission for the trial or

8       hearing.  It was written down that day and that was

9       testified to.  It was written down that day by the

10      detective who Officer Boccio told the statement of

11      admission to.  It was typed into the crime report.  It

12      was included in the paperwork and served on the defense

13      at the arraignment nineteen months ago.  It was

14      written --

15               MR. BERGER:  There is no evidence of this.

16      It's just speculation.

17               THE COURT:  All right, it's going to be your

18      recollection that controls with regards to what is or

19      is not evidence.  This is just arguments of the People.

20               You may continue.

21               MR. PERRI:  There is no evidence that the

22      defendant was tricked into saying what he said.  There

23      is no evidence that he was threatened, no threat

24      evidence, intimidated.  There are two simple questions

25      that prompt the unthinkable, otherwise, irrational

1    response, arrest me.  She says, I raped her daughter.

2    It's stupid.  I licked her once.  Officer Boccio was

3    going to invent a statement?  It would have been

4    damaging, tried to make everything sound worse, not

5    better.  The sentiment in that statement, no big deal

6    corroborated by everything else in the incident that

7    was discovered.  This is no big deal in the statements

8    and on the stand here.  It wasn't serious.  I didn't

9    think I was in that much trouble, and therefore, the

10   evidence, as a whole, shows you, the defendant, made

11   that statement and made it voluntary, and Officer

12   Boccio's testimony is credible.

13        Detectives Baran and Pacheco, despite the

14   defendant's self-serving unsupported testimony to the

15   contrary, some of the rest of the evidence in this case

16   before he proves in his native language, before he gave

17   a written confession, he knowingly, voluntarily waived

18   those rights in Spanish.  Si twice, two signatures

19   after two questions about waiving his rights.

20        Detective Pacheco testified for you that he

21   read the first two full paragraphs to the defendant and

22   the third signature of the defendant read the

23   declaration out loud to Detective Pacheco.  The card

24   has the translation on it, you can read it just as it

25   was read to him in Spanish by Detective Pacheco.

1        Detective Pacheco is a native Spanish
2   speaker.  He testified he is from Puerto Rico, who is a
3   twenty-plus year veteran of New York City and the
4   Nassau County Police Department.  The defendant proved
5   he was capable, but he did it before you on the stand
6   here.

7        The language, although, it is technical, it's
8   not that hard.  It doesn't require that a lawyer be
9   provided to understand your basic constitutional
10  rights, the right to remain silent, keep your mouth
11  shut.  The Judge will explain further the explanation
12  of those rights, just that the defendant was advised of
13  them.

14        Now, the statement to Detective Baran itself.
15  Detective Baran is a thirty-year-plus veteran of the
16  police department.  You don't have to like him.  You
17  may believe he did do the bare minimum investigating
18  this case.  I'm not saying you have to believe
19  otherwise.  Defense counsel brought out on cross those
20  additional evidence, supposedly could have been
21  gathered if he bothered to gather it.  He could have
22  possibly led to additional charges, but Detective Baran
23  explained additional evidence that was speculative
24  evidence, but doesn't take away from all of the
25  evidence currently before you about this one charge.

1          The one charge the defendant is facing, but
2     that the lack of interest, the lack of interest in
3     filing as many charges as possible could get on the
4     defendant, arguably doing the bare minimum.  It goes to
5     Detective Baran's credibility in this case.  Why would
6     he go the extra mile?  Why would he go the extra mile
7     and lie and get this guy, the defendant, he never met
8     before.  He's either lazy, as defense counsel wants you
9     to believe, or he is not.  One of the two.  If you want
10    to be both, exactly at the same time.  Go get a liar,
11    going to try to create more evidence, but at the same
12    time, fail to explore all of the possibilities.  If he
13    really had it out for the defendant and was willing to
14    lie to risk his career since he was aware that Mya had
15    said that things had happened before, wouldn't you
16    include those in inserting lines in the defendant's
17    statement?  According to the defendant, wouldn't he
18    have made it worse since he was tricking him anyway?
19    Wouldn't he had made it more than a tickle game, or
20    describing it as a tickle game is part and parcel of
21    how this defendant views everything that occurred on
22    October 16th?

23          Everything speaks of the fact that this
24    defendant is bilingual.  He was given an option to
25    speak in Spanish, instead he chose to try in English.

1      It's not reasonable that Crystal was friends with the
2      defendant for a decade, had him as a baby-sitter, and
3      he helped the children with homework if he didn't speak
4      and read.  The defendant's job itself in the MTA as a
5      NICE bus driver, according to your common sense and the
6      testimony, he had to literally see in English and the
7      document was in front of his face.  He signed it.  He
8      had to read it.

9            Police Officer Boccio's hearing, the
10     defendant makes his statements of admission, told you
11     other information.  The defendant followed many
12     directions during the arrest process in English.  He
13     asked for and received food in English.  He asked to
14     use the bathroom in English.

15           The defendant spoke with Detective Baran in
16     English about the incident in a incoherent manner.
17     There is no testimony in this case that Detective
18     Pacheco had a separate conversation with the defendant
19     in Spanish about the incident.  That simply was not
20     part of the record.

21           The defendant acknowledged that is all of the
22     information in People's 12 in his statement of
23     admissions is correct up until the one damning
24     sentence.  The evidence proved that information came
25     from the defendant.  Detective Baran doesn't speak

1    Spanish.  All of that information, the correct
2    information that the defendant acknowledges came from
3    him.  Just basic literacy.  To read the statements, you
4    did not have to have a BA in Shakespearean Drama.
5    Although, it would be necessary to understand the
6    defendant's statement, it's basically his words that he
7    offered, rather than as it would be the rights card,
8    you are giving him words that he has to understand from
9    someone else.  The statement itself was composed as
10   much as practicable, using the defendant's words and
11   you could notice how similar to how he testified.  I
12   noticed before using the term little girl, instead of
13   naming Mya.  This is evidence the statement came from
14   him and not from Detective Baran's imagination.

15            According to the statement, it was prompted
16   by simple question of Miranda, just as it occurred with
17   Officer Boccio.  Detective Baran did not tell him he
18   was charged with criminal sexual act in the first
19   degree.  But also, the defendant did not dispute this.
20   He never asked.  He never asked what he was charged
21   with.  Defense counsel said, wouldn't you ask.  And
22   that might be true, but the reason why you would ask
23   what am I charged with, because you are innocent of a
24   crime.  Why didn't he ask?  Because he knew why he was
25   there.  There was no delaying reporting.  He was

1     arrested at the scene.  He already admitted everything
2     to Detective Boccio, what he did.  The evidence shows
3     he knew why he was there, and it is reasonable and
4     responsible police work to think if he actually told
5     him the technical name for the charges, criminal sexual
6     act in the first degree, either it would have tainted
7     the interview and led to the accusation that it was fed
8     to him, the facts he had to admit to, or to be guilty
9     of a crime, or it would have possibly led him to shut
10    down, and that's a reasonable concern as a detective.
11    You don't want the guy you are interviewing to suddenly
12    stop talking, to stop consenting to answering the
13    questions, and you don't want this defendant to say,
14    I'm not going to give you a DNA sample.

15          The Judge will instruct you on the law.  It
16    does not require the defendant ever be told what he was
17    charged with.  He's not required for the law, and it
18    didn't happen.  And there's good reason why.  He knows
19    why it was there.

20          THE COURT:  How much longer?  I want to give
21    the people a chance to stretch.

22          MR. PERRI:  That's fine.  We can do that.

23          THE COURT:  Let's take a five-minute stretch
24    and use the facility.

25          (Whereupon, the jury exited the courtroom.)

1              (Whereupon, the jury entered the courtroom.)

2              (Whereupon, the jury entered the courtroom.)

3              THE CLERK:  Both sides ready?

4              MR. PERRI:  Yes.

5              MR. BERGER:  Yes.

6              THE COURT:  Welcome back, everyone.

7              Mr. Perri.

8              MR. PERRI:  Yes, your Honor.

9              Ladies and gentlemen, the statement, the

10   conversation between Detective Baran and the defendant

11   started with just a question of what happened with Mya.

12   There is no evidence of tricks, no evidence of games,

13   no evidence of Detective Baran leading the defendant to

14   what he said.  Look at the substance of the statement

15   itself.  If it were a lie, why would Detective Baran

16   include the disparaging comments, why would he include

17   the statement about how the defendant cares about and

18   helps the children with their homework.  Those facts

19   are in there because they are what the defendant was

20   seeing.  They were building an excuse that he hoped law

21   enforcement that day would take and hoped you would now

22   give him the benefit of the doubt.  Even the manner in

23   which it was a criminal act or sexual act.  It's not

24   reasonable that Detective Baran would, himself, call a

25   six-year-old girl's vagina a pussy, a man who has

1    worked years to stop child sexual physical abuse
2    freely of his own choice use that word to support that
3    term.

4              The evidence shows that's not reasonable and
5    the statement also says that oral sex was just a
6    tickle.   The idea that oral sex on a six-year old could
7    be described that way, doesn't align with Detective
8    Baran.   It aligns with the defendant's attitude,
9    attempt to make it seem not as bad as it actually is.

10             Common sense tells you that the defendant,
11   having been caught almost in the act, wanted the
12   detective to think it was a mistake, a game, a fun
13   little thing, rather than the painful simple truth that
14   he committed a heinous act of sexual abuse on a child.
15   All of the evidence in this case compels you, pushes
16   you to the conclusion that this defendant was molesting
17   Mya just as he confesses, just as the DNA shows you,
18   just as Mya, Sincere testified to, and Crystal
19   testified that this wasn't the first time.

20             Most of the statement that he signed,
21   especially the most critical portion, was Detective
22   Baran stated unequivocally on the stand that they were
23   the defendant's exact words.  That the defendant said,
24   he tickled Mya's pussy with his mouth.  In addition to
25   being his words, you know the defendant adopted his

1       statement.   There is evidence in the record that he

2       read it in English.   He was able to read the statement

3       here on the stand before you, who he wants you to

4       believe he picked up that ability while he has been

5       incarcerated, adopted it because he made corrections.

6       He pointed out mistakes and went back and multiple

7       portions of the document is going all of the way down

8       and signing the bottom of each one.   There weren't

9       sentences shoved in that went unnoticed.

10                  The defendant reads on a sixth grade level

11      like a graduate student.   The statement, you know the

12      defendant knowingly adopted, because out of an

13      abundance of caution, it wasn't left in English, it was

14      translated to him in Spanish.

15                  Detective Pacheco, a native speaker, he

16      testified here to you that he uses Spanish everyday.

17      He grew up speaking Spanish, learned English in school,

18      took no issue with the actual accuracy of any of the

19      translation.   Although, how fluid Detective Pacheco

20      performed when he had to do it on the spot, had to

21      translate the handwritten grammatically incorrect

22      apology letter of the defendant here on the stand, at

23      no point as either the defendant or defense counsel

24      actually said, Detective Pacheco wasn't accurate in his

25      translation.

1        As we said in the beginning, Detective
2    Pacheco never met Crystal, Sincere, never met Mya,
3    didn't know the defendant before that day.  Under the
4    circumstances, not even his case.  Detective Pacheco
5    testified under oath he translated all of the letter,
6    the entirety of it and specifically testified before
7    all of you he did translate pussy as vagina.  He
8    translated it that way because there could be no
9    mistake, no ambiguity, no thinking, other than it was a
10   six-year-old's vagina that the defendant admitted
11   multiple times that he had oral sexual contact with.

12       The only other role Detective Pacheco, he
13   translated the defendant's letter.  In that letter, it
14   is more evidence, but when defense counsel gets upset
15   about the fact he got more evidence, it is the exact
16   opposite position, again, for not getting enough
17   evidence.  There is no way to win, according to defense
18   counsel's rule with respect to judging the police
19   department.  You could get more, it's because you are
20   doing something wrong.  If you don't get more, you are
21   doing something wrong no matter what.  Somehow that
22   translates into reasonable doubt.

23       Instead, the detective gets more evidence.
24   He got evidence in a written letter that the defendant
25   was sorry for something, not sorry for Crystal.  Sorry

1    for something that was done and specifically addressed

2    to Crystal and Mya, a thousand pardons.  Please drop

3    the charges.  This is after Miranda warnings.  This is

4    after the statement of admission.  The apology letter

5    is additional evidence.

6          As the night went on in the special victims

7    squad, the defendant got more desperate.  Crystal

8    caught him in the act, and Mya outcried.  He confessed

9    to it twice already, Officer Boccio and Detective

10   Baran.  What is there left to being, and that is what

11   his apology letter is.  It's compelling.  Defense

12   counsel, he should have said in there what he did.  Do

13   you think saying to Crystal, I had oral sex with your

14   daughter would actually get him what he wanted at that

15   point, actually get her to accept a thousand pardons

16   and drop the charges?  No that does not make sense, but

17   each and every step of the evidence shows the

18   defendant's admissions are part of a plan.  It's a

19   particular plan, but a bad plan to escape the full

20   responsibility for his conduct.  It was a tickle.  I

21   licked her once.  It was a tickle game.  I'm sorry, I

22   meant no harm.  Please drop the charges.

23          Throughout this case, in the statements and

24   on the stand, when he tells you it wasn't serious when

25   he was already in custody, he admits to what he has to

1    do, but then he leaves out, denies all of the rest that
2    he can't.  He furnishes excuses.  He downplays the
3    intention by the abuse and begs forgiveness.

4         There is zero evidence in this case of
5    trickery, deceit, maltreatment, or promise, or any
6    other form of misconduct of giving free voluntary
7    statements.  The defendant's admission don't exist in a
8    vacuum, but they're one piece of a pretty simple puzzle
9    before you.  They are one support of a many legged
10   table that is proving the defendant's guilt beyond a
11   reasonable doubt.  No single part of this case holds
12   everything up by itself.  The voluntary admission
13   statements fit with everything else you learned in this
14   case, and the evidence proves collectively not that
15   there is a grand conspiracy had by a six-year old.
16   That the defendant admitted his guilt, a guilt the
17   People have independently proven beyond a reasonable
18   doubt.

19        The last portion of the evidence is the DNA.
20   It doesn't get much more separate than the DNA, despite
21   what defense counsel says.  It does not exonerate in
22   any way, shape, or form, either according to experts or
23   the defendant's guilt.

24        You learned where all of the DNA used in this
25   case came from, how it was tested, how Mya's tiny body

People's summation          1539

1     was swabbed and examined at NUMC, the buccal swab, the

2     defendant's DNA had not been collected at that point,

3     and all of that evidence was turned over, sealed, a

4     sealed envelope inside of the box, sealed by Nurse

5     McAllister, who herself had her, Mya, reported that

6     Danny licked my coochie, that she sealed all of that

7     evidence after exam, turned it over directly to

8     Detective Baran, received by the Medical Examiner's

9     Office, still sealed, just as Nurse McAllister had it.

10         Then it was tested by Mr. Chillseyzn.  How

11    about his background?  His entire career in forensic

12    genetics.  He worked for the Medical Examiner's Office

13    in the City of New York, State of New Jersey, and here

14    in Nassau County for over 15 years.  He, himself,

15    examined thousands of pieces of evidence, created

16    thousands of DNA and made a comparison.  He was always

17    found proficient and competent, and it's he who

18    testified as an expert in New York, New Jersey, never

19    being found by a Court not to be an expert in forensic

20    genetics.

21         Mr. Chillseyzn, a forensic geneticist, who

22    actually tested evidence in this case, whom defense

23    counsel found no problem with any of the testing that

24    he did.  He handled the evidence.  He compiled the

25    findings.  Mr. Chillseyzn was not flown in from

1   Chicago, not the owner of a private laboratory, not

2   being paid for his testimony.

3           First, Mr. Chillseyzn testified that the

4   vulva swab of Mya's genitals indicated on October 16,

5   2013, there was saliva present there.  Unlike defense

6   counsel's expert, he never overpromised.  He did not

7   make inferences, didn't make guesses.  He only stated

8   to you exactly what he knew and what he scientifically

9   proved.  He never claimed that he could, with any

10  scientific certainty, identify who deposited the saliva

11  because the saliva itself doesn't have DNA from skin

12  cells.

