*To be argued by:*
DORI COHEN

*Argument Time:* 15  Minutes

# New York Supreme Court

## Appellate Division : Second Department

THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

– *against* –

TO BE HEARD ON THE
ORIGINAL PAPERS

DANIEL RAMOS,

*Defendant-Appellant.*   *A.D. No.* 2015-07623
*Ind. No.* 742N/14

## BRIEF FOR DEFENDANT-APPELLANT

N. SCOTT BANKS
*Attorney for Defendant-Appellant*
*Attorney in Chief*
*Legal Aid Society of Nassau County*
*40 Main Street, 3rd Floor*
*Hempstead, NY 11550*
*(516) 560-6400*

**OF COUNSEL:**
TAMMY FEMAN
DORI COHEN

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO C.P.L.R. § 5531 . . . . . . . . . . . . . . . . . . . . . . .  1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
    Mapp/Huntley/Dunaway Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
    The People's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
    Trial Order of Dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
    The Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
    Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
    Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

    POINT ONE

    THE TRIAL COURT ERRED IN DETERMINING THAT THE
    SEVEN-YEAR-OLD COMPLAINANT WAS SWEARABLE
    AND IN NOT REVIEWING THAT DETERMINATION
    AFTER HER UNTRUSTWORTHY TESTIMONY . . . . . . . . . . . . . . . .  23

    POINT TWO

    APPELLANT'S RIGHT TO PRESENT HIS DEFENSE AND SIXTH
    AMENDMENT RIGHT TO CONFRONT THE WITNESSES
    AGAINST HIM WERE VIOLATED WHEN THE TRIAL COURT
    WOULD NOT ALLOW COMPLAINANT'S MOTHER TO BE
    RECALLED TO THE WITNESS STAND TO TESTIFY TO HER
    STATE OF MIND IN RELATION TO A PRIOR INCIDENT, AND
    WHEN THE TRIAL COURT CURTAILED HER CROSS
    EXAMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

POINT THREE

THE TRIAL COURT ERRED IN FAILING TO
MEANINGFULLY RESPOND TO A JURY NOTE AND
IN NOT ASKING THE JURY FOR FURTHER CLARIFICATION ... 35


POINT FOUR

THE TRIAL COURT'S BIAS AGAINST THE DEFENSE
THROUGHOUT THE TRIAL DEPRIVED APPELLANT
OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL AND
HIS RIGHT TO PRESENT A DEFENSE ........................ 37


POINT FIVE

THE TRIAL COURT ERRED IN ALLOWING BARAN TO
TESTIFY THAT COMPLAINANT TOLD HIM ABOUT PRIOR
INCIDENTS, WHEN THAT PRIOR CONSISTENT STATEMENT
WAS IMPROPER BOLSTERING .............................. 42


POINT SIX

THE JURY'S GUILTY VERDICTS WERE AGAINST
THE WEIGHT OF THE EVIDENCE ........................... 47


POINT SEVEN

THE SENTENCE IMPOSED ON APPELLANT WAS
UNNECESSARILY HARSH AND EXCESSIVE UNDER
THE CIRCUMSTANCES ..................................... 56

POINT EIGHT

APPELLANT'S FOURTH AMENDMENT RIGHT AGAINST
UNREASONABLE SEARCHES AND SEIZURES WAS
VIOLATED WHERE THE POLICE DID NOT HAVE
PROBABLE CAUSE TO ARREST HIM, AND HIS
FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS
WAS VIOLATED WHERE HIS WRITTEN STATEMENT
WAS INVOLUNTARY AND USED AGAINST HIM AT TRIAL  . . . .  62


CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  66


CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
-------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                              Respondent,

                    -against-                    A.D. No. 2015-07623

DANIEL RAMOS,

                              Defendant-Appellant.
-------------------------------------------------------------------x

## STATEMENT PURSUANT TO C.P.L.R. § 5531

1.      The indictment number in the court below was 742N/14.

2.      The full names of the original parties to this action were the People of the State
        of New York - Against - Daniel Ramos.

3.      This action was commenced in the Nassau County Court, State of New York.

4.      This action was commenced by the filing of Indictment number 742N/14 on
        May 19, 2014, and by the filing of Felony Complaint CR# 2013CR338372 on
        October 17, 2013.

5.      This is an appeal from a judgment of conviction rendered July 24, 2015,
        convicting appellant after a jury trial of one count each of Criminal Sexual Act
        in the First Degree (P.L. §130.50[3]) and Endangering the Welfare of a Child
        (P.L. §260.10[1]), for which he was sentenced to fifteen years of imprisonment
        on the Criminal Sexual Act conviction, and one year of imprisonment on the
        Endangering the Welfare of a Child conviction, to be served concurrently to
        the fifteen-year term, as well as a $300 surcharge, a $25 crime victims'
        assistance fee, a $50 DNA fee, a $50 SORA fee, a $1,000 supplemental crime
        victim assistance fee, and $190.44 in restitution, all fees and surcharges to be
        imposed by civil judgment.

1

6. This is an appeal from a judgment of conviction following a jury trial before the Hon. Teresa K. Corrigan rendered on July 24, 2015.

7. This appeal is on the original record pursuant to permission granted by the Court.

## PRELIMINARY STATEMENT

This is an appeal from a judgment of conviction following a Nassau County jury trial on July 24, 2015 (Corrigan, J.), convicting appellant of one count each of Criminal Sexual Act in the First Degree (P.L. §130.50[3]) and Endangering the Welfare of a Child (P.L. §260.10[1]), sentencing him to fifteen years imprisonment on the Criminal Sexual Act conviction, and one year imprisonment on the Endangering the Welfare of a Child conviction, concurrently to the fifteen-year term, as well as a $300 surcharge, $25 crime victims' assistance fee, $50 DNA fee, $50 SORA fee, $1,000 supplemental crime victim assistance fee, and $190.44 restitution, in civil judgment.

This Court granted appellant leave to appeal on the original papers and typewritten briefs, and assigned Kent Moston, now succeeded by N. Scott Banks, Attorney in Chief of the Legal Aid Society, as counsel on January 21, 2016.

There were no codefendants below.

There was no stay of judgment pending appeal.

Appellant is presently incarcerated pursuant to this judgment.

## STATEMENT OF FACTS

Mapp/Huntley/Dunaway Hearing

A Mapp/Huntley/Dunaway hearing took place on September 25, October 3 , and 7, November 20, and December 3, 2014 (H1[1]:3). The relevant facts of the hearing are recounted in Point Eight, *infra*.

The People's Case

CRYSTAL RAMIREZ lived in an apartment in Roosevelt with her two children, Sincere (age 10) and Mya (age 6), on October 16, 2013 (T[2]:609-11).

Appellant was Crystal's "children's father friend's father" and she knew him for 13-14 years (T:613,629). Crystal made an in-court identification of appellant (T:613). She was friends with appellant, who was a bus driver (T:613-15). Appellant had babysat her children "[a]bout four or five" times (T:615). Crystal did not own a car, and appellant would pick up her and the kids and drive them to run errands (T:630-32). Appellant helped her for nine months prior to the incident (T:633).

The day of the incident, Crystal was upset because her close friend had died

---

[1] Numbers in parentheses preceded by "H1" refer to the transcribed minutes of the Mapp/Huntley/Dunaway hearing held before Hon. Teresa K. Corrigan on September 25, and October 3 and 7, 2014, in Part 44 of the Supreme Court of Nassau County.

[2] Numbers in parentheses preceded by "T" refer to the transcribed minutes of the Jury Trial held before Hon. Teresa K. Corrigan on May 5-7, 11-14, 19-21 and 26-29, 2015, in Criminal Term Part 43 of the Supreme Court of Nassau County.

4

(T:615). She and appellant walked to a deli together (T:658-59). Her children were at school, and she and appellant drank liquor brought by appellant (T:616-17). She had three drinks but did not finish the last one because she called the police after she found appellant "in the kitchen with" Mya (T:617,660). Crystal and appellant were on her porch when her children came home and went into the apartment, around 2:45 p.m. (T:618).

At some point, appellant went inside and was gone for "[a]bout ten minutes" (T:619). Crystal went inside (T:619-20,658). She walked through the living room into the kitchen and saw Mya "with her pants and panties around one ankle" and appellant was standing behind her, appearing "caught, ashamed, embarrassed" (T:620-21).

Crystal asked "[w]hat the F is going on" and Mya pointed at appellant and said "he licked my coochie" (T:622,654). Crystal never saw appellant lick Mya's vagina (T:660). She grabbed Mya and went into the living room to put her clothes back on, telling appellant to "get the F out" (T:622,654). Appellant walked towards the door and said "don't believe her. She is lying" (T:622). Crystal locked the door after appellant left and called the police (T:623,647). The 911 tape was played outside of the presence of the jury, and Crystal stated she said her daughter was claiming a family friend "tried to eat her out" and her daughter stated "he ate her coochie"

5

(T:652).  To "eat" meant "putting your mouth on someone's vagina" (T:652-53).

Officers arrived, and spoke to Crystal and Mya (T:623,654-55).  Appellant was outside with the officers (T:624).  Crystal and her children were transported to the hospital, where Mya was seen by a nurse examiner (T:624).  Mya's pajama pants and panties were taken off and she was swabbed (T:625).  The pajama pants and panties were admitted into evidence (T:625-27).  Crystal spoke with Detective Baran at the hospital, outside Mya's presence, and then she and they went home (T:627-28).

There was a discussion concerning the admission into evidence of the Ramirez children therapy records (T:634-46).   The People objected as irrelevant and doctor-patient privileged (T:635).  Defense counsel argued that the People had opened the door by eliciting testimony concerning Mya's change in behavior and that counsel had information that Crystal watched pornography in front of her children, and "created a situation in which this child [Mya] cannot distinguish between reality and what she saw in the pornographic films" (T:636-37).  The court agreed to an in camera inspection (T:639-40,666).

If the court found the therapy records were relevant, defense counsel could recall Crystal to the witness stand and continue the testimony (T:640).

