To Be Argued by:
Brian Witthuhn
Time Requested: 15 minutes

# Supreme Court of the State of New York
# Appellate Division: Second Judicial Department

---

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

A.D. No.:
2015-07623

- against -

IND. No.:
742N-2014

DANIEL RAMOS,

Defendant-Appellant.

# RESPONDENT'S BRIEF

MADELINE SINGAS
District Attorney, Nassau County
*Attorney for Respondent*
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Tammy J. Smiley
Brian Witthuhn
  Assistant District Attorneys
  *of Counsel*

CONFIDENTIAL PURSUANT TO CIVIL RIGHTS LAW § 50-b

## TABLE OF CONTENTS

Page

Preliminary Statement ...............................................................................i

Statement of Facts
   Introduction....................................................................................1
   The *Mapp/Huntley/Dunaway* Hearing .......................................2
     The People's Case....................................................................2
      Pre-Arrest Statements.........................................................2
      Post-Arrest Statements and Buccal Swab ........................3
     Defendant's Case...................................................................7
     Arguments of Counsel..........................................................7
     The Hearing Court's Decision ..............................................8
   The Trial........................................................................................9
     The *Molineux* Application .....................................................9
     The People's Case....................................................................9
     Defendant's Case.................................................................12
     The People's Rebuttal Case ................................................15
     Therapy Records And Defense Applications To Recall Crystal....................15
      Therapy Records And Unrelated Incident With Sincere ..........................15
      Defense Motions To Recall Crystal.................................17
     Swearability Hearing...........................................................18
     Prior Consistent Statement About Uncharged Incidents.............................19
     Jury Note Regarding The 911 Call ....................................20
     The Verdict ..........................................................................20
   The Sentencing Proceeding ......................................................21

Point I
   The Police Had Probable Cause To Arrest Defendant, And His
   Written Statement Followed The Voluntary Waiver Of His
   Rights ........................................................................................22

Point II
   The Court Properly Found The Victim Swearable Because She
   Knew The Difference Between A Truth And A Lie, And That
   False Testimony Could Lead To Punishment ............................26

Point III
 The Court Properly Denied Defendant's Repeated Applications
 To Recall The Victim's Mother To The Witness Stand ............................. 30

Point IV
 The Court Responded Meaningfully To The Jury's Note Asking
 To Hear The 911 Call Or Read Its Transcript ........................................... 35

Point V
 The Court Properly Allowed Testimony About A Prior
 Consistent Statement By The Victim Because Counsel
 Challenged Her Testimony As A Recent Fabrication ................................ 36

Point VI
 The Evidence Convincingly Supported The Jury's Verdict ..................... 39

Point VII
 The Court Made Fair Decisions, Supported By Law,
 Throughout The Trial ............................................................................... 45

Point VIII
 The Court Imposed A Fair Sentence ....................................................... 50

Conclusion .................................................................................................. 52

Certificate of Compliance

# Supreme Court of the State of New York
# Appellate Division: Second Judicial Department

━━━━•••⋗⋖•••━━━━

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

- against -

DANIEL RAMOS,

Defendant-Appellant.

━━━━•••••━━━━

# RESPONDENT'S BRIEF

———

## PRELIMINARY STATEMENT

Defendant appeals from a judgment of the Supreme Court, Nassau County, rendered July 24, 2015, convicting him, following a jury trial, of criminal sexual act in the first degree (Penal Law § 130.50[3]) and endangering the welfare of a child (Penal Law § 260.10[1]). The court sentenced defendant to a determinate term of fifteen years' imprisonment and ten years' post-release supervision (Corrigan, J.).

Defendant is presently incarcerated. There were no codefendants.

<u>STATEMENT OF FACTS</u>

<u>Introduction</u>

On October 16, 2013, Crystal R. walked into her kitchen and found defendant with Mya, her six-year-old daughter. Mya's pants and underwear were around her ankles. She told Crystal that defendant had licked her vagina. Defendant was arrested and made three incriminating statements to police officers, including a lengthy written statement of admission. Forensic testing established to a certainty of one in 175,000,000 that defendant's DNA was on Mya's underwear. Furthermore, saliva was present on both the underwear and a vulva swab taken from Mya.

Defendant was charged under Nassau County Indictment 742N/14 with violating one count of criminal sexual act in the first degree (Penal Law § 130.50[3]) and one count of endangering the welfare of a child (Penal Law § 260.10[1]). Following a pretrial suppression hearing, the court denied defendant's motion to suppress the statements he made to law enforcement and a buccal swab taken from him the night of his arrest.

Defendant's case thereafter proceeded to trial. On May 29, 2015, a jury convicted defendant on both counts. The court sentenced him to a prison term of fifteen years.

The *Mapp/ Huntley/ Dunaway* Hearing[1]

Starting on September 25, 2014, the court held a hearing on defendant's motion to suppress his pre- and post-arrest statements and a buccal swab.

The People's Case

Pre-Arrest Statements

During the late afternoon of October 16, 2013, uniformed police officers JOSEPH BOCCIO and Thomas Wigand of the Nassau County Police Department ("NCPD") were on patrol in a marked police car.  At approximately 5:21 p.m., they received a radio assignment to respond to 124 Park Avenue, Roosevelt, where a female wanted to report the sexual abuse of her six-year-old daughter (Boccio: H6-7).

After arriving at 124 Park Avenue, the officers met Crystal R. and her daughter, Mya, who was under ten years old. Crystal told them that defendant had licked her daughter's "coochie," meaning vagina. Mya also told the officers that "he" had licked her "coochie."   Crystal pointed out defendant, who was standing about twenty feet away in the parking lot in front of the residence (Boccio: H7-8).

At that point, Wigand stayed with Crystal and Mya while Boccio approached defendant and identified himself as a police officer. Boccio asked defendant, "What's going on? Why are we here?" He responded, "Arrest me. She's saying I raped her

---

[1] Numbers in parentheses preceded by "H" refer to pages of the suppression hearing minutes, numbers in parentheses preceded by "D" refer to pages of the oral argument and decision on the suppression hearing, numbers in parentheses preceded by "T" refer to pages of the trial minutes, and numbers in parentheses preceded by "S" refer to pages of the sentencing minutes.

daughter." Boccio followed up, "I'm going to need a little more than that. What exactly happened?" Defendant admitted, "It was a mistake. I licked her once in the bedroom." Boccio then placed him under arrest (Boccio: H9-11).

Other than that colloquy, Boccio did not speak with defendant prior to the arrest and his weapon was holstered on his waist. They spoke entirely in English and had no difficulty communicating (Boccio: H11-13).

Additional officers responded to the scene and transported Mya and Crystal to the Nassau University Medical Center ("NUMC"). The NCPD Special Victims Squad was notified of the developing case (Boccio: H12-13).

Post-Arrest Statements and Buccal Swab

Detective MAURICE BARAN of the Special Victims Squad, a thirty-year veteran of law enforcement, became involved in the case later that day. He went to NUMC, where he met Mya and Crystal. He spoke with them in an examination room in the pediatric emergency area of the hospital (Baran: H92-94, 96).

Crystal told Baran that Mya was six years old and had gone into the apartment when she came home from school earlier that day. Crystal was on the porch, but at some point went inside the house only to find Mya in the kitchen with her pajama bottoms and underwear around her ankles, and with defendant standing behind her. Crystal asked what was happening and Mya said that defendant had either "ate" or "licked" her "coochie." Crystal also gave a signed, written statement to an NCPD officer confirming, in sum and substance, the same details (Baran: H94-95, 98).

3

Mya told Baran that defendant had placed his mouth on her vagina. Moreover, Mya told him that defendant had sexually abused her before (Baran: H96-97, 138).

At approximately 11:40 p.m., after returning from the hospital, Baran entered the Special Victims Squad arrest room to speak with defendant. The arrest room had a computer desk to which defendant had one wrist handcuffed, and measured about eight feet by eight feet. He first asked whether defendant needed anything to eat or drink, to go to the bathroom, or had any medical issues, and defendant said he was fine (Baran: H98-101).

The initial conversation took place in English, but Baran noticed a slight Spanish accent and asked defendant whether he would prefer to have his constitutional rights read to him in Spanish. Defendant said that he would, so Baran asked Detective REINALDO PACHECO, also of the NCPD Special Victims Squad, who was fluent in Spanish, to read the defendant his rights from a department-issued card (Baran: H101-03; Pacheco: H217; People's Exhibit 4 [*Miranda* card]).

When Baran requested assistance, Pacheco came into the arrest room. He read the Spanish side of the rights card, which translated into English as the following:

> Before asking you any questions you should understand you
> have the right to remain silent and that any statements you
> make may be used against you in court. Also, you have the
> right to talk to a lawyer before answering any questions or
> have a lawyer present at any time. If you cannot afford to
> hire a lawyer, one will be furnished you, if you wish, and you
> have the right to keep silent until you have had a chance to
> talk to a lawyer. Do you understand?

