UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
DANIEL RAMOS,

                Petitioner,

                                   MEMORANDUM AND ORDER

      -against-                  19-CV-1125(JS)

WILLIAM LEE,

                Respondent.
----------------------------------X
APPEARANCES

For Petitioner:     Daniel Ramos, <u>pro se</u>
                     #15-A-3367
                     Great Haven Correctional Facility
                     P.O. Box 4000
                     Stormville, New York 12582

For Respondent:    Cristin N. Connell, Esq.
                     Brian Witthuhn, Esq.
                     Nassau County District Attorney's Office
                     262 Old Country Road
                     Mineola, New York 11501

SEYBERT, District Judge:

       Pending before the Court is the <u>pro se</u> petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (hereafter, the "Petition") of Petitioner Daniel Ramos ("Petitioner"). (<u>See</u> Petition, ECF No. 4-1.)[1] Following a jury trial, Petitioner was

---

[1]  Petitioner's February 25, 2019 petition included the full names of two minor children involved in the underlying incident. (ECF No. 1.)  Thereafter, and in response to the Court's March 1, 2019 Order, Petitioner filed an amended petition on March 14, 2019, supplanting the original petition, redacting the names of the minor children and referring to them only by their initials. (ECF No. 4.)

convicted of one count of New York Penal Law § 130.50(3), Criminal Sexual Act in the First Degree, and one count of New York Penal Law § 260.10(1), Endangering the Welfare of a Child. Now seeking habeas relief, Petitioner raises eight claims: (1) the trial court erred by deeming the complainant swearable; (2) the trial court violated Petitioner's Sixth Amendment rights to present a defense and confront the witnesses against him; (3) the trial court erred by failing to meaningfully respond to a jury note; (4) the trial court's bias against the defense violated Petitioner's Due Process rights to a fair trial and to present a defense; (5) the trial court erred in admitting improper bolstering testimony regarding alleged prior incidents of abuse; (6) the jury's verdict was against the weight of the evidence; (7) the sentence imposed was unnecessarily harsh and excessive; and, (8) because there was no probable cause for his arrest, and his involuntary written statement was used against him at trial, Petitioner's Fourth Amendment rights were violated. (See Petition, ECF pp. 3-17.) For the following reasons, the Petition is DENIED in its entirety.

<u>BACKGROUND</u>[2]

I. <u>The Offense Conduct and Subsequent Investigation</u>

On October 16, 2013, Crystal Ramirez walked into her kitchen and saw her six-year-old daughter, M.R.,[3] with her pants and underwear around one ankle, and Petitioner standing directly behind her. (<u>See</u> Tr. 621:3-11.) Crystal asked what was going on and M.R. pointed to Petitioner and stated "he licked my coochie." (<u>Id.</u> at 621:25-622:6.) Crystal picked up her daughter, started dressing her, and yelled at Petitioner to get out. (<u>See</u> <u>id.</u> at 622:12-20.) Once Petitioner left her apartment, Crystal locked the door and called 911. (<u>See</u> <u>id.</u> at 622:25-6.)

Police Officer Joseph Boccio ("Officer Boccio") of the Nassau County Police Department ("NCPD") responded to the 911 call at Crystal's apartment. (<u>See</u> <u>id.</u> at 694:25-695:5.) Upon arriving there, Officer Boccio observed Petitioner approximately twenty feet away, standing in the parking lot and leaning

---

[2] The background is drawn from the transcript of Petitioner's combined <u>Mapp</u>/<u>Dunaway</u>/<u>Huntley</u> suppression hearing ("Hr'g Tr.") (<u>see</u> ECF No. 7-1), the transcript of the state court's oral ruling on Petitioner's suppression motion ("Ruling Tr.") (<u>see</u> ECF No. 7-13, beginning at ECF p. 123), and the transcripts of Petitioner's state court criminal trial ("Tr.") (<u>see</u> ECF Nos. 7-2 (pp. 1-844), 7-3 (pp. 845-1644)).

[3] On October 16, 2013, the complainant, M.R., was six years old, and her brother, S.R., was ten years old. (<u>See</u> Tr. 611:4-9, 611:18-24.) Since both children were minors when the underlying events occurred, the Court shall refer to them by their initials only. <u>See</u> Fed. R. Civ. P. 5.2(a)(3).

against a car, but first approached Crystal and M.R. to speak with them regarding what happened. (See id. at 695:6-696:13.) They both reported that Petitioner licked her M.R.'s "coochie." (See Hr'g Tr. 8:10-14; 20:14-18.)

Officer Boccio then approached Petitioner and asked him what happened. (Tr. 697:20-23.) Petitioner stated, "[S]he said I raped her daughter. Please arrest me." (Id. at 698:1-2.) When Officer Boccio asked for clarification, Petitioner replied, "[I]t was stupid, I licked her once in the bedroom." (Id. at 698:7-10.) Thereafter, Officer Boccio placed Petitioner under arrest. (See id. at 698:11-13.) He was transported to the NCPD Special Victims Squad ("SVS") in Bethpage, New York, while M.R. and Crystal were taken by ambulance to Nassau County University Medical Center ("NCUMC"). (See id. at 699:11-22; 624:1016.)

At NCUMC, Kathleen McAllister ("McAllister"), a sexual assault nurse examiner, conducted an examination of M.R. and collected evidence using a sexual offense examination collection kit, commonly referred to as a rape kit. (See Tr. 822:2; 823:1025; 824:17-19.) During the examination: McAllister collected M.R.'s pajama pants, underwear, and a vulva swab; and, M.R. reported to McAllister that "Daniel licked my coochie." (See id. at 826:20-22; 830:19-23; 831:21-24; 834:21-25.) Detective Maurice Baran ("Detective Baran") was the lead special

victims detective assigned to investigate the incident (see id. at 936:19-22), who: responded to NCUMNC; interviewed Crystal and M.R.; and, took possession of the evidence collected by McAllister. (See id. at 834:12-16; 835:1-4; 938:12-939:10.)

After Detective Baran left NCUMC, he went to the Bethpage SVS where he interviewed Petitioner. (Tr. 1020:8-13.) After Petitioner waived his Miranda rights, Petitioner made admissions, including that he had "told her I was going to tickle her and I pulled down her pants and underwear and tickled her pussy with my mouth." (Id. at 963:13-14; 952:11-19; 950:20-951:7.) Detective Baran typed up Petitioner's statement, which Petitioner reviewed, corrected, and then signed. (See id. at 956:5-960:12.) In addition to his written statement, Petitioner: wrote a letter of apology in Spanish to M.R. and Crystal (see id. at 965:11-19); and consented to give a DNA sample, taken by buccal swab, which was collected by Detective Baran. (See id. at 967:3-16.)

II. The Suppression Hearing and Trial

On September 25, 2014, a suppression hearing was held in New York Supreme Court, Nassau County, before the Honorable Teresa K. Corrigan. Petitioner argued there was no probable cause for his arrest, and sought suppression of his oral and written statements, and the buccal swab taken from him while in custody. (See generally Hr'g Tr.) In opposition, the

prosecution presented three witnesses to testify regarding the circumstances surrounding Petitioner's arrest, statements, and buccal swab: Officer Boccio, Detective Baran, and Detective Reinaldo Pacheco ("Pacheco").

Officer Boccio testified: about responding to the 911 call of a woman seeking to report the sexual abuse of her six-year-old daughter (see Hr'g Tr. 7:6-12); thereafter, speaking with Crystal and her daughter, M.R.; and, then, speaking with Petitioner outside of Crystal's apartment (see id. at 7:13-8:9, 9:12-16). Officer Boccio further testified: about asking Petitioner why he was there and what had occurred (see id. at 10:1-3); that Petitioner responded, "Arrest me. She's saying I raped her daughter," (id. at 10:4-7); upon a request for clarification, Petitioner stated, "It was a mistake. I licked her once in the bedroom." (Id. at 10:8-18.) Officer Boccio also testified that: at the time Petitioner made his statements to Officer Boccio, Petitioner was not under arrest or handcuffed; he (Boccio) had his firearm holstered; and, after speaking with Petitioner, he placed Petitioner under arrest. (See id. at 10:23-11:16.)