13          Defense counsel brought the same fact out

14  himself.  He cross-examined Mr. Chillseyzn, although,

15  he misrepresented the record to you.  Here the evidence

16  shows that Chillseyzn exercised professional restraint

17  and testified to the facts.  On the same swab, Mya's

18  vulva swab, he testified to the fact that there was

19  some small amount of male DNA on that swab.  Defense's

20  expert was forced to concede this was true, that there

21  is a difference between it not existing and not having

22  enough to find the alleles and make a profile.  The

23  amount of YSTR male DNA was measured, quantified, and

24  in the bench notes, as their expert conceded.  It's

25  nevertheless there, male DNA, alongside with saliva and

1   Mya's genetic code, after all, they were swabbing Mya's
2   vulva.

3          Mr. Chillseyzn turned his attention to Mya's
4   underwear.  He found two saliva stains on the inside of
5   the material in the front, the area closest to Mya's
6   vagina.  The clothing area contained mostly Mya's DNA.
7   Mya's skin cells were rubbing on that all day long,
8   along with Mya's DNA.  There was additional DNA, male
9   DNA, enough male DNA to create profiles.  Through
10  various forms of testing, Mr. Chillseyzn was able to
11  determine the following:

12         The defense expert conceded the findings were
13  true.  For the first stain 1-A1, the male donor in that
14  stain is either the defendant or a male patrilineal
15  relative of him.  And for the second stain, stain 1-A2
16  in Mya's underwear, the minor autosomal kind, who was
17  also the major male YSTR DNA contributor in that same
18  stain, has a has profile consistent with the defendant.

19         For that second stain, Mr. Chillseyzn
20  testified that the statistical analysis was conducted,
21  and the defense's expert never questioned the stats and
22  it reveals it's a one and 175 million chance it's
23  anyone else other than the defendant whose DNA is in
24  that saliva stain.

25         Defense counsel made a big deal about the

1    minor donor and second stain, and there was testing

2    conducted of that minor donor, but no match found.  And

3    so, maybe defense counsel is right, there is a second

4    guilty party.  The fact that the minor contributor

5    hasn't been identified doesn't in any way, shape or

6    form take away the fact that the defendant's DNA is in

7    there on both stains alone, not in one of the stains,

8    but in both stains, and one and 175 million that the

9    other person wasn't found with Mya with her pants down,

10   that other person, who is speculative, that defense

11   counsel talks about wasn't the one that got all of the

12   access that this defendant did over the months before

13   this incident.

14            Mr. Chillseyzn testified to nothing more and

15   promised nothing less than the facts.  The tests and

16   numbers shows no leaps, no inferences, no educated

17   guesses.  Defense counsel's last problem when brought

18   up on summation is he didn't test all of the unstained

19   areas of the underwear.  Their own expert conceded his

20   lab could of done that testing, and if, in fact, it was

21   critical, why didn't they do it?  They had an expert

22   here.  They had a laboratory that could have conducted

23   it if it would have proved anything.  They should have

24   accomplished that testing.  What happens if you tested

25   one other area that wasn't stained?  That area, the

1    defendant's DNA didn't show up there.  Then the

2    argument would be, we didn't test the right area.  You

3    have to test every single square centimeter, destroy

4    the entire item before there would be any actual

5    result, and it doesn't lead anywhere and not a natural

6    problem, because if it was, the defense would have

7    addressed it.

8            The defense hopes to ignore DNA testimony.

9    The defense hopes you will ignore, set aside, and look

10   past all of over evidence in this case, blindly assume,

11   you will assume without the basis of the known facts

12   this is all just a coincidence.  Trust the defendant,

13   disbelieve every other single fact witness in this

14   trial.  Then hopes you will speculate without Mya, then

15   six years old, drooled, spit, or otherwise deposited

16   her own saliva on her own genitals at the same

17   fortuitous moment that Crystal opened the door at that

18   moment, that the defendant happened to be there on the

19   ground putting on her underwear.  That level of

20   coincidence just isn't reasonable.  This case is not

21   just about the DNA evidence.  This case is not just

22   about victim's testimony, it is not just about

23   confession, not just about an admission, not just about

24   two civilians testifying.

25           This is a case, a very sad, simple case about

1   all of it, all of it together, layer after layer of

2   evidence coming together, urging you, ladies and

3   gentlemen, urging you to inexorable conclusion that

4   this defendant is guilty for what he is charged.  That

5   all of the corroboration, all of the independent

6   evidence, all of the testimony coming together to push

7   that beyond any reasonable doubt.  This evidence shows

8   you this case really isn't complicated.  It might be a

9   lot.  I might have talked to you a ridiculous amount of

10  time.  It's not complicated.  It isn't.

11              After hearing all of the evidence in the

12  case, you have come to understand it happened to Mya.

13  It's tragic, painful, disturbing, but clear.  Do not

14  lose sight of the fact that nothing that is actually

15  before you as evidence, none of the testimony, no part

16  of the oral statements of admission, none of the --

17  except the defendant's testimony, clouds or contradicts

18  anything else that was presented to you in this trial.

19  The only reasonable answer to all of the questions I've

20  asked to you, ask yourselves over and over, according

21  to the evidence, the defendant is guilty beyond a

22  reasonable doubt.  You have credible disinterested

23  testimony from the family, separate independent

24  corroboration from law enforcement, from DNA, from

25  medical personnel.

People's summation          1545

1          I ask you now to do your duty.  I ask you to

2    go back, weigh the evidence.  You won't find it

3    lacking.  Return the only fair and just verdict when

4    you apply the law to all of the evidence going on.  It

5    demands that this defendant is guilty, guilty of both

6    counts, guilty of criminal sexual act in the first

7    degree for having oral sexual contact with Mya, a child

8    under eleven, and for that same exact conduct, the

9    evidence compels you to find him guilty of endangering

10   the welfare of a child.  Thank you.

11          THE COURT:  All right.  Ladies and gentlemen,

12   given the hour of the day, I'm not going to start my

13   charge on the law to you because we would have to stop

14   before I got finished.  We'll start with my charge on

15   the law tomorrow morning at 10:00 a.m.  When I complete

16   my charge to you on the law, you will then be told to

17   return to the jury room and start your deliberations.

18          Between now and then, you must keep an open

19   mind.  Do not discuss this case amongst yourselves or

20   with anyone else.  Do not permit anyone to discuss the

21   case in your presence.  Do not talk to the lawyers,

22   witnesses, or the defendant about anything during this

23   overnight break.

24          And do not visit or view the place where the

25   charged crime was allegedly committed, or any other

1        place involved in this case.

2                And if there is any news coverage of the

3        case, do not read or listen to any accounts or

4        discussions of the case reported by the news media.  Do

5        not attempt to research any, fact, issue or law related

6        to this case, whether by discussion with others.  By

7        research, I mean the library, the internet or by any

8        other means or source.  Have a great evening.  See you

9        tomorrow morning at 10:00 a.m. sharp.

10               (Whereupon, the jury exited the courtroom.)

11               THE COURT:  Anything for the record?

12               MR. PERRI:  No, your Honor.

13               THE COURT:  Defense?

14               MR. BERGER:  The arguments made propounded by

15       the prosecutor were made in bad faith.  We predicted,

16       when I submitted Court Exhibit X to you that it would

17       make an argument that out of the blue, Crystal Ramirez

18       is now distressed about what she sees in the kitchen,

19       when the prosecutor clearly knows that this woman has

20       been through a bad experience with respect to all of

21       this.  We predicted he would make it and he made it in

22       bad faith because the prosecutor knows what Crystal

23       Ramirez had been through.

24               We also -- Mr. Perri, in bad faith talked

25       about Sincere's testimony and how he broke down because

                                                              kmm

1     he had seen pornography.  When the fact of the matter

2     is, Sincere most likely broke down only because of what

3     was done to him many years ago.  But to make that

4     argument to this jury, when he knows what Sincere has

5     been through, is a second exhibit of bad faith.

6            And then he says to the jury the fact that he

7     knows that is not in evidence.  That was Boccio's

8     supposed statements that were put in the arrest

9     reports.  Now, I made an objection to that at the time

10    and you sustained it.  That's not in evidence, but for

11    Mr. Perri to get up before this jury and say that

12    Boccio did make notes when he didn't make notes, number

13    one, and number two, whenever the reports -- and he

14    said the reports were put in there by the detectives

15    and given to Mr. Berger, it's true that the reports

16    were given to me, but the reports that were written

17    down by the detectives are not in evidence.  You

18    sustained the objection because they didn't testify to

19    that, nor could they.

20           So, in three separate instances, Mr. Perri

21    made bad faith arguments to the jury when he knew

22    better.  He can't get around that.  He knew better.

23           On that basis, I move to dismiss the

24    indictment with prejudice against him for making bad

25    faith arguments to this jury.

1        THE COURT:  Do you want to be heard?

2        MR. PERRY:  The People oppose defense

3    counsel's application with respect to two of three

4    instances.  He failed to object in a timely fashion

5    during the summation, so he waived the objection to do

6    that.  He can't now bring it up to the Court.  The

7    People exhibited no bad faith in any of their

8    arguments.  The People oppose defense counsel's

9    application.

10        MR. BERGER:  If timely is a necessary basis

11   for bad faith arguments, then I don't think the

12   Appellate Court will really --

13        MR. PERRI:  May we approach?

14        THE COURT:  Sure, you could approach.

15        (Whereupon, there was a sidebar discussion

16   with the Court and counsel, as follows:)

17        MR. PERRI:  I don't know if you want a record

18   now.  People take exception to defense counsel

19   constantly throwing around the term bad faith without

20   any basis and make allegations that go to the heart of

21   the People's personal credibility, constantly in front

22   of the jury, or in front of the audience in the

23   courtroom.  You need to address --

24        MR. BERGER:  I spelled it out clearly, your

25   bad faith.

1       THE COURT: We're going to finish this here

2    because what I'm going to say you might not want the

3    audience here either. I noticed, Mr. Berger, numerous

4    times in your summations when you blatantly ignored the

5    directives of this Court with regard to sustained

6    objections and moving forward. I will note the

7    numerous times you, throughout this trial, that you

8    have blatantly ignored this Court and put forth

9    statements about this Court's behavior that were not

10   backed up with any evidence.

11      I will note that during the summations I gave

12   you both leeway to make arguments that you felt were

13   appropriate and only stopped you from making these

14   arguments when they were so far afield of what the

15   evidence showed that there was no proper place for

16   them.

17      I do not find either of you during your

18   summations to have acted in bad faith, possibly

19   overzealous in some of your arguments. Possibly,

20   desirous of ignoring the Court's directive. I did not

21   find bad faith. I will not sit here and have bad faith

22   continue within the theme by the defense of everyone's

23   actions in the courtroom, except the defense. You

24   don't have to like my decision, but I'm not going to

25   sit here and have a record made in front of this

Proceedings                    1550

1   audience that for the umpteenth time discusses bad

2   faith that is not evidenced anywhere in this record.

3          Your application for a mistrial for dismissal

4   of the indictment, for whatever it is you want to have

5   happened now, that application is denied.

6          I will charge this will jury in the morning

7   and they will deliberate accordingly.   That's the end

8   of this record.   Have a good night, gentlemen.

9          MR. PERRI:   Thank you, your Honor.

10          MR. BERGER:   Thank you.

11          (Whereupon, the trial was adjourned to May

12   27, 2015.)

13          *            *            *

14

15

16

17

18

19

20

21

22

23

24

25

1551

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NASSAU : CRIMINAL TERM PART 43

3    -------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,       :   Indictment
4                                               :   No. 742N/14
                 -against-                      :
5                                               :
     DANIEL RAMOS,                              :
6                                               :
                            Defendant.          :
7    -------------------------------------------X

8                                  May 27, 2015
                                   262 Old Country Road
9                                  Mineola, New York

10
     B E F O R E:
11
           HONORABLE TERESA K. CORRIGAN,
12                   Acting Supreme Court Justice

13
     A P P E A R A N C E S:
14
     (As Previously Noted)
15

16

17                  *      *      *      *      *

18

19                  THE CLERK:  Case on trial, Indictment Number

20     742N of 2014, People of the State of New York vs.

21     Daniel Ramos.

22                  Let the record reflect all parties are

23     present.  The jury is not present at this time.

24                  Carmen Knight is the Spanish interpreter

25     today.

kmm

Proceedings                    1552

1              Are the People ready to proceed?

2              MR. PERRI:  Yes, your Honor.

3              THE CLERK:  Defense counsel ready?

4              MR. BERGER:  Yes, your Honor.  I have an

5    application.

6              THE COURT:  Go ahead.

7              MR. BERGER:  May it please the Court, when we

8    ended yesterday, I had made an application for, I

9    believe it was a mistrial based upon three arguments

10   that the prosecution had put forth during his summation

11   which I thought were unfair.  I am making now a fourth

12   argument with respect to something the prosecutor did

13   in his summation, which I would suggest to the Court is

14   actually the most egregious action taken by the

15   prosecutor in his summation.

16             The prosecutor said that my argument with

17   respect to the examination of the non-stained portion

18   of the underwear could have been tested by the

19   defense's expert and we didn't do it.  That, is clearly

20   burden shifting.

21             Now, the prosecutor was aware of the concept

22   that there is no burden upon the defendant to do

23   anything.  He mentioned it at least two to three times

24   during his summation.  Nevertheless, he made a

25   statement that the defense's expert could have examined

Proceedings                    1553

1   a non-stained area, but didn't.  The implication, if

2   not the outright suggestion to the jury was, because if

3   he had done that, it would not have been favorable to

4   the defense.  But even if it wasn't his intention, it

5   still was a possible approach that could have been

6   taken.  But even if we ignore that approach, Judge, the

7   fact that he is making this suggestion that we didn't

8   do something, was absolutely wrong.  Because, as I

9   said, it's burden shifting in violation of New York and

10  Federal Law.

11          Now, I'm asking the Court to declare a

12  mistrial based upon that conduct by Mr. Perri.  If the

13  Court fails to grant that application, I'm asking for

14  the Court, in the alternative, to either tell the jury

15  immediately when they come in before your charge, or

16  during the charge, that the arguments that Mr. Perri

17  made was improper and wrong, and that they are not to

18  consider it, that the defendant has no burden to put

19  forth anything, that it's only the People.  You said it

20  a number of times.  I think it needs to be emphasized

21  because the arguments propounded by the prosecutor was

22  way out of line and totally improper.

23          The Court can, if it chooses to have the

24  reporter read back that last section of Mr. Perri's

25  summation just for your edification, but I think we all

Proceedings                    1554

1    recall Mr. Perri said that, in fact, they could have

2    called their own expert to have examined the

3    non-stained area of the underwear.

4            THE COURT:  People.

5            MR. PERRI:  The People oppose defense

6    counsel's application for a mistrial, as defense

7    counsel noted, on at least three occasions in my

8    summation, I noted the defense has no burden that they

9    had to prove nothing.  Specifically, in switching from

10   comments on the defense's case to the People's own

11   case, I stated that I had to revisit the People's case

12   because the burden is the People's and the People's

13   alone in this matter.

14            With respect to the comments about the

15   testing of the unstained area, it is the People's

16   position it is fair comment.  It was directed at the

17   defense's expert's testimony and defense counsel's

18   arguments in summation classifying such testing as

19   critical to the proper testing of the evidence in the

20   case.  That the People do not believe any lengthy

21   curative instruction, or specifically, separate

22   curative instruction would be required.

23            The People would understand the Court, in

24   abundance of caution, may wish to add a curative

25   instruction specifically addressing that argument.  The

kmm

Proceedings                 1555

1    People's position would be simply state that the People

2    made arguments during summation regarding additional

3    DNA testing and to remind the jury as the People did

4    repeatedly, throughout their summations, say the burden

5    never shifts, the defense carries no burden.  The

6    summations are not evidence.

7           MR. BERGER:  My response is that you could

8    say it fifty times during summation and come out and

9    put a burden defense on the end by making arguments

10   that we should have tested or we could have tested.