Crystal's son, ten-year-old SINCERE FELICIANO RAMIREZ, testified that an oath is "I swear to the truth," and if you do not tell the truth, "you would not, um,

6

be out of here as soon as possible" (T:691). Sincere was asked if he knew what an oath was and responded "I don't know" (T:691). Outside the jury's presence, defense counsel argued that Sincere did not know what an oath was and that Sincere should not have been allowed to testify, and neither should Mya (T:724-29). The court disagreed (T:725-26).

On October 16, 2013, Police Officer JOSEPH A. BOCCIO responded to 124 Park Avenue in Roosevelt at 5:21 p.m. (T:693-95,709). He encountered Crystal and Mya Ramirez, and appellant (T:695-96,705). Boccio made an in-court identification of appellant (T:696). When he asked Crystal what happened, she said, while in Mya's presence, that appellant "licked her daughter's coochie" (T:705,707,711,714-16). At the hearing, Boccio testified that Crystal had told him that she did not witness the incident (T:706). Boccio then asked Mya, in front of her mother, what happened, and she said that "he licked her coochie" (T:708). It took Mya one-and-a-half to two minutes to respond (T:710-11,715-16). Boccio did not ask Mya who did it, and she never stated the name of the person (T:710-11).

Appellant was 20 feet away from Crystal, standing in a parking lot leaning against a car (T:696,708,717). Boccio communicated with appellant in English (T:697). He identified himself as an officer and asked him "what is going on? Why am I here?" (T:697). Appellant responded, "She said, I raped her daughter [. . .] arrest

7

me" (T:698,711-12).  Boccio said, "I'm going to need a little more than that" and appellant replied, "it was stupid.  I licked her once in the bedroom" (T:698,713-14). Boccio never wrote down appellant's statements, but he told them to Detective Baran (T:711-14,720-23).

Boccio placed appellant under arrest and put him in the back of his police car (T:698).   Appellant  stayed  there  for  approximately  30  minutes  before  Boccio transported him to the Special Victims Squad at 6:28 p.m. (T:698-99).  Appellant was there for eight to nine hours (T:700,718).  Boccio took appellant to the bathroom, and gave him pizza (T:700).

MYA FELICIANO RAMIREZ was seven years old and lived with her mother Crystal and brother Sincere (T:764-65).  Maya explained, girls have a private part called a "[c]oochie" located "[b]etween your legs" (T:766).  Appellant was her "mom's friend" who would drive them places and babysit for her (T:766,772).  Mya identified appellant in court (T:766-67).

Last year, Mya was in the kitchen, wearing pajamas and underwear, when appellant "take my pants off, take my underwear off and lick my coochie" with his mouth (T:768,776).  He licked it once for approximately five seconds (T:776-78). They were both standing up and appellant bent down, without holding or touching her (T:777-79).  He did not say anything to her before he did it (T:778).  Her mother came

into the kitchen, "[g]ot mad, grabbed Danny [appellant] and kicked him out" (T:768). Appellant left the house, and her mother called the police (T:768-69). Mya heard her mother call the police (T:790-91). She did not hear her mother say "ate" her coochie to the police (T:791). Mya went in an ambulance to a hospital, and met a nurse (T:769). She took her clothes off, and the nurse "put Q-Tips in my coochie, so if I was bad or good" (T:769-70). Mya spoke to the police after she went to the hospital, and told them appellant "licked" her "coochie" without mentioning any other incidents (T:809-11).

Defense counsel showed Mya a picture of a building, where appellant used to take her and her family, and she would talk to someone named Georgina (T:774-75). Mya told Georgina, on October 21, 2013, that the incident happened five previous times, but she never told that to anyone else (T:782,785-87,799).

The remainder of Mya's testimony is discussed in Points One and Six, *infra*. Mya's certified medical records were admitted into evidence (T:820).

On October 16, 2013,  KATHLEEN MCALLISTER, a registered  sexual assault nurse examiner at Nassau County Medical Center, conducted a sexual assault exam on Mya in the pediatric emergency room (T:824). Mya stated that "Daniel licked my coochie" (T:820-23,826). Mya indicated her coochie was her "front genital area" (T:826-27). McAllister spoke with Crystal first, in the presence of Mya

(T:837). Crystal told her that "a known family friend was found" with Mya, and her "pants were down" (T:838). McAllister examined Mya's vagina and anus, and there were no findings, or injuries (T:840-41,845). McAllister would have included if Mya had ever been sexually abused prior to that date in the medical records (T:840-42). There were no notes in Mya's medical records regarding prior sexual abuse (T:841-42). The notes stated that Mya was playful, alert, talkative, follows direction, answers questions (T:843). The sexual assault evidence kit was admitted into evidence (T:827-29).

CHRISTOPHER CHILLSEYZN, an expert in forensic genetics and DNA analysis at the Nassau County Medical Examiner's Office Division of Forensic Services, received Mya's sexual offense evidence collection kit and appellant's buccal swab taken from inside his cheek (T:846,862-63). He developed a DNA profile of Mya from the swabs in her kit, which all tested negative for semen, but the vulva swab tested positive for saliva (T:868-69). The perianal swab tested negative for saliva (T:869). Male DNA was present in the vulva swab, but Chillseyzn was not able to develop a DNA profile from it (T:870-71).

Mya's underwear tested negative for semen but positive for saliva (T:872). The DNA from the underwear was from Mya and an "unknown male" (T:873,882). Further testing revealed "a mixture of at least two male individuals" (T:873,880-81).

10

Chillseyzn developed a DNA profile for appellant (T:876). Appellant could not be excluded as the source of the DNA from one of the two underwear stains, and his DNA profile was consistent with the second stain (T:876-77,882).

On October 16, 2013, Detective MAURICE BARAN responded to the hospital where he spoke with Crystal and Mya (T:938-39). Mya was not present when he spoke with Crystal (T:939). Crystal never told him that she observed any alleged sexual abuse (T:976). Baran made an in-court identification of appellant (T:937-38).

Baran told Crystal that Mya would be examined by a nurse, and then later the family would be taken to the squad in order to conduct a videotape interview with Mya, but that never occurred (T:978,1073). Baran spoke with Mya, who told him that "Danny" . . . "ate" her "coochie" (T:939-40,1010,1028-30,1038). Baran asked her if he had ever done that before, and Mya "nodded her head up and down" (T:940,976-77,1008-09,1029,1031-34,1038-39).

Baran collected a "sexual offense collection kit" and Mya's pajama bottoms from the nurse for the evidence management unit (T:940-41,943,970).

At Special Victims Squad, appellant was held handcuffed in the arrest room (T:944-45). Baran spoke English to appellant (T:947,985-86). Appellant was read his Miranda rights at 11:40 p.m. (T:948,979). Appellant told Baran he would prefer having the rights read to him in Spanish (T:948,985-86,1014-16) and Detective

11

Pacheco read the rights card to appellant in Spanish (T:948-49,987). Appellant, Baran and Pacheco all signed the rights card admitted as evidence (T:950-51,994-95).

Appellant said he "would try [to give his statement] in English" (T:951,988-91,996). Appellant stated that he was hanging out with Mya's mother and he went to the bathroom (T:952,996-97). He then "played a tickle game" with Mya and "tickled her pussy" (T:952).

Baran took down the statement for approximately 45 minutes (T:954,980,998-99). Baran's testimony at the hearing that he took the statement verbatim was incorrect (T:999-1002). It took approximately 45 minutes to take the statement (T:954,980). The written statement was admitted into evidence, and published to the jury (T:955,961-64). Appellant read the statement, at first aloud and then in an "undertone," and made corrections (T:956-57,981-82,997,1003-04). Pacheco read the statement to appellant in Spanish, for approximately 10-13 minutes (T:957-59,997-98,1002-03,1011). Baran, Pacheco and appellant all signed it (T:960-61,1044).

Baran asked appellant to write a letter to Crystal and Mya apologizing for what happened, and appellant wrote it in Spanish (T:964-65,992,1017,1024-25). The apology letter was admitted into evidence (T:965-66). Baran obtained appellant's DNA sample (T:967-69).

12

On October 16, 2013, Detective REINALDO PACHECO read appellant his rights from the rights card in Spanish at 11:40 p.m. in the Special Victims Squad (T:1108-11). Appellant wrote "Si" and signed his name three times, indicating he understood his rights and was willing to answer questions without an attorney (T:1111-12). Pacheco made an in-court identification of appellant (T:1107).

Pacheco read appellant's statement to him in Spanish and translated corrections (T:113-15,1121,1123-24,1136-38). Pacheco, Baran and appellant all signed both pages of the statement (T:1116,1138).

Trial Order of Dismissal

The court denied defense counsel's application for a trial order of dismissal (T:1144,46).

The Defense Case

DAVID RAMOS was appellant's son and a sergeant in the Marine Corps (T:1160-61). He lived with his father until he was 18, and communicated with him regularly by telephone (T:1164). Family and friends said appellant was "always so kind, he's gentle, he's fair, he's firm, and discipline-wise, and basically, he's just kind of gentle" (T:1162). David's godparents stated appellant was "always funny, caring, gentle, and a great dad" (T:1163). David never heard anything negative about appellant with children (T:1163).

13

STEPHANY FIGUEROA RAMOS, appellant's daughter-in-law, recently had a child, and was a private first class in the Army Reserve (T:1166-68,1171). She had known appellant for three to four years (T:1172). She believed that appellant was "gentle[,] kind, great with kids" and "funny" (T:1168-69). She heard from approximately seven others "how good he [appellant] was teaching the kids there [at the high school] how to play soccer, play together as a team, obedience behind the game. How to rely and trust each other" (T:1169,1173). She heard at a family dinner that appellant was a "funny guy, extremely funny, sweet person" and "[v]ery kind" (T:1170).