4

Defendant read the card himself, wrote "si" ("yes") three times on the card as Pacheco read it, and signed it at the end. Pacheco left shortly thereafter and Baran continued with defendant without any difficulty communicating in English (Baran: H102-05; Pacheco: H219-23).

Baran asked defendant whether he would like to give a written statement describing his version of the events of that day and he said that he would. Using the computer in the arrest room, Baran typed up the statement as defendant went along. On occasion, Baran interjected to ask a question or direct him to return from a tangent. Baran printed the statement and read through it with defendant, who made and initialed four corrections. Pacheco returned and read the statement, as corrected, to defendant in Spanish. After translating the statement, Pacheco also initialed the four edits that defendant had made. All three men signed the statement (Baran: H106-09; Pacheco: H224-26; People's Exhibit 5 [defendant's written statement]).

Defendant told Baran that he had gone over to his friend Crystal's house after his work ended at 11:30 a.m. that day to "hang out and have a few drinks with her." He and Crystal stayed on the front porch. Later in the day, Crystal's kids came home and went inside. At one point, defendant told Crystal he needed to use the bathroom and went inside himself. Mya tried to follow him into the bathroom, but he told her to wait outside. Mya was standing in the kitchen waiting for him when he came out. He told her "[he] was going to tickle her and [he] pulled down her pants and underwear and tickled her pussy with [his] mouth." Afterwards, he told her to pull her pants up, but

Crystal came in before she could. Defendant tried to claim that he had simply been playing with Mya, but she told Crystal twice that he had licked her vagina. Defendant had "made a big mistake and [he was] very sorry for what he did" (Baran: H110-13; People's Exhibit 5).

After defendant signed the statement of admission, Baran asked him if he wanted to write a letter to Mya and Crystal. Defendant said he would and Baran gave him a pen and paper. Defendant wrote and signed a letter in Spanish (Baran: H113-15; People's Exhibit 6 [defendant's apology letter]).

Defendant addressed the letter to Crystal and Mya and told them he was asking for "a thousand pardons." He was "very remorseful" and "never intended to do any harm." The letter concluded with a plea for forgiveness and for Crystal "to retract the charges against [him]" (Pacheco: H227; People's Exhibit 6).

After defendant wrote the apology letter, Baran left the room and began to process the arrest. He returned a short time later, however, to ask defendant whether he would consent to giving his DNA in a sample. Defendant said he would. Baran performed a buccal swab kit, which involved taking two swabs of the inside of defendant's cheek to collect samples. Once again, Baran relayed all explanation and instructions regarding the buccal swab kit in English. Defendant had no trouble understanding (Baran: H117-19).

Defendant's Case

Defendant presented no evidence (H269).

Arguments of Counsel

After the close of evidence, defense counsel requested an adjournment to prepare oral arguments (H270-71). When the arguments took place, defendant argued that Boccio had no probable cause to arrest defendant because he had no reliable information regarding defendant's conduct. In particular, defendant pointed out that Crystal had not actually seen defendant lick Mya's vagina. He claimed that Mya's words could not form a basis for probable cause because of her age -- she was merely parroting her mother. Consequently, the fruits of the unlawful arrest should be suppressed. Furthermore, Boccio's initial questioning of defendant in the parking lot near the scene constituted custodial interrogation. Defendant also argued the written statement should be suppressed because Baran conducted the interview in English even though defendant was more comfortable in Spanish (D95-98, 100, 119).

The People argued that Crystal's report of the situation in which she encountered defendant with Mya, the victim's confirmation that defendant had licked her vagina, and defendant's pre-arrest admission ("It was a mistake. I licked her once in the bedroom.") together established probable cause (D105).

Furthermore, Boccio, refraining from any use, display, or threat of force, asked defendant simple preliminary questions as he stood in a public parking lot. As such, the People argued, the court should not suppress the pre-arrest statements (D107-09).

7

Next, the People argued that defendant's written statement to Baran and apology letter to Mya and Crystal resulted from the voluntary waiver of his *Miranda* rights. As an initial matter, Pacheco read the rights card to defendant in Spanish. In any event, regardless of whether defendant preferred Spanish, the record was uncontroverted that defendant understood and communicated effectively with Baran in English. Similarly, the People contended that defendant's oral consent to the buccal swab, following his valid waiver of his *Miranda* rights, permitted the police to take the sample (D111, 116).

### The Hearing Court's Decision

The court orally issued a decision crediting the testimony of the People's witnesses and denying defendant's suppression motion. The court determined that "[b]ased on the statement of the mother after her observations of defendant and the child, the statement of the child, and the statement of the defendant at the scene, the police had probable cause to arrest the defendant." Furthermore, the pre-arrest admission "at the scene was not subject to *Miranda*, as defendant was not in custody, nor was he being interrogated." Lastly, the written statements and consent to the buccal swab occurred only after defendant provided "a knowing, intelligent, and voluntary waiver of his *Miranda* rights" (D90, 123-30).

8

The Trial

### The *Molineux* Application

The People sought permission to introduce evidence of an incident sometime in the months preceding October 16, 2013, in which defendant had oral sexual contact with Mya's vagina while alone with her in Crystal's bedroom (T8).

The court denied the application, but said it would revisit its ruling if defendant were to "open the door" (T15-16).

### The People's Case

As of 2013, CRYSTAL R. had known defendant for about thirteen years -- defendant's son was the longtime friend of her children's father. Crystal lived at 124 Park Avenue, Roosevelt, Nassau County, with her daughter, MYA, and son, SINCERE. Over the past year especially, Crystal and defendant had become friends, and he would often help her out by driving her places or babysitting the children. At the time, Mya was six and Sincere was ten years old. Crystal and defendant always spoke to each other in English (Crystal: T611-15).

On the morning of October 16, 2013, Crystal was mourning the loss of a friend and asked defendant to come over with some alcohol, which he did. Crystal and defendant were drinking on her porch when the kids came home from school and went inside the apartment around 2:45 p.m. The apartment had a living room, entered from the porch, followed by a kitchen, then a bedroom and bathroom. The kitchen had a door that, when shut, closed it off from the living room. Sincere finished his homework

9

then began playing video games in the living room. Mya put on pajama bottoms and played throughout the apartment (Crystal: T610, 615-18).

Later that afternoon, another acquaintance stopped by to talk with Crystal, and she shared a cigarette with him on the porch steps. Defendant went inside the apartment during that time. Approximately ten minutes later, Crystal's friend left and she went inside the apartment as well (Crystal: T619-20).

Inside the apartment, while Sincere played video games in the living room, defendant brought Mya into the kitchen and pulled down her pants and underwear. He bent down from the waist and licked Mya's vagina (Mya: T768, 777; Sincere: T674).

When Crystal came inside and opened the door to the kitchen, she found Mya with her pants and underwear down around her ankles and defendant standing directly behind her. Defendant looked "caught, ashamed, embarrassed." Crystal said, "What the fuck is going on?" Mya, in response, pointed up at defendant and said, "He licked my coochie," which meant her vagina (Mya: T768; Crystal: T621-22; Sincere: T675-76).

Crystal kicked defendant out of the apartment and called the police (Mya: T768-69; Crystal: T622-23; Sincere: T677). Officer Boccio and his partner responded to the scene at approximately 5:21 p.m. Crystal and Mya told him what had happened, then he approached defendant, who was standing nearby in a public parking lot. Boccio asked him, "What is going on? Why am I here?" He responded, "She's saying I raped her daughter. Arrest me." Boccio followed up, "I'm going to need a little more than that." Defendant admitted, "It was stupid. I licked her once in the bedroom." Boccio

10

placed him under arrest and eventually transported him to the Special Victims Squad (Boccio: T694-99).

Mya and Crystal rode in an ambulance to NUMC, where both met and spoke with Detective Baran. A sexual assault nurse examiner interviewed and collected evidence from Mya, including her pajama pants, underwear, and a vulva swab. Mya told the nurse examiner, "Daniel licked my coochie" (KATHLEEN MCALLISTER [nurse examiner]: T826, 830-34).

At approximately 11:40 p.m., Baran returned from the hospital to the Special Victims Squad and sat down with defendant in the arrest room. Defendant voluntarily waived his rights after Detective Pacheco read them to him in Spanish. Baran interviewed him in English without difficulty, and defendant gave a lengthy written statement of admission. Among other things, defendant said that he had pulled down Mya's pants and underwear and "tickled her pussy with [his] mouth." Defendant signed the rights card, made and initialed multiple corrections to the written statement, and signed his written statement (Baran: T944-64; Pacheco: T1109-16).

Furthermore, defendant consented to a buccal swab and wrote an apology letter in Spanish to Mya and Crystal. He asked for their forgiveness, said he had meant no harm, and pleaded with Crystal to withdraw the charges against him (Baran: 965-68; Pacheco: 1117-18).

11

CHRISTOPHER CHILLSEYZN, an expert in forensic genetics and DNA analysis from the Nassau County Medical Examiner's Office, received the sexual offense evidence collection kit from the examination of Mya and the buccal swab from defendant (Chillseyzn: T852, 862).