Detectives Baran and Pacheco testified to the circumstances of Petitioner's statements taken at the NCPD SVS. The testimony elicited from them included that: after observing Petitioner spoke with a Spanish accent, Detective Baran asked

whether Petitioner would prefer his rights read to him in Spanish (see Hr'g Tr. 101:7-16 (Baran)); Detective Pacheco, a Spanish speaker, read Petitioner his <u>Miranda</u> rights in Spanish from a <u>Miranda</u> card (see id. at 101:17-24 (Baran), 219:7-13 (Pacheco)); after Petitioner's <u>Miranda</u> rights were read to him, both Detectives Baran and Pacheco signed the card, and Petitioner wrote "<u>Si</u>" on the card in three places and then signed his name at the bottom; (see id. at 104:18-105:4 (Baran), 222:3-13 (Pacheco)); and, after Detective Pacheco left the interview room, Detective Baran and Petitioner continued to speak to each other in English without difficulty (see id. at 105:7-9 (Baran), 222:14-223:9 (Pacheco)).

Detective Baran further testified that: he asked Petitioner what happened between him and M.R., and Petitioner responded that he was just tickling her and playing with her (see Hr'g Tr. 105:19-23); Petitioner agreed to give a written statement, which was typed by Detective Baran (see id. at 105:24-106:21); after the statement was prepared, Petitioner read the statement, made corrections, and wrote his initials next to the corrections (see id. at 107:13-108:2, 108:17-22); Petitioner also wrote an apology letter in Spanish to Crystal (see id. at 113:24-114:3); and, Petitioner consented to a buccal swab (see id. at 117:14-22). Detective Pacheco also testified that he read to Petitioner in Spanish the statement prepared by

Detective Baran and that, thereafter, Petitioner signed it. (See id. at Tr. 225:3-20.)

Subsequently, in a bench ruling, the court denied Petitioner's suppression motion in all respects. (See Ruling Tr. 130:20-21.) Regarding probable cause, the hearing court stated, "Based on the statement of the mother after her observations of defendant and the child, the statement of the child and the statement of the defendant at the scene, the police had probable cause to arrest the defendant." (See id. at 129:15-19.) Regarding Petitioner's oral statement at the scene, the court stated that it "was not subject to Miranda [sic], as defendant was not custody, nor was he being interrogated." (Id. at 129:19-21.) Regarding Petitioner's written statement, the court ruled that "[s]uch statement was freely and voluntarily and intelligently provided after a knowing, intelligent and voluntary waiver of his Miranda [sic] rights." (Id. at 130:7-9.) The court also noted that of Petitioner's ability to speak and understand English, his "desire to speak in English after receiving warnings in Spanish does not negate the validity of the warnings or the statement." (Id. at 130:4-6.) Additionally, "[t]he defendant clearly speaks and understands a good amount of English, but it was prudent to give Miranda [sic] warnings in Spanish." (Id. at 130:15-17.)

Petitioner's jury trial commenced in early May 2015, also before Honorable Teresa K. Corrigan. (Tr. at 1.) Prior to trial, the court denied the prosecution's <u>Molineux</u> application seeking to introduce prior bad acts and uncharged crimes, specifically that on at least one occasion prior to October 16, 2013, Petitioner had oral sexual contact with M.R.'s vagina while alone with her in Crystal's bedroom, and exposed his penis and used it to make contact with M.R.'s buttocks. (<u>See</u> Tr. 8:12-9:3, 15:1-5.) However, the court also stated that if defense counsel were to "open the door" to the incident, the court would revisit its ruling. (<u>Id.</u> at 15:9-16:6.)

During the trial, the prosecution presented testimony of numerous law enforcement witnesses involved in the investigation, expert witnesses, and civilian eyewitnesses. (<u>See</u> Tr. 225:18-1012:4). Crystal Ramirez testified that on October 16, 2013, she resided in Roosevelt, New York, with her two children, M.R. and S.R., who were six years old and eleven years old, respectively. (<u>See</u> <u>id.</u> at 610:4-9, 610:23-611:1, 4-9, 18-20.) Crystal further testified that she: knew Petitioner through her children's father, having met him approximately thirteen to fourteen years earlier (<u>see</u> <u>id.</u> at 613:4-11); had become closer with Petitioner in the year leading up to the incident (<u>see</u> <u>id.</u> at Tr. 613:23-24); and, allowed Petitioner to

help her by driving her different places and babysitting her children (see id. at 613:23-24, 615:5-7; 630:15-24).

As to October 16, 2013, Crystal testified that: because she was upset after learning a close friend had passed away, Petitioner came to her home with alcohol and the two proceeded drinking (Tr. 615:14-20, 616:15-20, 617:1-8); her children were still at school when Petitioner first arrived (see id. at 616:18-20); when M.R. and S.R. arrived home from school at approximately 2:45 p.m., Crystal and Petitioner were still drinking on the outside porch (see id. at 618:2-10); and both M.R. and S.R. went into the apartment while Crystal and Petitioner remained on the porch (see id. at 618:17-20).

Crystal continued to explain that: at some point, another acquaintance stopped by to smoke a cigarette with Crystal on the porch (Tr. 618:21-619:7); at that time, Petitioner went into the apartment for about ten minutes (see id. at 619:8-20); and, after the acquaintance left, she went into the apartment, walked past S.R. on the couch in the living room, and went into the kitchen (see id. at 620:4-22.) She further testified that when she walked into the kitchen, Crystal saw M.R. with her pants and underwear around one ankle and Petitioner standing behind her, looking "caught, ashamed, embarrassed." (Id. at 621:3-20.) M.R. told Crystal that Petitioner licked her "coochie," at which point Crystal told

Petitioner to get out and called the police.[4]  (See id. at 622:2-4; 622:18-20; 623:3-6.)

McAllister testified regarding her interaction with M.R. at the NCUMC, including: administering the rape kit; M.R.'s physical examination; interviewing M.R.; and, the evidence collection.  (See Tr. 822:2; 823:1025; 824:17-19; 826:20-22; 830:19-23; 831:21-24; 834:21-25.)   McAllister also testified about giving Detective Baran the sex offense evidence collection kit.  (See id. at 834:8-16.)

The prosecution also presented DNA evidence through the testimony of Christopher Chillseyzn, an expert in forensic genetics and DNA analysis from the Nassau County Medical Examiner's Office.  (See Tr. 846-882.)   He testified that he reviewed and analyzed the sexual offense evidence collection kit taken from M.R. by McAllister.  (See id. at 862:14-22).   Chillseyzn's examination revealed the presence of both saliva and male DNA on M.R.'s vulva swab and the presence of saliva in two stains, Stains A-1 and A-2, on M.R.'s underwear.  (See id. at 869:19-870:3; 870:23-871:3; 872:2-9.)   As to the Stains,

---

[4]  While Crystal testified that she called 911, the prosecution did not enter the 911 call or radio run into evidence.  (See Tr. 623:3-6.)   During cross-examination, defense counsel sought to enter Crystal's 911 call to refresh her recollection regarding the verbiage she used when she made the call.  (See id. at 647:18-25; 648:11-649:2.)   The court ruled that the tape could be played for Crystal outside the presence of the jury to refresh her recollection.  (See id. at 650:22-651:12.)

Chillseyzn testified that: he compared the DNA profiles found in them to the buccal swab taken from Petitioner (see id. at 876:3-14); Stain A-1 contained DNA consistent with Petitioner and his male patrilineal relatives (see id. at 876:15-20); while Stain A-2 had two male DNA contributors, the major male contributor matched Petitioner's profile (see id. at 877:4-8); and, the matching DNA profiles (a) from Stain A-1 could be expected to be found in one in one thousand one-hundred seventy-one individuals, and (b) from Stain A-2 could be expected to be found in approximately one in one-hundred seventy-five million individuals (see id. at 877:13-22).