11   That's changing it.  That doesn't cure what he did, and

12   all I'm saying is it seems to mean the prosecutor is

13   acknowledging that this might be appropriate.  I think

14   it's absolutely necessary to make a curative

15   instruction here telling the jury Mr. Perri's comments

16   were in error, he should not have made such an

17   argument.  There is no burden upon the defense to do

18   anything with respect to the testing of the underwear.

19          MR. PERRI:  Finally, defense counsel

20   repeatedly attempted to ignore the Court's evidentiary

21   rulings during his summation.  The People didn't

22   request a special specific statement to the jury that

23   defense counsel's behavior was inappropriate, wrong and

24   asking him for -- to be chastised.

25          Secondly, defense counsel failed to object in

Proceedings                    1556

1    a timely fashion.  He did not preserve.

2              It is the People's position for appellate

3    review, he waited until after summations on the eve of

4    charge.  Even bringing it up at this point it is not

5    the appropriate time.

6              THE COURT:  Enough.  Here is how the Court

7    will handle this.  I'm fully aware of the statement

8    that was made.  I'm also fully aware of Mr. Perri

9    continually stating throughout his summation that the

10   burden is the People's alone.  When I read to the jury

11   the presumption of innocence, the burden of proof

12   charge, I plan on adding the following:

13             The statement here goes on to talk about, in

14   fact, the defendant is not required to prove or

15   disprove anything.  This is what I will add.  During

16   the People's summation, you may have heard Mr. Perri

17   state that the defense could have had his expert test

18   the underwear in this case.  Although, not evidence,

19   that statement is to be disregarded by you, the jury,

20   as you know, because I have just told you the defendant

21   is not required to prove or disprove anything.

22             It goes back to my regular charge to the

23   contrary, the People have the burden of proving the

24   defendant guilty beyond a reasonable doubt.  That is

25   what I will add with regards to this matter.  And when

kmm

Proceedings                    1557

1    the jury is ready, we will bring them in.

2              Do we have them?

3              If either wants to put a comment on the

4    record, you may do that now to preserve the record.

5              MR. PERRI:  The only comments the People

6    would have to say is they wholly disregard it as posed

7    to be able to use it to judge the credibility of the

8    expert witness classification of the test being

9    critical.  The People would say that inference would be

10   permitted, however, the burden, your description of the

11   defendant having no burden, is completely appropriate.

12             THE COURT:  All right.  I appreciate your

13   request.  I'll leave it as stated.

14             MR. PERRI:  Understood, your Honor.

15             MR. BERGER:  I assume you are denying the

16   application for a mistrial?

17             THE COURT:  I am denying the application for

18   a mistrial.

19             THE CLERK:  After the jury is charged, I'll

20   be taking the evidence from you.  Just have it ready,

21   please.

22             (Whereupon, the jury entered the courtroom.)

23             THE CLERK:  Do both sides stipulate all sworn

24   jurors are present, People?

25             MR. PERRI:  Yes, your Honor.

Proceedings                    1558

1          THE CLERK:  Defense counsel?

2          MR. BERGER:  Yes, your Honor.

3          THE COURT:  Good morning, everyone, members

4     of the jury.  It now becomes my duty to charge you to

5     the law which applies to this case.  Before doing so,

6     however, I would like to thank you, and I know counsel

7     thanks you also for your devotion to your duty as

8     citizens of the community and, in particular, for your

9     attention, patience, and understanding during this

10    trial.

11          It is now the utmost importance that these

12    final words in this case be given to you in a calm,

13    quiet atmosphere of reason thought.

14          Ladies and gentlemen, a trial by jury in

15    criminal cases is the very foundation of the true

16    administration of justice in our society.  It is a

17    means by which we calmly, rationally, and objectively

18    try to arrive at the truth in a given situation.

19          After I charge you upon the law, you will

20    then retire to your final deliberations.  You, as

21    jurors and I as the Court, have a great responsibility

22    to see that a just result is reached both on the law

23    and on the facts.  It is most important that you give

24    careful attention to my charge to you.  This merely

25    means that I will instruct you as to what the law of

1    this case is, and what law you should you apply to the

2    facts in this case, as you find them to be. It also

3    embodies the statement of the Court of what your duties

4    are as jurors, as distinguished as to what my duties as

5    the presiding judge are in this case.

6              You will find as I move along the charge is

7    divided essentially into two principle parts. First,

8    there is a general statement of the law applicable to

9    all jury trials in a criminal case.

10             Secondly, there is a statement of law which

11   particularly applies to the crimes charged in this

12   indictment. The mere fact that an indictment has been

13   handed down creates no presumption of the defendant's

14   guilt. Being, the indictment is merely an accusation

15   or the mechanics by which an accused is brought to

16   trial. It is without probative force and carries no

17   inference of guilt.

18             The fundamental duty of a jury in this case,

19   as in any case, is to determine the facts. You are a

20   factfinding body. Indeed, the law says that you are

21   the exclusive judges of the facts. On the other hand,

22   and with equal emphasis, I charge you that you are

23   bound to accept the law of the case as I instruct you.

24             After you have determined the questions of

25   fact, apply the law, as charged by me, and render a

Proceedings                    1560

1    verdict based upon the facts as you have decided them

2    and under the law as charged by the Court, each of you

3    must individually agree on the verdict.  You must each

4    decide the case for yourself.  However, you have a duty

5    to consult with each other and to deliberate with a

6    view towards reaching an agreement provided it can be

7    done without violence to your individual judgment.  You

8    are required to impartially consider the evidence with

9    your fellow jurors before arriving at your verdicts.

10        In the course of your deliberations you

11   should not hesitate to reexamine your own views and

12   change your opinion if convinced it is erroneous, but

13   you should never surrender your honest conviction as to

14   the weight or effect of the evidence solely because of

15   the opinion of your fellow jurors or merely to return a

16   verdict.

17        In short, you are expected to confer, to

18   exchange ideas, to listen to your fellow jurors with an

19   open mind, remembering that each of you must

20   individually decide this case.  Whatever your verdict

21   may be in this case, each count must be by unanimous

22   vote of you, the jury.  It is essential that you base

23   your verdict upon the evidence and the evidence alone

24   as you have heard it from the mouths of the witnesses

25   and from the exhibits and/or stipulations which were

kmm

1    introduced into evidence.

2            You must not, under any circumstance, indulge

3    in speculation or guesswork, nor are you to consider

4    anything outside of the evidence.  In other words, do

5    not try to be detectives.  Do not try to conjecture

6    what you would do, or what should have been done, or

7    might have been done, or what could have been done.

8    You are not to base your verdict on sympathy or upon

9    what the reaction to your verdict may be, whether it be

10   popular or unpopular, whether it pleases or displeases

11   anyone, or what the effects may be insofar as

12   punishment of the defendant is concerned.

13           The question of punishment is simply not your

14   function, nor a matter for your interest or concern.

15   But a function which the law places upon the Court

16   alone.  It rests with the judge and the judge alone to

17   fix such punishment as may be provided by law and, of

18   course, only in the event that it becomes necessary.

19   As I have said, your verdict is to be based upon the

20   evidence and the evidence alone.

21           The opening statements, summations, arguments

22   and remarks of counsel, are not evidence.  They are

23   arguments propounded by the respective lawyers to

24   assist you in arriving at a conclusion, telling you

25   what they believe to be the conclusions you should draw

Proceedings                    1562

1   from the evidence.  Neither is anything I say or might

2   have said to you with regard to the facts to be

3   regarded as evidence.  It is not evidence.  Evidence, I

4   repeat, is sworn testimony, plus the exhibits.  I

5   further charge you that questions alone are not

6   evidence.  It is a question together with the answer to

7   it which is considered as evidence.

8           If the attorneys during the course of their

9   summation or I, in my charge, should allude to any

10  alleged facts and your recollection of those facts

11  disagrees with the attorneys or my recital of them,

12  disregard what we have had to say for it is your

13  recollection of the facts which governs.

14          I have tried to preside impartially without

15  influencing you in your determination of the facts, and

16  if you have any feelings to the contrary, please put

17  them out of your mind.  It is for you, the jury, as I

18  have already instructed you, to say what the facts in

19  this case are and whether the defendant is to be

20  convicted or acquitted.

21          During the course of the trial it has been

22  necessary for me to rule on the admission of evidence

23  and on motions made with respect to the applicable law.

24  You must not infer from any such ruling I have made or

25  from anything that I have said during the course of the

                                                        kmm

1    trial that I hold any view whatsoever on the issue of

2    whether the defendant is guilty or not guilty.  Any

3    views of mine would in any event, would be totally

4    irrelevant since it is your recollection of the

5    evidence and your determination of the issues of fact

6    which control.

7              During the course of the trial, incidents may

8    have occurred which you were instructed to disregard

9    and to dismiss from your minds, and at times questions

10   were asked as to which objections were interposed and

11   sustained.  Certain testimony was also stricken from

12   the evidence in this case.  Whether these matters were

13   trivial or consequential is of no concern to you.  For

14   they are simply not involved in this case and must not

15   impinge upon any part of your deliberations.  You must

16   not be influenced by them, nor shall you draw any

17   inferences with respect to any of them.  You must

18   decide the case solely upon the competent evidence

19   before you, and determine the issues on what you

20   believe to be the credible evidence.

21             I might add parenthetically, if your

22   recollection of certain testimony should fail, or if

23   you find yourself in doubt as to any of my instructions

24   on the law, it's your privilege, if you so desire, to

25   return to the Court for the purpose of having such

kmm

1     testimony or instructions read to you.  However, please

2     understand that it may take a period of time for the

3     court reporter to locate that which is to be read to

4     you, and therefore, there may be a delay from the time

5     you send in a note until you hear the read back.

6              In addition, you may request to see in the

7     jury room any exhibits that have been introduced into

8     evidence at this trial.

9              I call to your attention that a number of

10    items have been referred to and/or marked for

11    identification, but have not been received in evidence

12    as exhibits.  Since they are not evidence, they cannot

13    be considered by you, and therefore, will not be

14    submitted to you.  I repeat, however, that those

15    exhibits which have been admitted into evidence, are

16    available to you upon a written request.

17             We now turn to the fundamental principles of

18    our law that apply in all criminal trials.   The

19    presumption of innocence, the burden of proof and the

20    requirement of proof beyond a reasonable doubt.

21             Throughout these proceedings, the defendant

22    is presumed to be innocent.  As a result, you must find

23    the defendant not guilty unless on the evidence

24    presented at this trial, you conclude that the People

25    have proven the defendant guilty beyond a reasonable

Proceedings                    1565

1    doubt.   The defendant is not required to prove that he

2    is not guilty.   In fact, the defendant is not required

3    to prove or disprove anything.

4         During the People's summations, you may have

5    heard Mr. Perri restate that the defense could have had

6    his expert test the underwear in this case.   Although,

7    not evidence, that statement is to be disregarded by

8    you.   As you know, because I have just told you, the

9    defendant is not required to prove or disprove

10   anything.   To the contrary, the People have the burden

11   of proving the defendant guilty beyond a reasonable

12   doubt.   That means before you can find the defendant

13   guilty of a crime, the People must prove beyond a

14   reasonable doubt every element of the crime, including

15   that the defendant is the person who committed that

16   crime.

17        I charge you that the burden of proof never

18   shifts from the People to the defendant.   If the People

19   fail to satisfy their burden of proof, you must find

20   the defendant not guilty.   If the People satisfy their

21   burden of proof, you must find the defendant guilty.

22        Now, what does our law mean when it requires

23   proof of guilt beyond a reasonable doubt?   The law uses

24   the term proof beyond a reasonable doubt to tell you

25   how convincing the evidence of guilt must be to permit

kmm

Proceedings                    1566

1    a verdict of guilty.  The law recognizes in dealing

2    with human affairs there are very few things in this

3    world that we know with absolute certainty.  Therefore,

4    the law does not require the People to prove the

5    defendant guilty beyond a reasonable doubt.  On the

6    other hand, it's not sufficient to prove that the

7    defendant is probably guilty.

8         In a criminal case, the proof of guilt must

9    be stronger than that.  It must be beyond a reasonable

10   doubt.  A reasonable doubt is an honest doubt of the

11   defendant's guilt for which a reason exists based upon

12   the nature and quality of the evidence.

13        It is an actual doubt, not an imaginary

14   doubt.  It is a doubt that a reasonable person acting

15   in a matter of this importance would be likely to

16   entertain because of the evidence that was presented or

17   because of the lack of convincing evidence.  Proof of

18   guilt beyond a reasonable doubt is proof that leaves

19   you so firmly convinced of the defendant's guilt that

20   you have no reasonable doubt of the existence of any

21   element of the crime, or of the defendant's identity as

22   the person who committed the crime.

23        In determining whether or not the People have

24   proven the defendant's guilt beyond a reasonable doubt,

25   you should be guided solely by a full and fair

kmm

1       evaluation of the evidence.  After carefully evaluating

2       the evidence, each of you must decide whether or not

3       that evidence convinces you beyond a reasonable doubt

4       of the defendant's guilt.  Whatever your verdict may

5       be, it must not rest upon baseless speculations.  Nor,

6       may it be influenced in any way by bias, prejudice, or

7       sympathy, or by a desire to bring an end to your

8       deliberations, or to avoid an unpleasant duty.

9               If you are not convinced beyond a reasonable

10      doubt that the defendant is guilty of a charged crime,

11      you must find the defendant not guilty of that crime.

12      If you are convinced beyond a reasonable doubt that the

13      defendant is guilty of a charged crime, you must find

14      the defendant guilty of that crime.

15              As judges of the facts you, alone, determine

16      the truthfulness and accuracy of the testimony of each

17      witness.  You must decide whether a witness told the

18      truth and was accurate, or instead testified falsely or

19      was mistaken.

20              You must also decide what importance to give

21      to the testimony you accept as truthful and accurate.

22      It is the quality of the testimony that is controlling,

23      not the number of witnesses who testify.

24              If you find that any witness has

25      intentionally testified falsely as to any material

Proceedings                    1568

1       fact, you may disregard that witness's entire

2       testimony, or you may disregard so much of it as you

3       found was untruthful and accept so much of it as you

4       find to have been given truthfully and accurately.

5                    There is no particular formula for evaluating

6       the truthfulness and accuracy of another person's

7       statements or testimony.  You bring to this process all

8       of your varied experiences.  In life you frequently

9       decide the truthfulness and accuracy of statements made

10      to you by other people.  The same factors used to make

11      those decisions should be used in this case when

12      evaluating the testimony.

13                   Some of the factors that you may wish to

14      consider in evaluating the testimony of a witness are

15      as follows:

16                   Did the witness have an opportunity to see or

17      hear the events about which he or she testified?  Did

18      the witness have the ability to recall those events

19      accurately?  Was the testimony of the witness plausible

20      and likely to be true, or was it implausible and not

21      likely to be true?  Was the testimony of the witness

22      consistent or inconsistent with other testimony or

23      other evidence in the case?  Did the manner in which

24      the witness testified reflect upon the truthfulness of

25      that witness's testimony?  To what extent, if any, did

1       the witness's background, training, education, or

2       experience affect the believability of that witness's

3       testimony?  Did the witness have a bias, hostility or

4       some other attitude that affected the truthfulness of

5       the witness's testimony?

6               You may consider whether a witness had or did

7       not have a motive to lie.  If a witness had a motive to

8       lie, you may consider whether and to what extent, if

9       any, that motive effected the truthfulness of that

10      witness's testimony.  If a witness did not have a

11      motive to lie, you may consider that as well in

12      evaluating the witness's truthfulness.

13              You may consider whether a witness has any

14      interest in the outcome of the case.  Or instead,

15      whether the witness has no such interest.  You are not

16      required to reject the testimony of an interested

17      witness or to accept the testimony of a witness who has

18      no interest in the outcome of the case.  You may,

19      however, consider whether an interest in the outcome or

20      the lack of such interest affected the truthfulness of

21      the witness's testimony.

22              You may consider whether a witness has

23      engaged in criminal conduct, and if so, whether and to

24      what extent it effects the truthfulness of that

25      witness's testimony.  You are not required to reject

Proceedings                    1570

1    the testimony of a witness who has engaged in criminal

2    conduct or to accept the testimony of a witness who has

3    not.  You may, however, consider whether a witness's

4    criminal conduct has effected the truthfulness of the

5    witness's testimony.