CHRISTY HERNANDES dated appellant's son Carlos in 2008, and had known appellant for seven years (T:1176-77,1180). She lived in appellant's house for two years, and her children spent time with appellant and his family (T:1177-79). Appellant's sister-in-law spoke of appellant's kindness and gentleness with children because she had a son who spent time with him (T:1179). Christy never heard anything negative about him with children (T:1180).

DR. KARL REICH, an expert in the field of DNA analysis (T:1196-97), examined the three pieces of evidence containing saliva — the two regions cut out from the underwear, and the vulva swabs, and determined that the physical findings did not reflect that a male licked the skin or vagina of a female (T:1200). Saliva was

14

"an extremely rich source of DNA" and it did not "take very much saliva to get a robust DNA signal" (T:1200-02). The "amount of male DNA" was "extremely small," and that was not "consistent with it being saliva" (T:1201). The vulva swabs "did not give a male DNA profile," and in Reich's experience reviewing sexual assault cases "where the assailant would have licked the victim, those swabs almost always return a robust male DNA profile," and that was not evident on the samples tested in this case (T:1201).

There was "no credible or reliable evidence of male DNA on the vulva swabs" (T:1202). Saliva was indicated, and there was "a very robust signal from the female," so "the obvious conclusion" was that the DNA came from the female (T:1202-03,1254-55). The largest contributor of the DNA on the three samples was from the female, which was to be expected (T:1203,1221,1237-38,1249-51,1264). Chillseyzn's testimony "with respect to a trace of male DNA from the vulva swab" was not contained in the summary report, indicating that the laboratory did not consider it "reliable or sufficient for reporting" (T:1203-04,1244-46). It "did not meet the test of robustness, reliability or sureness" (T:1204). Chillseyzn's conclusion was "not sufficiently justified from the results" obtained (T:1204,1211-12,1260-61).

The document containing the trace analysis of the vulva swab was admitted into evidence (T:1205). The electropherogram demonstrated that the data for the

15

trace of male DNA in the vulva swab did not reach a reportable threshold (T:1206-11). Reich's conclusion was that the saliva from the three samples came from the female (T:1212-13). Saliva was "a body fluid that is transferred easily" (T:1213). It could be transferred simply by touching yourself, or your underwear (T:1214).

With respect to the underwear stains, the vast majority of the DNA was from a female, but male DNA was detected, although it was "not the amount of male DNA" that would be "consistent with it being saliva" (T:1215-17). There was no way to know with a scientific degree of certainty that there was male saliva present (T:1217). The amount of male DNA present in the underwear stains was more consistent as coming from touching than from saliva (T1217-18). If appellant touched the underwear, and it was then put on, DNA could transfer to the vulva area (T:1264).

The dried secretions on the three samples were not saliva, so Reich concluded that there was "not a lot of saliva" on the samples (T:1218-19). DNA from saliva could be transferred by touch even after the saliva had dried (T:1220-21). One of the underwear stains contained DNA from two males, one of which was consistent with appellant, and the other was an unknown male (T:1221-23,1253-54). That sample had a sufficient amount of male DNA to be considered reportable (T:1225).

Appellant DANIEL RAMOS was an American citizen who had been in the United States since 1989 (T:1273). He obtained a commercial driver's license around

16

2000, got married between 2003 and 2005, and had two children (T:1274). As a bus driver, he would transport children to and from school, and also transport handicapped people (T:1275-76). He transported children for 12 to 13 years (T:1299).

Appellant had never been arrested before (T:1277). He spoke basic English but could "[n]ot really" read English, and was more comfortable speaking Spanish (T:1277). Prior to the incident, he lived in a house with his sister-in-law's child and Christy Hernandes' children (T:1278-79).

Crystal would occasionally go to his house with her ex-husband, who was friends with appellant's son (T:1279,1329). Crystal and her ex-husband had not lived together for approximately one year prior to the incident (T:1280). Crystal did not own a car, and she frequently called appellant to: drive her places with her children, lend her money (which she never paid back), and babysit (T:1280-81,1285,1330).

On October 16, 2013, Crystal called appellant and asked him to stop by her house; he felt tired and went home (T:1299). She called twice more, saying they could have a good time, and asked him to buy her a Long Island Iced Tea, a hero sandwich and a pack of cigarettes, which he did (T:1300,1334). When he arrived at her house, they drank and she smoked on her porch (T:1301).

The children arrived around 3:15 p.m., and Sincere went inside to do his

17

homework. Mya wanted to play with appellant, but he ignored her (T:1301). Crystal told him to get Mya, and he told Mya to do her homework (T:1301). Appellant asked Crystal to close the door because she was smoking and it could hurt the children (T:1301,1334). When Crystal told appellant to help Mya with her homework, he did (T:1301-021335-36).

Appellant went back outside to drink with Crystal (T:1302). He later went inside to use the bathroom, and found Mya clothed in a shirt but naked from the waist down, her clothes in her hand (T:1302-03). He told Mya to put on her clothes, as she tried to follow him into the bathroom (T:1303). Appellant went in the bathroom, shut the door, and when he was finished, Mya was waiting outside the bathroom (T:1303-04).

Appellant took Mya's clothes and said she needed to put them on because Crystal "was going to punish her" if she did not (T:1304). They went into the kitchen, he "sat her on the floor" and started dressing her in her panties and pajamas (T:1304-05,1337). He stood her up and her panties and pajamas were "around her knees" (T:1305). He "didn't want to touch her anymore because of her mom" so he told her to pull up her clothes, and as "she bent to bring up her little pants, her mother walked in at that time" (T:1305).

Crystal asked "what the fuck. What is going on here?" and then asked Mya if

18

appellant "was eating her coochie" to which Mya replied yes (T:1305,1343). Appellant told Crystal that he "did not do anything" and he was told to "leave the house immediately" if he did not want the police called; appellant complied because he "didn't want any troubles with her" (T:1306,1343-44). Crystal was "[s]uper angry" (T:1306). Appellant never at any time put his mouth or tongue on Mya's vagina, and never put his penis inside her anus (T:1306).

He went outside to his car (T:1306). Mya was at the window, and he asked her if Crystal was going to call the police, to which she replied "my mom, you know how she is" (T:1306,1309,1344). He asked Mya why Crystal called the police (T:1344). He stayed, waiting for Crystal to come outside so they "could fix this issue" (i.e., the "bad thoughts that she was having") but she never came (T:1309-10).

Despite Boccio's testimony, appellant never stated "arrest me, she says I raped her daughter" or "I made a mistake, I licked her once in the bedroom" when the police arrived (T:1311). Appellant was arrested and transported from the scene (T:1312).

Appellant signed the Miranda rights card because the police told him to sign it (T:1312-13,1340-41,1345). He was never read his rights from the card, and did not know what he was signing (T:1312-13,1346). He had never seen a rights card prior to the date of the incident, and did not read it on that date (T:1367). He signed the written statement because the police told him to do so (T:1313). The word "girl" was

19

corrected, but only because the police told appellant to write the correction (T:1365-66).  He initialed the document because the police told him to do so (T:1367).  He looked at the words but did not read them (T:1341,1361-62,1365).

Appellant understood some of the questions that Baran asked him in English (T:1348).  Appellant never stated to the detectives that he told Mya he was going to tickle her, that he pulled down her pants and underwear, that he "tickled her pussy" with his mouth (T:1313-14,1319).  He knew what the word "pussy" meant but he did not "use those kinds of words" (T:1314).  He told the detectives his address, who he lived with, where he worked, and his social security number, because they asked him (T:1314).

At the time he was arrested, he did not read English too well, and did not understand the written statement "too well" (T:1314-15).  The detectives never read to him that he stated he told Mya he was going to tickle her, he pulled down her pants and underwear and ticked her pussy with his mouth, nor were those statements read to him in Spanish (T:1315,1322).  He never told the detectives that Crystal asked "what are you doing" when she came into the kitchen, because she asked Mya if appellant "was eating her coochie" (T:1319).  He never told the detectives that he said to Mya that he was playing with her and Mya said no, he was "licking my pussy" (T:1320).  He never told the detectives he made a big mistake and he was very sorry

20

for what he did (T:1321). He told the detectives that he touched Mya's clothing but they did not write it down (T:1338-39).

Appellant told the police that Mya was scared of Crystal and that Mya "looked like she was very intimidated by her mother" (T:1320-21).

Baran told him to write an apology letter in Spanish "[s]aying sorry," and appellant wrote it because he was told to do so (T:1322-23,1359-60,1368). He apologized because Crystal was "super angry," he did not like to "offend people," and he was "also very scared" (T:1323,1360). The letter said he was sorry and that he never intended to do any harm to anyone (T:1361).

Appellant never touched Mya in any sexual way, never put his mouth or tongue on her vagina, and never put his penis in her anus (T:1324). It never "crossed [his] mind" to do that with Mya or any child (T:1324).[3]

## Verdict

The jury convicted appellant of one count each of Criminal Sexual Act in the First Degree (P.L. §130.50[3]) and Endangering the Welfare of a Child (P.L. §260.10[1]) (T:1638-40).

---

[3] The testimony of the People's rebuttal witness, JOSHUA HANSON, is not included because it is irrelevant to the issues raised on appeal (T:1371-87).

21

Sentence

Appellant was sentenced, on July 24, 2015, to a determinate term of fifteen years of imprisonment and ten years of post-release supervision on the criminal sexual act in the first degree conviction (P.L. §130.50[3]), and one year of imprisonment on the endangering the welfare of a child conviction (P.L. §260.10[1]), to be served concurrently, and to mandatory fines, fees, surcharges and restitution. A civil judgment was entered (S[4]:18-20). A permanent order of protection was issued against appellant and in favor of complainant (S:19-21).

The relevant portions of the sentence proceedings are recounted in Point Seven, *infra*.

---

[4] Numbers in parentheses preceded by "S" refer to the transcribed minutes of the Sentence held before Hon. Teresa K. Corrigan on July 24, 2015, in Part 43 of the Supreme Court of Nassau County.