He established that both saliva and male DNA were present on the vulva swab. Mya's underwear, moreover, had two stains (A-1 and A-2) which both tested positive for the presence of saliva. Stain A-1 contained DNA which was consistent with defendant and his male patrilineal relatives. The other stain, A-2, contained DNA from two males. The DNA profile from the major male contributor matched defendant's profile. That matching DNA profile could be expected to be found in approximately one in 175,000,000 individuals (Chillseyzn: T867-78).

Defendant's Case

Defendant presented three character witnesses. His son, DAVID RAMOS, "love[d] [his father] to death" and "would do anything for him." According to David, defendant had a reputation for kindness and gentleness towards children (David: T1163, 1166). Defendant's daughter-in-law, STEPHANY FIGUEROA-RAMOS, also said that defendant was kind and gentle towards children and had positive parenting traits that she hoped to emulate (Stephany: T1169). CHRISTY HERNANDES, who had dated defendant's other son, similarly stated that defendant had a reputation for kindness towards children (Hernandes: T1180).

12

In addition, DR. KARL REICH, an expert in DNA analysis, said that the test results indicated that some male DNA was present on the vulva swab, but not enough to conclude that for a certainty. He agreed, however, that the vulva swab contained saliva (Reich: T1201, 1236, 1246-48).

Reich conceded that both underwear stains contained saliva and defendant's DNA. He argued that the amount of defendant's DNA was more consistent with defendant touching the underwear with his fingers rather than licking Mya's vagina, which Reich would have expected to leave a larger sample (Reich: T1196, 1200-03, 1217, 1248, 1252, 1254).

Lastly, defendant testified on his own behalf. For approximately a year before the date of incident, defendant frequently drove Crystal and her children places, lent Crystal money (which she never repaid), and occasionally bought them meals and babysat the kids. He did all of this uncompensated, out of kindness, and on top of his responsibilities to his wife, family, and employer (Ramos: T1280-81, 1287-88, 1331-32).

On October 16, 2013, defendant went to Crystal's house and kept her company on her porch. Around 3:15 p.m., Mya and Sincere came home. Later in the afternoon, he went inside to use the bathroom (Ramos: T1300-02).

According to defendant, he encountered Mya in the bathroom, and she was naked from the waist down with her clothes in her hand. Defendant told her to wait outside and put her clothes on. After he came out, however, she still had her clothes in her hand. He brought her into the kitchen and sat her on the floor, took the "panties"

13

and pajama bottoms, and started putting them on her. He only pulled the underwear and pajamas up to her knees, then stood her up. Defendant told Mya to pull the clothes up the rest of the way, but Crystal walked in at that time (Ramos: T1302-05).

Crystal said, "What the fuck? What is going on here?" Then she asked, "Was [he] eating [your] coochie?" Mya said yes. Defendant denied that he had done anything, but Crystal told him to leave the house and called the police. As he stood on the porch, Mya came to the window and they "had a conversation." Defendant asked whether Crystal had actually called the police. Mya responded, "You know my mom, you know how she is" (Ramos: T1305-06, 1309-10).

The police arrived within a few minutes. Defendant never made the statements Officer Boccio had attributed to him. Later, at the Special Victims Squad, the detectives never read the rights card to defendant, in English or Spanish. He only wrote "si" three times and signed it because they told him to (Ramos: T1311-12).

Defendant confirmed that he had, in fact, told Baran all of the innocuous details contained within the written statement of admission. He denied, however, telling Baran that he had licked Mya's vagina. Moreover, Pacheco never translated the statement into Spanish. Defendant claimed he only made corrections to the statement, initialed it multiple times, and signed it because the detectives told him to (Ramos: T1313-22, 1357).

14

Similarly, defendant wrote the apology letter to Mya and Crystal, but only at the detectives' directive. He apologized in the letter not because he had sexually abused Mya, but instead because he could see Crystal was angry with him and he "[did] not like to offend people" (Ramos: T1322-23).

People's Rebuttal Case

JOSHUA HANSON, an expert in child sexual abuse and sexual perpetration, explained that sexual predators often engage in a process of "grooming" their child victims. In that process, a perpetrator first seeks to "ingratiate" himself with the child and his/her family. He then uses that trust to get time alone with the victim, at which point he sexualizes the relationship. Furthermore, the grooming process incentivizes predators to appear kind and gentle towards children in order to gain access to them (Hanson: T1380-84).

Therapy Records And Defense Applications To Recall Crystal

Therapy Records And Unrelated Incident With Sincere

Crystal was the People's first witness to testify. On cross-examination, defense counsel asked her whether defendant had brought Mya and Sincere to South Shore Child Guidance Center ("South Shore") for therapy. The People objected and the court excused the jury to hear argument of counsel (T634-35).

Defense counsel argued that the prosecutor's direct examination had opened the door to exploration of Mya's therapy. Furthermore, he had "information that [had] been provided to [him]" that Crystal watched pornography in the home. Per counsel, that

15

"created a situation in which [Mya] cannot distinguish between reality and what she saw in pornographic films." Accordingly, he asked the court to sign a subpoena for South Shore records related to both Mya's and Sincere's therapy. Counsel already had the subpoena prepared (T637-38).

The prosecutor opposed defendant's application as insufficient to merit a "fishing expedition" into the children's irrelevant and confidential counseling records. Moreover, he speculated to the court and defense counsel regarding the possible reasons for the therapy: (1) the children's father had assaulted Crystal in 2012, and (2) in the past, Sincere had been the victim of an attempted criminal sexual act by his uncle, Alex Feliciano (his father's brother) (T637, 642).

The court agreed to sign the subpoena, but said it would inspect any records *in camera* for relevance prior to disclosing them (T640, 642).

Counsel returned to his cross-examination of Crystal. He asked her no questions about the unrelated case in which Sincere had been abused (T647-61). Although the court stopped counsel from asking Crystal about pornography, it permitted him to ask both Mya and Sincere whether they had seen such movies. They had not (Sincere: T689; Mya: T795).

South Shore responded promptly to the subpoena -- the court had received the records by the morning of Mya's testimony. After its review, the court determined that one page of the records was relevant to the instant case and disclosed it to the prosecution and defense. Furthermore, the court explained that the children were in

16

therapy due to domestic violence within the family (i.e., their father against Crystal) and some longstanding disciplinary issues. Contrary to the defense's assertions, the records did not relate to the children viewing pornography or Mya's inability to distinguish such movies from reality (T737-38).

Later in the trial, counsel told the court that his office had represented Alex Feliciano in the case where he had sexually abused Sincere. Based on his review of the file, counsel said that the case took place in 2007, when Sincere was three years old, six years before the incident here, more than seven years prior to the trial, and before Mya was born. In that case, Crystal found Feliciano trying to force Sincere to perform oral sex on his exposed penis. The uncle pled guilty to the top count, attempted criminal sexual act in the first degree, and was incarcerated pursuant to that judgment at the time of trial (T1081-82, 1088).

### Defense Motions To Recall Crystal

Although he did not try to question Crystal regarding the prior case when she was on the stand, counsel subsequently made multiple unsupported applications to recall her so that he could do precisely that. The motions meandered, but the thrust of his argument was that the prior victimization of Sincere affected Crystal's state of mind when she encountered defendant alone with her half-naked daughter. Her state of mind, in turn, caused her to overreact to what the defense maintained was a harmless situation. The court denied each motion (T895-97; T1081-1104; T1293-94; T1370).

During the most extensive argument, the court explained its multiple grounds for denying the motion to recall Crystal. Among its reasons, the court noted that Crystal never claimed to have witnessed defendant touching Mya's vagina -- she reacted to what her daughter told her. More important than Crystal's actions, the jury had to evaluate defendant's statements to police and the DNA evidence. Recalling Crystal for evidence on a collateral matter from eight years prior to the trial would tend to confuse the jury and unnecessarily prolong the trial (T1096-1100).

Swearability Hearing

The court conducted a hearing to determine Mya's swearability prior to her testimony. Mya was seven years old and in second grade in school at the time. She knew she was there "[b]ecause of Danny." She stated, "You have to tell the truth." If not, "You lie." Furthermore, "If you lie, you get punished." If Mya lied at home, then she would get punished, including having her toys taken away. She understood that if she promised to tell the truth here, but did not, then the court could "get [her] in trouble . . . [and] find that [she] did something wrong" (Mya: T750-52).

Mya explained that calling the judge's robe purple would be a lie because it was, in fact, black. Similarly, calling the stuffed animal that she had brought with her green, even though it was blue, would be a lie (Mya: T751, 754).

18

Lastly, Mya did not know what it meant "to take an oath," but said that telling the truth meant, "You raise your hand and that means you are telling the truth" about "something that happened." If Mya told a lie in the courtroom that day, she would be "taken away," but she would not lie (Mya: T754, 756).

Because Mya could recognize the difference between a truth and a lie, and she had articulated negative consequences for lying, the court determined she was swearable (T757-59).