M.R. and her brother S.R. also testified. (See generally Tr. 764-816.) Prior to M.R.'s testimony, the trial court conducted a swearability hearing to determine whether she understood the oath and could be sworn in as a witness. (See Tr. 750-761.) During that hearing examination, M.R. stated: she was seven years old and in second grade (see id. at 752:20-25); she understood she was in court because of Petitioner (see id. at 750:22-24); that "[y]ou have to tell the truth" and if you do not, then "you lie" (see id. at 751:7-13). M.R. demonstrated her understanding of what constituted a lie by answering hypothetical questions. (See id. at 17-24; 754:13-19.) M.R. stated she understood that lying in court would be wrong and had consequences, explaining that if she lies at home she gets

punished.   (See id. at 751:25-19.)   Over defense counsel's objection, the court found M.R. was swearable as she understood the difference between the truth and a lie.   (See id. at 757:2-758:13.)   Thereafter, M.R. testified, recounting what happened on October 16, 2013 (see id. at Tr. 767-770), and, in particular, testifying that Petitioner licked her "coochie" in the kitchen (See id. at 768:4-8.)   In cross-examination, defense counsel questioned M.R. regarding prior incidents of alleged sexual abuse by Petitioner, i.e., what Petitioner had allegedly done to her, how many times it occurred, and whether she disclosed this to anyone.   (See id. at 780:19-783:19; 785:6-786:2; 786:18-790:3; 794:20-795:6; 795:16-796:7; 797:8-798:14; 800:3-801:21; 803:10-804:21.)   Relatedly, during Detective Baran's testimony, the trial court permitted Baran to testify that, while at the NCUMC, M.R. reported to him that Petitioner had sexually abused her before.[5]   (Tr. 940:6-15.)

M.R.'s brother, S.R., also testified, stating: that while he was playing video games in the living room, Petitioner came into the apartment and went into the kitchen with M.R. and closed the door (Tr. 674:11-675:1); he then saw Crystal go into the kitchen and start screaming; he could see inside the kitchen and that M.R.'s pants were on the floor (see id. at 676:22-25);

---

[5]   Earlier, the court had ruled, over objection, that defense counsel's cross examination of M.R. opened the door to testimony regarding prior incidents of abuse.   (See Tr. 908-931.)

and, he then heard Petitioner first say that M.R. was lying, but later heard Petitioner admit that he did it (see id. at 677:16-24.)

At the close of the prosecution's case, defense counsel moved for dismissal pursuant to New York Criminal Procedure Law § 290.10, which the court denied.  (Tr. 1144:4-1146:20.)  Thereafter, defense counsel presented three character witnesses, i.e., Petitioner's son, David Ramos; Petitioner's daughter-in-law, Stephany Figueroa-Ramos; and, David Ramos' former girlfriend, Christy Hernandes, who each testified regarding Petitioner's reputation for kindness and gentleness towards children.  (See id. at 1161-1166; 1166-1175;1176-1182.) The defense also introduced the expert testimony of Dr. Karl Reich, a DNA analysis expert, who testified that the amount of male DNA found was extremely small and not consistent with it being from saliva.  (See id. at 2100:21-1201:7.)  He further testified that the vulva swab did not contain a male DNA profile, which was also inconsistent with the presence of saliva.  (See id. at 1201:8-14.)  On cross-examination, Dr. Reich conceded that both Stains found on M.R.'s underwear contained saliva and Petitioner's DNA (see id. at 1254:7-1255:1), but maintained that amount of DNA found in the underwear was more consistent with Petitioner touching the

14

underwear with his fingers rather than licking M.R.'s vagina (see id. at 1217:5-11; 1263:20-1264:8).

Petitioner testified in his own defense (see generally Tr. 1273-1368), first providing some general background, e.g.: he knew Crystal and her children, and would drive Crystal places and lend her money that was never paid back (see id. at 1279:13-16; 1280:7-17); and, he would take M.R. and S.R. to get food, with Crystal's permission, and would sometimes babysit them (see id. at 1281:3-5; 1290:5-1291:1). Regarding October 16, 2013, Petitioner testified: he went to Crystal's apartment after she called him twice asking him to come over (see id. at Tr. 1300:4-8); he bought Crystal Long Island iced teas, a sandwich, and cigarettes (see id. at 1300:9-15); he and Crystal sat on the porch while she drank and smoked (see id. at 1300:25-1301:4); at 3:15 p.m., the children came home from school (see id. at 1301:6-18); and, he took M.R. inside to help her with her homework, and when M.R. finished, he went back outside (see id. at 1301:14-1302:11).

Petitioner continued his testimony about the afternoon of October 16, stating: while outside with Crystal, he asked her permission to go inside and use the bathroom (Tr. 1302:17-22); when inside, he saw M.R. partially naked from the waist down and holding her clothes (see id. at 1302:22-1303:7); he believed M.R. was changing her clothes after school (see id. at 1302:23-

25); M.R. tried to follow him into the bathroom but he told her to wait outside and put on her clothes (see id. at 1303:8-18.) According to Petitioner, when he got out of the bathroom: he brought M.R. into the kitchen where he took the clothes from her and started to dress her (see id. at 1304:10-12, 1304:19-1305:1); he stood M.R. up for her to pull up her panties and pajama bottoms, which where around her knees (see id. at 1305:3-15); and, Crystal came into the kitchen as M.R. bent down to pull up her clothes (see id. at 1305:14-15). Petitioner stated that Crystal questioned him, asking what was going on (see id. at 1305:17-18) and then asked M.R. whether Petitioner "was eating her coochie" and M.R. responded "yes." (Tr. 1305:19-21.)

As to the subsequent investigation, Petitioner testified: he never made any of the statements to which Officer Boccio testified (Tr. 1311:11-25); he was taken to the police precinct where he was interviewed by Detective Baran (see id. at 1312:4-10); he signed the Miranda rights card only because the detectives told him to do so, and his Miranda rights were not actually explained to him (see id. at 1312:11-1313:8). Additionally, while Petitioner acknowledged that he made some of the statements contained in the written statement, he denied ever telling Detective Baran that he tickled M.R. with his mouth. (See Tr. 1313:22-1314:22.) Moreover, Petitioner

testified that Detective Pacheco never translated the written statement into Spanish. (See Tr. 1322:4-8.)

In rebuttal, the prosecution called Joshua Hanson, an expert in child sexual abuse and sexual perpetration (see generally Tr. 1375-1387), who testified about, inter alia, the concept of grooming, with the perpetrator: first ingratiating himself with the child and the family to establish likeable and being safe (see id. at 1383:4-9); thereafter, gaining enough trust to be alone with the child (see id. at 1383:10-11); and, then sexualizing the relationship (see id. at 1383:11-12). Thus, according to Hanson, one strategy a perpetrator uses is to appear kind and gentle towards children. (See id. at 1383:13-19).