6              You may consider whether a witness made

7    statements at this trial that are inconsistent with

8    each other.  You may also consider whether a witness

9    made previous statements that are inconsistent with his

10   or her testimony at trial.  You may consider whether a

11   witness testified to a fact here at trial that

12   witnesses omitted to state a prior time when it would

13   have been reasonable and logical for the witness to

14   have stated the fact.

15             In determining whether it would have been

16   reasonable and logical for the witness to have stated

17   the omitted fact, you may consider whether the

18   witness's attention was called to the matter and

19   whether the witness was specifically asked about it.

20             If a witness has made such inconsistent

21   statements or omissions, you may consider whether and

22   to what extent they affect the truthfulness or accuracy

23   of that witnesses's testimony here at this trial.

24             MR. PERRI: May we approach?

25             THE COURT:  Step up.

kmm

1          (Whereupon, there was a sidebar discussion

2     with the Court and counsel, as follows:)

3          MR. PERRI:  I don't know.  I don't know if it

4     was intentional, but in the CJI, as the defendant has

5     testified in a trial, there is the instruction that the

6     defendant is an interested witness and you didn't say

7     that.

8          (Whereupon, the proceedings resumed.)

9          THE COURT:  The contents of a prior

10    inconsistent statement are not proof of what happened.

11    You may use evidence of a prior inconsistent statement

12    only to evaluate the truthfulness or accuracy of the

13    witness's testimony here at trial.  You may consider

14    whether a witness's testimony is consistent with the

15    testimony of other witnesses or with other evidence in

16    the case.

17         If there were inconsistencies by or among

18    witnesses, you may consider whether they were

19    significant inconsistencies related to important facts,

20    or instead were the kind of minor inconsistencies that

21    one might expect from multiple witnesses to the same

22    event.

23         In this case you have heard the testimony of

24    a police officer and detectives.  The testimony of a

25    witness should not be believed solely and simply

 1    because the witness is a police officer or a detective.

 2    At the same time, a witness's testimony should not be

 3    disbelieved solely and simply because the witness is a

 4    police officer or a detective.  You must evaluate a

 5    police officer's or detective's testimony in the same

 6    way you would evaluate the testimony of any other

 7    witness.

 8         You have heard testimony about the

 9    prosecutor, or a lawyer, or an investigator speaking to

10    a witness about the case before the witness testified

11    at this trial.  The law does not prohibit a party from

12    speaking to a witness about the case before the witness

13    testifies.  Nor does it prohibit the prosecutor, or a

14    lawyer, or an investigator from reviewing with the

15    witness the questions that will be asked at trial.

16         You have also heard testimony that a witness

17    read certain materials pertaining to the case before

18    the witness testified at trial.  The law does not

19    prohibit a witness from doing so.

20         Now, although not required to do so, the

21    defendant in this case testified in his own behalf.

22    His testimony should be considered by you as you would

23    the testimony of any other witness.  The defendant is,

24    of course, an interested witness, interested in the

25    outcome of the trial.  You may, as jurors wish to keep

Proceedings                1573

1    such interest in mind, in determining the weight and

2    credibility to be given to his testimony.  You should

3    not, however, reject the testimony of the defendant

4    merely because of his interest.  It is your duty, as in

5    the case of all witnesses, to accept such testimony of

6    the defendant as you believe to be truthful and reject

7    only such testimony as you believe to be false.

8            You will recall that you heard testimony from

9    experts in the area of DNA and an expert in child

10   sexual abuse and sexual penetration called by the

11   People, and an expert in the area of DNA called by the

12   defense; all who testified about certain matters and

13   gave opinions on those matters.  Ordinarily, a witness

14   who is testifying about facts and is not permitted to

15   give an opinion, where, however, scientific, medical,

16   technical or other specialized knowledge will help the

17   jury understand the evidence or to determine a fact in

18   issue.  A witness with expertise in a specialized field

19   may render opinions about such matters.  You should

20   evaluate the testimony of any such witness just as you

21   would the testimony of any other witness.  You may

22   accept or reject such testimony in whole or in part,

23   just as you may with respect to the testimony of any

24   other witness.

25            In deciding whether or not to accept such

kmm

1    testimony, you should consider the following:   The

2    qualification and believability of the witness, the

3    facts and circumstances upon which the witness's

4    opinion was based, the accuracy or inaccuracy of any

5    assumed or hypothetical fact upon which the opinion is

6    based, the reasons given for the witness's opinion and

7    whether the witness's opinion is consistent or

8    inconsistent with other evidence in the case.

9              I will now discuss the law as it relates to

10   testimony concerning statements the defendant made to

11   the police.

12             Our law does not require that a statement by

13   a defendant be in any particular form.  It may be oral,

14   or written.   There is no requirement that a statement

15   be made under oath.

16             Under our law, before you may consider any

17   such statement as evidence in this case, you must first

18   be convinced that the statement attributed to the

19   defendant was, in fact, made or adopted by him.   In

20   determining whether the defendant made or adopted the

21   statement, you may apply the tests of believability and

22   accuracy that we have already discussed.

23             A defendant adopts a statement when he

24   knowingly acknowledges the contents of the statement as

25   his own.  A statement in written form need not have

1       been written by the defendant provided that the

2       defendant adopted the statement.  Also, under our law,

3       even if you find the defendant made a statement, you

4       may still not consider it as evidence in the case,

5       unless the People have proven beyond a reasonable doubt

6       that the defendant made the statement voluntarily.

7                  How do you determine whether the People have

8       proven beyond a reasonable doubt that the defendant

9       made a statement voluntarily?  Two ways:

10                 One, there is testimony that while the

11      defendant was in custody he was questioned by the

12      police and made certain statements, including an

13      apology letter.  With respect to the alleged written

14      statement of admission and the apology letter, under

15      our law, before a person in custody may be questioned

16      by the police, that person first must be advised of his

17      rights.

18                 Second, he must understand those rights.

19                 And third, must voluntarily waive those

20      rights and agree to speak to the police.

21                 If any one of those three conditions is not

22      met, a statement made in response to questioning is not

23      voluntary, and therefore, you must not consider it.

24      There is no particular point in time that the police

25      are required to advise the defendant in custody of his

Proceedings                    1576

1    rights, so long as they do so before questioning

2    begins.

3            A defendant in custody need be advised only

4    once of the rights, regardless of how many times or to

5    whom the defendant speaks after having been so advised,

6    provided that the defendant is in continuous custody

7    from the time he was advised of his rights to the time

8    he was questioned, and there was no reason to believe

9    that the defendant had forgotten or no longer

10   understood his rights.

11           While there are no particular words that the

12   police are required to use in advising the defendant,

13   in sum and substance, the defendant must be advised,

14   one, that he has the right to remain silent.

15           Two, that anything he says may be used

16   against him in a court of law.

17           Three, that he has the right to consult with

18   the lawyer before answering any questions, and the

19   right to the presence of a lawyer during any

20   questioning.

21           And four, that if he cannot afford a lawyer,

22   one will be provided for him prior to any questioning,

23   if he so desires.

24           Before you may consider as evidence a

25   statement made by the defendant in response to

Proceedings                    1577

1      questioning, you must find beyond a reasonable doubt

2      that the defendant was advised of his rights,

3      understood those rights, and voluntarily waived those

4      rights and agreed to speak to the police.  If you do

5      not make those findings, then you must disregard the

6      statement and not consider it.

7              With respect to both the oral statement made

8      to the police before being taken into custody, and the

9      written statement and apology letter after the

10     defendant was taken into custody, under our law, a

11     statement is not voluntary if it is obtained from the

12     defendant by the use or threatened use of physical

13     force upon the defendant.

14             In addition, a statement is not voluntary if

15     it is obtained by means of any other improper conduct

16     or undue pressure which impairs the defendant's

17     physical or mental condition to the extent of

18     undermining his ability to make a choice whether or not

19     to make a statement.

20             In considering whether a statement was

21     obtained by any means of improper conduct or up undue

22     pressure which impaired the defendant's mental

23     condition or extent of undermining his mental

24     condition, of whether or not to make a statement, you

25     may consider such factors as the defendant's age,

1    intelligence, and physical and mental condition, and

2    the conduct of the police during their contact with the

3    defendant, including, for example, the number of

4    officers questioning the defendant, the manner in which

5    the defendant was questioned, the defendant's treatment

6    during the period of detention and questioning, and the

7    length of time the defendant was questioned.  It is for

8    you to evaluate and weigh the various factors to

9    determine whether or not in the end a statement was

10   obtained by means of any improper conduct or undue

11   pressure which impaired the defendant's physical or

12   mental condition to the extent of undermining his or

13   her ability to make a choice of whether or not to make

14   a statement.

15          If the People have not proven beyond a

16   reasonable doubt that a statement of the defendant was

17   voluntarily made, then you must disregard the statement

18   and not consider it.  If the People have proven beyond

19   a reasonable doubt that a statement of the defendant

20   was voluntarily made, then you may consider that

21   statement as evidence and evaluate it as you would any

22   other evidence.

23          Under our law, a person may not be convicted

24   of an offense solely upon evidence of a confession or

25   admission made by that person without additional proof

Proceedings                    1579

1     that offense charged has been committed.  This law is

2     designed to make sure that a person is not convicted

3     upon his own words of a crime that did not take place.

4     Thus, you may not convict the defendant solely on his

5     own statements.  There must be some additional proof

6     that the crimes charged were committed.

7              Now, there are two types of evidence, namely

8     direct evidence and circumstantial evidence.  Let me

9     explain what constitutes a direct and circumstantial

10    evidence and how they differ.

11             Direct evidence is evidence of a fact based

12    on a witness's personal knowledge or observation of

13    that fact.  A person's guilt of a charged crime may be

14    proven by direct evidence, if standing alone that

15    evidence satisfies a jury beyond a reasonable doubt of

16    the person's guilt of that crime.

17             Circumstantial evidence is direct evidence of

18    a fact from which a person may reasonably infer the

19    existence or nonexistence of another fact.  A person's

20    guilt of a charged crime may be proven by

21    circumstantial evidence if that evidence, while not

22    directly, establishes guilt, gives rise to an inference

23    of guilt beyond a reasonable doubt.

24             Let me give you an example of the difference

25    between direct evidence and circumstantial evidence.

kmm

1    Suppose in a trial one of the parties is trying to

2    prove it was raining on a certain morning.  A witness

3    testifies that on that morning she walked to the

4    subway, and as she walked, she saw rain falling.  She

5    felt it striking her face and heard it slashes on the

6    sidewalk.  That testimony of the witness's perception

7    would be direct evidence that it rained on that

8    morning.  The question for the jury would then be

9    whether the jury found the testimony truthful and

10   accurate, beyond a reasonable doubt.

11          Suppose, on the other hand, the witness

12   testified that it was clear as she walked to the

13   subway, that she went into the subway and got on the

14   train and that while she was on the train she saw

15   passengers come in at one station after another,

16   carrying wet umbrellas and wearing wet clothes and rain

17   coats.  That testimony constitutes direct evidence of

18   what the witness observed and because inference that it

19   was raining in the area would flow naturally,

20   reasonably, and logically from that direct evidence,

21   the witness's testimony would constitute circumstantial

22   evidence that it was raining in the area.

23          The law draws no distinction between

24   circumstantial evidence and direct evidence in terms of

25   its weight or importance.  The type of evidence may be

Proceedings                1581

1    enough to establish guilt beyond a reasonable doubt

2    depending upon the facts of the case, as the jury finds

3    them to be.

4             Now, in this case, witnesses testified about

5    the defendant's reputation in the community for

6    kindness and gentleness towards children.  Such

7    evidence was offered to establish that the defendant is

8    of such character to make it unlikely that he committed

9    the crimes charged.

10            Under our law, evidence of good character,

11   even if believed, does not excuse criminal conduct, if

12   that conduct is proven beyond a reasonable doubt.  When

13   considered with all of the other evidence in the case,

14   however, evidence of good character makes it rise to a

15   reasonable doubt where without it, none would exist.

16            If evidence of good character, when

17   considered with all of the other evidence in the case

18   raises a reasonable doubt of the defendant's guilt,

19   then you must find the defendant not guilty.  On the

20   other hand, if you are satisfied that the defendant's

21   guilt has been proven beyond a reasonable doubt,

22   notwithstanding the evidence of his good character,

23   then you must find the defendant guilty.

24            Now, we come to the second part of my charge,

25   which as I told you at the outset, I will instruct you

kmm

Proceedings                1582

1    on the material legal principles applicable to the

2    crimes with which the defendant is charged.  And then I

3    will briefly explain the application of law to the

4    facts upon which you will be required to deliberate and

5    render your verdict.  I also reiterate my admonitions

6    that you are to draw no inference whatsoever from my

7    reference or lack of reference to any of the testimony,

8    or other evidence as indicative of any opinion on my

9    part as to credibility, weight or importance of any

10   evidence in this case.

11        Members of the jury, you will notice some of

12   the definitions are the same and apply to more than one

13   count of the indictment.  Although, I may give that to

14   you only once you are to consider the crimes charged in

15   each count separately and apply those instructions

16   wherever it is applicable.

17        The first count is criminal sexual act in the

18   first degree.

19        Under our law, a person is guilty of criminal

20   sexual act in the first degree when he engages in oral

21   sexual conduct with another person who is less than

22   eleven years old.

23        Under our law it is also an element of this

24   offense that the oral sexual conduct was committed

25   without the consent of that other person.  Oral sexual

1    conduct takes place without a person's consent when

2    that person is deemed by law to be incapable of

3    consent.  Under our law, a person is deemed incapable

4    of consenting to oral sexual conduct when she is less

5    eleven years old.

6          Thus, the law deems oral sexual conduct with

7    such a person to be without that person's consent even

8    if, in fact, that person did consent.  It is not a

9    defense to this charge that the actor did not know that

10   person with whom the actor had oral sexual conduct, was

11   less than eleven years old or that actor believed that

12   such person was eleven years old or more on the date of

13   the crime.

14         The term oral sexual conduct used in the

15   definition of this crime has its own special meaning in

16   our law.  I will now give you the meaning of this term.

17         Oral sexual conduct means conduct between

18   persons consisting of contact between the mouth and the

19   penis, the mouth and the anus, or the mouth and the

20   vulva or vagina.

21         In order for you to find the defendant guilty

22   of this crime, the People are required to prove from

23   all of the evidence in this case, beyond a reasonable

24   doubt, both of the following two elements:

25         One, that on or about October 16, 2013, in

Proceedings                1584

1    the County of Nassau, the defendant, Daniel Ramos,

2    engaged in oral sexual conduct with Mya Feliciano

3    Ramirez.

4              And two, that Mya Feliciano Ramirez was less

5    than eleven years old.  Therefore, if you find that the

6    People have proven beyond a reasonable doubt both of

7    those elements, you must find the defendant guilty of

8    the crime of criminal sexual act in the first degree as

9    charged in the first count.

10             On the other hand, if you find that the

11   People have not proven beyond a reasonable doubt either

12   one or both of those elements, you must find the

13   defendant not guilty of the crime of criminal sexual

14   act in the first degree as charged in the first count.

15             The second count is endangering the welfare

16   of a child.

17             Under our law, a person is guilty of

18   endangering the welfare of a child when that person

19   knowingly acts in manner likely to be injurious to the

20   physical, mental, or moral welfare of a child less than

21   seventeen years old.

22             The term knowingly has its own special

23   meaning in our law.  I'll now give you the meaning of

24   that term.

25             A person knowingly acts in a manner likely to

Proceedings                    1585

1     be injurious to the physical, mental, moral welfare of

2     a child when that person is aware that he is acting in

3     such a manner actual harm to the child need not result.

4     The defendant must act in a manner which is likely to

5     be injurious to the physical, mental, moral welfare of

6     a child, knowingly of the likelihood of such injury.

7              Knowledge of the age of the child is not an

8     element of this crime, and it is not a defense to this

9     charge that the defendant did not know the age of the

10    child or believed the age of the child to be seventeen

11    years or more.