## POINT ONE

**THE TRIAL COURT ERRED IN DETERMINING THAT THE SEVEN-YEAR-OLD COMPLAINANT WAS SWEARABLE AND IN NOT REVIEWING THAT DETERMINATION AFTER HER UNTRUSTWORTHY TESTIMONY.**

Mya, the seven-year-old complainant, did not meet the statutory standard for

giving either sworn or unsworn testimony. The trial court erred in determining that

she was swearable, and in not revisiting that determination after her contradictory and

confusing testimony. This error requires reversal of appellant's convictions and a

remand for a new trial.

C.P.L. §60.20(2) states in part:

A witness less than nine years old may not testify under oath unless the court is satisfied that he or she understands the nature of an oath. If under either of the above provisions, a witness is deemed to be ineligible to testify under oath, the witness may nevertheless be permitted to give unsworn evidence if the court is satisfied that the witness possesses sufficient intelligence and capacity to justify the reception thereof. A witness understands the nature of an oath if he or she appreciates the difference between truth and falsehood, the necessity for telling the truth, and the fact that a witness who testifies falsely may be punished.

A hearing was held to determine the swearability of Mya (T:750-62). Mya

stated that she did not know what an oath was (T:753-54). Telling the truth meant

"[y]ou raise your hand and that means you are telling the truth" about something that

happened (T:754). If she told a lie in the courtroom, she would "be taken away" but

23

that would not happen to her (T:756). Mya stated that "[y]ou have to tell the truth," and if you do not, then you lie, and if you lie, then "you get punished" (T:751). If the judge said she was wearing purple, but she was wearing black, that would be a lie (T:751). If she lies at home, she would get punished, such as a time out or toys taken away (T:752). The court can get her in trouble if she does not tell the truth when it was important to do so (T:752).

Defense counsel argued that the legislature stated that a child of nine could testify, and this child was seven (T:757,761). Her testimony showed that: she believed if you raise your hand, you tell the truth (T:755), her answers were purely rehearsed (T:759), and she was unable to discern if an incident took place, having stated to her therapist it happened more than once and to the prosecutor only once (T:760). Over defense counsel's objection, the court erroneously found Mya swearable, although "a little younger than her years developmentally" (T:757-58).

Mya's testimony was often contradictory and confusing. She swore to tell the truth, and if she lied, she would be "taken away and your mom will go to jail" (T:779). She never lied (T:780). Mya said it was not true that the incident happened five times previously (T:780,782), and subsequently said it was true, and it happened in her mother's room, with her wearing pajamas and both of them standing up and appellant bending down to lick her "coochie" (T:781,787). She claimed her mother

24

was home, on the porch, during the daytime, all five times (T:788,800-01), but also stated that it happened at night when her mother was not home (T:797). She stated that appellant took off her pants and "[p]ut his pecker in" her "butt" and it hurt (T:788-89). Mya said she told her mother about this incident but then immediately said she did not know if she told her (T:789,793). Further showing an inability to testify as a seven-year-old, she stated that she learned the word "pecker" from her brain but she learned the word "butt" from her mother (T:790). Confusingly, Mya stated she bled when her guinea pig bit her, but she did not bleed when appellant put his pecker in her butt, and denied stating that she had just said she bled from the pecker (T:792-93). Later on in her testimony, she said it did not bleed and she did not cry (T:799).

Mya claimed that appellant "licked" her "coochie" twice, and kissed her on her lips, in the previous incidents (T:795-96). Mya's account was that appellant put his pecker in her butt three times, in her mother's room, at night while her mother was out, and it hurt each time (T:797-98). She was wearing her pajamas all five times that it supposedly happened, even during the daytime (T:806). She did not know the exact dates of the incidents (T:808).

Mya's version changed to that it happened two times before (T:782), and then that it happened once before, but that was not true (T:781,783,785,802-03). Mya also

25

"always forget[s]" because she "always freeze" her "memories about that" (T:782).

The child did not tell her mother because "she knows she could whoop" her "with the

belt," which she did whenever she was "bad," and it would hurt (T:782-83,793-94).

Under these circumstances, the trial court erred when it found Mya swearable.

Mya clearly stated at the swearability hearing that she did not know what an oath

meant (T:753-54). Although Mya stated she understood the difference between a

truth and a lie, the trial court should not have deemed her swearable since she had no

understanding of an oath, and therefore, its nature and consequences. It is well settled

that a child cannot give sworn testimony even if he or she understands the difference

between a truth and a lie, when there is no knowledge of the nature and consequences

of an oath, which was the case here.  See People v. Davis, 304 A.D.421,421 (1st

Dep't 2003); People v. Ranum, 122 A.D.2d 959,960-61 (2d Dep't 1986); People v.

Smith, 104 A.D.2d 160,163 (2d Dep't 1984).

The trial court further erred when it did not revisit its determination following

Mya's testimony. The court could have determined that Mya's testimony would be

unsworn, and provided a jury charge on the need for corroboration of unsworn

testimony, pursuant to C.P.L. §60.20(3). In People v. Murphy, 139 Misc.2d 83 (Sup.

Ct. Kings County 1988), the trial court found a nine-year-old witness to be swearable,

and after his testimony, realized that determination was incorrect. "Under these

26

circumstances, the trial court has an obligation to alter its determination. To hold otherwise would require that court to adhere mechanically to a ruling made in the exercise of its discretion which it knows to be erroneous." Id. at 87.

Here, however, Mya failed to even meet the statutory requirement for giving unsworn testimony, as she lacked "sufficient intelligence and capacity to justify the reception" of her unsworn testimony. See generally People v. Rose, 223 A.D.2d 607,608 (2d Dep't 1996). Her testimony was convoluted and contradictory, and illustrated that she did not know the difference between a truth and a lie, or she was confused about what in fact was the truth. See Matter of Arnaldo R., 24 A.D.3d 326,327-28 (1st Dep't 2005) (seven-year-old witness's "account of appellant's conduct was at best confusing," court doubted child understood nature of oath). Here, even the trial court found Mya to be "a little younger than her years developmentally," such that as a seven-year-old she was not capable of testifying (T:757).

Since the trial court committed reversible error in finding Mya swearable, in not revisiting that determination after her conflicting and confusing testimony, and in not deeming her lacking in sufficient intelligence and capacity to even give unsworn testimony, appellant's convictions should be reversed and this matter remanded for a new trial before a different judge. C.P.L. §60.20(2).

27

## POINT TWO

**APPELLANT'S RIGHT TO PRESENT HIS DEFENSE AND SIXTH AMENDMENT RIGHT TO CONFRONT THE WITNESSES AGAINST HIM WERE VIOLATED WHEN THE TRIAL COURT WOULD NOT ALLOW COMPLAINANT'S MOTHER TO BE RECALLED TO THE WITNESS STAND TO TESTIFY TO HER STATE OF MIND IN RELATION TO A PRIOR INCIDENT, AND WHEN THE TRIAL COURT CURTAILED HER CROSS-EXAMINATION.**

Appellant was precluded from presenting his theory of the case to the jury, that complainant's brother had been sexually abused by his uncle, and Crystal, complainant's mother, jumped to the wrong conclusion when she saw appellant dressing complainant, an error requiring reversal and a new trial. The right of cross-examination "is included in the Federal and State constitutional right of the accused to confront the witnesses against" him. People v. Ashner, 190 A.D.2d 238,246 (2d Dep't 1993) (citing, *inter alia*, U.S. Const, Sixth Amendment; N.Y. Const., art. I, §6). Although trial courts "retain wide discretion to limit cross-examination, [. . .] curtailment will be judged improper when it keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony." Id. at 246-47.

The court erroneously denied appellant's application to recall either Sincere or Crystal, in order to have the jury hear that Sincere's uncle sexually abused him seven years earlier, to illustrate the family dynamics, and to explain Crystal's unusual

reaction and why she would jump to a conclusion upon seeing Mya with appellant, which influenced Mya into making a false statement (T:895-97,900-08).

The court erroneously ruled that it was not "legally proper" to recall witnesses because it was "extraneous" and an "unrelated incident that happened years ago" (T:903,907). Defense counsel maintained that he could not "put in what is an obvious defense here" and the defense "should be able to show her [Crystal's] motivation as to why she reacted in this way" when she saw appellant dressing her daughter (T:901,903,906).

Later on, outside the presence of the jury, a conference was held to discuss information defense counsel had just acquired, specifically, that the events of Sincere's prior abuse from his uncle were eerily similar to the events alleged by complainant's mother against appellant (T:1077-104). In 2007, Crystal discovered the uncle pushing Sincere's face to his penis and making contact (T:1081-82). Crystal immediately removed Sincere from the room, yelled at the uncle and called the police (T:1082). Defense counsel wanted to demonstrate to the jury that Crystal had experienced the same "traumatic situation" before, and "her frame of mind was such that she's assumed this may be going on again" (T:1083-84). She was a mother and she reacted "hastily and emotionally, and may have come to a conclusion" regarding the situation between Mya and appellant (T:1084).

29

Both children had been in therapy prior to the current incident (T:1084-85). Crystal's state of mind, upon viewing the incident with Mya and appellant, was important, and relevant information for the jury to hear (T:1085-86). Defense counsel asked that Crystal be recalled to the witness stand in order to be questioned concerning her state of mind given the prior traumatic incident involving Sincere (T:1086,1093-94). Crystal's state of mind was important because her actions influenced Mya (T:1095-96).

The court denied the application to recall Crystal, stating that Crystal's observations in 2007 resulted in a guilty plea, so any testimony concerning the 2007 incident was improper bolstering, in that her observations were credited (T:1097-98). The court noted that there was DNA evidence and appellant's statement (T:1099). The court ruled the events of 2007 were too remote to have an impact on Crystal's testimony (T:1099-100).

Defense counsel stated that it would be the defense problem if there was bolstering and the court should only determine "whether or not her [Crystal's] state of mind becomes relevant in making observations" (T:1100-01). A traumatic experience could stay with someone for twenty years; recency was relative (T:1101). Defense counsel found it irrelevant for the court to bring up the DNA evidence and statement in this context, contending that the court decided the evidence was

30

overwhelming already (T:1102-04).