### Prior Consistent Statement About Uncharged Incidents

On cross-examination of Mya, defense counsel focused on the circumstances and disclosure of prior instances in which defendant sexually abused her. The People had avoided such direct testimony pursuant to the court's *Molineux* ruling. Repeated questions struck at the veracity of her complaints of prior incidents, including, among many: "Was it true? Was that true? Which is true? Mya, that didn't happen, it didn't happen five times before, did it? These things didn't happen, did they, Mya?" Furthermore, counsel asked numerous questions regarding the details of the prior abuse, including where and when it had occurred, and what defendant had done (Mya: T773-806).

The court later permitted Detective Baran to testify, as he had at the suppression hearing, that Mya indicated to him at the hospital that defendant had sexually abused her before. The court ruled that the cross-examination of Mya had opened the door to such testimony by raising the issue of recent fabrication (Baran: T908-35, 940).

19

### Jury Note Regarding The 911 Call

During its deliberations, the jury sent a note asking "to the [sic] hear the 911 call from Crystal or the transcript, if it was on the record. If it's on the record, can we see slash hear it?" Defense counsel urged the court to ask the jurors whether they wanted a readback of Crystal's testimony about calling the police. The court demurred, declining to read an ambiguity into an otherwise clear note. It told the jury that neither the call itself nor a transcript of it was in evidence (T1597-1600).

### The Verdict

On May 29, 2015, the jury convicted defendant of criminal sexual act in the first degree (Penal Law § 130.50[3]) and endangering the welfare of a child (Penal Law § 260.10[1]) (T1638).

<u>The Sentencing Proceeding</u>

On July 24, 2015, defendant appeared for sentencing. The People requested a twenty-year term of incarceration, stating that it was traumatic for both Mya and Sincere to have to testify at trial, Mya had expressed ongoing fear that defendant would ever be released from prison, and Crystal wanted defendant sentenced to the maximum period of incarceration, twenty-five years. Furthermore, defendant had sexually abused Mya in prior uncharged incidents (S3-4).

Defense counsel argued that the court should sentence defendant to the minimum of five years. He pointed to the character witnesses defendant had presented and his otherwise exemplary life, as well as his lack of prior convictions. He also disputed whether any of the uncharged prior acts had actually occurred (S5-15).

The court noted that the jury had discredited defendant's explanations of his statements to police and how saliva and his DNA ended up on Mya's underwear. Furthermore, he misled the jury about barely speaking English, despite clear evidence to the contrary. Defendant had "told a tale at every turn, trying to blame everyone but [himself], going so far as to have [his] attorney blame the mother here at sentencing." Accordingly, the court sentenced defendant to a term of fifteen years' incarceration with ten years of post-release supervision (S18-19).

<u>POINT I</u>

The Police Had Probable Cause To Arrest Defendant, And His Written Statement Followed The Voluntary Waiver Of His Rights (answering defendant's brief point VIII).

By the time Officer Boccio arrested defendant, Mya had told him that defendant had licked her vagina and defendant himself had admitted it. As such, he had probable cause to arrest defendant. Furthermore, defendant voluntarily waived his *Miranda* rights prior to giving his written statement of admission.

An officer may arrest a person when there is "reasonable cause to believe that such person committed a crime." C.P.L. § 140.10(1)(b). Reasonable cause, in turn, exists when "information which appears reliable" makes it "reasonably likely" that the suspect committed an offense. C.P.L. § 70.10(2). "The probable cause determination of the hearing court, which had the advantage of hearing and seeing the witnesses firsthand, is to be accorded great weight on appeal, and will not be disturbed unless clearly unsupported by the record." *People v. Francis*, 44 A.D.3d 788, 789 (2d Dept. 2007).

Here, Mya informing Boccio that defendant had licked her vagina sufficiently established probable cause (Boccio: H8, 26). *See, e.g.*, *People v. Mendoza*, 49 A.D.3d 559, 560 (2d Dept. 2008) (where "an identified citizen accuses another individual of a specific crime, the police possess probable cause to arrest"). Furthermore, Boccio learned that Mya had disclosed to Crystal before approaching defendant (Boccio: H8, 24). *See People v. Kennedy*, 282 A.D.2d 759 (2d Dept. 2001) (hearsay may supply probable cause); *accord People v. Jansson*, 305 A.D.2d 942, 943 (3d Dept. 2003) (oral

statements of victim and aunt, to whom she disclosed, sufficient for probable cause). Lastly, defendant admitted pre-arrest, "It was a mistake. I licked her once in the bedroom" (H10). *See, e.g., People v. Foy*, 26 A.D.3d 344 (2d Dept. 2006) (defendant's pre-arrest statements provided probable cause). As the arrest was based on probable cause, there was no "unconstitutional seizure" meriting suppression. Defendant's Brief at 64.

Contrary to defendant's assertions, Mya need not have been older, nor have answered more promptly, to have permitted Boccio to rely on her statement. Defendant's Brief at 62-63; *cf. People v. Hetrick*, 80 N.Y.2d 344, 349-50 (1992) (no swearability requirement for nine-year-old to supply probable cause). The cases defendant cites to support his claim that the information Boccio had was "[too unreliable] to effectuate the arrest" simply do not stand for that proposition. Defendant's Brief at 62; *see People v. Gittens*, 211 A.D.2d 242, 244 (2d Dept. 1995) (discussing "fellow officer" rule); *People v. Cantor*, 36 N.Y.2d 106, 111 (1975) (discussing suppression of poisonous fruits).

Next, defendant's admission, "I licked her once in the bedroom," was not the result of custodial interrogation (Boccio: H10). *See generally* C.P.L. § 60.45; *Miranda v. Arizona*, 384 U.S. 436 (1966). The court's finding in this regard "must be afforded great deference" on appeal. *People v. Ellerbe*, 265 A.D.2d 569 (2d Dept. 1999).

Defendant was standing in a public parking lot, leaning against a car (Boccio: H8). *See People v. Rodney P.*, 21 N.Y.2d 1 (1967) (preliminary questioning of defendant outside his house by officer who intended to arrest him, but had not done so, held not

custodial). Boccio had his handcuffs and gun holstered, he approached alone on foot, he never threatened or used force on defendant, and he asked only two benign preliminary questions (Boccio: H9-11). *See, e.g., People v. Dorsey*, 118 A.D.2d 653 (2d Dept. 1986) ("a reasonable person, innocent of any crime, would not have believed that he was in custody had he been in the defendant's position"). Accordingly, the court properly denied defendant's motion to suppress his pre-arrest statements.

Finally, the prosecution established that defendant voluntarily waived his rights before speaking with Baran. No officer threatened or coerced defendant, and Pacheco read him the department-issued rights card in Spanish (Baran: H115-17; Pacheco: H219-23; Boccio: H10-11). *See, e.g., Moran v. Burbine*, 475 U.S. 412, 421 (1986) (valid *Miranda* waiver requires that defendant understand the rights and waive them voluntarily). Defendant wrote "si" three times and signed the rights card (Pacheco: H222). *See, e.g., People v. Valverde*, 13 A.D.3d 658, 659 (2d Dept. 2004) (waiver valid where Spanish-speaking officer translated rights, even though defendant initially did not understand right-to-counsel question and crossed out answer). Pacheco also translated the written statement into Spanish for defendant before he signed it (Pacheco: H224). *Cf. People v. Sirno*, 76 N.Y.2d 967, 968 (1990) (waiver valid where officer asked question in English, defendant asked to see warnings in Spanish, officer gave him Spanish rights card to read to himself, then defendant gave statement).

In any event, though defendant may have felt more comfortable speaking in Spanish when conversing with Baran, that did not change the fact that he understood English. *Accord People v. Mora*, 36 A.D.3d 1142, 1143-44 (3d Dept. 2007). All three witnesses gave uncontroverted testimony that defendant had no difficulty communicating in English (Boccio: H10-11; Baran: H100, 105, 119; Pacheco: H223). *See People v. Hung Le*, 139 A.D.2d 666 (2d Dept. 1988). Defendant's claim that he could not speak to Baran in English simply because Pacheco read him his rights in Spanish does not follow. Defendant's Brief at 64-65.

Lastly, defendant's use of an interpreter at the pretrial hearing was not evidence and, anyway, was consistent with court policy of liberally providing interpreters. *See* N.Y. Ct. Rules § 217.1(a). Moreover, the sole case defendant cites is inapposite because there the officer who translated the rights card into Spanish did not testify at the hearing. *See People v. Alberto*, 22 Misc. 3d 786 (Dist. Ct. Suffolk County 2008).

## POINT II

The Court Properly Found The Victim Swearable Because She Knew The
Difference Between A Truth And A Lie, And That False Testimony Could Lead To
Punishment (answering defendant's brief, Point I).

At her swearability hearing, Mya exhibited that she knew the difference between
a truth and a lie. She knew that she had to testify truthfully. She articulated negative
consequences for lying. The court, therefore, properly exercised its discretion in finding
Mya swearable. In any event, the People presented substantial evidence to corroborate
her testimony.