Relevant to the instant Petition, throughout the trial defense counsel made several applications that were denied by the trial court. For example: During Crystal's cross examination testimony, defense counsel made an application seeking therapy records. (See Tr. 636:10-637:1.) Outside the presence of the jury, defense counsel argued that because the prosecution asked Crystal whether M.R.'s behavior changed after the date of the incident, the door was opened to this line of inquiry; thus, defense counsel sought to establish that the children were attending therapy at South Shore Child Guidance Center prior to the incident. (See id. at 636:10-20.) Defense

counsel had prepared a subpoena seeking the therapy records (see
id. at 636:21-637:1) and, in support of his application and to
show it was not a fishing expedition, defense counsel (1) made
an offer of proof that he received information that Crystal
watched pornography in front of her children, and (2) argued
that (a) as a result, M.R. was unable to distinguish between
reality and what she saw in pornographic films, and (b) this was
the reason that the family was in therapy.  (See id. at 637:14-
23.)  The prosecution opposed this application as irrelevant,
but informed the court that there were two prior unrelated
incidents that the prosecutor speculated were the true basis for
therapy: (i) that Crystal was the victim of domestic violence by
the children's father which resulted in an arrest for assault in
2012; and (ii) M.R.'s brother, S.R., was the victim of an
attempted criminal sexual act by his uncle, his father's
brother.  (See id. at 642:1-22.)  The trial court agreed to sign
the subpoena and review the therapy records in camera to inspect
them for relevance prior to disclosing the records to counsel.
(See id. at 642:23-643:17.)  Thereafter, defense counsel
continued his cross examination of Crystal; he did not question
Crystal about the abuse S.R. experienced by his uncle.  The
trial court sustained an objection against defense counsel
questioning whether Crystal watched pornography in her house,
but allowed counsel to ask S.R. and M.R. if they had ever seen

pornographic movies; they each testified that they had not. (Tr. 689:5-9; 795:9-11.)

Prior to M.R.'s testimony, the court received the therapy records from South Shore Child Guidance Center; after, in camera review, the court: disclosed to counsel one page from those records as directly relevant to the case (see Tr. 737:5-11); there was nothing in the therapy records demonstrating that M.R. had any difficulty distinguishing between reality and fantasy or understanding truth telling (see id. at 737:12-20); and, while maintaining confidentiality, stated that the basis for therapy was not pornography, as suggested by defense counsel, but a history of domestic violence and some disciplinary or behavioral issues (see id. at 737:21-738:5).

Thereafter, defense counsel made multiple applications to recall Crystal as a witness to question her regarding S.R.'s prior abuse by his uncle. (See, e.g., Tr. 895:1-897:19; 1081:5-1086:16; 1292:22-1294:20; 1370:1-8.) Defense counsel informed the court that his office represented S.R.'s uncle in the abuse case and, based on his review of the file, reported that in 2007, when S.R. was three and before M.R. was born, Crystal found the uncle attempting to force S.R. to perform oral sex. (See id. at 1082:11-1083:11). As such, defense counsel argued that the prior incident affected Crystal's state of mind such that she overreacted to what was a harmless situation. (See id.

at 1083:12-1084:19.)    The  trial  court  denied  each  motion,
explaining  there  were  multiple  grounds  for  its  denials,  i.e.,
the  remoteness  of  the  2007  incident  involving  S.R.,  before  M.R.
was  born,  compared  to  the  incident  with  Petitioner  and  Crystal's
testimony  at  trial  (see  id.  at  1097:1-8);  that  Crystal  did  not
claim  to  have  witnessed  Petitioner  touching  or  licking  M.R.,  but
rather  reacted  to  what  M.R.  told  her  (see  id.  at  1097:23-
1098:3);  and,  considering  the  case  evidence,  it  was  unnecessary
to  recall  Crystal  to  answer  questions  on  a  collateral  issue  (see
id.  at  1099:17-1100:5).

At  the  close  of  all  the  evidence,  defense  counsel  and
the  prosecution  delivered  their  summations  to  the  jury,  the
court  instructed  the  jury  on  the  law,  and  the  jury  deliberated.
(See  Tr.  1084:7-1139:25.)    During  deliberations,  the  jury  sent  a
note  to  the  court  requesting  "to  the  [sic]  hear  the  911  call
from  Crystal  or  the  transcript,  if  it  was  on  the  record.    If
it's  on  the  record,  can  we  see  slash  hear  it."  (Id.  at  1597:13-
16  (transcript  of  the  court  reading  the  jury  note  into  the
record).)    Defense  counsel  requested  that  the  court  clarify  with
the  jury  whether  it  wanted  to  hear  a  readback  of  Crystal's
testimony  regarding  the  911  call,  but  the  court  declined.    (See
id.  at  1599:3-15.)    Instead,  the  court  informed  the  jury  that
neither  the  call  nor  transcript  of  it  was  part  of  the  record

evidence.[6]   (See id. at 1600:20-25.)   On May 29, 2015, the jury convicted Petitioner of Count One, Criminal Sexual Act in the First Degree, and of Count Two, Endangering the Welfare of a Child.  (See id. at 1637:20-1638:9.)

III. The Sentence

On July 24, 2015, Petitioner was sentenced by the court.   (See Sent'g Tr., ECF No. 7-5.)   The prosecution requested a sentence of twenty years' incarceration, which was less than the maximum sentence permissible under the law.  (See id. at 2:25-5:3.)  Defense counsel and Petitioner both addressed the court, and Petitioner maintained his innocence.  (See id. at 5:7-15:6,17:2-7.)   On Count One, the court sentenced Petitioner to fifteen years' incarceration with ten years' post-release supervision; on Count Two, the court imposed a sentence of one year's incarceration; the sentences were ordered to run concurrently.  (See id. at 18:24-19:11.)

IV. The Appeal

In August 2017 and through counsel, Petitioner appealed his conviction and sentence to the Second Department

---

[6]  The Court notes that there appears to be a typographical error in the transcript, which states "With regards to your request to hear the 911 call from Crystal or the transcript, if it was on the record, another 911 call or the transcript of that call is part of the evidence in this case."   (Tr. 1600:20-23.) Contextually, however, it is clear that the trial court informed the jury that neither the call nor the transcript of the call was part of the evidence in the case.

(see generally Appellant Br., ECF No. 7-6), arguing: (1) the
trial court erred in determining that M.R. was swearable (see
id. at 23-27); (2) his Sixth Amendment rights to present a
defense and confront the witnesses against him were violated by
his not being allowed to be recalled Crystal as a witness (see
id. at 28-34); (3) the court erred by failing to meaningfully
respond to a jury note (see id. at 35-36); (4) the trial court's
bias against the defense throughout the trial violated his right
to a fair trial and his right to present a defense (see id. at
at 37-41); (5) the trial court erred by allowing Detective Baran
to testify regarding prior incidents, which constituted improper
bolstering (see id. at at 42-46); (6) the jury's verdict was
against the weight of the evidence (see id. at at 47-55); (7)
the sentence imposed was unnecessarily harsh and excessive (see
id. at 56-61); and (8) his Fourth Amendment right against
unreasonable searches and seizures was violated because there
was no probable cause for his arrest, and his Fourteenth
Amendment right to Due Process was violated because his
involuntary written statement was used against him at trial (see
id. at 62-65).

    The Second Department affirmed the judgment.  See
People v. Ramos, 164 A.D.3d 1267, 1267, 83 N.Y.S. 3d 580, 580
(2d Dep't 2018) (docketed as ECF No. 7-9).  It found, inter
alia: as to swearability: the trial court "providently exercised

its discretion in determining that the then seven-year-old complainant was competent to give sworn testimony," id.; as to Petitioner's Sixth Amendment claim: the trial court similarly exercised its discretion "in denying defense counsel's motion to recall the complainant's mother to testify because defense counsel sought to cross-examine her about a matter that was collateral and would have caused delay," id. (citations omitted); as to the jury note: that argument was without merit, see id.; as to alleged bias against the defense: "[t]he record does not support the defendant's contention that the Supreme Court acted with bias against him in its evidentiary rulings," id.; as to Detective Baran's testimony regarding prior incidents: "because defense counsel assailed the testimony of the complainant on cross-examination as a recent fabrication, the Supreme Court correctly admitted the prior consistent statement of the complainant on direct examination of a law enforcement witness" id. (citations omitted); as to Petitioner's claim that his Fourth and Fourteenth Amendment rights were violated: first, denial of Petitioner's suppression motion was proper since, at the scene of the crime, Petitioner "was not the subject of custodial interrogation at that time[]," second, Petitioner's statement made at the police station was "made voluntarily after the defendant knowingly, intelligently, and voluntarily waived his Miranda rights," id. (citations omitted),

and third, "the police had probable cause to arrest [Petitioner] based on his statements and the accusations of the complainant and her mother," id. (citations omitted); and, as to the weight of the evidence: the verdict was not against the weight, nor was Petitioner's sentence excessive, id.