12             In order for you find the defendant guilty of

13    this crime, the People are required to prove from all

14    of the evidence in this case, beyond a reasonable

15    doubt, each of the following three elements:

16             One, that on or about October 16, 2013, in

17    the County of Nassau, the defendant, Daniel Ramos acted

18    in a manner likely to be injurious to the physical,

19    mental, or moral welfare of Mya Feliciano Ramirez.

20             Two, that the defendant did so knowingly.

21             And three, that Mya Feliciano Ramirez was

22    less than seventeen years old.

23             Therefore, if you find that the People have

24    proven beyond a reasonable doubt each of those

25    elements, you must find the defendant guilty of the

kmm

Proceedings                1586

1   crime of endangering the welfare of a child as charged

2   in the second count.

3           On the other hand, if you find the People

4   have not proven beyond a reasonable doubt any one or

5   more of those elements, you must find the defendant not

6   guilty of the crime of endangering the welfare of a

7   child as charged in the second count.

8           We now reached that part of my charge dealing

9   with the process of deliberations.  Your verdict on

10  each count you consider, whether guilty or not guilty,

11  must be unanimous.  That is, each and every juror must

12  agree to it.  No one expects all jurors will have the

13  same view of the case when they first enter the jury

14  room.  To reach a unanimous verdict, you must

15  deliberate with the other jurors.  That means you

16  should discuss the evidence and consult with each

17  other, listen to each other, give each other's views

18  careful consideration and reason together when

19  considering the evidence.  And when you deliberate, you

20  should do so with a view towards reaching an agreement

21  if that can be done without surrendering individual

22  judgment.

23          Each of you must decide the case for

24  yourself, but only after a fair and impartial

25  consideration of the evidence with the other jurors.

kmm

Proceedings                    1587

1    You should not surrender an honest view of

2    the evidence simply because you want the trial to end

3    or you are outvoted.  At the same time you should not

4    hesitate to reexamine your views and change your mind

5    if you become convinced that your position was not

6    correct.

7            In other words, ladies and gentlemen, when

8    you enter the jury room, you may have individually

9    reached certain tentative opinions and conclusions.

10   Before finalizing those opinions and conclusions, you

11   should deliberate with the other jurors.  You should be

12   open to reason and be willing either to adhere to your

13   opinion and conclusion if persuaded you are correct, or

14   to change your opinions for conclusion if persuaded you

15   are not correct.  To the best of your ability, I ask

16   you to apply common sense and good judgment.  Do not

17   let fear, favor, sympathy, bias, prejudice,

18   consideration of possible sentence or punishment sway

19   your minds in any way in analyzing the testimony.

20   Decide this case, as you have promised, fairly on the

21   evidence and on the law, whether you agree with the law

22   or not.

23           You may see any or all of the exhibits which

24   were received in evidence.  Simply write me a note

25   telling me which exhibit or exhibits you want to see.

kmm

Proceedings                    1588

1    Certain evidence will be immediately available to you.

2    Other evidence can be viewed by you.  Please write a

3    note asking for any evidence not otherwise available to

4    you.

5            You may also have the testimony of any

6    witness read back to you in whole or in part.  Again,

7    if you want a read back, write me a note telling me

8    what testimony you wish to hear.  If you are interested

9    in hearing only a portion of what a witness's testimony

10   was, please specify it in your note which witness and

11   with as much detail as possible which part of the

12   testimony you want to hear back.

13           Of course, when testimony is read back,

14   questions to which an objection was sustained and

15   material otherwise struck from the record, is not read

16   back to you.  If you have a question on the law, write

17   me a note, specify what you want me to review with you.

18           Now, under our law the first juror selected

19   is known as the foreperson.  During deliberations, the

20   foreperson's opinion and vote are not entitled to

21   anymore importance than that of any other juror.  What

22   we ask the foreperson to do during deliberations is to

23   sign any written note that the jury sends to the Court.

24   The foreperson does not have to write the note or agree

25   with its contents.  The foreperson's signature only

1    indicates that the writing comes from the jury.

2           The foreperson may, but does not have to

3    chair the jury's discussions during deliberations.

4    When the jury reached a verdict, guilty or not guilty,

5    the entire jury will be asked to come to court.  The

6    foreperson will be asked whether the jury has reached a

7    verdict.  If the foreperson says yes, he will be asked

8    what the verdict is for each charged crime.  After

9    that, the entire jury will be asked whether that is

10   their verdict and will answer yes or no.

11          Finally, upon the request of the interested

12   party, each juror will be asked individually whether

13   the announced verdict is the verdict of that juror.

14   Upon being asked, each juror will answer yes or no

15   individually.  I will give you a form known as a

16   verdict sheet when you retire to your deliberations.

17   The verdict sheet lists the counts submitted for your

18   consideration and the possible verdicts.  Please use

19   the form to record your verdict with an X or a

20   checkmark in the appropriate place for each count you

21   consider in accordance with my instructions.

22          Finally, there are a few remaining rules

23   which you must observe during deliberations.

24          One, while you are here in the courthouse

25   deliberating on the case, you will be sequestered.

Proceedings                1590

1     Meaning, you will be kept together in the jury room

2     under the supervision of a court officer.  You may not

3     leave the jury room without permission.  And if you

4     have a cell phone or other electronic device, you will

5     be asked to please give it to the court officer to hold

6     for you while you are engaged in deliberations.

7                You must deliberate about the case only when

8     you are all gathered together in the jury room.  You

9     must not, for example, be discussing the case as you go

10    to and from the courtroom.  Thus, for any reason all

11    twelve of you are not gathered together in the jury

12    room, please stop deliberating until all twelve are

13    again present in the jury room.

14                During your deliberations you must only

15    discuss the case amongst yourselves.  You must not

16    discuss the case with anyone else, including a court

17    officer or permit anyone other than a fellow juror to

18    discuss the case in your presence.  If you may have a

19    question or request, you must communicate with me by

20    writing that note and signed by the foreperson.  Give

21    the note to a court officer, who will in turn give it

22    to me.  When the jury room door is opened, give the

23    court officer the note.  Please stop deliberating until

24    the officer has left the room and the door is closed

25    again.

1          In any note that you send me, do not tell me

2     what the vote of the jury is on any of the counts.

3     Every note will be answered.  It may take a little time

4     to get back to you.  If you can continue to work on

5     your deliberations without the note being answered,

6     please do so.  Otherwise, please wait patiently until

7     we get the note answered.  That concludes my

8     instructions.  Before I excuse you, let me see the

9     attorneys at the bench.

10               (Whereupon, there was a sidebar discussion

11     with the Court and counsel, as follows:)

12               THE COURT:  Any exceptions to the charge

13     before I release them?

14               MR. PERRI:  No, your Honor.

15               MR. BERGER:  No, your Honor.

16               THE COURT:  Any additions to the charge

17     before I release them?

18               MR. PERRI:  The only question -- the only

19     other question I had your Honor, was in the statement

20     that was prior to custody, that there -- just to

21     clarify that, the requirement of Miranda warnings were

22     just for the written statement.

23               MR. BERGER:  You made it clear when you

24     charged that every -- when he was custody, that's when

25     the Miranda warnings are required and they could

Proceedings                    1592

1      consider any other statement.  I think you covered the
2      point.
3                THE COURT:  I want to make sure I read it
4      right.  Give me one second.
5                MR. PERRI:  If you feel you covered it, you
6      covered it.
7                THE COURT:  I understand.
8                I even highlighted it to make sure I read it
9      slowly.  What I read with respect to both the oral
10     statement made to the police before being taken into
11     custody and the written statement, the apology letter
12     after the defendant was taken into custody, I go on to
13     say what is needed or not needed.  Although, it might
14     not have been artfully put forth as the People want, I
15     do feel it's been covered.  I'm not going to say
16     anything additional at this time.
17               I'm going to assume we're going to release
18     the only one alternate remaining.
19               MR. BERGER:  No, I'm not releasing her.
20               THE COURT:  Okay.  I assumed you are
21     releasing.
22               MR. BERGER:  No I'm not.
23               THE COURT:  You might agree to substitute, if
24     that becomes necessary.
25               MR. BERGER:  Absolutely.

Proceedings                    1593

1           THE COURT:  I want to give her instructions

2      then.  I will retire the first twelve to start their

3      deliberations.  I will then give this instruction to

4      the alternate juror, and let her know she will be

5      sitting alone reading a book.  We'll let her know and

6      if and when she could leave.

7           MR. PERRI:  Yes, your Honor.  Thank you.

8           (Whereupon, the proceedings resumed.)

9           THE COURT:  The twelve sworn jurors are now

10     free to go to the jury room and start your

11     deliberations once that door is closed.

12           If the alternate could please wait.

13           (Whereupon, the jury exited the courtroom and

14     began deliberations.)

15           THE COURT:  All right, since our jury of

16     twelve is about to begin its deliberations, I now

17     charge you that and I emphasize that there must be no

18     further communication or contact between the trial jury

19     of twelve and my one remaining alternate juror.  You

20     will be provided with a convenient and private place to

21     await the rendition of the trial jury's verdict.

22           I, again, admonish you that you are not to

23     discuss this case with anyone at this time.  You may

24     not read anything about this case.  You are not allowed

25     to have anyone discuss the case in your presence.  You

Proceedings                    1594

1    are not allowed to talk to the lawyers or the

2    defendant, or the witnesses about anything during this

3    time that you are waiting.  You may not form an opinion

4    as to any factual issues, nor are you to form or

5    express any opinion as to the guilt or innocence of the

6    defendant unless and until such time as you are either

7    released from this court for your services or requested

8    to participate in the trial jury's deliberations.  Do

9    you understand my instructions to you?

10                ALTERNATE JUROR ONE:  Yes, I do.

11                THE COURT:  Hopefully you brought a book or

12   something you could read.  You may now may retire to a

13   private place.

14                (Whereupon, the alternate exited the

15   courtroom.)

16                THE COURT:  Let me ask the attorneys, is

17   there any evidence you would agree to send into the

18   jury now, or would you refer prefer to wait for notes?

19                MR. BERGER:  Judge, at this point, I consent

20   to giving the jury the exhibits that they asked for,

21   all or part.  I don't think it's necessary for you to

22   call us back.  If that's what you want to do, we'll do

23   it.  Normally when I'm asked, I consent to the exhibits

24   being given.  We say yes.  It doesn't require the

25   attorneys to be present.

Proceedings          1595

1            THE COURT:  What I want to make sure, I heard

2       you consent to the jury giving the exhibits that they

3       asked for without calling the parties back in, correct?

4            MR. BERGER:  Correct.

5            THE COURT:  We will wait for them to ask for

6       the exhibits.  I won't call you back in to provide them

7       with those exhibits, but when we are all gathered

8       again, I'll obviously make you both aware of what they

9       requested and what is being sent to them.

10           MR. PERRI:  The People have no problem with

11      providing them exhibits or waiting for them to request

12      for the exhibits in either situation.  It is not

13      required we be present.

14           MR. BERGER:  Should we leave them in the

15      courtroom?

16           THE CLERK:  I'll go over with you the

17      exhibits so everybody can see what I'm taking

18      possession of to confirm it is marked in evidence and

19      that as soon as we're done with that, I'll take

20      possession of it and you are free to leave.

21           MR. PERRI:  Thank you.

22           (Whereupon, a recess was taken.)

23           *              *              *

24

25

                                                    kmm

1       THE CLERK:  Case on trial continued,

2   Indictment 742N of 2014, People of the State of New

3   York vs. Daniel Ramos.

4       Let the record reflect all parties are

5   present.  The jury is not present at this time.

6       Are the People ready?

7       MR. PERRI:  Yes, your Honor.

8       MR. BERGER:  Yes, your Honor.

9       THE COURT:  We received a note from the jury.

10  It's been marked Court Exhibit Number XI.  You both

11  read it, but I'll read it into the record.

12      We, the jury, would like to hear the

13  transcript of Crystal's testimony, the part when she

14  walks in the kitchen and sees Danny with Mya.  Mya's

15  testimony when Crystal walked in.  Daniel's testimony

16  when Crystal walked in.

17      It is now ten to one.  I need to send the

18  jury to lunch at this point, so that will give

19  everybody the lunch hour to determine if you have any

20  of the minutes transcribed, what portion you think

21  should be read back.  I'll ask that everyone be back

22  here in the courtroom by 2:15 sharp so we can determine

23  if there is an agreement on what should be read back.

24  If not, the Court will make the ultimate decision as to

25  what will be read back.  It will include, direct and

kmm

Proceedings                    1597

1    cross of each witness with regards to these requests,

2    and we'll call the jury now to release them for lunch.

3              MR. BERGER:  Were the exhibits asked for?

4              THE COURT:  Obviously, it will be in the

5    rounds of direct and cross, redirect, recross,

6    re-redirect, if that should exist.

7              MR. PERRI:  Understood.

8              THE COURT:  While waiting for the jury to be

9    brought into the courtroom, we received another note.

10   It is marked Court Exhibit Number XII.  I will give you

11   each a chance to look at it in a moment.  I'll read it

12   into the record.

13             We, the jury, would like to the hear the 911

14   call from Crystal or the transcript, if it was on

15   record.  If it's on the record, can we see slash hear

16   it.  The forensic report that shows Daniel Ramos's DNA

17   from the stains, the layout of the apartment from

18   Crystal, the apology from Daniel Ramos, the statement

19   given to Detective Baran.

20             With regards to this note, upon their return

21   from lunch, we will provide them with the physical

22   exhibits so they will get the forensic report related

23   to -- the forensic report from the DNA.  They'll get

24   the entire reports.  We'll give them the apology letter

25   and give them the statement that was given to Detective

1   Baran.   Those will be handed to them immediately over
2   the lunch break, while you are looking for the other
3   testimony they already sought.   Please look for the
4   testimony that deals with the layout of the apartment,
5   as testified to by Crystal, if that exists.   And I will
6   advise them that they are -- that the 911 call itself,
7   and/or any transcript of the call are not part of the
8   evidence and --
9                MR. BERGER:   They are.
10               THE COURT:   Listen to what they asked for.
11   They want to hear the 911 call.   That's not in
12   evidence.
13               MR. BERGER:   I understand.
14               THE COURT:   They want a transcript of the 911
15   call.   That is not in evidence.
16               MR. BERGER:   Judge, what I did hear, which I
17   think they're asking for, I asked her after she came,
18   after we played the 911 call for her, then I asked her,
19   did you say the following in the 911, and she answered
20   it.
21               THE COURT:   If they're looking for testimony,
22   they'll write another note seeking testimony.   This
23   note asks for either to hear the 911 call.   It's not in
24   evidence, or to see a transcript of the call.   There's
25   no transcript of the call in evidence.   It's a very

Proceedings                    1599

1    specific note.  It will be answered that way, if they

2    want something else, they can certainly ask for it.

3                    MR. BERGER:  I ask you to ask them, are you

4    looking for any testimony with respect to Crystal

5    having made reference to the transcript of the 911

6    call.  That is what I think they're asking for.  She

7    did acknowledge that she said certain things after

8    hearing the 911 call.  That's all I'm asking you to ask

9    them, if they're looking for Crystal's reference to the

10   transcript.

11                   THE COURT:  I'm not going to ask them

12   anything.  I'll answer their questions.  They seem like

13   an intelligent group.  After I answer their questions

14   and if they seek something else, they'll write another

15   note.

16                   (Whereupon, the jury entered the courtroom.)

17                   THE CLERK:  Both sides stipulate all sworn

18   jurors are present and properly seated?

19                   MR. PERRI:  Yes, your Honor.

20                   THE CLERK:  Defense counsel?

21                   MR. BERGER:  Yes, your Honor.

22                   THE COURT:  Welcome back.  I received two

23   notes from you.  Members of the jury, give me one

24   moment.

25                   The notes read as follows:  The first note,

kmm

Proceedings                              1600

1     which we marked as Court Exhibit Number XI reads, we,

2     the jury, would like to hear the transcript of

3     Crystal's testimony, the part when she walks in the

4     kitchen and sees Danny with Mya.  Mya's testimony when

5     Crystal walked in.  Daniel's testimony when Crystal

6     walked in.