Defense counsel repeatedly renewed his application to recall Crystal, including after the People's case, stating that the defense contested the accuracy and credibility of the DNA evidence and the police officers, and the court should not have relied on the DNA and appellant's statement in denying the application (T:1152-54). The court clarified that it denied the application mainly due to the remoteness in time of the incident with Sincere and his uncle, as well as the fact that Crystal did not see the current incident, that Mya was not born when the prior incident with Sincere occurred, and that there was DNA evidence and appellant's statement, although the court was not the trier of fact (T:1154-55).

During the defense case, defense counsel argued that the incident with Sincere and his uncle was not too remote because the children were still in therapy as of the date of the incident, and it would explain why Crystal reacted the way that she did (T:1292-94).

After the defense case, defense counsel renewed his application to recall Crystal, and submitted a memorandum of law in support (T:1370). The court denied the application (T:1370-71).

After Crystal testified, defense counsel moved for a mistrial, arguing that he could not present a defense when the court would not let him delve into Crystal

31

watching pornography with her children, and a six-year-old child typically would not know the phrase "ate her coochie" (T:662-63). The court denied the mistrial motion (T:663-65).

The court's curtailing of Crystal's cross-examination and denial of defense counsel's application to recall her to the witness stand deprived appellant of his Sixth Amendment right of confrontation and violated his constitutional right to present a defense. The defense theory was that appellant was helping Mya get dressed when Crystal walked in on them and she jumped to an erroneous conclusion. Crystal's state of mind was highly relevant to show that a similar traumatic incident had occurred in her past, and that would help explain her viewing the instant matter in a particular context that was unfavorable to appellant. "[T]he jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness's] testimony which provided 'a crucial link in the proof.'" Ashner, 190 A.D.2d at 248; see also People v. Baranek, 287 A.D.2d 74,79-80 (2d Dep't 2001) ("[t]he severe restrictions placed by the trial court on the complainant's cross-examination prevented the defense from presenting its theory of the case to the jury").

In Baranek, this Court concluded that the jury should have been made aware of the complainant's psychiatric history "to assist them in assessing the reliability of

32

her testimony and determining whether her account [. . .] was accurate." Id. at 79.

Here, too, the jurors could have put Crystal's testimony in its proper context had they

known about her state of mind due to the prior traumatic incident involving her son.

See People v. Rosovich, 209 A.D.2d 554,555 (2d Dep't 1994) (curtailment of cross-

examination concerning matters "which tended to prove a motive in accusing the

defendant of sodomy" reversible error); People v. Gibian, 76 A.D.3d 583,585 (2d

Dep't 2010) (curtailment of defendant's testimony regarding his mother's state of

mind, which would help to explain his theory of the case, reversible error and not

harmless).

     This error was not harmless, as appellant was denied his constitutional right to

present his theory of the defense to the jury and there was a reasonable possibility that

the error might have contributed to appellant's convictions. Ashner, 190 A.D.2d at

248-29; People v. McLeod, 122 A.D.3d 16,21 (1st Dep't 2014) (limitation of cross-

examination violated defendant's right to confrontation and was not harmless). The

jury was precluded from hearing testimony that would have explained why Crystal

jumped to the wrong conclusion upon seeing appellant with her daughter. Even if

this Court could consider this error harmless, the trial court's cumulative errors,

delineated in the other points, *infra*, deprived appellant of a fair trial and were not

harmless. Baranek, 287 A.D.2d at 81; People v. Thompson, 111 A.D.3d 56,69 (2d

33

Dep't 2013) (cumulative errors required reversal where defendant was denied constitutional right to present a defense in a case where there was DNA evidence and defendant's statement). Appellant's convictions should be reversed and a new trial ordered before a different judge.

## POINT THREE

**THE TRIAL COURT ERRED IN FAILING TO MEANINGFULLY RESPOND TO A JURY NOTE AND IN NOT ASKING THE JURY FOR FURTHER CLARIFICATION.**

The jury sent five notes during the course of deliberations. The second note asked, *inter alia*, "to hear the 911 call from Crystal of the transcript, if it was on record. If it's on the record, can we see slash hear it" (T:1597). The court stated it would respond by advising the jury that an audiotape or transcript of the 911 call was not in evidence (T:1598). Defense counsel continuously objected thereafter, arguing that the court should make further inquiry because Crystal discussed the 911 call in her testimony on cross-examination, and that was in the record (T:1598-99,1602-03,1605,1614-18). The jury might not be "smart" enough or "sophisticated in the ways of the system" to ask again for the 911 testimony (T:1615). The court denied defense counsel's requests (T:1599,1602-03,1605,1619). This was error.

C.P.L. §310.30 states that, in response to a jury note asking for further information, the court "must give such requested information or instruction as the court deems proper." The court must respond meaningfully. People v. Malloy, 55 N.Y.2d 296, 302 (1982). In determining whether a court has abused its discretion, one factor to be evaluated is "the form of the jury's question, which may have to be clarified before it can be answered." Id.

Here, the court abused its discretion in not seeking clarification of the jury note, despite defense counsel's repeated requests to do so. The court "abused its discretion by declining to provide the jurors with information that they plainly wanted and incorrectly characterizing the state of the evidence on the subject of their inquiry" by stating that "an audiotape or transcript of the 911 call was not in evidence" when in fact, the jury may have wanted to hear Crystal's testimony about the 911 call. People v. Taylor, 26 N.Y.3d 217,224-25 (2015). A court may request clarification from the jury and should have done so here, as in People v. Cordero, 308 A.D.2d 494,494 (2d Dep't 2003); and in People v. Dini, 292 A.D.2d 631,632 (2d Dep't 2002). This was error warranting reversal. C.P.L. §310.30.

## POINT FOUR

**THE TRIAL COURT'S BIAS AGAINST THE DEFENSE THROUGHOUT THE TRIAL DEPRIVED APPELLANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL AND HIS RIGHT TO PRESENT A DEFENSE.**

"The right of every person accused of crime to have a fair and impartial trial before an unbiased court and an unprejudiced jury is a fundamental principle of criminal jurisprudence." People v. De Jesus, 42 N.Y.2d 519,523 (1977); see also People v. Zamorano, 301 A.D.2d 544,545 (2d Dep't 2003). "[T]he Bench must be scrupulously free from and above even the appearance or taint of partiality." DeJesus, 42 N.Y.2d at 524.

Throughout the course of appellant's trial, many of the trial court's rulings violated appellant's due process rights and resulted "in a trial that was decidedly skewed in the People's favor." People v. Bryant, 34 Misc.3d 136A (App. Term 2d Dep't 2011) (quoting People v. Carroll, 95 N.Y.2d 375,387 [2000]).

> The right to present a defense constitutes "a fundamental element of due process of law" and it is one of the "minimum essentials of a fair trial. . . . The right to offer the testimony of witnesses and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the [trier of fact] so it may decide where the truth lies."

People v. Bradley, 99 A.D.3d 934,936 (2d Dep't 2012) (internal and end citations omitted).

After Boccio testified, defense counsel moved for a mistrial, or a recusal, contending that the court was biased against the defense (T:731-36). Defense counsel stated that the judge yelled at him the day before about the irrelevant rape shield law, made a sarcastic comment about appellant being the source of the pornography information, agreed to review the therapy records in camera so defense counsel could not see all of them, and refused to sign a subpoena for police department protocols in "interviewing children in alleged sex offense cases" (T:731-34). Defense counsel contended that the judge, as a former prosecutor (T:744), was "instinctively protecting" the "whole complainant's case," including when she initially denied counsel's request to play the 911 tape (T:735-36). The court denied the application for a mistrial or recusal, and turned over to both parties one page of Mya's therapy records, which were dated subsequent to the date of the incident, and therefore, according to defense counsel, irrelevant to the point he was making (T:736-39).

During jury deliberations, defense counsel made another motion for a mistrial, contending that "the Court has exhibited a bias towards the prosecution and against the defense," possibly because the judge was "a career prosecutor" (T:1612). Defense counsel maintained that the court sustained objections to defense counsel's summation, but overruled objections to the prosecution's closing, without basis (T:1612-14). In addition, one of the jury notes asked to hear Crystal's 911 call or to

38

see a transcript of the call, and the court told the jury those were not in evidence without inquiring if they meant that they wanted to hear Crystal's testimony relating to the 911 call, a response continuously objected to by defense counsel (T:1614-18). Defense counsel argued that "[t]he Court shouldn't be thinking in terms of who it is helping and who it is not helping" but rather, "what do they [the jurors] want" and can the court "give it to them [the jurors]?" (T:1616). The People opposed, and the Court denied the mistrial motion (T:1618-19).

"Unless disqualification is required under Judiciary Law §14, a judge's decision on a recusal motion is one of discretion.'" People v. Glynn, 21 N.Y.3d 614,618 (2013). "Even . . . when recusal is sought based upon 'impropriety as distinguished from legal disqualification, the judge . . . is the sole arbiter.'" People v. Hazzard, 129 A.D.3d 1598,1598 (4th Dep't 2015) (quoting People v. Moreno, 70 N.Y.2d 403,406 [1987]). Here, the court abused its discretion in not recusing itself.