A witness less than nine years old is swearable if "she understands the nature of
an oath." C.P.L. § 60.20(2). In turn, a witness understands the nature of an oath if "she
appreciates the difference between truth and falsehood, the necessity for telling the
truth, and the fact that a witness who testifies falsely may be punished." *Id*.

"The resolution of the issue of witness competency is exclusively the
responsibility of the trial court, subject to limited appellate review." *People v. Parks*, 41
N.Y2d 36, 46 (1976); *see also People v. Hickey*, 133 A.D.2d 421, 422 (2d Dept. 1987)
(competency ruling "should be sustained . . . absent a clear showing of an abuse of
discretion"); *cf. People v. Groff*, 71 N.Y.2d 101, 104 (1987) (prosecutor's swearability
determination for grand jury entitled to deference). The court here not only heard Mya's
sufficient answers, but also had the opportunity to observe her demeanor and capacity.
*Parks*, 41 N.Y2d at 46 (trial court's direct observations of witness important in

26

competency determination). Having observed her, the court properly exercised its broad discretion to find Mya swearable.

Mya demonstrably met all the statutory requirements to give sworn testimony. She drew a clear distinction between the truth and a lie (T751). She also successfully determined that two statements the court made by way of example were lies (T751, 754). *See People v. Schultz*, 168 A.D.2d 468 (2d Dept. 1990) (eight-year-old swearable where he "appreciated the difference between truth and falsity"). Moreover, she assured the court both that she knew, "You have to tell the truth," and that she would, in fact, tell the truth (T751, 756). *Accord People v. Fournier*, 137 A.D.3d 1318, 1321 (3d Dept.) (court properly received sworn testimony from seven-year-old who knew difference between truth and lie, "that it was necessary that she tell the truth," and that she could be punished if she lied), *leave denied*, 28 N.Y.3d 929 (2016). Lastly, Mya articulated that lying in general may lead to punishment ("If you lie, you get punished"), as well as punishments specific to her own truthfulness, such as having her toys taken away (T751, 752, 756). *See People v. Robrigado*, 254 A.D.2d 438 (2d Dept. 1998) (seven-year-old properly sworn where she had "some conception" of consequences of false testimony).

Mya did not need to know what the word "oath" meant or what it meant "to take an oath in this courtroom" in order to give sworn testimony (T753-54). *See* Defendant's Brief at 26; *People v. McDaniel*, 165 A.D.2d 817, 817-18 (2d Dept. 1990) (not required that eight-year-old be able "to define the meaning of an oath" where she "understood the meaning of telling a lie, that it was wrong to lie, and that she would be

27

'punished' for lying"). The statute itself allows for that possibility because, by definition, a witness "understands the nature of an oath" who knows the difference between truth and lies, the importance of telling the truth, and the possibility of punishment for false testimony -- all of which Mya exhibited. *See* C.P.L. § 60.20(2).

Furthermore, any inconsistencies in Mya's trial testimony were a matter of credibility for the jury, not swearability. As discussed above, Criminal Procedure Law section 60.20(2) enumerates three factors that determine whether a witness understands the nature of an oath. Consistent trial testimony is not among them. *Id*. Conversely, the court permitted defendant to argue in summation that Mya "[told] us so many inconsistent things on the witness stand here in front of you, that she should not be believed," and it charged the jury on inconsistency as a credibility factor (T1404, 1570). *See* C.J.I. (2d ed.) Credibility of Witnesses. In short, the court made a proper swearability ruling, and allowed defendant to use inconsistencies at the proper time.

Regardless, this Court has never held that a witness's trial testimony retroactively invalidated a competency determination. Defendant relies solely on a distinguishable decision from a trial court thirty years ago. *See People v. Murphy*, 139 Misc. 2d 83 (Sup. Ct. Kings County 1988). In *Murphy*, the court found the victim swearable and a jury convicted the defendant. *Id*. However, the "child's panicked demeanor, his facial expressions, and his constant need for reassurance and guidance . . . " convinced the court it had made a mistake. *Id*. at 85. Furthermore, there was paltry corroborating evidence. *Id*. at n. 4. Accordingly, the court set aside the verdict. *Id*. at 89.

Here, the court had no such misgivings after personally observing Mya's complete testimony and the corroborating evidence was substantial.

Relatedly, any error resulting from the court finding Mya swearable was harmless. *See People v. Crimmins*, 36 N.Y.2d 230, 237 (1975). Had the court instead permitted only unsworn testimony, then it would have had to charge the jury on the need for corroboration. *See* C.P.L. § 60.20(3). Corroborative evidence, in turn, "is legally sufficient if it tends to establish the crime and that defendant committed it." *Groff*, 71 N.Y.2d at 109; *see* C.J.I. (2d ed.) Corroboration of Unsworn Witnesses (corroboration "tends to establish that the offense was in fact committed" and "to connect the defendant with the commission of the offense"). In this case, the People presented ample evidence to satisfy that low bar -- Crystal found defendant alone with Mya with her pants down, defendant made three incriminating statements to police, including a complete admission, and both the prosecutor's and defendant's experts agreed that Mya's underwear contained saliva and defendant's DNA.

Lastly, defendant's claim that the court should not even have permitted Mya to give unsworn testimony is meritless. Mya's sensible and responsive answers demonstrated that she had "sufficient intelligence and capacity to justify the reception" of her testimony. C.P.L. § 60.20(2); *see People v. Scott*, 86 N.Y.2d 864, 865 (1995) (no abuse of discretion in allowing four-year-old sex crime victim to give unsworn testimony where child understood difference between truth and lie).

POINT III

The Court Properly Denied Defendant's Repeated Applications To Recall The Victim's Mother To The Witness Stand (answering defendant's brief, Point II).

Evidence that Sincere had been sexually abused eight years before the instant trial had trifling probative value. Conversely, that evidence was remote, collateral, and had substantial potential to obscure the important issues for the jury to deliberate. Accordingly, the court properly exercised its discretion to deny defendant's repeated motions to recall Crystal.[2] Regardless, any error was harmless because defendant presented the exact defense which he now claims the court abridged.

In resolving defendant's motions to recall Crystal, the court had broad discretion. First, it had discretion to allow defendant to recall a witness or not. *See People v. Flowers*, 102 A.D.3d 885, 885-86 (2d Dept. 2013) (trial court "providently exercised its discretion and did not deprive [defendant] of due process and the right to present a defense by denying his request to recall a certain witness for further cross-examination"); *People v. Gibson*, 106 A.D.3d 834, 835 (2d Dept. 2013); *see also People v. Olsen*, 34 N.Y.2d 349, 353 (1974) (court has authority to alter order of proof "in its discretion"); Judiciary Law § 2-b (court has expansive power to control form of proceeding); *accord Huddleston v. United States*, 485 U.S. 681, 690 (1988) (trial courts exercise "broadest sort of discretion in controlling the order of proof at trial").

---

[2] At trial, defendant asked to recall Crystal or Sincere. His appeal relates only to his requests to recall Crystal.

Next, the court's determination that the prior case with Sincere was collateral is subject to review only for abuse of discretion. *See People v. Feldman*, 299 N.Y. 153, 169 (1949) ("Whether evidence is 'too remote,' i.e. whether it is proximately relevant to some fact in issue[,] is a question for the court . . . "); *see also People v. Martinez*, 177 A.D.2d 600, 601 (2d Dept. 1991).

Furthermore, the court had discretion to limit the scope of cross-examination. "[T]rial courts retain wide discretion to limit cross-examination based on concerns about, among other things," confusion of the issues, misleading the jury, or marginal relevance. *People v. Ashner*, 190 A.D.2d 238, 246 (2d Dept. 1993) (citations omitted). In particular, "cross-examination of a witness upon collateral matters is in the discretion of the trial court, and its rulings should not be disturbed absent an improvident exercise of discretion." *People v. Rosovich*, 209 A.D.2d 554, 555 (2d Dept. 1994). The Confrontation Clause guarantees an opportunity only for an effective cross-examination, not an unrestrained one. *People v. McMahon*, 149 A.D.3d 1102 (2d Dept.), *leave denied*, 29 N.Y.3d 1130 (2017).

Here, the evidence defendant sought to adduce upon recalling Crystal had scant probative value. Defendant claims that cross-examining Crystal about the sexual abuse that Sincere experienced would have buttressed his argument that Crystal jumped to an incorrect conclusion (T1083-84). Defendant's Brief at 32. Initially, the claim is based upon conjecture -- a mother need not have observed previous sexual abuse in order to fear the worst upon finding her six-year-old daughter naked from the waist down, alone

31

with a grown man. *See People v. Francisco*, 44 A.D.3d 870 (2d Dept. 2007) (court properly limited speculative questioning on motive to fabricate); *cf. People v. Kennedy*, 47 N.Y.2d 196, 202 (1979) ("close judicial supervision is necessary to ensure that the jury does not make inferences which are based not on the evidence presented, but rather on unsupported assumptions drawn from evidence equivocal at best").