Through counsel, Petitioner sought leave to appeal to the New York State Court of Appeals, which request was denied on December 10, 2018. See People v. Ramos, 32 N.Y.3d 1128, 117 N.E.3d 825, 93 N.Y.S. 3d 266 (2018) (docketed as ECF No. 7-12).

This Petition followed.

DISCUSSION

## I. The Legal Standard

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), to restrict "the power of federal courts to grant writs of habeas corpus to state prisoners." Williams v. Taylor, 529 U.S. 362, 399 (2000). A state prisoner seeking habeas corpus relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254, as amended by AEDPA, provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claims that was not adjudicated on the merits in State court

24

> proceedings unless the adjudication of the
> claim--(1) resulted in a decision that was
> contrary to, or involved an unreasonable
> application of, clearly established
> [f]ederal law, as determined by the Supreme
> Court of the United States.

28 U.S.C. § 2254. The AEDPA established a deferential standard of relief, seeking to "avoid[ ] unnecessarily 'disturbing the State's significant interest in repose for concluded litigation, denying society the right to punish some admitted offenders, and intruding on state sovereignty to a degree matched by few exercises of federal judicial authority.'" Virginia v. LeBlanc, 137 S. Ct. 1726, 1729 (2017) (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)) (brackets omitted). Accordingly, a habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court. Herrara v. Collins, 506 U.S. 390, 401 (1993). Ultimately, "the petitioner bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." Jones v. Vacco, 126 F. 3d 408, 415 (2d Cir. 1997); see also Hawkins v. Costello, 460 F. 3d 238, 246 (2d Cir. 2006).

Thus, a federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim either:

> (1) resulted in a decision that was contrary
> to, or involved an unreasonable application
> of, clearly established Federal law, as

> determined by the Supreme Court of the
> United States; or
> (2) resulted in a decision that was based on
> an unreasonable determination of the facts
> in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has construed the AEDPA "to give independent meaning to 'contrary [to] and 'unreasonable.'" Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000). A state court's decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case different than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A decision involves "an unreasonable application" of clearly established federal law when a state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. This standard does not require that all reasonable jurists agree that the state court was wrong; rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)). The AEDPA "'imposes a highly deferential standard for evaluating state-court rulings and demands that

state-court decisions be given the benefit of the doubt.'" Jones v. Murphy, 694 F.3d 225, 234 (2d Cir. 2012) (quoting Hardy v. Cross, 565 U.S. 65, 66 (2011)). Section 2254(d), as amended by the AEDPA, "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Harrington, 562 U.S. at 102.

Assuming that a petitioner's claims are cognizable on habeas review, a petitioner must exhaust state court remedies before coming to federal court. Exhaustion of state court remedies requires that a petitioner fairly present the claim in state court, allowing the state court the "'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" See Jackson v. Edwards, 404 F.3d 612, 619 (2d Cir. 2005) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). "A petitioner has 'fairly presented' his claim only if he has 'informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'" Jones v. Keane, 329 F.3d 290, 294-95 (2d Cir. 2003) (quoting Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997)). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." Daye v.

Att'y Gen. of N.Y., 696 F.2d 186, 191-92 (2d Cir. 1982) (collecting cases).

In addition, a federal court will not review a habeas petition if a petitioner's claims were decided at the state level on "independent and adequate" state procedural grounds. Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). This procedural bar applies even if the state court addressed the merits in the alternative, but decided the claim on independent procedural grounds. Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

To obtain review of procedurally barred claims, a state prisoner must show either (1) "cause for the default and actual prejudice as a result" or (2) actual innocence. Coleman, 501 U.S. at 750.

## II. Application

Here, Petitioner argues that: (1) the trial court erred by deeming the complainant swearable; (2) his Sixth Amendment rights to present a defense and confront the witnesses against him were violated; (3) the trial court erred by failing to meaningfully respond to a jury note; (4) the trial court's bias against the defense violated his Due Process rights to a fair trial and to present a defense; (5) the trial erred in admitting improper bolstering by allowing testimony regarding alleged prior incidents of abuse; (6) the jury's verdict was

against the weight of the evidence; (7) the sentence imposed was unnecessarily harsh and excessive; and (8) his Fourth Amendment rights were violated because there was no probable cause for his arrest, and his involuntary written statement was used against him at trial.[7]  (Petition, ECF pp. 3-17.)

A. Witness Swearability Claim

Petitioner claims that the trial court's swearing-in of M.R. was in error, and, therefore, he is entitled to habeas relief.  However, as discussed supra, the Appellate Division held that the trial court "providently exercised its discretion in determining that [M.R.] was competent to give sworn testimony," stating that "[t]he examination of the child revealed that she knew the difference between telling the truth and telling a lie, promised to tell the truth, and indicated she would be punished if she lied."  People v. Ramos, 164 A.D.3d 1267, 1267, 83 N.Y.S. 3d 580, 580 (2d Dep't 2018) (citing N.Y. CRIM. PROC. LAW § 60.20(2), which, at the time of Petitioner's trial, provided in relevant part that "[a] child less than twelve years old may not testify under oath unless the court is satisfied that [she] understands the nature of an oath").

---

[7]  The Court notes that Petitioner's claims essentially renew his claims raised on direct appeal.  After his appeal was denied, Petitioner sought leave to appeal all appellate claims before the New York Court of Appeals.  As such, the Court acknowledges, and Respondent does not contest, that all of Petitioner's claims are properly exhausted.

As an initial matter, "[i]t is not the province of a federal habeas court to reexamine state-court determination on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see also Lewis v. Jeffers, 497 U.S. 764, 780 (1990). Whether the trial court properly admits sworn testimony from a child complainant in accordance with the requirements of C.P.L. § 60.20(2) is a matter best left to the New York state courts. See, e.g., Rodriguez v. Greiner, 274 F. Supp. 2d 264, 267 (E.D.N.Y. 2003) (holding that "[w]hether the properly admitted unsworn testimony of the victim was sufficiently corroborated in accordance with the requirements of New York C.P.L. 60.20(3) is a matter left to the state courts"). Thus, this claim is not cognizable on habeas review.

Even if the Court looks to the merits of Petitioner's claim, it is clear he is not entitled to relief. During the swearability hearing, the trial court's colloquy with M.R. established that M.R. understood: the difference between the truth and a lie, as demonstrated by her responses to the hypothetical questions posed by the court (see Tr. 751:17-24; 754:13-19); and, that lying in court would be wrong and had consequences (see id. at 751:25-19). Thus, M.R.'s responses to questions posed to her during the swearability hearing satisfied the trial court that M.R. was able to be sworn. (See id. at 757:2-758:13.)

Petitioner has not identified any federal constitutional right which was abridged by M.R.'s having been sworn to testify at his trial that would justify this Court's interference, on habeas review, with the trial court's swearability ruling. Nor has Petitioner identified an error in the trial court's swearability ruling, especially considering a trial court has broad discretion in admitting sworn child testimony. Nothing in the record indicates that the trial court abused its discretion in admitting M.R.'s testimony.

Accordingly, as Petitioner's witness swearability claim is without merit, it fails to warrant granting habeas relief.

B. Sixth Amendment Claim

Petitioner claims he is entitled to habeas relief on the grounds that his Sixth Amendment rights were infringed when the trial court would not allow Crystal to be recalled as a witness for additional cross examination, arguing his cross examination was curtailed, which denied him the right to present a defense and to confront the witnesses against him. (Petition, ECF pp. 4-5.) On direct appeal, the Appellate Division rejected this claim, stating "[t]he Supreme Court providently exercised its discretion in denying defense counsel's motion to recall the complainant's mother to testify because defense counsel sought to cross-examine her about a matter that was collateral and

would have caused delay." <u>Ramos</u>, 164 A.D.3d at 1267(citations omitted).   The Court finds that the Appellate Division's decision reasonably rejected both Petitioner's arguments and was not contrary to, nor an unreasonable application of, federal law.