7            The second note we received from you, which

8     is marked Court Exhibit number XII reads as follows:

9     We, the jury, would like to hear the 911 call from

10    Crystal or the transcript if it was on record.  If it's

11    on record, can we see slash hear it?  Forensic report

12    that shows Daniel Ramos's DNA from the stains, layout

13    of apartment from Crystal, apology letter from Daniel

14    Ramos, statement given to Detective Baran.

15           With regards to the second note, and your

16    request for the forensic reports, and the apology

17    letter and the statement, you will receive that when

18    you come back from your lunch break.  That will be

19    brought into the deliberating room with you.

20           With regards to your request to hear the 911

21    call from Crystal or the transcript, if it was on the

22    record, another 911 call or the transcript of that call

23    is part of the evidence in this case.  We will, after

24    lunch, give you the read backs you requested related to

25    the first note and the part of the second note that

Proceedings                1601

1    asks for the layout of the apartment from Crystal.

2              Now, I'm addressing you at this point to

3    please stop deliberating over your lunch break.

4              Madam alternate, you are free to have lunch

5    with your fellow jurors because there will be no

6    deliberating over the lunch break.

7              Please remember to keep an open mind.  Do not

8    discuss the case amongst yourselves or with anyone

9    else.  Don't permit anyone to discuss the case in your

10   presence.  Do not talk to the lawyers, witnesses or the

11   defendant about anything.

12             During this lunch break, don't get in your

13   cars and go visit the place where the alleged crime was

14   committed or any other place involved in the case.  And

15   don't get on your phones to try to research or review

16   anything about this case over your lunch break.  You

17   are no longer deliberating at this time.

18             Enjoy your lunch.  Come back at 2:15.  When

19   all twelve of you are back in the room, you may start

20   deliberating.  Again, you do not have to wait for me to

21   tell you that, but all twelve of you must be present,

22   and we will call you into the courtroom as soon as we

23   have everything ready for you with regards to your

24   requests.  Enjoy your lunch.

25             (Whereupon, the jury exited the courtroom.)

Proceedings                    1602

1            MR. BERGER:  If you read the note again, you

2       see it says, see or hear the transcript.  What they're

3       saying to you, that while there is no written

4       transcript for you to give them, there's never a

5       written transcript for you to give to the jury.  That's

6       clear.  It uses the word hear.  They want to hear what

7       it was Crystal said when I questioned her about what

8       she had said on the 911 call.

9            Now, you can say they are a smart jury.  The

10      jury gets confused.  They don't remember all of the

11      testimony as clearly as counsel does.  All I'm asking

12      you to do is, do you mean when you say hear, that you

13      want to hear the testimony given by Crystal with

14      respect to what she said on the 911 call?  That would

15      clear this up.  To me they say see and hear.  If you

16      can't let them see the transcript, which we understand

17      they want to hear what the transcript -- what she said

18      -- she said on the 911 call.

19            THE COURT:  So your request is noted for the

20      record.  I understand what you are asking.  I'm not

21      going to ask this jury any questions.  If there is

22      something else they want from the Court, they will put

23      it in a note and let us know.  See you at 2:15.

24            MR. BERGER:  It gives the impression that it

25      doesn't exist.  It does.

                                                        kmm

1    THE COURT:  All I'm saying to you, it's not

2    this Court's job to ask questions that puts ideas or

3    thoughts into their head because then every time I get

4    a note, depending on who it helps or doesn't help, I

5    could start making colloquy with them.  The way this

6    Court will handle this, is the way I handle it on every

7    other case, whether I've been sitting here or been an

8    attorney in this county.  The questions in the note are

9    answered as they are asked.  If there is something else

10   the jury wants, they will write another note.

11       MR. BERGER:  I'm saying my experience has

12   been the judges ask the jury what they mean, what they

13   want.

14       THE COURT:  Your position is noted for the

15   record.  I appreciate that and I will see you all at

16   2:15.

17       (Whereupon, a luncheon recess was taken.)

18              *              *              *

19

20

21

22

23

24

25

1604

1           A F T E R N O O N    S E S S I O N

2

3

4               THE CLERK:  Case on trial continued, People

5       of the State of New York vs. Daniel Ramos.

6               All parties are present.  The jury is not

7       present at this time.

8               Are the People ready?

9               MR. PERRI:  Yes, your Honor.

10              THE CLERK:  Defense counsel ready?

11              MR. BERGER:  Yes, your Honor.

12              THE COURT:  Did you all have an opportunity

13      to go over the read back material to respond to the two

14      notes, People?

15              MR. PERRI:  Yes, your Honor.

16              THE COURT:  Mr. Berger?

17              MR. BERGER:  The first note, just the first

18      note.

19              THE COURT:  The second note asked for

20      testimony related to the layout of the apartment.

21              MR. BERGER:  Yes, we went over that.

22              THE COURT:  Any disagreement as to what is

23      going to be read back by the reporter?

24              MR. PERRI:  No, your Honor.

25              MR. BERGER:  Not what is going to be read

Proceedings                    1605

1    back, but I already read on the record my -- I'm asking

2    the Court to give the jury what they want and to send

3    them a question asking them, because normally we want

4    to accommodate the jurors.  Ask them, do you mean this,

5    or do you mean that?  I'm not saying you are putting

6    words in their mouths.  Do you want Crystal's testimony

7    as to what she said in the 911?  It's clearly in the

8    record.  I remember that clearly.  All I'm saying,

9    because again, can we see it because you can't, because

10   it's not a transcript.  Can you hear it?  They did

11   throw the word hear in there.  Do you want Crystal,

12   what she said to the 911 operator.  That's all I'm

13   asking you to ask them.

14              THE COURT:  I appreciate your request and

15   understand your question, and I'm not going to do that.

16   I'm not going to ask the jurors any questions.  I'm not

17   going to ask them to explain their notes.  I answered

18   that question, and if they have follow-up questions,

19   they'll let the Court know.

20              (Whereupon, the jury entered the courtroom.)

21              THE CLERK:  Do both sides stipulate all sworn

22   jurors are present and seated properly here?

23              MR. PERRI:  Yes, your Honor.

24              MR. BERGER:  Yes, your Honor.

25              THE COURT:  Welcome back.  I hope you enjoyed

Proceedings                1606

1    your lunch.  We're now going to have the read backs you

2    requested.

3              (Whereupon, the record was read back.)

4              THE COURT:  All right, ladies and gentlemen,

5    all twelve jurors can go back and resume deliberations.

6              Alternate number one will go into the

7    separate room.  Thank you.

8              (Whereupon, the jury exited the courtroom and

9    deliberations resumed.)

10             THE CLERK:  Case on trial continued,

11   Indictment Number 742N of 2014, People of the State of

12   New York vs. Daniel Ramos.

13             Let the record reflect all parties are

14   present.  The jury is not present at this time.

15             Are the People ready?

16             MR. PERRI:  Yes, your Honor.

17             THE CLERK:  Defense counsel ready?

18             MR. BERGER:  Yes, your Honor.

19             THE COURT:  We received another note from the

20   jury.  We marked it Court Exhibit XIII.  It reads as

21   follows:  We, the jury, would like to see the rights

22   card.  Sincere's testimony read back, and at what point

23   did he break down and cry.  Detective Boccio's

24   conversation with Daniel Ramos referring to, quote, I

25   licked her once in the bedroom, close quote.  We just

                                                        kmm

Proceedings                1607

1    want to verify the statement.

2              It is now twenty after four.  I've been

3    letting the jury leave by 4:30 each day.  We will call

4    the jury in at this time.  I will read the note into

5    the record again in their presence.  We already sent

6    the rights card to them, so they have that.  I would

7    advise them that tomorrow morning, as soon as they are

8    all gathered, we will read back Sincere's testimony and

9    indicate to them at what point he broke down and cried.

10   We'll have to look at the record, but I believe the

11   only way that would be indicated is when the Court

12   said, let's take a break.

13             MR. PERRI:  Your Honor, I have a copy of the

14   transcript, and actually, Mr. Berger asked on page 145,

15   let the record reflect the witness is hanging his head

16   down.  He seems upset.  The Court says, yes.  The

17   record should reflect the witness is crying.

18             THE COURT:  We'll read all of his testimony

19   and normally we wouldn't read colloquy like that.  We

20   will read those couple of sentences, and we will also

21   get Detective Boccio's testimony between now and

22   tomorrow morning related to the statement of Mr. Ramos.

23   I'll let them go for tonight and bring them in.  I will

24   tell them to be back here at 10:00 a.m. tomorrow.  I

25   ask the attorneys to be here at 9:45 so you can go

Proceedings                    1608

1    through with regard to Detective Boccio, whatever needs

2    to be gone through.  It appears they are asking for all

3    of Sincere's testimony, based on the way this is

4    written.  I will advise them we will read his entire

5    testimony tomorrow morning, and then if that's wrong,

6    based on how they had written this note, they will let

7    us know.

8                    MR. PERRI:  Yes, your Honor.

9                    MR. BERGER:  Yes, your Honor.

10                   (Whereupon, the jury entered the courtroom.)

11                   THE CLERK:  Do both sides stipulate all sworn

12   jurors are present, People?

13                   MR. PERRI:  Yes, your Honor.

14                   THE CLERK:  Defense counsel?

15                   MR. BERGER:  Yes, your Honor.

16                   THE COURT:  Good afternoon.  We received your

17   note, which we marked as Court Exhibit XIII, which

18   reads as follows:  We, the jury, would like to see the

19   rights card.  Sincere's testimony read back.  And at

20   what point did he break down and cry.  Detective

21   Boccio's conversation with Daniel Ramos referring to

22   quote, I licked her once in the bedroom, close quote.

23   We just want to verify the statement.

24                   We are going to get to this note more than

25   likely tomorrow morning, given the hour of the day.

1       Now, it's 4:25 in the afternoon.  It is my

2       understanding we have already sent in the rights card.

3       That will be available to you again tomorrow when you

4       get here and resume your deliberations.  Once everyone

5       is gathered up tomorrow morning, we will then bring you

6       into the courtroom and read back to you Sincere's

7       entire testimony, and we will indicate to you at what

8       point he broke down and cried, and then we will also

9       read back to you Detective Boccio's interaction with

10      Daniel Ramos referring to the statement that you put in

11      your note.

12              I'm going to ask that you all be back here

13      tomorrow morning at 10:00 a.m.  Remember, once all

14      twelve of you are in the room and the door is closed,

15      you can resume your deliberations.  Please do not

16      deliberate until all twelve of you are present in the

17      room.

18              To my alternate, please also be here at 10:00

19      a.m.  You will go to the place where the officers

20      instruct you to go.  At this point I'm asking you to --

21      I'm asking you and telling you that you must stop your

22      deliberations.  You are being sent home for the

23      evening.

24              Please remember to keep an open mind through

25      the overnight.  Do not discuss the case amongst

1      yourselves or with anyone else.  Do not permit anyone

2      to discuss the case in your presence.  Do not talk to

3      the lawyers, witnesses, or the defendant about anything

4      during this overnight break.

5               Do not visit or view the place where the

6      charged crime was allegedly committed or any other

7      place involved in this case, and if there is any news

8      coverage of the case, do not read, view, or listen to

9      any accounts or discussions of the case reported by the

10     news media.  And do not attempt to research any fact,

11     issue, or law related to this case, whether by

12     discussion with others, by research in the library, the

13     Internet, or by any other means or source.

14               Have a great evening.  We'll see you tomorrow

15     at 10:00 a.m. sharp.  Thank you.

16               (Whereupon, the jury exited the courtroom.)

17               THE COURT:  If the attorneys can be here at

18     9:45 in the morning so you can go through the testimony

19     with the reporter.

20               MR. PERRI:  Yes, your Honor.

21               MR. BERGER:  Yes.

22               (Whereupon, the trial was adjourned to May

23     28, 2015.)

24               *                    *            *

25

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF NASSAU : CRIMINAL TERM PART 43

3   -------------------------------------------X
    THE PEOPLE OF THE STATE OF NEW YORK,     :   Indictment
4                                            :   No. 742N/14
              -against-                      :
5                                            :
    DANIEL RAMOS,                            :
6                                            :
                       Defendant.            :
7   -------------------------------------------X

8                           May 28, 2015
                            262 Old Country Road
9                           Mineola, New York

10
    B E F O R E:
11
        HONORABLE TERESA K. CORRIGAN,
12                Acting Supreme Court Justice

13
    A P P E A R A N C E S:
14
    (As Previously Noted)
15

16              *      *      *      *      *

17

18

19              THE CLERK:   Case on trial continued,

20   Indictment Number 742N of 2014, People of the State of

21   New York vs. Daniel Ramos.

22              Let the record reflect all parties are

23   present, the jury is not present at this time.

24              Carmen Knight is the Spanish interpreter.

25              People, ready to proceed?

Proceedings                    1612

1          MR. PERRI:  Yes, your Honor.

2          THE CLERK:  Defense counsel?

3          MR. BERGER:  Yes, I have an application,

4     though.  Madam clerk, may I have the exhibit.

5          I'm going to be making a motion for a

6     mistrial.  I will explain my reasons on the record,

7     more specifically, to the reasons as it applies to my

8     new application.

9          What I want to put on the record is the

10    following:  Your Honor, is aware of the fact I have,

11    during the trial made a number of motions for a

12    mistrial.  I have disputed the Court's rulings.  It has

13    become clear on the basis of the rules, in my opinion,

14    the Court has exhibited a bias towards the prosecution

15    and against the defense.  Maybe it's because you were a

16    career prosecutor.  I don't know.  The reasons are

17    unimportant.  I looked at the rulings and from my

18    perspective, that's what has become evidence to me

19    here.

20         During my summation I was interrupted many

21    times by the prosecutor.  In fact, probably more than I

22    can recall.  If you take a look at my summation, you

23    will see that every inference I asked the jury to draw,

24    was based upon actual evidence that was produced here

25    at this trial.  For example, I started to say that

Proceedings                    1613

1     Dr. Reich was asked by law enforcement to lecture to

2     them about DNA and DNA testing.  Mr. Perri objected.

3     You sustained the objection.  I'm not quite sure why

4     that was objectionable.  It was a fact in evidence.

5     Dr. Reich testified that he was hired by law

6     enforcement, but for whatever reason, Mr. Perri

7     objected and you sustained it.  I'm not exactly sure

8     why.

9            And then when Mr. Perri made a big deal about

10    the electropherographs that were mistakenly put into

11    the documentation, given to the defense, and I tried to

12    draw an analogy to why it was unfair and why the

13    prosecution was being hypocritical in examining

14    Dr. Reich, for an error they created, and I tried to

15    draw an analogy, Mr. Perri objected, and you sustained

16    it.  You can't -- I mean, defense lawyers have the

17    right to be creative.  I wasn't making up facts, I was

18    drawing an analogy which obviously wasn't in evidence,

19    and the fact is, that you simply, in that regard,

20    sustained the objection.  Yes, you would tell the jury

21    what the juries remembers is their business, but you

22    sustained it when I objected to Mr. Perri's comments,

23    you overruled them, but told the jury it's their

24    recollection that counts.

25            Mr. Perri, in one of his references to the

kmm

1    jury, stated that Boccio's statements, that he says he

2    heard from the defendant about, I licked her once in

3    the bedroom and arrest me.  She said, I raped her

4    daughter.  That's not in evidence.  Mr. Perri made

5    reference to something that wasn't in evidence, because

6    he wanted to show that was in the arrest reports, but

7    it's not in evidence.  And yet, not only did you not

8    sustain my objection, you overruled and told the jury

9    they could consider what they have to consider when

10   testimony comes to the evidence in the case.

11            Now, Judge, the specifics about my particular

12   application in this case, and it troubles me because I

13   cannot understand the Court's ruling.  The Court would

14   note in exhibit -- Court Exhibit number XII, we, the

15   jury, would like to hear the 911 call from Crystal.

16            I'm going to deal with that part first.

17   That's the first part of the sentence.  The only thing

18   that that could mean is they want to hear what Crystal

19   said to the 911 operator.  Very simple, or they say, go

20   on, or the transcript, if it was on record.