The court exhibited bias against the defense continuously throughout the trial, and not limited solely to those instances delineated by defense counsel in his mistrial motions. The court erroneously found (T:725-26) that ten-year-old Sincere could testify after he responded "I don't know" when asked if he understood what an oath was (T:691) and stated "I swear to the truth," and if you do not tell the truth, "you would not, um, be out of here as soon as possible" (T:691,724-29). People v. Smith,

39

104 A.D.2d at 163.

The error most harmful to the defense, described further in Point Two , *supra*, involved the court denying defense counsel's multiple motions to recall Crystal to the witness stand to testify as to her state of mind during the incident, and how it related to a prior traumatic similar incident. Indeed, at one point, the court listed one of the reasons for its denial of the motions as the DNA evidence and appellant's statement which were present in the case. Defense counsel correctly argued that the court had already decided the case in its mind, that the evidence was overwhelming against appellant, and its rulings were colored by that bias. It was therefore imperative for the court to recuse itself. See Pickering v. Lehrer, 25 A.D.3d 677,679 (2d Dep't 2006) (excluding evidence that was unfavorable to the party of which it "evinced a clear bias in favor" was error and mandated a new trial before a different judge); Matter of Baby Girl Z., 140 A.D.3d 893,894-95 (2d Dep't 2016) (hearing court "had a predetermined outcome of the case in mind" and "generally demonstrated bias," mandating new hearing before different judge); Doe v. Dep't of Education, 54 A.D.3d 352,353-54 (2d Dep't 2008) (court improperly precluded relevant evidence and exhibited bias, resulting in remand for new trial before different justice); Abrams v. Renaissance Equity Holdings, 43 Misc.3d 57,60 (App. Term 2d Dep't 2014) (matter reversed and remitted before a different judge where judge "made a number

of intemperate remarks at trial which were indicative of possible bias," among other errors).

The cumulative errors by the trial court, especially when viewed through the judicial bias lens, served to deprive appellant of his constitutional rights to a fair trial and to present a defense. See People v. Dean, 50 A.D.3d 1052,1055-56 (2d Dep't 2008); People v. Horton, 145 A.D.3d 1575,1575-77 (4th Dep't 2016); People v. Slide, 76 A.D.3d 1106,1108 (2d Dep't 2010); People v. Shanis, 36 N.Y.2d 697,699 (1975).

The deprivation of a defendant's constitutional right to a fair trial is not subject to harmless error analysis. People v. Robinson, 2017 N.Y. Slip.Op. 04473 (2d Dep't 2017); People v. Mees, 47 N.Y.2d 997,998 (1979). Here, the trial court abused its discretion in denying defense counsel's mistrial motions and motion to recuse itself. The cumulative errors by the court, and its bias against the defense, deprived appellant of his constitutional rights to present a defense and to a fair trial. Appellant's convictions should be reversed and this matter should be remanded for a new trial before a different judge. People v. Reynolds, 90 A.D.3d 956,957 (2d Dep't 2011).

## POINT FIVE

**THE TRIAL COURT ERRED IN ALLOWING BARAN TO TESTIFY THAT COMPLAINANT TOLD HIM ABOUT PRIOR INCIDENTS, WHEN THAT PRIOR CONSISTENT STATEMENT WAS IMPROPER BOLSTERING.**

The trial court erred in allowing Baran to testify that Mya nodded her head up and down when he asked her if any incidents with appellant had occurred previously, in that those incidents were brought up on cross-examination merely to show the inconsistency in the number of times of those incidents, and not as an allegation of a recent fabrication.

In most cases, "a witness's trial testimony may not be bolstered with prior consistent statements because 'an untrustworthy statement is not made more trustworthy by repetition.'" People v. Rosario, 17 N.Y.3d 501,513 (2011) (citations omitted). "[T]he admission of prior consistent statements may, by simple force of repetition, give to a [factfinder] an exaggerated idea of the probative force of a party's case." People v. Memon, 145 A.D.3d 1492,1493 (4th Dep't 2016) (quoting People v. Smith, 22 N.Y.3d 462,466 (2013). However, "[w]hen a 'witness'[s] testimony is assailed — either directly or inferentially — as a recent fabrication, the witness may be rehabilitated' with a prior consistent statement made at a time predating the motive to fabricate." Id. (citations omitted). "[N]ot all inconsistencies developed on cross-

42

examination imply that a witness' testimony is fabricated. Questions designed to demonstrate that the testimony is the product of confusion or mistake do not charge fabrication." People v. Seit, 86 N.Y.2d 92,96 (1995).

Prior to Baran's testimony, the People made an application to have Baran testify to the fact that Mya told him at the hospital that appellant had abused her prior to the incident, as a rebuttal to defense counsel's portrayal of Mya's testimony regarding prior incidents as a "recent fabrication" (T:908-09). The People contended that defense counsel had opened the door to the testimony regarding prior incidents, and Baran's testimony should come in as rebuttal, and "completing a narrative and explaining procedures" (T:908-09,913).

Defense counsel argued that the nurse witness testified there was no notation regarding any prior incidents in her notes, and Mya had testified that she told the prosecutor it happened once previously, and told her therapist it had happened five times previously (T:910,913,929-30). Defense counsel brought it up on cross-examination "solely to show the inconsistency of the number of times she [Mya] claims this happened in order to show it didn't happen at all," and "inconsistency is a reflection of lack of credibility" (T:913-14).

The court stated it had to first determine whether the cross-examination "put forth testimony of that which can be seen as a recent fabrication" and if so, then "the

43

testimony can come from someone other than the actual witness who said it" which would aid in "establishing the credibility of the witness" (T:925-26).

Defense counsel countered that it must be a recent fabrication, that the witness "changed her story" and had "motive for recent fabrication" (T:926). The defense position was that it was "a fabrication from the time of the arrest" and therefore, not a recent fabrication (T:926). A prior consistent statement could never be brought in for bolstering (T:927). Defense counsel maintained that the People had to "establish that there was a reason for her recent fabrication" and they had not done that, as it was the same motive since the time of appellant's arrest (T:928-29). Defense counsel brought out the prior incidents solely to show all of the inconsistent statements that Mya had made, to the nurse, prosecutor and therapist (T:929-30). The discussion continued (T:930-32).

The court erroneously ruled Baran could testify that Mya told him that there were prior incidents, and it was allowing it in for "credibility purposes only" but noted defense counsel's exception (916,934-35). The court erred in allowing Baran to testify that Mya nodded her head up and down when he asked her if there were any prior incidents, in that defense counsel was not contending Mya's statements about prior incidents were recent fabrications. Baran's testimony constituted improper bolstering, requiring reversal of appellant's convictions and a remand for a new trial.

44

Defense counsel was focusing on the different numbers of prior incidents that Mya had reported to various people, in order to show that there were inconsistencies in her testimony, which could potentially affect her credibility with the jury, especially as a child witness.   There was no allegation of recent fabrication and, indeed, the People did not even allege the motive for the purported recent fabrication. It was the defense position that the allegations of the incidents occurred since the date of the incident, and were not recent.   In fact, defense counsel brought out on cross-examination that Mya had told her therapist about prior incidents one week after the charged incident, which was 19 months prior to the date of her testimony.   Since defense counsel manifestly was not asserting, or even inferring, that Mya's testimony about the prior incidents was a recent fabrication, but rather the product of mistake or confusion, Baran's testimony regarding Mya's affirmation of the alleged prior incidents was improper bolstering and should not have been admitted into evidence by the court.   "If the same motive to falsify which exists at the time of the testimony existed at the time the prior consistent statement was made, the statement remains inadmissible."   People v. McClean, 69 N.Y.2d 426,428 (1987).

This error was not harmless, because the improper bolstering led the jury to add credence to Mya's testimony about prior incidents, and the jury may have been led to believe that appellant had a propensity towards the alleged conduct.   Therefore,

45

appellant's convictions should be reversed and this matter should be remanded for a new trial before a different judge.  Rosario, 17 N.Y.3d at 513-14; McClean, 69 N.Y.2d at 430-31.

## POINT SIX

## THE JURY'S GUILTY VERDICTS WERE AGAINST THE WEIGHT OF THE EVIDENCE.

A verdict is not supported by the weight of the evidence unless, based upon all of the credible evidence, the finding is not unreasonable. People v. Bleakley, 69 N.Y.2d 490 (1987). Resolution of issues of credibility, as well as the weight to be accorded to the evidence presented, are primarily questions to be determined by the fact finder. See People v. Gaimari, 176 N.Y. 84,94 (1903). While the jury's determination should typically be accorded great weight on appeal, here, for the reasons set forth below, the jury's determination of guilt was wholly unsupported by the record and should not remain undisturbed. See People v. Garafolo, 44 A.D.2d 86,88 (2d Dep't 1974).

Here, even based upon the testimony of the People's witnesses, the verdicts were unreasonable. The evidence supports the conclusion that appellant was not guilty.

Appellant testified that he was attempting to dress Mya with her underwear and pajama bottoms when Crystal came in and jumped to a conclusion about what was occurring (T:1304-05,1337). His testimony was consistent with his DNA having gotten on Mya's underwear, in that he had touched the underwear in his attempt to

47

clothe her. Furthermore, adding to reasonable doubt, it was determined by both testifying DNA experts that the DNA on Mya's underwear came from two males, one of which was appellant and the other an "unknown male."

Dr. Reich testified that, with respect to the underwear stains, the vast majority of the DNA was from a female, but male DNA was detected, although it was "not the amount of male DNA" that would be "consistent with it being saliva" (T:1215-17). There was no way to know with a scientific degree of certainty that there was male saliva present (T:1217). The amount of male DNA present in the underwear stains was more consistent as coming from touching than from saliva (T1217-18). If appellant touched the underwear, and it was then put on, DNA could transfer to the vulva area (T:1264).

The dried secretions on the three samples were not saliva, so Reich concluded that there was "not a lot of saliva" on the samples (T:1218-19). DNA from saliva could be transferred by touch even after the saliva had dried (T:1220-21). One of the underwear stains contained DNA from two males, one of which was consistent with appellant, and the other was an unknown male (T:1221-23,1253-54). No DNA testing was done on the non-stain area of the underwear, and if appellant's DNA had been found on the non-stain portion, then that would have meant that his DNA was "on the item for some other reason" and it would not be "associated with the stain"

48

solely (T:1226-28).

Chillseyzn also testified that the DNA from the underwear was from Mya and an "unknown male" (T:873,882). Further testing revealed "a mixture of at least two male individuals" (T:873,880-81). The unstained portion of the underwear was not tested for DNA (T:881).