In any event, Crystal never claimed to have witnessed defendant licking Mya's vagina. Instead, Mya told her that he had (Crystal: T622; Boccio: H20; Baran: H95). Thus, the case hinged on the veracity of Mya's complaint, and conclusions Crystal may or may not have drawn were immaterial. *See, e.g., People v. Giles*, 11 N.Y.3d 495, 499 (2008) (evidence is relevant if it is probative of a material fact).

Moreover, the abuse of Sincere had no bearing whatsoever on Crystal's credibility or the accuracy of her memory at defendant's trial, a point which defendant acknowledged (T1096).

Balanced against this minimal probative value, the court had significant reasons not to recall Crystal for further cross-examination. The abuse of Sincere was remote in major respects: it took place eight years prior to the instant trial, before Mya was born, and it involved a different defendant and a different victim, let alone differences in conduct. *See Martinez*, 177 A.D.2d at 601 (court may exclude relevant evidence where it is too remote).

In addition, the court risked obscuring the main issues, misleading the jury, and unnecessarily prolonging the trial by introducing evidence of Sincere's case and its effect

32

on Crystal's state of mind. As the court noted, "[Crystal's] actions are not on trial." Instead, the jury had to grapple with the reliability of Mya's testimony, defendant's statements to law enforcement, and DNA evidence (T1099). *See, e.g., Ashner*, 190 A.D.2d at 246; *accord* Fed. R. Evid. 403 (court may exclude evidence with danger of confusing the issues or misleading the jury).

Lastly, defendant's request would have unnecessarily resulted in the public airing and traumatic reliving, for Crystal or Sincere, of the intimate details of how Sincere's uncle sexually abused him when he was three years old. *See* Civil Rights Law § 50-b (embodying desire to protect privacy of victims of sex crimes); *cf. People v. Jones*, 82 A.D.2d 674, 678-79 (2d Dept. 1981) (upholding closure of courtroom designed to minimize shame and embarrassment of rape victim).

The cases which defendant cites are distinguishable. Each involved a court preventing a defendant from cross-examining on, or introducing evidence of, matters that struck at the heart of the prosecution, as opposed to the tenuous subject here. *See Ashner*, 190 A.D.2d at 238 (key witness's motive to lie); *People v. Baranek*, 287 A.D.2d 74 (2d Dept. 2001) (complainant in burglary case suffered from hallucinations that people were breaking into her home); *Rosovich*, 209 A.D.2d at 554 (victim's motive to falsify and lack of credibility); *People v. McLeod*, 122 A.D.3d 16 (1st Dept. 2014) (accomplice witness's bias, credibility, and motive to fabricate); *People v. Thompson*, 111 A.D.3d 56,

67 (2d Dept. 2013) (complainant "repeatedly and consistently identified another individual as the perpetrator of the alleged crime").[3]

Regardless, any alleged error in denying the motions to recall Crystal was harmless. *See Crimmins*, 36 N.Y.2d at 237. He told the jury that Crystal found Mya in "an ambiguous situation" and "jump[ed] to a conclusion" (T1398-99). He also told the jury that after Crystal reached an incorrect conclusion, Mya went along with it rather than risk further upsetting her mother (T1402-03). Thus, he presented the defense he wanted. The court's denial of his applications to recall Crystal for evidence of a separate, remote crime with marginal relevance (at best) to this case had little, if any, detrimental effect on his presentation of that defense. If anything, the court's ruling protected defendant by eliminating the considerable risk of unduly crediting Crystal's testimony, as her observations led to a top-count plea in Sincere's case (T1088). Either way, the court did not abridge defendant's constitutional right to present a defense.

---

[3] Defendant's remaining case dealt with an improper hearsay ruling. *People v. Gibian*, 76 A.D.3d 583 (2d Dept. 2010).

34

## POINT IV

### The Court Responded Meaningfully To The Jury's Note Asking To Hear The 911 Call Or Read Its Transcript (answering defendant's brief point III).

The jury sent a note asking to hear the 911 call or read its transcript. Neither the call nor its transcript was in evidence. Accordingly, the court properly responded to the note by informing the jury that those two items were not in evidence.

In response to a jury note, the court must give "such requested information" as it "deems proper." C.P.L. § 310.30. The court must respond "meaningfully." *People v. Malloy*, 55 N.Y.2d 296, 302 (1982). It need not, however, provide the jurors with, or advise them they were entitled to, something they did not ask for. *People v. Salaman*, 231 A.D.2d 464 (1st Dept. 1996).

Here, the court was not required to make something out of nothing. *Cf. People v. Ford*, 30 A.D.3d 306 (1st Dept. 2006) (no error for court officer to tell jury requested items were not available because they were not in evidence, because that was ministerial function). The note was clear, the response was clear (T1597-1600). *See Salaman*, 231 A.D.2d at 464. The jury sent four other notes asking, in one way or another, for readbacks of specific portions of testimony (T1596, 1606, 1622, 1627). It was perfectly capable of requesting testimony about Crystal calling 911, or following-up on the court's response, if it had wanted.

35

## POINT V

The Court Properly Allowed Testimony About A Prior Consistent Statement By The Victim Because Counsel Challenged Her Testimony As A Recent Fabrication (answering defendant's brief point V).

Although the People avoided questioning Mya about prior incidents pursuant to the court's *Molineux* ruling, defendant cross-examined her comprehensively on past abuse. Subsequently, the court permitted Detective Baran to testify that Mya told him at the hospital that defendant had previously abused her as well. In light of the extensive evidence on the matter which defendant elicited himself, the court's ruling was proper to allow the People to rebut claims of recent fabrication.

The prohibition against "bolstering" refers, in relevant part, to "the fortification of a witness's testimony and credibility through the use of a prior consistent statement." *People v. Buie*, 86 N.Y.2d 501, 510 (1995). A court may admit a witness's prior consistent statement only to rebut a claim of recent fabrication, as such statements otherwise constitute impermissible hearsay. *Id*. In turn, "[i]f upon cross-examination a witness'[s] testimony is assailed -- either directly or inferentially -- as a recent fabrication, the witness may be rehabilitated with prior consistent statements that predated the motive to falsify." *People v. McDaniel*, 81 N.Y.2d 10, 18 (1993). The prior consistent statement need not predate all motives to fabricate. *People v. Woods*, 80 A.D.3d 718 (2d Dept. 2011) (citing *People v. Baker*, 23 N.Y.2d 307, 322-23 [1968]).

Here, defendant directly attacked Mya's testimony about prior incidents as a recent fabrication. The record utterly belies his claim that he only highlighted an

36

inconsistency between the amount of times she said it had happened before. Defendant's Brief at 45. Instead, counsel devoted the vast majority of his cross-examination to questions about whether Mya was telling the truth about prior incidents[4] and the details of those incidents.[5] Notably, counsel also asked numerous questions about whether Mya had reported the past abuse to anyone prior to the instant case.[6]

Such questioning directly challenged whether Mya fabricated prior incidents after defendant's arrest. Indeed, defendant made that explicit in his summation:

> Now, she needs to keep herself as a victim in order to avoid her mother's raft [sic]. So, five days later, she exaggerates her victimized [sic] by saying it happened five times, as kids do, kids exaggerate... Mya gets sympathy by being believed and being believed she is a victim. Mya simply makes herself more of a victim by saying to her [South Shore counselor], oh, it happened five times before (T1407).

Furthermore, Mya's statement to Baran predated the alleged "motive to falsify" (garnering additional sympathy by "mak[ing] herself more of a victim," a week later to her counselor and months later to the prosecutor [T1407-11]). *See Woods*, 80 A.D.3d at 718 (defendant opened door to prior consistent statement by inferring recent fabrication on cross-examination, and statement predated at least one motive to fabricate).

---

[4] E.g., "Was it true? I'm asking you now, Mya, did this happen five times before?" (T780); "And that wasn't true, was it?" (T785); "Mya, that didn't happen five times before, did it?" (T786); "You are saying this, it happened?" (T805).

[5] E.g., "Where did these five times happen?" (T781); "And were you wearing pajamas again the same way?" (T787); "And your mother was in the house those times?" (T788); "Did it hurt?" (T798); "So, it didn't happen then at nighttime?" (T801).

[6] E.g., "Did you tell your mother?" (T781); "Did you tell her afterwards?" (T783); "Did you say anything to anybody?" (T789); "Did you ever tell [Sincere] that these things happened?" (T794).

At a minimum, the extensive cross-examination on whether and how she reported prior incidents led to an inference that she made up the past abuse (T1407). *See McDaniel*, 81 N.Y.2d at 18. Accordingly, the court providently exercised its discretion to allow evidence of a prior consistent statement.

In any event, the alleged error was harmless. *See Crimmins*, 36 N.Y.2d at 237. Evidence of Mya's prior consistent statement constituted eight *lines* of transcript (Baran: T940). On the other hand, defendant's cross-examination of Mya focused almost exclusively on prior incidents for over twenty-five *pages* of transcript (Mya: T780-807). Thus, even within the limited subject of Mya's reporting of past incidents, the prior consistent statement played a minor role. The statement's importance was even more minimal relative to the main issues the jury had to consider, including Mya's account of the charged crime, DNA evidence, and defendant's statements to law enforcement. *See People v. Walsh*, 289 A.D.2d 517, 518 (2d Dept. 2001) (improper bolstering harmless where "no significant probability that defendant would have been acquitted but for [the] statement").