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986).   At the same time, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324 (2006) (internal quotation omitted).   Further, a defendant in a state criminal prosecution has a right, guaranteed by the Sixth and Fourteenth Amendments to the Constitution, "to be confronted with the witnesses against him."   U.S. Const. Amend. VI; <u>see also</u> <u>Pointer v. Texas</u>, 380 U.S. 400, 401 (1965) (holding that the Sixth Amendment Confrontation Clause is made applicable to the states by the Fourteenth Amendment).   However, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985) (<u>per curiam</u>). Trial courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-

examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Furthermore, the preclusion of the cross-examination "must not have been harmless, that is, it must have had a substantial and injurious effect or influence in determining the jury's verdict." Alvarez v. Ercole, 763 F.3d 223, 230 (2d Cir. 2014). Further, a criminal defendant "has a fundamental due process right to present a defense." United States v. Mi Sun Cho, 713 F.3d 716, 721 (2d Cir. 2013) (citations omitted). However, a criminal defendant's right to present a defense "is not absolute, for a defendant must comply with established rules of procedure and evidence designed to assure both fairness and reliability." Id., 713 F.3d at 721. As such, "a defendant does not have an unfettered right to offer testimony [or other evidence] that is inadmissible under the rules of evidence." Id. "[W]ell established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Holmes v. S. Carolina, 547 U.S. 319, 326 (2006).

Here, Petitioner argues that he was denied his right of presenting his theory of the case to the jury, and was

precluded from eliciting testimony from Crystal that S.R. was sexually abused by an uncle years prior. He maintains such evidence would support his theory that Crystal was more likely to jump to a false conclusion about what she saw when she walked into the kitchen, when what was occurring was--as he alleges-- Petitioner was merely trying to dress M.R. Additionally, Petitioner argues that he was precluded from questioning Crystal about watching pornography in the home with her children. Given the remoteness of time between the incident involving S.R. and that involving M.R., the trial court precluded this evidence. Moreover, since Crystal did not claim to have witnessed Petitioner touching or licking M.R., but rather testified that she reacted to what M.R. told her., and considering the evidence in the case, the court determined that it was unnecessary to recall Crystal to answer questions on a collateral issue.

Petitioner has failed to demonstrate that the trial court abused its discretion in denying his application to recall Crystal for additional cross examination or that precluding additional cross-examination had a substantial and injurious effect in determining the jury's verdict. Defense counsel had an opportunity to cross-examine Crystal following her direct testimony. While defense counsel attempted to question Crystal regarding watching pornography, the court sustained an objection and she did not answer the question. However, M.R. and S.R.

both testified that they had not watched pornography at home. Second, defense counsel's application to recall Crystal to question her regarding the 2007 abuse of S.R., before M.R. was even born and involving a different perpetrator, addressed an incident that was not only remote in time, but bore little relevance to Petitioner's case. Indeed, given the wealth of evidence from the trial, e.g., testimony from M.R., S.R., and Crystal; DNA evidence; and Petitioner's own admissions, whether or not Crystal may have been affected by S.R.'s abuse was only marginally relevant and collateral. As such, the Appellate Division's decision regarding the trial court's evidentiary rulings was not contrary to, or an unreasonable application of, federal law.

Additionally, Petitioner is unable to demonstrate that he was denied his right to present a defense. First, Petitioner testified in his own defense and claimed that his actions were innocent and that he was only trying to dress M.R. when Crystal walked in. (See Tr. 1304:1-1305:18.) Second, during his summation, defense counsel argued that Crystal walked into the kitchen, observed Petitioner and M.R., and jumped to an incorrect conclusion. (See id. at 1399:16-23.) Any probative value of introducing cross-examination testimony from Crystal that her state of mind may have been altered due to S.R.'s abuse was outweighed by other issues, such as causing delay,

remoteness in time, introducing a collateral issue, and confusion of the issues. See Holmes, 547 U.S. at 326. Thus, it was not unreasonable for the Appellate Division to conclude that the trial court acted within its discretion in making its evidentiary rulings; nor was it contrary to clearly established federal law to rule to exclude this evidence.

Accordingly, Petitioner's Sixth Amendment claim fails to compel granting habeas relief.

C. Jury Note Claim

Petitioner claims that he is entitled to habeas relief because the trial court failed to meaningfully respond to a jury note, specifically the second jury note requesting "to hear the 911 call from Crystal (Mother) of the transcript, if it was on record. If it's on the record, can we see/hear it." (Petition, ECF p. 6.) The Appellate Division held this claim was without merit because "[i]t is undisputed that the court informed the jury that no 911 call or transcript of that call was part of the evidence in the case." Ramos, 164 A.D.3d at 1267. This Court finds Petitioner's jury note claim does not warrant habeas relief for the following reasons.

Criminal Procedure Law § 310.30 establishes the procedure by which a trial court must respond to jury notes, i.e., the trial court must give "such requested information" that it "deems proper." C.P.L. § 310.30. Even if a state court

errs in denying a defendant's claim of a violation of N.Y. Crim. Proc. Law § 310.30, "[v]iolations or errors of state law or procedure generally do not constitute grounds for habeas review," and "[a] claim premised on a violation of New York Criminal Procedure Law Section 310.30 does not allege a violation of a federally protected right." Cornado v. Bellnier, No. 10-CV-5265, 2012 WL 6644637, at *5 (S.D.N.Y. Sept. 20, 2012) (citations omitted), report & recommendation adopted by 2012 WL 6681692 (S.D.N.Y. Dec. 21, 2012). Hence, Petitioner's jury note claim does not provide a basis for federal habeas relief.

In any event, even if the Court were to reach the merits of Petitioner's claim, it would be found to be meritless. A review of the record demonstrates that the trial court followed the procedure required by C.P.L. § 310.30. While the 911 call was played for Crystal outside the presence of the jury to refresh her recollection, neither the 911 call nor the transcript of it was ever entered into evidence. Under New York law, a trial court is not required to provide a jury with materials not introduced as evidence during trial. See People v. Salaman, 231 A.D.2d 464, 464 (2d Dep't 1996) (finding that the trial court correctly informed the jury that it was not entitled to a Grand Jury transcript as it was not in evidence); People v. Thatcher, 85 A.D.3d 1065, 1066 (2d Dep't 2011) (finding that, in response to a jury note requesting a police

report that was not in evidence, the trial court did not err by denying defendant's request to inform the jury there was testimony regarding the report).  As such, Petitioner's claim is without merit.

Accordingly, Petitioner's jury note claim fails to support habeas relief.

D. <u>Bias Against Defense Claim</u>

Petitioner asserts that the trial court's bias against the defense, as evidenced by the court's evidentiary rulings, violated his Due Process rights to a fair trial.  Petitioner raised this claim on direct appeal and the Appellate Division denied it, stating that "[t]he record does not support the defendant's contention that the Supreme Court acted with bias against him in its evidentiary rulings."  <u>Ramos</u>, at 1267 (citations omitted).

For Petitioner to prevail on his claim of judicial bias, he must demonstrate that he did not receive a trial "by an unbiased and impartial judge without a direct personal interest in the outcome of the hearing."  <u>Ungar v. Sarafite</u>, 376 U.S. 575, 584 (1964).  "Mere allegations of judicial bias or prejudice do not state a due process violation."  <u>Brown v. Doe</u>, 2 F.3d 1236, 1248 (2d Cir. 1993), <u>cert. denied</u>, 510 U.S. 1125 (1994); <u>see also</u> <u>LoCascio v. United States</u>, 473 F.3d 493, 495 (2d Cir. 2007)("judicial opinions alone almost never constitute

a valid basis for a bias or partiality motion" (quotations omitted)).