21            Now, I'm not exactly sure what that means,

22   the transcript.  They can't get a transcript, and then

23   they go on, if it's on the record, can we see it or

24   hear it?  So, when they're asking for the transcript,

25   they think it's something already been prepared and

Proceedings                1615

1    they want to take it with them into the jury room, the

2    deliberation room, which they can't do.  I understand

3    that, or hear it.  The phrase here, what they are

4    really saying to the Court in this note is, we want to

5    know what Crystal Ramirez said to the 911 operator.

6              Now, your Honor knows that is in evidence in

7    this case, because after she heard the 911 tape, I then

8    proceeded to ask her questions about what she said and

9    she answered them.  So, that is in the record.  This is

10   what the jury wants to hear, but you said in your

11   ruling, the jury is smart.  I'm not going to give them

12   what they haven't asked for, and my answer to that was,

13   the jury is not so smart.  None of them sat in a

14   criminal case before.  They're not sophisticated in the

15   ways of the system.  It's up to the Court to interpret

16   and see what it is they want.  For you to say, I'm not

17   going to give them what -- I don't know what they want,

18   I suggest is not supported by the facts in the case.

19             Now, you did say yesterday that when you were

20   a prosecutor, this is how I did it.  When I was a

21   judge, I think for the five cases you have been on

22   trial, this is how you did it.  If that means that the

23   prosecutor has urged the Court in the past cases in

24   which you were a trial attorney to say, don't give them

25   what you think they want, make sure they verbalize it

Proceedings                    1616

1    exactly, specifically, well, Judge, what would you have

2    wanted this jury to write to you?  Would it have been

3    sufficient if they said we want to hear Mr. Berger's

4    questions of Crystal Ramirez on what she said to the

5    911 operator?

6              Now, they think from what you ruled when you

7    said the 911 tape is not in evidence, then it's not in

8    evidence.  They shouldn't -- how specific do they have

9    to get?  Don't you think that, and your statement

10   yesterday, Judge, I'm not going to consider whether or

11   not it helps one side or the other as to what their

12   questions are.  That's irrelevant.  The Court shouldn't

13   be thinking in terms of who it is helping and who it is

14   not helping.  The only issue the Court should be

15   thinking about is, what do they want.  Can I give it to

16   them?  Is it in evidence?  Period.  We know what they

17   want.  The Court surely must know.  You must know that

18   what they want is what Crystal Ramirez said to the 911

19   operator.  There is no other interpretation from the

20   question as set forth in Court Exhibit Number XII,

21   none.

22             Now, do you remember, Judge, when you were

23   part of the voir dire process, you told every single

24   prospective juror how important it was for them to keep

25   an open mind.  You used your husband as an example.  He

Proceedings                    1617

1       was the one who didn't exhibit that quality, that he

2       says, it's my way or the highway, is the way I think

3       you put it, and that we don't need jurors who don't

4       keep an open mind.

5              Judge, we also need judges who do the same,

6       and prosecutors, and defense lawyers who do the same

7       because justice is not defined by whether or not a

8       guilty person is convicted or an innocent person is

9       acquited.  That's not justice.

10             Justice is twelve fair-minded jurors with a

11      fair-minded judge, with an ethical prosecutor, an

12      ethical defense lawyer doing the best they can under

13      the rules of our law and whatever happens, if it comes

14      under that fair process, that's justice.  Even if it's

15      factually wrong in the conclusion that they come to,

16      Judge, I'm asking you to exhibit the same quality or

17      the opposite of the quality that you said was not

18      acceptable by your husband and take a look at this and

19      ask yourself, what is it the jury is looking for?  We

20      know what they're looking for.  We know there can be no

21      other interpretation, and for you to ask it, to

22      verbalize it in some specific way so you clearly know

23      it is not taking a look at this exhibit in an open

24      minded way because we know what the jury was looking

25      for.  And I'm asking you to have that part of the

kmm

1    transcript read back to them and honor the request that

2    they made, because I saw after you made that ruling,

3    it's not in evidence, some jurors looked at the other

4    jurors to say, you see, whatever it was.  I have no

5    idea what they were thinking.  It was important to that

6    juror, or those jurors to know what it was.  Why would

7    we not give it to them?  Is there any other rational

8    explanation for what these jurors wanted?  We know it's

9    there.  We know it's in evidence.  I'm asking you to

10   reconsider your failure, and to reconsider.  I'm asking

11   because this is the most sacrosanct part of the trial.

12   We go out of our way to make sure the jurors are not

13   tainted one way or the other, to fail them.  Whether

14   you think it's important, or I think it's important, or

15   Mr. Perri thinks it is important, is irrelevant.

16   Failure to give them what they think is important seems

17   to me to be the basis for a mistrial.  I'm asking you

18   to reconsider and get the jury -- let the jury get that

19   part of the testimony that we know is in evidence.

20             THE COURT:  Thank you.

21             MR. PERRI:  Very briefly, with respect to

22   defense counsel's application, the People oppose.

23   There is no basis for a mistrial.  Specifically, the

24   request to have the testimony read back to the jury,

25   they have not requested it be read back.  The People

Proceedings                1619

1      oppose that as well.  There is no ambiguity in the

2      jury's question.  We, the jury, would like to hear the

3      911 call.  That is not possible.  It is not in

4      evidence, from Crystal, or the transcript of it.  That

5      is not in evidence and not possible.  If it's on the

6      record, can we see it or hear it?  They just asked for

7      a transcript or the actual recording.  That's,

8      obviously, what the sentence is referring to, the

9      hearing, the recording, or seeing the transcript.  They

10     have, in various other requests of this Court,

11     specified that they wanted testimony.  They did not do

12     that in this request.  There is no ambiguity.  There is

13     no need for the Court to make any interpretation if

14     there was ambiguity.  If the Court would ask additional

15     questions, but as the question is clear, the jury

16     received answers from the Court.  They are free to send

17     follow-up notes, and there are no grounds for a

18     mistrial, your Honor.

19              THE COURT:  Thank you.  The Court considered

20     the application of the defense and response of the

21     People.  The application for the Court to read the

22     testimony related to the 911 call is denied.  The

23     request for a mistrial is likewise denied.

24              Are we ready to do the read backs for the

25     jury?

Proceedings                    1620

1           MR. PERRI:  Yes, your Honor.

2           MR. BERGER:  Yes, your Honor.

3           THE COURT:  Bring in the jury, please.

4           (Whereupon, the jury entered the courtroom.)

5           THE CLERK:  Do both sides stipulate all sworn

6  jurors are present, People?

7           MR. PERRI:  Yes, your Honor.

8           MR. BERGER:  Yes, your Honor.

9           THE COURT:  Good morning, everyone.  Welcome

10  back.  At the close of business yesterday, you all sent

11  in a note.  We marked it as Court Exhibit XIII.  I read

12  it into the record yesterday.  Let me do it again this

13  morning so you know what you are about to hear from the

14  court reporter.

15           You sent in a note, we, the jury, would like

16  to see the rights card that has already been provided

17  to you.  Then you stated Sincere's testimony read back,

18  and at what time did he break down and cry.  The court

19  reporter will handle that shortly.

20           Additionally, you asked for Detective

21  Boccio's conversation with Daniel Ramos, referring to,

22  quote, I licked her once in the bedroom.  You state, we

23  just want to verify the statement.

24           We'll now handle those two questions.

25           (Whereupon, the record was read back.)

Proceedings                    1621

1           THE COURT:  That concludes the read back for

2     this note.  If there is anything additional you need

3     from us, let us know.  Continue your deliberations.

4                (Whereupon, the jury exited the courtroom.)

5           THE CLERK:  Case on trial continued,

6     Indictment 742N of 2014, People of the State of New

7     York vs. Daniel Ramos.

8                Let the record reflect all parties are

9     present.  The jury is not present at this time.

10                Are the People ready?

11           MR. PERRI:  Yes, your Honor.

12           THE CLERK:  Defense counsel ready?

13           MR. BERGER:  Yes, your Honor.

14           THE COURT:  We received a note from the jury.

15     It's been marked Court Exhibit XIV.  It reads as

16     follows:  We, the jury, one, would like to hear the

17     evidence from Mr. Chillseyzn and Dr. Reich regarding

18     the vulva swab, specifically, related to saliva found.

19                Two, Dr. Reich's comment on wiping after

20     urinating and possibly wiping away DNA.

21                Three, please clarify whether saliva testing

22     identifies DNA.

23                Four, please go over the definition of

24     reasonable doubt.

25                Five, please reread the definition of

Proceedings                    1622

1      endangering the welfare of a child.

2              We'll call them in now and send them out to

3      lunch.  With regards to the first three requests, we

4      will answer that via read back.

5              With regards to the request for the

6      definition of reasonable doubt and the definition of

7      endangering the welfare of a child, I'll read that from

8      the charge.

9              People, did you see the note?

10             MR. PERRI:  Yes, your Honor.

11             MR. BERGER:  Yes, I did.

12             THE COURT:  All right.  Let's bring in the

13     jury.

14             (Whereupon, the jury entered the courtroom.)

15             THE CLERK:  Do both sides stipulate all sworn

16     jurors are present, People?

17             MR. PERRI:  Yes, your Honor.

18             THE CLERK:  Defense counsel?

19             MR. BERGER:  Yes, your Honor.

20             THE COURT:  Good afternoon, everyone.  We

21     received a note from you that we marked as Court

22     Exhibit XIV.

23             It reads as follows:  We, the jury, one,

24     would like to hear the evidence from Mr. Chillseyzn and

25     Dr. Reich regarding the vulva swab.  Specifically,

Proceedings                    1623

1    related to saliva found.

2              Two, Dr. Reich's comment on wiping after

3    urinating and possibly wiping away DNA.

4              Three, please clarify whether saliva testing

5    identifies DNA.

6              Four, please go over the definition of

7    reasonable doubt.

8              Five, please reread the definition of

9    endangering the welfare of a child.

10             It's approximately twenty to one.  At this

11   time, I'm going to send you all for your lunch break.

12   When you come back from lunch, we will have read backs

13   for you on each question that you have put forth to the

14   Court.

15             Between now and then, let me give you those

16   admonitions I know you all know so well.  Please

17   remember to keep an open mind.  Do not discuss the case

18   amongst yourselves, or with anyone else during this

19   break.  Do not permit anyone to discuss the case in

20   your presence.  Do not talk to the lawyers, witnesses,

21   or the defendant about anything during this break.

22             Do not visit or view the place where the

23   charged crime was allegedly committed, or any other

24   place involved in the case.  If there is any news

25   coverage of the case, ignore it and don't get on your

kmm

Proceedings                    1624

1      phones and attempt to research the case.  Have a great

2      lunch.  I'm ordering you at this time to stop

3      deliberating.  Do not discuss this case any further

4      until my twelve jurors are back in the jury room after

5      lunch with the door closed.  Please try to get back

6      around 2:00.  If you can continue your deliberations

7      without the information in the note, please do so.

8      Otherwise, wait for us to call you into the room here

9      and we will start the read backs.

10               To my alternate, you are allowed, of course,

11     to be with your fellow jurors with lunch, but no

12     discussion of the case and you will be back around

13     2:00.

14               (Whereupon, the jury exited the courtroom.)

15               THE COURT:  The attorneys should go through

16     together with the reporter at whatever is a convenient

17     time for all of you so you can see what you believe

18     should be read back.  Any disagreement with regards to

19     that, it will be brought to my attention, and we will

20     make a decision after it's brought to my attention.

21               See you all around 2:00 or soon thereafter,

22     as you are both ready.

23               (Whereupon, a luncheon recess was taken.)

24               *                 *                 *

25

kmm

Proceedings                  1625

1                A F T E R N O O N   S E S S I O N

2

3

4              THE CLERK:  Case on trial continued,

5    Indictment Number 742N of 2014, People of the State of

6    New York vs. Daniel Ramos.

7              All parties are present.  The jury is not

8    present at this time.

9              Are the People ready?

10             MR. PERRI:  Yes, your Honor.

11             THE CLERK:  Defense counsel ready?

12             MR. BERGER:  Yes.

13             THE COURT:  With regards to Court Exhibit

14   XIV, which is the note we received right before lunch,

15   have both parties reached an agreement on the read

16   backs related to the first three questions?

17             MR. PERRI:  No, your Honor.

18             THE COURT:  What is your opinion?

19             MR. PERRI:  The section in connection with

20   defense counsel requesting the -- related to the touch

21   DNA be included in relation to whether or not the third

22   question be whether or not there was saliva testing.

23             THE COURT:  It says clarify whether saliva

24   testing identifies DNA.

25             MR. PERRI:  The People oppose that.  There's

kmm

1       not an explanation of touch DNA, which is a separate
2       concept.  Defense counsel discussed and differentiated
3       that.  The People would oppose that being read back,
4       your Honor.

5                   MR. BERGER:  I'm asking for ten lines to be
6       included after the last portion that we agreed upon
7       everything, except the ten lines.

8                   THE COURT:  The Court --

9                   MR. BERGER:  See if you take a look at the
10      first two questions, it's clear and Mr. Perri and I
11      read the transcript with respect to Mr. Chillseyzn and
12      Dr. Reich.  It is clear from their testimony that you
13      could get DNA from saliva.  What I am reading into this
14      question, and I think it has to be taken broadly since
15      they have gotten the answer to the question, the answer
16      to the first two requests is that all I wanted them --
17      because the saliva deals with stains 1-A1 and 1-A2.  In
18      that our position is that the defendant's DNA is there
19      from the touch DNA.  That's all I'm asking that to be
20      read, so they just don't -- because a literal reading
21      of the third question is not asking for anything they
22      don't -- wouldn't already get from the first two.  All
23      I'm saying, I don't think it is contested factually.
24      Read it, the touch DNA can be transferred to the stains
25      1-A1 and 1-A2 simply having touched an item, or in this

Proceedings                    1627

1   case, the underwear.  I don't think it means -- if

2   anything, it clarifies things.  They understand the

3   stains are not just saliva, but that the stains contain

4   DNA, and since we already know there is no tests to

5   separate the source of DNA on the station, that

6   Mr. Chillseyzn and Dr. Reich have conceded, all I'm

7   saying is this is a complete picture to point out the

8   touch DNA can be in the saliva taken, and that's what I

9   think they're asking for when asked for the third

10  question.

11          The question is:  It reads on this note,

12  please clarify whether the saliva testing identifies

13  DNA has nothing to do with touch DNA.  That section

14  will not be read.

15          THE COURT:  We have since received a second

16  note while everyone was working on the last note.  This

17  is Court Exhibit XV.  It states:  We, the jury, would

18  like to hear from Daniel, when Daniel walked into the

19  house and went to the bathroom.

20          Have you both agreed on the read back for

21  that?

22          MR. PERRI:  Yes, your Honor.

23          MR. BERGER:  Yes.

24          THE COURT:  The second part of that, can we

25  see the nurse's report.  I believe, we have medical

Proceedings                    1628

1    reports.

2              MR. PERRI:  Nurse, the SANE nurse examination

3    report from Nurse McAllister are the medical records in

4    evidence.  That was today.

5              THE COURT:  It would be my intention to send

6    back that item which is medical records.  I'm not sure

7    what the exhibit number is.  I'll tell you in one

8    minute.

9              It would be Court Exhibit -- People's Exhibit

10   3.  It will be sent back after read backs.

11   Additionally, after the court reporter finishes her

12   complete read back, I'll then read to the jury

13   reasonable doubt, and I'll read endangering the welfare

14   of a child.

15             MR. PERRI:  Yes.

16             MR. BERGER:  Yes.

17             (Whereupon, the jury entered the courtroom.)

18             THE CLERK:  Do both sides stipulate all sworn

19   jurors are present, People?

20             MR. PERRI:  Yes.

21             THE CLERK:  Defense.

22             MR. BERGER:  Yes.

23             THE COURT:  I hope you enjoyed your lunch.

24   While we were working on answering your note that we

25   received before lunch, we did receive another note from

kmm

Proceedings                    1629

1    you that has been marked Court Exhibit XV.  It reads as

2    follows:  We, the jury, would like to hear from Daniel

3    when Daniel walked into the house and went to the

4    bathroom.  It then says, can we see the nurse's report?