Appellant testified that he asked Crystal if he could use the bathroom, and she agreed (T:1302,1337). When he went to the bathroom, he saw Mya clothed in a shirt but naked from the waist down, her clothes in her hand (T:1302-03). He told her to put on her clothes, and she tried to follow him into the bathroom, but he told her not to (T:1303). He went in and shut the door, and when he was finished, she was still outside the bathroom (T:1303-04).

Appellant took Mya's clothes and said she needed to put them on because Crystal "was going to punish her" if she did not (T:1304). They went into the kitchen, he "sat her on the floor" and started dressing her in her panties and pajamas (T:1304-05,1337). He stood her up and her panties and pajamas were "around her knees" (T:1305). He "didn't want to touch her anymore because of her mom" so he told her to pull up her clothes, and as "she bent to bring up her little pants, her mother walked in at that time" (T:1305).

Appellant also denied saying many of the statements in his written statement.

49

He testified that he understood some of the questions that Baran asked him in English (T:1348). Appellant never stated to the detectives that he told Mya he was going to tickle her, that he pulled down her pants and underwear, that he "tickled her pussy" with his mouth (T:1313-14,1319). He knew what the word "pussy" meant but he did not "use those kinds of words" (T:1314). He did tell the detectives his address, who he lived with, where he worked, and his social security number, because they asked him (T:1314).

At the time he was arrested, he did not read English too well, and did not understand the written statement "too well" (T:1314-15). The detectives never read to him that he stated he told Mya he was going to tickle her, he pulled down her pants and underwear and ticked her pussy with his mouth, nor were those statements read to him in Spanish (T:1315,1322). He did tell the detectives many of the items in the statement, but not all (T:1315-21). He never told the detectives that Crystal asked "what are you doing" when she came into the kitchen, because she asked Mya if appellant "was eating her coochie" (T:1319). He never told the detectives that he said to Mya that he was playing with her and Mya said no, he was "licking my pussy" (T:1320). He never told the detectives that he made a big mistake and he was very sorry for what he did (T:1321). He never stated the clause at the end of the statement (T:1321). He told the detectives that he touched Mya's clothing but they did not

50

write it down in the statement (T:1338-39).

Baran told him to write an apology letter in Spanish "[s]aying sorry," and appellant wrote it because he was told to do so (T:1322-23,1359-60,1368). He apologized because Crystal was "super angry," he did not like to "offend people," and he was "also very scared" (T:1323,1360). The letter said he was sorry and that he never intended to do any harm to anyone (T:1361).

In all of the times that appellant was with Mya, he never touched her in any sexual way, never put his mouth or tongue on her vagina, and never put his penis in her anus (T:1324). It never "crossed [his] mind" to do that with Mya or any child (T:1324).

Although there was a written statement and DNA evidence, appellant's explanations belied the jury's determination of guilt of the charges beyond a reasonable doubt. This Court has reversed convictions even where there was DNA evidence and a statement from the defendant where, as here, the defendant has repeatedly maintained his innocence. See, e.g., Thompson, 111 A.D.3d at 63-68 (defendant maintained innocence, there was DNA evidence and a statement, reversed due to cumulative errors and violation of right to present defense); People v. Oneill, 141 A.D.3d 606,608 (2d Dep't 2016) (convictions against weight of evidence where defendant "testified at trial to a completely different version of events" than the

51

police, including that the police "told him what to write" in his written statement, and he had no prior arrests and had been gainfully employed).

Mya's story was contradictory, confusing, and incredible, and as she was the sole witness to the incident, no one else testified as to the specific facts of appellant's alleged conduct that day. See People v. Martin, 52 Misc.3d 140A (App. Term 2d Dep't 2016) (conviction against weight of evidence where complainant's and other witness's testimony was inconsistent and contained discrepancies); People v. Washington, 52 Misc.3d 140A (App. Term 2d Dep't 2016) (same).

Mya's account was unworthy of belief and sounded like the fabrication of a seven-year-old. She swore to tell the truth, and if she lied, she would be "taken away and your mom will go to jail" (T:779). Mya said it was not true that the incident happened five times previously (T:780,782). But then she subsequently said it was true, and it happened in her mother's room, with her wearing pajamas and both of them standing up and appellant bending down to lick her "coochie" (T:781,787). Mya claimed her mother was home, during the daytime, all five times (T:788,800-01), but she subsequently stated that it happened at night when her mother was not home (T:797). She said she told her mother but then immediately said she did not know if she told her (T:789,793). Mya stated she bled when her guinea pig bit her, but she did not bleed when appellant put his pecker in her butt, and denied stating that she

52

had just said she bled from the pecker (T:792-93). Later, she also said it did not bleed and she did not cry (T:799). Her account was incredible at best.

Mya testified that appellant "licked" her "coochie" twice, and kissed her on her lips, in previous incidents (T:795-96). She was wearing her pajamas all five times that it happened, even during the daytime (T:806).

She also stated that it happened two times before and three times (T:782,797-98). She told the prosecutor that it happened once before, but that was not true (T:781,783,785,802-03). Mya "always forget[s]" because she "always freeze" her "memories about that" (T:782). She did not tell her mother because "she knows she could whoop" her "with the belt," which she did whenever she was "bad," and it would hurt (T:782-83,793-94).

McAllister, the nurse who had examined Mya the night of the incident, testified that she would want to know if Mya had ever been sexually abused prior to that date, and if Mya had indicated yes, she would have written it down in the medical records (T:840-42). There were no notes in Mya's medical records about any prior sexual abuse (T:841-42). The notes stated that Mya was playful, alert, talkative, follows direction, answers questions (T:843). This direct contradiction with Mya's unreliable testimony further undermines the jury's verdict of guilt beyond a reasonable doubt. See Arnaldo R., 24 A.D.3d at 327-28 (seven-year-old complainant's testimony was

53

"at best confusing" and "medical records undermined" the State's case).

Significantly, Baran never interviewed Mya, and no explanation was given for that omission. Baran told Crystal that Mya would be examined by a nurse, and then later the family would be taken to the squad in order to conduct a videotape interview with Mya, but that never occurred (T:978,1073). The protocol required that the interview would be conducted by someone skilled in interviewing child victims of sexual abuse, and those people were present at the squad, but the interview never occurred there (T:979,1020-21). Crystal had "begged" Baran not to bring Mya down to be interviewed when it might last until 1:00 a.m. or 2:00 a.m. (T:1040,1045). Baran had called the sex crimes unit of the District Attorney's office the next day about interviewing Mya "and was advised to hold off on that" (T:1045-47,1061-63). After an arrest was made, the police did not pursue investigations unless directed to by the District Attorney's office (T:1046-47). It was unknown why the District Attorney's office told Baran not to interview Mya, but that circumstance only serves to add to the reasonable doubt inherent in this case.

Taking into account all of the various factors delineated above leads to the conclusion that no reasonable juror could conclude that appellant was guilty of the charged crimes beyond a reasonable doubt. The jury's determination of guilt was not supported by the record, in a case where the 7-year-old complainant's testimony was

contradictory and confusing, the complainant was never interviewed by the police, no other witness saw the incident, the nurse who examined the complainant did not write anything in her medical records about any evidence of prior abuse, and there was DNA evidence of two males on the underwear.

For all of the foregoing reasons, the jury's verdicts of guilt beyond a reasonable doubt were against the weight of the evidence. Appellant's convictions should therefore be reversed. C.P.L. §§470.15(5), 470.20(5).

## POINT SEVEN

## THE SENTENCE IMPOSED ON APPELLANT WAS UNNECESSARILY HARSH AND EXCESSIVE UNDER THE CIRCUMSTANCES.

Appellant, a first-time offender, was sentenced, on July 24, 2015, to a determinate term of fifteen years of imprisonment and ten years of post-release supervision on the criminal sexual act in the first degree conviction, and one year of imprisonment on the endangering the welfare of a child conviction, to be served concurrently (S:18-20).

The People stated at sentencing that appellant had "no prior criminal contact with the criminal justice system" and had been offered sentences of five years prior to indictment, seven years prior to hearing and ten years prior to trial (S:3,15).

Defense counsel argued that the People had asked for five years prior to indictment and seven years prior to trial (S:5,9,14). Appellant had "led an exemplary life" and was a "bus driver for children" (S:9-10). Character witnesses "had only the kindest and best things to say about him" (S:9). Appellant claimed he was innocent and should not be penalized for going to trial, especially since he had "an unblemished record" (S:10-11,14-15). Appellant could not "admit and be remorseful when his position is that he didn't do anything and didn't do what was charged here" (S:16). Under these circumstances, the sentence imposed on appellant was

56

unnecessarily harsh and excessive.

A sentencing decision is unquestionably a matter committed to the exercise of a trial court's discretion.  See, e.g., People v. Farrar, 52 N.Y.2d 302,305 (1981). However, under C.P.L. §470.15, an intermediate appellate court may, in the interest of justice, reverse or modify a sentence imposed by a lower court upon a determination that the sentence is illegal or unduly harsh or severe:

> An intermediate appellate court has broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances, even though the sentence may be within the permissible statutory range. This sentence-review power may be exercised, if the interest of justice warrants, without deference to the sentencing court.

People v. Delgado, 80 N.Y.2d 780,783 (1992).  As such, this Court may substitute its own discretion in determining "whether the sentence is excessive to the extent that there was a failure to observe the principles of sentencing."  People v. Suitte, 90 A.D.2d 80,86 (2d Dep't 1982); cf. C.P.L. § 470.15(2)(c).  In determining what constitutes an appropriate sentence, a court should consider "the crimes charged, the particular circumstances of the offender, and the purpose of a penal sanction."  Suitte, 90 A.D.2d at 83.

Here, according to the presentence investigation report, appellant was a naturalized United States citizen with a valid New York driver's license.  He was gainfully employed as a bus driver prior to the incident. He is currently 57 years old.