## POINT VI

The Evidence Convincingly Supported The Jury's Verdict (answering defendant's brief point VI).

The prosecution's case against defendant was truly compelling, and fully warranted the jury's guilty verdict. The victim testified to defendant licking her vagina, and her mother's observations, defendant's statements, and DNA evidence all corroborated her account. Accordingly, the evidence overwhelmingly supported the jury's verdicts.

Defendant is entitled to review of the weight of the evidence. C.P.L. § 470.15(5). First, the Court should determine whether, based on all the credible evidence, a finding different from that of the trier of fact would have been reasonable. *See People v. Romero*, 7 N.Y.3d 633, 643 (2006). If the jury reasonably could have reached a different conclusion, the Court must next weigh the probative force of conflicting testimony and the relative strength of any inferences that may be drawn from such testimony. *Id.* Where the record leads the Court to conclude that the trier of fact failed to give the evidence proper weight, the Court may set aside the verdict. *Id.* at 643-44.

A weight-of-the-evidence review, however, is not an "open invitation" for the Court to substitute its own judgment for that of the trier of fact. *People v. Cahill*, 2 N.Y.3d 14, 58 (2003). Indeed, the Court must accord "great deference" to the jury's "opportunity to view the witnesses, hear the testimony and observe demeanor." *People*

*v. Bleakley*, 69 N.Y.2d 490, 495 (1987). Thus, the reversal of a conviction following a weight-of-the-evidence review is "far from commonplace." *Cahill*, 2 N.Y.3d at 59.

Here, defendant's claim that the verdict was against the weight of the evidence centers on four chief complaints: (1) Mya's testimony was incredible; (2) Detective Baran never interviewed Mya after the arrest date; (3) DNA evidence was unpersuasive; and (4) defendant's version of events was credible. Defendant's Brief at 47-55.

Defendant points to alleged inconsistencies only in Mya's testimony about prior, uncharged incidents -- her testimony about the instant case was internally consistent and consistent with other witnesses. Defendant's Brief at 52-54. Initially, some inconsistencies regarding prior sexual abuse would be expected because Mya would "always freeze [her] memories" about (presumably traumatic) prior incidents (Mya: T782). And the prosecutor, pursuant to the *Molineux* ruling, told Mya not to discuss prior incidents, only for her to be subjected to vigorous cross-examination focused almost entirely on past abuse (T813). For that matter, given Mya's age, some inconsistencies would be expected regardless of the subject of her testimony. *See Fournier*, 137 A.D.3d at 1320 (verdict was not against the weight of the evidence where seven-year-old sex offense victim testified inconsistently about the *charged* incident, because not uncommon for young children to testify inconsistently).

Certainly, in describing prior abuse, Mya did not "give[ ] irreconcilable testimony pointing both to guilt and innocence" in the instant case. *People v. Hampton*, 21 N.Y.3d 277, 288 (2013) (citations omitted). Of course, her testimony differed from defendant's

40

account, but resolution of credibility questions was for the jury. *See id.* Defendant "fully explored [any inconsistent aspect]" of Mya's testimony in his cross-examination and summation, and the jury nonetheless credited her (Mya: T780-805; T1404). *People v. Thiel*, 134 A.D.3d 1237, 1239 (3d Dept. 2015). Moreover, even if there were inconsistencies in Mya's testimony regarding uncharged abuse, those inconsistencies could not serve as a legitimate basis for defendant's claim. *See, e.g.*, *People v. Shofkom*, 63 A.D.3d 1286, 1287 (3d Dept. 2009); *see also People v. Parris*, 70 A.D.3d 725, 727 (2d Dept. 2010).

Similarly, the fact that the District Attorney's office took over the investigation after the arrest date, so that Baran never conducted a follow-up interview with Mya after speaking with her in the hospital, is irrelevant. Defendant's Brief at 54. The prosecutor took over the investigation from the police. That is not a ground for relief. Other than the claim itself, defendant offers no factual or legal support that would justify overturning the jury's guilty verdict based on whether Baran or the assistant district attorney conducted the follow-up interviews. *See Cahill*, 2 N.Y.3d at 58.

Next, defendant's DNA expert agreed with the People's expert in major respects. Both experts agreed that the vulva swab contained saliva, and that Mya's underwear contained saliva and defendant's DNA. Reich diverged from Chillseyzn regarding male DNA on the vulva swab: he accepted that testing showed that the swab contained male DNA, but not enough to make that conclusion with certainty (Reich: T1201, 1246-48).

41

Significantly, Reich did not dispute that defendant deposited DNA on Mya's underwear, where saliva was also present. He instead argued that the amount of defendant's DNA was more consistent with him touching the underwear with his fingers than with him making oral contact. He acknowledged that multiple factors could have affected the amount of DNA deposited, including the length of contact, natural rubbing-off as Mya wore her underwear, and whether Mya had wiped her vagina after using the bathroom (Reich: T1201, 1235-36, 1251-53).

Thus, the experts conflicted only in a limited sense. Perhaps Reich was even correct that, in a vacuum, the amount of defendant's DNA on Mya's underwear was more consistent with manual rather than oral contact. The jury, however, was not operating in a vacuum. It could consider the additional factors of the presence of saliva on Mya's vagina and underwear, Mya's testimony that defendant licked her, Crystal's corroborating observations, and defendant's inculpatory statements.

Relatedly, the jury accorded defendant's testimony the proper weight -- it discredited him. Defendant offered nothing more than self-serving contrivances. He admitted that he wrote "si" three times on the rights card, then signed it. He conceded that Baran called in Pacheco to present the card in Spanish. Inexplicably, according to defendant, despite going through that effort, and although the card had a bolded title, "Notification of your rights before being questioned," the detectives told him to sign the card without reading it, which he supposedly did (Ramos: T1312, 1341, 1345-46).

42

Defendant's explanation of his written statement of admission also begs belief. He admitted to telling Baran every piece of information in his statement, with the glaring exception of, "I told her I was going to tickle her and pulled down her pants and underwear and tickled her pussy with my mouth." On direct-examination, he said he only signed and initialed corrections on the statement where the detectives told him to do so. On cross-examination, however, he said he reviewed the document and corrected mistakes. He also volunteered that he pointed out a missing word to Baran and initialed that correction. But the sentence just *two lines* below, "[I pulled down her underwear and tickled her pussy with my mouth]"? Defendant "[didn't] see those words" (Ramos: T1313-19, 1351, 1357).

Defendant's testimony strained credulity in multiple other ways as well, and the bottom line is that the jury agreed with that assessment. The jury observed both Mya and defendant testify. It heard how defendant looked "caught, ashamed, embarrassed," when Crystal found him alone with her half-naked daughter behind closed doors (Crystal: T621). It reviewed defendant's multiple incriminating statements, and listened to his implausible story of how they came about. The jury heard uncontroverted evidence that saliva was on Mya's vagina and underwear, and defendant's DNA was on her underwear. The jury reached the inescapable conclusion that defendant was guilty. This Court should accord the jury's sensible decision the deference to which it is entitled. *See Bleakley*, 69 N.Y.2d at 495.

Lastly, compared with the evidence of guilt here, the cases defendant cites are inapposite. *See People v. O'Neill*, 141 A.D.3d 606 (2d Dept. 2016) (police stopped masked men and recovered gun incident to arrest, but failed to voucher masks, lost *Miranda* card and defendant's original statement, and did not record arrest); *People v. Washington*, 52 Misc. 3d 140(A) (App. Term, 9th & 10th Jud. Dists., 2016) (complainant had motive to lie and her trial testimony contradicted supporting deposition and testimony of police officers); *People v. Martin*, 52 Misc. 3d 140(A) (App. Term, 9th & 10th Jud. Dists., 2016) (the only two witnesses conflicted with each other). Here, the People's evidence was overwhelming and compelled the jury's guilty verdict.

## POINT VII

The Court Made Fair Decisions, Supported By Law, Throughout The Trial (answering defendant's brief point IV).

Defendant perceived evidence of the court's bias behind many of its rulings, no matter how routine. In reality, the court made fair decisions, supported by law, throughout the trial. The court was not required to recuse itself simply because defendant opted to tilt at windmills.

The court had discretion to recuse itself or not. *See People v. Glynn*, 21 N.Y.3d 614, 618 (2013). Defendant alleges a litany of errors he believes demanded exercise of that discretion. None of the allegedly-biased rulings constituted error, much less error that deprived defendant of a fair trial. *See People v. DeJesus*, 42 N.Y.2d 519, 523 (1977).

"The error most harmful to the defense," according to defendant, was the court's denial of his repeated motions to recall Crystal. Defendant's Brief at 40. As discussed above, however, the court's decision was a provident exercise of its broad discretion. *Supra*, Point III. Defendant bemoans that the court, in denying the recall motions, noted that defendant made incriminating statements and there was DNA evidence. Per defendant, that showed "that the court had already decided the case in its mind[ ] that the evidence was overwhelming against appellant, and its rulings were colored by that bias." Defendant's Brief at 40.