Petitioner claims that the trial court's bias against him is evidenced by: (1) the court yelling at defense counsel; (2) the court making a sarcastic remark; (3) the court's ruling regarding the therapy records requested by defense counsel; (4) the court's refusal to sign a subpoena requested by defense counsel; (5) the court overruling defense counsel's summation objections and sustaining the prosecution's summation objections; (6) the court's refusal to recall Crystal as a witness; and (7) denying defense counsel's multiple motions for a mistrial. For the reasons that follow, the trial court's decision, as affirmed by the Appellate Division, is neither contrary to, or an unreasonable application of, United States Supreme Court precedent, nor based upon an unreasonable determination of the facts in light of the evidence before it.

Initially, as discussed supra, the Court has already determined that, as the Appellate Division held, the trial court acted within its discretion by refusing to allow Crystal to be recalled to the witness stand. Additionally, "yelling" at defense counsel, or making an alleged sarcastic remark, is not indicative of a Due Process violation. See, e.g., Brown, 2 F.3d at 1248 ("Mere allegations of judicial bias or prejudice do not state a due process violation." (citation omitted)). Further,

Petitioner's claim that the trial court refused to sign a subpoena on behalf of defense counsel is belied by the record. The trial court agreed to subpoena and review the therapy records from South Shore Guidance Center in camera, which it did and, thereafter, disclosed one page from the records to counsel. (See Tr. 642:23-643:17; 737:5-11.) Petitioner's remaining examples of judicial bias are each instances of evidentiary rulings. From a review of the record, the Court does not find that any of the trial court's evidentiary rulings displayed any "deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555 (1994). Rather, as the Appellate Division held, "[t]he record does not support [Petitioner]'s contention that the [trial c]ourt acted with bias against him in its evidentiary rulings." Ramos, 164 A.D.3d at 1268 (citations omitted).

Accordingly, Petitioner's judicial bias claim fails to support Petitioner's request for habeas relief.

E. Improper Bolstering Claim

Petitioner seeks habeas relief on the grounds that the trial court erred when it allowed Detective Baran to testify that the complainant, M.R., told him that there were other incidents where Petitioner made or attempted sexual contact with her. (Petition, at ECF p. 9.) Petitioner argues that such testimony constituted improper bolstering. Petitioner raised

this claim on direct appeal, and, the Appellate Division found that "[c]ontrary to [Petitioner]'s contention, because defense counsel assailed the testimony of the complainant on cross-examination as a recent fabrication, the Supreme Court correctly admitted the prior consistent statement of the complainant on direct examination of a law enforcement witness." Ramos, 164 A.D.3d at 1267.

"Under Supreme Court jurisprudence, a state court's evidentiary rulings, even if erroneous under state law, do not present constitutional issues cognizable under federal habeas review." McKinnon v. Superintendent, Great Meadow Corr. Facility, 422 F. App'x 69, 72-73 (2d Cir. 2011) (citing Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir.2006)); see also Estelle, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Such claims do not arise to constitutional magnitude unless the evidentiary error was "so pervasive as to have denied [defendant] a fundamentally fair trial." Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985). Indeed, "the concept of bolstering really has no place as an issue in criminal jurisprudence based in the United States Constitution" and is a state law evidentiary issue. See Castaldi v. Poole, No. 07-CV-1420, 2013 WL 789986, at *7 (E.D.N.Y. Mar. 1, 2013)(quotations and citations omitted); see also Lebron v. Sanders, No. 02-CV-

6327, 2008 WL 793590, at *20 (S.D.N.Y. Mar. 25, 2008) (holding
that a violation of New York's "bolstering" rule does not rise
to a constitutional violation); Smith v. Walsh, No. 00-CV-5672,
2003 WL 22670885, at *6 (E.D.N.Y. Oct. 20, 2003) (holding that a
bolstering claim is not a cognizable basis for federal habeas
relief).  As such, Petitioner's claim does not raise a federal
question as is not cognizable on habeas review.

Regardless, the Court does not find that Petitioner's
bolstering claim has any merit.  Prior to trial, the trial court
denied the prosecution's Molineux application to question M.R.
regarding any prior incidents of abuse by Petitioner, with the
caveat that the prosecution could renew the application if
defense counsel opened the door to that line of questioning.
(See Tr. 14:22-16:6.)  During M.R.'s direct testimony, the
prosecution did not ask any questions regarding any alleged
prior incidents; however, on cross-examination, defense counsel
questioned M.R. extensively about allegations of prior incidents
of abuse by Petitioner, including to whom she reported them.
(See id. at 780:19-783:19, 785:6-786:2, 786:18-790:3, 794:20-
795:6; 795:16-796:7, 797:8-798:14, 800:3-801:21, 803:10-804:21.)

Following M.R.'s testimony, and prior to Detective
Baran taking the witness stand, the prosecution made an
application to question the detective about prior incidents of
sexual abuse by Petitioner reported to him (Baran) by M.R.  (See

Tr. 908:14-909:20.)   Finding that defense counsel opened the door during M.R.'s cross examination, the trial court granted the application, thereby allowing the prosecution to put forth Detective Baran to rebut defense counsel's recent fabrication and credibility arguments.   (See id. at 915:19-916:5.)   Under New York state law, the trial court's ruling was not erroneous. See People v. McDaniel, 81 N.Y.2d 10, 18, 611 N.E.2d 265 (1993) (finding that if, during cross-examination, a witness' testimony is assailed as a recent fabrication, the witness may be rehabilitated using prior consistent statements); People v. Walsh, 289 A.D. 2d 517, 518, 735 N.Y.S. 2d 586 (2d Dep't 2001); People v. Wilens, 198 A.D. 2d 463, 463, 603 N.Y.S. 2d 585 (2d Dep't 1993).   Even where evidence is erroneously admitted in violation of state law, there is no due process violation unless the evidence, when "viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.   In short it must have been crucial, critical, highly significant." Young v. McGinnis, 411 F. Supp. 2d 278, 304 (E.D.N.Y. 2006) (quoting Collins v. Scully, 755 F.2d 16, 19 (2d Cir.1985)) (internal quotation marks omitted).   Here, because Petitioner cannot demonstrate that the state court's evidentiary ruling was erroneous, or that any alleged error violated his right to a fundamentally fair trial,

his improper bolster claim does not provide grounds for granting habeas relief.

F. Against the Weight of the Evidence Claim

Petitioner argues that he is entitled to habeas relief on the grounds that the jury's verdict is against the weight of the evidence. However, Petitioner's claim is not cognizable here as it does not raise a federal question. See McKinnon, 422 F. App'x at 75. Since it is based solely on state law, it is unreviewable in a federal habeas corpus proceeding. See 28 U.S.C. § 2254(a); Estelle, 502 U.S. at 67-68, Butler v. Cunningham, 313 F. App'x 400, 401 (2d Cir. 2009); Smith v. Lee, No. 11-CV-0530, 2014 WL 1343066, at *10 (E.D.N.Y. Mar. 31, 2014) ("It is well settled that a 'weight of the evidence' claim is distinct from an 'insufficiency of the evidence' claim and is a state claim based on N.Y.C.P.L. § 470.15(5) that is not reviewable in a federal habeas proceeding." (citing McKinnon, 422 F. App'x at 75)).

To the extent Petitioner's claim can be construed as raising a federal claim that the evidence was insufficient to support the conviction, that argument is without merit. A Petitioner arguing a sufficiency of the evidence claim "bears a very heavy burden." United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009). A criminal conviction will not be disturbed if "after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Policano v. Herbert, 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" (quoting Jackson, 443 U.S. at 324)). When considering a claim of legally insufficient evidence, the facts are viewed in the light most favorable to the verdict. See Garbutt v. Conway, 668 F.3d 79, 80-81 (2d Cir. 2012) (per curiam). Moreover, "[i]n considering a petition for writ of habeas corpus based on insufficient evidence to support a criminal conviction in the state courts, a federal court must look to state law to determine the elements of the crime." Green v. Abrams, 984 F.2d 41, 44-45 (2d Cir. 1993).