5    At the end of all of the read backs in court, we'll

6    send that report back to you into the jury room.

7         At this time we're going to handle both

8    notes, Court Exhibit XIV and Court Exhibit XV.  Court

9    Exhibit XIV, we will give you that.  You requested

10   Mr. Chillseyzn and Dr. Reich.  I will also then give

11   you the definition of reasonable doubt and will reread

12   endangering the welfare of a child.

13         (Whereupon, the record was read back.)

14         THE COURT:  What does it mean when the law

15   requires proof of guilt beyond a reasonable doubt.  The

16   law uses the term proof beyond a reasonable doubt to

17   tell you how convincing the evidence of guilt must be

18   to permit a verdict of guilty.  The law recognizes in

19   dealing with human affairs there are very few things in

20   this world that we know with absolute certainty.

21         Therefore, the law does not require the

22   People to prove the defendant guilty beyond all

23   possible doubt.  On the other hand, it is not

24   sufficient to prove that the defendant is probably

25   guilty.

Proceedings                1630

1        In a criminal case, the proof of guilt must

2   be stronger than that.   It must be beyond a reasonable

3   doubt.   A reasonable doubt is an honest doubt of the

4   defendant's guilt for which a reason exists based upon

5   the nature and quality of the evidence.   It is an

6   actual doubt, not an imaginary doubt.   It is a doubt

7   that a reasonable person, acting in a matter of this

8   importance, would be likely to entertain because of the

9   evidence that was presented or because of the lack of

10  convincing evidence.

11       Proof of guilt beyond a reasonable doubt is

12  proof that leaves you so firmly convinced of the

13  defendant's guilt that you have no reasonable doubt of

14  the existence of any element of the crime or of the

15  defendant's identity as the person who committed the

16  crime.

17       In determining whether or not the People have

18  proven the defendant's guilt beyond a reasonable doubt,

19  you should be guided solely by a full and fair

20  evaluation of the evidence.   After carefully evaluating

21  the evidence, each of you must decide whether or not

22  that evidence convinces you beyond a reasonable doubt

23  of the defendant's guilt.   Whatever your verdict may

24  be, it must not rest upon baseless speculations, nor

25  may it be influenced in any way by bias, prejudice,

Proceedings                    1631

1    sympathy, or by a desire to bring an end to your

2    deliberations or to avoid an unpleasant duty.

3              If you are not convinced beyond a reasonable

4    doubt that the defendant is guilty of a charged crime,

5    you must find the defendant not guilty of that crime.

6              If you are convinced beyond a reasonable

7    doubt that the defendant is guilty of a charged crime,

8    you must find the defendant guilty of that crime.

9              The second count in this case is endangering

10   the welfare of a child.

11             Under our law, a person is guilty of

12   endangering the welfare of a child when that person

13   knowingly acts in a manner likely to be injurious to

14   the physical, mental, or moral welfare of a child less

15   than 17 years old.

16             The term knowingly has its own special

17   meaning in our law.  I'll now give you the meaning of

18   that term.

19             A person knowingly acts in a manner likely to

20   be injurious to the physical, mental, moral welfare of

21   a child when that person is aware that he is acting in

22   such a manner.  Actual harm to the child need not

23   result.  The defendant must act in a manner which is

24   likely to be injurious to the physical, mental, or

25   moral welfare of a child knowing the likelihood of such

                                                        kmm

Proceedings                 1632

1    injury.  Knowing of the age of the child is not an

2    element of this crime, and it is not a defense to this

3    charge that the defendant did not know the age of the

4    child or believed the age of the child to be 17 years

5    or more.

6            In order for you to find the defendant guilty

7    of this crime, the People are required to prove from

8    all of the evidence in this case, beyond a reasonable

9    doubt, each of the following three elements:

10           One, that on or about October 16, 2013, in

11   the County of Nassau, the defendant, Daniel Ramos,

12   acted in a manner likely to be injurious to the

13   physical, mental, or moral welfare of Mya Feliciano

14   Ramirez.

15           Two, that the defendant did so knowingly.

16           And three, that Mya Feliciano Ramirez was

17   less than 17 years old.

18           Therefore, if you find that the People have

19   proven beyond a reasonable doubt each of those

20   elements, you must find the defendant guilty of the

21   crime of endangering the welfare of a child as charged

22   in the second count.

23           On other hand, if you find the People have

24   not proven beyond a reasonable doubt any one or more of

25   those elements, you must find the defendant not guilty

kmm

1    of the crime of endangering the welfare of a child as

2    charged in the second count.

3              You may resume your deliberations. Thank you

4    very much.

5              (Whereupon, the jury exited the courtroom and

6    deliberations resumed.)

7              THE CLERK:  Case on trial continued,

8    Indictment 742N of 2014, People of the State of New

9    York vs. Daniel Ramos.

10             Let the record reflect all parties are

11   present.  The jury is not present at this time.

12             People ready?

13             MR. PERRI:  Yes, your Honor.

14             THE CLERK:  Defense counsel ready?

15             MR. BERGER:  Yes, your Honor.

16             THE COURT:  It's about 4:35.  I'm going to

17   call the jury in and send them home for the night.

18   I'll ask them to gather at 9:30 tomorrow morning to

19   continue with their deliberations.

20             (Whereupon, the jury entered the courtroom.)

21             THE CLERK:  Do both sides stipulate all sworn

22   jurors are present, People?

23             MR. PERRI:  Yes, your Honor.

24             MR. BERGER:  Yes, your Honor.

25             THE COURT:  Given the hour of the day and I

Proceedings                1634

1    apologize I kept you a little longer than I intended,

2    but we're going to let you go for the night.  You are

3    now to stop all deliberations through the overnight.

4    You must keep an open mind throughout this timeframe.

5    Do not discuss the case amongst yourselves or with

6    anyone else during this break.  Do not permit anyone to

7    discuss the case in your presence.  Do not talk to the

8    lawyers, witnesses, or the defendant about anything

9    during this break, and do not visit or view the place

10   where the charged crime was allegedly committed, or any

11   other place involved in the case.

12            And if in the overnight there is any news

13   coverage of the case, do not read, view or listen to

14   any accounts or discussions of the case reported by the

15   news media.

16            And do not attempt to research any fact,

17   issue, or law related to this case, whether by

18   discussion with others, by research in the library, or

19   on the Internet, or by any other means or source.

20            I'm going to ask you to please be here

21   tomorrow morning at 9:30 to start your deliberations at

22   9:30 tomorrow morning.  Once you are all gathered in

23   the room at 9:30, please start your deliberations.  We

24   will be here for you if there is anything you need from

25   the Court.

kmm

Proceedings                    1635

1        Madam alternate, you are not to discuss this

2    case, obviously, either through the overnight.  These

3    admonitions apply to you also.  Be back at 9:30

4    tomorrow morning in a separate room where you are being

5    kept.

6            Thank you, all.  Have a great evening.

7            (Whereupon, the jury exited the courtroom.)

8            (Whereupon, the trial was adjourned to May

9    29, 2015.)

10            *                    *                    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1636

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF NASSAU : CRIMINAL TERM PART 43

 3   ------------------------------------------X
     THE PEOPLE OF THE STATE OF NEW YORK,     :   Indictment
 4                                            :   No. 742N/14
                 -against-                    :
 5                                            :
     DANIEL RAMOS,                            :
 6                                            :
                           Defendant.         :   Jury Trial
 7   ------------------------------------------X

 8                                   May 29, 2015
                                     262 Old Country Road
 9                                   Mineola, New York

10
     B E F O R E:
11
             HONORABLE TERESA K. CORRIGAN,
12                   Acting Supreme Court Justice

13
     A P P E A R A N C E S:
14
     (As Previously Noted)
15

16                *      *      *      *      *

17

18                   THE CLERK:   Remain seated, come to order.

19       Case on trial continued, Indictment Number 742N of

20       2014, People of the State of New York vs. Daniel Ramos.

21                   Let the record reflect all parties are

22       present.   The jury is not present at this time.

23                   Carmen Knight is the Spanish interpreter

24       today.

25                   Are the People ready?
```

kmm

Proceedings                    1637

1              MR. PERRI:  Yes, your Honor.

2              THE CLERK:  Defense counsel ready?

3              MR. BERGER:  Yes, your Honor.

4              THE COURT:  We received a note from the jury.

5    It's now been marked Court Exhibit XVI.  It reads the

6    following:  We, the jury, have a verdict.

7              Are we ready for the jury, People?

8              MR. PERRI:  Yes.

9              MR. BERGER:  Yes.

10             THE COURT:  Bring in the jury.

11             (Whereupon, the jury entered the courtroom.)

12             THE CLERK:  Do both sides stipulate all sworn

13   jurors are present and seated properly?

14             MR. PERRI:  Yes, your Honor.

15             MR. BERGER:  Yes, your Honor.

16             THE COURT:  Good morning, everyone.  We have

17   received your note, and it has been marked Court

18   Exhibit XVI.  It reads:  We, the jury, have a verdict.

19   Please turn your attention to the clerk of the court.

20             THE CLERK:  Under indictment number 742N of

21   2014, People of the State of New York vs. Daniel Ramos.

22             Mr. Foreman, has the jury agreed upon a

23   unanimous verdict?

24             THE FOREPERSON:  Yes.

25             THE CLERK:  Will you please rise and you may

kmm

Proceedings                    1638

1     take the verdict sheet out.

2              As to count one, criminal sexual act in the

3     first degree, what is your verdict, guilty or not

4     guilty?

5              THE FOREPERSON:  Guilty.

6              THE CLERK:  As to count two, endangering the

7     welfare of a child, what is your verdict, guilty or not

8     guilty?

9              THE FOREPERSON:  Guilty.

10             THE CLERK:  You may be seated.

11             Members of the jury, listen to your verdict

12    as it stands recorded.  You say, through your

13    foreperson, that each of you find the defendant guilty

14    of count one, criminal sexual act in the first degree,

15    and guilty of count two, endangering the welfare of a

16    child, and so say you all?

17             (Whereupon, the jury collectively responded

18    yes.)

19             THE COURT:  Would you like the jury polled?

20             MR. BERGER:  Yes, your Honor.

21             THE CLERK:  Jurors, at this time, I will

22    reread your verdict and then ask you each individually

23    if that was your verdict.

24             Members of the jury, you say that you find

25    the defendant guilty as to count one, criminal sexual

kmm

Proceedings                    1639

1    act in the first degree, and guilty of count two of

2    endangering the welfare of a child.

3              Juror number one, is that your verdict?

4              JUROR NUMBER ONE:  Yes.

5              THE CLERK:  Juror number two, is that your

6    verdict?

7              JUROR NUMBER TWO:  Yes.

8              THE CLERK:  Juror number three, is that your

9    verdict?

10             JUROR NUMBER THREE:  Yes.

11             THE CLERK:  Juror number four, is that your

12   verdict?

13             JUROR NUMBER FOUR:  Yes.

14             THE CLERK:  Juror number five, is that your

15   verdict?

16             JUROR NUMBER FIVE:  Yes.

17             THE CLERK:  Juror number six, is that your

18   verdict?

19             JUROR NUMBER SIX:  Yes.

20             THE CLERK:  Juror number seven, is that your

21   verdict?

22             JUROR NUMBER SEVEN:  Yes.

23             THE CLERK:  Juror number eight, is that your

24   verdict?

25             JUROR NUMBER EIGHT:  Yes.

1          THE CLERK:  Juror number nine, is that your

2     verdict?

3          JUROR NUMBER NINE:  Yes.

4          THE CLERK:  Juror number ten, is that your

5     verdict?

6          JUROR NUMBER TEN:  Yes.

7          THE CLERK:  Juror number eleven, is that your

8     verdict?

9          JUROR NUMBER ELEVEN:  Yes.

10          THE CLERK:  Juror number twelve, is that your

11     verdict?

12          JUROR NUMBER TWELVE:  Yes.

13          THE COURT:  Members of the jury, in a few

14     moments you will be released from jury duty.  Before

15     you go, I would like to thank you for the service you

16     have given.  You have taken on the very difficult task

17     of judging a fellow human being and done so admirably.

18     You have carried on traditions in the very heart of our

19     constitution, and, once again, proved why a trial by a

20     jury is best and the finest way to resolve a

21     controversy in a civilized manner.  You have shown

22     you're proud in becoming part of this tradition.  The

23     simple truth is, without persons like yourselves who

24     are ready, willing and able to serve on a jury, the

25     tradition could not continue.  Because of you that

Proceedings                    1641

1     tradition shall pass on to those who come after us.

2     You have done your part in keeping the right of trial

3     by jury alive.

4               I hope you have found this experience

5     rewarding, and I hope you look forward to serving on

6     another jury at some point in the future, not the near

7     future.  You have a few years before you need to worry

8     about that.  We, the Court and the lawyers are

9     extremely grateful for your service.  I thank you on

10    their behalf and myself.  You are formally discharged

11    from further jury service at this time.  That means the

12    admonitions I've been giving you, that they no longer

13    apply, and you may talk to anyone you wish to about the

14    case and go anywhere you want to go.  When you leave,

15    the lawyers may wish to talk to you.  The choice is

16    yours.  If you want to talk to them, please feel free

17    to do so.  If you do not want to talk to them, let an

18    officer know and no one will approach you.  Again,

19    thank you.  I wish each of you the very best.  Have a

20    wonderful summer.

21               (Whereupon, the jury exited the courtroom.)

22               THE COURT:  At this time, date for

23    sentencing, please.

24               MR. PERRI:  The People do have an application

25    for the defendant's custody to be changed to remand,

Proceedings                    1642

1     your Honor.

2              THE COURT:  Do you want to be heard on that

3     Mr. Berger?

4              MR. BERGER:  No, your Honor.

5              THE COURT:  The defendant will be remanded,

6     and I think we need to go four to six weeks, whatever

7     works for both sides.  Let's say the week of July 13th.

8     What works for both of you?

9              MR. BERGER:  At this point, whatever you

10    pick.

11             THE COURT:  Why don't we say Monday, July

12    13th.

13             MR. PERRI:  Yes, your Honor.

14             THE COURT:  Very good.

15

16          *              *              *

17

18         The foregoing is hereby certified to be a true and

19    accurate transcript of the proceedings as transcribed

20    from the stenographic notes.

21

22

23

24                        KAREN M. MASLER
25                        Senior Court Reporter

kmm

1643

1          I N D E X

2

3    WITNESS                Direct     Cross    Redirect    Recross
     FOR THE PEOPLE
4
     C. Ramirez             610        629
5    S. Ramirez             670        679
     P.O. Boccio            693        702      720/722     721/722
6    Mya Ramirez            764        770      807         809
     K. McAllister          821        836      844         845
7    C. Chillseyzn          846        879      883
     Det. Baran             935        971      1036/1071   1045/1072
8    Det. Pacheco           1105       1118
     J. Hanson              1376       1384     1385        1386
9

10   FOR THE DEFENDANT

11   David Ramos            1160       1163
     Stephany Ramos         1164       1171     1175
12   Christy Hernandes      1176       1180
     Dr. Reich              1189       1231     1257        1265
13   Daniel Ramos           1273       1326     1363

14

15

16          E X H I B I T S

17
     PEOPLE'S         Description              For Id.     In Ev.
18
     1                P.J. pants               625         626
19   2                underwear                625         627
     3                medical records          819         820
20   4                sex offense kit          819         829
     5                DNA file I               819         862
21   6                DNA file II              819         862
     7                buccal swab              819         875
22   8                bus co. Records          921
     9                rights card              921         950
23   10               stmt. Of Daniel Ramos    921         955
     11               apology letter           921         966
24   12               eletropherogram                      1249

25

kmm

1644

1    INDEX CONTINUED:

2

3    DEFENDANT'S        Description              For Id.    In Ev.

4    A                 photo                      744
     B                 trace doc.                1205
5    C                 YSTR doc.                            1223
     D                 YSTR doc.                            1223
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

kmm