The current offense represented appellant's only involvement with the criminal justice system. A lack of experience with the criminal justice system has been a factor relied on by this Court in reducing sentences. See, e.g., People v. Gilliard, 150 A.D.3d 1147,1148 (2d Dep't 2017) (sentence reduced from 12 years to 10 years where it was defendant's "first contact with the criminal justice system"); People v. Conley, 150 A.D.3d 1023,1023-24 (2d Dep't 2017) (indeterminate sentence reduced from 2 to 7 years, to 1 to 3 years, due to, *inter alia*, defendant's "lack of experience with the criminal justice system").

In People v. Hutzler, 270 A.D.2d 934 (4th Dep't 2000), the defendant was convicted of two counts of sodomy in the second degree and one count of endangering the welfare of a child. He was sentenced to consecutive indeterminate terms of 2-1/3 to 7 years of incarceration on the sodomy counts, which the court directed to run concurrently, thereby reducing his maximum sentence from 14 years to 7 years. The defendant had no criminal history and had "maintained his innocence," just like appellant in the instant matter.

In People v. Hill, 34 A.D.3d 1130 (3d Dep't 2006), the defendant was convicted of sexual abuse in the first degree, course of sexual conduct against a child in the second degree, and two counts of endangering the welfare of a child. He was sentenced to consecutive terms of 7 years on the two top counts, which the court

58

reduced to consecutive terms of 4 years each, thereby reducing his sentence from 14 years to 8 years. Among the factors the court considered were the age of the defendant (63 years old), his steady employment, and no prior criminal convictions. Here, appellant is 57 years old, had been steadily employed prior to the incident, and had no criminal convictions.

In People v. Wilson, 255 A.D.2d 612 (3d Dep't 1998), the defendant was convicted of six counts of sexual abuse in the first degree, sodomy in the first degree, and three counts of endangering the welfare of a child, all involving "three young girls ages seven to nine." He was sentenced as a second felony offender to 10 years of incarceration on the sodomy conviction. His sentence was two-thirds of appellant's sentence, even though his conduct was much more egregious and involved three times the number of victims.

In People v. Nowinski, 36 A.D.3d 1082 (3d Dep't 2007), the defendant was convicted of the B violent felonies of course of sexual conduct in the second degree and sexual abuse in the second degree, involving three victims, and sentenced to concurrent 7-year determinate sentences. Appellant's sentence seems unusually harsh and excessive by comparison.

The final recommendation of the probation department merely indicated, "Imprisonment at the New York State Department of Correctional Services is

59

mandatory" (p.8). There was not, however, any recommendation to exceed the mandatory minimum period of imprisonment, which was 5 years. The sentencing judge independently made the decision to significantly exceed the minimum, in a case where the People had stated at sentencing that appellant had been offered plea deals of 5 years prior to indictment, 7 years prior to hearing and 10 years prior to trial. Defense counsel had argued that appellant should not be penalized for going to trial. A sentence of 15 years, when the People had originally offered 5 years, is excessive under these circumstances. See People v. Brown, 70 A.D.2d 505,506 (1st Dep't 1979) ("the difference between the sentence the court had conditionally promised, 3-1/3 to 10 years, and that ultimately imposed, 8 to 24 years, is so great as to perhaps create the appearance that the defendant was being punished for proceeding to verdict, rather than receiving merely the sentence which his crime and record justified").

The diverse purposes of a penal sanction, such as deterrence, rehabilitation, retribution, and isolation, would best be served by sentencing appellant to a lower term of incarceration. See Suitte, 90 A.D.2d at 83,86; People v. Notey, 72 A.D.2d 279,282 (2d Dep't 1980).    The complainant, according to the presentence investigation report, "is now doing very well."   Where there is no physical or lasting injury to the victim, there is no need to increase appellant's term of incarceration for

the purpose of personal retribution. If the personal status of a defendant does indeed continue to be "the most significant factor in the sentencing process," Notey, 72 A.D.2d at 283, no excessive incarceration is necessary, for this appellant would not benefit from additional years in a correctional facility. The objectives of deterrence and isolation would be readily accomplished through a lesser term, and while there is no reason to believe any need exists for further retribution, such a need would in any event be fulfilled without him serving the unnecessarily harsh and excessive sentence he received.

For all of the foregoing reasons, appellant entreats this Court to reduce his period of incarceration from the sentence of 15 years he received.

## POINT EIGHT

**APPELLANT'S FOURTH AMENDMENT RIGHT AGAINST UNREASONABLE SEARCHES AND SEIZURES WAS VIOLATED WHERE THE POLICE DID NOT HAVE PROBABLE CAUSE TO ARREST HIM, AND HIS FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS WAS VIOLATED WHERE HIS WRITTEN STATEMENT WAS INVOLUNTARY AND USED AGAINST HIM AT TRIAL.**

The hearing court erred in determining that the police had probable cause to arrest appellant where the information Boccio relied upon to effectuate the arrest was unreliable. People v. Gittens, 211 A.D.2d 242,244 (2d Dep't 1995); People v. Cantor, 36 N.Y.2d 106,111 (1975). At the hearing, Boccio testified that when he responded to the scene, Crystal told him that someone "licked her daughter's [. . .] coochie," and when pressed about who did that, she said appellant (H1:8,20,24-25). Crystal did not see appellant do it (H1:20,30,48-50). Boccio asked Mya what happened, and she mimicked that "he licked her [. . .] coochie or coulter" (H1:20,22,25-26). It took "a few minutes" for Mya to respond to his question (H1:25-27). Mya never said who licked her (49-50).

The police arrested appellant based on the unreliable statements of a six-year-old. The police did not have probable cause to arrest appellant, as the information came from a six-year-old girl with "no indicia of reliability" who was "repeating what

62

her mother said" (H2⁵:91-93). Crystal and Mya were sitting right next to each other when Crystal told the police that appellant "ate my daughter's cuchi" (H2:93-94). Crystal never witnessed the incident (H2:94,98). The officer asked Mya right in front of her mother what happened, and it took Mya 15 to 30 seconds to repeat back what she had heard her mother just say (H2:94-95).

Moreover, the buccal swab should have been suppressed because there was no probable cause to arrest appellant (H2:117). Crystal did not witness the incident, and had not given a supporting deposition until after appellant was already arrested (H2:118). The statements that appellant purportedly made at the scene did not support the other statements because he said he licked her but did not say where, and he said it happened in the bedroom which was different than what Crystal said (H2:118-19). In addition, he was in custody because an innocent person would not have believed they were free to leave, and Boccio testified that: appellant was not free to leave after he heard the child's statements (H1:34), he questioned appellant without administering warnings and he had a visible gun on his waist (H1:10-11). Cantor, 36 N.Y.2d at 111.

Furthermore, the oral and written statements, and the buccal swab, which were

_____

⁵ Numbers in parentheses preceded by "H2" refer to the transcribed minutes of the Mapp/Huntley/Dunaway hearing held before Hon. Teresa K. Corrigan on November 20, 2014 and December 3, 2014, in Part 44 of the Supreme Court of Nassau County.

"the fruits of that unconstitutional seizure," should have been suppressed. Id. at 114; see also People v. Bouton, 50 N.Y.2d 130,134-36 (1980) (reversing sodomy and sexual abuse convictions finding no probable cause existed even where police obtained detailed statements from eleven-year-old victims).

The hearing court also erred in finding that appellant's written statement was given voluntarily when it was given in English, although he had asked for his Miranda rights to be read to him in Spanish and had written an apology letter at the request of the police in Spanish (H1:101,113-16,142,149-54,156-58,203,205,209).

After Baran typed the statement and asked appellant to read it aloud, appellant said he wanted the statement read to him in Spanish (H1:189-91,200). Pacheco then read the statement to appellant in Spanish (H1:172-73,186). Appellant initialed corrections and signed the statement (H1:108-09,187-89,201-02).

Baran asked appellant if he wanted to write a letter to Crystal and Mya, and he said yes, and he "wrote something in Spanish" (H1:113-16,151-52,203,205,209).

Here, Baran testified that he knew Spanish was appellant's native language (H1:150-51). Appellant asked for his Miranda rights to be read to him in Spanish, and he had written an apology letter at Baran's behest in Spanish (H1:101,113-16,142,149-54,156-58,203,205,209). The written statement was given by appellant in English and typed by Baran in English (H1:106,147-48,150,156,158).

Furthermore, "the statement purportedly given by [appellant] display[ed] a fluency in the English language which [was] not consistent with . . . [appellant's] difficulties in speaking English." People v. Alberto, 22 Misc.3d 786,791 (Dist. Ct. Suffolk County 2008). Indeed, appellant had a Spanish interpreter by his side during every day of the hearing and trial. He was not able to effectively communicate in English and his statement was therefore involuntary, violating his Fourteenth Amendment right to due process. Blackburn v. Alabama, 361 U.S. 199,205 (1960).

As there was no probable cause for appellant's arrest and his written statement was given involuntarily, the oral and written statements and buccal swab should have been suppressed. Reversal is warranted. U.S. Const. amend. IV, XIV; N.Y. Const. art. 1, §§6, 12.

## CONCLUSION

**FOR THE ABOVE STATED REASONS, APPELLANT'S CONVICTIONS SHOULD BE REVERSED AND THE INDICTMENT DISMISSED, OR IN THE ALTERNATIVE, A NEW TRIAL SHOULD BE ORDERED BEFORE A DIFFERENT JUDGE.**

Respectfully submitted,

N. SCOTT BANKS
Attorney in Chief
BY:

Dori Cohen
Attorney for the Defendant-Appellant
Legal Aid Society of Nassau County
40 Main Street, 3rd Floor
Hempstead, NY 11550
(516) 560-6422

OF COUNSEL
TAMMY FEMAN
DORI COHEN

66

## CERTIFICATE OF COMPLIANCE
## Pursuant to 22 N.Y.C.R.R. §670.10.3(f)

The foregoing brief was prepared by computer. A proportionally spaced typeface was used as follows:

Name of typeface: Times New Roman
Point Size:        14
Line Spacing:      Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 13,933.