45

The record belies that extraordinary conclusion. Defendant misconstrues the

court's words:

> ... when the evidence is too remote or speculative of a motive to fabricate,
> the trial court may, in its discretion, exclude such proof.
>
> Now, I have that as my base and have [counsel] saying it's not about
> [Crystal's] motive to fabricate, it's about her actions. Her actions are not
> on trial. What we all seem to be forgetting in this case is that subsequent
> to this child going to the hospital there is a statement by the defendant,
> and there is DNA evidence that points to this defendant as the potential
> perpetrator of this crime. That is something the jury will have to decide.
> The court doesn't get to make that decision. The court certainly gets to
> look at all of the evidence before it in making a determination as to
> whether or not a matter is so completely collateral that it would tend to
> confuse the jury or even, more so in this case, prolong a trial unnecessarily
> and bring forth evidence that is to do nothing more than to make a witness
> relive a traumatic event from [six years prior to this incident and eight
> years prior to this trial] (T1099).

The court brought up defendant's admissions and DNA evidence explicitly for the

proper considerations of whether the evidence defendant sought to adduce by recalling

Crystal was collateral and whether it would confuse the jury. Defendant's claim that this

passage embodies the "most harmful" example of the court's bias requires a bewildering

leap. *See People v. Smith*, 123 A.D.3d 950 (2d Dept. 2014) ("nothing the Supreme Court

said during the proceedings gave any hint of any judicial bias").

Defendant also complains that the court reviewed the subpoenaed South Shore

records *in camera* "so defense counsel could not see all of them[.]" Defendant's Brief at

38. Far from exhibiting bias, the court was adhering to law which required it to retain

confidential subpoenaed records to inspect them for relevance. *See* C.P.L. § 610.25(1);

*People v. Gissendanner*, 48 N.Y.2d 543 (1979).

46

Furthermore, the court properly denied defendant's amorphous request to subpoena NCPD protocol for interviewing sex offense victims. Defendant's Brief at 38. Defendant offered no factual predicate to justify the subpoena -- he wanted to fish for irrelevant impeachment material to couple with his unpersuasive contention that Baran, not the prosecutor, should have conducted follow-up interviews with Mya. *See, e.g., Gissendanner*, 48 N.Y.2d at 549-50. Regardless, defendant made the exact arguments in his closing about supposed deficiencies in Baran's conduct for which he claimed he needed the "protocol" (T1414-19). Thus, even if the court's decision to deny the subpoena constituted error, the prejudicial effect of that error was alleviated. Regardless, defendant was not deprived of a fair trial.

Next, defendant rehashes his claim that the court should have responded differently to the jury's note asking to hear the 911 call or read its transcript. Defendant's Brief at 38-39. As discussed above, the court did not need to clarify an already unambiguous note. *Supra*, Point IV.

Defendant also claims that the court improperly sustained the People's objections to portions of his closing. Defendant's Brief at 38. Defendant took issue with the prosecutor's objections to his description of Reich's credentials, and counsel's inappropriate attempt to characterize the ADA's conduct as "dirty pooling," "a gotcha moment," "deliberately deceptive," and being like "the son that kills his parents and then asks for mercy because he is an orphan" (T1442, 1443-48, 1612). First, as to Reich's credentials, the court initially sustained an objection to counsel's comment that

Reich had taught law enforcement about DNA testing. Immediately afterwards, however, the court allowed him to say that twice (T1442). Thus, the court's initial ruling, proper or not, was rendered moot and in no way deprived defendant of a fair trial.

Second, the court properly sustained objections to counsel's unwarranted *ad hominem* attacks against the prosecutor. Per defendant, the prosecutor's grievous offense was that one print-out in the DNA testing packet contained three graphs from an unrelated case. Although (1) the graphs were clearly marked with different file numbers, (2) marked as pertaining to DNA from a handgun, (3) the packet was timely disclosed to defendant, and (4) Reich's paid, expert analysis included reading the packet, counsel nonetheless assailed the prosecutor (T1240-41). Regardless of the fact that the insults were not merited, the court properly sustained objections to them because they were personal attacks rather than fair comment on the evidence. *See, e.g.*, *People v. Williams*, 29 N.Y.3d 84, 88 (2017). Moreover, defendant's inability to belittle the prosecutor did not deprive him of a fair trial.

Lastly, defendant alleges that the court "yelled at him . . . about the irrelevant rape shield law" and made a sarcastic comment about defendant being the source of information for counsel's application to subpoena South Shore records. Defendant's Brief at 38. First, the record reflects no injudicious remarks. Outside the presence of the jury, and in response to a defense application, the court stated that defendant wanted to elicit irrelevant testimony from the People's witnesses, just as questioning a rape victim about her past relationships would be improper (T726). Using that analogy

48

did not prejudice defendant, let alone deprive him of a fair trial. *See People v. Griffin*, 134 A.D.3d 1228, 1231 (3d Dept. 2015) (record did not support judicial bias claim).

Similarly, the court's supposedly "sarcastic" comment was reasonable in context. Counsel asked the court to subpoena South Shore records. He made the confident, but incorrect, claim, "Judge, as an officer of the court, I'm making a representation to this court that the reason the children were going to therapy was because they were watching pornography." The People disputed that assertion. The court, needing to know counsel's basis for his statement, commented, "So says your client" (T639). Not only was that response temperate, especially in light of the boldness of defendant's assertion, but also the court was obligated to discern what factual predicate existed, if any, to justify its subpoena of confidential therapy records. *See Gissendanner*, 48 N.Y.2d at 550. In any event, the court signed the subpoena, undermining the notion that the alleged sarcasm deprived him of a fair trial.

Defendant's claims of bias, though oft-repeated at trial, have no legal or factual basis. In reality, the court made prudent decisions and defendant received a fair trial.

POINT VIII

The Court Imposed A Fair Sentence (answering defendant's brief point VII).

Upon his conviction of criminal sexual act in the first degree (Penal Law § 130.50[3]), a class B felony, defendant faced a maximum sentence of twenty-five years in prison and a minimum of five. *See* Penal Law § 70.02(3)(a). The court split the difference, imposing a term of fifteen years' incarceration (S19). Moreover, defendant faced between five and twenty years of post-release supervision. *See* Penal Law § 70.45(2a)(f). The court imposed only ten (S19). Under those circumstances, and all those attendant to the case, the sentence was appropriate.

Sentencing is appropriately left to the sound discretion of the trial court. *People v. Suitte*, 90 A.D.2d 80, 83 (2d Dept. 1982). This Court, however, may modify an otherwise legal sentence which it deems unduly harsh. C.P.L. § 470.15(6)(b). In order to exercise this power, the Court must determine not only that the sentence imposed was harsh and excessive, but also that there is some demonstrated "need to impose a different view of discretion than that of the sentencing Judge." *Suitte*, 90 A.D.2d at 86.

Acknowledging that "[a] sentencing decision is unquestionably a matter committed to the exercise of a trial court's discretion," defendant nonetheless claims his sentence is excessive, and he seeks an unspecified reduction. Defendant's Brief at 57. The trial court should not punish defendant for exercising his right to a trial. Nor should it reward him. Instead, the nature of the crime fully warranted the court's sentence. *See People v. Garcia*, 46 A.D.3d 573, 574 (2d Dept. 2007) (sentencing court

properly considered serious nature of offense). In addition, the prosecutor asked for twenty years' imprisonment based on the lasting fear that defendant instilled in his six-year-old victim, and Crystal's desire to see him receive maximum punishment (S4-5). *Cf. People v. Dyer*, 60 A.D.3d 690 (2d Dept. 2009) (People's lesser recommendation at sentencing factor in appellate court's interest-of-justice reduction). The court's fifteen-year sentence, in the middle of the prison range and on the low end of the post-release supervision range, was appropriate.

## CONCLUSION

## The Judgment Of Conviction Should Be Affirmed.

Dated:  Mineola, New York
        January 25, 2018

Respectfully submitted,

MADELINE SINGAS,
District Attorney, Nassau County
*Attorney for Respondent*
262 Old Country Road
Mineola, New York 11501
(516) 571-3800

Tammy J. Smiley
Brian Witthuhn
 Assistant District Attorneys
  *of Counsel*

## CERTIFICATE OF COMPLIANCE WITH 22 NYCRR § 670.10.3(f)

BRIAN WITTHUHN does hereby certify as follows: This brief was prepared by computer; the body of the brief is double-spaced and utilizes a proportionately spaced typeface (Garamond) of 14-point size; the footnotes are single-spaced and utilize the same typeface and 12-point size; and, according to the word count of the word processing system used (Microsoft Word), the brief contains 12,231 words, exclusive of the cover, table of contents, certificate of compliance, and proof of service.

Dated:   Mineola, New York
         January 25, 2018

Brian Witthuhn
Assistant District Attorney