As noted, Petitioner was convicted of one count of Criminal Sexual Act in the First Degree and one count of Endangering the Welfare of a Child. Pursuant to the New York State Penal Law, "[a] person is guilty of criminal sexual act in the first degree when he or she engages in oral sexual conduct or anal sexual conduct with another person who is less than

eleven years old." N.Y. Penal Law § 130.50(3). Further, "[a] person is guilty of endangering the welfare of a child when he or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directs or authorizes such child to engage in an occupation involving a substantial risk of danger to his or her life or health." N.Y. Penal Law § 260.10(1).

At trial, the evidence demonstrated that: Crystal walked in on Petitioner in the kitchen with her six-year-old daughter, M.R., finding M.R. with her underwear and pants around her ankles and Petitioner bent over M.R.; M.R. told her mother that Petitioner licked her "coochie"; and, after Crystal called 911 and the police arrived, Petitioner made two statements, one admitting to licking M.R. while in the kitchen. The state court record further establishes that after his arrest, Petitioner made more inculpatory statements to Detective Baran, the voluntariness of which was litigated at both the pre-trial suppression hearing and the trial. While Petitioner contends that M.R.'s testimony was "contradictory and confusing," it was corroborated by Crystal, S.R., and even Petitioner's own statements to police.

Moreover, DNA evidence was presented at trial, with both the prosecution and defense presenting DNA experts. Despite differing views, the DNA experts agreed on certain

aspects of the evidence, _e.g._, that the vulva swab contained saliva and that M.R.'s underwear contained saliva and Petitioner's DNA.   Further, the defense DNA expert did not contest that Petitioner deposited DNA on M.R.'s underwear, where saliva was also present.

Having considered each of the crimes for which Petitioner was convicted, the Court concludes that the Appellate Division's upholding of the convictions is neither contrary to nor an unreasonable application of clearly established federal law and its decision was not based on an unreasonable determination of the facts.   Accordingly, Petitioner's insufficient evidence claim is without merit.

G. Harsh and Excessive Sentence Claim

Petitioner contends that his sentence of fifteen years of imprisonment followed by ten years of post-release supervision is harsh and excessive, thereby entitling him to habeas relief. (See Petition at ECF pp. 12-13.)   However, it is well settled that an excessive sentence claim, such as Petitioner's, does not present a required federal constitutional issue when the received sentence "is within the range prescribed by state law."   White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992); see also Taylor v. Connelly, 18 F. Supp. 3d 242, 268 (E.D.N.Y. 2014).   Under New York state law, the maximum sentence permitted for a violation of Criminal Sexual Act in the First

Degree, a Class "B" Felony, is a term of imprisonment of twenty-five years.   See N.Y. Penal Law §§ 130.50(3); 70.00(2)(b). Additionally, under New York state law, the maximum sentence permitted for a violation of Endangering the Welfare of a Child, a Class "A" Misdemeanor, is term of imprisonment of one year. See N.Y. Penal Law §§ 260.10(1); 70.15(1).   Thus, Petitioner's sentence of fifteen years of imprisonment for Criminal Sexual Act in the First Degree, and sentence of one year of imprisonment for Endangering the Welfare of a Child both fall within what is permitted by applicable statute and, hence, do not present a federal constitutional issue.   Therefore, Petitioner's harsh and excessive sentence claim is untenable on habeas review.

    H. Fourth Amendment Claim

        Petitioner claims that he is entitled to habeas relief on the grounds that his Fourth Amendment rights were violated because: (1) there was no probable cause for his arrest; and (2) his written statements to law enforcement were involuntary. (See Petition, at ECF pp. 14-16.)   However, on direct appeal, the Appellate Division denied Petitioner's claim that there was no probable cause for his arrest, holding "[w]e agree with the hearing court's determination that the police had probable cause to arrest the defendant based on his statement and the accusations of [M.R.] and her mother."   Ramos, 164 A.D.3d at

1267 (citations omitted).   With respect to Petitioner's claim that his written statements were involuntary, the Appellate Division ruled "[t]he statement was made voluntarily after the defendant knowingly, intelligently, and voluntarily waived his Miranda rights."  Id. (citations omitted.)

Petitioner's claims arise under the exclusionary rule grounded in the Fourth Amendment, and, as such, are not cognizable on habeas review where, as here, the state court has "provided an opportunity for full and fair litigation" of this constitutional claim.  See Stone v. Powell, 428 U.S. 465, 494-95 (1976).  To prevail on this claim, Petitioner would need to demonstrate either that he was not given a full and fair opportunity to litigate the claim because the state failed to provide "corrective procedures" by which the claim could be adjudicated or that he was unable to avail himself of the state's procedures "because of an unconscionable breakdown in the underlying process."  Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992).  Petitioner is unable to make either showing.

During the suppression hearing prior to his trial, Petitioner (1) argued there was no probable cause for his arrest, and (2) sought suppression of (a) his statements and (b) the buccal swab taken from him.  Based upon the evidence presented at that hearing, i.e., that in response to Crystal's 911 call, Officer Boccio went to her apartment, where he first

49

spoke with Crystal and M.R., who reported that Petitioner licked M.R.'s vagina, and, then spoke with Petitioner, who admitted to licking M.R., the trial court found there was sufficient probable cause for Petitioner's arrest. (Hr'g Dec. Tr. 129:15-19 ("Based on the statement of the mother after her observations of [Petitioner] and the child, the statement of the child and the statement of the [Petitioner] at the scene, the police had probable cause to arrest the defendant."); id. at Hr'g Dec. Tr. 129:19-21 (ruling Petitioner's oral statement at the scene "was not subject to Miranda, as [Petitioner] was not custody, nor was he being interrogated").)

As to Petitioner's contention that his post-arrest written statement was involuntary because it was given in English although he is Spanish speaking, the evidence contradicts that position. Both Detectives Baran and Pacheco testified that Petitioner was read his Miranda rights in both English and Spanish before his written statement was taken. The evidence further established that after Detective Baran typed Petitioner's statement, (1) Petitioner read it and made corrections to it, and (2) Detective Pacheco translated the statement into Spanish before Petitioner signed it. Thus, based upon the facts and circumstances of the case, the trial court ruled Petitioner's written statement "was freely and voluntarily and intelligently provided after a knowing, intelligent and

voluntary waiver of his <u>Miranda</u> rights." (Hr'g Dec. Tr. 130:7-9; <u>see also</u> <u>id.</u> at 130:15-17 ("The defendant clearly speaks and understands a good amount of English, but it was prudent to give <u>Miranda</u> warnings in Spanish."); <u>see also</u> <u>id.</u> at 130:13-14 (ruling same evidence supported finding Petitioner's buccal swab was given knowingly, intelligently, and voluntarily).)

Hence, the record evidence demonstrates that Petitioner was afforded a full and fair opportunity in state court to litigate his Fourth Amendment claims. Accordingly, no basis lies upon Petitioner's Fourth Amendment claims to grant the requested habeas relief.


CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Petitioner's petition for a writ of habeas corpus (ECF No. 4) is DENIED in its entirety.

Further, because the Petitioner has not made a substantial showing that he was denied a constitutional right, the Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2). The Court also certifies that any appeal of this Order would not be taken in good faith, and thus his <u>in forma pauperis</u> status is denied for the purposes of any appeal. <u>See</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 444-45 (1962).

IT IS FURTHER ORDERED that the Clerk of the Court close this case and mail a copy of this Order to the <u>pro se</u> litigant.

SO ORDERED.


_/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated: July _30_, 2021
       Central Islip, New York